1  PETER A. SCHEY (Cal. Bar No. 58232)
2  CARLOS R. HOLGUÍN (Cal. Bar No. 90754)
   Center for Human Rights & Constitutional Law
3  256 South Occidental Boulevard
4  Los Angeles, CA 90057
   Telephone: (213) 388-8693
5  Emails: pschey@centerforhumanrights.org
6  crholguin@centerforhumanrights.org

7
8  *Class Counsel for Plaintiffs*
   *Additional Plaintiffs' counsel on next page*
9

10

11                    UNITED STATES DISTRICT COURT
12
13        CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION
14

15  JENNY LISETTE FLORES, *et al.*,          Case No. CV 85-4544-DMG (AGRx)
16
                Plaintiffs,                   **EXHIBIT 3: DECLARATION OF**
17                                            **CAROL SOBEL IN SUPPORT OF**
18        v.                                  **MOTION FOR AWARD OF**
                                              **ATTORNEYS' FEES**
19  MERRICK GARLAND, Attorney General, *et*
    *al.*,                                    Hearing:  December 2, 2022
20                                            Time:     10:00 AM
                Defendants.                   Judge:    Hon. Dolly Gee
21

22

23

24

25

26

27

28

1    *Attorneys for Plaintiffs continued*

2

3    USF SCHOOL OF LAW IMMIGRATION CLINIC
     Bill Ong Hing (Cal. Bar No. 61513)

4    2130 Fulton Street
     San Francisco, CA 94117-1080

5    Telephone: (415) 422-4475

6    Email: bhing@usfca.edu

7

8    LA RAZA CENTRO LEGAL, INC.
     Stephen Rosenbaum (Cal. Bar No. 98634)

9    474 Valencia Street, #295
     San Francisco, CA 94103

10   Telephone: (415) 575-3500

11

12

13

14

15

16

17   / / /

18

19

20

21

22

23

24

25

26

27

28                                    ii

DECLARATION OF CAROL A. SOBEL

I, CAROL A. SOBEL, declare:

1. I am an attorney admitted to practice before the Supreme Court of the State of California, United States District Courts for the Central District of California and the Eastern District of California, the Ninth Circuit Court of Appeals and the Supreme Court of the United States.  This declaration is submitted in support of the fees requested by counsel at CENTER FOR CONSTITUTIONAL AND HUMAN RIGHTS in this matter. The declaration is based on personal knowledge and, if called to testify to the facts set forth below, I could and would do so competently.

2. I graduated from law school and was admitted to practice in 1978.  Following 20 years with the ACLU Foundation of Southern California, I entered private practice in April of 1997. My practice primarily involves complex civil rights litigation, focusing on the rights of homeless persons, First Amendment rights and police practices. Exhibit "1" is my resumé.

3. I received many awards for my legal work over the years. In 2008, I was named a California Lawyer of the Year (CLAY) for civil rights by California Lawyer Magazine. That same year, I was also named a Top 75 Women Litigators in California by the Daily Journal Corporation. In 2007, I received an Angel Award from California Lawyer Magazine for pro bono work and was also named by the Daily Journal as one of the Top 100 Most Influential Lawyers in California. In 2013, 2014, and 2017, I was named one of the top women lawyers in Los Angeles or Southern California. In the past, I received several awards from the ACLU Foundation of Southern California, including the First Amendment Award. In June 2017, I received a lifetime award from the ACLU Foundation of Southern California. I have been named as a SuperLawyer in the area of First Amendment or civil rights litigation consistently for more than a decade. Additional recognition of my legal work is set forth in my attached resumé.

4. For the six years prior to 1997, I held the position of Senior Staff Counsel in the legal department of the ACLU Foundation of Southern California. During that time period, I was responsible for preparing many of the fee motions in cases where the

1

ACLU represented the prevailing party. Because the ACLU does not bill clients on an hourly basis for its services, I was required to obtain information to establish reasonable market rates for the ACLU lawyers.

5.  It was my practice to obtain current billing rates for lawyers of comparable skill and experience at several firms throughout the City. I did this on an annual basis, contacting partners who were familiar with the ACLU lawyers in question so that they could make an informed judgment about the comparable skill levels of the attorneys at their firms whose rates were then used to establish ACLU billing rates. At the time that I consulted these individuals, I was aware that the partners had been personally involved as pro bono counsel with the ACLU and worked with the ACLU lawyers for whom I sought to establish market billing rates, so they were able to assess the skill and experience of the ACLU lawyers based on personal knowledge.

6. Since entering private practice, I have continued to survey fee motions submitted by private firms each year to obtain relevant comparisons for billing rates. I generally begin this process the first time in each year I prepare a fee motion, or enter into settlement discussions regarding fees. As part of my survey, I make it a point to obtain information concerning rates for attorneys in both larger law firms engaged in complex litigation, as well as smaller boutique civil rights law firms.

7. To obtain information concerning rates charged by attorneys in the Southern California legal market, I also review attorney fee applications and awards in cases other than my own.  Specifically, I regularly review fee applications submitted by, and awards to, private attorneys practicing the range of civil rights law, As well as court awards made to the ACLU, Disability Rights Legal Center ("DLC"), Disability Rights Advocates, Asian Americans Advancing Justice, Neighborhood Legal Services Los Angeles (NLSLA); Public Counsel, the Western Center on Law and Poverty ("WCLP"), MALDEF and other public interest groups in Los Angeles. I also review fee motions filed by private civil rights and public interest firms and attorneys, including McLane Bednarski & Litt; Schonbrun Seplow Harris  Hoffman & Zeldes; Hadsell Stormer & Renick; The Cochran Firm; Rosen Bien Galvan & Grunfeld; and Altschuler Berzon,

among other firms.

8. Because many of the cases brought by public interest groups are co-counseled by attorneys at private commercial firms, I have access to those billing rates as well. In addition to these two methods, when I become aware of a case where statutory fees are sought, I regularly obtain fee applications and any resulting awards from on-line public records for the courts, as well as from legal research databases such as LEXIS and Westlaw. Included in my review of fee applications and awards are those by, and awards to, large firms engaged in complex litigation to assess customary billing rates for these firms, many of which also serve as pro bono counsel in public interest cases. I estimate that I review around 100 or more fee motions and fee awards annually.

9. My declarations in support of fee applications for civil rights and public interest attorneys have been cited repeatedly by courts as evidence of reasonable market rates. For example, in *Nadarajah v. Holder,* 569 F.3d 906, 912-914 (9th Cir. 2009), the Ninth Circuit referenced my declaration with approval in support of the application of attorneys from the ACLU for fees under the Equal Access to Justice Act ("EAJA"). Two recent decisions in which the Court noted with approval my declaration as admissible evidence of market rates include *S.G. v. City of Los Angeles*, Case No. 17-cv-9003 JAK - MRWx (C.D. Cal. Apr. 12, 2021) [Dkt. 266 at p. 6]; and, *Ubaldo Arroyo, et al. v. United States Department of Homeland Security, et al., Case No.* SACV 19-815 JGB (SHKx) (C.D. Cal. Jan 2, 2020) [Dkt. 53 at p. 7].

10. Other cases in which courts cited to my declaration as evidence to award reasonable market rates include *Torrance Unified School District v. Magee*, 2008 U.S. Dist. LEXIS 95074 (CD CA 2008), granting fees pursuant to the federal IDEA statute, 20 U.S.C. §1415(i)(3)(c), the Court cited to my declaration as persuasive evidence of market rates. In *Atkins v. Miller*, CV 01-01574 DDP (CD CA 2007), the Court awarded fees to a 1975 graduate at $675 an hour, citing to my declaration and that of Barry Litt to support the rates. Id. at pp. 8-9 and n.4. Other cases in which my declaration was cited favorably include this Court's order in *Charlebois v. Angels Baseball LP*, SAC 10-0853 DOC(May 30, 2012); *Orantes-Hernandez v.Holder*, 713 F.Supp.2d 963-

3

964(C.D.Cal.2010); *Hiken v. DOD*, 2013 U.S. Dist. LEXIS 118165 (N.D. Cal. Jan. 14, 2013), *Vasquez v. Rackauckas*, 2011 U.S. Dist. LEXIS 83696 (C.D. Cal. 2011); *Rauda v. City of Los Angeles*, 2010 U.S. Dist. LEXIS 138837 (C.D. Cal. 2010); *Jochimsen v. County of Los Angeles, supra*; *Dugan v. County of Los Angeles*, Case No. cv-11-08145 CAS (C.D.Cal. March 3,2014); *Carrillo v. Schneider Logistics*, Case: 12-55042 (9th Cir. 2014); *Flores v. City of Westminster*, SA-CV-11-0278 DOC (C.D. Cal. Oct. 23, 2014); *Webb v. Officer J. Ackerman*, 13-CV-01992 PLA (C.D. Cal. January 4, 2018), Doc. 180, p.5;  *Garza v. City of Los Angeles*, 2:16-cv-03579-SVW-AFM, 2018 U.S. Dist. LEXIS 227294, (C.D. CA  2018); and *Wagafe v. Trump*, Case No. 2:17-CV-00094-RAJ (W.D. WA 2019).  Recently, the Circuit cited my declaration in approving EAJA rates to the ACLU in *Gomez-Sanchez v. Barr, sub nom Gomez-Sanchez v. Sessions,* 892 F.3d 985 (9th Cir. 2018).  *Jochimsen* held that I was qualified to opine on reasonable market rates.

11.    In addition, I have litigated statutory fee issues at the appellate level in several of my cases. Most notably, I was lead counsel before the California Supreme Court in *Tipton-Whittingham v. City of Los Angeles*, 34 Cal.4th 604 (2004), the companion case to *Graham v. Daimler-Chrysler*, 34 Cal.4th 533 (2004), establishing the continued vitality of the "catalyst" fee doctrine in California courts. I was also lead counsel in *Jones v. City of Los Angeles*, 555 Fed.Appx. 659 (2014), establishing entitlement to fees as a "prevailing party" based on the Ninth Circuit's necessary approval of a settlement that was conditioned on vacatur of the panel decision.

12.    My present billing rate is $1150 an hour.  As my resumé indicates, my primary areas of practice involve complex constitutional cases, focusing on homelessness litigation, First Amendment issues, and Fourth and Fourteenth Amendment claims.  In the past, I also litigated employment discrimination cases.  The *Tipton-Whittingham* case discussed in paragraph 11 was a class-action employment discrimination case against the Los Angeles Police Department on behalf of female employees.  It was one of several class-action challenges on behalf of women in then non-traditional employment (police officers, firefighters, correctional officers) in which

4

I was counsel.

13.   Although I litigate some less expansive individual cases, my primary focus is impact litigation, including multi-plaintiff cases and class actions. While some of my cases may be more simple than others, I use the same rate in all cases on the premise that my skill generally allows me to handle a simpler case in fewer hours than it would take a less experienced attorney.  I understand this approach to rates to be consistent with Ninth Circuit authority.  *See Van Skike v Director, Office of Workers' Compensation Programs*, 557 F.3d 1041, 1046 (9th Cir. 2009) (relative "simplicity" or "complexity" of a case is reflected in the efficiency of hours, not the lodestar rate.

14.  I have not filed a fee motion at my current 2022 rate; however, my rates were approved in several recent class actions where the Court was required to conduct an independent lodestar analysis of the attorney fees.  In *Charmaine Chua v. City of Los Angeles*, *et al.*, Case 2:16-cv-00237-JAK-GJS (C.D. Cal. 2020) [Dkt. 158], the Court approved the fees to class counsel based on 2019 rates in a lodestar cross-check. [Dkt. 147]   In *Chua*, I applied the rate of $1,000 an hour for 2019.  At the time, I had 10 years less experience than Mr. Schey has now.

14.   In addition, I settled several cases in 2018 applying $975 an hour as my rate. The most recent fee awards I received in a contested fee motion were in 2014.  I applied a rate of $875 in *Desertrain v. City of Los Angeles*, 754 F.3d 1147 (9th Cir. 2014).  The parties settled the trial court and appellate fees together with a five percent reduction of the appellate lodestar. The Ninth Circuit then approved the full requested fee award at the 2014 rate of $875 an hour.  *See CPR for Skid Row v. City of Los Angeles*, 779 F.3d 1098 (9th Cir. 2015).  Applying a modest 3.1 percent annual cost-of living increase to my approved 2014 rate, and with no adjustment to the base rate, the  equivalent 2022 rate would be approximately $1,125 an hour.   This is just slightly above the 2021 rate the Court previously approved for Mr. Schey in this matter, when he had seven years more experience than did I in 2021.

15.  My opinion on the reasonableness of the rates sought by counsel in this matter is based on comparisons to rates approved for attorneys of comparable skill,

experience and reputation in the Los Angeles legal market, where the attorneys are based. In all of the fee declarations that I prepare, I apply my understanding of *Blum v. Stenson*, 465 U.S. 886 (1984), that "rates charged in private representations may afford relevant comparisons." *Id.* at 895 fn. 11.  I understand this to mean that fees for civil rights lawyers should approximate rates charged by attorneys of comparable skill, experience and reputation in the relevant legal market and engaged in similarly complex litigation, regardless of whether the attorneys work for a non-profit, represent individuals on contingency, serve as in-house counsel, or charge a minimal rate for paying clients with the  possibility of receiving a market rate award if successful. *See, Nadarajah v Holder,* 569 F3d at 910 (awarding market rates to attorneys at the ACLU).

16.  I apply several additional principles to analyze reasonable market rates. First, when available, I look to rates awarded to the attorney in previous cases based on my understanding that such awards are strong evidence of reasonable market rates. *See Chaudhry v. City of Los Angeles*, 751 F3d 1096, 1111 (9th Cir. 2014); *U.S. v. $28,000 in U.S. Currency*, 802 F.3d 1100, 1106 (9th Cir. 2015); *Camacho v. Bridgeport Fin., Inc.,* 523 F.3d 973, 976 (9th Cir. 2008).

17.  Next, I look to evidence of billing rates by attorneys engaged in similarly complex business litigation as an approved method of establishing reasonable market rates for civil rights attorneys who do not regularly bill clients on an hourly basis.  This approach recognizes that most civil rights attorneys are not paid hourly for their services at market rates. *See e.g.,* Pearl, *California Attorney Fee Awards*, CEB 2012, §9.109 (2012). Evidence of billing rates for other attorneys that I rely on is drawn from fee awards as well as declarations regarding rates filed in pending cases. Such evidence is one of the most common ways to establish market rates. *See e.g., Beauchamp v Anaheim Union High Sch. Dist,* 816 F.3d 1216, 1224 (9th Cir 2016); *U.S. v $28,000 in U.S. Currency*, 802 F3d at 1106 (district court erred by ignoring plaintiff's supporting rate declarations); and *Chaudhry*, 751 F3d at 1111.

18. As noted above, I review a combination of approximately100 fee motions, fee awards, and supporting declarations in the course of a year. I obtain this information

from court orders awarding statutory fees or awarding fees as a discovery sanction. I subscribe to several websites that report legal news. If I learn of a case where there is likely to have been a fee motion, I review the docket and obtain a copy of any fee motion, supporting declarations and fee award from public sources, including on-line documents for the courts and PACER. In addition, if I provide a fee declaration and the opposition then files an expert challenging the proposed rates, I search PACER and the various Superior Court dockets to find cases where the defense expert provided fee declarations, as well as cases where the same expert filed a declaration supporting high market rates in fee-shifting cases.

19. I do not rely on surveys if other more specific comparative information is available. General rate surveys do not provide specific rates by years of experience but, instead, rely on an average or "range" of fees, often covering attorneys with unequal experience in a single category and capping rates after approximately 25 years. *See Jordan v. Multnomah County*, 815 F.2d 1258, 1263-64 (9th Cir. 1987). In addition to the absence of information about how long the various partners and associates are practicing, there is often no indication of whether they do transactional law, anti-trust, or other similarly complex litigation.

20. If I rely on decisions that are more than two years old, I extrapolate a comparable current rate by applying a modest increase of 3.1 percent. This is the average amount of the increase in the legal services component of the Consumer Price Index. The data is available at http://www.bis.gov/news.release/cpi.102.htm (Table2.Consumer Price Index for All Urban Consumers (CPI-U): U.S. city average, by detailed expenditure category). Although the database has not yet published the 2021/2022 COLA, I anticipate it will be considerably higher and mirror the increase d inflation rate. I employ this practice based on the decision in *Hiken v. DOD,* which underscored that "market rates in effect more than two years *before* the work was performed" are not current rates under the lodestar analysis. 802 F.3d at 1107 (9th Cir. 2016) (emphasis in original).

21. I am informed that counsel seek EAJA enhanced rates for attorney Peter

Schey.  It is my understanding that Mr. Schey is a 1973 admittee and seeks enhanced EAJA rates for 2019-2022.  I provided a supporting rate declaration for the prior fee applications filed by Plaintiffs' counsel in this action. The Court previously approved enhanced EAJA rates for Mr. Schey of $950 an hour for 2019. $1050 an hour for 2020, $1,150 an hour for 2021, and $1,250 an hour for 2022 would be at or below hourly rates courts have awarded lawyers with the same or even  less experience  than Mr. Schey.

22.    Based on my involvement in the Los Angeles legal market as a civil rights attorney for 40 years, I am aware that Mr. Schey is a highly skilled and respected immigration attorney and constitutional litigator.  He was co-counsel on several cases with the ACLU shortly after I first began working there in 1977. While I have not worked with him on litigation, my former colleagues at the ACLU who did express to me their views that he is highly skilled, has considerable expertise in constitutional litigation and enjoys an excellent reputation.

23.    Counsel for Plaintiffs provided me with several documents that underpin this motion.  I reviewed the TRO Application that was filed by counsel on June 26, 2019. [Doc. # 572]. I am familiar with the range and complexity of the issues that were raised in that motion. I also reviewed the 63-page settlement executed by the parties on May 21, 2022 [Doc. # 1254] and the Court's orders giving preliminary and final approval of the settlement. [Docs. # 1255, 1278].

24.    Based on my experience reviewing fee awards and fee applications, I believe that the rates sought by this motion are well within the range of reasonable rates in the Los Angeles legal market for attorneys of comparable skill, experience and reputation.  To support my opinion on the reasonableness of the rates sought by this motion, I attach recent fee awards and supporting declarations in a variety of civil rights and employment discrimination cases in the Los Angeles legal market. Each document is a true and correct copy of the document as it appears in the respective Court's files.

25.  The Ninth Circuit has repeatedly recognized that comparable rates are not

1   limited to the specific area of litigation.  "[T]he proper scope of comparison is not so
2   limited, but rather extends to all attorneys in the relevant community engaged in 'equally
3   complex Federal litigation,' no matter the subject matter." *See Prison Legal News v.*
4   *Schwarzenegger*, 608 F.3d 446, 455 (9th Cir. 2010) (quoting *Blum*, 465 U.S. at 893)).
5   *See also*, *Van Skike v. Dir., OWCP*, 557 F.3d 1041, 1046-47 (9th Cir. 2009).

6       26.   Attached at Exhibit 2 is a copy of the Order issued in *Duncan Roy v. County*
7   *of Los Angeles*, Case No. CV 12-09012 (FFMx), approving fees to McLane, Bednarski
8   & Litt and the ACLU of Southern California.  Because the Court's Order does not list
9   the rates approved for each attorney, I attach at Exhibit 3 Mr. Litt's declaration in the
10  motion for final approval of the class settlement and the fees to class counsel.  The chart
11  of rates for all attorneys is set out at page 18 of Exhibit 3.  Mr. Litt's approved 2021 rate
    was $1,275 an hour.  *Id.*

12      27.   Attached at Exhibit 4 is a copy of the Order issued in *McKibben v.*
13  *McMahon, et. al.*, Case No. EDCV 14-2171 JGB (February 28, 2019), approving rates
14  in a class action settlement based on the lodestar analysis.  The motion was filed in
15  2018.  The Court noted and approved the reasonableness of Barry Litt's billing rate  of
16  $1,150 an hour.  Ex. 3, p. 19.   In 2018, Mr. Litt had the same amount of experience as
17  Mr. Schey has now.  Applying a 3.1 percent annual cost-of-living increase to Mr. Litt's
18  2018 rate, the equivalent 2022 rate would be approximately $1,300 an hour, just slightly
19  below the rate approved for Mr. Litt in *Roy*.

20      28.   Attached at Exhibit 5 is the Order approving fees for Dale Galipo in *Paola*
21  *French, et al. v. City of Los Angeles, et al.* EDCV 20-00416 JGB (SPx). Dkt. 165.  Mr.
22  Galipo's approved 2022 rate is $1100 an hour.  I know Mr. Galipo  personally and
23  provided supporting declarations for him in the past, although I did not provide one in
24  *French*.  Based on my personal knowledge, I am aware that Mr. Galipo graduated from
25  UCLA Law School in 1984 but was not admitted until 1988.  He currently has 34 years
26  of experience, 15 years less than Mr. Schey.

27      29.   Attached at Exhibit 6 is the decision in *Asfall v. L.A. Unified Sch. Dist.*,
28  Case No. 18-cv-00505 CBM (C.D. Cal. 2020)  In *Asfall*, fees were approved for lead

attorney Bernard Alexander at the 2020 rate of $950. I know Mr. Alexander and have provided supporting fee declarations for his firm in the past. Based on my past review of his credentials, I am aware that he was admitted in 1987. At the time of the award in *Asfall*, Mr. Alexander had 16 years less experience than Mr. Schey has now. The difference of $300 between Mr. Alexander's 2020 rate and the 2022 rate now requested for Mr. Schey amounts to an annual hourly increase of $18.75 an hour, which translates into less than a two percent annual increase over 16 years.

30. Attached at Exhibit 7 is the Order approving attorney fees for Dale Galipo at the 2021 rate of $1,100 an hour in *Donastorg v. City of Ontario*, Case No. EDCV 18-992 JGB (SPx), 2021 U.S. Dist. LEXIS 246890, *19 (C.D. Cal. 2021).

31. Attached at Exhibit 8 is a copy of the decision approving attorney's fees in *Garcia v. Seltzer-Dorene Management Co., Inc.*, LASC Case BC 699421, dated December 7, 2021. In *Garcia*, the Court approved fees for attorney Carney Shegerian at Shegerian & Associates. Because the Court's final Order does not set out the specific rates approved, I also provide the Court's tentative order. The final approved rates for all counsel are contained in Table C, page 13 of the tentative ruling. The 2021 rate for Mr. Shegerian is $1,300 an hour. Based on my review of Ms. Shegerian's website and the State Bar website, I understand Mr. Shegerian is a 1990 law graduate. Even with nearly two decades less experience that Mr. Schey has, Mr. Shegerian's 2021 rate is $50 an hour higher than the 2022 rate sought by Mr. Schey.

33. Attached at Exhibit 9 is the Declaration of Laurie Largent in support of fees in a class-action settlement. The attorneys are all at Robins, Geller, a well-known class-action litigation firm based in San Diego. Ms. Largent sets out the 2019 rates for attorneys at her firm, including several at more than $1,000 an hour. Ex. 9, p. 13. A 2019 rate of $1,150 an hour was applied for Spencer Burkholz. *Id.* I reviewed his listing on the State Bar and believe he is a 1990 law graduate. The 2019 rate for Ms. Largent was $1,040 an hour. Based on my review of her listing on the State Bar, I believe Ms. Largent was admitted in 1991. In 2019, Mr. Burkholz and Ms. Largent had

approximately two decades less experience than Mr. Schey has now.

34.    Based on the foregoing, it is my opinion that the rates sought herein are reasonable for aattorneys of comparable skill, experience and reputation in the Los Angeles legal market.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 26th day of August, 2022 at Los Angeles, California.

CAROL A. SOBEL

11

EXHIBIT 1

# CAROL A. SOBEL

725 Arizona Avenue• Suite 300 • Santa Monica, CA 90401 •
Tel. 310 393-3055 • Email carolsobellaw@gmail.com

## Employment:

| | |
|---|---|
| LAW OFFICE OF CAROL A. SOBEL | APRIL, 1997 TO PRESENT |

Solo civil rights law firm.

SENIOR STAFF COUNSEL             1990 TO APRIL, 1997
*ACLU Foundation of Southern California*

Responsible for conducting civil rights and civil liberties litigation in state and federal courts in California; supervise litigation by ACLU volunteer counsel and other ACLU legal staff.

STAFF ATTORNEY                1985 TO 1990
*ACLU Foundation of Southern Califorina*

Civil liberties litigation, primarily in the areas of Establishment Clause and Free Exercise violations, as well as other First Amendment rights.

ASSOCIATE DIRECTOR              1979 TO 1985
*ACLU Foundation of Southern California*
*American Civil Liberties Union of Southern California*

Under the direction of the Executive Director, responsible for administration of two non-profit organizations, including working with Boards of Directors on development of policy on civil liberties issues.  Engaged in litigation and assisted Legal Director in coordination and supervision of pro bono attorneys.

DEVELOPMENT DIRECTOR             1977 TO 1979
*ACLU Foundation of Southern California*
*American Civil Liberties Union of Southern California*

Responsible for conducting a variety of fundraising efforts to meet a million-dollar plus annual budget for a 501(c)(3) and a 501(c)(4).

## Admitted to Practice:

| | |
|---|---|
| California Supreme Court | November, 1978 |
| United States Supreme Court | September, 1991 |
| Ninth Circuit Court of Appeals | August, 1986 |
| U.S.D.C. Central District of California | February, 1986 |
| U.S.D.C.  Eastern District of California | June, 1990 |

## Litigation Experience:

### Federal courts:   (Partial listing of published opinions and significant cases)

*CPR for SKID ROW,*
779 F.3d 1098 (9th Cir. 2015)
Partial reversal of summary judgment in favor of the Defendant and holding that California Penal Code §403 could not lawfully be applied to criminalize the expressive activity of the Plaintiffs for protesting on Skid Row.
(Lead counsel and argued on appeal)

*Desertrain v. City of Los Angeles*
754 F.3d 1114 (9th Cir. 2014)
Reversal of summary judgment in favor of the Defendants and holding that Los Angeles Municipal Code §85.02, prohibiting parking a vehicle on public streets or parking lots any time of day or night if a person "lives" in the vehicle, is unconstitutionally vague.
(Lead counsel and argued on appeal)

*Lavan v. City of Los Angeles*
693 F.3d 1022 (9th Cir. 2012), *affirming* grant of preliminary injunction 797 F.Supp.2d 1005 (C.D. Cal. 2011)
Preliminary injunction barring City from confiscating and immediately destroying the property of homeless individuals on Los Angeles' Skid Row.
(Lead Counsel)

*Long Beach Area Peace Network v. City of Long Beach*
522 F.3d 1010 (9th Cir. 2008), as amended July 24, 2009
Upholding and reversing in part on appeal a decision of the district court granting Plaintiffs' request for a preliminary injunction to enjoin a municipal parade ordinance that included vague permit standards setting, *inter alia*, advance-notice requirements  police charges based on the past unlawful conduct of third parties without adequate standards to limit the discretion of public officials charged with implementing the parade ordinance.
(Lead counsel)

*Fitzgerald v. City of Los Angeles*
485 F.Supp.2d 1137 (CD CA 2008)
Extending injunction against police sweeps of homeless persons on Los Angeles' Skid Row on the grounds of searching for parole and probation violations.  See below for discussion of permanent injunction in 2003.
(Co-Counsel)

*Multi-Ethnic Immigrant Worker Organizing Network (MIWON) v. City of Los Angeles*
246 F.R.D. 621 (C.D. Cal. 2007)
Order granting class certification in challenge to police assault on a lawful assembly of immigrant rights supporters by the Los Angeles Police Department on May Day, 2007.
(Class Co-Counsel)

*Edward Jones, et al., v. City of Los Angeles*,
444 F.3d 1118 (9th Cir. 2006), vacated pursuant to settlement 505 F.3d 1006 (2007)
Challenge to City of Los Angeles Municipal Code §41.18(d), prohibiting sitting, lying or sleeping on any street or sidewalk anywhere in the City at any time of day or night.  Plaintiffs, all of whom are homeless persons, brought an 8th Amendment as-applied challenge to their arrests and citations for violating the ordinance when there was no available adequate shelter.
(Co-counsel)

*Terry Tipton-Whittingham, et al. v. City of Los Angeles*
316 F.3d 1059 (9thCir. 2003)
Challenge by City of Los Angeles to interim fee award granting plaintiffs' fees as "catalysts" under state civil rights fee shifting statutes.  Following oral argument, the Ninth Circuit certified issue of continued availability of "catalyst" fees under California law after adverse decision by the United States Supreme Court rejecting catalyst fee doctrine under federal law absent express legislative authorization.  Certified for hearing before the California Supreme Court and ultimately upheld the catalyst fee doctrine under California law.
(Co-counsel; argued in Ninth Circuit)

*Fitzgerald v. City of Los Angeles*
2003 U.S. Dist. LEXIS 27382 (CD CA 2003)
Permanent injunction enjoining Fourth Amendment violations by the Los Angeles Police Department (LAPD). The injunction prevents the LAPD  from engaging in stops of homeless persons for parole and probation sweeps on Skid Row without reasonable suspicion to believe that specific individuals are on parole or probation and subject to a search condition, or that the individual has engaged in, or is about to commit a crime.
(Lead counsel)

*Khademi v. South Orange County Community College District*
194 F.Supp.2d 1011 (C.D. CA 2002)
First Amendment facial challenge invalidating college policy  regulating time, place and manner of student speech on campus.
(Lead counsel)

*Mardi Gras of San Luis Obispo v. City of San Luis Obispo*
189 F. Supp.2d 1018 (C.D. Cal. 2002)
Preliminary injunction to enjoin a municipal parade ordinance that required lengthy advance-notice requirement and permitted high insurance and police charges based on the past unlawful conduct of third parties without adequate standards to limit the discretion of public officials charged with implementing the parade ordinance.

*Bauer v. Sampson*
261 F.3d 775 (9th Cir. 2001)
First Amendment challenge to disciplinary action against college professor for publication of an alternative newsletter criticizing elected and appointed public officials and disclosing wrongdoing by college officials and personnel. The college sought to discipline the professor for violating the district's policies on discrimination and work-place violence. The polices were declared unconstitutional as applied to the professor's speech.

*H.C. v. Koppel*
203 F.3d 610 (9th Cir. 2000)
Dismissal of federal civil rights action filed in federal court against state court judge and appointed counsel for minor in family law matter. Circuit held that Younger Abstention applied and non-custodial parent had adequate state court remedy.

*Justin v. City of Los Angeles*
2000 U.S. Dist. LEXIS (CD Cal. 2000)
Class action to enjoin police sweeps of homeless population on Los Angeles' Skid Row. Permanent injunction stipulated to in settlement following certification of the injunctive relief class.
(Lead counsel)

*Los Angeles Alliance for Survival, et al. v. City of Los Angeles*
987 F. Supp. 819 (1997); 157 F.3d 1162 (9th Cir. 1998); on certification to the California Supreme Court, 22 Cal.4th 352 (2000); 224 F.3d 1076 (9th Cir. 2000)
Injunction issued in challenge to municipal ordinance barring so-called "aggressive solicitation" in broad areas of traditional public fora. Preliminary injunction entered by district court based on California Constitution. On appeal, the Ninth Circuit certified the California Constitution question to the California Supreme Court. Following decision by the California Supreme Court, the Ninth Circuit upheld the original injunction.
(Co-counsel)

*Service Employees International Union 660 v. City of Los Angeles*
114 F. Supp.2d 966 (C.D. Cal. 2000)
Challenge to the "no-protest zone" at the Democratic National Convention in Los Angeles in 2000, as well as a preliminary injunction to enjoin the City of Los Angeles parade ordinance.
(Co-counsel)

*United States v. Wunsch*
54 F.3d 579 (9th Cir. 1995);84 F.3d 1110 (9th Cir. 1996) (reargument)
First Amendment challenge to discipline of male attorney for "gender bias" in sending note to female Asst. U.S. Attorney after she successfully moved to disqualify him as defense counsel in a criminal case. Ninth Circuit invalidated the penalty and declared unconstitutional California's "offensive personality" regulation on attorneys' professional conduct. (Argued and briefed on appeal).

*American Jewish Congress v. City of Beverly Hills*
65 F.3d 1539 (9th Cir. 1995);90 F.3d 379 (9th Cir. 1996) (en banc)
First Amendment challenge to display of a religious symbol on public property and to permit scheme for expressive activities in public fora in the City of Beverly Hills. The en banc panel held the permit scheme unconstitutional and found that a preference had occurred for the display of a particular religious symbol. The en banc decision was unanimous. (Argued and briefed on appeal)

*Baca v. Moreno Valley Unified School District*
936 F. Supp. 719 (C.D. Cal. 1996)
First Amendment challenge to school board regulations preventing speakers from making disparaging remarks about public employees during public board meetings.

*Wallin v. City of Los Angeles*,
1194 U.S. App. LEXIS 2343 (9th Cir. 2004)

Circuit dismissed appeal of defendant City and law enforcement officers from denial of qualified immunity. Appellee, a female officer with the Los Angeles Police Department, alleged that appellants violated her right to equal protection, due process and right to petition the government because they violated LAPD confidentiality regulations and delayed the investigation into her allegations of co-worker rape.

(Lead counsel)

*National Abortion Federation v. Operation Rescue*
8 F.3d 680 (9th Cir. 1993)
Class-action state-wide injunction against blockades of women's health care clinics by anti-abortion activists. First case decided under the "frustrate and hinder" clause of 42 U.S.C. § 1985(3), the 1871 Ku Klux Klan Act. Appeals court held cause of action under "frustrate and hinder" clause was properly plead and reversed 12(b)(6) ruling on that claim.

(Co-lead counsel throughout; argued on appeal)

*Hewitt v. Joyner*

940 F.2d 1561 (9th Cir. 1991)

Establishment Clause challenge to Christian  theme park, Desert Christ Park, owned and operated by San Bernardino County.  Ninth Circuit held County ownership and operation of the park violated the Establishment Clause.

(Lead counsel throughout litigation; argued on appeal).

*Standing Deer v. Carlson*

831 F.2d 1525 (9th Cir. 1986)

First Amendment challenge for Native Americans at Lompoc Federal Penitentiary to regulation barring religious headbands in the dining facilities for purported health reasons.

(Argued and briefed on appeal)

*Burbridge v. Sampson*

74 F.Supp.2d 940 (C.D. Ca. 1999)

First Amendment challenge to community college policy regulating student speech in public fora on campus. Court issued a preliminary injunction, declaring the college's speech regulations unconstitutional.

*Rubin v. City of Santa Monica*

823 F.Supp. 709 (C.D. Ca. 1993)

First Amendment challenge to city permit scheme limiting access to public parks for protected expressive activities.  Court issued a preliminary injunction and declared the permit scheme unconstitutionally on vagueness grounds and procedural due process grounds.  (Lead counsel)

# State Court

*Terry Tipton-Whittingham, et al. v. City of Los Angeles*

34 Cal.4th 604 (2002)

California continues to recognize "catalyst" fee awards to prevailing parties under the private attorney-general statute (Cal. Code  of  Civ. Proc. §1021.5) and Fair Employment and Housing Act (FEHA) despite change in federal civil rights fee-shifting law.  Under California law, there is no requirement of a judicial determination establishing a change in the legal obligations of the parties.

(Co-counsel and argued at California Supreme Court)

*Los Angeles Alliance for Survival v. City of Los Angeles*

22 Cal.4th 352 (2000)

Ordinance restricting certain activity as "aggressive solicitation" was not content-based under California Constitution

(co-counsel)

*Williams v. Garcetti*

5 Cal.4th 561 (1993), *sub nom Williams v. Reiner*, 13 Cal.App.4th 392 (1991)

Challenge on due process grounds to portion of STEPP law which imposed a criminal penalty  on parents of minor children engaged in or at risk of delinquent conduct.

(Argued and brief on appeal to California Supreme Court)

*Sands v. Morongo Unified School District*

53 Cal.3d 863 , *cert denied*, 112 U.S. 3026 (1991)

225 Cal.App.3d 1385 (1989)

Establishment Clause challenge invalidating prayers at public high-school graduations.

(Argued and briefed as lead counsel throughout litigation)

*Walker v. Superior Court of Sacramento*

47 Cal.3d 112 (1988)

Establishment Clause/Free Exercise/Due Process challenge to criminal prosecution of Christian Science parents for death resulting from use of prayer instead of traditional medicine in treatment of ill child.  (Wrote amicus brief on due process issues).

*Irvine Valley College Academic Senate, et al. v. South Orange County Community College District*

129 Cal.App.4th 1482 (2005)

Statutory construction of plain language of Education Code §87360, bolstered by legislative intent, requires actual joint agreement and mutual development of revisions to faculty hiring policies.

(co-counsel, drafted final briefs on appeal)

*Fashion 21, et al. v. Coalition for Humane Immigrant Rights (CHIRLA), et al.*

111 Cal.App.4th 1128 (2004)

Special motion to strike defamation complaint by retainer against garment worker advocates must be granted as the plaintiff retailer could not establish a probability of prevailing on the merits of their claims.  Garment worker advocates properly relied on draft labor commission regulations suggesting retailer could be liable for sweatshop conditions of manufacturing of its retail goods.

(lead counsel at all stages)

*Gonzalez v. Superior Court*

33 Cal.App.4th 1539 (1995)

Challenge to discovery order in sexual harassment case requiring plaintiff to disclose name of confidential informant who provided her with photographic evidence of harassment.  "After-acquired evidence" rule applied to require disclosure.

(Lead counsel in trial court and appeal)

*Lantz. v. Superior Court of Kern County*

28 Cal.App.4th 1839 (1994)

Privacy rights challenge to interpretation of Consumer Personnel Records Statute (CCP § 1985(3), requiring strict adherence to statutory procedures and limiting exemption of local government agencies from adhering to statutory requirements.

(Lead counsel throughout litigation)

*Rudnick v. McMillan*

25 Cal.App.4th 1183 (1994)

Defamation verdict involving public figure plaintiff and local environmentalist author of letter to editor overturned on basis that letter was protected opinion and public figure subject to constitutional malice proof burden.  Wrote amicus brief which formed basis of appellate ruling.

*Westside Sane/Freeze v. Hahn*

224 Cal.App.3d 546 (1990)

Challenge to restrictions on First Amendment petition activities in shopping center.

(Co-counsel, co-wrote appeal)

*City of Glendale v. Robert George*

208 Cal.App.3d 1394 (1989)

Reversal of trial court order imposing prior restraints on speech of "Presidential Santa" on the basis that he constituted a public nuisance to his neighbors in a residential area.

(Argued and briefed on appeal)

*McCarthy v. Fletcher*

207 Cal.App.3d 130 (1989)

Challenge to removal of textbooks from school reading list based on community-based religious objections. Court of Appeal reversed summary judgment decision, holding that there was sufficient evidence of constitutionally impermissible factors in evaluation of appropriateness of class-room reading materials.

(Argued and brief on appeal)

*Fiske v. Gillespie*

200 Cal.App.3d 130 (1988)

Challenge to sex-based actuarial presumptions in insurance industry rate for particular types of life insurance and annuity benefits.

(Co-Counsel, Argued on appeal)


# Publications:
## (Partial listing)s


*Catalyst Fees After Buckhannon*

Civil Rights Litigation and Attorney Fees Annual Handbook

(January 2006)


*Free Speech and Harassment: An Overview*
*in the Public Employee Sector*

CPER: CALIFORNIA PUBLIC EMPLOYEE RELATIONS

Institute of Industrial Relations - UC Berkeley

June 1999  No. 136


*Defeating Employer Defenses to Supervisor Liability*
*After* Ellerth *and* Faragher

ADVOCATE, October 1998


*Student Expression Under California Law*

UCLA Journal of Education

Volume 3, pp. 127-137 (1989)


*Should Attorneys Be Disciplined For Gender Bias*

Point/Counterpoint ABA Journal   August, 1995


*Fight Illegal Police Practices in State Court*

Los Angeles Daily Journal

March 6, 1992


*Judicial Oversight Limited by Supreme Court*

Los Angeles Daily Journal

May 6, 1991


*Jury Nullification is Conscience of Community*

Los Angeles Daily Journal

August 31, 1990


*A Basic Right Merits Shield From The Mob*

Los Angeles Times

August 11, 1991 p.M5

*Prop 115 revisited: Police charged with crimes
deserve fair trials too*
Los Angeles Daily News
May 7, 1991

*Prayer Doesn't Belong at Graduation*
USA Today
May 15, 1991 p. A10

*Killea Tactic Can Only Hurt the Church in the Long Run*
Los Angeles Times (San Diego)
November 20, 1989 p.B7

*The Fifth is a Shield for All*
Los Angeles Times
August 6, 1988   II8
(authored for Exec. Dir. ACLU)

*Which Way Will Rehnquist Court Turn?*
Los Angeles Daily News
June 18, 1986 p.21

*Constitution Exacts Cost for Religious Freedom*
Los Angeles Daily News
June 8, 1986 FOCUS  p.3

## Education:

| | |
|---|---|
| Peoples College of Law | J.D.  May, 1978 |
| Douglass College.For Women, Rutgers University | B.A . June, 1968 |

## Professional and
## Community Activities:

| | |
|---|---|
| Adjunct Professor - Loyola Law School<br>Civil Rights Advocacy Practicum | 2007-present |
| Blue Ribbon Panel on LAPD Rampart Inquiry, Member | 2004-2006 |
| Ninth Circuit Gender Bias Task Force<br>Convenor, Advisory Committee on Employment Law | 1992-1993 |
| Ninth Circuit Conference on "Ethnicity, Race, and Religion in the Ninth Circuit"<br>Member, Working Subcommittee | 1993 |
| Los Angeles Public Interest Law Journal<br>Advisory Board | 2007-present |

| | |
|---|---|
| Los Angeles Center for Law and Community Action<br>Member, Board of Directors | 2015-present |
| National Police Accountability Project<br>Member, Advisory Board and Board of Directors | 2006-present |
| National Lawyers Guild, Los Angeles - President | 2001-2008 |
| National Lawyers Guild - National Executive Vice President | 2009-2011 |
| National Lawyers Guild Far West Regional Vice-President | 2003-2005 |
| National Lawyers Guild, National Executive Committee | 2003-2012 |
| NLG National Mass Defense Committee, Co-chair | 2003-2012 |
| Women Lawyers Association of Los Angeles<br>Member, ProChoice Committee | 1985-2002 |
| The California Anti-SLAPP Project<br>Member, Board of Directors | 1995-2010 |

## Awards:
## (Partial listing)

| | |
|---|---|
| PEN Freedom to Write Award | 1991 |
| American Jewish Congress Tzedek Award | 1992 |
| Planned Parenthood Los Angeles, Distinguished Service Award | 1990 |
| Freethought Heroine Award | 1992 |
| National Lawyers Guild - Los Angeles | 1999 |
| ACLU of Southern California Pro Bono Attorney Award | 2001 |
| Asian Pacific American Legal Center Pro Bono Award | 2003 |
| California Lawyer: Super Lawyer -Civil Rights/Constitutional Law | 2004-2019 |
| ACLU of Southern California Freedom of Expression Award | 2007 |
| Daily Journal Top 100 Most Influential Lawyers in California | 2007 |

National Lawyers Guild - Ernie Goodman Award                                            2007

Angel Award - California Lawyer Magazine Award for pro bono work                        2007

CLAY Award (California Lawyer of the Year - civil rights) - California Lawyer Magazine   2008

Top 75 Women Litigators in California - Daily Journal                              2008, 2013

California Super Lawyers - Top 50 Women Lawyers in Southern California                   2014

National Lawyers Guild, Los Angeles Law for the People Award                            2014

ACLU Lifetime Achievement Award                                                         2017

EXHIBIT 2

JS-6

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DUNCAN ROY, *et al.*, | Case No.: 2:12-cv-09012-AB (FFMx) |
| Plaintiffs, | **ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND GRANTING MOTION FOR ATTORNEYS' FEES AND COSTS** |
| vs. | |
| COUNTY OF LOS ANGELES, *et al.*, | |
| Defendants. | |

Upon review and consideration of the Settlement Agreement (the "Settlement Agreement"), (Dkt. No. 608), and the exhibits attached thereto, made and entered into by counsel for the Parties, who represent that their respective clients have approved the settlement, the Court **GRANTS** final approval to the class action settlement, resolving the Motion for Final Approval of Class Action Settlement, (Dkt. No. 627), and also **GRANTS** the Motion for Award of Attorneys' Fees and Costs, (Dkt. No. 615).

The Named Plaintiffs/Class Representatives are Alain Martinez-Perez and Clemente de la Cerda. Plaintiffs are former prisoners of the Los Angeles County Sheriff's Department ("LASD"), whose claims arose from the LASD's policy of detaining inmates beyond the expiration of their state criminal charges on the basis of immigration detainers ("detainers" or "ICE holds"), which are issued by Immigration and Customs Enforcement ("ICE") for suspected immigration violations. Plaintiffs specifically challenged: 1) LASD's practice of holding inmates on detainers after they became due for release on criminal matters (i.e. after they were acquitted or otherwise ordered released by a judge, or after serving a jail sentence); 2) LASD's practice of incarcerating arrestees with bail of less than $25,000 who, in the absence of an immigration detainer, would have been released on their own recognizance pursuant to LASD policy; and 3) LASD's (disputed) practice of refusing to accept bail on behalf of inmates with immigration detainers.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

I.     **The Settlement is Approved as Fair, Reasonable and Adequate under Federal Rule of Civil Procedure 23(e)(2)**

1.     This Order incorporates by reference the definitions in the Settlement Agreement, a copy of which was attached to the Preliminary Approval Motion.

1

(Dkt. No. 608). All terms defined therein shall have the same meaning in this Order.

2.     A Fairness Hearing was held on January 7, 2022, to consider the fairness, reasonableness, and adequacy of the Settlement under Federal Rule of Civil Procedure 23(e)(2), including the application by Class Counsel for attorneys' fees and expenses.

3.     The Settlement Agreement is hereby **approved**. The Court finds that the class settlement fund of $14,000,000 and its proposed allocation, as well as the other provisions contained within the Settlement Agreement, are within the range of what would constitute a fair, reasonable, and adequate settlement in the best interests of the Class as a whole, and that the terms of the Settlement Agreement otherwise satisfy Federal Rule of Civil Procedure 23(e) and due process requirements.

4.     Class counsel invested substantial time, effort, and resources into litigating this matter. Settlement proceedings commenced only after class counsel had developed a thorough understanding of the evidence through discovery, class certification litigation, and litigation of dispositive motions. The settlement agreement was negotiated at arm's length before Antonio Piazza, an experienced mediator. The settlement represents an excellent outcome to class members, especially considering the risk of loss at trial. All class members are treated equally under the settlement agreement, except for the two class representatives who will receive modest incentive awards.

5.     The Court finds that the incentive awards of $10,000 to the two class representatives are appropriate and reasonable. The awards are hereby **approved**.

2

## II.    **Notice & Results of the Claims Process**

1.     The Class Administrator has performed all tasks required of it, including establishing a website and call-in numbers, posting the relevant materials to the website, mailing and emailing class notices and following up, and processing claims.

2.     Due and adequate notice of the proceedings having been given to the Class, and a full opportunity has been offered to the Class to participate in this hearing. As required by this Court, the Class Administrator directed notice using mail, email, text message, and direct social media contacts, to all persons identified as Class Members. The notice given to the Class Members was fully in compliance with the requirements of Rule 23 of the Federal Rules of Civil Procedure.

3.     The Administrator issued notice to 19,923 individuals. There was a total of 1,166 unique claimants. There were 15 exclusion requests. There were also three objections, one of which was ultimately withdrawn.

4.     Pursuant to the terms of the Settlement Agreement, Defendants may review the claims of any "Potential *Gerstein* Class Members" by referencing their I-247 Detainer Form. They may then determine whether these Class Members were subject to ongoing removal proceedings or a final order of removal. Defendants have agreed to notify Plaintiffs of any potential *Gerstein* Class Members whose claims they contest. Should any dispute arise regarding the approval of potential *Gerstein* Class Members, the Parties will meet-and-confer in good faith to reach a resolution. If the dispute cannot be resolved, they will submit a stipulation advising the Court of their respective positions.

5.     The administrator shall preserve all written communications from Class Members in response to the Class for at least three years or pursuant to further order of the Court. All written communications received by the Claims Administrator from Class Members relating to the Settlement Agreement shall be

3

available at all reasonable times for inspection and copying by Counsel for the Parties. The Class Administrator will prepare a list of all rejected claims, including the reasons for rejection, and maintain the list in a case file.

### III. Late Claims

1. The Court **approves** nine late claims that were submitted since October 10, 2021. By agreement, the Parties may agree to approve any additional late claims received up to the time of distribution, without the need for further stipulation or review by the Court. Should the Parties disagree as to the approval of a claim, they shall advise the Court.

### IV. Objections

1. There were originally three objections to the Settlement Agreement, by Victor Diaz, Esteban Hernandez, and Sundiata Bakaba. Mr. Bakaba has now indicated that he would like to remain in the class. (*See* Dkt. No. 637). Therefore, the Court now addresses the objections of Mr. Diaz and Mr. Hernandez.

2. The first objection is made by Victor Diaz. Mr. Diaz seeks expungement of some criminal charges and compensation for time spent wearing an ankle bracelet. He does not object to the compensation provided for his over-detention as a result of this settlement. Expungement of criminal charges is not available as relief in a class-wide damages lawsuit, and a claim against ICE for liberty violations is beyond the scope of this lawsuit. Mr. Diaz had the option of excluding himself from the settlement in order to pursue claims against ICE independently; however, he chose not to do so. For these reasons, Mr. Diaz's objection is **overruled**.

4

3.    The second objection is made by Esteban Hernandez. Mr. Hernandez objects on the grounds that no claims against the LAPD were included in this case, despite the fact that the LAPD was responsible for his initial arrest. Mr. Hernandez does not object to the financial terms of the Settlement Agreement. Mr. Hernandez is at liberty to independently pursue a claim against the LAPD, since this settlement only releases the County (not the City or the LAPD) from further claims arising out of this lawsuit. For this reason, Mr. Hernandez's objection is **overruled**.

**V.    <u>Payment of the Class Fund, Attorneys' Fees, Class Administration Fees and Distribution to Class Members</u>**

1.    The Court **approves** total litigation costs of $257,991.04, which includes $50,000 paid to Centro de los Derechos del Migrante for transnational outreach during the notice period (advanced by Plaintiffs' Counsel).

2.    The Court **approves** total administration costs not to exceed $350,000. This includes $287,360.76 for work performed before the filing of this motion.

3.    The Court **approves** a fee award of $4,200,000, which is equivalent to 30% of the settlement fund. This award is justified by the fact that Plaintiffs' attorneys achieved significant results for the class and undertook lengthy and risky litigation.

4.    The Court **approves** a distribution model whereby each valid over-detention claimant shall receive the maximum per day compensation of $1,000. Each no-bail notation claimant shall receive $250.

**VI.    <u>*Cy Pres* Distribution</u>**

1.    The Parties have agreed that all funds not consumed by the administration costs, litigation costs, attorneys' fees, and direct payments to Class

5

Members shall be directed to *cy pres* distribution. Given the Court's award of $4,200,000 in attorneys' fees and costs, the resulting *cy pres* amount is $5,385,008.96. The Parties have agreed that these funds (i) may only be used to fund representation of persons facing immigration consequences because of criminal arrest or conviction in Los Angeles County, and (ii) may not be used to supplant funding already provided by the Board of Supervisors. In order to fulfill these aims, the Parties have agreed that 100 percent of the funds will be used to provide *cy pres* eligible services by the Los Angeles County Office of the Public Defender ("PD") and the Office of the Alternate Public Defender ("APD"). Moreover, these funds will be fully administered by the PD and APD.

2.    Per the terms of the Parties' *cy pres* agreement, (*see* Dkt. No. 636), the County shall invest and utilize the *cy pres* funds within a three to five-year cycle, depending on how expeditiously each recipient is able to utilize the funds in a way that maximizes impact for clients. The funds shall be used by the PD and the APD to hire contract immigration attorneys, at-will post-bar law clerks, and contract paralegals, who will be embedded within their respective Immigration Units to provide services to persons facing immigration consequences because of a criminal arrest or conviction in the County, and who would not already receive or be eligible for such services under existing PD and APD funding.

3.    In particular, *cy pres* funding shall be used to provide the following:

    a.  Post-conviction relief (PCR) proceedings for all *cy pres* eligible PD and APD clients.

    b.  Immigration and removal legal representation for all *cy pres* eligible PD and APD clients, including, but not limited to, Deferred Action for Childhood Arrivals (DACA) recipients, Special Juvenile Immigrant Status (SJIS) children, and homeless/near homeless immigrants.

c. Immigration detention bond proceedings for all *cy pres* eligible PD and APD clients.

d. A systematic built-in referral process for PD and APD to refer *cy pres* eligible clients to the Department of Consumer and Business Affairs' new Immigration Legal Services Program, if necessary, for referral to other County-provided support services, at no cost to the *cy pres* funds.

e. All other immigration-related matters within *cy pres* requirements.

4. Finally, the *cy pres* funds shall be made available for use by the PD and the APD based on the proportion of total case filings handled by each of the departments, with the expectation being that seventy-five percent of the funds shall be allocated to the PD and twenty-five percent shall be allocated to the APD.

## VII. **Final Resolution**

1. It is hereby determined that all Class Members are bound by this Final Approval Order, except for the 15 Class Members who filed an exclusion notice, namely the following:

1. **Luis Vazquez**
Reference Number: 311712KGWRFC4
Main Number: 33110641

2. **Jorge Najera**
Reference Number: 311712HFJ9H7Q
Main Number: 32777969

3. **Enrique Ontiveros**
Reference Number: 3117122QXSSY0
Main Number: 32235037

4. **Saroeun Lanh**
Reference Number: 311712H3TQ7HG
Main Number: 32575101

5. **Sergio Sandoval**
Reference Number: 311712CPFJPQF
Main Number: 33295370

7

6. **Hamdi Saleh**
Reference Number: 31171287Z4N38
Main Number: 33257588

7. **Aparicio Moreno**
Reference Number: 311712M1FXFHS
Main Number: 33398223

8. **Walexsy Figueroa**
Reference Number: 31171252KJ2DN
Main Number: 33135431

9. **Salvador Panduro**
Reference Number: 311712BXVDMYV
Main Number: 4452065

10. **Jason Kim**
Reference Number: 311712HWSRJXK
Main Number: 4652791

11. **Chien Nguyen**
Reference Number: 311712G0G1Y4G
Main Number: 33267056

12. **Alex Gonzalez**
Reference Number: 3117124NFMNY0
Main Number: 32741774

13. **Vicente Lopez**
Reference Number: 311712MHV0NG8
Main Number: 32878272

14. **Carlos Duran**
Reference Number: 31171288ZGK0B
Main Number: 33008781

15. **Jorge Chavez Zuniga**
Reference Number: 311712GZP3Q8F
Main Number: 33344706

2.      Only objecting class members have the right to appeal an order

approving a settlement. *See Newberg on Class Actions* §14:13 (5th ed.) ("Class

members who object but whose objections are rejected by the district court may

seek to appeal that rejection."); *Devlin v. Scardelletti*, 536 U.S. 1, 1, 122 S. Ct.

2005 (2002) (holding that absent class members who object in a timely manner to

approval of a settlement at a fairness hearing have the power to bring an appeal

8

without first intervening; rejecting the contention that only Named Plaintiffs and formal interveners qualify as parties).

3.     This Order's issuance date constitutes the effective date of settlement. This date also constitutes the final judgment in this case. This lawsuit is therefore **dismissed, with prejudice**, and without fees or costs to any party, except as otherwise expressly provided by this Order.

4.     Each and every Class Member, other than those who have opted out, hereby unconditionally, fully, and finally releases and forever discharges Defendants, their agents, servants, officers, officials, and/or employees, from further claims that arise out of the allegations raised by Plaintiffs in the complaint or any amended complaint in the lawsuit.

5.     This Order is binding on all non-opt-out Class Members and their privies, and it prevents them from bringing a subsequent suit alleging the same or similar claims for relief as contained in the complaint or in any amended complaint in this lawsuit and based upon facts occurring prior to the execution of the Settlement Agreement.

6.     If for any reason the settlement contemplated by the Settlement Agreement does not become effective (whether as a result of further judicial review or otherwise), this Court's final judgment and order of dismissal, including but not limited to the release of claims previously ordered, shall be rendered null and void and vacated *nunc pro tunc*; the Parties will revert to the positions they occupied prior to the execution of the Settlement Agreement; and all proceedings in connection with the settlement shall be without prejudice to the status quo ante rights of the Parties to the lawsuit. In such event, the Parties expressly do not waive, and will not be construed to have waived, any claims, arguments, objections, and/or defenses.

7. The Court retains jurisdiction to enforce the Settlement Agreement's terms, although no Party anticipates that there should be any issue regarding implementation of the Settlement Agreement.

8. From the date of this Order forward, each Party shall bear its own costs, including attorneys' fees.

**IT IS SO ORDERED.**

DATED: February 3, 2022

_____

HON. ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT JUDGE

EXHIBIT 3

Barrett S. Litt, SBN 45527
blitt@mbllegal.com
Lindsay Battles, SBN 262862
lbattles@mbllegal.com
MCLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Jennifer Pasquarella, SBN 263241
jpasquarella@aclusocal.org
Jessica Karp Bansal, SBN 277347
jbansal@aclusocal.org
Mohammad Tajsar, SBN 280152
Zoë Mckinney, SBN 312877
Jordan Wells, pro hac vice
ACLU FOUNDATION OF SOUTHERN CALIFORNIA
1313 W. 8th Street
Los Angeles, CA 90017
Phone: (213) 977-9500
Facsimile: (213) 977-5299

Attorneys for Plaintiffs
(Other counsel listed below)

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DUNCAN ROY, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, *et al.*,<br><br>Defendants.<br>. | Case No. CV 12-09012 (FFMx)<br>[Honorable André Birotte, Jr.]<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS**<br><br>[*FILED CONCURRENTLY WITH DECLARATION OF BARRETT S. LITT; EXHIBITS*]<br><br>**Date:**  **November 19, 2021**<br>**Time:**  **10:00 A.M.**<br>**Place:**  **Courtroom 7B** |

CHRIS NEWMAN, SBN 255616
 newman@ndlon.org
NATIONAL DAY LABORER ORGANIZING NETWORK
1030 S. Arroyo Pkwy, Suite 106
Pasadena, California 91105
Telephone: (626) 799-2160
Facsimile: (626) 799-3560

MARK M. FLEMING (pro hac vice)
mfleming@heartlandalliance.org
NATIONAL IMMIGRANT JUSTICE CENTER
224 S. Michigan Avenue, Suite 600
Chicago, IL 60604
Telephone: (312) 660-1628
Facsimile: (312) 660-1505

# **TABLE OF CONTENTS**

I.      INTRODUCTION ............................................................................ 1

II.     COUNSEL'S REQUESTED AWARD IS REASONABLE ......................... 2

    A.   In Common Fund Cases, Federal Courts Typically Award Fees Based on a Percentage of the Fund, With Reference to the Circumstances of the Case and Lodestar .......................................................... 2

    B.   The Circumstances of this Case Support a One-Third Award ............. 5

        1.   The Exceptional Results in this Case Support a 1/3 Award ....... 5
            a)  The Settlement Provides Significant Direct Compensation to Class Members .................................................... 5
            b)  The Litigation Provides Considerable Indirect Compensation Should Few Class Members Come Forward ......................... 7
            c)  The Litigation Conferred Substantial Benefits Beyond the Class Fund ........................................................ 9

        2.   The Litigation was Handled on a Contingency Basis and Imposed Burdens and Risks that Support a One-Third Award 10
            a)  This Contingency Case Was Very Hard-Fought and Imposed Substantial Burdens on Plaintiffs' Counsel ......................... 10
            b)  The Case Carried Significant Risks Arising from the Complexity of the Legal Issues, Class Certification and Difficulty Locating Class Members ................................... 13

        3.   The Requested Award is At The Low End Of The Market Rate for Individual Civil Rights Cases ............................................. 17

    C.   A Lodestar Cross-Check Supports A One-Third Award ................... 17
        1.   Counsel's Rates are Reasonable ............................................... 18
        2.   Counsel's Hours Are Reasonable ............................................. 22
        3.   The Lodestar Cross-Check Produces a Low Multiplier of 1.4, Supporting the Requested Fee of 33% ..................................... 23

III.    THE COSTS ARE REASONABLE ........................................................... 25

IV.     CONCLUSION ........................................................................... 25

i

# TABLE OF AUTHORITIES

### Federal Cases

*Acosta v. Frito-Lay, Inc.*,
   2018 WL 2088278 (N.D. Cal. May 4, 2018)....................................................4, 23

*Barjon v. Dalton*,
   132 F.3d 496 (9th Cir. 1997) ............................................................................21

*Beaver v. Tarsadia Hotels*,
   2017 WL 4310707 (S.D. Cal. Sept. 28, 2017) ...............................................4, 24

*Blum v. Stenson*,
   465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) ......................................22

*Boyd v. Bank of Am. Corp.*,
   2014 WL 6473804 (C.D. Cal. Nov. 18, 2014) ....................................................16

*Bradburn Parent Teacher Store, Inc. v. 3M*,
   2007 WL 1468847 (E.D.Pa.,2007) .....................................................................24

*Bynum v. D.C.*,
   412 F. Supp. 2d 73 (D.D.C. 2006) .......................................................................4

*Charlebois v. Angels Baseball LP*,
   993 F. Supp. 2d 1109 (C.D. Cal. 2012) ...............................................................21

*Coles v. City of Oakland*,
   2007 WL 39304 (N.D.Cal. Jan. 4, 2007)..............................................................22

*Craft v. Cty. of San Bernardino*,
   624 F. Supp. 2d 1113 (C.D. Cal. 2008) ...............................................................25

*Davis v. Mutual Life Ins. Co.*,
   6 F.3d 367 (6th Cir. 1993) ................................................................................16

*Fischel v. Equitable Life Assur. Soc'y of U.S.*,
   307 F.3d 997 (9th Cir. 2002) .........................................................................21, 23

*Fox v. Vice*,
   563 U.S. 826, 131 S. Ct. 2205, 180 L. Ed. 2d 45 (2011) ...............................14, 23

*Gaskill v. Gordon*,
   160 F.3d 361 (7th Cir. 1998) ..............................................................................17

*Greer v. Dick's Sporting Goods*, Inc.,
   2020 WL 5535399 (E.D.Cal. 2020) ......................................................................4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Harris v. Marhoefer*,
   24 F.3d 16 (9th Cir. 1994) ...................................................................25

*Hensley v. Eckhart*,
   461 U.S. 424 (1983)..................................................................4, 14

*Hopkins v. Stryker Sales Corp.*,
   2013 WL 496358 (N.D.Cal. Feb. 6, 2013) ...........................................23

*In re Apple Inc. Device Performance Litigation*,
   2021 WL 1022866 (N.D. Cal. 2021) ...................................................19

*In re Bluetooth Headset Prods. Liab. Litig.*,
   654 F.3d 935 (9th Cir. 2011) ........................................................2, 3

*In re Buspirone Antitrust Litig.*, Civ.A.No.,
   01-MD-1410 (S.D.N.Y. Apr. 11, 2003) (S.D.N.Y. Apr. 11, 2003) ..................24

*In re Cardizem CD Antitrust Litig.*, Civ.A.No.,
   99-MD-1278 (E.D.Mich. Nov. 26, 2002) (E.D.Mich. Nov. 26, 2002) ..............24

*In re Enron Corp. Securities, Derivative & ERISA Litigation*,
   586 F.Supp.2d 732 (S.D.Tex. 2008)..................................................3

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*,
   2017 WL 6040065 (N.D. Cal. Dec. 6, 2017)..........................................24

*In re Omnivision Technologies, Inc.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2008).................................................3

*In re Optical Disk Drive*,
   959 F.3d (9th Cir., 2020) ...............................................................5

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
   148 F.3d 283 (3d Cir. 1998) ..........................................................24

*In re Remeron Direct Purchaser Antitrust Litigation*,
   2005 WL 3008808 (D.N.J. 2005) ...............................................17, 25

*In re Rite Aid Corp. Sec. Litig.*,
   396 F.3d 294 (3rd Cir. 2005)..........................................................22

*In re Vitamins Antitrust Litig.*, Civ.A.No. 99-197, MDL No. 1285,
   2001 WL 34312839 (D.D.C. July 16, 2001) .........................................24

*In re Washington Pub. Power Supply Sys. Sec. Litig.*,
   19 F.3d 1291 (9th Cir. 1994) .........................................................23

*Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289, at *12 (E.D. Cal. Sept. 1,
   2011) ......................................................................................5

iii

*Maley v. Del Glob. Techs. Corp.*,
  186 F. Supp. 2d 358 (S.D.N.Y. 2002) ....................................................25

*Mauss v. NuVasive, Inc.*,
  2018 WL 6421623 (S.D. Cal. Dec. 6, 2018) ....................................4, 13

*Missouri v. Jenkins*,
  491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) ......................21

*Moore v. James H. Matthews & Co.*,
  682 F.2d 830 (9th Cir. 1982) .................................................................22

*Moreno v. City of Sacramento*,
  534 F.3d 1106 (9th Cir. 2008) ...............................................................22

*Nachshin v. AOL, LLC*,
  663 F.3d 1034 (9th Cir. 2011) .................................................................8

*Nat. Collegiate Athletic*,
  768 Fed.Appx. (9th Cir. 2019) .................................................................4

*Nichols v. SmithKline Beecham Corp.*,
  2005 WL 950616 (E.D.Pa.,2005) .....................................................4, 24

*Parker v. Vulcan Materials Co. Long Term Disability Plan*,
  2012 WL 843623 (C.D.Cal. Feb. 16, 2012) ..........................................22

*Pena v. Taylor Farms Pacific, Inc.*,
  2021 WL 916257 (E.D. Cal. 2021) ...........................................................3

*Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*,
  483 U.S. 711 (1987) ...............................................................................16

*Romero v. Producers Dairy Foods, Inc.*,
  2007 WL 3492841 (E.D. Cal. Nov. 14, 2007) .........................................4

*Roy v. Cty. of Los Angeles*,
  2018 WL 914773 (C.D. Cal. Feb. 7, 2018) ..............................................9

*Seguin v. County of Tulare*,
  2018 WL 1919823 (E.D. Cal. Apr. 24, 2018) ........................................16

*Smith v. Experian Information Solutions, Inc.*,
  2020 WL 6689209 (C.D.Cal. 2020) .......................................................24

*Spann v. J.C. Penney Corp.*,
  211 F. Supp. 3d 1244 (C.D. Cal. 2016) .................................................24

*Steiner v. Am. Broad. Co.*,
  248 Fed.Appx. 780 (9th Cir. 2007) ........................................................25

*Vizcaino v. Microsoft Corp.*,
  290 F.3d 1043 (9th Cir. 2002) ...................................................................... Passim

*Williams v. MGM-Pathe Commun. Co.*,
  129 F.3d 1026 (9th Cir.1997) ...................................................................... 1

*Young v. Cty. of Cook*, No. 06 C 552,
  2017 WL 4164238 (N.D. Ill. Sept. 20, 2017) ........................................... 5

**State Cases**

Federal Statutes

42 U.S.C. § 1988 .......................................................................................... 21

Federal Rules

FRCP Rule 23 .............................................................................................. 15

Other Authorities

*3 Newberg* §14.03 ....................................................................................... 24

California Senate Bill No. 54 ...................................................................... 9

## MEMORANDUM OF POINTS & AUTHORITIES

## I.    INTRODUCTION

This case arose from the Los Angeles County Sheriff's Department's ("LASD") practice of unlawfully holding persons on warrantless immigration detainers. It was filed in October 2012. In 2018, after six years of hard-fought litigation, Plaintiffs secured affirmative summary judgment on liability. They also secured an order re-affirming class certification and acknowledging the availability of classwide general damages. After these decisions, the parties scheduled a mediation, followed by nearly two years of further negotiations before a final settlement was reached. The settlement was approved by the County of Los Angeles in October 2020 and preliminarily approved by the Court on November 25, 2020. Dkt. 610.

The total size of the non-reversionary settlement fund is $14,000,000 from which costs of class administration, litigation costs, incentive awards, and attorneys' fees will be taken. The settlement provides for direct financial compensation to over 20,000 class members who were unlawfully incarcerated by the LASD pursuant to warrantless, immigration detainers. Assuming the claims rate falls within the expected range (addressed *infra*), all valid claimants will receive $1,000 per day for each day they were unlawfully detained (with a maximum of 25 days). On average, claimants will be entitled to several thousand dollars. The settlement also provides that funds, if any, left after paying class members, be used for indirect compensation to class members in the form of *cy pres* funding to programs that provide legal assistance to non-citizens who face immigration consequences as a result of their involvement with the Los Angeles County criminal justice system.

Through this motion, Plaintiffs' counsel requests an attorney's fee award equivalent to 33.3% (1/3) of the $14 million class fund ($4,660,620).[1] The lodestar

---

[1] For purposes of determining the size of the fund from which a percentage is taken, all funds – including attorneys' fees, litigation costs and class administration costs – are

cross-check strongly supports the reasonableness of the requested fee. The requested award translates to a multiplier of approximately 1.4 (based on a total lodestar calculation of $3,334,730). A multiplier of less than 2 is considered very modest and at the lower end of multipliers routinely approved by courts in this circuit.

The requested fee is also reasonable given the specific circumstances of this case, including the novelty and complexity of the issues, the highly contested nature of this litigation, and the exceptional result for class members. This case involved over 4,300 hours of work spanning nearly nine years. It represents one of the most hard-fought, legally intricate, and risky cases Plaintiffs' counsel has taken on a contingency basis. Despite significant liability and class certification challenges, Plaintiffs' counsel ultimately negotiated a highly favorable settlement for class members ensuring substantial, monetary compensation for each day of unlawful incarceration and indirect compensation in the form of meaningful *cy pres* funding. *See* Decl. Barrett S. Litt ("Litt Dec."), ¶¶33-54 (detailing risks and favorable outcome).

## II. COUNSEL'S REQUESTED AWARD IS REASONABLE

### A. In Common Fund Cases, Federal Courts Typically Award Fees Based on a Percentage of the Fund, With Reference to the Circumstances of the Case and Lodestar

In common fund cases, Ninth Circuit courts use two alternate methods to calculate attorneys' fees: the lodestar method and the percentage of the fund approach. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 941-942 (9th Cir. 2011). While either may be used, the percentage-of-the-fund method is by far

included in determining the size of the fund. *See Williams v. MGM-Pathe Commun. Co.*, 129 F.3d 1026 (9th Cir.1997) (reversing award of attorneys' fees because trial court failed to base fee award on the entire settlement, rather than the amount claimed; here, because the fund is non-reversionary, all funds go to claiming class members or specified programs to the extent there are funds left).

the dominant approach. *In re Omnivision Technologies, Inc.,* 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2008) (citing, *inter alia*, *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002); *see also*, *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 748 (S.D.Tex. 2008) ("Most federal courts use the percentage of the fund approach in awarding attorneys' fees in common fund classes";" the primary basis of the [class] fee award remains the percentage [of the class fund] method."). The percentage of the fund approach is preferred because it most closely aligns the interests of counsel and the class by ensuring that counsel directly benefit from increasing the size of the class fund and working efficiently. *See e.g. Vizcaino*, 290 F.3d at 1050 ("lodestar method is merely a cross-check on the reasonableness of a percentage figure, and it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee, since the lodestar method does not reward early settlement."); *In re Omnivision*, 559 F.Supp. at 1046 (citing *In re Activision Sec. Litig.*, 723 F.Supp.1373, 1374-77 (N.D. Cal. 1989) (collecting cases)). *See also*, Litt Decl., ¶¶68-75.

In the Ninth Circuit, 25% is considered the benchmark or starting place for analyzing fees. *Vizcaino*, 290 F.3d at 1048. In most cases, however, the fee award *exceeds* the 25% benchmark. *In re Omnivision* 559 F. Supp. 2d at 1047 (N.D. Cal. 2009) ("This court's review of recent reported cases discloses that nearly all common fund awards range around 30%").

Any percentage award "must be supported by findings that take into account all of the circumstances of the case." *Vizcaino*, 290 F.3d at 1050. Awards over the 25% benchmark are particularly appropriate "when counsel achieves exceptional results for the class, undertakes extremely risky litigation, generates benefits for the class beyond simply the cash settlement fund, or handles the case on a contingency basis." *See* e.g., *Pena v. Taylor Farms Pacific, Inc.,* 2021 WL 916257, at *4-6 (E.D. Cal. 2021).

Federal courts typically cross-check the reasonableness of a percentage award by calculating the lodestar and multiplier. *Vizcaino*, 290 F.3d at 1050; *Nat. Collegiate Athletic*, 768 Fed.Appx. at 654 (9th Cir. 2019); *Acosta v. Frito-Lay, Inc.*, 2018 WL 2088278, at *11-12 (N.D. Cal. May 4, 2018). To conduct a lodestar cross-check, a court takes "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley v. Eckhart*, 461 U.S. 424, 33 (1983). Multipliers are expected. *See Vizcaino*, 290 F.3d at 1050. If the multiplier falls within an acceptable range, it further supports the conclusion that the fees sought are reasonable. *See id.* The majority of multipliers fall between 1.5 and 4. *Id.* A multiplier of less than two is low. *Acosta*, 2018 WL 2088278, at 14.

Percentage awards vary considerably with respect to both the actual percentage awarded and multiplier. Courts often approve awards equal to one-third of the class fund, sometimes more, depending on the relationship to lodestar and specific circumstances of the case. *Mauss v. NuVasive, Inc.,* No. 13CV2005 JM (JLB), 2018 WL 6421623, at *5–10 (S.D. Cal. Dec. 6, 2018) ("District courts in this circuit have routinely awarded fees of one-third of the common fund or higher after considering the particular facts and circumstances of each case") (citing *Beaver v. Tarsadia Hotels*, 2017 WL 4310707, at *10 (S.D. Cal. Sept. 28, 2017) (listing Ninth Circuit cases approving a fee award of one-third the common fund); *Greer v. Dick's Sporting Goods*, Inc., 2020 WL 5535399, at *8-11 (E.D.Cal. 2020) (approving 33% fee with 1.24 multiplier); *Romero v. Producers Dairy Foods, Inc.,* 2007 WL 3492841, at *4 (E.D. Cal. Nov. 14, 2007) ("Empirical studies show that…fee awards in class actions average around one-third of the recovery" citing Newberg (4th Ed.)).

These decisions are consistent with decisions in other circuits. *See e.g., Nichols v. SmithKline Beecham Corp.*, 2005 WL 950616 (E.D.Pa.,2005) ("[s]ince *Vizcaino,* courts have awarded attorneys' fees amounting to between 25% and 35% of the common fund" in a wide range of cases); *Bynum v. D.C.*, 412 F. Supp. 2d 73

(D.D.C. 2006) (awarding 1/3 of $12 Million fund); *Young v. Cty. of Cook*, No. 06 C 552, 2017 WL 4164238, at *1 (N.D. Ill. Sept. 20, 2017) (noting the availability of 1/3 of the fund as attorney fees; awarding 1/3 in the follow-on insurance litigation); *Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289, at *12 (E.D. Cal. Sept. 1, 2011) (fees in common fund cases average 32% or 34.64%).[2]

Here, Plaintiffs' counsel seeks an award equivalent to 33.3% of the class fund, which represents a lodestar multiplier of approximately 1.4. This low multiplier supports the reasonableness of a 1/3 fee award, particularly considering the challenging circumstances of this case and outstanding result.

## B. The Circumstances of this Case Support a One-Third Award

Any percentage of the fund award "must be supported by findings that take into account all of the circumstances of the case." *Vizcaino*, 290 F.3d at 1050. In assessing reasonableness, courts may consider: (1) the results achieved; (2) the risk undertaken by class counsel, (3) whether the litigation generated benefits beyond a cash payment; (4) the market rate for similar representations; and (4) whether the representation was undertaken on a contingency basis. *In re Optical Disk Drive*, 959 F.3d at 930 (9th Cir., 2020) (citing *In Vizcaino*, 290 F.3d at 1048–50 (9th Cir. 2002). We address these factors below.

### 1. The Exceptional Results in this Case Support a 1/3 Award

#### a) The Settlement Provides Significant Direct Compensation to Class Members

Class counsel obtained a $14 million settlement with no reversion to the Defendants, which will result in significant recoveries to persons who were over-detained on ICE-holds. After costs and maximum fees, and assuming a 1/3 of the fund fee, there will be approximately $8,700,000 for distribution to class members.

---

[2] Mr. Litt has handled three over-detention class actions over the past 20 years, with settlements ranging from $6 Million to $27 Million (including strip searches), in each of which the fee award was 1/3 of the fund or higher. See Litt Dec., ¶¶42-45.

The amount of each claimant's share depends on the total number of valid claims. In Plaintiffs' counsel's experience, most jail class action cases have a claims rate of 10-25% depending on various factors, including the size of the class, the amount of potential recoveries, and duration of the litigation. Here, we anticipated a very low claims rate based on several considerations. First, significant time has elapsed since the relevant underlying events. Two class periods run from October 2010 to June 2014. The other class runs from October 2010 to October 2012. When the underlying events are so remote in time, class members may have less interest in pursuing claims and may be more difficult to locate given very old class data. Second, the class is comprised almost entirely of non-citizens who were facing both criminal charges and alleged civil immigration violations. A significant number were deported to Mexico and Central America, where they will be very difficult to reach. We anticipate that many of those who remained in Southern California may be reluctant to come forward due to fear that they could expose their immigration status. We also recognize that many class members struggle with financial difficulties that undermine their to maintain stable housing and phone numbers. Given these challenges, we expect a claims rate between 4% - 8%, even with a very robust outreach plan.[3] Litt Decl., ¶¶39-41.

Provided the claims rate is 10% or less – the maximum anticipated rate– all *Gerstein* and No Money Bail claimants will recover the maximum of $1,000 per day (up to a maximum of $25,000 per claimant).[4] The average *Gerstein* class

---

[3] There are currently 1,888 claims filed, which translates to a claims rate of 8.8%. Of these claims, however, 1,293 are non-targeted and have not been matched back to a valid class member. These claims are pending review. Counting only approved, validated claims, the claims rate is 2.7%. We anticipate that the final claims rate will fall between 4% and 8%, which is in the range of what we anticipated in light of the challenges in this case.. Litt Decl., ¶40.

[4] Including both the estimated *Gerstein* class members and all No-Money-Bail class members, there are a total of 80,063 over-detention days. Assuming that approximately 10% of No-Bail-Notation class members make claims, each of $250 (per the settlement agreement), the total award to that subclass would be $144,250, leaving $8,555,750 for

member has 2.3 days of unlawful incarceration, meaning their average award would be $2,300. The average No-Money-Bail class member has 4 days of incarceration. Their average award would be $4,000. Approximately 1,500 individuals belong to both classes and will likely see average awards of over $5,000. Litt Decl., ¶41.

The individual recoveries fall on the higher side of recoveries in jail over-detention class actions. Class counsel, Barrett Litt, has extensive experience with over-detention class actions and has handled several throughout the United States. The recovery in this case - $1,000 per day – is substantially more than claimants recovered in any of his prior cases, even after recoveries in those cases are adjusted for inflation. His most recent case, *Barnes v. District of Columbia*, Case 1:06-cv-00315-RCL-02-956 (RCL) (D.D.C.), settled in 2014 with an over-detention recovery for the first day of $370 ($415 accounting for inflation), and $250 for each day after that. Litt Decl., ¶42-43.

The individual recoveries in this case also represent an exceptional outcome given the difficulty class members would have experienced litigating individual cases. Given the value of the average claim, the overwhelming majority could not have pursued financially viable individual claims, especially given the risks arising from the absence of clear precedent establishing liability. And while some class members have larger claims, many would have been unavailable or reluctant to come forward for fear of exposing their immigration status.

**b)    *The Litigation Provides Considerable Indirect Compensation Should Few Class Members Come Forward***

Even if the claims rate remains relatively low, the lawsuit will provide substantial indirect benefits to the class. If the maximum available for distribution

---

distribution to the *Gerstein* and No-Money-Bail class members. This would compensate 8,556 days at $1,000 per day, which constitutes 10.7% of the total over-detention days attributable to class members.

is not consumed by all valid claims (paid at the maximum per-diem award), any remainder will be used to fund legal services for non-citizens in Los Angeles County who face potential immigration consequences as a result of their involvement with the Los Angeles County criminal justice system.

The settlement agreement provides that the parties will each be able to designate the use of 50% of the *cy pres* funds to qualifying programs, with reasonable approval from the other party. Although both parties have elected to defer their designations until after the notice period closes and the total *cy pres* amount is calculated, based on discussions so far, it is likely that at least some funds will be distributed to the Immigration Unit of the Los Angeles County's Public Defender's Office ("LACPD ") and the possibly LA Justice Fund. (Both the settlement agreement and the law limit *cy pres* designations related to the issues in this case. *See, e.g., Nachshin v. AOL, LLC*, 663 F.3d 1034, 1036 (9th Cir. 2011)) (*cy pres* remedy should "account for the nature of the plaintiffs' lawsuit, the objectives of the underlying statutes, and the interests of the silent class members").

The Immigration Unit of the LACPD provides critical criminal-immigration legal support to public defenders handling cases of immigrants whose criminal charge(s) may impact their immigration status. The work of this unit is vital to ensuring that public defenders meet their constitutional obligation to advise clients of the immigration consequences of any conviction and to mitigate adverse immigration consequences from a conviction. *Cy pres* funds could be used to support the Immigration Unit's ongoing development of a more holistic immigration legal services model, including fund additional attorney positions to represent LACPD clients.

The Los Angeles Justice Fund is a fund devoted to increasing legal representation for individuals and families subject to removal proceedings in Los Angeles County. The Fund is a partnership between Los Angeles County, the City

of Los Angeles, the Weingart Foundation, and the California Community Foundation (CCF). While most LAJF grants are dedicated to funding legal representation for those who cannot otherwise afford a lawyer to represent them in immigration court, consistent with the settlement agreement, funding from the *Roy* settlement could be dedicated specifically to legal representation of detained individuals with a criminal conviction. These services would specifically benefit *Roy* class members and people who are currently in the custody of the Los Angeles Sheriff's Department and are facing immigration consequences as a result.

Below is a chart estimating the total amount of *cy pres* funding based on various claims rates we consider to be possible. *See* Litt Decl., ¶¶47-51.

| Direct Compensation vs. Indirect (Cy Pres) Distribution | | | | | |
|---|---|---|---|---|---|
| Claims Rate | Est. # of Class Members | Est. Compensated Days | Per Day Recovery | Total for Class Members | Total *Cy Pres* |
| 4% | 743 | 2,860 | $1,000 | $2,860,000 | $5,940,000 |
| 5% | 928 | 3,575 | $1,000 | $3,575,000 | $5,225,000 |
| 6% | 1,114 | 4,290 | $1,000 | $4,290,000 | $4,510,000 |
| 7% | 1,300 | 5,005 | $1,000 | $5,005,000 | $3,795,000 |
| 8% | 1,486 | 5,720 | $1,000 | $5,720,000 | $3,080,000 |

    c)    **The Litigation Conferred Substantial Benefits Beyond the Class Fund**

The settlement conferred substantial benefits to the class beyond compensation to class members and *cy pres* funding. A week after the lawsuit was filed, LASD issued a policy directive emphasizing that immigration holds should not prevent arrestees from posting bails. This directive ensured that immigration detainers would no longer interfere with class members' constitutionally protected right to post bail. In June 2014, the LASD ceased holding persons solely on the basis of immigration detainers. The lawsuit was a significant contributing factor in the cessation of LASD's unlawful detainer policies.[5]

---

[5] While the Court found that the passage of Senate Bill No. 54, which went into effect on January 1, 2018, prohibit the Roy Defendants from engaging in the challenged conduct of

The lawsuit also represents the first successful class action litigation to hold a large law enforcement agency financially responsible for unlawfully detaining non-citizens on immigration detainers. The settlement itself – against the largest law enforcement agency in the United States – will have a significant deterrent effect on other law enforcement agencies that have considered honoring warrantless detainers from ICE. Litt Decl., ¶¶52-54.

### 2.   The Litigation was Handled on a Contingency Basis and Imposed Burdens and Risks that Support a One-Third Award

Counsel has invested over 4,300 hours over the nearly nine-year duration of this case, including on the investigation; prefiling settlement efforts; litigating discovery, class certification, and dispositive motions; settlement negotiations spanning two years. This investment of time and effort carried significant risk given the complexity of the legal issues, uncertainty of the outcome, and contingency nature of the litigation. *See* Litt Decl., ¶¶33-38.

### a)   This Contingency Case Was Very Hard-Fought and Imposed Substantial Burdens on Plaintiffs' Counsel

This was an exceptionally hard-fought case. From the outset, Defendants made clear that they would vigorously resist any classwide resolution involving damages. Despite their approach, Plaintiffs made every effort to resolve the case as efficiently as possible by initiating settlement discussions prefiling, approximately one year into the litigation, and after dispositive motions were decided. Litt Decl., ¶59.

In 2012, after completing their preliminary investigation, Plaintiffs' counsel initiated pre-filing settlement discussions. Although the County engaged in these negotiations, no progress was made towards changing its detainer policies. Plaintiffs filed this lawsuit on October 12, 2012. Over the course of the next year,

---

detaining an individual on the basis of an immigration hold, and thus rendered the claim moot (*Roy v. Cty. of Los Angeles*, 2018 WL 914773, at *27 (C.D. Cal. Feb. 7, 2018), the Defendants had ceased this practice in light of the current litigation well before that.

Plaintiffs continued to advocate for an early resolution, deferring formal discovery while the parties engaged in informal exchanges of information to facilitate an early mediation. During this time period, Plaintiffs advocated strenuously to obtain database information that would enable them to determine the size of the class and calculate how long class members were over-detained. Litt Decl., ¶60.

The first mediation session occurred in March 2014 before Michael Moorehead. While the parties made some progress towards settling Duncan Roy's individual damages claim, they were not able to make progress towards a classwide settlement, in part, because several key liability issues remained heavily contested. Plaintiffs also determined that no productive discussions concerning classwide settlement could occur until the County disclosed database information necessary to identify persons who had been over-detained on immigration holds and to calculate the number of days they were held. Litt Decl., ¶61.

Following the March 2014 mediation, the parties commenced formal discovery. Plaintiffs' counsel expended considerable time and resources analyzing voluminous policy documents, ESI, and taking depositions. Plaintiffs' counsel analyzed over 400,000 pages of discovery produced by the County as well as significant discovery produced by the Department of Homeland Security in the related Gonzalez case. Counsel also took ten depositions related to liability issues including LASD policies and practices concerning immigration detainers, release record-keeping and database systems related to the release process. Counsel also defended the depositions of class reps, propounded written discovery and responded to discovery. Litt Decl., ¶62.

The ESI analysis was extremely labor intensive and consumed tremendous resources. Defendants initially maintained that no database information existed that would permit the identification of class members. After numerous exchanges between Plaintiffs' counsel and the County, Plaintiffs were able to secure at least temporary access to lists of fields and code tables to begin to identify what

database information could be used to identify class members. Through extensive consultation, Plaintiffs' counsel's database experts were eventually able to draft database queries and code to identify class members. Most of the costs incurred on this case related to consultation with database experts to devise queries to identify class members. Litt Decl., ¶63.

In 2016, Plaintiffs' counsel moved for class certification. Defendants vigorously opposed the motion, contesting whether common liability issues existed and whether it was possible to identify class members using the County's database systems. Plaintiffs' counsel spent considerable time and resources working with their database experts to demonstrate that it was possible to identify persons who had been held solely on detainers and that they could identify persons corresponding to specific classes and subclasses arising from various theories of liability. Defendants also contested class treatment was appropriate for non-economic damages for unlawful incarceration. On September 9, 2016, the Court certified two injunctive relief classes and four damages classes (including one subclass). Dkt. 184, 9/9/16 Class Cert Order. Litt Decl., ¶64.

After class certification issued, the parties litigated cross motions for summary judgment. On February 8, 2018, the Court granted summary judgment to Plaintiffs on their Fourth Amendment and Equal Protection claims. *See* Dkt. 395, p. 6. The Court's summary judgment decision issued on February 8, 2018. Defendants filed a motion for reconsideration, which was denied on July 11, 2018. (Dkt. 395) The Court simultaneously issued an order denying Defendants' motion to decertify the class and finding that class members were entitled to classwide general damages. (Dkt. 394) ("The Court agrees with these decisions and finds that general damages are available on a class-wide basis here."). The Court also granted Plaintiffs' motion to expand the certified 48 Hour *Gerstein* class to a general *Gerstein* class to conform to the summary judgment ruling. (Dkt. 396). Litt Decl., ¶65.

Following the liability and class certification decisions, the parties entered settlement negotiations, which proved significantly more protracted than expected. On December 3, 2018, the parties participated in a full day settlement conference before Antonio Piazza, a well-known and highly regarded mediator. The December 3, 2018 conference resulted in a settlement in principle, but did not resolve several key terms and a dispute regarding the class size. Even after reaching a settlement in principle, it took well over a year and numerous discussions among or between counsel and Mr. Piazza to agree to the specific settlement terms. The final settlement agreement was approved by the County in October 2020. Litt Decl., ¶66.

Since preliminary was approval granted, Plaintiffs' counsel have expended significant hours working with the claims administrator to develop the strongest possible notice and outreach plan. Plaintiffs' counsel has participated closely in the development of the notice packets, case website, paid advertising (television, radio and social media) and monitoring of the response to the notice and outreach campaign. Litt Decl., ¶67.

Contingency work of this magnitude obviously requires that counsel turn down other cases. Counsel advanced all costs and went without any compensation throughout the years it was litigated. These considerations support a fee of 33%. *See*, *Vizcaino*, 290 F.3d at 1049 (emphasizing that "counsel's representation of the class-on a contingency basis-extended over eleven years, entailed hundreds of thousands of dollars of expense, and required counsel to forgo significant other work, resulting in a decline in the firm's annual income;" and noting that counsel pursued the case "in the absence of supporting precedents" making the case "extremely risky."). *See also, e.g., Mauss,* 2018 WL 6421623, at *5-10.

  **b)** ***The Case Carried Significant Risks Arising from the Complexity of the Legal Issues, Class Certification and Difficulty Locating Class Members***

Plaintiffs' counsel assumed significant risks in litigating this case. While all

contingent fee cases are risky, class actions tend to be especially precarious given the demanding standards for class certification and higher stakes involved. In Plaintiffs' counsel's assessment, this case was exceptionally high risk among class actions because it involved highly  complex legal issues and no clear precedent governing the outcome. As counsel's billing records demonstrate, the lion's share of work on this case work occurred over a six-year period *before* there was a liability decision or any meaningful indication that Plaintiffs would prevail. From the first mediation session in 2014, defense counsel made clear they contested Plaintiffs' liability analysis and would vigorously oppose class certification.

The outcome of this case was always tenuous. Plaintiffs' counsel initiated the case based on a preliminary investigation revealing that the LASD routinely held non-citizens based on warrantless immigration detainers issued by ICE. There appeared to be viable claims, but given the lack of clear precedent governing this practice, considerable work was required to develop specific theories of liability. Liability hinged on a complex analysis of the intersection between federal immigration law; the federal Constitution's protections under the Fourth, Fifth and Fourteenth Amendments; and California state law state law restrictions on the authority of state or local officers to enforce federal civil immigration law.[6] As the Court is aware, this area of the law has remained in flux through the pendency of this litigation and remains in flux today. The case also involved complex analysis of potential causes of action under state law (false imprisonment, violation of California Bane Act) and state law immunities applicable to government entities.

---

[6] Although Plaintiffs did not ultimately prevail on the state law claims, the time spent on them is compensable because we explained in all reasonable time spent in achieving the favorable outcome is compensable, even if "the plaintiff failed to prevail on every contention." *Hensley v. Eckerhart,* 461 U.S. 424, 435, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). See also *Fox v. Vice*, 563 U.S. 826, 834, 131 S. Ct. 2205, 2214, 180 L. Ed. 2d 45 (2011) (presence of "unsuccessful claims does not immunize a defendant against paying for the attorney's fees that the plaintiff reasonably incurred in remedying a breach of his civil rights").

*See* Litt Decl., ¶33.

Class certification presented several significant risks, arising in part from the complex liability analysis and its intersection with Rule 23's commonality requirement. Plaintiffs' counsel had to establish that the specific, alternate theories of liability supporting their claims could be translated to classes and subclasses that would satisfy FRCP Rule 23's commonality requirement. Plaintiffs' counsel also had to demonstrate that persons satisfying each of the definitions could be sufficiently identified using a combination of data stored in various LASD databases (AJIS, DIMMS and DHS databases). Plaintiffs' counsel invested substantial time and resources developing queries from which release dates could be calculated, with no guarantee that this work would yield the answers they needed. Even as late as 2018 when the parties designated experts, Defendants maintained that it was not possible to identify class members. It was not until April 2019, months after the mediation session in which the case was settled in principle, that Defendants acknowledged that Plaintiffs had developed an appropriate methodology for identifying class members.  Litt Decl., ¶34.

The risk surrounding class certification was compounded by the difficulty in securing appropriate class representatives. Two of the class representatives had been deported, including one of the two original damages class representatives – Annika Alliksoo. Ms. Alliksoo had been deported to Estonia, making it very difficult for her to participate in the litigation. She was eventually dismissed from the lawsuit. The only remaining damages class representative was Alain Martinez-Perez. Given the circumstances underlying this case, and the reluctance of non-citizens to come forward to prosecute a case against a large law enforcement agency, there was always significant risk of losing the sole damages class representative and not being able to find a suitable replacement.  Litt Decl., ¶35.

Even with class certification and affirmative summary judgment, it was unclear whether Plaintiffs would be able to secure any meaningful recovery for

class members. Though the Court issued an order recognizing the availability of classwide damages, the amount of damages was left to be decided by a jury. The uncertainty of what jurors might award to persons who had been accused of both criminal and civil immigration offenses presented a significant risk. This risk was compounded by the difficulty in locating class members to come forward to participate in a jury trial on damages. In light of these considerations, there was a considerable risk that the case could result in a very small financial recovery (low per day damages multiplied by only the small fraction of class members willing to come forward to participate in a trial). Litt Decl., ¶36.

In the context of these risks, Plaintiffs' counsel's ability to settle the case in a way that guaranteed substantial financial recoveries for class members who could be located, coupled with indirect compensation to account for difficulties locating class members, is a testament to their skill and commitment to class members. The risks involved heavily weigh in favor of a 1/3 fee award.[7] *See Seguin v. County of Tulare*, 2018 WL 1919823, at *6 (E.D. Cal. Apr. 24, 2018) (approving 35% award where case was lengthy, hard-fought, complex and where counsel accepted the case on a contingency basis when the outcome was uncertain and litigation risky – emphasizing that "thousands of class members – many of them in difficult financial and social circumstances – will receive hundreds of dollars on average).

---

[7] Small firms such as those here face even greater risks in litigating large class actions with no guarantee of payment. *Boyd v. Bank of Am. Corp.*, No. SACV 13-0561-DOC, 2014 WL 6473804 (C.D. Cal. Nov. 18, 2014) (C.D. Cal. Nov. 18, 2014) (fee award of 33% rather than 25% benchmark, finding heightened risk of small firm representation should be rewarded with larger percentage fee for good result); *see also, Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*, 483 U.S. 711, 750 (1987) (Delaware Valley II) (plurality opinion) ("Contingent litigation may pose great risks to a small firm or a solo practitioner because of the risk of nonpayment may not be offset so easily by the presence of paying work. . .."); *Davis v. Mutual Life Ins. Co.*, 6 F.3d 367, 382 (6th Cir. 1993) ("[T]he maintenance of comparatively large pieces of litigation preens small firms from diversifying risk by taking on additional clients . . .").

### 3.     The Requested Award is At The Low End Of The Market Rate for Individual Civil Rights Cases

The fee of 33% is reasonable in relation to the market for contingent fees. An award of 33% is at the low end of the market rate for contingency work. Litt Dec., ¶32 (1/3 of the recovery is a low contingency fee for cases that are heavily litigated; 40% is common for complex cases that go through summary judgment or trial). In defining a 'reasonable fee' in representative actions, the law should 'mimic the market.' *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998) ("When a fee is set by a court rather than by contract, the object is to set it at a level that will approximate what the market would set."). Attorneys "regularly contract for contingent fees between 30% and 40%." *In re Remeron Direct Purchaser Antitrust Litigation,* 2005 WL 3008808, 16 (D.N.J. 2005) (citing cases).

### C. A Lodestar Cross-Check Supports A One-Third Award

Plaintiffs' counsel has calculated their lodestar at **$3,334,730.** See Litt Dec., ¶101. [8] This represents a multiplier of approximately 1.4. The tables below provide relevant information for each biller, and the relevant detailed timesheets are submitted as an exhibit to Mr. Litt's declaration. The time cutoff for hours worked is March 31, 2021.[9] These calculations omit work performed exclusively on the related *Gonzalez* case and in negotiating a settlement of Duncan Roy's individual damages claims.[10] Litt Decl., ¶101.

| MCLANE, BEDNARSKI & LITT (and previous Litt firms) | | |
| --- | --- | --- |

---

[8] This does not account for the remaining work, which includes work done after April 1 on this motion, the yet to be drafted motion for Final Approval and Order, responses to objections to the extent necessary, and ongoing work with the Class Administrator and class members as needed, which time will be provided for the Final Approval Hearing.
[9] The Litt firms had nine billers who billed under 2 hours on the case; all of those were eliminated.
[10] The Litt firms excluded 66.3 hours for work performed exclusively on Gonzalez and 220.7 for work performed exclusively on Duncan Roy's individual case. Litt Decl., ¶101.

| Name | Practice Years | Hours | Rate | Total |
|---|---|---|---|---|
| Barrett Litt | 52 (1969) | 622.4 | $1,275.00 | $793,560 |
| Lindsay Battles | 13 (2008) | 1,829.1 | $750.00 | $1,371,825 |
| Julia White | Sr. Paralegal | 31 | $375.00 | $11,625 |
| Marie Bolanos | Sr. Paralegal | 246.8 | $375.00 | $92,550 |
| Esteban Gil | Jr. Paralegal | 196.3 | $190.00 | $37,297 |
| Michelle Angeles | Exp. Paralegal | 50.1 | $285.00 | $14,278 |
| **Litt Total** | | | | **$2,321,136** |
| **ACLU OF SOUTHERN CALIFORNIA** | | | | |
| Peter Eliasberg | 27 (1994) | 41.32 | $950 | $39,254 |
| Ahilan Arulanantham | 22 (1999) | 9.17 | $875 | $8,024 |
| Peter Bibring | 19 (2002) | 12 | $825 | $9,900 |
| Jennifer Pasquarella | 15 (2006) | 643.65 | $775 | $498,829 |
| Katie Traverso | 09 (2012) | 160.35 | $600 | $96,210 |
| Maricela Lopez-Krulak | Sr. Paralegal | 10 | $375 | $3,750 |
| Jessica Karp Bansal | 12 (2009) | 1.53 | $725 | $1,109 |
| Sandra Kang | Paralegal | 2.11 | $375 | $791 |
| **ACLU Total** | | | | **$657,867** |
| **National Day Laborer Organizing Network** | | | | |
| Jessica Karp Bansal | 12 (2009) | 424.5 | $725 | **$307,763** |
| **National Immigrant Justice Center** | | | | |
| Mark Fleming | 15 (2006) | 36.5 | $775 | **$28,288** |
| **ACLU Immigrant Rights Project** | | | | |
| Katherine Desmoreau | 12 (2009) | 21.4 | $725 | $15,515 |
| Mariam Azhar | Jr. Paralegal | 21.9 | $190 | $4,161 |
| **IRP Total** | | | | **$19,676** |
| | | | | |
| **TOTAL** | | **4,360.13** | | **$3,334,730** |

### 1.   *Counsel's Rates are Reasonable*

The reasonableness of the rates used for the lodestar cross-check are supported by the declaration of Barrett S. Litt. Litt Decl. ¶¶94-129, as well as the Declaration of Carol Sobel (to be filed as a supplemental declaration during the week of April 26 because Ms. Sobel is unavailable due to the press of other matters until then). Both are experienced civil rights attorneys, who have been recognized

18

as attorney fee experts by various courts. The attorney rates range from $600-$1275, and $125-$375 for paralegals of various levels of experience. These rates are well supported by rates for similarly experienced legal professionals in other practice areas.

Class Counsel are highly experienced litigators in the fields of immigration, civil rights, and class actions. *In re Apple Inc. Device Performance Litigation*, 2021 WL 1022866, at *8-9 (N.D. Cal. 2021) (approving 28.3% of the fund fee award of $80,600,000, resulting in multiplier of 2.232 in a megafund settlement of $310 Million; emphasizing that class counsel were "among the very best in their practice area; their "strategic and efficient lawyering…encouraged a just and efficient determination of [the] litigation;" and noting that megafund cases in the nine figures generally have lower % awards).

Class counsel includes Barrett Litt and Lindsay Battles of McLane, Bednarski & Litt. Mr. Litt is one of the most highly regarded civil rights lawyers in California, and has extensive class action and civil rights experience, as his Declaration and CV attest. He likely has more civil rights class action experience than any attorney practicing in the Central District. Mr. Litt has been named a Super Lawyer continuously since 2005 and is listed in Best Lawyers In America. Mr. Litt's Declaration and CV contain a variety of attestations to his skill, experience and reputation from judges in this District. *See, e.g.*, *Rodriguez et al. v. County of Los Angeles et al.*, CV 10-6342-CBM (AJWx) (Mr. Litt "is considered one of the leading civil rights attorneys in the country"). His CV identifies numerous certified class actions in which he has been the, or one of the, lead counsel as well as pending class actions.

Ms. Battles is also a highly experienced civil litigator in the area of class actions and civil rights.  Ms. Battles career has primarily focused on civil rights class actions. She served as co-lead counsel on class actions challenging LASD's practice of performing highly invasive group strip searches on female jail

detainees. The case resulted in a settlement of $53 million against the LA County. She has also served as counsel on class actions challenging delays in transferring Ventura County jail detainees to hospitals for restorative psychiatric treatment and discriminatory jail practices affecting gay, bisexual and transgender inmates within the San Bernardino County jail. She has also worked on various individual civil rights cases arising from wrongful convictions and in-custody deaths. Litt Decl, ¶97-99 (detailing Ms. Battles' experience and recognition).

The core legal team includes nationally recognized experts in the area of federal immigration enforcement: Jennifer Pasquarella and Jessica Karp Bansal of the ACLU of Southern California and Mark Fleming of the National Immigrant Justice Center. Jennifer Pasquarella was co-lead counsel on this case and on the related case, *Gonzalez v. ICE*, CV-13-04416. She is the Director of the Immigrants' Rights Project at the ACLU of Southern California. She also directs and manages the statewide immigrants' rights advocacy for the ACLU of California, which works to curtail abusive immigration enforcement practices. Ms. Pasquarella has extensive experience litigating class action and individual cases challenging abuses within the immigration enforcement system. She serves as lead counsel on *Wagafe v. Trump*, Case No. 27-00094 (W. Dist. Wash 2017)), a class-action lawsuit challenging a government program that delayed immigration and citizenship applications by Muslims. She has also served as counsel on challenging backlogs in processing naturalization applications due to the FBI "name check," wage and hour violations against immigrant workers, and FBI surveillance of mosques and individuals on account of their religious practice. Litt Decl., ¶123 (including case names and numbers).

Jessica Karp Bansal is a staff attorney at the ACLU of Southern California and previously the Litigation Director of the National Day Laborer Organizing Network (also co-counsel on this case). She has spent her entire career working on immigrants' rights cases and has extensive experience representing immigrants in

class action cases addressing systemic issues in the federal immigration system. Ms. Bansal is co-lead counsel in the related *Gonzalez v. ICE* case. She has also served as counsel on class actions challenging the government's failure to appoint legal representatives for immigrants with serious mental abilities, the failure to protect immigration detainees from COVID-19, and state laws criminalizing the solicitation of day labor. Litt Decl. ¶124.

Mark Fleming is the associate director of the NIJC Federal Litigation Project where he focuses on litigation at the intersection of state and local law enforcement and civil immigration enforcement. He has litigated multiple class action cases related to ICE use of immigration detainers. Litt Decl. ¶125.

We use current rates for all work to account for the risk of non-payment. Current rates for complex federal litigation are commonly used in this District to adjust for delay in payment. *See, e.g., Missouri v. Jenkins,* 491 U.S. 274, 282, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) ("adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of the statute [42 U.S.C. § 1988]"); *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1010 (9th Cir. 2002) (use of current rates in class actions is a well established method of ensuring that "[a]ttorneys in common fund cases [are] compensated for any delay in payment"); *Barjon v. Dalton*, 132 F.3d 496, 502–03 (9th Cir. 1997); *Charlebois v. Angels Baseball LP*, 993 F. Supp. 2d 1109, 1119 (C.D. Cal. 2012) (lodestar award in settled class action, citing *Missouri v. Jenkins*; use of current rates "is justified by comparable increases in the market" (citing *Coles v. City of Oakland,* 2007 WL 39304, *7 (N.D.Cal. Jan. 4, 2007) (adjustment factors include more than inflation, such as attorneys' additional years of experience or changes in the legal market) (quoting *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)); *see also Parker v. Vulcan Materials Co. Long Term Disability Plan,* 2012 WL 843623, *7 (C.D.Cal. Feb. 16, 2012) (approving as reasonable an approximate 10 percent

21

increase between 2011 rates and 2012 "to account for expertise gained over time, or to keep up with the increasing cost of maintaining a practice").

## 2. *Counsel's Hours Are Reasonable*

Reasonable hours are those that "would have been undertaken by a reasonable and prudent lawyer to advance ,,, his client's interest in the pursuit of a successful recovery." *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 839 (9th Cir. 1982) (internal quotations omitted). Deference is due prevailing counsel's judgment regarding the hours reasonably spent; "lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee…. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; *after all, he won, and might not have, had he been more of a slacker.*" *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) (emphasis added).

Collectively, counsel invested approximately 4,300 hours. The hours invested in this case are extremely reasonable considering the duration of the litigation, the complexity of the liability issues, and Defendants' vigorous opposition to liability and class certification. We support our calculations with detailed billing records, submitted as Exhibits C, D, and E to the Litt Declaration. *See In re Rite Aid Corp. Sec. Litig.,* 396 F.3d 294, 306–07 (3rd Cir. 2005) (noting that "[t]he lodestar cross-check calculation need entail neither mathematical precision nor bean-counting" and that "[t]he district courts may rely on summaries submitted by the attorneys and need not review actual billing records"); *Fox v. Vice*, 563 U.S. 826, 838 (2011) ("[T]he determination of fees 'should not result in a second major litigation' and 'trial courts need not, and indeed should not, become green-eyeshade accountants.").  These records demonstrate the immense effort expended into developing the liability theories, analyzing database information,

conducting discovery, litigating class certification, litigating dispositive motions, and advocating for the class in settlement discussions, which spanned two years.

### 3. *The Lodestar Cross-Check Produces a Low Multiplier of 1.4, Supporting the Requested Fee of 33%*

After determining the lodestar, the Court divides the total fees sought by the lodestar to arrive at the multiplier. *Acosta*, 2018 WL 2088278, at *13 (N.D.Cal., 2018). If the multiplier falls within an acceptable range, it further supports the conclusion that the fees sought are, in fact, reasonable. *Id.* Here, the requested fee represents a multiplier of approximately 1.4, which falls on the end of reasonable multipliers. *Id.* at *14 (observing that a 1.94 multiplier is "…at the lower end of the Ninth Circuit's scale").

Multipliers are expected in successful class action litigation. "The purpose of [a] multiplier is to account for the risk Class Counsel assumes when they take on a contingent-fee case." *Hopkins v. Stryker Sales Corp.,* 2013 WL 496358, at *4 (N.D.Cal. Feb. 6, 2013); *see also, e.g., In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1295 n.2 (9th Cir. 1994) (reversing denial of risk multiplier in class action; "[i]f this 'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing," distinguishing common fund cases from fee shifting awards because the class pays the attorneys from the common fund); *Fischel v. Equitable Life Assur. Soc'y of U.S.,* 307 F.3d at 1008 (abuse of discretion to deny multiplier in risky class action where lodestar is based on non-contingent rates).

Percentage awards resulting in a fee of **one to four** times the lodestar are common. *Vizcaino*, 290 F.3d at 1051, n.6 (approving multiplier of 3.65 at 28% of class fund) (citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998) ("multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied."

23

(quoting *3 Newberg* §14.03 at 14–15)). The majority of awards translate to multipliers greater than 1.5. *Vizcaino*, 290 F.3d at 1051, n.6.

Numerous recent decisions have approved multipliers far exceeding the multiplier presented here. *See e.g., In re Apple Inc. Device Performance Litigation*, 2021 WL 10228666, at *8-9 (N.D. Cal. 2021) (approving fee award of $80,600,000, resulting in multiplier of 2.232; awarding 26% of class fund); *Nichols v. SmithKline Beecham Corp.*, 2005 WL 950616 (E.D.Pa.,2005) (awarding 30% of a $65 Million class fund resulting in a 3.15 multiplier);[11] *Smith v. Experian Information Solutions, Inc.*, 2020 WL 6689209, at *6-7 (C.D.Cal. 2020) (Multiplier of 3.8 appropriate where counsel "…took the case on a contingency at a time when the outcome was tenuous and achieved an excellent result;" awarding 25% of class fund); *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 2017 WL 6040065, at *9 (N.D. Cal. Dec. 6, 2017) (3.66 multiplier is "well within the range of multipliers awarded in similar cases;" citing cases); *Beaver,* 2017 WL 4310707, at *8–14 (S.D. Cal. Sept. 28, 2017) (1/3 of approximately $51 Million fund, analyzing propriety of fee under both California and federal law) (multiplier of 2.89); *Spann v. J.C. Penney Corp.,* 211 F. Supp. 3d 1244, 1265 (C.D. Cal. 2016) (27% of the fund, resulting in multiplier of 3.07); *Bradburn Parent Teacher Store, Inc. v. 3M*(, 2007 WL 1468847 (E.D.Pa.,2007) (35% of nearly $40 Million fund; multiplier of 2.5); *In re Remeron Direct Purchaser Antitrust Litigation*, 2005 WL 3008808, *11 (D.N.J.,2005), (awarding 1/3 of $75 Million class fund resulting in 1.8 multiplier); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 370-71 (S.D.N.Y. 2002) (awarding 33 1/3% of fund, which translated to "the modest multiplier of 4.65"); *see also*, *Steiner v. Am. Broad. Co.*, 248 Fed.Appx. 780, 783 (9th Cir. 2007) (6.85

---

[11] The cases listed by the *Nichols* court were *In re Buspirone Antitrust Litig.,* Civ.A.No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003) (awarding 33.3% of a $220 million dollar fund; multiplier of 8.46); *In re Cardizem CD Antitrust Litig.,* Civ.A.No. 99-MD-1278 (E.D.Mich. Nov. 26, 2002) (awarding 30% of a $110 million fund; multiplier of 3.7); *In re Vitamins Antitrust Litig.,* Civ.A.No. 99-197, MDL No. 1285, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001) (awarding about 34% of an approximately $360 million fund; multiplier of 3.5).

multiplier "falls well within the range of multipliers that courts have allowed"); *Craft v. Cty. of San Bernardino*, 624 F. Supp. 2d 1113 (C.D. Cal. 2008) (awarding 25% of fund in early settlement, resulting in multiplier in excess of 5; canvassing class cases with high multipliers). Given the low multiplier of 1.4, the requested fee is strongly supported by the lodestar cross-check.

## III.   THE COSTS ARE REASONABLE

An attorney is entitled to "recover as part of the award of attorney's fees those out-of-pocked expenses that would normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994) (citation omitted). Class counsel seeks slightly above **$230,378** in costs (exclusive of class administration), predominantly for expert fees and mediation costs. The expert fees relate primarily to database experts who extensively analyzed database information produced by LASD and DHS. Costs are calculated through March 31, 2021. Limited additional expert costs may be incurred to assist with calculating distributions to class members. Contained at ¶131 of Mr. Litt's Declaration is a summary list of expenses by category and the total amount advanced for each category. The cost detail is available should the Court wish to see it.

The costs of class administration are not included in the costs listed above. They are estimated at $350,000 plus additional funds for transnational outreach campaigns. Plaintiffs' counsel has advanced $25,000 for transnational outreach (included in the total above) and anticipate an additional $25,000 to be paid at the end of the notice period.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs' counsel's motion should be granted.

1    DATED: April 22, 2021            Respectfully submitted,

2

3                                      McLANE, BEDNARSKI & LITT, LLP

4                                      By: */s/ Barrett S. Litt*
                                            Barrett S. Litt
5

6                                      By: */s/ Lindsay Battles*
                                            Lindsay Battles
7

8                                      Attorneys for Plaintiffs

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT 4

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 14-2171 JGB (SPx)** | Date | February 28, 2019 |
|---|---|---|---|
| Title | ***Dan McKibben, et al. v. John McMahon et al.*** | | |

Present: The Honorable     JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:    Order (1) GRANTING Plaintiffs' Motion for Attorneys' Fees (Dkt. No. 86); and (2) GRANTING Plaintiffs' Motion for Final Approval of Class Settlement (Dkt. No. 90)  (IN CHAMBERS)**

On January 18, 2019, Plaintiffs[1] Pedro Guzman, Nick Ou, Sean Lint, Anthony Oliver, Timothy Walker, Ilich Vargas, William Kennedy, Jonathan Robertson, Steve Aka Lynn Price, Bryan Bagwell, Christopher Crawford[2], Frederick Crockan, Taheash White, Michael Aka Madison Hatfield, and Kevin Aka Veronica Pratt (collectively, "Plaintiffs" or "Named Plaintiffs") filed a Motion for Final Approval of Class Settlement.  ("MFACS," Dkt. No. 90.) On November 7, 2018, Plaintiffs moved for attorneys' fees and costs. ("MAF," Dkt. No 86.) These matters are unopposed.  The Court held a hearing on these matters on February 11, 2019. Upon consideration of the papers filed in support of these motions, as well as oral arguments presented by the parties, the Court GRANTS Plaintiff's MFACS and GRANTS Plaintiffs' MAF.

## I.  BACKGROUND

On May 20, 2015 Plaintiffs filed a Second Amended Complaint against Defendants Sheriff John McMahon, Greg Garland, Jeff Rose, Sergeant James Mahan, Corporal Armando

---

[1] Plaintiff Dan McKibben passed away while this lawsuit was pending, and is not listed as a Plaintiff.  His name is still used as the Case Name.

[2] At the February 11, 2019 hearing, Plaintiffs' Counsel reported that Christopher Crawford passed away while this motion was pending.

---

Castillo, the County of San Bernardino ("the County"), and San Bernardino Sheriff's
Department ("SBCSD") (collectively "Defendants"). ("SAC," Dkt. 37.) Plaintiffs sue each
individual defendant in both his individual and official capacity. (Id.) Plaintiffs allege three
causes of action: (1) violation of 42 U.S.C. § 1983 for depriving Plaintiffs of equal protection
afforded by the 14th Amendment based on sexual orientation, gender identity, and gender; (2)
violation of Cal. Civ. Code § 52.1 for interfering with Plaintiffs' rights to equal protection under
the California Constitution; and (3) injunctive relief under Article 1, § 7 of the California
Constitution and violation of Cal. Govt. Code §1135(A) by the County, SBCSD, and McMahon.
(Id.)

On August 15, 2018, Plaintiffs filed a Motion for Preliminary Approval of Class Action
Settlement. On September 10, 2018, the Court granted the preliminary approval of this class
action settlement and granted conditional certification of the proposed settlement classes.
("Preliminary Approval Order," Dkt. No 84.) In the Preliminary Approval Order, the Court
ordered:

1. The Settlement Agreement is preliminarily approved as fair, reasonable, and adequate
   for members of the settlement class.

2. The following settlement classes are certified for settlement purpose only:

   a. Damages Class: Individuals who, between October 22, 2012 (two years prior
      to the filing of the original complaint, which is the statute of limitations period
      under 42 U.S.C. § 1983) and March 31, 2018 (the end of the month in which
      the settlement was reached in principle) were gay, bisexual, and/or
      transgender inmates housed in the Alternative Lifestyle Tank of the San
      Bernardino County Jail facility known as West Valley Detention Center.

   b. Injunctive Relief Class: Individuals who currently are, or in the future will be,
      gay, bisexual, and/or transgender inmates housed in the San Bernardino
      County jails, including but not limited to those housed in the Alternative
      Lifestyle Tank.

3. Barrett S. Litt, David McLane, and Lindsay Battles of Kaye, McLane, Bednarski &
   Litt, and Melissa Goodman, Amanda Goad, Brendan Hamme, and Aditi Fruitwala of
   the ACLU Foundation of Southern California are appointed as class counsel for
   purposes of settlement only.

4. Named Plaintiffs Pedro Guzman, Nick Ou, Sean Lint, Anthony Oliver, Timothy
   Walker, Ilich Vargas, William Kennedy, Jonathan Robertson, Steve Aka Lynn Price,
   Bryan Bagwell, Christopher Crawford, Frederick Crockan, Taheash White, Michael
   Aka Madison Hatfield, and Kevin Aka Veronica Pratt are qualified to act as
   representatives of the settlement classes and are preliminarily appointed as class
   representatives.

Case 2:95-cv-04545-DMG-AGR Document 281-2 Filed 08/27/22 Page 73 of 182 Page ID
Case 5:14-cv-05171-DMG-SP Document 103-1 Filed 02/28/19 Page 3 of 22 Page ID #:1947
#:47301

5. JND Legal Administration is appointed as the settlement administrator.

6. The settlement notice, as set forth in Exhibit B to the Settlement Motion, is approved in form and substance for use in the administration of the Settlement Agreement. The Court grants the parties the authority to finalize the contact information, website address, response dates, and fairness hearing dates in accordance with this Order.

7. JND Legal Administration is directed to mail the notice and claim form to all individuals entitled to receive notice within two weeks of this Order.

8. Settlement class members will have until January 7, 2019 to file a claim, opt-out, or file an objection to the Settlement Agreement.

9. The final approval hearing will be scheduled for February 11, 2019 at 9:00 a.m. in Courtroom 1 of the United States District Court for the Central District of California, Eastern Division located at 3470 12th Street, Riverside, California 92501.

(Id. at 19-20).

## II.   THE SETTLEMENT AGREEMENT

Plaintiffs filed a Settlement Agreement on August 15, 2018. ("Settlement Agreement," Dkt. No. 78.)  The Court preliminarily approved the Settlement Agreement on September 10, 2018. (Preliminary Approval Order.) The terms of the Settlement Agreement are discussed below.

## A.  Settlement Classes

The settlement classes for the purposes of the settlement of this case include both a Damages Class and an Injunctive Relief Class.

The Damages Class includes "individuals who, between October 22, 2012 (two years prior to the filing of the original complaint, which is the statute of limitations period under 42 U.S.C. § 1983) and March 31, 2018 (the end of the month in which the settlement was reached in principle) self-identified as gay, bisexual and/or transgender inmates ("GBT inmates") housed in the Alternative Lifestyle Tank ("ALT") of the San Bernardino County Jail facility known as West Valley Detention Center ('WVDC')."  (Settlement Agreement §1, ¶ 10.)

The Injunctive Relief Class includes "individuals who currently are, or in the future will be, GBT inmates housed in the San Bernardino County jails, including but not limited to those housed in the ALT."  (Id. § 1, ¶ 18.)  The finalized class list consisted of 660 individuals. ("Keough Declaration," Dkt. No. 92 ¶ 4.)

## B. Release

All settlement class members agree to release their claims as follows:

The Settlement Agreement, as of the Effective Date, resolves in full all claims against the Released Persons[3] by all of the SCMs,[4] including the Named Plaintiffs, involving violations of law or constitutional rights, including, without limitation, their equal protection rights under federal and California law, their rights under California Civil Code § 52.1, any other rights under any other federal, state or local law, regulation, duty, or obligation, or any other legal theory, action or cause of action, which arise from the class-wide factual allegations alleged in the complaint , as well as any claim regarding the bus transportation of transgender inmates (hereafter "Covered Claims").

When the Settlement Agreement is final, as of the Effective Date, all SCMs, including the Named Plaintiffs, waive all rights to any and all claims relating to damages or reimbursement of any kind for the Covered Claims.  This waiver and release shall include a full release and waiver of unknown rights regarding the Covered Claims that may exist as of the Effective Date.

As of the Effective Date, the SCMs, including the Named Plaintiffs, hereby waive any and all rights to pursue, initiate, prosecute, or commence any action or proceeding before any court, administrative agency or other tribunal, or to file any complaint regarding acts or omissions by the Released Persons with respect to the Covered Claims during the Class Period that fit within the definition of the Damages Class; and further, as it relates to this waiver or Release, expressly waive the provisions of California Civil Code § 1542, which provides that "a general

---

[3] Released Persons refers to:

> Defendants and their affiliates, subsidiaries, predecessors, successors, and/or assigns, together with past, present and future officials, employees, representatives, attorneys, and/or agents of San Bernardino County, including John McMahon, or any of them. "Released Persons" also includes any and all insurance carriers, and/or their representatives and attorneys, for the Released Persons.

(Settlement Agreement § II, ¶ 26)

[4] SCMs stands for "Settlement Class Member," which refers to:

> [A]ny member of the Damages class as defied above (whether or not s/he files a Timely Claim form), including representatives, successors and assigns, who does not file a valid and timely Request for Exclusion as provided for in this Settlement Agreement.

(Settlement Agreement § II, ¶ 28.)

**CIVIL MINUTES—GENERAL**     Initials of Deputy Clerk MG

release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor."

. . .

Any Class Member who does not Opt-Out as set forth in this Settlement Agreement, shall be deemed conclusively to have become an SCM and to be bound by the Settlement Agreement and all subsequent proceedings, orders and judgments herein, regardless of whether s/he files a claim form.

(Settlement Agreement § VI, ¶¶ 21-23, 45.)

## C. Financial Terms

Below is an overview of the financial terms of the Settlement Agreement:

- Gross settlement amount ("Class Fund"):      $950,000.00
- Expert, consulting, mediation costs          $36,304.49
- Settlement administration costs:             $37,500.00[5]
- Service award to class representatives:      $55,500.00[6]
- Net settlement amount:                       $818,195.51
- Attorneys' fees and costs:                   $1,100,000.00[7]

(MFACS at 3.)

The Class Fund is non-reversionary.  (Settlement Agreement §IV, ¶ 11.)  However, if 11 to 24 Damages Class members opt-out of the class, Defendants will receive a credit against the Class Fund based on the amount each individual opt-out was due under the initial formula. (Settlement Agreement § XI, ¶ 48.)  The credit is not available if 10 or fewer Damages Class Members opt-out.  (Id.)  If 25 or more Damages Class members or any Named Plaintiffs opt-out, Defendants have the option to use the same credit formula or rescind the Settlement Agreement. (Id. § XI, ¶ 49.)  No damages class members opted out of the settlement.  (Keough Decl. ¶17.)

---

[5] The Settlement administration cost here differs from the cost listed in the Preliminary Approval because the County has already paid a $2,500 deposit to the Claims Administrator.

[6] This amount differs from the amount listed in the Settlement Agreement because Plaintiff Christopher Crawford passed away and will no longer receive a Service Award.  The net settlement amount is also adjusted to reflect this change.

[7] Attorneys' fees and litigation costs (excluding mediation and expert costs) are included in a request for attorneys' fees separate from the settlement amount.  (Settlement Agreement ¶ 30.)

## 1. Damages Class Members

Each Damages Class member is eligible to receive payment.  Individual settlement
amounts to class participants are paid from the net settlement amount.  The portion of the net
settlement amount payable to each Damages Class participant will be calculated through a points-
based formula.  (Settlement Agreement § IV, ¶¶ 8-9.)  The total points for each participant will
be added together, and each participant's recovery will be a percentage of the net settlement
amount based on that class member's percentage of the total points for participants making
timely claims.  (Id. § IV, ¶ 9.)  In addition to this formula, there is a recovery floor of $40 per
participant and a recovery ceiling of $10,000 per participant.  (Id. § IV, ¶ 10.)  This recovery
ceiling "is to ensure that outliers who have outsized claims do not distort the meaningfulness of
the recovery to the remaining class members.  (Such outliers would be entitled to opt out and
pursue their own claims if they so chose.)"  (Id.)

The formula to calculate the points each Damages Class member receives is designed to
account for the fact that the severity of the challenged conditions varied over time and depended
on an inmate's sentencing status, security classification, and work eligibility.  (MFACS at 5-6.)
Those Damages Class members who were low security risks were more adversely affected by the
challenged conditions because they would have received more out-of-cell time than inmates
deemed a higher security risk.  (Id.)  Additionally, all Damages Class members were denied
access to certain programs whose availability varied based on sentencing status and work
eligibility.  (Id.)  Finally, the challenged conditions before October 14, 2014 were more restrictive
and receive higher point values than conditions after October 14, 2014.  (Id.)  Based on these
considerations and others addressed in the Settlement Motion, Plaintiffs divide these
confinement conditions into nine categories and assign point values depending on their relative
severity.  (Settlement Agreement § IV, ¶ 8.)  Points are assigned for each day a Damages Class
member was incarcerated in a given category and aggregated.  (Id.)  Below are the nine per diem
categories and corresponding point values:

- Category 1: Sentenced, work-eligible (Pre-October 2014)            100
- Category 2: Sentenced, not work-eligible (Pre-October 2014)        60
- Category 3: Pre-sentenced, lower security risk (Pre-October 2014)  55
- Category 4: Pre-sentenced, higher security risk (Pre-October 2014) 45
- Category 5: Pre-sentenced, unknown security risk (Pre-October 2014) 45
- Category 6: Sentenced, work-eligible, no job (Post-October 2014)   65
- Category 7: Sentenced, work-eligible, inferior job (Post-October 2014) 50
- Category 8: Sentenced, not work-eligible (Post-October 2014)       35
- Category 9: Pre-sentenced (Post-October 2014)                      20

(Id. § IV, ¶ 8.)

As of the time of the MFACS, Claim Forms from 165 class members have been approved.
(MFACS at 3.)  This represents approximately 25% of the total 655 class members.  (Id. at 11)
Based on this number, the mean recovery is $4,000-$5,000.  (Id.)  On February 7, 2019 Plaintiffs

**CIVIL MINUTES—GENERAL**     Initials of Deputy Clerk MG

filed a notice of additional late claims. ("Late Claims Notice," Dkt. No. 94.) Counsel has been made aware that two claims were filed after the January 7, 2019 cut-off date and that additional class members were incarcerated and did not receive the Class Notice. (Id.) As of February 4, 2019, the Claim Administrator has received ten additional claims. (Id.) Plaintiffs request this Court approve the payment of these ten late claims and any claims postmarked as of February 11, 2019. (Id.) Additionally, class representative Frederick Crockan has attempted to file his claim on multiple occasions, but his claim forms have not been received by the Class Administrator. (Id.) Plaintiffs request the Court deem Crockan to have filed a timely claim. (Id.) Further, Mr. Joe Raymond Fierro, a verified class member, never received a claim form. ("Additional Late Claim Notice," Dkt. No. 95.) Plaintiffs request the court deem Mr. Fierro to have timely filed a claim. (Id.) At the February 11, 2019 hearing Defendants represented they do not oppose this request. Finally, on February 22, 2019, Counsel filed an ex parte application regarding the late filing of Andrew Afoa, who, due to no fault of his own, never received a claim form prior to the cut-off date. (Dkt. No. 98.) Counsel notes Defendant's counsel has no objection to the ex parte application. (Id.) The Court APPROVES these requests.

### 2. Class Representatives

The Settlement Agreement provides a total of $55,500 of the gross settlement amount to the Named Plaintiffs. (Settlement Agreement §IV, ¶ 3.) There are 14 Named Plaintiffs, and each would receive between $2,000 to $5,500 depending on counsel's assessment of their contributions to the litigation. (Id.) The Settlement Agreement proposes exact amounts for each of the Named Plaintiffs in paragraph 3.

### 3. Settlement Administration Costs

The settlement administrator, JND Legal Administration ("JND" or "Administrator"), will be paid from the gross settlement amount. (Id. § IV, ¶ 2.) Class counsel requested bids and selected the most reasonable bid based on price, scope of services, and capabilities of the administrator. (Id. § IX, ¶ 31.) In its bid JND estimated the administration to have a maximum of $40,000. (Id. § IV, ¶ 2.) The cost of administration totaled the $40,000 indicated in the Settlement Agreement. (MFACS at 3; Keough Decl. ¶ 22.) At the February 11, 2019, Defendants counsel informed the Court that the County has already paid $2,500 of the total Claims Administration cost as a deposit, making the outstanding total $37,500.

### 4. Attorneys' Fees and Costs

Class counsel seeks an award of attorneys' fees separate from the gross settlement amount. (Settlement Agreement § IV, ¶ 12.) Class counsel seeks $1,100,000 in attorneys' fees and costs in a separate motion under 42 U.S.C. § 1988 and Cal. Civ. Code § 52.1(h), which provide attorneys' fees for prevailing plaintiffs. (See MAF at 2.) This amount was independently negotiated with the assistance of a professional mediator and, in order to effectuate the settlement, substantially discounted below the amounts Plaintiffs would have sought in an attorneys' fees motion. (Id. at 12; Settlement Agreement § IV ¶ 13.)

## D.  Injunctive Relief

The Settlement Agreement also provides for injunctive relief over a three-year period. (MFACS at 16, "Injunctive Relief Agreement," Dkt. No 90-2 at 15.)  The terms of the injunctive relief are detailed in Exhibit 2 and include the development of policies not yet drafted.  (Id. at 16.)  Defendants estimate the resources associated with these Injunctive Terms will be approximately $500,000 per year.  (Id.)

There are nine parts to the proposed Injunctive Terms: (1) create the PREA-GBTI Committee ("the Committee")[8]; (2) establish policies for Housing and Classification Issues; (3) establish inmate worker options for GBTI inmates; (4) require access to programming; (5) require equal tier time for GBTI inmates; (6) require training on GBTI, PREA, and sexual harassment issues for staff, contractors, volunteers, and other inmates; (7) require specific policies for transgender inmates; (8) establish a zero-tolerance policy for harassment and ensuring PREA compliance; and (9) establish procedures to enforce the Settlement Agreement. (See generally "Injunctive Terms," Dkt. No 78-3.)

Importantly, these terms include provisions to ensure that GBTI inmates have comparable access as their peers in general population to programming, education, religious services, tier time, and work.  Additionally, the terms provide for housing that considers an inmate's sexual orientation and gender identity when making assignments, and considers a GBTI inmate's preferences.  Finally, the terms provide specific policies needed to address the needs of transgender inmates, including housing assignment, choice as to the gender of deputies performing searches, and access to hormonal medication to treat gender dysphoria.  (See generally Injunctive Terms; see also MFACS at 14.)

The complete text of the Injunctive Terms is available at Dkt. No. 78-3.

## E.  Notice

The Settlement Agreement proposed the following procedure to notify the settlement class members of the Settlement Agreement.  The Administrator will be responsible for mailing class notice and the claim form to class members at their last known address.  (Settlement Agreement § IX, ¶ 32.)  The Administrator will use customary means to search for the last known address and do "whatever else is reasonably appropriate in order to reasonably notify Class Members . . . ."  (Id.)  Additionally, Defendants will post a summary notice in the ALT for the duration of the class notice period with a statement that the full notice will be provided on request.  (Id.)

---

[8] "PREA" refers to the Prison Rape Elimination Act, and "GBTI" refers to individuals who are gay, bisexual, transgender, or intersex.

The class notice describes the particulars of this case, provides the class definition, provides information for claimants to contact the Administrator, notifies the Damages Class members of the case website, and contains a series of questions and answers to help explain the Settlement Agreement. (Id. ¶ 34; see also "Class Notice," Dkt. No. 81-2.) The Administrator will mail the class notice as soon as practicable after preliminary approval. (Settlement Agreement § IX, ¶ 35.) The Administrator will include in the physical mailing a claim form. (Id. § X, ¶ 37.) In addition to physical mail, the Administrator will also gather, to the extent reasonably possible and cost effective, email addresses of class members. (Id. § IX, ¶ 36.) A claim form will be timely submitted if it is received before the cutoff date, which Plaintiffs propose should be January 7, 2019. (Proposed Order at 3.) If a class member submits a deficient claim form the Administrator will provide mail notice of the deficiency and give the class member 30 days to provide a proper form. (Settlement Agreement § X, ¶ 39.) If the original form is received before the cutoff date, the corrected claim will still be considered timely. (Id.)

A class member who wishes to opt-out of the Damages Class must submit a request to be excluded to the Administrator before the cutoff date. (Id. § XI, ¶ 43.) Class members who do not timely opt-out of the Damages Class are deemed to have participated in the settlement and will be bound by the Settlement Agreement and all subsequent proceedings, even if s/he did not file a claim form. (Id. ¶ 45.)

## F. Performance of the Settlement Agreement

JND Legal Administration is serving as the settlement administrator. (Settlement Agreement IX, ¶ 31.) The Administrator received 165 approved Claim Forms from individuals identified as Settlement Class Members. (Keough Decl. ¶ 21.) Four Claim Forms have been denied as duplicative. (Id.) 382 Claim Forms were submitted by individuals who do not appear on the Class List. (Id.) Two Claim Forms were missing signatures or other required information and were deemed deficient. (Id.) An additional two Claim Forms were received as of January 14, 2019 with postmarks dated after the January 7, 2019 deadline. (Id.) The claims administrator has received a total of 555 claims to date. (Id.) On February 7, 2019, Plaintiffs filed a Late Claim Notice informing the Court that 10 late claims were filed. (Late Claims Notice.) The Court granted Plaintiffs' request to approve the payment of these late claims. See supra Part II.C.1.

## III.   Legal Standard

## A. Class Action Settlement

Class action settlements must be approved by the Court. See Fed. R. Civ. P. 23(e). Whether to approve a class action settlement is "committed to the sound discretion of the trial judge." Class Plaintiffs v. Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992). A strong judicial policy favors settlement of class actions. See id.

Nevertheless, the Court must examine the settlement as a whole for overall fairness. See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1026 (9th Cir. 1998). Neither district courts nor

appellate courts have the power to delete, modify, or substitute provisions in the negotiated settlement agreement.  See id.  "The settlement must stand or fall in its entirety."  Id.

In order to approve the class action settlement herein, the Court must conduct a three-step inquiry.  See Adoma v. Univ. of Phoenix, Inc., 913 F. Supp. 2d 964, 972 (E.D. Cal. 2012).  First, it assesses whether the parties have met notice requirements under the Class Action Fairness Act.  Id.  Next, it determines whether the notice requirements of Federal Rule of Civil Procedure 23(c)(2)(B) have been satisfied.  Id.  Finally, the Court must find that the proposed settlement is fair, reasonable, and adequate under Rule 23(e)(3).  Id.

## B.  Attorneys' Fees

Class Counsel also requests approval of its request for attorneys' fees.  In the Ninth Circuit, the court has discretion to use either a percentage of the fund or a lodestar approach in compensating class counsel.  See, e.g., Paul, Johnson, Alston & Hunt v. Graulty, 886 F.2d 268, 272 (9th Cir. 1989); In re Washington Pub. Power Supply Sys. Sec. Lit., 19 F.3d 1291, 1295 (9th Cir. 1994).  When a statutory fee is available, such a statutory fee award is appropriate independent of the class damages fund.  See Staton v. Boeing Co., 327 F.3d 938, 972 (9th Cir. 2003) ("in a class action involving both a statutory fee-shifting provision and an actual or putative common fund, the parties may negotiate and settle the amount of statutory fees along with the merits of the case, ...[and] the amount of such attorneys' fees can be approved if they meet the reasonableness standard when measured against statutory fee principles").  Here, a statutory fee is available under both 42 U.S.C. § 1988 and Cal. Civ. Code § 52.1(h).  "The 'lodestar method' is appropriate in class actions brought under fee-shifting statutes (such as federal civil rights, securities, antitrust, copyright, and patent acts), where the relief sought—and obtained—is often primarily injunctive in nature and thus not easily monetized. . ." In re Bluetooth Headset Prod. Liab. Litig., 654 F.3d 935, 941 (9th Cir. 2011).

The lodestar figure is calculated by multiplying the number of hours the prevailing party reasonably expended on the litigation (supported by adequate documentation) by a reasonable hourly rate for the region and for the experience of the lawyer.  Staton 325 F.3d at 965.  Statutory attorneys' fees are not correlated to the size of recovery but instead look to the attorneys' reasonable hours and rates, as well as the public benefit conferred by the litigation.  See City of Riverside v. Rivera, 477 U.S. 561, 575 (1986).

## IV.    Rule 23 Requirements

## A.  Rule 23(a) and (b)

In its Preliminary Approval Order, the Court certified the Settlement Classes in this matter under Rules 23(a) and 23(b)(2) and (3).  (Preliminary Approval Order at 3–8.)  Accordingly, the Court "need not find anew that the settlement class[es] meet[] the certification requirements of Rule 23(a) and (b)."  Adoma, 913 F. Supp. 2d at 974; see also Harris v. Vector Marketing, No. C-08-5198, 2012 WL 381202 at *3 (N.D. Cal. Feb. 6, 2012) ("As a preliminary matter, the Court notes that it previously certified . . . a Rule 23(b)(3) class . . . [and thus] need

not analyze whether the requirements for certification have been met and may focus instead on whether the proposed settlement is fair, adequate, and reasonable."); In re Apollo Group Inc. Securities Litigation, Nos. CV 04–2147-PHX-JAT, CV 04–2204-PHX-JAT, CV 04–2334–PHX-JAT, 2012 WL 1378677 at *4 (D. Ariz. Apr. 20, 2012). Here, the Settlement Classes have not changed since they were conditionally certified. All the criteria for class certification remain satisfied, and the Court hereby confirms its order certifying the Settlement Classes.

## B. Rule 23(c)(2) Notice Requirements

Rule 23(c)(2)(B) requires the Court "direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). Similarly, Rule 23(e)(1) requires a proposed settlement may only be approved after notice is directed in a reasonable manner to all class members who would be bound by the agreement. Fed. R. Civ. P. 23(e)(1). In its Preliminary Approval Order, the Court approved the notice sent to Settlement Class members. The claims administrator timely mailed the Notice Packet, provided e-mail notice, established a toll-free number to provide information on the settlement, created a settlement website, and advertised the settlement on the internet through Facebook. (Keough Declaration ¶¶ 7–15.) The Court therefore finds that notice to the Settlement Class was adequate.

## C. Rule 23(e)

Under Rule 23(e), "the claims, issues, or defenses of a certified class may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). "The primary concern of [Rule 23(e)] is the protection of those class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties." Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco, 688 F.2d 615, 624 (9th Cir. 1982). The Court's inquiry is procedural in nature. Id. Pursuant to Rule 23(e)(2), "[i]f the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Court held a final approval hearing on February 11, 2019. In determining whether a settlement agreement is fair, adequate, and reasonable to all concerned, the Court may consider some or all of the following factors:

> (1) the strength of the plaintiff's case;

> (2) the risk, expense, complexity, and likely duration of further litigation;

> (3) the risk of maintaining class action status throughout the trial;

> (4) the amount offered in settlement;

> (5) the extent of discovery completed, and the stage of the proceedings;

> (6) the experience and views of counsel;

> (7) the presence of a governmental participant; and

(8) any opposition by class members.

Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1242 (9th Cir. 1998). This list of factors is not exclusive and a court may balance and weigh different factors depending on the circumstances of each case. See Torrisi v. Tucson Elec. Power Co., 8 F.3d 1370, 1376 (9th Cir. 1993).

### 1. Strength of Plaintiffs' Case

The initial fairness factor addresses Plaintiffs' likelihood of success on the merits. See Rodriguez v. W. Publ'g Corp., 563 F.3d 948, 964–65 (9th Cir. 2009). In determining the probability of Plaintiffs' success on the merits, there is no "particular formula by which that outcome must be tested." Id. at 965.

Plaintiffs considered their liability case to be strong, especially since California expressly applies strict scrutiny to claims of sexual orientation discrimination. (MFACS at 9.) However, Defendants similarly believe they have a strong defense in asserting that Plaintiffs made voluntary and informed decisions to be housed in the ALT. (Id.) Additionally, Defendants contest that a proper comparison for GBT inmates are general population inmates, and instead assert that protective custody inmates are the proper comparison group. (Id.)

Given the challenges Plaintiffs would face in continued litigation over such issues, the Court finds this factor weighs in favor of approval.

### 2. Risk, Expense, Complexity, and Likely Duration of Further Litigation

Plaintiffs' counsel acknowledges the risk, expense, and likely duration of litigation. (MFACS at 10-11.) Plaintiffs anticipate that even with what they perceive to be strong claims, litigation would take several years. (Id.) This would also greatly increase the costs of litigation. At this stage, Plaintiffs' counsel already seek $1,100,000 in attorneys' fees and costs, and at a substantially discounted rate. (Id. at 7.) Stretched over years of potential litigation, this sum would be substantially larger.

The risk, expense, complexity, and likely duration of further litigation weigh in favor of final approval. Without the Settlement Agreement, the parties would be required to litigate class certification, as well as the ultimate merits of the case—a process which the Court acknowledges is long, complex, and expensive. Settlement of this matter will conserve the resources of this Court and the parties, thus weighing heavily in favor of final approval.

### 3. Risk of Maintaining Class Action Status Throughout the Trial

Because the Court is not aware of any risks to maintaining class-action status throughout trial, this factor is neutral. Barbosa v. Cargill Meat Sols. Corp., 297 F.R.D. 431, 445 (E.D. Cal. 2013); see also In re Veritas Software Corp. Sec. Litig., No. 03–0283, 2005 WL 3096079, at *5 (N.D. Cal. Nov. 15, 2005) (vacated in part on other grounds, 496 F.3d 962 (9th Cir. 2007)) (favoring neither approval nor disapproval of settlement where the court was "unaware of any

risk involved in maintaining class action status"); <u>Vasquez v. Coast Valley Roofing, Inc.</u>, 266 F.R.D. 482, 489 (E.D. Cal. 2010) (finding that there were no facts that would defeat class treatment, the factor was considered "neutral" for purposes of final approval of class settlement).

### 4. Amount Offered in Settlement

In determining whether the amount offered in settlement is fair, a court compares the settlement amount to the parties' estimates of the maximum amount of damages recoverable in a successful litigation. <u>In re Mego Fin. Corp. Sec. Litig.</u>, 213 F.3d 454, 459 (9th Cir. 2000), as amended (June 19, 2000).

In valuing this litigation, Plaintiffs' Counsel estimated each class members would recover a few thousand dollars. (MFACS at 9.) Under this Settlement, the average recovery for claiming class members is $4,000-5,000. (<u>Id.</u>) Additionally, Plaintiffs' Counsel considers the monetary recovery highly favorable when compare to other class actions for damages in the jail context involving over-detentions and strip searches. (<u>Id.</u> at 10.)

Plaintiffs also believe that the Injunctive Terms contribute significant additional value. (<u>Id.</u>) Plaintiffs' counsel, who are experienced in class action litigation regarding civil rights issues, believe the Injunctive Terms are "groundbreaking" and a "model in many respects." (<u>Id.</u> at 10-11.) Plaintiffs' counsel determined that the benefit to the class of this injunctive relief was of such value that they agreed to a significantly reduced fee in return. (<u>Id.</u>)

The Court finds this factor weighs in favor of final approval.

### 5. Extent of Discovery Completed and Stage of the Proceedings

This factor requires the Court evaluate whether "the parties have sufficient information to make an informed decision about settlement." <u>Linney</u>, 151 F.3d at 1239.

Plaintiffs assert they negotiated with Defendants at arms' length and without collusion, which is evidenced by the extensive discovery and mediation process. (MFACS at 14.) Plaintiffs conducted extensive document discovery. (<u>Id.</u> at 12.) Although Plaintiffs did not conduct depositions, there were several meetings with Defendants' counsel to address issues regarding jail operations. (<u>Id.</u>) SBCSD provided both formal and informal discovery concerning the operation and conditions of general population inmates as well as ALT inmates. (<u>Id.</u>) Additionally, Plaintiffs' counsel inspected with an expert consultant WVDC premises where GBT and non-GBT inmates are housed, as well as the Glen Helen Rehabilitation Center. (<u>Id.</u>) The parties further held several in-person settlement conferences through private mediation before the Hon. Carla Woehrle (Ret.). (<u>Id.</u> at 2.)

///

---

**CIVIL MINUTES—GENERAL**

The Court finds the parties have engaged in substantial investigation of the facts and the applicable law.  This factor weighs in favor of granting final approval of the Settlement Agreement.

### 6.  Experience and Views of Counsel

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation."  Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc., 221 F.R.D. 523, 528 (C.D. Cal. 2004) (internal citation and quotation marks omitted).  Plaintiffs' counsel has extensive experience serving as counsel in civil rights class actions.  (MFACS at 13.)  Litt is a well-known civil rights lawyer with decades of experience.  (MAF at 10).   McClane has worked on civil rights and criminal defense cases for the last fifteen years.  (Id.)  Battles has been practicing civil rights cases for ten years.  (Id.)  Goodman, Goad, Hamme, Hill, and Fruitwala of ACLU SoCal have 15, 13, 6, 4 and 4 years of experience respectively. (Id.) Counsel further submits that the proposal is fair.  (MFACS at 11.)  This weighs in favor of final approval.

### 7.  Presence of a Governmental Participant

"The participation of a government agency serves to protect the interests of the class members, particularly absentees, and approval by the agency is an important factor for the court's consideration."  Marshall v. Holiday Magic, Inc., 550 F.2d 1173, 1178 (9th Cir. 1977).  Here, the County and SBCSD are government agencies, and as such, their participation and consent to the terms of injunctive relief weigh in favor of approving the settlement.

### 8.  Opposition of Class Members

The existence of overwhelming support for a settlement agreement by the class lends weight to a finding that the settlement agreement is fair, adequate, and reasonable.  DIRECTV, Inc., 221 F.R.D. at 529 ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").

Here, the record supports that class members have a positive reaction to the proposed settlement.  JND has approved and received 165 Claim Forms.  (Keough Decl. ¶ 21.)  As of the date of the declaration, the settlement administrator had not received any opt-out requests nor any objections to the settlement. (Id. ¶¶ 17-19.)  Assuming this trend continues, this indicates that the classes approve of the settlement.  Accordingly, this factor weighs in favor of final approval.

///
///
///
///

## D. Settlement Administration Costs

Plaintiffs seek $40,000 in settlement administration costs, the same amount that this Court preliminarily approved as part of the Settlement Agreement. (MFA at 4; Preliminary Approval Order at 6.) The Court approves $40,000 in administration costs.

## E. Incentive Awards

The trial court has discretion to award incentives to the class representatives. See In re Mego, 213 F.3d at 463 (9th Cir. 2000); Pelletz, 592 F. Supp. 2d at 1329. The criteria courts have used in considering the propriety and amount of an incentive award include: (1) the risk to the class representative in commencing a class action, both financial and otherwise; (2) the notoriety and personal difficulties encountered by the class representative; (3) the amount of time and effort invested by the class representative; (4) the duration of the litigation; and (5) the personal benefit, or lack thereof, enjoyed by the class representative. Van Vranken v. Atl. Richfield Co., 901 F. Supp. 294, 299 (N.D. Cal. 1995).

The settlement provides a slight benefit to the 15 Named Plaintiffs (ranging from $2000 to $5,500 in addition to their class member formula award, depending on the role and contribution of the class representative). (MFACS at 17.) Although there is a larger than normal number of class representatives, it is because Class Counsel determined there were several categories of class representatives necessary to represent class members in custody with standing to seek injunctive relief and class members not in custody who were not subject to PLRA restrictions. (Id.) Class Counsel also determined that they needed a larger than usual number of class representatives due to the variety of deprivations at which the Complaint was aimed (e.g., drug treatment, mental health treatment, education, work opportunities), for each of which it was important to have a class representative who personally experienced the deprivation. (Id.)

Here, the class representatives were (either at the time of the filing of the complaint or previously) in SBCSD custody. (Id. at 19.) Those who were in custody exposed themselves to risk of retaliation, and those not in custody were still at risk of re- arrest and retaliation. (Id.) All Named Plaintiffs put their names in the public arena. (Id.) Plaintiffs' counsel spent dozens of hours interviewing class representatives while they were in custody, increasing their potential risk and demonstrating their personal participation in the litigation. (Id.)

Class Counsel asserts the requested amounts are well within the range of court approved incentive payments in recognition of work done on behalf of the class and in consideration of the risk undertaken in bringing the action. (Id.) "An incentive award of $5,000 per class representative is in line with other awards approved in this circuit." Weeks v. Kellogg Co., No. CV 09-08102 MMM RZX, 2013 WL 6531177, at *37 (C.D. Cal. Nov. 23, 2013). See also In re Online DVD-Rental Antitrust Litig., 779 F.3d 934, 943 (9th Cir. 2015) (affirming $5,000 incentive award even though the average class member received only $12); In re Mego, 213 F.3d at 463 (approving a $5,000 incentive award for each class representative).

---

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk <u>MG</u>

Given these Named Plaintiffs' involvement in the case and their assumption of significant risk, the Court AWARDS the following incentive awards:

| NAME | INCENTIVE AWARD[9] |
|---|---|
| Bryan Bagwell | $5,000 |
| Frederick Crockan | $5,000 |
| Pedro Guzman | $3,000 |
| Michael Aka Madison Hatfield | $5,000 |
| William Kennedy | $3,000 |
| Sean Lint | $2,000 |
| Anthony Oliver | $5,500 |
| Nick Ou | $3,000 |
| Kevin Aka Veronica Pratt | $5,500 |
| Steven Aka Lynn Price | $3,000 |
| Jonathan Robertson | $3,000 |
| Illich Vargas | $5,500 |
| Tim Walker | $5,000 |
| Taheash White | $2,000 |
| **TOTAL** | **$55,500.00** |

## V.   ATTORNEYS' FEES AND COSTS

Class counsel seeks $1,100,000 in attorneys' fees and costs in a separate motion under 42 U.S.C. § 1988 and Cal. Civ. Code § 52.1(h), which provide reasonable attorneys' fees for prevailing plaintiffs. (MFACS at 7.) This amount was independently negotiated with the assistance of a professional mediator and, in order to effectuate the settlement, substantially discounted below the amounts Plaintiffs would have sought in an attorneys' fees motion. (Id.)

## A.  The Lodestar Approach is Appropriate

The lodestar approach is appropriate because this is a class action brought under fee-shifting statutes where the primary relief sought is injunctive relief. See In re Bluetooth Headset Prod. Liab. Litig., at 941. The Ninth Circuit noted it has "repeatedly made it clear that the level of success achieved by a civil rights plaintiff should be measured by more than the amount of damages awarded." Morales v. City of San Rafael, 96 F.3d 359, 365 (9th Cir. 1996), opinion amended on denial of reh'g, 108 F.3d 981 (9th Cir. 1997). In Morales, the damages verdict was itself "significant. . . [and] established a deterrent to the City, its law enforcement officials and others who establish and implement official policies."

---

[9] Christopher Crawford passed away and will no longer receive an incentive award. See supra Part II.C.

---

**CIVIL MINUTES—GENERAL**                      Initials of Deputy Clerk MG

Here, Plaintiffs request $1,100,000 in attorneys' fees, which exceeds the class damages fund. In a case without an available statutory fee, this disparity would be inappropriate. However, in a case like this, it is common for statutory fees to exceed recovered damages, particularly where Plaintiffs obtained significant injunctive relief. Plaintiffs secured injunctive relief on a groundbreaking issue. The parties agree these statutory fees are appropriate. Like in Morales, the relief obtained through this settlement creates a deterrent for state agents has an effect on official policies. The value of this relief is difficult to measure but should not be underestimated given the critical implications for the injunctive class members and the potential for use as a model for other correctional facilities.

Given the nature of this case and the relief granted, this Court finds the lodestar method appropriate in this case.

## B. The Requested Fees are Reasonable

Class counsel seeks $1,100,000 in attorneys' fees. (MFACS at 7.) This number was negotiated by the parties with the assistance of a professional mediator and represents a significantly discounted lodestar. (Id.)

District courts using the lodestar method to determine reasonable fees under § 1988 engage in a two-step process. First, courts "apply ... the 'lodestar' method to determine what constitutes a reasonable attorney's fee." Costa v. Comm'r of Soc. Sec. Admin., 690 F.3d 1132, 1135 (9th Cir. 2012); Morales 96 F.3d at 363; Ballen v. City of Redmond, 466 F.3d 736, 746 (9th Cir. 2006). Second, "[t]he district court may then adjust [the lodestar] upward or downward based on a variety of factors." Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008). Statutory attorneys' fees are not correlated to the size of recovery but instead look to the attorney's reasonable hours and rates, as well as the public benefit conferred by the litigation. See City of Riverside v. Rivera, 477 U.S. 561, 575 (1986).

### 1. Computation of the Lodestar

Under the lodestar method, the district court "multiplies the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." Ballen, 466 F.3d at 746 (internal quotation marks omitted); Hensley v. Eckerhart, 461 U.S. 424, 433 (1983). The product of this computation—the "lodestar figure"—is a "presumptively reasonable" fee under 42 U.S.C. § 1988. See Ballen, 466 F.3d at 746.

### a. Reasonable Number of Hours

To calculate attorneys' fees using the lodestar method, a court must determine the reasonable number of hours for which the prevailing party should be compensated. See, e.g., Fischer v. SJB-P.D. Inc., 214 F.3d 1115, 1119 (9th Cir. 2000). Ultimately, a "reasonable" number of hours equals "[t]he number of hours ... [which] could reasonably have been billed to a private client." Moreno, 534 F.3d at 1111. The prevailing party has the burden of submitting

billing records to establish that the number of hours it has requested is reasonable.  See In re Wash. Pub. Power Supply Sys. Sec. Litig., 19 F.3d 1291, 1305 (9th Cir. 1994).  Thus, to determine whether attorneys for the prevailing party could have reasonably billed the hours they claim to their private clients, a district court should begin with the billing records the prevailing party has submitted.  Gonzalez v. City of Maywood, 729 F.3d 1196, 1202 (9th Cir. 2013)

Here, Class Counsel provides billing records that were contemporaneously maintained which detail the time spent working on this case.  ("Ex. C," Dkt. No 87-3; "Ex. E," Dkt. No. 88-1.)  In their MFACS, Plaintiffs provide tables that include each timekeeper who worked on the case and the number of hours they worked.  (MFACS at 13.)  Billed hours were spent on activities such as extensive document review and analysis, interviewing class representatives and class members, and settlement negotiations.  (Id. at 12.)  Plaintiffs note that negotiating the terms of injunctive relief was particularly time consuming and took several meetings with both the mediator and  counsel.  (Id.)

The Court has no reason to doubt the number of hours provided by Class Counsel.  This is especially true given the substantial discount from Class Counsel's lodestar total, as negotiated in the settlement.  Further, the hours provided by Class Counsel do not account for work done for the MFACS and MAF, ongoing work with the Class Administrator and class members, and an appearance at the final approval hearing.  (Id. at 14.)  Given these reasons and the time-intensive nature of a settlement involving injunctive relief, this Court finds that Class Counsel billed a reasonable number of hours.

### b.    Reasonable Hourly Rate

Class Counsel asserts their requested hourly rates are reasonable for attorneys of their skill, experience, and reputation.  California law entitles plaintiff attorneys to their requested rates if those rates are "within the range of reasonable rates charged by and judicially awarded comparable attorneys for comparable work."  Children's Hosp. & Med. Ctr. V. Bonta, 97 Cal. App. 4th, 740, 783 (Cal. Ct. App. 2002).  Federal law similarly instructs that "requested rates [should be] in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation."  Jordan v. Multnomah Cty., 815 F.2d 1258, 1263 (9th Cir. 1987).  In making this showing, "affidavits of the plaintiffs′ attorney[s] and other attorneys regarding prevailing fees in the community, and rate determinations in other cases are satisfactory evidence of the prevailing market rate."  Camacho v. Bridgeport Fin., Inc., 523 F.3d 973, 980 (9th Cir. 2008)(internal citations and marks omitted).

In calculating the lodestar, Plaintiffs may adjust for delay in payment.  See, e.g., Missouri v. Jenkins, 491 U.S. 274, 282 (1989) ("an appropriate adjustment for delay in payment—whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of the statute [42 U.S.C. §1988]"); Barjon v. Dalton, 132 F.3d 496, 502–03 (9th Cir. 1997) ("the district court may choose to apply either the attorney′s current rates to all hours billed or the attorney′s historic rates plus interest").  Generally, for a "fee award to be reasonable, it must be based on current, rather than historic, hourly rates."  Charlebois v. Angels

Baseball LP, 993 F. Supp. 2d 1109, 1119 (C.D. Cal.2012) (citing Jenkins, 491 U.S. at 282) (lodestar award in settled class action).

To demonstrate the reasonableness of Class Counsel's rates, Plaintiffs' attorneys Barrett S. Litt ("Litt") of Kaye, McClane, Bednarski and Litt ("KMBL") and Amanda Goad of the ACLU Foundation of Southern California ("ACLU SoCal") have submitted declarations attesting to their experience litigating federal civil rights class actions and detailing their work on this case. ("Litt Declaration," Dkt. No. 87; "Goad Declaration," Dkt. No. 88.) Litt is licensed to practice law in the State of California, the U.S. District Courts in the Central, Eastern, and Northern Districts of California, in the Ninth, Fourth, Fifth, Eleventh, and D.C. Courts of Appeal, and in the United States Supreme Court. ("Ex. B," Dkt. No. 87-2.) Litt has been practicing for 45 years and has litigated an extensive list of complex civil rights cases, many of which have involved fee-shifting provisions. (Litt Decl. at 30) Litt asserts he bills an hourly rate of $1,150.00. (Id.)

In addition, Litt's declaration provides information as to the experience and billing rates of Plaintiffs' counsel David S. McLane ("McLane"), Lindsay Battles ("Battles"), and Ron Kaye ("Kaye") of KMBL and Melissa Goodman ("Goodman"), Brendan M. Hamme ("Hamme"), Goad, Tasha Hill ("Hill") and Aditi Fruitwala ("Fruitwala") of ACLU SoCal. (Litt Decl. at 30-45.) Litt further provides information regarding the rates of senior paralegal Julia White and junior paralegals Esteban Gil and Rene Arriaza of KMBL, as well as senior paralegal Duaba Gonzalez of ACLU SoCal. (Id.) Litt provides tables supporting the proposition that each member of Plaintiffs' counsel's rates fall within the range of rates for attorneys and paralegals of comparable experience by comparing Plaintiffs' counsels' rates with others working at prominent civil rights firms and organizations in the Central District of California within a close range of experience. (Id.)

The Court finds the range of rates provided by these tables adequately establishes billing rates for civil rights attorneys in the forum. The relevant portions of this table state that: attorneys practicing civil rights litigation with 26-49 years of experience bill adjusted lodestar rates of $887-$1230 per hour; attorneys practicing civil rights litigation with 23-33 years of experienced bill adjusted lodestar rates of $738-$1220 per hour; attorneys practicing civil rights litigation with 9-15 years of experience bill adjusted lodestar rates of $603-$855 per hour; and attorneys practicing civil rights litigation with 1-6 years of experience billed adjusted lodestar rates of $336-$671 per hour (Id. at 31-43). Litt further notes that fee-paying litigants bringing similars action would pay much higher commercial rates for attorneys of similar or less experience practicing civil rights litigation. (Id.)

Plaintiffs request the hourly rates for attorneys: $875 for McLane, who has 32 years of experience; $600 for Battle, who has 10 years of experience; $875 for Kaye, who has 30 years of experience; $715 for Goodman, who has 15 years of experience; $640 for Goad, who has 13 years of experience; $480 for Hamme, who has six years of experience; $390 for Hill, who has four years of experience; and $390 for Fruitwala, who has four years of experience. (Litt Decl. at 29.) Plaintiffs request the following rates for non-attorney timekeepers: $335 for Julia White, a senior

paralegal; $195 for Diana Gonzalez, a senior paralegal; $175 for Rene Arriaza, a junior paralegal; $225 for Sujata Awasthi, a law clerk; $225 for Evan Ettinghoff, a law clerk. (Id.)

The provided tables reflect that the hourly rates of Plaintiffs' attorneys fall within the reasonable range for attorneys of their experience in this district. Further, the fact that counsel seeks a significantly discounted lodestar weighs in favor of finding that the provided rates are reasonable. Plaintiffs' calculated lodestar total is $2,647,267.35. (Id.) They seek only the discounted amount of $1,100,000. (MFACS at 7.) Accordingly, this Court finds the rates, as reflected in Plaintiffs' motion for attorney's fees and costs are reasonable.

### 2. Adjustments to the Lodestar

After computing the lodestar figure, district courts may adjust that figure pursuant to a "variety of factors." See Moreno, 534 F.3d at 1111. "[T]he district court accounts for the following factors in the lodestar computation: '(1) the novelty and complexity of the issues, (2) the special skill and experience of counsel, (3) the quality of representation, (4) the results obtained, and (5) the contingent nature of the fee agreement.'" Gonzalez v. City of Maywood, 729 F.3d 1196, 1209 (9th Cir. 2013)(citing Kerr v. Screen Guild Extras, Inc., 526 F.2d 67, 70 (9th Cir. 1975)).

The Court has already provided an analysis for many of these factors above, including: (1) the novelty and complexity of the issues; (2) counsel's skill and experience; (4) the results obtained; and (5) the contingent nature of the fee arrangement. In those analyses, the Court found that all these factors weighed in favor of approving the settlement. The Court need not repeat this analysis and finds that these factors weigh in favor of approving Plaintiffs' motion for award of attorney's fees and costs. The Court turns to the remaining factor.

Management of this case involved working with a large number of class representatives, working with two different subclasses, and managing both federal and state law claims. Counsel also compiled and analyzed data over four years. Plaintiffs conducted extensive document discovery. (MAF at 12.) Although Plaintiffs did not conduct depositions, there were several meetings with Defendants' counsel to address issues regarding jail operations. (Id.) Additionally, Plaintiffs' counsel inspected with an expert consultant WVDC premises where GBT and non-GBT inmates are housed, as well as the Glen Helen Rehabilitation Center. (Id.) The parties further held several in-person settlement conferences through private mediation before the Hon. Carla Woehrle (Ret.). (Id. at 2.) The Court finds this factor weighs in favor of approval.

The aforementioned factors weigh in favor of approval. Notably, counsel achieved positive results and already stipulated to a substantially discounted lodestar during settlement. For the reasons stated above, the Court APPROVES Plaintiff's request for $1,100,000 in attorneys' fees.

///

## C. Costs

Federal and state fee shifting statutes allow for reimbursement of litigation expenses that "are normally charged to a fee-paying client, in the course of providing legal services. Reasonable photocopying, paralegal expenses, and travel and telephone costs are thus recoverable pursuant to § 1988." Thornberry v. Delta Air Lines, Inc., 676 F.2d 1240, 1244 (9th Cir. 1982), cert. granted, judgment vacated on other grounds, 461 U.S. 952 (1983).

Here, Plaintiffs request costs for travel, investigators, consultants, filing fees, photocopies, printing, scans, messenger services, telephone calls, postage, computerized legal research, and similar costs normally reimbursed by the client. See, e.g., In re Immune Responses Sec Litig., 497 F. Supp. 2d 1166, 1177-78 (S.D. Cal. 2007). Opinions of federal courts are applicable to determining allowable costs under California law. See, e.g., Bussey v. Affleck, 225 Cal. App. 3d, 1162, 1165 (Cal. Ct. App. 1990), abrogated on other grounds by Robert L. Cloud and Associates, Inc. v. Mikesell, 69 Cal. App.4th 1141 (1999).

The Settlement Agreement provides for payments of costs up to $37,000, payable from the Class Fund. (Settlement Agreement ¶ 30.) Counsel now requests $36,304.49 in costs. (MAF at 21.) This Court has reviewed the provided itemized list of costs and finds they are appropriate. The Court therefore APPROVES the requested amount for costs.

## VI.   CONCLUSION

For the reasons stated above, the Court:

1.   GRANTS final approval of the Settlement Agreement and Injunctive Terms;

2.   APPROVES payment of the ten late claims and any claims postmarked on or before February 11, 2019;

3.   APPROVES Plaintiffs' requests to deem Frederick Crockan, Joe Raymond Fierro, and Andrew Afoa to have filed a timely claim;

4.   AWARDS Class Counsel attorneys' fees in the amount of $1,100,000.00;

5.   AWARDS Class Counsel costs in the amounts of $36,304.49 as provided in the Settlement Agreement;

6.   AWARDS the following amounts to the Named Plaintiffs:

///
///
///

| NAME | INCENTIVE AWARD |
|---|---|
| Bryan Bagwell | $5,000 |
| Frederick Crockan | $5,000 |
| Pedro Guzman | $3,000 |
| Michael Aka Madison Hatfield | $5,000 |
| William Kennedy | $3,000 |
| Sean Lint | $2,000 |
| Anthony Oliver | $5,500 |
| Nick Ou | $3,000 |
| Kevin Aka Veronica Pratt | $5,500 |
| Steven Aka Lynn Price | $3,000 |
| Jonathan Robertson | $3,000 |
| Illich Vargas | $5,500 |
| Tim Walker | $5,000 |
| Taheash White | $2,000 |
| **TOTAL** | **$55,500.00** |

7.  ORDERS the payment of $37,500 to the claims administrator; and

8.  DISMISSES the Complaint WITH PREJUDICE.

**The Court ORDERS such judgment be entered.**

EXHIBIT 5

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 20-00416 JGB (SPx)** | Date | May 10, 2022 |
|---|---|---|---|

| Title | ***Paola French, et al. v. City of Los Angeles, et al.*** |
|---|---|

Present: The Honorable   JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| TANISHA CARRILLO | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:   **Order (1) DENYING Defendant's Motion for Judgment as a Matter of Law (Dkt. No. 138); (2) GRANTING IN PART Plaintiffs' Motion for Attorneys' Fees (Dkt. No. 145); and (3) VACATING the May 16, 2022 Hearing (IN CHAMBERS)**

Before the Court are two post-trial motions: (1) a motion for judgment as a matter of law, or alternatively for new trial, filed by Defendant City of Los Angeles ("City") ("Rule 50b Motion," Dkt. No. 138); and (2) Plaintiffs Paola French and Russell French's ("Plaintiffs") motion for attorneys' fees ("Fee Motion," Dkt. No. 145) (collectively, "Motions"). The Court finds these matters appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering the papers filed in support of and in opposition to the Motions, the Court DENIES the Rule 50(b) Motion and GRANTS IN PART the Fee Motion. The hearing set for May 16, 2022 is VACATED.

## I.   BACKGROUND

On February 28, 2020, Paola French and Russell French ("Plaintiffs") commenced this action against Defendants City of Los Angeles ("City") and Salvador Sanchez ("Sanchez") (collectively, "Defendants"). ("Complaint," Dkt. No. 1.) Plaintiffs alleged that Mr. Sanchez, who was an officer with the Los Angeles Police Department ("LAPD") at the time, used excessive force against them and their son Kenneth French ("Decedent," or "Kenneth") inside of a Costco warehouse store in Corona, California. (See id.) On April 1, 2020, Plaintiffs filed a first amended complaint as of right. ("FAC," Dkt. No. 10.) Following the Court's order dismissing Plaintiffs' federal causes of action (Dkt. No. 19), Plaintiffs filed a second amended complaint on July 20, 2020. ("SAC," Dkt. No. 21.) On January 8, 2021, the Court dismissed-in-

part one of Plaintiffs' municipal liability claims, dismissed Plaintiffs' second municipal liability
claim and negligent training, hiring, and retention claim, and granted Plaintiffs leave to amend.
(Dkt. No. 45.)  On January 18, 2021, Plaintiffs filed a third amended complaint, the operative
complaint.  ("TAC," Dkt. No. 46.)

   The TAC asserted twelve causes of action: (1) unreasonable search and seizure, unlawful
detention and arrest in violation of 42 U.S.C. § 1983 ("Section 1983"); (2) unreasonable search
and seizure, excessive force in violation of Section 1983; (3) unreasonable search and seizure,
denial of medical care in violation of Section 1983; (4) interference with familial relationship in
violation of the Fourteenth Amendment's Substantive Due Process Clause and Section 1983; (5)
municipal liability, unconstitutional custom, practice, or policy in violation of Section 1983; (6)
false arrest/false imprisonment; (7) battery, including wrongful death; (8) negligence, including
wrongful death; (9) negligent infliction of emotional distress; (10) violation of the Bane Act, Cal.
Civil Code § 52.1; (11) negligent training, hiring, and retention; and (12) loss of consortium.  (See
TAC.)

   On October 4, 2021, the Court granted in part and denied in part the City's motion for
summary judgment.  ("MSJ Order," Dkt. No. 92.)  The Court dismissed Plaintiffs' municipal
liability claim (Count Five), but denied summary judgment on Plaintiffs' state law claims
(Counts Six through Twelve).  (Id. at 16.)

   Following oral arguments on Plaintiffs' two motions in limine on October 4, 2021, the
Court granted the motions on October 12, 2021.  ("MIL Order," Dkt. No. 94.)  The Court
precluded any references to Kenneth's alleged theft of a vehicle; statements relating to the
alleged theft and Kenneth's mental health; and references to certain conclusions and
determinations by the Riverside County District Attorney, Riverside grand jury, the California
Attorney General, the Los Angeles Police Commission, and the City, including that Mr.
Sanchez's actions were "out of policy."  (Id. at 4–5.)

   On October 19, 2021, a jury trial began on Plaintiffs' federal and state law claims.  (Dkt.
No. 106.)

   On October 26, 2021, following the parties' presentation of the evidence, Plaintiffs
voluntarily dismissed their Section 1983 claims for unlawful detention and arrest (Count One),
denial of medical care (Count Three), and interference with familial relationship (Count Four),
as well as their state law claims for false arrest/false imprisonment (Count Six) and negligent
training, hiring, and retention claim (Count Eleven).  (Dkt. No. 129, 10-26-21 RT 550:4-20.)
Plaintiffs' remaining six claims were as follows: (1) excessive force under Section 1983 (Count
Two), (2) battery (Count Seven), (3) negligence (Count Eight), (4) negligent infliction of
emotional distress ("NIED") (Count Nine), (5) violation of the Bane Act (Count Ten), and (6)
loss of consortium (Count Twelve).  (10-26-21 RT 550:21-551:13.)

//
//

The Court also heard arguments on the parties' respective motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) ("Rule 50a") that day. The Court granted in part and denied in part Plaintiffs' motion and denied the City's motion, ruling that (1) Mr. Sanchez's use of force was unreasonable and, therefore, excessive, and (2) Mr. Sanchez's excessive force caused Plaintiffs' and Kenneth's injuries as a matter of law. (Id. 562:7-25.) The Court determined that, as a result, the corresponding elements for Plaintiffs' battery, negligence, NIED, and Bane Act claims were also satisfied as a matter of law. (Id. 562:12-16.) However, the Court found that disputed factual issues required the jury to determine whether Mr. Sanchez acted under color of state law and in the course and scope of his employment. (Id. 563:1-3.)

On October 27, 2021, the jury returned a verdict for Plaintiffs. ("Special Verdict," Dkt. No. 114.) The jury answered, "Yes," to all questions: whether Mr. Sanchez acted under color of state law during the incident, whether Mr. Sanchez acted within the course and scope of his employment with the City as a peace officer during the incident, whether he negligently inflicted severe emotional distress on Plaintiffs, and whether Plaintiffs suffered loss of consortium as a result of Mr. Sanchez's use of unreasonable force against them. (Id. at 3–4.) The jury awarded $17,002,000.00 in total damages: (1) $4,000,000.00 for Kenneth's pre-death pain and suffering and loss of life damages; (2) $4,771,000.00 in compensatory damages for Paola French; (3) $400,000.00 in loss of consortium damages for Paola French; (4) $5,431,000.00 in compensatory damages for Russell French; (5) $400,000.00 in loss of consortium damages for Russell French; and (6) $2,000,000.00 for Plaintiffs' past and future wrongful death damages. (Id. at 5–7.)

On November 29, 2021, the Court entered judgment consistent with the Special Verdict. (Dkt. No. 133.)

On December 27, 2021, the City timely filed the Rule 50b Motion. (See Rule 50b Mot.) Plaintiffs opposed on January 10, 2022. ("Rule 50b Mot. Opp'n," Dkt. No. 142.) On January 11, 2022, they corrected the Rule 50b Opposition. (Dkt. No. 144.) On January 24, 2022, the City replied. ("Rule 50b Mot. Reply," Dkt. No. 148.)

On January 24, 2022, Plaintiffs filed the Fee Motion.[1] (See Fee Mot.) In support, Plaintiffs filed the following documents:

- Declaration of Dale K. Galipo, with attached exhibits ("Galipo Declaration," Dkt. No. 145-2);
- Declaration of Eric Valenzuela, with attached exhibits ("Valenzuela Declaration," Dkt. No. 145-10);
- Declaration of John Fattahi, with attached exhibits ("Fattahi Declaration," Dkt. No. 145-16);
- Declaration of Alejandro Monguia, with attached exhibits ("Monguia Declaration," Dkt. No. 145-21);

---

[1] Plaintiffs initially filed the Fee Motion as a motion for application to tax costs, but filed a notice of errata to clarify that it is a motion for attorneys' fees. (Dkt. No. 149.)

- Declaration of Renee V. Masongsong, with attached exhibits ("Masongsong Declaration," Dkt. No. 150);
- Declaration of Karen Slyapich, with attached exhibits ("Slyapich Declaration," Dkt. No. 145-24);
- Declaration of Santiago Laurel, with attached exhibits ("Laurel Declaration," Dkt. No. 145-26);
- Declaration of Marielle Sider, with attached exhibits ("Sider Declaration," Dkt. No. 145-29); and
- Declaration of Benjamin Nisenbaum ("Nisenbaum Declaration," Dkt. No. 147).

On February 7, 2022, the City opposed the Fee Motion. ("Fee Mot. Opp'n," Dkt. No. 151.)

On February 22, 2022, Plaintiffs replied. ("Fee Mot. Reply," Dkt. No. 156.) In support, Plaintiffs filed the following additional documents:

- Supplemental Declaration of Mr. Galipo ("Supplemental Galipo Declaration," Dkt. No. 156-1);
- Supplemental Declaration of Mr. Valenzuela ("Supplemental Valenzuela Declaration," Dkt. No. 156-2);
- Supplemental Declaration of Ms. Masongsong ("Supplemental Masongsong Declaration," Dkt. No. 156-3);
- Supplemental Declaration of Mr. Fattahi ("Supplemental Fattahi Declaration," Dkt. No. 156-4); and
- Declaration of John Burton ("Burton Declaration," Dkt. No. 156-5).

## II.   DEFENDANT'S RULE 50(B) MOTION

The City renews its motion for judgment as a matter of law on Plaintiffs' Section 1983 and state law claims, arguing that no reasonable jury could have found that Mr. Sanchez acted in the course and scope of his employment or under color of state law. (See Rule 50b Mot.) The City alternatively asserts that errors by the Court serve as grounds for a new trial. (Id. at 12–19.)

### A.  Legal Standard

#### 1.  Rule 50(b): Motion for Judgment as a Matter of Law

Under Federal Rule of Civil Procedure 50(b) ("Rule 50(b)"), a court may grant a motion for judgment as a matter of law ("JMOL") after a jury trial if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "The test applied is whether the evidence permits only one reasonable conclusion." E.E.O.C. v. Go Daddy Software, Inc., 581 F.3d 951, 961 (9th Cir. 2009). This standard mirrors the summary judgment standard. Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986)). If

there is substantial evidence to support a contention, the court may not grant JMOL. <u>Watec Co. v. Liu</u>, 403 F.3d 645, 651 n.5 (9th Cir. 2005). Substantial evidence must be sufficient for reasonable minds to accept it as support for a conclusion, even when the evidence might also support a contrary conclusion. <u>George v. City of Long Beach</u>, 973 F.2d 706, 709 (9th Cir. 1992). The court must view the facts and draw inferences in the manner most favorable to the non-moving party. <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

Procedurally, a Rule 50(b) motion is "a renewed Rule 50(a) motion." <u>E.E.O.C.</u>, 581 F.3d at 961. Accordingly, a party must first make a Rule 50(a) JMOL motion "before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). If the court denies the Rule 50(a) motion and allows the case to go to the jury, a party may make a renewed motion for judgment as a matter of law within twenty-eight days after the entry of judgment. Fed. R. Civ. P. 50(b). The renewed JMOL motion "may include an alternative or joint request for a new trial under Rule 59." <u>Id.</u> Because a Rule 50(b) motion is a renewed motion, "[a] party cannot raise arguments in its post-trial motion [under Rule 50(b)] that it did not raise in its pre-verdict Rule 50(a) motion." <u>Freund v. Nycomed Amersham</u>, 347 F.3d 752, 761 (9th Cir. 2003).

### 2. Rule 59: Motion for New Trial

Federal Rule of Civil Procedure 59 ("Rule 59") authorizes new trials "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). A motion for new trial "must be filed no later than 28 days after the entry of judgment." Fed. R. Civ. P. 59(b). For a timely motion, a court generally "must uphold a jury verdict if it is supported by substantial evidence." <u>Guy v. City of San Diego</u>, 608 F.3d 582, 585–86 (9th Cir. 2010). Evidence is "substantial" to support a jury's finding when it is "'adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion.'" <u>Id.</u> (internal citations omitted). The Court has "a duty to reconcile the jury's special verdict responses on any reasonable theory consistent with the evidence." <u>Id.</u> at 586.

However, the court may grant a new trial, even when substantial evidence supports the verdict, if "the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent … a miscarriage of justice." <u>United States v. 4.0 Acres of Land</u>, 175 F.3d 1133, 1139 (9th Cir. 1999). Courts may also grant a new trial where the amount of damages is "grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." <u>Del Monte Dunes v. City of Monterey</u>, 95 F.3d 1422, 1435 (9th Cir. 1996). "[T]he district court can weigh the evidence, make credibility determinations, and grant a new trial for any reason necessary to prevent a miscarriage of justice." <u>Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.</u>, 762 F.3d 829, 841 (9th Cir. 2014).

"Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order." Fed. R. Civ. P. 61. "[T]he court must disregard all errors and defects that do not affect any party's substantial rights." <u>Id.</u>

### 3. Rule 51: Objections to Jury Instructions and Verdict Form

Federal Rule of Civil Procedure 51 ("Rule 51") controls post-trial objections to jury instructions and the form of the verdict. Fed. R. Civ. P. 51(c); <u>Ayuyu v. Tagabuel</u>, 284 F.3d 1023, 1026 (9th Cir. 2002). "A party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1). To be timely, a party must object (1) "on the record and out of the jury's hearing before the instructions and arguments are delivered," or (2) if "a party was not informed of an instruction or action on a request before" the aforementioned opportunity, then "promptly after learning that the instruction or request will be, or has been, given or refused." Fed. R. Civ. P. 51(c)(2), (b)(2). Objections that a party fails to raise "until after the jury has rendered its verdict and was discharged" are "waived." <u>Yeti by Molly, Ltd. v. Deckers Outdoor Corp.</u>, 259 F.3d 1101, 1109 (9th Cir. 2001).

## B. Defendant's Rule 50(b) Motion

The City moves for judgment as a matter of law on the grounds that: (1) no reasonable jury could have found that Mr. Sanchez acted within the course and scope of his employment as an LAPD officer when he shot Plaintiffs; and (2) no reasonable jury could have found that Mr. Sanchez acted under color of state law to impose liability under 42 U.S.C. § 1983. (Rule 50b Mot. at 6–11.) For the reasons below, the Court disagrees.

### 1. Vicarious Liability for State Law Claims

The City first contests the jury's verdict that Mr. Sanchez acted "within the course and scope of his employment with the City of Los Angeles as a peace officer during the incident" on Plaintiffs' vicarious liability claim. (Special Verdict at 3.)

The parties are familiar with the doctrine of respondeat superior by now; the Court summarizes just the pertinent principles. "[A]n employer is vicariously liable for the torts of its employees committed within the scope of the employment." <u>Lisa M. v. Henry Mayo Newhall Mem'l Hosp.</u>, 12 Cal. 4th 291, 296 (1995). A tort occurs within the scope of employment when it is "engendered by or arise[s] from the work," meaning that: (1) the act is an "outgrowth of the employment," or the risk of tortious injury is "inherent in the working environment" or "typical of or broadly incidental to the [employer's] enterprise; or (2) the act is "a generally foreseeable consequence" of "the employer's enterprise." <u>Lisa M.</u>, 12 Cal. 4th at 298–99. The scope of employment inquiry is "a question of fact," but becomes a "question of law" when "the facts are undisputed and no conflicting inferences are possible." <u>Mary M. v. City of Los Angeles</u>, 54 Cal. 3d 202, 213 (1991). Governmental entities can be held vicariously liable "when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct." <u>Id.</u> at 215. In such cases, a court should consider all facts "in the context of the enterprise of policing." <u>Perez v. City & Cnty. of S.F.</u>, 75 Cal. App. 5th 826, 841 (2022).

Renewing its argument from trial, the City argues that the undisputed evidence showed "that Sanchez was off-duty, out of uniform, and shopping with his family when he opened fire on the Frenches in a crowded store far outside the Los Angeles city limits." (Rule 50b Mot. at 7.) The only possible evidence linking Mr. Sanchez to the LAPD was, in the City's view, his possession of an LAPD-approved gun, which is insufficient. (Id.) Because no reasonable jury could conclude from this record that Mr. Sanchez's shooting arose from, or was a foreseeable risk inherent to, LAPD's enterprise, the City asserts that Mr. Sanchez did not act within the scope of his employment and vicarious liability should not have attached. (Id. at y–9.)

The City's argument ignores countervailing evidence presented to the jury. True, Mr. Sanchez was not dressed as a police officer. Mr. Sanchez testified in his videotaped deposition played at trial that he had come home at the end of a shift, changed out of his uniform, then drove to Costco in a personal vehicle. (10-22-21 RT 415:19-417:7.) He wore a polo shirt, shorts, and tennis shoes, and witnesses at Costco did not recognize him as a police officer offhand. (Id. 417:8-10; 10-20-21 RT 31:22-32:21; 10-21-21 RT 136:13–15.)

However, substantial evidence supported a causal nexus between Mr. Sanchez and his employment with LAPD before and during his use of force. Despite leaving his shift and changing his clothes, Mr. Sanchez went to Costco carrying his LAPD-approved gun that contained LAPD-approved ammunition, as well as his LAPD identification card. (10-22-21 RT 404:18-24, 10-20-21 RT 94:7-95:15.) According to LAPD's Person Most Knowledgeable ("PMK") Andrew Kukla's testimony, the only reason why Mr. Sanchez could enter Costco with a concealed firearm at the time was because he was a police officer authorized to do so by the state. (10-21-21 RT 153:2-9.) Firearms also hold a "central role … in policing." Perez, 75 Cal. App. 5th at 837. A jury could reasonably infer from this evidence that Mr. Sanchez was cloaked with the authority of an LAPD officer.

Moreover, this was not a case where "possession of a Department-approved firearm" alone linked Mr. Sanchez's actions to his employment. Perez, 75 Cal. App. 5th at 842. Instead, the jury heard additional evidence tending to show that Mr. Sanchez deployed LAPD training and invoked peace officer authority during the incident—even though he was off-duty. According to William Harmening and Mr. Sanchez, Mr. Sanchez drew his concealed, LAPD-approved gun after he was struck on the head by Kenneth. (10-20-21 RT 280:14-16; 10-22-21 RT 404:18-24.) PMK Kukla testified that off-duty police officers have peace officer authority to respond to public offenses, whether or not they are in uniform or outside the City's geographic jurisdiction, and that being struck on the head could constitute a public offense. (10-21-21 RT 156:7-157:4, 301:6-11.) Paola French testified that she saw Mr. Sanchez pull his gun out and heard him say he was a police officer.[2] (10-20-21 RT 94:7-95:15.) When Mr. Sanchez began to

---

[2] The City challenges the credibility of this testimony. (Rule 50b Mot. at 3.) The City misapprehends the analysis applicable on a motion for judgment as a matter of law. The Court "may not make credibility determinations or weigh the evidence," but may ask only whether the jury had sufficient evidence to support its conclusion. E.E.O.C., 581 F.3d at 961 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)).

shoot, a witness observed that he used the gun like a police officer by shooting from the hip. (10-20-21 RT 48:5-10, 13-16, 58:18-25.) The witness testified that this stance is taught in law enforcement and indicated that Mr. Sanchez might have been a police officer. (Id.) Others testified that after the shooting, Mr. Sanchez verbally identified himself as an off-duty officer, showed his LAPD identification card to officers and witnesses responding to the scene, and indicated that Kenneth was "the shooter." (Id. 65:22-66:1, 76:6-24; 10-21-21 RT 128:7-15, 129:1-12, 142:5-10.) Drawing all inferences in Plaintiffs' favor, a jury could reasonably conclude that Mr. Sanchez's conduct was an outgrowth of his employment and a generally foreseeable consequence of LAPD's policing enterprise.

Of course, the jury also heard testimony that could support the City's depiction of Mr. Sanchez as an individual who abused his position for personal reasons. Mr. Sanchez testified in his deposition that he believed he was acting to protect his life and his son's life. (10-22-21 RT 434:9-15.) A jury could find that Mr. Sanchez was more interested in his son's safety than the public's. A jury could further conclude that Mr. Sanchez only identified himself as an LAPD officer to avoid the consequences of his actions.

But that is not the only possible conclusion, which is what the City must prove at this stage. While "[a]n act serving only the employee's personal interest is less likely to arise from or be engendered by the employment," Lisa M., 12 Cal. 4th at 298, an "abuse of authority" motivated by personal desire "arise[s] out of the employment" when it does "not evince a complete departure from [an employee's] duties." Rizzo v. Ins. Co. of State of Penn., 969 F. Supp. 2d 1180, 1192 (C.D. Cal. 2013); see also Farmers Ins. Grp. v. County of Santa Clara, 11 Cal. 4th 992, 1004 (1995) ("[W]here the employee is combining his own business with that of his employer, or attending to both at substantially the same time, no nice inquiry will be made as to which business he was actually engaged in at the time of injury, unless it clearly appears that neither directly nor indirectly could he have been serving his employer."). A jury, viewing the evidence in the light most favorable to Plaintiffs and drawing all inferences in their favor, could reasonably find that Mr. Sanchez's desire to protect his son overlapped with his duties as a peace officer. Because he acted, at least in part, as a police officer, his actions were not "purely" motivated by self-interest. Rizzo, 969 F. Supp. 2d at 1192. Accordingly, the Court concludes that there was substantial evidence for the jury to reasonably conclude that Mr. Sanchez acted within the scope of employment for LAPD.

The City's arguments for a contrary conclusion—many of which the Court considered and dismissed in the summary judgment order ("MSJ Order," Dkt. No. 92)—are unavailing. The City first contends that Mr. Sanchez's conduct was not a foreseeable risk as a matter of law because Mr. Sanchez committed an "off-duty battery." (Rule 50b Mot. at 9.) California courts, however, have rejected drawing a hard line between on-duty and off-duty actions to determine employer liability.[3] A police officer's "off-duty" status does not "insulate" an employer "from

---

[3] This aversion reflects the "'deeply rooted sentiment' that it would be unjust for an enterprise to disclaim responsibility for injuries occurring in the course of its characteristic activities." Perez, 2022 WL 611530, at *3 (quoting Mary M., 54 Cal. 3d at 208).

potential liability for the torts of these officers." Inouye v. County of Los Angeles, 30 Cal. App. 4th 278, 281 (Cal. Ct. App. 1994). Instead, the City can be held vicariously liable for "injuries caused after work hours," as long as the action was "engendered by events or conditions relating to the employment." Farmers Ins. Grp., 11 Cal. 4th at 1006. There is no presumption against vicarious liability solely because an officer is off-duty.[4] Moreover, as discussed above, the evidence supports a conclusion that Mr. Sanchez's off-duty actions occurred within the scope of his or her employment.

The City next claims that the act of "declaring one's self to be a police officer and then summarily opening fire on people in a crowded store" is utterly divorced from "the business of law enforcement." (Rule 50b Mot. at 9.) Yet courts have imposed vicarious liability under similar facts. In Reason v. City of Richmond, 2021 WL 2268892, at *1, 5 (E.D. Cal. June 3, 2021), the court found that off-duty police sergeant acted within the scope of his employment when—following a confrontation over a parking spot at "a busy gas station" in a different city from his employer—he "identified himself as a police officer and opened fire into the back of [the decedent's] body." In Bradley v. County of San Joaquin, 2018 WL 4026996, at *1, 6 (E.D. Cal. Aug. 23, 2018), a court found that an off-duty deputy sheriff, who was engaged in an illicit transaction in a parking lot, acted within the scope of his employment when he "declared his status as law enforcement" then open fired on individuals in the parking area. Reason and Bradley suggest that erratic shootings by off-duty police officers are "not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." Rizzo, 969 F. Supp. 2d at 1191 (quoting Lisa M., 12 Cal. 4th at 302).[5]

The City finally argues that Mr. Sanchez's actions after he shot the French family are irrelevant to the inquiry. (Rule 50b Mot. Reply at 3.) The City offers no authority in support of this assertion.[6] Even if the Court assumed this position to be true, however, the evidence discussed above substantially supports a jury finding that Mr. Sanchez acted in the course and scope of his employment <u>during</u> the shooting. Therefore, this argument fails.

---

[4] As Plaintiffs note, the City's citations to cases about the "coming and going rule" are inapposite.

[5] The City further asserts that because the shooting occurred "hours away" from the City's jurisdiction, it was not a risk inherent to LAPD's enterprise. (Rule 50b Mot. at 7–8.) Reason rejected this same argument, finding there was no "binding or persuasive authority which states that police officers … outside their jurisdiction are per se unable to act within the scope of their employment." Reason, 2021 WL 2268892, at *6.

[6] Courts, at times, seem to consider may consider an officer's actions after his or her use of force in the scope of employment analysis. See Reason, 2021 WL 2268892, at *5 (noting that after officer open-fired on decedent, he "showed his badge to deter witnesses from attending to [decedent]" and "identif[ied] himself" as an officer when calling for police backup); Jasso v. County of Los Angeles, 2015 WL 13916216, at *14 (C.D. Cal. Oct. 13, 2015) (finding probative defendant's use of his "badge to allegedly deter witnesses from intervening" after he assaulted an individual).

---

In sum, the City fails to meet its burden of showing that only one reasonable conclusion exists. Because the Court concludes that substantial evidence supports the jury's verdict that Mr. Sanchez acted within the scope of his employment, judgment as a matter of law is unwarranted on Plaintiffs' vicarious liability claim.

## 2. Color of State Law under 42 U.S.C. § 1983

The City also challenges the jury's verdict finding that Mr. Sanchez acted "under color of state law during the incident" for Plaintiffs' Fourth Amendment excessive force claim under 42 U.S.C. § 1983. (Special Verdict at 3.)

To prevail on their Section 1983 claim, Plaintiffs must have shown that Mr. Sanchez acted under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988). "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." Id. at 50. However, an officer acts as a private citizen if he or she does not act under color of state law. Van Ort v. Estate of Stanewich, 92 F.3d 831, 835 (9th Cir. 1996). For off-duty officers, the Ninth Circuit has outlined "three critical requirements" to determine whether they acted under color of state law: (1) "the defendant's action must have been performed while the officer is acting, purporting, or pretending to act in the performance of his or her official duties"; (2) "the officer's pretense of acting in the performance of his duties must have had the purpose and effect of influencing the behavior of others"; and (3) "the challenged conduct must be related in some meaningful way either to the officer's governmental status or to the performance of his duties." Anderson v. Warner, 451 F.3d 1063, 1068–69 (9th Cir. 2006) (internal citations omitted).

As with its vicarious liability arguments, the City recycles many of the same authority and arguments the Court rejected in the MSJ Order. To warrant judgment as a matter of law, however, the City must show that the evidence at trial gives rise to only one reasonable jury conclusion: that Mr. Sanchez did not act under color of state law when he shot the French family. Viewing all evidence in the light most favorable to Plaintiffs, the Court finds that the City fails to meet this burden because there was substantial evidence for the jury to conclude that Mr. Sanchez acted under color of state law.

First, the jury heard testimony that tended to show that Mr. Sanchez acted or pretended to act as a peace officer. As discussed above, Paola French, who was located nearest to Mr. Sanchez, testified that she heard him say he was a police officer during the shooting. (10-20-21 RT 94:7-95:15.) It is well-established that officers who identify themselves as law enforcement act or pretend to act in the performance of their official duties. See Anderson, 451 F.3d at 1069 (plaintiff testified that he "heard [the officer] tell witnesses he was a cop"); c.f. Hyun Ju Park v. City & Cnty. of Honolulu, 952 F.3d 1136, 1140 (9th Cir. 2020) (officers "never identified themselves as officers, displayed their badges, or 'specifically associated' their actions with their law enforcement duties"); Huffman v. County of Los Angeles, 147 F.3d 1054, 1058 (9th Cir. 1998) (officer "never identified himself as a sheriff's deputy"); Van Ort v. Estate of Stanewich,

92 F.3d 831, 838 (9th Cir. 1996) (officer "conceal[ed] his identity," "did not display a badge to plaintiffs and denied being a police officer"). The City acknowledges, and this Court has already stated, that cases in which the officer "never identified himself" are readily distinguishable. (Rule 50b Mot. at 10–11 (citing Huffman, 147 F.3d at 1058); MSJ Order at 12–13.)

The City's attempt to diminish the significance of Mr. Sanchez's self-identifying statement fails. (Rule 50b Mot. at 11 (citing Cook v. Morrow, 2007 WL 3022607, at *6 (N.D. Cal. Oct. 12, 2007)).) This is not a case where the jury heard just "one comment" without additional "affirmative representations" that Mr. Sanchez was performing official duties. Cook, 2007 WL 3022607, at *6. Witnesses and officers at the scene testified that after the shooting, Mr. Sanchez again verbally identified himself as an off-duty officer and showed his LAPD identification card. (Id. 65:22-66:1, 76:6-24; 10-21-21 RT 128:7-15, 129:1-12, 142:5-10.) Accordingly, there was sufficient evidence to demonstrate the first requirement under Anderson.

Second, the record supports the conclusion that Mr. Sanchez's actions had the purpose and effect of influencing the behavior of others. Again, Mr. Sanchez identified himself as an LAPD officer on scene. While the City argues that this act could further no purpose, a jury could find that Mr. Sanchez announced himself to reassure witnesses and officers that he was not the perpetrator of a crime.[7] Moreover, witness testimony showed that his statements achieved this intended effect. One witness, Omar Barraza, testified that once Mr. Sanchez said he was an off-duty officer and "provid[ed] his ID and badge," he felt that it was not only safe to approach Mr. Sanchez, but also "necessary to believe" Mr. Sanchez's words "[b]ecause he [was] a member of law enforcement." (10-20-21 RT 66:9-15, 69:23-71:5.) Mr. Barraza further testified that he told Mr. Sanchez to "make his weapon safe and holster his weapon" as "the scene did not appear to be a danger anymore." (Id. 68:14-69:3.) A jury could infer that Mr. Barraza, who had served in the Air Force and worked for California's correctional system, could have disarmed Mr. Sanchez

_____

[7] The City makes many broad assertions of law—some of which are incorrect—yet includes few citations to the actual record. For example, the City limits its discussion of the evidence to Mr. Sanchez's identification of himself before he began to shoot, then asserts that "[i]t is unclear … how Sanchez could have intended [his comment] to influence the conduct of people whom he then summarily shot." (Rule 50b Mot. at 11.) The City misunderstands the law. In Anderson, the Court found that plaintiff's observations of the officer's actions after plaintiff "regained consciousness" and the assault had ended were significant to the color of state law analysis. Anderson, 451 F.3d at 1066, 1069. Accordingly, the Court's review of the record is not limited to Mr. Sanchez's statements before he fired his gun.

The City also argues that the only difference between a police officer who uses deadly force with a gun under peace officer authority and a private citizen who does the same is an officer's ability to detain and arrest an individual. (Rule 50b Mot. at 10; Rule 50b Mot. Reply at 4–5.) The City stretches the imagination with this incredulous claim. Perhaps the City forgets that private citizens do not ordinarily say that they are a police officer then show law enforcement identification—unless they are officers. See Anderson, 451 F.3d at 1069 (finding that "a janitor employed by the Sheriff's Office" who says, "I am a cop, stand back," is "not invoking his governmental status—for the simple reason that he is not, in fact, a 'cop'") (emphasis omitted).

**CIVIL MINUTES—GENERAL**  Initials of Deputy Clerk TC_

if necessary—but simply asked Mr. Sanchez to holster the gun because he had learned that Mr. Sanchez was a police officer. (Id. 64:1-10.) Corona Police Department Officer Steven Hungerford, who responded to the shooting, similarly testified that he did not handcuff Mr. Sanchez due, in part, to Mr. Sanchez's statement that he was an off-duty LAPD officer. (10-21-21 RT 128:7-131:8.) Taken together, a jury could reasonably infer that Mr. Sanchez identified himself with the purpose and effect of receiving this more deferential treatment.

Finally, the same evidence that supports the first two Anderson requirements sufficiently demonstrates that Mr. Sanchez's conduct meaningfully related to his governmental status or the performance of his duties. As the Court previously stated, this third requirement means that Mr. Sanchez "invoked his actual status." (MSJ Order at 13 (quoting Anderson, 451 F.3d at 1069).) The jury heard testimony that Mr. Sanchez said he was a police officer during the shooting, told Mr. Barraza and Mr. Hungerford that he was an off-duty officer, and showed his LAPD identification card to Mr. Barraza and Mr. Hungerford. (10-20-21 RT 94:7-95:15, 65:22-66:23, 128:7-16.) A jury could reasonably conclude that at each of these moments Mr. Sanchez invoked his status as a police officer.

Accordingly, the Court concludes that substantial evidence supports the jury's verdict that Mr. Sanchez acted under color of state law when he shot the French family then told witnesses and responding officers that he was an off-duty officer. "[M]isuse of power, possessed by virtue of state law and possibly only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of state law.'" Dang Vang v. Vang Xiong X. Toyed, 994 F.2d 476, 479 (9th Cir. 1991) (quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 929 (1982)).

Because the City fails to show that the evidence permits only one conclusion on either Plaintiffs' vicarious liability claim or Section 1983 claim, the Court DENIES the Rule 50b Motion for judgment as a matter of law.

## C. Defendant's Alternative Rule 59 Motion

The City alternatively moves for a new trial on the grounds that: (1) the jury instruction defining course and scope of employment for vicarious liability under California law was erroneous; (2) the failure to bifurcate trial into damages and liability phases resulted in undue prejudice to the City; (3) the special verdict form failed to specifically allocate damages for the state law claims and the Section 1983 claim; (4) the Court erroneously admitted evidence of Mr. Sanchez's subjective beliefs; (5) the Court should have submitted the City's proposed special interrogatories to the jury; and (6) the Court failed to instruct the jury to find intent under the Bane Act. (Rule 50b Mot. at 12–19.) The Court considers each argument in turn.

//
//
//
//
//

## 1. Jury Instructions for "Scope of Employment"

First, the City argues that the Court's jury instructions defining "scope of employment" for Plaintiffs' vicarious liability claims were erroneous. The City asserts that the Court should have used California Civil Jury Instructions ("CACI") No. 3721, instead of CACI No. 3720, and should have included the City's proposed instruction that the jury should not consider Mr. Sanchez's subjective beliefs. The City raised these objections before and during trial. (Dkt. No. 97 at 41; Dkt. No. 110 at 2; 10-26-21 RT 582:20-584:23.)

"Jury instructions must fairly and adequately cover the issues presented, must correctly state the law, and must not be misleading." Hung Lam v. City of San Jose, 869 F.3d 1077, 1085 (9th Cir. 2017) (quoting Hunter v. County of Sacramento, 652 F.3d 1225, 1232 (9th Cir. 2011)). The district court holds "substantial latitude in tailoring jury instructions." Mockler v. Multnomah County, 140 F.3d 808, 812 (9th Cir. 1998).

The Court rejects the City's assertion that CACI No. 3721 is the proper "scope of employment" instruction for police officers. CACI No. 3721 provides model jury instructions for determining scope of employment with respect to "Peace Officer's Misuse of Authority." (See CACI No. 3721.) However, as the Court previously noted, CACI No. 3721 applies to "on-duty" officers. (Id. § 3721(a) ("The conduct occurs while the peace officer is on duty as a peace officer…."); 10-26-21 RT 583:23-584:10.) During trial, the Court overruled the City's proposal to use CACI No. 3721 because the City failed to address whether CACI No. 3721 applied to the actions of off-duty officers, like Mr. Sanchez. Its only suggestion then was to simply delete any references to "on duty" from the instruction, including required elements. (10-26-21 RT 583:2-6.) The Court was not obligated to instruct the jury using CACI No. 3721 based on this faulty reasoning. In the instant motion, the City again fails to cite any authority for its position that CACI No. 3721 covers off-duty officers. Accordingly, the Court finds that it did not err by declining to follow CACI No. 3721.

Moreover, the Court's given instruction is an accurate statement of the law. Jury Instruction No. 21 was based on CACI No. 3720, the model instruction for "scope of employment." (See CACI No. 3720.) Relying on CACI No. 3720, as well as CACI No. 3722 ("Scope of Employment – Unauthorized Acts"), Jury Instruction No. 21 stated the following:

With respect to Paola French and Russell French's state law claims only, in order to obtain a verdict against the City of Los Angeles, they must prove that Salvador Sanchez was acting within the scope of his employment as a police officer for the City of Los Angeles when he fired the shots at Plaintiffs and Decedent.

Salvador Sanchez's acts were within the scope of his employment with the City of Los Angeles Police Department if:

(a) They are reasonably related to the kinds of tasks that Salvador Sanchez was employed to perform; or

(b) They are reasonably foreseeable in light of the Los Angeles Police Department's business or Salvador Sanchez's job as a police officer.

The liability of the City of Los Angeles extends beyond its actual or possible control of Salvador Sanchez to include risks inherent in or created by the enterprise. Salvador Sanchez need not have been engaged in an act directly benefiting the City of Los Angeles.

(Jury Instruction ¶ 21; see also CACI No. 3722.) This instruction is consistent with established California precedent. See Lisa M., 12 Cal. 4th at 298–99 (finding tort arises from employment when the risk of tortious injury is "typical of or broadly incidental" to the employer's enterprise or the tort is, "in a general way, foreseeable from the employee's duties"); Farmers Ins. Grp., 11 Cal. 4th at 1006 (noting that off-duty employees act within the scope of employment when their "tortious actions are engendered by events or conditions relating to the employment"); Carr v. Wm. C. Crowell Co., 28 Cal. 2d 652, 655–56 (1946) (holding that "[t]he employer's responsibility for the tortious conduct of his employee 'extends far beyond his actual or possible control" and involve risks of injury "inherent in the working environment").

The City argues that an instruction based on CACI No. 3720 was too "general" and failed to adequately instruct jurors on the scope of employment for off-duty officers. (Rule 50b Mot. at 13.) Yet, as just discussed, courts apply the same, foundational test reflected in CACI No. 3720 to determine whether any officer acts within the scope of his or her employment, rather than CACI No. 3721's formulation. See Farmers Ins. Grp., 11 Cal. 4th at 1007 (finding that a deputy sheriff who sexually harassed his colleagues did not act within the scope of his employment because his actions "were motivated for strictly personal reasons unrelated to" his duties as a deputy sheriff"); Mary M., 54 Cal. 3d at 214 (reiterating the same test, without alteration, to determine whether a sergeant acted within the scope of his employment); Inouye, 30 Cal. App. 4th at 281–82 (stating that "[a]n employer's liability extends to torts of an employee committed within the scope of his employment" and holding that the County of Los Angeles could be held vicariously liable for the tortious conduct of an off-duty officer). In addition, Jury Instruction No. 21 is specifically tailored to LAPD's "business" as a law enforcement agency and Mr. Sanchez's "job as a police officer." (See Jury Instruction No. 21.)

For the same reason, the City's claim that "reasonably related" and "reasonably foreseeable" are "legally erroneous and very vague" fails. (Rule 50b Mot. at 14; Rule 50b Mot. Reply at 7.) Jury Instruction No. 21 reflects the law. The City's contentions do not.[8] Further, a

---

[8] For example, the City asserts that "California courts have been clear that 'reasonably foreseeable is not the standard in determining whether an off-duty police officer was acting within the course and scope of employment," citing Bussard v. Minimed, Inc., 105 Cal. App. 4th 798, 805 (2003). (Rule 50b Mot. Reply at 7 (emphasis in original).) In fact, Bussard states that in going-and-coming cases, "case law applies a foreseeability test." Bussard, 105 Cal. App. 4th at 804. It is unclear how Bussard supports the City's seemingly incorrect statement of law.

plain reading of Jury Instruction No. 21 shows that it does not, as the City asserts, allow a finding of acting within the scope of employment solely on the basis of Mr. Sanchez's employment as a police officer. (Rule 50b Mot. at 13.)

The City finally argues that the Court erred by excluding its proposed instruction concerning Mr. Sanchez's subjective beliefs. (Rule 50b Mot. at 14.) The proposed instruction stated that "Mr. Sanchez's subjective beliefs should not be considered in determining whether he was acting within the course and scope of his employment with the City of Los Angeles" and that the jury "should consider the totality of Mr. Sanchez's actions at the time of the incident." (See Dkt. No. 110.) However, an "employee's motive is [not] irrelevant" to the scope of employment analysis. Lisa M., 12 Cal. 4th at 298. Mr. Sanchez's belief that he acted within the scope of his employment tended to show whether he acted only in his personal interest or if his conduct, "even if misguided, was intended to serve the employer in some way." Lisa M., 12 Cal. 4th at 298. Therefore, the Court's exclusion of the City's proposed instruction was proper.

Accordingly, the Court concludes that Jury Instruction No. 21 fairly and adequately instructed the jury on the scope of employment elements, correctly stated the law, and was not misleading. The Court DENIES the Rule 50b Motion for a new trial on this basis.

### 2. Bifurcation

The City next argues that the Court erred by not bifurcating liability from damages at trial. (Rule 50b Mot. at 15–16.) The City asserts that evidence of Plaintiffs' "severe and traumatic damages" and "the amount of their alleged economic losses" was unduly prejudicial and irrelevant to whether Mr. Sanchez's use of deadly force was excessive and whether the City was vicariously liable. (Id. at 15.)

As an initial matter, the City never formally moved for bifurcation before or during trial. Instead, the City submitted a one-sentence request to bifurcate—devoid of any arguments—in its proposed pretrial conference order.[9] (Dkt. No. 90-1 at 25–26.) While this request preserved the argument, the City, as the moving party, still held the "burden of proving that the bifurcation will promote judicial economy and avoid inconvenience or prejudice to the parties." Spectra-Physics

---

The City also contends without support that the jury should have found that Mr. Sanchez's actions were "meaningfully related" to "the LAPD's business of providing police services in the City of Los Angeles." (Rule 50b Mot. Reply at 7.) But there is no "meaningfully related" test for vicarious liability. Instead, this test pertains to the color of state law analysis under Section 1983. Anderson, 451 F.3d at 1069 (holding that "the challenged conduct must be related in some meaningful way either to the officer's governmental status or to the performance of his duties"). Nor did the City object at trial to Jury Instruction No. 21's definition of relevant enterprise. Even if it had, this argument fails: because the scope of employment analysis is a "question of fact," the jury, not the Court, determines the scope of the City's "business."

[9] Indeed, the Court wonders why the City failed to lodge any motions in limine of its own if it believed that Plaintiffs would present prejudicial evidence.

---

Lasers, Inc. v. Uniphase Corp., 144 F.R.D. 99, 101 (N.D. Cal. 1992). The City utterly failed to meet this burden in the pretrial conference order.

Nor has the City satisfied its burden of proving that a single trial on liability and damages was clearly erroneous. Federal Rule of Civil Procedure 42(b) ("Rule 42(b)") "confers broad discretion upon the district court to bifurcate a trial." Hangarter v. Provident Life & Acc. Ins. Co., 373 F.3d 998, 1021 (9th Cir. 2004) (quoting Zivkovic v. S. Cal. Edison Co., 302 F.3d 1080, 1088 (9th Cir. 2002)). A court may order bifurcation "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). While Rule 42(b) authorizes courts "to separate trials into liability and damage phases," Estate of Diaz v. City of Anaheim, 840 F.3d 592, 601 (9th Cir. 2016), it "does not require" bifurcation. Hangarter, 373 F.3d at 1021. Bifurcation "is the exception rather than the rule." Clark v. I.R.S., 772 F. Supp. 2d 1265, 1269 (D. Haw. 2009) (citing Hangarter, 373 F.3d at 1021).

Here, the City contends that Plaintiffs presented "inflammatory and unduly prejudicial" evidence, but fails to identify any specific item of evidence or testimony or note in the motion the objections it made during trial regarding the allegedly prejudicial evidence. (Rule 50b Mot. at 15.) The City belatedly attempts to cure this deficiency in its reply by noting that "the medical witnesses, Kevin French, and Emma [sic] French," and "[t]he admitted exhibits concerning damages" should have been considered separately. (Rule 50b Mot. Reply at 7.) But the City fails to define who the "medical witnesses" were or specify what exhibits pertained to damages.[10] Even if such a vague assertion were sufficient to warrant a new trial—which it is not—neither the law nor the full record supports the City's position.

First, evidence of "the severity of injuries" is relevant to "evaluating the amount of force used." Felarca v. Birgeneau, 891 F.3d 809, 817 (9th Cir. 2018) (citing Santos v. Gates, 287 F.3d 846, 855 (9th Cir. 2002)). Evidence of the French family's injuries was thus relevant to Plaintiffs' excessive force claim. Second, none of the testimony from any of the six medical professionals, Kevin French, or Ema French was so "inflammatory" as to cause undue prejudice. To be sure, some of the evidence presented was grim. But that reason alone is not enough to bifurcate a trial, particularly for an excessive force case. Moreover, whatever prejudicial effect their testimonies could have was limited by the City's opportunity to cross-examine the witnesses and by jury instructions on the elements for each claim. ("Jury Instructions," Dkt. No. 120.) See Benson Tower Condo. Owners Ass'n v. Victaulic Co., 105 F. Supp. 3d 1127, 1208 (D.

---

[10] At trial, seventeen witnesses testified, including four doctors and two nurses. The witnesses in medical professions testified on a variety of topics, however, including "life-care planning," which is not strictly medical. Elizabeth Holakiewicz, a registered nurse, testified that a life-care plan is "a spreadsheet that itemizes out the items of care" a patient needs, the price of such care, and the frequency that the various components of care are required over the course of a patient's projected life. (10-22-21 RT 355:18-356:9.) It is unclear whether Ms. Holakiewicz falls within the City's category of "medical witnesses." In addition, the parties admitted twenty exhibits during trial. It is the City's burden, and not that of the Court's, to articulate which exhibits matter on the City's motion.

Or. 2015) (finding no error in declining to bifurcate when defendants "fail[ed] to explain how the Court's jury instructions were insufficient to cure any potential jury confusion"). Finally, nothing in the record supports the conclusion that a separate trial to prove actual damages would have promoted judicial economy and avoided inconvenience.

The City's reliance on <u>Estate of Diaz v. City of Anaheim</u>, 840 F.3d 592 (9th Cir. 2016), is misplaced. There, the district court had granted in part a motion to bifurcate, "severing punitive damages from liability and compensatory damages." <u>Estate of Diaz</u>, 840 F.3d at 597. The court also ruled pretrial that evidence about the decedent's gang membership and drug use could be admitted for the limited purpose of damages. <u>Id.</u> at 598–600. On appeal, the Ninth Circuit held that the district court abused its discretion by admitting evidence that was beyond the scope of its pretrial ruling and irrelevant to any issue—damages or liability. <u>Id.</u> at 601. The Court noted that even "the parties and district court had repeated trouble tracking precisely why this prejudicial evidence was admissible for <u>any purpose</u>." <u>Id.</u> at 602 (emphasis added). In addition, because "gang evidence ha[d] the potential to be particularly prejudicial," the Court found that the district court should have fully bifurcated the liability and damages phases. <u>Id.</u>

Here, evidence and testimony pertaining to the French family's physical and mental damages were relevant to damages and, to a lesser extent, liability. There is no evidence that the jury confused the issues before it because it heard evidence of damages at the same time as that of liability. Nor does the City cite any authority for the proposition that, in excessive force cases, "evidence of severe and traumatic damages" is categorically unduly prejudicial.[11] (Rule 50b Mot. at 15; Rule 50b Mot. Reply at 7.) Therefore, <u>Estate of Diaz</u> is clearly distinguishable.

Accordingly, the Court DENIES the Rule 50b Motion on the basis of bifurcation.

### 3. Special Verdict Form

The City argues, as it did at trial, that the Court erred by rejecting its proposed special verdict form that separated damages for violations of federal and state law.[12] (Rule 50b Mot. at 16–17.) The special verdict form used did not require the jury to specifically allocate damages for Plaintiffs' Section 1983 claim and for the state law claims. (Special Verdict at 5–7.) The City avers that the state law claims may give rise to post-trial, indemnity claims, but the Special

---

[11] Indeed, such a position would be untenable. As Plaintiffs argue, excessive force cases resulting in death or serious injury would be unable to proceed in a single trial. (Rule 50b Mot. Opp'n at 19.)

[12] To the extent the City challenges the absence of a jury instruction that advised the jury to "separate the amount of the damages between the federal claims and the state law claims on the verdict form," the objection is untimely. (Rule 50b Mot. at 16.) The City withdrew this objection at trial and did not object to Jury Instruction Nos. 24 and 25.[12] (10-26-21 RT 585:14-587:15.) For Jury Instruction No. 25, the Court adopted the City's proposed revision to it. (10-26-21 RT 587:1-16.)

---

Verdict prevents it from discerning the exact amount at issue. (Rule 50b Mot. at 17.) Accordingly, the City seeks a new trial on damages.

The district court holds "complete discretion" over the use of a special or general verdict, including "the form of the verdict." Mangold v. Cal. Pub. Utilities Comm'n, 67 F.3d 1470, 1476 (9th Cir. 1995). The Court need only ensure that "the questions are adequate to obtain a jury determination of all the factual issues essential to judgment." Saman v. Robbins, 173 F.3d 1150, 1155 (9th Cir. 1999). That is why "it is preferable not to combine theories [of liability]" on a verdict form, Mangold, 67 F.3d at 1476, but not necessarily for damages that have become "a postverdict legal issue for the court." Duran v. Town of Cicero, 653 F.3d 632, 640 (7th Cir. 2011).[13]

Based on the above principles, the Court finds that its use of the special verdict form was not clearly erroneous. First, indemnification was not an issue before the jury, as the City had not asserted indemnification as a counterclaim or affirmative defense. ("City Answer," Dkt. No. 47; City's Proposed Pretrial Conference Order," Dkt. No. 90-1 at 16; 10-26-21 RT 570:17-24.) If the City had done so, a jury would require a special verdict form that specifically apportions damages for the state law claims and the Section 1983 claim to determine liability. See, e.g., Magnum Foods, Inc. v. Continental Cas. Co., 36 F.3d 1491, 1498–99 (10th Cir. 1994) (holding that in an insurance action "when grounds of liability are asserted" by an insured against the insurer, the insurer holds a "duty not to prejudice the insured's rights by failing to request special interrogatories or a special verdict in order to clarify coverage of damages"). However, because the City did not seek indemnification in the instant litigation, damages are no longer a liability issue, but "a postverdict legal issue for the court." Duran, 653 F.3d at 640.

Second, because "[d]amages are not assessed 'by defendant' or 'by claim' but 'for' an injury," a verdict form need not allocate damages between the separate claims when a plaintiff suffered "a single, indivisible injury" from "a continuous course of action." Archibald v. County of San Bernardino, 2018 WL 6017032, at *9 (C.D. Cal. Oct. 2, 2018) (citing Duran, 653 F.3d at 640); c.f. Thomas v. Cannon, 289 F. Supp. 3d 1182, 1199 (W.D. Wash. 2018) (denying plaintiff's Rule 50 challenge regarding a verdict form that "listed each claim brought by that Plaintiff and a line for the jury to assign damages for that claim," where the plaintiff had asserted divisible injuries arising from multiple federal and state law claims). This is because "the jury's task is to award a sum of money to compensate the plaintiff for that injury, not to enter a damages award against each defendant who is or will be liable on the judgment." Duran, 653 F.3d at 640 (emphasis in original).

//
//

---

[13] When a plaintiff seeks punitive damages, the Ninth Circuit has expressed that "a separate verdict for each claim and a separate verdict on punitive damages is strongly preferred." Cancellier v. Federated Dep't Stores, 672 F.2d 1312, 1317 (9th Cir. 1982). However, Plaintiffs did not seek punitive damages here.

CIVIL MINUTES—GENERAL                Initials of Deputy Clerk TC_

Archibald addressed the exact issue the City raises. There, parents of an individual killed by a deputy sheriff brought excessive force and denial of medical care claims under Section 1983 and battery, negligence, and Bane Act claims under state law against the deputy and county. Archibald, 2018 WL 6017032, at *1. The jury returned a verdict for the plaintiffs on all claims and awarded $7 million in pre-death pain and suffering damages for the decedent and $6.5 million and $2 million damages to the parents, respectively. Id. The defendants "complain[ed] that the Special Verdict Form for damages does not allocate damages between the state law negligence claim and the § 1983 claims, or between damages awarded" against the sheriff and the County. Id. at *9. The Archibald court disagreed, finding that "it would have made no sense to ask the jury to apportion [the] damages" because the deputy's "conduct resulting in [the decedent's] injury and death was a continuous course of action resulting in a single indivisible injury." Id. Moreover, the county's liability "was not a fact issue for the jury," as vicarious liability for the state law claims had been established and there was no Monell claim. Id. The court further noted that "asking the jury to award damages per claim and per defendant for an indivisible injury can result in reversible error because it arguably invites the jury to award multiple recoveries for a single injury." Id.

Like in Archibald and as the Court ruled at trial, Plaintiffs suffered a single, indivisible injury from Mr. Sanchez's conduct: the same facts presented to the jury supported a finding of damages under either the state law claims or Section 1983 claim. (10-27-21 RT 617:19-22.) Accordingly, the special verdict form adequately allowed the jury to determine damages on the relevant injury. Moreover, the jury found that Mr. Sanchez had acted in the course and scope of his employment, which established the City's vicarious liability for the state law claims. (Special Verdict at 3.) The Court dismissed Plaintiffs' Monell claims at summary judgment, so the City's liability was no longer a fact issue for the jury. The jury had no obligation to separately determine the City's and Mr. Sanchez's respective shares of the judgment. Indeed, a special verdict form that required specific damages allocations for the state law and Section 1983 claims carried the risk of greater jury confusion and double recovery. Accordingly, the Court concludes that the special verdict form does not warrant a new trial.

### 4. Admission of Evidence

The City next argues that the Court erred when it admitted evidence of Mr. Sanchez's subjective beliefs about his compliance with LAPD training and policies, but excluded rebuttal evidence of the City's finding that Mr. Sanchez's actions were "out of policy." (Rule 50b Mot. at 17–18.) Though the City fails to specifically identify the Court's allegedly objectionable rulings, it appears to challenge the Court's orders: (1) granting Plaintiffs' motion in limine to exclude ex post facto determinations by the Los Angeles Police Commission, the City, and LAPD that Mr. Sanchez's actions were "out of policy," which the City had opposed (MIL Order at 5); and (2) admitting testimony from Lieutenant David Smith of LAPD's Force Investigation Decision about Mr. Sanchez's statements in his employee's report, to which the City specifically objected. (10-26-21 RT 538:23-539:7.)

//

---

The "harmless error" standard governs whether a court's admission or exclusion of evidence warrants a new trial. Fed. R. Civ. P. 61. "[T]he court must disregard all errors and defects that do not affect any party's substantial rights." Id.; Haddad v. Lockheed Cal. Corp., 720 F.2d 1454, 1457 (9th Cir. 1983).

The Court initially notes that the City never sought to exclude evidence of Mr. Sanchez's belief that he acted as an off-duty officer through a motion in limine. Nor did the City object at trial to the admission of Mr. Sanchez's videotaped deposition, in which he testified to the contents of his employee report, even though it knew the jury would hear this segment. (10-22-21 RT 406:23-410:8.) Further, the City itself introduced Mr. Sanchez's employee report into evidence. In light of these actions, the Court finds the City's current objection unpersuasive.

Furthermore, the Court finds that its rulings were neither erroneous nor affected the City's substantial rights under the "harmless error" standard. First, evidence of Mr. Sanchez's subjective beliefs was relevant to the vicarious liability analysis for Plaintiffs' state law claims. As discussed above regarding the jury instructions, Mr. Sanchez's motives are relevant to whether he acted in the course and scope of his employment as a police officer. Lisa M., 12 Cal. 4th at 298. His statements in the employee report that he acted pursuant to his LAPD training and job tended to show that he did not act solely to serve his "personal interest," but "intended to serve the employer in some way." Id. The probative value of this evidence was also high given that Mr. Sanchez did not testify at trial.

Second, the admission of this evidence did not unduly prejudice the City. Because the City introduced Mr. Sanchez's employee report into evidence during its examination of Mr. Smith, Plaintiffs were entitled to cross-examine Mr. Smith about the employee report. In addition, as noted above, before the Court admitted the objected to witness testimony, the jury had watched Mr. Sanchez's videotaped deposition, in which he testified to the same statements in his employee report. It was not more prejudicial for the jury to hear the same testimony from the City's own witness than to hear Mr. Sanchez testify about the contents of the report. Moreover, even before this evidence came in, the record was replete with evidence from which a jury could determine that Mr. Sanchez had acted in the course and scope of his employment and under color of state law. As discussed at length above, the jury heard many witnesses testify that Mr. Sanchez had identified himself as an officer multiple times on the scene verbally and by showing his LAPD identification card. Given this testimonial evidence, it is unlikely that the jury afforded much weight to Mr. Sanchez's statements in his employee report.

Nor did the Court's exclusion of the "out of policy" findings make Mr. Smith's testimony more prejudicial to the City. The City chose to introduce Mr. Sanchez's employee report—knowing its contents, without seeking any exclusions or limitations, and knowing it could not rely on LAPD's "out of policy" finding to rebut the contents of the report. The City cannot now argue that its own misstep requires reversal of the MIL Order. Moreover, the Court maintains, as it did before trial, that the ex post facto determinations by LAPD and the City would have been unfairly prejudicial to Plaintiffs. As the Court explained at the motion in limine hearing, whether Mr. Sanchez acted outside of LAPD policy was an administrative standard,

whereas whether he acted under the color of state law and in the course and scope of his employment were constitutional and state law standards. A jury, however, might confuse the relevant standards at issue and give undue weight to "official" decisions and confuse the relevant standards at issue. (MIL Order at 5.) Even with the admission of evidence of Mr. Sanchez's beliefs, the undue prejudice of the LAPD findings outweigh their probative value.

Accordingly, the Court concludes that neither the admission of Mr. Sanchez's statements in his employee report nor the exclusion of LAPD's findings that he acted "out of policy" substantially affected the City's rights. Moreover, because any purported error was harmless, a new trial is not warranted on this basis.

### 5. City's Special Interrogatories

The City further argues that the Court erred when it denied the City's proposed special interrogatories. (Rule 50b Mot. at 18–19.) The Court disagrees.

Federal Rule of Civil Procedure 49(b)(1) allows a court to submit interrogatories "on one or more issues of fact" to the jury with a general verdict form. Fed. R. Civ. P. 49(b)(1). "The decision whether to submit special interrogatories to the jury is a matter committed to the discretion of the district court." Hung Lam, 869 F.3d at 1086 (internal citations and quotation marks omitted).

Here, the proposed special interrogatories included a broad range of questions, such as whether Mr. Sanchez was off-duty during the incident,[14] whether he had probable cause to believe that Plaintiffs committed a public offense, and whether he acted with malice, fraud, or corruption. (Dkt. No. 98.) Contrary to the City's assertion, these interrogatories would not have allowed the Court to determine whether as a matter of law Mr. Sanchez acted under color of law or in the scope of his employment. (Rule 50b Mot. at 18.) The questions focus on specific facts that support the City's theory of the case. However, they omit other disputed facts relevant to the inquiry. Further, the City concedes that some of the questions were directed toward post-trial indemnification issues that were not before the Court. (Rule 50b Mot. Opp'n at 22.) The City's belief that such interrogatories would assist judicial efficiency is insufficient reason to submit unnecessary and potentially confusing questions to the jury. Accordingly, the Court's decision to refuse the City's proposed special interrogatories was not a miscarriage of justice.

### 6. Bane Act

The City finally argues that the Court erred by finding that the intent element of Plaintiffs' Bane Act claim had been met. (Rule 50b Mot. at 19.) It contends that insufficient evidence supported a determination that Mr. Sanchez intended to shoot each Plaintiff and Kenneth and that the jury should have received instructions to find specific intent. (Id.)

---

[14] Whether Mr. Sanchez was off-duty during the incident was not in dispute at trial, as the Court had found it was undisputed that he was off-duty in the MSJ Order. (MSJ Order at n.4.)

Neither the record nor the law supports the City's position. After the parties' presentations, the Court found based on overwhelming evidence that Mr. Sanchez used excessive force against Plaintiffs and Kenneth. It is established law that "the elements of [an] excessive force claim under [California Civil Code] § 52.1 are the same as under § 1983." Cameron v. Craig, 713 F.3d 1012, 1022 (9th Cir. 2013). Because "[e]xcessive force … is by its very nature egregious," a finding of excessive force establishes the necessary intent to interfere with or attempt to interfere with Plaintiffs' rights under the Bane Act. Orr v. Brame, 727 F. App'x 265, 268–69 (9th Cir. 2018) (agreeing with majority of California federal district courts that had held that a plaintiff need not prove "coercion independent from the coercion inherent in the seizure or use of force" in Fourth Amendment excessive force cases). Therefore, the Court was not required to find separate intent or instruct the jury to determine intent under the Bane Act.

In sum, the Court concludes that none of the issues raised by the City support a new trial. Accordingly, the Court DENIES the Rule 50b Motion.

### III. PLAINTIFFS' MOTION FOR ATTORNEY'S FEES

Plaintiffs move for attorneys' fees as the prevailing party under 42 U.S.C. § 1988 and California law. (See Fee Mot.) The Court considers whether the requested fees are reasonable.

## A. Legal Standard

In general, courts apply the "American Rule," where "each party in a lawsuit ordinarily shall bear its own attorney's fees unless there is express statutory authorization to the contrary." Hensley v. Eckerhart, 461 U.S. 424, 429 (1983). Under 42 U.S.C. § 1988 ("Section 1988"), a court may, in its discretion, award reasonable attorneys' fees in a suit seeking to vindicate rights under 42 U.S.C. § 1983. Braunstein v. Ariz. Dep't of Transp., 683 F.3d 1177, 1187 (9th Cir. 2012); 42 U.S.C. § 1988(b). Plaintiffs who prevail on a Bane Act claim are also entitled to attorneys' fees. Chaudhry v. City of Los Angeles, 751 F.3d 1096, 1112 (9th Cir. 2014) (citing Cal. Civ. Code § 52.1(h)).

The customary method of determining the reasonableness of attorneys' fees under either 42 U.S.C. § 1988 or the Bane Act is the lodestar method. Ballen v. City of Redmond, 466 F.3d 736, 746 (9th Cir. 2006) (Section 1988); Chaudhry, 751 F.3d 1096 (Bane Act). Under this method, a court multiplies "the time spent" with the "reasonable hourly compensation of each attorney involved in the presentation of the case." Hensley, 461 U.S. at 433. This lodestar figure is "presumptively reasonable." Id. "The district court may then adjust [the lodestar] upward or downward based on a variety of factors." Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008). These factors include:

(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5)

---

the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases."

Id. Because "California law allows for a multiplier of the lodestar to compensate for the risk of contingent representation," the Ninth Circuit allows a "a plaintiff [who] succeeds on both federal and state claims" to seek "the state-law multiplier." Chaudhry, 751 F.3d at 1112 (citing Ketchum v. Moses, 24 Cal. 4th 1122, 1133 (2001), and Mangold v. Cal. Pub. Utilities Comm'n, 67 F.3d 1470, 1478–79 (9th Cir. 1995)). The fee applicant holds the "burden of showing that the claimed rate and number of hours are reasonable." Blum v. Stenson, 465 U.S. 886, 897 (1984).

## B. Lodestar Analysis

Plaintiffs' counsel requests $1,928,781.00[15] in attorneys' fees for 1,801.05 hours worked. (See Fee Mot. Reply at 11–12.) The requested fee amount includes time associated with drafting the Fee Motion Reply and represents the lodestar figure multiplied by a 1.5 enhancement, as detailed below:

| Attorney / Biller | | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Dale K. Galipo | Attorney | 547.3 | $1,100.00 | $602,030.00 |
| John Fattahi | Attorney | 37.4 | $785.00 | $29,359.00 |
| Renee V. Masongsong | Attorney | 462.8 | $600.00 | $277,680.00[16] |
| Eric Valenzuela | Attorney | 459 | $700.00 | $321,300.00 |
| Alejandro Monguia | Legal Assistant | 11.4 | $200.00 | $2,280.00 |
| Karen Slyapich | Legal Assistant | 176.9 | $200.00 | $35,380.00 |
| Santiago Laurel | Legal Assistant | 37.75 | $200.00 | $7,550.00 |
| Marielle Sider | Legal Intern | 68.5 | $150.00 | $10,275.00 |
| **SUBTOTAL** | | **1,801.05** | | **$1,285,854.00** |
| 1.5 Multiplier | | | | $642,927.00 |
| **TOTAL** | | | | **$1,928,781.00** |

The City argues that the requested fee award is unreasonable and challenges the hourly rates, number of hours, and lodestar multiplier as excessive. (See Fee Mot. Opp'n.)

---

[15] Plaintiffs' counsel requests $1,929,231.00 in the Fee Motion Reply. (Fee Mot. Reply at 11–12.) However, this amount includes errors in calculation that the Court notes below. As such, the Court construes the requested fee amount as $1,928,781.00.

[16] Plaintiffs' counsel calculates Ms. Masongsong's lodestar as $277,980.00. (Fee Mot. Reply at 12.) However, the Court's own calculation of 462.8 hours at $600 per hour yields $277,680.00.

---

### 1. Hourly Rate

Reasonable fees under Section 1988 are calculated according to the prevailing market rates in the relevant legal community. <u>Gates v. Deukmejian</u>, 987 F.2d 1392, 1405 (9th Cir. 1992). Because "the relevant community is the forum in which the district court sits," <u>Prison Legal News v. Schwarzenegger</u>, 608 F.3d 446, 454 (9th Cir. 2010), the prevailing rates in the Central District of California control here.

#### a. Dale Galipo

Plaintiffs' counsel requests an hourly rate of $1,100 per hour for Mr. Galipo. (Fee Mot. at 22.) The City does not contest this rate. (Fee Mot. Opp'n at 3.) As both parties recognize, this Court has previously found Mr. Galipo's requested rate reasonable. <u>See</u> <u>Donastorg v. City of Ontario</u>, 2021 WL 6103545, at *8 (C.D. Cal. Sept. 23, 2021). The Court finds no reason to reach a different conclusion here. Mr. Galipo's requested rate of $1,100 per hour is reasonable.

#### b. John Fattahi

Plaintiffs' counsel requests an hourly rate of $785 per hour for Mr. Fattahi. (Fee Mot. at 22.) The City argues that Mr. Fattahi's rate should be reduced either to $725 per hour, the rate awarded to him by a federal court in 2020, or $740 per hour, which the City states is the upper boundary for rates for litigation associates in the Los Angeles area. (Fee Mot. Opp'n at 2–3.)

Mr. Fattahi is a solo practitioner who has practiced for fifteen years and manages his own firm, the Law Office of John Fattahi, since 2011. (Fattahi Decl. ¶¶ 4, 6; Galipo Decl. ¶ 26.) He has litigated plaintiff's civil rights cases for thirteen years. (Fattahi Decl. ¶¶ 4–6.) In 2020, a different court in this District approved Mr. Fattahi's hourly rate of $725 per hour in another excessive force case against the City. (<u>Id.</u> ¶ 3; <u>id.</u>, Ex. 2 (attaching "Order Granting Plaintiff L.D.'s Supplemental Fee Motion" in <u>L.D., et al. v. City of Los Angeles</u>, No. 2:16-cv-04626-PSG-SK (C.D. Cal. June 30, 2020)).)

Based on Mr. Fattahi's experience, the Court finds that hourly rates for partners provide a more appropriate measure for Mr. Fattahi's compensation than rates for associates. The Court, on its own motion, takes judicial notice of the <u>2021 Real Rate Report: The Industry's Leading Analysis of Law Firm Rates, Trends, and Practices</u> ("2021 Real Rate Report"). While Plaintiffs are correct that the Real Rate Report does not address civil rights practice, this Court has found that the report provides a helpful reference point and consults it here. According to the 2021 Real Rate Report, the median rate for litigation partners in Los Angeles was $715 per hour, while the mean rate was $759 per hour. (2021 Real Rate Report at 17.) Litigation partners in the third quartile earned $1,042 per hour. (<u>Id.</u>) Mr. Fattahi's requested rate of $785 per hour is within the range of what other litigation partners earn. Moreover, this rate reflects a moderate increase from Mr. Fattahi's approved rate in 2020 to account for inflation. The Court, therefore, concludes that Mr. Fattahi's requested rate of $785 per hour is reasonable.

### c. Renee Masongsong

Plaintiffs' counsel requests an hourly rate of $600 per hour for Ms. Masongsong. (Fee Mot. at 22.) The City does not contest this rate. (Fee Mot. Opp'n at 3.) Ms. Masongsong is a senior associate attorney at the Law Offices of Dale K. Galipo, who has practiced for ten years. (Masongsong Decl. ¶¶ 5, 8.) She has worked almost exclusively on civil rights litigation for the past nine years. (Id. ¶¶ 8–11.) For the instant action, she was one of two associates who handled the day-to-day case management, and she worked on law and motion and discovery issues. (Id. ¶ 12; Valenzuela Decl. ¶ 17.) Mr. Galipo declares that Ms. Masongsong was influential in obtaining the successful verdict here. (Galipo Decl. ¶¶ 24–25.) In April 2020, another court in this district approved Ms. Masongsong's hourly rate of $550 per hour in an officer-involved, excessive force case against the City. (Masongsong Decl. ¶ 14; "Frias Fee Order," Id., Ex. 2 (attaching Juan Frias v. City of Los Angeles, et al., No. 2:16-cv-04626-PSG-SK, ECF No. 199).) Under these facts, the Court finds that Ms. Masongsong's requested rate of $600 per hour is reasonable.

### d. Eric Valenzuela

Plaintiffs' counsel requests a rate of $700 per hour for Mr. Valenzuela. (Fee Mot. at 22.) The City argues that his rate should be reduced to $600 per hour, like that of Ms. Masongsong. (Fee Mot. Opp'n at 3.) Plaintiffs' counsel responds that Mr. Valenzuela's higher rate is justified because he second chaired the trial and examined witnesses. (Fee Mot. Reply at 1.)

It is true that Mr. Valenzuela and Ms. Masongsong share similarities in practice experience. Like Ms. Masongsong, Mr. Valenzuela is a senior associate attorney at the Law Offices of Dale K. Galipo. (Valenzuela Decl. ¶ 5.) He has practiced for nine years and litigates police excessive force cases almost exclusively. (Id. ¶¶ 5–9.) In this case, he also handled the day-to-day case management with Ms. Masongsong, drafted motions, and propounded discovery. (Id. ¶¶ 16–17.) However, as Plaintiffs' counsel notes, Mr. Valenzuela conducted examinations of four witnesses at trial. (Id. ¶ 10; Galipo Decl. ¶ 22; Fee Mot. Reply at 1.) Accordingly, a higher hourly rate for Mr. Valenzuela is reasonable.

### e. Alejandro Monguia, Karen Slyapich, and Santiago Laurel

Plaintiffs' counsel requests a rate of $200 per hour for Mr. Monguia, Ms. Slyapich, and Mr. Laurel, all legal assistants. (Fee Mot. at 22.) The City does not contest this rate. (Fee Mot. Opp'n at 3.) This Court has previously approved this same rate for paralegals. See Donastorg, 2021 WL 6103545, at *9; see also Di Gioia v. Ford Motor Co., 2020 WL 1955311, at *5 (C.D. Cal. Apr. 1, 2020). Mr. Galipo attests to the significant contributions Ms. Slyapich and Mr. Monguia made in the instant case. (Galipo Decl. ¶¶ 27–29.) Accordingly, the Court finds that $200 per hour is a reasonable rate for Mr. Monguia, Ms. Slyapich, and Mr. Laurel.

//
//
//

### f. Marielle Sider

Plaintiffs' counsel requests an hourly rate of $150 per hour for Ms. Sider, a legal extern at the Law Offices of Dale K. Galipo. (Fee Mot. at 22; Sider Decl. ¶ 1.) The City argues that Ms. Sider's rate should be reduced to $125 per hour, the rate this Court approved for her last year. (Fee Mot. Opp'n at 3 (citing Donastorg, 2021 WL 6103545, at *9).)

The City correctly notes that the Court previously found that an hourly rate of $125 per hour was reasonable for Ms. Sider. Donastorg, 2021 WL 6103545, at *9. The Court based this determination on the evidence submitted to support Ms. Sider's rate as a legal intern and a 2020 case finding $125 per hour reasonable for law student interns. Id. Since then, however, Ms. Sider declares that she has been hired as a permanent employee with the title "legal extern." (Sider Decl. ¶ 3.) Moreover, a modest increase of her rate to account for inflation is appropriate. Accordingly, the Court finds that Ms. Sider's requested rate of $150 per hour is reasonable.

In sum, the Court concludes that Plaintiffs' counsel's requested rates are reasonable.

### 2. Hours Billed

Plaintiffs' counsel requests attorneys' fees for a total of 1,801.05 hours worked on this case. (Fee Mot. at 22; Fee Mot. Reply at 12.) The City argues that these hours should be reduced because they include (1) unbillable clerical tasks, (2) impermissible block billing and travel time, and (3) duplicative billing. (Fee Mot. Opp'n at 3–10.)

### a. Clerical Tasks

The City challenges certain hours billed by Mr. Galipo, Ms. Masongsong, Mr. Laurel, Ms. Slyapich, and Mr. Monguia as clerical tasks that should be excluded. (Fee Mot. Opp'n at 6–8.) This Court has previously found that "copying and scanning documents and calendaring dates" are "purely clerical tasks," whereas "prepar[ing ] a letter to opposing counsel requesting production of documents," "prepar[ing ] deposition notices," "reviewing and organizing case files and creating and updating pleading clips" are not purely clerical tasks. Smith v. County of Riverside, 2019 WL 4187381, at *8 (C.D. Cal. June 17, 2019).

The City first contends that Mr. Galipo's travel time for hearings and work on the federal complaints were unwarranted. (Fee Mot. Opp'n at 6.) The Court disagrees. The Court expects counsel for parties to appear in person unless they request a virtual appearance. Moreover, all "[r]easonable travel time by the attorney is compensable, at full rates." Rodriguez v. County of Los Angeles, 96 F. Supp. 3d 1012, 1025 (C.D. Cal. 2014). The City also offers no evidence in support of its contention that the hours billed for Mr. Galipo's review of the federal complaints were inflated simply because Plaintiffs had already filed a complaint in state court. Accordingly, changes to Mr. Galipo's hours are unnecessary on this basis.

//

The City also challenges various time entries by Ms. Masongsong, such as reviewing and organizing case files, undertaking "paralegal type" tasks, and packing boxes. (Fee Mot. Opp'n at 6–7.) However, reviewing and organizing case files are not purely clerical tasks. Moreover, as Plaintiffs argue, it was reasonable for Ms. Masongsong to directly prepare certain trial exhibits, communicate with the mortuary about expenses, coordinate witnesses and experts, and calculate medical billing because the tasks were essential to proving Plaintiffs' claims and theory of the case. (Fee Mot. Reply at 6.) By contrast, the Court agrees with the City that time spent to pack boxes after trial is not billable. (Masongsong Decl., Ex. 1 at 15 (10/27/2021).) Though Ms. Masongsong's timesheet does not state how long this task took, the Court determines that a reduction of 0.5 hours is appropriate.

The City next asserts that Mr. Laurel, Ms. Slyapich, and Mr. Monguia have multiple time entries for purely clerical tasks. The Court agrees. These tasks include: printing and copying files (Mr. Laurel), as well as downloading and saving court filings and calendaring deadlines (Ms. Slyapich and Mr. Monguia). Accordingly, the Court reduces Mr. Laurel's hours by 5.5 hours, Ms. Slyapich's hours by 5.2 hours, and Mr. Monguia's hours by 0.5 hours.

### b. Block Billed Time

The City argues that Mr. Galipo, Ms. Masongsong, Mr. Valenzuela, and Mr. Laurel have impermissibly block-billed time. (Fee Mot. Opp'n at 8.) In general, courts look unfavorably on block billing in timesheets because it "does not allow the Court to scrutinize the amount of time spent performing each task." Rahman v. FCA US LLC, -- F. Supp. 3d --, 2022 WL 1013433, at *4 (C.D. Cal. Mar. 29, 2022) (internal citations omitted). A court may "reduc[e] or eliminat[e] certain claimed hours" based on such billing practices, but it may not "deny[] all fees." Mendez v. County of San Bernardino, 540 F.3d 1109, 1129 (9th Cir. 2008), overruled on other grounds by Arizona v. ASARCO LLC, 773 F.3d 1050 (9th Cir. 2014). However, a court need not reduce hours for block-billing if it can determine the reasonableness of the hours spent on each task. See Donastorg, 2021 WL 6103545, at 13–14.

The City challenges Mr. Galipo's time entries for "trial preparation" as overbroad. (Fee Mot. Opp'n at 8.) For each of these entries, however, he explains that "[t]rial preparation includes: discussions and meetings with co-counsel and staff, meeting with and preparing witnesses, reviewing statements, investigation reports, medical records, photos, audio, video, depositions, expert reports, pleadings, pre-trial documents including jury instructions, verdict forms, exhibits, client preparation, preparation for voir dire, opening statement, direct and cross examination, [and] closing and rebuttal arguments." (Galipo Decl., Ex. 1 at 6.) Further, his trial and trial preparation time totals 206 hours over 19 days, which is reasonable. See Donastorg, 2021 WL 6103545, at *14 (finding reasonable Mr. Galipo's 224.8 hours billed for "trial and trial preparation" over 17 days). Thus, the Court will not reduce Mr. Galipo's hours on this basis.[17]

//

---

[17] The City again asserts that travel time is not recoverable, but this is incorrect.

The City also contests certain time entries by Ms. Masongsong, Mr. Valenzuela, and Mr. Laurel. (Fee Mot. Opp'n at 8.) The Court finds that Ms. Masongsong's hours billed to "other trial participation" are not vague or unreasonable. See Rodriguez, 96 F. Supp. 3d at 1025 (finding the presence of more than one attorney reasonable where "[a] second attorney may serve as a sounding board or be necessary to assure that valuable testimony … is obtained during the limited time allotted"). However, the Court agrees that some hours entered by Ms. Masongsong, Mr. Valenzuela, and Mr. Laurel are impermissibly block-billed. (Masongsong Timesheet at 7/20/20, 12/07/20, 12/09/20, and 5/17/21; Valenzuela Timesheet at 9/20/21, 10/01/21, 10/13/21; Laurel Timesheet at 10/01/21.) Accordingly, the Court reduces these block-billed hours by 10%.[18] See Banas v. Volcano Corp., 47 F. Supp. 3d 957, 968 (N.D. Cal. 2014) (recognizing "a district court's authority to reduce block-billed hours by 10% to 30%). Ms. Masongsong's hours are reduced by 0.8 hours, Mr. Valenzuela's hours are reduced by 1.2 hours, and Mr. Laurel's hours are reduced by 0.2 hours.

### c. Duplicative Billing

The City finally argues that the timesheets of Mr. Galipo, Ms. Masongsong, Mr. Valenzuela, Mr. Fattahi, and Ms. Sider reflect duplicative billing and unnecessary staffing. (Fee Mot. Opp'n at 9–10.) "Even duplicative work, however, is not a justification for cutting a fee, unless 'the lawyer does unnecessarily duplicative work." Mendez, 540 F.3d at 1129 (quoting Moreno v. City of Sacramento, 534 F.3d 1106, 1113 (9th Cir. 2008)) (emphasis in original).

The Court has reviewed the time entries identified by the City and finds that Plaintiffs' counsel sufficiently explains that such hours were not unnecessarily duplicative. (Fee Mot. Reply at 8–10.) Therefore, the Court declines to reduce any hours on this basis.

Accordingly, the Court concludes that Plaintiffs' counsel may seek fees for a total of 1,787.15 hours, as detailed below:

| Attorney / Biller | Hours Billed | Revised Hours |
|---|---|---|
| Dale K. Galipo | 547.3 | **547.3** |
| John Fattahi | 37.4 | **37.4** |
| Renee Masongsong | 462.8 | **461.5** |
| Eric Valenzuela | 459 | **457.8** |
| Alejandro Monguia | 11.4 | **10.9** |
| Karen Slyapich | 176.9 | **171.7** |
| Santiago Laurel | 37.75 | **32.05** |
| Marielle Sider | 68.5 | **68.5** |
| **TOTAL** | 1,801.05 | **1,787.15** |

---

[18] The Court rounds this figure up to the nearest tenth decimal place.

### 3. Multiplier

Based on the Court's reduced hours, Plaintiffs' counsel's lodestar is $1,281,954.00. Plaintiffs' counsel seeks a 1.5 multiplier of the lodestar to bring their total requested fee amount to $1,922,931.00. (Fee Mot. at 17–21.) Though the City argues that a multiplier is unwarranted under federal or state law, this is incorrect. (Fee Mot. Opp'n at 11–15.) As noted above, the Ninth Circuit allows a plaintiff who succeeds on both federal claims and a Bane Act claim to seek "the state-law multiplier." Chaudhry, 751 F.3d at 1112. That is the case here.

To determine whether to apply the state-law multiplier, the Court looks to: "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award." Ketchum, 24 Cal. 4th at 1132; see also Frias Fee Order at 9.

Here, the issues in this case were more simplified than in other excessive force cases. The determinative questions were whether Mr. Sanchez acted under color of state law and in the course and scope of his employment during the incident. However, the case presented its own difficulties as Mr. Sanchez was off-duty and outside of Los Angeles County at the time. (Galipo Decl. ¶ 20; Fattahi Decl. ¶ 6.) Since Mr. Sanchez did not testify at trial, Plaintiffs' counsel also had to skillfully piece together evidence from numerous witnesses, experts, and Mr. Sanchez's videotaped deposition to make their case to the jury. (Galipo Decl. ¶ 20.) Mr. Galipo and Mr. Fattahi declare that working on this case precluded other employment opportunities for their respective firms. (Id. ¶ 18; Fattahi Decl. ¶ 6.) Finally, Plaintiffs' counsel litigated the case on a contingency basis without receiving interim payments and incurred over $154,000.00 in costs. (Galipo Decl. ¶ 30; Fattahi Decl. ¶ 6.) Under these facts, the Court finds that the requested multiplier is justified. Accordingly, the Court applies a 1.5 multiplier to the lodestar calculation of $1,281,954.00 for a total award of $1,922,931.00.

In sum, the Court GRANTS IN PART the Fee Motion as follows:

| Attorney / Biller | | Revised Hours | Hourly Rate | Revised Lodestar |
|---|---|---|---|---|
| Dale K. Galipo | Attorney | 547.3 | $1,100.00 | $602,030.00 |
| John Fattahi | Attorney | 37.4 | $785.00 | $29,359.00 |
| Renee v. Masongsong | Attorney | 461.5 | $600.00 | $276,900.00 |
| Eric Valenzuela | Attorney | 457.8 | $700.00 | $320,460.00 |
| Alejandro Monguia | Legal Assistant | 10.9 | $200.00 | $2,180.00 |
| Karen Slyapich | Legal Assistant | 171.7 | $200.00 | $34,340.00 |
| Santiago Laurel | Legal Assistant | 32.05 | $200.00 | $6,410.00 |
| Marielle Sider | Legal Intern | 68.5 | $150.00 | $10,275.00 |
| **SUBTOTAL** | | 1,787.15 | | **$1,281,954.00** |
| 1.5 Multiplier | | | | $640,977 |
| **TOTAL** | | | | **$1,922,931.00** |

## IV.   CONCLUSION

For the above reasons, the Court ORDERS the following:

1.   The Court DENIES the City's Rule 50b Motion;

2.   The Court GRANTS IN PART Plaintiffs' Fee Motion and AWARDS Plaintiffs' counsel $1,922,931.00 in attorneys' fees; and

3.   The May 16, 2022 hearing is VACATED.


**IT IS SO ORDERED.**

EXHIBIT 6

# Asfall v. L.A. Unified Sch. Dist.

United States District Court for the Central District of California

October 28, 2020, Decided; October 28, 2020, Filed

Case No.: 18-cv-00505-CBM

**Reporter**

2020 U.S. Dist. LEXIS 214414 *; 2020 WL 6650783

MICHAEL ASFALL, Plaintiff, vs. LOS ANGELES UNIFIED SCHOOL DISTRICT, Defendant.

**Prior History:** Asfall v. L.A. Unified Sch. Dist., 2018 U.S. Dist. LEXIS 237233 (C.D. Cal., July 31, 2018)

## Case Summary

### Overview

HOLDINGS: [1]-The court granted the plaintiff's motion for relief from late filing of attorney's fees and costs because the record revealed the plaintiff acted based on excusable neglect and in good faith since the plaintiff diligently filed the fee motion upon learning of his error and appears to have delayed in filing the fee motion under a mistaken belief that a separate document constituting a judgment was required before the fee motion could be filed.

### Outcome

Motion for relief granted and fee motion granted.

**Counsel:** [*1] For Brian Groven, an individual, Defendant: Narmin A Shahin, Los Angeles Unified School District, Los Angeles, CA; Paul V Carelli IV, Artiano Shinoff, San Diego, CA; Venessa F Martinez, LEAD ATTORNEY, Los Angeles Unified School District, Los Angeles, CA.

For Jan Murata, an individual, Defendant: Narmin A Shahin, Los Angeles Unified School District, Los Angeles, CA; Paul V Carelli IV, Artiano Shinoff, San Diego, CA; Venessa F Martinez, LEAD ATTORNEY, Los Angeles Unified School

District, Los Angeles, CA.

For Los Angeles Unified School District, a California public entity, Defendant: David V Greco, Los Angeles Unified School District, Los Angeles, CA; Narmin A Shahin, Los Angeles Unified School District, Los Angeles, CA; Paul V Carelli IV, Artiano Shinoff, San Diego, CA; Venessa F Martinez, LEAD ATTORNEY, Los Angeles Unified School District, Los Angeles, CA.

For Michael Asfall, an individual, Plaintiff: Britt Lacey Karp, Alexander Morrison and Fehr LLP, Los Angeles, CA; J Bernard Alexander III, Alexander Morrison and Fehr LLP, Los Angeles, CA.

**Judges:** CONSUELO B. MARSHALL, UNITED STATES DISTRICT JUDGE.

**Opinion by:** CONSUELO B. MARSHALL

## Opinion

### ORDER RE: DKT. NO. 233; DKT. NO. 214

The matter before the Court is Plaintiff's [*2] Motion for Relief From Late Filing of Attorney's Fees and Costs (the "Relief Motion") (Dkt. No. 233), and Motion for Attorney's Fees and Costs (the "Fee Motion") (Dkt. No. 214). The Relief Motion is fully briefed. (*See* Dkt. No. 234 (Opp.); Dkt. No. 235 (Reply).) The Fee Motion is fully briefed. (Dkt. No. 216 (Opp.); Dkt. No. 218 (Reply).)

### I. BACKGROUND

LAUSD terminated Plaintiff from his coaching position at Harbor Teacher Preparation Academy in retaliation for complaints Plaintiff made concerning the allegedly inequitable treatment of the girls' soccer program as compared to the boys' basketball program. The case was tried to a jury. Defendant moved for judgment as a matter of law during trial, which was submitted. The jury returned a verdict finding LAUSD liable to Plaintiff for retaliation under Title IX and awarded $100,000 in damages, but not liable for retaliation under Cal. Labor Code § 1102.5. (Dkt. No. 174 (Verdict).) Judgment was entered on February 24, 2020.

After trial, Plaintiff moved for post-verdict injunctive relief, which the Court denied on February 11, 2020. (*See* Dkt. No. 191.) Over two months later, Defendant filed a motion for renewed judgment as a matter of law or, in the alternative, a **[*3]** motion for new trial, which the Court denied on May 19, 2020. (*See* Dkt. No. 198.) On June 8, 2020, Defendant filed a notice of appeal of the order denying judgment as a matter of law or a new trial.

Plaintiff filed the Fee Motion on July 14, 2020. Defendant argues in Opposition that the Fee Motion is untimely. Thereafter, Plaintiff filed the Relief Motion regarding the purported untimely filing of the Fee Motion.

## II. JURISDICTION

The Court has jurisdiction over this action under 28 U.S.C. § 1331.

## III. DISCUSSION

### A. The Fee Motion Is Untimely

When a separate document embodying the judgment is not entered but is required, then "judgment is entered in the civil docket ... [when] 150 days have run from the entry in the civil

docket." Fed. R. Civ. P. 58(c)(2)(B). The verdict was entered on the civil docket on September 25, 2019. Therefore, judgment entered by operation of law on February 24, 2020. *See Orr v. Plumb*, 884 F.3d 923, 929 (9th Cir. 2018) ("[E]ntry of the jury special verdict started the 150-day countdown...").

A motion for attorney's fees must "be filed no later than 14 days after the entry of judgment[.]" Fed. R. Civ. P. 54(d)(2)(B)(i). The 14-day period in which a motion for attorney's fees must be filed is tolled pending the outcome of post-trial motions under Fed. R. Civ. P. 50 or 59. *See Bailey v. County of Riverside*, 414 F.3d 1023, 1024 (9th Cir. 2005). "Therefore, the Rule 54(d)(2)(B) motion for **[*4]** fees is timely if filed no later than 14 days after the resolution of a Rule 50(b), Rule 52(b), or Rule 59 motion." *Id.*

Here, the time for filing the Fee Motion was tolled from February 24, 2020 to May 19, 2020, the date on which the Court denied Defendant's Rule 50 and Rule 59 motions. (*See* Dkt. No. 198.) Therefore, the Fee Motion was due on June 2, 2020, fourteen days after May 19, 2020. Plaintiff did not file the Fee Motion until July 14, 2020. (*See* Dkt. No. 214.)

Thus, the Court finds the Fee Motion is untimely.

### B. The Relief Motion

"When an act may or must be done within a specified time, the court may, for good cause, extend the time ... on a motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b). To determine whether Plaintiff acted with excusable neglect, the Court applies a factor test set out in *Pioneer Inv. Services Co. v. Brunswick Associates Ltd. Partnership*, 507 U.S. 380, 395, 113 S. Ct. 1489, 123 L. Ed. 2d 74 (1993). Factors to be considered are: (1) whether Defendant would be prejudiced by the late filing; (2) the length of the delay and impact on efficient court administration; (3) the reason for the delay, including whether it was in reasonable control of the Plaintiff; and (4)

whether Plaintiff and his counsel acted in good faith. *Id.* at 395.

## 1. Prejudice to Defendant

Defendant argues it will be prejudiced **[*5]** if Plaintiff is permitted to file his motion for attorney's fees because an untimely Fee Motion deprives Defendant "of the opportunity to evaluate the motion and fees sought before having to retain an appellate attorney and file a notice of appeal," will result in a separate appeal being filed, will result in budgeting uncertainties for the school district, has required expenditure of additional money to oppose the Relief Motion, and may affect the speed at which the appeal is resolved. (Dkt. No. 234 at p. 12:9-28.)

The Court rejects Defendant's arguments. Under Fed. R. App. 4(a)(1)(A), Defendant was required to notice an appeal by June 19, 2020, 30 days after the Court denied Defendant's Rule 50 and Rule 59 motion on May 19, 2020. *See* Fed. R. App. 4(a)(1)(A). As Plaintiff argues, if the Fee Motion was timely filed on June 2, 2020, the earliest hearing date for the Fee Motion would be June 30, 2020. *See* C.D. Cal. L.R. 6-1. Thus, Defendant would have been required to notice a separate appeal of a timely-filed motion for attorney's fees if that motion was granted. Moreover, the cost of defending the Relief Motion and Fee Motion cannot constitute prejudice.

## 2. Length of Delay

"Failure to comply with the time limit in Rule 54 is sufficient reason to deny a motion **[*6]** for fees absent some compelling showing of good cause." *In re Veritas Software Corp. Securities Litig.*, 496 F.3d 962, 972-73 (9th Cir. 2007) (citing *Kona Enterprises, Inc. v. Estate of Bishop*, 229 F.3d 877, 889-90 (9th Cir. 2000)).

Plaintiff delayed 28 days before filing the Fee Motion. Courts have found lengthier delays to be reasonable. *See Laurino v. Syringa General Hosp.*, 279 F.3d 750, 754 (9th Cir. 2002) (finding five-week delay not unreasonable); *see also In re Veritas*, 496 F.3d at 974 ("While the district court would not have abused its discretion in granting [an untimely] fee application, it did not abuse its discretion in denying it.").

Accordingly, the Court finds that the length of the delay was not unreasonable in this case.

## 3. Reason for the Delay and Good Faith

Plaintiff argues his counsel filed the Fee Motion late because they were confused about when the motion was due without a separate judgment, especially considering the long delay before Defendant filed their Rule 50 and Rule 59 motion. Plaintiff contends his counsel "acted promptly when he discovered there may be an issue" with the timeliness of his Fee Motion. In *Pincay v. Andrews*, 389 F.3d 853, 860 (9th Cir. 2004), the Ninth Circuit affirmed an order granting extension of the time to file the notice of appeal where the movant argued excusable neglect based upon a misreading of the rules of procedure. Moreover, the Ninth Circuit has recognized the separate document requirement exists to prevent confusion for post-verdict motions and appeals. **[*7]** *Casey v. Albertson's Inc.*, 362 F.3d 1254, 1258 (9th Cir. 2004) (citation omitted).

Defendant argues the rule for automatic entry of judgement is clear, and Plaintiff does not explain the basis for his belief that the federal rules of civil procedure did not apply, nor why he did not move for attorney's fees after the denial of the post-trial motions.

The Court finds Plaintiff acted based on excusable neglect and in good faith. Plaintiff diligently filed the Fee Motion upon learning of his error and appears to have delayed in filing the Fee Motion under a mistaken belief that a separate document constituting a judgment was required before the Fee Motion could be filed. A negligent mistake by counsel in reading a rule "represents the beginning

of our inquiry as to whether the negligence is excusable, not the end of it." *Pincay*, 389 F.3d at 858-59. Under the circumstances of this case, the prejudice Plaintiff will suffer if the Relief Motion is denied outweighs the prejudice to Defendant.

Therefore, the Court **GRANTS** the Relief Motion and consider the Motion for Fees.

## C. The Fee Motion

Plaintiff seeks $1,160,748 in attorney's fees, based on the total hours worked multiplied by the billing rate of the attorney, plus a lodestar multiplier of 2.0 "due to the difficult nature of this **[*8]** case and the outstanding result." (Dkt. No. 214 at p. 6:3-10.)

The Court, within its discretion, may award Plaintiff attorney's fees pursuant to 42 U.S.C. § 1988. *See also Hensley v. Eckerhart*, 461 U.S. 424, 429, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983) ("The purpose of [Section] 1988 is to ensure 'effective access to the judicial process' for persons with civil rights grievances."). "The Supreme Court has instructed that '[t]he initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate,' an approach commonly known as 'lodestar.'" *Vargas v. Howell*, 949 F.3d 1188, 1194 (9th Cir. 2020) (citation omitted). "Reasonable hourly rates 'are to be calculated according to the prevailing market rates in the relevant community.'" *Id.* (citation omitted.) In addition, the Ninth Circuit has "identified no fewer than 12 factors 'to be considered in the balancing process.'" *Id.* (quoting *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975)).[1]

---

[1] The factors from *Kerr*, 526 F.2d at 69-70, are:

(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal services properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, **[*9]** (8)

Plaintiff was the prevailing party on one of his claims and is therefore entitled to attorney's fees. *See Hensley*, 461 U.S. at 434, 436.

## 1. Billing Rate and Hours

### a. Jay Bernard Alexander, III

### i. Billing Rate

Jay Bernard Alexander, III ("Alexander") bills at a rate of $950.00 per hour. (Alexander Decl. at ¶ 28.) Alexander's billing rate reflects his thirty years of experience, specialty in employment cases, history of success in employment litigation, and designation as a "Top 100 Southern California Super Lawyer[], by Los Angeles Magazine and Law & Politics." (*See id.* at ¶¶ 3-19.) Alexander also submits declarations from experienced attorneys who practice in the civil rights and employment arenas, who attest to the experience and skill of Alexander and confirm that his billing rate is reasonable. (*See* Decl. of V. James Desimone at ¶¶ 10-11; Decl. of Lee Feldman at ¶¶ 11, 13; Decl. of Carol L. Gillam at ¶ 13.) Additionally, courts have approved Alexander's $850 **[*10]** per hour billing rate for 2018. (Alexander Decl. at Ex. 3, 4, 5.) Defendant argues that Alexander has limited experience in the civil rights area such that his hourly rate should be reduced, however the claims at issue in the trial were for retaliation under Title IX and California law arising from the termination of Plaintiff, where Alexander's employment specialty was transferrable.

Based on these submissions, the Court finds a billing rate of $950.00 per hour is reasonable for Alexander.

---

the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

## ii. Hours Billed

Alexander billed 323.1 hours during the pendency of this matter. (Alexander Decl. at ¶ 38.) Exhibit 2 to Alexander's declaration is an invoice reflecting the total hours he worked, as well as his associates. Defendant argues the attorney's fees claimed by Alexander should be reduced to the extent he claims work billed for the defamation claim, duplicative billing, inter-office correspondence, administrative tasks, and an appeal. (Dkt. No. 216-1 (Decl. of Vanessa Martinez) at Ex. A-F.)

Defamation

The Ninth Circuit holds "that, while hours spent on an unsuccessful claim 'that is distinct in all respects from [the plaintiff's] successful claim' should be excluded, '[w]here a lawsuit consists **[*11]** of related claims, a plaintiff who has won substantial relief should not have his attorney's fees reduced simply because the district court did not adopt each contention raised.'" *Ibrahim v. U.S. Dep't of Homeland Security*, 912 F.3d 1147, 1174 (9th Cir. 2019) (quoting *Hensley*, 461 U.S. at 440). To determine whether claims are related, the Ninth Circuit "do[es] not require commonality of *both* facts *and* law," but rather asks "whether the unsuccessful and successful claims arose out of the same course of conduct." *Id.* (italics in original, internal quotation marks and citations omitted).

Here, Plaintiff asserted a claim for defamation, which the Court dismissed on summary judgment. (*See* Dkt. No. 73.) Therefore, Plaintiff did not prevail on that claim. Moreover, Plaintiff's claim for defamation did not arise from the same course of conduct as his successful Title IX claim. While the Title IX claim alleged Defendant retaliated against Plaintiff for events which occurred during his employment, the defamation claim involved statements made by employees of Defendant after Plaintiff had been terminated. (*See id.* at p. 9:26-10:6.)

Therefore, the Court reduces the attorney's fee award for time spent on the defamation claim. Accordingly, the Court excludes 17.7 hours billed by Alexander for work **[*12]** related to the defamation claim.

Duplicative Billing

Courts "examine with skepticism claims that several lawyers were needed to perform a task, and should deny compensation for such needless duplication as when three lawyers appear for a hearing when one would do." *Democratic Party of Wash. State v. Reed*, 388 F.3d 1281, 1286 (9th Cir. 2004) (internal citations omitted).

Defendant identifies instances in which Alexander and others participated in the same client meetings, reviewed the same emails and documents, and prepared for and attended the same deposition and mediation. The Court finds the time billed by multiple lawyers was reasonable, except for time billed by multiple attorneys for attending the deposition of Brian Groven and the mediation. The Court awards Alexander fees for that time, but will exclude time billed by other lawyers at his firm for the same meetings.

Inter-Office Correspondence

Alexander billed 16.3 hours for services such as sending and reviewing emails, as well as discussions and meetings with lawyers and paralegals at the firm. Those activities total $15,485 at Alexander's billing rate. The Court acknowledges that interoffice communication is necessary, but an award of the total time Alexander billed for interoffice communication in this **[*13]** matter is unreasonable. Therefore, the Court reduces the award to $7,600, reflecting 8 hours for interoffice communication billed at $950 per hour.

Clerical Tasks

Page 6 of 8

"Purely clerical or secretarial tasks should not be billed" at the rate of lawyers or paralegals, "regardless of who performs them[.]" *Missouri v. Jenkins*, 491 U.S. 274, 288 n. 10, 109 S. Ct. 2463, 105 L. Ed. 2d 229 (1989).

Here, Alexander billed 0.3 hours to review his calendar. That is not legal work, and the Court reduces the fee award by 0.3 hours.

Appeal

Although the Ninth Circuit has not addressed this issue, the Eleventh Circuit has held that a district court is not permitted to award attorney's fees rendered for an appeal because the rules of the appellate court govern the award of fees on appeal. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1356-57 (11th Cir. 2009). Because the Ninth Circuit requires litigants to apply for fees through the procedures of Fed. R. App. P. 39-1.6, the Court finds Plaintiff is precluded from obtaining fees for work performed for an appeal.

Alexander billed 1.8 hours for services related to the appeal by Defendant. Accordingly, the Court reduces the billing hours of Alexander by 1.8 hours.

Therefore, the Court finds that the lodestar for Alexander's work is $280,250, reflecting 295 hours billed at a rate of $950.00 per hour.[2]

b. Tracy Fehr

Tracy Fehr ("Fehr") billed 6.3 **[*14]** hours at a billing rate of $650 per hour. (Fehr Decl. at ¶¶ 10, 16.) Fehr's billing rate reflects her fifteen years of experience, specialty in employment law, and designation as a "Southern California 'Rising Star' by Super Lawyers Magazine." (*Id.* at ¶¶ 4-5, 9.) A court approved her billing rate of $595 per hour in 2018. (*Id.*, Ex. 4.) Defendant does not argue Fehr's

billing rate is unreasonable. Therefore, the Court finds a billing rate of $650.00 per hour is reasonable for Fehr.

Fehr billed 3.8 hours for services rendered on this matter, including assisting with the motion for summary judgment and mediation. (Fehr Decl. at ¶ 15; *see also* Alexander Decl., Ex. 2.) Fehr billed 2.5 hours assisting in the pending appeal, which the Court excludes.

Accordingly, the Court finds that the lodestar for Fehr's work is $2,470, reflecting 3.8 hours billed at a rate of $650 per hour.

c. Jessica Choi

Jessica Choi ("Choi") billed 289 hours at an hourly rate of $350 per hour. (*See* Fee Motion at p. 16:1-9; *see also* Alexander Decl. at Ex. 2.) Choi has not filed a declaration in support of her motion for fees because she is no longer employed by Alexander Krakow & Glick, LLP, although the parties agree Choi **[*15]** would be a third-year associate if she continued with that firm. Plaintiff submits declarations from experienced attorneys who practice in the employment and civil rights law, who declare that a billing rate of $350 per hour is reasonable for a third-year associate. (*See* Gillam Decl. at ¶ 13; Desimone Decl. at ¶ 11; Feldman Decl. at ¶ 15.) Plaintiff submits no evidence reflecting the specialty or experience of Choi, and Choi billed significantly while she was a first-year associate, which requires additional supervision. Therefore, the Court finds a reduced billing rate of $250 per hour is reasonable.

The Court finds Choi billed 83.8 hours on work related to Plaintiff's unsuccessful defamation claim. Moreover, the Court finds Plaintiff's fees are duplicative regarding Choi's attendance at a client meeting at which Alexander was present, as well as multiple reviews of trial documents and emails. Duplicative fees total 2.2 hours. Additionally, the Court finds Choi billed 12.5 hours for inter-office correspondence and 0.2 hours for clerical tasks,

---

[2] The attorney's fee award includes Alexander's services on this case from its inception through trial, participation in discovery, and motion practice, reduced consistently with this order.

which were unreasonable.

Accordingly, the Court finds a lodestar amount of $47,575 for Choi's work is reasonable, reflecting 190.3 hours billed [*16] at a $250 per hour billing rate.

### d. Britt L. Karp

Britt L. Karp ("Karp") billed 311 hours for services rendered in this case at a billing rate of $475 per hour. (Karp Decl. at ¶¶ 7, 12.) Karp's billing rate reflects her nine years of experience in litigation, and significant experience in trials and arbitration. (*Id.* at ¶¶ 3, 5-6.) Moreover, Karp attaches declarations filed in support of a motion for fees in California Superior Court and the Central District, which evidence that her billing rate is within the range of other firms in the community. Defendant does not dispute the reasonableness of Karp's billing rate. Accordingly, the Court finds Karp's billing rate of $475 per hour is reasonable.

The Court finds Karp billed 2.1 hours on work related to Plaintiff's unsuccessful defamation claim. Moreover, the Court finds Karp billed 10.7 hours in duplicative work, including attendance at a deposition and mediation in which Alexander was present, and 0.7 hours on clerical tasks, which was unreasonable. Additionally, Karp billed 2.7 hours on work related to an appeal, which the Court excludes.

Accordingly, the Court finds a lodestar amount of $140,030 for Karp's work is reasonable, reflecting [*17] 294.8 hours of work billed at a rate of $475 per hour.

### e. Gustin Ham

Gustin Ham ("Ham") is an Office Manager at Alexander Krakow & Glick, LLP, who performs paralegal work. (Ham Decl. at ¶¶ 1, 4.) Ham bills at a rate of $210 per hour for paralegal work, and his rate of $195 per hour has been approved in three cases. (*Id.* at ¶¶ 5-6.) Plaintiff submits declarations

from experienced attorneys who practice in the employment and civil rights law, who declare that this billing rate is reasonable. (*See* Gillam Decl. at ¶ 13; Desimone Decl. at ¶ 11; Feldman Decl. at ¶ 15.) Defendant does not dispute that this is a reasonable billing rate for an experienced paralegal. Accordingly, the Court finds Ham's billing rate of $210 per hour is reasonable.

Although the billing record reflects that Ham billed 50.6 hours for attending trial, Ham declares that he billed only 24.7 paralegal hours in this matter. (Ham Decl. at ¶ 9.) Defendant argues that Ham performed non-paralegal tasks at trial, but Ham's declaration indicates he helped to "prepare all of Plaintiff's exhibits for use at trial, coordinated with witnesses and managed the audio-visual presentation of all exhibits, videotaped deposition testimony, [*18] and Plaintiff's closing argument PowerPoint." (*Id.* at ¶ 7.)

The Court finds that reasonable paralegal fees in this action are $5,187, reflecting 24.7 hours billed at a reasonable rate of $210 per hour.

### f. Natalie Khoury

Natalie Khoury ("Khoury") is a "law clerk" who billed 15.91 hours at a billing rate of $225, for a total of $3,580. Khoury has not filed a declaration explaining her billing rate, although Alexander declares he "is familiar with the rates charged for law clerks" and therefore "set a reasonable rate of $225 per hour for her." (Alexander Decl. at ¶ 29.) No other evidence supports her billing rate, nor does Plaintiff provide authority in which the services of a law clerk are recoverable on a motion for attorney's fees.

Therefore, the Court does not award fees based on the hours billed by Khoury.

* * * *

Accordingly, the Court finds $475,512 in attorney's fees is reasonable in this case.

2020 U.S. Dist. LEXIS 214414, *18

**D. The Court applies a multiplier of 1.1 in this case**

Plaintiff moves the Court to apply a multiplier of 2.0 to the fee award. "In appropriate cases, the district court may adjust the 'presumptively reasonable' lodestar figure based upon the factors listed in [*Kerr*, 526 F.2d at 69-70]." *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1158 (9th Cir 2002) (citations omitted). Courts "need **[*19]** not consider all twelve factors, but only those called into question by the case at hand and necessary to support the reasonableness of the fee award." *Kessler v. Associates Financial Services Co.*, 639 F.2d 498, 500 n.1 (9th Cir. 1981).

Here, the *Kerr* factors do not support awarding Plaintiff a multiplier of 2.0. Plaintiff argues a multiplier is justified because of the complexity of the claims and the minimal loss suffered by Plaintiff. The Court finds those factors are already encompassed by the lodestar amount awarded to Plaintiff. However, the Court recognizes that Plaintiff's counsel worked on contingency and that the Title IX retaliation claim is a novel theory on which he prevailed.

Accordingly, the Court applies a 1.1 multiplier to the attorney's fee award. The total award in attorney's fee, including a 1.1 multiplier, is $523,063.20.

**E. Plaintiff is entitled to cover costs under Fed. R. Civ. P. 54(d)**

"It is well established that attorney's fees under 42 U.S.C. § 1988 include reasonable out-of-pocket litigation expenses that would normally be charged to a fee paying client, even if the court cannot tax these expenses as 'costs' under 28 U.S.C. § 1920." *Trustees of Cost. Indus. v. Redlands Ins. Co.*, 460 F.3d 1253, 1257 (9th Cir. 2006).

Plaintiff claims costs of $664.84 for fees related to service of process; $6,495.00 for depositions, and

$400 for Clerk's Fees, totaling $7,559.84. Those items **[*20]** are taxable as costs under Local Rule 54-3, and Defendant does not dispute the costs.

Therefore, the Court awards $7,559.84 in costs.

**IV. CONCLUSION**

The Court **GRANTS** Plaintiff's Relief Motion (Dkt. No. 233) and **GRANTS** Plaintiff's Fee Motion (Dkt. No. 214.) The Court awards $523,063.20 in attorney's fees and $7,559.84 in costs to Plaintiff against Defendant.

**IT IS SO ORDERED**.

DATED: October 28, 2020.

/s/ Consuelo B. Marshall

CONSUELO B. MARSHALL

UNITED STATES DISTRICT JUDGE

_____

**End of Document**

EXHIBIT 7

# Donastorg v. City of Ont.

United States District Court for the Central District of California

September 23, 2021, Decided; September 23, 2021, Filed

EDCV 18-992 JGB (SPx)

**Reporter**
2021 U.S. Dist. LEXIS 246890 *; 2021 WL 6103545

Richard Donastorg v. City of Ontario, et al.

## Case Summary

### Overview

HOLDINGS: [1]-In a motion for attorneys' fees in an action for excessive force in violation of the Fourth Amendment and 42 U.S.C.S. § 1983, and infliction of emotional distress, 42 U.S.C.S. § 1997e(d) did not apply to preincarceration violations, even if plaintiff was a prisoner as defined by the PLRA when he filed suit because to cap attorney's fees for confined litigants would encourage them to abandon their claims, and would disproportionately affect those without bail resources; [2]-A 15% downward adjustment to the lodestar was appropriate in light of plaintiff partial success since plaintiff prevailed only as to one defendant, and did not prevail on his Fourth Amendment claims against the other eleven individual defendants, the intentional infliction of emotional distress claim against all twelve individual Defendants, or the vicarious liability claim against the city defendant.

### Outcome

Plaintiff's motion for attorneys' fees granted in part.

### Counsel: [*1] For Richard Donastorg, Plaintiff:
Dale K Galipo, LEAD ATTORNEY, Hang Dieu Le, Law Offices of Dale Galipo, Woodland Hills, CA; Sharon J Brunner, LEAD ATTORNEY, Law Offices of Sharon J Brunner, Victorville, CA; James Stephen Terrell, James S Terrell Law Offices, Victorville, CA.

For City of Ontario, Joe Estrada, Brennan

Falconieri, Flesher, Sergeant, Edward Flores, Gabriel Gutierrez, Joseph Giallo, Corey Hettinga, Joshua Hovey, William Mlodzinski, Christian Nelsen, Matthew Ross, Bryce Wilson, Defendants: Daniel S Roberts, Cole Huber LLP, Ontario, CA.

For Richard T. Copeland, Mediator (ADR Panel): Richard T Copeland, LEAD ATTORNEY, Conflict Solution Services, Pasadena, CA.

**Judges:** JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JESUS G. BERNAL

## Opinion

CIVIL MINUTES—GENERAL

**Proceedings: Order (1) GRANTING IN PART Plaintiff's Motion for Attorneys' Fees (Dkt. No. 128).**

Before the Court is Richard Donastorg's ("Plaintiff") motion for attorneys' fees. ("Motion," Dkt. No. 128.). The Court held a hearing on the Motion on September 20, 2021. Upon consideration of the papers filed in support of and in opposition to the Motion, as well as the argument of counsel, the Court GRANTS IN PART the Motion.

### I. BACKGROUND

On May [*2] 7, 2018, Plaintiff commenced an excessive use of force action against the City of Ontario ("City") and fifteen City police officers. ("Complaint," Dkt. No. 1.) The Complaint

originally asserted a total of ten claims for relief. (Id.) By stipulation of the parties, however, several of the original parties and claims were dismissed. (Dkt. Nos. 30, 36, 57.) At the time of trial, the remaining Defendants were the City and twelve officers: Joe Estrada, Brennan Falconieri, Flesher, Edward Flores, Gabriel Gutierrez, Joseph Giallo, Corey Hettinga, Joshua Hovey, William Mlodzinski, Christina Nelsen, Matthew Ross, and Bryce Wilson (collectively, "Defendants"). (See Compl.; Dkts. Nos. 30, 36, 57.) Plaintiff's two remaining claims alleged: (1) excessive force in violation of the Fourth Amendment and 42 U.S.C. § 1983, and (2) infliction of emotional distress. (See Compl.; Dkt. Nos. 30, 36, 57.)

A jury trial began on June 8, 2021 and lasted seven days. (Dkt. Nos. 98, 99, 100, 101, 105, 106, 108.) On June 17, 2021, the jury reached a verdict in favor of Plaintiff's Fourth Amendment excessive use of force claim against Defendant Joshua Hovey. ("Verdict," Dkt. No. 123.) The jury awarded Plaintiff damages totaling $500,000. (Id.) The jury made no **[*3]** finding of liability as to Defendants City of Ontario, Bryce Wilson, James Flesher, William Mlodzinski, Joseph Estrada, Gabriel Gutierrez, Joseph Giallo, Edward Flores, Christian Nelsen, Matthew Ross, Corey Hettinga, and Brenna Falconieri. (Id.) On August 5, 2021, the Court entered judgment and allowed Plaintiff to apply to the Court for an award of costs and reasonable statutory attorneys' fees as permitted by federal law. ("Judgement," Dkt. No. 127.)

On August 19, 2021, Plaintiff timely moved for an award of attorneys' fees against Defendants. (See Mot.) In support of the Motion, Plaintiff included the following documents:

• Declaration of Dale K. Galipo in Support of the Motion ("Galipo Declaration," Dkt. No. 128-1;)

• Timekeeping Record for Dale K. Galipo ("Galipo Declaration, Ex. 1," Dkt. No. 128-2);

• Biography of Dale K. Galipo for the Irving Green Memorial Lecture ("Galipo Declaration, Ex. 2," Dkt. No. 128-3);

• Order on Motion for Attorneys' Fees in Ramirez, et al. v. Oxnard Police Dep't, No. 13-1615, slip op. (C.D. Cal. Sept. 17, 2015) ("Ramirez Order," Dkt. No. 128-4);

• Order on Motion for Attorneys' Fees in Craig v. County of Orange, 2019 U.S. Dist. LEXIS 238484, 2019 WL 12379198, at *1 (C.D. Cal. Sept. 5, 2019) ("Craig Order," Dkt. No. 128-5);

• Order on Motion for Attorneys' Fees **[*4]** in Frias v. City of Los Angeles, 2020 U.S. Dist. LEXIS 129936, 2020 WL 4001620, at *1 (C.D. Cal. Apr. 23, 2020) ("Frias Order," Dkt. No. 128-6;)

• Declaration of James S. Terrell in Support of the Motion ("Terrell Declaration," Dkt. No. 128-7);

• Timekeeping Record for James S. Terrell ("Galipo Declaration, Ex. 6," Dkt. No. 128-8);

• Declaration of Sharon J. Brunner in Support of the Motion ("Brunner Declaration," Dkt. No. 128-9);

• Timekeeping Record for Sharon J. Brunner ("Galipo Declaration, Ex. 7," Dkt. No. 128-10);

• Declaration of Hang D. Le in Support of the Motion ("Le Declaration," Dkt. No. 128-11);

• Timekeeping Record for Hang D. Le ("Galipo Declaration, Ex. 8," Dkt. No. 128-12);

• Declaration of Karen Slyapich in Support of the Motion ("Slyapich Declaration," Dkt. No. 128-13);

• Timekeeping Record for Karen Slyapich ("Galipo Declaration, Ex. 9," Dkt. No. 128-14);

• Declaration of Marielle Sider in Support of the Motion ("Sider Declaration," Dkt. No. 128-15);

• Timekeeping Record for Marielle Sider ("Galipo Declaration, Ex. 10," Dkt. No. 128-16);

• Declaration of John Burton ("Burton Declaration," Dkt. No. 128-17);
• Declaration of Michael J. Haddad ("Haddad Declaration," Dkt. No. 128-18);
• Declaration of Paul Hoffman ("Hoffman Declaration," Dkt. No. 128-19); and

• Declaration of Benjamin **[*5]** Nisenbaum ("Nisenbaum Declaration," Dkt. No. 128-20).

Defendants opposed the Motion on August 30, 2021. ("Opposition," Dkt. No. 130.) In support of the Opposition, Defendants included the following documents:
• Declaration of Sean Struebing in Support of Opposition ("Struebing Declaration," Dkt. No. 131); and
• Declaration of Daniel S. Roberts in Support of Opposition ("Roberts Declaration," Dkt. No. 132.)

Plaintiff replied on September 3, 2021. ("Reply," Dkt. No. 133.)

## II. LEGAL STANDARD

### A. 42 U.S.C. § 1988

Under 42 U.S.C. § 1988, a court may, in its discretion, award reasonable attorneys' fees in a suit seeking to vindicate rights under 42 U.S.C. § 1983. Braunstein v. Ariz. Dep't of Transp., 683 F.3d 1177, 1187 (9th Cir. 2012); 42 U.S.C. § 1988(b). "In the Ninth Circuit, the customary method of determining the permissible amount of attorneys' fees under § 1988 is the 'lodestar' method." Ballen v. City of Redmond, 466 F.3d 736, 746 (9th Cir. 2006). Under the lodestar method, the district court "multiplies the number of hours the prevailing party reasonably expended on the litigation by a reasonable hourly rate." Ballen, 466 F.3d at 746 (internal quotation marks omitted); Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983). The product of this computation—the "lodestar figure"—is a presumptively reasonable" fee under 42 U.S.C. § 1988. See id. "The district court may then adjust [the lodestar] upward or downward based on a variety of factors." Moreno v. City of Sacramento, 534 F.3d 1106, 1111 (9th Cir. 2008). These factors include:

(1) the time **[*6]** and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

Ballen, 466 F.3d at 746. The moving party has the burden to produce evidence that the rates and hours worked are reasonable. See Intel Corp. v. Terabyte Int'l, 6 F.3d 614, 623 (9th Cir. 1993).

### B. Prison Litigation Reform Act

"Congress has adopted special standards and limitations on attorney's fees for prevailing plaintiffs seeking monetary damages authorized by 42 U.S.C. § 1988 when the prevailing plaintiff is a prisoner." Rodriguez v. County of Los Angeles, 96 F. Supp. 3d 1012, 1017 (C.D. Cal. 2014). "[A]ttorney's fees which are subject to the PLRA are capped at 150% of the judgment awarded to prisoner plaintiffs." Id.; see also 42 U.S.C. § 1997e(d)(2). Moreover, "[n]o award of attorney's fees [under Section 1997e(d)] shall be based on an hourly rate greater than 150 percent of the hourly **[*7]** rate established under section 3006A of Title 18 for payment of court-appointed counsel." 42 U.S.C. § 1997e(d)(3).

## III. DISCUSSION

Plaintiff requests that the Court award attorneys' fees in the amount of $997,310.00 for 1,378.5 hours worked.[1]

### A. Prevailing Party

Defendants do not contest that Plaintiff is a prevailing party. (Opp'n at 1.) A jury found in favor of Plaintiff's Fourth Amendment claims against Defendant Hovey and awarded Plaintiff $500,000 in damages. (See Verdict; Mot. at 1, 4.) The Judgment entered pursuant to the Verdict confirmed that Plaintiff was "the prevailing party." (Judgment at 2.) Because Plaintiff "receive[d] at least some relief on the merits of his claim," the Court finds that he has prevailed. Hewitt v. Helms, 482 U.S. 755, 759, 107 S. Ct. 2672, 96 L. Ed. 2d 654 (1987); see also Farrar v. Hobby, 506 U.S. 103, 109, 113 S. Ct. 566, 121 L. Ed. 2d 494 ("Under our 'generous formulation' of the term, 'plaintiffs may be considered "prevailing parties" ... if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit'" (quoting Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983)).).

### B. Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e

Defendants do not dispute Plaintiff's entitlement to attorneys' fees, but oppose the amount he seeks. Defendants argue that although Plaintiff is a prevailing party entitled to attorneys' fees under Section 1988, the Prison Litigation Reform Act

---

[1] Plaintiff's counsel initially requested $1,015,730 in attorneys' fees for 1,397.1 hours worked. (See Mot.) However, after Defendants identified errors in the number of hours billed, Plaintiff acknowledges that some of the hours billed should be stricken. (Reply at 3; Opp'n at 14-17.) Plaintiff's counsel also requests additional hours for time spent researching and drafting the Reply. (Reply at 11-12.) Based on those adjustments and the Court's own calculations, the Court construes Plaintiff's requested attorneys' fees amount as $997,310.00 for 1,378.5 hours worked.

("PLRA"), 42 U.S.C. § 1997e, applies here and [*8] limits his recovery. (Opp'n at 2.) Defendants contend that any civil rights action filed by a "prisoner," defined as one who is "confined to any jail, prison, or other correctional facility," 42 U.S.C. §§ 1997e(a), (d)(1), falls within the PLRA's scope, and Plaintiff was in custody at the time he filed his Complaint. (Id. at 2-3.) Thus, Defendants argue, even if Plaintiff's cause of action arose from preincarceration violations, his claim falls within the PLRA's scope, and he can only recover attorneys' fees as prescribed by the PRLA.

Plaintiff counters that the PLRA has no application to Plaintiff's case, because the PLRA pertains to causes of action arising from "prison conditions." (Reply at 1.) Defendants' expansive reading would contravene established law confirming that the PLRA is for prison-related actions. (Id. at 1-2.) Moreover, Plaintiff argues that broadening the PLRA's attorneys' fees provision to subsume preincarceration claims defeats the legislative intent of Section 1983 and Section 1988. (Id. at 2-3.)

The PLRA limits attorneys' fees in civil rights actions brought by incarcerated persons as follows:

> In any action brought by a prisoner who is confined to any jail, prison, or other correctional facility, in which attorney's [*9] fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that -
>> (A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988 of this title; and
>> (B) (i) the amount of the fee is proportionately related to the court ordered relief for the violation; or
>>> (ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.

42 U.S.C. § 1997e(d)(1). The parties do not dispute that Plaintiff was a "prisoner," as defined by the

PLRA, at the time he filed suit. When Plaintiff brought the action, Plaintiff was confined at the West Valley Detention Center. (Opp'n at 2.)

The Court finds that Section 1997e(d) does not apply to claims brought by incarcerated individuals for violations that occurred prior to their confinement. Because Section 1997e(d) implicates civil rights claims brought under Section 1983 and attorneys' fees brought pursuant to Section 1988, the Court must consider the PLRA in conjunction with Sections 1983 and 1988. Neither the PLRA nor the purpose and policies behind Sections 1983 and 1988 support Defendants' position.

The PLRA was created to address claims filed by prisoners regarding violations experienced in [*10] confinement. The Supreme Court held so nearly twenty years ago. In Porter v. Nussle, the Court determined that Section 1997e(a) of the PLRA, which requires incarcerated persons pursuing Section 1983 civil rights claims to exhaust administrative remedies, "applies to all inmate suits about prison life." 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002) (emphasis added). The Court specifically rejected the provision's application to "preincarceration claims." Id. at 529. According to the Court, "Congress inserted 'prison conditions' into the exhaustion provision simply to make it clear that preincarceration claims fall outside § 1997e(a), for example, ... , a § 1983 claim against [a prisoner's] arresting officer." Id. Though Porter dealt with Section 1997e(a) and not Section 1997e(d), it distinguished between preincarceration claims and claims arising from confinement. The same line must be drawn with respect to Section 1997e(d). See, e.g., Robbins v. Chronister, 402 F.3d 1047, 1053 (10th Cir. 2005) ("Robbins I"), reh'g granted, Robbins v. Chronister, 435 F.3d 1238 (10th Cir. 2006) ("Robbins II") ("Constitutional claims arising before the events causing the plaintiff's incarceration are unrelated to prison confinement" (emphasis in original).)

Defendants argue that the Court must read Section 1997e(d) independently from Section 1997e(a).

Whereas Section 1997e(a) explicitly identifies actions "with respect to prison conditions," Section 1997e(d) broadly references "any action brought by a prisoner," without the limiting [*11] language of "prison conditions." (Opp'n at 5.) Defendants contend that this evidences Congress's intent to treat Section 1997e(d) differently from Section 1997e(a), namely, to restrict attorneys' fees in all civil rights claims filed by incarcerated individuals, even for violations arising before their confinement.

The Court is not persuaded. First, Defendants unwittingly explain why such a reading is untenable: "One provision of a statute should not be interpreted in a manner that renders other sections of the same statute 'inconsistent, meaningless or superfluous.'" (Opp'n at 11-12 (quoting United States v. Fiorillo, 186 F.3d 1136, 1153 (9th Cir. 1999).) When the text of the two provisions is not identical, this "whole act rule" requires the Court to read Section 1997e(a) and Section 1997e(d) consistently and in accordance with the PLRA's purpose. Defendants assert that the correct construction of Section 1997e(d) is to not only replace the body of law restricting PLRA's scope to prison conditions with an unsupported proposition; but also to include preincarceration causes of actions that courts had explicitly kept out of the PLRA's scope. The Court rejects this wholesale reinterpretation of the PLRA. The Court's binding precedent, such as Porter, finds that Section 1997e(d) only applies to actions arising from prison life.

Application [*12] of Defendants' interpretation demonstrates why it cannot hold. Under their theory, all litigants must quickly file their lawsuits as soon as a violating event occurs and prior to any incarceration (if they are able to anticipate such an event), or after their incarceration ends (if it does end). This view would punish the act of filing a complaint while in any form of confinement, even when their confinement is incidental, unrelated to the constitutional violation, or unforeseen. Here, Defendant Holvey violated Plaintiff's Fourth

2021 U.S. Dist. LEXIS 246890, *12

Amendment rights on May 8, 2016, at a gas station parking lot, not in jail, prison, or other correctional facility. ("Summary Judgment Order," Dkt. No. 60, at 2; Judgment at 2.) Plaintiff was arrested at the encounter, and his custodial status thereafter remained out of his control. (Id.) As Defendants acknowledge, "Plaintiff was incarcerated from May 2016 when he was first booked until October 2018," when he was released because his time in jail was credited to his full sentence. (Opp'n at 2-3.) For Plaintiff to file his civil rights lawsuit prior to confinement was impossible. In Defendants' view, Plaintiff should have anticipated the exact timing of his release and then [*13] brought suit in order to avoid the PLRA's reach. This result is clearly irrational and bears no relation to Congress's intended goal of "curtail[ing] frivolous prisoners' suits." Perez, 632 F.3d at 558.

Similarly, Plaintiff contends that "[t]he fee cap application would disproportionately affect the rights of low income and indigent individuals who are forced to remain in custody pending a resolution of their criminal case simply because they cannot afford bail." (Reply at 3.) Such a consequence similarly runs counter to Section 1988, which functions "to encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel." City of Riverside v. Rivera, 477 U.S. 561, 578, 106 S. Ct. 2686, 91 L. Ed. 2d 466 (1986) (quoting Kerr v. Quinn, 692 F.2d 875, 877 (2d Cir. 1982)). To cap attorney's fees for confined litigants would encourage them to abandon their claims, and would disproportionately affect those without bail resources.

Second, there is a simple explanation for why Section 1997e(a) specifies "prisons conditions" and Section 1997e(d) does not: Not all prisoners' rights claims necessarily pertain to prison conditions. For example, prison conditions claims may allege the provision of "[in]adequate food, clothing, shelter, and medical care." Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 128 L. Ed. 2d 811

(1994). But prisoners may also allege other [*14] constitutional violations, such as infringement of their free speech rights or due process rights that they suffer while confined. Turner v. Safley, 482 U.S. 78, 84, 107 S. Ct. 2254, 96 L. Ed. 2d 64 ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."). The statute seeks to capture all civil rights violations detained litigants experience in confinement. It does not encompass violations that occur outside of that narrow context. As such, the Court disagrees with Plaintiff to the extent that Plaintiff argues the PLRA governs "prison conditions." (Reply at 1.) The PLRA governs civil rights violations that occur in jail, prison, or other correctional facility.

Defendants cite Robbins II, 435 F.3d 1238 (10th Cir. 2006), in support of Section 1997e(d)'s expansion. Robbins II, however, is non-binding and inapposite. It purports to apply a "plain language" analysis of Section 1997e(d), then, viewing the provision in isolation, holds that the PLRA caps attorneys' fees for preincarceration civil rights claims. Id. at 1244. Robbins II ignores Section 1997e(a) and relevant case law. This approach, therefore, is incompatible with the Ninth Circuit's whole act rule.

In addition, Robbins II court reaches its decision only by reversing itself. In Robbins I, the court applied additional principles of statutory interpretation [*15] under the "absurdity doctrine"[2] and found that the PLRA's legislative history specifically addresses "prison conditions litigation." 402 F.3d at 1052. Based on this evidence, the court reasoned that "[f]ailing to distinguish between pre-incarceration cases and post-incarceration cases would lead to absurd results." Id. at 1054. The Robbins I court concluded that "Congress gave no indication of any intent to impose a fee limitation

---

[2] The "absurdity doctrine" allows courts to look to a statute's purpose when "applying the plain language 'would produce an absurd and unjust result which Congress would not have intended.'" Robbins I, 402 F.3d at 1050 (internal citations omitted).

2021 U.S. Dist. LEXIS 246890, *15

on <u>pre-incarceration civil rights</u> claims brought by plaintiffs who <u>subsequently</u> become prisoners and file their action while in prison." <u>Id.</u> at 1051. Upon rehearing the matter en banc, however, the <u>Robbins II</u> court rejected the <u>Robbins I</u> court's compilation of legislative history and elected to look only at the "plain language." <u>Robbins II</u>, 435 F.3d at 1244. Citing no relevant authority, the <u>Robbins II</u> court simply concludes, "[T]here is simply nothing bizarre about treating prisoner suits alleging preincarceration civil-rights violations the same as prisoner suits alleging violations of civil rights during incarceration." <u>Id.</u> A conclusory statement and an imprecise analysis cannot support Defendants' position. Indeed, the conflicting <u>Robbins</u> decisions caution the Court against authorizing sweeping changes to the PLRA's scope.

[**16]** Significantly, <u>Robbins II</u>'s analysis fails to discuss Sections 1983 and 1988. As the Court discusses below, and as <u>Robbins I</u> recognized, interpreting Section 1997e(d) to include preincarceration claims would yield absurd and unjust results that are contrary to the important policies underlying Section 1983 and Section 1988. Accordingly, for the foregoing reasons, the Court declines to follow <u>Robbins II</u> and its interpretation of Section 1997e(d) of the PLRA.[3] While Defendants cite other authority, none are precedential, and they are either not on point or rely on <u>Robbins II</u>, which this Court rejects.

Defendants fail to discuss the impact of their position on the policy goals of Sections 1983 and 1988. Instead, Defendants argue that, because Section 1997e(d) of the PLRA limits attorney's fees to 150% of the hourly rates such established under

section 3006A of Title 18, the hourly rates for Plaintiff's counsel are actually 20% to 35% of what Plaintiff requests. (Opp'n at 3-4.) Thus, Defendants contend that Plaintiff's lodestar is $244,145.75, rather than $1,015,730—or 24% of what Plaintiff initially requested.[4] (Id. at 24-25.) Defendants assert further reductions are necessary and claim that, because the PLRA requires a portion of the Plaintiff's damages award to pay for the attorney's fees, Defendants' responsibility is minimal, and likely $0. (Id. at 24-25.) Plaintiff argues that "[t]o apply the PLRA fee cap to pre-incarceration police misconduct and excessive force cases would undercut the intended deterrent effect under sections 1983 and 1988 and create a chilling effect on important civil rights police misconduct litigation." (Reply at 3.) The Court agrees.

"The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally **[*17]** guaranteed rights and to provide relief to victims if such deterrence fails." <u>Wyatt v. Cole</u>, 504 U.S. 158, 161, 112 S. Ct. 1827, 118 L. Ed. 2d 504 (1992) (citing <u>Carey v. Piphus</u>, 435 U.S. 247, 254-57, 98 S. Ct. 1042, 55 L. Ed. 2d 252 (1978)). In fact, "Congress enacted § 1988 specifically because it found that the private market for legal services failed to provide many victims of civil rights violations with effective access to the judicial process." <u>City of Riverside</u>, 477 U.S. at 576. Reasonable attorneys' fees under Section 1988, thus, must be "sufficient to induce a capable attorney to undertake the presentation of a meritorious civil rights claim." <u>Perdue v. Kenny A. ex rel. Winn</u>, 559 U.S. 542, 552, 130 S. Ct. 1662, 176 L. Ed. 2d 494 (2010). "Congress recognized that reasonable attorney's fees under § 1988 are not conditioned upon and need not be proportionate to an award of money damages." City of Riverside, 477 U.S. at 576. Indeed, "[a] rule that limits attorney's fees in civil rights cases to a proportion of the damages awarded would seriously undermine Congress' purpose in

---

[3] The facts of <u>Robbins</u> illustrate why Defendants' position is absurd. As a result of Robbins's encounter with police officers, he was taken to the hospital "for treatment of two gunshot wounds to the chest and one to his lower left side." <u>Robbins I</u>, 402 F.3d at 1048. Three days later, he was criminally charged. Trial Br. for Def. at *1, <u>Robbins v. Chronister</u>, 2000 WL 35627450 (D. Kan. Sept. 13, 2000) (No. 97-3489). Under Defendants' view, the plaintiff should have filed his complaint sometime after he was shot, while hospitalized for gunshot wounds, and before he was detained.

[4] Plaintiff's Reply acknowledges that the Motion contained errors in the lodestar calculation. (Reply at 3.)

enacting § 1988." Id. Therefore, while Congress subsequently enacted the PLRA to limit attorneys' fees in actions brought by detained litigants, this restriction must be applied narrowly to effectuate Section 1988's purpose.

Furthermore, "Congress expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit 'does so not for himself alone but also as a "private attorney general,"' vindicating a policy that Congress considered of the highest [*18] importance.'" City of Riverside, 477 U.S. at 575. Actions for preincarceration violations serve different interests and policy goals than those that seek to remedy conditions of confinement. Blurring this distinction would increase the burdens of litigating an already difficult area of law and create needless confusion in the applicable standards.

Accordingly, the Court concludes that Section 1997e(d) of the PLRA does not apply to preincarceration violations, even if Plaintiff was a "prisoner" as defined by the PLRA when he filed suit. Accordingly, the Court proceeds to review Plaintiff's request for attorneys' fees pursuant to Section 1988.

## C. Section 1988: Lodestar Analysis

Plaintiff's counsel initially requested $1,015,730 in attorneys' fees for 1,397.1 hours worked. (See Mot.) However, after Defendants identified errors in the number of hours billed, Plaintiff acknowledges that some of the hours billed should be stricken. (Reply at 3; Opp'n at 14-17.) Plaintiff's counsel also requests additional hours for time spent researching and drafting the Reply. (Reply at 11-12.) Based on those adjustments and the Court's own calculations, the Court construes Plaintiff's requested attorneys' fees amount as $997,310 based on 1,378.5 hours worked.

Plaintiff's counsel presents the [*19] following lodestar calculation for four attorneys, one paralegal, and one legal intern:

Go to table1

Defendants contest the reasonableness of Plaintiff's attorneys' fees request based on high hourly rates, improper hours, and Plaintiff's success in the litigation. The Court first calculates a reasonable fee using the lodestar method, and then considers whether an upward or downward multiplier is appropriate.

## 1. Hourly Rate

Reasonable fees under Section 1988 are calculated according to the prevailing market rates in the relevant legal community. Gates v. Deukmejian, 987 F.2d 1392, 1405 (9th Cir. 1992). Generally, "the relevant community is the forum in which the district court sits." Prison Legal News v. Schwarzenegger, 608 F.3d 446, 454 (9th Cir. 2010). Thus, the prevailing rates in the Central District of California control.

The Court consults the 2020 Real Rate Report: The Industry's Leading Analysis of Law Firm Rates, Trends, and Practices ("Real Rate Report") as a starting point. See Relman Colfax PLLC v. Fair Housing Council, 2021 U.S. Dist. LEXIS 93147, 2021 WL 1895905, at *4-5 (C.D. Cal. Mar. 16, 2021). Because the Real Rate Report "identifies [*20] attorney rates by location, experience, firm size, areas of expertise and industry, as well as specific practice areas, and is based on actual legal billing, matter information, and paid and processed invoices from more than eighty companies," it provides "a much better reflection of true market rates than self-reported rates in all practice areas." Id.

## a. Dale Galipo

Plaintiff's counsel requests an hourly rate of $1,100 per hour for Dale Galipo. According to the 2020 Real Rate Report, partners working in commercial litigation at large firms in Los Angeles earn between $941 and $1,235. (Real Rate Report at 111.) Mr. Galipo's requested rate of $1,100 does not outpace what other litigation partners earn. See

Frias v. City of Los Angeles, 2020 U.S. Dist. LEXIS 129936, 2020 WL 4001620, at *3 (C.D. Cal. Apr. 23, 2020) (comparing Mr. Galipo's requested rate of $1,200 to the 2018 Real Rate Report). Nor does his rate appear inflated because of the contingent nature of the case, as Defendants contend. (Opp'n at 22.) Plaintiff's counsel has cited other cases in which he has been awarded attorney's fees at or around the rate he currently requests. (Galipo Decl., Exs. 4-6.)

The Court agrees with the courts that have recognized that, "[w]hen it comes to police excessive force cases in Los Angeles, Mr. Galipo **[*21]** is without question at the top of his field." Id. 2020 U.S. Dist. LEXIS 129936, [WL] at *3 (quoting Valenzuela v. City of Anaheim, et al., SACV 17-278 CJC (DFMx), Dkt. No. 435, at 34). Plaintiff's counsel submits extensive documentation of Mr. Galipo's success trying police misconduct cases all around California, including in Southern California. (Galipo Decl. ¶¶ 13-18.) Declarations submitted by experienced civil rights litigators who practice in Southern California further support Mr. Galipo's exceptional skills. (See Burton Decl.; Haddad Decl.; Hoffman Decl.; Nisenbaum Decl.) Accordingly, the Court finds that Mr. Galipo's requested rate of $1,100 per hour is reasonable.

**b. James Terrell and Sharon Brunner**

Plaintiff's counsel requests an hourly rate of $600 per hour for James Terrell and Sharon Brunner. The 2020 Real Rate Report lists the median rate for litigation partners in Los Angeles at $660 per hour. (Real Rate Report at 28.) Mr. Terrell and Ms. Brunner both manage their firms and have practiced for 27 years and 19 years, respectively. (Mot. at 15; Terrell Decl. ¶ 8; Brunner Decl. ¶ 8.) Both Mr. Terrell and Ms. Brunner litigate civil rights cases. (Terrell Decl. ¶¶ 9, 11, 19-20; Brunner Decl. ¶¶ 9, 11, 20.) They were the **[*22]** two attorneys representing Plaintiff prior to Mr. Galipo's association into the case. (Terrell Decl. ¶¶ 12, 18; Brunner Decl. ¶¶ 12, 19.) Accordingly, the

Court finds that the requested rate of $600 per hour for Mr. Terrell and Ms. Brunner is reasonable.

**c. Hang Le**

Plaintiff's counsel requests an hourly rate of $550 per hour for Hang Le, a senior associate attorney at the Law Offices of Dale K. Galipo. (Le Decl. ¶ 8.) The 2020 Real Rate Report provides that the median rate for litigation associates in Los Angeles is $535, with rates of $740 in the upper quartile. (Real Rate Report at 28.) Ms. Le has practiced for eight years. (Mot. at 15.) She has "worked almost exclusively on 42 U.S.C. § 1983 civil rights cases involving police excessive force," including on various civil rights cases resulting in multi-million-dollar verdicts and settlements. (Le Decl. ¶¶ 8, 10.) Accordingly, the Court finds that Ms. Le's requested rate of $550 per hour is reasonable.

**d. Karen Slyapich**

Plaintiff's counsel requests an hourly rate of $200 per hour for Karen Slyapich, a litigation assistant at the Law Offices of Dale K. Galipo. (Slyapich Decl. ¶ 1.) The 2020 Real Rate Report shows that paralegals typically earn between **[*23]** $175 and $311. See Relman Colfax PLLC, 2021 U.S. Dist. LEXIS 93147, 2021 WL 1895905, at *5 (citing the Real Rate Report at 11). Ms. Slyapich has worked in the legal field for approximately 28 years and with the Law Offices of Dale K. Galipo for 5 years. (Slyapich, Decl. ¶¶ 2-3.) This Court has previously found that $200 per hour is a reasonable rate for paralegals. See, e.g., Di Gioia v. Ford Motor Co., 2020 U.S. Dist. LEXIS 73975, 2020 WL 1955311, at *5 (C.D. Cal. Apr. 1, 2020). Accordingly, the Court finds that Ms. Slyapich's requested rate of $200 per hour is reasonable.

**e. Marielle Sider**

Plaintiff's counsel requests an hourly rate of $150 per hour for Marielle Sider, a legal intern with the

Case 2:85-cv-04544-DMG-AGR   Document 1281-3   Filed 08/27/22   Page 143 of 182   Page ID
#:47371

Page 10 of 16
2021 U.S. Dist. LEXIS 246890, *23

Law Offices of Dale K. Galipo. (Sider Decl. ¶ 1.) Ms. Sider is a rising third-year law student at Pepperdine University School of Law. (Id. ¶ 2.) She has served as a law clerk with the Public Defenders Office of Los Angeles and worked as a legal assistant for one year. (Id.) Plaintiff's counsel presents only Ms. Sider's declaration and timesheet as evidence of her credentials. Mr. Galipo's declaration attests to the work and experience of Ms. Le and Ms. Slyapich, but not of Ms. Sider. Accordingly, the Court reduces Ms. Sider's hourly rate to $125 per hour. See Greenpeace, Inc. v. Stewart, 2020 U.S. App. LEXIS 15577, 2020 WL 2465321, at *7-9 (9th Cir. May 12, 2020) (finding the rate of $125 per hour reasonable for law student interns).

In sum, the Court concludes that the [*24] hourly rates of $1,100 for Mr. Galipo, $600 for Mr. Terrell and Ms. Brunner, $550 for Ms. Le, $200 for Ms. Slyapich, and $125 for Ms. Sider are reasonable.

## 2. Hours Billed

Plaintiff's counsel requests attorneys' fees for a total of 1,378.5 hours worked on this case:

⊞ Go to table2

Defendants argues for a reduction of the total hours Plaintiff's counsel report based on: (a) Mr. Galipo's association into the case, (b) block billing, (c) duplicative time, and (d) administrative time. Moreover, Defendants requests that the Court apply a downward adjustment to the requested lodestar amount, because Plaintiff prevailed against only one of the Defendants.

Plaintiff's counsel also requests to include time spent working on the Motion and Reply.

## a. Work Performed Prior to the Law Offices of Dale K. Galipo's Association into the Case

Defendants assert that Plaintiff's counsel cannot seek fees for the 16.2 hours of work conducted by

Mr. Galipo and Ms. Le before Mr. Galipo appeared as counsel of record for Plaintiff. (Opp'n at 15, 19.) Plaintiff's counsel responds that Plaintiff [*25] retained Mr. Galipo's firm prior to March 2020 "to perform certain work and consultations in the case." (Reply at 5.)

Plaintiff notified the Court that Mr. Galipo had associated into the case on March 11, 2020. (Dkt. No. 61.) Plaintiff reports 11.5 hours between August 28, 2019 and January 6, 2020 as time worked on the case. (Galipo Decl., Ex. 1 at 1.) Neither Mr. Terrell's nor Ms. Brunner's declarations or timesheets confirm when Plaintiff retained Mr. Galipo's firm. The Court notes, however, that Mr. Galipo's time entry for August 30, 2019 is recorded as "[r]eview 2-200 Agreement for co-counsel and client." (Galipo Decl., Ex. 1 at 1.) Moreover, Mr. Galipo's time entries reflect access to privileged materials and conversations:

- October 21, 2019: "Receive copy of the expert report by Ernest Burwell. Review Same."
- November 4, 2019: "Review defendants' Rule 26 expert reports. Meet with Hang Le to discuss."
- December 17, 2019: "Telephone call with Sharon Brunner re case."
- January 6, 2020: "Review mediation brief and discuss same with Hang Le and Sharon Brunner."

(Id.) Similarly, Ms. Le reports 4.7 hours worked between October 9, 2019 and February 7, 2020 that reflect those same entries. In [*26] addition, Ms. Le reports time for "[r]eviewing and provid[ing] input on Plaintiff's opposition to Defendants' MSJ" on February 7, 2020. Accordingly, the Court finds the 16.2 hours reported prior to the association of Mr. Galipo's firm into the case are reasonable.

## b. Block Billing

Defendants argue that a further reduction of Plaintiff's counsel's hours are appropriate, as they have been block-billed. (Opp'n at 15.) "Courts

generally frown on block billing where discrete and unrelated tasks are lumped into one entry, as the practice can make it impossible ... to determine the reasonableness of the hours spent on each task." Navarro v. Gen. Nutrition Corp., 2004 U.S. Dist. LEXIS 24258, 2004 WL 2648373, at *9 (N.D. Cal. Nov. 19, 2004).

From May 30, 2021 to June 15, 2021, Plaintiff's counsel, Mr. Galipo, recorded his time as "trial preparation" or "trial and trial preparation" without specifying what tasks were completed. A footnote accompanies these labels to explain that "[t]rial preparation includes: discussions and meetings with co-counsel and staff, meeting with and preparing witnesses, reviewing statements, investigation reports, medical records, photos, audio, video, depositions, expert reports, pre-trial documents including jury instructions, verdict form, exhibits, client preparation, preparation [*27] for voir dire, opening statement, direct and cross examination, opening, closing and rebuttal arguments." (Galipo Decl., Ex. 1 at 5.) The Court acknowledges that two other courts in this district have admonished Plaintiff's counsel expressly for this method of block-billing and reduced Plaintiff's counsel's hours as a result. See Frias v. City of Los Angeles, 2020 U.S. Dist. LEXIS 129936, 2020 WL 4001620, at *5 (Apr. 23, 2020); Craig v. County of Orange, SACV 17-00491-CJC (KESx), Dkt. No. 231, at *8-9 (C.D. Cal. Sept. 5, 2019). In those cases, however, counsel billed 300 to nearly 400 hours as "trial preparation." Those courts found that 247.2 hours and 351.4 hours, respectively, were reasonable for trial preparation. Here, Plaintiff's counsel's "trial preparation" and "trial and trial preparation" hours" total 224.8 hours over 17 days. Because this amount of time is reasonable, the Court does not reduce for block-billing. However, the Court warns Plaintiff's counsel to change his practice of block-billing.

### c. Duplicative Time

Defendants request deductions from Mr. Terrell,

Ms. Brunner, and Ms. Le's hours because Plaintiff's counsel improperly seeks compensation for duplicative hours. "[D]etermining whether work is unnecessarily duplicative is no easy task." Moreno, 534 F.3d at 1112. For example, in cases drawn out over many years, [*28] "a lot of legal work product will grow stale; a competent lawyer won't rely entirely on last year's, or even last month's, research[.]" Id. Moreover, courts are discouraged from second-guessing staffing decisions. Id. at 1114-15. Thus, this Court will only deduct unnecessarily duplicative work from a fee award. Id. at 1112.

First, Defendants argue that Mr. Terrell's and Ms. Brunner's hours billed to the trial should be reduced because Mr. Galipo tried the case, and Mr. Terrell and Ms. Brunner did not substantially participate. (Opp'n at 16-17.) Plaintiff's counsel replies that this was a complex case, involving twelve defendant officers and expert witnesses. (Reply at 5.) Thus, it is reasonable to have three attorneys at trial, including to "serve as a sounding board or be necessary to assure that valuable testimony is obtained during the limited time allotted for depositions and trial." (Id. (citing Rodriguez v. Cnty. of Los Angeles, 96 F. Supp. 3d 1012, 1025 (C.D. Cal. 2014)). The Court agrees with Plaintiff's counsel. As other courts recognize, "[e]mploying multiple attorneys or firms is per se not unreasonable," and "[m]ultiple attorneys may be essential for planning strategy, eliciting testimony or evaluating facts or law," including at trial. PSM Holding Corp. v. Nat'l Farm Fin. Corp., 743 F. Supp. 2d 1136, 1157 (C.D. Cal. 2010). Accordingly, the Court will not [*29] reduce Plaintiff's counsel's hours for staffing three attorneys at trial.

Second, Defendants contend that Mr. Terrell and Ms. Brunner's hours are duplicative, because they both billed time for propounding discovery requests, some of which were never served on Defendants. (Opp'n at 17.) As Defendants acknowledge, however, the time entries for Mr. Terrell and Ms. Brunner denote separate discovery

requests. Plaintiff's failure to serve those requests does not make them duplicative. Accordingly, the Court finds that Plaintiff's counsel's hours for drafting discovery requests are reasonable.

Third, Defendants contend that time Ms. Le spent reviewing case files and documents duplicates work that Mr. Terrell and Ms. Brunner conducted. (Opp'n at 18-19.) In Defendants' view, time spent to "get up to speed" is unnecessarily duplicative. (Id. at 18.) The Court disagrees. As Plaintiff notes, the Ninth Circuit has found that when "[a] lawyer [ ] needs to get up to speed with the research performed," it "is duplication, of course, but it's necessary duplication" and "inherent in the process of litigating over time." Moreno, 534 F.3d at 1112. This Court has previously found that "[i]t is a dangerous proposition that only [*30] one attorney may properly spend time reviewing a case record, as no reasonable attorney could provide meaningful or ethical litigation support without being familiar with the critical documents." Harlow v. Metro. Life Ins. Co., 379 F. Supp. 3d 1046, 1057 (C.D. Cal. 2019). Thus, it is reasonable—indeed, responsible—that Ms. Le reviewed the record to familiarize herself. There is no reason why Ms. Le "should perform this necessary work for free." Moreno, 534 F.3d at 1112. Thus, the Court finds that Ms. Le's hours for reviewing the case files are reasonable.

### d. Purely Clerical Time

Defendants contend that Ms. Slyapich's time includes clerical tasks that must be excluded from the total hours billed. In support, Defendants cite Nadarajah v. Holder, which states, "When clerical tasks are billed at hourly rates, the court should reduce the hours requested to account for the billing errors." 569 F.3d 906, 921 (9th Cir. 2009). Plaintiff responds that only "purely clerical tasks" cannot be billed for attorneys' fees. See Missouri v. Jenkins by Agyei, 491 U.S. 274, 288 n.10, 109 S. Ct. 2463, 105 L. Ed. 2d 229 (1989) ("[P]urely clerical or secretarial tasks should not be billed at a paralegal

rate, ...."). The Court agrees that the standard, including as articulated under Nadarajah, is to exclude purely clerical tasks.

This Court has previously found that "copying and scanning documents and calendaring dates" are "purely [*31] clerical tasks," whereas "prepar[ing ] a letter to opposing counsel requesting production of documents," "prepar[ing ] deposition notices," "reviewing and organizing case files and creating and updating pleading clips" are not purely clerical tasks. Smith v. County of Riverside, 2019 U.S. Dist. LEXIS 170421, 2019 WL 4187381, at *8 (C.D. Cal. June 17, 2019). The Court reduces Ms. Sidler's hours for any time billed as calendaring, which totals 0.5 hours. In addition, the Court finds that time billed for confirming schedules of witnesses and making hotel accommodations are also purely clerical, and the Court reduces Ms. Sidler's hours by 0.7 hours. Other hours that Defendants contest were not spent on clerical tasks. Accordingly, the Court finds that Ms. Sidler reasonably incurred 38 hours of work on this case.

### e. Time Spent on the Motion

Plaintiff's counsel requests, and Defendants do not seem to oppose, attorneys' fees for work performed on the instant Motion and Reply. (Mot. at 14; Reply at 11-12.) Time spent establishing an entitlement to fees under 42 U.S.C. § 1988 is compensable. See Clark v. City of Los Angeles, 803 F.2d 987, 992 (9th Cir. 1986). Accordingly, the Court finds that the 0.4 hours Plaintiff's counsel worked on the Motion and 11.2 hours worked on the Reply are reasonable.

Based on the adjustments discussed above, the Court finds that Plaintiff's counsel [*32] reasonably billed 1,377.3 hours. Accordingly, the Court concludes that $993,757.50 is a reasonable lodestar amount.

⊞ Go to table3

### 3. Costs

Plaintiff does not request costs, so they are not at issue here.

## 4. Adjustments

Defendant argues that a downward adjustment of the lodestar figure is appropriate because Plaintiff only prevailed against Defendant Hovey, and not against the other eleven individual Defendants and one municipal Defendant. (Opp'n at 21.) Moreover, Defendants contend that Plaintiff spent a substantial time at trial trying to prove claims against other individual Defendants. (Id.) Accordingly, Defendants request a 50% reduction of the fee award. (Id. at 22.) Plaintiff replies that a downward adjustment is not reasonable, because the time spent on the other named defendant officers directly relates to Plaintiff's success at trial. (Reply at 7-8.) "[T]he work performed to obtain deposition and trial testimony from the [*33] other defendant officers would have been done regardless," as the officers are "important witnesses to the incident." (Id. at 8.) Further, Plaintiff asserts that the damages award is five times the Defendants' last and highest settlement offer and, thus, a great result. (Galipo Decl. ¶ 29.) Plaintiff also argues that, by prevailing against even one Defendant, Plaintiff's counsel achieved exceptional results. (Mot. at 12.) In addition, because during its deliberations the jury asked whether answers on the special verdict form required unanimity, Plaintiff argues that "there is a strong possibility that the jury's finding of no liability for the individual defendants, except Joshua Hovey, was not unanimous." (Reply at 8.)

"When a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." Hensley, 461 U.S. at 436. In the Ninth Circuit, courts evaluate the reasonableness of the fee award in light of the results obtained "by answering two questions: 'First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the

plaintiff achieve [*34] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?'" McCown v. City of Fontana, 565 F.3d 1097, 1103 (9th Cir. 2009). However, "[t]here is no precise rule or formula for making these determinations." Hensley, 461 U.S. at 436. The Court has "considerable discretion" to "determine whether the prevailing plaintiff achieved excellent results," but this discretion "must be accompanied by a clear explanation that the district court has considered the relationship between the amount of fees awarded and the results obtained." Navarro, 2004 U.S. Dist. LEXIS 24258, 2004 WL 2648373, at *13.

First, the Court considers whether Plaintiff failed to prevail on claims that were unrelated to the claims on which he succeeded. "[I]n a lawsuit where the plaintiff presents different claims for relief that 'involve a common core of facts' or are based on 'related legal theories,' the district court should not attempt to divide the request for attorney's fees on a claim-by-claim basis." McCown, 565 F.3d at 1103. "Instead, the court must proceed to the second part of the analysis and 'focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.'" Id. (quoting Hensley, 461 U.S. at 435). All of Plaintiff's claims arise from a common core of facts, namely, his arrest on May [*35] 8, 2016. The Court accepts Plaintiff's position that Plaintiff likely would have deposed and examined the other individual Defendants at trial as witnesses, if not as defendants. Accordingly, the Court finds that Plaintiff's claims are all related for the purpose of determining attorneys' fees.

Next, the Court considers whether Plaintiff achieved a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award. Courts recognize that "success in a lawsuit is not always measured by the formal relief obtained." Clark, 803 F.2d at 990 (citing Maher v. Gagne, 448 U.S. 122, 129, 100 S. Ct. 2570, 65 L. Ed. 2d 653 (1980)); see also City of Riverside, 477 U.S. at 575 ("Because damages

awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief."). The Court must "consider not only the monetary results but also the significant nonmonetary results [Plaintiff] achieved for himself and other members of society." Morales v. City of San Rafael, 96 F.3d 359, 365 (9th Cir. 1996).

Plaintiff prevailed on his Fourth Amendment claim against Defendant Hovey and was awarded $500,000 in damages. The Court acknowledges that Plaintiff obtained success and agrees that it is challenging to prevail at all in civil rights [*36] claims against police officers. Moreover, as Plaintiff notes, the case has difficult facts, including Plaintiff's methamphetamine use (Mot. at 12), which present greater hurdles to prevailing. Importantly, the Court cannot discount that the "jury's verdict validates [plaintiff's] belief that [Defendant Holvey's] conduct was unconstitutional." Sanchez v. County of San Bernardino, 2014 U.S. Dist. LEXIS 199466, 2014 WL 12734756, at *19 (C.D. Cal. Mar. 10, 2014).

However, the Court cannot agree the results were excellent. Because Plaintiff prevailed only as to one Defendant, and did not prevail on his Fourth Amendment claims against the other eleven individual Defendants, the intentional infliction of emotional distress claim against all twelve individual Defendants, or the vicarious liability claim against the City of Ontario Defendant, the Court concludes that Plaintiff achieved partial success. Factors that would compel the Court to find otherwise do not exist here. See, e.g., Ramirez, et al. v. Oxnard Police Dep't, No. 13-16165, 2015 U.S. Dist. LEXIS 200620, slip op. at *11-13 (C.D. Cal. Sept. 17, 2015) (Dkt. No. 219) (deeming an almost $3 million award and jury verdict on half of the plaintiff's claims "substantial success"); Clark, 803 F.2d at 990 (finding that, where plaintiffs had not sought damages, but received injunctive relief, "they achieved the practical result they sought");

Sanchez, 2014 U.S. Dist. LEXIS 199466, 2014 WL 12734756, at *19 (deeming a $200,000 award in damages and jury verdict against the sole defendant [*37] on plaintiffs' excessive force claim "an excellent recovery").

Even as the Court adjusts the lodestar downward, the Court remains cognizant of Section 1988's purpose: "to encourage the bringing of meritorious civil rights claims which might otherwise be abandoned because of the financial imperatives surrounding the hiring of competent counsel." City of Riverside, 477 U.S. 561, 578 (1986). As such, the Court refuses to apply a 50% downward adjustment, as Defendants request. Doing so would certainly discourage future civil rights plaintiffs, who may mistakenly believe that one must prevail on every claim against every defendant in order to recover. Moreover, the case upon which Defendants rely, Harris v. Marhoefer, 24 F.3d 16 (9th Cir. 1994), only considers monetary results to determine the plaintiff's "success," and thus has limited value here.

In light of the presumptively reasonable lodestar, Plaintiff's partial success, and the strong policy of encouraging civil rights litigation through attorneys' fees, the Court concludes that a 15% downward adjustment to the lodestar is appropriate. This conclusion results in an adjusted lodestar of $844,693.88.[8]

Plaintiff requests a multiplier only in the event that the Court determines the PLRA applies to the case. Because the Court finds the PLRA [*38] does not apply, the Court does not address Plaintiff's request. Moreover, because the time, labor, and skill of Plaintiff's counsel are already reflected in the fee award, the Court also does not find that a multiplier is warranted here.

## IV. CONCLUSION

---

[8] The Court rounds the amount up to the nearest hundredth decimal place.

2021 U.S. Dist. LEXIS 246890, *38

The Court GRANTS IN PART Plaintiff's motion for attorneys' fees with the aforementioned adjustments. The Court AWARDS Plaintiff $844,693.88 in attorneys' fees.

**IT        IS        SO        ORDERED**.

2021 U.S. Dist. LEXIS 246890, *38

**Table1** (Return to related document text)

| Attorney / Biller | Years in Practice | Hours | Hourly Rate | Lodestar |
|---|---|---|---|---|
| Dale K. Galipo | 32 | 500.1[5] | $1,100.00 | $550,110.00 |
| James S. Terrell | 27 | 369 | $600.00 | $221,400.00 |
| Sharon J. Brunner | 19 | 247[6] | $600.00 | $148,200.00 |
| Hang D. Le | 8 | 90.7[7] | $550.00 | $49,885.00 |
| Karen Slyapich | Paralegal | 39.2 | $200.00 | $7,840.00 |
| Marielle Sider | Leg. Intern | 132.5 | $150.00 | $19,875 |
| **TOTAL** | | **1,378.5** | | **$997,310.00** |

**Table1** (Return to related document text)

---

**Table2** (Return to related document text)

| Attorney / Biller | Hours |
|---|---|
| Dale K. Galipo | 500.1 |
| James S. Terrell | 369 |
| Sharon J. Brunner | 247 |
| Hang D. Le | 90.7 |
| Karen Slyapich | 39.2 |
| Marielle Sider | 132.5 |
| **TOTAL** | **1,378.5** |

**Table2** (Return to related document text)

---

**Table3** (Return to related document text)

| Attorney / Biller | Hours | Hourly Rate | Lodestar |
|---|---|---|---|
| Dale K. Galipo | 500.1 | $1,100.00 | $550,110.00 |
| James S. Terrell | 369 | $600.00 | $221,400.00 |
| Sharon J. Brunner | 247 | $600.00 | $148,200.00 |
| Hang D. Le | 90.7 | $550.00 | $49,885.00 |
| Karen Slyapich | 38 | $200.00 | $7,600.00 |
| Marielle Sider | 132.5 | $125.00 | $16,562.50 |
| **TOTAL** | **1,377.3** | | **$993,757.50** |

**Table3** (Return to related document text)

---

End of Document

---

[5] The Court reduces Mr. Galipo's hours from 513.5 to 510.3 hours, and subtracts the duplicative 10.2 hours noted in Plaintiff's Reply. (Galipo Decl., Ex. 1; Reply at 3.)

[6] The Court reduces by striking 16.4 hours from Ms. Brunner's originally reported time of 263.4 hours. (Reply at 3; Mot. at 15.)

[7] Plaintiff's Reply notes that Ms. Le worked an additional 11.2 hours to research and draft the Reply. Accordingly, the Court increases Ms. Le's billed time to 90.7 hours.

EXHIBIT 8

FILED
Superior Court of California
County of Los Angeles

DEC 1 0 2021

Sherri R. Carter, Executive Officer/Clerk

BY: R. INOSTROZA, DEPUTY

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

# FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| ALBERT GARCIA and STEPHANIE GARCIA,<br><br>       Plaintiffs,<br><br>vs.<br><br>SELTZER-DOREN MANAGEMENT COMPANY, INC. dba SIERRA MANAGEMENT, GRESHAM APARTMENTS INVESTORS, and SELTZER-DOREN COMPANY & AFFILIATES,<br><br>       Defendants. | Case No.:  BC 699 421<br>*(Consolidated with Case No. BC 699 422)*<br><br>**The Honorable Richard L. Fruin**<br><br>[~~PROPOSED~~] ORDER GRANTING PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES<br><br><br><br>Hearing Date:  December 7, 2021<br>Trial:          August 2, 2021<br>Action Filed:   March 26. 2018 |

1       Plaintiff Albert Garcia and Stephanie Garcias' motion for attorney fees pursuant to

2  Government Code section 12965(b) came on for hearing on December 7, 2021.

3       Having read and considered plaintiffs' motion and defendants' opposition, and

4  having heard oral arguments of counsel, and good cause appearing,

5       IT IS ORDERED that plaintiffs' motion is GRANTED.

6       Defendants are ordered to pay $~~1,263,133.~~95 in attorney fees, as stated in the

*$ 1,58,447.35*

7  Court's tentative ruling, attached hereto as Exhibit 1.

8

9

10       IT IS SO ORDERED

11

12  Dated: December *10*, 2021

13                By: _____

14                    The Honorable Richard L. Fruin

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[~~PROPOSED~~] ORDER

# EXHIBIT 1

# 12   TENTATIVE RULINGS          9:15 a.m., Tuesday, December 7, 2021

ALBERT GARCIA, STEPHANIE GARCIA v. SELTZER–DOREN MANAGEMENT
COMPANY, INC. dba SIERRA MANAGEMENT, GRESHAM APARTMENTS INVESTORS,
SELTZER–DOREN COMPANY & AFFLIATES, Case BC 699421.

### A. RULING ON PLAINTIFFS' MOTION FOR AN AWARD OF ATTORNEYS' FEES PLUS A MULTIPLIER:

**Attorneys' Fees Sought in Plaintiffs' Motion:**

Prevailing plaintiffs by statute are authorized to seek an award for their attorneys' fees to the extent reasonably incurred to prosecute FEHA claims.

Plaintiffs in this fee motion seek attorneys' fees in the amount of $1,578,665 and ask the Court to exercise its discretion to increase that amount with a fee enhancement (a "multiplier") of 1.75, for a total attorneys' fees award of $2,762,663.75.

The court must review the attorneys' time records to prepare a lodestar analysis. The lodestar is calculated by a multiplying the number of hours for necessary legal services x a reasonable hourly rate for each timekeeper performing such tasks. Ketchum v. Moses (2001) 24 Cal. App.4th 1122, 1132 (attorneys' fees awarded after grant of a special motion to strike); Horsford v. Board of Trustees (2005) 132 Cal.App.4th 359, 394 (attorneys' fees awarded after a plaintiffs proved employment discrimination in a jury trial).

The Court in preparing a lodestar calculation has prepared the tabulations that are provided in the Appendix. Table A organizes plaintiffs' attorneys' time records to show by year the number of hours each timekeeper has charged to the litigation.

Table B reflects minor reductions in the hours reported for various timekeepers. Plaintiffs conceded a reduction in the hours reported by Messrs. Morrison and Ross, after receiving defendants' opposition to the fee motion. The Court also discovered and corrected an overcounting of 1.2 hours in Lim's time records. (Any undercounting of hours was not corrected.)

Table C contains any adjustments in the hours and billing rates for certain timekeepers by the Court in preparing its lodestar calculation.

1

### Plaintiffs Are Prevailing Parties Under the FEHA Attorneys' Fee Statute

Plaintiffs prevailed at trial on claims alleging discrimination and retaliation under the Fair Employment and Housing Act (FEHA), Government Code section 12900 et seq. Plaintiffs, therefore, are entitled to recover their reasonable attorneys' fees under Government Code section 12965(b), reading: "In civil actions brought under this section, the court, in its discretion, may award reasonable attorney's fees and costs...."

As stated in Horsford v. Board of Trustees 132 Cal. App. 4th supra at 394, an award of attorneys' fees "accomplishes the Legislature's expressly stated purpose of FEHA 'to provide effective remedies that will eliminate these discriminatory practices' [as identified in Gov. Code section 12920]. In order to be effective in accomplishing the legislative purpose of assuring the availability of counsel to bring meritorious actions under FEHA the goal of an award of attorney fees 'is to fix a fee at the fair market value for a particular action' [citing Ketchum v. Moses, supra, at 1132]."

Albert Garcia sued the two defendants for discrimination and retaliation based on medical condition (thyroid cancer) in violation of FEHA and for wrongful termination. The jury awarded Albert Garcia $2,352,924 in economic and non–economic damages, and further found, on clear and convincing evidence, that the defendants' conduct constituted "malice, oppression and/or fraud." In the phase 2 trial, the jury imposed $4 million in punitive damages in favor of Albert Garcia. (See, Exh. 11.)

Stephanie Garcia sued defendants for association discrimination and retaliation (based on Albert's medical condition) in violation of FEHA and for wrongful termination. (After her death Stephanie's estate was substituted in as a plaintiff.) The jury awarded the Stephanie Garcia Estate economic damages of $30,726, and further found, on clear and convincing evidence, that the defendants' conduct constituted "malice, oppression and/or fraud." In the phase 2 trial, they jury imposed punitive damages in the sum of $1,250,000 in favor of the Stephanie Garcia Estate.  (Exh. 11.)

The Court, in October, denied defendants' motions for a new trial and for judgment notwithstanding the verdict.

### Trial Court Proceedings:

The litigation spanned four years. Plaintiffs were represented by attorneys from two law firms: Ross & Morrison and Shegerian & Associates.

Plaintiffs retained the Ross & Morrison Law Firm in November 2017; that law firm filed separate complaints for Albert Garcia and Stephanie Garcia that were consolidated for discovery and trial.

Ross & Morrison negotiated the association of Shegerian & Associates as trial counsel in October 2018. The Shegerian Firm, however, billed limited hours to the case before this year. Carney Shegerian was plaintiffs' trial lawyer. Before 2021, he billed only 3.5 hours to the matter.

The matter was tried to a jury from July 6 to August 6, 2021 with the trial proceedings adjourned at various times to accommodate the availability of individual jurors. Mr. Shegerian was assisted during trial by Anthony Nguyen and Mark Lim.

The trial was transmitted over a video conferencing platform and was accessible to remote viewers. The proceedings available through the video facility could also be seen on a large monitor in the courtroom. Half of the jury elected to sit in the audience area of the courtroom to maintain social distancing from one another as recommended by the pandemic emergency orders. The video facility permitting the jurors seated in the audience area to better follow the trial testimony. Using the video facility counsel examining from behind the counsel table could be seen as well as the judge presiding from the bench. The video cameras did not show the witnesses testifying from the witness chair. The jury box was not visible, although the jurors spaced in the audience area could be seen. All persons in the courtroom were wearing masks over their mouth and nostrils. The video platform also allowed for remote examination of witnesses, should that be needed, and the monitor mounted on the wall was also used to project trial exhibits and excerpts played from video-graphed depositions.

The Court was surprised to see Mr. Morrison appear on the monitor before the voir dire panel was admitted into the courtroom on the first day of the trial. The Court told counsel he did not want attorneys to watch the trial remotely if they intended to seek to recover attorneys' fees for their time watching the trial. Mr. Shegerian assured the Court that attorneys who were not present the courtroom would not be seeking to charge for any time spent in watching the trial. However, the time records attached to this fee motion (Exhs. 1 and 2) show Morrison and Ross viewed large periods of the trial, and, while their time records state "no charge" for their trial-watching time, they seek to charge for hours spent in conferring with the trial team based on their watching of the trial proceedings over the teleconferencing facilty. The Court was unaware during the trial that Morrison and Ross were viewing the trial as neither turned on their cameras after the Court commented on the first day.

3

**Findings re Hours and Hourly Fee Rates for Shegerian & Associates:**

An attorney's billing rate sought in a fee motion must be shown to be necessary to a plaintiff's success; otherwise it is not under the statute "reasonably spent." [1]

Shegerian & Associates seek attorneys' fees for lawyers employed by that firm at the following hourly rates: Carney Shegerian--$1,300; Anthony Nguyen--$1,000; Jill McDonell--$1,000; Mark Lim--$700; Zackery Lynch--$375; and William Reed--$850. Time records are provided for all of those lawyers. Exhibits  3, 4, 5, 6, 7 and 8. Those lawyers, other than McDonell and Lynch, provide declarations in support of the fee request.

Little information is provided about the firm's practices in preparing time records. Mr. Nguyen made this brief statement (repeated in other declarations): "I am familiar with the proper procedure for calculating hourly bills. I understand which tasks are billable and which are not." Mr. Nguyen does not say whether the attorneys prepare the time records contemporaneously with the legal task that is reported; or whether the attorneys use actual time for their entries. The appellate decisions indicate that the trial court is to accept, unless suspicion is aroused, attorney time representations, and the Court will accept the number of hours claimed by Shegerian & Associates as substantially correct.

Having observed plaintiffs' trial team, Messrs. Shegerian, Nguyen and Lim, over the course of the trial, the Court formed a favorable opinion of their trial skills. Mr. Shegerian has previously tried cases in Department 15. He is a successful plaintiff's-side trial lawyer in employment cases. His trial skills are praised by other plaintiff's-side employment lawyers—in the declarations of Nicholas C. Rowley, Abash Homampour, Gary A. Dordick and Reza Mirroknian—in support of his requested $1,300 per hour rate. Mr. Rowley says: "As far as the Southern California legal community goes, Mr. Shegerian is among the best of the best. There is no employment lawyer in the country who has his success record or who tries as many cases." Rowley decl., para. 11. Mr. Dordick says:  "I know Mr. Shegerian to be the preeminent employment lawyer in the country." Dordick decl., para 10. The Court will approve a billing rate for Mr Shegerian in this matter at $1,300 per hour.

The Court will approve a billing rate of $900 per hour for Mr. Nguyen, a 2008 law graduate. That hourly rate was approved for him by Judge Victor Chavez in 2020.  Nuygen decl., para. 10. At the trial Nguyen examined two

---

[1] "'Reasonably spent' means that time spent 'in the form of inefficient or duplicative efforts is not subject to compensation. (Id at [Kitchum] 1132.'" Horsford v. Board of Trustees, 132 Cal.App.4th supra at 394.

witnesses and gave the rebuttal closing in the phase 2 trial. His ability during the trial to marshal the witness and documentary evidence assisted the lead examining attorney. Mr. Shegerian testified to his value to the trial team.

The billing rates charged by the attorneys practicing at Shegerian & Associates are recommended by the four declarants in a non-specific manner. Mr. Dordick says: "I also understand that Mr. Nguyen, Ms. McDonell (sic), Mr. Lim, Mr. Ross, Mr. Morrison, and Mr. Lynch, are requesting hourly rates of $1,000, $1,000, $850, $700, $975, $975, and $375, respectively. Based on my knowledge of their experience and abilities, I believe their requested rates to be within the range of comparable market rates charged by attorneys in Los Angeles." Dordick decl, para. 10. These comments are echoed in the Rowley, Homampour and Mirroknian declarations. These declarants, however, do not display any familiarity with the facts of this case nor of the actual contributions made in this case by each of the referenced attorneys. They further do not define in any way what is meant by their term "within the range of comparable market rates." The declarations provide little support for the requested lodestar rates. The Court assumes, however, because the declarants do not say otherwise, that these plaintiff's-side employment trial lawyers are proposing market rates for lawyers representing plaintiffs in contingent fee cases. As the appellate decisions state, an appropriate multiplier for a contingent fee case may be embodied in the hourly rate approved in a lodestar analysis rather than added after the lodestar calculation is made. Ketchum v. Moses, 24 Cal. App.4th supra at 1133; Horsford v. Board of Trustees, 132 Cal.App.4th supra at 394.

The Court will approve a $650 hourly rate for Mr. Lim, a 2016 law graduate. That rate for Mr. Lim was previously approved by Judge Victor Chavez. Lim examined two witnesses at trial and otherwise maintained contact with the potential witnesses during the trial.

The remaining three attorneys providing legal services for the Shegerian Law Firm with their billing rates are Jill McConell ($1,000 per hour), William Reed ($850), and Zachery Lynch ($375). McConell, a 1992 law graduate, contributed 9.9 hours, all on September 27, 2021, in preparing oppositions to defendants' motions for new trial and JNOV. (Exh. 7.) She is a specialist in preparing appellate and motion briefs. Shegerian decl., para. 24. Plaintiffs' briefs filed in opposition to defendants' post-trial motions were well researched and written. The Court will approve a lodestar $900 hourly rate for McConell.

William Reed provided legal services in attending with Mr. Morrison a mediation on July 22, 2019. His legal services were not otherwise used in the litigation. (His charge of 0.3 hours on 10/19/21 to review the Orrick declaration appears to be billed in error—there is no Orrick declaration). The Court believes that a $450 hourly rate is appropriate for Mr. Reed's contribution to the case. In

5

the mediation (which was unsuccessful) Mr. Morrison was the lead attorney; his firm was then managing the Garcia litigation. Whatever knowledge Reed gained about the case was not material as Reed provided no further legal services for the in the Garcia case.

The Court will approve an hourly rate for Mr. Lynch in the amount requested ($375). Lynch billed time to the case in the months April through September 2021; his time entries (in Exh. 6) indicate that he assisted the trial team in making contacts with the trial witnesses.

**Findings re Hours and Hourly Fee Rates of Ross & Morrison:**

Andrew J. Morrison and Gary B. Ross filed declarations to support their fee request, testifying that Exhibits 1 and 2 to be "a true and correct copy of my time records detailing the time and hours I spent on this case." The declarations, however, provide no information concerning their time keeping practices such as whether each attorney recorded time entries concurrently as the legal services are provided. The time records show Ross and Morrison communicated with each other constantly about the litigation, even about routine matters. For instance, Morrison's entry for July 9, 2018 states: "review and analysis of defendants' responses to Form Interrogatories; conclude not to make a motion to compel"; while Ross' entry for the same date states "receipt, review and preliminary analysis of defendants' responses to plaintiff's first set of Form Interrogatories; strategy and analysis re: whether the bring a discovery motion (motion to compel further responses)."

Defendants' opposition complains that the Ross & Morrison time entries show extensive duplication, saying that "100 out of the total 350 entries (160 hours out of total 380 hours billed) by Mr. Ross are described as tasks performed by Mr. Morrison." Opp. 7: 11 and 22-23. Conferencing is appropriate, and often beneficial, when several attorneys are working as a team, but the extent of the conferencing in this case between Morrison and Ross when both are experienced employment lawyers and are claiming $975 per hour billing rates is a concern.

In October 2018 Ross & Morrison entered negotiations to associate a different law firm, Shegerian & Associates, to represent the plaintiffs at trial. Morrison's October 12 time entry reads: "telephone call from Gary Ross ... (he's on his way to meet client with Carney Shegerian)," while Ross' time entry three days later reads: "10/12-10/15 extensive communications with client, ADM and co-counsel re: retention of co-counsel for trial...." Ross & Morrison formally associated Shegerian & Associates as co-counsel on November 13, 2018. It is not a criticism that Ross & Morrison selected the Shegerian firm to be trial counsel but that circumstance should be considered in determining a lodestar calculation of the Ross & Morrison legal fees. In the legal market,

premium legal rates are accorded to lawyers who undertake to prove the case to a jury, while lesser rates are accorded to attorneys who provide legal services up to the trial.

### A. Reduction in Hours Claimed by Ross & Morrison:

Plaintiffs in their reply concede that 15.15 hours of Morrison's time was for clerical functions and should not have been included in the lodestar calculation. Plaintiffs likewise concede that 4.9 hours of Ross' time should not have been billed. The time adjustments for specific dates are shown in the Nguyen declaration filed on November 24. (These adjustments are also reflected in Table B.) These minor reductions do not address all of defendants' duplicate-billing concerns, but the Court, on the evidence it has, concludes not to make further reductions in the hours claimed for duplicate billing.

The Court will, however, deduct the Ross & Morrison hours for the time that they billed during the trial period, that is between July 5 through August 6, 2021. In this period Morrison and Ross provided to the Shegerian trial team their observations based on their remote viewing of the trial. For instance, Mr. Morrison in his time entry for July 13 (Exh. 1) states:

> "Review and analysis of text from Gary Ross including discussion re potential issues due to juror attrition; email responding to same (1.25); review and analysis of brief re grossing up damages and mitigation (.08); attend trial via Court Connect – attorneys only (1.09); strategy and legal analysis re: CACI issue; read CACIs; read court of appeals ruling; draft email; shorten email; send email (1.58); extensive strategy and legal analysis re: principal/agent issues (1.08)"

The Shegerian team consisted of three experienced and prepared trial attorneys. Plaintiffs' fee motion, in the declarations, have not provided any evidence that the contributions from Messrs. Morrison and Ross based on their remote observation of the trial provided material benefit to the trial team. The Court need not make a finding that the observations of Morrison and Ross rendered during the trial had no value; they were simply duplicative of the legal services rendered by the trial team and, thus, were not reasonably necessary. The Court finds that the time was beyond what was required given the competence of the trial team.

The time, moreover, is based on counsel's remote viewing of the trial proceedings. The Court stated expressly on the trial's first day that it would not approve legal fees based on counsel's remote viewing of the trial proceedings. Plaintiffs did not at any time request any exception from that ruling.

The hours that are deducted from Mr. Morrison's time entries in July and August are 16.58; and from Mr. Ross' time entries 36.00 hours.

7

## B. Reduction in Billing Rates Claimed by Ross & Morrison:

The hourly rates claimed by Ross & Morrison ($975 per hour for each
partner) are not shown to be market rates for the legal services they provided.
Plaintiffs provide no evidence that other courts have approved their legal fees in
any lodestar calculation. Mr. Ross identifies two employment cases in which he
was the prevailing attorney (see, Ross decl. referencing Dudley v. Sycamore
Hathaway, BC 500071 and Beck v. Sybase, Inc., BC 1738551), but he noticeably
does not state when those victories were achieved nor what lodestar legal fee
he received from the trial judges.

The Court of Appeals criticized the performance of Ross & Morrison in this
action, and that fact bears upon a lodestar calculation of their reasonable legal
fee. Ross & Morrison, as plaintiffs' counsel, submitted an opposition to a
motion for summary judgment from Gresham Apartments Investors that failed
to comply with CRC, Rule 3.116 dealing with the submission of deposition
testimony as an exhibit. The trial judge for that reason struck and, therefore,
did not consider the deposition evidence that was submitted to oppose the
motion. The trial judge, therefore, granted the motion and dismissed defendant
Gresham Apartments Investors from the action. The appellate court said:
"although the [trial] court did not expressly grant summary judgment because
of the procedural default, it effectively did." Slip Op. 15. The loss was rectified
when the appellate court reversed the judgment that had dismissed that
defendant but said the dismissal occurred because Ross & Morrison did
"something we would not expect most lawyers to do." Slip Op. 14.

The appeal from the loss of the summary judgment motion caused harm to
plaintiffs. It delayed the trial for more than two years, and during that delay
plaintiff Stephanie Garcia contracted COVID-19 and died. Because of her death,
her estate was barred from recovering non-economic damages. CCP section
377.34. The jury likely would have awarded non-economic damages to her: it
awarded economic damages to her estate. That the appellate court concluded
the trial judge abused its discretion in striking plaintiffs' opposing evidence
because their counsel failed to submit the evidence in a manner compliant with
Rule 3.1116 does not change the fact that the trial court granted summary
judgment against plaintiffs' claims against Gresham Apartments Investors
because Ross & Morrison did not file a rule-compliant opposition.

Plaintiffs' motion provides no explanation for how the default occurred.
There is no statement, for instance, that plaintiffs' counsel were familiar with
and tried to follow Rule 3.116 for submitting deposition excerpts as exhibits to
a summary judgment motion. Plaintiffs' motion, furthermore, does not discuss
the impact that plaintiffs' counsel's failure should have on their claims for high
end legal fees.

8

Plaintiffs' failure to address this issue is separately a reason to reduce the legal fees claimed by Messrs. Morrison and Ross in their fee motion.

The Court recognizes that the Court of Appeal reversed the trial judge. The Court, however, assumes that the trial judge would have denied the summary judgment had it been required to accept the deposition exhibits that were stricken. The loss of the motion ultimately did not deprive plaintiffs an opportunity to prosecute their claims against Gresham Apartments Investors, although it reduced the damages recoverable by the Stephanie Garcia estate and caused greater expense in the prosecution of plaintiffs' claims. Defendants should not bear the expense caused by the failure of plaintiffs' counsel to comply with CRC Rule 3.1116.

In the absence of any other benchmark, the Court will approve a lodestar attorney's fee for Messrs. Morrison and Ross of $735 per hour. This is the hourly rate that defense counsel, who testifies he specializes like Ross & Morrison in employment litigation, received in representing defendant Gresham Apartments Investors in this case. Mackey decl., para. 15.

**Findings re Plaintiffs' Fee Enhancement Claim:**

"[T]he lodestar is the basic fee for comparable legal services in the community; it may be adjusted based on factors including as relevant herein, (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award. (Sorano III, supra, 20 Cal.3d at p.49.) The purpose of such adjustment is to fix a fee at the fair market value for the particular action." Ketchum v. Moses (2001) 34 Cal.4th 1122, 1132.

Only one of the four factors identified in the Ketchum decision is applicable to plaintiffs' fee motion.

The case did not present novel or difficult questions. The underlying facts for the wrongful termination claims were not disputed at trial. As the Court said in its written rulings denying defendants' post-trial motions: "Selzer–Doran Management manages 35 other apartment buildings, and, as a practice, employs couples to serve as resident managers in each apartment building, providing them with the use of an apartment during their employment as their principal compensation. Defendants argued that although Albert was an exemplary employee, no complaints ever having been received about him, the termination of the Garcias as employees and as tenants was justified because complaints had been received about Stephanie and defendants had concluded that her personality was not conducive to her duties in showing and renting vacant apartments." The principal issue at trial, given that defendants were

9

informed of Albert's medical condition, was whether defendants' reason for
terminating the Garcias' employment and evicting them from their home was
pretextual. This issue is not novel; it is the issue in FEHA termination cases.
Presenting evidence on the issue was not uniquely difficult. Defendants had
little documentation to support their contention that Stephanie's performance
was deficient or that they had given notice to Stephanie that her performance as
a rental manager was deficient. (The Court sustained Mr. Shegerian's immediate
objection to defendants' attempt to introduce the vacancy rates in other
Seltzer–Doren managed buildings because defendants had objected to
plaintiffs' efforts before trial to obtain that information.) Whether Gresham
Apartments Investors was liable for the termination decision made by its
management agent Seltzer–Doren was potentially a significant issue but not
one that required legal analysis at trial because the issue was decided before
trial by the Court of Appeals.

Ross & Morrison did not find the need to take extensive factual discovery.
The parties exchanged written discovery which is standard for an employment
case. Ross & Morrison took four depositions, all of employees of defendants,
and defended only the two depositions taken of the plaintiffs. The depositions
taken after the matter was remanded back to the trial court were each side's
designated experts. The meager discovery supports the view that the case did
not present novel or difficult issues.

The second factor—the skill displayed at trial—does not merit a fee
enhancement. The skill of plaintiffs' lead trial counsel has earned for him a
lodestar attorney's fee of $1,300 per hour. The trial team, as a unit, was
effective in investigating and in presenting facts at trial to support plaintiffs'
argument that they were subject to unlawful discrimination. Shegerian's
examination of adverse witnesses was prepared, aggressive and focused, as
needed in this case, but that would be expected from a $1,300 per hour lawyer.
The lodestar fee rate establishes the presumptive market value for a lawyer's
time. The Court finds no basis to go beyond that presumptive value in this case.

The Court disagrees with Mr. Nugyen's argument that the fact the jury
returned a substantial verdict for the plaintiffs in itself establishes the verdict
was produced by the skills of their lawyers. Reply 1: 14–16. The substantial
verdict in this case derived from its facts: defendants expelled plaintiffs from
their home and their employment because Albert Garcia required treatment and
recuperation time for throat cancer and defendants argued their failure to
accommodate Albert's medical condition with explanations that the jury,
apparently, did not find credible.

This Court, when considering whether a multiplier to a lodestar is
appropriate, is guided by our Supreme Court in its Ketchum decision:

10

"[A] trial court should award a multiplier for exceptional representation only when the quality of representation far exceeds the quality of representation that would have been provided by an attorney of comparable skill and experience billing at the hourly rate used in the lodestar calculation. Otherwise, the fee award will result in unfair double counting be unreasonable." 24 Cal 4th, supra, at 1139.

Applying that guidance to this case, the question is: did the Shegerian trial team obtain results that would not have been expected from another high-priced plaintiff's-side employment lawyer (say, Gary Dordick)? The fee motion provides no evidence to conclude that the quality of plaintiffs' trial lawyers "far exceeds" that would have been obtained by another lawyer of comparable skills.

Plaintiffs gesture to the third factor—that taking this case "precluded other employment"—but no facts are offered to support any such assertion. Shegerian states: "The trial in this case demanded that Plaintiff's counsel spend more than 10 hours per day on multiple days. Thus, this commitment had a dramatic ability of (sic) counsel's ability to accept work in other cases." Shegerian decl. para. 21. Mr. Shegerian offers no facts for his statement. Did his firm turn down other meritorious cases? The 10 hour work days occurred when Mr. Shegerian was trying this action, altogether nine days. The Garcia trial, moreover, occurred during the first month in which the LASC re-opened for civil jury trials. The fact that Shegerian does not identify any other trial for which he was committed (and which he could not continue to a future date) suggests his statement is formulaic and not based on fact. Ross & Morrison, the other law firm representing plaintiffs, do not say that their firm was precluded from representing other clients because of the demands of this case. Their time records do not indicate their commitment to this case precluded other legal work.

There is, in sum, no evidence that either Shegerian or Ross & Morrison rejected other cases because of their commitment to this case. There being no supporting facts, the Court disregards entirely the assertions that plaintiffs' counsel were precluded from other work because of the demands of this case.

The fourth factor—that counsel represented plaintiffs under a contingency contract—does merit a modest increase in the lodestar amount. The multiplier in a contingency case recognizes that there will be a delay, even in a successful case, in the payment of front-end legal fees and costs. There has been a delay, in this case, in payment to plaintiffs' counsel as legal fees, assuming that counsel would otherwise have been paid on a monthly basis. However, most of Shegerian & Associates' legal fees were incurred within the last ten months, substantially mitigating any burden due to a delay in payment. (The attorneys' fee award will draw 10 percent interest once entered in the

11

judgment.) The legal fees incurred by Ross & Morrison have accrued over four years, although two of those years can be attributed to their procedural default that resulted in a grant of summary judgment subsequently reversed on appeal. The high hourly fees claimed as lodestar rates by lawyers representing clients with FEHA claims suggest that those rates already include a contingency premium. Those high hourly rates claimed by attorneys in employment cases are attested to in plaintiffs' motion. Rowley decl., para. 9; Dordick decl., para. 9; Homampur decl., para. 15; and Mackey decl., paras. 15 and 16. As the Horsford decision states: "The contingency adjustment may be made at the lodestar phase of the court's calculation or by applying a multiplier to the noncontingency lodestar calculation (but not both)." 132 Cal.App.4[th] supra at 395.

Plaintiffs also make an argument that is beyond the analysis structure prescribed by controlling authority, namely that in establishing a fee enhancement the Court should award a high multiple because the Dow Jones Average has increased dramatically since when this case was filed. That argument is specious. The lodestar–plus–multiplier approach "anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary." Ketchum v. Moses 24 Cal.4[th] supra at 1134. Investing after–tax earnings in the stock market is a bet on a roulette wheel; it does not provide an "objective determination" to recognize what a willing buyer and a willing seller will pay in a marketplace for legal services rendered on a noncontingent basis. The Court thinks less of plaintiffs' motion for making this fallacious argument.

The Court, after reviewing the factors pertinent to this case, shall award a 1.1 multiplier to the lodestar calculation.

Attorneys' Fee Award.

The attorneys' fee awarded to plaintiffs in this case is $1,263,133.95. That calculation of this amount is shown on Table C in the Appendix. The lodestar is to be multiplied by a 1.1 fee enhancement.

## B. RULING ON DEFENDANTS' MOTION TO TAX COSTS

The Court has reviewed the motion but has not prepared a written tentative ruling.

BC699421 - TIME SHEET TABULATION
RE: MOTION FOR ATTORNEY FEES

**[TABLE A]     ORIGINAL HOURS**

| Attorney | Rate/hr | Exh. Total | Exh # | Table Total | HOURS BILLED BY YEAR | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 2017 | 2018 | 2019 | 2020 | 2021 |
| Ross | $975.00 | 382.20 | #2 | 410.18 | 26.85 | 118.80 | 155.03 | 44.75 | 64.75 |
| Morrison | $975.00 | 529.00 | #1 | 529.20 | 2.45 | 146.69 | 252.01 | 79.29 | 48.76 |
| Shegerian | $1,300.00 | 195.70 | #3 | 195.70 | 0.00 | 2.60 | 0.60 | 0.30 | 192.20 |
| Nguyen | $1,000.00 | 180.10 | #4 | 181.10 | 0.00 | 5.00 | 7.10 | 0.80 | 168.20 |
| Lim | $700.00 | 279.90 | #5 | 278.70 | 0.00 | 0.00 | 24.60 | 7.90 | 246.20 |
| Reed | $850.00 | 15.80 | #8 | 15.80 | 0.00 | 0.00 | 15.50 | 0.00 | 0.30 |
| Lynch | $350.00 | 94.60 | #6 | 94.60 | 0.00 | 0.00 | 0.00 | 0.00 | 94.60 |
| McDonell | $1,000.00 | 9.90 | #7 | 9.90 | 0.00 | 0.00 | 0.00 | 0.00 | 9.90 |

**TABLE B-1**

| | EXH* | Conceded | Reduced | TOTAL |
|---|---|---|---|---|
| Ross | 382.20 | 4.90 | 16.58 | 360.72 |
| Morrison | 529.00 | 15.15 | 36.00 | 477.85 |
| Shegerian | 195.70 | 0.00 | 0.00 | 195.70 |
| Nguyen | 180.10 | 0.00 | 0.00 | 180.10 |
| Lim | 279.90 | 0.00 | 1.20 | 278.70 |
| Reed | 15.80 | 0.00 | 0.00 | 15.80 |
| Lynch | 94.60 | 0.00 | 0.00 | 94.60 |
| McDonell | 9.90 | 0.00 | 0.00 | 9.90 |

**[TABLE B]     AMENDED HOURS**

| Attorney | Rate/hr | Exh. Total | Exh # | Table Total | HOURS BILLED BY YEAR | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 2017 | 2018 | 2019 | 2020 | 2021 |
| Ross | $975.00 | 360.72 | #2 | 410.18 | 26.85 | 115.55 | 153.68 | 44.45 | 28.75 |
| Morrison | $975.00 | 477.85 | #1 | 514.05 | 2.45 | 144.62 | 239.51 | 78.79 | 32.10 |
| Shegerian | $1,300.00 | 195.70 | #3 | 195.70 | 0.00 | 2.60 | 0.60 | 0.30 | 192.20 |
| Nguyen | $1,000.00 | 180.10 | #4 | 181.10 | 0.00 | 5.00 | 7.10 | 0.80 | 168.20 |
| Lim | $700.00 | 278.70 | #5 | 278.70 | 0.00 | 0.00 | 24.60 | 7.90 | 246.20 |
| Reed | $850.00 | 15.80 | #8 | 15.80 | 0.00 | 0.00 | 15.50 | 0.00 | 0.30 |
| Lynch | $350.00 | 94.60 | #6 | 94.60 | 0.00 | 0.00 | 0.00 | 0.00 | 94.60 |
| McDonell | $1,000.00 | 9.90 | #7 | 9.90 | 0.00 | 0.00 | 0.00 | 0.00 | 9.90 |

**[TABLE C]     AMENDED HOURS & RATES**

| Attorney | Rate/hr | HOURS | FEES | Table Total | FEES PER YEAR | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | 2017 | 2018 | 2019 | 2020 | 2021 |
| Ross | $735.00 | 360.72 | $265,129.20 | 0.00 | $19,734.75 | $84,929.25 | $112,954.80 | $32,670.75 | $21,131.25 |
| Morrison | $735.00 | 477.85 | $351,219.75 | 0.00 | $1,800.75 | $106,295.70 | $176,039.85 | $57,910.65 | $23,593.50 |
| Shegerian | $1,300.00 | 195.70 | $254,410.00 | 0.00 | $0.00 | $3,380.00 | $780.00 | $390.00 | $249,860.00 |
| Nguyen | $900.00 | 180.10 | $162,090.00 | 0.00 | $0.00 | $4,500.00 | $6,390.00 | $720.00 | $151,380.00 |
| Lim | $650.00 | 278.70 | $181,155.00 | 0.00 | $0.00 | $0.00 | $15,990.00 | $5,135.00 | $160,030.00 |
| Reed | $450.00 | 15.80 | $7,110.00 | 0.00 | $0.00 | $0.00 | $6,975.00 | $0.00 | $135.00 |
| Lynch | $350.00 | 94.60 | $33,110.00 | 0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $33,110.00 |
| McDonell | $900.00 | 9.90 | $8,910.00 | 0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $8,910.00 |

$1,263,133.95

12/13/2021

EXHIBIT 9

Case 2:85-cv-04544-DMG-AGR Document 1281-3 Filed 02/27/23 Page 168 of 182 Page ID
#:24816
Case 8:17-cv-00118-DMG-DFM Document 603 Filed 02/20/23 Page 1 of 18 Page ID
#:24816

ROBBINS GELLER RUDMAN
  & DOWD LLP
SPENCER A. BURKHOLZ (147029)
LAURIE L. LARGENT (153493)
ROBERT R. HENSSLER JR. (216165)
MATTHEW I. ALPERT (238024)
ERIKA OLIVER (306614)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
spenceb@rgrdlaw.com
llargent@rgrdlaw.com
bhenssler@rgrdlaw.com
malpert@rgrdlaw.com
eoliver@rgrdlaw.com

Lead Counsel for Plaintiff

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| In re BANC OF CALIFORNIA SECURITIES LITIGATION | No. SACV 17-00118 AG (DFMx) consolidated with SACV 17-00138 AG (DFMx) |
| This Document Relates To: | CLASS ACTION |
| ALL ACTIONS. | DECLARATION OF LAURIE L. LARGENT FILED ON BEHALF OF ROBBINS GELLER RUDMAN & DOWD LLP IN SUPPORT OF AWARD OF ATTORNEYS' FEES AND EXPENSES |

DATE: March 16, 2020
TIME: 10:00 a.m.
CTRM: 10D
JUDGE: Hon. Andrew J. Guilford

Case 2:85-cv-04544-DMG-AGR Document 128-3 Filed 02/27/23 Page 169 of 182 Page ID
#:24316
Case 8:17-cv-00118-DMG-DFM Document 603 Filed 02/20/23 Page 2 of 18 Page ID
#:24317

I, LAURIE L. LARGENT, declare as follows:

1.     I am a member of the firm of Robbins Geller Rudman & Dowd LLP ("Robbins Geller" or the "Firm"). I am submitting this declaration in support of my Firm's application for an award of attorneys' fees, expenses and charges ("expenses") in connection with services rendered in the above-entitled action (the "Litigation").

2.     This Firm is counsel of record for Lead Plaintiff Iron Workers Local No. 25 Pension Fund ("Plaintiff"), and the Class.

3.     The information in this declaration regarding the Firm's time and expenses is taken from time and expense printouts and supporting documentation prepared and/or maintained by the Firm in the ordinary course of business. I am the partner who oversaw and/or conducted the day-to-day activities in the Litigation and I reviewed these printouts (and backup documentation where necessary or appropriate) in connection with the preparation of this declaration. The purpose of this review was to confirm both the accuracy of the entries on the printouts as well as the necessity for, and reasonableness of, the time and expenses committed to the Litigation. As a result of this review, reductions were made to both time and expenses in the exercise of billing judgment. Based on this review and the adjustments made, I believe that the time reflected in the Firm's lodestar calculation and the expenses for which payment is sought herein are reasonable and were necessary for the effective and efficient prosecution and resolution of the Litigation. In addition, I believe that these expenses are all of a type that would normally be charged to a fee-paying client in the private legal marketplace.

4.     After the reductions referred to above, the number of hours spent on the Litigation by the Firm is 11,048.97. A breakdown of the lodestar is provided in the attached Exhibit A. The lodestar amount for attorney/paraprofessional time based on the Firm's current rates is $7,561,131.30. The hourly rates shown in Exhibit A are the usual and customary rates set by the Firm for each individual.

- 1 -

Case 2:85-cv-04544-DMG-AGR Document 1283 Filed 02/27/23 Page 170 of 182 Page ID
Case 2:17-cv-00102-DMG-GDF-N Document 503 Filed 02/20/23 Page 3 of 18 Page ID
#:24817
#:24317

5.     The Firm seeks an award of $1,575,210.83 in expenses and charges in connection with the prosecution of the Litigation. Those expenses and charges are summarized by category in the attached Exhibit B.

6.     The following is additional information regarding certain of these expenses:

(a)    Filing, Witness and Other Fees: $18,423.47. These expenses have been paid to the Court for filing fees and to attorney service firms or individuals who either: (i) served process of the complaint or subpoenas; (ii) obtained copies of court documents for Plaintiff; or (iii) delivered courtesy copies to the Court. The vendors who were paid for these services are set forth in the attached Exhibit C.

(b)    PR Newswire: $700.00. This expense was necessary under the Private Securities Litigation Reform Act of 1995's ("PSLRA") "early notice" requirements, which provides, among other things, that "[n]ot later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class – (I) of the pendency of the action, the claims asserted therein, and the purported class period; and (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class." *See* 15 U.S.C. §78u-4(a)(3)(A)(i).

(c)    Transportation, Hotels & Meals: $46,818.52. In connection with the prosecution of this case, the Firm has paid for travel expenses to, among other things, attend court hearings, meet with witnesses, mediators and opposing counsel and take or defend depositions. The date, destination and purpose of each trip is set forth in the attached Exhibit D.

(d)    Court Hearing Transcripts and Deposition Reporting, Transcripts and Videography: $50,121.36. The vendors who were paid for these services are listed in the attached Exhibit E.

- 2 -

4821-8804-5233.v1

1          (e)     Experts/Consultants/Investigators: $1,238,734.24.

2                  (i)     Compass     Lexecon,     LLC     ("Compass Lexecon"):

3    $373,054.09.  Compass Lexecon is an economic consulting firm and its economists

4    assisted Plaintiff's expert Dr. Pirrong with his work rebutting defendants' experts'

5    opinions on market manipulation, spoofing and layering and cross-market derivative

6    manipulation.  The economists at Compass Lexecon spent a substantial amount of

7    time reviewing and analyzing the expert reports submitted by defendants, which

8    included over 7,000 pages of exhibits, analyzing significant volumes of securities

9    trading data relied upon by defendants' experts, deciphering defendants' experts'

10   calculations and computer code used to manipulate raw data, performed their own

11   independent analysis of the data relating to trading of Banc of California stock

12   (including trade-related variables), and conducted analyses and comparisons of

13   various pricing data points.

14                 (ii)    Crowninshield Financial Research, Inc. ("Crowninshield"):

15   $356,616.00.  Crowninshield is a financial economics consulting firm.  Lead Counsel

16   retained Professor Steven P. Feinstein (Ph.D., CFA), the President of Crowninshield

17   and an Associate Professor of Finance at Babson College, to offer opinions at

18   summary judgment and testify at trial regarding loss causation and damages relating to

19   Banc of California stock.  Dr. Feinstein and his team spent considerable time studying

20   the record and public information, including analyst reports and SEC filings in order

21   to be able to address the markets in which Banc of California securities traded,

22   disclosures related to Banc of California's operations and any related price movement

23   in Banc of California's stock.  Based on this work, Dr. Feinstein provided detailed

24   information and analyses that were utilized in analyzing loss causation and damages.

25   Dr. Feinstein provided a detailed expert report opining on these issues.  Dr. Feinstein

26   also provided a rebuttal report to address the opinions of two of defendants' experts

27   with regard to loss causation and damages.  Dr. Feinstein and his team also drafted the

28

- 3 -

Case 2:85-cv-04544-DMG-AGR Document 128-3 Filed 02/27/23 Page 172 of 182 Page ID
#:24510
Case 8:17-cv-00118-DMG-DFM Document 603 Filed 02/20/23 Page 5 of 18 Page ID
#:24510

Plan of Allocation governing the distribution of the Settlement Fund among Class Members.

(iii)   Stanford Consulting Group, Inc. ("Stanford Consulting"): $203,595.00.  Stanford Consulting is a financial economics consulting firm.  Lead Counsel retained Zachary Nye, Ph.D., a financial economist and Vice President at Stanford Consulting Group, to provide expert economic analysis on the market efficiency of Banc of California's stock during the Class Period and the economic materiality of information to investors.  Dr. Nye has an A.B. in Economics from Princeton University; an M.Sc. in Finance from the London Business School; and a Ph.D. in Finance from the Paul Merage School of Business at the University of California, Irvine.  Dr. Nye prepared a report in support of Plaintiff's motion for class certification, and Lead Counsel referred to and relied on Dr. Nye's report and event study to argue that Banc of California's securities reacted quickly to new, material information during the Class Period, and that its securities traded in an efficient market.  Dr. Nye and his team spent time studying the record and public information, including analyst reports and Banc of California's SEC filings, in order to analyze the market in which Banc of California stock traded, disclosures related to Banc of California's business, and the movements of Banc of California's stock in response to the disclosures and events identified in the complaint.  Dr. Nye produced a rebuttal report detailing his opinions in response to defendants' expert.  Dr. Nye's work was necessary to support Plaintiff's motion for class certification, which was granted by the Court.

(iv)   Kalorama Partners, LLC: $186,125.00.  Through Kalorama Partners, LLC, Lead Counsel retained the services of Harvey L. Pitt, the former chairman of the SEC, to provide expert opinions at summary judgment and testimony at trial on issues concerning internal disclosure controls for publicly traded companies like Banc of California, disclosures relating to proxy statements and materiality.  Mr. Pitt's opinions were based on his distinguished career, which first began at the SEC

- 4 -

4821-8804-5233.v1

1    and continued for over a decade, where he served as the SEC General Counsel for

2    three years before leaving and then returning to serve as the 26th Chairman of the

3    SEC from 2001-2003. Mr. Pitt was also a senior partner and Co-Chairman of Fried,

4    Frank LLP for almost 25 years, and has also served as a fiduciary director to

5    numerous public and non-public companies, for-profit and non-profit organizations

6    and private sector and governmental advisory boards. Mr. Pitt also has extensive

7    teaching experience at a number of law schools. In connection with his 31-page

8    report, Mr. Pitt spent a significant amount of time reviewing Banc of California's

9    2016 Proxy Statement, Banc of California's SEC filings, deposition testimony given

10   in this case, documentary evidence and consulted with Lead Counsel and its in-house

11   forensic accountants throughout the process.

12              (v)     Tasta Group dba Caliber Advisors, Inc. ("Caliber

13   Advisors"): $47,025.00. Caliber Advisors is a financial economics consulting firm.

14   Lead Counsel retained Bjorn Steinholt, CFA, the managing director of Caliber

15   Advisors, to provide the initial damages analysis for purposes of mediation. Mr.

16   Steinholt prepared an event study that analyzed the movements in the price of Banc of

17   California stock in comparison to the broader stock market and prepared damages

18   analyses for Lead Counsel. Based on this work, Mr. Steinholt provided Lead Counsel

19   with detailed information and analyses that provided support for Plaintiff's arguments

20   regarding damages with respect to the August 2018 mediation and June 2019

21   mediation, which ultimately led to the Settlement.

22              (vi)    Stephen Craig Pirrong: $42,550.00. Lead Counsel retained

23   Craig Pirrong, Ph.D. to review and respond to the analysis and opinions of two experts

24   offered by defendants to rebut loss causation. Dr. Pirrong provided an expert rebuttal

25   report to both of defendants' experts on the issue market manipulation, spoofing and

26   layering and cross-market derivative manipulation. Dr. Pirrong is Professor of

27   Finance at the Bauer College of Business, University of Houston and obtained his

28   undergraduate and Ph.D. in economics from the University of Chicago. A large part

- 5 -

of his professional work has focused on market manipulation and pricing, which includes eleven peer reviewed articles and a book on manipulation and pricing. Dr. Pirrong has also served on the Commodity Futures Trading Commission Energy and Environment Markets Advisory Board. The staff of Compass Lexecon assisted Dr. Pirrong with his work in this case. In connection with his 30-page report, Dr. Pirrong and Compass Lexecon reviewed and analyzed a substantial amount of trading data, including shot sale trading volume data for securities (including Banc of California securities) traded on various exchanges, including the NYSE and the NASDAQ.

(vii)   L.R. Hodges & Associates, Ltd. ("LRH&A"): $25,019.15. Over a six-month period (October through December 2016 and March through May 2017) in which LRH&A provided investigative services to Robbins Geller, LRH&A expended 109.6 hours for combined fees of $21,880.00, and incurred related expenses of $3,139.15 for a total of $25,019.15. LRH&A's research staff expended 36.1 hours to research, identify, and confirm the employment status of prospective witnesses, locating all key targets, as well as maintaining and updating an evolving witness list to support other investigative individuals. This also involved research, retrieval and analysis of relevant documents, including SEC filings, media articles, court filings, as well as other materials related to the case issues. The case manager and interviewing investigators expended a combined 73.5 hours to research, review and analyze materials in preparation for the investigation; contacting and conducting interviews with targeted third-party witnesses; and thereafter, preparing comprehensive interview summaries and other case reports. In addition, these individuals were involved in analyzing key case issues, as well as establishing and executing the joint litigation-investigation plan, and participating in numerous strategy sessions and investigation briefings with Robbins Geller.

(viii)   Kumar Venkataraman dba Wodehouse Consultants, LLC: $4,750.00. Through Wodehouse Consultants, LLC, Lead Counsel consulted with Professor Kumar Venkataraman to provide an initial analysis of the opinions put forth

- 6 -

4821-8804-5233.v1

by defendants' experts on the issues of market manipulation and spoofing and layering
as defenses to loss causation. Professor Venkataraman is the Professor of Finance and
the Maguire Chair in Energy Management in the Cox School of Business at Southern
Methodist University and has a Ph.D. in Finance from Arizona State University.
Professor Venkataraman specializes in the area of market microstructure, evaluation
of trading strategies and the functioning of equity, fixed-income and energy markets.
In connection with the consultation, Professor Venkataraman undertook a detailed
review of the expert report of Joseph Mitts submitted by Banc of California and
consulted with Lead Counsel on rebutting the opinions therein.

(f) Photocopies: $4,783.61. In connection with this case, the Firm
made 23,957 photocopies. Robbins Geller requests $0.15 per copy for a total of
$3,593.55. Each time an in-house copy machine is used, our billing system requires
that a case or administrative billing code be entered and that is how the number of in-
house copies were identified as related to the Litigation. The Firm also paid
$1,190.06 to outside copy vendors. A breakdown of these outside charges by date and
vendor is set forth in the attached Exhibit F.

(g) Online Legal and Financial Research: $76,777.67. This category
includes vendors such as LexisNexis Products, PACER, Thomson Financial,
TransUnion Acquisition Corp. and Westlaw. These resources were used to obtain
access to SEC filings, factual databases, legal research and for cite-checking of briefs.
This expense represents the expenses incurred by Robbins Geller for use of these
services in connection with this Litigation. The charges for these vendors vary
depending upon the type of services requested. For example, Robbins Geller has flat-
rate contracts with some of these providers for use of their services. When Robbins
Geller utilizes online services provided by a vendor with a flat-rate contract, access to
the service is by a billing code entered for the specific case being litigated. At the end
of each billing period in which such service is used, Robbins Geller's costs for such
services are allocated to specific cases based on the percentage of use in connection

- 7 -

4821-8804-5233.v1

1    with that specific case in the billing period.  As a result of the contracts negotiated by

2    Robbins Geller with certain providers, the Class enjoys substantial savings in

3    comparison with the "market-rate" for *a la carte* use of such services which some law

4    firms pass on to their clients.  For example, the "market rate" charged to others by

5    LexisNexis for the types of services used by Robbins Geller is more expensive than

6    the rates negotiated by Robbins Geller.

7                (h)     eDiscovery Database Hosting: $73,888.53.  Robbins Geller

8    requests $73,888.53 for hosting eDiscovery related to this Litigation.  Robbins Geller

9    has installed top tier software, infrastructure and security.  The platform implemented,

10   Relativity, is offered by over 100 vendors and is currently being used by 198 of the

11   AmLaw200.  Over 30 servers are dedicated to Robbins Geller's Relativity hosting

12   environment with all data stored in a secure SSAE 16 Type II data center with

13   automatic replication to a datacenter located in a different geographic location.  By

14   hosting in-house, Robbins Geller is able to charge a reduced, all-in rate that includes

15   many services which are often charged as extra fees when hosted by a third party

16   vendor.  Robbins Geller's hosting fee includes user logins, processing, deduplication,

17   OCRing, TIFFing, bates stamping, exports, productions and archiving – all at no

18   additional cost.  Also included is unlimited structured and conceptual analytics (*i.e.*,

19   email threading, inclusive detection, near-dupe detection, concept searching, assisted

20   review, clustering, and more).  Robbins Geller is able to provide all these services for

21   a rate that is typically much lower than outsourcing to a third party vendor.  Utilizing

22   a secure, advanced platform in-house has allowed Robbins Geller to prosecute actions

23   more efficiently and has reduced the time and expense associated with maintaining

24   and searching electronic discovery databases.  Similar to third-party vendors, Robbins

25   Geller uses a tiered rate system to calculate hosting charges.  The amount requested

26   reflects charges for the hosting of over 1.2 million pages of documents produced by

27   defendants and third parties in this action.

28                (i)     Mediation Fees: $62,684.04.

4821-8804-5233.v1

Case 2:85-cv-04544-DMG-AGR Document 1281-3 Filed 08/27/22 Page 177 of 182 Page ID
#:44525
Case 8:17-cv-00118-DMG-DFM Document 603 Filed 02/10/20 Page 10 of 16 Page ID
#:7452

(i)    Phillips ADR Enterprises, P.C. ("Phillips ADR"):
$55,184.04.  The parties retained the Honorable Layn Phillips (Ret.) and Michelle
Yoshida of Phillips ADR to assist with settlement negotiations following the Court's
March 6, 2019 order requiring the parties to renew discussions with a mediator.  ECF
No. 551 at 2.  Counsel for all parties attended a full-day, in-person mediation session
in New York, New York, with Judge Phillips and Ms. Yoshida on June 21, 2019.
Prior to the mediation, the parties exchanged briefs detailing their claims and defenses
in the case.  Although no agreement was reached that day, negotiations continued
through Judge Phillips and Ms. Yoshida over the following three months and on
September 15, 2019, the parties accepted a mediator's proposal from Judge Phillips to
resolve the case for $19,750,000.00.  This expense represents Plaintiff's one-half
share of the fees for the mediation services provided by Phillips ADR.

(ii)    Fairbank and Vincent dba Fairbank ADR ("Fairbank
ADR"): $7,500.00.  Pursuant to Local Rule 16-15, the parties agreed to follow ADR
Procedure No. 3 (private mediation) and retained Robert Fairbank of Fairbank ADR to
assist with settlement negotiations.  Counsel for all parties attended an in-person
mediation with Mr. Fairbank on August 10, 2018, in Los Angles, California, however,
the case did not resolve.  Prior to the mediation, the parties exchanged briefs detailing
their claims and defenses in the case, which were reviewed and analyzed by Mr.
Fairbank.  This expense represents Plaintiff's one-half share of the fees for the
mediation services provided by Fairbank ADR.

7.    The expenses pertaining to this case are reflected in the books and
records of this Firm.  These books and records are prepared from receipts, expense
vouchers, check records and other documents and are an accurate record of the
expenses.

- 9 -

4821-8804-5233.v1

Case 2:85-cv-04544-DMG-AGR Document 1280-3 Filed 08/27/22 Page 178 of 182 Page ID
#:44525
Case 8:17-cv-00118-DMG-DFM Document 603 Filed 02/10/20 Page 11 of 101 Page ID
#:4406

8.     The identification and background of my Firm and its partners is attached hereto as Exhibit G.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 10th day of February, 2020, at San Diego, California.

s/ Laurie L. Largent
_____
LAURIE L. LARGENT

4821-8804-5233.v1

Case 2:85-cv-04544-DMG-AGR Document 1281-3 Filed 08/27/22 Page 179 of 182 Page ID
#:44526
Case 8:17-cv-00118-DMG-DFM Document 603 Filed 02/10/20 Page 12 of 187 Page ID
#:44527

EXHIBIT A

Case 2:85-cv-04544-DMG-AGR   Document 1261-3   Filed 08/27/22   Page 180 of 182   Page ID
#:44527
Case 8:17-cv-00118-DMG-DFM   Document 1263   Filed 02/10/20   Page 13 of 16   Page ID
#:44527

# EXHIBIT A

*In re Banc of California Securities Litigation*, SACV 17-00118 AG (DFMx)
Robbins Geller Rudman & Dowd LLP
Inception through December 30, 2019

| NAME | | HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| Alpert, Matthew | (P) | 3,389.80 | 800 | $ 2,711,840.00 |
| Burkholz, Spencer | (P) | 281.90 | 1,150 | 324,185.00 |
| Daley, Joseph | (P) | 26.00 | 925 | 24,050.00 |
| Gusikoff Stewart, Ellen | (P) | 5.00 | 1,030 | 5,150.00 |
| Henssler, Robert | (P) | 606.50 | 850 | 515,525.00 |
| Largent, Laurie | (P) | 2,000.57 | 1,040 | 2,080,592.80 |
| Myers, Danielle S. | (P) | 5.45 | 800 | 4,360.00 |
| Pintar, Theodore | (P) | 100.70 | 1,050 | 105,735.00 |
| Saham, Scott H. | (P) | 60.90 | 950 | 57,855.00 |
| Mendoza, Alexander | (A) | 38.00 | 175 | 6,650.00 |
| Oliver, Erika | (A) | 1,617.40 | 480 | 776,352.00 |
| McCormick, Tricia | (OC) | 27.25 | 880 | 23,980.00 |
| Walton, David | (OC) | 67.80 | 1,030 | 69,834.00 |
| Araya-Schraner, Natasha | (SA) | 7.00 | 360 | 2,520.00 |
| Rudolph, Andrew | (FA) | 12.10 | 725 | 8,772.50 |
| Sader, Brad | (FA) | 346.90 | 575 | 199,467.50 |
| Yurcek, Christopher | (FA) | 6.10 | 725 | 4,422.50 |
| Hughes, Zackary | (FAI) | 15.50 | 75 | 1,162.50 |
| Ignacio, Angelica | (FAI) | 10.50 | 75 | 787.50 |
| Mouannes, Charbel | (FAI) | 27.00 | 75 | 2,025.00 |
| Wat, Emily | (FAI) | 44.50 | 75 | 3,337.50 |
| Barhoum, Anthony | (EA) | 20.35 | 430 | 8,750.50 |
| Cabusao, Reggie | (EA) | 22.25 | 335 | 7,453.75 |
| Uralets, Boris | (EA) | 13.20 | 415 | 5,478.00 |
| Roelen, Scott | (RA) | 32.30 | 295 | 9,528.50 |
| Brandon, Kelley | (I) | 74.00 | 290 | 21,460.00 |
| Keita, C. Oumar | (LS) | 8.00 | 290 | 2,320.00 |
| Ulloa, Sergio | (LS) | 6.00 | 290 | 1,740.00 |
| Frazier, Joshua | (LC) | 70.00 | 170 | 11,900.00 |
| Rigby, John | (SUA) | 57.10 | 175 | 9,992.50 |
| Hart, Miranda | (SLC) | 87.90 | 170 | 14,943.00 |
| Paralegals | | 1,439.85 | 275-350 | 468,046.25 |

Case 2:85-cv-04544-DMG-AGR Document 1281-3 Filed 08/27/22 Page 181 of 182 Page ID
Case 8:17-cv-00118-DMG-DFM Document 603 Filed 02/10/20 Page 14 of 1617 Page ID
#:54528

| NAME | | HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| Document Clerks | | 482.30 | 100-150 | 66,980.00 |
| Shareholder Relations | | 38.85 | 100-150 | 3,935.00 |
| **TOTAL** | | **11,048.97** | | **$ 7,561,131.30** |

(P) Partner
(A) Associate
(OC) Of Counsel
(SA) Staff Attorney
(FA) Forensic Accountant
(FAI) Forensic Accounting Intern
(EA) Economic Analyst
(RA) Research Analyst
(I) Investigator
(LS) Litigation Support
(LC) Law Clerk
(SUA) Summer Associate
(SLC) Summer Law Clerk

Exhibit A
- 12 -

1

2                    **CERTIFICATE OF SERVICE**

3

4    I hereby certify that I am over the age of 18 and not a party to this action and on

5    August 27, 2022, I served the foregoing exhibit on all counsel of record by means of

6    the District Clerk's CM/ECF electronic filing system.

7                                              /s/*Peter Schey*
                                               *Counsel for Plaintiffs*
8                                              CENTER FOR HUMAN
                                               RIGHTS AND
9                                              CONSTITUTIONAL LAW
                                               Peter A. Schey
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28