ANDREA SHERIDAN ORDIN (SBN 38235)
STRUMWASSER & WOOCHER LLP
1250 Sixth Street, Suite 205
Santa Monica, California 90401
Telephone: (310) 576-1233
Facsimile: (310) 319-0156
E-mail: aordin@strumwooch.com

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MERRICK B. GARLAND, Attorney General of the United States, *et al.*,<br><br>Defendants. | CASE NO. CV 85-4544-DMG (AGRx)<br><br>**NOTICE OF FILING OF JUVENILE CARE MONITOR REPORT BY DR. PAUL H. WISE** |

In accordance with the Court's Orders, Dr. Paul H. Wise submits the attached Juvenile Care Monitor Report.  The redacted material in the Juvenile Care Monitor Report on pages 17 & 18 have been deemed confidential by the Juvenile Care Monitor and the Parties.

These assessments are required by the provisions of a recent settlement agreement approved by the Court on July 29, 2022 [Doc.# 1278] (the Settlement) which mandates many new and specific custodial conditions and procedures for immigrant children in federal custody.  The Settlement also established the Juvenile Care Monitor (JCM) position to access CBP compliance with the provisions of the Settlement.

DATED:      January 30, 2023          Respectfully submitted,

Andrea Sheridan Ordin
STRUMWASSER & WOOCHER LLP


By    /s/ Andrea Sheridan Ordin
        Andrea Sheridan Ordin

*Legal Advisor to Juvenile Care Monitor*
*Dr. Paul H. Wise*

*This report is subject to the Protective Order Governing the Handling of Confidential Material Related to Oversight by Special Master/Independent Monitor, ECF No. 513.*

# JUVENILE CARE MONITOR REPORT
## January 2023

**Submitted by Paul H. Wise, MD, MPH**

**Juvenile Care Monitor**

# **CONTENTS**

I.      SUMMARY………………………………………………………1

II.     THE CBP SETTLEMENT AND THE JUVENILE CARE
        MONITOR .......................................................................................7

III.    MONITORING ACTIVITIES AND DATA ANALYSIS………...10

IV.     CONDITIONS AT CBP FACILITIES...…………………………...15

V.      CAREGIVERS……………………………………………….....44

VI.     TRAUMA-INFORMED CARE AND CHILD-APPROPRIATE
        ENVIRONMENT……………………………………………….47

# SUMMARY

This report presents the evaluation and recommendations of the Juvenile Care Monitor who is charged with conducting independent assessments of custodial conditions for children held in Customs and Border Protection (CBP) facilities in the Rio Grande Valley (RGV) and El Paso sectors.  These assessments are required by the provisions of a recent settlement agreement approved by the Court on July 29, 2022 [Doc. # 1278] (the Settlement) which mandates many new and specific custodial conditions and procedures for immigrant children in federal custody.  The Settlement also established the Juvenile Care Monitor (JCM) position to assess CBP compliance with the provisions of the Settlement.

The JCM conducts a variety of monitoring activities. This report has drawn upon site visits to CBP facilities, interviews with children and families in CBP custody, interviews with unaccompanied children (UCs) in shelters run by the Office of Refugee Resettlement (ORR), the Department of Health and Human Services, and the analysis of data provided by CBP on custodial operations involving UCs and children in families.

While the JCM examines all Settlement requirements and reports all concerns related to settlement compliance, the primary focus of the JCM is on those requirements and concerns that have the greatest potential consequences on the health and well-being of children in CBP custody.  All concerns related to Settlement compliance or other custodial concerns generated by interviews or observed during site visits were immediately conveyed to CBP and remedial action monitored.

**The CBP Settlement Agreement**

The Settlement mandates a number of specific requirements for the care of immigrant children in U.S. custody.  It supplements the *Flores* Settlement Agreement (FSA) which since 1997 has required that immigrant children in custody be housed in "safe and sanitary" conditions.  Children covered by the Settlement are individuals less than 18 years-of-age and include both unaccompanied children (UCs) and children in families.

The Settlement mandates a full range of custodial requirements, most of which CBP has met. Overall, CBP has made major advances in enhancing the custodial conditions provided immigrant children and families. However, important concerns related to Settlement compliance remain and require remediation or purposeful review.  The assessment of the most important custodial requirements outlined in the Settlement are summarized below:

- **Juvenile Priority Facilities.** A fundamental provision in the Settlement is the designation of specific facilities in each sector to house and process UCs and families.  These juvenile priority facilities, designated Central Processing Centers (CPCs), have been established in the RGV and El Paso sectors in accordance with the Settlement and are the locations where almost all children and families are held in custody within the sectors.

- **Family unity.**  The Settlement requires that CBP not separate children from their parents or legal guardians unless, on rare occasions, there is a perceived risk of harm to the child. However, children who are apprehended with a trusted adult other than a parent or legal guardian (eg. adult sibling, grandparent, or aunt) are considered UCs and transferred to ORR care.  There

was some variation regarding the holding of children with the trusted adult in the CPC until transfer to ORR. This variation in policies regarding the holding of children with their trusted adult deserves close attention.

- **Time in custody and overcrowding.** In both sectors, UCs were regularly transferred to ORR care within the required 72 hours, most within 48 hours. This represents a major improvement and reflects the high priority CBP and ORR have given the processing of UCs. Children in families experienced a wider range of times in custody, some remaining in facilities with high census for up to 14 days. Large increases in apprehensions placed significant strain on CBP's custodial systems. There were periods in which there was considerable overcrowding for families in one CPC, at times reaching approximately four times the designated maximum occupancy for the holding areas. This level of overcrowding adversely affected many of the essential custodial services mandated in the Settlement, as noted in the sections below.

- **Medical Care.** The Settlement requires CBP to provide a multilayered medical system for children and families in custody. CBP has met this requirement by establishing around the clock medical services in the CPCs and most other main CBP stations in the two sectors. These services include basic screening, more extensive medical assessments for UCs and other selected groups of children, the provision of medications for acute or chronic conditions, and the referral of children to local hospitals or other health facilities when needed. In addition, CBP has implemented an electronic health record which has facilitated improved clinical documentation and coordination. Mental health services were confined to children in clear distress and were provided by the contracted medical personnel. Despite the

3

establishment of this system, there was considerable variation in the
implementation and performance of several important medical protocols,
including the medical assessment of older children with chronic medical
conditions, the maintenance of chronic medication regimens, repeat health
interviews for children held longer than 72 hours, and the conveyance of
medical information upon release or transfer from CBP custody. Of particular
concern was the adequacy of medical supervision when the custodial census is
high, both in the CPCs and the facilities used for isolating children and
families with contagious illnesses.

- **Warmth, Garments, and Sleep.**  The Settlement requires that CBP ensure
  that the holding environment maintain a temperature between 69 and 83
  degrees, provide clean and warm garments to children in custody, and that the
  holding conditions are conducive to adequate sleep.  CBP has met the
  temperature requirements in the CPCs, although the lower limit of the
  allowable range may need to be revised upward. Garments, including sweat
  suits, socks and footwear, and beanies for young children, were provided in the
  CPCs. All children were provided with a sleeping mat and mylar blanket.
  Light dimming capabilities varied considerably.  The greatest impediment to
  adequate sleep was overcrowding, particularly in holding areas for families.

- **Nutrition.**  The Settlement requires the provision of age-appropriate meals
  and snacks that meet children's daily nutritional needs. Water and adequate
  hydration are also mandated by the Settlement.  CBP has generally met this
  requirement.  Water was readily available upon apprehension, in the CPCs
  and during transport. Snacks were available at all times in the CPCs. Two
  hot meals and one cold meal were provided each day. Infant formula and

toddler foods were available in the CPCs. The quality of and satisfaction with the provided food varied considerably and will require continued monitoring.  In addition, the food offerings for children 2-5 years of age do not appear age-appropriate and will require review and revision.

- **Hygiene and Sanitation**.  The Settlement outlines a series of hygiene and sanitation requirements for all children entering CBP custody.  Shower requirements were generally met for UCs.  However, with very high censuses and times in custody of greater than 4 days, access to showers for children in families varied considerably, at times not meeting Settlement requirements.  The availability of toothbrushes for children in families also often did not meet Settlement requirements.

