# ATTACHMENT C

# Table of Contents

**Introduction** ............................................................................................................................2

**ORR Programs & Capacity** ......................................................................................................3

    Number of Minors in ORR Custody...............................................................................3

    ORR Programs and Bed Capacity .................................................................................3

    De-licensing of Beds by State Action ...........................................................................4

    Census of Minors in Each of the Agency's Facilities .....................................................5

    Average Length of Stay ................................................................................................7

    Updates Plans to Expand Capacity in Standard Shelter Beds and ICF ...........................7

**DHUC Health Services: June 1, 2022 to May 31, 2023** ..............................................................8

    Health Care Services ...................................................................................................8

    Initial Medical Examination .........................................................................................8

    Tuberculosis ...............................................................................................................9

    Public Health Surveillance ...........................................................................................9

    Staffing .......................................................................................................................9

    Topic-Specific Medical Trainings................................................................................10

    Mental and Behavioral Health Services .....................................................................10

    Trauma Informed Workforce Initiative ......................................................................11

    Minors with Special Health Care Needs.....................................................................11

    Data-to-Action Initiatives ..........................................................................................11

**COVID-19 in ORR Facilities**.....................................................................................................12

    Minors Currently Testing Positive for COVID-19 ........................................................13

    Updates on ORR Policies on Use of ICF .....................................................................13

    Oversight of ICF Medical Operations .........................................................................13

    COVID-19 Vaccine Distribution .................................................................................13

**ORR's Support of Afghan, Ukrainian, and Haitian Minors** ......................................................14

    Unaccompanied Afghan Minors ................................................................................14

    Ukrainian Minors ......................................................................................................15

    Haitian Minors ..........................................................................................................15

**Placement in Restrictive Settings**..........................................................................................15

    Staff Secure ..............................................................................................................15

    Residential Treatment Center.....................................................................................16

    Secure .......................................................................................................................17

    Out of Network Placements........................................................................................18

    Notice of Placement ..................................................................................................19

    Appeals of More Restrictive Placement Decision ........................................................20

    Flores Bond Redetermination Hearing ......................................................................20

    Placement Review Panel............................................................................................21

**Services at ORR Influx Care Facilities and Standard Facilities** ...............................................**21**

Case Management Services at ICF .................................................................................. 21

Recreational Services at ICF ........................................................................................... 22

Educational Services at ICF ............................................................................................ 22

Calls or Visits with Sponsors and Family at ICF ............................................................ 23

Legal Services at ICF ...................................................................................................... 23

Case Management Services at Standard Facilities ........................................................ 23

Recreational Services at Standard Facilities ................................................................. 24

Educational Services at Standard Facilities................................................................... 24

Calls or Visits with Sponsors and Family at Standard Facilities ................................... 24

Legal Services at Standard Facilities ............................................................................. 25

**Policies & Field Guidance for Program Improvements** ....................................................**25**

Family Reunification Process and Case Management .................................................... 25

Background Checks ........................................................................................................ 25

Home Studies ................................................................................................................. 26

Medical Services ............................................................................................................ 26

Reporting ....................................................................................................................... 26

Staffing ........................................................................................................................... 26

COVID-19 ........................................................................................................................ 27

**Juvenile Coordinator Site Visits** ....................................................................................**27**

**Summary** ...........................................................................................................................**32**

**Field Guidance Appendix** ................................................................................................**33**

1

**ORR JUVENILE COORDINATOR ANNUAL REPORT**

**July 1, 2023**

**Aurora Miranda-Maese, ORR Juvenile Coordinator**

## Introduction

This is the third annual report for the Office of Refugee Resettlement (ORR) submitted by the Juvenile Coordinator to The Honorable Dolly M. Gee. The first annual report for ORR was submitted by the Juvenile Coordinator on July 1, 2020. The Juvenile Coordinator was excused from filing an annual report in 2021 given the several interim reports that were filed throughout the year, and the second annual report was submitted on July 1, 2022. Pursuant to the July 29, 2022 Status Conference, the Court ordered that the Juvenile Coordinators for Customs and Border Protection (CBP), Immigration and Customs Enforcement (ICE), and ORR each file their 2023 Annual Report regarding their respective agency's compliance with the Flores Settlement Agreement (FSA) by July 1, 2023. A status conference is set for July 27, 2023.

This report covers a one-year period, from June 1, 2022 to May 31, 2023. Any reference to activity outside of the reporting period is included to provide context and place the activities within the broader framework of ORR's overall operations.

## ORR Programs & Capacity

### Number of Minors in ORR Custody

During the annual reporting period, ORR received referrals for approximately 122,677 minors and discharged approximately 126,069 minors.

Figure 1 below illustrates the trend in ORR referrals and discharges over the course of the annual reporting period.

*Figure 1: ORR Referrals and Discharges from June 1, 2022 to May 31, 2023*



### ORR Programs and Bed Capacity

ORR continued building and maintaining sufficient capacity during the reporting period to accommodate a potential influx of unaccompanied minors arriving at the U.S. border. In the last annual report, ORR established Emergency Intake Sites (EIS) due to the impacts of the international COVID-19 pandemic and the historically high volume of unaccompanied minors that arrived at the U.S. border. However, ORR began closing EIS and transferring minors to other ORR programs in June 2021. By June 2022, however, ORR transitioned the last two EIS into Influx Care Facilities (ICF). In March 2023, ORR stopped placing minors at one of the remaining ICF's (Pecos ICF) and the facility's operations went dormant. ORR has stopped placing minors at the other ICF (Ft. Bliss ICF), and operations at this facility will become dormant on June 30, 2023.

Figure 2 below illustrates results of ORR's bed capacity, and the average number of minors referred to ORR during the reporting period.

*Figure 2: Average Funded Bed Capacity and Average Number of Minors in ORR Custody[1]*



| | June | July | Aug | Sep | Oct | Nov | Dec | Jan | Feb | March | April | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg Bed Capacity | 20,661 | 21,048 | 21,179 | 19,803 | 18,846 | 17,744 | 17,645 | 17,269 | 16,696 | 16,224 | 16,086 | 16,798 |
| Avg UC In-Care | 11,023 | 11,768 | 9,694 | 9,499 | 9,862 | 10,217 | 10,877 | 7,553 | 7,984 | 8,132 | 9,546 | 8,804 |

## De-licensing of Beds by State Action

On May 31, 2021, the State of Texas issued an emergency proclamation directing the Texas Health and Human Services Commission (HHSC) to amend its regulations to "discontinue state licensing of any child-care facility in this state that shelters or detains [UC] under a contract with the Federal government."[2] The proclamation directed HHSC to "deny a license application for any new child-care facility that shelters or detains UC under a contract with the Federal government, to renew any existing such licenses for no longer than a 90-day period following the date of this order, and to provide notice and initiate a 90-day period beginning on the date of this order to wind down any existing such licenses." On July 13, 2021, HHSC issued an emergency rule implementing the directives of the Governor's proclamation; the emergency rule exempted Federal grantees from state-licensing requirements and provided for the rescission of grantees' existing licenses.[3]  The proclamation was originally set to expire on November 9, 2021, but was extended to January 8, 2022.[4] Subsequently, HHSC published a second emergency rule effective January 9, 2022, reinstating the terms of the earlier emergency rule, and setting additional requirements for those programs that serve both unaccompanied minors and domestic children.[5] The

---

[1] Figure 2 illustrates the average funded bed capacity and the average number of minors in ORR custody from June 1, 2022 to May 31, 2023.

[2] May 31, 2021, Emergency Proclamation, *available* at:
https://gov.texas.gov/uploads/files/press/DISASTER_border_security_IMAGE_05-31-2021.pdf.

[3] *See* 26 TAC § 745.115.

[4] *See* HHSC, Press Release:  New Emergency Rules Adopted Related to Governor's Proclamation Declaring Disaster (Jan. 10, 2022), https://www.hhs.texas.gov/provider-news/2022/01/10/new-emergency-rules-adopted-related-governors-proclamation-declaring-disaster.

[5] *See also* 26 TAC § 745.115 (amended Jan. 9, 2022), 26 TAC § 745.10301.

latest emergency rule is anticipated to remain in effect. HHSC has indicated that it plans to issue a Notice of Proposed Rulemaking to make the terms of the emergency rule permanent.

On September 28, 2021, the Governor of the State of Florida issued an Executive Order[6] directing the Florida Department of Children and Families (DCF) to determine whether childcare and child placing agencies which serve minors should continue to be licensed by DCF.  If not, this Order directed DCF to amend state licensing standards to require a cooperative agreement between the State of Florida and the Federal government in order for DCF to issue or renew licenses for ORR's programs. On December 10, 2021, DCF issued an emergency rule amending the Florida Administrative Code Rule 65C-46.022 to implement the directives of the Executive Order, such that no license will be issued or renewed unless and until there is a cooperative agreement in place between the State of Florida and the Federal government that provides Florida with notice of and an opportunity for consultation regarding the resettlement of minors in Florida.[7]  The Florida Office of the Governor has confirmed to HHS that it has no intention of entering into the cooperative agreement contemplated by the emergency rule.  As of May 31, 2022, the actions of the State of Texas and the State of Florida impacts approximately 31% of ORR's 205 programs (excluding ICF and EIS).

