ANDREA SHERIDAN ORDIN (SBN 38235)
STRUMWASSER & WOOCHER LLP
1250 Sixth Street, Suite 205
Santa Monica, California 90401
Telephone: (310) 576-1233
Facsimile: (310) 319-0156
E-mail: aordin@strumwooch.com

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | CASE NO. CV 85-4544-DMG (AGRx) |
| Plaintiffs, | **NOTICE OF FILING OF JUVENILE CARE MONITOR REPORT BY DR. PAUL H. WISE** |
| v. | |
| MERRICK B. GARLAND, Attorney General of the United States, *et al.*, | |
| Defendants. | |

1    In accordance with the Court's Orders, Dr. Paul H. Wise submits the
2    attached Juvenile Care Monitor Report.

3    These assessments are required by the provisions of a recent settlement
4    agreement approved by the Court on July 29, 2022 [Doc.# 1278] (the
5    Settlement) which mandates many new and specific custodial conditions and
6    procedures for immigrant children in federal custody.  The Settlement also
7    established the Juvenile Care Monitor (JCM) position to access CBP compliance
8    with the provisions of the Settlement.

13   DATED:      Juy 18, 2023            Respectfully submitted,

15                                       Andrea Sheridan Ordin
                                         STRUMWASSER & WOOCHER LLP

17                                       By    /s/ Andrea Sheridan Ordin
18                                            Andrea Sheridan Ordin

19                                       *Legal Advisor to Juvenile Care Monitor*
20                                       *Dr. Paul H. Wise*

# JUVENILE CARE MONITOR REPORT
## July 2023

**Submitted by Paul H. Wise, MD, MPH**

**Juvenile Care Monitor**

# CONTENTS

I.      SUMMARY………………………………………………………...1

II.     CBP SETTLEMENT AND THE JUVENILE CARE MONITOR…8

III.    MONITORING ACTIVITIES AND DATA ANALYSIS………….10

IV.     CONDITIONS AT CBP FACILITIES……………………………..13

V.      CAREGIVERS………………………………………………….23

VI.     TRAUMA-INFORMED CARE…………………………………...25

VII.    ENHANCED MEDICAL SUPPORT……..………………………28

GLOSSARY

BP    Border Patrol
CBP   Customs and Border Protection
CPC   Central Processing Center
FSA   Flores Settlement Agreement
HRL   Harlingen Texas Border Patrol Station
JCM   Juvenile Care Monitor
JPF   Juvenile Priority Facility
OPR   Office of Professional Responsibility
ORR   Office of Refugee Resettlement
RGV   Rio Grande Valley
SCD   Sickle Cell Disease
SSF   Soft-sided Facility
TIC   Time-in-Custody

## I. SUMMARY

This report presents the evaluation and recommendations of the Juvenile Care Monitor who is charged with conducting independent assessments of custodial conditions for children held in Customs and Border Protection (CBP) facilities in the Rio Grande Valley (RGV) and El Paso sectors.  These assessments are required by the provisions of a settlement agreement approved by the Court on July 29, 2022 [Doc. # 1278] (the Settlement) which mandates many new and specific custodial conditions and procedures for immigrant children in federal custody.  The Settlement also established the Juvenile Care Monitor (JCM) position to assess CBP compliance with the provisions of the Settlement.  This report covers the period of January through May 2023.

This report also includes an assessment of the circumstances associated with the death of an 8-year-old girl, ADRA*, while in the Border Patrol station in Harlingen, Texas on May 17, 2023.  This assessment was conducted as part of the JCM monitoring responsibilities, with a specific focus on the implications for CBP compliance with the requirements of the Settlement.

The JCM conducts a variety of monitoring activities. This report has drawn upon site visits to CBP facilities, interviews with children and families in CBP custody, interviews with unaccompanied children (UCs) in shelters run by the Office of Refugee Resettlement (ORR), the Department of Health and Human Services, and the analysis of data provided by CBP on custodial operations involving UCs and children in families.

  *Only initials are used in this report

2

While the JCM examines all Settlement requirements and reports all concerns related to Settlement compliance, the primary focus of the JCM has been on those requirements and concerns that have the greatest potential consequences for the health and well-being of children in CBP custody.  All concerns related to Settlement compliance or other custodial issues generated by interviews or observations during site visits were immediately conveyed to CBP and remedial action monitored.

The Settlement mandates a full range of custodial requirements, many of which CBP has met.  However, important concerns related to Settlement compliance remain and require remediation or purposeful review.  The Settlement also requires that children and families in custody be provided with certain visual, written, or verbal notice of their legal rights and expected elements of custodial care.  A summary of the Settlement components assessed in this report are presented below:

- **Juvenile Priority Facilities.** A fundamental provision in the Settlement is the designation of specific facilities in each sector to house and process UCs and families. These Juvenile Priority Facilities (JPFs), often designated Central Processing Centers (CPCs), have been established in both the RGV and El Paso sectors.  However, there have been recent changes in the locations and physical plants of the JPFs in both sectors, changes that will require ongoing monitoring and evaluation.

3

- **Time in custody and overcrowding.**  In both sectors, UCs continue to be regularly transferred to ORR care within the required 72 hours, most within 48 hours.  Children in families, however, experienced a wider range of times in custody, some remaining in facilities for up to 14 days. The previous JCM report documented substantial overcrowding in family holding areas in El Paso.  However, this overcrowding has been largely resolved after families were transferred to a new, soft-sided facility (SSF) with greater available space. This has proven to be a major improvement in custodial conditions for children in families in the El Paso sector.

- **Warmth, garments, and sleep.**  The Settlement requires that CBP ensure that the holding environments maintain a temperature between 69 and 83 degrees, provide clean and warm garments to children in custody, and that the holding conditions are conducive to adequate sleep.  CBP has met the ambient temperature requirements outlined in the Settlement.  However, the availability of extra garments for children who feel cold varied for children in families.  The sleep environment remains problematic as light dimming capabilities also varied in the different facilities.  All children were provided with a sleeping mat and mylar blanket.

- **Nutrition.**  The Settlement requires the provision of water and age-appropriate meals and snacks that meet their daily nutritional needs. CBP has met many of these requirements but not all.  Water was readily available upon apprehension, in the JPFs and during transport. Snacks were available at all times in the JPFs. Two hot meals and one cold meal were provided each day. Infant formula and toddler foods were available in the JPFs. The quality of and satisfaction with the provided food varied considerably and will require continued monitoring.  The primary deficiency continues to be

the provision of adult meals to young children.  This was documented in the prior JCM report as well and does not comply with the requirement that CBP provide age-appropriate food to all children in custody.

- **Hygiene and sanitation**.  The Settlement outlines a series of hygiene and sanitation requirements for all children entering CBP custody.  CBP has generally met this Settlement requirement.  The prior JCM report documented that shower requirements were generally met for UCs.  However, it also noted that in overcrowded settings, children in families had highly variable access to showers during prolonged stays.  The alleviation of overcrowding of families in the El Paso sector has been associated with improved access to showers. Sanitation in the JPFs continues to meet the requirements of the Settlement.

- **Caregivers.** The Settlement requires that CBP develop a "caregiver" program directed at providing a variety of direct custodial services to children in CBP custody.  CBP has recently expanded the number of caregivers in the JPFs and has deployed them in all the UC holding areas, an important enhancement. Site visits have confirmed that caregivers are providing supervision of UCs and are facilitating child-friendly activities in the UC holding pods.  Caregivers have also been deployed in isolation facilities and units when UCs or families are present.  Site visits during this reporting period found no caregivers deployed in family holding areas, despite the fact that children in families may be experiencing prolonged times-in-custody.  CBP reports making efforts to place caregivers in family holding areas, an enhancement that would help meet the activity and psychological needs of all children in custody.

