1  ANDREA SHERIDAN ORDIN (SBN 38235)
   STRUMWASSER & WOOCHER LLP
2  1250 Sixth Street, Suite 205
   Santa Monica, California 90401
3  Telephone: (310) 576-1233
   Facsimile: (310) 319-0156
4  E-mail: aordin@strumwooch.com

5

6                  **UNITED STATES DISTRICT COURT**

7          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

8

9   JENNY LISETTE FLORES, *et al.*,        CASE NO. CV 85-4544-DMG (AGRx)

10                                          **NOTICE OF FILING OF**
11                  Plaintiffs,             **JUVENILE CARE MONITOR**
                                            **REPORT BY DR. PAUL H. WISE**
12          v.

13

14  MERRICK B. GARLAND,
    Attorney General of the United
15  States, *et al.*,

16

17                  Defendants.

18

19

20

21

22

23

24

25

26

27

28

1    In accordance with the Court's Orders, Dr. Paul H. Wise submits the
2  attached Juvenile Care Monitor Report.

3    These assessments are required by the provisions of a recent settlement
4  agreement approved by the Court on July 29, 2022 [Doc.# 1278] (the
5  Settlement) which mandates many new and specific custodial conditions and
6  procedures for immigrant children in federal custody.  The Settlement also
7  established the Juvenile Care Monitor (JCM) position to access CBP compliance
8  with the provisions of the Settlement.

13  DATED:      September 15,  2023      Respectfully submitted,

15                                     Andrea Sheridan Ordin
                                       STRUMWASSER & WOOCHER LLP

17                                     By  __/s/ Andrea Sheridan Ordin__
18                                         Andrea Sheridan Ordin

19                                     *Legal Advisor to Juvenile Care Monitor*
20                                     *Dr. Paul H. Wise*

**JUVENILE CARE MONITOR REPORT**

**September 2023**

**Submitted by Paul H. Wise, MD, MPH**

**Juvenile Care Monitor**

**CONTENTS**

I.      SUMMARY……………………………………………………...3

II.     CBP SETTLEMENT AND THE JUVENILE CARE MONITOR...12

III.    MONITORING ACTIVITIES AND DATA ANALYSIS………….14

IV.     CONDITIONS AT CBP FACILITIES……………………………..18

V.      CAREGIVERS……………………………………………………43

VI.     TRAUMA-INFORMED CARE………………………………...47

VII.    ENHANCED MEDICAL SUPPORT……..………………………51

**GLOSSARY**

| | |
|---|---|
| BP | Border Patrol |
| CBP | Customs and Border Protection |
| CPC | Central Processing Center |
| CWSP | Child Welfare Specialist Program, Office of Health Security, DHS |
| EHF | El Paso Hardened Facility |
| FSA | Flores Settlement Agreement |
| JCM | Juvenile Care Monitor |
| JPF | Juvenile Priority Facility |
| OCMO | Office of the Chief Medical Officer, CBP |
| ORR | Office of Refugee Resettlement |
| RGV | Rio Grande Valley |
| SSF | Soft-sided facility |
| TIC | Time in custody |

## I. SUMMARY

This report presents the evaluation and recommendations of the Juvenile Care
Monitor who is charged with conducting independent assessments of custodial
conditions for children held in Customs and Border Protection (CBP) facilities in
the Rio Grande Valley (RGV) and El Paso sectors.  These assessments are required
by the provisions of a settlement agreement approved by the Court on July 29,
2022 [Doc. # 1278] (the Settlement) which mandates many new and specific
custodial conditions and procedures for immigrant children in federal custody.  The
Settlement also established the Juvenile Care Monitor (JCM) position to assess
CBP compliance with the provisions of the Settlement.  This report covers the
period of June through August 2023.

The Settlement mandates a full range of custodial requirements, many of which
CBP has met.  However, there remain provisions of the Settlement that CBP has
not met and require purposeful remediation.  This report is primarily focused on
the custodial conditions in the RGV sector.  Although covering observations made
during site visits to the El Paso sector, concerns generated by site visits to the RGV
facilities late in the prior reporting period and early in this reporting period
required a more concentrated focus on the processes and conditions affecting
children being held in the RGV sector.

The JCM conducts a variety of monitoring activities. This report has drawn upon
site visits to CBP facilities, interviews with children and families in CBP custody,
and the analysis of data provided by CBP on custodial operations involving
unaccompanied children (UCs) and children in families.

While the JCM examines all Settlement requirements and reports all concerns
related to Settlement compliance, the primary focus of the JCM has been on those
requirements and concerns that have the greatest potential consequences for the
health and well-being of children in CBP custody.  All concerns related to
Settlement compliance or other custodial issues generated by interviews or
observations during site visits are immediately conveyed to CBP and remedial
action monitored.

The Settlement also requires that children and families in custody be provided with
certain visual, written, or verbal notice of their legal rights and expected elements
of custodial care.  A summary of the Settlement components assessed in this report
are presented below:

•      **Juvenile Priority Facilities.** A fundamental provision in the Settlement is
the designation of specific facilities in each sector to house and process UCs and

4

families. These Juvenile Priority Facilities (JPFs), often designated Central

Processing Centers (CPCs), have been established in both the RGV and El Paso

sectors.  However, there have been recent changes in the locations and physical

plants of the JPFs in both sectors.  In the RGV sector, the JPF was moved from the

Donna Facility to the Ursula Facility during the prior reporting period and back

again to the Donna Facility during the current reporting period.  These transitions

in the JPF were associated with changes in overcrowding, the processing and

holding of families, and in a variety of custodial conditions.


•      **Time-in-custody and overcrowding.**  In both sectors, UCs continue to be

regularly transferred to ORR care within the required 72 hours, most within 48

hours.  Children in families, however, experienced a wider range of times in

custody, although the times-in-custody for families during site visits were noted to

be somewhat shorter during this reporting period.  National data from CBP

suggested that the percentage of families held in custody for greater than 72 hours

fell significantly between the April-May and June-July periods. These data also

suggest that among families held for longer than 72 hours, 42 percent were held for

longer than 5 days during the April-May period but only 7 percent were held for

longer than 5 days during the June-July period.  (See Table 2).  Site visits to the El

Paso JPF continued to document no overcrowding.  Site visits to the Ursula

Facility in the RGV documented significant overcrowding in the pods holding male head of families.  Other holding areas were not overcrowded.  Site visits to the Donna Facility during this reporting period documented no overcrowding.  The risk of overcrowding remains substantial if apprehensions continue to increase.  Therefore, close monitoring of this fundamental custodial condition will continue.

•      **The separation of families while in custody.**  Site visits in the RGV sector have documented the regular practice of separating children from their parents while in custody.  Under this policy, children are held in pods devoted to UCs.  CBP has regularly placed older boys apprehended with their mothers in male UC holding areas. However, this report documents that in the RGV, children of the same gender as their parent, some as young as 8 years of age, were being held separately from their parents.  A declaration provided by the Plaintiffs reported that even younger children were held separately from their parents in the RGV.  The justification for this practice was based on the lack of available space in the family holding pods. Interviews with parents and children found that there were minimal or no opportunities for phone contact or direct interaction between parent and child. The separation of families and the lack of interaction while in custody do significant, and potentially lasting, harm to children, particularly younger children.

Given the seriousness of holding children apart from their parents, the JCM will continue to monitor these practices closely.

- **Warmth, garments, and sleep.**  The Settlement requires that CBP ensure that the holding environments maintain a temperature between 69 and 83 degrees, provide sleeping mats, clean and warm garments to children in custody, and that the holding conditions are conducive to adequate sleep.  CBP has met the ambient temperature requirements outlined in the Settlement.  However, site visits during this reporting period documented a failure to provide sleeping mats to all families and UCs, a basic custodial requirement of the Settlement. Subsequent site visits found that all family members and UCs had been provided with a sleeping mat after the JPF had been moved from the Ursula Facility to the Donna Facility.  Also, interviews revealed that some children who felt cold had not been offered extra garments. The sleep environment was also negatively affected by facilities' inability to dim overhead lights at night.

