ANDREA SHERIDAN ORDIN (SBN 38235)
STRUMWASSER & WOOCHER LLP
1250 Sixth Street, Suite 205
Santa Monica, California 90401
Telephone: (310) 576-1233
Facsimile: (310) 319-0156
E-mail: aordin@strumwooch.com

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES, *et al*., | CASE NO. CV 85-4544-DMG (AGRx) |
| Plaintiffs, | **NOTICE OF FILING OF JUVENILE CARE MONITOR REPORT BY DR. PAUL H. WISE** |
| v. | |
| MERRICK B. GARLAND, Attorney General of the United States, *et al*., | |
| Defendants. | |

1       In accordance with the Court's Orders, Dr. Paul H. Wise submits the

2 attached Juvenile Care Monitor Report.

3       These assessments are required by the provisions of a recent settlement

4 agreement approved by the Court on July 29, 2022 [Doc.# 1278] (the

5 Settlement) which mandates many new and specific custodial conditions and

6 procedures for immigrant children in federal custody.  The Settlement also

7 established the Juvenile Care Monitor (JCM) position to access CBP compliance

8 with the provisions of the Settlement.

9

10

11

12

13 DATED:     November 13,  2023     Respectfully submitted,

14

15                            Andrea Sheridan Ordin
                           STRUMWASSER & WOOCHER LLP

16

17                            By  _*/s/ Andrea Sheridan Ordin*_

18                               Andrea Sheridan Ordin

19

20                            *Legal Advisor to Juvenile Care Monitor*
                           *Dr. Paul H. Wise*

21

22

23

24

25

26

27

28

**JUVENILE CARE MONITOR REPORT**

**November 2023**

**Submitted by Paul H. Wise, MD, MPH**

**Juvenile Care Monitor**

**CONTENTS**

I.      SUMMARY ........................................................... 3

II.     CBP SETTLEMENT AND THE JUVENILE CARE MONITOR .. 11

III.    MONITORING ACTIVITIES AND DATA ANALYSIS ................ 13

IV.     CONDITIONS AT CBP FACILITIES ................................. 16

V.      CAREGIVERS .................................................. 38

VI.     TRAUMA-INFORMED CARE ..................................... 42

VII.    ENHANCED MEDICAL SUPPORT…............................... 45

**GLOSSARY**

| | |
|---|---|
| BP | Border Patrol |
| CBP | Customs and Border Protection |
| CPC | Central Processing Center |
| CWSP | Child Welfare Specialist Program, Office of Health Security, DHS |
| EHF | El Paso Hardened Facility |
| FSA | Flores Settlement Agreement |
| JCM | Juvenile Care Monitor |
| JPF | Juvenile Priority Facility |
| OCMO | Office of the Chief Medical Officer, CBP |
| ORR | Office of Refugee Resettlement |
| RGV | Rio Grande Valley |
| SSF | Soft-sided facility |
| TIC | Time in custody |

2

## I. SUMMARY

This report presents the evaluation and recommendations of the Juvenile Care
Monitor who is charged with conducting independent assessments of custodial
conditions for children held in Customs and Border Protection (CBP) facilities in
the Rio Grande Valley (RGV) and El Paso sectors. These assessments are required
by the provisions of a settlement agreement approved by the Court on July 29,
2022 [Doc. # 1278] (the Settlement) which mandates many new and specific
custodial conditions and procedures for immigrant children in federal custody. The
Settlement also established the Juvenile Care Monitor (JCM) position to assess
CBP compliance with the provisions of the Settlement. This report covers the
period of September through October 2023.

The JCM conducts a variety of monitoring activities. This report has drawn upon
site visits to CBP facilities, interviews with CBP personnel, contracted medical
staff, and with children and families in CBP custody. In addition, analyses of data
provided by CBP are also included in this report.

While the JCM examines all Settlement requirements and reports all concerns
related to Settlement compliance, the primary focus of the JCM has been on those
requirements and concerns that have the greatest potential consequences for the

3

health and well-being of children in CBP custody. All concerns related to
Settlement compliance or other custodial issues observed during site visits are
immediately conveyed to CBP for remedial action.

A summary of the Settlement components assessed in this report are presented
below:

• **Juvenile Priority Facilities.** A fundamental provision in the Settlement is
the designation of specific facilities in each sector to house and process
Unaccompanied Children (UCs) and families. These Juvenile Priority Facilities
(JPFs), often designated Central Processing Centers (CPCs), have been established
in both the RGV and El Paso sectors. In the RGV sector, the JPF during this
reporting period was located in the Donna Facility in Donna, Texas. Families were
also held for relatively brief times for processing in several of the Border Patrol
stations in the sector. All UCs encountered in the sector were quickly transported
to the Donna Facility. In El Paso, the JPF was located in the El Paso Hardened
Facility (EHF). However, the Soft-Sided Facility (SSF), located adjacent to the
EHF, was also used for some families when the number of families in custody was
high.

4

•     **Time-in-custody and overcrowding.** In both sectors, UCs continue to be transferred to ORR care within the required 72 hours, most within 48 hours. Children in families, however, experienced a wider range of times in custody, although most were transferred out of CBP custody within 5 days. (See Table 2). Site visits to the Donna Facility in the RGV during this reporting period found the total number of individuals in custody fell below the designated maximum occupancy. However, the September visit to the Donna Facility found overcrowded conditions in several family holding areas. The September site visit to the El Paso JPF documented substantial overcrowding with the total number of individuals held in the EHF and SSF more than double the designated maximum capacity for the two facilities combined. Significant overcrowding in the family holding areas was observed. Given the impact of overcrowding on a variety of custodial conditions, continued efforts to prevent overcrowding in the JPFs is warranted.

•     **The separation of families while in custody.** Prior JCM site visits documented the practice of holding children as young as 8 years of age apart from their parents while in custody. Parents and children are reunited upon transfer or release from CBP custody. This policy has been implemented to reduce overcrowding in family holding areas and requires that the children held apart are placed in pods devoted to UCs. Prior reports noted the concern that holding

children apart from their parents could exacerbate the stress children experience in custody and potentially do lasting harm, particularly to younger children. The site visits to the Donna Facility during this reporting period found that CBP continued to hold children apart from their families, but this practice was confined to children older than 12 years of age. Significantly, interviews with parents and children in the Donna Facility revealed that there were minimal or no opportunities for phone contact or direct interaction between the separated parent and child. Site visits to the El Paso EHF also found that older children were being held apart from their parents while in custody. However, children and parents were permitted to interact on a regular basis.  An important new development has been CBP's recent issuance of field guidance strengthening its practices regarding holding children together with their parents and in ensuring frequent visitation for those families held apart while in custody.

•       **Warmth, garments, and sleep.** The Settlement requires that CBP ensure that the holding environments maintain a temperature between 69 and 83 degrees, provide sleeping mats, clean and warm garments to children in custody, and that the holding conditions are conducive to adequate sleep. CBP has met the ambient temperature requirements outlined in the Settlement. However, the September site visit to the Donna Facility found that there were no sweatshirts or other warm clothing available for children who felt cold. However, an adequate supply of

6

warm clothing was available at the Donna Facility during the October site visit. Sweatshirts were available at the El Paso EHF at the time of both site visits.

