CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
Sarah E. Kahn (Cal. Bar No. 341901)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.email

*Attorneys for Plaintiffs*

*Additional counsel listed on following page*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>MERRICK GARLAND, Attorney General the United States, *et al.*,<br><br><br>        Defendants. | No. CV 85-4544-DMG-AGRx<br><br>MEMORANDUM IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT RE OPEN-AIR DETENTION SITES<br><br>Hearing: March 29, 2024<br>Time: 9:30 a.m.<br>Hon. Dolly M. Gee |

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe (Cal. Bar No. 299296)
Diane de Gramont (Cal. Bar No. 324360)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email: mwroe@youthlaw.org

CHILDREN'S RIGHTS
Leecia Welch (Cal. Bar No. 208741)
88 Pine Street, Suite 800
New York, NY 10005
Telephone: (212) 683-2210
Email: lwelch@childrensrights.org

# TABLE OF CONTENTS

I.     Introduction ..........................................................................................1

II.    Statement of Facts ..............................................................................2

   A.   Children Are Held at OADS in Deplorable Conditions ...............................3

     *1.   CBP fails to provide children shelter at OADS.* ...........................3

     *2.   Conditions at OADS are grossly unsanitary.* .............................4

     *3.   CBP fails to provide children held at OADS with minimally adequate food or water.* .........................................................................5

     *4.   Children face medical emergencies in OADS with little to no assistance from CBP.* ............................................................................6

   B.   CBP Directs Children to OADS and Imposes its Authority There .............7

   C.   Children Must Remain at the OADS Until Processed By CBP ...................9

III.   Argument ............................................................................................11

   A.   Children at OADS are in the Legal Custody of CBP and are Therefore Entitled to the Protections Guaranteed by the *Flores* Settlement Agreement. ...11

     *1.   CBP has custody of noncitizen children from the moment of first discovery.* ...................................................................................12

     *2.   CBP has authority to determine where children are detained.* ..............14

     *3.   CBP controls conditions at OADS.* ..........................................16

     *4.   CBP unilaterally determines when noncitizens can leave OADS.* ..........17

   B.   CBP Maintains OADS in Unsafe and Unsanitary Conditions Inconsistent with a Concern for the Particular Vulnerability of Minors. ...............................18

   C.   CBP Separates Children from their Families and Fails to Ensure Contact with Family Members .........................................................................20

   D.   CBP Fails to Expeditiously Process Class Members ................................20

IV.    Conclusion..........................................................................................21

# TABLE OF AUTHORITIES

**CASES**

*Adams v. Johns-Manville Corp.*, 876 F.2d 702 (9th Cir. 1989)...............................11

*Flores v. Barr*, 934 F.3d 910 (9th Cir. 2019)...............................................11, 13, 19

*Flores v. Barr*, No. 85-4544, 2020 WL 5491445 (C.D. Cal. Sept. 4, 2020)....*passim*

*Flores v. Garland,* 3 F.4th 1145 (9th Cir. 2021)...............................................12, 14

*Flores v. Sessions*, 394 F. Supp. 3d 1041 (C.D. Cal. 2017).......................11, 12, 19

**STATUTES**

8 U.S.C. § 1232(a)(2)(B) ............................................................................... 13

8 U.S.C. § 1232(b)(2).............................................................................. 1, 13

**OTHER AUTHORITIES**

*Flores* Settlement Agreement ........................................................*passim*

Reply in Support of Application to Vacate the Injunction Pending Appeal, *DHS v. Texas*, No. 23A607, 2024 WL 145108 (U.S. Jan. 10, 2024) .......................13, 14

U.S. Customs and Border Protection*, National Standards on Transport, Escort, Detention, and Search* (Oct. 2015) .......................................................13, 14, 15

## I.   INTRODUCTION

U.S. Customs and Border Protection ("CBP") is holding *Flores* class members outdoors in open-air detention sites ("OADS") along the U.S. border in extraordinarily unsafe and unsanitary conditions. Children have spent anywhere from several hours to several days at these sites before CBP transports them to brick-and-mortar facilities for formal processing.

Children in OADS are in the legal custody of CBP and are therefore entitled to the full protections of the *Flores* Settlement Agreement ("FSA").[1] *See* FSA ¶ 10. CBP has decision-making authority over the welfare and legal status of these children from the moment of first discovery in the United States. *See Flores v. Barr*, No. 85-4544-DMG, 2020 WL 5491445, at *4 (C.D. Cal. Sept. 4, 2020); 8 U.S.C. § 1232(b)(2). CBP directs noncitizen children to wait at OADS for formal processing, including regularly physically transporting or escorting children to specific OADS. While children are at OADS, they cannot leave without CBP permission and are subject to CBP orders. CBP has at times exercised its authority to separate families, requiring adult men to move to different OADS than their children or other family members.

Both accompanied and unaccompanied children are regularly detained at OADS. CBP is plainly failing to meet its obligations to these children as it offers them no shelter or medical care and little to no sanitation, food, water, or blankets. Children and their families are forced to take shelter in porta potties, dumpsters, or tarps filled with trash to escape the cold, wind, and rain. Children and families must depend on the generosity of volunteers to meet their most basic needs. Some arrive with or develop serious medical conditions while at OADS and rely on humanitarian volunteers for medical care. CBP often fails to assist children in

---

[1] Plaintiffs anticipate Defendants will take the position that children in OADS are not class members. *See* Ex. 1, Declaration of Mishan Wroe, Ex. C, February 29, 2024.

desperate need and sometimes exercises its authority over OADS to obstruct access to critical supplies provided by volunteers and to emergency medical services.

Although the numbers of detained children and the length of their detention at the OADS has varied over the last year, there is no question that the OADS are unequivocally unsafe and unsanitary. Holding children in these sites flagrantly violates the requirements of the Settlement. Without court intervention, CBP will continue to fail to meet its obligations to class members. The Court should grant Plaintiffs' motion and order Defendants to comply with the Settlement by immediately placing all class members in safe and sanitary facilities.

