BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director
SARAH B. FABIAN
Senior Litigation Counsel
FIZZA BATOOL
JOSHUA C. MCCROSKEY
Trial Attorneys
United States Department of Justice
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: 202-616-4863
Facsimile: 202-305-7000
Email: fizza.batool2@usdoj.gov
*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | Case No. 2:85-cv-04544-DMG |
| Plaintiffs, | |
| v. | **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE, ECF NO. 1392** |
| MERRICK GARLAND, Attorney General of the United States, *et al.*, | Hearing Date: March 29, 2024 |
| Defendants. | Time: 9:30 a.m. |
| | Hon. Dolly M. Gee |

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................1

II. BACKGROUND ...................................................................................3

    A. Statutory Background .......................................................................3

    B. Factual Background ..........................................................................4

    C. Plaintiffs' MTE .................................................................................8

III. ARGUMENT .......................................................................................9

    A. This Court Lacks Jurisdiction Over Plaintiffs' MTE ..............................9

        1. USBP Has Not Arrested or Apprehended Minors in these Areas ....9

        2. USBP Does Not Have Legal Custody Over Minors in these
           Areas.................................................................................13

    B. Defendants Should Not Be Required to Implement the Procedures
        Requested by Plaintiffs.......................................................22

IV. CONCLUSION ....................................................................................24

CERTIFICATE OF SERVICE.....................................................................26

i

# TABLE OF AUTHORITIES

## CASES

*Barton v. Barr*,
    140 S. Ct. 1442 (2020)..................................................................... 3

*Evans v. City of Bakersfield*,
    22 Cal. App. 4th 321, 27 Cal. Rptr. 2d 406 (1994)...........................11

*Flores v. Barr*,
    407 F. Supp. 3d 909 (C.D. Cal. 2019)...........................................1, 10

*Flores v. Barr*,
    No. 85-4544-DMG, 2020 WL 5491445 (C.D. Cal. Sept. 4, 2020).........13, 14, 20

*Flores v. Lynch*,
    828 F.3d 898 (9th Cir. 2016) ...........................................................16

*Flores v. Sessions*,
    394 F. Supp. 3d 1041 (C.D. Cal. 2017)............................................. 2

*Florida v. Bostick*,
    501 U.S. 429 (1991) ...........................................................11, 12, 13

*Founding Members of the Newport Beach Country Club v. Newport Beach
    Country Club, Inc.*,
    109 Cal. App. 4th 944 (Cal. Ct. App. 2003).......................................10

*I.N.S. v. Delgado*,
    466 U.S. 210 (1984) ........................................................................12

*In re Tony C.*,
    21 Cal.3d 888, 148 Cal. Rptr. 366, 582 P.2d 957 (1978)....................11

*Orr v. Bank of America, NT & SA*,
    285 F.3d 764 (9th Cir. 2002) ..........................................................15

*DHS v. Thuraissigiam*,
    140 S. Ct. 1959 (2020)..................................................................... 3

*United States v. Armour & Co.*,
    402 U.S. 673 (1971) ........................................................................10

ii

*United States v. Asarco, Inc.*,
    430 F.3d 972 (9th Cir. 2005) ............................................................................10

## FEDERAL STATUTES

6 U.S.C. § 211(c)(8) ........................................................................................ 3

6 U.S.C. § 211(e)(3)(A)-(B) ............................................................................ 3

8 U.S.C. § 1103 ............................................................................................... 3

8 U.S.C. § 1103(a)(3) ...................................................................................... 3

8 U.S.C. § 1103(a)(5) ...................................................................................... 3

8 U.S.C. § 1225(a)(1) ...................................................................................... 3

8 U.S.C. § 1225(a)(3) ...................................................................................... 3

8 U.S.C. § 1226 ............................................................................................... 3

8 U.S.C. § 1232 .............................................................................................16

8 U.S.C. § 1357(a)(1)-(2) ............................................................................... 4

## FEDERAL RULES OF EVIDENCE

FRE 801(c) ....................................................................................................15

FRE 802 .........................................................................................................15

## FEDERAL REGULATIONS

8 C.F.R. § 287.1(c) .......................................................................................... 4

## STATE CODES

Cal. Penal Code § 834 ..............................................................................10, 11

Cal. Civ. Code § 1636 ....................................................................................10

1

**MISCELLANEOUS**

*DHS v. Texas*,
   No. 23A607, 2024 WL 51018 (U.S. Jan. 2, 2024) ...............................................17

*DHS v. Texas*,
   No. 23A607, 2024 WL 145108 (U.S. Jan. 10, 2024) .........................................17

National Standards on Transport, Escort, Detention, and Search ("TEDS") (Oct.
   2015), https://www.cbp.gov/sites/default/files/assets/ documents/2020-Feb/cbp-
   teds-policy-october2015.pdf (last visited Mar. 4, 2024)....................................16

## I.   <u>INTRODUCTION</u>

On February 29, 2024, Plaintiffs filed a Motion to Enforce Settlement Regarding Open-Air Detention Sites ("MTE") alleging violations of the *Flores* Settlement Agreement ("FSA" or "Agreement") and seeking an order against Defendants U.S. Department of Homeland Security ("DHS") and U.S. Customs and Border Protection ("CBP"). ECF No. 1392-1. Plaintiffs allege that CBP has been "holding *Flores* class members outdoors in open-air detention sites ("OADS") along the U.S. border in extraordinarily unsafe and unsanitary conditions." *Id.* Plaintiffs contend that minors in these areas are in the legal custody of CBP and are therefore entitled to protections under the Agreement. *Id.* This Court should deny Plaintiffs' MTE because *Flores* obligations have not been triggered and Plaintiffs' proposed relief is unwarranted.

As an initial matter, this Court lacks jurisdiction over Plaintiffs' claims because the minors in these areas—close to the California-Mexico border—have not been arrested or apprehended by CBP and are not in the legal custody of CBP. Therefore, these minors are not *Flores* class members. The Agreement defines *Flores* class members as "[a]ll minors who are detained in the legal custody of the [Immigration and Naturalization Service ("INS")]." FSA at ¶ 10. Before an individual is detained, he or she must first be arrested or apprehended. And detention is a prerequisite to legal custody. But, here, Plaintiffs contend that CBP has legal custody of minors who have not yet been arrested or apprehended. Moreover, Plaintiffs attempt to insert new terms and procedures into the Agreement despite this Court's prior rulings regarding the binding contractual nature of a consent decree. *Flores v. Barr*, 407 F. Supp. 3d 909, 931 (C.D. Cal. 2019).

