CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
Sarah E. Kahn (Cal. Bar No. 341901)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.email

*Attorneys for Plaintiffs*

*Additional counsel listed on following page*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>MERRICK GARLAND, Attorney General the United States, *et al*.,<br><br><br>        Defendants. | No. CV 85-4544-DMG-AGRx<br><br>REPLY IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT RE OPEN-AIR DETENTION SITES<br><br>Hearing: March 29, 2024<br>Time: 9:30 a.m.<br>Hon. Dolly M. Gee |

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe (Cal. Bar No. 299296)
Diane de Gramont (Cal. Bar No. 324360)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email: mwroe@youthlaw.org

CHILDREN'S RIGHTS
Leecia Welch (Cal. Bar No. 208741)
88 Pine Street, Suite 800
New York, NY 10005
Telephone: (212) 683-2210
Email: lwelch@childrensrights.org

# TABLE OF CONTENTS

I.  **Introduction** ...................................................................................................... 1

II. **Argument** ........................................................................................................... 3

  A.  *Flores Legal Custody Begins When CBP First Discovers a Child.* ............. 3

    1.  CBP exercises legal authority and discretionary control from the moment of first discovery. ..................................................................................... 3

    2.  Defendants' definition of legal custody would nullify the Settlement's expeditious processing requirement. ............................................................ 5

  B.  *Children Directed to Wait in OADS Have Been Arrested and Apprehended.* ............................................................................................... 6

    1.  As DHS represented to the Supreme Court, a field interview is not required for a child to be arrested and apprehended. ..................................... 7

    2.  Defendants' definitions of arrest are consistent with Plaintiffs' assertion that apprehension occurs at the time of initial discovery. ............................. 10

  C.  *Children Directed to Remain in OADS are Detained and are Not Free to Leave.* .............................................................................................................. 12

  D. *Conditions at the OADS Plainly Violate the Settlement.* .............................. 16

    1.  The Settlement permits no exceptions to the requirement that class members be placed in safe and sanitary conditions that are consistent with their particular vulnerability as minors. ............................................... 16

    2.  Defendants do not dispute that conditions in OADS are unsafe, unsanitary, and inconsistent with a concern for the particular vulnerability of minors ............................................................................................................. 17

    3.  Defendants fail to expeditiously process children at the OADS. ............. 18

III. **Conclusion** ...................................................................................................... 21

# TABLE OF AUTHORITIES

## CASES

*DHS v. Texas*,
    144 S.Ct. 715 (Mem) (2024) ..................................................................... 6

*Flores v. Barr*,
    No. 85-4544, 2020 WL 5491445 (Sept. 4, 2020) ........................................ *passim*

*Flores v. Barr*,
    934 F.3d 910 (9th Cir. 2019) ..................................................................... 4

*Flores v. Johnson*,
    212 F. Supp. 3d 864 (C.D. Cal. 2015) ............................................... 3, 5, 13, 16

*Flores v. Rosen*,
    984 F.3d 720 (9th Cir. 2020) ..................................................................... 6

*Flores v. Sessions*,
    394 F. Supp. 3d 1041 (C.D. Cal. 2017) ............................................. 6, 9, 13, 16

*Florida v. Bostick*,
    501 U.S. 429 (1991) ........................................................................ 12, 14, 15

*INS v. Delgado*,
    466 U.S. 210 (1984) ............................................................................... 12

*Michigan v. Chesternut*,
    486 U.S. 567 (1988) ............................................................................... 15

*Pinel v. Aurora Loan Servs., LLC*,
    814 F. Supp. 2d 930 (N.D. Cal. 2011) ....................................................... 3

*Terry v. Ohio*,
    392 U.S. 1 (1968) .................................................................................. 14

*Texas v. DHS*,
    No. 23-55, 2023 WL 8285223 (W.D. Tex. Nov. 29, 2023) ............................. 7, 8

## STATUTES

8 U.S.C. § 1101(a)(27)(J) ............................................................................ 16

8 U.S.C. § 1158 ........................................................................................ 16

8 U.S.C. § 1225(a)(1) ................................................................................. 3

8 U.S.C. § 1232(a)(2)(B) ...................................................................... 3

8 U.S.C. § 1232(b)(2) ...................................................................... 4, 18

8 U.S.C. § 1357(a) ...................................................................... 3

Cal. Civ. Code § 1641 ...................................................................... 3

Cal. Penal Code § 834 ...................................................................... 11

Cal. Penal Code § 835 ...................................................................... 11

**REGULATIONS**

8 C.F.R. § 236.3(g)(2) ...................................................................... 6

Apprehension, Processing, Care, and Custody of Alien Minors and
    Unaccompanied Alien Children, 84 Fed. Reg. 44,392 (Aug. 23, 2019) (to be
    codified at 8 C.F.R. part 236) ...................................................................... 6

**OTHER AUTHORITIES**

Black's Law Dictionary (11th ed. 2019) ...................................................................... 11

*Flores* Settlement Agreement ...................................................................... *passim*

Reply in Support of Application to Vacate the Injunction Pending Appeal, *DHS v.
    Texas*, No. 23A607, 2024 WL 145108 (U.S. Jan. 10, 2024) ............... 7, 8, 10, 11

U.S. Customs and Border Protection, *National Standards on Transport, Escort,
    Detention, and Search* (Oct. 2015) ...................................................................... 4, 10

U.S. Dept. of Homeland Sec. Office of the Inspect. Gen., *Results of Unannounced
    Inspections of CBP Holding Facilities in the San Diego Area* (Nov. 15, 2023) 19,
    20

## I.   INTRODUCTION

In their response to Plaintiffs' Motion to Enforce, Defendants appear to concede that noncitizen children are enduring unsafe and unsanitary conditions in open-air sites and that these sites raise serious humanitarian concerns. Instead, Defendants assert, incorrectly, that these dangerous conditions are not their responsibility and argue that Plaintiffs are attempting to change the terms of the *Flores* Settlement Agreement ("FSA" or "Settlement").

