UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 85-4544-DMG (AGRx) | Date | April 3, 2024 |
| Title | *Jenny L. Flores, et al. v. Merrick Garland, et al.* | Page | 1 of 12 |

Present: The Honorable  **DOLLY M. GEE, CHIEF UNITED STATES DISTRICT JUDGE**

| KELLY DAVIS | NOT REPORTED |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
|---|---|
| None Present | None Present |

**Proceedings: IN CHAMBERS—ORDER RE PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT RE "OPEN AIR DETENTION SITES" [1392]**

## I.
## INTRODUCTION

On February 29, 2024, Plaintiffs filed a motion to enforce the *Flores* Settlement Agreement ("FSA") with respect to Class Members allegedly being detained in inhumane conditions at "Open Air Detention Sites" ("OADS") along the California-Mexico border. [Doc. # 1392 ("MTE").] Defendants largely do not seem to challenge Plaintiffs' presentation of facts concerning the conditions in the OADS—rather, Defendants maintain that the Court lacks jurisdiction over Plaintiffs' MTE because the United States Border Patrol ("USBP") does not have legal custody over the minors in the OADS. The motion is fully briefed. [Doc. ## 1398 (Opp.), 1399 (Reply)]. The Court held a hearing on the MTE on March 29, 2024.

Having carefully considered the parties' arguments and for the reasons set forth below, the Court **GRANTS in part** and **DENIES in part** Plaintiffs' motion to enforce.

## II.
## BACKGROUND

A. **The *Flores* Agreement**

On January 28, 1997, the Court approved the *Flores* Agreement—a class action settlement—between Plaintiffs and the federal government. *See Flores v. Sessions*, 862 F.3d 863, 866 (9th Cir. 2017). At the time of the settlement, the Immigration and Naturalization Service ("INS") was the primary agency tasked with enforcing the nation's immigration laws. It was the INS's conduct that was at issue in the *Flores* litigation, which is memorialized in the Agreement's class definition: "All minors who are detained in the legal custody of the INS." FSA at ¶ 10 [Doc. # 101].

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 85-4544-DMG (AGRx) | Date | April 3, 2024 |
| Title | *Jenny L. Flores, et al. v. Merrick Garland, et al.* | Page | 2 of 12 |

In 2002, Congress passed the Homeland Security Act, which abolished the INS and restructured the agencies responsible for enforcing immigration laws. The newly created Department of Homeland Security ("DHS") and the Office of Refugee Resettlement ("ORR")—an agency within the Department of Health and Human Services ("HHS")—took over the duties of INS. 6 U.S.C. §§ 251, 279, 291. DHS also inherited the responsibilities of the former U.S. Customs Service. *Id.* at § 203(1). The immigration and customs security and enforcement-related functions were comingled and vested into two agencies within DHS: Customs and Border Protection ("CBP") and Immigration and Customs Enforcement ("ICE"). *See* 6 U.S.C. § 211; *id.* at § 252 (establishing the Bureau of Border Security); H.R. Doc. No. 108-32, at 1 (renaming the Bureau of Border Security the "Bureau of Immigration and Customs Enforcement").

The *Flores* Agreement is binding upon the named Defendants and their "agents, employees, contractors and/or successors in office." FSA at ¶ 1. Consequently, after the reorganization of the INS, its "obligations under the Agreement now apply to the Department of Homeland Security and the Department of Health and Human Services." *Flores v. Barr*, 934 F.3d 910, 912 n.2 (9th Cir. 2019).

