BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director
FIZZA BATOOL
JOSHUA C. MCCROSKEY
Trial Attorneys
District Court Section
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-4863
Fax: (202) 305-7000
Email: fizza.batool2@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MERRICK B. GARLAND, Attorney General of the United States, *et al.*,<br><br>Defendants. | Case No. 2:85-cv-04544-DMG<br><br>**DEFENDANTS' MOTION TO TERMINATE THE FLORES SETTLEMENT AGREEMENT AS TO THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**<br><br>Hearing Date: June 7, 2024<br>Time: 9:30 a.m.<br>Hon. Dolly M. Gee<br>[Proposed] Order Filed Concurrently |

## NOTICE OF MOTION

NOTICE IS HEREBY GIVEN that the U.S. Department of Justice and the U.S. Department of Health and Human Services ("HHS"), by and through undersigned counsel, will bring this motion for hearing on June 7, 2024, at 9:30 a.m. or as soon thereafter as counsel may be heard, before United States Chief District Judge Dolly M. Gee, in Courtroom 8C, 8th Floor, at the Los Angeles – 1st Street courthouse located within the Central District of California.

## COMPLIANCE WITH LOCAL RULE 7-3

This motion is made following a telephonic meeting of counsel pursuant to L.R. 7-3, and paragraph 37 of the *Flores* Settlement Agreement ("FSA"), which took place on May 2, 2024.

## MOTION TO TERMINATE SETTLEMENT AGREEMENT AS TO HHS

HHS hereby moves to terminate the FSA as to HHS under paragraph 40 of the FSA and Federal Rule of Civil Procedure 60(b)(5). In light of the publication of regulations implementing the FSA and the significant unforeseen changes in circumstances since the FSA was signed, the continuation of the FSA as to HHS is no longer equitable. In the alternative, if the Court does not entirely terminate the FSA as to HHS, HHS moves to partially terminate the FSA with respect to any provisions implemented by consistent regulations.

This motion is based upon the above Notice, the accompanying Memorandum of Points and Authorities, all pleadings and papers on file in this action, and such other matters as may be presented to the Court at the time of the hearing.


Dated: May 10, 2024                    Respectfully submitted,


                                       BRIAN M. BOYNTON
                                       Principal Deputy Assistant Attorney General
                                       Civil Division

WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director

*/s/ Fizza Batool*
FIZZA BATOOL
JOSHUA C. MCCROSKEY
Trial Attorneys
U.S. Department of Justice
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-4863
Email: fizza.batool2@usdoj.gov

*Attorneys for Defendants*

# <u>TABLE OF CONTENTS</u>

I. INTRODUCTION ...................................................................................1

II. BACKGROUND..................................................................................3

    A. The Statutory Framework Has Changed Since 1985 ................................3

    B. Prior Regulatory Efforts Have Not Taken Effect ......................................4

    C. The Factual and Legal Landscape Has Evolved Over the Last 27 Years...7

    D. The Foundational Rule Adds Many Additional Protections and
       Safeguards for Unaccompanied Children ................................................10

    E. The Foundational Rule Accounts for Unforeseen Changed
       Circumstances Since 1997 .....................................................................13

III. ARGUMENT....................................................................................15

    A. Courts Must Be Flexible in Releasing Governmental Operations
       from Long-Term Institutional Consent Decrees ......................................15

       1. Significant Changed Factual Conditions Warrant Modification
          of the FSA Licensed Placement Requirement ...............................18

       2. ORR's Response to De-Licensing by States Reflects Its
          Professional Judgment and Is a Suitably Tailored Response .........21

    B. Standard Programs Are Different from DHS's Proposed
       Unlicensed Family Residential Centers...................................................23

    C. Consistent with the Ninth Circuit's Approach, the Court Should
       Terminate the FSA as to HHS Even Though HHS Is Only One
       Successor of the Legacy INS..................................................................24

IV. CONCLUSION .................................................................................25

CERTIFICATE OF SERVICE..................................................................27

# <u>TABLE OF AUTHORITIES</u>

## CASES

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977)...................................................................17

*D.B. v. Cardall*,
   826 F.3d 721 (4th Cir. 2016)..................................................3, 4

*Flores v. Lynch* ,
   ("Flores I"), 828 F.3d 898 (9th Cir. 2016) ........................... 4

*Flores v. Rosen*,
   ("Flores II"), 984 F.3d 720 (9th Cir. 2020)..................................*passim*

*Freeman v. Pitts*,
   503 U.S. 467 (1992)...................................................................25

*Frew ex rel. Frew v. Hawkins*,
   540 U.S. 431 (2004)...................................................................23

*Hampton v. Mow Sun Wong*,
   426 U.S. 88 (1976)....................................................................17

*Hook v. State of Ariz.*,
   120 F.3d 921 (9th Cir. 1997)....................................................16

*Horne v. Flores*,
   557 U.S. 433 (2009)..............................................................*passim*

*In re Pearson*,
   990 F.2d 653 (1st Cir. 1993) ....................................................16

*Jackson v. Los Lunas Comm. Prog.*,
   880 F.3d 1176 (10th Cir. 2018)...........................................21, 23

*Kelly v. Wengler*,
   822 F.3d 1085 (9th Cir. 2016)...................................................22

*Marshall v. Lansing*,
   839 F.2d 933 (3rd Cir. 1988)...................................................... 3

ii

*Mathews v. Diaz*,
 426 U.S. 67 (1976) ................................................................17, 18

*Pigford v. Veneman*,
 292 F.3d 918 (D.C. Cir. 2002) ....................................................22

*Reno v. Flores*,
 507 U.S. 292 (1993) ............................................3, 7, 17, 18

*Rufo v. Inmates of Suffolk County Jail*,
 502 U.S. 367 (1992) ..................................................*passim*

*United States v. Washington*,
 573 F.3d 701 (9th Cir. 2009) ......................................................17

*Webster v. Doe*,
 486 U.S. 592 (1988) ................................................................. 3

**FEDERAL STATUTES**

6 U.S.C. § 279(a) ................................................................. 4

6 U.S.C. § 279(b) ................................................................. 4

8 U.S.C. § 1232 ................................................................. 4

8 U.S.C. § 1232(b)(1) ................................................................. 4

8 U.S.C. § 1232(b)(3) ................................................................19

8 U.S.C. § 1232(c)(2)(A) ................................................................12, 20

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 60(b)(5) ................................................................15

