CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
Sarah E. Kahn (Cal. Bar No. 341901)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email: crholguin@centerforhumanrights.org

*Attorneys for Plaintiffs*

*Additional counsel listed on following page*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | No. CV 85-4544-DMG-AGRx |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TERMINATE *FLORES* SETTLEMENT AS TO HHS** |
| v. | |
| MERRICK GARLAND, Attorney General the United States, *et al.*, | Hearing: June 21, 2024<br>Time: 10:00 a.m.<br>Hon. Dolly M. Gee |
| Defendants. | |

1   NATIONAL CENTER FOR YOUTH LAW
2   Mishan Wroe (Cal. Bar No. 299296)
    Diane de Gramont (Cal. Bar No. 324360)
3   1212 Broadway, Suite 600
4   Oakland, CA 94612
    Telephone: (510) 835-8098
5   Email: mwroe@youthlaw.org
6
    NATIONAL CENTER FOR YOUTH LAW
7   Rebecca Wolozin (admitted *pro hac vice*)
8   818 Connecticut Ave. NW, Suite 425
    Washington, DC 20006
9   Telephone: (202) 868-4792
10  Email: bwolozin@youthlaw.org
11  CHILDREN'S RIGHTS
    Leecia Welch (Cal. Bar No. 208741)
12  2021 Fillmore Street
13  San Francisco, CA 94115
    Telephone: (415) 602-5202
14  Email: lwelch@childrensrights.org
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Table of Contents

I.   INTRODUCTION...................................................................................1

II.  ARGUMENT .......................................................................................2

   A.   **The Foundational Rule Fails to Implement HHS's Obligations Under the Settlement** .............................................................................................**2**

     1.   The Rule is Not a Suitably Tailored Modification of the State Licensing Requirement ......................................................................2

       *a.   The "standard program" in the Rule is fundamentally inconsistent with the Settlement.* ................................................................. 3

       *b.   Modification of the state licensing requirement is premature because HHS's actions acknowledge the Rule is not a durable remedy.* .................. 5

       *c.   The Rule lacks oversight mechanisms necessary to protect children.* .. 6

       *d.   Accreditation is not required by the Rule and is not a substitute for state licensing.* ................................................................................9

       *e.   Defendants' proposed modification is not in the public interest.* ....... 10

     2.   The Rule Creates Impermissible Exceptions to "Standard Program" Placement ...................................................................................... 11

     3.   The Rule Fails to Guarantee the Settlement's Protections for Children Placed Out-of-Network ......................................................... 12

   B.   **Partial Termination of the Settlement is Unjustified**............................**14**

     1.   Partial Termination is Inconsistent with the Termination Clause........... 14

     2.   Defendants Fail to Demonstrate that Partial Termination is Warranted on Equitable Grounds........................................................................ 16

       *a.   HHS has not fully and satisfactorily complied with the Settlement.* ... 18

       *b.   Terminating jurisdiction over HHS will compromise effective enforcement of the Settlement as to DHS.* ................................................. 20

       *c.   Defendants have not shown a good faith commitment to the whole of the Court's decree.* ................................................................................ 23

III. CONCLUSION.................................................................................25

# Table of Authorities

## CASES

*Armstrong v. Newsom*, 58 F.4th 1283 (9th Cir. 2023) ...................................... 24

*Bobby M. v. Chiles*, 907 F.Supp. 368 (N.D. Fla. 1995) ...................................... 21

*Coleman v. Brown*, 922 F.Supp.2d 1004 (E.D. Cal. 2013) ................................... 5

*Fisher v. Tucson Unified Sch. Dist.*, 652 F.3d 1131 (9th Cir. 2011) ..................... 23

*Flores v. Barr*, 407 F.Supp.3d 909 (C.D. Cal. 2019) ..................................... *passim*

*Flores v. Barr*, 2019 WL 2723798 (C.D. Cal. June 28, 2019) ............................... 24

*Flores v. Barr*, 2020 WL 2758792 (C.D. Cal. Apr. 24, 2020) ............................... 18

*Flores v. Barr*, 2020 WL 2758795 (C.D. Cal. May 22, 2020) ................................ 18

*Flores v. Barr*, 2020 WL 5491445 (C.D. Cal. Sept. 4, 2020) ..................... 19, 22, 24

*Flores v. Garland*, Order re Plaintiffs' Motion to Enforce Settlement re "Open Air Detention Sites," April 3, 2024 [Doc. # 1406] ....................................... 24

*Flores v. Johnson*, 212 F.Supp.3d 864 (C.D. Cal. 2015) ..................................... 4

*Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016) ....................................... 4, 15

*Flores v. Rosen*, 984 F.3d 720 (9th Cir. 2020) ..................................... *passim*

*Flores v. Sessions*, 2018 WL 10162328 (C.D. Cal. July 30, 2018) ................. 18, 19

*Flores v. Sessions*, 2018 WL 4945000 (C.D. Cal. July 9, 2018) ..................... 11, 14

*Flores v. Sessions*, 394 F.Supp.3d 1041 (C.D. Cal. 2017) ............................. 24, 25

*Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017) ..................................... 18, 20

*Freeman v. Pitts*, 503 U.S. 467 (1992) ........................................... *passim*

*Frew v. Hawkins*, 540 U.S. 431, 442 (2004) ............................................. 11

*Gates v. Rowland*, 39 F.3d 1439 (9th Cir. 1994) ....................................... 15

*Ho. v. San Francisco Unified Sch. Dist.*, 965 F.Supp.1316 (N.D. Cal. 1997) ........ 16

*Horne v. Flores*, 557 U.S. 433 (2009) ........................................... 2, 5, 17

*Jeff D. v. Kempthorne*, 365 F.3d 844 (9th Cir. 2004) ................................... 2

*Jeff D. v. Otter*, 643 F.3d 278 (9th Cir. 2011) ..................................... 16, 18

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016) ..................................... 3, 11

*L.V.M. v. Lloyd*, 318 F.Supp.3d 601 (S.D.N.Y. 2018) ................................... 18

*Pigford v. Veneman*, 292 F.3d 918 (D.C. Cir. 2002) ................................... 3, 11

*Rouser v. White*, 825 F.3d 1076 (9th Cir. 2016) ............................. 15, 16, 23

*Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367 (1992) ................... 2, 12, 17

*Smith v. Bd. of Educ. of Palestine-Wheatley Sch. Dist.*, 769 F.3d 566 (8th Cir. 2014) ......................................................................... 17

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) ............................. 6

## FEDERAL REGULATIONS

45 C.F.R. § 410.1001 ............................................................. 3, 12, 13

45 C.F.R. § 410.1101 ........................................................... 11, 12, 21

45 C.F.R. § 410.1103 ................................................................. 4

45 C.F.R. § 410.1105 ................................................................................ 12
45 C.F.R. § 410.1201 .................................................................................. 3
45 C.F.R. § 410.1303 ............................................................................ 4, 13
45 C.F.R. § 410.1103 .................................................................................. 3
45 C.F.R. § 410.1800 .................................................................................. 4
45 C.F.R. § 410.2002 .................................................................................. 9

**FEDERAL REGISTER**

Federal Licensing of Office of Refugee Resettlement Facilities Request for
    Information, 86 Fed. Reg. 49,549 (Sept. 3, 2021) ...................................... 5
Notice of Proposed Rulemaking, Unaccompanied Children Program Foundational
    Rule, 88 Fed. Reg. 68,908 (Oct. 4, 2023) ................................................ 5
Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34,384 (Apr.
    30, 2024) ........................................................................................ *passim*

