1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

JENNY LISETTE FLORES, *et al.*,

                    Plaintiffs,

          v.

MERRICK GARLAND, Attorney General of the United States, *et al.*,

                   Defendants.

)
)
)
)
)
)
)
)
)
)

Case No. CV 85-4544-DMG (AGRx)

**ORDER RE DEFENDANTS' MOTION TO TERMINATE *FLORES* SETTLEMENT AGREEMENT AS TO DEFENDANT HHS [1414]**

-1-

On May 10, 2024, Defendants filed a Motion to Terminate the *Flores* Settlement Agreement ("FSA" or "Agreement") as to the U.S. Department of Health and Human Services ("HHS") under Federal Rule of Civil Procedure 60(b)(5) and Paragraph 40 of the FSA.  [Doc. # 1414.]  The Motion is fully briefed.  [Doc. ## 1427 ("Opp."), 1435 ("Reply")].  The Court held a hearing on the Motion on June 21, 2024. Following the hearing, the parties filed supplemental briefing.  [Doc. ## 1443 ("Motion Supp."), 1444 ("Opp. Supp.").]  Having carefully considered both sides' written submissions and oral argument, the Court **GRANTS in part and DENIES in part** the Motion for the reasons set forth below.

# I.

# INTRODUCTION

On January 28, 1997, the District Judge then presiding over this case approved the *Flores* Agreement.  *See Flores v. Sessions*, 862 F.3d 863, 866 (9th Cir. 2017). Paragraph 40 of the Agreement initially stated:  "All terms of this Agreement shall terminate the earlier of five years after the date of final court approval of this Agreement or three years after the court determines that the INS [Immigration and Naturalization Service] is in substantial compliance with this Agreement, except that the INS shall continue to house the general population of minors in INS custody in facilities that are licensed for the care of dependent minors."  FSA ¶ 40 [Doc. # 101 at 8].[1]  On December 7, 2001, the parties stipulated to modify Paragraph 40 such that it now reads:  "All terms of this Agreement shall terminate 45 days following defendants' publication of final regulations implementing this Agreement[.] Notwithstanding the foregoing, the INS shall continue to house the general population of minors in INS custody in facilities that are state-licensed for the care of dependent minors."  *See* Pl.'s Ex. 2 at 70–73 (Dec. 7, 2001 Stipulation) (alterations omitted) [Doc. # 101].

---

[1] Page citations herein refer to the page numbers inserted by the CM/ECF system.

The parties originally contemplated that Defendants would initiate action to publish the terms of the FSA as final regulations within 120 days after final district court approval of the Agreement.  FSA ¶ 9 [Doc. # 101 at 13].  It has taken much longer than that.  Paragraph 9 makes clear, however, that "[t]he final regulations shall not be inconsistent with the terms of [the] Agreement."  [Doc. # 101 at 13.]

On October 4, 2023, HHS issued a Notice of Proposed Rulemaking ("NPRM") which would replace regulations concerning the placement, care, and services provided to unaccompanied children referred to the Office of Refugee Resettlement ("ORR") and implement the terms of the FSA.  *See* Unaccompanied Children Program Foundational Rule, 88 Fed. Reg. 68,908 (Oct. 4, 2023).  HHS received over 73,000 comments to the proposed rule and published the Final Rule on April 30, 2024. *See* Foundational Rule, 89 Fed. Reg. 34,384.  The Foundational Rule is set to become effective on July 1, 2024.  *Id.*

## II.
## BACKGROUND

### A.    The 2019 Rule

This Motion is not the first time that Defendants have sought to terminate the FSA on the basis of proposed regulations.  In August 2019, HHS and the U.S. Department of Homeland Security ("DHS") published a joint rule intended to implement the FSA and moved to terminate the Agreement.  *See* Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children, 84 Fed. Reg. 44,392–535 (Aug. 23, 2019) ("2019 Rule").  Plaintiffs moved to enforce the FSA and to enjoin the 2019 Rule.  [Doc. ## 516, 634.]  The Court denied Defendants' Motion, granted Plaintiffs' Motion, and enjoined Defendants from implementing the regulations.  [Doc. # 688.]  On appeal, the Ninth Circuit held that although certain regulations consistent with the FSA could take effect, this Court did not abuse its discretion when it denied Defendants' motion to terminate due to the nature and scope of the inconsistent aspects of the 2019 Rule and the Government's

motion at that time to terminate the *entire* Agreement. *See Flores v. Rosen*, 984 F.3d 720, 737 (9th Cir. 2020). The 2019 Rule was never implemented.

