Andrea Sheridan Ordin (SBN 38235)
STRUMWASSER & WOOCHER LLP
1250 Sixth Street, Suite 205
Santa Monica, California 90401
Telephone: (310) 576-1233
Facsimile: (310) 319-0156
E-mail: aordin@strumwooch.com

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | CASE NO. CV 85-4544-DMG (AGRx) |
| Plaintiffs, | **NOTICE OF FILING OF JUVENILE CARE MONITOR REPORT BY ANDREA S. ORDIN** |
| v. | |
| MERRICK B. GARLAND, Attorney General of the United States, *et al.*, | |
| Defendants. | |

1  In accordance with the Court's Orders, Andrea Sheridan Ordin submits
2  the attached Juvenile Care Monitor Report.

3  This Report is required by the provisions of the Agreement approved by
4  the Court on December 14, 2023 [Doc.# 1381].  The Juvenile Care Monitor has
5  discussed drafts of this Report with the Parties.

13  DATED:    December 13, 2024    Respectfully submitted,

15  Andrea Sheridan Ordin
   STRUMWASSER & WOOCHER LLP

17  By   /s/ Andrea Sheridan Ordin
18     Andrea Sheridan Ordin

19  *Juvenile Care Monitor*

# JUVENILE CARE FINAL MONITOR REPORT
## December 2024

**Submitted by Andrea Sheridan Ordin Juvenile Care Monitor**
**Dr. Nancy Ewen Wang, Medical Advisor Dr. Paul H. Wise Medical Expert**

**TABLE OF CONTENTS**

I.    SUMMARY ...................................................................................2

II.   MONITORED CONDITIONS UNDER THE SETTLEMENT ....................2

III.  MONITORING ACTIVITIES AND DATA ANALYSIS.............................4

IV.  CONDITIONS AT CBP FACILITIES ...........................................5

V.   TRAUMA-INFORMED CARE AND CHILD-APPROPRIATE ENVIRONMENT.............................................................10

VI.  ENHANCED MEDICAL SUPPORT ...........................................11

## I.    SUMMARY

This Final Report presents the evaluation and observations of the Juvenile Care Monitor (JCM), Medical Advisor and Medical Expert who are charged with conducting independent assessments of custodial conditions for children held in U.S. Customs and Border Protection (CBP) facilities in the Rio Grande Valley (RGV) and El Paso sectors. After two years of negotiations between the parties, these assessments were required by the provisions of a settlement agreement, CBP Settlement Agreement, ECF No. 1254-1 (Settlement), approved by the Court on July 29, 2022 [Doc. # 1278] (the "Settlement"). In the Settlement, the parties agreed to many new and specific custodial conditions, procedures, and requirements for immigrant children in federal custody. The Settlement also established the JCM position to assess CBP compliance with the provisions of the Settlement.  The first JCM appointed was Dr. Paul H. Wise, who served in that position until the conclusion of his term on December 11, 2023.  On December 14, 2023, Andrea Sheridan Ordin was appointed Juvenile Care Monitor and Dr. Paul H. Wise was appointed as the Medical Advisor to the JCM. [Doc. # 1381.] On February 8, 2024, Dr. Paul H. Wise was asked to continue to serve as Medical Expert with Dr. Nancy Wang as Medical Advisor.

## II.   MONITORED CONDITIONS UNDER THE SETTLEMENT

This report summarizes the observations and assessments from site visits to two Juvenile Priority Facilities (JPFs), El Paso and Donna by the JCM, Medical Advisor, and Medical Expert.

Those visits included interviews with CBP personnel, contracted medical staff, and with accompanied and unaccompanied children and families in CBP custody.

The JCM team has concentrated on the following critical Settlement components in this Final Report:

- **Juvenile Priority Facilities**. In the RGV sector, the JPF during this reporting period was in the Donna Facility in Donna, Texas.  In El Paso, the JPF was located in the El Paso Hardened Facility (EHF).

- **Time in custody.** The TVPRA recognizes the harm of excessive time in custody to children.  The Flores Settlement, Paragraph 28 requires that all stays for children that exceeds three days be recorded, whether or not they are in custody with family members.

- **Holding members of families separately while in custody.**  As noted in prior reports given that holding of children separately from their parents and other family members during their time in custody is potentially harmful, the Settlement requires that this practice be justified by an articulable operational reason, take into consideration the child's age and vulnerabilities, and that steps be taken to mitigate any potential harm, including regular visitation and access to telephone contact with family members.

- **Nutrition.**  The Settlement requires the provision of age-appropriate meals and snacks that meet children's daily nutritional needs.

- **Caregivers.** The Settlement requires that CBP develop a "Caregiver" program directed at providing a variety of custodial services to children in CBP custody. This provision is seen as the linchpin to providing a child-friendly, safe and sanitary environment. Caregivers are required to be well-trained in meeting the needs of the children during their stay, wherever they stay while in custody, including any time spent in intake and medical isolation.

- **Trauma-informed Care and Child-Appropriate Environment**
The requirements of the Settlement mandate that the JCM assess both the structure and performance of the CBP medical system for children in custody.

- **Assessment of the CBP Monitoring Capabilities**
Part VII of this Final Report discusses the monitoring capabilities of CBP at the conclusion of the JCM term.

## III.    MONITORING ACTIVITIES AND DATA ANALYSIS

### A.    Site Visits

Four site visits were conducted at CBP facilities in September and November 2024 as detailed below. The JCM team had full access to all sections of all facilities providing care for children. In addition, the JCM team had full freedom to conduct interviews away from CBP personnel with both children and parents in custody.

