**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | ) Case No. CV 85-4544-DMG (AGRx) |
| Plaintiffs, | ) |
| v. | ) **ORDER RE PLAINTIFFS' MOTION** |
| JAMES MCHENRY, Acting Attorney General of the United States,[1] *et al.*, | ) **TO MODIFY 2022 CBP SETTLEMENT** ) **[1526]** |
| Defendants. | ) |

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the Court substitutes Acting Attorney General James R. McHenry for former Attorney General Merrick Garland.

On December 20, 2024, Plaintiffs filed a motion to modify ("MTM") the 2022 Settlement Agreement ("2022 Settlement") that clarified the United States Customs and Border Protection's ("CBP") obligations under paragraphs 11 and 12A of the *Flores* Settlement Agreement ("FSA" or "Agreement").[2] [Doc. # 1526.] The MTM is fully briefed. [Doc. ## 1534 ("Opp."), 1536 ("Reply"), 1543 ("Sur.").] The Court held a hearing on the MTM on January 24, 2025. Because the 2022 Settlement is a consent decree interpreting the FSA and the Court retained jurisdiction in Paragraph 35 of the FSA to oversee the effectuation of its terms, the Court **GRANTS in part** the motion.

# I.
# INTRODUCTION

On January 28, 1997, the District Judge then presiding over this case approved the *Flores* Settlement Agreement. *See Flores v. Sessions*, 862 F.3d 863, 866 (9th Cir. 2017). Among other more specific requirements, Paragraphs 11 and 12A of the FSA require that detained accompanied and unaccompanied class members be housed in safe and sanitary conditions with particular regard for the vulnerability of minors. [Doc. ## 101 at 14–15.]

In 2019, Plaintiffs requested a temporary restraining order to address the conditions in CBP facilities in the El Paso and Rio Grande Valley ("RGV") sectors, alleging that the conditions were inhumane and unsafe, in violation of the FSA. [Doc. # 572 ("TRO").] After years of mediation, the parties reached a settlement agreement, and the Court granted final approval of the 2022 Settlement on July 29, 2022. [Doc. # 1278 ("2022 Settlement Approval").] The 2022 Settlement clarified the parties' understanding of Paragraphs 11 and 12A of the FSA, as they applied to conditions of CBP detention in the El Paso and RGV sectors.

---

[2] Although Plaintiffs have characterized this matter as a motion to modify, even if the Court were to construe it as a motion to enforce the 2022 Settlement, the remedies imposed herein would remain the same.

As part of the 2022 Settlement, Defendants agreed to ensure that CBP facilities in the El Paso and RGV sectors provide class members with access to "toilets, sinks, showers, hygiene kits, drinking water, age-appropriate meals and snacks, medical evaluations and appropriate medical treatment, clothing and blankets, caregivers in certain facilities, adequate supervision to protect minors from others, and adequate temperature control and ventilation." 2022 Settlement Approval at 2.[3] The 2022 Settlement also required prioritization of family unity so long as it was operationally feasible and created the "Juvenile Care Monitor" ("JCM") role to allow for the independent monitoring of CBP's compliance with the 2022 Settlement and the FSA more broadly. *Id.*

The 2022 Settlement included a termination provision, stating that "[t]his Agreement shall terminate two and one half years from its Effective Date, or upon the termination of the *Flores* Settlement Agreement, whichever is sooner." 2022 Settlement § II.8. The 2022 Settlement is currently set to terminate on January 29, 2025.