- **Caregivers.** The Settlement requires that CBP develop a "caregiver" program directed at providing a variety of direct custodial services to children in CBP custody. CBP has met this requirement by placing caregivers in the CPCs to assist with showers and other hygiene tasks, caring for very young UCs, and in providing some child-friendly activities.  However, the number of caregivers in the CPCs will need to be dramatically increased to mitigate the impact of overcrowding and meet the activity and psychological needs of children in custody.  In addition, the positioning of caregivers in isolation facilities holding children remains a need that should be addressed urgently.  CBP is well aware of these needs and is working with the JCM on solutions.

- **Child-appropriate Environment.** The Settlement requires that children be treated with dignity, respect, and recognition of their particular vulnerabilities. Multiple, unsupervised interviews with children during all CBP and ORR site

visits reported that the children felt safe in CBP custody. There were no reports of physical or verbal abuse by CBP personnel or by other children in custody. However, some older children reported harsh language used by CBP agents when the children were apprehended as part of a large group of mostly adults in the field.  All CPC holding areas have televisions playing informational and educational videos.  The holding areas for UCs in the El Paso CPC have child-friendly activities, including books, toys, and art materials, all supervised by caregivers.  In the RGV CPC, these activities were confined to the nursery area holding very young and infant UCs and supervised by caregivers. The main holding pods in the RGV CPC had no child-friendly activities.

**Overall Assessment and Child Well-Being**

The Settlement mandates a large number of specific custodial and procedural requirements. CBP has met many of these requirements.  Important improvements have been implemented, particularly in the speed with which UCs are being transferred to ORR care, the general medical systems deployed in facilities holding children, and the placement of some caregivers in the CPCs.

Nevertheless, there remain areas of custodial services that require improvement, some, such as the care of UCs in isolation stations, demand urgent remediation. Moreover, regular overcrowding of CBP facilities represents the most far-reaching threat to compliance with the agreement and to the provision of essential custodial services for children. It also underscores CBP's responsibility to address overcrowding and mitigate its impact on children in custody.

## II. THE CBP SETTLEMENT AND THE JUVENILE CARE MONITOR

### II.A. The CBP Settlement

On July 29, 2022, the Court granted final approval of a settlement that resolved a motion to enforce compliance with the Flores Settlement Agreement (FSA) regarding conditions and standards at CBP facilities in the Rio Grande Valley ("RGV") and El Paso sectors along the Southwest Border ("the Settlement"). The Settlement is a lengthy and complex document that specifies a large number of specific custodial requirements.  The Settlement was the result of nearly three years of mediation between the Plaintiffs and Defendants and overseen by the Special Master, Ms. Andrea Ordin, and informed by the Special Expert, Dr. Paul H. Wise, both appointed by the Court.

Through the Settlement, the Plaintiffs and Defendants sought to clarify their understanding of the custodial conditions that CBP must provide class members while in detention in the RGV and El Paso sectors.  The FSA, established in 1997, contains the broad mandate that immigrant children be housed in "safe and sanitary" conditions with particular regard for the vulnerability of minors. The Settlement articulates a series of specific custodial requirements, including the designation of "Juvenile Priority Facilities," to which minors must be transferred within 48 hours of arrival at any other CBP facility within the Sector.

The Settlement addresses the importance of family unity, requiring minors to be housed with their family members whenever possible, and that reasonable efforts to facilitate contact between family members will be made if an operational need to separate a family exists. Under the Settlement, CBP must notify ORR when unaccompanied minors who are related are in need of placement and should

7

also make all reasonable efforts to provide UCs with daily access to a phone in
order to contact family members.

## II.B. The Juvenile Care Monitor

The Settlement established the role of a court-appointed Juvenile Care Monitor
(JCM), with a mandate and authority to monitor CBP's compliance with the
provisions of the Settlement in the RGV and El Paso sectors. On August 3, 2022,
Dr. Paul H. Wise was appointed the Juvenile Care Monitor for a 16-month term.
Prior to his appointment as the JCM, Dr. Wise served since July 2019 as the Special
Expert working with the Special Master (Ms. Andrea Ordin) to provide the Court
with independent assessments of custodial conditions in CBP facilities in the RGV
and El Paso sectors and in ORR Emergency Intake Sites/Influx Care Facilities
around the country.

The JCM is subject to the Protective Order Governing the Handling of Confidential
Material Related to Oversight by Special Master/Independent Monitor, ECF No.
513. Subject to that Protective Order, he will have access to CBP documents and
records, may conduct announced and unannounced visits to CBP facilities in the
RGV and El Paso Sectors, may conduct interviews with class members and
accompanying adult family members, and may conduct interviews with CBP
employees and the employees of its contractors.

All concerns related to Settlement compliance or other custodial concerns observed
during site visits were immediately conveyed to CBP. In addition, the JCM has also
analyzed data from CBP in order to determine whether CBP is in compliance with the
terms of the Settlement, including time in custody and whether there is overcrowding
at CBP juvenile priority facilities, as defined in the Settlement.

As defined in the Settlement, the JCM also inspects non-priority CBP facilities for the purpose of determining whether the facility is holding or is prepared to hold UCs or families in compliance with the Settlement.

The JCM is charged with preparing reports to be filed with the Court. If these reports are deemed confidential by the Juvenile Care Monitor or the Plaintiffs or the Defendants, the report will be filed under seal with the Court.  Either Party may file objections to or comments to the reports. Any objections or comments regarding confidential matters shall be filed under seal.

The JCM is charged with assessing CBP's compliance with the provisions of care articulated in the Settlement.  The Settlement also requires the JCM to identify issues that deserve purposeful discussion or ameliorative action. This report represents the first of these reports and is purposefully comprehensive in its examination of CBP custodial practices.

It is important to note that the JCM has been given full access to CBP facilities and relevant data and has been treated at all times with professionalism and courtesy by CBP leadership and operational personnel in the RGV and El Paso sectors. In addition, the JCM has been working with the full, responsive engagement of the CBP Office of the Chief Medical Officer and sector operational leaders to address the areas of concern and deficiencies noted in this report.

## III.  MONITORING ACTIVITIES AND DATA ANALYSIS

The JCM conducts a variety of monitoring activities. This report has drawn upon 3 sources of information:

- Site visits and interviews in CBP facilities
- Interviews at ORR facilities with UCs regarding their experiences in CBP custody
- CBP data on apprehensions and custodial operations of juveniles in custody

### III.A. Site Visits

### III.A.1.  CBP Facilities.

Between the establishment of the JCM role in August 2022 and the date of this report, 6 site visits were conducted at CBP facilities.  These site visits were both announced and unannounced visits, in which the JCM had full access to all sections of all facilities providing care to children.  In addition, the JCM had full freedom to conduct interviews away from CBP personnel with both children and parents in custody.  The dates and location of the site visits to CBP facilities were as follows:

### III.A.1.a.  CBP El Paso
- August 16*
- October 17-18*
- November 5
- December 6

### III.A.1.b.  CBP Rio Grande Valley
- Sept 13**
- Nov 1

> *JCM visit accompanied by Ms. Andrea Ordin, Special Master
> **JCM visit assisted by Dr. Cristel Escalona, MD

### III.A.2.  ORR Facilities.

Interviews with UCs were conducted during site visits to the 2 Influx Care Facilities (ICFs).  These facilities were formerly designated Emergency Intake Sites (EISs) but have enhanced their services to meet the more comprehensive ICF standards. The interviews were conducted with both boys and girls of varying ages between 12 and 17.  The interviews were held in private settings without ORR staff present and included discussion of their experiences in CBP custody.  The dates and location of the site visits to the ORR ICF facilities were as follows:

### III.A.2.a.  Office of Refugee Resettlement, Influx Care Facility, Pecos, Texas
- August 15

### III.A.2.b.  Office of Refugee Resettlement, Influx Care Facility, Ft. Bliss, Texas
- August 16
- October 17*

> \*JCM visit accompanied by Ms. Andrea Ordin, Special Master

### III.B. CBP Data Analysis

CBP provided monthly reports on the number of children held in custody for  longer than 72 hours.  In addition, weekly or biweekly reports on census figures for UCs and families being held in the 2 sectors were also provided.  In October 2022, CBP reported a total of 59,800 family unit (FMUA) encounters (includes all individuals in the family, including both adults and minors) and 11,991 unaccompanied children encounters. The data reflect the continuing challenge faced by CBP during a period of increased encounters on the Southwest Border.  (See Figure A).

| OCTOBER 2022 CBP SOUTHWEST BORDER FMUA/UC ENCOUNTERS BY SECTOR | | | | | | |
|---|---|---|---|---|---|---|
| **Sector** | **August 2022 FMUA Encounters** | **October 2022 FMUA Encounters** | **% Change in FMUA Encounters August to October** | **August 2022 UC Encounters** | **October 2022 UC Encounters** | **% Change in UC Encounters August to October** |
| El Paso | 7,817 | 16,667 | +  113.2 % | 2,026 | 2628 | + 29.7 % |
| RGV | 5,671 | 5,460 | - 3.72 % | 5,360 | 4925 | - 8.12 % |
| **TOTAL** | **13,488** | **22,127** | **+ 64 %** | **7,386** | **7,553** | **+ 2.3 %** |

*Figure A*

Not only have the overall number of families and UCs continued to increase, but the sectors at which they are encountered also remains dynamic.  Traditionally, the RGV sector has recorded the largest monthly total of encounters.  However, as Figure B depicts, the El Paso and the Del Rio sectors far surpassed the RGV figure during November 2022.  These figures represent all encounters and not just those of UCs and families.