Immediately upon learning of the State of Texas' actions, ORR began exploring options to mitigate the serious impact of State de-licensing actions on ORR's standard care provider network. After efforts to resolve the matter with Texas and Florida were unsuccessful, ORR published a Request for Information (RFI) in the *Federal Register* on September 3, 2021. The RFI solicited feedback from the public on the prospect of establishing a Federal Licensing Office within HHS, which would license programs only in instances where the State was unwilling to license or engaged in de-licensing activities similar to the actions taken by Texas and Florida. ORR has announced its intent to publish proposed regulations establishing a regulatory framework for new Federal Licensing of ORR facilities, which will be used when State governments do not provide State licensing of such facilities. The notice indicates that the new office created to manage the Federal licensing will be located within the Administration for Children and Families (ACF), but not within ORR.

Texas' and Florida's implementation of their de-licensing initiative remains an emergent issue.  ORR is in close contact with care providers in those states regarding developments at the State level and potential operational impacts.

### The census of minors in each of the agency's facilities

Figure 4 below summarizes ORR's bed capacity as of May 31, 2023. This information is dynamic as ORR continues to pursue efforts to increase bed capacity. Therefore, it is likely that the information depicted in the figure below changed very soon after it was produced.

---

[6] Fl. Executive Order No. 21-223 (September 28, 2021), available at https://www.flgov.com/wp-content/uploads/orders/2021/EO_21-223.pdf.
[7] *See* Emergency Rule 65CER21-3, https://www.flrules.org/gateway/ruleNo.asp?id=65CER21-3

*Figure 4: ORR Bed Capacity and Occupancy as of May 31, 2023[8]*

| Program Type | Available | | | Unavailable | Total Funded Bed Capacity |
|---|---|---|---|---|---|
| | Occupied | Unoccupied | Total | | |
| Shelter | 5578 | 5748 | 11326 | 1196 | 12522 |
| Transitional Foster Care | 606 | 964 | 1570 | 703 | 2273 |
| Long Term Foster Care | 446 | 85 | 531 | 227 | 758 |
| Influx Care Facilities | 458 | 1042 | 1500 | 0 | 1500 |
| Staff Secure & Therapeutic Staff Secure | 21 | 71 | 92 | 26 | 118 |
| Residential Treatment Center | 6 | 34 | 40 | 10 | 50 |
| Secure | 0 | 0 | 0 | 24 | 24 |
| *Total* | *7115* | *7944* | *15059* | *2186* | *17245* |

There are several reasons that ORR capacity includes unavailable beds. Consistently throughout the reporting period, three reasons have accounted for most of the unavailable beds: 1) staffing issues; 2) foster family limitations; and 3) facility or maintenance issues. Figure 5 provides insight on the reasons that 2,101 beds were unavailable on May 31, 2023.

*Figure 5: Reasons for Unavailable Beds as of May 31, 2023[9]*



---

[8] Figure 4 depicts ORR's total funded bed capacity as of a specific moment in time. The information depicted in this chart fluctuates very frequently due to the constant operations necessary to serve minors.
[9] Figure 5 illustrates data at a given point in time; this changes because programs are constantly adding and subtracting beds throughout each day as circumstances arise.

The average length of stay for minors currently in the agency's facilities and for minors who have been released.

Figure 6 below is a measure of time that a minor remains in ORR care, which is known as the length of care (LOC). The first measure, labeled *UC In-care LOC* (in orange), tracks the average LOC for minors still in ORR custody as of May 31, 2023. For these minors, the LOC is calculated from the day they are admitted to ORR custody to May 31, 2023. The second measure, *UC Discharged LOC* (in blue), tracks the average LOC for minors from the day they are admitted into ORR custody to the day they are discharged from ORR custody.

*Figure 6: Average Length of Care for Minors from June 1, 2022 to May 31, 2023*



| | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| UC Discharged LOC | 26 | 27 | 28 | 30 | 29 | 29 | 28 | 31 | 27 | 26 | 27 | 25 |
| UC In-Care LOC | 37 | 42 | 48 | 45 | 46 | 41 | 46 | 50 | 48 | 46 | 44 | 53 |

Updates on ORR's plans, if any, to expand capacity, particularly of standard shelter beds and influx care facilities; and

ORR converted two EIS (Ft. Bliss and Pecos) to ICF in June 2022. On September 16, 2022, ORR issued a notification to Congressional, State and Local Elected Officials, and Stakeholders that stated ORR would not reactivate a site in Carrizo Springs, Texas, as an ICF for unaccompanied minors. Although there are efforts to establish an ICF in Greensboro, NC to accommodate future influxes, ORR is not currently placing any minors in ICF's.

ORR remains focused on expanding the use of state standard programs by announcing an availability of funds under a Standing Notice of Funding Opportunity (SNOFO). The timeline from issuance of the NOFO to availability of additional beds is approximately one year. During that year-long timeline, ORR reviews responses to the NOFO's, with awarding of grants typically occurring several months after the NOFO was published. The balance of the year-long process involves setting up the program, undergoing state licensing and related requirements, and recruiting, hiring, and training staff.

On May 24, 2023, ORR issued a Notice of Funding Opportunity (NOFO), which sought additional residential Therapeutic Group Home (TGH) services, which is scheduled to award on July 24, 2023. Additionally, ORR issued a NOFO on May 31, 2023, seeking Residential Treatment Center (RTC) services, which is scheduled to award on July 31, 2023.

## DHUC Health Services: June 1, 2022 to May 31, 2023

Within ORR's Unaccompanied Children Programs, DHUC oversees public health screenings and the provision of health services to minors in ORR care. DHUC monitors for serious medical conditions and communicable diseases of public health importance through an automated notification system. DHUC responds to care provider programs seven days a week and provides management guidance on communicable diseases, serious mental health conditions, and complex medical cases. DHUC also ensures reporting of public health information to the appropriate public health authorities and coordinates public health responses with the local health jurisdiction.

### Health Care Services

ORR facilitates and funds health care for all minors in care. ORR has developed its healthcare policies with the goals of ensuring the children's physical and mental well-being and the safety of care providers, medical personnel, and communities. Through ORR's care providers and other healthcare professionals, minors receive the following services:

- An Initial Medical Exam (IME)

- Routine medical and dental care

- Family planning services, including pregnancy tests and comprehensive information about and access to medical reproductive health services and emergency contraception

- Emergency health services

- Immunizations

- Administration of prescribed medications and special diets

- Appropriate mental health interventions

Care providers must deliver services in a standardized manner that is sensitive to the age, culture, native language, and needs of each minor.

### Initial Medical Examination

Each minor must receive an Initial Medical Examination (IME) within two business days of admission. The purpose of an IME is to assess general health, administer vaccinations in keeping with U.S. standards, identify health conditions that require further attention, and detect communicable diseases, such as influenza and active tuberculosis. The IME is performed by a licensed health care provider (MD, DO, NP, or PA). The IME is based on a well-child examination, adapted for the unaccompanied minors population with consideration of screening recommendations from the American Academy of Pediatrics, the CDC,

and the U.S. Preventive Services Task Force. If a vaccination record is not located or a minor's vaccination status is not up-to-date, the minor receives all vaccinations in accordance with the ACIP recommended catch-up schedule, approved by the CDC. Minors also receive seasonal influenza and COVID-19 vaccines. Data from the IME is entered into a web-based data repository accessible by DHUC staff who routinely monitor reports to ensure care provider programs are adhering to ORR guidelines and timelines. Any minor who is identified through intakes screening or the IME as having a unique medical, urgent dental, or mental health need is referred to a specialist (e.g., psychiatrist, cardiologist) for further evaluation.

### Tuberculosis

As part of the IME, minors receive a tuberculosis (TB) screening that can result in a diagnosis of latent tuberculosis infection (LTBI). LTBI requires 3-9 months of treatment to prevent potential progression to active TB disease, a threat to both the individual's and the public's health. Minors are not routinely treated for LTBI while in ORR care because the average length of stay is typically shorter than the time required to complete treatment, and because there could be negative effects from discontinuing LTBI treatment before completion, such as developing drug-resistant TB. In 2018, DHUC developed a post-unification LTBI reporting system to help states identify unified minors with LTBI living in their state. This process uses the CDC's Epi-X system, a web-based network that allows for the secure transfer of LTBI data between ORR and state TB control programs. More than 2,450 LTBI notifications were made to 44 states during the reporting period.

Minors with LTBI who remain in ORR care for 3 months or more are recommended to be seen by the local public health department TB clinic to start treatment.

### Public Health Surveillance

DHUC routinely tracks communicable diseases occurring among minors in care and advises care provider staff on infection prevention, infection control, and public health reporting in line with local, state, and federal public health guidelines. This includes COVID-19, influenza, and other common communicable diseases that might occur in the ORR program setting.

### Staffing

DHUC is currently comprised of 30 medical and public health professionals including six medical officers (all board certified in their specialty), four epidemiologists (two at the PhD level), two nurse epidemiologists, three nurse practitioners, one advanced practice psychiatric nurse, two licensed clinical social workers, one psychologist, one data manager, one medical case manager, eight quality assurance specialists, and one special advisor. Four team members received additional training through the CDC Epidemic Intelligence Service program, a two-year applied epidemiology fellowship. In addition, three epidemiologists previously worked in infectious diseases at the CDC. Eleven members are Commissioned Officers in the United States Public Health Service (USPHS) Commissioned Corps.

From June 1, 2022 to May 31, 2023, eight open positions were filled within the Division: 1) DHUC Director; 2) Child Psychologist (Mental and Behavioral Health Services Team); 3) Tuberculosis Lead, Medical Epidemiologist, Epidemiologist, and Nurse Epidemiologist (Communicable Disease Surveillance and Response Team), and 4) two Quality Assurance Specialists (Program Training & Support Team).