- **Child-appropriate environment.** The Settlement requires that children be treated with dignity, respect, and in recognition of their particular vulnerabilities. CBP has generally met this Settlement requirement. Children interviewed during all CBP and ORR site visits reported that they felt safe in CBP custody. There were no reports of physical or verbal abuse by CBP personnel or by other children in custody.   All JPF holding areas had televisions playing informational and entertainment videos.  The RGV JPF has added child-friendly activities, including books, toys, and art materials, in the UC holding pods, all supervised by caregivers.  The El Paso JPF has long maintained these activities in the UC holding pods.  However, during the site visits, no caregivers or child-friendly activities were noted in the family holding pods, an important deficiency.  The recent shift of the RGV JPF to the Ursula location eliminated outdoor recreation areas for children.

- **Medical Care and implications of a child death in custody.** The requirements of the Settlement mandate that the JCM assess both the structure and the performance of the CBP medical system for children in custody.  CBP has established the required medical infrastructure, including around-the-clock medical services in the JPFs and most other main CBP stations in the two sectors. However, the prior JCM report identified a series of concerns regarding the quality of medical services and the adequacy of coordination and accountability practices, practices that all high-quality medical systems require. These concerns continued to characterize the CBP medical system during this current reporting period, concerns that provide the systemic context for the tragic death of a child in CBP custody in the RGV.  This report concludes that the death of this child in custody was clearly preventable. Moreover, this report examines the circumstances of this

6

death and their critical implications for the CBP medical system and its compliance with the Settlement's requirements.

**Overall Assessment of Child Well-Being in CBP custody**

The Settlement mandates a large number of specific custodial and procedural requirements. CBP has met many of these requirements.  Important improvements have been implemented over this reporting period, particularly in the alleviation of overcrowding and the enhanced deployment of caregivers. However, there also remain areas of custodial services that are not in compliance with the Settlement and require improvement, some urgently, such as the quality and accountability of the contracted medical system for children in CBP custody.

The Settlement also requires a series of legal notices be provided to older UCs and parents or legal guardians of children in families in custody.  The display of the required poster depicting the requisite custodial and procedural conditions while in CBP custody has been met.  However, a comprehensive assessment of the actual provision of these legal notices is required.  This report does not include such an assessment; rather, a full assessment of compliance with the legal notice requirements of the Settlement will be provided in a separate report that reflects legal guidance from both plaintiffs and defendants.

The situation on the border is inherently dynamic.  However, compliance with the provisions of the Settlement is a constant requirement.  Changes in immigration policies and the forces that drive unauthorized migration generate crescendos and decrescendos of apprehensions, which, in turn, confront CBP with a constantly evolving challenge to its holding capacity and systems of custodial services. Consequently, the conditions in CBP facilities should not be considered static or

fixed; rather, they will always be contingent on CBP's ability to respond to the dynamic character of the border and its legal and humanitarian demands. It is important to appreciate, therefore, both the substantial burden on CBP to constantly respond to changing circumstances as well as the unwavering mandate to monitor CBP's performance in meeting the requirements of the Settlement.

## II. **THE CBP SETTLEMENT AND JUVENILE CARE MONITOR**

On July 29, 2022, the Court granted final approval of a settlement that resolved a motion to enforce compliance with the Flores Settlement Agreement (FSA) regarding conditions and standards at CBP facilities in the Rio Grande Valley and El Paso sectors along the Southwest Border. The Settlement is a lengthy and complex document that specifies a large number of specific custodial requirements. The Settlement was the result of nearly three years of mediation between the Plaintiffs and Defendants and overseen by the Special Master, Ms. Andrea Ordin, and informed by the Special Expert, Dr. Paul H. Wise, both appointed by the Court.

The FSA, established in 1997, contains the broad mandate that immigrant children be housed in "safe and sanitary" conditions with particular regard for the vulnerability of minors. The July 2022 Settlement articulates a series of specific custodial requirements, including the designation of "Juvenile Priority Facilities," to which minors must be transferred within 48 hours of arrival at any other CBP facility within the sector.

The Settlement established the role of a court-appointed Juvenile Care Monitor, with a mandate and authority to monitor CBP's compliance with the provisions of the Settlement in the RGV and El Paso sectors. On August 3, 2022, Dr. Paul H. Wise was appointed the Juvenile Care Monitor for a 16-month term. Prior to his appointment as the JCM, Dr. Wise served since July 2019 as the Special Expert working with the Special Master (Ms. Andrea Ordin) to provide the Court with independent assessments of custodial conditions in CBP facilities in the RGV and El Paso sectors.  Under the provisions of the Settlement, the JCM has access to CBP documents and records, may conduct announced and unannounced visits to CBP facilities in the RGV and El Paso sectors, may conduct interviews with class members and accompanying adult family members, and may conduct interviews with CBP employees and the employees of its contractors.

It is standard JCM policy that any and all concerns related to Settlement compliance or other custodial issues observed during site visits are immediately conveyed to CBP.  In addition, the JCM also analyzes data from CBP in order to determine whether CBP is in compliance with the terms of the Settlement, including time in custody and whether there is overcrowding at CBP JPFs, as defined in the Settlement.

It is important to note that throughout this reporting period the JCM has been given full access to CBP facilities and relevant data and has been treated at all times with professionalism and courtesy by CBP leadership and operational personnel in the RGV and El Paso sectors.

## III. MONITORING ACTIVITIES AND DATA ANALYSIS

The JCM conducts a variety of monitoring activities. This report has drawn upon 3 sources of information: site visits and interviews in CBP facilities; interviews at facilities run by the Office of Refugee Resettlement, Health and Human Services, (ORR) with UCs regarding their experiences in CBP custody; and CBP data on apprehensions and custodial operations of juveniles in custody.

### III.A. Site Visits

### CBP Facilities

Between January 1 and May 31, 2023, 8 site visits were conducted at CBP facilities. These site visits were both announced and unannounced visits, in which the JCM had full access to all sections of all facilities providing care for children. In addition, the JCM had full freedom to conduct interviews away from CBP personnel with both children and parents in custody. The dates and location of the site visits to CBP facilities were as follows:

- CBP El Paso

  o    February 2-3
  o    March 17-18
  o    April 25-27

- CBP Rio Grande Valley

  o    February 14*
  o    March 11-12
  o    April 23-24
  o    May 21-26
  o    May 31*

 *Site visit conducted by Dr. Cristel Escalona

**ORR Facility**

Interviews with UCs were conducted during one visit to the Influx Care Facility
at Ft. Bliss, Texas on April 26.  The interviews were conducted with both boys
and girls of varying ages between 12 and 17. The interviews were held in private
settings without ORR staff present and focused on their experiences in CBP
custody.

## III.B. CBP Data Analysis

CBP provided monthly reports on the number of UCs apprehended as well as the
number of family unit encounters (includes all individuals in the family,
including both adults and minors). These data are presented for the reporting
period in Table 1.  CBP also provides data on children who are held in custody
for longer than 72 hours.  These are presented in Table 2.

CBP data as well as site visit interviews have documented that it is rare that UCs
are held in CBP custody for more than 72 hours.  When the 72-hour limit is
surpassed, it is almost always due to special circumstances, such as a child
initially reporting that they are over 18 years old or for a protracted medical
issue.  Children in families, however, are routinely held for more than 72 hours.
The variation in extended time in custody for families reflects differences in
removal policies and home country demographics, the census in CBP facilities,
and local processing capabilities, among other factors. The termination of the
Title-42 policy and the institution of new removal policies for families and single
adults could result in more protracted time in custody for families.  This concern
will require close monitoring, particularly for its potential impact on
overcrowding.