- **Nutrition.**  The Settlement requires the provision of water and age-appropriate meals and snacks that meet children's daily nutritional needs. CBP has met many of these requirements but not all.  Water was readily available upon apprehension and in the JPFs.  Snacks were available at all times in the JPFs. Two

7

hot meals and one cold meal were provided each day. Site visits found that infant formula and toddler foods were available in the JPFs. The quality of and satisfaction with the provided food varied considerably and will require continued monitoring.  The primary deficiency continues to be the provision of adult meals to young children.  This has been a persistent problem and site visits during this reporting period documented no change in food offerings for young children. This represents a persistent arena of noncompliance with the Settlement requirement that CBP provide age-appropriate food to all children in custody.

• **Hygiene and sanitation**.  The Settlement outlines a series of hygiene and sanitation requirements for all children entering CBP custody.  In the past, CBP has generally met this Settlement requirement.  However, during this reporting period, interviews with families and UCs in the RGV sector found only variable compliance with the Settlement's provision of regular showering opportunities. Sanitation and adequate hygiene supplies in the JPFs continued to generally meet the requirements of the Settlement except in areas characterized by overcrowding. The alleviation of overcrowding was associated with a return to prior levels of adequate hygienic conditions.

• **Caregivers.** The Settlement requires that CBP develop a "caregiver" program directed at providing a variety of custodial services to children in CBP custody.  CBP has recently expanded the number of caregivers in the JPFs and has deployed them to all the UC and most family holding areas, an important enhancement. Site visits have confirmed that caregivers are providing supervision of UCs and are facilitating child-friendly activities in the UC holding pods. Caregivers have also been deployed in isolation areas when UCs or families are present.  The initiation of the Child Welfare Specialist Program (CWSP) in the Office of Health Security, Department of Homeland Security and a renewed emphasis on the caregiver program by the Office of the Chief Medical Officer (OCMO), CBP, have greatly enhanced the potential of the caregiver program to improve the material and psychosocial well-being of children in CBP custody. However, this potential will only be realized if the number and training of caregivers continues to be enhanced.  The JCM will continue to monitor the numbers and functions of the caregivers in the months to come.

• **Child-friendly environment.**  The Settlement requires that children be treated with dignity, respect, and in recognition of their particular vulnerabilities. CBP has met certain elements of this general Settlement requirement. Significantly, children interviewed during all site visits reported that they felt safe in CBP

custody. There were no reports of physical or verbal abuse by CBP personnel or by other children in custody.  Most JPF holding areas had televisions playing informational and entertainment videos.  However, these efforts to provide trauma-informed care and a child-friendly environment have been rendered irrelevant for children who have been separated from their parents while in custody.

•    **Enhanced medical care.**  The requirements of the Settlement mandate that the JCM assess both the structure and the performance of the CBP medical system for children in custody.  CBP has established the required medical infrastructure, including around-the-clock medical services in the JPFs and most other main CBP stations in the two sectors. However, the prior JCM reports identified a series of concerns regarding the quality of medical services and the adequacy of coordination and accountability practices, practices that all high-quality medical systems require. Significantly, OCMO has recently initiated a series of important reforms, many of which attend directly to the concerns and recommendations included in prior JCM reports.  For example, OCMO has implemented protocols to help ensure appropriate consultation with pediatric advisers for children at elevated medical risk.  OCMO has worked closely with the JCM in crafting these enhanced procedures and protocols, all of which will be the focus of ongoing OCMO and JCM evaluation.

**Overall Assessment of Child Well-Being in CBP custody**

The Settlement mandates a large number of specific custodial and procedural requirements. CBP continues to meet many of these requirements.  Important improvements have been implemented over the past two reporting periods, particularly in the alleviation of overcrowding and the enhanced deployment of caregivers.  However, this report documents that some important custodial services were not in compliance with the Settlement. Some of these services, such as a lack of sleeping mats, were corrected within this reporting period.  The holding of parents and children separately while in custody in the RGV remains a central concern as does continued weaknesses in the quality and accountability of the contracted medical system for children in CBP custody.

While the situation on the border is inherently dynamic, compliance with the provisions of the Settlement remains a constant requirement.  Changes in immigration policies and the forces that drive unauthorized migration can generate crescendos and decrescendos of apprehensions, which, in turn, confront CBP with an everchanging challenge to its holding capacity and systems of custodial services for children.

11

Accordingly, the conditions in CBP facilities should never be considered static or fixed; rather, they will always be contingent on CBP's ability to respond to the dynamic character of the border and its legal and humanitarian demands. JCM monitoring, therefore, must respect both the substantial burden on CBP to constantly respond to changing border conditions as well as its unwavering mandate to fully meet the requirements of the Settlement.

## II.     THE CBP SETTLEMENT AND JUVENILE CARE MONITOR

On July 29, 2022, the Court granted final approval of a settlement (the Settlement) that resolved a motion to enforce compliance with the Flores Settlement Agreement (FSA) regarding conditions and standards at CBP facilities in the Rio Grande Valley (RGV) and El Paso sectors along the Southwest Border. The Settlement is a lengthy and complex document that specifies a large number of specific custodial requirements.  The Settlement was the result of nearly three years of mediation between the Plaintiffs and Defendants and overseen by the Special Master, Ms. Andrea Ordin, and informed by the Special Expert, Dr. Paul H. Wise, both appointed by the Court.

The FSA, established in 1997, contains the broad mandate that immigrant children be housed in "safe and sanitary" conditions with particular regard for the vulnerability of minors. The July 2022 Settlement articulates a series of specific custodial requirements, including the designation of "Juvenile Priority Facilities," to which minors must be transferred within 48 hours of arrival at any other CBP facility within the sector.

The Settlement established the role of a court-appointed Juvenile Care Monitor (JCM), with a mandate and authority to monitor CBP's compliance with the provisions of the Settlement in the RGV and El Paso sectors. On August 3, 2022, Dr. Paul H. Wise was appointed the Juvenile Care Monitor for a 16-month term. Prior to his appointment as the JCM, Dr. Wise served since July 2019 as the Special Expert working with the Special Master (Ms. Andrea Ordin) to provide the Court with independent assessments of custodial conditions in CBP facilities in the RGV and El Paso sectors.  Under the provisions of the Settlement, the JCM has access to CBP documents and records, may conduct announced and unannounced visits to CBP facilities in the RGV and El Paso sectors, may conduct interviews with class members and accompanying adult family members, and may conduct interviews with CBP employees and the employees of its contractors.

It is standard JCM policy that any and all concerns related to Settlement compliance or other custodial issues observed during site visits are immediately conveyed to CBP.  In addition, the JCM also analyzes data from CBP in order to determine whether CBP is in compliance with the terms of the Settlement, including time in custody and whether there is overcrowding at CBP JPFs, as defined in the Settlement.

It is important to note that throughout this reporting period, as in all prior periods, the JCM has been given full access to CBP facilities and relevant data and has been treated at all times with professionalism and courtesy by CBP leadership and operational personnel in the RGV and El Paso sectors.

## III. MONITORING ACTIVITIES AND DATA ANALYSIS

The JCM conducts a variety of monitoring activities. This report has drawn upon two sources of information: site visits in CBP facilities and CBP data on apprehensions and custodial operations involving juveniles in custody.

14

## III.A. Site Visits

Between June 1 and August 31, 2023, 6 site visits were conducted at CBP
facilities, detailed below. The JCM had full access to all sections of all facilities
providing care for children. In addition, the JCM had full freedom to conduct
interviews away from CBP personnel with both children and parents in custody.
The dates and location of the site visits to CBP facilities were as follows:

- CBP El Paso
  - June 29-30*
  - August 9-10*

- CBP Rio Grande Valley
  - June 27-28*
  - July 20**
  - August 11-12***
  - August 30**

*Site visit conducted by Dr. Paul H. Wise
**Site visit conducted by Dr. Cristel Escalona
*** Site visit conducted by Dr. Paul H. Wise and Dr. Cristel Escalona

## III.B. CBP Data Analysis

CBP provided monthly reports on the number of UCs apprehended as well as the
number of family unit encounters (includes all individuals in the family,
including both adults and minors). These data are presented for the reporting

period in Table 1.  CBP also provides data on children who are held in custody

for longer than 72 hours.  These are presented in Table 2.