• **Nutrition.** The Settlement requires the provision of water and age-appropriate meals and snacks that meet children's daily nutritional needs. CBP has met many of these requirements but not all. Water was readily available upon apprehension and in the JPFs. Snacks were available at all times in the JPFs. Two hot meals and one cold meal were provided each day. Infant formula and toddler foods were available in the JPFs. The quality of and satisfaction with the provided food varied considerably, particularly at times of high census. The primary deficiency continues to be the provision of adult meals to young children. This represents a persistent arena of noncompliance with the Settlement. However, CBP is working with the JCM to create appropriate menu items for young children.

• **Hygiene and sanitation**. The Settlement outlines a series of hygiene and sanitation requirements for all children entering CBP custody. During this reporting period, interviews with families and UCs found variable compliance with the Settlement's provision of regular showering opportunities, particularly when the facility was overcrowded. Sanitation and hygiene supplies in the JPFs continued to generally meet the requirements of the Settlement except in areas

7

characterized by significant overcrowding. The alleviation of overcrowding was associated with a return to prior levels of adequate hygienic conditions.

• **Caregivers.** The Settlement requires that CBP develop a "caregiver" program directed at providing a variety of custodial services to children in CBP custody. CBP has met this requirement as caregivers have been deployed in the JPF's UC and family holding areas. Site visits have confirmed that caregivers are providing supervision of UCs and are facilitating child-friendly activities in the UC holding pods in the El Paso EHF; child-friendly activities were less evident in the Donna Facility.  Caregivers have also been deployed in isolation areas when UCs or families are present. The Child Welfare Specialist Program (CWSP) in the Office of Health Security, Department of Homeland Security and a renewed emphasis on the caregiver program by the Office of the Chief Medical Officer (OCMO), CBP, have an opportunity to enhance the caregiver program's impact on the material and psychosocial well-being of children in CBP custody. However, this impact is not yet evident in the JPFs and will only be realized if the number and training of caregivers continues to expand.

- **Child-friendly environment.** The Settlement requires that children be treated with dignity, respect, and in recognition of their particular vulnerabilities. CBP has met certain elements of this general Settlement requirement. Significantly, children interviewed during all site visits reported that they felt safe in CBP custody. There were no reports of physical or verbal abuse by CBP personnel or by others in custody. Most JPF holding areas had televisions playing informational and entertainment videos. However, the continued practice of holding children as young as 13 apart from their parents while in custody only elevates the potential for significant trauma among the children.  In addition, parents, children and caregivers reported that they were not aware that they could request visitation with their children when separated.

- **Enhanced medical care.** The requirements of the Settlement mandate that the JCM assess both the structure and the performance of the CBP medical system for children in custody. CBP has established the required medical infrastructure, including around-the-clock medical services in the JPFs and most other main CBP stations in the two sectors. However, prior JCM reports identified a series of concerns regarding the quality of medical services and the adequacy of coordination and accountability practices, practices that all high-quality medical systems require. Significantly, site visits in both sectors during this reporting period found enhanced medical staffing and improvements in many of the areas

9

identified earlier as being of concern. In particular, the identification of children at elevated medical risk, consultation with supervising pediatricians, and enhanced monitoring of children in isolation areas have all improved. It is critical that the quality assurance system be strengthened.  Continued improvement is also required in the monitoring of all children at elevated risk in holding pods and in the conveyance of essential medical information to CBP personnel, between health institutions, and to parents and health providers caring for children following transfer or release.

**Overall Assessment of Child Well-Being in CBP custody**

The Settlement mandates a large number of specific custodial and procedural requirements. CBP continues to meet many of these requirements. Important improvements have been implemented over the past year, particularly in the deployment of caregivers and more recently, the effectiveness of the medical system. However, this report also documents that some important custodial services were not in compliance with the Settlement. Some of these services, such as regular showering opportunities, age-appropriate meals for young children, and holding environments not plagued by overcrowding remain long-standing problems. In addition, the practice of holding children less than 15 years of age apart from their parents is also a persistent concern. However, recent field guidance regarding family holding practices and efforts to improve menu items

10

for young children could enhance compliance with the Settlement.

## II.     THE CBP SETTLEMENT AND JUVENILE CARE MONITOR

On July 29, 2022, the Court granted final approval of a settlement (the Settlement) that resolved a motion to enforce compliance with the Flores Settlement Agreement (FSA) regarding conditions and standards at CBP facilities in the Rio Grande Valley (RGV) and El Paso sectors along the Southwest Border. The Settlement is a lengthy and complex document that specifies a large number of specific custodial requirements.  The Settlement was the result of nearly three years of mediation between the Plaintiffs and Defendants and overseen by the Special Master, Ms. Andrea Ordin, and informed by the Special Expert, Dr. Paul H. Wise, both appointed by the Court.

The FSA, established in 1997, contains the broad mandate that immigrant children be housed in "safe and sanitary" conditions with particular regard for the vulnerability of minors. The July 2022 Settlement articulates a series of specific custodial requirements, including the designation of "Juvenile Priority Facilities," to which minors must be transferred within 48 hours of arrival at any other CBP facility within the sector.

11

The Settlement established the role of a court-appointed Juvenile Care Monitor

(JCM), with a mandate and authority to monitor CBP's compliance with the

provisions of the Settlement in the RGV and El Paso sectors. Other sectors along

the Southwest border are not currently subject to JCM monitoring. On August 3,

2022, Dr. Paul H. Wise was appointed the Juvenile Care Monitor for a 16-month

term. Prior to his appointment as the JCM, Dr. Wise served since July 2019 as the

Special Expert working with the Special Master (Ms. Andrea Ordin) to provide

the Court with independent assessments of custodial conditions in CBP facilities

in the RGV and El Paso sectors. Under the provisions of the Settlement, the JCM

has access to CBP documents and records, may conduct announced and

unannounced visits to CBP facilities in the RGV and El Paso sectors, may

conduct interviews with class members and accompanying adult family

members, and may conduct interviews with CBP employees and the employees

of its contractors.

It is standard JCM policy that any and all concerns related to Settlement

compliance or other custodial issues observed during site visits are immediately

conveyed to CBP. In addition, the JCM also analyzes data from CBP in order to

determine whether CBP is in compliance with the terms of the Settlement,

including time in custody and whether there is overcrowding at CBP JPFs, as

12

defined in the Settlement.

It is important to note that throughout this reporting period, as in all prior periods, the JCM has been given full access to CBP facilities and relevant data and has been treated at all times with professionalism and courtesy by CBP leadership and operational personnel in the RGV and El Paso sectors.

## III. MONITORING ACTIVITIES AND DATA ANALYSIS

The JCM conducts a variety of monitoring activities. This report has drawn upon two sources of information: site visits in CBP facilities and CBP data on apprehensions and custodial operations involving juveniles in custody.

## III.A. Site Visits

Between September 1 and October 31, 2023, 4 site visits were conducted at CBP facilities, detailed below. The JCM had full access to all sections of all facilities providing care for children. In addition, the JCM had full freedom to conduct interviews away from CBP personnel with both children and parents in custody. The dates and location of the site visits to CBP facilities were as follows:

- CBP El Paso

    o    September 25-26
    o    October 25

• CBP Rio Grande Valley

    o     September 27

    o     October 23-24

## III.B. CBP Data Analysis

CBP provides monthly reports on the number of UCs apprehended as well as the number of family unit encounters (includes all individuals in the family, including both adults and minors). These data are presented for the latest available months in Table 1. CBP also provides data on children who are held in custody for longer than 72 hours. These are presented in Table 2.