## II.   STATEMENT OF FACTS

Since at least February 2023, CBP has held children in OADS. *See* Ex. 2, Declaration of Pedro Rios ¶ 4, February 21, 2024 ["Rios Dec."]. Both unaccompanied and accompanied children are held at these sites. *See id.* ¶ 37-38; Ex. 3, Declaration of Flor De Luna Alvarez-Lopez ¶ 7, February 28, 2024 ["Alvarez-Lopez Dec."]; Ex. 4, Declaration of Erika Pinheiro ¶¶ 12-14, February 26, 2024 ["Pinheiro Dec."]; Ex. 5, Declaration of Dr. Theresa Cheng ¶¶ 10-11, February 23, 2024 ["Cheng Dec."]. CBP directs class members to remain at OADS for indefinite periods of time while they await formal processing, holding children overnight and in some cases for multiple nights. *See* Pinheiro Dec. ¶¶ 7, 12-13, 26-27 (unaccompanied children have stayed overnight at OADS and families with young children have sometimes spent multiple nights); Cheng Dec. ¶ 12 (five-year old and twelve-year-old spent three nights at the OADS); *see also* Ex. 6, Declaration of Adriana Jasso ¶ 28, February 21, 2024 ["Jasso Dec."]; Rios Dec. ¶¶ 19-20, 36.

Plaintiffs are currently aware of at least seven OADS within California, in CBP's San Diego Sector. Four of the OADS—Whiskey 8, Whiskey 4, Spooner's Mesa, and 91X—are located west of the San Ysidro Port of Entry between the

primary and secondary U.S. border walls. *See* Rios Dec. ¶ 6. The other three OADS—Moon Valley, Tower 177, and Willows—are located outside the remote desert town of Jacumba and are monitored by CBP agents and surveillance towers. *See* Pinheiro Dec. ¶¶ 28-30, 45; Ex. 7, Declaration of Sarah Kahn ¶ 26, 55, February 27, 2024 ["Kahn Dec."]. All of these sites are under CBP control.

**A. Children Are Held at OADS in Deplorable Conditions**

 1. <u>CBP fails to provide children shelter at OADS.</u>

  CBP provides no shelter at OADS and children are left exposed to the elements. *See* Kahn Dec. ¶¶ 12, 58, 63, 105; Pinheiro Dec. ¶¶ 41-42, 45; Rios Dec. ¶¶ 27-28. As a result, people sleep in dirt littered with garbage, exposed to scorpions, snakes, and insects. *See* Pinheiro Dec. ¶ 43; Alvarez-Lopez ¶ 24. Some children and other noncitizens have resorted to sheltering in porta potties and dumpsters to escape the wind and rain. *See* Pinheiro Dec. ¶¶ 15, 43; Kahn Dec. ¶ 105; Cheng Dec. ¶ 32. Volunteers provide tents and tarps, but there are not enough and conditions are unsanitary. *See* Pinheiro Dec. ¶ 43; Ex. 8, Declaration of Saulo ¶ 3, February 3, 2024 ["Saulo Dec."].

  The temperature variations are extreme at OADS; it can be very hot and dry during the day and it can drop below freezing at night. *See* Pinheiro Dec. ¶¶ 41-42; Rios Dec. ¶ 11; Kahn Dec. ¶ 75, 81, 96, 101; *see also* Cheng Dec. ¶¶ 26-29 ("I alternated between worrying that children and other vulnerable groups would get heat stroke or hypothermia."). CBP occasionally provides mylar blankets to detainees, but no other protection from the elements. Alvarez-Lopez Dec. ¶ 23; Rios Dec. ¶ 26; Kahn ¶ 49. Recently there has been heavy rainfall, leaving people cold and soaking wet. *See* Alvarez-Lopez Dec. ¶ 23; Kahn Dec. ¶¶ 7, 15, 75, 81; Ex. 9, Declaration of G. ¶¶ 8-11, February 21, 2024.

  Children are at particular danger from exposure to the cold temperatures. *See* Pinheiro Dec. ¶ 15 (two children were hospitalized for hypothermia in February 2024); Saulo Dec. ¶¶ 13, 16 ("My daughter was so cold that she was shaking . . . I

1  was panicking, I was afraid she would die from the cold."); Kahn Dec. ¶¶ 67-69

2  ("One father crouched so close to the fire, attempting to provide warmth to his

3  baby, that smoke engulfed his baby. . . . Border Patrol agents could easily see the

4  parents desperately trying to warm up their babies.").

5      People held at these sites have no choice but to burn brush and garbage to try

6  to stay warm. *See* Pinheiro Dec. ¶ 46; Kahn Dec. ¶¶ 91, 114; Cheng Dec. ¶ 25. The

7  brush that is available in Jacumba is often creosote, which can be toxic when

8  burned. *See* Pinheiro Dec. ¶ 46. Noncitizens and volunteers at OADS experience

9  watery eyes, a burning sensation in their throats, black mucous coming from their

10  noses and throats, and other respiratory problems. *See* Pinheiro Dec. ¶ 46; Cheng

11  Dec. ¶ 25.

12      2.  <u>Conditions at OADS are grossly unsanitary.</u>

13      There are no permanent toilets or showers at the OADS and CBP fails to

14  provide people with basic hygiene items. *See* Alvarez-Lopez Dec. ¶¶ 26-27; Kahn

15  Dec. ¶ 29; *see also* Ex. 10, Declaration of E.G. ¶ 11, February 3, 2024 ["E.G.

16  Dec."] ("There is no soap, no water, and no way to keep warm."). CBP very

17  recently set up handwashing stations at certain OADS, but some were filled with

18  trash. *See* Kahn Dec. ¶¶ 46, 119; *see also* Pinheiro Dec. ¶ 47. Although CBP has

19  set up some portable toilets, they are not regularly serviced and the few porta

20  potties provided are insufficient for the number of people who need them, making

21  them quickly unusable. *See* Kahn Dec. ¶ 29; Rios Dec. ¶ 30; E.G. Dec. ¶ 8;