CBP's efforts to provide certain limited amenities and services prior to minors' arrest and apprehension do not trigger *Flores* obligations. CBP recognized humanitarian concerns and, together with the assistance of volunteers, sought to alleviate such concerns to the best of its ability when it could not immediately arrest

1

or apprehend minors due to a surge in migration. CBP's provision of that humanitarian assistance does not mean the noncitizens are in CBP's custody.  CBP has been apprehending and transporting minors to safe and sanitary U.S. Border Patrol ("USBP") facilities in a prompt manner.  But until that occurs, Plaintiffs are not in DHS custody.

Further, the Court should decline Plaintiffs' proposed relief as it is outside the four corners of the Agreement, inconsistent with the Agreement, and in some instances superfluous. Plaintiffs' proposed order, ECF No. 1392-2, would have the Court order extensive procedural relief that is outside the scope of the Agreement. This Court has already held that procedural remedies are not available to Plaintiffs for violations of the Agreement. *See* ECF No. 470 (July 30, 2018) at 2-3 (concluding that Plaintiffs are entitled to only such relief as is explicitly or implicitly authorized by the Agreement and not procedural remedies that are not set forth in the FSA). Despite this previous ruling, Plaintiffs' MTE asks the Court to order Defendants to apply a novel standard—found nowhere in the Agreement—for the apprehension of minors and asks the Court to impose an arbitrary "two hours after first discovery by DHS" record-keeping process that is similarly unsupported. ECF No. 1392-2 at ¶ 4. The Agreement did not contemplate, nor does it reflect any meeting of the minds regarding, "discovery" of minors. Indeed, the term itself is nowhere to be found in the Agreement. Plaintiffs also seek coercive remedies such as monthly reporting for six months that go beyond the monitoring provisions of the Agreement, *see id.*, despite having made no showing that Defendants are in violation of the Agreement. *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1048–50 (C.D. Cal. 2017). This Court has previously declined to order remedies that are outside of the four corners of the Agreement, and it should again decline to do so here.

## II.  **BACKGROUND**[1]

### A. **Statutory Background**

The Secretary of Homeland Security has "the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of [noncitizens]."  8 U.S.C. § 1103(a)(5).[2]  The Secretary may "establish such regulations" and "perform such other acts as he deems necessary for carrying out his authority under" the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1103(a)(3). CBP, an agency within DHS, is charged with "enforc[ing] and administer[ing] all immigration laws," including "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal. . . and transfer of persons unlawfully entering. . . the United States." 6 U.S.C. § 211(c)(8). USBP is "the law enforcement office of [CBP] with primary responsibility for interdicting persons attempting to illegally enter. . . the United States" and for "deter[ring] and prevent[ing] the illegal entry of terrorists, terrorist weapons, persons, and contraband." 6 U.S.C. § 211(e)(3)(A)-(B).

Congress has provided that a noncitizen "present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival. . .)" is "deemed. . . an applicant for admission." 8 U.S.C. § 1225(a)(1); *see also DHS v. Thuraissigiam*, 140 S. Ct. 1959, 1982 (2020) ("[a noncitizen] who tries to enter the country illegally is treated as an 'applicant for admission'" with certain statutory rights). The INA authorizes immigration officers to "inspect[]" all such applicants. 8 U.S.C. § 1225(a)(3); *see also* 8 U.S.C. § 1226

---

[1] Given the history of the *Flores* litigation and this Court's familiarity with this case, Defendants provide a summary tailored to the issues presented by Plaintiffs' recent MTE, ECF No. 1392-1.

[2] Federal law refers to non-U.S. citizens or nationals as "aliens." 8 U.S.C. § 1103. The Department of Homeland Security typically refers to such persons as noncitizens. *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020).

3

(authorizing apprehension and detention). Border Patrol agents have authority, without a warrant, "to interrogate any [noncitizen] or person believed to be [a noncitizen] as to his right to be or to remain in the United States" and "to arrest any [noncitizen] who in his presence or view is entering or attempting to enter the United States in violation of any law" where the individual is likely to abscond. 8 U.S.C. § 1357(a)(1)-(2). And Congress has specifically directed that "within a distance of twenty-five miles from any" external boundary to the United States, Border Patrol agents shall "have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of [noncitizens] into the United States." 8 U.S.C. § 1357(a)(3).[3]

## B. Factual Background

The USBP San Diego Sector ("SDC") encompasses 56,831 square miles, including 931 miles of coastal border, from the California border with Mexico north to Oregon. *See* Declaration of Brent L. Schwerdtfeger ("Schwerdtfeger Decl.") ¶ 3, attached hereto as Defs.' Ex. A. SDC has seven stations: Imperial Beach, Chula Vista, Brown Field, Campo, Boulevard, San Clemente, and Newton-Azrak. *Id.* SDC also operates the San Diego Area Detention Facility, a temporary soft-sided structure ("soft-sided facility") designed to increase the detention capacity and processing capability within SDC. *Id.* SDC has a total detention capacity of 2,716 across all facilities, including all stations and the soft-sided facility, and currently employs approximately 1,847 Border Patrol agents. *Id.*

Border Patrol agents identify, track, and arrest persons suspected of making unlawful entry into the United States. *Id.* ¶ 4. As part of these duties, Border Patrol agents conduct a "field interview" to determine whether an individual they encounter

---

[3] "[P]atrolling the border to prevent the illegal entry of [noncitizens] into the United States. . . means conducting such activities as are customary, or reasonable and necessary, to prevent the illegal entry of [noncitizens] into the United States." 8 C.F.R. § 287.1(c).