Plaintiffs do not ask the Court to expand or modify the Settlement. Plaintiffs are simply asking the Court to interpret the term "legal custody" in the Settlement consistent with (1) the Settlement as a whole, including its requirement for expeditious processing; (2) the Court's prior orders; and (3) the Department of Homeland Security's ("DHS") position before the U.S. Supreme Court just two months ago.

The Settlement requires that whenever DHS "takes a minor into custody, it shall expeditiously process the minor . . . ." FSA ¶ 12.A. Defendants seek to nullify this requirement by unilaterally defining a child as "in custody" only at the point that U.S. Customs and Border Protection ("CBP") is ready to process the child, regardless of when CBP first discovered the child. *See* Defs. Br. [Doc. # 1398] at 5. Under Defendants' interpretation of the Settlement, a child can be discovered by CBP, instructed to wait for an indefinite period of time, made to sit or stand in line to be counted, and still not be in "custody" until CBP decides, in its sole discretion, to complete a field interview. *See id.* at 5, 18. The Settlement did not grant Defendants unilateral authority to determine when children become class members. Such an interpretation would plainly undermine the Settlement's mandatory requirements.

This is not the parties' first dispute about whether Defendants have legal custody over noncitizen children. The Court has held that the term "legal custody" in the Settlement refers to the family law definition of legal custody. *Flores v.*

*Barr*, No. 85-4544, 2020 WL 5491445, at *3 (Sept. 4, 2020). Under this standard, the relevant issue is DHS's "authority to make decisions relating to the welfare and legal status of the children," *id.* at *4, not whether children are under the equivalent of criminal arrest and secure detention. CBP indisputably has authority to make critical decisions involving the welfare of noncitizen children in open-air detention sites ("OADS"). In any event, children that CBP directs to await processing in OADS have been apprehended and arrested and are not free to leave.

Defendants accept DHS's position before the Supreme Court in *DHS v. Texas* that apprehension and custody began when CBP first encountered noncitizens and directed them to a staging area for processing. Defendants can identify no material facts to distinguish the situation in Texas from the OADS in California. Defendants instead rely on conclusory assertions that noncitizens in California are not apprehended, are not directed to OADS, and are not restricted in their movements. These generalized statements in no way rebut the specific evidence from multiple first-hand declarants that CBP directs and transports noncitizens to OADS, exercises its authority to restrict their movements, and instructs people to remain in these sites.

Plaintiffs acknowledge that CBP faces logistical challenges related to the number and location of border crossings, but these operational concerns do not dictate whether children are class members under the Settlement. Once CBP discovers children and orders them to proceed to or remain in a specific area, CBP has control over the children and legal responsibilities toward them. At that point, they become class members and Defendants must ensure that they are held in safe and sanitary conditions, consistent with a concern for the particular vulnerability of minors, and that they are expeditiously processed.

2

## II.   ARGUMENT

### A. Flores Legal Custody Begins When CBP First Discovers a Child.

The Court has previously outlined the proper principles for interpreting a consent decree. *See, e.g.*, *Flores v. Johnson*, 212 F. Supp. 3d 864, 870 (C.D. Cal. 2015). As relevant here, "[w]hen interpreting the language of a contract, 'the whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.'" *Flores v. Barr*, 2020 WL 5491445, at *3 (quoting Cal. Civ. Code § 1641). "Courts must interpret contractual language in a manner that gives force and effect to every provision, and not in a way that renders some clauses nugatory, inoperative or meaningless." *Flores v. Johnson*, 212 F. Supp. 3d at 870 (quoting *Pinel v. Aurora Loan Servs., LLC*, 814 F. Supp. 2d 930, 943 (N.D. Cal. 2011)).

This Court has already interpreted the term "legal custody" in the Settlement. After considering the Settlement as a whole, the Court held that the class definition "employs the formal meaning of 'legal custody,' derived from family law, signifying the right and responsibility to care for the well-being of the child and make decisions on the child's behalf." *Flores v. Barr*, 2020 WL 5491445, at *3. CBP agents unquestionably have the "authority to make decisions relating to the welfare and legal status of the children," *id.* at *4, as soon as they first discover a noncitizen child.

1.  CBP exercises legal authority and discretionary control from the moment of first discovery.

It is undisputed that CBP has the authority to determine a child's admissibility and make other important decisions relating to a noncitizen child as soon as they discover the child. *See* Defs. Br. at 3-4; *see also* 8 U.S.C. § 1232(a)(2)(B); 8 U.S.C. § 1225(a)(1); 8 U.S.C. § 1357(a); Declaration of Brent L. Schwerdtfeger ¶¶ 4-5, 16, 18 [Doc. # 1398-1] ("Schwerdtfeger Dec."). As Defendants acknowledge, at first encounter CBP can choose to conduct a field interview and process a noncitizen child or "exercise[] its discretion not to

immediately perform field interviews." *See* Schwerdtfeger Dec. ¶¶ 16, 18. In either case, if CBP directs the child to wait in a specific area, the child remains within CBP control and CBP can decide to complete a field interview whenever it chooses. *See Flores v. Barr*, 2020 WL 5491445, at *4 ("DHS agents have near complete control over whether, when, and how they apprehend individuals").