**B.      Open Air Detention Sites (OADS)**

Beginning in or around October 2022, large groups of migrants started entering the United States from Mexico at an area west of the San Ysidro Port of Entry. Declaration of Brent L. Schwerdtfeger ¶ 6 [Doc. # 1398-1 ("Schwerdtfeger Decl.")]. CBP's Imperial Beach Station ("IMB") covers this area. *Id.* Later, beginning in or around March 2023, the desert town of Jacumba, California also started seeing increased numbers of migrants entering the United States and waiting to be processed. *Id.* ¶ 12. CBP's Boulevard Station ("BLV") and Campo Station ("CAO") cover this area together. *Id.* The number of these individuals soon outnumbered the capacities of the detention facilities in IMB, BLV, and CAO areas. *Id.* ¶¶ 6, 12. As a result, large groups of people have been left waiting for anywhere from several hours to multiple days before CBP can process them and transport them to a detention facility. Declaration of Dr. Theresa Cheng ¶ 12 [Doc. # 1392-8 ("Dr. Cheng Decl.")]. The areas in which they have been waiting have grown into the OADS at issue in this motion.

The MTE raises concerns over the conditions at seven OADS in the San Diego area, each of which has a name. Four OADS—Whiskey 8, Whiskey 4, Spooner's Mesa, and 91X—are located west of the San Ysidro Port of Entry, and three OADS—Moon Valley, Tower 177, and Willows—are located in Jacumba. The parties agree that these OADS exist, but they dispute whether the individuals within the OADS are in the legal custody of CBP.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544-DMG (AGRx) | Date | April 3, 2024 |
|---|---|---|---|
| Title | *Jenny L. Flores, et al. v. Merrick Garland, et al.* | Page | 3 of 12 |

At the San Ysidro OADS, migrants are waiting between two 30-foot fences. They crossed the first (or "primary") fence and only go past or through the secondary fence if they are being taken by either CBP for processing or EMTs for emergency medical care. Depending on the site, the Jacumba OADS are surrounded by the border wall, train tracks, a highway blocked by CBP vehicles, the desert, mountains, or some combination of the above. CBP patrols the areas around the OADS and there are No Trespassing signs with CBP's emblem posted at some of the sites. Because the sites are in the desert, temperatures at the OADS vary significantly throughout the day. In summer, temperatures can be over 110 degrees and, in the winter, temperatures can drop to around 20 degrees. The topography at the OADS is quite rocky, sandy, and barren, so there is little natural shelter from the elements. There are typically some trees and various forms of brush that migrants try to burn to keep warm at night. Declaration of Erika Pinheiro ¶ 12 [Doc. # 1392-14 ("Pinheiro Decl.")]. Children have been held at the OADS for anywhere "from several hours to several days." MTE at 25; Declaration of Pedro Rios ¶¶ 15, 17 [Doc. # 1392-5 ("Rios Decl.")]; Declaration of Flor de Luna Alvarez-Lopez ¶ 23 [Doc. # 1392-6 ("Alvarez-Lopez Decl.")].

On any given day, nonprofit volunteers report witnessing anywhere from dozens to hundreds of migrants "camping" in the OADS, including children. Rios Decl. ¶ 7. For example, during a week and a half in May 2023, Border Kindness volunteers saw approximately 1,800 people at the Tower 177, Willows, and O'Neill sites.[1] Declaration of Jacqueline Arellano ¶ 5 [Doc. # 1392-7 ("Arellano Decl.")]. From March to December 2023, officers from the IMB station made over 71,000 arrests, and officers from the BLV and CAO stations collectively made over 96,000 arrests. Schwerdtfeger Decl. ¶¶ 6, 12. Over 20,000 of BLV and CAO's arrests were made in December 2023 alone. *Id.* ¶ 12.

Volunteers and advocates at the border have expressed many concerns over the access to adequate food and water, sanitation, and medical services at the OADS, all of which the Court examines below. Although nonprofit organizations frequent the sites to supply clothing, blankets, food, water, and other necessities to the best of their abilities, the need outpaces their ability to provide this assistance. Plaintiffs contend that CBP has an obligation to care for the minors at the OADS. Pinheiro Decl. ¶ 7.