**FEDERAL REGULATIONS**

8 C.F.R. § 236.3(b)(9) ................................................................23

45 C.F.R. § 75.371 ................................................................22

45 C.F.R. § 410.................................................................................................1

45 C.F.R. § 410.1001.................................................................................14, 15

45 C.F.R. § 410.1003(a).....................................................................................10

45 C.F.R. § 410.1003(f).....................................................................................10

45 C.F.R. § 410.1003(e).....................................................................................11

45 C.F.R. § 410.1104(b).....................................................................................11

45 C.F.R. § 410.1105(a)(1).................................................................................10

45 C.F.R. § 410.1105(a)(2).................................................................................11

45 C.F.R. § 410.1201(a).....................................................................................11

45 C.F.R. § 410.1202(b).....................................................................................11

45 C.F.R. § 410.1202(c).....................................................................................11

45 C.F.R. § 410.1203(a).....................................................................................11

45 C.F.R. § 410.1204.........................................................................................11

45 C.F.R. § 410.1210.........................................................................................12

45 C.F.R. § 410.1302...................................................................................10, 12

45 C.F.R. § 410.1303.............................................................................10, 21, 22

45 C.F.R. § 410.1304...................................................................................10, 12

45 C.F.R. § 410.1306.........................................................................................10

45 C.F.R. § 410.1307.........................................................................................10

45 C.F.R. § 410.1308.........................................................................................12

45 C.F.R. § 410.1309.........................................................................................13

45 C.F.R. § 410.1601(a).....................................................................................12

45 C.F.R. § 410.1800(a).....................................................................................11

45 C.F.R. § 410.1800(c)......................................................................11

45 C.F.R. § 410.1903...........................................................................11

45 C.F.R. § 1001................................................................................14

**FEDERAL REGISTER**

*Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children,*
  84 Fed. Reg. 44,392 (Aug. 23, 2019) ......................................5, 23

*Processing, Detention, and Release of Juveniles,*
  63 Fed. Reg. 39,759 (July 24, 1998).......................................... 5

*Processing, Detention, and Release of Juveniles,*
  67 Fed. Reg. 1670 (2002)............................................................ 5

*Unaccompanied Children Program Foundational Rule,*
  88 Fed. Reg. 68,908 (Oct. 4, 2023) ...........................................10

*Unaccompanied Children Program Foundational Rule ("Foundational Rule"),*
  89 Fed. Reg. 34,384 (Apr. 30, 2024) ...................................1, 10, 14

**STATE CODE**

26 Tex. Admin. Code 745.115 ...........................................................8, 9

**MISCELLANEOUS**

Dep't of Justice, Immigr. & Naturalization Serv., *Fact Sheet– INS' Office of Juvenile Affairs*, (Aug. 1, 2002),
  https://webharvest.gov/peth04/20041108084954/http://uscis.gov/graphics/public affairs/factsheets/OJA.pdf ............................................................ 7

Fla. Executive Order No. 21–223 (Sep. 28, 2021), www.flgov.com/wp-content/uploads/orders/2021/EO_21-223.pdf.................................... 8

ORR Fact Sheet, *Referrals*, https://www.acf.hhs.gov/orr/about/ucs/facts-and-data (last visited May 10, 2024)....................................7, 19

*ORR Foundational Rule*, Regulations.gov, www.regulations.gov/docket/ACF-2023-0009 ...................................................................................................10

ORR, *Unaccompanied Children Released to Sponsors by State*, https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state (last visited May 9, 2024).........................................................20

Proclamation by the Governor of the State of Texas (May 31, 2021), https://gov.texas.gov/uploads/files/press/DISASTER_border_security_IMAGE_05-31-2021.pdf ........................................................................................... 8

## <u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO TERMINATE THE *FLORES* SETTLEMENT AGREEMENT AS TO THE U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES</u>

## I.  INTRODUCTION

For 27 years, the *Flores* Settlement Agreement ("FSA" or "Agreement") has governed substantial aspects of the care and custody of unaccompanied children in federal custody—through Congress's transfer of the functions of the Immigration and Naturalization Service ("INS") to the U.S. Department of Health and Human Services ("HHS") and the U.S. Department of Homeland Security ("DHS"), the passage of two major statutes governing the care and custody of unaccompanied children, and a significant increase in the number of unaccompanied children referred to the care of the Office of Refugee Resettlement ("ORR"). By its own terms the FSA was meant to be temporary. The parties initially agreed that the FSA would terminate no later than five years after final court approval and then later agreed that the FSA would terminate 45 days after the INS published final regulations implementing the FSA. FSA ¶ 40 (as modified by Stipulation, Dec. 7, 2001).

On April 30, 2024, HHS's Administration for Children and Families published the Unaccompanied Children Program Foundational Rule ("Foundational Rule"), 89 Fed. Reg. 34,384 (Apr. 30, 2024) (to be codified at 45 C.F.R. pt. 410), which governs ORR's Unaccompanied Children Program ("UC Program"). The Rule faithfully implements the FSA requirements applicable to HHS; in a number of respects exceeds FSA requirements; and in some instances, necessarily takes a modified approach in light of substantially changed circumstances since 1997. The Rule is expansive and responsive to the changing needs of ORR's UC Program. ORR anticipates it will guide its operations and provide needed protections to unaccompanied children for years to come.

The Rule not only implements the FSA requirements but also provides many important additional protections for unaccompanied children, including, *inter alia*, provisions that codify the requirements of the preliminary injunction in *Lucas R. v. Becerra*, No. 18-cv-05741 (C.D. Cal.), expand post-release services and access to legal services, require care provider facilities to use evidenced-based, trauma-informed, and culturally sensitive behavior management strategies, and create an independent Ombuds Office to receive and respond to complaints.

The Rule also responds to unforeseen changed circumstances since 1997. Most notably, since 2021, two states—Texas and Florida—have refused to license child-care programs that serve unaccompanied children in federal custody, and South Carolina has announced its intention to do so. The FSA requires unaccompanied children to be placed in state licensed programs with some exceptions, but the actions of these states have made that requirement impossible to meet in those states. Accordingly, ORR has developed a response that aims to ensure the safety and well-being of unaccompanied children without causing extraordinary disruption to ORR's UC Program. As provided in the Foundational Rule, ORR will continue to require all programs to be state-licensed or, if state licensing is not available because the state refuses to license programs serving unaccompanied children, to adhere to the state's licensing requirements. Further, the Rule provides for enhanced monitoring of standard programs in states that do not allow state licensing of programs providing care and services to unaccompanied children. Moreover, ORR requires all programs to be accredited by an independent nationally recognized accrediting organization or be in the process of seeking such accreditation. The safeguards that ORR has put in place in response to several states' de-licensing efforts reflect ORR's best judgment about how to protect the safety and well-being of children, based on twenty years of experience administering the UC Program.

"If a durable remedy has been implemented, continued enforcement of [a consent decree] is not only unnecessary, but improper." *Horne v. Flores*, 557 U.S. 433, 450 (2009). The Foundational Rule is a durable remedy that significantly enhances the protections for unaccompanied children in many areas and provides a "suitably tailored response" to the substantially changed circumstances since 1997. *See Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 383 (1992). Even after termination of the FSA as to HHS, the requirements incorporated in the Foundational Rule will remain judicially enforceable. *See Marshall v. Lansing*, 839 F.2d 933, 943 (3rd Cir. 1988) (stating that agency regulations "have the force of law"); *see also Webster v. Doe*, 486 U.S. 592, 602 n.7 (1988) ("the Agency's failure to follow its *own regulations* can be challenged under the APA" (emphasis in original)). The FSA's goals have been achieved. The Court should terminate the FSA as to HHS.