**STATE STATUTES AND REGULATIONS**

Cal Code Regs tit. 22, § 87818 .................................................................... 8
Cal Code Regs tit. 22, § 87820 .................................................................... 8
Cal Code Regs tit. 22, § 87844 .................................................................... 8
Cal Code Regs tit. 22, § 87845 .................................................................. 10
Cal. Health & Safety Code § 1538 ............................................................... 8
Cal. Health & Safety Code § 1534 ............................................................... 9
Cal. Health & Safety Code § 1550 ............................................................... 9
Del. Code Ann. tit. 14, § 3004A ................................................................. 8
Fla. Admin Code § 65C-46.002 ................................................................... 8
Fla. Admin Code § 65C-46.003 ................................................................... 8
Fla. Admin Code § 65C-46.005 ................................................................... 8
Fla. Stat. Ann. § 409.175 .................................................................. 8, 9, 10
Ill. Admin. Code tit. 89, § 383.25 ............................................................. 10
lll. Admin. Code tit. 89, § 383.35 ............................................................... 8
Mass. Gen. Laws Ann. ch. 15D § 9 ............................................................. 8
Mich. Comp. Laws Ann. § 722.118a .......................................................... 10
N.Y. Comp. Codes R. & Regs. tit. 18, § 441.8 ............................................. 8
55 Pa. Code § 20.31 ................................................................................. 10
Tex. Hum. Res. Code Ann. § 42.044 ..................................................... 8, 10
26 Tex. Admin. Code § 745.211 ................................................................. 7
26 Tex. Admin. Code § 745.339 ................................................................. 7
26 Tex. Admin. Code § 745.345 ................................................................. 7
26 Tex. Admin. Code § 745.351 ................................................................. 7
26 Tex. Admin. Code § 745.8613 ............................................................... 9
26 Tex. Admin. Code § 745.8603 ............................................................... 9

## I.  INTRODUCTION

For over 25 years the *Flores* Settlement Agreement ("Settlement" or "FSA") has guaranteed independent oversight of the government's treatment of children in federal immigration custody. Defendants now request the Court: (1) modify the Settlement's "licensed program" requirement and (2) partially terminate the Settlement as to the Department of Health and Human Services ("HHS") based on the Unaccompanied Children Program Foundational Rule ("the Rule"), 89 Fed. Reg. 34,384 (Apr. 30, 2024). *See* Defendants' Memorandum of Points and Authorities ("Ds. MPA"). The Court should deny both requests.

In violation of the Settlement, the Office of Refugee Resettlement ("ORR") has operated unlicensed "standard programs" in Texas and Florida since 2021. State licensing is a critical component of the Settlement intended to protect children through independent oversight. When Texas and Florida ceased licensing ORR facilities, Defendants did not seek modification of the Settlement. Instead, HHS indicated it would promulgate federal licensing regulations to provide comparable oversight in these states. But years later, HHS chose to publish the Foundational Rule *before* developing an alternative licensing framework. Rather than creating a durable remedy, Defendants have codified their violations and ask the Court to sanction HHS's unrestricted use of unlicensed facilities. Defendants' proposed modification fails to guarantee meaningul oversight critical to keeping children safe and deprives Plaintiffs of an essential element of their bargain. Modification should be denied.

The Rule also fails to implement HHS's obligations under the Settlement in other ways. The Rule permits indefinite delays in standard placement if a child is apprehended in a remote area or is accused of being a danger to self or others. It also endorses placement in restrictive facilities under circumstances not permitted by the Settlement. Further, the Rule impermissibly exempts out-of-network ("OON") placements from the Settlement's standards, leaving vulnerable children

1

without any protections.

Finally, Defendants fail to justify partial termination as to HHS. The plain language of the Settlement does not contemplate partial termination. To obtain partial termination on equitable grounds, Defendants must show: (1) full and satisfactory compliance by HHS; (2) that jurisdiction over HHS is not necessary or practicable to ensure compliance by the Department of Homeland Security ("DHS"); and (3) good-faith commitment to the whole of the Settlement. *See Freeman v. Pitts*, 503 U.S. 467, 491 (1992). Defendants cannot—and have not even attempted to—meet this standard. The robust record in this case demonstrates unequivocally that partial termination is inappropriate.

## II.   ARGUMENT

### A.   The Foundational Rule Fails to Implement HHS's Obligations Under the Settlement

#### 1.   The Rule is Not a Suitably Tailored Modification of the State Licensing Requirement

Defendants seek modification of the Settlement to permit the use of unlicensed "standard programs" in states that refuse to license ORR facilities. Ds. MPA at 21. Defendants fail to establish that this modification is suitably tailored to the changed licensing circumstances in Texas and Florida.

"[A] party seeking modification of a consent decree must establish that a significant change in facts or law warrants revision of the decree and that the proposed modification is suitably tailored to the changed circumstance." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 393 (1992). Defendants bear the burden of satisfying this standard. *Jeff D. v. Kempthorne*, 365 F.3d 844, 851 (9th Cir. 2004); *see also Horne v. Flores*, 557 U.S. 433, 447 (2009) ("The party seeking relief bears the burden of establishing that changed circumstances *warrant relief*") (emphasis added).

"[A] modification of a court order is 'suitably tailored to the changed
circumstance' when it 'would return both parties as nearly as possible to where
they would have been absent' the changed circumstances." *Kelly v. Wengler*, 822
F.3d 1085, 1098 (9th Cir. 2016) (quoting *Pigford v. Veneman*, 292 F.3d 918, 927
(D.C. Cir. 2002)). To be suitably tailored, a modification "must preserve the
essence of the parties' bargain." *Pigford*, 292 F.3d at 927. Defendants' proposed
modification deprives Plaintiffs of the essential purpose of their bargain—
independent and comprehensive oversight of the treatment of class members.

a.  The "standard program" in the Rule is fundamentally inconsistent with the Settlement.

State licensing is a material term of the Settlement. *Flores v. Barr*, 407
F.Supp.3d 909, 919 (C.D. Cal. 2019). The Settlement generally requires that class
members be placed in state-licensed programs within three or five days of initial
apprehension, or "as expeditiously as possible" in an emergency or influx. FSA
¶ 12.A; *see also id.* ¶¶ 6, 19. Licensed programs must comply with applicable state
laws *as well as* specific minimum standards. FSA Ex. 1. This bedrock state
licensing requirement is reflected throughout the Settlement. *See, e.g.*, FSA ¶ 7
(child with special needs); ¶ 8 (medium security facility); ¶ 12.C & Ex. 3
(contingency plan for licensed beds). State licensing is so central to the Settlement
that "even after its termination, Defendants are obligated to house class members
in state-licensed facilities." *Flores v. Barr*, 407 F.Supp.3d at 919 (citing FSA ¶ 40).

With two exceptions,[1] the Rule replaces the Settlement's references to
"licensed program" with "standard program." In states that do not license ORR
programs, a "standard program" can be unlicensed. 45 C.F.R. § 410.1001. The
Rule generally equates standard programs with licensed programs, without *any*
preference for licensed over unlicensed placements and without contingency

---

[1] 45 C.F.R. §§ 410.1103(e), 410.1201(a)(5).

3

planning specific to licensed beds.[2] *See, e.g.*, 45 C.F.R. §§ 410.1800(a), (b); Ds. App. A [Doc. # 1414-5 at 15].