**B.      2021 Executive Orders in South Carolina, Texas, and Florida**

In the time since Defendants' previous motion to terminate, the Governors of three states—South Carolina, Texas, and Florida—have issued Executive Orders altering the ways that their states license ORR-funded facilities and programs. Motion at 16; Defs.' Ex. A, Declaration of Toby Biswas ¶ 11 [Doc. # 1414-2 ("Biswas Decl.")]. In South Carolina, unaccompanied migrant children may no longer be placed "into residential group care facilities or foster care facilities located in, and licensed by, the State of South Carolina." E.O. No. 2021-19 (Apr. 12, 2021).[2] This particular change, however, does not affect ORR's current operations in South Carolina because ORR funds only three transitional foster care programs in the state, all of which are still licensed. Motion at 17; Biswas Decl. ¶ 12.

On May 31, 2021, the Governor of Texas directed the state's Health and Human Service Commission ("HHSC") to "discontinue state licensing of any child-care facility in [Texas] that shelters or detains [unaccompanied children] under a contract with the Federal government." Motion at 17; *see* Proclamation by the Governor of the State of Texas (May 31, 2021).[3] In response, Texas HHSC "exempted" ORR facilities from Texas' licensing requirements, meaning that it was no longer possible for ORR to obtain a license to comply with the state's statutes, rules, and standards even if it wanted to. 26 Tex. Admin. Code §§ 745.111, 745.115. In September 2021, the Governor of Florida followed suit and directed Florida's Department of Children and Families ("DCF") to delicense, and cease granting or renewing licenses for, ORR facilities that serve unaccompanied minors. Motion at 17; Fla. Executive Order No. 21-223 (Sept. 28, 2021).

---

[2]      The South Carolina Governor's Executive Order can be found at: https://perma.cc/GNK4-T825.

[3] The Texas Governor's Proclamation can be found at: https://perma.cc/W3ZG-XZ3J.

As of April of this year, ORR's total operational standard bed capacity was 13,093 beds, 7,317 and 480 of which were in Texas and Florida, respectively. Texas and Florida thus hold approximately 60% of ORR's operational standard bed capacity. Motion at 17; Defs.' Ex. C, Declaration of Joel Nelson ¶ [Doc. # 1414-3 ("Nelson Decl.")]. The above-described Executive Orders have had a substantial impact upon ORR's operations in these states, as state licensure is explicitly required by the terms of the FSA. *See Flores v. Barr*, 407 F. Supp. 3d 909, 919 (C.D. Cal. 2019) (rejecting Defendants' attempt to avoid the state licensure requirement because "the purpose of the [Agreement's] licensing provision is to provide class members the essential protection of regular and comprehensive oversight by an *independent* child welfare agency.").

### III.

### LEGAL STANDARD

Federal Rule of Civil Procedure 60(b)(5) "encompasses the traditional power of a court of equity to modify its decree in light of changed circumstances." *Frew v. Hawkins*, 540 U.S. 431, 441 (2004) (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 380 (1992)). This rule permits a party to be relieved from "a final judgment, order, or proceeding" when "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." *See* Fed. R. Civ. P. 60(b)(5). The Supreme Court has interpreted Rule 60(b)(5)'s use of the disjunctive word "or" to signal that "each of the provision's three grounds for relief is independently sufficient." *Horne v. Flores*, 557 U.S. 433, 454 (2009).

A party seeking modification or termination of a consent decree bears the burden of showing that "a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383 (1992); *see Flores v. Rosen*, 984 F.3d at 741. This "significant change" may be either in factual conditions or in law, and courts take a "flexible approach" to modifying consent decrees in institutional reform litigation to

"ensure that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant." *Rufo*, 502 U.S. at 383; *Horne*, 557 U.S. at 448.  If the moving party satisfies its burden, the Court must then determine whether the party's proposed modification is "suitably tailored" to the changed circumstance. *Id.*  A modification is suitably tailored when it "would return both parties as nearly as possible to where they would have been absent the changed circumstances." *Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) (internal citations omitted).

## IV.

## DISCUSSION

### A.   Modification Due to Changed Circumstances

Defendants first seek to modify the FSA based on "changed circumstances"—namely, South Carolina, Texas, and Florida's decisions to no longer license ORR-funded facilities.  Defendants further move to terminate the FSA as to HHS in light of HHS' publication of the Unaccompanied Children Program Foundational Rule. 89 Fed. Reg. 34,384 (Apr. 30, 2024) (to be codified at 45 C.F.R. pt. 410) ("Foundational Rule" or "Rule").