The dates and location of the site visits to CBP facilities were as follows:

- CBP El Paso
o September 26, 2024: Medical Advisor (Dr. Nancy Ewen Wang), Medical Expert (Dr. Paul Wise)

- CBP Rio Grande Valley
o September 30, 2024:
- Donna:  Medical Advisor
- Brownsville CBP station:  Medical Expert

- CBP Rio Grande Valley
- November 11, 12, 2024:
- Medical Advisor and JCM with OCMO

- CBP El Paso
- November 13, 2024
- Medical Advisor

### B.    CBP Data Analysis

As in all prior JCM reports, CBP provides data designed to inform the plaintiffs and the JCM of the number of minors in custody whose length of stay in RGV and El Paso facilities exceeds 72 hours. Although JCM has reported the monthly data regularly in prior JCM reports, recent JCM visits to the RGV and El Paso facilities raised questions as to whether the data provided actually captured all children in families with TIC times over 72 hours.  JCM has asked for clarification in monthly memos to CBP and asked for additional explanations in the November Draft Interim Report provided to the parties. Prior to the conclusion of the JCM term, we expect to make a clarification available.

## IV.    CONDITIONS AT CBP FACILITIES

Since August 2023, the JPF in Rio Grande Valley has been the Donna Facility, which is composed of a series of large, soft-sided structures, some with hardened walls, and had been long used as the JPF in this sector.  Occasionally, some families have been processed in non-JPF U.S. Border Patrol (BP) stations, including the McAllen BP station in particular.  The El Paso Hardened Facility (EHF) is in El Paso.

### A.    Overcrowding

Throughout September, October, and November, both Donna and El Paso EHF each had a markedly low census.  Although there was no overcrowding, a significant number of children and families were in custody in excess of 5 days, and several families, transferred from other facilities, had been in custody as long as 15 to 20 days.  Although all the extended times for families were not explained, delays in obtaining and scheduling transportation is and has been one of the primary causes for significant delays.

During all site visits during this period, the census at both sites has been significantly below capacity.  Many of the pods were empty and the number of individuals in each of the occupied holding pods was observed to be below capacity.

### B.    Holding Members of Families Separately While in Custody

The Settlement explicitly encourages family unity while in CBP custody.  The section "child-appropriate environment" begins with "Absent an articulable operational reason, class members apprehended with adult family members (including non-parents or legal guardians) shall remain with that family member during their time in CBP custody." The Settlement goes on to insist that "When there is an operational need to house family members separately, CBP shall make and record the reasons for holding them apart and all reasonable efforts to ensure that the family members have the opportunity to interact."

### <u>Current Observations</u>

In September, CBP continued to routinely hold children separately from parents or trusted adults in the Donna facility.  CBP personnel were unclear about the protocol being used to determine when to hold children separately from trusted adults, and when in the process after apprehension, such a determination occurred.  Moreover, at Donna, some non-parent trusted adults were transferred to the Ursula

facility and JCM was informed that children would then have no contact (visits or phone calls) with these family members.

As detailed in prior Reports, interviews at Donna with parents and children being held separately revealed significant variation in the availability of regular visits. The visits were not uniformly scheduled or logged when they occurred. Some children who had not been offered contact with a parent or trusted adult experienced emotional distress. On occasion, a child would refuse to engage or respond with tears.

During the November 11, 2024, visit to Donna, the JCM observed regular visitation for families and that the visits were being scheduled and logged. In addition, Donna scheduled a new visitation program in the afternoon in which the families left their pods and visited in small groups on the covered recreation and athletic fields. Personnel stated that they were able to provide group visitation because of the lack of overcrowding.

## Assessment

*As noted in prior reports, (including the last two filed reports plus the early warning memos from JCM on June 25, 2024, and August 6, 2024) any holding of children separately from their parents, guardians, or trusted adult during their time in custody is potentially harmful. The Settlement requires that this practice be justified by an articulable operational reason, take into consideration the child's age and vulnerabilities, and that steps be taken to mitigate any potential harm. The reasons for holding a child separately should also be documented. The regular visits and documentation at Donna on November 11, 2024 was encouraging.*

*In El Paso, although the availability and regularity of visitation for children and families continues to improve, there was a single incident in which a child held apart from a trusted adult was not explained.*

## C.    Nutrition

The Settlement requires that CBP ensure that children have access to age-appropriate meals and snacks that meet their daily nutritional needs. Access to clean drinking water is also mandated by the Settlement.

## Current Observations

During the September visits and interviews with families and their children, children held apart from their parents and unaccompanied children (UCs) again

documented that water and snacks were always available from soon after apprehension through their entire time in CBP custody.  During all site visits to the JPFs, infant formula, bottled water, and mixing instructions were readily available. Families with young children reported variable access to pureed pouches and milk for toddlers.  For the first time this year, the attached child appropriate menus for toddlers have been implemented in both JPFs.

## Assessment

*The menus are a significant improvement over past years.  Although some parents at Donna reported that the meals as delivered were too "hard" or "old," the Donna facility menu reveals variety, improved edibility and toddler size portions. It is recommended that nutritional value of these meals be re-evaluated for the next contract.  Many of the toddler meals are just smaller versions of the adult meals, and one day in the week, cheerios is the evening meal.  Caregivers assisting in the serving of meals should exercise discretion in providing the children with requested food.  For an example, in one instance, a parent was unable to provide a bottle for a three-year old because she was told that bottles were only available for children two years or younger.  In another example, a mother was denied the use of pureed foods when the child could not eat the meals provided.*

## D.    Warmth, Garments, and Sleep

## Current Observations

The JPFs continue to be in general compliance with the temperature requirements of the Settlement.  However, as noted in prior JCM reports, many children still feel cold at night and in the daytime at the lower end of the allowable temperature range. Consequently, the ready availability of extra sweatshirts, sweatpants, and other outerwear must be available on request to compensate for the cold ambient environment.

During the September and November visits, the relatively poor communication with children and parents regarding the availability of extra warm clothing, if needed, continues at both JPFs.  Interviewed parents at the Donna JPF reported that they did not know that they could request additional clothing.  Some reported that they were told that they could have only one sweatshirt for their child in addition to the mylar blanket.  At both facilities, beanies were not readily available.

Although families were shown a video explaining the clothing available to them at the time of intake, families did not recall that information.  As further discussed in the Caregiver portion of this Report, the Caregivers appear to be untrained in their role in assisting the children in obtaining warm clothing.