## II.
## BACKGROUND

### A. Conditions at CBP Facilities

Plaintiffs submitted substantial evidence, in the form of declarations of class members and their family members, that the conditions at CBP facilities are in violation of the FSA. Children housed in CBP facilities regularly complained of being refused clean clothing or extra layers, unreasonably cold temperatures in their rooms, being separated from their family members, having little to no outside time, being refused toys or activities other than coloring, and receiving cold, or even frozen, food. *See, e.g.*, M.A.C.M. Decl. ¶ 11 (refused clean clothes for 15 days); C.A.C.M. Decl. ¶¶ 10, 19 (was not given enough warm clothing); A.I.P.P. Decl. ¶ 7 (reported being very cold

---

[3] Page citations herein refer to the page numbers inserted by the CM/ECF system.

at night, causing respiratory issues); N.M.F.C. Decl. ¶ 4 (13-year-old girl separated from her sister and mother); G.O.F.F. Decl. ¶¶ 12, 15 (detained for 10 days and only allowed to color or watch TV); D.L.P. Decl. ¶ 10 ("dinner is served practically frozen, typically an actual frozen burrito"). In response, Defendants point to their guidance requiring compliance with the FSA requirements, but they do not offer any specific evidence rebutting the class members' descriptions of the conditions.

In December 2024, the JCM reported "general compliance" with the conditions and amenity requirements of the Agreement. JCM Final Report at 25 [Doc. # 1522]. She still noted, however, that "certain arenas of custodial care were documented to be more variable in their compliance[.]" *Id.* For example, the JCM concluded that the facilities tended to be in general compliance with the temperature requirements of the Settlement, but also noted that many children still reported feeling cold at night. Even if a facility's temperature is technically compliant, the JCM emphasized the importance of readily available extra layers upon request, as "having extra clothing readily available . . . has been the primary means of avoiding the necessity of raising the minimum allowable temperature." *Id.* at 9–10. Regarding the food offerings, the JCM commended CBP for the "significant improvement" in its menus, but also recommended that the nutritional value of the meals be re-evaluated in the near future. *Id.* at 9; *see* W.O.C.M. Decl. ¶ 13 (describing a dinner of only Cheerios cereal without milk).

**B.     Extended Time in Custody**

During the summer and fall of 2024, the JCM began to question the accuracy of CBP's monthly time in custody ("TIC") reports. JCM Final Report at 6. Specifically, the JCM found that the reported estimates of class members who had TIC times greater than 72 hours were lower than expected in light of the apprehension numbers and information learned during interviews with detained class members and their families. *Id.*; JCM Status Report at 6–7 [Doc. # 1540]. In December 2024, CBP provided the JCM with revised reports for October, November, and December 2024. JCM 2025

Status Report at 7. These revised reports showed "significantly higher" percentages of accompanied minors with TIC greater than 72 hours than had been shown in the prior reports. The new numbers estimated that in October, November, and December, respectively, 34.1%, 34.2%, and 39.2% of accompanied minors in the El Paso sector had TIC times greater than 72 hours. These estimates were 74.9%, 69.6%, and 53.1% for the RGV sector. *Id.* The JCM determined that "continued clarification of the definitions and methods used to generate these [CBP] reports would help provide confidence [in the accuracy of the reports]" and that this issue "deserve[s] continued review." *Id.* at 7–8.

### C. Monitoring

The 2022 Settlement provides that "[p]rior to the effective transition of monitoring functions, the Juvenile Care Monitor shall approve Defendant's final monitoring protocols." 2022 Settlement § IX.12. In her most recent update to the Court, the JCM expressed concerns about CBP's ability to effectively assume the monitoring duties of the JCM. JCM 2025 Status Report at 5. For example, the Juvenile Coordinator Division ("JCD"), which is primarily tasked with assessing the conditions for children in custody, expects that it will only be able to conduct three visits to combined Juvenile Priority Facilities in the El Paso and RGV sectors during 2025. At a minimum, the JCM would recommend "one visit to each of the Juvenile Priority Facilities per quarter." *Id.* Without more frequent visits, the JCM concluded that "it remains unclear how general conditions, amenities, and procedures will be monitored appropriately." *Id.*

Similarly, the JCM was unable to adequately assess the CBP medical and caregiver monitoring systems because "many of the most important elements of the medical and Caregiver monitoring systems are still being planned, have only recently been implemented, or have had only minimal operational experience in actual facility settings." *Id.* at 6.