*Figure B*

The increases in family encounters in the El Paso sector have put pressure upon CBP to avoid severe overcrowding and to provide the custodial services to families required by the Settlement.

Although this report does not address the care provided single adults in CBP custody, it is important to recognize that recent increases in the number of single adults in CBP custody can reduce the physical space available to hold families and children. It also places a competitive burden on CBP for processing and the provision of custodial services. Indeed, the recently renovated "Ursula" CBP facility in the RGV sector was intended to hold UCs; however, it is currently being used exclusively to hold single adults. The El Paso CPC was similarly intended to hold only families and UCs. However, the large number of single adults apprehended in the El Paso sector has forced CBP to utilize large parts of the CPC to hold single adults. This has meant that the services and amenities provided at the CPC,

13

including medical coverage, must accommodate large numbers of single adults at the same facility that is designated the sector's Juvenile Priority Facility.

Despite the large numbers of apprehensions in the RGV and El Paso sectors, CBP has been able to expeditiously transfer UCs to the care of ORR. Based on CBP data and review of time in custody figures during site visits, the time from apprehension to transfer to ORR was less than 72 hours. The average was usually less than 48 hours. Of the 7,553 UCs encountered in the RGV and El Paso sectors in October, none were held more than three days. In the prior month, only four unaccompanied minors, all of whom were over 12 years, had been held in CBP custody for more than 72 hours. The UCs held in CBP custody for longer than 72 hours were complex cases, such as those who had initially falsely claimed to be over 18 years of age. In the month of November 2022, CBP reported that over the entire Southwest border, 11 UCs were held longer than 72 hours, none in the RGV or El Paso sectors.

Unlike UCs, many families had protracted times in custody. According to CBP data for November 2022, 1,117 children in families remained in CBP custody longer than 72 hours. Approximately half of these children were less than 7 years of age, generally considered "tender age" children. (See Figure C). Of these, 75% were in custody less than 5 days. Review of family data and interviews during site visits revealed times in custody over 3 days were common in El Paso which had experienced a major increase in the number of families brought into custody. During November, El Paso reported 93 children in families were in custody for greater than 7 days; this represented 78% of all children in families held for greater than 7 days across the whole Southwest border.



*Figure C*

## IV.   CONDITIONS AT CBP FACILITIES

### IV.A.   Facility Designation

CBP has created juvenile priority facilities in both the Rio Grande Valley and El Paso sectors.  These have been designated Central Processing Centers (CPCs) which are the primary sites within the sectors for holding UCs and families in custody.  UCs and families apprehended in locations relatively distant from the CPCs may be initially held in CBP stations until transfer to the CPCs can be arranged.  Interviews with UCs and families apprehended at locations distant from the CPCs reported transfer to the CPC within 48 hours, mostly within 24 hours.

### IV.A.1.   Rio Grande Valley

The CPC in RGV is a soft-sided facility comprised of multiple pods. Each pod is comprised of clear plastic walls and a door that remains unlocked and without windows to the outside environment.  The doors lead to a central corridor connected to other holding pods.  Snacks, water, and sanitary facilities are positioned in the corridor. The corridor has 2 exits, one at each end at which contracted guards are stationed to prevent UCs or family members from exiting without being accompanied by a CBP agent or contracted guard.  A CBP agent is also stationed in a tower in the corridor with full visibility into the pods.  There is no use of fencing in any of the pods.

### IV.A.2.   El Paso

The CPC in El Paso is a hard-sided facility composed of large holding pods with CBP agents or contracted guards stationed at the doors.  UCs or family members are not permitted to exit the holding pods without being accompanied by a CBP agent or contracted guard.  The pods have windows facing an internal corridor but none to the outside environment.  Snacks, water, and sanitary facilities are positioned within the holding pods.  The facility is composed of two, long wings connected by a series of fenced, outdoor catwalks.  There is no fencing used in the holding pods.

The visited non-juvenile priority facilities (Border Patrol stations) in both sectors had available supplies for children required by the Settlement.

### IV.B.   Overcrowding

Overcrowding is the custodial condition with the greatest potential to undermine the quality of care provided children in CBP custody.  The Settlement defines overcrowding as "a level of occupancy that exceeds the physical space required to maintain a safe and sanitary environment for each individual in custody." In

addition to lack of physical space, virtually all custodial systems, including hygiene and sanitation, medical care, and trauma-informed care are profoundly stressed by censuses that surpass facility capacity and systems' design.

### IV.B.1.    Observations

Data and site visits to the RGV CPC, confirmed that the pods holding UCs and families were at or below official maximum capacity limits. Site visits to the El Paso CPC, however, documented major overcrowding in the pods holding families.



All site visits since August 2022 documented significant overcrowding in the pods holding families in the El Paso CPC.  (See Table 1). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ ▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮.  The highest ratio of individuals held compared to the maximum occupancy of the pods in use was on November 5th when there were 4.63 times the maximum occupancy being held.

Table 1. The number of individuals held in Family pods at El Paso CPC during site
visits.

Observations and interviews with families in the El Paso CPC documented the
overcrowded conditions generated significant concerns in virtually all custodial
arenas.  Sleeping mats were necessarily placed in close proximity to each other.
Sleep was quite difficult as the general noise level and the crying of the large
number of young children and infants in the pods was considerable.  Family
members were largely confined to the pods, commonly for protracted periods.
Parent reports as well as direct observation underscored that the lack of privacy and
personal space, inadequate sleep, and absence of meaningful activities were
associated with elevated levels of psychological distress and emotional volatility
among the children held in these pods. The overcrowded conditions had the effect
of rendering the trauma-informed care systems required by the Settlement (See
Section VII.3.D.7 of the Settlement) largely unenforceable.

Although the pods and toilet areas were cleaned once per shift and families made
an effort to neaten their areas, the number and proximity of persons being held
made it difficult to maintain a clean environment at all times.

### IV.B.2.   Assessment

The legal requirements of the Settlement recognize that rapid increases in apprehensions, or "surge situations" may impact CBP's ability to maintain full compliance with the Settlement.  In such situations CBP is obligated to "take all necessary steps to mitigate any non-compliance and comply with this Agreement to the extent possible…" (See Section V. of the Settlement).  The overcrowding in the El Paso CPC documented in this report reflects a period of increased apprehensions within the sector.

CBP has made efforts to reduce overcrowding and there are recent indications that overcrowding has eased somewhat.  In addition, despite the substantial overcrowding, CBP prioritized the care and processing of UCs.

Under the Settlement, it is important to recognize that overcrowding was associated with deficiencies in custodial conditions.  These deficiencies are specified in more detail in the sections below.

### IV.B.3.   Recommendations

Persistent overcrowding in the El Paso CPC family pods has created highly deficient conditions that warrant reduced occupancy and urgent enhancements of custodial amenities and services.

CBP is well aware of the challenges generated by this overcrowding and has undertaken a series of actions to reduce the number of families being held in the CPC. Evaluating the effectiveness of each specific action is beyond the scope of this report. Rather, this report emphasizes the persistence and impact of overcrowding and the need to both prevent overcrowding and mitigate its effects on children and families in custody.

**IV.B.3.a.**     Cleaning services could be enhanced to refresh toilet and sink areas more often than once per shift.

**IV.B.3.b.**     The number of medical provider teams should be increased.  This would permit greater attention to the medical assessment of older children with significant medical needs and enhanced surveillance of ill or young children being held in family pods.