## Topic-Specific Medical Trainings

DHUC continues to hold topic-specific webinars to keep care provider programs (including ORR-funded medical care staff) up-to-date on complex medical and public health topics. During the reporting period, DHUC held trainings on the following:

- Epidemiology, clinical presentation, lab diagnosis, treatment, and UC Portal documentation of syphilis (June 2022)

- Care of the pregnant unaccompanied child (October 2022)

- Influenza diagnosis, treatment, and control among UC in ORR Care (November 2022)

- COVID-19 intake procedures for UC newly admitted into ORR custody (January 2023)

- HIV diagnosis, care, and discharge planning (May 2023)

- Revisions to Field Guidance #6: COVID-19 testing, isolation, masking, and other procedures (May 2023)

## Mental and Behavioral Health Services

The daily work of the DHUC/Mental and Behavioral Health Services Team (MBHST) involves tracking acute psychiatric hospitalizations, reviewing behavioral health significant incident reports and treatment authorization requests for behavioral care and psychological evaluations, and answering questions from the care provider network. The team also reviews every case in residential treatment (including Out-of-Network (OON) facilities) every thirty days to ensure the minor meets the criteria for remaining in a residential level of care. DHUC/MBHST provides technical assistance and clinical consultations to care providers and has partnered with external professional organizations to help with these consultations.

During the reporting period, the DHUC/MBHST collaborated with colleagues from the UC program to work on several new initiatives. The first initiative, a medication consent pilot program in Texas, introduced new procedures for obtaining consent for administration of psychotropic medications when parental consent could not be obtained. Under certain circumstances, the proposed medication is now reviewed by outside psychiatric consultation. The MBHST assisted the care providers with procedural training in conjunction with Point Comfort Underwriters (PCU) and the UC Policy Unit and continues to meet weekly to solidify the process for eventual roll-out nationwide.

MBHST also worked closely with the health informatics and quality assurance teams to improve UC Portal documentation of mental health symptoms, diagnoses, and treatment of minors in care. Diagnosis options in the UC Portal were changed from disorder-based conditions to symptom-based conditions as a minor with potential mental health concerns (identified during the IME) should be referred to a mental health specialist for evaluation, in order to prevent the premature and inappropriate labeling of a minor. Autogenerated notifications in the UC Portal were created to alert MBHST if/when a minor is diagnosed with a mental health disorder, prescribed a psychotropic medication, or is placed in an out-of-network RTC. The MBHST and the informatics team presented a webinar on these changes and how they reflect ORR's overall approach to behavioral health care.

## Trauma Informed Workforce Initiative

The UC Program has partnered with Duke/National Child Traumatic Stress Network (NCTSN) and Learning Systems International (LSI) on two major training initiatives that will be required for all ORR and grantee staff. Duke and NCTSN are leading the Trauma Informed Workforce Initiative that consists of two levels of training — a two-hour module on the general principles of trauma-informed approaches and an eight-hour advanced module for grantee clinicians and case managers. As part of the partnership, consultants who are experts in implementing trauma-informed care are available for several hours each week for consultation with grantee and ORR staff. Finally, a subset of grantee clinicians will be trained in Trauma-Focused Cognitive Behavioral Therapy (TF-CBT), which is an evidenced based training for licensed clinicians.

## Minors with Special Health Care Needs

DHUC identifies and monitors minors with special health care needs while in ORR care, including nearly 1,020 minors with special health care needs during the reporting period. These minors had a variety of medical conditions including, but not limited to, cardiac, oncologic, genetic, ophthalmologic, gastrointestinal, autoimmune, and developmental conditions. This is in addition to pregnant minors who received comprehensive obstetric and gynecologic care, along with coordination of care after unification. From June 1, 2023 to May 31, 2023, approximately 118 serious medical and dental procedure requests were reviewed and approved during this period. ORR also helped support the specialized placement and ongoing care of 21 children requiring assistance with activities of daily living in out-of-network acute rehabilitation hospitals.

## Data-to-Action Initiatives

During the reporting period, DHUC initiated several projects to ensure quality and continuity of care for all minors. In particular, DHUC runs a twice-weekly report to identify concerning communicable and complex physical and mental health problems among the minors aging out of care. In the beginning of this project, DHUC staff reviewed lists of minors in advance of their age-out, which included their test results, diagnoses, and treatments, and identified those minors who may need care prior to aging out or those minors who required a higher-level of care following age-out. DHUC staff communicates with care provider personnel to ensure the minors are provided specialty care (when feasible) prior to release. DHUC also works with care provider staff to assure that timely follow-up care is scheduled after release and other support systems are in place.

Also, DHUC continues to improve oversight mechanisms to ensure minors in ORR care receive timely treatment for diagnosed conditions. In January 2023, DHUC developed a weekly report to identify minors who have been diagnosed with gonorrhea but do not have the appropriate treatment documented in the UC Portal Health Tab. When a minor is identified, DHUC takes immediate action to provide the ORR care provider program with documented treatment instructions or helps formulate a plan to ensure the minor receives the recommended treatment. A similar report was initiated in April 2023 to ensure minors receive appropriate treatment for diagnosed chlamydia infections.

## COVID-19 in ORR Facilities

Two major updates to ORR COVID-19 guidance were released during the reporting period. Updates were made to bring ORR's COVID-19 guidance in line with updated CDC COVID-19 guidance, including CDC Guidance on Management of COVID-19 in Homeless Service Sites and in Correctional and Detention Facilities.

On January 24, 2023, DHUC issued revised Field Guidance #6: COVID-19 Procedures for Unaccompanied Children and Care Provider Staff (previously Field Guidance #6: COVID-19 Intakes Procedures for Unaccompanied Children Newly Admitted into ORR Custody). This guidance pertains to both standard care provider programs and to ICF.

Key updates included:

- Discontinued requirement for a 7-day quarantine following exposure to a person with COVID-19;

- New opportunity for shortened medical isolation for *some* children with COVID-19 who have a negative viral test *or* who are being discharged directly to sponsors;

- Clarification that DHUC does not need to review and grant individual approval for shortened COVID-19 medical isolation (either for return to general program population or for discharge directly to sponsor); and,

- Translation of 'COVID-19 Discharge Letter for Sponsors' to additional languages (Chuj, Dari, Haitian Creole, Kaqchikel, K'iche, Pashto, K'ekchi, Mam, and Spanish)

On May 17, 2023, DHUC issued another revision to Field Guidance #6 and updated the document title to "COVID-19 Procedures for UC and Care Provider Staff." The key revisions included:

- Adjusted COVID-19 intake testing requirements to better align with the FDA's new "instructions for use" (i.e., package insert) for COVID-19 rapid antigen tests;

- Discontinued universal masking for minors and staff as an everyday prevention strategy; added universal masking for minors and staff as an enhanced strategy;

- Discontinued staff and visitor symptom screening and temperature checks prior to facility entry;

- Updated test types for post-exposure COVID-19 testing;

- Introduced new criteria for shortened medical isolation for minors placed in long-term foster care programs that attend community-based school;

- Discontinued requirement for case managers to call sponsors 7–10 days after unification to determine whether the child has COVID-19 symptoms;

- Discontinued voluntary reporting of staff COVID-19 cases to DHUC;

- Updated guidance on staff return to work following COVID-19 infection or exposure; and

- Discontinued use of the 'COVID-19 Symptom and Temperature Check at the Time of Discharge or Transfer' form

Additionally, Field Guidance #2: COVID-19 Verbal Screening and Temperature Check for Staff and Visitors and Field Guidance #4: COVID-19 Discharge Guidance were rescinded and superseded by these revisions to Field Guidance #6.

During the reporting period, DHUC continued to provide case-specific guidance to care provider programs on COVID-19 testing, vaccination, medical isolation, exposure quarantine, and other mitigation measures.

### The number of minors currently testing positive for COVID-19

During the last full week of the reporting period (May 21-27, 2023), 52 minors were diagnosed with and isolated for COVID-19 throughout the standard shelter network and ORR ICF.

### Updates on ORR policies regarding the use of ICF

As of June 4, 2022, both Pecos and Ft. Bliss facilities have transitioned from EIS to ICF. Prior to the transition, DHUC provided extensive training to and monitoring of the EIS medical contractors to support their expansion of medical services as the sites transitioned to ICF's. This expansion of medical services required both structural growth and staff development in order to change from the Modified Health Assessment (MHA) to the more comprehensive Initial Medical Exam (IME). The sites established onsite phlebotomy and lab services to conduct age and risk-factor based communicable disease screenings. The sites procured x-ray machines and designed imaging rooms to conduct tuberculosis screening and radiographic evaluations for acute injuries. The sites also strengthened the number of community medical, mental health, and dental specialists contracted by ORR's third-party insurance underwriter to enable easier access to off-site specialized care.

DHUC worked with ORR's Information Technology (IT) department to ensure health data integrity would be maintained within ORR's electronic data system (UC Portal), during the EIS-to-ICF transition. DHUC provided multiple comprehensive trainings for proper documentation of the additional data collected. Subsequently, DHUC distributed guidance documents to the ICF's and held Q&A sessions as well.