11

**Table 1**. **Total Apprehensions by Month and Demographic Group, Nationwide**

|  | JANUARY | FEBRUARY | MARCH | APRIL | MAY |
|---|---|---|---|---|---|
| **INDIVIDUALS IN FAMILY UNITS** | 25,829 | 25,644 | 33,269 | 46,514 | 44,900 |
| **UNACCOMPANIED CHILDREN** | 9,034 | 10,419 | 11,853 | 11,064 | 9,548 |

**Table 2. Children with Time in Custody (TIC) Greater than 3 Days (72 Hours), Nationwide**

**Children in Families**

|  | JANUARY | FEBRUARY | MARCH | APRIL | MAY |
|---|---|---|---|---|---|
| **3-5 DAYS** | 191 | 106 | 486 | 643 | 580 |
| **6-7 DAYS** | 28 | 19 | 191 | 326 | 212 |
| **8-14 DAYS** | 7 | 6 | 114 | 243 | 68 |
| **>14 DAYS** | 0 | 0 | 2 | 38 | 1 |
| **TOTAL** | 226 | 131 | 793 | 1250 | 861 |

**Unaccompanied Children**

|  | JANUARY | FEBRUARY | MARCH | APRIL | MAY |
|---|---|---|---|---|---|
| **3-5 DAYS** | 1 | 2 | 3 | 1 | 12 |
| **6-7 DAYS** | 4 | 0 | 2 | 0 | 4 |
| **8-14 DAYS** | 1 | 0 | 0 | 1 | 3 |
| **>14 DAYS** | 0 | 1 | 1 | 5 | 1 |
| **TOTAL** | 6 | 3 | 6 | 7 | 20 |

## IV. CONDITIONS AT CBP FACILITIES

### IV.A. Facility Designation

In compliance with the Settlement, CBP has created Juvenile Priority Facilities
(JPFs) in both the Rio Grande Valley and El Paso sectors. These have often been
designated Central Processing Centers (CPCs) which are the primary sites within
the sectors for holding UCs and families in custody. UCs and families apprehended
in locations relatively distant from the CPCs may be initially held in CBP stations
until transfer to the CPCs can be arranged. Interviews with UCs and families
apprehended at locations distant from the CPCs reported transfer to the CPC within
48 hours, mostly within 24 hours.

### Prior Report Assessment

The prior report documented that the soft-sided facility located in Donna, Texas
(Donna Facility) served as the CPC in the RGV sector.  The prior report noted that
the CPC in the El Paso sector was located in a hard-sided facility which was
experiencing considerable overcrowding in the family holding pods.  Because of
this overcrowding, the holding pod dedicated to UCs was a single pod separated
into boys' and girls' sections by a temporary barrier.  Families were held with adult
males and females (parents) in the same pods.

### Current Observations

In the RGV sector, the Donna Facility served as the JPF for most of this reporting
period.  However, in late May, the JPF was moved to the renovated "Ursula"
location.  This facility had previously been used to house single adults.  However,
at the end of this reporting period both UCs and families were being housed at the
Ursula location. The Ursula facility is a hard-walled building with a processing

13

area comprised of interview desks, a medical intake unit, and temporary holding cells.  The larger holding area is comprised of 20 pods, separated into 4 holding areas which share a central atrium.  Each holding area has a central atrium which includes an elevated platform that serves as a watchtower, snacks, water, and for UC areas, activities such as coloring books and toys.  There is no use of chain-link fence in the holding areas.

In the El Paso sector, CBP opened a new soft-sided facility (SSF) in January 2023, which became the JPF for families in the sector.  This facility is comprised of a large central processing area and multiple holding pods.  Families in the new SSF were separated by parent gender.  During most of this reporting period, UCs continued to be housed in the hard-sided, CPC facility with each gender provided with a full holding pod. However, recently UCs were moved to the SSF location as well.

**Assessment**

In the RGV, the shift of the JPF to the Ursula location provides some important environmental and logistical improvements.  However, the fixed physical plant of the Ursula facility could prove problematic if the number of UC or family apprehensions increase in the sector.

**Recommendation**

The potential for overcrowding in the Ursula facility requires close monitoring.  In addition to the prospect of exceeding the maximum occupancy of holding pods in the Ursula facility, any need to begin using BP stations or other facilities to hold UCs or families on a regular basis would challenge the Settlement requirement for designating Juvenile Priority Facilities to hold children in each sector.

## IV.B. Overcrowding

Overcrowding is the custodial condition with the greatest potential to undermine the quality of care provided children in CBP custody.  The Settlement defines overcrowding as "a level of occupancy that exceeds the physical space required to maintain a safe and sanitary environment for each individual in custody."

### Prior Assessment and Recommendations

The prior report documented significant overcrowding of family holding areas in the El Paso JPF.  This overcrowding was associated with "highly deficient" custodial conditions, including problems with cleanliness, hygiene, medical care, and caregiver coverage.  In response, the prior report recommended immediate efforts to reduce the number of families being held in the El Paso JPF.  UCs, although not overcrowded, were being held in a single pod with a temporary barrier separating boys and girls.

The JPF in the RGV sector was not observed to be overcrowded during the prior reporting period.

### Current Observations

In the RGV, both data and site visit observation did not suggest overcrowding in the Donna JPF.  In El Paso, the transfer of families to the SSF alleviated the significant overcrowding observed at the former location.  During most of this reporting period, UCs in El Paso were held in the hard-walled CPC.  The transfer of families to the SSF permitted CBP to expand the holding area for UCs, such that each gender was housed in their own pod.  Direct observations and

15

interviews with UCs confirmed that the number of UCs held in the CPC did not
approach the maximum occupancies of the assigned pods.

Direct observations and interviews during this reporting periods with families
held in the SSF documented no overcrowding and that the number of individuals
in families held in the assigned pods did not approach the maximum occupancy
levels.

**Assessment**

Direct observations and interviews with UCs and families in the El Paso CPC and
new SSF documented that the overcrowding observed during the prior reporting
period was not present during the site visits.  Ongoing monitoring of census data
for the El Paso and RGV Juvenile Priority Facilities between site visits suggested
that this level occupancy was maintained during the reporting period.  This
represented a major improvement in the custodial conditions observed in the El
Paso sector.

**Recommendations**

The occupancy levels in both the RGV and El Paso sectors can vary from day-to-
day. Because overcrowding represents a major determinant of custodial conditions,
occupancy levels will continue to require close monitoring via occupancy data
tracking and site visits.

## IV.C. Nutrition

The Settlement requires that CBP ensure that children have access to age-appropriate meals and snacks that meet their daily nutritional needs. Water and adequate hydration are also mandated by the Settlement.

### Prior Assessment and Recommendations

CBP has generally met the nutrition requirements of the Settlement.  Water was readily available upon apprehension, in the JPFs, and during transport. Snacks were available at all times in the JPFs. Two hot meals and one cold meal were provided each day. Infant formula and toddler foods were available in the JPFs. The primary concern had been that children 2-5 years of age were being provided with adult foods only.  The primary recommendation was that young children should be offered age-appropriate food.