CBP data as well as site visit interviews have documented that it is rare that UCs

are held in CBP custody for more than 72 hours.  When the 72-hour limit is

surpassed, it is almost always due to special circumstances, such as a child

initially reporting that they are over 18 years old or for a protracted medical

issue.  Children in families, however, are routinely held for more than 72 hours.

The variation in extended time in custody for families reflects differences in

removal policies and home country demographics, the census in CBP facilities,

and local processing capabilities, among other factors. The termination of the

Title-42 policy and the institution of new removal policies for families and single

adults could result in more protracted time in custody for families.  This concern

will require close monitoring, particularly for its potential impact on

overcrowding.

**Table 1**. **Total Apprehensions by Month and Demographic Group, Nationwide\***

|  | JUNE | JULY |
|---|---|---|
| **INDIVIDUALS IN FAMILY UNITS** | 25,829 | 25,644 |
| **UNACCOMPANIED CHILDREN** | 9,034 | 10,419 |

**Table 2. Children with Time in Custody (TIC) Greater than 3 Days (72 Hours), Nationwide**

**Children in Families**

|  | JUNE | JULY |
|---|---|---|
| **3-5 DAYS** | 162 | 697 |
| **6-7 DAYS** | 16 | 14 |
| **8-14 DAYS** | 9 | 10 |
| **>14 DAYS** | 0 | 15 |
| **TOTAL** | 187 | 737 |

17

**Unaccompanied Children**

|            | JUNE | JULY |
|------------|------|------|
| **3-5 DAYS** | 0 | 2 |
| **6-7 DAYS** | 0 | 2 |
| **8-14 DAYS** | 0 | 0 |
| **>14 DAYS** | 0 | 1 |
| **TOTAL** | 0 | 5 |

*Data source: CBP

## IV. CONDITIONS AT CBP FACILITIES

### IV.A. Facility Designation

In compliance with the Settlement, CBP has created Juvenile Priority Facilities
(JPFs) in both the Rio Grande Valley and El Paso sectors. These have often been
designated Central Processing Centers (CPCs) which are the primary sites within
the sectors for holding UCs and families in custody. UCs and families apprehended
in locations relatively distant from the JPFs may be initially held in CBP stations
until transfer to the JPFs can be arranged. Interviews with UCs and families
apprehended at locations distant from the JPFs reported transfer to the JPF within
48 hours, mostly within 24 hours.

18

During this reporting period, the JPFs have been in transition in both the El Paso and RGV Sectors.  In El Paso, the JPF was moved from a soft-sided facility (SSF) comprised of multiple tent structures to a new, very large, tent facility with hardened walls (El Paso Hardened Facility or EHF).  This facility was erected adjacent to the SSF and contains 120 holding pods.  By the end of this reporting period, both UCs and families were housed in the EHF.

In the RGV Sector, the JPF was moved from the Donna Facility to the renovated "Ursula" location in late May.  The Donna Facility is composed of a series of large, soft-sided structures, some with hardened walls, and had been long used as the JPF in this sector.  The Ursula facility is a hard-walled building that had been used to hold single adults.  As noted in the prior JCM report, the Ursula location, while providing some important environmental and logistical improvements was limited by its fixed physical plant and minimal capacity to meet substantial increases in census.

Because apprehensions of UCs and families in the RGV Sector increased substantially in July, families were placed in the Donna Facility in addition to the Ursula Facility.  Some families apprehended in the McAllen region of the RGV also underwent initial intake processing in the McAllen Border Patrol Station.

Generally, these families were either released or transferred to the Donna Facility within 8 to 12 hours. In August, the JPF in the RGV Sector was moved back to the Donna Facility. The Ursula Facility returned to its prior use for single adults. The McAllen Border Patrol Station continued to be used for the intake processing of some families.

## IV.B. Overcrowding

Overcrowding is the custodial condition with the greatest potential to undermine the quality of care provided children in CBP custody. The Settlement defines overcrowding as "a level of occupancy that exceeds the physical space required to maintain a safe and sanitary environment for each individual in custody."

**Prior Assessment and Recommendations**

During the prior reporting period, there was no observed overcrowding in either the RGV or El Paso Sectors. However, the shift of the JPF in the RGV to the Ursula Facility was noted to reduce the capacity of BP to expand holding capacity in the face of increased UC or family apprehensions. In response, the prior report recommended enhanced monitoring of the Ursula Facility.

**Current Observations**

The June 28th site visit to the Ursula Facility occurred when this location was the JPF and held the UCs and families in the RGV Sector.  The total number of individuals being held at the time of the site visit did not surpass the maximum occupancy determined by CBP for the Ursula Facility.  However, significant overcrowding was noted in certain holding pods.  Specifically, there was substantial overcrowding in the two pods holding male parents.  Overcrowding of these pods was associated with inadequate sleeping conditions and cleanliness of the pods and sanitation areas.  The July 20th site visit also documented significant overcrowding and lack of cleanliness in the holding areas for male parents.

The BP decision to shift UCs and families to the Donna Facility during the latter portion of this reporting period had alleviated at the time of the site visits the overcrowding documented earlier at the Ursula Facility.

Site visits to the El Paso sector facilities did not document overcrowding during this reporting period.  This represented a continued positive response to the significant overcrowding that was documented in the January 2023 JCM report.

**Assessment**

Although the overall census figures in the RGV facilities did not surpass the maximum occupancy limits overall, there was persistent, substantial overcrowding of the male parent holding areas in the Ursula Facility during the early portion of this reporting period.  CBP's decision to shift of the JPF to the Donna Facility resulted in the elimination of the overcrowding at the time of the site visits.

**Recommendations**

Continued monitoring of the overall census and holding conditions in the Donna Facility and any other facility used as a JPF in the RGV sector is warranted.  In addition, the use of the McAllen Station as well as all other BP stations in the RGV for family processing or holding will continue to be assessed.

If apprehensions continue to increase, the risk of overcrowding remains substantial.  Therefore, close monitoring of this fundamental custodial condition will continue to be a high JCM priority in both the RGV and El Paso sectors.

## IV.C. The Separation of Families While in Custody

During two site visits to the Donna Facility in the RGV, interviews with family

members in custody revealed that some children who were apprehended with their

parents were being held separately in pods devoted to UCs.  Site visits found that

both boys and girls were being held separately, some as young as 8 years of

age.   A declaration provided by the Plaintiffs reported that even younger children

were held apart from their parents.  Separated children included girls separated

from mothers and boys separated from their fathers.  None of the interviewed

children had visited with their parents since they were separated, including

children who had been separated for 4 days.  Most of the children were not aware

of any protocols that would allow them to request a visit with their parents.


Declarations obtained by Plaintiff attorneys from children and parents being held at

the Donna Facility in August reported similar separation and custodial experiences

as those obtained from interviews conducted during JCM site visits.


BP reported that these separations were necessary to avoid overcrowding of family

holding pods and that there was available space in the UC holding pods.  BP also

reported that children younger than 8 years had not been separated from their

parents while in custody.

23

**Assessment**

The observed separation of children from their parents while in CBP custody raises important concerns regarding CBP compliance with the Settlement as well as for the general and potentially long-term well-being of the children affected by this custodial policy.  However, any assessment of this policy is best served by placing it within a broader historical and operational context.  It has been a relatively common practice to separate certain types of families while in custody.  Older teenage boys who are apprehended with their mothers may be separated from their mothers and held with boy UCs of a similar age.  This is done so that teenage boys are not held in the same pods with large numbers of what are often, very young women. Children may also be held separately from a parent on the relatively rare occasion that BP has reason to believe that a parent may pose a risk to the child.

The separations observed in the RGV pertained only to the families' time in custody, as parents and children were reunited upon their release from custody.  These separations in custody, therefore, should be distinguished from the family separations associated with the "Zero Tolerance" policy in 2018 in which children were separated from parents at apprehension and ultimately transferred to the Office of Refugee Resettlement, HHS, as UCs.