CBP data as well as site visit interviews have documented that it is rare that UCs are held in CBP custody for more than 72 hours. When the 72-hour limit is surpassed, it is almost always due to special circumstances, such as a child initially reporting that they are over 18 years old or for a protracted medical issue. Children in families, however, are routinely held for more than 72 hours. The variation in extended time in custody for families reflects differences in removal policies and home country demographics, the census in CBP facilities, and local processing capabilities, among other factors.

14

**Table 1**. **Total Encounters by Month and Demographic Group, Southwest Border\***

|  | AUGUST | SEPT |
|---|---|---|
| **INDIVIDUALS IN FAMILY UNITS** | 93,111 | 103,027 |
| **UNACCOMPANIED CHILDREN** | 13,527 | 13,154 |

\*Data source: CBP

**Table 2. Time in Custody of >72 hours by Demographic Group Unaccompanied Children\***

|  | AUGUST | SEPT |
|---|---|---|
| **3-5 DAYS** | 20 | 11 |
| **6-7 DAYS** | 0 | 1 |
| **8-14 DAYS** | 1 | 0 |
| **>14 DAYS** | 2 | 1 |
| **TOTAL** | 23 | 13 |

\*Data source: CBP

**Children in Families***

|  | AUGUST | SEPT |
|---|---|---|
| **3-5 DAYS** | 1261 | 1552 |
| **6-7 DAYS** | 35 | 52 |
| **8-14 DAYS** | 16 | 15 |
| **>14 DAYS** | 2 | 1 |
| **TOTAL** | 1314 | 1620 |

*Data source: CBP

# IV. CONDITIONS AT CBP FACILITIES

## IV.A. Facility Designation

In compliance with the Settlement, CBP has created Juvenile Priority Facilities (JPFs) in both the Rio Grande Valley and El Paso sectors. These have often been designated Central Processing Centers (CPCs) which are the primary sites within the sectors for holding UCs and families in custody. UCs and families apprehended in locations relatively distant from the JPFs may be initially held in CBP stations until transfer to the JPFs can be arranged. Interviews with UCs and families

apprehended at locations distant from the JPFs reported transfer to the JPF within 48 hours, mostly within 24 hours.

Over the past year, the JPFs have been in transition in both the El Paso and RGV Sectors. In El Paso, the JPF was moved from a hard-walled facility (CPC) to a soft-sided facility (SSF) comprised of multiple tent structures and later to a new, very large, tent facility with hardened walls (El Paso Hardened Facility or EHF). This facility was erected adjacent to the SSF and contains 120 holding pods. During the September 25th visit, all UCs and most families were being held in the EHF, with some families also held in the SSF. However, during the October 25th visit, all UCs and families were being held in the EHF.

In the RGV Sector, the JPF has also undergone substantial change over the past 6 months. In late May 2023, the JPF was moved from the "Donna Facility" located in Donna, Texas to the renovated "Ursula" location in McAllen, Texas. However, an increase in the census of families in the sector required that in August the JPF return to the Donna Facility which has a greater holding capacity. The Donna Facility is composed of a series of large, soft-sided structures, some with hardened walls, and had been long used as the JPF in this sector. In addition, some families have been processed in non-JPF Border Patrol (BP) stations, including the

McAllen BP station in particular. The holding of families in these facilities,

however, has been of short duration.


## IV.B. Overcrowding

Overcrowding is the custodial condition with the greatest potential to undermine

the quality of care provided children in CBP custody. The Settlement defines

overcrowding as "a level of occupancy that exceeds the physical space required

to maintain a safe and sanitary environment for each individual in custody."


## Prior Assessment and Recommendations

Visits to the RGV sector during the prior reporting period documented substantial

overcrowding in some holding areas in the Ursula facility. However, this

overcrowding was generally resolved after the JPF was moved to the larger

Donna Facility.


Site visits to the El Paso sector facilities did not document overcrowding during

the prior reporting period.

**Current Observations**

The two visits to the Donna Facility during this reporting period found that the total number of individuals being held did not surpass the maximum occupancy designated for the facility. However, during the September visit, several pods holding families were overcrowded with only minimal space between sleeping mats. The October visit found no overcrowding in the Donna Facility.

The September 25 visit to the El Paso sector found significant overcrowding. The total number of individuals being held in the EHF and SSF combined was approximately 2.24 times the maximum capacity designated for the two facilities.  Families were being held in both the EHF and the SSF. Most of the holding pods for families were overcrowded with several of the family holding pods having no space between sleeping mats. UCs were housed in the EHF only. The holding pods for UCs were not overcrowded. The October visit found that the overcrowded conditions had improved significantly.  The census was substantially below the maximum capacity of the EHF, the only facility holding families and UCs at that time (the SSF was not in use).

**Assessment**

The findings during this reporting period underscored the dynamic nature of the border in these two sectors. The number of apprehensions can vary profoundly

19

over what is often a relatively short period of time. It is important to note that the

overcrowding documented in the El Paso EHF in September had been alleviated

in the October visit. The availability of larger or contiguous additional facilities

has provided some capacity to house a rapidly growing census. However, even

with this ability to flex holding capacity, the reality remains that the facilities in

both sectors are vulnerable to overcrowding.

**Recommendations**

Continued monitoring of the overall census and holding conditions in the JPFs in

the RGV and El Paso sectors is warranted. In addition, the use of the other BP

stations in the RGV sector for family processing or holding will also need to be

assessed to ensure the length of time and the conditions experienced by families

remain compliant with the Settlement.

**IV.C. The Separation of Families While in Custody**

**Prior Assessment and Recommendations**

During two prior site visits to the Donna Facility in the RGV, interviews with

family members in custody revealed that some children who were apprehended

with their parents were being held separately in pods devoted to UCs. Site visits

found that both boys and girls were being held separately, some as young as 8 years of age.   Declarations provided by the Plaintiffs confirmed these observations. Interviews also documented that children and parents were not regularly provided with opportunities to interact while separated. BP reported that holding children and parents apart was necessary to avoid overcrowding of family holding pods and that there was available space in the UC holding pods.

It was noted that it had long been routine practice that some older boys may be held apart from a mother because of the difficulty of holding teenage boys in the same pod with large numbers of women. The concerns with the policy at the Donna Facility was that younger children were being held apart from a parent and opportunities for interaction between the child and parent were minimal.

**Current Observations**

The practice of holding children apart from their parents during their time in custody continued at the Donna Facility during the current reporting period. BP reported that no children younger than 13 years of age had been held apart, a qualification that was consistent with observations made at the site visits and interviews. While most of the children held apart from their parents who were interviewed had been in custody for less than 4 days, there were also several families that had been held apart for 5 days at the time of the site visit.