22  Pinheiro Dec. ¶ 47; Alvarez-Lopez Dec. ¶ 26. Sometimes the porta potties are so

23  unsanitary, people cannot use them and must relieve themselves outdoors. *See*

24  Pinheiro Dec. ¶ 47; Cheng Dec. ¶ 32. Even if porta potties are usable, they are

25  often unavailable because the weather conditions are so severe that children and

26  others crowd into the filthy porta potties to escape the wind and cold. *See* Kahn

27  Dec. ¶ 105; Pinheiro Dec. ¶¶ 15, 43; Cheng Dec. ¶ 32.

28

Some OADS have dumpsters, but these dumpsters are not regularly serviced and the sites are filled with garbage. *See* Alvarez-Lopez Dec. ¶ 25; Cheng Dec. ¶¶ 25, 31; Saulo Dec. ¶ 3; Kahn Dec. ¶¶ 27, 29, 106; *see also id.* ¶ 31 ("The camp had a distinct, putrid smell, even in the windy post-storm air."). Children and others nevertheless attempt to shelter in dumpsters to escape the cold. *See* Pinheiro Dec. ¶¶ 15, 43.

3. <u>CBP fails to provide children held at OADS with minimally adequate food or water.</u>

Despite holding children at OADS for long periods of time, CBP provides inadequate and inconsistent food and clean water. *See* Rios Dec. ¶¶ 25, 27; Jasso Dec. ¶¶ 22-25; Pinheiro Dec. ¶¶ 7, 36, 44, 47, 63; Kahn Dec. ¶¶ 12, 30, 54, 57, 66, 72, 80, 107, 111, 119; Saulo Dec. ¶ 9. CBP agents sometimes provide just a single bottle of water and granola bar or a couple crackers per person. *See* Jasso Dec. ¶ 23; Pinheiro Dec. ¶ 44; Kahn Dec. ¶ 111; Ex. 11, Declaration of Lillian Serrano ¶ 19, February 26, 2024 ["Serrano Dec."]. At other times they provide no food or water at all. *See* E.G. Dec. ¶ 10; Kahn Dec. ¶¶ 12, 30; *see also* Cheng Dec. ¶ 28 (at least six formula-fed infants were held at OADS without formula).

CBP depends on volunteers to provide basic provisions for people at the OADS. *See* Rios Dec. ¶ 16; Kahn Dec. ¶ 30; Jasso Dec. ¶¶ 6-7, 23, 25; Alvarez-Lopez Dec. ¶¶ 15, 21-22; Serrano Dec. ¶¶ 6, 23; *see also id.* ¶ 11 (agents inform volunteers of number of migrants at open-air sites so volunteers can "prepare and pack lunches for Border Patrol agents to take to the migrants in those sites"). At the same time, CBP controls when, where, and whether volunteers are permitted to provide this essential humanitarian aid, at times restricting people's access to basic necessities. *See* Rios Dec. ¶¶ 16, 22-24; Jasso Dec. ¶¶ 24, 26-27; Serrano Dec. ¶¶ 10-11. CBP has even undermined class members' access to critical supplies by threatening volunteers with arrest. *See* Serrano Dec. ¶¶ 20-21; Rios Dec. ¶ 24. When volunteers are unable to provide humanitarian aid, the situation is dire. *See*

Rios Dec. ¶ 32 ("I spoke with a group of men from India who told me they were starving. They showed me the leaves they were eating. They had been there for 5 days.").

4.  <u>Children face medical emergencies in OADS with little to no assistance from CBP.</u>

CBP provides no first aid or medical care at OADS, even though many children arrive sick or injured or become sick while detained at OADS. *See* Cheng ¶¶ 33-42; Alvarez-Lopez Dec. ¶¶ 28, 33-34, 37, 39; Jasso Dec. ¶¶ 29-32; Rios Dec. ¶¶ 34, 39-40; Pinheiro Dec. ¶ 53; *see also* Saulo Dec. ¶¶ 15-16 ("[W]e told [CBP that our daughter] was freezing and she needed help. They told us to call 911. We tried to call 911 but we didn't know what address to tell them."). Instead, CBP agents and noncitizens rely on humanitarian volunteers to provide first aid. *See* Alvarez-Lopez Dec. ¶¶ 33-34, 37; *see also* Cheng Dec. ¶¶ 39-41 (CBP agents did not assist dying 13-year-old boy until volunteer doctor requested help); Rios Dec. ¶ 35 (CBP agent asked volunteers to monitor boy with a high fever).

When children are too sick or injured to remain at OADS, volunteers plead with CBP for access to emergency medical services. *See* Pinheiro Dec. ¶ 59; Serrano Dec. ¶¶ 25-30; *see also* Cheng Dec. ¶ 34 ("[W]e had to advocate with Border Patrol just to get them to call for an ambulance, taking precious time and limiting our ability to help other migrants in need."); Jasso Dec. ¶¶ 30-32 (describing volunteer efforts to get Border Patrol to respond to medical emergencies, including a child who suffered an epilepsy attack). Even when people can call for emergency care, ambulances sometimes refuse to come all the way to the OADS in Jacumba because of the remote location and rugged terrain. *See* Pinheiro Dec. ¶¶ 57, 60; Cheng Dec. ¶ 37. Some CBP agents refuse to help transport noncitizens to the ambulances. *See* Cheng Dec. ¶¶ 36-37; Pinheiro Dec. ¶ 57. At Whiskey 8, CBP agents must open a gate to permit ambulances to access noncitizens suffering medical emergencies. *See* Jasso Dec. ¶ 34.

CBP agents have also actively compromised access to medical care. For example, CBP agents regulate access by medical volunteers and have at times barred medical volunteers from the sites. *See* Pinheiro Dec. ¶ 49 ("Volunteer doctors, nurse practitioners, and medical students told me that they have been asked to leave the OADS by Border Patrol, even though Border Patrol is not providing any medical triage or treatment onsite."); Cheng Dec. ¶¶ 24, 44-46 (volunteer doctor provided care through slats in the border wall because Whiskey 8 is located between two border walls in a restricted area); *see also id.* ¶ 35.