4

is a noncitizen who entered the United States unlawfully. *Id.* ¶ 5. The field interview consists of either a consensual encounter where the agents question the individual regarding their nationality and immigration status, or an investigative stop based on reasonable suspicion of an immigration violation. *Id.* If the agents establish probable cause to believe the individual is subject to arrest, the individual is at that point arrested and transported to a facility for processing. *Id.* Processing includes conducting background checks, obtaining biometric data, and determining the administrative pathway for the disposition of the individual's case. *Id.*

Around October 2022, large groups of individuals began to unlawfully enter the United States from Mexico between the ports of entry within the Imperial Beach Station's ("IMB") area of responsibility, an area west of the San Ysidro Port of Entry and within five miles of the Pacific Ocean coastline. *Id.* ¶¶ 6, 7. Eventually, the number of individuals arriving exceeded IMB's ability to immediately conduct a field interview and arrest them, due to constraints in detention capacity, staffing, and transportation. *Id.* ¶ 6. The detention capacity at IMB is approximately 205 individuals. *Id.* And, beginning in January 2023, SDC had seven buses available for large group transportation across the entire Sector. *Id.* The maximum capacity based on the safety rating for each bus is no more than 47 passengers. *Id.* From March through December 2023, IMB alone made over 71,000 arrests, accounting for approximately 32 percent of SDC's total arrests in that time. *Id.* In fiscal year 2023 (October 2022 to September 2023), IMB arrested 255 unaccompanied noncitizen children ("UCs") and 5,366 noncitizens in family units. *Id.* A family unit is defined as one or more noncitizen children under the age of 18 with one or more of their noncitizen parent(s) or legal guardian(s). *Id.* In fiscal year 2024 (beginning in October 2023), IMB has arrested 411 UCs and 3,588 persons in family units. *Id.*

The groups of individuals arriving in IMB consisted of dozens to hundreds of individuals, who unlawfully entered the United States by crossing the primary fence on the border with Mexico using ladders or other means. *Id.* ¶ 7. Such individuals

5

are often believed to be assisted by cartel-affiliated smuggling organizations. *Id.* Over time, large groups of individuals began to concentrate primarily in two locations within IMB's area of operations known as Whiskey 4 ("W4") and Whiskey 8 ("W8"). *Id.* ¶ 8. Individuals have also entered and congregated in areas known as Spooner's Mesa and 91X. Spooner's Mesa is approximately one mile to the west of W8 and 91X is approximately two and one-third miles to the west of W8. *Id.*

At W4, there is an International Boundary Barrier ("IBB") consisting of a 30-foot-high primary fence on the south side of the Tijuana River on the border with Mexico. *Id.* ¶ 9. At W8, the IBB consists of a 30-foot-high primary fence and a 30-foot-high secondary fence that run parallel to each other along the boundary line between the United States and Mexico. *Id.* ¶ 10. The area between the fences at W8—which is restricted to authorized personnel with "No-trespassing" signage posted—ranges in size from about 60 feet wide to about 120 feet wide, depending on the location. *Id.* Individuals arriving in the area of W4 and W8 as part of these large groups who surmounted the primary fence generally remained in the area in which they entered until Border Patrol agents conducted a field interview, arrested them, and transported them to a USBP facility for processing. *Id.* ¶ 11.

Beginning in approximately March 2023, large groups of individuals also began to arrive in Jacumba, California, an area along the international boundary between the United States and Mexico approximately 60 miles east of the Pacific Ocean coastline. *Id.* ¶ 12. Both the Boulevard Station ("BLV") and Campo Station ("CAO") areas of responsibility encompass parts of Jacumba. *Id.* Similar to what occurred at IMB, the number of individuals arriving in large groups exceeded CAO's and BLV's ability to immediately conduct a field interview and arrest them, due to constraints in detention capacity, staffing, and transportation. *Id.* The detention capacity at BLV is approximately 207 individuals and at CAO is approximately 246 individuals. *Id.* As noted above, during this period, SDC had approximately seven buses available for large group transportation across the entire Sector, with a

maximum capacity of 47 passengers per bus. *Id.* From March through December 2023, CAO and BLV combined made over 96,000 arrests, accounting for nearly 43 percent of SDC's total arrests in that time. *Id.* In September 2023, BLV and CAO made nearly 11,000 arrests for the month, and arrests increased each subsequent month to over 20,400 arrests in December 2023. *Id.* The December 2023 arrests by CAO and BLV accounted for nearly 60 percent of SDC's total arrests that month. *Id.* In fiscal year 2023 (October 2022 through September 2023), CAO and BLV combined arrested 130 UCs and 3,972 persons in family units. *Id.* In fiscal year 2024 (beginning October 2023), CAO and BLV combined have arrested over 697 UCs and 13,274 persons in family units. *Id.*

In the Jacumba area, the IBB consists of a single 30-foot-high fence along the international boundary between the United States and Mexico, with no secondary fence. *Id.* ¶ 13. Therefore, once individuals have entered the United States across the IBB in the Jacumba area, there is no further fencing restricting their movement. *Id.* Again, many of the individuals entering in large groups are believed to be assisted by cartel-affiliated smugglers who guide their unlawful entry into the United States. *Id.* As in IMB, these large groups arrived in numbers that exceeded USBP's ability to immediately conduct a field interview and arrest them. *Id.* Accordingly, individuals began to congregate primarily in four locations known to SDC as the 75 Road, 177 Tower, Willows, and 121 Tower in Zone 28. *Id.* The area known as "Moon Valley" or "Valley of the Moon Trail" was not an area that large groups typically congregated. *Id.* The closest USBP Stations are BLV and CAO, within approximately nine miles and twenty-one miles, respectively, from the locations where individuals congregated. *Id.* Similar to the IMB area, individuals congregating in Jacumba generally remained in the area in which they entered until Border Patrol agents conducted a field interview, arrested them, and transported them to a USBP facility for processing. *Id.* ¶ 14.

Congregation at any of the locations in IMB or Jacumba is believed to occur under the direction of smugglers. *Id.* ¶ 15. SDC does not have a policy or practice of directing or encouraging individuals to go to these locations, and does not have a policy or practice of transporting or guiding individuals to these locations to await arrest, transport, and processing. *Id.*

In 2023, Border Patrol agents generally arrested noncitizens that comprised the large groups within 24 hours of their encounter. Currently and throughout 2024, large groups of individuals arriving in the IMB and Jacumba areas are generally arrested within 12 hours of encounter. *Id.* ¶¶ 11, 14, 27. Border Patrol agents prioritize interviewing, arresting, and transporting vulnerable populations (UCs, family units, pregnant individuals, and the elderly or infirm) from the field to the nearest USBP station for processing as soon as possible. *Id.* ¶¶ 19, 22, 24, 31.