The Trafficking Victims Protection Reauthorization Act ("TVPRA") and CBP's detention standards do not modify the Settlement. They do, however, affect CBP's rights and responsibilities toward noncitizen children and help inform when CBP's "authority to make decisions relating to the welfare and legal status of the children" begins. *See Flores v. Barr*, 2020 WL 5491445, at *4. Because CBP has authority to make decisions affecting noncitizen children's welfare from the moment of first discovery, CBP requires agents to "consider the best interest of the juvenile at all decision points beginning at the *first encounter* . . . ." U.S. Customs and Border Protection, *National Standards on Transport, Escort, Detention, and Search*, 4 (Oct. 2015) ["TEDS Manual"] (emphasis added), https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf; *see also Flores v. Barr*, 934 F.3d 910, 916 (9th Cir. 2019) (rejecting argument that the Court improperly incorporated TEDS standards into the Settlement). CBP also has a legal duty to track the unaccompanied children it encounters and notify the Department of Health and Human Services ("HHS") within 48 hours of discovery. *See* 8 U.S.C. § 1232(b)(2). It is illogical to assume CBP can comply with that requirement if it does not interview children to determine their status and does not consider a child to be in custody during those 48 hours. *See Flores v. Barr*, 2020 WL 5491445 at *6 (adopting interpretation that harmonizes Settlement, TVPRA, and Title 42 requirements).

4

2. <u>Defendants' definition of legal custody would nullify the Settlement's expeditious processing requirement.</u>

Interpreting legal custody to begin when CBP first discovers a child is consistent with the Settlement as a whole, including the requirement that "[w]henever the INS takes a minor into custody, it shall expeditiously process the minor . . . ." FSA ¶ 12.A. Conversely, Defendants' proposed interpretation of legal custody would render the expeditious processing requirement meaningless. *See Flores v. Johnson*, 212 F. Supp. 3d at 870. Under Defendants' view, a child is not in custody until the moment they are transported to a facility for processing. *See* Defs. Br. at 5. This interpretation places sole discretion in the hands of individual CBP agents to determine when a child is or is not protected by the Settlement and creates a loophole where one did not exist at the time of the Settlement.

For example, Defendants acknowledge that CBP agents count people at the San Ysidro and Jacumba OADS "to determine the number of individuals in need of transportation and compare that number with available detention space at the SDC facilities." Schwerdtfeger Dec. ¶ 18. Defendants assert that these individuals are not yet in custody, despite CBP apparently already having determined they will be transported to immigration detention facilities. *Id.* ¶¶ 17-18. As Plaintiffs outlined in the Motion to Enforce, during these counts, noncitizens at OADS are required to sit or stand in line to be counted and can be left sitting or standing for hours at a time awaiting processing. *See* Memorandum in Support of Motion to Enforce Sec. II.B [Doc. # 1392-1] ("Pls. MTE"); *see also* Declaration of Pedro Rios ¶¶ 11, 21, 37 [Doc. # 1392-5] ("Rios Dec."); Declaration of Flor De Luna Alvarez-Lopez ¶ 15-16 [Doc. # 1392-6] ("Alvarez-Lopez Dec."); Declaration of Adriana Jasso ¶ 13 [Doc. # 1392-9] ("Jasso Dec."). It is implausible to argue that CBP has not detained individuals being counted, given that the asserted purpose of counting is to prepare to transport individuals to immigration detention facilities. *See* Schwerdtfeger Dec. ¶ 18. If the expeditious processing provision in the Settlement

1   does not cover children in this situation, then it is essentially inoperative. *See*

2   *Flores v. Johnson*, 212 F. Supp. 3d at 870.

3         Defendants themselves discuss the Settlement's expeditious processing

4   provision in terms of the time for processing after first encounter. *See* Defs. Br. at

5   22-23 (arguing that Plaintiffs' proposed order requiring expeditious processing "is

6   superfluous as DHS is *already* promptly apprehending and processing minors" and

7   individuals "are generally arrested by Border Patrol agents within 12 hours of

8   encounter"). Defendants do not, and cannot, explain how their interpretation of

9   legal custody can be reconciled with the Settlement's expeditious processing

10   requirement.

11         **B. Children Directed to Wait in OADS Have Been Arrested and**

12             **Apprehended.**

13         The term "arrest" in Paragraph 12.A of the Settlement has the same meaning

14   as the more commonly used immigration term "apprehension."[1] Defendants do not

15   distinguish these terms in their brief and acknowledge that arrest, like

16   apprehension, includes "temporary detainment." *See* Defs. Br. at 17. DHS's recent

17   briefing before the Supreme Court and Defendants' cited definitions of arrest both

18   support the conclusion that children at OADS have been arrested within the

19   meaning of Paragraph 12.A of the Settlement.

20

21

      _____

22

23   [1] Courts interpreting the Settlement and CBP have used the term "apprehension" when addressing CBP's obligations under Paragraph 12.A following a child's

24   arrest. *See, e.g.*, *Flores v. Rosen*, 984 F.3d 720, 737 (9th Cir. 2020); *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1071 (C.D. Cal. 2017); *Flores v. Johnson*, 212 F.

25   Supp. 3d at 880, 886-87; 8 C.F.R.§ 236.3(g)(2)(i). In the preamble to the 2019 Final Rule, CBP represented that 8 C.F.R. § 236.3(g)(2), which uses

26   "apprehension" instead of "arrest," provided "identical" protection to the safe and sanitary provision in Paragraph 12.A. *See* Apprehension, Processing, Care, and

27   Custody of Alien Minors and Unaccompanied Alien Children, 84 Fed. Reg. 44,392, 44,430 (Aug. 23, 2019) (to be codified at 8 C.F.R. part 236).

28

1. <u>As DHS represented to the Supreme Court, a field interview is not required for a child to be arrested and apprehended.</u>

In January 2024, DHS successfully sought emergency intervention from the U.S. Supreme Court to vacate an injunction restricting CBP's ability to cut border wire set up by the state of Texas. *See DHS v. Texas*, 144 S.Ct. 715 (Mem) (2024). The district court in that case made several factual findings, including that CBP agents failed to apprehend noncitizens after they cut the border wire. *Texas v. DHS*, No. 23-55, 2023 WL 8285223, at *13 (W.D. Tex. Nov. 29, 2023). Specifically, the district court found that noncitizens were not "interviewed, questioned as to citizenship, or in any way hindered in their progress into the United States" and that "Border Patrol agents orally direct persons whom they have just witnessed illegally entering the United States to walk as much as a mile or more—with vanishingly little if any further supervision or direction—and present themselves at the nearest immigration processing center." *Id.* at *4, *13. The district court concluded that this situation "constitutes neither 'apprehension' nor 'detention.'" *Id.* at *13-14 & n.13.