---

[1] The O'Neill site is not currently in use.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544-DMG (AGRx) | Date | April 3, 2024 |
|---|---|---|---|
| Title | *Jenny L. Flores, et al. v. Merrick Garland, et al.* | Page | 4 of 12 |

## III.
## LEGAL STANDARD

Although the Court has already defined the legal standard on a motion to enforce in previous orders, it will do so again here since the Court has not decided a motion to enforce in this case for several years. *See Flores v. Sessions*, 394 F. Supp. 3d 1041, 1048–50 (C.D. Cal. 2017); *Flores v. Johnson*, 212 F. Supp. 3d 864, 869–70 (C.D. Cal. 2015).

As is now well-established in this action, this Court has the inherent power to enforce the terms of the Agreement because, with certain exceptions not relevant here, the Agreement "provides for the enforcement, in this District Court, of the provisions of this Agreement. . . ." *See* FSA ¶ 37; *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380-81, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994); *Dacanay v. Mendoza*, 573 F.2d 1075, 1078 (9th Cir. 1978). "[T]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir. 2004) (quoting *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992)).

The *Flores* Agreement is a consent decree. "Consent decrees have the attributes of both contracts and judicial acts," and in interpreting consent decrees, courts apply traditional contract principles. *Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir. 1990). Under California law, a court must interpret a contract with the goal of giving effect to the mutual intention of the parties as it existed at the time of contracting. Cal. Civ. Code § 1636. Where the parties dispute the meaning of specific contract language, "the court must decide whether the language is 'reasonably susceptible' to the interpretations urged by the parties." *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 798, 79 Cal. Rptr. 2d 273 (1998). If the contract is clear, however, the plain language of the contract governs. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1264, 10 Cal. Rptr. 2d 538 (1998).

The Court must consider the contract as a whole and be sure "to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Pinel v. Aurora Loan Servs., LLC*, 814 F. Supp. 2d 930, 943 (N.D. Cal. 2011) (quoting Cal. Civ. Code § 1641) (internal quotation marks omitted). "Courts must interpret contractual language in a manner that gives force and effect to every provision, and not in a way that renders some clauses nugatory, inoperative or meaningless." *Id.* When necessary, a court can look to the subsequent conduct of the parties as evidence of their intent. *See Crestview Cemetery Assn. v. Dieden*, 54 Cal. 2d 744, 754, 8 Cal. Rptr. 427 (1960). If there is still uncertainty after the Court applies the foregoing rules, "the language

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 85-4544-DMG (AGRx) | Date | April 3, 2024 |
| Title | *Jenny L. Flores, et al. v. Merrick Garland, et al.* | Page | 5 of 12 |

of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Cal. Civ. Code § 1654.

## IV.
## DISCUSSION

### A.     Evidentiary Objections

Defendants objected to specific statements in certain declarations on the ground that those statements are hearsay under Federal Rules of Evidence 801(c) and 802. Opp. at 20 n.4. Their objections concern the following three allegations: (1) that minors have spent multiple nights at the OADS; (2) that minors are separated from their parents; and (3) that Border Patrol agents tell minors to stay at the OADS and returns them if they leave. *Id.* Plaintiffs assert that they offered the contested statements not for the truth of the matter asserted, but to establish that the particular statements were made. Reply at 18 n.6.

Having reviewed the record, the Court concludes that Plaintiffs have offered non-hearsay evidence to support the three challenged allegations. *See* Dr. Cheng Decl. ¶ 12 (multiple nights);[2] Jasso Decl. ¶¶ 17–18 (family separation); Dr. Cheng Decl. ¶ 22 (telling minors to stay at the OADS); Pinheiro Decl. ¶¶ 24, 25 (bringing minors to OADS); Arellano Decl. ¶¶ 9–10 (same); Saulo Decl. ¶¶ 11–13 (telling family to stay at OADS); E.G. Decl. ¶ 12 (telling minor to stay at OADS). Nonetheless, where possible, the Court avoids citing evidence to which Defendants have objected. To the extent the Court does not directly address any of Defendants' objections in this Order, it is because the Court did not rely on the objected-to evidence in reaching its ruling. Any objections to such evidence are **OVERRULED as moot**.