## II. BACKGROUND[1]

### A. The Statutory Framework Has Changed Since 1985.

This case was instituted on July 11, 1985. Compl., ECF No. 1. At the time, the legacy INS had responsibility for the care and custody of unaccompanied children. *See D.B. v. Cardall*, 826 F.3d 721, 731-32 (4th Cir. 2016). In 1985, unaccompanied children in INS custody filed a class action challenging the policies regarding their detention. *Id.*; *see also Reno v. Flores*, 507 U.S. 292 (1993). In 1997, after 12 years of litigation, the parties settled the claims and entered the FSA. The FSA "established a 'nationwide policy for the detention, release, and treatment of minors in the custody of the INS'" including "a general policy favoring less restrictive placements" of unaccompanied children and "release" of unaccompanied children "rather than detention." *D.B.*, 826 F.3d at 732; *see also* FSA ¶ 9.

---

[1] Given the history of the *Flores* litigation and this Court's familiarity with this case, Defendants provide a summary tailored to the issues presented by this motion.

In 2002, Congress enacted the Homeland Security Act ("HSA"), which abolished the INS and transferred the majority of its functions to DHS; however, the HSA "carved out" "[a]ll functions with respect to the care and custody of [unaccompanied children]," which were instead transferred to HHS. *D.B.*, 826 F.3d at 732 (quoting 6 U.S.C. § 279(a)). HHS was given responsibility for the care and custody of unaccompanied children and making all placement decisions for unaccompanied children and was prohibited from releasing unaccompanied children on their own recognizance. *See* 6 U.S.C. § 279(a), (b).

In 2008, Congress enacted the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA"), which further addressed issues relating to unaccompanied children and provided additional protections to unaccompanied children in federal custody. 8 U.S.C. § 1232. As the Ninth Circuit explained, the "TVPRA partially codified the [FSA] by creating statutory standards for the treatment of unaccompanied minors." *Flores v. Lynch ("Flores I")*, 828 F.3d 898, 904 (9th Cir. 2016). The TVPRA affirmed that "the care and custody of all unaccompanied children, including responsibility for their detention, where appropriate, shall be the responsibility of" HHS. 8 U.S.C. § 1232(b)(1).

Through these statutory changes, the FSA has remained in effect and continues to govern various aspects of ORR's UC Program along with initial apprehension and transfer of unaccompanied children to HHS by DHS and other federal agencies.

**B. Prior Regulatory Efforts Have Not Taken Effect.**

By its own terms, the FSA was intended to be temporary. Paragraph 40 of the FSA addresses termination of the Agreement. As originally agreed in 1997, it specified that "[a]ll terms of this Agreement shall terminate the earlier of five years after the date of final court approval of this Agreement or three years after the court determines that the INS is in substantial compliance with this Agreement." FSA ¶ 40. On December 7, 2001, when the original termination date was nearing, the

parties amended paragraph 40 to provide that the Agreement "shall terminate 45 days following defendants' publication of final regulations implementing this Agreement." FSA ¶ 40 (as amended). The Agreement also specified that notwithstanding termination, "INS shall continue to house the general population of minors in INS custody in facilities that are licensed for the care of dependent minors." *Id.*

Several regulatory efforts have taken place since 1997. *See, e.g.*, 63 Fed. Reg. 39,759 (1998); 67 Fed. Reg. 1670 (2002). On August 23, 2019, HHS published a joint rule with DHS intended to implement the FSA and thus enable the Court to terminate the Agreement. *See* Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 84 Fed. Reg. 44,392–535 (Aug. 23, 2019) ("2019 Rule"). The 2019 Rule comprised two sets of regulations: one issued by DHS and the other by HHS. The HHS regulations addressed the care and custody of unaccompanied children, and the DHS regulations addressed other provisions of the FSA that pertained to DHS. *Id.* at 44,526.

After DHS and HHS issued their proposed regulations and before the 2019 Rule was published, Plaintiffs moved to enforce the FSA and enjoin the 2019 Rule. ECF Nos. 516, 634. Following extensive litigation, the Ninth Circuit found HHS's 2019 Rule to be "largely consistent" with the FSA. *Flores v. Rosen ("Flores II")*, 984 F.3d 720, 736 (9th Cir. 2020). The Ninth Circuit held all the HHS regulations could take effect except for two regulations: one related to placement of an unaccompanied child in a secure facility if the child is "otherwise a danger to self or others" and one that required a child in a secure or staff-secure facility to request a bond hearing rather than "opt out" of one. *Id.* at 732, 735-36. Although the Ninth Circuit held the majority of the HHS regulations could take effect, it also found that the district court did not abuse its discretion in declining to terminate the portions of the FSA covered by those regulations, noting that the Government moved to "terminate the Agreement in full, not to modify or terminate it in part." *Id.* at 737.

Consistent with its findings, the Ninth Circuit held the FSA "therefore remains in effect," and the Government could move to terminate those portions of the FSA covered by the valid portions of the HHS regulations.[2] *Id.*

Separately, a group of states sought to enjoin the Government from implementing the 2019 Rule based on other grounds including the Administrative Procedure Act ("APA"). *California v. Mayorkas*, No. 2:19-cv-07390 (C.D. Cal. filed Aug. 26, 2019). After the Ninth Circuit's decision in *Flores II*, Plaintiff-States in *California v. Mayorkas* filed supplemental briefing requesting a narrowed preliminary injunction, alleging several of the HHS portions of the 2019 Rule violated the APA. Subsequently, the parties entered settlement discussions. On December 10, 2021, the Government informed the Court that HHS did not plan to seek termination of the FSA or to ask the Court to lift its injunction as to the HHS regulations. *See id.*, Status Report, ECF No. 150 (C.D. Cal. Dec. 10, 2021). Instead, HHS would consider a future rulemaking that would more broadly address issues related to the custody and care of unaccompanied children by HHS and would replace the 2019 Rule. *Id.* Based on this agreement, the Court placed the *California v. Mayorkas* litigation in abeyance while HHS engaged in new rulemaking to replace and supersede the HHS regulations in the 2019 Rule. *See id.*, Stipulation re Request to Hold Plaintiffs' Claims as to HHS Under Abeyance, ECF No. 159 (C.D. Cal. Apr. 12, 2022); *see also* Order Approving Stipulation, ECF No. 160. Consequently, the 2019 Rule was not implemented.

---

[2] With respect to the DHS portions of the 2019 Final Rule, the Ninth Circuit held some of the DHS regulations regarding initial apprehension and detention were consistent with the FSA and could take effect, but the remaining DHS regulations were inconsistent with the FSA and the district court properly enjoined them. *See id.* at 744.