The sole provision specifically addressing unlicensed standard programs is a general statement that "ORR shall conduct enhanced monitoring [of unlicensed programs], including on-site visits and desk monitoring." 45 C.F.R. § 410.1303(e). The Rule does not explain how this "enhanced monitoring" differs from ORR's ordinary monitoring. *See* 45 C.F.R. § 410.1303(a).

"[T]he purpose of the licensing provision is to provide class members the essential protection of regular and comprehensive oversight by an *independent* child welfare agency." *Flores v. Barr*, 407 F.Supp.3d at 919 (internal citation omitted); *see also Flores v. Lynch,* 828 F.3d 898, 906 (9th Cir. 2016) ("obvious purpose" of state licensing "is to use the existing apparatus of state licensure to independently review detention conditions"); *Flores v. Johnson*, 212 F.Supp.3d 864, 879 (C.D. Cal. 2015) (Defendants agree with Plaintiffs that oversight was the animating concern behind the licensing provision.").

Given the licensing requirement's purpose and centrality to the Parties' bargain, any suitably tailored modification must provide for comparable independent oversight. ORR's undefined "enhanced monitoring" provides even *less* oversight than other substitutes for state licensing the Court previously considered and rejected. *See, e.g.*, *Flores v. Johnson*, 212 F.Supp.3d at 879

---

[2] The Rule incorporates Settlement Paragraph 6's requirement that ORR "make reasonable efforts to provide licensed placements in those geographical areas where DHS encounters the majority of unaccompanied children." 45 C.F.R. § 410.1103(e). But this provision mandates only "reasonable efforts" and does not prioritize licensed placements in a non-border state over unlicensed placements. Contrary to Defendants' representation, the Settlement does not *require* placements in Texas and Florida. Ds. MPA at 9, 18. If licensed placements are unavailable, reasonable efforts cannot produce them and the Settlement neither requires nor favors placement in those states.

(Defendants proposed inspections by "an independent compliance inspector" and modification "to allow for Plaintiffs to have oversight").

### b. Modification of the state licensing requirement is premature because HHS's actions acknowledge the Rule is not a durable remedy.

Defendants represent that the Rule is "implementing all the elements of the FSA's licensed placement requirement that ORR could implement." Ds. MPA at 22. But HHS's own actions demonstrate the government does not view the Rule as a "durable remedy" and plans to do more. *Horne*, 557 U.S. at 450.

In September 2021, HHS stated in a Request for Information ("RFI") that it was considering federal licensure of ORR facilities by "a component outside of ORR." 86 Fed. Reg. 49,549, 49,550. In 2023, HHS stated in the Notice of Proposed Rulemaking on the Foundational Rule that, "in the spirit of current FSA requirements," HHS is developing a separate regulation on federal licensing of ORR care providers in states where licensure is unavailable. 88 Fed. Reg. at 68,916 n.52 (Preamble). The Foundational Rule confirms HHS is still developing this regulation but does not indicate its expected release date or any justification for failing to include licensing requirements in this Rule. 89 Fed. Reg. at 34,392 n.61.

The Ninth Circuit suggested that non-state licensed facilities "might" be acceptable if regulations allowed for "licensing" similar to the Settlement. *Flores v. Rosen*, 984 F.3d 720, 740 (9th Cir. 2020); Ds. MPA at 24. But the Rule does not provide for licensing. It is merely a temporary stopgap pending future licensing regulations. Until such regulations are published, neither Plaintiffs nor the Court can assess whether they represent a suitably tailored modification. *See Coleman v. Brown*, 922 F.Supp.2d 1004, 1043 (E.D. Cal. 2013) (holding that "it is entirely premature for defendants to seek vacatur" because "[w]hatever resolution defendants contend that they have achieved, that resolution is, without a doubt, not a durable one.").

1   Defendants' argument that modification is necessary now to avoid violating

2   the Settlement rings hollow. Defendants have been out of compliance with the

3   Settlement in Texas and Florida for years. The Rule merely codifies this dangerous

4   status quo. The Parties have discussed this issue and the importance of alternative

5   independent oversight since 2021. *See* Declaration of Mishan Wroe ¶¶ 23-27, May

6   31, 2024 ("Wroe Dec."). In a June 2022 meet and confer, Defendants represented

7   that they were planning to propose federal licensing rules to address this problem.

8   Wroe Dec. ¶ 27. Plaintiffs have refrained from filing a Motion to Enforce on this

9   issue to give Defendants time to develop a solution. Plaintiffs remain willing to

10  provide Defendants a reasonable amount of time to develop a durable remedy.[3]

c.   The Rule lacks oversight mechanisms necessary to protect children.

13  The Rule lacks *independent* oversight and any substitute for the essential

14  functions of state licensing. State licensing protects children's safety and well-

15  being by setting comprehensive minimum standards *and* providing the

16  administrative capacity, expertise, and procedures necessary to monitor and

17  enforce those standards. *See* Ex. 1, Declaration of Jill Mason ¶¶ 15-24, 35-38, May

18  29, 2024 ("Mason Dec."); Ex. 2, Declaration of Larry Bolton ¶¶ 5-12, May 29,

---

[3] Plaintiffs reserve the right to enforce the Settlement if Plaintiffs become aware of unsafe conditions in specific unlicensed facilities. *See, e.g.,* Motion to Enforce Settlement re Emergency Intake Sites, September 10, 2021 [Doc. # 1161]. If Defendants insist they suddenly need an immediate solution, Defendants could comply with the Settlement by moving children out of unlicensed facilities "as expeditiously as possible." FSA ¶ 12A. This would not require closing ORR facilities in Texas and Florida. Defendants have instead opted to treat unlicensed programs and licensed programs equally while flouting their obligation to provide comparable oversight. Of course, ORR also had the option to sue Texas and Florida to enjoin their blatant discrimination against the federal government. *See, e.g.*, *United States v. California*, 921 F.3d 865, 878 (9th Cir. 2019). Given these options, Defendants' claim that complying with the Settlement's licensing requirement is "impossible" is palpable hyperbole.

2024 ("Bolton Dec."); Ex. 3, Declaration of Carrie Vander Hoek ¶¶ 11, 13, 15, May 30, 2024 ("Vander Hoek Dec."). Requiring programs to meet state licensing standards without mechanisms necessary to ensure compliance falls inexcusably short of what is required to keep children safe. Vander Hoek Dec. ¶¶ 20-21; Mason Dec. ¶¶ 15-24, 35-38; Bolton Dec. ¶¶ 6, 8-11.

In a comment to the proposed Rule, the attorneys general of 19 states expressed serious concern that the Rule lacked adequate oversight mechanisms for unlicensed facilities "critical to ensure that children are not housed in conditions that are harmful to their health and safety." *See* Ex. 4, Comment of States Attorney General at 12, December 4, 2023. The attorneys general urged ORR to include "minimum monitoring and enforcement functions" in the Rule, including (1) "requirements for inspection, screening, and documentation review prior to the placement of any UACs in a facility"; (2) background check requirements for staff; (3) requirements for the frequency of monitoring visits; "(4) a procedure for receiving, investigating, and responding to complaints within a specified timeframe; and (5) a framework for the enforcement of standards, including procedures for suspension or termination of a facility." *Id.* at 14.