#### 1.   Standard Programs

Defendants argue that the changed circumstances in Texas and Florida, when considered alongside the FSA's requirement that class members be placed in state-licensed programs, warrant modification of the Agreement.   Through the Foundational Rule, Defendants propose that ORR will continue to require all "standard programs"[4] to be state-licensed.  If state licensing is not an option, like in

---

[4] The Foundational Rule defines a "standard program" as "any program, agency, or organization that is licensed by an appropriate State agency to provide residential, group, or transitional or long-term home care services for dependent children, including a program operating family or group homes, or facilities for unaccompanied children with specific individualized needs; or that meets the requirements of State licensing that would otherwise be applicable if it is in a State

Florida and Texas, those programs will still be required to adhere to the state's licensing requirements, as they would be if state licensing were still available.  Motion at 30.

Plaintiffs contend that the Foundational Rule is not a suitably tailored modification of the state licensing requirement for the following reasons:  (1) it does not provide for comparable independent oversight, (2) the new Ombuds Office lacks enforcement authority, (3) it does not provide a mechanism for reporting abuse, (4) it does not provide for mandatory initial vetting and inspections of facilities, and (5) accreditation is neither required by the Foundational Rule nor a sufficient substitute even if it were.  The Court will address each of these concerns in turn.[5]

> ### a.    Independent Oversight

Plaintiffs are understandably apprehensive that, without state licensure, there will be a lack of oversight of unlicensed facilities.  Both this Court and the Ninth Circuit have consistently recognized the importance of independent oversight of these facilities.  *See Flores v. Barr*, 407 F. Supp. 3d at 919; *Flores v. Lynch*, 828 F.3d 898, 906 (9th Cir. 2016) (stating that the "obvious purpose" of the licensing requirement is "to use the existing apparatus of state licensure to independently review detention conditions").

Defendants assert that the Foundational Rule creates additional safeguards to ensure that unlicensed facilities comply with their state's licensing requirements.  First, the Rule requires "enhanced monitoring" by ORR of unlicensed facilities, which includes more frequent on-site visits and regular desk monitoring.  Motion at 11; 45 C.F.R. § 410.1303(e); Biswas Decl. ¶ 20.  Second, unlicensed facilities will also be subject to additional monitoring by "a team of state licensing subject-matter experts

---

that does not allow state licensing of programs providing care and services to unaccompanied children."  45 C.F.R. § 410.1001.

[5] There are many aspects of the Foundational Rule to which Plaintiffs do not object.  This Order addresses only Plaintiffs' articulated areas of concern.

in the HHS Administration for Children and Families."  Reply at 18; Defs.' Ex. D, Supplemental Declaration of Toby Biswas ¶ 6 [Doc. # 1435-1 ("Biswas Supp. Decl.")].  This team will monitor and inspect facilities at the same time intervals that state licensure teams would have done, but never less frequently than twice per year.  Defs.' Ex. E, Declaration of Maxine M. Maloney ¶ 5 [Doc. # 1435-2 ("Maloney Decl.")].  Third, all standard programs—licensed and unlicensed—must be accredited by an independent nationally recognized accrediting organization, or be in the process of obtaining accreditation, to receive funding from ORR.  Motion at 11; Biswas Decl. ¶ 23.  Lastly, the Rule creates an independent Ombuds Office to receive and respond to any complaints or reports of abuse or violations.  Foundational Rule at 34,573, Subpart K.  The ombudsperson may review cases, conduct site visits, issue public reports, investigate grievances, and "refer concerns to the HHS Office of the Inspector General and other federal agencies such as the U.S. Department of Justice."  Reply at 20; Foundational Rule at 34,574.

Plaintiffs assert that each safeguard is not a substitute for state licensing.  Defendants have not offered any individual safeguard, however, as a one-stop solution for the changed circumstances in Texas and Florida.  Instead, Defendants argue that all the safeguards, *taken together*, provide an equivalent, even if not identical, method of oversight.  The FSA did not account for what would happen if state licensure was no longer available, and Defendants have offered a reasonable workaround based on their experience implementing the FSA.  Here, unlike when the Court denied Defendants' proposed substitutes for state licensing in the past, it is now "unworkable" for Defendants to fully comply with the FSA's state licensing requirement, and Defendants have presented an alternative that is more satisfactory than anything they had proposed in the past.  *See Rufo*, 502 U.S. at 384; *Flores v. Johnson*, 212 F. Supp. 3d 864, 879 (C.D. Cal. 2015).