## Assessment

*It is essential that additional clothing be available for children who are cold while in custody.  Children have long reported cold temperatures in CBP facilities and having extra clothing readily available for children has been the primary means of avoiding the necessity of raising the minimum allowable temperatures or revising ventilation systems in the JPFs.  The availability of clothing requires both that an adequate quantity of clothing be readily available at the holding pods and that children and parents know that they are entitled to request and obtain additional garments for children from Caregivers or agents.  Given the possibility of reluctance of some parents to request additional garments, Caregivers should be given the discretion to affirmatively offer warm clothing when observing a child is cold.*

## E.    Caregivers

The CBP Settlement requires that CBP develop a "Caregiver" program directed at providing a variety of direct custodial care services to children in CBP custody, including vigilance for medical need or distress, helping parents, and providing activities for children.

## Current Observations

Site visits revealed that there was significant variation in the extent to which Caregivers responded to families expressing the needs of their children and supervised child-focused activities.  Caregivers too often were hesitant about interaction with the families and unclear regarding their responsibilities to communicate with CBP personnel when children or families wished to visit other family members, use the telephone, or seek medical attention, or obtain adequate warm clothing.  Although Caregivers have been given pocket cards to wear on their lanyards referencing their duty to refer any medical or mental health issues, many Caregivers appear to be unaware of their responsibility to observe the children for signs of medical or emotional distress and their responsibility to refer to CBP or medical if necessary.

In El Paso, Caregivers were actively engaged with unaccompanied children of all ages inside the pods. However, no Caregivers were providing assistance in the family pods. The activities for UCs at El Paso were diverse and included books, games and drawing (materials were donated/brought in by the Caregivers). The activities provided by the Caregivers for the accompanied children were extremely limited, primarily including paper and crayons.

At the Donna JPF, under six-year-old unaccompanied children are held in a special area in which Caregivers provide comprehensive childcare services. As noted in prior JCM reports, the Caregivers in this special holding area have been consistently observed to be actively involved with the children and supervise play with a variety of child-friendly toys and activities.

Caregivers in the holding areas for older UCs (generally older than 6 years) were stationed in the corridor between holding pods and supervised some activities. The level of engagement was variable, with some Caregivers actively engaged with the children, while others remained more passive. Unlike El Paso, Caregivers stated they were not permitted to enter the older UC pods. They also did not enter the family holding pods and were generally less sure of their roles and responsibilities. Outdoor activities were not observed at Donna during the month of September, but a schedule for daily outdoor activity for the children was implemented in early November 2024.

## Assessment

*There continues to be variation in Caregiver function and the understanding of the Caregiver role as recently as the November 11, 2024, monitoring trip with OCMO. Turnover in the program appears to be high as many of the Caregivers reported that they were new to the position. Clarification of the Caregiver role and the enhanced training and supervision for the Caregivers remains a persistent need. Although OCMO is still soliciting additional staff, OCMO has intensified its monitoring and plans for enhanced training and supervision.*

*As noted in the prior reports, CBP is meeting the Settlement's requirements regarding the number and deployment of Caregivers. The major benefits of the Caregiver program have been reviewed in prior JCM reports. Specific Caregiver duties and responsibilities as outlined in the Statement of Work have still not yet been implemented in any uniform manner. For example, the Statement of Work requires that the Caregivers "shall be actively engaged in all pods holding children, including pods holding families," which is not the current practice in*

*either JPF.  The Caregivers are further instructed to "plan, organize, supervise,
and participate in activities and recreation (e.g., games, art, crafts, reading,
outdoor physical activity, etc.)." All forms of indoor recreation are extremely
limited, although occasionally enhanced by individual Caregivers.*

*It is strongly recommended that CBP and its contractors provide a variety of
games and other children friendly activities.  The Caregivers should not rely upon
receiving voluntary contributions. It is also recommended that Caregivers meet the
needs of children throughout the duration of their stays, including during any time
spent in intake and medical isolation.  It is expected that the Child Welfare
Specialist Program (CWSP) will be implemented early next year.*

## V.     TRAUMA-INFORMED CARE AND CHILD-APPROPRIATE ENVIRONMENT

The Settlement mandates that the JPFs implement care strategies that attend to the
emotional and psychological challenges that migrant children confront both before
and during CBP custody.  Recognizing the potential that children in CBP care may
have experienced trauma in their home communities, on their journey, and while in
custody, the Settlement calls upon CBP to make efforts to foster reassurance,
resilience, and psychological well-being. (See Section VII.3.D.7 and Section
VII.8.B8 in the Settlement).  The JCM and Medical Expert and Medical Advisor
had a comprehensive meeting to review current CBP medical monitoring protocols
in early November.  An assessment of the CBP medical monitoring protocols is
more fully described in section VI of this Report.

### Current Observations

Interviews with UCs and families continue to confirm that all felt physically safe
while in CBP custody and had been treated professionally by CBP personnel and
contractors in the RGV and El Paso sectors.

Of note, the JCM interviewed unaccompanied children in the Donna JPF who were
unaware of their right to make phone calls.  Others reported that they had tried to
gain access to the phones, but were unable to do so.  The children consistently
expressed anxiety because of lack of information regarding family awareness of
their status and where and when they were to be going next.

In the Donna JPF, the pods holding unaccompanied children have phones located
in an accessible area.  However, the children reported that they had received no

routine guidance regarding the use and availability of making calls. Caregivers did not assist children in making phone calls. In El Paso, a cellular phone was brought to each holding pod daily, a system that both the children and CBP agents reported to be working well.

**Assessment**

*That UCs and families feel safe in CBP custody is a fundamental precondition for trauma-informed care. It is, therefore, essential to emphasize the importance of the reports from UCs, parents, and children held apart from their parents, that they felt physically safe in CBP care.*

*As mentioned earlier in this report, it is CBP's responsibility to provide basic child-friendly materials, such as coloring books, crayons, games, etc. in all JPFs. Although Caregivers have contributed such materials, (primarily for unaccompanied children), CBP should ensure that these materials are available for all children. The persistent failure to address these issues undermines the implementation of trauma-informed elements of CBP custodial care.*

*In addition, the phone call system for children and parents of children should be reevaluated. The rules vary significantly depending on the facility, and the individual CBP personnel and caretakers. On the posted Flores poster, the section regarding rights to phone access was crossed out. New signs should be provided with a uniform message of the rights to phone calls for children and families.*

## VI.   ENHANCED MEDICAL SUPPORT

The Settlement requires a robust medical care system for juveniles in CBP custody. CBP has addressed this requirement by deploying contracted medical teams in the RGV and El Paso JPFs and any other facilities housing children. These teams include an advanced medical practitioner (either a nurse practitioner or physician assistant) and 2-3 medical support personnel, usually medical assistants or emergency medical technicians. These teams are required to be present 24 hours a day, 7 days a week. In addition to the on-site medical teams, supervising physicians, including pediatricians, are assigned in each sector to provide on-call consultation, clinical protocol development, and quality assurance reviews.