//

# III.
# LEGAL STANDARD

Federal Rule of Civil Procedure 60(b) "encompasses the traditional power of a court of equity to modify its decree in light of changed circumstances." *Frew v. Hawkins*, 540 U.S. 431, 441 (2004) (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 380 (1992)). The party seeking modification of a consent decree bears the burden of showing that "a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383 (1992); *see Flores v. Rosen*, 984 F.3d at 741. This "significant change" may be either in factual conditions or in law. *Rufo*, 502 U.S. at 383. If the moving party satisfies its burden, the Court must then determine whether the party's proposed modification is "suitably tailored" to the changed circumstance. *Id.* A modification is suitably tailored when it "would return both parties as nearly as possible to where they would have been absent the changed circumstances." *Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) (internal citations omitted).

# IV.
# DISCUSSION

## A. Subject Matter Jurisdiction

Defendants first advance the argument that the Court does not have jurisdiction to modify the 2022 Settlement because, unlike the FSA, the 2022 Settlement was merely a settlement agreement and not a consent decree subject to potential modification by the Court. Defendants thus further argue that, in order to modify the 2022 Settlement pursuant to Rule 60(b), the Court was required to either (1) retain jurisdiction over the settlement or (2) incorporate the settlement into its approval order, neither of which the Court did. Defendants' arguments are contrary to both well-established law and the specific facts of this case.

### 1. The 2022 Settlement is a Class Action Settlement and Consent Decree

"A consent decree is a hybrid; it is both a settlement and an injunction." *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1185 (9th Cir. 2013). In other words, a

consent decree is "essentially a settlement agreement subject to continued judicial policing." *See United States v. State of Oregon*, 913 F.2d 576, 580 (9th Cir. 1990). Whether a settlement agreement is titled an "agreement" or a "consent decree" is not dispositive—"it is the reality, not the nomenclature which is at issue." *See Aronov v. Napolitano*, 562 F.3d 84, 90 (1st Cir. 2009) (collecting cases and agreeing with other circuits that the "formal label of 'consent decree' need not be attached" for an agreement to be a consent decree).

As both this Court and the Ninth Circuit have repeatedly acknowledged, and Defendants do not contest, the *Flores* Settlement Agreement is a consent decree. *See Flores v. Lynch*, 828 F.3d 898, 905 (9th Cir. 2016). Like the FSA, the 2022 Settlement is a class action settlement to which the Court granted preliminary and, following adequate notice to the class, final approval, consistent with Fed. R. Civ. P. 23. [Doc. ## 1255, 1278.]

Given that the 2022 Settlement came to fruition solely to clarify the parties' understanding of, and ensure CBP's compliance with, certain portions of the FSA, it would be nonsensical to treat one as a consent decree and the other as a garden variety settlement agreement. Essentially, Defendants contend that Plaintiffs should be required to bring a separate contract action to modify or enforce the terms of the 2022 Settlement. That would not only be a waste of judicial time and resources, but it also would be contrary to the "judicial policing" procedures agreed to by the parties in the 2022 Settlement. *See Oregon*, 913 F.2d at 580. The 2022 Settlement was not just a private settlement agreement between Plaintiffs and CBP—it explicitly included provisions requiring the Court's involvement. *See, e.g.*, 2022 Settlement §§ IX.1 (requiring the JCM to be "given authority by the Court" to monitor compliance); IX.2 (requiring the JCM to provide quarterly reports to the Court); IX.3 (requiring the parties to get approval from the Court before hiring additional monitoring aides); XIII (setting out a dispute resolution procedure that includes enforcement in this Court).

Rather than being an isolated agreement between the parties, the 2022 Settlement is, by its nature, tied to the FSA. *See* 2022 Settlement § II.8, n.2 (clarifying that if Paragraphs 11 and 12A of the FSA were terminated with regard to CBP, then the 2022 Agreement would also be terminated). Accordingly, Plaintiffs' ability to adequately enforce Paragraphs 11 and 12A of the FSA in this Court necessarily relies upon this Court's ability to interpret, modify, and enforce the 2022 Agreement.