**IV.B.3.c.**     Sufficient caregivers and CBP agent support should be assigned to provide child-friendly activities and recreation for children held in family pods.

**IV.B.3.d.**     Families with young children should be advised that age-appropriate foods and snacks are available upon request.

## IV.C.   Enhanced Medical Support

The Settlement requires a robust medical care system for juveniles in CBP custody. (See Special Considerations: Annex I).  CBP has generally met this requirement by establishing around-the-clock medical coverage in all CBP facilities caring for children.  Both the RGV and El Paso CPCs have contracted medical personnel on-site 24 hours per day and 7 days per week. The medical team includes an advanced medical practitioner (either a nurse practitioner or physician assistant) and 2-3 medical support personnel, usually medical assistants or emergency medical technicians.  The CPCs are usually staffed by at least 3 medical teams. In addition to the on-site medical teams, 2 supervising pediatricians in each sector provide on-call consultation, clinical protocol development, and quality assurance reviews.

Despite the successful deployment of these medical structures, this report documents several medical services that are of concern, some in need of urgent

remediation.  The JCM has worked closely with CBP's Office of the Chief Medical Officer to address noted concerns and will continue to monitor the performance of the medical system for children in custody. The specific issues of concern are presented below within the discussion of each medical system component.

The CBP medical system for children is focused on immediate identification and treatment of acute medical needs and the frontline maintenance of chronic medical conditions. This system is comprised of 6 arenas of medical assessment and response:

### IV.C.1.    Medical Care Upon Apprehension

CBP agents are responsible for identifying and addressing all acute medical emergencies in the field by administering appropriate first-line care and seeking emergency medical assistance from local health systems if required.

### IV.C.1.a.    Observations

Interviews with UCs, family members, medical contractors and CBP agents reported that while unusual, direct referrals from the field to emergency medical systems or local health facilities have occurred, generally associated with injuries or exposure.  Orthopedic injuries due to falls from the border wall have occurred and required referral to local hospitals for evaluation.

### IV.C.1.b.  Assessment

Medical care upon apprehension met the requirements of the Settlement.

### IV.C.1.c.  Recommendations.  None

### IV.C.2.     Health Intake Interviews

CBP is responsible for conducting health interviews with all UCs and family members upon arrival at CBP facilities.  At the CPCs, these initial interviews are conducted before entry into the facility.  Usually conducted by contracted medical support personnel, such as emergency medical technicians, these interviews are conducted in a standardized, scripted format.  These interviews are directed at identifying any acute or chronic medical condition and the presence of a contagious condition, including symptoms of Covid-19.  The interviews are conducted in association with a cursory examination of skin for evidence of rashes consistent with a contagious condition.

### IV.C.2.a.     Observations

Direct observation during all visits and interviews with UCs, family members, medical staff and CBP agents confirmed that these Health Intake Interviews are being conducted on all individuals entering the CPCs and visited Border Patrol stations.  Appropriate treatment and washing and showering facilities are available for all individuals identified with scabies or lice.

### IV.C.2.b.  Assessment

The conduct of the Health Intake Interviews appeared to meet the CBP Settlement requirements.

### IV.C.2.c.   Recommendations: None

### IV.C.3.     Medical Assessments

Medical assessments are conducted by a nurse practitioner or physician assistant and are of 3 forms:

**IV.C.3.a.     Medical Assessment by Protocol.** These assessments are mandated because of a child's status, specifically, all UCs and all tender age (<12 years) children in families.  Although not required by the Settlement, CBP undertakes to conduct medical assessments on all juveniles when the census permits.  These are to be performed within the first 24 hours after apprehension and a supplemental health interview after 5 days, if still in custody. (See Section VIII.1 of the Settlement).

### IV.C.3.a.(1)  Observations

Direct observation during all visits and interviews with UCs, family members, medical staff and CBP agents confirmed that all UCs and tender age children in families have received medical assessments. When censuses were relatively stable or low, all children received medical assessments. However, when censuses were high, assessments were not routinely conducted for children in families older than 12 years of age.  In addition, there was considerable variation in the performance of a supplemental medical interview for tender age children in families held for 5 days or longer.  Indeed, the required 5-day repeat interview appeared to be unusual in overcrowded family holding pods.

### IV.C.3.a.(2).  Assessment

The medical assessments for UCs met the requirements outlined in the Settlement. However, there were deficiencies in the performance of the required repeat medical assessment for children in families who remained in custody for longer than 5 days.

### IV.C.3.a.(3).  Recommendations

**III.C.3.a.(3)(a).** A more formal system for conducting 5-day repeat medical assessments is required. The 5-day repeat medical assessment is most important

when families are being held for protracted periods in overcrowded conditions. However, because of other important demands on available medical staff, this medical protocol appears to be given relatively low priority under these conditions.

**IV.C.3.a.(3)(b).** Documentation of the 5-day repeat medical assessment should be strengthened and included in ongoing, medical quality assurance processes.

**IV.C.3.b.    Medical Assessment after Affirmative Response on Health Intake Interview.** These assessments are conducted because a medical concern is identified in the Health Intake Interview.

**IV.C.3.b.(1).  Observations**

It is important to recognize that CBP has established around-the-clock medical services in the CPCs and most other CBP facilities encountering children.  This is a major accomplishment that serves as the core capability in meeting the assessment and treatment requirements outlined in the Settlement.  However, variation was observed in whether all children received medical assessments.

When medical assessments were confined to children under 12 years of age, it was not clear how the need for medical assessments was identified for children in families older than 12 years. Of special concern was whether children in families older than 12 years identified upon entry as having known conditions or disabilities receive a full medical assessment by the on-site, contracted medical team. The Settlement requires that children with a chronic disorder or disability receive a medical assessment only if *acute* needs are identified by the Health Intake Interview. (See VII.3.D.2 of the Settlement).  This places the responsibility of distinguishing an acute need from a chronic issue on personnel conducting the Health Intake Interview.

It should be remembered that these contracted personnel are usually emergency medical technicians (EMTs) or medical assistants (MAs) who are almost always conducting the interviews with large numbers of people in sally ports before entry into the facility. In addition, the Settlement also has a provision that states "CBP shall treat all class members in custody with dignity, respect and special concern for their particular vulnerability as minors and place each class member in the least restrictive setting appropriate to the class member's age and special needs." (See Section VII.B.8.A of the Settlement). CBP has also been committed to making appropriate custodial accommodations for children with disabilities and special needs. These considerations would seem to require a medical assessment for any child, regardless of age, who is identified by the Health Intake Interview as having a significant chronic illness or disability. Such a medical assessment would attend to medical concerns by ensuring that there were no unrecognized acute needs, which can be subtle at times.  This would also provide essential guidance to CBP personnel regarding any need for special custodial arrangements. This concern was underscored by observations during site visits that the presence and custodial implications of a serious chronic or disabling condition may not be fully conveyed to the appropriate CBP personnel.  CBP has been informed of these concerns and is working with the JCM on addressing these issues.

Two cases identified during site visits are illustrative.  A teenaged minor being held in a sector CPC as part of a family was observed to be using a wheelchair. Upon closer observation and discussions with the parents, the child had significant motor, speech and cognitive disabilities due to a condition identified soon after birth.  The parents reported that the child had not received a medical assessment despite being in custody for 5 days.  Discussions with the contracted medical team in the facility revealed that because of high census no medical assessments were being performed on children in families above the age of 12, including those with chronic conditions

25

and no apparent acute needs.  Confining medical assessments to children below 12 years (tender age) was justified based on the high census of UCs and families in the CPC at the time and is permitted under the Settlement.  The only exceptions to this policy were when older children were identified through the Health Intake Interviews as having an acute issue or who required medication.  In addition, all UCs regardless of age were receiving full medical assessments.

The second case involved a 4-year-old child with a serious, chronic deformity of the leg who was observed during a site visit being held with his mother in the other sector's CPC.  The child had received a medical assessment by the contracted medical team and the deformity was noted.  However, there was no documentation that this information was conveyed to CBP personnel.  After inquiring about this case during the site visit, the medical team conveyed this information to CBP.  However, the medical condition was characterized as not requiring any particular custodial or disposition considerations because the child was not taking medication.  While the child was not then taking medication, the child did experience intermittent pain.  Current medication use should not be seen as the only criterion for special custodial or disposition consideration by CBP. Indeed, CBP has long used more comprehensive criteria for determining custodial and disposition decisions for accompanied children with significant medical conditions.