### Oversight of ICF Medical Operations

During the reporting period, DHUC continued to provide medical, mental health, and public health oversight to ICF contractors. This oversight was conducted via standing phone calls, daily email communications, and review of UC Portal documentation. DHUC provided regular reviews to ensure ICF were meeting ORR health requirements and quality standards. Individual case consultations for minors with special healthcare needs were regularly conducted to facilitate immediate transfer of care from ICF to standard ORR programs.

### COVID-19 Vaccine Distribution

As of May 30, 2023, a cumulative total of 126,642 minors received the first dose of the COVID-19 vaccine in ORR care (e.g., some minors were vaccinated in home country), and a cumulative total of 58,717 minors received a second dose in ORR care.

## ORR's Support of Afghan, Ukrainian, and Haitian Minors

### Unaccompanied Afghan Minors

In the final days of the War in Afghanistan in mid-to-late 2021, Operation Allies Welcome (OAW) saw a record number of at-risk Afghans evacuated from Afghanistan. These at-risk Afghans included minors who were unable to be accompanied by a parent or legal guardian. Once these minors reached safety in the U.S., many were referred to ORR's care as Unaccompanied Afghan Minors (UAM).

Efforts to aid OAW were broken down into two phases: Phase 1) the initial arrival of families and minors to the overseas military bases and safe havens (US state side military bases); and Phase 2) involved subsequent efforts to place minors in standard and appropriate care settings. Phase 1 has been completed and Phase 2 ended in September 2022.

The ORR policy team collaborated with grantees and other partners to implement various policies as follows:

- Issuance of Field Guidance #19: Unaccompanied Afghan Minor Processing; updated on January 6, 2023, which specifies the removal of references to safe haven processing, added clarifications regarding home studies for UAM, and added instructions regarding the processing of UAM to arriving parents and primary caregivers from Afghanistan;

- Issuance of two FAQ documents regarding ORR Unaccompanied Afghan Minors: FAQ#1; and FAQ#2, which was revised in December 2022 to include updates on medical and dental services, mental health services, religious services, and COVID-19 quarantine;

- Updated portions of the safety and wellbeing call checklist to better reflect the cultural needs of discharged UAM;

- Released translation of key documents into Dari and Pashto languages;

- Issuance of Field Guidance #22: Interpreters Working with the Unaccompanied Children (UC) Programs for UAM care providers to access translation services;

- Issuance of Field Guidance #23: Volunteers Working with Unaccompanied Children in March 2022, which outlines the requirements for volunteers working with minors in the care and custody of ORR, including UAM;

- Implementation of trainings on cultural competencies such as Ramadan (one of the holiest months of the year for Muslims), nutrition, and family reunification;

- Creation of a UAM resource mailbox for use by care providers with questions pertaining to the care of UAM;

- Ongoing contract with a third-party contractor to allow for additional case management support for UAM at ORR care provider facilities;

- Mentorship and support from local Afghan communities; and,

14

- Collaboration with the Unaccompanied Refugee Minors (URM) program to expeditiously place UAM who are accepted into the URM program.

The above list is not exhaustive as efforts to support UAM in care remain ongoing. As of May 26, 2023, approximately 534 UAM were referred for ORR placement with 46 still in ORR care as of May 31, 2023.

### Ukrainian Minors

Unlike the planned evacuation of UAM, the Ukrainian minors in ORR care were not part of any evacuation plan. Most of these minors arrived at the U.S. border and were referred to ORR in the traditional manner. However, the number of Ukrainian minors referred to ORR was significantly lower than originally anticipated. From March 1, 2022 to May 26, 2023, there were 84 Ukrainian minors referred for ORR placement with one Ukrainian minor still in ORR care and 83 Ukrainian minors discharged from ORR.

### Haitian Minors

During fiscal year 2022, ORR has seen a significant increase in the number of Haitian children arriving at the southwestern border of the United States. Many of the Haitian immigrants initially fled their country due to social unrest and scarcity of resources. As with Ukrainian minors, ORR attempts to place Haitian minors at programs situated near communities with culturally appropriate resources. Therefore, ORR has designated four ORR programs in Florida for the placement of Haitian minors. However, Haitian minors are periodically placed at other ORR programs when the Florida based programs reach maximum capacity.  ORR attempts to place Haitian minors together and assists programs in locating Haitian Creole interpreters.

From September 1, 2021 to May 26, 2023, there were 684 Haitian minors who were referred to ORR; with 42 minors physically in ORR care and 642 minors who have been discharged.

## Placement in Restrictive Settings

ORR maintains a variety of placement settings based on the individual needs of unaccompanied minors. Though the majority of minors are placed in least restrictive settings such as shelter and transitional foster care, ORR has capacity for those minors who require a heightened level of care and supervision. As mandated by law, ORR places a minor in the least restrictive setting that is in the best interests of the child. Currently, ORR has three specialized levels of care to accommodate those minors who require a heightened level of care and supervision. The program types include Staff Secure, Therapeutic Staff Secure, Secure, and RTC. Anytime a minor is placed in a Staff Secure, Secure, or RTC there is an extensive process to determine if the minor qualifies for these levels of care.

### Staff Secure

The ORR Policy Guide in Section 1.1 Summary of Policies for Placement and Transfer of Unaccompanied Children in ORR Care Provider Facilities describes all of the considerations regarding placement and transfer. Per the ORR Policy Guide Section 1.2.4: Secure and Staff Secure Care Provider Facilities and Children Entering the United States Unaccompanied:

A staff secure care provider is a facility that maintains stricter security measures, such as higher staff to minor ratio for supervision, than a shelter in order to control disruptive behavior and to prevent escape. A staff secure facility is for minors who may require close supervision but do not need placement in a secure facility. Service provision is tailored to address a minor's individual needs and to manage the behaviors that necessitated the minor's placement into this more restrictive setting. The staff secure atmosphere reflects a more shelter, home-like setting rather than secure detention. Unlike many secure care providers, a staff secure care provider is not equipped internally with multiple locked pods or cell units. In almost all states, staff-secure providers maintain identical type of license as a non-secure care provider, and for such purposes are not viewed as different from a non-secure care provider.

Those minors who have been identified for a staff secure setting have either arrived by transfer, or as a direct referral from ORR Intakes. In placing minors in Staff Secure via transfer or direct intake, ORR considers if the minor:

- Has engaged in unacceptable behavior that has proven to be unacceptably disruptive to the normal functioning of a shelter care facility such that a transfer is necessary to ensure the welfare of others;

- Is an escape risk;

- Has reported gang involvement (including prior to placement in ORR custody) or displayed gang affiliation while in care;

- Has non-violent criminal or delinquent history not warranting placement in a secure care provider facility, such as isolated or petty offenses; or,

- Is ready for step down from a secure facility.

Additionally, the referring ORR Care Provider must conduct ongoing assessments and staff the minor's case with a Case Coordinator and FFS prior to referral. Once it has been determined that the minor can be referred to Staff Secure, the referring ███████ Case Coordinator refers the minor's case to a Staff Secure provider who reviews the case and determines if the minor is appropriate for their facility. If the minor meets the receiving Staff Secure criteria and does not violate their state licensing requirements, the minor will be accepted. Currently, ORR operates a total of nine Staff Secure facilities, five of which are Therapeutic Staff Secure facilities.

### Residential Treatment Center

Section 1.4.6 of the ORR Guide provides information on placement in a  Residential Treatment Center (RTC). When a minor has been recommended into an RTC, a licensed psychologist or psychiatrist must have determined that the youth is a danger to self or others. In addition, ORR will consider transfer to an RTC if the following has been determined:

- The minor has not shown reasonable progress in the alleviation of his/her mental health symptoms after a significant period of time in outpatient treatment. (Note: the amount of time within which progress should be demonstrated varies by mental health diagnosis).

- The minor's behavior is a result of his/her underlying mental health symptoms and/or diagnosis and cannot be managed in an outpatient setting.

- The minor requires therapeutic-based intensive supervision as a result of mental health symptoms and/or diagnosis that prevent him or her from independent participation in the daily schedule of activities.

- The minor presents a continued and real risk of harm to self, others, or the community, despite the implementation of short-term clinical interventions (such as, medications, a brief psychiatric hospitalization, intensive counseling, behavioral management techniques, 24-hour supervision, supportive services or therapeutic services).

An RTC is a sub-acute, time limited, interdisciplinary, psycho-educational, and therapeutic 24-hour-a-day structured program with community linkages, provided through non-coercive, coordinated, individualized care, specialized services and interventions. RTC's provide highly customized care and services to individuals following either a community-based placement or more intensive intervention, with the aim of moving individuals toward a stable, less intensive level of care or independence. ORR uses an RTC at the recommendation of a psychiatrist or psychologist or with ORR Treatment Authorization Request (TAR) approval for a minor who poses a danger to self or others and does not require inpatient hospitalization. Unlike acute care psychiatric hospitals that offer emergency and/or life-threatening mental health services, RTC provide longer term therapeutic services to treat mental health needs. Those minors who enter RTC facilities are referred from various ORR facilities throughout the United States. Prior to a minor being considered for RTC, the referring ORR care providers must conduct ongoing assessments and staff the minor's case with Case Coordinator and FFS prior to referral. Once the psychological or psychiatric evaluation has been completed, and the minor has been recommended for RTC placement, the referring Case Coordinator refers the minor to an RTC placement and reviews the case and makes the determination whether the minor is appropriate for their facility. The transfer process to an RTC is the same as Staff Secure programs with the exception that minor must have a recommendation from a licensed clinical psychologist or psychiatrist prior to referral. Currently, ORR operates three RTC's in the United States.