### Current Observations

Site visits and interviews with families and UCs documented that water and snacks were always available from soon after apprehension through their time in CBP custody.  During all site visits to both the JPFs and other sector BP stations, infant formula, bottled water, and mixing instructions were available.  Toddler packets of pureed fruits and vegetables were also available at the JPFs.  Reports regarding the quality of the food, however, varied considerably.  During times of high census, there were several reports of hot meals being served at room temperature.  In addition, some UCs reported that the taste was not acceptable and that they had relied primarily on snacks and fruit for their food intake.

Beyond food quality, the primary concern was the continued practice of
providing young children with adult meals.  No change regarding young-child
food offerings has been implemented since the last report.

**Assessment**

CBP has met many of the nutritional provisions in the Settlement. Water and
snacks have been provided to families and UCs throughout their stays in CBP
custody.  Three meals per day have also been provided, although the quality
appears to vary, particularly when the census is high.  The continued failure to
provide young children with age-appropriate food remains noncompliant with the
nutritional requirements outlined in the Settlement.

**Recommendations**

Young children should be provided with age-appropriate food during their
custody in the JPFs.  CBP should explore the options available to add these
offerings to their existing meal contracts in these facilities. The quality of
food offerings will require continued monitoring.

**IV.D. Temperature and Garments**

The Settlement requires the maintenance of a temperature range no less than 69°
Fahrenheit and no more than 83° Fahrenheit inside CBP holding facilities in the
RGV and El Paso sectors.

**Prior Assessment and Recommendations**

The prior report found that thermometers had been installed in all the pods holding families and children in the JPFs.  During all site visits, the temperatures were found to fall within the required range.  However, while temperatures in holding areas were observed to be in the range required by the Settlement, some children reported feeling cold.  Prior recommendations included reassessing the lower limit of 69° as well as ensuring the availability of additional clothing, including sweatshirts, jackets, and hats.  Also, laundering services in the El Paso CPC was considered inadequate during the prior reporting period.

**Current Observations**

Site visits documented that all holding pods had functioning thermometers that registered temperatures that fell within the required range. Despite pod temperatures recorded within the prescribed range, UCs and family members often noted feeling cold during their time in the JPFs and stations.

The Settlement also requires that CBP facilities maintain a stock of clothing in a variety of sizes that can be distributed to UCs and children in families. Site visits to the JPFs observed UCs being provided with sweatpants, t-shirts, sweatshirts, socks, and footwear.  These were generally provided at their first shower, usually within 12 hours after apprehension.  Beanies can assist in keeping infants and young children warm, but these were observed to be in use only irregularly in family holding pods.  Caregivers in the UC holding areas helped ensure that adequate garments were provided.  However, in the family holding areas, parents were not well informed that extra garments for children were available.  Mylar blankets were distributed to all UCs and family members.  Replacement blankets were available upon request for those that were ripped or soiled.  The shift of

19

families and UCs to the new SSF in El Paso provided new laundering capabilities
which remedied the lack of such services in the prior CPC.

**Assessment**

The Juvenile Priority Facilities are currently in compliance with the temperature,
mat, and blanket requirements of the CBP Settlement. However, many children
often felt cold at the lower end of the allowable temperature range. The
Settlement requirement that external clothing be available to provide adequate
warmth is being met for UCs. However, compliance with this requirement for
children in families was highly variable. The lack of parental awareness of the
availability of additional garments led to children feeling cold for long periods of
time while in custody.

**Recommendations**

There is no reason that children should report feeling cold for extended periods of
time while in CBP custody. If the lower acceptable temperature limit is not
raised, then greater efforts should be made to have additional clothing available
and to ensure that parents are informed that additional garments are available if
needed. Given the reports of children feeling cold, continued monitoring of the
temperature and garment availability provisions is warranted.

**IV.E. Sleep**

The Settlement requires that CBP make efforts to create custodial conditions
that are compatible with adequate sleep.

**Prior Assessment and Recommendations**

During the prior reporting period, sleep conditions were generally adequate and met the requirements of the Settlement.  However, an important exception was the experience of families in overcrowding holding pods in the El Paso CPC. The primary recommendation was to reduce overcrowding.

**Current Observations**

Site visits documented that all UCs and individuals in families had received a mat and mylar blanket.  In the current Juvenile Priority Facilities there is minimal ability to dim the overhead lights.

**Assessment**

Conditions conducive to sleep are a crucial contributor to child well-being. CBP is meeting the sleep requirements of providing a mat and mylar blanket.  It is important to note that the alleviation of overcrowding greatly improved sleeping conditions, particularly for families in the El Paso sector.  However, as noted in the previous section, the mylar blanket alone may not provide sufficient warmth to support adequate sleep.  Additional garments or warmer blankets will be necessary for many children in custody.  In addition, the capability to dim lights at night also remains inadequate.

**Recommendations**

Continued monitoring of overcrowding remains important in meeting the sleep requirements of the Settlement.  Efforts to enhance warmth and the technical ability to dim lights at night should also be pursued.

## IV.F. Hygiene and Sanitation

The CBP Settlement outlines a series of hygiene and sanitation requirements for all children entering CBP custody.  Showers are to be provided soon after arrival at the JPF and again at 48-hour intervals. Toothbrushes should be provided daily and also upon request.

### Prior Assessment and Recommendations

Inadequate hygiene and sanitation conditions, such as irregular showering and toothbrushing opportunities were noted in overcrowded family holding areas. Recommendations included the fundamental challenge of reducing overcrowding as well as enhanced efforts to provide regular showers and toothbrushes.

### Current Observations

During site visits, the pods and the sanitation areas were generally clean and well supplied.  Interviews with families and UCs suggested that showers were generally made available according to the schedule outlined in the Settlement. Caregivers facilitated the availability of toothbrushes to UCs on a daily basis. However, families were given access to toothbrushes only during showering opportunities.

### Assessment

The hygiene and sanitation conditions for UCs and families in custody generally met the requirements outlined in the Settlement.  The alleviation of overcrowding has greatly improved the hygienic conditions in the family holding areas.  However, the current practice of providing toothbrushes to

families only during shower opportunities is not compliant with the provisions
of the Settlement.

**Recommendation**

The deployment of caregivers in family holding areas should facilitate the daily
provision of toothbrushing opportunities for families, a required custodial
element of the Settlement. The hygiene and sanitation conditions will continue
to be monitored, particularly given the changes in JPF locations in both the
RGV and El Paso sectors.

## V. CAREGIVERS

The CBP Settlement requires that CBP develop a "caregiver" program directed at
providing a variety of direct custodial care services to children in CBP custody.

**Prior Assessment and Recommendations**

During the prior reporting period, caregivers in the RGV JPF were confined to the
shower and nursery (the area for UCs less than 6 years of age) areas only.  In El
Paso, caregivers were active in the UC pods but not in the family holding pods.
More broadly, the number of caregivers deployed in the JPFs was insufficient to
meet the needs of children in custody.  The primary recommendation was to
increase the number of caregivers in order to ensure that they can better provide
basic assistance with hygiene, trauma-informed care, and child-friendly activities.
In addition, it was recommended that CBP deploy caregivers in all pods holding
children, including those holding families.

## Current Observations

The number of caregivers in both sectors has been increased substantially.  In the RGV JPF, caregivers are now deployed in the UC holding pods, an important advance in providing trauma-informed care.  Both male and female caregivers were available on all shifts.  However, during the site visits, caregivers were not involved with the care of children in families, except for assisting with showers and laundry.  In the El Paso JPF, caregivers have long been active in the UC holding pods and continue to provide important support services for these children.  During this reporting period, caregivers were not deployed in family holding areas in either sector.  Caregivers were placed in isolation facilities whenever UCs or families were transferred to these locations.  In addition, a new group of contracted personnel, called "porters", have been deployed in the El Paso SSF.  They are positioned at the entrances of the holding pods and assist with services such as meal preparation and the allocation of basic necessities.