The Settlement supports the maintenance of family unity during CBP custody. (See
section VII.8.B.).  However, it also gives CBP some discretion regarding family
separation when there is "an operational need".  Because of the importance of
family unity while in custody, the relevant sections of the Settlement are
reproduced below:

### B. Family Unity

*1. Absent an articulable operational reason, class members
apprehended with adult family members (including non-parents or
legal guardians) shall remain with that family member during their
time in CBP custody, in accordance with TEDS, as well as the
requirements of the TVPRA.*

*2. Non-parent or legal guardian family members may include adult
siblings, grandparents, cousins, aunts, uncles, great-aunts, or great-
uncles.*

*3. When there is an operational need to house family members
separately, CBP shall make and record the reasons for holding them
apart and all reasonable efforts to ensure that the family members
have the opportunity to interact. Agents shall inform class members of
all ages that, if they are housed separately from a family member, they*

*can ask agents, guards, or caregivers to interact with that family*

*member. "Family member" includes both parents/legal guardians*

*and non-parents/legal guardians that were traveling with a class*

*member of any age. This information will be provided orally and via*

*the poster attached as Exhibit 1.*

*4. CBP shall take into account a class member's age and special*

*needs in determining whether it is appropriate to house a class*

*member separately from his or her family member.*

*5. Each facility may hold family members in a different manner based*

*on different demographics and the capabilities of the facilities. For*

*instance, in some facilities, it may be necessary to house all teenage*

*boys together, regardless of whether they entered with a family*

*member. In other facilities, it may be possible to hold a teenage boy*

*with his accompanying family member. In all cases, efforts shall be*

*made at each facility to ensure interaction between family members.*

*These efforts can include having a common area with benches for*

*visiting throughout the day, sharing meals together in a common area*

*or participating in recreational time together.*

*6. Orientation training for security guards and caregivers shall*

*inform the caregivers and security guards that class members are able*

> *to ask for and shall, barring exceptional circumstances, have contact*
>
> *and interaction with family members housed in the same facility.*

The Settlement does not define an "operational need" nor does it clearly constrain the time over which an operational need can extend.  Accordingly, whether the documented family separations are permitted under the Settlement is subject to legal deliberation and potentially, to the legal procedures outlined in the Settlement to resolve questions of CBP compliance.

The holding of children and parents separately was noted during the August 11 and August 30 site visits to the Donna Facility. The Donna Facility is a large, tent-based structure that served as the JPF in the RGV for several years before the JPF was moved to the Ursula Facility in May 2023.  The transition of the JPF back to the Donna Facility during this reporting period was based on the additional holding capacity of the Donna Facility and the greater flexibility the Donna Facility affords CBP to respond to changes in family and UC apprehensions.  Indeed, the move back to the Donna Facility was associated with the alleviation of the substantial overcrowding documented in the Ursula Facility during site visits in June and July.  However, the separation of young children from their parents had not been

documented by the JCM while the Donna Facility served as the JPF prior to the move to the Ursula Facility in May 2023.

The Settlement requires that CBP "take into account a class member's age and special needs in determining whether it is appropriate to house a class member separately from his or her family member." The site visits found that children who had been separated from their parents while in custody at the Donna Facility were between the ages of 8 and 17. Declarations provided by the Plaintiffs reported that younger children had also been held apart from their parents in the RGV sector. CBP operational leaders at the Donna Facility told the JCM that "tender aged children", generally defined as below the age of 6 years, were not subject to separation. Whether this lower age limit meets the Settlement provision that age be taken into account will again require legal deliberation.

The essential context for these Settlement provisions and their legal assessment is the fundamental understanding that hold a child separately while in custody is bad for children. Separating a child from a parent can be profoundly traumatic for children and can have lasting, harmful effects. While the risk of these effects is elevated among tender aged children and can vary based on a variety of factors, the

potential that separating a child and parent while in CBP custody will have serious, deleterious effects remains substantial for all children.

Of special concern are the children aged 6-15 years who were subject to separation while in the Donna Facility.  In this context, it is important to note that CBP has implemented improvements in custodial practices over the past year that can mitigate some of the harmful effects generated by holding parents and children apart.  Interviews with children have consistently revealed that they do not feel physically threatened while in CBP custody.  In addition, the deployment of caregivers in the UC holding areas have improved the custodial environment, particularly for younger children.  Nevertheless, despite these improvements, the potential harm associated with holding children apart from their parents remains substantial.  Interviews with separated children in this age group revealed significant emotional distress related to separation, including sustained crying and disorientation, particularly due to the child's uncertainty as to the location of the parent and when, and even if, child and parent might be reunited.

Recognition of the potential harm associated with family separation while in custody is reflected in the Settlement provisions regarding trauma-informed care (See Section VII.1.3.D.7 and Special Considerations: Annex I, Section IB.) and

that facilitate regular interaction between any separated parent and child.  Clearly, separating younger children conflicts directly with any commitment to trauma-informed care.  Moreover, the children being held separately who were interviewed during the two August site visits to the Donna Facility reported that they had not had any interaction with a parent since they entered the UC holding pod and few knew that they were entitled to request such a meeting. Discussions with caregivers assigned to the UC holding pods also suggested that they were not aware that children held separately from their parents could request contact with a parent while in custody.   During the site visits, the JCM did not observe posters or other materials advising parents and minors of their rights to interaction.  Interviews also revealed that parents being held apart from their children did not know of the requirement that CBP make and record the reasons for holding parent and child apart.  While the Settlement provides CBP with some discretion regarding these provisions, the interviews with the separated children and with the deployed caregivers indicated noncompliance with the Settlement provisions regarding interactions between separated parents and children while in custody.

**Recommendations**

The primary recommendation is to terminate the separation of young children (children less than 16 years of age) from their parents while in CBP custody.  On

many instances in the past, CBP has shown significant adaptive capacity to create sufficient holding areas and configurations to allow families with younger children to remain together while in custody.  Indeed, family separation was avoided at the Donna Facility in the past even during periods of very high census.  CBP must constantly address the dynamic challenges generated by evolving trends in family and UC apprehensions.   However, given the potential harm of family separation for younger children and CBP's past ability to avoid this practice, it is recommended that CBP elevate the priority accorded the maintenance of family unity at the Donna Facility and at all other JPFs.

The second recommendation is that if the holding of parents and children separately continues, CBP must ensure that their personnel and caregivers inform the affected families of their rights and provide opportunities for regular visitation.

The failure to provide parents and older UCs with information regarding their rights when being held separately in CBP custody raises the larger issue of CBP compliance with the provisions of the Settlement mandating that a series of legal notices be provided to class members (Section XI of the Settlement). Consequently, this arena of compliance will receive enhanced JCM monitoring.

## IV.D. Nutrition

The Settlement requires that CBP ensure that children have access to age-appropriate meals and snacks that meet their daily nutritional needs. Water and adequate hydration are also mandated by the Settlement.

### Prior Assessment and Recommendations

Prior JCM reports found that CBP has generally met the nutrition requirements of the Settlement.  Water was readily available upon apprehension, in the JPFs, and during transport. Snacks were available at all times in the JPFs. Two hot meals and one cold meal were provided each day. Infant formula and toddler foods were available in the JPFs. The primary concern had been that children 2-5 years of age were being provided with adult foods only.  The primary recommendation was that young children should be offered age-appropriate food.

### Current Observations

Site visits and interviews with families, children held apart from their parents and UCs documented that water and snacks were always available from soon after apprehension through their time in CBP custody.  During all site visits to both the JPFs and the McAllen BP Station, infant formula, bottled water, and mixing instructions were available.  Toddler packets of pureed fruits and vegetables were

also available at the JPFs.  Reports regarding the quality of the food continued to

vary.

The primary nutritional concern was the continued practice of providing young

children (2-5 years) with adult meals.  During this reporting period, the site visits

to both the RGV and El Paso JPFs documented that there has been no

improvement in the appropriateness of meals offered young children.