Interviews with the children being held separately at the Donna Facility reported
that most had not had any interaction with a parent since they entered the UC
holding pod. In addition, few knew that they were entitled to request such a
meeting. Discussions with caregivers assigned to the UC holding pods also
suggested that they were not aware that children held separately from their parents
could request contact with a parent while in custody. During the site visits, the
JCM did not observe posters or other materials advising parents and children of
their rights to interact. These observations suggest that while the younger children
are no longer being held separately from their parents, the lack of routine
opportunities for parent-child interaction noted on earlier JCM visits had not been
rectified.

Observations and interviews at the El Paso EHF also found that older children
were being held apart from their parents when gender differences were present.
No children younger than 13 years were identified as being held apart during the
site visits. Unlike at the Donna Facility, there were routine opportunities for
parent-child interaction at the El Paso EHF. The reduced census had permitted the
use of unoccupied holding pods, in addition to the recreation areas, for the parent-
child interactions, which were occurring at least once daily.

It is important to emphasize that this practice of holding children apart from their

22

parents pertained only to the families' time in custody. Parents and children were reunited upon their release from custody. These holding practices, therefore, should be distinguished from the family separations associated with the "Zero Tolerance" policy in 2018 in which children were separated from parents at apprehension and ultimately transferred to the Office of Refugee Resettlement, HHS, as UCs.

**Assessment**

The practice of holding children apart from their parents while in CBP custody has continued, although with important revisions. The prior report reviewed in some detail the implications of this practice for Settlement considerations. Given that any separation of children from their parents during their time in custody is potentially harmful, the Settlement requires that this practice be justified by compelling operational concerns, take into consideration the child's age and vulnerabilities, and that steps be taken to mitigate any potential harm.

The exclusion of young children from the separate holding policy has been an important improvement. Nevertheless, children of any age could experience significant distress and potentially long-term harm by being held apart from their parents. Therefore, steps to mitigate these potential adverse effects, particularly providing opportunities for frequent interaction between parent and child, are

23

essential.

The failure to implement routine visitation opportunities at the Donna Facility in the RGV stood out as an important area of noncompliance with the Settlement. As stated in prior reports, the separation of children, regardless of their age, from their parents while in custody has the potential to inflict substantial and at times, lasting harm.  This potential harm is far more likely to occur in younger children, a reality that should restrict the separate holding practice to older children, preferably older than 15 years of age.  The regular provision of visitation opportunities, therefore, is an important means of mitigating the potential effects of holding children and parents apart.  The implementation of routine visitation at the El Paso EHF was a welcome development.

Given these observations and concerns, CBP's recent issuance of strengthened field guidance regarding family holding practices could result in much improved holding conditions.  The guidance as described by CBP reads as follows:

> On October 17, 2023, U.S. Border Patrol (USBP) issued guidance to the field reiterating that, absent an articulable safety or security concern, all members of a family unit should be housed together to the greatest extent operationally feasible, while taking into account the best interest of the child and all applicable legal requirements, including the requirements of the Prison Rape Elimination Act

*(PREA) and its implementing regulations. This guidance also provides that, when members of a family unit are held separately within a USBP facility, agents must document the articulable safety or security concerns for such separate holding. Lastly, the guidance provides that, if members of a family unit are housed separately within a facility, they should be placed together for visitation for at least 1 hour, at least three times within a 24-hour period. This contact must also be documented.*

**Recommendations**

The CBP guidance summarized above represents an important step forward in addressing the concerns noted in this and prior JCM reports.  The primary recommendation has been to interpret the provisions of the Settlement as requiring efforts to minimize the practice of holding children apart from their parents. This perspective is particularly consequential when younger children (children less than 15 years of age) are held apart from their parents. The special vulnerabilities of children less than 12 years of age should exempt them from all separate holding practices.

There can be little doubt that frequent visitation opportunities for children and

parents can be a drain on CBP manpower, particularly during periods of high census. Nevertheless, enhanced efforts required in the recent CBP field guidance should ensure frequent interaction between parent and child when held separately. This should include informing affected families of their right to visitation. As noted in the CBP guidance, opportunities for interaction should not be viewed as optional; rather, CBP personel should have the logistical and organizational support to ensure routine provision. CBP must also ensure that their personnel and contracted caregivers inform the affected families of their rights regarding visitation.

It is also recommended that CBP support greater integration of trauma-informed care and the role of caregivers into mitigation strategies. The prospect of the still developing child welfare initiative within DHS and CBP provides an important opportunity to create a more coherent approach to caring for children held apart from their parents while in custody.

CBP's family holding practices are of central importance to the well-being of children in custody. It is essential, therefore, that these holding practices continue to be documented through ongoing monitoring activities.  While the October 17 field guidance holds promise as an important step forward, how its mandates are implemented over time warrants close, continued scrutiny.

The observations in this and prior JCM reports concerning the lack of parental and child knowledge of their right to interact regularly when held apart have raised broader concerns regarding CBP's compliance with the provisions of the Settlement mandating that a series of legal notices be provided to class members (Section XI of the Settlement). CBP has maintained that the required posters and informational videos are displayed in the JPFs.  Site visits have documented the required posters are exhibited and that the informational videos are being played on some television monitors.  However, given the complex reality of these custodial environments, there are clearly pragmatic ways to enhance these displays' effectiveness in conveying the information in question.  It is recommended, therefore, that CBP consider discussing with the JCM potential steps that could better ensure that crucial information is ultimately conveyed to children and families in custody.  In addition, this arena of compliance should be closely monitored as potential enhancements are implemented.

**IV.D. Nutrition**

The Settlement requires that CBP ensure that children have access to age-appropriate meals and snacks that meet their daily nutritional needs. Water and adequate hydration are also mandated by the Settlement.

**Prior Assessment and Recommendations**

Prior JCM reports found that CBP had generally met the nutrition requirements
outlined in the Settlement. Water and snacks were available soon after
apprehension and were always available in the JPFs. Two hot meals and one cold
meal were provided each day. Infant formula and toddler foods were available in
the JPFs. The primary concern has been that children 2-5 years of age are being
provided with adult foods only. Consequently, the primary recommendation has
been that young children should be offered age-appropriate food.

 **Current Observations**

Site visits and interviews with families, children held apart from their parents and
UCs documented that water and snacks were always available from soon after
apprehension through their time in CBP custody.  During all site visits to the
JPFs, infant formula, bottled water, and mixing instructions were readily
available. Packets of pureed fruits and vegetables were also available at the JPFs.
UCs had ready access to fruits at all times. Reports regarding the quality of the
food remain highly variable. The lack of menu variety becomes an issue for
families held for longer than 4-5 days.


The primary nutritional concern remains the continued practice of providing
young children (2-5 years) with adult meals. During this reporting period, the

site visits to both the RGV and El Paso JPFs documented that there has been no

improvement in the appropriateness of meals provided to young children.


**Assessment**

CBP continues to meet most of the nutritional provisions in the Settlement. Clean

water and snacks have been provided to families and UCs throughout their stays in

CBP custody. Three meals per day have also been provided, although the quality

appears to vary, particularly when the census is high. The continued failure to

provide young children with age-appropriate food remains noncompliant with the

nutritional requirements outlined in the Settlement.