CBP further undermines access to medical care by threatening people seeking medical assistance with a loss of the right to seek asylum. *See* Pinheiro Dec. ¶ 56; Alvarez-Lopez Dec. ¶¶ 30, 34; *see also* Rios Dec. ¶ 36 (mother declined recommended medical treatment for herself and one-year-old baby after agents threatened negative immigration consequences if they went to the hospital). CBP agents have also accused noncitizens of faking illness to try to leave OADS. *See* Alvarez-Lopez Dec. ¶¶ 31-32; Pinheiro Dec. ¶¶ 54, 58; Serrano Dec. ¶¶ 25, 29; *see also* Cheng Dec. ¶ 37 ("Border Patrol . . . insisted that migrants fake medical emergencies in order to leave the camps and questioned my triaging and diagnoses of migrants' health conditions.").

**B. CBP Directs Children to OADS and Imposes its Authority There**

CBP instructs children to remain at OADS to await formal processing. In some cases, CBP transports individuals to OADS in CBP vehicles. *See* Jasso Dec. ¶ 8-10; Rios Dec. ¶¶ 16-17; Pinheiro Dec. ¶¶ 24-25; Serrano Dec. ¶¶ 6-7; Cheng Dec. ¶ 14; Alvarez-Lopez Dec. ¶¶ 14, 37. In other instances, CBP provides instructions to walk to specific OADS. *See* Jasso Dec. ¶¶ 9-10; Pinheiro Dec. ¶¶ 25, 39; Rios Dec. ¶¶ 12, 14-15, 41; Serrano Dec. ¶¶ 9-10. CBP also directs groups of noncitizens to follow CBP agents or CBP vehicles to OADS. *See* Pinheiro Dec. ¶ 24; Serrano Dec. ¶ 8; Kahn Dec. ¶¶ 52-53, 98, 115, 117; *see also* E.G. Dec. ¶ 6 ("The agents told us to follow them and they drove here. We walked behind the

van from the wall."); Saulo Dec. ¶ 8 (CBP agents "led us in a group down the mountain towards the camp, lighting the way with their flashlights").

CBP agents decide which noncitizens can remain at which OADS. This sometimes even includes separating families. For example, CBP routinely requires men to move to a site called Spooner's Mesa. *See* Jasso Dec. ¶ 10; Alvarez-Lopez Dec. ¶¶ 10-13; Serrano Dec. ¶ 10; Pinheiro Dec. ¶ 16; Rios Dec. ¶¶ 14-15. CBP has separated fathers from their children to send them to different areas of the same OADS, or to a different OADS. *See* Jasso Dec. ¶ 16. CBP has also separated male children from their parents. *See id.* ¶ 15 ("[A] mother . . . said that Border Patrol agents had separated [her minor son] from her and sent him to the Spooner's Mesa OADS . . . [T]he agent was dismissive of the concerns about separating the mother from her minor child.").

While at OADS, CBP agents instruct everyone present to stay within the site and to wait. *See* Pinheiro Dec. ¶¶ 26-27; E.G. Dec. ¶ 12. They make children and others sit or stand in rows for long periods of time. *See* Rios Dec. ¶¶ 10-11, 37; Jasso Dec. ¶ 13. CBP agents drive through the OADS with ATVs or cars to check that people are following their instructions. *See* Rios Dec. ¶ 11. If people are not seated or standing as instructed, CBP agents yell at everyone, including the children. *See id.*; Alvarez-Lopez ¶ 17.

CBP regularly subjects individuals at OADS, including children, to "counts" wherein they order individuals to stand in rows and then count everyone present. *See* Rios Dec. ¶ 21; Jasso Dec. ¶ 13; Alvarez-Lopez ¶¶ 15-16. CBP agents sometimes conduct counts in the middle of night, forcing people to wake up and leave their makeshift shelters to stand in the cold and rain. *See* Jasso Dec. ¶ 13. Agents have required everyone, including children, to wear only one layer of clothing during the count. *Id.* Parents have pleaded with CBP agents to allow their children to remain asleep under tarps during the count, but CBP agents deny these

requests. *Id.* CBP agents yell at anyone, including children, who attempt to return to their makeshift shelters without permission to leave. *Id.*

Some CBP agents are aggressive and vulgar toward the people they hold at OADS, including children. *See* Kahn Dec. ¶¶ 92-94 (CBP agent directed family to separate and responded aggressively in English when girls pleaded with agent to keep their family together); Rios Dec. ¶ 33 (CBP agent responded to a person asking a question by saying "'I don't give a fuck how long you've been here,' and another said 'get the fuck away from me.'"); Jasso Dec. ¶ 18 (CBP agent began to scream and swear at a woman who did not have her passport when he demanded it.).

## C. Children Must Remain at the OADS Until Processed By CBP

CBP instructs people to stay at their designated OADS and determines whether and when children and adults can leave the site. *See* E.G. Dec. ¶ 12; Saulo Dec. ¶ 19; Pinheiro Dec. ¶¶ 29-30; *see also* Serrano Dec. ¶ 13 ("I witnessed a Border Patrol agent tell a group of migrants that if they did not follow instructions, he would leave them outside to wait to be transported without access to food and water for as long as the agent wanted."). To ensure that people stay within designated OADS, CBP threatens individuals with deportation or other negative immigration consequences if they attempt to leave. *See* Saulo Dec. ¶ 19; Rios Dec. ¶ 36; Pinheiro Dec. ¶¶ 26-27 (at Willows OADS, "Border Patrol agents say [migrants] cannot cross the railroad track, or they will be deported.").