## C. **Plaintiffs' MTE**

On February 29, 2024, Plaintiffs filed an MTE alleging that, since February 2023, CBP has been "holding *Flores* class members outdoors in open-air detention sites ("OADS") along the U.S. border in extraordinarily unsafe and unsanitary conditions," for "several hours to several days" before transporting them to "brick-and-mortar facilities for formal processing" in violation of Paragraph 12.A. of the Agreement. ECF No. 1392-1, at 1-2. Plaintiffs argue that minors in these sites are in the legal custody of CBP and are therefore entitled to protections under the Agreement. *Id.* Plaintiffs allege that they are currently aware of seven sites within California, in CBP's San Diego Sector: "Four of the OADS—Whiskey 8, Whiskey 4, Spooner's Mesa, and 91X—are located west of the San Ysidro Port of Entry between the primary and secondary U.S. border walls. [] The other three OADS—Moon Valley, Tower 177, and Willows—are located outside the remote desert town of Jacumba and are monitored by CBP agents and surveillance towers." *Id.* at 2-3

(internal citations omitted). Plaintiffs assert that "[a]ll of these sites are under CBP control." *Id.* at 3.

Plaintiffs further assert that minors are held in unsafe and unsanitary conditions at these sites. *Id.* 3-7. Specifically, Plaintiffs allege that CBP does not provide shelter to minors, and volunteers have provided tents and tarps, but there are not enough. *Id.* at 3. Plaintiffs allege that minors are exposed to harsh fluctuations in temperature, and individuals have burned brush and garbage to stay warm. *Id.* at 4. Plaintiffs allege that "[t]here are no permanent toilets or showers," at these sites, and CBP does not provide basic hygiene items. *Id.* Plaintiffs allege that CBP does not provide adequate and consistent food and water, and CBP "depends on volunteers to provide basic provisions" for individuals at these sites. *Id.* at 5. Plaintiffs allege that CBP does not provide first aid or medical care for minors at these sites, and CBP "rel[ies] on humanitarian volunteers to provide first aid." *Id.* at 6. Plaintiffs contend that CBP directs minors to these sites, asserts its authority at these sites, and does not permit individuals to leave these sites. *Id.* at 7-10.

## III. <u>ARGUMENT</u>

### A. <u>This Court Lacks Jurisdiction Over Plaintiffs' MTE.</u>

This Court should deny Plaintiffs' MTE.  Federal immigration law provides CBP with wide discretion in carrying out its law enforcement duties for the arrest and apprehension of noncitizens.  And the Agreement does not encompass—and it was not intended to encompass—the process and procedures prior to and for the arrest and apprehension of minors. The Agreement "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS." FSA ¶ 10. With regards to minors at issue in the MTE, the *Flores* obligations provided under the Agreement have not been triggered because USBP has not arrested or apprehended any of the minors, nor has USBP assumed legal custody of such minors. Plaintiffs' MTE would impose *Flores* obligations *before* minors have even

been arrested or apprehended by USBP, without considering the legal and practical implications. The Court should reject such claims.

### 1.   USBP Has Not Arrested or Apprehended Minors in these Areas.

This Court has recognized that "[t]he *Flores* Agreement is a binding contract and a consent decree"; "[i]t is a creature of the parties' own contractual agreements and is analyzed as a contract for purposes of enforcement." *Flores v. Barr*, 407 F. Supp. 3d 909, 931 (C.D. Cal. 2019). Like a contract, a consent decree "must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 681 (1971); *United States v. Asarco, Inc.*, 430 F.3d 972, 980 (9th Cir. 2005) (a consent decree "must be discerned within its four corners, extrinsic evidence being relevant only to resolve ambiguity in the decree."). The "basic goal of contract interpretation" is to give effect to the parties' mutual intent "at the time of contracting." *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.,* 109 Cal. App. 4th 944, 955 (Cal. Ct. App. 2003) (citing Cal. Civ. Code § 1636).

The Agreement defines *Flores* class members as "[a]ll minors who are detained in the legal custody of the INS." FSA ¶ 10. Further, Paragraph 12.A. specifically provides that "*[f]ollowing arrest*, the [DHS] shall hold minors in facilities that are safe and sanitary and that are consistent with the [DHS]'s concern for the particular vulnerability of minors." FSA ¶ 12.A. (emphasis added). Black's Law Dictionary defines arrest as "[a] seizure or forcible restraint [especially] by legal authority," and "the apprehension of someone for the purpose of securing the administration of the law [especially] of bringing that person before a court." Black's Law Dictionary (11th ed. 2019). Similarly, the California Penal Code defines arrest as "taking a person into custody, in a case and in the manner authorized by law." *See* Cal. Penal Code § 834 (West). It is made by "an actual restraint of the person, or by submission to the custody of an officer. The person arrested may be subjected to

10

such restraint as is reasonable for his arrest and detention." *Id.* § 835. A detention occurs "if the suspect is not free to leave at will—if he is kept in the officer's presence by physical restraint, threat of force, or assertion of authority." *Evans v. City of Bakersfield*, 22 Cal. App. 4th 321, 330, 27 Cal. Rptr. 2d 406, 411 (1994) (citing *In re Tony C.*, 21 Cal.3d 888, 895, 148 Cal. Rptr. 366, 582 P.2d 957 (1978).)).

In SDC, when encountering an individual, Border Patrol agents first conduct a "field interview" to ask questions pertaining to the individual's nationality and immigration status to determine if the individual is subject to arrest under the federal immigration laws. Schwerdtfeger Decl. ¶ 5. If a Border Patrol agent has probable cause to believe that the individual is subject to arrest, then *at that point*, the individual is arrested and transported to the nearest station or soft-sided facility for processing. *Id.* Processing includes conducting background checks, obtaining biometric data, and determining the administrative pathway for the disposition of the individual's case. *Id.* Here, given the large number of individuals arriving in the IMB and Jacumba areas, Border Patrol agents could not immediately conduct a field interview and arrest individuals due to constraints in detention capacity, staffing, and transportation. *Id.* ¶¶ 6, 12, 16.

Prior to a field interview and arrest, minors are not detained in the legal custody of DHS. FSA ¶ 10; *see also* Schwerdtfeger Decl. ¶¶ 11, 14. Relevant to the parties' understanding of the Agreement, Fourth Amendment case law developed in the 1980s and 1990s explains that an individual is detained by the government "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty" of an individual. *Florida v. Bostick*, 501 U.S. 429, 433–34 (1991) (internal quotation marks and citation omitted). "[A] court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Id.* at 439–40. In *Bostick*, police interacted with passengers on a bus that was about to

depart. *Id.* at 436. The Supreme Court held that a passenger on the bus may have felt confined, but he felt that way because he did not want to miss the departure of the bus, not because of police coercion. *Id.* Thus, his freedom of movement "was restricted by a factor independent of police conduct." *Id.* at 436–37.