Before the Supreme Court, DHS argued that the district court's factual finding "rests on an unsupported and plainly erroneous view of what [CBP's] statutory responsibilities entail." Reply in Supp. of Appl. to Vacate the Inj. Pending Appeal, *DHS v. Texas*, No. 23A607, 2024 WL 145108, at *6 (U.S. Jan. 10, 2024) ("*DHS v. Texas* Reply"). DHS insisted that neither apprehension nor detention "requires the kind of physical custody that the district court appeared to demand" and that "[u]nder a correct application of those definitions, the noncitizens were apprehended as they exited the river . . . ." *Id.* at *7. DHS acknowledged that CBP did not question migrants, review their documents, or determine nationality at the location of first encounter, *id.* at *8, but maintained that "Texas is wrong in asserting that Border Patrol has not apprehended noncitizens at the time they cross through the wire and are directed to staging areas

for further processing," *id.* at \*19; *see also id.* ("[E]ven if Texas were correct in its narrow view of what *Border Patrol properly regards as apprehension*, the direction of migrants to the staging area is a reasonable course in aid of apprehension and initiation of processing there.") (emphasis added).

Defendants acknowledge that noncitizens in Texas were apprehended after they exited the river and were not free to leave. Nonetheless, they assert that in this analogous situation with a border wall rather than a river, noncitizens in the OADS have not been apprehended and are not restricted in their movements. *See* Defs. Br. at 17. Defendants fail to identify any meaningful factual distinctions.

In both Texas and California: (1) CBP agents encountered noncitizens and made a discretionary decision not to immediately conduct a field interview. *See DHS v. Texas* Reply at \*8; Schwerdtfeger Dec. ¶¶ 16, 18; (2) CBP agents directed individuals to a staging area to await further processing and did not always exercise continuous physical custody. *See DHS v. Texas* Reply at \*7; Pls. MTE Sec. II.B; (3) law enforcement was present in the area. *See DHS v. Texas* Reply at \*7; Pls. MTE Sec. II.B; and (4) noncitizens did not "proceed further into the United States on their own." *DHS v. Texas* Reply at \*7-8; Pls. MTE Sec. II.B & C.

The issue of whether people were free to leave on their way to the processing area was central to the parties' dispute in *DHS v. Texas*. The district court found that people could leave. *See Texas v. DHS*, 2023 WL 8285223, at \*13 & n.13. In response, DHS noted that "Texas presented no evidence that its personnel saw any migrants fleeing to the interior rather than moving to the staging area." *DHS v. Texas* Reply at \*9. Here, Defendants similarly acknowledge that in practice people do not leave the OADS in San Ysidro and Jacumba. *See* Defs. Br. at 17. Defendants' characterization of agents directing or escorting individuals to OADS in California as "no different than any law enforcement officer directing heightened traffic to avoid disorder and disarray," Defs. Br. at 18, is indistinguishable from agents in Texas directing migrants to a staging area where

1    processing could be done in a more "controlled and orderly setting," *DHS v. Texas*
2    Reply at *8.

3        If anything, there is *stronger* evidence here that CBP restricts people's
4    movements and prevents them from leaving. In addition to verbally directing
5    people to OADS, CBP agents sometimes physically escort or transport people,
6    including children, to these sites. *See* Pls. MTE Sec. II.B; *see also* Declaration of
7    E.G. ¶ 6 [Doc. # 1392-13] ("E.G. Dec."); Declaration of Saulo ¶ 8 [Doc. # 1392-
8    11] ("Saulo Dec."); Rios Dec. ¶¶ 12, 14-16, 41; Alvarez-Lopez Dec. ¶¶ 14, 37;
9    Declaration of Erika Pinheiro ¶¶ 24-25 [Doc. # 1392-7] ("Pinheiro Dec.");
10   Declaration of Dr. Theresa Cheng ¶ 14 ("Cheng Dec.") [Doc. # 1392-8]; Jasso.
11   Dec. ¶¶ 8-10; Declaration of Sarah Kahn ¶¶ 52-53, 98, 115 & Ex. J ("Kahn Dec.")
12   [Doc. # 1392-10]; Declaration of Lilian Serrano ¶ 6-8 ("Serrano Dec.") [Doc.
13   # 1392-14]. CBP agents also instruct people at the OADS to remain there. *See* Pls.
14   MTE Sec. II.C; *see also* E.G. Dec. ¶ 12; Saulo Dec. ¶ 19; Rios Dec. ¶ 36. Finally,
15   these sites are monitored by CBP agents and surveillance equipment. *See* Pls. MTE
16   Sec. II.C; Defs. Br. at 19.[2] As in Texas, CBP uses OADS as staging areas for
17   processing and is regularly present at the OADS.

18       Defendants do not even attempt to rebut this extensive and specific evidence
19   from multiple first-hand declarants. Instead, Defendants offer generalized
20   statements to the contrary. Such generalized statements are utterly insufficient to
21   refute Plaintiffs' factual showing.[3] *See Flores v. Sessions*, 394 F. Supp. 3d at 1054

22   _____

23   [2] It is irrelevant whether surveillance equipment was in place prior to or after CBP
24   began using these sites as OADS. CBP plainly has an incentive to direct
     noncitizens to areas where it already has surveillance in place.
25   [3] Defendants' assertions that it is not CBP policy or practice to direct individuals to
26   the OADS or instruct them to remain there are especially unpersuasive given that
     advocates made formal complaints to the DHS Office of Civil Rights and Civil
27   Liberties ("CRCL") in May and December 2023 describing these practices. *See*

28

                                              9

(explaining that CBP declarations "generally discuss the policies and practices at the CBP stations" but "[n]one of this generalized evidence . . . undermines the veracity of Plaintiffs' first-hand experiences.").