### B.     Definitions

Defendants argue that the individuals in the OADS, including Class Members, are not "in the custody of" CBP because they have not yet been arrested or apprehended. Opp. at 14–27. Plaintiffs, on the other hand, contend that: (1) CBP has apprehended minors at OADS because they are not free to leave, and (2) minors at OADS are in the legal custody of CBP because CBP

---

[2] Defendants challenge Dr. Cheng's statement about seeing minors being held for multiple nights because "it is ambiguous whether the declarant is relying on personal knowledge or hearsay." Dr. Cheng stated that she went to all three OADS in Jacumba every day during the week she describes in her declaration, so the Court does not find it to be "ambiguous" whether she is relying on personal knowledge. Defendants' hearsay objection to paragraph 12 of Dr. Cheng's declaration is **OVERRULED**.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 85-4544-DMG (AGRx) | Date | April 3, 2024 |
| Title | *Jenny L. Flores, et al. v. Merrick Garland, et al.* | Page | 6 of 12 |

is in control of the conditions at the OADS and thus in control of the welfare of the Class Members detained within the OADS.

  1. **Legal Custody**

  This is not the first disagreement the parties have had about the meaning of "legal custody" as it relates to the FSA. In September 2020, prompted by CBP's "hoteling" of noncitizens during the height of the COVID-19 pandemic, the Court clarified the meaning of "legal custody" under the *Flores* Agreement:

> The Agreement employs the formal meaning of "legal custody," derived from family law, signifying the right and responsibility to care for the well-being of the child and make decisions on the child's behalf. *See* Black's Law Dictionary (11th ed. 2019) (defining "legal custody" as "[t]he authority to make significant decisions on a child's behalf, including decisions about education, religious training, and healthcare"); Cal. Fam. Code §§ 3003, 3006 (defining "legal custody" as "the right and the responsibility to make the decisions relating to the health, education, and welfare of a child"); *see also In re Jennifer R.*, 14 Cal. App. 4th 704, 710 (1993) (recognizing legal custody as the ability to make "major decisions that are going to effect [sic] the life of the child").

The Court determined that the family law definition for "legal custody" was the most appropriate in the *Flores* context because each use of "custody" or "legal custody" in the FSA "connotes the ability to provide care and supervision for the child." *Flores v. Barr*, No. CV-85-4544-DMG (AGRx), 2020 WL 5491445 at * 3 (C.D. Cal. Sept. 4, 2020). The Ninth Circuit affirmed this Court's decision that the minors were in the legal custody of DHS because "it [was] clear that DHS maintain[ed] physical control and exercise[d] decision-making authority over the minors held in hotels under Title 42." *Flores v. Garland*, 3 F.4th 1145, 1155 (9th Cir. 2021).

  Here, applying the same definition, the Court concludes that CBP maintains legal custody over minors at OADS. CBP has decision-making authority over the health and welfare of the children at OADS. CBP also exercises physical control over the minors at OADS.

  a. **Control of Health and Welfare**

  The ability to exercise discretion over, and make decisions affecting, a child's health and welfare is indicative of maintaining legal custody of the child, regardless of whether that decision is to provide or withhold care. For example, in *Mueller v. Auker*, the Muellers refused to treat their