**C. The Factual and Legal Landscape Has Evolved Over the Last 27 Years.**

Since the FSA was signed in 1997, and particularly in the last decade, the number of unaccompanied children arriving in the United States has greatly increased. In 1993, the Supreme Court recognized that a one-year surge of "more than 8,500 . . . [minors] – as many as 70% of them unaccompanied" – represented a "problem" that is "serious." *Flores*, 507 U.S. at 295. The INS reported that the number of unaccompanied minors arriving in the United States had been 2,375 in fiscal year ("FY") 1997. Dep't of Justice, Immigr. & Naturalization Serv., *Fact Sheet– INS' Office of Juvenile Affairs*, (Aug. 1, 2002), https://webharvest.gov/peth04/20041108084954/http://uscis.gov/graphics/publicaffairs/factsheets/OJA.pdf.   In FY 2014, the number of referrals grew to 57,496 and in FY 2019 there were 69,488 referrals to ORR. *See* ORR Fact Sheet, *Referrals*, https://www.acf.hhs.gov/orr/about/ucs/facts-and-data (last visited May 10, 2024). After a sharp dip in 2020, largely due to the pandemic and the policy under Title 42 that resulted in the expulsion of migrants at the border, including unaccompanied children, the number of referred unaccompanied children to ORR in FY 2021 climbed to 122,731. *See id*. Since 2021, referrals have remained high at 128,904 referrals in FY 2022 and 118,938 referrals in FY 2023. *See id*.

While the increased number of referrals in the last three years has made it essential to expand licensed placements to reduce reliance on emergency and influx facilities, the actions of three states have created significant new challenges for ORR's efforts to place unaccompanied children in state-licensed programs. *See* Defs.' Ex. A, Declaration of Toby Biswas ("Biswas Decl.") ¶ 11. On April 12, 2021, the Governor of South Carolina issued an Executive Order that "prevent[s] placements of unaccompanied migrant children . . . into residential group care facilities or foster care facilities located in, and licensed by, the State of South Carolina." E.O. No. 2021-19 (Apr. 12, 2021). The purpose of the Executive Order was to address the "large cohort of [unaccompanied] children suddenly occupying

foster care placements otherwise available to children who enter the care of the State" and to address the "emergency related to the 2019 Novel Coronavirus ('COVID-19')." *Id.* at 1. South Carolina's action has had little impact on the UC Program because only a small number of children were placed in South Carolina programs before the Governor's action. Biswas Decl. ¶ 12. Today, ORR funds only three transitional foster care programs in South Carolina that are licensed by the State. *Id.*

Then, on May 31, 2021, the Governor of Texas issued a proclamation directing the Texas Health and Human Service Commission ("HHSC") to amend its regulations to "discontinue state licensing of any child-care facility in this state that shelters or detains [unaccompanied children] under a contract with the Federal government." *See* Proclamation by the Governor of the State of Texas (May 31, 2021), https://gov.texas.gov/uploads/files/press/DISASTER_border_security_IMAGE_05-31-2021.pdf. The stated reason for the proclamation was to respond to the "ongoing surge of individuals unlawfully crossing the Texas-Mexico border[.]" *Id.* Subsequently, Texas HHSC "exempted" ORR care provider facilities from the State's licensing requirements. *See* 26 Tex. Admin. Code 745.115. Texas' action had a much larger effect on the UC Program because, historically, a majority of ORR's operational standard bed capacity has been located in Texas. Biswas Decl. ¶ 12. As of April 22, 2024, ORR's data collection system showed that its operational standard bed capacity was 13,093 beds, of which 7,317 beds were in Texas. *See* Defs.' Ex. C, Declaration of Joel Nelson ("Nelson Decl.") ¶ 4. The State's action has made it impossible for Texas providers, many of whom have operated shelters for unaccompanied children for ten or more years and have developed extensive experience in this area, to maintain state licensing. Biswas Decl. ¶ 14.

Four months later, the Governor of Florida issued an Executive Order that directed the Florida Department of Children and Families ("DCF") to de-license ORR care provider facilities. Fla. Executive Order No. 21–223 (Sept. 28, 2021),

www.flgov.com/wp-content/uploads/orders/2021/EO_21-223.pdf. The Executive Order sought to address the "mass illegal entry" of immigrants along the "Southwest Border." *Id.* Accordingly, Florida DCF then de-licensed ORR's care provider facilities. As of this filing, Texas and Florida continue to refuse to license ORR-funded child-care facilities solely because they serve unaccompanied children. While Florida has not had as large a presence in the UC Program as Texas, the combination of delicensed facilities in Texas and Florida has been substantial. As of April 22, 2024, ORR's data collection system showed that its operational standard bed capacity in Florida was 480 beds. Nelson Decl. ¶ 4. Therefore, about 60% of ORR's operational standard bed capacity is in Texas and Florida.

Licensure has been important to the UC Program because an active license demonstrates compliance with generally accepted minimum standards of residential child-care facilities to ensure the health, safety, and well-being of children served by the residential care provider. Biswas Decl. ¶ 10. For most of the years in which the UC Program has operated since the program came to ORR in 2003, there had been no tension between the FSA requirements to place children in licensed programs and the FSA requirement to place children in "those geographic areas where the majority of minors are apprehended, such as California, southeast Texas, southern Florida and the northeast corridor." FSA ¶ 6. In fact, ORR has built a large share of its care provider facility network in Texas and Florida, consistent with the FSA requirement that unaccompanied children be placed in areas where the majority of children are apprehended. *See* Nelson Decl. ¶ 4.

The fact that state licensure ceased to be available in Texas and Florida, which accounts for a majority of ORR's standard beds, necessitated a response that would ensure good quality conditions in ORR-funded programs and continuity of the UC Program, as reflected in the Foundational Rule.

### D. The Foundational Rule Adds Many Additional Protections and Safeguards for Unaccompanied Children.

On October 4, 2023, HHS issued a Notice of Proposed Rulemaking. *See* Unaccompanied Children Program Foundational Rule, 88 Fed. Reg. 68,908 (Oct. 4, 2023). HHS received and considered over 73,000 comments to the proposed rule, including comments from Plaintiffs' counsel. *See ORR Foundational Rule*, Regulations.gov, www.regulations.gov/docket/ACF-2023-0009. HHS published the Final Rule on April 30, 2024, and it will become effective on July 1, 2024. *See* Foundational Rule, 89 Fed. Reg. 34,384. The purpose of the new and more comprehensive rule is to "codify a uniform set of standards and procedures that will help to ensure the safety and well-being of unaccompanied children in ORR care, implement the substantive terms of the FSA, and enhance public transparency as to the policies governing the operation of the [UC Program]." 89 Fed. Reg. at 34,384 (Executive Summary).