Despite these concerns, the Rule leaves central functions of state licensing completely unaddressed. For example, it does not require vetting and inspection of new facilities to ensure they are capable of meeting minimum standards before accepting children. Nor does the Rule ensure that relevant ORR staff have expertise in state licensing standards. *Cf.* Bolton Dec. ¶¶ 9, 11. Texas licensing, by contrast, requires an on-site inspection to determine compliance with minimum standards and laws *before* issuing a license and requires a facility to demonstrate compliance on a continuing basis for at least three months, with three inspections during this period. *See* 26 Tex. Admin. Code §§ 745.211, 745.339, 745.345, 745.351. Other states similarly verify that facilities can meet minimum standards prior to licensure. *See, e.g.*, Mason Dec. ¶¶ 16-18; Bolton Dec. ¶ 6; Vander Hoek

Dec. ¶ 11; Cal Code Regs tit. 22, §§ 87818, 87820, 87844(a)(1); Del. Code Ann. tit. 14, § 3004A; Fla. Stat. Ann. § 409.175(6)(b); Fla. Admin Code §§ 65C-46.002, 65C-46.003, 65C-46.005.

The Rule's lack of mandatory initial vetting and inspections is especially concerning as the Government Accountability Office ("GAO") previously found that ORR repeatedly failed to take minimum steps to vet its grantees, including failing to: (1) confirm information on applications, (2) adequately verify past state licensing violations, (3) review past performance and incidents of abuse and (4) ensure applicants were state-licensed or eligible for state licensure. Ex. 5, GAO Report at 2, 16-21. The report also found that ORR failed to adhere to its own regulations on auditing facilities and its own policies on monitoring visits. *Id.* at 33-34; *see also id.* at 34 (noting similar findings in 2016).

Perhaps even more concerning, the Rule provides no clear mechanism for children or *anyone* to report abuse, neglect, or standards violations at unlicensed facilities, and no guarantee of follow-up investigations. Texas does not currently investigate reports of abuse or neglect at ORR facilities, and it is unclear what, if any, investigation is done by ORR. Vander Hoek Dec. ¶¶ 16-19. State agencies, by contrast, are required to receive and promptly investigate complaints of licensing violations or maltreatment at licensed facilities. *See, e.g.*, Vander Hoek Dec. ¶¶ 13-15; Mason Dec. ¶¶ 21-24, 33; Bolton Dec. ¶ 9; Fla. Stat. Ann. § 409.175(8)(b); lll. Admin. Code tit. 89, § 383.35; Mass. Gen. Laws Ann. ch. 15D § 9(c); N.Y. Comp. Codes R. & Regs. tit. 18, § 441.8; Tex. Hum. Res. Code Ann. § 42.044(c). In California, for example, the licensing agency must conduct an onsite inspection of a facility within 10 days of receiving a complaint. *See* Cal. Health & Safety Code § 1538(c)(1). Investigating and responding to complaints requires substantial capacity. *See* Bolton Dec. ¶¶ 5, 9-11. Without timely investigations, children can be left in dangerous situations after allegations of abuse or neglect. Vander Hoek Dec. ¶ 19.

Defendants do not rely on the Ombuds Office in their modification request. Regardless, this office is no substitute for state licensing. The Ombuds "may" receive reports but is not required to investigate or even respond to the reports, much less within any defined period. 45 C.F.R. § 410.2002(a). Moreover, unlike the robust enforcement mechanisms of state licensing, the Ombuds lacks *any* enforcement authority. 45 C.F.R. § 410.2002; *cf.* Mason Dec. ¶ 24; Bolton Dec. ¶¶ 8-10; Cal. Health & Safety Code §§ 1534, 1550; Fla. Stat. Ann. § 409.175(9); 26 Tex. Admin. Code §§ 745.8603, 745.8613.

> d. <u>Accreditation is not required by the Rule and is not a substitute for state licensing.</u>

Given the Rule's lack of independent oversight, Defendants rely on accreditation as a substitute. This reliance is misplaced.

First, *accreditation is not actually required by the Rule*. Accreditation is a grant requirement that ORR could change at any time and that ORR retains the discretion to waive. *See* 89 Fed. Reg. at 34,485 (Preamble) (noting that accreditation can be waived). And unlike state licensing, facilities can accept children before receiving accreditation. *See* Declaration of Allison Blake ¶ 19 [Doc. # 1414-3] ("Blake Dec.") (18 programs in Texas and Florida "are in the process of obtaining accreditation"). The Rule therefore allows children to be placed in standard programs without a state license, accreditation, or any equivalent vetting and inspection by anyone.

Moreover, accreditation organizations have private standards and particular areas of focus. *See* Mason Dec. ¶¶ 27, 36; Blake Dec. ¶ 12. Accreditation organizations do not monitor compliance with state licensing standards and cannot substitute for comprehensive state licensing oversight. *See* Mason Dec. ¶¶ 35-36. Accreditation organizations also differ in their level of rigorousness and there are

no clear benchmarks for what it means to be a nationally recognized accreditation agency. Mason Dec. ¶¶ 28-30.[4]

Once a facility is accredited, accreditation agencies do not carry out ongoing oversight and visit programs only once every few years. *See* Mason Dec. ¶¶ 33-35, 37. One of ORR's own grantees raised this concern in response to HHS's RFI on federal licensing, noting that in some instances accreditation requires inspections only every three to five years, which can "create health and safety risks for youth in care at these facilities." *See* Ex. 6, Southwest Key Programs Comment at 6, October 2021. For large organizations, accreditation staff may not even visit every facility. Mason Dec. ¶ 34. Further, accreditation organizations are not charged with investigating complaints and are unable to close facilities that violate standards. Mason Dec. ¶¶ 34, 37-38, 40.

State licensing agencies, by contrast, generally conduct inspections at least annually, and more often if investigating complaints. *See, e.g.*, Mason Dec. ¶¶ 21-23; Cal Code Regs. tit. 22, § 87845(b); Fla. Stat. Ann. § 409.175(8)(a); Ill. Admin. Code tit. 89, § 383.25(c); Mich. Comp. Laws Ann. § 722.118a; Tex. Hum. Res. Code Ann. § 42.044(b); Fla. Stat. Ann. § 409.175(8)(a); 55 Pa. Code § 20.31.

### e. Defendants' proposed modification is not in the public interest.

Texas and Florida's refusal to license ORR facilities endangers immigrant children in those states. Despite HHS representing for years that it is working on federal licensing regulations to address this problem, it has yet to create a durable remedy. "[W]hat is certain is that the children who are the beneficiaries of the *Flores* Agreement's protections and who are now in Defendants' custody are

---

[4] It is unclear how ORR determines which accreditation organizations to recognize. Some ORR facilities are accredited by Praesidium, Blake Dec. ¶ 19, but this is not one of the organizations mentioned in the Rule's Preamble, 89 Fed. Reg. at 34,486. Praesidium is specifically focused on sexual abuse prevention, not child welfare standards more generally. Mason Dec. ¶ 27.

blameless . . . In implementing the Agreement, their best interests should be paramount." *Flores v. Sessions*, 2018 WL 4945000, at *5 (C.D. Cal. July 9, 2018).

Modification is not in the public interest because—as Defendants themselves acknowledge—licensing oversight is important "to ensure the health, safety, and well-being of children." Ds. MPA at 9. Licensing was a central part of the Parties' bargain and HHS itself has concluded that additional rules on federal licensing are required. Defendants are not entitled to deference under these circumstances.[5] *See Flores v. Barr*, 407 F.Supp.3d at 928. Until Defendants develop a durable remedy that provides independent oversight comparable to state licensing and returns the Parties as nearly as possible to their original bargain, modification is premature. *See Kelly,* 822 F.3d at 1098; *Pigford*, 292 F.3d at 927.