At the hearing, Plaintiffs raised the issue that Defendants' safeguards, such as HHS's specialized "ACF Licensing Team" and accreditation, are not actually

required by the Foundational Rule and are therefore unenforceable.  Although it is true that not every safeguard is explicitly written into the Rule, the FSA is equally silent regarding some of the oversight and monitoring provisions that are now considered fundamental aspects of the FSA.  For example, the FSA does not spell out how states will enforce their licensing requirements.  In like manner, the Rule requires unlicensed facilities still to adhere to their state's licensing requirements, and Defendants' proffered safeguards are designed to mimic the oversight presumably provided by state licensing.  Therefore, if Defendants fail to provide adequate safeguards—whether it is the ones they have already created, or new mechanisms tailored to future circumstances—then they would also fail to adhere to the state's licensing requirements.  That failure would be an enforceable violation of the Rule.  The only difference between the oversight provided by the Rule and state oversight is that ORR, a separate specialized team within HHS, an accreditation agency, and the Ombuds Office are overseeing the facilities' compliance with state requirements, rather than the state itself.  The Court therefore concludes that Defendants' proposed oversight modification is "suitably tailored" because it returns the parties "as nearly as possible" to where they would have been prior to Texas' and Florida's Executive Orders.  *Cf. Kelly*, 822 F.3d at 1098.

> **b.  Ombuds Office**

Defendants offer the Ombuds Office for the Unaccompanied Children Program as an additional form of oversight, similar to that of the *Flores* Monitor.  *See* Foundational Rule at 34,573 ("HHS believes that an Office of the Ombudsman is a sound solution to serve a similar function as the oversight currently provided by the *Flores* monitor.").  The Ombuds is to be situated within the Administration for Children and Families ("ACF"), not within ORR, and will be "an independent, impartial, and confidential public official with authority and responsibility to receive, investigate and informally address complaints about Government actions, make

findings and recommendations and publicize them when appropriate, and publish reports on its activities."  45 C.F.R. § 410.2000.

Plaintiffs are concerned that the Ombuds lacks "any" enforcement authority, but like the *Flores* monitor and Juvenile Coordinator, the ombudsperson is primarily meant to be a source of oversight and monitoring rather than an independent enforcing authority.  Opp. at 14 (emphasis omitted).  Nonetheless, the ombudsperson may refer concerns to the HHS Office of the Inspector General ("OIG") and other federal agencies such as the U.S. Department of Justice.  Reply at 20.  Outside of state enforcement, which is no longer possible in Texas and Florida, and enforcement by this Court, which was never intended to last indefinitely, it is unclear what alternative enforcement mechanisms would be both viable and satisfactory to Plaintiffs.

### c.   Initial Vetting

Plaintiffs take further issue with the Rule's alleged lack of mandatory vetting and inspection of new facilities before they begin accepting children.  Opp. at 12–13.  Defendants assert, however, that the ACF Licensing Advisory Team will be responsible for "rigorous initial vetting of prospective grantees with respect to adherence to state licensing standards" in non-licensing states.  Maloney Decl. ¶ 7.  The Foundational Rule requires that unlicensed facilities be monitored on the same timeline, and meet the same standards, that would be required if the state had not ceased licensing, and this requirement applies equally to new and already existing facilities.  *Id.* ¶ 5.  The Court therefore will not deny Defendants' request for modification based on inadequate vetting.

### d.   Reporting Abuse

Plaintiffs assert that the Foundational Rule fails to provide a "clear mechanism for children or [others] to report abuse, neglect, or standards violations at unlicensed facilities," Opp. at 8–10, but this is incorrect.  Beginning on July 1, 2024, in states that are no longer investigating reports of abuse—currently only Texas—a "Division on Child Protection Investigations" within ORR will be responsible for investigating

any reports of abuse, neglect, or other violations.  Reply at 19; Maloney Decl. ¶¶ 14, 18; Biswas Supp. Decl. ¶ 14.  Further, ORR is in the process of drafting an interim final rule ("IFR") that will provide additional mechanisms for reporting and investigating abuses.  Biswas Supp. Decl. ¶ 20.  The IFR is intended to "replicate" the investigative infrastructure in place in states that no longer license ORR facilities.  *Id.*  The Court thus conditionally finds that this modification is suitably tailored to the changed circumstances.  If the IFR is not enacted or is contrary to what Defendants have represented it to be, Plaintiffs may seek reconsideration on this basis.

### e.   Accreditation

The parties do not dispute that accreditation alone is not a substitute for state licensure.  There are important differences between state licensure and accreditation, such as public versus private standards, broad versus specific areas of focus, and responsibilities to investigate complaints.  Opp. at 14–15; Pls.' Ex. 1, Declaration of Jill Mason ¶¶ 28, 31, 33, 34 [Doc. # 1427-3 ("Mason Decl.")]; Pls.' Ex. 6, Southwest Key Programs Comment at 7 [Doc. # 1427-8 ("Southwest Comment")].  Defendants offer accreditation, however, not as a substitute for state licensing, but as an *additional* safeguard to ensure that facilities meet the requisite standards.  This is illustrated by the fact that the ORR requires *all* facilities—regardless of licensure status—to be accredited before they are eligible to receive funding.