JCM monitoring has focused not only on whether the required medical system is in fact present in the JPFs but also on the system's performance in providing quality medical services to children in CBP custody.

Prior JCM reports have attempted to elevate those elements of the CBP medical care system that are of particular importance in meeting the special character of CBP's medical mission. These include:

- The identification of children at elevated medical risk;
- The reduction of medical risk in CBP facilities;
- Enhanced pediatric consultation and enhanced medical monitoring of children at elevated medical risk while in CBP custody; and
- Improved conveyance of medical information among CBP personnel, contracted health providers, and subsequent medical providers.

This report finds continued improvement in the performance of the CBP medical system for children, which improvement has accelerated markedly in the last 6 months. A full list of important elements of medical care is outlined in Part VII of this report, The Assessment of CBP Monitoring Capabilities.

## A.    Identification of Children at Elevated Medical Risk

Prior JCM reports have emphasized the importance of accurately identifying children at elevated medical risk upon entry into CBP custody. It has been a longstanding CBP protocol to administer an initial medical assessment to all children entering CBP custody. OCMO has recently implemented a protocol to help ensure that the examining medical personnel assess elevated risk in a more complete and standardized format. This protocol also requires direct consultation with a supervising pediatrician whenever a child with a potentially elevated risk diagnosis is identified.

## **Current Observations**

Site visit interviews and reviews of medical documentation suggested routine provider compliance with the OCMO risk assessment protocols. The OCMO protocol defines elevated risk by a list of specified diagnoses. The electronic medical record (EMR) system flags a child at elevated risk whenever one of the elevated risk diagnoses is noted in the EMR. JCM has been able to monitor the electronic monitoring system only once since its operation. During the November Donna site visit, two children who were worthy of elevated risk had not been accurately flagged. However, the two children had been monitored and expeditiously placed accurately, one at ORR and the other was placed in close observation prior to placement, by the Donna personnel, without reference to the assistance of electronic monitoring.

## Assessment

*JCM site visits during this September suggest that there has been substantial improvement in the ability of the CBP medical system to identify elevated medical risk in children as they enter custody or soon thereafter. The reliance on a specified list of risk diagnoses requires ongoing reassessment as some adjustment of the listed diagnoses may be necessary as experience with the system grows. The JCM worked with OCMO on refining this system. However, the central importance of risk identification upon entry will require that the CBP monitoring system be committed to ongoing reassessment of this process and revision whenever necessary.*

## B.    Conveying Essential Medical Information to CBP

It is essential that medical providers convey information regarding children at increased medical risk to appropriate CBP personnel.

Prior JCM reports noted the lack of a standard mechanism by which medical personnel communicated with CBP operators regarding the medical status of children in custody.  Communicating acute medical needs, such as a medical decision to transfer a patient to a local medical facility, is a routine, daily occurrence in the JPFs.  What was reported lacking this September was a systematic means by which medical personnel could alert CBP leadership in the JPF that a child at elevated medical risk, but not in acute distress, was in custody.

## Current Observations

Interviews with medical staff revealed that CBP was overall receptive to the decision to transfer a patient to a local medical facility.  However, sometimes when there were many transfers, some staff felt some resistance from the agents. Medical providers reported that they generally communicated to CBP verbally whenever a child was found to be at elevated risk. Site visits found that a digital alert system has been established by which CBP personnel can monitor the provision of medications or other processes for children identified at elevated risk. However, further refinements will likely be necessary.  In August, the system identified a large number of children to be monitored, but the system did not distinguish between children requiring routine medical monitoring and those few who warranted focused attention.

In November, OCMO had instituted changes to the referral form indicating whether a child had gone to the hospital after referral, but JCM has not yet had the

13

opportunity to observe the impact of the new form and whether CBP received adequate information from outside medical providers.

**Assessment**

*The system for conveying medical information to CBP personnel is in transition. Establishing a digital mechanism that allows medical personnel to place an alert on the child's electronic CBP record is a significant improvement. However, the JCM was not able to assess its use or impact on CBP procedures.*

*Further monitoring is required to ensure that the new system is fully implemented and informing CBP operations and decision-making.*

## C.    The Reduction of Medical Risk in CBP Facilities

Prior JCM reports have suggested that CBP could take steps to reduce the clinical burden on its medical system by expediting the disposition of children at significantly elevated medical risk.  Based on JCM site visits in September, the identification of children at elevated medical risk and the conveyance of this information to appropriate CBP personnel have both improved.  However, it is still not clear that this information is being used consistently in determining the nature or timing of disposition.  As noted in prior JCM reports, the Settlement does not require CBP to consider medical risk in disposition decisions.  Nevertheless, holding children at elevated medical risk in custody for what appears to be increasingly longer times will inevitably place additional stress on the ability of the CBP medical system to ensure the well-being of children at elevated medical risk while in custody.

## D.    Enhanced Pediatric Consultation of Children Identified at Elevated Medical Risk While in CBP Custody

Identification of children at elevated medical risk or potentially at elevated medical risk requires direct consultation with a supervising pediatrician.

**Current Observations**

Interviews with medical staff and review of medical records suggest that medical providers in the JPF were appropriately consulting supervising pediatricians and that the supervising pediatricians were responsive to the medical staff's consultative calls.