### 2. The Court Maintains Jurisdiction over the 2022 Settlement

Defendants rely on *Kokkonen* for the proposition that the Court neither retained jurisdiction over the 2022 Settlement nor incorporated the agreement into its Approval Order because it did not include an explicit statement that it was doing either of those things.[4] *See Kokkonen v. Guardian Life Ins. Co. of America,* 511 U.S. 375, 381–81 (1994) (explaining that courts may maintain ancillary jurisdiction over a settlement agreement by either retaining jurisdiction or by incorporating terms of the settlement agreement into the court's order). Defendants fail, however, to acknowledge important distinctions between *Kokkonen* and this case.

*Kokkonen* concerned a settlement agreement in a case raising state law claims arising under diversity jurisdiction that resulted in the dismissal of the case with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(1)(ii). *Compare id. with Bd.of Trustees of Hotel & Rest. Emps. Loc. 25 v. Madison Hotel, Inc.*, 97 F.3d 1479, 1484 (D.C. Cir. 1996) (distinguishing *Kokkonen* because the underlying dispute involved issues of federal law). In *Kokkonen*, the Supreme Court's decision, in part, relied upon the "tenuous" relationship between: (1) an action concerning "the breach of an agreement that produced the dismissal of an earlier federal suit" and (2) the

---

[4] The Court need not, and does not, reach the issue of whether it "incorporated" the 2022 Settlement into its Approval Order, but it is nevertheless worth noting that the Court's 2022 Settlement Approval Order was more than a simple procedural approval order. The Approval Order summarized, and even quoted certain sections of, the 2022 Settlement. *See* 2022 Settlement Approval. This goes far beyond the "mere awareness and approval of [the settlement agreement's] terms" described in *Kokkonen*. *See* 511 U.S. at 381.

earlier, factually distinct federal suit. *Id.* at 379. This is in stark contrast to this case, where the relationship between CBP's compliance with the 2022 Settlement—which interprets the FSA—and the Court's continuous oversight of the *Flores* action is not tenuous at all. *See Duvall v. Hogan*, No. CV-ELH-94-2541, 2021 WL 2042295 (D. Md. May 21, 2021) (considering the nearly six decades-long "history of [the] case and the extend of judicial involvement" in deciding that the settlement agreement at issue was a modifiable consent decree). There is no question that the Court still retains federal question jurisdiction over the FSA and the *Flores* case as a whole, because the subject matter of Plaintiffs' various motions to enforce pertains to the claims underlying the lawsuit. *Cf. Kokkonen*, 511 U.S. at 380 ("[T]he facts underlying respondent's dismissed [federal] claim [] and those underlying its claim for breach of settlement agreement have nothing to do with each other").

Moreover, the FSA includes a provision stating, in no uncertain terms, that the Court "shall retain jurisdiction over this action" until the Court determines that the Government is in "substantial compliance" with the Agreement. FSA ¶ 35. When the Court issued its order approving the 2022 Settlement, it also denied Plaintiffs' underlying TRO request as moot, but otherwise took no action to relinquish its jurisdiction over the *Flores* action or impair its inherent authority to "manage its proceedings . . . and effectuate its decrees." *See Kokkonen*, 511 U.S. at 380. Therefore, it was not necessary for the Court to include language in its Approval Order that it "retained jurisdiction" over the 2022 Settlement (or any other orders and proceedings in this case) because its jurisdiction flows from the original retention of jurisdiction language in the *Flores* Agreement. Thus, until the *Flores* action is dismissed pursuant to Paragraph 35 of the FSA, the Court need not include in every single one of its orders that it retains jurisdiction because its retention of jurisdiction is explicitly set forth in the FSA.

B.  **Rule 60(b)**

1.  **Changed Circumstances**

"The failure of substantial compliance with the terms of a consent decree can qualify as a significant change in circumstances that would justify the decree's temporal extension." *Labor/Cmty. Strategy Ctr. V. Los Angeles Cnty. Metro. Transp. Auth.*, 564 F.3d 1115 (9th Cir. 2009); *see also Kelly*, 822 F.3d at 1098 ("Under well established law, substantial violation of a court order constitutes a significant change in factual circumstances."); *accord Thompson v. U.S. Dep't of Hous. & Urban Dev.*, 404 F.3d 821, 828–29 (4th Cir. 2005); *David C. v. Leavitt*, 242 F.3d 1206, 1212 (10th Cir. 2001). "Like terms in a contract, distinct provisions of consent decrees are independent obligations, each of which must be satisfied before there can be a finding of substantial compliance." *Rouser v. White*, 825 F.3d 1076, 1081 (9th Cir. 2016).