Interviews with UCs in ORR facilities and families after release from CBP custody also raised questions regarding the maintenance of medication regimens both while in CBP custody and in preparation for discharge or transfer.  The most frequent concern has been the interruption of a medication regimen upon apprehension without appropriate resumption.  Current CBP protocols require the continued use of medications in the UC or family's possession at apprehension if the medication is

identifiable as approved for use in the U.S. and it is consistent with therapy indicated by the medical assessment.  If the medication is not identifiable or approved, then it must be replaced by CBP in accordance with the medical assessment by the facility's contracted medical personnel. This can be difficult for UCs as they are being transferred to ORR quickly, usually within 24 or 48 hours. Direct observation of these procedures during site visits confirmed that many individuals are released or transferred with medication in hand or, for UCs, attached to their transfer documentation. However, there continue to be reports of UCs presenting to ORR and children in families presenting to non-governmental organizations without indicated medications.

It should be noted that observations and interviews during site visits cannot provide a complete basis for the definitive assessment of current medical procedures. This is the mandate of ongoing, quality assurance processes conducted by the medical contractor in association with CBP medical oversight.

Nevertheless, the two cited cases and a variety of other discussions with families, contracted medical staff, and CBP operational leaders, suggest considerable variation in how medical assessments are being conducted, in the procedures for conveying medical information to CBP, how CBP integrates this information into custodial and disposition decision-making, and how medications and medical information are provided upon transfer or release.

**IV.C.3.b.(2).  Assessment**

As required by the Settlement, CBP has established a structure for providing medical assessments in response to findings on the Health Intake Interview. However, there has been considerable variation in how this structure has been implemented which, in

turn, raises questions regarding the thoroughness with which the requirements of the
Settlement are being met.  In particular, the current practice would appear to allow
some acute issues associated with chronic conditions to go undetected and relevant
medical information left unconveyed to CBP personnel.

The failure to provide appropriate medication to children in CBP custody or upon
transfer or release would be a violation of the Settlement (See Special
Considerations: Annex I, IE).  However, it is not clear how often such a failure
occurs. Of special concern are children in families who leave CBP custody without
needed medication or a prescription for needed medication. These concerns require
ongoing quality assurance scrutiny and close monitoring by the JCM.

### IV.C.3.b.(3). Recommendations

**IV.C.3.b.(3)(a).** The medical assessment protocols for children in custody warrant
immediate review and clarification, particularly regarding children in families older
than 12 years of age with a chronic medical condition or disability.  This review
should be conducted to reflect appropriate, high quality medical practices as
determined by the Office of the Chief Medical Officer, CBP, in collaboration with
the medical contractor and the JCM.

**IV.C.3.b.(3)(b)**. The clarified protocols should be immediately incorporated into
the orientation and in-service training of contracted medical personnel.

**IV.C.3.b.(3)(c).** CBP medication protocols should be reviewed to ensure that
indicated medications are provided to all children in need.  The JCM is working with
CBP on addressing this concern and will monitor these practices closely and identify
the prevalence of inadequate medication provision.

**IV.C.3.b.(3)(d).**  Quality assurance processes should purposefully monitor the implementation and quality of the medical assessment and medication protocols.

## IV.C.3.c.    Medical Assessment for Conditions Identified While a Child Is in a Holding Pod.

These assessments, often labeled "sick call" are conducted for children who have medical problems, such as fever, vomiting, cough, or other symptoms or signs while in a holding pod.  The ability of children and families in custody to access medical care is conveyed on posters displayed throughout the CPCs and in videos that are played on pod televisions.  In addition, children known to the medical staff as requiring regular medication or enhanced surveillance are brought to the medical sick call location as needed.

### IV.C.3.c.(1).  Observations

Medical personnel do not enter the holding pods except when called to respond to an emergency medical situation. UCs requiring medical evaluation while in a holding pod can come to the attention of medical personnel in 3 ways.  First, the child can bring a medical concern to the attention of CBP personnel directly. Second, CBP personnel overseeing the pod may observe a child in need of medical care. Third, when caregivers are present in the pod, they may identify a need for medical attention and alert CBP personnel. This creates a  situation in which nonmedical personnel are responsible for recognizing that a child is in need of medical attention. In the El Paso CPC, caregivers are deployed in the UC pods and add an important layer of engagement that undoubtedly helps identify children in need of medical assessment.  In the RGV CPC, caregivers are only deployed in the pod holding very young UCs. UCs older than 6 years are held in pods without

caregivers which relegates medical surveillance to CBP agents commonly overseeing more than 100 children.

The identification of children in families requiring medical attention while in a holding pod depends primarily on the vigilance of parents. Interviews with parents in family holding pods reported that CBP agents had been responsive to their requests for medical attention.  Children are routinely brought with a parent to the medical "sick call" station for an evaluation by contracted medical personnel. However, despite informational videos and posters, some parents reported hesitation in requesting a medical assessment for fear of delaying or jeopardizing any potential release into the United States.  Caregivers are not currently deployed in pods holding families.  This eliminates an important means by which all children in need of immediate care can be identified.  CBP agents overseeing family holding pods may be responsible for more than 400 individuals in an overcrowded pod which generally precludes any meaningful role in identifying children in need of medical care.

### IV.C.3.c.(2).  Assessment

The Settlement does not mandate any specific procedures for monitoring the medical condition of children while they are being held in pods.  However, these procedures do nevertheless relate to the quality of medical services for children in CBP custody.

### IV.C.3.c.(3).  Recommendations

**IV.C.3.c.(3)(a).** Efforts should be made to deploy caregivers in all pods holding children, including pods holding families.  (See Section V of this report for more detailed observations and recommendations regarding caregivers).

**IV.C.3.c.(3)(b).** Caregiver orientation should include procedures for immediately bringing a medical concern to the attention of CBP personnel.

**IV.C.3.c.(3)(c).** Communication and coordination between contracted medical providers and CBP personnel and caregivers should be strengthened to ensure appropriate surveillance and response to any medical concerns occurring in holding pods.

**IV.C.3.c.(3)(d).** A careful review of all cases of children experiencing serious medical conditions while in holding pods is warranted. This should begin with a review of all transfers of children to local health facilities that resulted in a hospital admission. These data have been requested by the JCM and will be analyzed with CBP medical leadership.

**IV.C.3.c.(3)(e).** If case reviews suggest that there is a significant risk of delayed recognition of serious medical conditions among children in holding pods, enhanced surveillance of children in holding pods by trained medical personnel is warranted.

**IV.C.4.    Isolation Facilities and Covid-19 Protocols.**

Families and UCs diagnosed with a communicable disease, such as Covid-19, influenza, and varicella, are held in a designated, isolation facility. In RGV, this has alternated between an isolation pod within the CPC facility and a Border Patrol station within the sector. One medical team, including a physician assistant or nurse practitioner and 3 support personnel, is deployed in these designated facilities. All UCs are routinely tested for Covid-19 at entry to the CPC and diverted to the isolation facility if positive. Family members are tested only if presenting with

symptoms compatible with Covid-19 infection. Masks are made available to all individuals in custody but on recent site visits, they are rarely used or used ineffectively.  Caregivers are deployed in the RGV isolation location while no caregivers are present in the El Paso isolation facility, regardless of the number of families or UCs in custody at that location.

### IV.C.4.a.    Observations

Recent site visits during periods when large numbers of individuals were being held in isolation stations suggest important Settlement provisions were not fully met.

Depending on patterns of infectious diseases in areas through which migrants have traveled, relatively large numbers of adults and children may be held in isolation locations.  On a recent site visit there were 54 total individuals, including 39 children, being held in the isolation station adjacent to the El Paso CPC.  Several weeks prior to the visit, there were more than 90 individuals held in this location. However, only the one medical team was responsible for the monitoring and care of all these patients.

Isolation stations (not the isolation pod intermittently used at the RGV CPC) are Border Patrol stations usually used to hold single adults.  These are comprised of hard-walled cells with a sink, water fountain, and toilet with a window facing internally toward the station's observation station.  Children in families are held with a parent; UCs are held alone, with other UCs, or with families, depending on the census and isolation requirements. Single adults are also held in the isolation stations but not in the same cells as families or UCs.  On one site visit, there was a six-year-old with Covid-19 infection held alone in one cell. On a subsequent visit, there was a 12-year-old and a 17-year-old held together alone in one cell.