Secure

███████████████████ was the only secure facility until it terminated its cooperative agreement with ORR and no longer accepted minors as of March 17, 2023. Currently, there are no ORR secure facilities in ORR's care provider network. However, ORR is pursuing opportunities to add secure facilities as soon as possible.

A secure setting is a facility with a physically secure structure with staff who are able to control violent behavior. ORR uses a secure facility as the most restrictive placement option for a minor who poses a danger to self or others or has been charged with having committed a criminal offense. A secure facility may be a licensed juvenile detention center or a highly structured therapeutic facility. An ORR secure facility receives minors as direct referrals from the ORR Intake Team, or transfers from various ORR Care Providers. One or more of the following is required for a minor to be placed in a secure facility:

a) Has been charged with a crime, is chargeable with a crime, or has been convicted of a crime; or is the subject of delinquency proceedings, has been adjudicated delinquent, or is chargeable with a delinquent act; and assesses whether the crimes or delinquent acts were:

- Isolated offenses that (1) were not within a pattern or practice of criminal activity and (2) did not involve violence against a person, or the use or carrying of a weapon (e.g., breaking and entering, vandalism, DUI, status offenses, etc.); or

- Petty offenses which are not considered grounds for a stricter means of detention in any case (e.g., shoplifting, joy riding, disturbing the peace).

b) Has committed, or has made credible threats, to commit a violent or malicious act while in ORR custody;

c) Has committed, threatened to commit, or engaged in serious, self-harming behavior that poses a danger to self while in ORR custody;

d) Has engaged in conduct that has proven to be unacceptably disruptive of the normal functioning of a staff secure facility in which the youth is placed such that transfer may be necessary to ensure the welfare of the minor or others;

e) Has self-disclosed violent criminal history in ORR custody that requires further assessment; or

f) Has a history of or displays sexual predatory behavior, or has engaged in inappropriate sexual behavior

Prior to a minor being considered for secure placement, referring ORR care providers must conduct ongoing assessments and staff the minor's case with a Case Coordinator and FFS, prior to referral. Once it has been determined the minor can be referred to secure care, the Case Coordinator refers the minor to a secure provider who reviews the case and makes a determination whether the minor is appropriate for their facility.

## Out of Network Placements

Since 2015, ORR's Policy Guide (at section 1.2) has provided that "ORR makes every effort to place children within the ORR funded care provider network. However, there may be instances when ORR determines there is no in-network care provider available to provide specialized services to meet an unaccompanied child's identified needs, or no in-network care provider equipped to meet those needs with the capacity to accept a new placement. In those cases, ORR will consider an out-of-network placement."

OON placements are state-licensed childcare facilities that provide care to those minors who exhibit significant mental health or special needs that cannot be met within the ORR care provider network. In order for a minor to enter an OON placement, the minor must receive a psychological or psychiatric evaluation recommending a level of care that ORR cannot secure in its existing network. Prior to a minor being referred to OON provider, the minor must be referred and denied by all recommended ORR placements. Additionally, the minor's case must be reviewed by the FFS Supervisor of Special Populations

prior to referring a minor to an OON placement. Once it has been determined that OON placements can be explored for the minor, the minor's attorney of record must be notified.

When the minor is accepted to the OON placement and is transferred to the program, the ORR referring program must continue to actively work on the minor's family reunification case and or concurrent case plan goal. The managing ORR care provider must maintain regular contact with the OON provider to ensure the OON is providing the minor with regular contact with minor's attorney of record, child advocate, and if necessary, the consulate or embassy. The managing ORR care provider participates in weekly staffing's with the OON placement and receives regular reports and incident reports. Any concerns identified by the assigned ORR care provider must be elevated to ORR. In addition, the assigned ORR care provider ensures the minor maintains their regular approved contacts with family. The FFS and or Contract Field Specialist (CFS) conducts monthly visits with the minor and meets with OON placement to discuss any concerns as they arise. The assigned FFS works in collaboration with the OON care provider and the assigned ORR care provider to ensure all the guidance is followed and the minor's case continues to move towards the case plan goal.

## Notice of Placement

Once a minor enters a specialized level of care such as a Staff Secure, RTC, Secure, or OON placement setting, the ORR care provider must review the Notice of Placement (NOP) with the minor within 48 hours of placement. At this time, the assigned Case Manager at the ORR facility will review the NOP in the minor's language of their understanding. The Case Manager at the ORR Care Provider facility must select the reason(s) on the NOP that led to the minor's placement and provide additional narrative as to why the minor was placed in a Staff Secure, RTC, Secure, or OON placement setting. The NOP is reviewed every 30 days or earlier to determine if the minor should remain in the placement or be transferred to a less restrictive setting. At any time, the minor may request a formal review of their NOP and request an attorney or child advocate to support them in contesting their existing placement.

In addition, on a weekly and monthly basis, the ORR Flores Compliance Team reviews every minor's NOP to ensure the placements are in full compliance with the NOP procedures and placement criteria. Each month, the Flores Compliance team reviews each minor's NOP to ensure each minor is placed properly and that the reasons for placement are documented appropriately on the NOP. In addition, the Flores Compliance Team checks whether each NOP was completed within the mandated timeframes and that the NOP was reviewed with the minor in their preferred language. If these milestones are not captured accurately on the NOP, ORR holds the program accountable by citing them with a Corrective Action Plan that informs them of the specific violation. The program is then required to submit a plan to ORR explaining how the Corrective Action will be resolved. The Flores Compliance Team has provided multiple trainings to all the ORR facilities and continues to provide training as needed. In October 2022 a revised NOP was issued, which complied with the Final Preliminary Injunction Order issued in *Lucas R. v. Becerra*.

Figure 7 below displays the total number of NOP reviews conducted by each type of restrictive setting during the annual reporting period. There was a total of nine corrective action plans issued to ORR care providers as a result of the NOP's that were found to be noncompliant with ORR policies and procedures.

*Figure 7: ORR NOP Reviews by Restrictive Setting from June 1, 2022 to June 2, 2023*

| Restrictive Facility Type | NOP Reviews | Corrective Action Plans |
|---|---|---|
| Secure | 189 | - |
| RTC | 201 | 6 |
| OON | 291 | -[10] |
| Staff Secure | 234 | 3 |
| *Total* | *915* | *9* |

Those minors who have been identified for transfer to Staff Secure, RTC, or Secure go through a rigorous process to determine if they qualify for such a placement based on the NOP criteria. In addition to the NOP criteria, the ORR care provider, Case Coordinator and FFS must consider the totality of the case when conducting a transfer. All evidence such as the minor's family reunification case status, legal status, medical, behavioral and mental health issues, and current functioning in the facility must be considered. Once it has been determined that the minor meets criteria for transfer, the Case Coordinator distributes the transfer request to the recommended program. The receiving program reviews the transfer request to determine if the minor meets their criteria and does not violate their respective State childcare licensing requirements. Once the minor is accepted and transferred to the receiving care provider, the minor and the new Case Manager review the NOP and the reasons why the minor was transferred. The minor, and minor's family/potential sponsor, local DHS office, Executive Office of Immigration Review (EOIR), and Child Advocate (if applicable) are all notified of the minor's transfer. The receiving program continues to work on the minor's primary case plan.

### Appeals of More Restrictive Placement Decision

Minors placed in more restrictive settings are able to appeal either their placement decision or the fact that they may not be released due to danger through various methods. The first method is by requesting a Flores Bond Redetermination Hearing (FBRH), which is available to all minors in ORR custody irrespective of the level of placement. The second method is by requesting an administrative review by ORR's Placement Review Panel (PRP). Each method is discussed below.

### Flores Bond Redetermination Hearing

Soon after admission to an ORR facility, all minors receive the Legal Resource Guide, which includes a copy of the Flores Bond Redetermination Hearing (FBRH) forms in English and Spanish. In addition, minors placed in Staff Secure, Secure, RTC, and OON facilities are reminded of their option to request an FBRH and are provided an opportunity to do so during their review of the NOP. The explanation and opportunity are provided to those minors in a more restrictive placement every 30 days and at the time their NOP is reviewed. In addition, minors are able to request an FBRH at any time while in ORR custody. In an FBRH, the immigration judge decides whether the minor poses a danger to the community. For the majority of minors in ORR custody, ORR has determined they are not a danger and therefore has placed them in shelters, group homes, and in some cases, staff secure facilities. An immigration judge does not rule on any of the following: a) release to a sponsor; b) the minor's placement or conditions of placement while in ORR custody; or c) release a minor on their own recognizance, although ORR will take into consideration

---

[10] Corrective action plans are not issued by OON facilities, but instead, refers this to the original program.

the immigration judge's decision about the minor's level of danger when assessing the minor's placement and conditions of placement.

For a minor without an attorney of record, ORR facilitates their FBRH request by filing it on their behalf with the Immigration Court in the area where they are placed. ORR also files responsive documents, which either contest the minor's position or indicates that ORR does not consider the minor a danger to self or the community.

During the annual reporting period, there were two (2) minors who requested a FBRH for reconsideration of placement in a RTC facility and an OON RTC facility; both of the minors' requests were withdrawn via their attorney.

## Placement Review Panel

In addition, minors can appeal their placement in a restrictive facility by requesting an administrative review before a panel of ORR staff. This administrative review is called the Placement Review Panel (PRP). The ORR staff are senior personnel who have several years of experience as professionals in the fields of child welfare, mental health and related policy. They are also veteran HHS staff, with experience in ORR's UC Program.