## Assessment

CBP has made considerable progress in expanding the number and contribution of caregivers in the JPF's.  Site visits and interviews with UCs confirmed that the caregivers have been actively engaged in supervising activities and identifying children in distress.  The placement of caregivers in isolation facilities is also an important development.  CBP reports that it is continuing efforts to increase the number of caregivers in facilities holding children and expects to have caregivers consistently positioned in family holding areas.  This would correct an important deficiency in custodial care and will be monitored closely.

**Recommendations**

The number of caregivers should be increased.  While the UC areas should be the
highest priority for caregiver coverage, family holding areas also require caregiver
services, particularly given the longer times-in-custody experienced by families.


## VI. TRAUMA-INFORMED CARE AND CHILD-APPROPRIATE ENVIRONMENT

The Settlement mandates that the JPFs implement care strategies that attend to
the emotional and psychological challenges that migrant children confront,
particularly when they are separated from their parents, families, and home
communities.  Recognizing the potential that children in CBP care may have
experienced trauma in their home communities, on their journey, and while in
custody, the Settlement calls upon CBP to make efforts to foster reassurance,
resilience, and psychological well-being. (See Section VII.7.D.7 and Section
VII.3.B.8 in the Settlement).


**Prior Assessment and Recommendations**

CBP has met the Settlement requirement of providing a safe environment for
children in the JPFs.  CBP and contracted personnel have also received training
in trauma-informed care.  However, inadequate numbers of caregiving personnel,
overcrowding, variation in holding children with a trusted adult, and the lack of
child-friendly amenities and activities have seriously constrained the ability of
CBP to provide adequate trauma-informed care and a child-appropriate
environment.  Recommendations included that there be a comprehensive
reassessment of the current CBP capabilities to provide trauma-informed care and

a child-friendly environment.  Also, the holding practices for children apprehended with a trusted adult require review.  While family holding policies can be complex and necessarily varied based on JPF census and physical layout, they should be examined with attention to the mitigation of emotional and psychological trauma, particularly among young children.

**Current Observations**

Interviews with UCs both in CBP custody and in ORR facilities revealed that they had been treated professionally by CBP personnel in the RGV or El Paso sectors. None of the UCs interviewed in the CBP and ORR facilities reported being verbally or physically abused by CBP personnel in the RGV or El Paso sectors.

The addition of caregivers to the UC holding pods in the RGV JPF was an important improvement in the provision of trauma-informed care.  Site visits documented that the caregivers were supervising the use of coloring books and games for young children and card and board games for older UCs.  The caregivers were also directly involved in caring for the very young, tender-aged UCs.  However, during this reporting period, caregivers were not observed to be providing services to children in families in either sector except for assistance with showering.  Televisions were working in the holding areas during site visits. The programs being played included an informational video regarding food and other amenities as well as children's programs in UC holding areas.

The shift of the JPF from the Donna Facility to the Ursula Facility has eliminated the capacity for outdoor recreation.  As noted earlier, child-friendly materials and

26

activities were only available in the UC holding pods where caregivers were present.

There is likely no greater contributor to the well-being of children in custody than holding them together with a parent or trusted adult.  Children are not routinely separated from parents or legal guardians when taken into CBP custody.  Separation can occur on rare occasions when initial CBP vetting reveals that a parent or legal guardian poses a potential threat to the child.  During their time in CBP custody, families are generally held in the same area.  However, the gender segregation policies in both the RGV and El Paso JPFs have meant that children in 2-parent families may be held in a separate room from one of the parents.  Although there is a general policy to permit some level of visitation by the separated parent, there appears to be great variation in how often this actually happens.

**Assessment**

CBP has met some of the basic requirements outlined in the Settlement regarding trauma-informed care and a child-appropriate environment.  The caregivers operating in the UC holding areas have proven to be a very positive influence on the UC experience in CBP custody.  However, the continued lack of caregivers and child-friendly materials and activities in the family holding areas remained a prominent deficiency, particularly given the longer times-in-custody for families during this reporting period.  Outdoor recreation opportunities have been eliminated in the RGV facility.  This raises concerns for children in families being held for protracted periods of time.  The holding pods have no windows to the outside world and the confinement of children to these rooms for multiple days does not attend to the special vulnerabilities and needs of children.  This in turn,

27

can effectively undermine other efforts to provide a trauma-informed, child-friendly environment.  More broadly, there is little coordination among the different elements of the trauma-informed care efforts in CBP facilities.

**Recommendations**

There is an opportunity for a more comprehensive and coordinated trauma-informed care program.  The development of the Child Welfare Specialist Program within the Office of Health Security, DHS, could provide the technical guidance and coordination needed to strengthen the existing program.  Continued increases in the number of caregivers could provide the critical personnel needed to implement a more robust trauma-informed care program.

## VII.  ENHANCED MEDICAL SUPPORT

The Settlement requires a robust medical care system for juveniles in CBP custody.  CBP has addressed this requirement by deploying contracted medical teams in the RGV and El Paso JPFs and any other facilities housing children.  These teams include an advanced medical practitioner (either a nurse practitioner or physician assistant) and 2-3 medical support personnel, usually medical assistants or emergency medical technicians.  These teams are required to be present 24 hours a day, 7 days a week.  The JPFs are usually staffed by at least 3 medical teams.  Isolation facilities that are holding minors are also required to have on-site medical teams at all times.  In addition to the on-site medical teams, supervising physicians, including a pediatrician, are assigned in each sector to provide on-call consultation, clinical protocol development, and quality assurance reviews.

28

**Prior Assessment and Recommendations**

The prior report noted that CBP has deployed a medical infrastructure that generally complies with the requirements of the Settlement. However, there were a series of concerns regarding the quality and consistency of the medical care provided. These concerns included:

- Variation in the thoroughness with which acute and chronic conditions are identified, documented, or required consultation with on-call physicians;

- The procedures for conveying medical information regarding children with chronic problems to BP personnel and how BP integrates this information into custodial and disposition decision-making;

- There was inconsistent conveyance of relevant medical information to BP agents responsible for custodial care and disposition, including release. There was also variation in how medical information was conveyed to ORR, including that for UCs with serious chronic conditions or disabilities;

- At times of high census, medical teams had decided to confine medical assessments to children under 12 years of age. Even children with a clear chronic condition or disability were, at times, excluded from the standard medical assessment protocol;

- There was some variation in the practices regarding the confiscation and replacement of appropriate medication to children in CBP custody or upon transfer or release;

- Failure to conduct repeat medical assessments on children held for 5 days or more. This is required in the Settlement and is intended to ensure that any deterioration in a child's medical status will be detected while in custody;

- Current medical protocols do not include regular assessment of children in their holding pods, including those with a known medical condition;

- In isolation facilities there was a lack of adequate medical supervision and surveillance, particularly when the census was high;

- Caregivers were not being deployed in isolation facilities when a UC or family is being held at that location;

- Based on interviews with parents after release and observation of release procedures and documentation in the CPCs, the provision of medical documentation to parents regarding the care their children received while in CBP custody was highly variable;

- The quality assurance program appeared to be profoundly inadequate as it was not clear how the systems of care were being assessed, including protocols for children with serious chronic disorders or children who develop acute conditions or deteriorate in CBP custody. There did not appear to be any review of the conveyance of medical information to BP personnel, supervisory physicians, to ORR, or to parents in families.