**Assessment**

CBP continues to meet many of the nutritional provisions in the Settlement. Water

and snacks have been provided to families and UCs throughout their stays in CBP

custody.  Three meals per day have also been provided, although the quality

appears to vary, particularly when the census is high.  The continued failure to

provide young children with age-appropriate food remains noncompliant with the

nutritional requirements outlined in the Settlement.

**Recommendations**

Young children should be provided with age-appropriate food during their

custody in the JPFs.  As noted in prior JCM reports, CBP should add these

offerings to their existing meal contracts in these facilities. This is particularly

important for children in families who generally spend longer times in custody than UCs. The quality of food offerings requires continued monitoring.

## IV.E. Temperature and Garments

The Settlement requires the maintenance of a temperature range no less than 69° Fahrenheit and no more than 83° Fahrenheit inside CBP holding facilities in the RGV and El Paso sectors.

### Prior Assessment and Recommendations

The prior report found that thermometers had been installed in all the pods holding families and children in the JPFs.  During all site visits, the temperatures were found to fall within the required range.  However, while temperatures in holding areas were observed to be in the range required by the Settlement, some children reported feeling cold.  Prior recommendations included reassessing the lower limit of 69° as well as ensuring the availability of additional clothing, including sweatshirts, jackets, and hats.  Also, laundering services in the El Paso CPC were inadequate during the prior reporting period.

34

**Current Observations**

Site visits to the Ursula Facility and Donna Facility in the RGV and the El Paso
EHF documented that holding pods had functioning thermometers that generally
registered temperatures within the required range. During one site visit, one pod at
the Donna Facility did not have a functioning thermometer.  On a subsequent visit,
another pod at the Donna Facility was noted to be at 66 degrees. These
observations were reported to CBP personnel who relayed the concern to the
facilities manager.

Despite nearly universal compliance with the temperatures required by the
Settlement, some UCs and family members reported feeling cold in the JPFs
during this reporting period.  Site visits to the Ursula Facility during this reporting
period observed that families and UCs who reported feeling cold did not know
that they could request additional clothing.  This issue persisted after the move to
the Donna Facility but was confined to specific family holding pods that were not
adequately served by caregivers.

In the El Paso EHF, site visits found that there were fewer children reporting
feeling cold than was noted in the RGV JPFs.  Caregivers assigned to the UC pods
were helpful in providing additional clothing for children when needed.  However,

parents in family holding areas were generally not aware that additional clothing
was available for their children.

**Assessment**

The JPFs were in general compliance with the temperature requirements of the
Settlement.  However, as noted in prior JCM reports, many children feel cold at the
lower end of the allowable temperature range.  The Settlement requirement that
external clothing be available to provide adequate warmth is generally being met
for UCs.  However, compliance with this requirement for children in families
remains highly variable.  The lack of parental awareness of the availability of
additional garments led to children feeling cold for long periods of time while in
custody.

**Recommendations**

As noted in prior JCM reports, there is no reason that children should report
feeling cold for extended periods of time while in CBP custody.  Therefore, as
recommended in prior JCM reports, if the lower acceptable temperature limit is
not raised, then greater efforts should be made to have additional clothing
available and to ensure that parents and children are informed that additional
garments are available if needed.  In addition, caregivers should receive additional

training regarding their role in providing additional clothing when necessary.
Given continued reports of children feeling cold, close monitoring of the
temperature and garment availability provisions of the Settlement is warranted.

**IV.F. Sleep**

**Current Observations**

Site visits to the Ursula Facility on June 28 and July 20 documented failures to
provide sleeping mats for all parents and children in custody.  This was the first
time that a JCM site visit documented a lack of sleeping mats in either a RGV or El
Paso JPF.

During the June 28 site visit to the Ursula Facility, the family holding pods for
female-headed families were provided with an inadequate number of sleeping
mats.  In one holding pod, 12 of 32 women reported that they and their child were
sleeping on the cement floor because they were not furnished with a sleeping mat.
All UCs had been provided with a sleeping mat.

During the July 20 site visit, the lack of available sleeping mats at the Ursula
Facility had worsened, as the holding pods for both male and female UCs did not

have adequate sleeping mats.  The holding pods for female-headed families

continued to lack adequate sleeping mats.

During both visits, concerns regarding a lack of adequate sleeping mats were

conveyed to BP personnel on-site.  The lack of sleeping mats was, of course,

known to BP personnel at the Ursula Facility and they reported that they were

engaged in acquiring additional mats for distribution to all individuals in custody.

Site visits to the Donna Facility found that CBP had resolved the inadequacy of

sleeping mats.  The site visits to the Donna Facility on August 11 and 30

documented that all UCs and families had been provided with a sleeping mat.

Site visits to the EHF in El Paso documented that all families and UCs were

provided with sleeping mats.  Interviews with families and UCs described adequate

sleeping conditions, although the brightness of the overhead lighting was noted as

a problem. BP personnel reported that despite the EHF's recent construction, the

lighting system in this facility did not have the capability for dimming.

**Assessment**

The failure to provide sleeping mats to UCs and families in custody is a violation of one of the most basic custodial requirements of the Settlement.  The fact that the lack of adequate sleeping mats persisted over several weeks was of particular concern.  Site visits to the Donna Facility documented the provision of mats to all UCs and families in custody.

It is also important to note that the transition of the JPF back to the Donna Facility was associated with the alleviation of overcrowding, which, along with a lack of mats, is among the most important contributors to inadequate sleeping conditions.

**Recommendations**

Maintaining adequate sleeping mats for all those in custody will continue to be an essential custodial requirement.  Continued monitoring of overcrowding, the availability of sleeping mats, and other elements of adequate sleeping conditions will remain a core focus of JCM activities.

**IV.G. Hygiene and Sanitation**

The CBP Settlement outlines a series of hygiene and sanitation requirements for all children entering CBP custody.  Showers are to be provided soon after arrival at the JPF and again at 48-hour intervals. Toothbrushes should be provided daily and also upon request.

**Prior Assessment and Recommendations**

During the prior reporting period, site visits to both the RGV and El Paso JPFs found that the holding pods and sanitation areas were generally clean and well supplied.  Interviews with families and UCs suggested that showers were generally made available according to the schedule outlined in the Settlement. Caregivers facilitated the availability of toothbrushes to UCs on a daily basis. However, families were given access to toothbrushes only during showering opportunities.

**Current Observations**

The site visits to the Ursula Facility during this reporting period documented highly variable hygiene and sanitation conditions.  Overcrowding of the holding pods for male parents was associated with a general deterioration of cleanliness and hygiene.  There were inadequate washing supplies in these areas. Interviews

described a lack of showering opportunities despite being in custody for several days.  These observations aligned with information provided by the Plaintiffs in declarations obtained from individuals held in the Ursula Facility in June.

Interviews obtained during the July 20 site visit to the Ursula Facility also documented that showering opportunities varied significantly in all the holding pods.  Some women in the female-headed family pods reported no showers despite more than 3 days in custody.  Both male and female UCs reported highly variable opportunities for showers with some reporting no shower even though they had been in custody for more than 36 hours.  The site visit to the Donna Facility on August 30 found generally improved showering regimens, although some male UCs were awaiting showers after more than 24 hours in custody.  Tender aged UCs were found to have all been bathed soon after entry into the facility.  Toothbrushes were made available only with showers.  Site visits to the EHF in El Paso documented adequate sanitation and hygiene conditions.  The holding pods were generally clean upon inspection and interviews described showering opportunities upon entry and at intervals required by the Settlement. Toothbrushes were provided with showers and the caregivers stationed in the UC pods also provided brushing opportunities on a daily basis.  However, declarations taken by the Plaintiffs on

dates other than those of the JCM site visits reported inadequate soap and drying

supplies in both the RGV and El Paso JPFs.


**Assessment**

The hygiene and sanitation conditions for UCs and families in custody were

highly variable during this reporting period.  Conditions in the Ursula Facility

during the early part of this reporting period were generally not in compliance

with the requirements of Settlement.  However, the site visit to the Donna

Facility at the end of this reporting period documented generally compliant

sanitation conditions.  Hygiene services depend heavily on regular, routinized

showering opportunities, a regimen that had yet to be fully implemented in

several holding pods at the Donna Facility at the end of this reporting period.