**Recommendations**

Young children should be provided with age-appropriate food during their

custody in the JPFs. As noted in all prior JCM reports, CBP should add these

offerings to their existing meal contracts in these facilities to comply with the

provisions in the Settlement. This is particularly important for children in

families who generally spend longer times in custody than UCs. While CBP

coordination with the JCM on this issue is welcomed, CBP can also utilize

the substantial resources of the US Government to help develop menu items

that are both appropriate for young children and relatively easy to provide in

custodial settings.  In addition, nutritional guidelines for early childhood and

day care settings have been developed by a number of state agencies around

the country.  As with all areas of CBP noncompliance, the provision of young

child meals requires ongoing monitoring.

## IV.E. Temperature and Garments

The Settlement requires the maintenance of a temperature range no less than 69°

Fahrenheit and no more than 83° Fahrenheit inside CBP holding facilities in the

RGV and El Paso sectors.

### Prior Assessment and Recommendations

During all prior site visits, the temperatures in holding areas were found to fall

within the required range. However, it was common for many children to

complain of feeling cold. Prior recommendations included reassessing the lower

limit of 69° as well as ensuring the availability of additional clothing, including

sweatshirts, jackets, and hats.

### Current Observations

Site visits to the Ursula Facility and Donna Facility in the RGV and the El Paso

EHF and SSF documented that holding pods had functioning thermometers or

were being regularly monitored by the facility contractors. JCM temperature

readings always fell within the prescribed range. Despite compliance with the
Settlement's temperature requirements, many children in the JPFs reported feeling
cold during this reporting period. The current remedy for this is the ready
availability of additional sweatshirts or other appropriate clothing.

During the September visit to the Donna Facility, there were no available
sweatshirts or other warm clothing for the children. It was not clear how this
occurred or why it had not been corrected as soon as the supply had run out. The
failure to have additional warm clothing available was immediately reported to BP
facility leadership, who moved quickly to rectify the situation. The October site
visit found that additional warm clothing was available and that the caregivers
were routinely providing this clothing to any child who reported feeling cold.
Some parents in the family holding pods, however, were not aware that additional
clothing was available.

In the El Paso EHF, site visits found that children were reporting feeling cold in
certain holding areas. Caregivers assigned to the UC pods were helpful in
providing additional clothing for children when needed. However, despite the
presence of caregivers and porters in the family holding areas, parents were
generally not aware that additional clothing was available for their children.

31

**Assessment**

The JPFs continue to be in general compliance with the temperature requirements of the Settlement. However, as noted in prior JCM reports, many children feel cold at the lower end of the allowable temperature range. With the exception of the Donna Facility during the September site visit, the Settlement requirement that external clothing be available to provide adequate warmth is generally being met for UCs. However, there remains relatively poor communication with parents regarding the availability of warm clothing if needed by their children.

**Recommendations**

As noted in prior JCM reports, there is no reason that children should report feeling cold for extended periods of time while in CBP custody. Therefore, as recommended in prior JCM reports, if the lower acceptable temperature limit is not raised, then greater efforts should be made to have additional clothing available and to ensure that parents and children are informed that additional garments are available if needed. In addition, caregivers and porters should receive additional training regarding their role in providing additional clothing when necessary. Given continued reports of children feeling cold, close monitoring of the temperature and garment availability provisions of the Settlement is warranted.

**IV.F. Sleep**

The Settlement requires that CBP make efforts to create custodial conditions that are compatible with adequate sleep.

**Prior Assessment and Recommendations**

The JCM report from the prior period documented that all UCs and individuals in families had received a mat and mylar blanket. This represented the resolution of a period in the RGV's Ursula Facility in which not all UCs or family members were provided with a sleeping mat. In the past, overcrowding has proven to be the primary cause of an inadequate sleep conditions. In addition, the inability to dim the overhead lights in the JPFs in both sectors has also been a persistent obstacle to an optimal sleeping environment. The primary recommendation was to reduce the number of individuals in overcrowded holding pods.

**Current Observations**

Site visits and interviews confirmed that in both sector JPFs, all UCs and families had been provided with a sleeping mat and mylar blanket. The census in both sectors had fallen to where there was no overcrowding, generally the greatest impediment to the sleep environment. During several site visits, the JCM was informed by CBP personnel that there existed limited ability to dim the lights in the Donna Facility, the EHF and the SSF. In addition, interviews with families

33

also suggested that the lights were not routinely dimmed for sleeping at night.

However, CBP has recently provided the JCM with information that these

facilities do, in fact, have the capability to dim the lights.  This is welcome

information and suggests that prior JCM reports were incorrect or that the use of

the dimming capabilities have been used only intermittently. Accordingly, the

routine dimming of the lights for sleep should be subject to ongoing monitoring.


**Assessment**

Site visits in both sectors found general compliance with the Settlement's sleep

provisions. The site visits and interviews during this reporting period found no

instances in which CBP failed to provide sleeping mats to UCs or families in

custody.  Ongoing monitoring should provide confidence that the overhead

light dimming practices in the JPFs optimize the sleep environment while still

ensuring the safety and well-being of children in custody.


**Recommendations**

Maintaining adequate sleeping mats for all those in custody will continues to be an

essential custodial requirement. Overcrowding, the availability of sleeping mats,

and other elements of adequate sleeping conditions will remain a core focus of

JCM monitoring activities.  It would be useful to review formal, written light

dimming protocols for each of the JPFs.  In addition, monitoring efforts should

include the observation of sleeping conditions at night.

## IV.G. Hygiene and Sanitation

The CBP Settlement outlines a series of hygiene and sanitation requirements for all children entering CBP custody.  Showers are to be provided soon after arrival at the JPF and again at 48-hour intervals. Toothbrushes should be provided daily and also upon request.

## Prior Assessment and Recommendations

During the prior reporting period, site visits to both the RGV and El Paso JPFs found that the holding pods and sanitation areas were generally clean and well supplied. Interviews with families and UCs suggested that showers were generally made available according to the schedule outlined in the Settlement. Caregivers facilitated the availability of toothbrushes to UCs on a daily basis. However, families were given access to toothbrushes only during showering opportunities.

Prior reports have underscored that overcrowding remains the greatest threat to the maintenance of hygiene and sanitation standards in CBP facilities in both sectors. Overcrowding in the JPF holding areas was associated with inadequate washing

supplies and showering opportunities, particularly for male head-of-household

holding areas. Declarations provided by the Plaintiffs during the earlier reporting

period aligned with the JCM documentation of inadequate hygiene and sanitation

standards during periods of significant overcrowding.

For families, toothbrushes are generally provided with showers. Caregivers

stationed in the UC holding pods also provided brushing opportunities on a daily

basis for UCs.

**Current Observations**

Site visits and interviews during this reporting period found that hygiene and

sanitation supplies were available in all holding pods, even when overcrowding

was present. Site visits found that sanitation and shower areas in the JPFs were

generally clean in both sectors.

Interviewed children and parents reported that showering opportunities varied

significantly when overcrowding was present. The September visit to the El Paso

JPFs found that UCs received daily showers. Families, however, reported shower

opportunities that could vary between every 2 to 4 days. The October visit found

the reduced census was associated with more regular shower opportunities,

generally provided to families every 48 hours. UCs continued to receive shower

36

opportunities daily. Site visits and interviews in the Donna Facility found that showers were generally available every 48 hours. Laundry service in both sectors was provided soon after entry for the UCs; families reported experiencing some delays in laundry services in the Donna Facility on both site visits. Toothbrushes continued to be provided to families only with showers. UCs in the El Paso EHF were provided with toothbrushes daily under the supervision of caregivers. UCs in the Donna Facility reported that there were some days in which toothbrushes were provided only with showers.