CBP also physically blocks exits to the sites by controlling gates or patrolling the exits on foot and in vehicles.[2] *See* Jasso Dec. ¶ 20 ("At Whiskey 8, all the migrants are stuck behind the secondary border wall."); Kahn Dec. ¶¶ 17, 55, 71, 83-84, 98; *id.* ¶ 26 ("The only way to exit the Willows OADS is by

---

[2] The remote location of the sites, coupled with the dangers that border the OADS, make it virtually impossible to leave. *See* Pinheiro Dec. ¶ 33.

traveling down a dirt road. . . Border Patrol trucks were parked and partially
blocking the road."); Pinheiro Dec ¶ 30 ("[W]henever I drive in and out of
Jacumba to access the camps, I see at least two to five Border Patrol trucks
patrolling the vicinity."); *id.* ¶ 45 ("Near the Willows OADS, there are Border
Patrol trucks always parked under a shade canopy."). CBP has also installed
surveillance towers at the OADS in Jacumba. *See id.* ¶ 28.

CBP agents have intercepted noncitizens who left an OADS and returned
them to the sites. *See* Pinheiro Dec. ¶ 29 ("[T]wo migrants walked out of the Moon
Valley OADS to a nearby gas station to buy supplies. They were apprehended by
Border Patrol and brought back to the Moon Valley OADS."). A CBP agent even
stopped a volunteer doctor they assumed was a noncitizen and told her they would
escort her back to the OADS. *See* Cheng Dec. ¶ 23.

CBP agents have at various times issued wristbands to noncitizens to track
their arrival and length of stay at OADS. *See* Rios Dec. ¶ 19; Jasso Dec. ¶¶ 11-12;
Pinheiro Dec. ¶ 31; Cheng Dec. ¶ 15. The wristbands vary in color to reflect the
date an individual arrived at the OADS. *See* Jasso Dec. ¶ 11. When CBP does not
use wristbands, processing is chaotic and individuals are often processed based on
how quickly they can get in line, rather than how long they have been at the OADS
or whether they are particularly vulnerable. *See* Pinheiro Dec. ¶ 32; Cheng Dec.
¶¶ 17-20. As a result, children and other vulnerable individuals remain at the
OADS for longer periods of time. *See* Pinheiro Dec. ¶ 32; Kahn Dec. ¶ 99; Cheng
Dec. ¶¶ 19, 43.

Although CBP sometimes prioritizes families with young children and other
vulnerable people, this does not appear to be a formal policy and at other times
CBP has processed single adults before families with children. *See* Pinheiro Dec.
¶¶ 31-32; Cheng Dec. ¶¶ 17-18; *see also* Kahn Dec. ¶ 99 (at about 11:45am, a CBP
agent transported out "single adults, most of whom had arrived in the last hour, and
left the families who had been waiting since 1 am behind."); Saulo Dec. ¶ 20

10

("They came a couple hours ago and they were lining everyone up but not the families."). In some cases, CBP agents have refused to prioritize unaccompanied children, even after these children were brought to CBP's attention. *See* Pinheiro Dec. ¶ 14 (CBP agent stated that he would not prioritize adolescents or children over five years old, regardless of whether they were unaccompanied).

CBP appears to exercise discretion as to how quickly it processes individuals out of the OADS. For example, OADS have been cleared quickly in advance of visits from higher-level DHS officials. *See id.* ¶¶ 36-39; *see also id.* ¶ 37 ("In the two to three days before [DHS headquarters staff] arrival, Border Patrol agents processed most migrants out of the Jacumba OADS" and "cleaned the camps of some of the garbage, dismantled some of the makeshift shelters built by migrants, and threw out tents and other shelters our collective had built"). These periods of faster processing then subside, and the cycle of detention continues. *Id.* ¶ 38.

## III.   ARGUMENT

### A. Children at OADS are in the Legal Custody of CBP and are Therefore Entitled to the Protections Guaranteed by the *Flores* Settlement Agreement.

The *Flores* Settlement Agreement protects "[a]ll minors who are detained in the legal custody of the INS." FSA ¶ 10. "Although the Agreement's terms refer to 'INS,' the Immigration and Naturalization Service's obligations under the Agreement now apply to the Department of Homeland Security and the Department of Health and Human Services." *Flores v. Barr*, 934 F.3d 910, 912 n.2 (9th Cir. 2019).  CBP is an agency of the Department of Homeland Security ("DHS"). *See Flores v. Sessions*, 394 F. Supp. 3d 1041, 1047 (C.D. Cal. 2017).

A "motion to enforce [a] settlement agreement essentially is an action to specifically enforce a contract." *Adams v. Johns-Manville Corp.*, 876 F.2d 702, 709 (9th Cir. 1989).  This Court has repeatedly affirmed its jurisdiction to enforce the Settlement and set out the principles for doing so.  *See, e.g., Flores v. Sessions*,

394 F. Supp. 3d at 1048-49.

The Settlement "employs the formal meaning of 'legal custody,' derived from family law, signifying the right and responsibility to care for the well-being of the child and make decisions on the child's behalf." *Flores v. Barr*, 2020 WL 5491445, at *3; *see also Flores v. Garland,* 3 F.4th 1145, 1154-55 (9th Cir. 2021). Children can be in the legal custody of both DHS and their parents. *See id.* at 1155 ("[T]he parents of children in government custody do retain parental rights, and more than one person or entity can have legal custody of a child.").

The Court previously held that children detained under Title 42 of the U.S. Code are *Flores* class members in DHS legal custody because "DHS has the authority to make decisions relating to the welfare and legal status of the children." *Flores v. Barr*, 2020 WL 5491445, at *4. In that case, legal custody was illustrated by DHS's control over "whether, when, and how they apprehend individuals," how minors are processed, "where and under what conditions to detain minors," and "when and whether minors" leave DHS custody. *Id.* at *4-5.

CBP exercises similar decision-making authority over children held in OADS. Children enter CBP's legal custody upon initial discovery and remain in CBP's legal custody until they are formally released or transferred to the custody of another federal agency.

1. CBP has custody of noncitizen children from the moment of first discovery.

CBP authority over a noncitizen child's welfare and legal status begins when CBP agents first encounter the child. When agents find a noncitizen child in the United States and direct them to proceed to and/or to remain in any location, the child is subject to CBP's control and CBP can choose to transport them for formal processing at any time. *See Flores v. Barr*, 2020 WL 5491445, at *4 ("DHS agents have near complete control over whether, when, and how they apprehend individuals" and whether to process them under Title 8 or Title 42).