Moreover, government agents may interact with and question individuals without detaining them. *See I.N.S. v. Delgado*, 466 U.S. 210, 215–17 (1984). In *Delgado*, INS agents systematically questioned workers at a factory while other agents were stationed at the doors to the building. *Id.* at 217–18. The Supreme Court found that there was no seizure because the workers continued to be free to move about their workplace. *Id.* at 218. The Supreme Court noted that the agents at the doors simply made sure that everyone was questioned and did not appear to prevent anyone from leaving. *Id.* The Court reasoned that the workers may have felt obligated to stay at the factory, but that obligation came from their employment, not from the INS agents. *Id.* While the INS may have apprehended individuals who fled, the Court held that the detention of those individuals did not mean that everyone else at the factory was detained. *Id.* at 220–21.

Here, individuals who have unlawfully crossed the border and seek to be processed may wish to stay in one of these areas near IMB or Jacumba, but any compulsion they may subjectively feel does not come from USBP's physical force or display of authority. If an individual decided to leave one of those areas, "there is no direct consequence for such an action, but if they are encountered by USBP, they, like any individual suspected of unlawfully entering the United States, may be subject to a field interview and when appropriate, arrest." Schwerdtfeger Decl. ¶ 18. Individuals appear to be staying in these areas for reasons independent of agency conduct, such as the provision of supplies from volunteers, and the desire to be arrested and processed by USBP. Even in areas where there are no fences or other barriers restricting their movement, the individuals congregating in IMB and

Jacumba generally wait to be arrested and do not further their entry into the United States. *Id.* ¶ 18.

While Border Patrol agents often patrol these areas, they do so pursuant to their statutory duties and obligations as they are "responsible for safeguarding all areas between the ports of entry." *Id.* ¶ 4. USBP is tasked with the deterrence, detection, and arrests of terrorists, undocumented noncitizens, and human smugglers who are entering or attempting to enter the United States, and with seizing terrorist-related weapons, illicit drugs, and other contraband. *Id.* However, patrol and surveillance of the border alone does not trigger arrest or detention. While individuals who attempt to further their entry into the United States may be subject to arrest and detention, like *Delgado*, this does not mean that USBP has arrested and detained individuals who voluntarily choose to remain in these areas. Finally, individuals who have unlawfully crossed the border and congregate in these areas may subjectively feel compelled to follow an agent's instructions, but the reasonable person test for detention presupposes a person who has not violated the law. *Bostick*, 501 U.S. 437-38. None of USBP's actions in these areas, as explained *supra*, would make a person feel that he or she was not at liberty to leave. On the contrary, the situation on the ground demonstrates that individuals wait to be arrested and transported to a USBP facility for processing. Schwerdtfeger Decl. ¶ 18.

### 2. USBP Does Not Have Legal Custody Over Minors in these Areas.

Contrary to Plaintiffs' assertion, the Agreement does not encompass and was not intended to encompass the legal custody of minors from the point of discovery or encounter. Plaintiffs primarily rely on the Court's Order from the Title 42 litigation where this Court held that "[t]he Agreement employs the formal meaning of 'legal custody,' derived from family law, signifying the right and responsibility to care for the well-being of the child and make decisions on the child's behalf." *See Flores v. Barr*, No. 85-4544-DMG, 2020 WL 5491445, at *3 (C.D. Cal. Sept. 4,

13

2020) ("Title 42 Order"). In assessing legal custody in the Title 42 context, this Court focused on the degree of control the government maintained over minors processed under Title 42. *Id.* at *4-5. Specifically, the Court noted that "DHS agents have near complete control over whether, when, and how they apprehend individuals under Title 42," "DHS also has complete control over where and under what conditions to detain minors under Title 42, including over the decision to house them in hotels," and "DHS has wide discretion to determine when and whether minors held under Title 42 leave their custody." *Id.*

Critically, the issue before the Court during the Title 42 litigation was not *whether* minors were in legal custody, but rather *who* had legal custody—DHS or the Centers for Disease Control and Prevention ("CDC"). The Court noted that "Defendants do not dispute the degree of control DHS exercises over the minors. They also rightly recognize that the Agreement contemplates a definition of 'legal custody' distinct from physical custody […]" Title 42 Order, at *5 (internal citations omitted). The Court determined that DHS maintained legal custody of minors subject to Title 42 expulsion because "[f]rom the moment they are *first apprehended* until they are released or expelled, DHS has the authority to make decisions relating to the welfare and legal status of the children." *Id.* at *4 (emphasis added). Again, here, USBP has not arrested or apprehended any minors in these areas. Moreover, USBP does not exercise control—much less "near complete control"—over minors in these areas, and therefore minors are not in CBP's legal custody as defined by the Court. *Id.* at *4. Plaintiffs' allegations that Defendants are violating the Agreement rely on strained readings of its terms and this Court's prior Title 42 Order.

To begin, Plaintiffs describe these areas as "open-air detention sites," which is inaccurate. These are open areas in the field near the California – Mexico border where individuals began congregating around October 2022 (in IMB) and March 2023 (in Jacumba). The areas are in the vicinity of the IBB, but, in Jacumba, in particular, there is a single 30-foot-high IBB with no further fencing. Schwerdtfeger,

14

Decl. ¶ 13. Plaintiffs assert four allegations in support of their contention that CBP
has legal custody over minors in these areas, namely: (1) CBP has custody of minors
from the moment of first discovery; (2) CBP has authority to determine where
minors are detained; (3) CBP controls conditions in these areas; and (4) CBP
unilaterally determines when minors leave these areas. ECF No. 1392-1, at 12-18.[4]
Defendants address each in turn.