Before the Supreme Court, DHS set forth a clear, workable definition of apprehension and detention. Once CBP (1) encounters a noncitizen and (2) directs them to await further processing in a specific area monitored by law enforcement, the noncitizen has been apprehended and detained. *DHS v. Texas* Reply at *7-8. This would apply to both noncitizens directed to proceed to a staging area and noncitizens who are already in a staging area and are directed to remain there. Legal custody does *not* require physical control, continuous supervision, or a formal field interview. *Id.*; *see also* TEDS Manual at 28 ("Physical restraint is not an essential element of detention."). DHS's own interpretation of legal custody in *DHS v. Texas* gives full effect to all the terms in the Settlement, including its requirement for expeditious processing.[4]

    2. <u>Defendants' definitions of arrest are consistent with Plaintiffs' assertion that apprehension occurs at the time of initial discovery.</u>

Because the Settlement involves immigration apprehension and the family law definition of "legal custody," legal authorities related to criminal arrest are of limited relevance. In any event, Defendants' cited definitions of "arrest" are consistent with the previously discussed definitions of "legal custody" and

_____

Serrano Dec. ¶ 3, Ex. A at 2-3, Ex. B at 5-6, 12-15 [Doc. # 1392-14 at 2, 11-12, 35-36, 42-45]. These complaints plainly put CBP leadership on notice of what is happening in the field.

[4] Plaintiffs' proposed order ties the class definition to "discovery" rather than "apprehension" because Plaintiffs anticipated a possible dispute over the meaning of the term "apprehension." *See* Plaintiffs' Proposed Order [Doc. # 1392-2]. Plaintiffs have no objection to the Court using "apprehension" instead of "discovery" to define when legal custody begins so long as the Court's order clarifies the meaning of this term consistent with DHS's definition in *DHS v. Texas*.

"apprehension." Defendants rely on Black's Law Dictionary and the California Penal Code. One of the Black's Law Dictionary definitions of "arrest" is "[t]he taking or keeping of a person in custody by legal authority . . . [specifically] the apprehension of someone for the purpose of securing the administration of the law [especially] of bringing that person before a court." Black's Law Dictionary (11th ed. 2019). By its own account, CBP apprehends noncitizens it encounters along the border for the purpose of securing the administration of immigration law. *See* Defs. Br. at 3-4; *DHS v. Texas* Reply at \*5-8.

The California Penal Code similarly defines arrest as "taking a person into custody, in a case and in the manner authorized by law." Cal. Penal Code § 834. An arrest may be made either by "an actual restraint of the person, *or* by submission to the custody of an officer." *Id.* § 835 (emphasis added). No actual restraint is necessary for an arrest if the individual submits to the officer's custody and assertion of authority, as noncitizens apprehended at the border overwhelmingly do. *See, e.g.*, Defs. Br. at 17 (CBP "is not aware of individuals in large groups in the IMB and Jacumba areas leaving or walking beyond the immediate border area in those locations").

Both definitions equate arrest with taking an individual into custody. Defendants' argument is thus inevitably circular. Defendants argue that children are not in CBP's custody because they have not been arrested, and they have not been arrested because they have not been taken into custody. Moreover, neither of these definitions offers any support for Defendants' assertion that a field interview is required prior to arrest. Given that DHS itself recently insisted that noncitizens can be apprehended and detained prior to a field interview, *DHS v. Texas* Reply at \*7-8, the Court should accord no weight to Defendant's new definition of arrest or

11

to the conclusory statements of a CBP official purporting to define custody for purposes of the Settlement.[5]

### C. Children Directed to Remain in OADS are Detained and are Not Free to Leave.

Defendants' reliance on Fourth Amendment caselaw is misplaced. As discussed, the Settlement employs the family law definition of "legal custody" rather than a criminal law definition of custody. *See Flores v. Barr*, 2020 WL 5491445, at *3-4. Under the family law definition, the critical factor is CBP's decision-making authority. *Id.* at *4. Although the class definition refers to children "detained in the legal custody of the INS," FSA ¶ 10, the term "detention" in the Settlement does not signify secure custody equivalent to criminal detention. To the contrary, Defendants are generally required to transfer minors to non-secure facilities. *See* FSA ¶¶ 6, 12.A, 19.

Even under Defendants' authorities, however, children CBP directs to wait in OADS are detained. In *Bostick* and *Delgado*, the Supreme Court held that no seizure occurred because people were free to continue their regular activities and were never told they could not leave. In *Bostick*, the Supreme Court emphasized that "the police specifically advised Bostick that he had the right to refuse consent" and that Bostick's movements were "'confined' in a sense, but this was the natural result of his decision to take the bus." *Florida v. Bostick*, 501 U.S. 429, 436 (1991). In *Delgado*, the Court held that people remained in the workplace because they were at work, not because of the actions of law enforcement. *INS v. Delgado*, 466 U.S. 210, 218 (1984).

By contrast, Defendants' own evidence and the fulsome evidence provided by Plaintiffs demonstrates that noncitizen children are not, in fact, free to leave

---

[5] Notably, Mr. Schwerdtfeger does not cite to any official CBP policies or other authorities for his conclusions as to when noncitizens are arrested and taken into custody.