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | CV 85-4544-DMG (AGRx) | Date | April 3, 2024 |
|---|---|---|---|
| Title | *Jenny L. Flores, et al. v. Merrick Garland, et al.* | Page | 7 of 12 |

daughter for meningitis, despite the emergency doctor's recommendations, because they were concerned that the treatment would put their daughter at a greater risk for other illnesses or injuries. 700 F.3d 1180, 1187 (9th Cir. 2012). The emergency doctor consulted a pediatrician, who then consulted a social worker. *Id.* The State took temporary legal custody of the Muellers' daughter and consented, on behalf of the minor, to the emergency medical treatment. *Id.* at 1192. The *Mueller* case is instructive here for two reasons. First, just as "legal custody" is required to consent to medical care on behalf of a minor, it also grants custodians or guardians the ability to *prevent* a minor from receiving care. Second, it exemplifies the now well-established principle that "juveniles, unlike adults, are always in some form of custody." *See Reno v. Flores*, 507 U.S. 292, 302 (1993) (quoting *Schall v. Martin*, 467 U.S. 253, 265 (1984) (internal quotation marks omitted)).

Here, given that the minors at the OADS are in "some form of custody," the question is whether they are in CBP's custody. Plaintiffs submitted 11 declarations, some with photos or other substantive attachments, describing the presence and behavior of CBP officers at the OADS. Many declarants recount seeing migrants, including children, suffering from significant injuries or other serious medical issues. *See* Rios Decl. ¶ 35 (monitoring a 12-year-old boy's 103-degree temperature); Pinheiro Decl. ¶ 37 (describing a 13-year-old boy who was badly injured in a car accident south of the border and soon died from his injuries); Arelano Decl. ¶ 19 (recounting seeing people in OADS having "seizures, symptoms of smoke inhalation, severe kidney pain to the point of vomiting, diabetic emergencies, and people going into labor); Saulo Decl. ¶ 15 (describing his daughter violently shaking from being so cold). Defendants contend that CBP provides emergency medical assistance to anyone they encounter who is in "apparent medical distress," but several of the declarants state otherwise. Opp. at 25; Dr. Cheng Decl. ¶ 39 (stating that she had to repeatedly ask CBP agent to help her do CPR). This means that, if the volunteers were not present, CBP would have unilateral control over whether minors received any form of medical care. In addition to CBP officers failing to provide medical care themselves, volunteers have also reported that local EMS only responds to emergency calls from CBP and will not respond to calls made by migrants or volunteers at the OADS. Alvarez-Lopez Decl. ¶ 31; Pinheiro Decl. ¶ 59; Arellano Decl. ¶ 19. Border Patrol sometimes declined to make 911 calls, accusing migrants of "faking" medical emergencies to try to leave the sites. Arellano Decl. ¶ 19; Serrano Decl. ¶¶ 25, 29; Alvarez-Lopez Decl. ¶ 31; Pinheiro Decl. ¶ 54. In other words, CBP agents exercise their discretion with regard to minors' health and welfare within the OADS.

It is also reported that CBP controls whether humanitarian organizations are allowed to provide aid through the border walls at the OADS. Kahn Decl. ¶¶ 20, 21. At one point, the volunteers and advocates had to speak with sector leadership to obtain permission to continue providing aid at the OADS. *Id.*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 85-4544-DMG (AGRx) | Date | April 3, 2024 |
| Title | *Jenny L. Flores, et al. v. Merrick Garland, et al.* | Page | 8 of 12 |

Plaintiffs have submitted voluminous evidence that CBP also largely controls the provision of porta-potties, handwashing stations, dumpsters, drinking water at the OADS. Although volunteers have been providing meals, water bottles, tarps, and tents to the extent possible, migrants have had to rely on CBP for anything more. For example, CBP installed a couple of porta-potties and dumpsters at each OADS, although they were quickly filled and irregularly serviced. *See* Rios Decl. ¶ 30; Pinheiro Decl. ¶ 47; Kahn Decl. ¶ 29; Alvarez-Lopez Decl. ¶ 26. Throughout January and February 2024, CBP placed two handwashing stations and one water station near the San Ysidro OADS and six handwashing stations and three water stations near the Jacumba OADS. Schwerdtfeger Decl. ¶ 26. CBP reports that two additional water stations are "anticipated for delivery" at the Jacumba sites. *Id.* Volunteers who have visited since the installation of these facilities have noted the handwashing and water stations are not regularly maintained either—the handwashing stations have been filled with trash and the spigots to the water stations are dirty. Kahn Decl. ¶ 119.