A comparison of the FSA with the Foundational Rule reveals that HHS carefully tracked the requirements of the FSA applicable to HHS. *See* Appendix A, ("App. A") Comparison of FSA to Foundational Rule. As an initial matter, the Foundational Rule issues mandatory regulations and adopts the FSA's commitment to treat all children in HHS custody with "dignity, respect, and special concern for their particular vulnerability as minors." 45 C.F.R. § 410.1003(a); *see* FSA ¶ 11. Among other things, the Rule incorporates all the FSA Exhibit 1 minimum standards to standard programs and secure facilities, *see* §§ 410.1302, 1303, 1304, 1307, and applies many of those standards to emergency and influx facilities even though this is not required by the FSA, *see* 45 C.F.R., pt. 410, Subpart I. The Rule further requires ORR to place "each unaccompanied child in the least restrictive setting that is in the best interests of the child," *see* § 410.1003(f), FSA ¶ 11; further, it requires that ORR have "clear and convincing evidence documented in the child's case file" of its reasoning for placement in a secure facility, *see* § 410.1105(a)(1), FSA ¶ 21,

and limits when a child can be placed in a secure placement, *see* § 410.1105(a)(2), FSA ¶ 23. The Rule also adopts the FSA's "order of preference" for release to a sponsor, *see* § 410.1201(a), FSA ¶ 14, and requires ORR to "make and record the prompt and continuous efforts on its part towards family unification and the release of the unaccompanied child," *see* § 410.1203(a), FSA ¶ 18. In the event of an emergency or influx, the Rule requires ORR to place each child as "expeditiously as possible" in a standard program, *see* §§ 410.1104(b), 410.1800(b), FSA ¶ 12.A., and requires ORR to develop a plan for addressing emergencies and influxes, *see* § 410.1800(a), (c)(1); FSA ¶ 12.C. The Foundational Rule also incorporates the FSA requirement "to make reasonable efforts to provide licensed placements in the geographical areas where DHS encounters the majority of unaccompanied children," *see* § 410.1103(e), FSA ¶ 6. And the Foundational Rule maintains the FSA's requirement that children placed in restrictive placements must receive a bond hearing (renamed "risk determination hearing") unless the child opts out, § 410.1903, FSA ¶ 24.A.

Several provisions in the Foundational Rule both implement and exceed FSA requirements. For example, the Foundational Rule codifies the sponsor assessment requirements in the FSA, but also incorporates the requirements of the TVPRA and ORR policies, including home studies in instances beyond those required by the TVPRA, *see, e.g.*, §§ 410.1202(b), (c); 410.1204. Similarly, beyond the requirements at FSA paragraph 13, Subpart H of the Foundational Rule requires the use of multiple forms of evidence when performing age determination procedures, consistent with the TVPRA, and establishes a minimum threshold for medical age assessments. Subpart H also establishes that ambiguous or debatable medical age assessments are resolved in favor of finding the individual is a child. In addition, the Foundational Rule implements FSA paragraph 18's requirement to record prompt and continuous efforts toward family reunification, *see* § 410.1203(a), but in addition requires care providers to continuously assess whether unaccompanied

children in their care are appropriately placed. *See* § 410.1601(a) (codified based on the requirement in the TVPRA that unaccompanied children be placed in the least restrictive setting that is in their best interests, subject to various considerations, 8 U.S.C. § 1232(c)(2)(A)).

In a number of instances, HHS incorporated new safeguards and protections for unaccompanied children that go beyond FSA requirements. For example, the Foundational Rule codifies the requirements of the preliminary injunction and agreed-upon settlement of Plaintiffs' Fourth Claim for Relief (legal representation) in *Lucas R. v. Becerra*, No. 2:18-cv-5741 (C.D. Cal. filed Jun. 29, 2018). These additional requirements provide significant protections to unaccompanied children regarding step-ups to restrictive facilities (Subpart B); release to parents, legal guardians, and close relative sponsors (Subpart C); and the right of unaccompanied children to seek the assistance of a legal representative of their choice at no cost to the federal government with respect to decisions involving their placement, release, custody, and/or the administration of psychotropic medications (Subpart D). The Foundational Rule also, among other things: includes strong language access requirements, such as offering unaccompanied children, at all care provider facilities and to the greatest extent practicable, the option of interpretation and translation services in the child's native or preferred language and in a way the child understands, and making placement decisions informed by language access considerations (§ 410.1306); expands post-release services for unaccompanied children to assist in their transition to the community and access to critical services like education, legal services, and healthcare (§ 410.1210); requires secure facilities to implement the same minimum standards that are required at standard facilities (§ 410.1302); requires that care provider facilities use evidenced-based, trauma-informed, and culturally sensitive behavior management strategies (§ 410.1304); expands the role of and clarifies the responsibilities of child advocates (§ 410.1308); expands access to *pro bono* legal services and funding of legal services in

immigration-related proceedings or matters, as well as for broader purposes that relate to protecting unaccompanied children from mistreatment, exploitation, and trafficking (§ 410.1309); and provides minimum standards for emergency and influx facilities to ensure that all unaccompanied children receive appropriate support and treatment while in ORR's custody even during emergencies and influxes (Subpart I).

The Rule further establishes a newly created Ombuds Office within HHS (Subpart K). The Ombuds Office will provide a mechanism for unaccompanied children and stakeholders to raise concerns about ORR policies and practices to an independent body. The ombudsperson will be an independent, impartial, and confidential public official with authority and responsibility to receive, investigate, and formally address complaints about government actions; make findings and recommendations; and publish reports as appropriate. Specifically, the ombudsperson may review individual cases, conduct site visits, issue public reports, and follow-up on grievances. They will also be able to refer concerns to the HHS Office of the Inspector General and other federal agencies such as the U.S. Department of Justice. The Ombuds Office will provide an important independent mechanism to identify and report concerns about the care of unaccompanied children and to investigate those concerns.

**E. The Foundational Rule Accounts for Unforeseen Changed Circumstances Since 1997.**

Given the increased number of referrals since 1997 and Florida, South Carolina, and Texas's recent refusal to license facilities that serve unaccompanied children, the Rule also reflects several modifications from the FSA that are intended to address the substantially changed circumstances.

The Rule makes important changes reflecting the reality that referrals are now much higher than in 1997 and that, not infrequently, there are sudden and large increases in referral numbers. The FSA defined an "influx" as "more than 130

minors eligible for placement in a licensed program." FSA ¶ 12.B. For well over a decade, ORR has been in an "influx," rendering the 130 number in the FSA inadequate. To account for the significantly increased referrals since 1997, the Foundational Rule adopts a more meaningful definition of "influx" in light of ORR's experience that has shown that expanding bed capacity rapidly becomes crucial when 85 percent (or more) of its standard program beds are already occupied. Preamble, 89 Fed. Reg. 34,552. Accordingly, the Rule defines influx as "for purposes of HHS operations, a situation in which the net bed capacity of ORR's standard programs that is occupied or held for placement by unaccompanied children meets or exceeds 85 percent for a period of seven consecutive days." 45 C.F.R. § 410.1001. And, because emergency and influx facilities are sometimes needed, the Rule establishes strong minimum standards for the operation of these facilities that are largely consistent with the FSA Exhibit 1 minimum standards. *See* Subpart I. These standards will provide enhanced protections to children who arrive during a period of influx.