## 2. The Rule Creates Impermissible Exceptions to "Standard Program" Placement

Even if the Court grants modification of the "licensed program" requirement, the Rule's provisions for standard placement are inconsistent with the Settlement. The Settlement enumerates limited exceptions to prompt licensed placement, such as if a child must be transported from a remote location or if Paragraph 21 applies. FSA ¶ 12.A.

Contrary to the Settlement's requirement that a child apprehended in a remote location be placed in a licensed program within five business days, FSA ¶ 12.A(4), the Rule permits indefinite delay in standard placement under these circumstances. 45 C.F.R. § 410.1101(d)(5).

The Rule also unlawfully expands the Settlement's exception for secure placement under Paragraph 21 by permitting indefinite delay in standard placement if "the referring federal agency indicates" that a child "[p]oses a danger to self or

---

[5] Providing government officials latitude in "the precise manner of the[] discharge" of their duties, *Frew v. Hawkins*, 540 U.S. 431, 442 (2004), does not require deference to Defendants' disavowal of the *necessity* of independent oversight.

others." 45 C.F.R. § 410.1101(d)(6). A generalized indication of "danger to self or others" does not satisfy Paragraph 21 and delay in standard placement based solely on this finding is impermissible. *Flores v. Rosen*, 984 F.3d at 732-33. Further, Settlement Paragraph 23 permits *medium* secure placement only as an alternative for a child who could otherwise be placed in a secure facility under Paragraph 21. But the Rule permits placement in medium secure (re-named "heightened supervision") facilities on grounds not permitted by the Settlement. For example, the Rule permits placement in this restrictive setting for "isolated or petty offenses," 45 C.F.R. § 410.1105(b)(2)(iv), whereas the Settlement specifies that "[p]etty offenses . . . are not considered grounds for stricter means of detention in any case," FSA ¶ 21.A.ii. The Rule also permits heightened supervision placement for a child who is "ready for step-down from a secure facility," without any requirement that the child continue to meet Settlement Paragraph 21 criteria. 45 C.F.R. § 410.1105(b)(2)(v). The Settlement has robust criteria for restrictive placement to avoid unnecessary placements in facilities not licensed "for dependent children." FSA ¶ 6; *cf.* 45 C.F.R. § 410.1001.

These inconsistencies are unrelated to the lack of licensure in Texas and Florida and cannot be a suitably tailored modification. *See Rufo*, 502 U.S. at 391 (court should "do no more" that modification "tailored to resolve the problems created by the change in circumstances.").

### 3. The Rule Fails to Guarantee the Settlement's Protections for Children Placed Out-of-Network

The Rule further fails to implement HHS's obligations by allowing children to be placed long-term in OON facilities that do not meet required standards.

The Rule exempts OON placements from Exhibit 1's minimum standards, including basic services and protections against abusive disciplinary practices. *See* FSA Ex. 1; 89 Fed. Reg. at 34,496 (Preamble) ("OON placements are not required to meet the requirements of subpart D as they are not included in ORR's definition

of care provider facilities."); 89 Fed. Reg. at 34,597 ("Subpart D – Minimum Standards and Required Services"); Ds. App. A [Doc. # 1414-5 at 39-51]; *see also* 45 C.F.R. § 410.1001 (OON placements "may include hospitals, restrictive settings, or other settings outside of the ORR network of care" and are not a "standard program"). Because they are not defined as care provider facilities, OON placements are also exempt from the Rule's monitoring provisions. 45 C.F.R. § 410.1303. And although the Rule provides that OON providers be "licensed by an appropriate State agency," it does not mandate they be licensed "for dependent children" as required by Paragraph 6 of the Settlement.[6] 45 C.F.R. § 410.1001.

Plaintiffs raised concerns about the lack of standards for OON placement in a comment to the proposed Rule. Ex. 7, Comment of *Flores* Class Counsel at 11-13. In response, HHS writes in the Preamble that the child's "case manager would monitor the unaccompanied child's care and ensure the unaccompanied child is receiving services," without specifying what services the case manager will be monitoring. 89 Fed. Reg. at 34,409-10. The mere presence of a case manager is plainly insufficient to protect children's rights when they have no legal entitlement to minimum standards. Moreover, the Rule itself does not address the role of a case manager for OON placements.

In the past ORR has failed to provide children placed OON regular contact with their case managers, consistent access to counsel, and language services required to engage in minimum services. *See* Ex. 8, Declaration of Jennifer Vanegas ¶ 12, July 19, 2022 ("Vanegas Dec."); Wroe Dec. ¶¶ 13-15 & Ex. B. Class members have also been hospitalized for weeks or months at a time in unacceptable conditions without services required by the Settlement. *See* Wroe Dec. ¶ 14 & Ex. A; Plaintiffs' Response to Juvenile Coordinators' Interim Reports

---

[6] As detailed below, children have been denied minimum services in hospitals that are presumably state-licensed to provide medical care.

at 8-9, November 23, 2020 [Doc. # 1039]; Declaration of Class Member at Nexus Children's Hospital at ¶¶ 6, 10-11, November 13, 2020 [Doc. # 1039-9] (child placed at hospital for seven months with little to do during the day and only 1.5 hours of class per week); Declaration of Class Member at Nexus Children's Hospital, at ¶¶ 7, 10 [Doc. # 1039-10] (child placed at hospital for six months without educational services).

The blanket exemption of OON placements from Settlement requirements is especially troubling as children are routinely placed OON for lengthy periods.[7] As of May 2, 2024, three class members were placed at hospitals for at least 58 days, 119 days, and 149 days, respectively. *See* Wroe Dec. ¶ 11. As of the same date, ten class members were held in other OON placements, including five children placed OON for over 130 days and two children for over 320 days. Wroe Dec. ¶ 9.

Children who are placed OON tend to be particularly vulnerable in terms of mental or physical health needs. *See* 89 Fed. Reg. at 34,409-11 (Preamble). The Rule inexcusably deprives them of critical protections under the Settlement.

## B. Partial Termination of the Settlement is Unjustified

Defendants have not met their burden to demonstrate that partial termination of the Settlement as to HHS is warranted under the Settlement's terms or on equitable grounds.

### 1. Partial Termination is Inconsistent with the Termination Clause

The Settlement's termination clause provides for full termination based on regulations that implement the entire Settlement. Paragraph 40, as modified, provides that "*All terms* of this Agreement shall terminate 45 days following

---

[7] Defendants' appendix confusingly places OON facilities alongside Settlement Paragraph 12.A related to initial apprehension. Ds. App. A [Doc # 1414-5 at 12-13]. If Defendants consider long-term OON placement a placement under Paragraph 12.A, this violates the time limits in Paragraph 12.A. FSA ¶ 12.A; *Flores v. Sessions*, 2018 WL 4945000, at *2.

1   [D]efendants' publication of final regulations implementing this Agreement.

2   Notwithstanding the foregoing, the INS shall continue to house the general

3   population of minors in INS custody in facilities that are state-licensed for the care

4   of dependent minors." (emphasis added).

5          Defendants appear to propose rewriting the clause as follows: "~~All~~

6   *Individual* terms of this Agreement shall terminate 45 days following Defendants'

7   publication of final regulations implementing *parts of* this Agreement.

8   Notwithstanding the foregoing, [ORR] shall continue to house the general

9   population of minors in [ORR] custody in facilities that are state-licensed for the

10  care of dependent minors, *provided the state in which ORR chooses to detain such*

11  *minors agrees to license ORR facilities*."