### 2.   Secure, Medium-Secure, and Out-of-Network Placements

Plaintiffs raise several issues with the Rule's regulations concerning secure and medium-secure ("heightened supervision") facilities, namely that the Rule allegedly permits:  potential "indefinite delay" in standard placement if the child poses a threat to self or others, placement in medium-secure facilities for isolated or petty offenses, and heightened supervision for no reason other than that the child is "step[ping]-down from a secure facility."  Opp. at 16–17.

First, Plaintiffs compare section 410.1101 to Paragraph 21 of the FSA, but the appropriate analogue to Paragraph 21 is section 410.1105.  Plaintiffs are correct that

section 410.1101(d) does not specify a timeline for placing children who may need a non-standard placement, but neither does Paragraph 21 of the FSA. To the extent that Plaintiffs are concerned that children will be placed in a secure facility solely because they pose a danger to self or others, section 410.1105(a) explicitly prohibits that scenario. 45 C.F.R. § 410.1105(a) ("A finding that a child poses a danger to self shall not be the sole basis for a child's placement in a secure facility").

Regarding Plaintiffs' second concern, the Court agrees that the Rule appears to impermissibly allow isolated or petty offenses to be considered in the decision to place an unaccompanied child in a heightened supervision facility. This plainly contradicts Paragraph 21 of the FSA, which clearly states that "this provision [defining when minors may be placed in more restrictive facilities] shall not apply to [isolated or petty] offense(s)." FSA ¶ 21(A)(i)–(ii). Defendants address this inconsistency in their supplemental briefing by asserting that the Rule does not allow isolated or petty offenses *alone* to justify placement in a heightened supervision facility. Motion Supp. at 4. The Court is not concerned, however, that the Rule authorizes heightened placement based *solely* on isolated or petty offenses. The Court reads Paragraph 21.A of the FSA to disallow isolated or petty offenses to have *any* effect upon ORR's decision to place a child in a heightened supervision or secure facility. Accordingly, the Court concludes that the Rule's treatment of isolated and petty offenses contravenes the FSA.

Similarly, the Court agrees with Plaintiffs that the Rule appears, impermissibly, to allow placement in a heightened supervision facility solely because a child is ready to "step-down" from a secure facility. § 410.1105(b)(2)(v). As Plaintiffs point out, the Rule does not contemplate the possibility that a child could be ready to move immediately from a secure facility to a standard program. Opp. 17. In their supplemental briefing, Defendants attempt to explain this inconsistency by relying on the Rule's requirement that children are placed "in the least restrictive setting appropriate[.]" Motion Supp. at 6 (citing 45 C.F.R. § 410.1103(a)). This coexisting

catchall, however, does not eliminate the fact that the Rule explicitly lists being "ready for step-down from a secure facility," without more, as an acceptable reason for a child's placement in a heightened supervision facility. The Court therefore declines to accept the regulations to the extent that they are inconsistent with the FSA in this respect. *See* FSA ¶¶ 21, 23.

Plaintiffs further assert that the Rule exempts out-of-network ("OON") facilities both from Exhibit 1's minimum standards and the Rule's monitoring provisions. Opp. at 17–19; Pls.' Ex. A (describing failure by an OON placement to provide a class member with the services required by Exhibit 1 of the FSA) [Doc. # 1427-1]. Defendants respond that the FSA does not address OON placements, and regardless, the Rule includes sufficient safeguards and protections for children in OON facilities. Reply at 19; Biswas Supp. Decl. ¶ 29. Defendants are undeniably correct that the FSA never uses the term "out-of-network," but it is nonetheless true that OON facilities have typically been considered another form of "secure" placement. *See Lucas R. v. Becerra*, No. CV-18-5741-DMG (PLAx), 2022 WL 4177454 at *22 (C.D. Cal. Mar. 11, 2022) (describing minors at OON facilities as having interests "under the Constitution, TVPRA, and FSA"); *see also Flores v. Lynch*, 828 F.3d at 905, 906. The primary issue regarding the Rule's treatment of OON facilities is that the Rule fails to provide *substantive* protections for the children placed at these facilities. Supp. Opp. at 7. Section 410.1105(c) addresses *when* children may be placed in an OON facility, but it does not provide any guarantees about the *conditions* at those placements. Minors in these placements are *Flores* class members and therefore entitled to protections under either the FSA or the Rule. As a result, the Court concludes that OON facilities should be included in the provisions of the Rule governing in-network facilities. To the extent they are not, the Rule is inconsistent with the FSA.