## Assessment

*There has been clear improvement in the utilization of pediatric consultation by
medical providers in the JPFs. This assessment is based on interviews with
medical staff and the review of EMR case records. This improved system of
pediatric consultation is important as CBP is charged with caring for tens of
thousands of children each year without any pediatricians on site. Because this
element of care is critical to the quality of medical services provided children in
custody, the improvements in consultation will require ongoing OCMO monitoring
and continued reinforcement.*

## E.    Enhanced Medical Monitoring

Children at elevated medical risk require enhanced monitoring of their medical
condition and well-being while in custody. Early JCM reports documented a
worrisome absence of a systematic approach to monitoring children at elevated
medical risk. More recently, OCMO has instituted an Enhanced Medical
Monitoring (EMM) protocol for the JPFs which provides guidelines for whom
EMM is required and the nature and frequency of the monitoring. Special elements
of the EMM include checks by medical personnel at least every 4 hours while in
custody.

## Current Observations

Site visits during September and November monitoring found that children in the
EMM system were being monitored every 4 hours by contracted medical
personnel. Some children in the EMM system had communicable diseases,
including influenza and Covid-19, and as per protocol, were placed in isolation
holding pods until they no longer posed a risk to others. Caregivers were stationed
at the isolation pods, although they were prohibited by their supervisors from
entering.

In the Donna JPF, selected families with children considered at elevated risk but
not requiring isolation for communicable diseases were being held in the small
isolation rooms near the medical stations. These rooms measure approximately
8ftx5ft with space for only one mat.

During the last two site visits, medications were procured more expeditiously and
children were able to use an essential medication of their own (if it was properly
labelled and packaged) until US medications arrived.

15

## Assessment

*The EMM program has improved the care of children identified at elevated medical risk. The potential that a child will deteriorate without awareness of that condition by medical personnel has been reduced substantially. Ongoing evaluation of this system is essential, particularly whether the list of conditions triggering entry into the EMM program should evolve. The use of isolation holding areas in the JPFs rather than in other CBP facilities, such as Border Patrol stations, has been an important advance.*

*The use of the small isolation rooms requires immediate reconsideration, and this recommendation has been communicated to OCMO after the site visit. Locating the families of concern near the medical station is commendable. However, the size of these rooms is inappropriate for holding families for any significant length of time. Additionally, a special effort should be made to ensure children in isolation are able to communicate with their caretaker, make phone calls, and access warm clothing.*

*As noted in prior JCM reports, there has been considerable variation in the administration of medications to children in CBP custody. Some children enter CBP custody with medications in hand. It can sometimes be difficult for a health provider to identify the medication being taken or the precise justification for its use. Guidelines exist for utilizing medications in hand or replacing them with a new prescription. New prescriptions may take time to acquire, which can sometimes be difficult when UCs are transferred quickly to ORR. A comprehensive review of the current protocols is indicated and new strategies may be required.*

*The Settlement specifies that children who are held for prolonged periods must receive a medical reassessment every 5 days. The 5-day repeat evaluation is an important means by which the medical system can ensure that children have not developed or exacerbated a risk condition while they are in custody. This component of care becomes even more essential when the times in custody are prolonged. The observed compliance with the requirement is encouraging.*

*In the November Donna visit, the mother of a thirteen year old girl who was held separate from her mother became sick while the two were visiting. The child was sent to see health providers, but the mother was not told of the outcome. JCM asked Medical about the health of the daughter, and was able to reassure the mother that she was being taken care of. It appears there is no process requiring*

16

*notification of the parent of results of medical examination or procedures. JCM recommends including such notification in current protocols.*

## F.    Strengthened Procedures for Referral to Local Medical Facilities

One of the most important components of the CBP medical system is the ability to transfer ill individuals to local health facilities for more definitive care. Prior JCM reports noted that interviews with medical providers revealed that on occasion, the medical decision to transfer a patient to a local health facility had been questioned by CBP personnel.

### Current Observations

Interviews during this reporting period suggested that generally CBP personnel have been responsive to medical requests for transfer and have facilitated transfers in a timely manner. However, there are still providers who report resistance from border patrol personnel to a decision to transfer, especially when there are multiple patients. There were also reports that referral facilities were not provided with adequate information regarding the child's care in CBP custody.

### Assessment

*Given the vital need to refer children with serious medical issues to local hospitals, it is important to continue to monitor this element of collaborative medical and CBP response. It is also potentially problematic if medical information regarding the patient is not adequately conveyed from CBP to the referral site. This can be particularly problematic when a child is referred without a parent or trusted adult. Important aspects of the medical history may not be available if the parent or trusted adult does not accompany the child or without CBP facilitating direct communication between hospital personnel and the trusted adult in CBP custody. Policies regarding parental or trusted adult accompaniment or phone communication should be reviewed and revised to ensure that health providers in local facilities have full and timely access to all medical information which may prove critical to the care of the child being referred for care.*

## G.    Supervision and Accompaniment of Children in Hospitals by Border Patrol Agents

JCM has received reports from hospital physicians who have raised concerns regarding custodial policies when children are undergoing medical examination and treatment. We have been told that agents are present when minors undergo

gynecological or other sensitive examinations.  There is clearly a need for children in CBP custody and the staffing burden on CBP for hospital referrals is real. However, current custodial policies for children in medical facilities warrant review by OCMO in order to ensure medically appropriate and safe medical procedures that protect the privacy of minors.

## H.    Ensuring Hospital Records Are Conveyed to CBP Medical Personnel

High-quality medical systems ensure that a record of the evaluation and treatment of a patient referred to another health provider be transmitted back to the original referring medical provider.  Prior JCM reports identified a lack of a consistent mechanism to ensure that this communication actually occurred.

## Current Observations

Medical providers stated that some medical information is being sent back to the JPF from referral hospitals. However, this information was limited and did not include information regarding tests performed, the results of these tests or the medications given.  Information sent back from the hospital is routinely scanned into the CBP patient medical record.  The November site visit at Donna showed improvement in medical information from the referral hospitals, but will require continued monitoring attention.