As described *supra* in section II, although CBP has made progress toward compliance with the 2022 Settlement, it has not yet satisfied each independent obligation, as is required for there to be substantial compliance. *See* JCM Final Report at 25 (describing that certain arenas of custodial care were "more variable in their compliance."). Critically, the 2022 Settlement *explicitly* requires the JCM's approval of CBP's monitoring procedures prior to the termination of monitoring by the JCM, and yet certain monitoring procedures are still being planned by CBP but have not been implemented. *See* 2022 Settlement § IX.12; JCM 2025 Status Report at 6. Because the JCM has not been able to "adequately assess the functional capabilities" of these monitoring systems, CBP cannot be found to be in compliance with that portion of the 2022 Settlement. This, alone, is enough to preclude CBP from meeting the "substantial compliance" standard. Thus, although the Court also is concerned about the potentially noncompliant conditions and amenities at CBP facilities, it need not address those issues here.

## 2. Suitably Tailored Modification

Plaintiffs request that the Court extend the term of the 2022 Settlement by another 2.5 years, thereby doubling its duration. Plaintiffs posit that this modification is suitably tailored because Defendants have "never substantially complied" with the provisions of the 2022 Settlement regarding: (1) family unity, (2) phone and legal counsel access, (3) sufficient clothing, (4) child-friendly, trauma informed approaches, and (5) self-monitoring policies and protocols. Defendants contend that an extension is not warranted because, even if CBP had failed to fully comply with the 2022 Settlement, Plaintiffs may still seek recourse through enforcement of the FSA. Opp. at 25.

Considering the evidence submitted by both sides, as well as the JCM's reports, it is evident to the Court that although CBP has not yet achieved substantial compliance with all the terms of the 2022 Settlement, it has made some notable progress. *See, e.g.,* JCM Final Report at 9 (noting the significant improvement in food menus); D.L.P Decl. ¶ 9 (stating that he can shower and brush his teeth every day). Accordingly, the Court finds it unnecessary to extend the agreement by an additional 2.5 years.

Plaintiffs rely heavily upon *Kelly v. Wengler* because the Ninth Circuit affirmed the district court's extension of the settlement agreement by two years (i.e., the original length of the settlement agreement). But unlike in *Kelly*, CBP has made significant improvements in some areas, thereby placing Plaintiffs in a better position than they were in 2.5 years ago. *See* 822 F.3d at 1098 (finding that the defendant had "violated the agreement from its inception"). Nonetheless, as noted by the JCM and described *supra*, CBP is not yet capable of wholly fulfilling its responsibilities under the 2022 Settlement and the FSA without the additional support provided by the JCM and the Court. Thus, the Court concludes that this case falls somewhere between *Kelly* (where there was virtually no compliance) and *Labor/Community Strategy Center* (where the consent decree had "served its purpose"). *See id.*; 564 F.3d at 1121. The Court finds

that an 18-month extension is a suitably tailored modification to the 2022 Settlement to effectuate its and the FSA's terms.

## V.

## CONCLUSION

In light of the foregoing, the Court **GRANTS in part** Plaintiffs' motion to modify the 2022 Settlement. The Court hereby **EXTENDS**: (1) the JCM's term by another six months, *nunc pro tunc*, from December 27, 2024 until June 27, 2025, with the option for further extensions due to lack of substantial compliance and (2) the termination date of the 2022 Settlement by 18 months, from January 29, 2025 until July 29, 2026.

**IT IS SO ORDERED.**

DATED: January 30, 2025

_____
DOLLY M. GEE
CHIEF U.S. DISTRICT JUDGE