**IV.C.4.b.  Assessment**

There were two conditions that did not meet the medical quality standards and custodial requirements for children in the Settlement. First, the presence of only one medical team (with one nurse practitioner or physician assistant) in the isolation station is inadequate when the census is high.  The census in one isolation station reached more than 125 individuals recently, a number that far surpasses the capabilities of one medical team to maintain close monitoring of this number of ill patients.  Contracted medical personnel reported that they are prohibited from entering the holding cells; all clinical assessments or monitoring, therefore, requires the patient be escorted from their cell to the medical area in the station.  The Settlement notes that the need for enhanced medical monitoring "shall be tailored to the individual clinical situation or circumstance" but should include "symptom check and temperature check by medical personnel... at a minimum every 4 hours." (See Special Considerations: Annex I, ID).  Presumably, ill children in the isolation station would require enhanced medical monitoring.  However, the prescribed monitoring protocol was not possible when the census was high.

Second, in addition to the medical concerns noted above, the placement of young UCs in isolation cells without assistance or the essential elements of trauma-informed care is a serious violation of the fundamental Settlement provision "CBP shall treat all class members in custody with dignity, respect and special concern for their particular vulnerability as minors and place each class member in the least restrictive setting appropriate to the class member's age and special needs."  (See Section VII.3.C.8.A. of the Settlement). The lack of caregivers in the isolation station has meant that young, even tender age UCs, can be left alone in a small cell, without

any activities, and unattended except for the CBP agents who are responsible for overseeing a relatively large number of holding cells in the station.

### IV.C.4.c.  Recommendations

**IV.C.4.c.(1)** Additional medical teams should be deployed rapidly to the isolation facilities when the number of patients and the severity of their illnesses warrant.

**IV.C.4.c.(2)** Caregivers should be present in isolation facilities to provide essential services to UCs and families held in these locations.  Child-friendly support services and activities should be provided to children held in isolation. CBP has recently reported that caregivers have been deployed in the El Paso isolation facility, an issue that will continue to be closely monitored by the JCM.

**IV.C.4.c.(3)** Quality assurance programs should monitor the services provided in the isolation stations, including compliance with enhanced monitoring protocols.  In addition, a review of hospital admissions among children in custody should include those transferred from the isolation locations.  CBP is collaborating with the JCM in addressing these issues.

### IV.C.5  Quality Assurance, Data, and Conveyance of Medical Information

The Settlement requires that CBP implement a medical system quality assurance program designed to monitor and improve the medical care provided to individuals in custody.  In addition, the Settlement requires that CBP "adopt policies requiring that class members who receive medical treatment in CBP custody leave CBP custody with appropriate information regarding their medical condition and treatment while in CBP custody." (See Special Considerations: Annex I, Section IH).

### IV.C.5.a.  Observations

CBP has established a functioning medical quality assurance system that has been focused primarily on the clinical care provided in the CPCs.  Chart review, trainings, and other elements of quality assurance are routinely conducted by supervisory physicians and other staff. CBP has established an electronic health record system that has greatly improved documentation and communication between medical providers as well as provided an important data source for assuring high quality medical care.  Site visits and interviews with medical personnel have confirmed these quality assurance components.

### IV.C.5.b. Assessment

The establishment of the quality assurance systems meets an important Settlement requirement.  Direct observation during site visits and interviews with medical personnel and individuals in custody suggest that direct, individual, clinical encounters have been consistent with current medical standards.

However, despite the strengths of these systems, there remain several arenas of quality assurance and documentation that do not meet Settlement requirements and deserve purposeful improvement.

There have been issues in the conveyance of medical information from CBP to ORR and to health providers for children in families subsequent to their time in CBP custody.  Recent site visits to ORR facilities have documented substantial improvement in the conveyance of medical information from CBP to ORR regarding UCs on medication or with special medical needs.  However, medical information on children in families who received medical care in CBP custody is not routinely provided to a parent upon transfer or release.

**IV.C.5.c.  Recommendations**

**III.C.5.c(1)**.  A more comprehensive quality assurance program would prove beneficial.  Specifically, the program should address not only the quality of direct clinical encounters but also the complex protocols and processes that attend to the special medical risks inherent in providing custodial care for hundreds of thousands of children each year.

**III.C.5.c(2)**. Greater attention should be addressed to the collection and analysis of systematic data on quality indicators such as the number, diagnoses, and severity of children admitted from CBP facilities to local hospitals.

**III.C.5.c(3).** Medical information regarding a child's medical care in CBP custody should be provided to parents upon transfer or discharge. This should be monitored as should medical information on UCs conveyed to ORR.

**IV.D.   Nutrition**

The Settlement requires that CBP ensure that children have access to age-appropriate meals and snacks that meet their daily nutritional needs. Water and adequate hydration are also mandated by the Settlement.

**IV.D.1.   Observations**

CBP provides water, snacks and food for children in CBP custody.  Site visits provided opportunities to observe facilities, sample food offerings and interview children and families about the amount and quality of food provided in CBP facilities, particularly in the CPCs. Water and snacks, including fresh fruit, are always available to children in the CPCs.

Site visits to apprehension locations on the border and interviews with UCs and families suggest that water is routinely available upon apprehension or shortly thereafter in the field prior to arrival at the CPC.  Soon after arrival, UCs and families have reported the availability of water and snacks. This is consistent with observations during site visits.  Snacks usually consist of bagged chips/pretzels/crackers and for UCs fresh fruit, usually including apples and bananas.

In general, food offerings at the CPCs generally meet the Settlement requirements of 2 hot meals and 1 cold meal each day, even when CPC censuses have been high. A typical daily menu could consist of a hot breakfast (breakfast sandwich with eggs, turkey, cheese) and an oat bar and fruit; a cold lunch (ham and spinach pita wrap), oat bar and fruit; and a hot dinner (chicken sandwich), granola bar, and fruit. Reports were mixed regarding the quality of the food. Samplings during site visits found that food was not spoiled and hot meals were warm. Most reports from UCs and families suggested that the food quality was adequate.  However, there were also reports, primarily from families being held amid a very high census, that the breakfast and dinner offerings were at times served at room temperature or cold. The dinner offerings were the same every day for at least one week. Water and snacks were always available, either in the holding pods or directly accessible nearby.

There is a requirement that all children have access to age-appropriate meals. This requirement is fulfilled by ensuring that the nutritional content of the food offerings meet official standards for the developmental needs of the child.  However, there is also a requirement that the food offering be generally appealing and can be ingested easily by a child in accordance with their developmental stage.

During all site visits to both the CPCs and other sector Border Patrol stations, infant formula, bottled water, and mixing instructions were available. Several varieties of formula were available, attentive to different infant ages and sensitivities to standard formulas. Toddler packets of a variety of pureed fruits and vegetables were also available at the CPCs during all site visits. Interviews with families confirmed that infant formula was readily available to meet all infant needs. However, under high census conditions, some interviewed families were not aware that toddler foods were available.

There remains an issue regarding age-appropriate food offerings for children in the 2–6-year-old age group. Currently, the food offerings for this age group are those offered to adults. The nutritional content of these adult food offerings would appear to meet the nutritional standards for children of this age group. However, it is not at all clear that these offerings are easily eaten by young children. In this context, it is important to note that cutting utensils are not provided to families in custody. Dietary offerings were reviewed by Dr. Mark Corkins, St. Jude Chair of Excellence in Pediatric Gastroenterology, Division Chief of Pediatric Gastroenterology, Hepatology and Nutrition, The University of Tennessee Health Science Center, and Chair, Committee on Nutrition, American Academy of Pediatrics. He agreed that the basic components of the diet would supply the calories and primary nutrient needs of the children. However, he concurred with the view that the adult offerings would likely be difficult for young children to eat. Fruit and other nutritious snack offerings could provide supplemental nutrition for young children. However, the nature of these snack offerings can vary and they may be confined to UCs and may not be available for families.

### IV.D.2.  Assessment

The nutritional offerings for children in CBP custody generally meet the requirements outlined in the CBP Settlement.  However, the appropriateness of adult offerings for children 2-5 years old is of concern and requires continued assessment as it may not meet the requirements outlined in the Settlement.

### IV.D.3.  Recommendations

**IV.D.3.a.**    The practice of providing young children with adult food offerings should be promptly reassessed. There is sufficient reason to consider the addition of more age-appropriate food items to the daily food offerings.