The PRP ensures that the minors (or their attorney of record) review any evidence supporting their placement at the secure or RTC placement prior to holding the panel. In addition, the minor (or their attorney) can opt to provide the PRP a written statement and/or request a hearing. It is the minor's decision whether to have both a written statement and a hearing or elect to engage in only one of the options. In cases where the minor does not have an attorney of record, ORR encourages the care provider to seek assistance for the minor from a contracted Legal Service Provider or a Child Advocate. ORR also arranges for the Juvenile Coordinator to act as an advocate for the minor if needed. After reviewing the evidence, statements, and holding the hearing (if elected), the PRP provides the minor a written decision regarding their placement.

During the annual reporting period, a total of twelve (12) minors requested a PRP. Six of the minors subsequently withdrew their request; the PRP affirmed the notice of placement for four of the minors and reversed the placement decision for two minors.


## Services at ORR Influx Care Facilities and Standard Facilities

### Case Management Services at ICF

Ft. Bliss transitioned to an ICF on June 4, 2022. The placement of minors at Ft. Bliss will end and operations will go dormant on June 30, 2023. The updates for Ft. Bliss ICF during the annual reporting period are as follows:

Within 24 hours of a minor's arrival, a Case Manager is assigned, and they complete their intake assessment. Once there is a Case Manager assigned, detailed information is obtained from the minor and they work on completing their full verified call log screening and initiate their first call to the caregiver in home country and the U.S. The case management team leads a daily interdisciplinary staffing of cases,

diagnosis and prognosis; this includes staff from case management, medical (i.e., Chief Medical Officer (CMO), Providers, Nurses, Clinicians) and ORR field staff to ensure situational awareness of any minor with a complex medical and/or behavioral health issue. A meeting is completed at the end of each day to review accomplishments and to report on any pending items.

During the reporting period, staffing ratios at Ft. Bliss ICF continued to operate at the required 1:8 ratio. Ft. Bliss ICF also secured interpreter services in person or telephone for all minors (dependent on the language) in all areas of the facility.

## Recreational Services at ICF

Recreational services evolved at Ft. Bliss ICF. The facility continues to offer physical education (PE) which includes the required large muscle activities as well as leisure activities to all children in care. The minors are offered opportunities to participate in strength conditioning and Zumba dance classes and are able to utilize portable arcade style games, traditional board games, playing cards, arts and crafts activities, and a library with a variety of books in both English and Spanish.

The facility also provides monthly acculturation events such as Central American, Mexican and U.S. Independence Days, Fall Festivals and Holidays to align with minors' the education curriculum and home country celebrations. The facility has incorporated and adheres to a weather advisory system to ensure safety against extreme heat, wind/dust, or cold temperatures to determine the amount of time minors may be outside. If outdoor activities are limited due to weather-related circumstances, Ft. Bliss ICF still ensures that minors receive indoor recreational services in each individual dorm.

## Educational Services at ICF

Minors receive 6 hours of educational services which consists of core classes from certified instructors in a standalone tent with hard-sided walls; this area is called "La Escuelita."  This new school structure and setting provides minors the opportunity to receive educational services in a more traditional classroom setting. The educational tent includes bulletin boards in the hallway to display minor's work and decorations related to topics in the educational curriculum. The educational department initiated a "Books on Wheels" program to promote reading and bring awareness of the library services at Ft. Bliss ICF. The educational team also incorporates holidays and cultural festivities to the lessons utilizing the Texas Essential Knowledge and Skills (TEKS) framework which are the state standards for Texas public schools.

The facility staff works collaboratively with others in youth services, case management, mental health and medical to bring awareness for Red Ribbon Drug Prevention week and Fire Safety Prevention month in the classroom and in a Fire Prevention activity presented by the contracted Fire Chief and Fire Fighters on site. Minors also receive an educational reassessment if on site at the 30-day mark to provide insight and document progress during their stay. Ft. Bliss ICF incorporated a contractor to assist minors with an in-person interpreter or via phone interpretation, dependent on the language, as needed in all areas of the facility.

## Calls or Visits with Sponsors and Family at ICF

Ft. Bliss ICF has added call centers to each dorm and has a team of staff stationed permanently in each dorm, so minors have easy access.  The call center works on providing and documenting a minimum of (2) calls to each child for 10 minutes or more if needed, monitored seven days per week. Also, the case management team provides additional calls to minors during their weekly visit with their case managers and clinicians, as needed.  Ft. Bliss ICF has also incorporated resource lines with pre-programmed phone numbers for minors to access legal services, all respective consulates, the ORR National Hotline and Child Abuse Hotline, and the national emergency hotline (i.e., 911) in all dorms. There is signage displayed for the minors in English and Spanish. The site interpretation contractor is also available at the dorms to assist minors with an in-person interpreter as needed.

## Legal Services at ICF

Ft. Bliss ICF ensures minors are aware of the legal services available to them during the orientation upon their arrival and throughout their stay. ███ is the Legal Service Provider at Ft. Bliss ICF to provide the minors with in-person services on site during daily business hours five days a week. The facility has provided two exclusive areas for the Legal Service Provider to conduct "Know Your Rights" presentations as well as individual interviews or to tend to special requests. ███ has utilized the space to create individual areas to meet with minors in a child friendly area.  Ft. Bliss ICF has placed bright orange boxes throughout the site so that minors can place a written request to visit with ███ staff as needed. ███ has also incorporated interpretation services for assistance when needed. Minors also receive a list of legal service providers throughout the U.S. for their use upon discharge.

## Case Management Services at Standard Facilities

Case managers initiate and facilitate the reunification process between the minors and their designated sponsors. During the reunification process, it is important that case managers tend to the minors needs by frequently meeting with them, referring appropriate childcare services, and following up on the services and needs of the minor. Also, case managers work closely with the FFS and case coordinators to advance cases and recommend release, reunification, or transfer of the minor to another facility.

When initiating a minor's case, case managers must first meet with the minor to orient them on the reunification process, check on immediate needs, and conduct assessments. Generally, case managers will connect with parents/legal guardians in home country to gain information on potential sponsors for the minor. Once information on the sponsor is available, the Case Manager contacts the sponsor to begin the reunification process. Subsequently, the Case Manager assists the sponsor with the Family Reunification Application (FRA). The Case Manager will maintain continuous communication with the sponsor through the reunification process; assessing suitability for minors' safety, informing the minors of their case status and needs while in ORR care, and assisting with completion of the reunification process.

Case managers frequently meet with minors to follow-up on updates on case status. Additionally, case managers work closely with mental health clinicians to foster and maintain the health and well-being of the minors in care. Case managers also facilitate contact with child advocates and legal representatives and alert other staff about the minor's needs.

The primary role of a Case Manager is to facilitate the reunification of minors and sponsors; however, cases where there is no sponsor (Category 4), the Case Manager may recommend the minors be transferred to a LTFC and/or other childcare programs. The Case Manager communicates with other appropriate program personnel throughout the reunification process, which allows for informed recommendations for the safe and timely release of the minors in care; this can involve recommendations for home studies before discharge or after care planning such as referrals for post-release services.[11]

## Recreational Services at Standard Facilities

ORR programs must provide minors with at least one hour of outdoor, large muscle activity daily. Programs also provide minors with at least one hour of structured leisure activities daily; such as reading, board games, table tennis, arts and crafts, etc. Programs may also arrange for off-site outings such as playing soccer at a local soccer field- etc.

## Educational Services at Standard Facilities

ORR assesses each minor individually to determine academic level and needs within 72-hours of a minor's arrival. With this assessment, program staff plan educational services that are appropriate to each minor's level of development and ability to communicate by grouping them into classes according to their respective academic development rather than by age.

ORR programs must provide at least six hours of school (Monday – Friday), concentrating primarily on coursework pertaining to Science, Social Studies, Math, and English, and must provide content that is sensitive to the cultural differences of the minors in care. Care providers are also encouraged to create vocational training opportunities that will provide minors with practical and competitive job skills and assist in the preparation for adulthood. Vocational programs may not replace academic education or be a substitute for the basic subject areas. Care providers must have the cultural awareness and systems in place to support the cultural identity and needs of each unaccompanied alien child.

## Calls or Visits with Sponsors and Family at Standard Facilities

ORR programs provide minors with at least two, ten-minute phone calls per week to pre-screened family members and sponsors. ORR programs keep a list of authorized callers or call recipients, and phone calls occur in a private setting. Program personnel administer these phone calls at designated times. Case managers and clinicians can also conduct additional supervised calls. On June 26, 2023, ORR published revised guidance significantly expanding the number and duration of weekly telephone calls. Minors will be entitled to at least 50 minutes worth of calls (either five 10-minute calls or one 50-minute call) every five days. In addition, minors will have opportunities to make 45-minute calls for special occasions (i.e., birthdays, holidays). This new guidance will be published as revised UC Policy Section 3.3.10 Calls, Visitation, Mail and Email.

With regard to visitation between minors and their family members, ORR encourages visitation between minors and family members, sponsors, or approved visitors. The visits may occur at the program or at an

---

[11] Post release services coordinate referrals to supportive services in the community where the minor resides and provide other child welfare services, as needed.

alternative public location under the supervision of ORR program staff. ORR program staff supervise the visits accordingly.