**Current Observations**

Initial health intake interviews appear to be consistently performed on all individuals before entering the holding areas in the JPFs. These interviews are directed at identifying any acute or chronic medical condition and the presence of a contagious condition, including symptoms of Covid-19. The interviews are conducted in association with a cursory examination of skin for evidence of rashes consistent with a contagious condition. Direct observation during all visits and interviews with UCs, family members, medical staff and CBP agents confirmed that these are being conducted on all individuals entering the JPFs and visited BP

stations. Appropriate treatment and washing and showering facilities were available for individuals identified with scabies or lice.

During the current reporting period, all UCs and children in families received medical assessments by an advanced medical practitioner (a nurse practitioner or physician assistant).  Direct observation during all site visits and interviews with UCs, family members, medical staff and CBP agents also confirmed that repeat assessments for children after 5 days in custody were also being conducted on all children.  These two observations address deficiencies noted in the prior JCM report and represent important improvements in the medical care provided children in CBP custody.

Surveillance policies for children in the holding pods remained minimal for most of this reporting period.  However, during the most recent site visits, medical personnel were observed visiting the holding pods in order to check on children at elevated medical risk and ask caregivers if they were concerned with the status of any child.  If these medical visits to the holding pods are sustained, this would represent an important enhancement in the medical monitoring of children in custody.

Site visits and interviews with medical personnel suggested that there was considerable variation in how children with serious chronic disorders are managed by medical personnel.  There appeared to be no protocol to guide when consultation with an on-call physician was required.  There was also no standard practice for informing responsible BP personnel that a child at elevated medical risk had entered custody.

31

Observation and interviews with children and families suggested that there was greater consistency in the administration of medications to children in custody. This remains a critical issue that requires continued close monitoring and ongoing communication with medical providers at ORR.

During site visits, the inspection of travel or release documents suggested that there remains considerable variation in the medical documentation that accompanies children when they leave CBP custody. The summary medical form for UCs was appropriately complete on a majority but not all children as they were being transferred to ORR.  Parents were not observed to be provided with documentation of the medical assessments or treatments their children received while in CBP custody.

## VII.A. The Death of ADRA

On May 17, 2023, ADRA, an 8-year-old girl, suffered a cardiac arrest while in the Border Patrol station in Harlingen, Texas and was declared deceased upon arrival at Valley Baptist Medical Center, a local hospital.  The primary investigation of the death, like all deaths in CBP custody, was undertaken by CBP's Office of Professional Responsibility (OPR) in association with local law enforcement and medical examiner.

The primary objective of this assessment of the death of ADRA was to identify and address urgently the systemic procedures and policies that proved catastrophically inadequate to prevent the deterioration in ADRA's condition and ultimately, her tragic death.  In this manner, the central concern of this assessment was less focused on identifying individual culpability than on any failures of the CBP medical and custodial systems and the urgent steps required to ensure that these

failures never again result in preventable harm or death.  The information essential
for this assessment was provided by the public reports of OPR, CBP, and
interviews as part of JCM monitoring activities both before and after ADRA's
death. This JCM report did not conduct independent interviews of the Border
Patrol personnel or medical providers directly involved with the care of ADRA
during her time in CBP custody.  The basic information regarding ADRA's time in
CBP custody is summarized below.

**Timeline: ADRA in CBP Custody\***

May 9, 2023, 9:34 PM, a family group consisting of two parents (an adult female
mother and adult male father) and three children (aged 8, 13, and 14) were taken
into U.S. Border Patrol custody as part of a larger group of 47 non-citizens
approximately eight tenths of a mile southeast of the Gateway International Port of
Entry in Brownsville, TX. Shortly thereafter, the group was moved approximately
0.4 miles east to the CBP-operated Camp Monument Staging Area where they
awaited transportation to the Donna CPC.

May 10, 2023, 7:50 AM, the family of five arrived at the Donna Facility and
moved through various stages of intake and in-processing over the next four hours.
At 12:20 PM, the eight-year-old was medically assessed, did not complain of any
acute illnesses or injuries, but the family did report a medical history including the
chronic conditions of sickle cell anemia and heart disease. After completing the
medical assessment, the mother, the fourteen-year-old adolescent, and the eight-
year-old girl were escorted to their housing pod.

May 14, 2023, at 4:11 PM, the eight-year-old girl voiced complaints of abdominal pain, nasal congestion, and cough and was seen within an hour by contract medical staff.  The child had a temperature of 101.8 degrees Fahrenheit; an influenza test was positive for Influenza A and negative for Influenza B.  Medical personnel provided the girl with acetaminophen, ibuprofen, and Oseltamivir (Tamiflu), as well as Ondansetron (Zofran).  Based on agency protocols, the entire family was transferred to the U.S. Border Patrol Station in Harlingen, TX (HRL), which was designated for cases requiring medical isolation for individuals diagnosed with or closely exposed to communicable diseases.

May 14, 2023, 5:09 PM, the family departed for the Harlingen Border Patrol Station (HRL) and arrived one hour later.  At 7:13 PM on May 14, 2023, CBP records indicate the eight-year-old girl was medically assessed by CBP-contracted medical personnel immediately upon her arrival at HRL.

May 17, 2023, the eight-year-old girl and her mother came to the HRL medical unit at least three times.  During the first visit, records indicate that the child complained of vomiting and was administered Ondansetron (Zofran) and instructed to hydrate and return if needed.  During the second visit, the child complained of a stomachache.  CBP contracted medical personnel annotated that she was stable and instructed the mother to follow-up if needed.  CBP records indicate that a third visit took place at approximately 1:55 PM, during which the mother was carrying the girl who appeared to be having a seizure, after which records indicate the child became unresponsive.  CBP-contracted medical personnel subsequently began to administer CPR and summoned emergency medical services.

May 17, 2023, at approximately 2:07 PM, South Texas Emergency Care (STEC) emergency medical services arrived at HRL and took over lifesaving. The girl and her mother were transported to the Valley Baptist Medical Center in Harlingen, TX, where the girl was declared deceased by medical personnel at that facility at 2:50 PM.

*Abstracted from OPR, CBP information

**Apprehension and Transport to the Donna Processing Facility**

CBP agents are responsible for identifying and addressing all acute medical emergencies in the field. This includes administering appropriate first-line care and seeking emergency medical assistance from local health systems if required. The prior report found that this aspect of the CBP medical system functioned well and met the requirements of the Settlement.

Review of the circumstances associated with ADRA's apprehension and initial hours in custody did not raise any substantial issues as she was reportedly without acute symptoms or family concerns. However, the time between apprehension and transport to the Donna Facility (approximately 9 hours) was prolonged due to the location of the apprehension (Brownsville, approximately 1 hour driving time to the Donna Facility) and the relatively large number of families and UCs apprehended in this location and requiring transport on May 9th. The Camp Monument location in Brownsville was constructed by BP to provide secured shelter and basic facilities and supplies for the temporary holding of apprehended individuals and families awaiting transport to formal CBP facilities.

**Medical Assessment at the Donna Facility**

Approximately 5 hours after arrival at the Donna Facility, ADRA was assessed by
contracted medical providers in the medical intake unit.  At that time, ADRA's
underlying conditions of Sickle Cell Disease (SCD) and a history of surgery to
repair a congenital heart defect were documented in the electronic medical record
(EMR) system.  Documents pertaining to ADRA's conditions and history of illness
and therapy were shown to the medical personnel by ADRA's mother at this time.