As noted in prior reports, the current practice of providing toothbrushes to

families only during shower opportunities is not compliant with the provisions of

the Settlement.  The presence of caregivers has permitted daily toothbrushing in

the EHF UC pods.  However, caregivers had not taken on this role in the RGV

JPFs.

42

**Recommendations**

Showering opportunities need to be standardized consistent with the provisions of the Settlement.  Until this reporting period, CBP in the RGV sector had a strong record of complying with these sanitation and hygiene requirements. These services had been fully compliant during the many months that the JPF was located at the Donna Facility prior to the transition to the Ursula Facility. Accordingly, ongoing JCM monitoring is expected to document continued improvement in hygienic services in the Donna Facility.

The deployment of caregivers in the JPFs has proven to be an important contributor to adequate sanitation and hygienic services.  Therefore, this report continues to recommend the purposeful expansion of the caregiver program.

**V. CAREGIVERS**

The CBP Settlement requires that CBP develop a "caregiver" program directed at providing a variety of direct custodial care services to children in CBP custody. The CBP Settlement requires that CBP develop a "caregiver" program directed at providing a variety of direct custodial care services to children in CBP custody.

**Prior Assessment and Recommendations**

The prior JCM report noted that CBP had substantially increased the number of
caregivers deployed in both the RGV and El Paso sectors.  In the RGV, caregivers
were deployed in the UC holding pods, an important advance in providing trauma-
informed care.  Both male and female caregivers were noted to be available on all
shifts.  However, during the prior reporting period, caregivers were not involved
with the care of children in families, except for assisting with showers and laundry.
Caregivers were placed in isolation locations, an important improvement,
particularly for the care of younger UCs.  In addition, a new group of contracted
personnel, called "porters", were deployed in the El Paso SSF.  Their role has been
to assist with services such as meal preparation and the allocation of basic
necessities.   The prior recommendation was to continue to build the caregiver
program with sufficient numbers to adequately staff the family holding areas.


**Current Observations**

Caregivers continue to play a crucial role in CBP's custodial systems for UCs and
families.  Site visits to the EHF in El Paso found caregivers in adequate numbers
and actively engaged with children in both the male and female UC holding pods.
Caregivers were observed supervising age-appropriate activities such as drawing
for the younger children and card games for older children in custody.  The number

44

of caregivers assigned to the family holding pods, however, was not sufficient to provide appropriate services.  There were no child-friendly activities observed in these areas.  Porters were stationed outside the doors of each family holding pod.

The number of caregivers in the RGV JPFs had also been increased compared to earlier in the year.  However, the number of caregivers still remains far below CBP and JCM estimates of the number required to meet the custodial needs of UCs and families being held in the sector.  During the Ursula site visits, caregivers were present in the UC holding areas.  However, their level of engagement with the children varied considerably. In the family holding areas, the number and activities of caregivers were inadequate given the number of children being held in these pods. Observations made at the Donna Facility were similar, with caregiver presence greater in the UC holding pods.  Caregivers were also assigned to the isolation areas holding both UCs and families.

**Assessment**

The major benefits of the caregiver program have been reviewed in prior JCM reports. It is also important to recognize that CBP has made considerable progress over the past year in expanding the number and contribution of caregivers in the JPF's.  Site visits and interviews with UCs confirmed that the caregivers have been

actively engaged in supervising activities and identifying children in distress.  The placement of caregivers in isolation facilities continues to be an important improvement, particularly when younger UCs are held in isolation.  Despite these positive developments, there has not been any observable expansion of the caregiver program during this reporting period.  This has been of particular concern given the exacerbation of psychosocial distress among children separated from their parents in the RGV.

The Office of Health Security, Department of Homeland Security, has continued to build a Child Welfare Specialist Program (CWSP) which will provide additional guidance for the full development of the caregiver program in CBP JPFs.  In addition, the Office of the Chief Medical Officer (OCMO) has added staff with the expressed purpose of improving both the caregiver program and trauma-informed care within CBP.  Leaders of both these initiatives and the JCM have communicated regularly and conducted joint site visits to best ensure that these important efforts will fully address the varied material and psychosocial needs of children in CBP custody.

**Recommendations**

As has been recommended in the prior JCM reports, the number of caregivers
should continue to be increased.  While the UC areas should be the highest priority
for caregiver coverage, family holding areas also require caregiver services,
particularly given the longer times-in-custody experienced by families.  In light of
the variation in caregiver engagement with the children in their assigned pods,
caregivers should receive additional training that reviews caregiver roles and
responsibilities in working with CBP personnel. It is also essential to purposefully
but rapidly integrate the efforts of new CWSP and OCMO initiatives with an
enhanced CBP commitment to the caregiver program.

## VI. TRAUMA-INFORMED CARE AND CHILD-APPROPRIATE
## ENVIRONMENT

The Settlement mandates that the JPFs implement care strategies that attend to the
emotional and psychological challenges that migrant children confront both before
and during CBP custody.  Recognizing the potential that children in CBP care may
have experienced trauma in their home communities, on their journey, and while in
custody, the Settlement calls upon CBP to make efforts to foster reassurance,

resilience, and psychological well-being. (See Section VII.3.D.7 and Section

VII.8.B8 in the Settlement).


**Prior Assessment and Recommendations**

Prior reports have documented that CBP has met the Settlement requirement of

providing a safe environment for children in the JPFs.  CBP and contracted

personnel have also received training in trauma-informed care.  However, prior

reports have documented the inadequate number of caregiving personnel and the

lack of child-friendly amenities and activities.  Although a variety of specific

CBP practices has been highlighted as requiring reform, the primary

recommendation has been that CBP quickly undertake a comprehensive

reassessment of all its current CBP trauma-informed strategies.


**Current Observations**

Trauma-informed care and child-friendly environments cannot be confined to a

few simple strategies.  Rather, virtually all CBP procedures and custodial

practices should be viewed as generating opportunities to mitigate the effects of

what the Settlement recognizes as "the potential for trauma in their home

communities and on their journey" as well as the stresses of confinement in CBP

custody.

Among the most important requirements is ensuring that children in custody feel physically safe.  As has been documented in prior JCM reports, extensive interviews with UCs and children in families during this reporting period revealed that they felt physically safe in CBP custody and had been treated professionally by CBP personnel in the RGV or El Paso sectors. None of the UCs interviewed in CBP custody reported being verbally or physically abused by CBP personnel in the RGV or El Paso sectors.

The role of the caregivers is central to meeting the goals of a trauma-informed strategy within CBP facilities.  The observed strengths and weaknesses of the caregiver program during this reporting program have been discussed above.

**Assessment**

There can be no doubt that the greatest concern regarding trauma-informed care has been the practice of separating children from their parents while in CBP custody.  None of the trauma-informed steps CBP has implemented over the past year has the ability to counteract the deleterious impact of separating a child from a parent while in a CBP facility.  Moreover, the harmful effects of these separations have been exacerbated by the apparent absence of regular contact between parents

49

and children separated while in custody and the lack of information about when
they will be reunited.

It should be noted that this assessment is not directed at answering the legal
question of whether these separations are, or are not, compliant with the
Settlement.  Rather, these concerns are merely a statement of pediatric fact
grounded in a wide and diverse child development literature.

## Recommendations

The two most important recommendations related to trauma-informed care and a
child-friendly environment are first, to terminate the practice of holding parents
and children separately while in CBP custody.  It is important to respect the
difficult responsibility CBP has of providing adequate processing and holding
capacity to meet any rapid increase in apprehensions.  However, alternatives to
holding children separately as a means of accommodating relatively high family
census figures should be prioritized.  Second, with the creation of the CWSP and
the enhanced commitment of the OCMO to trauma-informed care, CBP should
undertake a full reassessment of current CBP practices and take steps to develop
more comprehensive custodial care strategies for children in CBP facilities.