**Assessment**

As has been reported in prior JCM reports, overcrowding is the most common cause of inadequate hygiene and sanitation standards. The overcrowding documented in the September site visit to the El Paso EHF was accompanied by highly variable showering opportunities for families in custody. The October site visit found that the reduced census was associated with improved hygiene and sanitation standards that were in general compliance with the Settlement requirements.

As noted in prior reports, the current practice of providing toothbrushes to families only during shower opportunities is not compliant with the provisions of the Settlement. The presence of caregivers has permitted daily toothbrushing in

the EHF UC pods. However, caregivers in the Donna Facility have only
intermittently adopted this practice.

**Recommendations**

Even at times of relatively high census, showering and toothbrushing opportunities
need to be provided consistently in accordance with the provisions of the
Settlement. Although periods of high census can occur unpredictably, they occur
frequently enough to permit the development of procedures and capabilities that
can accommodate the hygiene and sanitation requirements mandated by the
Settlement even when apprehensions of UCs and families are elevated.

The deployment of caregivers in the JPFs has proven to be an important
contributor to improving sanitation and hygienic services. However, the role of
the caregivers in supporting the hygiene and sanitation requirements of children
in custody varies, particularly in the support provided families. It is
recommended that the role of the caregivers in hygiene and sanitation practices
be optimized across all CBP JPFs.

## V. CAREGIVERS

The CBP Settlement requires that CBP develop a "caregiver" program directed at
providing a variety of direct custodial care services to children in CBP custody.

38

**Prior Assessment and Recommendations**

The number of caregivers deployed in both the RGV and El Paso sector JPFs has grown significantly over the past year. Prior JCM reports have emphasized the importance of the caregivers in ensuring that CBP custodial care meets the requirements of the Settlement. The role of the caregivers, however, has varied among the different sectors and JPFs. In particular, the role of the caregivers in supporting the care of children in family holding areas has been minimal, except for assisting with showering.

The prior recommendations included continued efforts to expand the caregiver program and with sufficient numbers to adequately staff the family holding areas. In addition, a review of the caregiver roles and additional training to convey best practices within the JPFs were also recommended.

**Current Observations**

Site visits to the RGV and El Paso JPFs continue to underscore the crucial role of the caregivers within CBP custodial systems for children. In both sectors, caregivers were deployed in the UC and family holding areas as well as the showering locations. In addition, caregivers were also stationed at the intake areas, medical care units, and isolation areas.

39

In the UC areas, caregivers were observed supervising age-appropriate activities such as drawing for the younger children and card games for older children in custody. However, the ratio of caregivers to UCs was higher in the El Paso EHF compared with the ratio in the Donna Facility. This resulted in less direct engagement with the children in the Donna Facility. For example, it was typical during the Donna Facility site visits to find 2 caregivers assigned to the UC pods holding approximately 90 children, all older than 8 years of age. There were few child-focused activities evident, although children's programs were playing on the televisions. The "nursery" area, (which generally provides care for UCs less than 6 years of age) in the Donna Facility, however, was well staffed with caregivers supervising a variety of children's activities.

The role of the caregivers assigned to the family holding pods, however, remains quite variable. Site visits found that there were no child-friendly activities underway in the family areas. Also, interviews with the caregivers suggested that there was some uncertainty regarding their roles in supporting the care of children in families.

**Assessment**

CBP is meeting the Settlement's requirements regarding the caregiver program.

40

However, there remain important opportunities for improvement. The major benefits of the caregiver program have been reviewed in prior JCM reports. CBP has made considerable progress in expanding the number and responsibilities of caregivers in the JPF's. Site visits and interviews with UCs confirmed that while all spoke positively about the caregivers, there was significant variation in the extent to which they supervise child-focused activities.

The Office of Health Security, Department of Homeland Security, has established a Child Welfare Specialist Program (CWSP) which should provide additional guidance for continued improvements in the caregiver program. In addition, the Office of the Chief Medical Officer (OCMO) has enhanced its commitment to improving both CBP's caregiver program and trauma-informed care efforts.

**Recommendations**

As has been recommended in the prior JCM reports, the number of caregivers should continue to be increased. Of particular concern is the relatively few caregivers deployed in the UC holding areas at the Donna Facility and in the family holding areas in both sector JPFs.  CBP has conducted detailed assessments of the appropriate number of caregivers required in each of the sector JPFs.  It is recommended that CBP continue to make progress in reaching the optimal number of caregivers deemed appropriate for the JPFs.

It is also recommended that the CWSP and OCMO leadership better define
caregiver responsibilities and develop a enhanced training program that includes
best caregiver practices and their contribution to a strengthened trauma-
informed care system in CBP facilities.

## VI. TRAUMA-INFORMED CARE AND CHILD-APPROPRIATE ENVIRONMENT

The Settlement mandates that the JPFs implement care strategies that attend to the
emotional and psychological challenges that migrant children confront both before
and during CBP custody. Recognizing the potential that children in CBP care may
have experienced trauma in their home communities, on their journey, and while in
custody, the Settlement calls upon CBP to make efforts to foster reassurance,
resilience, and psychological well-being. (See Section VII.3.D.7 and Section
VII.8.B8 in the Settlement).

### Prior Assessment and Recommendations

Prior reports have documented that CBP has met the Settlement requirement of
providing a safe environment for children in the JPFs. CBP and contracted
personnel have also received training in trauma-informed care. However, prior

reports have also documented that other operational priorities and an overstretched
caregiver program have undermined the effectiveness of intended trauma-informed
custodial elements.

**Current Observations**

Interviews with UCs and families continue to confirm that all felt physically safe
while in CBP custody and reported having been treated professionally by CBP
personnel and contractors.

Caregivers represent a central component of CBP's trauma-informed capabilities.
The strengths and weaknesses of the caregiver program were addressed in a prior
section of this report.

**Assessment**

That UCs and families feel safe in CBP custody is a fundamental precondition for
trauma-informed care. It is, therefore, essential to emphasize the importance of
the reports from UC's, parents, and children held apart from their parents, that
they felt safe in CBP care.

However, overcrowding, an inadequate number of caregiving personnel,
inconsistencies in caregiver responsibilities, and the lack of child-friendly

amenities and activities have together, largely undermined the implementation of
any other trauma-informed elements of custodial care.

Moreover, the continued practice of holding children apart from their parents also
has the potential to exacerbate the trauma associated with CBP custody. While
confining this practice to older children exclusively is an important improvement, it
does not eliminate the burden on CBP to mitigate any deleterious effects.

It should be noted that this assessment is not directed at answering the legal
question of whether these separations are, or are not, compliant with the
Settlement. Rather, these concerns are merely a statement of pediatric fact
grounded in a wide and diverse child development literature.