CBP's decision as to where to hold children and when to process them has profound consequences for children's safety and well-being, especially in light of the dangerous and unsanitary conditions at OADS. *See* Section II(A), *supra*.

The Trafficking Victims Protection Reauthorization Act confirms that CBP's legal powers and responsibilities related to unaccompanied children begin at the time of discovery of the child. *See* 8 U.S.C. § 1232(b)(2) (requiring every federal agency to notify HHS "within 48 hours upon--(A) the apprehension or *discovery* of an unaccompanied alien child") (emphasis added); *see also* 8 U.S.C. § 1232(a)(2)(B) (authorizing "[a]n immigration officer who *finds* an unaccompanied alien child" from a contiguous country "at a land border or port of entry" to determine the child's admissibility and return the child to their country) (emphasis added).

Notably, CBP's own national standards recognize its responsibility to make decisions affecting both accompanied and unaccompanied children's welfare from the moment of initial encounter, stating that "Officers/Agents will consider the best interest of the juvenile *at all decision points beginning at the first encounter* and continuing through processing, detention, transfer, or repatriation." U.S. Customs and Border Protection*, National Standards on Transport, Escort, Detention, and Search*, 4 (Oct. 2015) ["TEDS Manual"] (emphasis added), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf; *see also Flores v. Barr*, 934 F.3d at 916 (approving use of TEDS Manual as evidence of government's own standards).

DHS acknowledges that CBP exercises custodial control over *all* noncitizens it encounters in the United States and instructs to await processing. DHS recently represented to the U.S. Supreme Court that noncitizens encountered by CBP and directed to staging areas for processing have been apprehended and are not free to leave. *See* Reply in Support of Application to Vacate the Injunction Pending Appeal at 19, *DHS v. Texas*, No. 23A607, 2024 WL 145108 (U.S. Jan. 10, 2024)

("Texas is wrong in asserting that Border Patrol has not apprehended noncitizens at the time they cross through the wire and are directed to staging areas for further processing."). The Solicitor General explained:

> Apprehension includes "temporary detainment," and detention includes "[r]estraint from freedom of movement." *Neither requires the kind of physical custody that the district court appeared to demand. Under a correct application of those definitions, the noncitizens were apprehended as they exited the river*: They were not free to proceed further into the United States on their own, but were directed to a staging area for further evaluation and processing, along a narrow direct road bounded by the concertina wire on one side and fencing on the other, in an area with law-enforcement officers present.

*Id.* at 7-8 (internal citations omitted) (emphasis added); *see also* TEDS Manual at 28 ("Physical restraint is not an essential element of detention."). Like individuals apprehended while crossing the Rio Grande River, noncitizens that CBP encounters along the border and directs to wait in OADS have been apprehended and detained.

CBP cannot evade its responsibilities as the legal custodian of the noncitizen children it encounters by holding them in OADS and delaying formal processing. The Settlement explicitly contemplates that children will enter legal custody prior to formal processing and imposes an affirmative duty on CBP to expeditiously process children. *See* FSA ¶ 12.A ("Whenever the INS takes a minor into custody, it shall expeditiously process the minor"); *see also* Section III(D), *infra*.

   2.  CBP has authority to determine where children are detained.

When CBP encounters noncitizen children, CBP "decides where and for how long to hold them," and the child is legally in CBP custody. *Flores v. Garland*, 3 F.4th at 1155. CBP agents take a variety of actions after encountering noncitizens along the border in the San Diego sector to control where they are held. This includes transporting individuals to OADS in CBP vehicles, using CBP vehicles to escort noncitizens to OADS, directing noncitizens to walk to a specific OADS, telling people at OADS to remain there, and separating families into

different OADS. *See* Section II(B), *supra*; *see also* E.G. Dec. ¶¶ 5-6; Saulo Dec. ¶ 8; Pinheiro Dec. ¶¶ 24-25; Serrano Dec. ¶¶ 6-10; Jasso Dec. ¶¶ 8-9, 15-17; Rios Dec. ¶¶ 12, 14-15, 41.

Although physical restraint via transport is not required to show custody, *see* TEDS Manual at 28, it is especially obvious that children are in CBP custody when they are transported to OADS in CBP vehicles. *See* Jasso Dec. ¶ 8-10; Rios Dec. ¶ 16; Pinheiro Dec. ¶¶ 24-25; Serrano Dec. ¶¶ 6-7; Cheng Dec. ¶ 14; Alvarez-Lopez Dec. ¶¶ 14, 37. CBP's transport standards refer to the transport of "detainees" and make clear that noncitizens transported in CBP vehicles are confined. *See* TEDS Manual at 5. These standards do not contemplate the possibility that CBP agents would transport noncitizens who are not detained. *Id.* at 5-8; *see also* Pinheiro Dec. ¶ 24 ("I have been in numerous meetings with DHS leadership where they unequivocally stated that they could not transport migrants unless they were in their custody.").

The Settlement similarly assumes that when CBP transports noncitizen children, the children are in CBP custody. The Settlement restricts the transport of unaccompanied minors with detained adults except in specified circumstances and requires CBP to "take necessary precautions for the protection of the well-being of such minors when transported with adults." FSA ¶ 25. This provision would have little meaning if the children CBP transports are not in its custody.

CBP's authority to decide *where* to hold noncitizens is also plainly illustrated by its practice of family separations. For example, CBP designates certain OADS such as Spooner's Mesa for adult men. *See* Section II(B), *supra*. This results in fathers being separated from their children and at least one instance where a 17-year-old boy was separated from his mother. *See* Jasso Dec. ¶¶ 15-16. That CBP has the power to separate families by sending some family members to different OADS who would otherwise choose to remain together demonstrates its custodial control. *See id.* ¶¶ 15-17, 25; Rios Dec. ¶ 41; Alvarez-Lopez Dec. ¶ 13

("I have witnessed mothers clinging to their sons who are barely adults and begging [CBP] not to separate them.").