---

[4] Defendants object to certain declarations submitted in support of Plaintiffs' motion
on the ground of hearsay under Federal Rules of Evidence 801(c) and 802. *See Orr
v. Bank of America*, *NT & SA*, 285 F.3d 764, 773–74 (9th Cir. 2002) (Evidence
submitted to the Court on motion practice must meet all requirements for
admissibility if offered at the time of trial.). *First*, regarding the allegation that
minors have spent multiple nights in these areas, three of the cited declarations rely
on inadmissible hearsay. *See* Pinheiro Decl. ¶¶ 7, 12-13, 26-27 ("[An individual]
told me . . . . I spoke to migrants . . . ."); Rios Decl. ¶¶ 19-20 ("I spoke to several
people . . . ."); Serrano Decl. ¶ 18 ("according to what migrants have shared with
me"). Although Plaintiffs present one example of two minors who allegedly stayed
at a site for multiple nights, *see* Cheng Decl. ¶ 12, it is ambiguous whether the
declarant is relying on personal knowledge or hearsay, *see id.* ¶ 1, and the declarant
does not even identify at which area minors were allegedly located, *see id.* ¶ 12
(referring to "Jacumba OADS" after previously naming three separate sites near
Jacumba). Plaintiffs also refer to minors staying "overnight," but the specific
examples found in Plaintiffs' declarations are of minors who *arrived* in the middle
of the night. *See* Jasso Decl. ¶ 28 (family arrived at 10:30 p.m.); Saulo Decl. ¶¶ 9
(family arrived around 3:00 a.m.); E.G. Decl. ¶¶ 7 (family arrived at 2:00 a.m.).
*Second*, regarding the allegation that minors are separated from their parents,
Plaintiffs' sole example is based on inadmissible hearsay about what an individual
said to the declarant. *See* Jasso Decl. ¶ 15. *Lastly*, regarding the allegation that
Border Patrol agents tell minors to remain in these areas and return those who leave,
Plaintiffs rely on hearsay statements. *See* Pinheiro Decl. ¶¶ 26–27, 29 ("[M]igrants
have consistently told me that Border Patrol agents tell them that they have to stay
in the camps, or they will be deported. . . . Contractors and volunteers have observed
migrants being apprehended and brought back to the OADS."); Serrano Decl. ¶¶ 9,
12 ("Migrants in Jacumba have also told me . . . ."). While the statements of Border
Patrol agents are not themselves hearsay, the statements of non-declarants about
what agents allegedly said to them are hearsay.

*First*, Plaintiffs incorrectly assert that "CBP authority over a noncitizen child's welfare and legal status begins when CBP agents first encounter the child," or upon "first discovery." ECF No. 1392-1, at 12. The terms "encounter" and "discovery" do not exist within the four corners of the Agreement. Plaintiffs cannot now insert or implicitly read in terms that were never included in the consent decree to advance their arguments. The terms that do exist in the Agreement are "apprehension," "arrest," "detention," and "processing." Plaintiffs cite the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), codified at 8 U.S.C. § 1232, in support of the proposition that "CBP's legal powers and responsibilities related to unaccompanied children [UCs] begin at the time of discovery of the child." *Id.* at 13. However, the Ninth Circuit already determined that the TVPRA—which specifically provides protections for UCs—did not modify the Agreement. *See Flores v. Lynch*, 828 F.3d 898, 904 (9th Cir. 2016) (stating that the "TVPRA partially codified the [FSA] by creating statutory standards for the treatment of [UCs]."). And, moreover, the TVPRA's timelines keyed to "discovery" of a UC relate solely to DHS' obligation to *notify* the U.S. Department of Health and Human Services' Office of Refugee Resettlement of the discovery of that child. It does not speak to or provide any obligations related to whether the child must be arrested by CBP. Plaintiffs also cite CBP's National Standards on Transport, Escort, Detention, and Search ("TEDS"),[5] which provide that USBP agents "will consider the best interest of the juvenile at all decision points beginning at the first encounter and continuing through processing, detention, transfer, or repatriation." U.S. CUSTOMS AND BORDER PROTECTION, October 2015, at 4. USBP's actions are consistent with TEDS because USBP continues to prioritize the transportation of minors to a USBP facility. More importantly, the Agreement predates both the TVPRA and TEDS, and they cannot be read as to retroactively apply to a consent

---

[5] October 2015, available at https://www.cbp.gov/sites/default/files/assets/ documents/2020-Feb/cbp-teds-policy-october2015.pdf (last visited Mar. 4, 2024).

decree. By extension, neither the TVPRA nor TEDS informed the parties' understanding of the Agreement in 1997.

Plaintiffs also mischaracterize the government's position before the U.S. Supreme Court in *DHS v. Texas*, No. 23A607, 2024 WL 145108 (U.S. Jan. 10, 2024). At issue in that case were specific instances when Border Patrol agents cut concertina wire to apprehend particular migrants or to provide emergency assistance. The government noted that *those noncitizens* were *apprehended* after they exited the river and then directed to an area "where other agents were present to begin the intake process in a controlled and orderly setting, before the migrants were transported by bus to a processing center to complete inspection and processing." *Id.* at *8. Not only were noncitizens not free to further their entry into the United States, but they also "were not free to leave during their transit to the processing site." Application to Vacate the Injunction Pending Appeal Entered by the United States Court of Appeals for the Fifth Circuit, *DHS v. Texas*, No. 23A607, 2024 WL 51018, at *21–22 (U.S. Jan. 2, 2024). Plaintiffs assert that "[l]ike individuals *apprehended* while crossing the Rio Grande River, noncitizens that CBP *encounters* along the border and directs to wait in OADS have been apprehended and detained." ECF No. 1392-1 at 14. However, "apprehended" and "encounter[ed]" are not synonymous terms. An encounter could lead to an arrest, but it is *not* an arrest. Further, as discussed above, USBP has not arrested minors at these areas. Schwerdtfeger, Decl. ¶¶ 6, 11, 12, 14. Defendants recognize that arrest may include "temporary detainment" and "detention includes '[r]estraint from freedom of movement.'" But USBP does not restrict the movement of individuals in the areas addressed in the MTE. *Id.* ¶ 18. At the same time, SDC is not aware of individuals in large groups in the IMB and Jacumba areas leaving or walking beyond the immediate border area in those locations, although there are options to do so. *Id.* For example, in Jacumba, there are roads and gas stations within walking distance of the locations where large groups congregate, and the town of Jacumba is less than two miles from individuals

17

congregating near Tower 75. *Id.* In IMB, individuals arrive in locations that are immediately adjacent to major metropolitan areas. *Id.* However, individuals generally remain in the locations where large groups congregate and do not further their entry into the United States. *Id.*