OADS and do not have independent reasons to remain there. As with the other points in Plaintiffs' Motion, Defendants make generalized assertions that they do not restrict noncitizens' movements but do not rebut Plaintiffs' copious specific evidence that CBP has the authority to restrict children's movements and does so in practice.[6] *See* Pls. MTE Sec. II.A.4, II.B; II.C; *see also Flores v. Sessions*, 394 F. Supp. 3d at 1054; *Flores v. Johnson*, 212 F. Supp. 3d at 882. CBP instructs noncitizens at OADS to stay, be counted, and await processing. *See* Serrano Dec. ¶ 13; E.G. Dec. ¶ 12; Saulo Dec. ¶ 19; Rios Dec. ¶¶ 10-11, 37; Jasso Dec. ¶ 13. Defendants even acknowledge that CBP, at times, instructs men to move to a different location from other populations.[7] *See* Schwerdtfeger Dec. ¶ 19; *see also*

---

[6] In a footnote, Defendants noted objections to certain pieces of Plaintiffs' declarations. Defs. Br. at 15 n.4. In their footnote, Defendants list two Federal Rules of Evidence and a blanket objection, followed by a list of citations. Defendants appear to challenge three facts: (1) "that minors have spent multiple nights in these areas"; (2) "that minors are separated from their parents"; and (3) "that Border Patrol agents tell minors to remain" in OADS and "return those who leave." *Id.* However, Defendants list a limited number of paragraphs in some declarations used to support those facts. As Defendants acknowledge, statements by a CBP officer to a declarant are not hearsay. *Id.* Plaintiffs introduce such statements not for the truth of the matter asserted, but to establish that the statement was made. Plaintiffs have presented non-hearsay evidence in support of each of these challenged facts. *See, e.g.*, Jasso Dec. ¶ 28 (children being held overnight in OADS); Jasso Dec. ¶ 15 (CBP officer dismissing concerns about separation of mother and child); Saulo Dec. ¶¶ 18-19 (noncitizens instructed to remain); *see also* E.G. Dec. ¶ 12; Cheng Dec. ¶¶ 23, 37. Defendants also themselves acknowledge that in 2023 people remained at OADS for 24 hours, *see* Defs. Br. at 8. Additionally, amidst objections to hearsay, Defendants insert complaints that are **not** evidentiary objections related to hearsay about what constitutes "overnight" and about an additional detail they would have liked in a paragraph of one declaration. Defs. Br. at 15 n.4.

[7] Defendants point to their justifications for separating single adult men from children and families. *See* Schwerdtfeger Dec. ¶ 19. But CBP's *intentions* in separating different populations are not at issue. The relevant legal question is

---

Pls. MTE Sec. II.B. CBP agents accuse people of "faking" medical emergencies just to leave the sites and regularly threaten noncitizens with immigration consequences if they leave the OADS, even to seek medical care for themselves or a family member. *See* Cheng Dec. ¶ 37; Alvarez-Lopez Dec. ¶ 32; Serrano Dec. ¶ 29; Saulo Dec. ¶¶ 17, 19; Rios Dec.¶ 36. Under these circumstances, noncitizen children's liberty has been restrained by "show of authority." *Bostick*, 501 U.S. at 434 (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n.16 (1968)).

Even if noncitizen children were to defy CBP authority and attempt to leave the OADS, they would be constrained from doing so. Defendants admit that children at Whiskey 8 (W8) and Whiskey 4 (W4) are held between 30-foot border fences. *See* Schwerdtfeger Dec. ¶ 10. On the U.S. side of the border, the area between border fencing is marked with "No-trespassing" signs and only CBP has access to the migrants held behind the secondary fence. *Id.* Humanitarian volunteers are "*permitted* to approach . . . to provide humanitarian aid, including water and food, at W8 . . . through the secondary fence." *Id.* at ¶ 20 (emphasis added). Defendants do not contest Plaintiffs' evidence that volunteers are generally *not permitted* access to Whiskey 4, Spooner's Mesa, or 91X. *See* Pls. MTE Sec. III.A.3; *see also* Jasso Dec. ¶¶ 24-27; Rios Dec. ¶¶ 7, 23.

Nor are children free to leave the unfenced OADS, contrary to Defendant's unsupported claims. *See* Schwerdtfeger Dec. ¶ 19. CBP blocks roads out of OADS with their vehicles. *See* Kahn Dec. ¶¶ 17, 26, 55, 71, 83-84; Pinheiro Dec. ¶¶ 30, 45. Although Defendants point to the presence of gas stations near the Jacumba sites as evidence that people's movements are not restricted, CBP agents have

---

whether CBP has the *authority* to control where noncitizens are held. Authority which they admit they have. *Id.* Moreover, even if it is not CBP policy to separate families, Plaintiffs have introduced evidence that family separation happens in practice. *See* Pls. MTE Sec. II.B. CBP agents appear to exercise discretion as to when they direct individuals to a different area and at least some are "dismissive" of reports that minors are separated from their parents. *See* Jasso Dec. ¶ 15.

apprehended people attempting to buy supplies at gas stations and brought them *back to the OADS* instead of CBP stations. *See* Pinheiro Dec. ¶ 29; *see also* Cheng Dec. ¶ 23 (CBP agent intercepted volunteer doctor they believed was a noncitizen to escort her back to the OADS).