Although the mere provision of humanitarian aid would not necessarily imply that Defendants have taken the recipients of such aid "in custody," there is other evidence of CBP's physical control over the minors held at the OADS, as discussed below.

      **b.**    **Physical Control**

There is significant evidence in the record that CBP has physical control over minors at the OADS. First, numerous declarants describe the different ways in which they have witnessed CBP direct migrants, including children, to the OADS. On some occasions, CBP vehicles transport and drop off migrants, of all ages, at the OADS. *See* Jasso Decl. ¶ 10; Pinheiro Decl. ¶ 24; Serrano Decl. ¶ 10; Alvarez-Lopez Decl. ¶¶ 14, 37. On other occasions, CBP has instructed them to follow their vehicles to OADS. *See* Rios Decl. ¶ 21; Arellano Decl. ¶ 9; E.G. Decl. ¶ 6; Saulo Decl. ¶ 8. CBP also will point and give migrants verbal directions to the OADS. *See* Alvarez-Lopez Decl. ¶ 9; Jasso Decl. ¶ 10; Serrano Dec. ¶ 11.

Declarants describe overhearing CBP officers tell migrants that they have to stay at the OADS unless they want to be deported or lose the chance to be processed. *See* Arellano Decl. ¶ 12; Alvarez-Lopez Decl. ¶ 17; Serrano Decl. ¶ 12. This includes telling migrants that they will not be processed if they leave the OADS in an ambulance due to a medical emergency. Rios Decl. ¶ 36; Alvarez-Lopez Decl. ¶ 30. At Spooner's Mesa,[3] one of the most difficult OADS for volunteers

---

[3] Spooner's Mesa is also known as "The Men's Camp" because Border Patrol typically sends any male over the age of 18 without a biological child or a legal spouse there. Alvarez-Lopez Decl. ¶ 11.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 85-4544-DMG (AGRx) | Date | April 3, 2024 |
| Title | *Jenny L. Flores, et al. v. Merrick Garland, et al.* | Page | 9 of 12 |

to reach, migrants who have asked CBP officers whether they can leave to get food and water have been told they cannot. Jasso Decl. ¶ 22. Any time someone at Spooner's Mesa has been allowed to leave, they have had to obtain permission from Border Patrol agents. *Id.* Further, although their efficacy is in dispute, many sites also have cameras that alert CBP if a migrant leaves. Rios Decl. ¶ 4; Pinheiro Decl. ¶ 29. If an individual does leave the OADS, Border Patrol brings them back. Arellano Decl. ¶ 11; *see also* Dr. Cheng Decl. ¶ 23 (recounting story of when a CBP officer saw her outside of the OADS, thought she was a migrant, and attempted to take her back to the Willows OADS).

From May to December 2023, CBP implemented a "wristband" system at the OADS. Under this system, CBP gave all migrants arriving at the OADS a wristband, the color of which was determined by their day of arrival. *See* Rios Decl. ¶ 18; Pinheiro Dec. ¶ 31; Schwerdtfeger Decl. ¶ 24. According to CBP, this was "to identify how long individuals had been present in those locations, in order to help prioritize whom to interview, determine [citizenship], arrest, and transport to a USBP station." Schwerdtfeger Decl. ¶ 24. After giving noncitizens a wristband, officers instructed migrants to walk towards the OADS and wait to be processed. Pinheiro Decl. ¶ 39. Although CBP asserts that they did not force migrants to take a wristband, there are no records of anyone declining a wristband. Schwerdtfeger Decl. ¶ 24. Even after CBP stopped utilizing the wristband system, agents still instruct migrants to line up to be counted. Alvarez-Lopez Decl. ¶ 16; Dr. Cheng Decl. ¶ 17; Schwerdtfeger Decl. ¶ 24.