Subject to some defined exceptions, the FSA requires children to be placed in a "licensed program," meaning a program that is licensed by "an appropriate State agency to provide residential, group, or foster care services for dependent children[.]" FSA ¶¶ 6, 19. The Foundational Rule provides for two types of "standard programs." One type is "licensed by an appropriate State agency to provide residential, group, or transitional or long-term home care services for dependent children, including a program operating family or group homes, or facilities for unaccompanied children with specific individualized needs . . . ." 45 C.F.R. § 1001. This language tracks the definition of "licensed program" in FSA paragraph 6.[3] In light of the actions by Texas, Florida, and South Carolina and the possibility that

---

[3] FSA ¶ 6 refers to "special needs minors," but the Foundational Rule uses the more modern phrase "unaccompanied children with specific individualized needs."

other states could de-license ORR programs in the future, the definition of "standard program" also includes a program which "meets the requirements of State licensing that would otherwise be applicable if [the program] is in a State that does not allow State licensing of programs providing care and services to unaccompanied children." *Id.*; *see also* App. A (comparison of FSA ¶ 6 to § 410.1001).

In sum, the factual and legal landscape has evolved over the last 27 years. The Foundational Rule adds many additional protections and safeguards for unaccompanied children, and it accounts for unforeseen changed circumstances since 1997.

## III.   ARGUMENT

The Foundational Rule faithfully implements the FSA requirements applicable to HHS; in a number of respects exceeds FSA requirements; and in some instances, necessarily takes a modified approach in light of substantially changed circumstances. The Rule is consistent with the FSA's goal of "set[ting] out nationwide policy for detention, release, and treatment of minors in the custody of [HHS]" and to "treat, all minors in [HHS] custody with dignity, respect and special concern for their particular vulnerability as minors." FSA ¶¶ 9, 11. The Rule provides numerous protections to unaccompanied children and provides a suitably tailored response to changed conditions that were never contemplated by the parties in 1997. Twenty-seven years later, there is ample reason to believe that the FSA's goals have been achieved. The Court should terminate the FSA as to HHS.

### A.   Courts Must Be Flexible in Releasing Governmental Operations from Long-Term Institutional Consent Decrees.

The Foundational Rule either meets or exceeds the requirements of the FSA or provides a suitably tailored response to unforeseen changed circumstances since 1997. In considering the appropriateness of terminating the FSA, the relevant standards to apply are those specified under Federal Rule of Civil Procedure 60(b)(5). This rule provides that a court may relieve a party from "a final judgment,

15

order, or proceeding [if] the judgment has been satisfied . . . or applying it prospectively is no longer equitable." In applying Rule 60(b)(5), district courts are to apply a "flexible standard." *Rufo*, 502 U.S. at 380.

Long-running institutional reform litigation, like this case, implicates the "equitable" clause in Rule 60(b)(5) due to "the passage of time [and] . . . changed circumstances." *Horne*, 557 U.S. at 448. "The party seeking relief bears the burden of establishing that changed circumstances warrant relief, but once a party carries this burden, a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Id.* at 447; *accord Flores v. Rosen*, 984 F.3d 720, 741 (9th Cir. 2020). The party seeking modification must show "either a significant change in factual conditions or in law" such as (1) "changed factual conditions make compliance with the decree substantially more onerous;" (2) "a decree proves to be unworkable because of unforeseen obstacles;" or (3) "enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384; *see also In re Pearson,* 990 F.2d 653, 658 (1st Cir. 1993) (court "not doomed to some Sisyphean fate, bound forever to enforce and interpret a preexisting decree without occasionally pausing to question whether changing circumstances have rendered the decree unnecessary, outmoded, or even harmful to the public interest"). Any resulting modification must be "suitably tailored" to resolve the problems created by the changed factual or legal conditions. *Rufo*, 502 U.S. at 383; *see also Hook v. State of Ariz.*, 120 F.3d 921, 924 (9th Cir. 1997).

In *Horne*, in the context of institutional litigation that involved enforcement of a nine-year-old order, the Supreme Court criticized the lower courts for failing to consider "whether, as a result of important changes during the intervening years, the State was fulfilling its obligations under the [law] by other means." 557 U.S. at 439. The Court went on to observe that a "flexible approach" to modifying consent decrees allows courts to "ensure that responsibility for discharging the State's

obligations is returned promptly to the State and its officials when the circumstances warrant." *Id*. at 450 (internal quotations and citations omitted). Indeed, "[i]f a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper," *id*. at 450, and the "longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with a State's democratic process," *id*. at 453; *see also United States v. Washington*, 573 F.3d 701, 710 (9th Cir. 2009) ("The [Supreme] Court has repeatedly reminded us that institutional reform injunctions were meant to be temporary solutions, not permanent interventions, and could be kept in place only so long as the violation continued.").

The Supreme Court has stressed that "the public interest and considerations based on the allocation of powers within our federal system require that the district court defer to [government officials] who have the primary responsibility for elucidating, assessing, and solving the problems of institutional reform, to resolve the intricacies of implementing a decree modification." *Rufo*, 502 U.S. at 392. These concerns are paramount in cases involving immigration, where judicial management represents "a substantial intrusion" into the workings of the political branches entrusted to manage policies towards migrants. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268, n.18 (1977). One of the underpinnings for this long-recognized proposition is that immigration policy involves "changing political and economic circumstances" that are appropriate for the Legislature or Executive to determine, not the Judiciary. *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *Flores*, 507 U.S. at 305–06; *see also Hampton v. Mow Sun Wong*, 426 U.S. 88, 101, n.21 (1976) (recognizing "power over aliens is of a political character and therefore subject only to narrow judicial review"). The Supreme Court has explained, "[f]or reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our [noncitizen] visitors has been committed to the political

17

branches of the Federal Government." *Flores*, 507 U.S. at 305 (quoting *Mathews*, 426 U.S. at 81).

### 1. Significant Changed Factual Conditions Warrant Modification of the FSA Licensed Placement Requirement.

The UC Program today is different in important ways from the one operated by the INS when the parties entered the FSA. While the Foundational Rule carefully tracks the requirements of the FSA applicable to HHS, *see* App. A, it also codifies a basic structure for the UC Program to provide transparency and accountability and reflects changes to the Program that have taken place over the last 27 years. The provisions of the Foundational Rule that implement the FSA requirements as to HHS either are identical to the 2019 Rule or, if not identical, have been crafted to improve safeguards and protections for unaccompanied children, including addressing the two areas of concern for the Ninth Circuit, or to address specifically a changed circumstance since 1997.