12         The Court "must interpret the contract to give effect to the mutual intention

13  of the parties as it existed at the time of contracting." *Gates v. Rowland*, 39 F.3d

14  1439, 1444 (9th Cir. 1994) (internal citation omited). "[L]ike terms in a contract,

15  distinct provisions of consent decrees are independent obligations, each of which

16  must be satisfied before there can be a finding of substantial compliance." *Rouser*

17  *v. White*, 825 F.3d 1076, 1081 (9th Cir. 2016). "Accordingly, courts don't release

18  parties from a consent decree unless they have substantially complied with *every*

19  *one* of its provisions." *Id.*

20         Here, the parties to the Settlement were Plaintiffs and a *unitary* defendant:

21  the Immigration and Naturalization Service ("INS"). At the time, the INS was

22  divided into regions with the autonomy to adopt separate policies and the original

23  certified class was specific to the Western Region. *See Flores v. Lynch*, 828 F.3d at

24  901-902. But neither Party contemplated that regulations implementing the

25  Settlement only as to the Western Region would allow that region to exit the

26  agreement, while the remaining regions remained.

27         The Settlement simply does not contemplate partial termination based on

28  partial implementation. To the contrary, partial termination is inconsistent with the

15

Settlement's stated goal to "set[] out nationwide policy for the detention, release, and treatment of minors in the custody of the INS." FSA ¶ 9.

### 2. Defendants Fail to Demonstrate that Partial Termination is Warranted on Equitable Grounds

Nor is partial termination justified on equitable grounds. The Supreme Court held that partial termination of a consent decree based on partial compliance must be informed by three factors: "[1] whether there has been full and satisfactory compliance with the decree in those aspects of the system where supervision is to be withdrawn; [2] whether retention of judicial control is necessary or practicable to achieve compliance with the decree in other facets of the [] system; and [3] whether the [defendant] has demonstrated . . . its good-faith commitment to the whole of the court's decree." *Freeman*, 503 U.S. at 473, 491 (1992). "In considering these factors, a court should give particular attention to the [defendant]'s record of compliance." *Id.* Partial termination is not justified unless the moving party satisfies "*all three parts* of *Freeman*'s three-part test." *Ho. v. San Francisco Unified School Dist.*, 965 F.Supp.1316, 1327 (N.D. Cal. 1997).

The Ninth Circuit has applied this test to the termination of consent decrees in multiple contexts. *See Jeff D. v. Otter*, 643 F.3d 278, 288 (9th Cir. 2011) (requiring consideration of the first and third *Freeman* factors before vacating consent decree in full); *see also Rouser*, 825 F.3d at 1081 ("[T]he court should examine defendants' entire 'record of compliance.'") (quoting *Freeman*, 503 U.S. at 491). Defendants bear the burden of demonstrating that termination is appropriate. *Jeff D. v. Otter*, 643 F.3d at 283-84.

Defendants cite *Freeman* in support of their request for partial termination, Ds. MPA at 25, but make no attempt to satisfy the *Freeman* factors. They instead rely almost exclusively on the Ninth Circuit's statement that Defendants may move

to partially terminate the Settlement. Ds. MPA at 24.[8] Stating that Defendants may *file* a motion to terminate in part is a procedural instruction to Defendants; it in no way directs the Court to grant the motion. Because Defendants did not move to terminate in part in 2019, the legal standard for partial termination was not before this Court or the Ninth Circuit. *Flores v. Rosen*, 984 F.3d at 737. A separate motion was required to allow the Court to consider partial termination on its merits under the applicable legal standard.

In any event, the Ninth Circuit made clear that any motion to terminate in part must demonstrate Defendants' commitment to the *whole* decree, including the rights of accompanied class members in DHS custody. *See Flores v. Rosen*, 984 F.3d at 744 n.12 ("Any motion to terminate the Agreement in part [as to HHS] would have to take into account our holding in *Flores I* that the Agreement protects both unaccompanied and accompanied minors.").[9]

---

[8] To the extent Defendants argue that partial termination is justified under *Horne*, they are wrong. Modification based on unexpected changed conditions and partial termination based on partial compliance are two separate requests subject to two different legal standards. The Supreme Court decided *Freeman* just two months after *Rufo* but did not cite *Rufo*, indicating it considered these cases to address separate issues. *See Freeman*, 503 U.S. 467; *Rufo*, 502 U.S. 367; *see also Smith v. Bd. of Educ. of Palestine-Wheatley Sch. Dist.*, 769 F.3d 566, 572 (8th Cir. 2014) (considering the applicability of *Freeman* and *Rufo* and noting "the significant differences between a petition to modify a consent decree on account of changed circumstances, and a petition to terminate all or part of a consent decree because the party subject to the decree has fully complied with its obligations"). Because Defendants seek both modification based on changed factual conditions *and* partial termination based on the Rule's purported implementation of the Settlement, they must satisfy both standards. *Cf. id.* at 574 (modification under *Rufo* did not warrant terminating other provisions unrelated to changed circumstances).

[9] Defendants suggest the Ninth Circuit's holding that the regulations should not be enjoined in full justifies termination in part. *See* Ds. MPA at 25. But, as the Ninth Circuit made clear, the scope of an injunction and the propriety of partial termination are separate issues, and the Settlement can coexist with regulations. *See Flores v. Rosen*, 984 F.3d at 737.

Because Defendants cannot satisfy each of the *Freeman* factors, the motion for partial termination should be denied.

a.  <u>HHS has not fully and satisfactorily complied with the Settlement.</u>

Defendants seeking to terminate a consent decree based on satisfaction of the decree must show substantial compliance. *See Jeff D. v. Otter*, 643 F.3d at 283. "[S]ubstantial compliance does imply something less than a strict and literal compliance with the contract provisions but fundamentally it means that the deviation is unintentional and so minor or trivial as not substantially to defeat the object which the parties intend to accomplish." *Id.* at 284 (internal citation omitted). "[O]nly final regulations that implement the *Flores* Agreement, incorporate the relevant and substantive terms, and are consistent with the terms thereof may formally terminate this consent decree." *Flores v. Barr*, 407 F.Supp.3d at 925 (internal citation omitted); *see also Flores v. Rosen*, 984 F.3d at 741.

As discussed above, the Rule's material inconsistencies with the Settlement preclude partial termination. *See* Section II.A, *supra*. Additionally, ORR cannot demonstrate a "consistent pattern of lawful conduct" and "record of compliance" with the Settlement. *See Freeman*, 503 U.S. at 491. The Court has repeatedly found ORR in violation of the Settlement. *See, e.g.*, *Flores v. Barr*, 2020 WL 2758795, at *1-2 (C.D. Cal. May 22, 2020); *Flores v. Barr*, 2020 WL 2758792, at *8-10, *12-13 (C.D. Cal. Apr. 24, 2020); *Flores v. Sessions*, 2018 WL 10162328, at *21 (C.D. Cal. July 30, 2018); *Flores v. Sessions*, 862 F.3d 863 (9th Cir. 2017); *see also L.V.M. v. Lloyd*, 318 F.Supp.3d 601, 613-14 (S.D.N.Y. 2018) (holding that ORR director review policy unnecessarily delayed release).

HHS's belated request for modification does not excuse years of violations by operating unlicensed facilities in Texas and Florida, especially when the proposed modification simply codifies ORR's existing deficient practices. *See* 89 Fed. Reg. at 34,485 (Preamble) (describing response to Texas's actions); *see also Flores v. Rosen*, 984 F.3d at 736 ("[T]he government has apparently disregarded

that right in practice, but it does not follow that we can sanction that disregard."); *Flores v. Sessions*, 2018 WL 4945000, at *2 (noting that "Defendants did not request an alteration of their legal obligations [as to accompanied minors] until many years later"). ORR also placed children in hospitals and other OON placements for weeks or months without access to the minimum services required by Settlement Exhibit 1. *See* Section II.A.3, *supra*.