//

//

### 3.    Plaintiffs' Proposed Solutions

In their Opposition, Plaintiffs contend that neither modification nor termination of the FSA is appropriate because it is not "impossible" for Defendants to comply with the FSA's licensing requirement.  Plaintiffs offer two alternatives that they argue would allow Defendants to comply with the FSA, notwithstanding the changed circumstances in Texas and Florida.  First, Plaintiffs suggest that the FSA does not require placement in either Texas or Florida, so Defendants "could comply with the Settlement by moving children out of unlicensed facilities 'as expeditiously as possible.'"  Opp. at 11, n.3.  Second, Plaintiffs suggest that Defendants could sue Texas and Florida "to enjoin their blatant discrimination against the federal government." *Id.*  As for Plaintiffs' first suggestion, Defendants counter that it would be impractical to either stop placements in Texas and Florida or to transfer all children out of those states and into licensing states.  The Court agrees.  As discussed *supra*, over half of ORR's bed capacity is in Texas and Florida, and "a majority" of unaccompanied children are encountered along the Texas-Mexico border.  Motion at 18–20; Biswas Decl. ¶ 16.  Establishing an equivalent number of housing options in other states would likely take years to accomplish. It would be not only impractical, but also potentially harmful to unaccompanied migrant children, to no longer operate facilities in these border states.  Further, the Court agrees with Defendants that suing Texas and Florida is neither the most efficient nor the most effective response to their decisions to stop licensing ORR-funded facilities.  Even if Defendants were ultimately successful in their lawsuit and the litigation was exceptionally quick (a highly unlikely prospect where litigation of this sort is concerned), there would still be an unknown period of time in which Defendants would be unable to comply with the FSA's licensing requirement, therefore failing to remedy the very issue that Defendants face now.

In sum, the Court concludes that modification with regard to state licensure is appropriate because the Foundational Rule is suitably tailored to the changed

circumstances in Florida and Texas.  The Rule "return[s] both parties as nearly as possible to where they would have been absent the changed circumstances" because it still requires unlicensed facilities to meet their state's licensing requirements. *Kelly*, 822 F.3d at 1098.  Although the form of oversight is necessarily different, the Rule creates multiple safeguards to account for this change.

The Court does not find, however, the modifications concerning secure, heightened supervision facilities and out-of-network placements to be suitably tailored to the change in circumstances, because Texas' and Florida's Executive Orders do not impact HHS's ability to comply with the relevant FSA provisions in that regard.

## B.   Termination of the FSA as to HHS

Defendants argue that the Court should terminate the Agreement as to HHS because the Foundational Rule "faithfully implements the FSA requirements applicable to HHS . . . and in some instances, necessarily takes a modified approach in light of substantially changed circumstances[.]" They assert that it is no longer equitable for HHS to be bound by the FSA.  Motion at 24.  Plaintiffs assert that termination is inappropriate because partial termination is both inconsistent with the FSA's termination clause and not justified on equitable grounds.

### 1.   Partial Termination

Paragraph 40 of the FSA, as amended, provides that "All terms of this Agreement shall terminate 45 days following [D]efendants' publication of final regulations implementing this Agreement.  Notwithstanding the foregoing, the INS shall continue to house the general population of minors in INS custody in facilities that are state-licensed for the care of dependent minors." FSA ¶ 40.  Plaintiffs contend that the use of the phrase "all terms" prohibits partial termination based on partial implementation.  Opp. at 20.  The Court disagrees.

Last time Defendants moved to terminate the Agreement, the Ninth Circuit explicitly clarified that:

"Although we hold that the majority of the HHS regulations may take effect, we also hold that the district court did not abuse its discretion in declining to terminate those portions of the Agreement covered by the HHS regulations. *The government moved the district court to terminate the Agreement in full, not to modify it or terminate it in part*. The Agreement therefore remains in effect, notwithstanding the overlapping HHS regulations. *If the government wishes to move to terminate those portions of the Agreement covered by the valid portions of the HHS regulations, it may do so*."

*Flores v. Rosen*, 984 F.3d at 737 (emphasis added). This language approves of partial termination of the FSA so long as the requisite legal standards for termination are met. The Court has no principled reason to find that partial termination of the FSA as to HHS is impermissible under the law, provided that Defendants bear their burden of demonstrating that they have satisfied the legal standards for such termination.

Plaintiffs also raise concerns that DHS will not comply with the FSA's requirement that it expeditiously transfer children to licensed placements if HHS is not required to expeditiously accept custody of those children. Opp. at 25; Supp. Opp. at 11. But DHS is still bound by the FSA and HHS has a "duty to *promptly* place unaccompanied children in the least restrictive setting that is in the best interest of the child" under both the Rule and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"). 45 C.F.R. § 410.1209(e); 8 U.S.C. 1232(c)(2)(A) (emphasis added). That ongoing duty does not change under the Foundational Rule.