## Assessment

*The conveyance of discharge information from local hospitals to medical personnel at the JPF is an improvement in the care of children at elevated risk. The JCM is highly supportive of efforts by OCMO to enhance the coordination of care between CBP and local health facilities.  Because of its importance, this component of care should be monitored closely.*

## I.    Conveyance of Medical Information from CBP to the Office of Refugee Resettlement (ORR) or a Child's Parents or Guardian

It is essential that ORR receive relevant medical information regarding the conditions and management of UCs while in CBP custody.

## Current Observations

It is difficult for the JCM to ascertain how well CBP is conveying important medical information to ORR for UCs upon transfer.  However, medical information was noted in the travel packets for UCs upon their transfer from CBP to ORR

facilities. This information is now being provided by medical personnel and is generated automatically by the EMR system which is a useful advance. However, incorrect assessment summaries were noted during one site visit in September.  Although this seemed relatively easy to correct, the accuracy of the transfer medical information will require ongoing monitoring.

## Assessment

*In early November, JCM participated in an excellent review of pending issues related to the transfer from CBP custody to ORR.  The ORR leadership acknowledged past difficulty in obtaining adequate medical summaries from CBP, but noted many improvements in recent months and committed to continuing regular high-level communication between CBP, OCMO, and ORR.  As noted in prior JCM reports, it is important to routinely provide parents or guardians of children at elevated medical risk with medical summary sheets that include diagnoses, medications, and other pertinent medical information prior to transfer out of CBP custody.  The automatic generation of medical forms for transfer out of CBP custody holds promise for the standard provision of this information. Ongoing evaluation of this element of care, therefore, is warranted.*

## J.    Medical Referrals for Children at Elevated Medical Risk in Families Being Released into the United States

Prior JCM reports have emphasized the need for CBP to ensure appropriate referral for those few children at significantly elevated risk who require specialized care soon after release into the United States.  This referral capability would help ensure that children at elevated medical risk do not deteriorate soon after release from CBP custody. There remains no standard protocol for this requirement, an issue that deserves continued attention, monitoring, and collaborative engagement between OCMO and potential medical referral partners.

## VII.  THE ASSESSMENT OF CBP MONITORING CAPABILITIES

The Settlement envisioned a transfer of compliance monitoring responsibilities from the Court-appointed JCM to internal CBP monitoring systems.  Accordingly, the Settlement included a provision terminating the JCM role 16 months after the initiation of the Agreement.  This term was extended several times by agreement of both parties and the Court, and is currently scheduled to end on December 27, 2024.  The Court Order of 9/11/2024 (Doc. 1470) requires:

"The Juvenile Care Monitor's final report shall be submitted no later than December 13, 2024. This report shall inform the Court and the Parties of the Juvenile Care Monitor's assessment of the efficacy of CBP's internal monitoring protocols as required by the Order Appointing Juvenile Care Monitor. [Doc. # 1280.]

**Transfer of Monitoring to CBP:** At the completion of the Juvenile Care Monitor's term, CBP shall assume responsibility for monitoring compliance with the terms of the Agreement, including monitoring whether there is overcrowding, as defined above. For a period of 30 days after the Juvenile Care Monitor's term ends — until the termination date of the Agreement, January 29, 2025—the Juvenile Care Monitor will work with the CBP Juvenile Coordinator to ensure an effective transition of monitoring functions, and will be compensated for this work."

The Agreement requires that "prior to the effective transition of monitoring functions, the JCM shall approve Defendant's final monitoring protocols." (See Agreement Section IX.12).  CBP has been forthcoming in sharing relevant monitoring protocols as they have been developed and the JCM has been active in engaging with CBP on the nature, scope, and quality of these protocols.

Many of the CBP monitoring protocols have required detailed technical and operational scrutiny and discussion. For the purpose of this report, the JCM team provides a summary of the monitoring protocols of greatest importance to the care of children in CBP custody.

## Overcrowding

Experience has shown no custodial condition is of greater consequence to the care for children than overcrowding. This is because overcrowding not only results in inappropriately confined living spaces but also the overburdening of virtually all custodial capabilities, including nutrition, hygiene, and medical care.

The Agreement defines overcrowding as "level of occupancy that exceeds the physical space required to maintain a safe and sanitary environment for each individual in custody."  (See Agreement Section IX.5) JCM has generally employed the operational definition of overcrowding as a census that surpasses the

assigned maximum capacity of the facility or holding location.  However, while a useful basic standard, CBP maintains some flexibility to enhance or restrict holding capacity in some facilities.  Therefore, the JCM has always supplemented the maximum facility holding capacity definition of overcrowding with inspections of the actual custodial conditions present in CBP facilities.

CBP maintains strong, real-time systems for monitoring facility censuses. These are all digital in nature and are readily available to CBP leadership and operational personnel at the headquarters, sector, and facility levels.  In addition, each CBP custodial facility and holding location (e.g., Pods) has been assigned a designated maximum capacity based on initial construction specifications. This allows CBP to closely monitor the census in relation to the designated maximum occupancy for all facilities holding children.

In general, overcrowding is driven by two primary factors: 1) the number of apprehensions and 2) the time in custody ("TIC times").  While the level of apprehensions is influenced by a number of factors, including, for example, perceived U.S. immigration policies at any given time, CBP is primarily reactive in dealing with variations in sector-level apprehensions across the border.  TIC times can generally reflect the ability of CBP to perform its required processing procedures.  Consequently, a high level of apprehensions may extend TIC times.  Under current policies, all unaccompanied children (UCs) who are not able to voluntarily return to Mexico are to be transferred to ORR, HHS, within 72 hours of apprehension (Note: Mexican unaccompanied children may be permitted to voluntarily return to Mexico in certain circumstances).

CBP has a variety of mechanisms to prevent or respond to overcrowding of UCs and children in families.  While security concerns prevent a detailed discussion of these mechanisms, they generally include 1) the rapid expansion of holding facilities; 2) the transfer of families to other, less stressed sectors; 3) expanding the capability to expeditiously remove families to home countries (or under certain conditions, to Mexico); or 4) release into the U.S. as per legal immigration procedures.