### IV.E.  Temperature and Garments

The Settlement requires the maintenance of a temperature range no less than 69° Fahrenheit and no more than 83° Fahrenheit inside CBP holding facilities in the RGV and El Paso sectors.

### IV.E.1.  Observations

The CPCs have generally met the temperature and garment requirements outlined in the Settlement.  All holding pods in both CPCs have temperature monitoring equipment in place.  Except on one occasion, all site visits to the CPCs showed temperatures within the prescribed range. The one exception was a temperature reading of 67 degrees in one pod holding UCs in the RGV CPC. The out-of-range temperature was reported immediately and the facility contractor responded to adjust the temperature settings to bring the temperature into compliance.

Despite pod temperatures recorded within the prescribed range, UCs and family members often noted feeling cold during their time in the CPCs and stations.

39

The Settlement also requires that CBP facilities maintain a stock of clothing in a variety of sizes that can be distributed to class members. Site visits to the CPCs observed UCs being provided with sweatpants, t-shirts, sweatshirts, socks, and footwear. These were generally provided at their first shower, usually within 12 hours after apprehension. Laundering capabilities varied between the 2 sectors. The El Paso CPC did not have laundering capacity which required the issuance of new clothing to all children and families brought into custody.  Laundering services were more available in the RGV CPC.

Beanies can assist in keeping infants and young children warm while in holding pods.  During site visits, beanies were observed being used and in CPC storerooms. However, many interviewed parents were not aware that the beanies were available. Mylar blankets were distributed to all UCs and family members.  Replacement blankets were available upon request for those that were ripped or soiled.

### IV.E.2.   Assessment

The Juvenile Priority Facilities (CPCs) are currently in compliance with the requirements of the Settlement. However, children may feel cold at the lower end of the allowable temperature range.  Laundering services in the El Paso CPC are inadequate to return original clothing to those in custody.

### IV.E.3.   Recommendations

**IV.E.3.a.**    Although the Settlement requires temperatures to remain above 69 degrees, CBP could reexamine this lower limit.  Additional garments should be made available to children when requested.

**IV.E.3.b.**   Laundering capabilities should be enhanced so that children and families can have their original clothing available to wear in addition to the garments provided by CBP.

**IV.E.3.c.**   Efforts should be made to better inform parents of the availability of beanies and other garments for infants and young children.

## IV.F.   Sleep

The Settlement requires that CBP make efforts to create holding conditions that are compatible with adequate sleep.

### IV.F.1.   Observations

All UCs receive a mat and mylar blanket. All family members receive a mat and mylar blanket, however infants and young children often sleep on a parent's mat. The sleeping conditions in the CPC holding pods vary considerably based on the census, ability to dim lighting, and disturbances associated with the entry of large numbers of individuals into the pods at night. While lighting in some holding pods cannot be dimmed, UCs and family members report that the overwhelming factor in undermining a healthy sleep environment is the number of people being held in the pod.  Overcrowding, often with hundreds of family members, including infants and young children, confined to one pod, made sustained sleep extremely difficult. Interviews with family members in these pods universally reported the inability to sleep as a primary concern.

### IV.F.2.   Assessment

The Juvenile Priority Facilities (CPCs) are generally meeting the requirements for sleep outlined in the CBP Settlement.  An important exception is the sleep conditions associated with overcrowding.

### IV.F.3.   Recommendation

Overcrowding and protracted stays are the most important impediments to adequate sleep and as well as to the provision of a variety of other requirements which are addressed in other sections of the report. The physical capabilities of facility lighting systems may preclude dimming and the need to place new arrivals into holding pods at night can also disrupt a sleep- compatible environment. Nevertheless, CBP should maintain efforts to minimize impediments to sleep and continue to explore improved sleep-related amenities and procedures.

### IV.G.   Hygiene and Sanitation

The CBP Settlement outlines a series of hygiene and sanitation requirements for all children entering CBP custody.  Showers are to be provided soon after arrival at the CPC and again at 48-hour intervals.  Toothbrushes should be provided daily and also upon request.

### IV.G.1.   Observations

Current CBP practices do not fully meet the requirements prescribed in the Settlement.  UCs were generally provided with a shower and given hygiene kits within 24 hours of apprehension, all within 48 hours. Toothbrushes were provided during shower visits.

Children in families were provided with a shower less regularly than UCs, particularly when the census was high.  During several site visits to the El Paso CPC, families reported receiving their first shower on day 3 and for those who had been held for a week or more, a second shower 4-5 days after the first.

Toothbrushes were provided with the showers; no toothbrushes were provided between shower opportunities.

In the CPCs, contracted cleaning services clean the showers, pods, sinks and toilet areas once each shift. Sink areas had soap and hand sanitizer available. Shower areas were clean on all site visits.  Observation during site visits found the sinks, toilet, and shower areas were generally clean.

Overcrowding generated challenges for both hygiene and sanitation services.  On two site visits, the toilet areas in 2 pods with a very high census of families were being heavily used and there was a considerable amount of wastepaper on the floor.

### IV.G.2.  Assessment

The Juvenile Priority Facilities (CPCs) are generally meeting the requirements for hygiene and sanitation mandated by the Settlement.  However, overcrowding and protracted times in custody have created highly variable showering and toothbrush offering practices for families.

### IV.G.3.  Recommendations

**IV.G.3.a.**    More rigorous attention to the showering schedules outlined in the Settlement. This would be particularly important during periods of high census and overcrowding.

**IV.G.3.b.**   Policies related to toothbrush provision should be reviewed. Alternatives to making toothbrushes available only when showering should be explored.

43

## V.    CAREGIVERS

The Settlement requires that CBP develop a "caregiver" program directed at providing a variety of direct, custodial care to children in CBP custody. The Settlement requires that caregivers be present in juvenile priority facilities (CPCs) on a 24-hour, 7 day a week basis and always have a mixed gender staff. Caregiver roles include the direct care for infants and children less than 5 years of age, assist children with showering and hygiene, assist parents with young children during showering, collect and distribute garments for laundering and distribution, and alert CBP personnel or medical staff for any medical or mental health concerns.

## V.A.    Observations

Site visits documented that caregivers, including both males and females and supervisors, were present in the El Paso and RGV CPCs on all shifts.

During site visits, the number of caregivers in the CPCs varied considerably.  In the RGV CPC, the number ranged from 19 to 27 caregivers plus 1-2 supervisors on the day shift; 16-20 on the night shift. Both male and female caregivers were present. They were deployed in the intake and shower areas and the nursery area for very young UC's. There were UCs under the age of 2 in this area and the caregivers were responsible for all elements of custodial care for these children. When weather and adequate CBP personnel allowed, caregivers were also engaged in outdoor activities. In the RGV, there were no caregivers or child-friendly activities or materials noted in either the UC or family holding pods.

In the El Paso CPC, there were between 10 and 20 caregivers and 2 supervisors present during the day shift; 10-14 caregivers during the night shift. Caregivers were deployed in the intake and shower areas.  However, unlike in the RGV, 1-2 caregivers were placed within each of the 2 UC pods. In addition to general

supervision, the caregivers in the pods oversaw child-friendly activities, including playing with toys, reading books, watching videos, and card games for teens. No caregivers were deployed in the family holding pods; rather, 1-2 caregivers were positioned in the corridor just outside the pods.  There were no child-friendly activities or materials positioned in the family holding pods.

In the RGV, caregivers are deployed in the CBP station functioning as an isolation facility.  However, in El Paso, there were no caregivers assigned in the isolation facility despite its holding as many as 39 children during one site visit.

## V.B.  Assessment

The current caregiver program meets the requirements outlined in the Settlement which mandates that caregivers, including supervisors, are present 24 hours a day/7 days a week in the CPCs, that the caregivers include both males and females, and that they receive appropriate training.  However, the number of caregivers deployed in the CPCs remains insufficient to meet the needs of children in custody and to mitigate the impact of significant overcrowding. Despite the important contributions of the current caregivers, the basic physical and psychological requirements of children in CBP custody will not be met until a far larger number of caregivers are deployed. The lack of appropriate numbers of caregivers undermines efforts to provide adequate custodial and trauma-informed care for both UCs and children in families. This understaffing also increases the custodial burden on CBP personnel in already crowded facilities.

## V.C.   Recommendations

**V.C.1.**    While the current caregiver program meets the minimal requirement outlined in the Settlement, the number of caregivers should be increased urgently to meet the needs of children in CBP custody.