<u>Legal Services at Standard Facilities</u>

ORR's sub-contracted legal service providers (LSP) offers minors Know Your Rights (KYR) presentations and conducts legal screenings within 10 business days of the minor's admission to an ORR facility. For minors released before meeting with an LSP, the LSP provides KYR presentations and legal screenings after they are discharged from ORR custody. At the discretion of the attorney and the minor, LSP offers minors ORR funded direct representation on the minor's immigration related cases. The LSP also offers court assistance and court preparation services to minors.

## Policies & Field Guidance for Program Improvements

<u>Family Reunification Process and Case Management</u>

ORR consistently reevaluates its policies and procedures to ensure they are unifying minors in ORR custody with approved sponsors in the safest and most efficient manner possible.

ORR has worked to expedite the sponsor assessment and reunification process by incorporating Field Guidance #14 into <u>ORR Policy Guide Section 2.2.3</u>, allowing case managers to assist sponsors in filling out the Family Reunification Application (FRA) during the sponsor interview. Field Guidance #14 also allowed the sponsor to send a picture of the signed signature page once he or she has verified the information contained in the application, speeding up the process.

Efforts to streamline the sponsor assessment process also included updates to the sponsor assessment forms aimed at removing duplicative questions and easing the burden on the FFS and case managers. ORR's Manual of Procedures (MAP) was modified to reflect those updates. This change eliminated the requirement for the potential sponsor to provide proof of immigration status or U.S. citizenship, which previously posed a challenge to potential sponsors, and in some cases, led to delays in the sponsor evaluation process.

In June 2021, ORR issued <u>Field Guidance #18: Expansion of Long-Term Foster Care Eligibility</u> to best serve minors where no viable sponsorship option is available. The field guidance expands eligibility to Category 4 cases in which a minor: (1 remains without viable sponsorship options; 2) is currently placed in a standard ORR care provider shelter; and (3 and is not otherwise ineligible under Policy Guide Section 1.2.6. Field Guidance #18 remains active.

<u>Background Checks</u>

To continue meeting background check needs and mitigate any delays to the release process, ORR expanded the availability of fingerprinting services through new contracts with Lutheran Immigration and Refugee Service (LIRS) and FieldPrint. As part of this expansion, ORR updated Section 2 of the MAP to incorporate guidance on scheduling fingerprinting appointments at the new ORR LIRS Digital Sites and FieldPrint locations. These updates include screening procedures for determining if a potential sponsor, adult caregiver, or household member is a good candidate for an appointment at a FieldPrint site.

ORR also implemented initiatives that addressed delays in the fingerprinting process. In addition to offering fingerprinting services at sixty-six (66) ORR Digital Fingerprinting sites or via mailed fingerprinting cards, ORR contracted with FieldPrint; with new FieldPrint locations added as of March 2023.

## Home Studies

ORR modified ORR Policy Guide Section 2.4.2 to clarify mandatory home study requirements for minors under the age of 12, recognizing that home study requirements may introduce delays in the sponsor assessment process prior to release to a non-relative sponsor. The revision also clarified that home studies are required where a non-relative sponsor has previously sponsored (or attempted to sponsor) additional minors, even when those previously-sponsored minors were related to the sponsor and there were no safety concerns.

In September 2021, ORR issued Field Guidance #20: Home Study Processing to streamline the sponsor assessment and review process and eliminate undue delays. This guidance grants care providers permission to conduct background checks and home studies concurrently and exempted sponsors and household members in Category 1 cases from the enhanced background checks that are typically required when a case is referred for a home study (the exemption applies only where there are no specific safety concerns with the sponsor or household members). Field Guidance #20 remains active.

## Medical Services

In November 2022, ORR revised Field Guidance #21: Compliance with Garza Requirements and Procedures for Unaccompanied Children Needing Reproductive Healthcare. This guidance has been revised to provide additional instructions for ORR federal staff, grantees, and contractors, when a minor is discovered to be pregnant and requests abortion care. Also, this revised guidance clarifies that ORR will make all reasonable efforts to secure a legal abortion for a pregnant minor who requests this procedure. This revised version supersedes the previous published Field Guidance #21 from October 1, 2021.

## Reporting

ORR revised its Serious Incident Report (SIR) reporting process as part of ORR's ongoing efforts to timely respond to emergency incidents and ensure the safety and wellbeing of minors in ORR custody; this includes additional SIR categories for more accurate record keeping and revised procedures for report of Emergency SIR's. Under the revised guidance, Emergency SIR's are now elevated to the FFS Supervisor, who are often in a better position to address the immediate needs of the minors, rather than the ORR Intakes Hotline. The ORR Policy Guide Section 4.10 and 5.8 (and accompanying sections in the MAP), included major revisions that imposed more stringent reporting timelines. The policies provide additional clarification for supervisors and staff in the form of visual charts with reporting requirements based on particular types of events that may occur involving minors in ORR custody. In December 2022, ORR revised Section 5.8 to include that under no circumstances may care providers threaten children with the use of Significant Incidents Reports to regulate their behavior.

## Staffing

In March 2022, ORR issued revisions to Field Guidance #22: Interpreters Working with the Unaccompanied Children (UC) Program as new preferred languages of minors in ORR custody are identified to aid these

efforts. This guidance outlines the minimum requirements for interpreters working with unaccompanied minors and UAM, and standard ORR care provider programs. Field Guidance #22 allows for the Interpreter Agreement to be signed by an interpreting company on behalf of its staff and clarifies that an Agreement is not required for Interpreters hired by third-party service providers. It allows for Interpreters with pending background checks to work with minors under direct line-of sight supervision by ORR or care provider staff. ORR has also offered interpretative guidance to clarify the circumstances under which ORR may permit staff or volunteers who have not yet completed background checks to have access to ORR care providers and supervised limited access to minors. In addition, in March 2022, ORR issued Field Guidance #23: Volunteers Working with Unaccompanied Children (PDF) ORR Agreement with Volunteers which creates a Volunteer Agreement Form and offers guidance on minimum requirements for volunteers working with minors. Both Field Guidance #22 and #23 remain active.

COVID-19

In January 2022, ORR issued revisions to Field Guidance #17: COVID-19 Vaccination of Unaccompanied Children (UC) in ORR Care. This guidance includes updates on internal procedures and external communications to acknowledge the newly available pediatric Pfizer vaccine for COVID-19. This revised guidance includes recommendations regarding vaccine boosters for all minors who have completed the primary vaccination series, an additional dose for immunocompromised minors, and updated language on isolation, quarantine, masking, and testing for vaccinated minors. A new handout was also released offering instructions for sponsors on obtaining the new vaccine for a minor in their care, with translations provided in Dari, Pashto, and Spanish.

## Juvenile Coordinator Site Visits

During the annual reporting period, the Juvenile Coordinator conducted site visits at five ORR standard care providers; including, Staff Secure, RTC, and shelter facilities. The purpose of these site visits was to:

a)  Review, assess and report to ORR on compliance with the Court's 2017 and 2018 Orders, and explain any reasons for substantial noncompliance, to include:

  ▪  Visiting ORR-funded facilities, interviewing minors at such facilities, interviewing program staff, and reviewing data; and

  ▪  Making recommendations to ensure compliance within ORR

b)  Perform any functions as ordered by the Court

c)  Respond to concerns raised by Plaintiffs' counsel related to the FSA

███████████████████████████ STAFF SECURE (San Antonio, TX)
**November 8-9, 2022**

███████████████████████████ Staff Secure (SS) accepts both male and female minors aged 13 to 17. A total of seven minors were interviewed (three females and four males).

27

This facility has maintained appropriate staffing levels and continues to hire new staff. This facility has maintained a steady hold on staff retention – a problem that many other shelters faced during the COVID-19 pandemic. Also, morale is good according to the staff members interviewed.

███████████████████ SS accepts minors from other facilities who meet the criteria for staff secure and accepts these minors timely. The staff at this facility incorporate monthly festivities for minors to celebrate holidays, birthdays, cultural events, etc. In fact, at the time the undersigned was present, the staff was preparing to have a baby shower for one of the female minors in care.

The program management team advised they have a good relationship with the legal service providers and ████████████. This facility has robust post-18 program planning services in place and works with ██████████████, a shelter run by ███████████████ that provides shelter to minors who are aging out. ████████████████████████ SS also networks with █████ for post-18 placements and continues to maintain a good working relationship with the facility. Additionally, the program places a lot of emphasis on providing the minors with life skills education in order to help prepare them for life in the U.S. outside of ORR shelter care.

Some of the concerns raised by program management were related to transfer delays – having minors in care that need to be transferred to a more specialized or higher level of care. Program management advised it is difficult for other programs to accept the minors from staff secure when they are ready to be stepped-up or stepped-down. The programs reach out to other congregate care shelters for transfer when a minor is ready to be stepped-down to a lower level of care, however, these shelters will scrutinize the minor's case record - going beyond a minor's time of good conduct.

The minors advised they were educated about the psychotropic medications they were taking, and the staff educated them on the reasons for the medications prescribed, the side effects, the risks, and what to expect as they began taking the medication. In addition, the clinical team at █████████████████ ██████ SS advised they provide psychoeducation to those minors with a history of taking illegal substances. The care provider is meeting the minimum standards of care per the FSA.