Sickle Cell Disease (SCD) is a genetic disorder that affects the stability of red
blood cells.  This can result in chronic anemia, painful occlusion of blood vessels,
acute injury to the lungs, bones, and brain, such as strokes, as well as long-term
damage to the eyes and kidneys.  Significantly, SCD can damage the spleen which
renders the affected children highly vulnerable to serious infections.  Children are
often prescribed medication to address some of these potential complications.
There was no documentation that the medical provider who conducted the initial
medical assessment at the Donna CPC consulted with the on-call physician.  There
was also no documentation that the presence of a child at greatly elevated medical
risk had had been conveyed to BP agents responsible for custodial care at the
Donna Facility or those making decisions regarding disposition, including removal
or release.

**Medical Illness Assessment**

Approximately 5 days after entry into the Donna Facility, ADRA was brought to
the medical unit responsible for assessing and treating illness among individuals
being held in the facility.  The child had fever, respiratory symptoms and
abdominal pain. A test for Influenza was positive for Influenza A.  The child was
started on medication for influenza as well as for reducing fever and discomfort.

The standard protocol for individuals who test positive for influenza while in custody is to transfer them to a designated "isolation" facility or holding pod.  This is to help reduce the risk of rapid spread of viral or other contagious illnesses within the facility's general population.  At the time of ADRA's diagnosis of influenza, the Harlingen, Texas Border Patrol Station was the designated isolation station for the RGV sector.

There was no documentation that the health provider who evaluated ADRA's acute illness with influenza consulted an on-call physician.  There was also no documentation that a transfer to a local health facility was contemplated.

**Care in the Harlingen Border Patrol Station**

ADRA was evaluated by medical staff upon her entry into the facility, an assessment that was documented in the EMR.  There was no documented consultation with an on-call physician.  It appears that the medical monitoring of ADRA's condition was not augmented in response to her elevated medical risk. Medical staff do not routinely enter the holding cells to assess vital signs or other indicators of clinical deterioration.  A caregiver was present at the station but there was no documentation of any specific service rendered.

The record shows that ADRA's condition worsened on day 6 of custody, day 2 in the Harlingen Station.  The following day, May 17th, the record documented that ADRA's mother repeatedly reported that her daughter's condition was deteriorating and that she needed to be transported immediately to a local hospital.  Despite the mother's pleas, no transfer to a local health facility was initiated.  Only after

37

ADRA lost consciousness and suffered an apparent cardiac arrest was an ambulance called.

## VII.B. Assessment

Based on the currently available information, the death of ADRA was a preventable tragedy that resulted from a series of failures in the CBP medical and custodial systems for children.  The proximate cause was poor clinical decision-making by the health providers responsible for her care in the Harlingen BP Station on the day of ADRA's death.  However, this report is focused on the systemic failures that *permitted* poor clinical decision-making by several health providers to result in a child's death.  These failures occurred at multiple levels and should not be viewed as rare anomalies but rather as systemic weaknesses that if not remedied, are likely to result in future harm to children in CBP custody.

All information suggests that the systems operating during apprehension generally conformed to the requirements of the Settlement.  However, the routine use of temporary holding areas before transport to the Donna facility, the sector's designated JPF, could prove problematic.  The use of these temporary holding locations should be confined to situations in which immediate transport to the JPF is not possible. The week of May 9th saw large numbers of apprehensions in the Brownsville area resulting in transportation delays and the need to stand-up the Camp Monument location.  Although CBP had deployed some medical staff to the Camp Monument site to address any acute issues, it is not clear if information related to ADRA's underlying condition was conveyed to BP or contracted personnel at the time of apprehension or while at the Camp Monument location. However, ADRA was in her usual state of health without acute problems upon

apprehension and did not appear to require any medical intervention at the Camp Monument site or during transport to the Donna Facility.

ADRA received a medical assessment relatively soon after the family entered the Donna facility.  During the assessment, the child's medical history and examination were documented in the EMR.  This conforms to the medical assessment protocol required by the Settlement.

The lack of physician consultation for a young child with SCD highlights the apparent lack of an appropriate protocol for assessing the custodial and medical requirements for children at elevated medical risk who are being held in CBP facilities.  Although ADRA was not experiencing any acute problems upon entry to the Donna facility, the need for enhanced concern regarding any change in medical status could have been discussed with an on-call physician and entered into the EMR.  This could have guided the decision-making of medical providers, including the need for transfer to a health facility, on subsequent shifts and in the Harlingen BP Station.

The apparent failure to notify BP personnel regarding the entry into the Donna facility of a child at elevated medical risk is also a breach of essential communication.  BP is ultimately responsible for the well-being of all individuals in custody and the presence of a child at elevated medical risk would seem to be an important issue to convey to the appropriate BP personnel.  Although there is no provision in the Settlement that requires BP to consider a child's medical status as part of disposition decisions, it would seem important for BP to be aware of the presence of a child at elevated medical risk, particularly if removal procedures imply a relatively lengthy stay in custody.

39

The medical system at the Donna Facility operated effectively in identifying that ADRA had acquired influenza and in administering the indicated medication. However, there appeared to be little appreciation of the elevated risk of serious complications associated with SCD. The failure to consult a physician or a local health facility for more extensive testing, treatment, or precautions raises fundamental concerns regarding the ability of the CBP medical system to care appropriately for children at elevated medical risk.

The events in the Harlingen Station resulting in ADRA's death raise a series of other profound concerns regarding not only the direct care she received but also the custodial and medical systems that failed to prevent ADRA's clinical deterioration and death. The admission of a young child with SCD and a fever to the Harlingen Station should have triggered a close consultation with an on-call pediatrician or an evaluation at a local hospital with expertise in pediatric specialty care. It is not clear what ongoing monitoring procedures were utilized to ensure that any worsening of ADRA's condition would be recognized. In addition, it is not clear whether the health providers responsible for ADRA's care on May 17th were aware of her underlying SCD. There was no documentation that they had reviewed her medical record or had been advised by a coworker of this high-risk condition.

This report can make no judgment as to the reasons why the health providers responsible for ADRA's care in the Harlingen Station were so reluctant to transfer ADRA to a local hospital. However, JCM interviews with contracted health providers in other locations and at other times over this reporting period have reported that BP personnel have, on occasion, questioned a medical provider's decision to transfer a patient to a local hospital, stressing the drain on BP manpower associated with escorting families or children to outside facilities. To

emphasize, this report includes no information that this issue played any role in influencing the decision-making associated with ADRA's care.  Rather, this issue is noted here as a more general concern regarding potential transfers of ill individuals to local health facilities.  BP concerns regarding transfers of individuals to local health facilities are understandable; but to confront medical personnel with these concerns when a transfer is being contemplated is both inappropriate and dangerous.  The decision to transfer an ill individual to a local health facility should be based on medical criteria alone as determined by the appropriate medical personnel.

## VII.C. Recommendations

The recommendations outlined below are directed at improved CBP compliance with the custodial and medical provisions of the Settlement. (These recommendations were conveyed to the CBP Office of the Chief Medical Officer on May 26).  These recommendations are first directed at immediate actions that address the systemic failures that could lead to additional instances of significant harm to children in CBP custody.  Additional recommendations that address more general arenas of custodial and medical services are also presented below.  The recommendations for immediate action are based on 3 general strategies:

- The reduction of medical risk in CBP facilities;
- Enhanced pediatric consultation and monitoring of children at elevated medical risk while in CBP custody;
- Improved conveyance of medical information among CBP personnel, contracted health providers, and subsequent medical providers.