## VII.  ENHANCED MEDICAL SUPPORT

The Settlement requires a robust medical care system for juveniles in CBP custody.
CBP has addressed this requirement by deploying contracted medical teams in the
RGV and El Paso JPFs and any other facilities housing children.  These teams
include an advanced medical practitioner (either a nurse practitioner or physician
assistant) and 2-3 medical support personnel, usually medical assistants or
emergency medical technicians.  These teams are required to be present 24 hours a
day, 7 days a week.  The JPFs are usually staffed by at least 3 medical teams.
Isolation facilities that are holding minors are also required to have on-site medical
teams at all times.  In addition to the on-site medical teams, supervising physicians,
including a pediatrician, are assigned in each sector to provide on-call consultation,
clinical protocol development, and quality assurance reviews.

**Prior Assessment and Recommendations**

The prior report noted that CBP has deployed a medical infrastructure that
generally complies with the requirements of the Settlement.  However, there were
a series of concerns regarding the quality and consistency of the medical care
provided.  These concerns included:

- Variation in the thoroughness with which acute and chronic conditions are
  identified, documented, or required consultation with on-call physicians;

51

- The procedures for conveying medical information regarding children with elevated medical risk to BP personnel and how BP integrates this information into custodial and disposition decision-making;

- There was inconsistent conveyance of relevant medical information to BP agents responsible for custodial care and disposition, including release. There was also variation in how medical information was conveyed to ORR, including that for UCs with serious chronic conditions or disabilities;

- At times of high census, medical teams had decided to confine medical assessments to children under 12 years of age.  Even children with a clear chronic condition or disability were, at times, excluded from the standard medical assessment protocol;

- There was some variation in the practices regarding the confiscation and replacement of appropriate medication to children in CBP custody or upon transfer or release;

- Failure to conduct repeat medical assessments on children held for 5 days or more.  This is required in the Settlement and is intended to ensure that any deterioration in a child's medical status will be detected while in custody;

- Medical protocols did not include regular assessment of children in their holding pods, including those with a known medical condition;

52

- In isolation facilities there was a lack of adequate medical supervision and surveillance, particularly when the census was high;

- Caregivers were not being deployed in isolation facilities when a UC or family is being held at that location;

- Based on interviews with parents after release and observation of release procedures and documentation in the CPCs, the provision of medical documentation to parents regarding the care their children received while in CBP custody was highly variable;

- The quality assurance program appeared to be profoundly inadequate as it was not clear how the systems of care were being assessed.  This was particularly concerning regarding protocols for children with serious chronic disorders, children who develop acute conditions, or deteriorate in CBP custody.  There did not appear to be any review of the conveyance of medical information to BP personnel, supervisory physicians, to ORR, or to parents in families.


**Current Observations and Recommendations**

The observations and assessment of the CBP medical care system for children are organized below in relation to the recommendations of the prior JCM report.  This prior report detailed weaknesses in these systems and listed a set of

recommendations that continue to outline the points of concern during this

reporting period.  These recommendations address three general strategies:

- The reduction of medical risk in CBP facilities;

- Enhanced pediatric consultation and monitoring of children at elevated
  medical risk while in CBP custody;

- Improved conveyance of medical information among CBP personnel,
  contracted health providers, and subsequent medical providers.


It is important to note that OCMO and BP sector leadership have been making

strong efforts recently to improve the medical care children are receiving in CBP

custody. These initiatives have included close consultation with the JCM and an

ongoing commitment to work closely with the JCM to address the varied medical

challenges that continue to require urgent reform.


## VII.A. The reduction of medical risk in CBP facilities

The most immediate step to prevent adverse child outcomes in CBP custody is to

reduce the clinical burden on the CBP medical system by expediting the transfer of

children at elevated medical risk out of CBP custody.  The ability to reduce the

level of medical risk among the juvenile population in CBP custody has, in turn,

three components:

### VII.A.1. The identification of children at elevated medical risk

The accurate identification of children at elevated medical risk during the initial intake screening and medical assessment is essential.  A basic protocol that defines elevated medical risk was recommended in the prior report.

OCMO has developed and implemented a protocol that defines elevated medical risk and the requirement that the contracted medical provider consult with a pediatric advisor for each child who meets, or could possibly meet, the criteria defining elevated medical risk.

JCM site visits confirmed that this protocol had been distributed and that the medical providers in the JPFs were aware of the protocol.  During site visits, the JCM routinely conducts detailed reviews of selected, "sentinel" cases of children with known elevated medical risks.  During this reporting period, these reviews revealed that consultation with a pediatric advisor had improved but remained somewhat variable among the large number of medical providers in the JPFs.  In addition, there were also indications that the increase in consultations with the pediatric advisors had placed new time burdens on the advisors.  This issue underscored the necessity of ensuring that adequate medical staffing is available to

implement the strengthened OCMO protocols guiding the management of children at elevated medical risk.

**Recommendation**

It is imperative that continued emphasis on consulting pediatric advisors be maintained as this provides the best guarantee that variations in the pediatric experience of contracted medical providers do not result in inadequate medical decision-making and care.

It will be important for OCMO and the medical contractor to work together to ensure that the burden on the pediatric advisors is conducive to the sustained implementation of the elevated medical risk protocol.  Appropriate adjustments to the definition of elevated medical risk and the number of pediatric advisors may be required.

**VII.A.2. Alerting CBP personnel of the presence of a child at increased medical risk**

 It is essential that medical providers convey information regarding children at increased medical risk to appropriate CBP personnel.  CBP is ultimately

responsible for the well-being of all individuals in their custody and should

certainly know when a child at elevated medical risk enters their custody.

Site visits suggested that this requirement remains a challenge in the JPFs.  Site

visits during this reporting period in both the El Paso and RGV sectors suggested

that there remains no standard format for the conveyance of medical information to

BP personnel.

**Recommendations**

The regular, routine conveyance of medical information will require new

procedures within the JPFs.  OCMO and BP sector leadership are actively

exploring the most effective and efficient means of conveying this information on a

routine basis.  Solutions are actively being examined, including computer-based

strategies as well as regular, joint exchanges at each change of shift.  The JCM will

continue to monitor progress on this issue.

**VII.A.3. CBP disposition decisions regarding children at increased medical
risk**

Ultimately, the reduction of medical risk in CBP facilities will require the

appropriate, expedited transfer of children at increased medical risk out of CBP

custody.  Decisions regarding disposition, including removal or release, can be

complex and ultimately relate to broader immigration policies.  However,

protracted stays by families with a child at elevated medical risk should be avoided

when appropriate.  It must be emphasized that only children medically cleared for

travel, transfer, or release, should be moved out of CBP custody and with attention

to the continuity of requisite care. The health and safety of the child should always

remain preeminent.  It was not clear during site visits whether there has been any

change in how medical risk was influencing disposition decisions.

**Recommendation**

The JCM will assess this issue through continued discussions with BP personnel,

the review of sentinel cases, and the analysis of time-in-custody data for children at

elevated medical risk.

**VII.B. Enhanced pediatric consultation and monitoring of children at elevated
medical risk while in CBP custody**

As noted above, consultation with a pediatric advisor is required for children at

elevated medical risk.  In addition, monitoring protocols for children at elevated

medical risk while in CBP custody is also an essential component of appropriate

medical care. Enhanced consultation and monitoring have four components, listed below.

## VII.B.1. Consultation with pediatric advisor

All children identified at the initial medical assessment as being at increased medical risk should be discussed with a pediatric advisor.  Consultation can help guide the management and monitoring requirements related to the child's medical issues.  All consultations with the pediatric advisor should be documented in the medical record.

As noted above, consultation with the pediatric advisor has improved but there remains considerable variation in when contracted medical providers seek pediatric consultation.  Recent cases, including the death of a child with Sickle Cell Disease in CBP custody, have underscored the need to reduce the isolated discretion with which medical providers manage children at increased medical risk.

## Recommendations

Full adoption of the protocols developed by OCMO for defining medical risk and seeking pediatric consultation remains an essential recommendation. In addition, continued evaluation and revision of this protocol will help ensure that the

practices within the current medical system are strengthened and ultimately eliminate preventable harm to children.