**Recommendations**

The two most important recommendations related to trauma-informed care and a
child-friendly environment are first, to minimize the practice of holding parents
and children separately while in CBP custody. Clearly, CBP has a responsibility to
avoid overcrowding and hold safely large numbers of children and adults of
diverse age and gender characteristics. However, alternatives to holding children
separately, particularly children less than 15 years of age, should be actively
explored.

44

It is also recommended that mitigation efforts, especially frequent parent-child visitations, be more actively pursued. Ensuring that the required manpower and appropriate space for these interactions should be more heavily prioritized.

In addition, the CWSP and OCMO should provide a more coherent plan for trauma-informed care and an ongoing process for ensuring that all opportunities for trauma-informed care are optimized.

## VII.  ENHANCED MEDICAL SUPPORT

The Settlement requires a robust medical care system for juveniles in CBP custody. CBP has addressed this requirement by deploying contracted medical teams in the RGV and El Paso JPFs and any other facilities housing children. These teams include an advanced medical practitioner (either a nurse practitioner or physician assistant) and 2-3 medical support personnel, usually medical assistants or emergency medical technicians. These teams are required to be present 24 hours a day, 7 days a week. In addition to the on-site medical teams, supervising physicians, including pediatricians, are assigned in each sector to provide on-call consultation, clinical protocol development, and quality assurance reviews.

JCM monitoring has focused not only on whether the required medical system is in
fact present in the JPFs but also on the system's performance in providing high
quality medical services to children in CBP custody.

Prior JCM reports have attempted to elevate those elements of the CBP medical
care system that required urgent improvement. These elements were identified
through direct observation, data analysis, interviews with medical personnel and
patients, and sentinel case analysis, including the detailed assessment of the tragic
death of an 8-year-old girl while in CBP custody. While the prior JCM reports
recommended a series of ameliorative steps, they could be summarized as falling
into three general strategies:

- The reduction of medical risk in CBP facilities;

- Enhanced pediatric consultation and monitoring of children at
  elevated medical risk while in CBP custody;

- Improved conveyance of medical information among CBP
  personnel, contracted health providers, and subsequent medical
  providers.

JCM monitoring has continued to note that OCMO, the medical contractor, and
CBP sector leadership have been making strong efforts to improve the medical care
children are receiving in CBP custody. These initiatives have included close
consultation with the JCM and recently, an increase in the number of contracted

medical personnel deployed in the JPFs. In addition, the availability of supervising
pediatricians has also been enhanced.


## VII.A. The reduction of medical risk in CBP facilities

Prior JCM reports have suggested that CBP could take steps to reduce the clinical
burden on its medical system by expediting the disposition of children at
significantly elevated medical risk.   The ability to reduce the level of medical risk
among the juvenile population in CBP custody has, in turn, three requirements: 1)
the identification of children at elevated medical risk; 2) alerting CBP personnel of
the presence of a child at increased medical risk; and 3) enhanced pediatric
consultation and monitoring of children at elevated medical risk while in CBP
custody.


## VII.A.1. Identifying children at elevated medical risk

Prior JCM reports have emphasized the importance of accurately identifying
children at elevated medical risk upon entry into CBP custody. It has been a
longstanding CBP protocol to administer an initial medical assessment to all
juveniles entering CBP custody. OCMO has recently implemented a
protocol to help ensure that the examining medical personnel assess
elevated risk in a more complete and standardized format. This protocol also
requires direct consultation with a supervising pediatrician whenever a child

47

with a potentially elevated risk diagnosis was identified. The prior JCM

report recognized that this protocol had been distributed to the contracted

CBP medical staff but how it was actually being used was somewhat

variable. The report recommended enhanced training of contracted medical

staff and stronger accountability mechanisms to ensure the protocol's

complete implementation.

JCM site visits in September and October found that the elevated risk protocol was

in general use in the JPF medical units. This has meant more accurate and

standardized identification of children at elevated medical risk and consultation

with the supervising pediatrician when such a risk is identified. Interviews with

medical staff reported that the supervising pediatricians were generally responsive

to the medical staff's consultative phone calls. However, the implementation of the

strengthened consultation protocols has the potential to significantly add to the

workload of the pediatric supervisors, an issue that may have been expressed as

their being less fully accessible to the medical staff at times.

## Recommendations

It is imperative that the enhanced engagement of consulting pediatricians be

maintained. This will require continued adherence to OCMO protocols and

ensuring that pediatrician coverage is adequate to meet all consultative demands.

48

Because pediatric consultation is a critical component of the CBP medical system, quality assurance processes and metrics should closely monitor and support this arena of care.

## VII.A.2. Conveying essential medical information to CBP

It is essential that medical providers convey information regarding children at increased medical risk to appropriate CBP personnel. CBP is ultimately responsible for the well-being of all individuals in their custody and should know when a child at elevated medical risk enters their custody.

Prior JCM reports noted the lack of a standard mechanism by which medical personnel communicated with CBP operators regarding the medical status of children in custody. Communicating acute medical needs, such as a medical decision to transfer a patient to a local medical facility, is a routine, daily occurrence in the JPFs. What is lacking however, is a means by which medical personnel can alert CBP leadership in the JPF that a child at elevated medical risk, but not in acute distress, is in custody. For example, a child with serious developmental disabilities and a seizure disorder may not require an urgent transfer to a local facility (a decision that should be made in consultation with the supervising pediatrician) but could, nevertheless, pose a risk of deterioration while

49

in custody. Similarly, the entrance of a child with Sickle Cell Disease or other serious, chronic disorder, should be conveyed to the responsible CBP personnel.

Although there has been greater recognition of the importance of this communication requirement between contracted medical staff and appropriate CBP personnel, interviews during the September and October site visits in both sectors found that it was still being met somewhat irregularly.   Some medical personnel assumed responsibility for conveying this information but other providers did not. There appears to be no digital mechanism for medical personnel to place an alert on the child's computer-based CBP record.

**Recommendation**

OCMO and CBP operational leadership should continue to identify practical mechanisms for the conveyance of medical information to the appropriate CBP personnel at the JPFs. This is likely going to require some form of digital communication by which relevant information in the electronic medical record can be easily conveyed to the digital CBP processing files.  Regardless of the system by which this information is regularly conveyed to CBP, adequate training of medical staff and responsible CBP personnel in the established system will be required.

**VII.B. Enhanced Medical Monitoring**

Children at elevated medical risk require enhanced monitoring of their medical
condition. Early JCM reports documented a worrisome absence of a systematic
approach to monitoring children at elevated medical risk. Rather, enhanced
monitoring was confined to children who required medication or were of special
concern to individual medical personnel.

JCM site visits during this reporting period found a greatly improved monitoring
system for children at elevated medical risk. OCMO had introduced an Enhanced
Medical Monitoring (EMM) protocol for the JPFs which provided guidelines for
whom EMM was required and the nature and frequency of the monitoring.

The primary focus of the EMM system has been children placed in isolation
holding pods because of a communicable disease, primarily influenza, COVID-19,
and varicella. Site visits documented that in addition to the always present security
personnel deployed in the isolation units, medical personnel visited the patients in
isolation approximately every 4 hours. The recent increases in medical personnel
in the JPFs permitted this more frequent EMM activity.

While the current EMM protocol represents an important advance in the CBP
medical system, there was irregular monitoring of children at elevated medical risk

who were not housed in the isolation areas. This issue represents an important opportunity for strengthening the EMM system and consequently, the quality of the CBP medical system in the JPFs.