### 3. CBP controls conditions at OADS.

CBP's unilateral control over the conditions at OADS further underscores that children held at these sites are in CBP custody. *See Flores v. Barr*, 2020 WL 5491445, at *5 ("DHS also has complete control over where and under what conditions to detain minors under Title 42").

CBP monitors noncitizens at OADS and requires them to comply with CBP orders. *See* Section II(B), *supra*. For example, CBP agents conduct regular "counts" of noncitizens at these sites. *See id.*; *see also* Jasso Dec. ¶ 13; Rios ¶ 21; Alvarez-Lopez ¶¶ 15-16. Even outside of formal counts, CBP agents sometimes subject noncitizens to full-body searches, Jasso Dec. ¶ 19, and instruct noncitizens at the OADS to remain seated and yell at them if they try to move, Rios Dec. ¶ 11; Alvarez-Lopez Dec. ¶ 17. At various times CBP has issued wristbands to monitor when noncitizens entered the OADS. *See* Pinheiro Dec. ¶¶ 31-32; Alvarez-Lopez Dec. ¶ 18; Jasso Dec. ¶¶ 11-12.

CBP also controls children's access to basic needs. CBP provides extremely minimal services such as porta potties, small snacks, minimal water, and mylar blankets. *See* Section II(A), *supra*; *see also* Jasso Dec. ¶¶ 23-24; Rios Dec. ¶¶ 25-27, 30, 32; Serrano Dec. ¶ 19; Alvarez-Lopez ¶¶ 21-22; Kahn Dec. ¶¶ 29, 111. Yet CBP also implicitly recognizes that it is not meeting the basic needs of migrants and depends on the generosity of volunteers to prevent an even greater humanitarian crisis. *See* Serrano Dec. ¶¶ 6, 10, 23; Jasso Dec. ¶¶ 23-25; Rios Dec. ¶ 16; Alvarez-Lopez ¶ 22. CBP nevertheless maintains control over volunteer access, preventing volunteers from entering sites like Spooner's Mesa and at times threatening to arrest volunteers attempting to provide humanitarian assistance at other sites. *See* Serrano Dec. ¶¶ 10, 20-21; Jasso Dec. ¶¶ 24-27; Rios Dec. ¶¶ 7, 23-24; Alvarez-Lopez Dec. ¶¶ 8-9. CBP similarly blocks detainees from leaving

OADS to access basic necessities such as food and water. *See* Jasso Dec. ¶¶ 25-26; *see also* Pinheiro Dec. ¶ 29 (noncitizens were re-apprehended by CBP and returned to OADS after they attempted to leave to buy supplies).

Further, CBP controls noncitizen's access to medical care, including by limiting access to emergency services and threatening families with negative immigration consequences for seeking emergency services. *See* Section II(A)(4), *supra*; Cheng Dec. ¶¶ 34-37, 44-46; Rios Dec. ¶ 36; Pinheiro Dec. ¶¶ 49-52, 54, 56.

4. <u>CBP unilaterally determines when noncitizens can leave OADS.</u>

Finally, CBP controls how long children remain in OADS before they are transported for formal processing. As in the Title 42 context, there appear to be no formal limits on children's length of stay in OADS. *See* Pinheiro Dec. ¶ 13; *see also Flores v. Barr*, 2020 WL 5491445, at *5 ("DHS has wide discretion to determine when and whether minors held under Title 42 leave their custody."). Children have been held at OADS overnight and sometimes for multiple days before CBP transports them for formal processing. *See* Pinheiro Dec. ¶¶ 12-14; Rios Dec. ¶¶ 19-20; Cheng Dec. ¶ 12; Serrano Dec. ¶ 18. At other times, CBP has rapidly processed all noncitizens out of OADS, seemingly in response to upcoming high-level visits or formal complaints. *See* Pinheiro Dec. ¶¶ 36-39.

CBP instructs people to remain in OADS and regularly threatens noncitizens with immigration consequences if they try to leave. *See* Section II(A)(4), (C), *supra*; *see also* Pinheiro Dec. ¶¶ 26-27; Serrano Dec. ¶¶ 9, 12; Saulo Dec. ¶ 19. CBP agents have even told volunteers that they believe individuals may fake medical emergencies to leave the OADS. *See* Alvarez-Lopez Dec. ¶¶ 32-33; Serrano Dec. ¶ 29; Cheng Dec. ¶ 37. That CBP agents express this concern demonstrates that neither CBP nor those they hold at OADS believe that noncitizens are free to leave on their own.

Indeed, at the San Ysidro OADS, noncitizens are physically fenced in and monitored by CBP agents, making it unfeasible to leave without CBP permission. *See* Jasso Dec. ¶ 20; Rios Dec. ¶ 6. At the Jacumba OADS, CBP has installed surveillance towers and CBP agents patrol the area on trucks and are regularly present onsite. *See* Pinheiro Dec. ¶¶ 14, 25, 28, 30-31, 45; Kahn Dec. ¶¶ 26, 33, 51-55, 62, 69, 71, 83-85, 98; Cheng Dec. ¶ 17. CBP has returned noncitizens who attempted to leave the OADS. *See* Pinheiro Dec. ¶ 29; *cf.* Cheng Dec. ¶ 23. CBP controls when noncitizen children are able to leave, and these children rightly believe that they must remain at the OADS until CBP decides to process them.[3]

CBP's control over where and under what conditions children are held and when children are allowed to leave OADS plainly demonstrates that CBP has "the authority to make decisions relating to the welfare and legal status of the children," *Flores v. Barr*, 2020 WL 5491445, at *4, from the moment of first encounter until the children's release or transfer to another agency.