*Second*, Plaintiffs allege that CBP has transported noncitizens to these areas in CBP vehicles, used CBP vehicles to escort noncitizens to these areas, and directed noncitizens to walk to a specific area and remain there, and even separated families into different areas. ECF No. 1392-1, at 14-15. CBP does not have a policy or practice of directing or encouraging individuals to go to these locations, and does not have a policy or practice of transporting or guiding individuals to these locations to await arrest, transport, and processing. Schwerdtfeger, Decl. ¶¶ 8, 15. However, to the extent that Border Patrol agents did direct or escort individuals to these areas, it would be no different than any law enforcement officer directing heightened traffic to avoid disorder and disarray. Further, family units congregating in these areas are not separated from each other. *Id.* ¶ 19. However, "*single adult men* congregating with large groups are at times instructed to move to a different location within the same area, away from other populations such as UCs and family units, within a few hundred yards of the location at which they arrived." *Id.* (emphasis added). These instructions to *single adult men* are issued for humanitarian and safety reasons, and to prioritize UCs and family units for field interviews, arrest, and transportation. *Id.*

*Third*, Plaintiffs' allegation that CBP controls conditions in these areas is unsupported. Plaintiffs assert that CBP monitors and orders noncitizens to comply with CBP orders. USBP does count the individuals in these locations, but only to "determine the number of individuals in need of transportation and compare that number with available detention space at the SDC facilities." *Id.* ¶ 18. This is a process antecedent to arrest, but not part of an arrest itself. From approximately May 9, 2023, to December 14, 2023, SDC provided colored wristbands to individuals arriving at areas in Jacumba and IMB to identify how long individuals had been

18

present, to help prioritize their arrest and transport to a USBP station. *Id.* ¶ 24. As provided above, USBP has and continues to prioritize the arrest, transportation, and processing of vulnerable populations. Moreover, individuals were not required to put on a wristband and could decline a wristband if they chose to do so. *Id.* Declining a wristband would likely have delayed their arrest and transportation. But passing out wristbands was not tantamount to taking individuals into custody.

Importantly, Plaintiffs' claims regarding monitoring and surveillance fail to consider that USBP must "patrol these areas, along with others, as part of its general duty to patrol and secure the border." *Id.* ¶ 21. At IMB, cameras were already in place prior to the recent arrival of large groups of individuals. *Id.* The cameras are part of the Remote Video Surveillance System ("RVSS") designed to detect unlawful entries into the United States. *Id.* The RVSS camera feeds are constantly monitored by SDC personnel in the Tactical Communications Center. In Jacumba, Anduril Surveillance Towers ("ASTs") are capable of providing surveillance in some areas, including 121 Tower and 177 Tower. *Id.* The RVSS and ASTs were put in place prior to the arrival of large groups, to assist in detecting unlawful entries to the United States in accordance with USBP mission. *Id.*

Given the unprecedented numbers of individuals entering these areas, which have overwhelmed CBP's operations and systems at various points, CBP attempted to redress humanitarian concerns. *Id.* ¶¶ 25-26. Specifically, SDC provides water and snacks to noncitizens in the large groups at the IMB and Jacumba areas if arrest and transportation to a USBP facility is not immediately available. *Id.* ¶ 25. SDC has also placed portable toilets, hand wash stations, and dumpsters in these areas, to alleviate humanitarian needs for those whom SDC could not immediately interview and arrest. USBP funded most of the amenities, except four dumpsters were provided by external entities, including a local elected official and a Non-Government Organization. *Id.* ¶¶ 25-26. As Plaintiffs acknowledge, volunteers have provided and continue to provide supplies and services to individuals in these areas. ECF No.

1392-1, at 16. And as Chief Schwerdtfeger attests, the public has access to the IMB and Jacumba areas to provide individuals with water and food, and supplies such as tents and other aid. Schwerdtfeger Decl. ¶ 20. SDC does not have a policy or practice of impeding or restricting public access to the Jacumba areas. Further, at W8, individuals waiting within the IBB (in between the primary and secondary fence) to be interviewed, arrested, and transported to a USBP station, may speak with members of the public, because SDC permits members of the public to approach the IBB in the IMB area. *Id.*

Further, if SDC encounters a person in the field—including in one of the IMB or Jacumba areas—who is in apparent medical distress, emergency medical assistance is provided, consistent with agency practice. However, full medical assessments are not conducted unless and until a person is in SDC custody. *Id.* ¶ 23.

*Finally*, Plaintiffs assert that CBP unilaterally determines when minors leave these areas for processing. Like any individual who is encountered by USBP, before he or she can be processed, they must first be arrested. Any delays in arrest are due to operational realities such as constraints in detention capacity, staffing, and transportation. It is by no means a delay tactic or means to assert control over individuals. Further, "SDC does not instruct its [Border Patrol agents] to tell the individuals congregating in the IMB and Jacumba areas that their immigration cases will be negatively impacted if they leave those areas." *Id.* ¶ 18. Presumably, however, if individuals left these areas on their own account, it would delay their arrest, which by extension may affect their ability to seek immigration relief or protection in the United States.

In sum, nothing Plaintiffs point to regarding how CBP interacts with minors in these areas rises to the level of establishing that CBP has the "right and responsibility" to care for minors in these areas, or the ability to "make decisions on the child's behalf." *See* Title 42 Order, at *3.

CBP does not manage or make decisions about the movement of individuals in these areas. While individuals at these areas may be subject to encounter and later arrest if they choose to further proceed into the United States, they are otherwise not restricted in their movement. It is only after CBP arrests noncitizens at these areas that CBP will then transport them to a CBP facility and process them, and it is only from the point of arrest that CBP has the ability to make decisions on behalf of *Flores* class members. Up until that point they are free to move around at will, beyond being subject to encounter and arrest if they further proceed into the United States. While the possibility of arrest may function as a form of restriction, it is no different from anyone in Mexico or Canada who may wish to unlawfully enter the United States, and who similarly would be subject to arrest if they did so.

Further, CBP's efforts at organizing individuals prior to their arrest do not amount to custody, and in any event, some of those efforts have since ceased. Early on, CBP provided colored wristbands to individuals. Indeed, Plaintiffs recognize that when CBP does not use wristbands, "processing is chaotic." *See* Pinheiro Dec. ¶ 32; Cheng Dec. ¶¶ 17-20. The wristbands were provided not to exercise control over these individuals, but rather to try to expedite CBP's ability to arrest them. Individuals were free not to take a wristband or to decline to go where CBP told them, and thus CBP did not exercise control over individuals through these actions.