Defendants themselves acknowledge that if people leave the OADS and encounter a CBP agent, they are subject to re-apprehension. *See* Defs. Br. at 12 (citing Schwerdtfeger Decl. ¶ 18).  Defendants further admit that "SDC is not aware of individuals in large groups in the IMB and Jacumba areas leaving or walking beyond the immediate border area in those locations," nor is SDC aware of any "individuals declining a wristband" that CBP used to track and process individuals held in OADS. Schwerdtfeger Dec. ¶¶ 18, 24. This is despite the horrific conditions at OADS, of which CBP is fully aware. *See id.* at ¶¶ 20, 22, 24, 26. Defendants also admit that uniformed CBP agents patrol OADS and conduct monitoring and enforcement related to their mission of detaining noncitizens. *Id.* ¶ 21. It seems to be no coincidence that CBP directs noncitizens to wait in areas that are visible to existing surveillance infrastructures whose camera feeds "are constantly monitored by SDC personnel" to detect noncitizens. *Id.* ¶ 21.[8]

Children in OADS are plainly not in the same position as other noncitizens who enter the United States without authorization but have not yet encountered CBP. Children in OADS have already been apprehended by CBP, have been instructed by CBP to remain there, and are under CBP surveillance. It follows that children held in an OADS that is monitored by CBP would have a reasonable belief they could not leave, and that if they did, they would be apprehended again. CBP's conduct in directing children to proceed to and/or to remain in OADS

---

[8] Defendants admit that they are highly motivated to ensure that individuals "await arrest at congregation areas" to facilitate eventual detention because it is easier to arrest people whom CBP has detected if they wait patiently than if they attempt to "evade" arrest. *See id.* at ¶ 30

"communicate[] to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Bostick*, 501 U.S. at 437 (quoting *Michigan v. Chesternut*, 486 U.S. 567, 569 (1988)).

Furthermore, children have no independent reason to remain in dangerous and unsanitary conditions without adequate food or water. *See* Pls. MTE Sec. II.A. Any "desire to be arrested and processed by USBP," Defs. Br. at 12, cannot be characterized as a reason independent of CBP conduct or display of authority. CBP agents tell noncitizens to wait in the OADS and people follow those orders. Defendants' suggestion that people remain in OADS because they want to facilitate their own immigration proceedings is both disingenuous and concerning. Contrary to Defendants' suggestion in their brief, no form of immigration relief available to an individual who has *already* entered without inspection requires that individual to be arrested by CBP at the border. *See, e.g.*, 8 U.S.C. § 1158 (asylum available to any individual physically present in the United States, regardless of form of entry or status); 8 U.S.C. § 1101(a)(27)(J) (special immigrant juvenile status available to youth physically present in the United States who meet other criteria, regardless of manner of entry or status). CBP incorrectly threatens people with negative immigration consequences to prevent them from leaving the OADS. *See* Saulo Dec. ¶ 19; Rios Dec. ¶ 36; Pinheiro Dec. ¶¶ 26-27.

### D. Conditions at the OADS Plainly Violate the Settlement.

1. <u>The Settlement permits no exceptions to the requirement that class members be placed in safe and sanitary conditions that are consistent with their particular vulnerability as minors.</u>

This Court has clearly articulated the Settlement's requirements for safe and sanitary conditions that are consistent with concern for the vulnerability of minors. *See Flores v. Sessions*, 394 F. Supp. 3d at 1053-61. Although the Settlement provides for some flexibility regarding the placement of minors in licensed placements during an emergency or influx, the requirement for safe and sanitary

conditions includes no such exception. *See* FSA ¶ 12.A. The reason for this is clear—even large increases in class members cannot excuse endangering children's safety. *See Flores v. Johnson*, 212 F. Supp. 3d at 882 (finding that "Defendants have wholly failed to meet even [the] minimal standard" of "safe and sanitary" conditions and have not "offer[ed] impossibility or similar doctrines as a defense to the apparent contractual violation."); *see also Flores v. Sessions*, 394 F. Supp. 3d at 1068 ("This purported lack of institutional resources to screen is no excuse for non-performance. Defendants entered into the *Flores* Agreement and now they do not want to perform—but want this Court to bless the breach. That is not how contracts work.").

> 2. <u>Defendants do not dispute that conditions in OADS are unsafe, unsanitary, and inconsistent with a concern for the particular vulnerability of minors.</u>

Defendants' assertion that they are not responsible for children's welfare prior to transport and their insistence that they *eventually* transport children to "USBP facilities that are safe and sanitary and that are consistent with DHS's concern for the particular vulnerability of minors" reveals their admission that OADS are none of those things. *See* Defs. Br. at 1-2, 22-23. Defendants also admit that hand washing stations were not installed until January 2024 and water stations were not installed until February 2024. *See* Schwerdtfeger Dec. ¶¶ 25-26. Defendants unjustifiably disclaim responsibility for ensuring humane conditions unless and until a child has been "transported to a USBP station for processing." *Id.* at ¶ 17.

Defendants assert that in 2023 CBP "generally" transported out individuals "within 24-hours of their encounter" and in 2024, CBP has transported people

within 12 hours of encounter. *See* Schwerdtfeger Dec ¶ 27.[9] As Plaintiffs' evidence demonstrates, it is dangerous for a child to be in an OADS for any amount of time, and 12 hours is far too long to go without adequate shelter, food, water, or medical care. *See* Pls. MTE Sec. II.A. As recently as February 2024, children have suffered medical emergencies because of exposure to cold and wet conditions at OADS. *See* Saulo Dec. ¶¶ 13, 16-17; Pinheiro Dec. ¶ 15; Kahn Dec. ¶¶ 67-69, 81.

    3. <u>Defendants fail to expeditiously process children at the OADS.</u>

    Defendants appear to argue that 12 hours is sufficiently expeditious to satisfy the requirement that they expeditiously process all minors. *See* Defs. Br. at 22-23. They are wrong, especially considering that processing and pre-processing time occurs in dangerous and unsanitary conditions. Furthermore, Defendants do not provide any *specific* evidence contradicting Plaintiffs' evidence that children have spent longer in OADS after being encountered by CBP. *See* Pls. MTE Secs. II, III.D. While the reduced time, if true, is encouraging, it does not reflect a consistent, ongoing reduction in time children are spending in OADS. The past 18