In light of the foregoing, the Court concludes that the minors at the OADS are in the legal custody of CBP because CBP exerts control over their health, welfare, and physical movement. Although it may be true that CBP did not initially *intend* for these locations to become OADS collectively holding thousands of migrants, it is nonetheless true the situation has evolved such that the minors held there are in the legal custody of CBP. As the Court stated in its "hoteling" decision, the Agreement applies anytime "the successors to the INS h[o]ld minors in their legal custody—whether 'by mere coincidence' or not[.]" *Flores*, 2020 WL 5491445 at *5.

    2.    **Arrest or Apprehend**

Both sides use the terms "arrest" and "apprehend" interchangeably in their briefing on this motion. The Court therefore declines to draw a distinction between the two terms for purposes of this motion. What is at issue here is the parties' disagreement over whether the minors at the OADS have been arrested or apprehended, regardless of which term is used. Essentially, Defendants argue that the terms of the FSA are not triggered until a minor has been actively arrested and transported to a detention facility. Opp. at 11. In contrast, Plaintiffs assert that a migrant minor is apprehended at "the moment of first encounter" because from that moment until

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 85-4544-DMG (AGRx) | Date | April 3, 2024 |
| Title | *Jenny L. Flores, et al. v. Merrick Garland, et al.* | Page | 10 of 12 |

the child's release or transfer, CBP makes decisions about the child's welfare and the child is not free to leave. MTE at 16.

The parties are concerned with the term "arrest" because Section V of the Agreement is titled "Procedures and Temporary Placement Following Arrest" and Paragraph 12.A states "[f]ollowing *arrest,* the INS shall . . . ." FSA at ¶ 12.A (emphasis added). The Court finds this emphasis on the term to be misguided because the Agreement itself draws little, if any, distinction between minors who are "in custody" and minors who have been "arrested." For example, the first sentence of Paragraph 11 discusses the treatment of all minors "in [] custody," in the same manner that Paragraph 12.A refers to their treatment "[f]ollowing arrest." Indeed, the class definition—"All minors who are detained in the legal custody of the INS"—makes no mention of arrest or apprehension. FSA at ¶ 10. If the parties meant for the Agreement to grant different protections to minors depending upon whether they had been formally arrested and booked, that would be clear from its language. Defendants give no explanation for why the parties would have intended to formalistically allow the INS and its successors to avoid being bound by the Agreement while a child was "in custody," but not yet technically "arrested." *See Badie,* 67 Cal. App. 4th at 798 ("the court must decide whether the language is 'reasonably susceptible' to the interpretations urged by the parties"). The Court finds no need to decide which party's definition of "arrest" is the correct one, and concludes that the minors held at the OADS are "in legal custody" within the meaning of the FSA and entitled to the protections that the Agreement provides.

**C.     Violation of the *Flores* Agreement**

Because Defendants do not seem to contest that the conditions at the OADS would be in violation of the FSA if the minors held there are Class Members—and the Court has just concluded that they are—the Court will only briefly address *why* the conditions at the OADS violate the FSA.

First, Plaintiffs proffer evidence, in the form of numerous declarations from both volunteers and noncitizens at the OADS, attesting to conditions that do not meet the "safe and sanitary" standard described in Paragraph 12 of the FSA. The limited number of dumpsters and porta-potties do not seem to be serviced frequently enough and are overflowing and unusable as a result. *See* Rios Decl. ¶ 30; Pinheiro Decl. ¶ 47; Kahn Decl. ¶ 29; Alvarez-Lopez Decl. ¶ 26. This means that the OADS not only have a foul smell, but also that trash is strewn about the OADS, and Class Members are forced to relieve themselves outdoors. *See* Pinheiro Decl. ¶ 47; Dr. Cheng Decl. ¶ 32. These realities only add to the unsafe and unsanitary conditions of the OADS. This is in violation of Paragraph 12.A's requirement that INS "hold minors in facilities that are safe and sanitary."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | CV 85-4544-DMG (AGRx) | Date | April 3, 2024 |
| Title | *Jenny L. Flores, et al. v. Merrick Garland, et al.* | Page | 11 of 12 |