The unavailability of state licensing in Texas, Florida, and South Carolina is a "significant change in factual conditions" that the parties to the FSA did not anticipate. *See Rufo*, 502 U.S. at 384. In fact, the FSA requires "licensed placements in those geographical areas where the majority of minors are apprehended, such as . . . southeast Texas [and] southern Florida[.]" FSA ¶ 6. Consequently, ORR largely developed its care provider network in those states and has relied on those states for decades. While the great majority of Foundational Rule requirements meet or exceed FSA requirements, the approach taken to standard programs reflects the reality that the FSA requirements for placing children in state licensed programs have become "unworkable," "substantially more onerous," and "detrimental to the public interest" in light of the actions taken by a set of states. *Rufo*, 502 U.S. at 384.

As stated above, a majority of ORR's operational bed capacity is in Texas and Florida. Nelson Decl. ¶ 4. ORR cannot afford to lose the bed capacity it has developed in those states over several decades, particularly in light of recent historic

referrals numbers: ORR received 128,904 referrals in FY 2022 and 118,938 referrals in FY 2023. ORR Fact Sheet, *Referrals*, https://www.acf.hhs.gov/orr/about/ucs/facts-and-data (last visited May 10, 2024). It is not possible for ORR to stop placing children in facilities in Texas and Florida without resulting in a catastrophic loss of already limited bedspace, which likely would result in children being placed for extended periods of time in emergency and influx facilities or being held in U.S. Customs and Border Protection custody for periods of time far in excess of the 72-hour period in which custody should be transferred to ORR absent exceptional circumstances under the TVPRA, 8 U.S.C. § 1232(b)(3). Biswas Decl. ¶ 13.

Besides requiring extensive reliance on emergency and influx facilities, shuttering standard facilities in Texas and Florida would have many other significant downsides that are not in the best interests of unaccompanied children or the public interest. To start, significant expertise has been developed over decades in many care provider programs in Texas and Florida. In fact, many programs in Texas and Florida have been operating ORR-funded facilities for a decade or more. *Id.* ¶ 15. New facilities likely would not have staff that have worked with this population of children, and new facilities may not have the same cultural competency that longstanding facilities in Texas and Florida offer. *Id.*

Additionally, most unaccompanied children are apprehended at the Southwest border, usually along the Texas-Mexico border. *Id.* ¶ 16. Shuttering facilities in Texas, in particular, would likely lead to longer wait times for unaccompanied children during which time they would remain in DHS custody because of the logistical challenges in transporting children over much longer distances. *Id*. Today, many children are transported by bus from the border to ORR-funded facilities in Texas, in particular. When facilities are available in Texas, children can quickly and relatively easily leave DHS custody and be transported to those facilities. *Id*. When ORR must rely on facilities in other parts of the country, the process of arranging

and implementing transportation is lengthier, costlier, and more complex, and may extend the period of time that children must remain in DHS custody. *Id.*

Moreover, many unaccompanied children are released to sponsors in Texas and Florida—nearly one-quarter of all releases in 2023.[4] Ceasing to operate programs in those states would disrupt efforts to promptly place children with their parents and other appropriate sponsors. Further, moving them from the Texas-Mexico border to another state and then back to Texas is not only inefficient and costly but also disruptive for the child and would likely add to the time that children spend in federal custody, rather than with their sponsors.

Finally, if ORR was forced to close facilities in a state that refused to license ORR-funded facilities, this would effectively signal to other states that by refusing to license ORR facilities, they could force the federal government to cease operating the UC Program in their states. In addition to being contrary to the best interests of children, this would place increasing burdens and pressures on states willing to license ORR-funded facilities. If ORR had to exit from any state that opted against licensing ORR-funded facilities and multiple states took this approach, it could potentially threaten ORR's very ability to operate the UC Program.

Given the unexpected actions by Texas, Florida, and South Carolina to de-license ORR funded programs, it is now "substantially more onerous," "unworkable," and "detrimental to the public interest" to close ORR funded programs in those states for the reasons stated above. Therefore, modification of the licensed placement requirement of the FSA is warranted here.[5]

---

[4] Calculations based on data available at ORR, *Unaccompanied Children Released to Sponsors by State*, https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state (last visited May 9, 2024).

[5] Neither the HSA nor TVPRA incorporate the licensed program requirement that is in the FSA. The TVPRA requires placement "in the least restrictive setting that is in the best interest of the child," but does not require placement in a state licensed program. *See* 8 U.S.C. § 1232(c)(2)(A).

### 2.   ORR's Response to De-Licensing by States Reflects Its Professional Judgment and Is a Suitably Tailored Response.

Where the Foundational Rule departs from the FSA by permitting children's placements in "standard programs" in states that refuse to license ORR-funded programs solely because they serve unaccompanied children, the Rule provides a "suitably tailored response," *id.* at 391, to unforeseen changed circumstances. In other words, the approach to standard programs in the Foundational Rule "is tailored to resolve the problems created by the change in circumstances." *Jackson v. Los Lunas Comm. Prog.*, 880 F.3d 1176, 1194 (10th Cir. 2018). "The party seeking relief bears the burden of establishing that changed circumstances warrant relief, but once a party carries this burden, a court abuses its discretion when it refuses to modify [the decree] in light of such changes." *Horne*, 557 U.S. at 447.

The FSA does not address situations where states discontinue or refuse to license ORR care providers. Because ORR continues to need Texas and Florida programs and does not want to encourage similar actions by other states, ORR has adopted policies and now regulations that best approximate what would be in place if these states were willing to license programs caring for unaccompanied children. In particular, the Foundational Rule achieves the objectives of the FSA licensed program requirement by ensuring that children are placed in child-care facilities that meet the licensing standards of their state in those states that refuse to license them and by providing for enhanced monitoring of these programs. *See* § 410.1303(e). Enhanced monitoring will include more frequent on-site visits and regular desk monitoring to ensure that programs are complying with the state's licensing requirements and ORR's policies and regulations. Biswas Decl. ¶ 20.

In addition, under the terms and conditions of their federal grants, standard programs agree to obtain accreditation by a nationally recognized accreditation organization. *See* Defs.' Ex. B, Declaration of Allison Blake ("Blake Decl.") ¶ 17. The purpose of accreditation is to ensure that programs meet predetermined,

evidence-informed standards for quality service provision and organizational governance by an independent entity. *Id.* ¶ 9. While state licensing standards are viewed by human services organizations as "minimum basic standards," accreditation is a seal of excellence that indicates an organization is committed to implementing and sustaining the best practices in their field. *Id.* ¶ 10. As an explicit requirement under standard programs' grants, ORR will monitor for compliance with this requirement pursuant to the Foundational Rule, *see* 45 C.F.R. § 410.1303; further, failure to maintain accreditation may subject standard programs to enforcement actions, including remedies for noncompliance as described at 45 C.F.R. § 75.371. Accreditation ensures that standard programs are meeting the highest level of care for unaccompanied children in ORR's custody. It also ensures that there is an organization, completely independent of ORR, that is providing monitoring and evaluation of ORR's standard programs. Blake Decl. ¶ 17.