Further, ORR held thousands of children in unsafe and unsanitary conditions in Emergency Intake Sites ("EISs") in 2021. Plaintiffs moved to enforce the Settlement and the Court later approved an agreement setting minimum standards at EISs. *See* Order Granting Final Approval of Settlement Agreement, September 23, 2022 [Doc. # 1288]; Motion to Enforce Settlement re EISs [Doc. # 1161].

In recent years, Plaintiffs have also met and conferred with Defendants after identifying Settlement violations that did not result in a motion to enforce. In 2022, for example, Plaintiffs learned of unaccompanied children detained by DHS for days or weeks in hotels in highly restrictive and harmful conditions, in violation of Paragraph 12.A and the Court's September 2020 Title 42 order. *See* Wroe Dec. ¶¶ 16-22; Plaintiffs' Response to ICE and CBP Juvenile Coordinators' Reports at 1-3, July 15, 2022 [Doc. # 1268]; *Flores v. Barr*, 2020 WL 5491445, at *8 (C.D. Cal. Sept. 4, 2020); *see also* Ex. 9, Declaration of M. Vaneza Alvarado ¶¶ 6-10, June 24, 2022 ("Alvarado Dec.") (two class members with heightened mental health needs were detained in hotels for over a week with no services and extremely limited access to counsel); Vanegas Dec. ¶¶ 9-11 (describing lack of services and abusive conditions of client's hotel detention).

This prolonged hotel detention was caused by HHS's practice of discharging children from its custody following arrest by local law enforcement and then refusing to timely resume custody, in violation of Paragraphs 12.A and 19 of the Settlement. *See* Wroe Dec. ¶¶ 16-18, 21; Alvarado Dec. ¶¶ 6-9; Vanegas Dec. ¶¶ 8-9, 12. After several months of negotiations between the Parties, ORR eventually

issued a new policy related to children arrested by local law enforcement. *See* Wroe Dec. ¶ 22.

Defendants clearly have not demonstrated "full and satisfactory compliance" as to HHS. *Freeman*, 503 U.S. at 491.

> b. Terminating jurisdiction over HHS will compromise effective enforcement of the Settlement as to DHS.

Defendants fail to make any showing that continued enforcement as to HHS is not "necessary or practicable to achieve compliance with the decree in other facets of the [] system." *Id.* at 491. The obligations of DHS and HHS under the Settlement are "intertwined or synergistic in their relation," *id.* at 497, and continued jurisdiction over HHS is necessary to ensure compliance by DHS.

The Settlement applies to *all* children in INS custody and does not delineate separate responsibilities for DHS and HHS. When the Homeland Security Act transferred the INS's functions related to the care and custody of unaccompanied children to ORR, it preserved the Settlement's requirements *in full* as to both DHS and HHS and required ORR to coordinate with DHS agencies. *Flores v. Sessions*, 862 F.3d at 870. "Congress did not intend to entirely remove unaccompanied minors from the auspices of authorities outside ORR" and instead "provided for the welfare of unaccompanied minors by ensuring coordination and cooperation among diverse governmenal agencies." *Id.* at 871.

Defendants fail to grapple with the interplay between DHS's and HHS's duties under the Settlement and do not explain how the Court could practically enforce the Settlement as to DHS only. DHS's ability to provide safe and sanitary conditions and to expeditiously transfer children to licensed placements requires HHS to timely accept custody of unaccompanied children from DHS. *See* Ds. MPA at 19. This in turn depends on HHS ensuring adequate licensed placements and releasing children from its custody without unnecessary delay to allow for new placements. *See, e.g.*, ORR Juvenile Coordinator Report at 4-8, June 4, 2021 [Doc.

# 1124-2] (describing ORR's efforts to increase capacity and expedite releases in response to increased referrals).

Section 410.1101 of the Rule illustrates these interrelationships. Subsections (b) and (c) state that ORR will work with the referring federal agency to accept custody of an unaccompanied child. Subsection (d) then lists various "exceptional circumstances" that exempt ORR from timely accepting custody, including an influx, emergency, apprehension in a remote location, and another entity's accusation that a child is a danger to self or others. 45 C.F.R. § 410.1101(d)(2)-(3). There is no requirement that ORR accept custody "as expeditiously as possible" in an influx or emergency. *Cf.* FSA ¶ 12.A.[10] The exceptions for remote locations or alleged dangerousness are inconsistent with the Settlement. *See* Section II.A.2, *supra*.

The enforcement problem is clear: DHS could hold an unaccompanied child in violation of Paragraph 12.A on the grounds that HHS has not yet identified a placement. Without jurisdiction over HHS, the Court would be unable to determine whether Defendants are identifying licensed placements as expeditiously as possible. *See Freeman*, 503 U.S. at 497 ("[A] continuing violation in one area may need to be addressed by remedies in another"); *cf. Bobby M. v. Chiles*, 907 F.Supp. 368, 372 (N.D. Fla. 1995) (granting partial termination of consent decree as to one of two juvenile facilities only after finding that "Dozier is independent from Eckerd in all pertinent respects").

This issue is far from theoretical. In April 2021, the Independent Monitor reported "severe overcrowding" in Customs and Border Protection ("CBP")

---

[10] Once a child is *in* ORR custody, the Rule requires standard placement as expeditiously as possible. But the Rule does not obligate ORR to timely *accept* custody from DHS. Remarkably, Defendants assert that Paragraph 12.A's transfer requirements do not apply to ORR, further illustrating their failure to address the interrelated responsibilities of DHS and HHS. *See* Ds. App. A [Doc. # 1414-5 at 13-14].

1    facilities that threatened "[v]irtually all the custodial and medical provisions

2    essential to adequate detention conditions." Independent Monitor Report at 4, April

3    2, 2021 [Doc. # 1103]. In response, *HHS* opened EISs, revised its Covid-19

4    protocols to accommodate more children, and created expedited release

5    procedures. *Id.* at 12-23. The Court ordered further reporting on CBP conditions

6    and capacity *and* updates on ORR's plans to expand capacity and to transfer

7    minors from EISs. *See* Order re Status Conference at 2-3, May 12, 2021 [Doc. #

8    1122].

9         Court-ordered monitoring has also revealed that ORR under-utilized its

10   licensed capacity. *See Flores v. Barr*, 2020 WL 5491445, at *8 (finding

11   Defendants were not placing children in licensed facilities as expeditiously as

12   possible because "ORR shelters were 97% vacant"); Plaintiffs' Response to ORR

13   Juvenile Coordinator's Annual Report, July 15, 2022 [Doc. # 1269] (data on

14   unused beds and history of Parties' meet and confers on this issue).

15        Relatedly, HHS takes the position that children must pass through DHS

16   custody prior to entering ORR custody—even if the child was previously in ORR

17   custody. *See* Wroe Dec. ¶¶ 16, 21; *see also* Ds. App. A [Doc. # 1414-5 at 18-19]

18   (stating that Settlement Paragraph 16 related to re-assuming legal custody "is not

19   relevant to ORR's Unaccompanied Children Program"). This policy resulted in

20   DHS detaining unaccompanied children in hotels while awaiting HHS placement,

21   in violation of the Settlement and the Court's orders. *See* Section II.B.2.a, *supra*.