In their supplemental briefing, Plaintiffs request, essentially, that the Court specify that every paragraph of the FSA that does not have a direct analogue in the Rule remains intact. To grant this request would require the Court to defy Supreme Court precedent. In *Rufo* and *Frew*, the Supreme Court clearly stated that principles of federalism require district courts to give "significant weight," "latitude," and "substantial discretion" to the government officials responsible for "deciding how

best to discharge their governmental responsibilities." 502 U.S. at 392; 540 U.S. at 442. Thus, the Court acknowledges that Defendants have some latitude in crafting a Rule that implements the FSA. Nonetheless, the Court addresses Plaintiffs' point that the Rule severely limits or eliminates Plaintiffs' counsel's access to information by excluding Paragraphs 24, 28–33, 37, and 40 from the Rule. Supp. Opp. at 21. It is not clear from the Rule who will have access to the data being collected under sections 1303, 1500, and 1501 of the Rule (Paragraph 28A of the FSA), or how they are meant to access that information. At least while the FSA remains partially in effect as to HHS, Plaintiffs' counsel's access to ORR facilities and to information about the children held at those facilities should be no different than it has been for the last 27 years under Paragraphs 32 and 33 of the FSA. Because the parties did not specifically address how these particular paragraphs would co-exist with a situation where regulations have been enacted, the Court will defer ruling on whether the regulations supersede Paragraphs 32 and 33.

The Court concludes that the Rule implements sections A–D of Paragraph 24, and that Paragraphs 24E, 28B, 29–31, 37, and 40 were relevant under the FSA only absent enactment of pertinent regulations. Regarding Paragraph 24A, Defendants have created an appropriate analogue for the FSA's "bond redetermination hearing" via the Foundational Rule's "risk determination hearing." 45 C.F.R. § 410.1903. The Rule also provides minors with an adequate explanation of their rights and access to legal services. *See* 45 C.F.R. § 410.1109; FSA ¶¶ 24B, 24D. Lastly, section 1901 codifies the notice requirements set forth in the *Lucas R* injunction regarding the "step-up" class, therefore guaranteeing that minors are aware of the rationale behind their particular placements. 45 C.F.R. § 410.1901; FSA ¶ 24C.

**2.    No Longer Equitable**

Plaintiffs and Defendants disagree over the appropriate standard for whether termination of a consent decree is "warranted on equitable grounds." According to Plaintiffs, partial termination requires consideration of: "[1] whether there has been

1    full and satisfactory compliance with the decree in those aspects of the system where

2    supervision is to be withdrawn; [2] whether retention of judicial control is necessary

3    or practicable to achieve compliance with the decree in other facets of the [] system;

4    and [3] whether the [defendant] has demonstrated . . . its good-faith commitment to

5    the whole of the court's decree."  Opp. at 21; *Freeman v. Pitts*, 503 U.S. 467, 473,

6    491 (1992).  Defendants contend, however, that past compliance with the consent

7    decree is irrelevant to whether termination is appropriate on equitable grounds.

8    Instead, Defendants argue that they have met their burden of showing that it is no

9    longer equitable to enforce the FSA as to HHS because "changed factual conditions

10   make compliance with the decree substantially more onerous," "[the FSA is]

11   unworkable because of unforeseen obstacles," or "enforcement of [the FSA as to

12   HHS] without modification would be detrimental to the public interest."  Motion at

13   25; *Rufo*, 502 U.S at 384.

14         Plaintiffs cite *Freeman v. Pitts* extensively in their Opposition, but there are

15   several important differences between *Freeman*, a school desegregation case, and the

16   case at hand.  As a preliminary matter, the petitioners in *Freeman* did not seek

17   termination of a consent decree pursuant to any provision of Rule 60(b).  This is

18   because the relevant agreement in *Freeman* was a court-ordered desegregation plan,

19   not a consent decree entered into voluntarily by the parties and solely monitored by

20   the court.  *See Freeman*, 503 U.S. at 471.  Further, as in other school desegregation

21   cases, the petitioners in *Freeman* were required to show that their school district had

22   achieved "unitary status"—as explicitly required by the Supreme Court in *Green v.*

23   *School Board of New Kent County*, 391 U.S. 430 (1968)—in order to be dismissed

24   from the litigation.  503 U.S. at 473.  Thus, "achievement of unitary status" was the

25   *Freeman* equivalent of the FSA's "publication of final regulations implementing this

26   Agreement"—a clear prerequisite to termination required by the agreement itself, not

27   a requirement set forth by a separate provision of law.  Although Defendants do not

28   make clear in their Motion which subsection of Rule 60 they purport to satisfy,

Defendants' stated standard is the correct one under the circumstances of this case. *See, e.g., Frew v. Hawkins*, 401 F. Supp. 2d 619, 633 (E.D. Tex. 2005), *aff'd sub nom. Frazar v. Ladd*, 457 F.3d 432 (5th Cir. 2006) (rejecting plaintiffs' argument that *Freeman* and the other school desegregation cases set the standard for consent decree termination); *accord N.L.R.B. v. Harris Teeter Supermarkets*, 215 F.3d 32, 36 (D.C. Cir. 2000); *Alexander v. Britt*, 89 F.3d 194 (4th Cir. 1996).