However, changes in border policies can have a significant effect on CBP's ability to respond to overcrowding.  Budgetary or logistical concerns may preclude rapid expansions of holding facilities.  Border policies and laws governing entry to the United States can also prolong TIC times and/or constrain CBP's ability to release families into the U.S. For example, past experience has shown that policies requiring enhanced processing or legal procedures while in CBP custody can result

in substantially prolonged TIC times.  In addition, major restrictions on CBP's
ability to release families into the U.S. can enhance the burden on removal
mechanisms, particularly flights to home countries.

**Summary Assessment of the Monitoring of Overcrowding**

CBP currently has real-time ability to accurately monitor overcrowding in its
facilities. CBP monitors the TIC times of all populations in custody.  USBP
coordinates with HHS/ORR on UCs in CBP custody for over 48 hours with no
placement scheduled to ensure that the UCs can be transferred out of USBP
custody within 72 hours.  USBP also monitors family units who have been in
custody for 120 hours or more, broken down by sector, including monitoring
whether a family unit is on an active manifest to be transferred out of custody.
USBP also receives a report of noncitizens who have spent 240 hours or more in
custody, broken down by sector and demographic.  These reports help inform
decisions regarding whether alternative processing pathways should be used to
expedite the release/reparation of family units in custody.  Ultimately relief from
overcrowding will depend not only on consistent monitoring of the data, but the
implementation of policy-driven constraints on CBP's ability to prevent or relieve
overcrowding when it occurs.

In addition, the Agreement gives the JCM the authority to alert the Plaintiffs and
the Court whenever censuses in CBP facilities in the El Paso or RGV sectors
approached or exceeded maximum capacity figures. The termination of the JCM
role would effectively eliminate this mechanism for informing Plaintiffs of
overcrowded conditions and the impact of any CBP ameliorative response.

**<u>Time in Custody (TIC Times)</u>**

JCM monitoring responsibilities have always included the ongoing assessment of
the length of time children are held in CBP custody.  Accordingly, CBP has
provided the JCM with monthly reports, called the Flores Reports, of children who
have been held in custody for longer than 72 hours in the previous month.  These
are important data and allow the JCM to assess custodial trends and the emergence
of TIC challenges within any given sector.

Analysis of the provided monthly data, however, have raised questions regarding
the definitions used to produce the monthly TIC time reports.  Of special concern
are the number of children in families who are reported to have TIC times greater
than 72 hours.  Estimates of the portion of apprehended children in families who

are reported to have TIC times greater than 72 hours appear to be lower than expected given the reported number of family apprehensions over the same time period. The JCM has requested clarification of the definitions used in tabulating the monthly reports.

## General Conditions and Amenities

The JCM has consistently reported on general custodial conditions and the provision of amenities required by the Agreement. These standards relate to nutrition and water, temperature regulation, garments, sleep conditions, and hygiene and sanitation. The monitoring of CBP medical systems has also been a central responsibility of the JCM. The scope and complexity of these systems is so substantial that it is discussed in a separate section later in this report.

JCM reports have documented CBP's general compliance with the conditions and amenity requirements of the Agreement. However, certain arenas of custodial care were documented to be more variable in their compliance, including the provision of additional garments when children were cold, showering and toothbrushing opportunities, and food offerings for young children.

CBP primarily relies on its Juvenile Coordinator Division to assess conditions for children in custody and CBP's compliance with the Agreement. This unit has regularly conducted inspection visits to CBP facilities and provided feedback and recommendations to CBP operational personnel and leadership. This unit has also provided annual reports to the Court regarding inspectional findings and its general assessment of CBP compliance with the Agreement.

The JCM has reviewed the Juvenile Coordinator Division inspection protocols and has observed this unit's inspection visits to CBP facilities in the El Paso and RGV sectors on several occasions. The JCD utilizes a comprehensive questionnaire in its interviews of parents, guardians, and both accompanied and unaccompanied children. The JCM has noted that these visits are thorough and conducted by committed and skilled personnel. At the conclusion of a site visit, the JCD prepares a summary of any issues which need to be addressed. The JCD requests a written response to the summary it has prepared. The JCM has noted these visits are thorough and conducted by committed and skilled personnel.

**Summary Assessment of Conditions and Amenities Monitoring**

Despite the important contribution of the Juvenile Coordinator Division, questions remain concerning CBP's ability to regularly monitor general conditions and amenity provision in CBP facilities holding large numbers of children.  Although the JCD has instituted an excellent Town Hall training program for hundreds of CBP personnel twice in the year, the primary concern is the relative infrequency in which the Juvenile Coordinator Division can visit facilities, facilities which must operate in a highly dynamic border environment.  As noted in the Juvenile Coordinator Report of 2024, the Juvenile Coordinator conducted 23 inspections of CBP facilities focused in nine USBP sectors and three OFO Field Offices.  Given the staff available, the number of facilities holding children, and the ongoing monitoring by the Juvenile Care Monitor, the CBP Juvenile Coordinator Division was able to schedule only one visit to Donna SSF and two visits to El Paso Hardened Facility in the 2023-2024 year.  A review of the current proposed 2024-2025 schedule by the CBP Juvenile Coordinator Division disclosed no significant increase in monitoring trips. Without a monitoring capability that can conduct regular visits or respond in a timely manner to emerging concerns in a particular sector or facility, it remains unclear how general conditions and amenities will be monitored appropriately.

## <u>Caregivers</u>

The caregiver program is a critical development provided in the Settlement.  The program is designed to provide essential care for young UCs as well as a variety of support services for older UCs and children in families.  Prior JCM reports have underscored the importance of caregiver services in the El Paso and RGV sectors.  However, these reports have also documented considerable variability in caregiver responsibilities and performance in the two sectors.  The variability of performance continued through November of this year.

OCMO has assumed responsibility for the management of the caregiver program, including the monitoring of its performance.  OCMO joined JCM on the November 2024 monitoring trip.  Enhanced training and guidance regarding caregiver responsibilities are currently envisioned as a means of ensuring the optimal contribution of the caregivers to CBP custodial care for children.  Monitoring compliance with these training and performance guidelines will be part of OCMO's planned documentation and visitation protocols.  OCMO has committed to working with the contractors to ensure enhanced training and guidance regarding caregiver responsibilities.