**V.C.2.**    It is important to recognize the potential roles the caregivers could play in the CPCs and other facilities holding children. These roles include the following:

- **Assistance with hygiene at intake.** There is a regular need for assistance at intake for individuals requiring shampoo or other hygiene regimens. Caregivers provide this assistance and help expedite the intake process, particularly when large numbers of UCs or families arrive at the facility.

- **Assistance with family showers**. Caregivers provide assistance to parents and children in the shower area, including supervision of children while a parent is showering, management of clothing submitted for laundering, and other related activities.

- **Assistance in tender age holding nursery**. This is an essential area for caregiver presence.  Care for these children involves basic supervision and assistance with young child hygiene, sanitation, nutrition, safety and play activities.  While the number of children in this age group can vary, the CPCs usually have between 15 and 30 children in custody. In the RGV CPC a special pod has been reserved for children in this age group.

- **Child friendly/trauma-informed activities in holding pods**. The caregivers will be an essential means of providing child friendly or trauma-informed care for UCs and families. To be in any way effective, these activities would have to be provided in the holding units, in which the UCs and families spend virtually all their time in CBP custody.  These activities can be developed in close collaboration with the new Child Welfare Specialists as well as with CBP medical and other available resources.

- **Assistance and supervision in outdoor recreation area**. There are 2 turf-covered, outdoor recreation areas at the RGV CPC and a dirt field at the El Paso CPC.  When weather permits, these areas could be utilized for a variety of

outdoor activities.  While security would still be provided by CBP personnel, caregivers could provide significant assistance in organizing child friendly/trauma-informed activities and maintaining appropriate order.

- **Assistance with care and activities for children held in isolation locations**. Children with a variety of communicable diseases are held in isolation locations, primarily in CBP stations and not the CPCs.  These stations hold children and families in hard-walled cells with a window facing the internal observation post staffed by CBP personnel.  Very young children, both UCs and in families, may be held in these locations for up to a week, with very little opportunity to leave their cells.  C aregiver assistance in these settings is essential.  In response, CBP reports that it has recently deployed caregivers to the isolation facility, an important improvement that will be monitored by the JCM closely.

CBP has been informed of these concerns regarding the caregiver program and has undertaken efforts to expand caregiver contracts. In addition, CBP has recently initiated a working group, that includes the JCM, to enhance the current caregiver program and expand both the number and roles of caregivers in facilities holding children.  This initiative deserves full support as it represents one of the most important steps CBP can take in the short term to ensure the health and psychological well-being of children in CBP custody.

## VI.  TRAUMA-INFORMED CARE AND CHILD-APPROPRIATE ENVIRONMENT

The Settlement mandates that the juvenile priority facilities implement care strategies that attend to the emotional and psychological challenges that migrant children confront, particularly when they are separated from their parents, families, and home communities.  Recognizing the potential that children in CBP care may have experienced trauma in their home communities, on their journey, and while in

47

custody, the Settlement calls upon CBP to make efforts to foster reassurance, resilience, and psychological well-being. (See Section VII.7.D.7 and Section VII.3.B.8 in the Settlement).

The reality is that trauma-informed care cannot be relegated to a confined arena of services.  While direct mental health services may be essential in some settings, virtually all elements of custodial care must be attentive to the complex emotional and psychological well-being of children in CBP custody.  Given this perspective, trauma-informed care for migrant children in custody extends far beyond routine services provided by most law enforcement agencies.  The challenge for CBP has been to develop, implement, and coordinate trauma-informed care capabilities and a child-friendly environment as part of virtually all custodial components of CBP systems.  The JCM monitoring program, therefore, assesses the effectiveness of trauma-informed care and a child-friendly environment in every component of CBP's care of children in custody.

## VI.A.  Observations

CBP personnel, contracted medical providers, and caregivers have received enhanced training in trauma-informed care.  A central component of this training has been the mitigation of traumatizing experiences both before and during CBP custody. Also essential has been training on the signs of emotional or psychological distress among children in custody.

Interviews with UCs both in CBP custody and in ORR facilities revealed that they had been treated professionally by CBP personnel in the RGV and El Paso sectors. None of the UCs interviewed in the CBP and ORR facilities reported being verbally or physically abused by CBP personnel in the RGV or El Paso sectors. In depth interviews explored the children's sense of security while in CBP custody.

48

Although they had complaints about a variety of elements of custodial care, particularly overcrowding and food quality, they reported feeling safe while in CBP facilities. Many UCs noted that after traveling for weeks or months from their home countries, often having been victimized by extortion, sexual assault, and beatings, their arrival in the CPCs was a relief of sorts and that they could sleep without fear of violence. However, several UCs in ORR facilities reported that when they were apprehended as part of a large group of families, single adults and UCs in a sector other than RGV or El Paso, CBP agents had used harsh language.

Televisions were working in all holding areas during site visits. The programs being played included an informational video regarding food and other amenities as well as children's programs in UC holding areas.

Outdoor recreation is available, weather permitting. The RGV CPC has two large turf fields with its own sanitary facilities. The El Paso CPC has one dirt field in poor condition. CBP has reported that a major renovation of the field is planned for the near future.

As noted earlier, child-friendly materials and activities were only present in pods where caregivers were present, specifically the UC holding pods in the El Paso CPC, and the tender age, nursery area of the RGV CPC. All other pods in the CPCs had no child-friendly materials or activities available. CBP reports that it has purchased child-friendly furniture and materials but has been prevented from placing these in the pods because of overcrowding.

There is likely no greater contributor to the well-being of children in custody than holding them together with a parent or trusted adult. Children are not routinely

49

separated from parents or legal guardians when taken into CBP custody. Separation can occur on rare occasions when initial CBP vetting reveals that a parent or legal guardian poses a potential threat to the child. Family unity policies in the 2 CPCs varied somewhat. In the RGV CPC, families were segregated by the gender of the parent; families with both male and female adults were, therefore, separated and held in different pods.  In El Paso, however, families were generally held together in the same pod.  Also, children who were apprehended with a trusted adult who was not a parent or legal guardian were generally held with the trusted adult while in the CPC.  Separation takes place when the child is transferred to an ORR facility.  However, there were exceptions to this trusted adult policy in both the RGV and El Paso CPCs. For example, on one site visit, a 7-year-old child being held in the UC holding pod had been apprehended with an aunt who was being held in a single adult holding area.  On another, a child who was apprehended with a grandmother was being held in a UC pod while the grandmother was being held in an adult holding area, apparently awaiting expulsion under Title-42. At the time of site visit, CBP personnel could not provide a particular reason for these separations while in custody.  In one of these cases, CBP personnel arranged for the child to have regular visits to the trusted adult.

## VI.B.   Assessment

CBP has met many of the requirements outlined in the Settlement regarding trauma-informed care and child-appropriate environment. CBP has made considerable progress in providing a safe environment for children in the CPCs and in providing enhanced training for CBP and contracted personnel in trauma-informed care.  However, overcrowding, variation in holding children with a trusted adult, and the lack of child-friendly amenities, activities, and caregiving personnel have seriously constrained the ability of CBP to provide adequate trauma-informed care and a child-appropriate environment. As stated earlier, this

current reality has rendered the trauma-informed care systems required by the
Settlement largely unenforceable.

## VI.C. Recommendations

**VI.C.1.**  There should be a comprehensive reassessment of the current CBP
capabilities to provide trauma-informed care and a child-friendly environment. The
development of the Child Welfare Specialist program, the current commitment to
expand the caregiver program, and experience with recent enhancements to child-
friendly activities in certain UC holding pods, all provide new opportunities to  craft
an improved custodial environment for children in custody.

**VI.C.2.** The holding practices for children apprehended with a trusted adult require
review. While family holding policies can be complex and necessarily varied based
on CPC census and physical layout, they should be examined with attention to the
mitigation of emotional and psychological trauma, particularly among young
children.

**CERTIFICATE OF SERVICE**

Case No. CV 85-4544- DMG (AGRx)

I am a citizen of the United States. My business address is 250 Sixth Street, Suite 205, Santa Monica, California 90401 . I am over the age of 18 years, and not a party to the within action.

I hereby certify that on January 30, 2023, I electronically filed the following documents with the Clerk of the Court for the United States District Court, Eastern District of California by using the CM/ECF system:

**NOTICE OF FILING OF JUVENILE CARE MONITOR REPORT BY DR. PAUL H. WISE**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the United States the foregoing is true and correct. Executed on January 30, 2023, at Los Angeles, California.

Jeff Thomson