███████████████ (Houston, TX)
**January 31 – February 1, 2023**

████████████████████████ accepts both males and females aged 11 to 17. A total of ten minors were interviewed during this site visit. █████████████ had recently relocated prior to the visit and construction at the new facility was still ongoing. The new facility allows for more room to expand capacity and services. However, the outdoor recreational area was significantly reduced in size, compared to the prior location. Program management advised that in order to compensate for the loss in outdoor space, they try to provide additional outings to the minors on a regular basis and also engage them in soccer tournaments with other minors who are in care at nearby facilities. Also, this facility has an underground garage that was being remodeled into a recreational area to house gym equipment, billiards and other game tables, as well as sofas and chairs so the minors can socialize and relax.

The minors interviewed indicated they had excellent care at this facility; and the staff are friendly and accommodating, and they feel welcomed, protected, and safe. A main complaint raised by the minors had to do with their dissatisfaction with the small outdoor space as it does not allow for ample space to play group sports. One of the minors from the group interview said outdoor space and time is essential in order

to feel normal, breathe fresh air, feel the sun in your face, and get exercise and move about freely when playing such sports. The minors all advised they receive their phone calls regularly and are afforded the privacy in which to do so; however, some desired longer phone calls with their families. They also wished more cultural food would be served, and when are served ethnic meals, they would like an expanded variety of the condiments that usually go with a particular dish to be added.

With regard to school, the minors all said they liked attending school and felt the teachers were excellent and the curriculum was challenging. The minors who were interviewed that had been there longer advised they were pleased to know how much they had learned since being at the facility.

This care provider accepts several minors with medically complex cases, which may result in a longer length of stay. Thus, the program expressed concerns over their challenges in meeting ORR's rigorous release benchmarks. They explained that it is difficult to release a minor when they are receiving treatment for illnesses such as cancer, tumors, heart ailments, etc. Consequently, minors with medically complex cases are kept in care until they have completed treatment or until their sponsor has the knowledge and ability to provide continuation of treatment for the minor, which results in the program receiving unfavorable reviews from ORR on their rates of releasing minors from ORR custody.

Overall, the facility meets the minimum standards of care. This is a facility that provides excellent medical care to minors with very complex medical needs. The medical team does well in caring for these minors by educating them about their illnesses, making medical appointments, providing transportation for appointments, providing pre-surgical and post-surgical care, etc. A few of the minors interviewed were being treated for a heart ailment and were recovering from heart surgery or COVID-19 or were awaiting a surgical procedure. The minors all advised the medical team has provided excellent care to them.

██████ RTC (Manvel, TX)
**February 1-2, 2023**

████████████████████████ (RTC) accepts both males and females aged 6 to 17. At the time of the visit, there was one 13-year-old female in care, and she was interviewed. The Program Director along with several other staff members were also interviewed during this site visit. Program management advised the reason for the low census of minors at the facility was partly due to the changes in the NOP process and also due to the fact that a significant amount of referral requests have been for minors with extremely aggressive behaviors, which this facility is not equipped to handle. Nonetheless, program management did indicate that having only one minor in care was not ideal nor altogether healthy for the minor as she had no one to learn with, socialize or play with and relied on the interactions of staff for all these needs.

The Lead Clinician, the Lead Case Manager, and the Medical Coordinator at ████ RTC were all interviewed and round table discussions were held with additional medical and case management staff. With regard to post-18 planning, ████ RTC staff advised they begin planning for a minor's age out well in advance of their 18th birthday.

The case management team has a good understanding of the minor's medication needs prior to release, and staff work with the sponsor or other post-18 program(s) to assure the minor's medication needs will be maintained. The Case Manager works to connect the minor to outside counseling services as well as

working with the minor's attorney to locate a shelter or program for those minors who do not have a family or friend with whom they can reunify.

Program management advised one of the challenges they face is with the difficulty in transferring a minor to a lower level of care once the minor is ready to be stepped-down. The least restrictive programs seem to remain focused on the review of historical documentation of a minor's difficulties (i.e., prior SIR's) rather than focusing on the progress that a minor has made while at ███ RTC.

The minor interviewed at ███ RTC had been in care for approximately ten days. She advised she felt safe and well cared for since her arrival. She advised she was not concerned by the fact that there were no other minors in care at the time of this visit. However, she expressed her desire to play and socialize with other minors in care eventually, as she would become lonely. The minor advised she likes the food served at the facility, and she also enjoys school where she receives a lot of individualized attention and tutoring. The minor knows which medications she is currently taking and the reasons she is prescribed these medications. She was very knowledgeable about her own health issues ████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████. She advised her anxiety has decreased substantially since she has been at ███ RTC. Also, she talks to her family twice per week and enjoys talking to her father the most.

The care provider appears to meet the minimum standards of care per the FSA. However, there is room for improvement with regard to updating the aesthetics of the facility in order to present a more child-friendly environment. Also, the minors in care at ███ RTC would benefit from increased community outings, such as to the library, museums, movie theater, etc.

███ **RTC** (Syosset, NY)
**April 4-5, 2023**

███ RTC accepts male minors aged 13 to 17. A total of six minors were interviewed – the two minors in care at the RTC and four minors who were stepped-down shelter care that were interviewed in a group setting.

███ RTC maintains a very supportive environment and the daily programming and clinical intervention remains a big factor with the minors in care. The program at ███ RTC has a strong vocational component and minors in care are taught about money management, colleges, basic life skills in the community, etc. The program also picks a weekly topic to discuss with the CAT 4 minors in an effort to keep them learning and engaged.

Program management advised the facility struggles with moving minors from different levels of care, and the ability to transition minors into a RTC has been made more difficult due to changes in the NOP process, which makes the transfer process more challenging.

███ RTC has seen an increase in staffing levels with retention currently at or near the pre-pandemic level. However, the program has challenges with retaining enough Spanish-speaking staff.

The facility grounds and campus are comprised of big open spaces, lawns, sidewalks, benches, etc. so the minors can enjoy time spent outdoors. The educational building is large, and the school setting is exactly

as a minor would have out in the community. ████ RTC offers a good learning environment for the minors and their academic program is accredited by the local Board of Education.

The medical services provided to the minors at ████ RTC are very good. Medical treatment and care are provided to the minors and medications that are prescribed are discussed with them in detail. The minors are also provided information about the potential side effects of the medications and side effects, if any, are discussed at every medical follow up. The medical team cares for minors with certain addictions (e.g., nicotine and marijuana use) for which the clinicians address and find alternate coping mechanisms/skills to address this. The Medical Coordinator advised that the nursing staff and doctors provide adequate assessments of these minors and seek outside providers as needed. The clinicians all work on-site in addition to working on an on-call basis at ████ RTC.

████ **STAFF SECURE** (Dobbs Ferry, NY)
**April 6-7, 2023**

████ SS accepts male minors aged 13 to 17. A total of six minors were interviewed at ████ – the two minors in care at the staff secure program and four minors who were stepped-down to shelter care that were interviewed in a group setting.

The low census at the time of the site visit at ████ SS was largely due to the changes in the Notice of Placement (NOP) process, according to program management, as it makes elevating minors to a higher level of care more difficult given the new criteria and documentation necessary. Additionally, the program at ████ lost approximately half of their youth care worker staff during the COVID-19 pandemic. Program management advised the staff at ████ SS work hard to discharge minors quickly and safely – reporting a high discharge rate in March 2023 (the month prior to this site visit). Program management advised it has been difficult to bring staffing levels up to where they should be with new hires filling open positions given the vaccination requirements that state all staff are to be fully vaccinated (including the flu vaccine). The staff at this facility are all bilingual in Spanish and English, which remains key when maintaining effective collaboration and working relationships with one another and with the minors in care.

The ████ continues to accept direct border placements due to Ft. Bliss ICF only taking referrals for COVID-19 positive minors and their siblings. Once a child is accepted into a staff secure facility, there usually is no delay in getting the minor to the program at ████.

The learning environment at ████ is tailored to each minor's independent needs, whether therapeutic or academic. The educational rooms were child friendly and brightly decorated and engaging for the students. The minors are provided focused support and the curriculum appeared appropriate. There was technology available for the students to utilize, and the room was filled with textbooks and novels. Also, visual aids were used and there was plenty of other support staff aside from the instructor to provide individualized help to the students.

With regard to post-18 planning, the care provider begins planning for age-outs approximately one to two months prior to a minor's 18th birthday in addition to working with any third parties in advance. In the New York City boroughs, such as Queens and Brooklyn, there are post-18 programs that work well with the care provider. All staff (clinical, case management and medical) are well informed of the programs available to the minors outside of the facility to connect them to various services. The medical team

assures minors of the medications they will be able to receive once discharged into the community so that continuity of care is not compromised. The medical team provided an excellent overview of the process by which they explain the medications and side effects (if any) to the minors in care. The care provider is meeting the minimum standards of care per the FSA.

## Summary

The undersigned respectfully submits this report to the Court pursuant to the Court Orders as previously stated above.

## Field Guidance Appendix

Field Guidance #6: COVID-19 Procedures for UC and Care Provider Staff .................................. .10, 12, 13

Field Guidance #19: Unaccompanied Afghan Minor Processing ................................................. 14

Field Guidance #22: Interpreters Working with the UC Program ........................................ 14, 27

Field Guidance #23: Volunteers Working with the UC Program .......................................... 14, 27

Field Guidance #18: Expansion of Long-Term Foster Care Eligibility ........................................ 25

Field Guidance #20: Home Study Processing .......................................................................... 26

Field Guidance #21: Compliance with Garza Requirements and Procedures for UC Needing Reproductive Healthcare .............................................................................................................................. 26

Field Guidance #17: COVID-19 Vaccination of UC in ORR Care ............................................... 27