41

**The reduction of medical risk in CBP facilities.** The most effective, immediate step to prevent adverse child outcomes in CBP custody is to reduce the clinical burden on the CBP medical system by expediting the transfer of children at elevated medical risk out of CBP custody. UCs are almost always transferred to ORR care within 72 hours, most within 48 hours. However, families are experiencing protracted times in custody. When families have a child at elevated medical risk, the burden on CBP medical systems is significantly enhanced. Factors determining a family's time in custody are complex. However, the presence of a child at elevated medical risk should be made known to BP personnel so that this issue can be considered in determining immigration pathways with different time-in-custody implications. The ability to reduce the level of medical risk among the juvenile population in CBP custody has three requirements:

- **The identification of children at elevated medical risk.** The accurate identification of children at elevated medical risk during the initial intake screening and medical assessment is essential. The definition of what conditions convey a significantly elevated medical risk should not be left to the discretion of any given health provider. Rather, a basic protocol should be developed and implemented urgently that defines elevated medical risk and provides a list of diagnoses that are considered to confer elevated risk. This protocol would include a requirement that the medical provider consult with a pediatric advisor for each child who meets, or could possibly meet, the criteria defining elevated medical risk.

- **Alerting CBP personnel of the presence of a child at increased medical risk.** It is essential that medical providers convey information regarding

each child at increased medical risk to appropriate CBP personnel.  The
conveyance of this information should be a central component of the
medical protocol concerning children at increased medical risk.

- **CBP disposition decisions regarding children at increased medical risk.**
  Ultimately, the reduction of medical risk in CBP facilities will require the
  expedited transfer of children at increased medical risk out of CBP custody.
  Decisions regarding disposition, including removal or release, can be
  complex and ultimately relate to broader immigration policies.  However,
  protracted stays by families with a child at elevated medical risk increases
  the burden on CBP to ensure the child's health and well-being.  Only
  children medically cleared for travel should be moved out of CBP custody.
  No child should leave CBP custody if acutely ill or medically unstable.

**Enhanced pediatric consultation and monitoring of children at elevated
medical risk while in CBP custody.**  Although efforts to reduce levels of medical
risk in CBP facilities is a fundamental strategy, there is also a need to strengthen
the medical monitoring of children at elevated medical risk while they are in CBP
custody.  This enhanced monitoring would have four components:

- **Consultation with pediatric advisor.**  All children identified at the initial
  medical assessment as being at increased medical risk should be discussed
  with a pediatric advisor.  A list of medical conditions or clinical criteria
  should be developed urgently that would require a pediatric consultation.
  This list would not be exhaustive; any condition that raises concerns
  regarding enhanced risk should also lead to a consultation.  Consultation can
  help guide the management and monitoring requirements related to the

43

child's medical issues.  All consultations with the pediatric advisor should be
documented in the medical record.

- **Placement and monitoring of child status in isolation facilities.**  All
  children at elevated medical risk who are being considered for transfer to an
  isolation facility should be discussed first with a pediatric consultant.  All
  children placed in isolation facilities must receive enhanced medical
  monitoring, including regular assessment of vital signs and other indicators
  of clinical status.  Any deterioration in a child's condition should prompt
  immediate transfer to a local medical facility or consultation with a pediatric
  advisor, or both.  All monitoring interactions should be documented in the
  medical record.

- **Monitoring child status in holding pods.**  All children at elevated medical
  risk should be assessed at least once per shift.  This could be conducted by
  medical personnel visiting the child in the holding pod.  However, when
  appropriate, the children could be brought to the medical area for
  assessment.  All monitoring interactions should be documented in the
  medical record.

- **Strengthened procedures for referral to local medical facilities.**
  Contracted health providers should be empowered to refer children to local
  health facilities whenever they feel it is medically indicated.  Although
  referral to local health facilities can place significant logistical burdens on
  BP staff and financial resources, it is essential that the decision to refer a sick
  child to an outside medical facility is based solely on medical
  considerations, considerations determined by responsible medical personnel.

A clear statement emphasizing this policy should be circulated urgently to all medical providers and responsible BP operators. In addition, a consultation with a pediatric advisor is also indicated whenever referral to a local medical facility is being considered. All urgent referrals should proceed expeditiously without the need for consultation. However, when there is any question regarding referral, the pediatric advisor should be consulted.

**Disciplined conveyance of medical information among health providers.** Adequate medical care for children at elevated medical risk depends upon the disciplined conveyance of medical information among the multiple health providers responsible for patient care. This requirement for disciplined communication relates to providers deployed in all CBP facilities, including all isolation units, as well as those who may provide care subsequent to release. The commitment to enhanced communication relates to seven domains:

- **Disciplined communication among health providers in CBP facilities.** Reports on the management and monitoring of children at elevated medical risk should be communicated formally at each provider shift change. These communication practices are a well-recognized component of the standard of care expected in all high-quality medical systems. These communication practices should also be conducted in all isolation units to ensure that all health providers are knowledgeable about the conditions and status of all ill children and those at elevated medical risk.

- **Ensuring hospital records are conveyed to CBP medical personnel.** It is the standard of care that documentation of the evaluation and treatment of any referred patient be transmitted back to the referring medical provider.

45

However, there is wide variation in what information a local health facility
conveys back to CBP medical personnel after a referral evaluation or even
an admission has been completed.  Agreements should be developed to
ensure that relevant documentation of any hospital evaluation, therapy, or
admission be conveyed to CBP medical personnel.

- **Conveyance of medical information to the Office of Refugee
  Resettlement (ORR).**  For all UCs, relevant medical information regarding
  any diagnoses, medication, or other developments in CBP custody should be
  documented and conveyed to ORR.  This remains an outstanding issue as the
  accurate conveyance of medical information to ORR remains highly
  variable.

- **Medical information should be provided to a child's parent or guardian.**
  For all children at elevated medical risk, parents or guardians should be
  provided with medical summary sheets that include diagnoses, medications,
  and other pertinent medical information prior to transfer out of CBP custody.

- **Medical referrals should be made for children at elevated medical risk
  in families being released into the United States.**   Standard medical
  practice requires that patients in need of continued care be referred to
  appropriate follow-up services.  Children who are medically stable but have
  special medical needs and are part of families scheduled for release into the
  United States would benefit from a referral to a facilitating NGO or medical
  facility in their US destination.  This referral capability would help ensure
  that children at elevated medical risk do not deteriorate soon after release
  from CBP custody.

46

- **Major improvement in medical quality assurance program.**  There is an urgent need to greatly improve the quality assurance program utilized by the medical contractor and CBP medical oversight.  Relevant metrics and datasets should be developed expeditiously which can assess the proper functioning of the medical systems identified in this and the prior JCM report as needing urgent reform.  High priority should be given to data on hospital admissions of children referred from CBP facilities, data that were requested by the JCM 4 months ago but have yet to be received.

- **Notification of rights.**  A comprehensive assessment of CBP practices regarding the notification of rights is required.  Although not a medical issue per se, it is not clear what practical recourse is available for older children or parents when custodial or medical practices are considered to be acutely jeopardizing the health of children in CBP custody.  The Settlement outlines a series of notice of rights requirements.  However, greater clarity is required to fully understand how these rights could potentially be exercised in acute situations.

**CERTIFICATE OF SERVICE**

Case No. CV 85-4544- DMG (AGRx)

I am a citizen of the United States. My business address is 250 Sixth Street, Suite 205, Santa Monica, California 90401 . I am over the age of 18 years, and not a party to the within action.

I hereby certify that on July 18, 2023, I electronically filed the following documents with the Clerk of the Court for the United States District Court, Eastern District of California by using the CM/ECF system:

**NOTICE OF FILING OF JUVENILE CARE MONITOR REPORT BY DR. PAUL H. WISE**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the United States the foregoing is true and correct. Executed on July 18, 2023, at Los Angeles, California.

Jeff Thomson