### VII.B.2.  Placement and monitoring of child status in isolation facilities

All children being considered for transfer to an isolation facility should be considered to be at elevated medical risk and discussed first with a pediatric consultant.  This does not include children with lice or scabies which in some facilities are held initially in an isolation area.  All children placed in isolation facilities must receive enhanced medical monitoring, including regular assessment of vital signs and other indicators of clinical status.  Any deterioration in a child's condition should prompt immediate transfer to a local medical facility or consultation with a pediatric advisor, or both.  All monitoring interactions should be documented in the medical record.

Site visits to the JPFs during this reporting period documented that children in isolation areas were receiving enhanced medical monitoring.  The nature and regularity of this monitoring varied somewhat.  However, the implementation of enhanced medical monitoring represents a major advance in the quality of medical services in CBP facilities.  As noted above, there also appeared to be some

variation in the consultation practices of medical practitioners regarding children at elevated medical risk, including for those transferred to isolation holding areas.

**Recommendation**

OCMO and JCM monitoring should continue to assess medical practices in the isolation areas as part of the broader assessment of the quality of medical care for children at elevated medical risk.

### VII.B.3.  Monitoring child status in holding pods

The prior report recommended that all children at elevated medical risk who are being held in family or UC holding pods should be assessed at least once per shift. Site visits to the JPFs in both sectors observed contracted medical personnel visiting the family and UC holding pods at least once per shift.  This was associated with the provision of prescribed medications for children in these pods. This is an important step in ensuring appropriate monitoring of children at risk while in CBP custody.

**Recommendation**

The utility and efficiency of this practice deserves continuing scrutiny.


**VII.B.4.  Strengthened procedures for referral to local medical facilities.**

Contracted health providers should be empowered to refer children to local health

facilities whenever they feel it is medically indicated.  In addition, the decision to

transfer a child to a local health facility should be considered in association with

parental concerns and be made in consultation with a pediatric advisor unless the

transfer must be made urgently without time for consultation.


Although referral to local health facilities can place significant logistical burdens

on BP staff and resources, there is significant risk that resistance to any given

transfer could lead to inappropriate hesitation in pursuing a transfer that was

otherwise deemed medically necessary.


Discussions during site visits suggest that this issue remains unresolved.  It is

important that BP feel confident that transfers to local health facilities are

medically required.  However, this confidence is best generated through

discussions at the policy level and through ongoing, collaborative data review.  It is

not appropriate for BP to question the need for or resist the transfer of any

individual child who is deemed in medical need of transfer.


**Recommendations**

A clear statement emphasizing appropriate transfer decision-making should be

circulated urgently to all medical providers and responsible BP operators.  In

addition, a consultation with a pediatric advisor is also indicated whenever referral

to a local medical facility is being considered and time allows.


Ongoing evaluation of transfer experiences and protocols is required.  In addition,

BP input into creating new procedures that reduce the burden on BP logistics is

also indicated.


**VII.C.  Disciplined conveyance of medical information among health
providers**

All high-quality medical systems have mechanisms that ensure that essential

medical information is conveyed to all personnel and institutions with

responsibility for patient care. Recent cases and insights from site visits have

highlighted the lack of such mechanisms within the CBP medical system for

children in custody. Prior JCM reports have emphasized this problem and called

for the development of systems that ensure the appropriate conveyance of relevant information.

### VII.C.1. Conveyance of medical information among health providers

It is a fundamental requirement that important medical information is shared within the CBP medical system.  OCMO has been focused on creating both new digital and human systems to address this systemic challenge. This could include the traditional medical "sign-outs" between medical providers at the change of shifts.  Although these systems are still being developed, CBP reports that major improvements will be made in the coming weeks.

### Recommendation

The JCM will review the performance of new OCMO strategies to improve this important component of high-quality care. This ongoing monitoring will include the assessment of enhanced communication practices in all isolation units.

### VII.C.2. Ensuring hospital records are conveyed to CBP medical personnel

It is the standard of care that documentation of the evaluation and treatment of any referred patient be transmitted back to the referring medical provider.

Site visits during this reporting period documented that this issue remains
unresolved.  There continues to be wide variation in what information a local
health facility conveys back to CBP medical personnel after a referral evaluation or
even an admission has been completed.

**Recommendation**

OCMO should pursue agreements with local health facilities that serve the CBP
pediatric population.  Regular systems should be developed to convey all relevant
medical information essential for the continued medical management of children
once they return to CBP custody.

**VII.C.3. Conveyance of medical information to the Office of Refugee
Resettlement (ORR).**

It is essential that ORR receive relevant medical information regarding the
conditions and management of UCs while in CBP custody. While the conveyance
of information to ORR appears to have improved over the prior two reporting
periods, recent cases have revealed continued gaps or errors in the medical
information CBP has provided ORR with UC transfers.

**Recommendation**

OCMO has been coordinating efforts with ORR to strengthen systems for medical information transfer.   CBP should continue to work collaboratively with ORR to create seamless information conveyance as UCs are transferred to ORR care.

**VII.C.4. Medical information provided to a child's parent or guardian**

Prior JCM reports have recommended that parents or guardians of children at elevated medical risk should be provided with medical summary sheets that include diagnoses, medications, and other pertinent medical information prior to transfer out of CBP custody.  Site visits found that some parents have been provided with summary medical sheets.  However, these contained minimal medical information.  The purpose of these medical documents is to allow the parent to provide essential medical information regarding care in CBP custody to a subsequent medical provider.  This is standard medical practice and should be a routine component of CBP disposition procedures.  OCMO has been working to improve this arena of medical documentation, including enhanced training for medical personnel responsible for preparing documentation prior to transfer or release and the development of efficient digital capabilities that could automate this requirement.

**Recommendation**

The JCM will continue to monitor the provision of medical documentation to parents and will maintain close communication with OCMO regarding its progress on strengthened documentation systems.

## VII.D. Medical referrals for children at elevated medical risk in families being released into the United States

Prior JCM reports have emphasized the need for CBP to ensure appropriate referral for those few children at significantly elevated risk who require specialized care soon after release.  This referral capability would help ensure that children at elevated medical risk do not deteriorate soon after release from CBP custody. JCM site visits continue to document that these referrals are not being made. However, OCMO, CWSP leadership, and the JCM have been in discussions with a network of pediatric providers in the United States who are dedicated to facilitating the appropriate referral of children released from CBP custody.  This effort will need to also engage migrant support NGOs on the border which are often involved with assisting families immediately upon release from CBP.  Also crucial will be greater support from federal and state programs responsible for ensuring essential care for vulnerable children with special health care needs.

### VII.E.  Major improvement in the medical quality assurance program

Prior JCM reports have underscored the urgent need to greatly improve the quality

assurance program utilized by the medical contractor and CBP OCMO.

Significant progress has been made over this reporting period in developing an

effective system of medical oversight and accountability.  OCMO is creating

relevant metrics and datasets, including the enhanced use of the existing electronic

medical record for quality assurance purposes. The utility of a new, more

expansive electronic medical record system is also being explored.


### Recommendation

Quality assurance activities will remain a high priority for JCM monitoring.  The

fundamental focus will continue to be the ability of the new systems being

introduced by OCMO to actually translate into a higher standard of medical care

for children in CBP custody.  Of special concern will be the ongoing assessment of

care provided children at elevated medical risk.  This will, in turn, require an

ability to evaluate the recommendations listed above, particularly patterns of

consultation with pediatric advisors, enhanced medical monitoring, and the timely

transfer of children in need of hospital-based care.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## CERTIFICATE OF SERVICE

Case No. CV 85-4544- DMG (AGRx)

     I am a citizen of the United States. My business address is 250 Sixth Street, Suite 205, Santa Monica, California 90401 . I am over the age of 18 years, and not a party to the within action.

     I hereby certify that on September 15, 2023, I electronically filed the following documents with the Clerk of the Court for the United States District Court, Eastern District of California by using the CM/ECF system:

**NOTICE OF FILING OF JUVENILE CARE MONITOR REPORT BY DR. PAUL H. WISE**

     I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

     I declare under penalty of perjury under the laws of the United States the foregoing is true and correct. Executed on September 15, 2023, at Los Angeles, California.

Jeff Thomson