**Recommendations**

OCMO and the medical contractor should review the current EMM protocols to identify practical means of expanding them to include children at elevated medical risk who are not housed in isolation areas but nevertheless require heightened medical monitoring while in custody.

**VII.C. Strengthened procedures for referral to local medical facilities.**

One of the most important components of the CBP medical system is the ability to transfer ill individuals to local health facilities for more definitive care. Prior JCM reports noted that interviews with medical providers revealed that on occasion, the medical decision to transfer a patient to a local health facility had been questioned by CBP personnel. There is no doubt that transferring an individual in custody to an outside medical facility creates a logistical and staffing burden on CBP operations.  However, prior JCM reports strongly recommended that the decision to transfer any individual patient be based on medical considerations alone and that CBP personnel gain confidence in the appropriateness of medical decision-making through collaborative discussions at the policy level and not in direct response to a

decision to transfer a patient.

Interviews during this reporting period suggested that CBP personnel have been
responsive to medical requests for transfer and have facilitated transfers in a timely
manner without questioning medical decision-making.  However,  site visits
suggested that there is some variation in whether parents are  allowed to
accompany children transferred to local health facilities for more advanced care.  It
is always best that parents accompany their children to an outside health facility.
However, it is not always appropriate, for example when the parent has multiple
children with them in custody.

**Recommendation**

The improvements observed in the transfer of patients to local health facilities
require continued reinforcement and monitoring.  Stanford protocols for when
parents should be allowed to accompany their children to an outside health
facility should be developed.  Given the importance of transfer procedures
and decision-making, a strengthened quality assurance system should address
this arena of CBP health care closely.

53

## VII.D.  Disciplined conveyance of medical information among health providers

All high-quality medical systems have mechanisms that ensure that essential medical information is conveyed to all personnel and institutions with responsibility for patient care. Prior JCM reports have noted a lack of such mechanisms within the CBP medical system.

Site visits and interviews during this reporting period suggest that communication between medical providers regarding concerning patients has improved substantially. However, there remained some variation in how individual medical providers attempted to convey this information, with some relying on the electronic medical record system and others on direct verbal communication.

### Recommendation

The improvements observed in the conveyance of information among medical providers will require continued reinforcement and monitoring. This is likely to be best supported by revisions in the electronic medical record system that facilitate attention directed to children at elevated medical risk. A strengthened quality assurance system should help guarantee that this arena of communication is optimized.

54

## VII.E. Ensuring hospital records are conveyed to CBP medical personnel

High-quality medical systems ensure that a record of the evaluation and treatment of a patient referred to another health provider be transmitted back to the original referring medical provider. Prior JCM reports identified a lack of a consistent mechanism to ensure that this communication actually occurred.

Site visits during this reporting period documented that this issue remains unresolved. There continues to be wide variation in what information a local health facility conveys back to CBP medical personnel after a referral evaluation or even an admission has been completed.

### Recommendation

OCMO should continue to pursue agreements with local health facilities that serve the CBP pediatric population. Medical documentation systems and institutional relationships between CBP and local health facilities should be coordinated so that essential hospital information is shared with CBP's medical providers for all children who are returned to CBP custody.

## VII.F. Conveyance of medical information to the Office of Refugee Resettlement (ORR)

It is essential that ORR receive relevant medical information regarding the

55

conditions and management of UCs while in CBP custody. Prior JCM reports

noted that while the conveyance of information to ORR appears to have improved,

some inconsistencies in the medical reporting system appeared to persist.

Site visits and interviews during this reporting period found that medical providers

had taken greater responsibility for ensuring that information in the electronic

medical record would appear automatically on the medical information form that

accompanies the child when transferred to ORR.

**Recommendation**

OCMO and ORR should continue to assess collaboratively the completeness and

quality of the information conveyed to ORR, particularly for children requiring

special medical or accommodative placements. An enhanced medical quality

assurance program should include the monitoring of the information CBP conveys

to ORR.

**VII.G. Medical information provided to a child's parent or guardian**

Prior JCM reports have recommended that parents or guardians of children at

elevated medical risk should be provided with medical summary sheets that

include diagnoses, medications, and other pertinent medical information prior to

transfer out of CBP custody. Prior site visits found that some parents have been

provided with summary medical sheets while most have not.

OCMO has been working with the JCM to improve this arena of medical

documentation, including the development of efficient digital capabilities that

could automate this requirement.

Site visits during this reporting period continued to find inconsistent provision of

medical documentation to parents of children at elevated medical risk who are

released or transferred for removal.

**Recommendation**

OCMO should continue its efforts to ensure that parents or guardians are provided

with appropriate documents regarding any diagnostic or treatment their child

received while in CBP custody.

**VII.H. Medical referrals for children at elevated medical risk in families being**

**released into the United States**

Prior JCM reports have emphasized the need for CBP to ensure appropriate referral

for those few children at significantly elevated risk who require specialized care

soon after release. This referral capability would help ensure that children at

elevated medical risk do not deteriorate soon after release from CBP custody.

**Recommendation**

OCMO should continue to explore ways to facilitate appropriate referral for the
select group of children in families who require medical follow-up soon after
release into the United States.

## VII.I.  Major improvement in the medical quality assurance program

Prior JCM reports have underscored the urgent need to improve CBP's medical
quality assurance program. Virtually all of the JCM's medical concerns and
recommendations should have been addressed by an effective quality assurance
program.

Site visits and interviews during this reporting period have documented important
improvements in the quality assurance activities. OCMO continues to create
relevant metrics and datasets, including the enhanced use of the existing electronic
medical record for quality assurance purposes.

**Recommendation**

The goal of an improved quality assurance program should be nothing less than the
creation and continued development of an exemplary, high-quality medical system
purposefully designed to meet the special requirements of CBP's law enforcement
mandate and the requirements of the Settlement. Accordingly, systems that ensure

58

that this goal is met should remain a high priority for OCMO, the medical

contractor, and CBP. This system should be provided with sufficient resources and

purview to continually monitor the critical elements of the medical care system in

CBP facilities and to provide OCMO, the medical contractor, and CBP with new

opportunities to improve the quality of medical care provided to all those who

come into CBP custody.

1

**CERTIFICATE OF SERVICE**

2

Case No. CV 85-4544- DMG (AGRx)

3

4

    I am a citizen of the United States. My business address is 250

5

Sixth Street, Suite 205, Santa Monica, California 90401 . I am over the age of 18 years,

6

and not a party to the within action.

7

    I hereby certify that on November 13, 2023, I electronically

8

filed the following documents with the Clerk of the Court for the United

9

States District Court, Eastern District of California by using the CM/ECF system:

10

**NOTICE OF FILING OF JUVENILE CARE MONITOR REPORT BY DR.**

11

**PAUL H. WISE**

12

    I certify that all participants in the case are registered CM/ECF users and that service

13

will be accomplished by the CM/ECF system.

14

15

    I declare under penalty of perjury under the laws of the United States the foregoing

16

is true and correct. Executed on November 13, 2023, at Los Angeles, California.

17

18

19

20

                                   Jeff Thomson

21

22

23

24

25

26

27

28