**B. CBP Maintains OADS in Unsafe and Unsanitary Conditions Inconsistent with a Concern for the Particular Vulnerability of Minors.**

The Settlement requires CBP to "hold minors in facilities that are safe and sanitary and that are consistent with [CBP's] concern for the particular vulnerability of minors." FSA ¶ 12.A; *see also Flores v. Barr*, 2020 WL 5491445, at *8 n.9 (noting that Settlement requires a "setting appropriate to the minor's age and special needs" and "special concern for their particular vulnerability as minors") (citing FSA ¶¶ 11-12.A)). Specifically, Paragraph 12.A requires Defendants to "provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services,

---

[3] Even if it were theoretically possible for a child to leave an OADS, secure detention has never been a requirement for legal custody under the Settlement. Rather, the Settlement explicitly provides for non-secure custody. *See* FSA ¶ 6.

adequate temperature control and ventilation, [and] adequate supervision to protect minors from others . . ..”

In its June 2017 order, the Court found that the conditions in CBP stations in the Rio Grande Valley Sector (“RGV Sector”) were unsafe and unsanitary. *See Flores v. Sessions*, 394 F.Supp.3d at 1053-61. The Ninth Circuit agreed, explaining that “[a]ssuring that children eat enough edible food, drink clean water, are housed in hygienic facilities with sanitary bathrooms, have soap and toothpaste, and are not sleep-deprived are without doubt essential to the children's safety.” *Flores v. Barr*, 934 F.3d at 916 .

CBP's abdication of its duties at OADS is far worse than CBP's “egregious” failure to adequately feed children in the RGV Sector. *See id.* At OADS, CBP provides *no* meals. *See* Section II(A)(3), *supra*; *see also* E.G. Dec. ¶ 10; Alvarez-Lopez Dec. ¶¶ 21-22. When CBP provides drinking water, it provides insufficient amounts at best. *See* Alvarez-Lopez Dec. ¶¶ 21-22; Pinheiro Dec. ¶ 44; Rios Dec. ¶¶ 25-27, 32.

This Court previously found that safe and sanitary conditions require basic hygiene products like soap, towels, showers, dry clothing, and toothbrushes, and sleeping space. *See Flores v. Sessions*, 394 F.Supp.3d at 1053-61. Yet CBP does not even provide *shelter* at OADS, let alone hygiene products, showers, or dry clothing. *See* Section II(A), *supra*; *see also* E.G. Dec. ¶¶ 9, 11; Alvarez-Lopez Dec. ¶¶ 23-27; Kahn Dec. ¶¶ 12, 58, 63, 79, 105. The only toilets available are unsanitary porta potties. *See* Section II(A)(2), *supra*. If the conditions in the RGV Sector did not comply with the Settlement, conditions in the OADS are plainly noncompliant.

Moreover, OADS are affirmatively dangerous places to detain children. It is impossible to comply with the Settlement's requirement of “adequate temperature control,” FSA ¶ 12.A, when children are left to sleep outdoors. Children have had to seek emergency medical care due to the extreme cold temperatures. *See* Pinheiro

Dec. ¶ 15; Saulo Dec. ¶¶ 13-17. CBP fails to provide any medical care and sometimes *impedes* emergency medical care. *See* Section II(A)(4), *supra*; *see also* Pinheiro Dec. ¶¶ 49, 51, 54. CBP does not supervise minors—including unaccompanied children—even if they become ill or have other urgent needs. *See, e.g.*, Pinheiro Dec. ¶ 13; Rios Dec. ¶ 35; Alvarez-Lopez Dec. ¶ 34.

Being held in OADS is also terrifying, particularly for children. *See* Kahn Dec. ¶ 42 ("Some of the children were clinging to their mothers and crying. Everyone I spoke to expressed fear, especially about being separated."); Rios Dec. ¶ 42 ("[I]n the night, the children cry. . . . [T]he adults have a way to cope, but the children are scared."); Pinheiro Dec. ¶ 53 (migrants appeared to experience panic attacks because "they did not know how long they would have to remain at the OADS."). The dangerous environment CBP has created at OADS is fundamentally inappropriate for any child and in no way complies with the Settlement's requirements for safe and sanitary conditions.

### C. CBP Separates Children from their Families and Fails to Ensure Contact with Family Members

Paragraph 12.A of the Settlement requires Defendants to ensure that children have "contact with family members who were arrested with the minor." At OADS, CBP separates children from family members and does not ensure continuing contact. *See* Section II(B), *supra*. Children separated from their families are not informed of their right to communicate with their families, nor are they told what is happening, where their families have been sent, or if they will ever see them again. *See* Pinheiro Dec. ¶ 23; Jasso Dec. ¶¶ 15-17; Kahn Dec. ¶¶ 42, 92-94.

### D. CBP Fails to Expeditiously Process Class Members

Paragraph 12.A of the Settlement provides that "[w]henever [CBP] takes a minor into custody, it shall expeditiously process the minor." In violation of the Settlement, CBP fails to expeditiously process children and instead holds them in OADS for indefinite periods of time. The time children have been held can range

from several hours to several days. *See* Section II, *supra*; Pinheiro Dec. ¶¶ 12-14; Cheng Dec. ¶ 12. CBP appears to have no set time limit on children's detention in OADS prior to formal processing and no clear policy to ensure children are expeditiously processed. *See* Pinheiro Dec. ¶¶ 13-14; Saulo Dec. ¶ 20; Cheng Dec. ¶¶ 17-19; Kahn Dec. ¶ 99; Alvarez-Lopez Dec. ¶ 39.

## IV.   CONCLUSION

Plaintiffs respectfully request that the Court grant this motion and order Defendants to comply with the Settlement with respect to all class members held at OADS.


Dated: February 29, 2024       CENTER FOR HUMAN RIGHTS AND
                               CONSTITUTIONAL LAW
                               Carlos R. Holguín
                               Sarah Kahn

                               NATIONAL CENTER FOR YOUTH LAW
                               Mishan Wroe
                               Diane de Gramont

                               CHILDREN'S RIGHTS
                               Leecia Welch


                               */s/ Mishan Wroe*
                               Mishan Wroe
                               *One of the Attorneys for Plaintiffs*