USBP has also observed members of the public access these areas to provide individuals with water and food. Plaintiffs assert that at various points USBP restricted volunteers' access who wanted to provide food, water, and medical care to minors at these areas. But USBP does not impede or restrict access to the Jacumba areas by members of the public. Further, individuals who are waiting within the IBB at W8 to be encountered, arrested, and transported to a USBP station may speak with and receive aid from members of the public. Indeed, Plaintiffs' counsel have also been visiting these areas, as evidenced by two declarations submitted in support of their MTE. *See* ECF Nos. 1392-12, 1392-13; Ex. 9, 10. Notably, Plaintiffs' counsel

21

did not need to follow the procedures outlined in the Agreement for attorney-client visits of *Flores* class members, such as formal notification to Defendants to arrange the attorney-client visits, because these areas are not USBP facilities and CPB does not in fact have legal custody over minors in these areas. FSA ¶ 32.A.; *Id.* Ex. 2 (m).

Ultimately, Plaintiffs seek to frame Defendants' good-faith humanitarian efforts to respond to a large number of unlawful crossings into the United States as an indication of legal custody under the Agreement. This cannot pass muster under the Agreement because the consent decree simply does not address processes and procedures prior to arrest and apprehension.

**B. <u>Defendants Should Not Be Required to Implement the Procedures Requested by Plaintiffs.</u>**

This Court should deny Plaintiffs' motion asking this Court to impose procedures that are outside the four corners of the Agreement. In addition to the reasons provided above why Plaintiffs' MTE should be denied, the Court should further consider the following specific errors and concerns that should preclude the entry of Plaintiffs' requested relief.

*First*, Plaintiffs request that all minors "discovered" by DHS in these areas and other locations are *Flores* class members as defined by Paragraph 10 of the Agreement. ECF No. 1392-2 ("Proposed Order") ¶ 1. This proposed relief— presented as a matter-of-fact statement—is, in fact, not supported nor required by any provision of the Agreement and seeks to broaden the definition of a *Flores* class member beyond the plain terms of the Agreement. Notably, Plaintiffs' use of the term "discovery" of a minor demonstrates that Plaintiffs cannot point to any definitive point at which CBP assumes legal custody of a minor.

*Second*, Plaintiffs request that DHS expeditiously process all minors and place minors in facilities that are safe and sanitary and that are consistent with DHS's concern for the particular vulnerability of minors. *Id.* ¶ 2. This proposed relief is superfluous as DHS is *already* promptly apprehending and processing minors and

22

transporting them to USBP facilities that are safe and sanitary and that are consistent with DHS's concern for the particular vulnerability of minors. Currently, individuals who congregate in these areas are generally arrested by Border Patrol agents within 12 hours of encounter. *See* Schwerdtfeger Decl. ¶ 27.

*Third*, Plaintiffs request that DHS cease directing minors to these areas or holding minors in these areas "except for the amount of time DHS is actively preparing the minor for transport or transporting the minor." Proposed Order ¶ 3. This proposed relief is unnecessary as DHS is not directing minors to these areas, it is not CBP policy or practice to do so, and, even if it occurred in the past, it was part of USBP's efforts to triage individuals to avoid disorder. Again, DHS is not *holding* minors in these areas. Once transportation and space at a USBP facility is available, USBP transports minors from the field to a USBP facility for further processing.

*Fourth*, Plaintiffs request a record system for minors following two hours of their discovery by DHS. *Id.* ¶ 4. This proposed relief is not required by the Agreement, is wholly inconsistent with the Agreement, and asks the Court to impose an arbitrary "two hours after first discovery by DHS" record-keeping process. Moreover, it seeks to impose a coercive remedy of reporting that is not contained in the Agreement, and is not based on any establishment of breach by a preponderance of the evidence. Instead, as Defendants have shown, CBP is taking comprehensive actions to facilitate the prompt arrest and transportation of minors. For example, SDC has increased the capacity of the soft-sided facility to 750 and has received approval to upgrade the total detention capacity at the soft-sided facility to 1,000 individuals when funding becomes available. *See* Schwerdtfeger Decl. ¶ 31. SDC also now has 15 buses to provide transportation for large groups. *Id.* Further, the proposed relief is not, on its face, limited to SDC, and thus would apply to each USBP sector, despite Plaintiffs' allegations relating to SDC only. This proposed relief would be unduly burdensome for USBP and dismissive of the operational realities of each USBP sector. Nothing in the Agreement, or common sense, suggests

that a Border Patrol agent in the field must (or even could) conduct the necessary questioning, review any relevant documents, and record information at the precise spot after two hours of "discovery of a minor."

*Finally*, Plaintiffs request that DHS provide minors contact with family members who are arrested with the minor. Proposed Order ¶ 5. This proposed relief is, again, superfluous as DHS does not separate family units, and prioritizes the arrest and transportation of minors (UCs and family units) to a USBP facility.

For the reasons explained above, Plaintiffs' proposed relief is inconsistent with the terms of the Agreement and unwarranted—particularly when Plaintiffs have failed to show a breach of the Agreement. Because the Agreement does not apply to minors who have not been arrested or apprehended by USBP, they are not in the legal custody of CBP, and therefore are not *Flores* class members at this juncture.

## IV.    **CONCLUSION**

For all of the above reasons, the Court should deny Plaintiffs' MTE and their proposed relief.

Dated: March 15, 2024                          Respectfully submitted,

                                               BRIAN M. BOYNTON
                                               Principal Deputy
                                               Assistant Attorney General
                                               Civil Division

                                               WILLIAM C. PEACHEY
                                               Director
                                               District Court Section
                                               Office of Immigration Litigation

                                               WILLIAM C. SILVIS
                                               Assistant Director

                                               SARAH B. FABIAN
                                               Senior Litigation Counsel

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*/s/ Fizza Batool*
FIZZA BATOOL
JOSHUA C. MCCROSKEY
Trial Attorneys
United States Department of Justice
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Telephone: 202-616-4863
Facsimile: 202-305-7000
Email: fizza.batool2@usdoj.gov

*Attorneys for Defendants*

25

## <u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED THAT:

I, Fizza Batool, am a citizen of the United States and am at least eighteen years of age. My business address is 450 Fifth Street, NW, Washington, DC 20001. I am not a party to the above-entitled action. I have caused service of the accompanying **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE, ECF NO. 1392**, on all counsel of record, by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically provides notice. I also notified Plaintiffs' counsel by electronic mail. I declare under penalty of perjury that the foregoing is true and correct.

DATED:  March 15, 2024

/s/ <i>Fizza Batool</i>
FIZZA BATOOL