---

[9] The Court has previously required additional reporting in response to violations of the Settlement. *See, e.g.*, *Flores v. Barr*, 2020 WL 5491445, at *10-11. Defendants state that they are already keeping records of "the length of time [individuals encountered by CBP subject to arrest] remained in the field before transport to a detention facility" *in addition* to the number of individuals arrested by each station within the sector and the "time in custody" of people "in custody at each facility." Schwerdtfeger Dec. ¶ 2. Such recordkeeping shows that CBP tracks information about individuals at OADS both before and after it takes them to a physical detention facility. This recordkeeping undermines Defendants' complaints about recording all instances in which a class member is held in the field longer than two hours since CBP already tracks this information. Defs. Br. at 23; *see also* Schwerdtfeger Dec. ¶ 2. Either Defendants are in violation of their obligations under the TVPRA because they are not identifying unaccompanied minors and accurately tracking the time from discovery for purposes of notification to HHS, or they are already tracking much of the information requested in Plaintiffs' proposed order. *See* 8 U.S.C. § 1232(b)(2).

months has shown that processing times ebb and flow, and conspicuously shorten when CBP and specific OADS are under scrutiny. *See* Pinheiro Decl. ¶¶ 36-39.

Although CBP's declarant generally asserts that CBP prioritizes children and other vulnerable groups for processing, he points to no official CBP policy or specific procedures to ensure that children are *actually* prioritized in practice. *See* Schwerdtfeger Dec. ¶¶ 19, 22, 24, 31. Even if such a policy exists, Defendants do not address Plaintiffs' specific evidence that CBP often fails to prioritize vulnerable groups and sometimes forces children and their families to wait in OADS while single adults who arrived later are processed first. *See* Pls. MTE Sec. III.D; *see also* Kahn Dec. ¶ 99; Saulo Dec. ¶ 20; Cheng Dec. ¶¶ 17-19; *see also Flores v. Johnson*, 212 F. Supp. 3d at 881-82 ("The mere existence of those policies tells the Court nothing about whether those policies are actually implemented, and the current record shows quite clearly that they were not."). Defendants appear to agree that, since CBP stopped issuing wristbands at OADS, "processing is chaotic." *See* Defs. Br. at 21 (citing Pinheiro Dec. ¶ 32; Cheng Dec. ¶¶ 17-20).

Plaintiffs recognize the challenges posed by the large number of people entering the United States through the southern border. However, as an agency tasked with addressing the ebbs and flows of migration into the United States, CBP has decades of experience planning for and responding to shifts in both where people enter and how many people enter.

In this case, the large number of people entering the San Diego sector is not a surprise. In fact, Defendants admit they have been aware of the increasing and large numbers of individuals entering for well over a year, since at least October 2022. *See* Schwerdtfeger Dec. ¶ 6. Two CRCL complaints were filed with DHS in May and December of 2023, highlighting the horrific conditions in the OADS. *See* Serrano Dec. ¶ 3, Exs. A-B. The second of these complaints was filed after CRCL

completed a review of the initial complaint and raised concerns with CBP about the conditions. Serrano Dec., Ex. B at ECF 31-32; *see also* Pinheiro Dec. ¶ 39.

Moreover, DHS's Office of the Inspector General ("OIG") inspected facilities in the San Diego Sector in May 2023. U.S. Dept. of Homeland Sec. Office of the Inspect. Gen., *Results of Unannounced Inspections of CBP Holding Facilities in the San Diego Area* (Nov. 15, 2023), https://www.oig.dhs.gov/sites/default/files/assets/2023-11/OIG-24-07-Nov23.pdf (last visited Mar. 19, 2024). Notably, the OIG's office found that "detainees in CBP custody experienced prolonged detention and overcrowding" despite three of the five stations visited (including Imperial Beach) being under capacity at the time of inspection, highlighting the need to better coordinate among stations within the sector. *Id.* at 5-6.[10] That several CBP stations were *under* capacity in May 2023 while CBP was holding children in OADS undermines CBP's capacity arguments.

Defendants assert they are making efforts to address their responsibilities to migrants entering the United States at the southern border. Schwerdtfeger Dec. ¶ 31. Yet, in the past year and a half, CBP has only managed to add capacity for 250 individuals in its soft-sided temporary facility to bring the San Diego sector's overall capacity to 2,716. *Id.* at ¶¶ 2, 6, 31. Although the number of people detained at OADS will continue to ebb and flow, without a court order clarifying

---

[10] Mr. Schwerdtfeger claims that the Imperial Beach Station capacity was a driving force behind CBP's use of OADS to corral and hold noncitizens it wished to arrest. *See* Schwerdtfeger Dec. ¶ 6 ("Over time, the number of individuals arriving in large groups exceeded IMB's ability to immediately conduct a field interview and arrest them, due to constraints in detention capacity, staffing, and transportation."). However, the OIG report reveals that in May 2023, when advocates filed a CRCL complaint outlining dire conditions at Whiskey 8 and nearby OADS, there was, in fact, capacity at the Imperial Beach Station. U.S. Dept. of Homeland Sec. Office of the Inspect. Gen., *Results of Unannounced Inspections of CBP Holding Facilities in the San Diego Area* (Nov. 15, 2023), https://www.oig.dhs.gov/sites/default/files/assets/2023-11/OIG-24-07-Nov23.pdf (last visited Mar. 19, 2024) at 6.

children's status as *Flores* class members, children will continue to suffer in dangerous conditions.

**III.   CONCLUSION**

Plaintiffs respectfully request the Court grant this motion and order Defendants to comply with the Settlement with respect to all class members held at OADS.

Dated: March 22, 2024            CENTER FOR HUMAN RIGHTS AND
                                 CONSTITUTIONAL LAW
                                 Carlos R. Holguín
                                 Sarah Kahn

                                 NATIONAL CENTER FOR YOUTH LAW
                                 Mishan Wroe
                                 Diane de Gramont

                                 CHILDREN'S RIGHTS
                                 Leecia Welch

                                 */s/ Mishan Wroe*
                                 Mishan Wroe
                                 *One of the Attorneys for Plaintiffs*

21