Second, although Defendants have provided bottled water and snacks to the migrants at the OADS, there is abundant evidence that what they are providing is not adequate for minors. *See* U.S. Customs and Border Protection, *National Standards on Transport, Escort, Detention, and Search*, at §§ 2.6, 5.6 (setting minimum standard that juveniles should receive a meal every six hours, at least two of which must be hot); *see also* Pinheiro Decl. ¶ 44 (explaining that, generally, CBP hands out one bottle of water and one pack of crackers to each migrant each day); Serrano Decl. ¶ 9 (describing the inconsistencies of when CBP provides water and snacks); Jasso Decl. ¶ 24 (same). This is not an "appropriate" provision of food for children and is thus in violation of Paragraph 12.A of the FSA.

Lastly, it appears that CBP has not been processing Class Members as expeditiously as possible. Although the Court recognizes the practical difficulties that CBP faces at the OADS in times of influx, Plaintiffs have submitted evidence that CBP finds the ability to process children more efficiently in times of scrutiny. *See* Pinheiro Decl. ¶ 37 (reporting on how between October 10–13, 2023, CBP was able to process most migrants out of the Jacumba OADS in only two to three days before DHS headquarters staff visited). Despite finding that CBP has violated the FSA by not processing minors at the OADS as expeditiously as possible, however, the Court declines to order a specific time limit as requested by Plaintiffs but not found in the Agreement. Instead, the Court reminds Defendants that the "clock" begins ticking as soon as minors are "in custody" of CBP, whether that is at an OADS or otherwise. Failure to process minors in a reasonably expeditious manner following notice of this decision may result in further remedial measures.

## V.
## CONCLUSION

In light of the foregoing, Plaintiffs' motion to enforce the *Flores* Agreement is **GRANTED in part** and **DENIED in part**. The Court hereby **ORDERS** as follows:

1. All minors who are detained in the legal custody of DHS at "Open Air Detention Sites" are Class Members as defined by Paragraph 10 of the *Flores* Agreement.

2. As required by Paragraph 12.A of the Settlement, DHS shall expeditiously process all Class Members in their custody. DHS shall place Class Members in facilities that are safe and sanitary and that are consistent with DHS's concern for the particular vulnerability of minors.

3. CBP shall cease directing minors to open-air sites or holding minors in open-air sites, except for the amount of time DHS reasonably requires to prepare the minor

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | |
|---|---|
| Case No.   **CV 85-4544-DMG (AGRx)** | Date   **April 3, 2024** |
| Title   ***Jenny L. Flores, et al. v. Merrick Garland, et al.*** | Page   **12 of 12** |

and/or actively arrange for transport of the minor to a more suitable facility, as this behavior constitutes unnecessary delay.

4. As required by Paragraph 28.A of the FSA, the CBP Juvenile Coordinator shall (a) maintain records and statistical information on minors held in CBP custody for more than 72 hours, *inclusive of* the amount of time any Class Member spends in the open-air sites; and (b) monitor compliance with the Agreement with respect to any minors held in open-air sites.

5. As required by Paragraph 12.A of the Settlement, DHS shall provide Class Members contact with family members who were arrested with the minor. This shall include all family members DHS encountered with the minor, including family members directed to proceed to and/or to remain in open-air sites.

6. The CBP Juvenile Coordinator shall file an interim report by **May 10, 2024** to provide the Court with an update regarding the number of minors held in open-air sites and the status of compliance with this Order. Plaintiffs may respond to the interim report by **May 17, 2024**.

**IT IS SO ORDERED.**