The approach taken in the Foundational Rule is a suitably tailored response to the changed and unforeseen facts. The Ninth Circuit has found that "a modification of a court order is 'suitably tailored to the changed circumstance' when it 'would return both parties as nearly as possible to where they would have been absent' the changed circumstances." *Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) (quoting *Pigford v. Veneman*, 292 F.3d 918, 927 (D.C. Cir. 2002)). The Foundational Rule reflects ORR's reasoned approach to placements in Texas and Florida (and to a much smaller extent South Carolina), by implementing all the elements of the FSA's licensed placement requirement that ORR could implement without the willingness of these states to license facilities serving unaccompanied children. Certainly, changed circumstances warrant relief here and "a district court should exercise flexibility in considering requests for modification [or vacatur] of an institutional reform consent decree." *Rufo*, 502 U.S. at 383. ORR's response to those changed circumstances in the Foundational Rule is reasonable, protects unaccompanied children, and reflects its experience operating the UC Program for

decades. "[P]rinciples of federalism require that federal courts give 'significant weight to the views of government officials,' and that '[government] officials with front-line responsibility for administering [a government program] be given latitude and substantial discretion.'" *Jackson*, 880 F.3d at 1192 (citing *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 441-42 (2004)). Due to their role as public servants, government officials are generally assumed to possess a significant level of expertise in carrying out their responsibilities. *See e.g.*, *Frew*, 540 U.S. at 442 ("As public servants, the officials of the [government] must be presumed to have a high degree of competence in deciding how best to discharge their governmental responsibilities."). The same deference to HHS should be accorded here.

### B. Standard Programs Are Different from DHS's Proposed Unlicensed Family Residential Centers.

HHS's standard programs do not raise the same concerns as the proposed U.S. Immigration and Customs Enforcement ("ICE") Family Residential Centers in DHS's portion of the 2019 Rule that were found to be inconsistent with the FSA. In the 2019 Rule, DHS proposed creating Family Residential Centers where families could remain in custody together in facilities that adhered to "family residential standards established by ICE." 84 Fed. Reg. at 44,526 (codified at 8 C.F.R. § 236.3(b)(9)). As ICE acknowledged, "most States do not offer a licensing program for family unit detention." *Id.* at 44,394, 44,419. Therefore, the import of the regulation was that it would "greatly expand[] DHS's ability to detain minors with their accompanying adults." *Flores II*, 984 F.3d at 739. The Ninth Circuit found that DHS's intent was "to 'detain' [families] together for 'enforcement' purposes" and therefore the regulations were "inconsistent with the [FSA]." *Id.* at 740 (internal citations omitted).

Here, unlike the DHS proposal in 2019, the modification to the licensed placement requirements in the FSA does not create a wholly new type of facility for the purpose of detaining families or otherwise with a different purpose than the FSA.

Rather, the Foundational Rule ensures that ORR has needed bed capacity while maintaining important protections for children by, among other things, requiring all programs to adhere to state licensing standards and ensuring enhanced monitoring of those facilities. Although the Ninth Circuit found DHS's 2019 regulations inconsistent with the FSA, it noted that the analysis might be different if the Government was simply licensing shelters and group homes for children: "We might conclude that the regulations regarding licensed facilities were consistent with the [FSA] if they simply allowed for the licensing of shelters or group homes, similar to those contemplated by the Agreement. . . ." *Flores II*, 984 F.3d at 740. Unlike DHS's proposal, ORR's standard programs will remain unchanged—they will continue to be shelters, group homes, and other residential child-care facilities where children are housed until they can be safely released to a sponsor.

### C. Consistent with the Ninth Circuit's Approach, the Court Should Terminate the FSA as to HHS Even Though HHS Is Only One Successor of the Legacy INS.

When the parties entered the FSA in 1997, the legacy INS was responsible for overseeing the care and custody of unaccompanied children. In the HSA, Congress divided the INS's responsibilities and transferred some of them to HHS; the vast majority were assigned to DHS. Because HHS has implemented the FSA by enacting the comprehensive Foundational Rule, the Court should terminate the FSA as to HHS. Termination here is consistent with the flexible approach that Rule 60 requires and ensures that responsibility is returned to the political branches where appropriate. *See Horne*, 557 U.S. at 450. Further, when discussing the 2019 Rule, the Ninth Circuit stated that terminating the FSA as to HHS was entirely permissible, despite affirming the district court enjoining significant portions of the DHS Rule. *See Flores II*, 984 F.3d at 737 ("If the government wishes to move to terminate those portions of the Agreement covered by the valid portions of the HHS regulations, it

may do so."). Thus, the Court should grant the Government's motion since the Rule has implemented HHS's responsibilities under the FSA.

## IV.   CONCLUSION

The Court should terminate the FSA as to HHS. HHS enacted regulations that are consistent with or exceed the requirements of the FSA or reflect the agency's reasoned judgment on how to respond to unforeseen changed circumstances after decades of experience operating the UC Program. Most notably, the agency has developed a reasoned approach to providing placements in states that refuse to license programs funded by ORR, recognizing that prospective application of the FSA's licensed program requirements is onerous, unworkable, and not in the public interest. Termination of the FSA as to HHS is warranted.

In the alternative, if the Court is unwilling to terminate the FSA as to HHS in its entirety, the Court should terminate the FSA as to all permissible portions of the Foundational Rule. The Ninth Circuit reached a similar conclusion as to the 2019 Rule, when it held that there was "no legal justification for enjoining" the entirety of the regulations. *Flores II*, 984 F.3d at 736; *cf. Freeman v. Pitts*, 503 U.S. 467, 490–91 (1992) ("[T]he court in appropriate cases may return control to the [government] in those areas where compliance has been achieved . . . ."). For all the reasons described in this memorandum, however, the FSA should be terminated in its entirety as to HHS so that ORR can operate the UC Program consistent with the requirements established by Congress, in the best interests of children, and in a manner that is responsive to the substantially changed and unforeseen circumstances since 1997.

Dated: May 10, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM C. SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation

*/s/ Fizza Batool*
FIZZA BATOOL
JOSHUA C. MCCROSKEY
Trial Attorneys
U.S. Department of Justice
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel: (202) 616-4863
Email: fizza.batool2@usdoj.gov

*Attorneys for Defendants*

## **CERTIFICATE OF SERVICE**

I certify that on May 10, 2024, I served a copy of the foregoing pleading and attachments on all counsel of record by means of the District Court's CM/ECF electronic filing system.

*/s/ Fizza Batool*
FIZZA BATOOL
Trial Attorney
U.S. Department of Justice