22   To resolve non-compliance with the Settlement, Plaintiffs had to meet and confer

23   with representatives of *both* HHS and DHS regarding this issue, and the remedy to

24   DHS's violations involved a change in HHS policy. *See* Wroe Dec. ¶¶ 16-22.

25        If HHS were not bound by the Settlement, the Court would be severely

26   limited in its ability to monitor Defendants' efforts to timely place children in

27   licensed programs and to order appropriate remedies. *Freeman*, 503 U.S. at 497.

28

1      Defendants' alternative request that the Court terminate those provisions of

2  the Settlement implemented by consistent regulations is similarly unworkable. The

3  Settlement assumes state licensing throughout as an underlying basis of protections

4  for children. Defendants do not identify any specific provisions of the Settlement

5  that are severable from this bedrock requirement.

6      c.  Defendants have not shown a good faith commitment to the whole

7          of the Court's decree.

8      Finally, Defendants have not demonstrated "an affirmative commitment to

9  comply in good faith with the *entirety* of" the Settlement. *Freeman*, 503 U.S. at

10  499 (emphasis added); *see also Flores v. Rosen*, 984 F.3d at 744 n.12; *Rouser*, 825

11  F.3d at 1081. In addition to HHS's violations, Defendants do not—and cannot—

12  demonstrate a good-faith commitment to the Settlement by DHS.

13      The Ninth Circuit specifically instructed that any motion to terminate in part

14  as to HHS must also account for the rights of *accompanied* minors. *Flores v.*

15  *Rosen*, 984 F.3d at 744 n.12. Yet Defendants' motion includes no mention of

16  accompanied minors, much less a commitment to compliance by DHS. After

17  promulgating flagrantly inconsistent DHS regulations in 2019, Defendants have

18  not signaled any intent to publish consistent regulations that recognize the rights of

19  accompanied minors. Defendants' willingness to omit DHS's vital obligations

20  reveals a lack of consideration of the whole decree.[11]

21      DHS cannot show a "consistent pattern of lawful conduct" and "record of

22  compliance" with the Settlement. *See Freeman*, 503 U.S. at 491; *see also Fisher v.*

23  *Tucson Unified Sch. Dist.*, 652 F.3d 1131, 1143-44 (9th Cir. 2011) (ordering

24  district court "to maintain jurisdiction until it is satisfied that the School District

25  has met its burden by *demonstrating*—not merely promising—its 'good-faith

26

27  _____

28  [11] Notably, Defendants substitute "HHS" for "INS" in describing the Settlement's
    goals, ignoring DHS entirely. *See* Ds. MPA at 15.

compliance . . . over a reasonable period of time.'") (quoting *Freeman*, 503 U.S. at 498). Indeed, "the history of this case is replete with findings of Defendants' non-compliance with the Agreement." *Flores v. Barr*, 407 F.Supp.3d at 924. Since Defendants last sought termination, the Court has repeatedly intervened to address new and continuing violations that endanger children's safety. *See, e.g.*, *Flores v. Garland*, Order re Plaintiffs' Motion to Enforce Settlement re "Open Air Detention Sites," April 3, 2024 [Doc. # 1406] ("OADS Order"); *Flores v. Barr*, 2020 WL 5491445, at *8-11.

Defendants also remain in active violation of the Settlement. The Court recently found that class members were detained in unsafe and unsanitary conditions in "Open Air Detention Sites." OADS Order. Despite the dire conditions, Defendants have failed to comply with this Order. *See* Plaintiffs' Response to CBP Juvenile Coordinator Report, May 17, 2024 [Doc. # 1422].

Further, Defendants have failed to remedy ongoing Settlement violations in CBP facilities. *See, e.g.*, *Flores v. Sessions*, 394 F.Supp.3d 1041 (C.D. Cal. June 27, 2017); *Flores v. Barr*, 2019 WL 2723798 (C.D. Cal. June 28, 2019). Despite a new settlement, Defendants continue to separate families in the Rio Grande Valley and El Paso Sectors without apparent operational necessity and fail to ensure consistent visitation. *See* Juvenile Care Monitor Report at 16, May 6, 2023 [Doc. # 1412] ("May 2024 JCM Report"); Juvenile Care Monitor Report at 6, Nov. 13, 2023 [Doc. # 1372] ("November 2023 JCM Report"). Additionally, Defendants fail to provide young children with appropriate meals or ensure adequate warm clothing. *See* May 2024 JCM Report at 18; November 2023 JCM Report at 28-29, 31. Improvements in some other areas do not excuse this continuing non-compliance. *See Armstrong v. Newsom*, 58 F.4th 1283, 1295-96 (9th Cir. 2023).

Despite the Court's specific findings that the Settlement requires access to adequate sleeping conditions, soap, showers, and toothbrushes, class members in the San Diego Sector report the lack of these basic necessities and a lack of privacy

in using the bathroom. *See Flores v. Sessions*, 394 F.Supp.3d at 1056, 1060-61; Declaration of KPR ¶¶ 11, 14, April 30, 2024 [Doc. # 1422-2] ("KPR Dec."); Declaration of AFBA ¶ 8, April 30, 2024 [Doc. # 1422-3] ("AFBA Dec."); Declaration of JAF ¶¶ 8-9, April 29, 2024 [Doc. # 1422-8] ("JAF Dec."). Class members also report a lack of "adequate temperature control" and "contact with family members who were arrested with the minor," in violation of Paragraph 12.A. KPR Dec. ¶ 15; AFBA Dec. ¶ 12; JAF Dec. ¶¶ 4-5, 9, 13. The Parties met and conferred regarding these violations on May 17, 2024. Wroe Dec. ¶¶ 28-29.

Finally, DHS continues to violate the Settlement's speedy release and transfer requirements. *See* May 2024 JCM Report at 10-11 (507 children were held in CBP custody along the Southwest Border for longer than 72 hours in January 2024 and 537 children were held for longer than 72 hours in February 2024). Alarmingly, not only does "CBP data reflect[] that . . . many children in families are routinely held for more than 72 hours", but 61 minors in January 2024 and 54 minors in February 2024 were in CBP custody for between six and 16 days. *Id.* at 11. This occurred "at a time when the census was comfortably below capacity," *id.*, again indicating Defendants' fundamental lack of commitment to complying with the whole of the Settlement.

## III.   CONCLUSION

For these reasons, and because termination as to HHS is not in the public interest, Defendants' motion should be denied. *See Flores v. Barr*, 407 F.Supp.3d at 928-929 ("[T]he evidentiary record before this Court overwhelmingly shows that throughout several presidential administrations, the Agreement has been necessary, relevant, and critical to the public interest in maintaining standards for the detention and release of minors arriving at the United States' borders.").

Dated: May 31, 2024

CENTER FOR HUMAN RIGHTS AND
CONSTITUTIONAL LAW
Carlos R. Holguín
Sarah Kahn

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe
Diane de Gramont
Rebecca Wolozin

CHILDREN'S RIGHTS
Leecia Welch

*/s/ Mishan Wroe*
Mishan Wroe
*One of the Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

I, the undersigned counsel of record for Plaintiffs, certify that this brief contains **7,989** words, which complies with the word limit set in the Court's order granting Plaintiffs' *ex parte* application for leave to extend word limit. Doc # 1419.

Dated:  May 31, 2024

/s/ Mishan Wroe
Mishan Wroe

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2024, I caused a copy of Plaintiffs' Opposition to be served to all counsel through the Court's CM/ECF system.

Dated:  May 31, 2024

/s/ Mishan Wroe
Mishan Wroe