If Defendants sought to terminate the FSA under the first prong of Rule 60(b)(5), or because "the judgment has been satisfied, released or discharged," then Defendants' record of compliance with the FSA would be relevant. *See, e.g., Jeff D. v. Otter*, 643 F.3d 278, 283–84, 290 n.4 (9th Cir. 2011) (analyzing the first prong of Rule 60(b)(5) and acknowledging that the analysis would be different if defendants sought vacatur under the "no longer equitable" prong). Here, however, Defendants appear to seek termination under the third "equitable" prong of Rule 60(b)(5). *See Horne*, 557 U.S. at 454 ("[E]ach of [Rule 60(b)(5)'s] three grounds for relief is independently sufficient.").

The "changed factual conditions" in Texas and Florida have undoubtedly made compliance with the FSA "substantially more onerous." As discussed above, it is now impossible for Defendants to comply with the licensing requirement of the FSA unless ORR transfers all children out of its facilities in Texas and Florida and ceases placing children in those states. This is not only substantially more onerous, but also, practically infeasible and "detrimental to the public interest," as it would eliminate approximately 60% of ORR's operational bed capacity in one fell swoop. Furthermore, it could not have been reasonably foreseeable that states would change their licensure programs so drastically as to make ORR's compliance with the FSA "unworkable." These events certainly were not anticipated at the time that Defendants entered into the FSA approximately 27 years ago. *See Rufo*, 502 U.S. at 385. Accordingly, Defendants have adequately shown that applying the FSA prospectively

is no longer equitable as to HHS so long as they can provide a reasonable alternative framework under the Foundational Rule that is consistent with the spirit of the FSA.

### 3.    Retention of Jurisdiction

On June 17, 2024, Plaintiffs filed a "Notice of Legislative Developments" informing the Court that 46 senators had introduced a joint resolution pursuant to the Congressional Review Act ("CRA") providing for congressional disapproval of the Foundational Rule.  [Doc. # 1436.]  If a CRA joint disapproval is approved by both houses of Congress and signed by the President, the rule at issue would be prevented from either going into effect or continuing in effect.  *See* 5 U.S.C. § 802.  If the Court relinquishes jurisdiction over HHS due to the Foundational Rule and Congress subsequently enacts this joint resolution, *Flores* class members in ORR custody could be left without *any* protections—which would be contrary to the terms of the FSA. The Court's termination of the FSA as to HHS is therefore conditional on there not being a recission of those regulations, such as the Foundational Rule, in a manner inconsistent with the FSA.   The Court also retains jurisdiction to modify the Agreement or this Order should further changed circumstances necessitate, to ensure that the Rule faithfully implements the FSA as the parties originally contemplated. *See United States v. Swift & Co.*, 286 U.S. 106, 114 (1932) ("[A] court does not abdicate its power to revoke or modify its mandate, if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong."); *Williams v. Edwards*, 87 F.3d 126, 131 (5th Cir. 1996) ("A consent decree may be judicially modified . . . when the court has reserved the power to modify and articulates the long-term objective to be accomplished).

### V.

### CONCLUSION

In light of the foregoing, the Court **GRANTS in part and DENIES in part** Defendants' motion.  The Court **conditionally and partially TERMINATES** the *Flores* Settlement Agreement as to the U.S. Department of Health and Human

Services, except Paragraphs 28A, 32, and 33 of the FSA, and those FSA provisions governing secure, heightened supervision, and out-of-network facilities, as described in Part IV(A)(2), *supra*.  Termination as to HHS, except as noted, shall take effect on July 1, 2024, the same day that the Foundational Rule takes effect, provided that the Foundational Rule is not subsequently rescinded or modified to be inconsistent with the FSA.  The Court retains jurisdiction to modify the Agreement or this Order should further changed circumstances make it appropriate.   The *Flores* Settlement Agreement remains in full force and effect as to the DHS, including the U.S. Customs and Border Protection and U.S. Immigration and Customs Enforcement.

**IT IS SO ORDERED.**

DATED:  June 28, 2024

_____
DOLLY M. GEE
CHIEF U.S.  DISTRICT JUDGE