**Summary Assessment of Caregiver Monitoring Protocol**

As noted in prior reports, the JCM has noted little progress over the past year in optimizing uniformity in caregiver contributions to CBP custodial care for children. OCMO is currently soliciting additional staff, and has intensified its monitoring with plans for enhanced training and supervision in order to be well prepared to implement an effective caregiver monitoring program. The current written protocol, as seen in the Statement of Work, is an excellent base for the training.

## Child-Appropriate Environment

The Agreement recognizes that a central requirement of a child-appropriate environment is the housing of a child with her parents, legal guardians, or other trusted adults. (See Agreement Section VII.8.B). However, prior JCM reports have documented the routine housing of children separately from their parents, legal guardians, or trusted adults, even when the facility census was low. The Agreement permits this practice when age and gender discontinuities exist (e.g., holding a teenage female separately from her father who will be housed with other fathers or single adult males) or when another specific operational need for separate housing can be articulated, a need that must be documented. The most recent JCM visit to the RGV JPF (Donna Facility) found greater compliance with the family unity requirements of the Agreement. In the visit, JCM observed group family visits in the large covered athletic facility.

When a documented operational need exists for housing children separately from their parents, legal guardians, or other trusted adult, the Agreement requires regular opportunities for family visitation while in custody. The JCM has documented considerable variation in visitation opportunities in the El Paso and RGV sectors, and a lack of accurate documentation of visits.

**Summary Assessment of Family Housing and Visitation Practices**

The monitoring of compliance with the Agreement's family housing and visitation requirements is the responsibility of CBP operational leaders. While the recent improvement in the housing and visitation practices in the RGV sector is welcomed, JCM reports have noted considerable lag times between the documentation of noncompliance and improvements in family housing and visitation practices. This suggests that purposeful and consistent monitoring of

housing and visitation practices in the JPFs will be required to ensure compliance with the Agreement's child-appropriate environment provisions.

## Medical Care

Over the past several years, CBP has made substantial progress in expanding the scope and improving the quality of medical care systems for children in custody. JCM reports have described these systems in some detail and have identified both arenas of recent improvement as well as those still in need of remediation.

Responsibility for CBP's medical care system lies with the Office of the Chief Medical Officer (OCMO), CBP. This unit is also responsible for monitoring its performance. Accordingly, the JCM has had regular, ongoing engagement with OCMO regarding medical system performance and its development of the requisite monitoring protocols.

OCMO's monitoring protocols are being developed to assess the performance of CBP's complex, multi-layered medical system. Although the JCM continues to have highly detailed discussions with OCMO regarding protocol development, the monitoring system is being designed to assess the following major elements:

- Field assessment and provision of emergency care prior to arrival at CBP facility.

- Correct identification of children at elevated medical risk upon arrival at CBP facility.

- Additional identification of children at elevated medical risk through mandated medical examination within 24 hours of apprehension.

- Mandated consultation with on-call pediatricians for all children identified at elevated medical risk and/or who require isolation.

- Appropriate medical management, including medication use when indicated, and performance of the Enhanced Medical Monitoring (EMM) system for all children identified with elevated medical needs.

- Appropriate and timely referral of children to local hospital or other health facility when medically required.

- Medical surveillance of children not initially identified as being at elevated medical risk but who later develop conditions that require medical attention.

- Accurate documentation in the electronic medical record of all relevant medical information and actions taken by contracted medical providers and CBP personnel.

- The timely sharing of information between contracted medical providers and CBP facility leadership regarding all children at elevated medical risk.

- The conveyance of essential medical information to referral health facilities.

- The conveyance of medical information to the Office of Refugee Resettlement, HHS for appropriate placement and medical management for all unaccompanied children.

- The provision of medical documentation to parents regarding medical care provided to their children while in CBP custody.

OCMO monitoring protocols are being developed to address these system components through a variety of quality assurance mechanisms that are generally employed to assess the performance of large medical systems. These include, but are not confined to, the review of electronic medical records of cases that meet specific diagnostic or procedural criteria, such as children entered into the Enhanced Medical Monitoring system; the review of sentinel events that provide special insight into system components likely to have a major impact on patient outcomes, such as urgent transport of a child from a CBP facility to a local hospital; and monitoring of real-time, electronic dashboards of the medical status of children in CBP custody.

**Summary Assessment of Medical Monitoring System**

The JCM's ongoing engagement with OCMO suggests that CBP has created a strong framework for monitoring the quality of medical services provided children in CBP custody. Many of the organizational and technical requirements of a robust medical monitoring system have been developed and a variety are already being piloted in CBP facilities. In addition, OCMO has been enhancing its monitoring capabilities by adding skilled personnel to oversee different monitoring system components.

However, at the time of this writing, the JCM cannot provide an assessment of the "efficacy" of the CBP medical monitoring system, as many of the most important components of the system are still being implemented or have had only minimal operational experience in actual facility settings.  Since its role was established, the JCM has been committed to providing a pragmatic assessment of the CBP medical monitoring system in action.  The current implementation status of the monitoring system, however, precludes this full JCM assessment and confines the comments in this report to the design and demonstrated technical capabilities of selected system components.

It is important to note that the JCM's inability to evaluate the actual performance of the CBP medical monitoring system is not due to a lack of CBP attention to this issue nor a resistance to the sharing of information regarding the nature or status of system development.  To the contrary, the JCM has been impressed by the seriousness with which OCMO has pursued the development of the medical monitoring system and the professional manner in which OCMO has engaged the JCM and provided it with requested information.

**CERTIFICATE OF SERVICE**

Case No. CV 85-4544- DMG (AGRx)

I am a citizen of the United States. My business address is 250 Sixth Street, Suite 205, Santa Monica, California 90401 . I am over the age of 18 years, and not a party to the within action.

I hereby certify that on December 13, 2024, I electronically filed the following documents with the Clerk of the Court for the United States District Court, Central District of California by using the CM/ECF system:

**NOTICE OF FILING OF JUVENILE CARE MONITOR REPORT BY ANDREA S. ORDIN**

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the United States the foregoing is true and correct. Executed on December 13, 2024, at Los Angeles, California.

Jeff Thomson