YAAKOV ROTH
Acting Assistant Attorney General
DREW C. ENSIGN
Deputy Assistant Attorney General
Civil Division
WILLIAM C. SILVIS
Assistant Director
JOSHUA C. MCCROSKEY
Trial Attorney
CHRISTINA PARASCANDOLA
MICHAEL CELONE
KATELYN MASETTA-ALVAREZ
Senior Litigation Counsel
United States Department of Justice
Office of Immigration Litigation – General Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
202-514-0120
Katelyn.Masetta.Alvarez@usdoj.gov
Attorneys for Defendants

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>PAMELA BONDI, Attorney General of the United States, *et al.*,<br><br>Defendants. | Case No. CV 85-4544<br><br>**DEFENDANTS' NOTICE OF MOTION TO TERMINATE SETTLEMENT AGREEMENT AND TO DISSOLVE INJUNCTION OF AGENCY REGULATIONS; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Fed. R. Civ. P. 60(b)(4), (5) & (6)<br>Hearing Date: July 18, 2025, 9:30 AM<br>Place: Courtroom 8C, First Street Courthouse<br>Honorable Dolly M. Gee, District Juge |

**NOTICE OF MOTION**

NOTICE IS HEREBY GIVEN that the U.S. Department of Justice (DOJ), the U.S. Department of Homeland Security (DHS), and the U.S. Department of Health and Human Services (HHS), by and through undersigned counsel, will bring this motion for hearing on July 18, 2025, at 9:30 a.m. or as soon thereafter as counsel may be heard, before United States Chief District Judge Dolly M. Gee, in Courtroom 8C, 8th Floor, at the Los Angeles – 1st Street courthouse located within the Central District of California.

**COMPLIANCE WITH LOCAL RULE 7-3**

This motion is made following a telephonic meeting of counsel pursuant to L.R. 7-3, and paragraph 37 of the Flores Settlement Agreement (FSA), which took place on May 13, 2025, and subsequent written correspondence. Plaintiffs oppose this motion. The parties agreed to a filing date of May 22, 2025, opposition on June 20, 2025, reply on July 3, 2025, and hearing on July 18, 2025.

**MOTION TO TERMINATE SETTLEMENT AGREEMENT; MOTION TO DISSOLVE INJUNCTION OF AGENCY REGULATIONS**

Defendants move to terminate the FSA under paragraph 40 of the FSA and Federal Rule of Civil Procedure 60(b)(4), (b)(5), and (b)(6). In light of the significant changes in circumstances since this Court entered the FSA 28 years ago, including the promulgation of regulations incorporating the goals of the FSA, and Supreme Court precedent that is inconsistent with continuing such a long-term decree, further continuation of the FSA is no longer equitable or in the public interest. The decree is also directly contrary to 8 U.S.C. § 1252(f)(1), as well as the Supreme Court's

2

decision in *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022). Pursuant to Federal Rule of Civil Procedure 60(b)(4), (b)(5) and (b)(6), Defendants thus move to dissolve the FSA.

This motion is based upon the above Notice, the accompanying Memorandum of Points and Authorities, all pleadings and papers on file in this action, and such other matters as may be presented to this court at the time of the hearing on the motion. Pursuant to Local Rule 7-15, Defendants do not waive oral argument.

DATED: May 22, 2025                Respectfully submitted,

                                   YAAKOV ROTH
                                   Acting Assistant Attorney General
                                   DREW C. ENSIGN
                                   Deputy Assistant Attorney General
                                   Civil Division
                                   Office of Immigration Litigation
                                   WILLIAM C. SILVIS
                                   Assistant Director

                                   */s/ Katelyn Masetta-Alvarez*
                                   KATELYN MASETTA-ALVAREZ
                                   CHRISTINA PARASCANDOLA
                                   MICHAEL CELONE
                                   Senior Litigation Counsel
                                   JOSHUA C. MCCROSKEY
                                   Trial Attorney
                                   United States Department of Justice
                                   Office of Immigration Litigation – General
                                   Litigation and Appeals Section
                                   P.O. Box 878, Ben Franklin Station
                                   Washington, DC 20044
                                   202-514-0120
                                   Katelyn.Masetta.Alvarez@usdoj.gov

                                   *Attorneys for Defendants*

4

# TABLE OF CONTENTS

INTRODUCTION .................................................................................1

BACKGROUND ...................................................................................6

    *The 1985 Complaint* .......................................................................6

    *The 1988 Rule* ...............................................................................7

    *The Supreme Court's Remand in* Reno v. Flores *(1993).* ..............8

    *The 1997* Flores *Settlement Agreement* .........................................9

    *Significant Changes in Circumstances Since 1997* ......................10

    Flores *Litigation Related to DHS* ................................................15

    *Resumption of Operations in FRCs* .............................................17

    *This Court's Retention of Jurisdiction over ORR's Implementation of the FSA at Secure, Heightened Supervision, and Out-of-Network Facilities* .............18

    *2025 ORR Policy Guidance* .........................................................19

LEGAL STANDARDS .......................................................................19

ARGUMENT .....................................................................................22

I.    **Dissolving the FSA as to DHS and Vacating the Permanent Injunction as to the 2019 DHS Rule Are Required under § 1252(f) and the Supreme Court's Decision in *Aleman Gonzalez.*** .................22

II.   **This Court Should Dissolve the Consent Decree Because Its Terms Have Been Substantially Satisfied as to HHS and DHS.** ...................25

    **A. HHS's Recent Policy Guidance Makes Plain that It Has Satisfied the Conditions of the FSA.** .................25

    **B. DHS Has Substantially Satisfied the Terms of the FSA** ...................26

III.  **Termination of the FSA Is Warranted Because Prospective Application Is No Longer Equitable.** ................................................32

i

**A. This Court Should Terminate the FSA Because It Improperly Commits Immigration Enforcement and Detention Decisions to the Judiciary Rather Than to the Executive.** ...................................................32

    1.   Enforcing the FSA Is Inequitable Because It Indefinitely Entangles the Judiciary in Managing Immigration Policy. .............................................33

    2.   Enforcing the FSA Is Inequitable Because It Prescribes the Substantive Result of Agency Rulemaking ...................................................44

**B. Termination of the Consent Decree Is Warranted Due to Changes in Factual and Legal Circumstances** .............................................................49

**CONCLUSION** ...................................................................................................55

# TABLE OF AUTHORITIES

Page(s)

Cases

*Agostini v. Felton*,
   521 U.S. 203 (1997)...................................................................... 22, 24

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
   429 U.S. 252 (1977).............................................................................33

*Biodiversity Assocs. v. Cables*,
   357 F.3d 1152 (10th Cir. 2004) .........................................................32

*Buck v. Davis*,
   580 U.S. 100 (2017)...................................................................... 22, 48

*Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS,
   2007 WL 1074070 (W.D. Tex. Apr. 9, 2007) ............................... 10, 11

*Citizens for a Better Env't v. Gorsuch*,
   718 F.2d 1117 (D.C. Cir. 1983)...........................................................46

*Conn. L,*
   *ight & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525 (D.C. Cir. 1982) ...47

*Conservation Nw. v. Sherman*,
   715 F.3d 1181 (9th Cir. 2013) ................................................ 32, 47, 48

*David B. v. McDonald*,
   116 F.3d 1146 (7th Cir. 1997) ............................................................40

*Dep't of Com. v. New York*,
   588 U.S. 752 (2019).............................................................................46

*E.O. v. United States*,
   651 F. Supp. 3d 331 (D. Mass. 2023)..................................................10

*Evans v. City of Chicago*,
   10 F.3d 474 (7th Cir. 1993) .......................................................... 40, 42

*Fiallo v. Bell*,
   430 U.S. 787 (1977).............................................................................34

*Flores v. Barr*,
   407 F. Supp. 3d 909 (C.D. Cal. 2019) ......................................... passim

*Flores v. Barr*,
   934 F.3d 910 (9th Cir. 2019) ..............................................................37

*Flores v. Huppenthal*,
   789 F.3d 994 (9th Cir. 2015) ..............................................................27

iii

*Flores v. Johnson*,
  212 F. Supp. 3d 864 (C.D. Cal. 2015) .....................................................15

*Flores v. Lynch*,
  828 F.3d 898 (9th Cir. 2016) ........................................................ passim

*Flores v. Meese*,
  934 F.2d 991 (9th Cir. 1990) ......................................................3, 6

*Flores v. Rosen*,
  984 F.3d 720 (9th Cir. 2020) ..................................... 16, 30, 31

*Flores v. Sessions*,
  394 F. Supp. 3d 1041 (C.D. Cal. 2017) ........................................ passim

*Florida v. United States*,
  660 F. Supp. 3d 1239 (N.D. Fla 2023) .....................................24

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010) .......................................................................40

*Galvez v. Jaddou*,
  52 F.4th 821 (9th Cir. 2022) ...............................................................23

*Garland v. Aleman Gonzalez*,
  596 U.S. 543 (2022)..................................................... 3, 22, 23, 29

*Harisiades v. Shaughnessy*,
  342 U.S. 580 (1952) ........................................................... 2, 34

*Heath v. De Courcy*,
  888 F.2d 1105 (6th Cir. 1989) ............................................................40

*Henson v. Fid. Nat'l Fin., Inc.*,
  943 F.3d 434 (9th Cir. 2019) ...........................................................21

*Horne v. Flores*,
  557 U.S. 433 (2009).......................................................... passim

*Housatonic River Initiative v. EPA*,
  75 F.4th 248 (1st Cir. 2023).............................................................46

*Huntt v. Gov't of Virgin Islands*,
  382 F.2d 38 (3d Cir. 1967) ............................................................45

*In re Pearson*,
  990 F.2d 653 (1st Cir. 1993)..........................................................40

*Int'l Union, United Mine Workers of Am. v. Bagwell*,
  512 U.S. 821 (1994)........................................................................39

*Jackson v. Los Lunas Cmty. Program*,
  880 F.3d 1176 (10th Cir. 2018) .......................................................21

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
  999 F.2d 831 (5th Cir. 1993) ...........................................................32

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990)........................................................................39

iv

*Mathews v. Diaz*,
  426 U.S. 67 (1976)............................................................ 33, 34, 43, 49
*Mayo v. United States*,
  319 U.S. 441 (1943)........................................................................36
*Nat'l Audubon Soc., Inc. v. Watt*,
  678 F.2d 299 (D.C. Cir. 1982)........................................................41
*New York v. United States*,
  505 U.S. 144 (1992)........................................................................39
*NRDC v. EPA*,
  859 F.2d 156 (D.C. Cir. 1988)........................................................47
*Patterson v. Newspaper & Mail Deliverers' Union of New York*,
  13 F.3d 33 (2d Cir. 1993)................................................................31
*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015)..........................................................................46
*Reno v. Flores*,
  507 U.S. 292 (1993)................................................................. passim
*Rufo v. Inmates of Suffolk Cnty. Jail*,
  502 U.S. 367 (1992).............................................................. 21, 29, 40
*San Francisco v. USCIS*,
  944 F.3d 773 (9th Cir. 2019)..........................................................33
*Trump v. Hawaii*,
  585 U.S. 667 (2018)........................................................................34
*Trump v. Vance*,
  591 U.S. 786 (2020)........................................................................36
*United States v. Carpenter*,
  526 F.3d 1237 (9th Cir. 2008) ................................................. 32, 48
*United States v. City of Miami*,
  2 F.3d 1497 (11th Cir. 1993)..........................................................27
*United States v. Washington*,
  573 F.3d 701 (9th Cir. 2009) .........................................................42
*Wages v. IRS*,
  915 F.2d 1230 (9th Cir. 1990) .......................................................19
*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
  5 F.4th 997 (9th Cir. 2021) ...........................................................39

**Statutes**

5 U.S.C. § 553.................................................................................46
5 U.S.C. § 553(c)............................................................................47
5 U.S.C. § 706(2)(A).......................................................................29

6 U.S.C. § 279 ................................................................................ 10, 28
6 U.S.C. § 279(b) ....................................................................................11
6 U.S.C. § 279(g)(2) ..............................................................................28
6 U.S.C. § 251 ........................................................................................10
8 U.S.C. § 1231(a)(6) ............................................................................23
8 U.S.C. § 1232 ......................................................................................28
8 U.S.C. § 1232(b)(2) ............................................................................13
8 U.S.C. § 1232(c)(2)(A) .......................................................................13
8 U.S.C. § 1252(a) (1996) .....................................................................29
8 U.S.C. § 1252(f)(1) ...................................................................... 2, 5, 22
34 U.S.C. § 30301 ..................................................................................13

**Rules**

Fed. R. Civ. P. 23(g) ..............................................................................34
Fed. R. Civ. P. 60(b)(4) .................................................................... 1, 2, 3
Fed. R. Civ. P. 60(b)(4)-(5) ...................................................................24
Fed. R. Civ. P. 60(b)(5) ................................................................ 20, 21, 26
Fed. R. Civ. P. 60(b)(6) ..........................................................................21

**Regulations**

6 C.F.R. § 115.13 ...................................................................................14
6 C.F.R. § 115.14(a) ..............................................................................14
8 C.F.R. § 236.3 .................................................................................. 9, 28
8 C.F.R. § 236.3(f) .................................................................................31
8 C.F.R. § 236.3(g) .................................................................................52
8 C.F.R. § 236.3(i)(4) .............................................................................52
8 C.F.R. § 236.3(i)(4)(iv) .......................................................................28
8 C.F.R. § 242.24(b)(1) (1992) ...............................................................8
45 C.F.R. § 410.1001 .............................................................................19
45 C.F.R. § 410.1201 .............................................................................52
45 C.F.R. §§ 410.1302 ...........................................................................52

**Other Authorities**

17A C.J.S. *Contracts* § 451 (2019) ......................................................44
Unaccompanied Refugee Children: Detention, Due Process, and Disgrace,
    2 Stan. L. & Pol'y Rev. 159 (1990) ................................................51

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants, in their official capacities, move to terminate the FSA completely and with respect to all Defendants, and to dissolve the Court's injunction of DHS's regulations for apprehension, processing, care, and custody of alien minors, ECF No. 690, as follows.

## INTRODUCTION

After 40 years of litigation and 28 years of judicial control over a critical element of U.S. immigration policy by one district court located more than 100 miles from any international border, it is time for this case to end.

Courts issuing injunctive relief in institutional-reform cases have a duty "to ensure that 'responsibility for discharging the [government's] obligations is returned promptly to the State and its officials' when the circumstances warrant." *Horne v. Flores*, 557 U.S. 433, 450 (2009) (citation omitted). "[T]he longer an injunction or consent decree stays in place, the greater the risk that it will improperly interfere with [government's] democratic processes." *Id.* at 453. Indeed, prolonged enforcement of consent decrees "may 'improperly deprive future officials of their designated legislative and executive powers.'" *Id.* at 450 (citation omitted). The Supreme Court has thus admonished lower courts considering Rule 60 motions simply to ascertain whether ongoing enforcement of the original order "[i]s supported by an ongoing violation of federal law" and not to focus on compliance with "the original order." *Id.* at 453-54.

These principles apply with even greater force to the federal government, especially to its enforcement of immigration laws: the Judiciary must not intrude

1

into the Executive's core foreign relations functions with indefinite oversight and micromanagement. *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952).

This case exemplifies the harms imposed by ongoing judicial management of Executive agencies. This Court entered the FSA as a consent decree in 1997 and amended it in December 2001. The FSA has governed the care and custody of unaccompanied alien children (UACs) ever since, notwithstanding intervening legislation by the U.S. Congress and agency regulations. In 2015, this Court expanded the FSA to *accompanied* children, *see Flores v. Lynch*, 828 F.3d 898, 906, 909 (9th Cir. 2016), even though it is obvious from the FSA's terms that the parties did not contemplate their inclusion. Thus, as to accompanied children, the national policy has long been set by a district court (and not the President or Congress), notwithstanding that the consent decree providing the basis for district-court supervision does not claim to regulate this class of aliens. That simply cannot be.

During the 28 years that this Court has controlled federal policy regarding the custody of alien children who are in the United States without immigration status, enormous, cardinal changes have occurred: surges of aliens have entered the U.S. in between ports of entry across the southwest border, including large groups of aliens who voluntarily surrendered to Border Patrol—surrenders orchestrated by traffickers; the demographics of aliens arriving at the border have shifted to include significantly higher numbers from countries outside the Western Hemisphere and higher numbers of children; a global pandemic necessitated the government's utilization of its expulsion authority to protect public health; and the subsequent lifting of the policy led to an upheaval in immigration policy for over two years.

2

Moreover, the conditions for UACs—the original plaintiffs in this case—have substantially improved from those that precipitated this suit four decades ago. The parties reasonably could not have foreseen such developments, let alone the cumulative effect of such developments, in 1997.

The Executive has not been able to react fully and meaningfully to these changes because the FSA has ossified federal-immigration policy. Successive Administrations have tried unsuccessfully to free themselves from the strictures of the consent decree and this Court's gloss on it. But detention of juvenile aliens continues to be—as it has been for more than a generation—dominated by the strictures of a 1997 agreement. This Court is obliged under *Horne* and other precedents to end this intrusive regime.

The legal and policy landscape has also changed beyond recognition. Plaintiffs claimed, in 1985, that the government's alleged policy or practice to condition bail for UACs on the child's parents or guardians appearing before an agent of the former Immigration and Naturalization Service (INS) violated due process and the Immigration and Nationality Act (INA). Plaintiffs cited the absence of established procedures for the conditions of custody or for reuniting children with parents or legal guardians. *See Reno v. Flores*, 507 U.S. 292, 295–96 (1993); *Flores v. Meese*, 934 F.2d 991, 995 (9th Cir. 1990), *rev'd Flores*, 507 U.S. at 292. In the FSA, the parties agreed to basic procedures addressing both matters. But since then, the legal basis for the agreement has withered away: Congress enacted legislation protecting UACs, and the agencies promulgated detailed standards and regulations implementing that legislation and the terms of the FSA.

3

The FSA itself has changed the immigration landscape by removing some of the disincentives for families to enter the U.S. unlawfully. Unlawful family migration barely existed in 1997. Since then, it has become widespread. U.S. Border Patrol reported a total of 614,020, 993,940, and 996,070 encounters with individuals in family units for FY2022, FY2023, and FY2024, respectively. Declaration of Marc Rosenblum, attached as Ex. B.

The numbers of UACs also increased during that time, with Border Patrol reporting 149,093 encounters with UACs on the Southwest border in FY2022, 131,519 in FY2023, and 99,704 in FY2024. Declaration of John Modlin, attached as Ex. A, ¶ 8. In those hundreds of thousands of cases, adults and children made the ill-conceived decision to entrust their children or themselves to human traffickers and embark on a dangerous journey to the U.S. southern border, which is recognized as the "world's deadliest migration land route."[1] Such conduct, often with the expectation of a quick release into the United States and avoidance of immigration enforcement, is due in large part to the FSA, which has prevented the federal government from effectively detaining and removing families. The FSA—which was designed to address the much narrower issue of finding custodians and

---

[1]     International Office of Migration, US-Mexico Border World's Deadliest Migration Land Route (Sept. 12, 2023), available at https://www.iom.int/news/us-mexico-border-worlds-deadliest-migration-land-route (Sept. 12, 2023) (viewed Apr. 7, 2025), attached as Ex. C. The loss of human life has been devastating, with 686 deaths and disappearances of migrants on the U.S.-Mexico border in calendar year 2022 alone, based on available—and incomplete—data. *Id.*

providing temporary care for UACs—removes the disincentives enacted by Congress to making this dangerous journey.

The law governing consent decrees cuts strongly against the FSA's longevity. No reasonable basis exists for one court to oversee all children in the custody of DHS and HHS—a major driver of the immigration system for 28 years, and subject to the self-interested monitoring and motions filed by lawyers appointed over a generation ago. Over the past decade, the government has paid more than $4.25 million to class counsel, either in awards for attorney fees and costs or in settlements to obtain releases from attorney-fee claims arising out of litigation in this case.[2] Courts are obliged under *Horne* and other precedents to discontinue such a regime.

It is time for the era of the *Flores* consent decree to end. Through this Rule 60(b) motion, Defendants seek to terminate the decree on multiple grounds, though any one alone would suffice. Relief is warranted under Rule 60(b) because: (1) under 8 U.S.C. § 1252(f)(1) this Court lacked jurisdiction to enter a class-wide injunction as to DHS and, with the benefit of recent Supreme Court precedent, clearly lacks jurisdiction to enforce the FSA now; (2) events following the FSA, including an intervening Act of Congress and the implementation of *Flores* principles and policies, obviate the need for the FSA; (3) continued enforcement of the FSA violates the Constitution's separation-of-powers principles by indefinitely entangling the Judiciary in the management of national-immigration policy; (4) the

---

[2]    These payments include $540,000 to class counsel for a release from attorney-fee claims arising out of class counsel's motion to enforce the FSA during the COVID-19 pandemic, ECF No. 1325, and $577,000 for a release from attorney-fee claims arising out of a motion to enforce at emergency-intake sites, ECF No. 1340.

FSA's terms violate the Administrative Procedure Act (APA); and (5) the FSA is no longer equitable given the dramatic changes that have occurred since 1997, including the creation of detailed custodial systems, which did not exist in 1997, for UACs and families who entered the United States unlawfully. For these reasons, this Court should grant this motion and dissolve the FSA in its entirety.

## BACKGROUND

### The 1985 Complaint

In 1984, in response to a huge uptick in illegal immigration and increased numbers of UACs, the former INS's Western Regional Office adopted an ad hoc policy permitting the release of detained minors—but only to their parents or lawful guardians, except in extraordinary cases when the juvenile could be released to individuals who agreed to care for the child's wellbeing. *See Flores*, 507 U.S. at 296.

On July 11, 1985, four plaintiffs, ages 13-16, who were citizens of El Salvador, in immigration custody, and unaccompanied by their parents or legal guardians, initiated this action. Compl. ¶¶ 12–15. They sought certification of a class defined as "all persons under the age of 18 who have been, are, or will be arrested and detained pursuant to [former] 8 U.S.C. 1252 by the INS within INS' Western Region and who have been, are, or will be denied release from INS custody because a parent or legal guardian fails to personally appear to take custody of them." *Flores*, 934 F.2d at 994–95.

The four plaintiffs alleged that they were required to share sleeping quarters with unrelated adults, provided no educational materials or recreational activities, received no medical examinations, and were denied reasonable visitation with

6

family and friends. Compl. ¶¶ 7, 42, 43, 45. Two plaintiffs alleged that their parent would not appear in person to accept physical custody of them because they feared being deported, and the third plaintiff alleged that her parents were in El Salvador, *id*. ¶¶ 28, 34, 40. The fourth plaintiff alleged that, after she met with her attorneys, INS agents strip-searched her. *Id*. ¶ 46. All four plaintiffs alleged that Defendants did not assess the qualifications of non-parent adults who were willing to take custody and care for them, and that, therefore, INS policy and practice was "a thinly veiled device to apprehend parents of incarcerated juveniles and to punish children for allegedly having entered the United States without lawful authority," *id*. ¶¶ 6, 8. Plaintiffs claimed that conditioning bond on their parents' or legal guardians' personal appearance violated their substantive-due-process right to be free from physical restraint, violated procedural due process by not requiring an individualized determination of the juvenile's best interests, and exceeded the Attorney General's authority under the former-immigration-detention statute, 8 U.S.C. § 1252 (repealed 1996), which permitted the INS to release aliens on bond or conditional parole.

### *The 1988 Rule*

In October 1987, INS initiated a rulemaking to adopt procedures relating to detention and release of juvenile aliens. 52 Fed. Reg. 38,245 (Oct. 15, 1987). In November 1987, the parties entered into a Memorandum of Understanding (1987 MOU) regarding detention conditions, under which minors in immigration custody for more than 72 hours would be housed in facilities that met or exceeded certain standards. *See* Memorandum of Understanding Re Compromise of Class Action:

Conditions of Detention, *Flores v. Meese*, No. 85–4544–RJK (C.D Cal., Nov. 30, 1987).

In May 1988, INS issued the rule, *Detention and Release of Juveniles*, 53 Fed. Reg. 17,449 (May 17, 1988) (the 1988 Rule). The 1988 Rule provided that alien juveniles generally "shall be released, in order of preference, to: (i) a parent; (ii) a legal guardian; or (iii) an adult relative (brother, sister, aunt, uncle, grandparent) who are not presently in INS detention." 8 C.F.R. § 242.24(b)(1) (1992). If the only listed individuals were also in INS detention, INS would consider simultaneous release of the juvenile and custodian "on a discretionary case-by-case basis." *Id.* § 242.24(b)(2). Under the rule, INS could hold minors in a detention facility designed for juveniles pending efforts to identify "suitable placement … in a facility designated for the occupancy of juveniles." *Id.* § 242.24(c).

For juveniles who were not released, the INS required a designated INS official, the "Juvenile Coordinator," to locate "suitable placement ... in a facility designated for the occupancy of juveniles." *Id.* § 242.24(c). INS could briefly hold the minor in any "INS detention facility having separate accommodations for juveniles," *Id.* § 242.24(d), subject to the terms of the 1987 MOU.

### *The Supreme Court's Remand in* Reno v. Flores *(1993).*

After this Court granted summary judgment in favor of Plaintiffs' challenge to the 1988 Rule, the Supreme Court intervened, reversing the Ninth Circuit's affirmance of this Court's decision. *Flores*, 507 U.S. at 315. The Supreme Court rejected Plaintiffs' substantive-due-process claim, noting that "'juveniles, unlike adults, are always in some form of custody' . . ., and where the custody of the parent

8

or legal guardian fails, the government may (indeed, we have said must) either exercise custody itself or appoint someone else to do so." *Id.* at 302 (citation omitted). As to Plaintiffs' procedural-due-process claim, the Supreme Court found the Constitution was satisfied by an INS process entitling alien juveniles to a hearing on detention before an immigration judge. *Id.* at 309. This Court likewise rejected Plaintiffs' statutory-authority argument. *Id.* at 312.[3]

### *The 1997* Flores *Settlement Agreement*

Though the Supreme Court rejected all of Plaintiffs' claims, the parties agreed to a settlement on remand. The FSA became effective on January 28, 1997, upon this Court's approval, and provides that "the court shall retain jurisdiction over this action." FSA, attached as Ex. J, ¶ 35. When the parties signed the FSA, INS was responsible for arresting, processing, detaining or releasing, and removing aliens, including UACs.

The purpose of the FSA was to establish a "nationwide policy for the detention, release, and treatment of minors in the custody of the INS." FSA ¶ 9. The parties expanded the settlement class beyond the Western Region, to cover "[a]ll minors who are detained in the legal custody of the INS." *Id.* ¶ 10. A "minor" is defined as "any person under the age of eighteen (18) years who is detained in the legal custody of the INS," but excludes minors who have been emancipated or incarcerated due to a criminal conviction as an adult. *Id.* ¶ 4. The detention of many

---

[3]    The 1988 Rule remains in effect today, although, in 1997, INS moved it to 8 C.F.R. § 236.3. *See* 62 Fed. Reg. 10,312, 10,360 (Mar. 6, 1997). In 2002, INS transferred relevant authority to the Director of the Office of Juvenile Affairs. *See* 67 Fed. Reg. 39,255, 39,258 (June 7, 2002).

alien minors occurred under what was, at the time, the discretionary-detention statute. *See Flores*, 507 U.S. at 309.

The FSA's terms reflect that the parties intended it to be a stopgap measure until Defendants promulgated regulations governing the care and custody of UACs. *See K.O. by & through E.O. v. United States*, 651 F. Supp. 3d 331, 338 (D. Mass. 2023) (observing that the FSA was intended to be a stopgap measure); *Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *2 (W.D. Tex. Apr. 9, 2007) (same). The FSA was originally set to expire within five years, but, in December 2001, this Court entered the parties' stipulation to amend the termination date to "45 days following defendants' publication of final regulations implementing this Agreement." ECF No. 13.

### *Significant Changes in Circumstances Since 1997*

Since the FSA was entered in 1997, the United States' public-policy interests have shifted. Events such as the September 11, 2001 terrorist attacks, and the growth of national-security threats such as drug trafficking and human smuggling by transnational criminal organizations, have necessitated policy responses that could not have been reasonably contemplated in 1997.

In 2002, Congress abolished INS and transferred its functions to the newly created DHS. *See* Homeland Security Act (HSA), Pub. L. No. 107–296, §§ 441, 451, 471, 116 Stat. 2135, 2205, 2308 (Nov. 25, 2002) (6 U.S.C. §§ 251, 271, 291, 542). With respect to the care of UACs, Congress transferred responsibility from the INS's UAC program to the Office of Refugee Resettlement (ORR) within HHS. 6 U.S.C.

10

§ 279.[4] ORR became responsible for coordinating and implementing the care and placement of UACs, making and implementing placement determinations, overseeing the infrastructure and personnel of UAC facilities, and other functions. 6 U.S.C. § 279(b).

In the wake of 9/11, DHS ended the practice of "catch-and-release."[5] Previously, families apprehended at the border generally were released rather than detained because of limited bed space. *Bunikyte*, 2007 WL 1074070, at *1 (citation omitted). The catch-and-release practice created enforcement vulnerabilities, namely that smugglers reportedly brought children across the border with groups of smuggled strangers and presented them as family units, in order to avoid detention if apprehended. Ex. C ¶ 7. Catch-and-release also incentivized families to bring children on a dangerous journey. *Id*. To maintain family unity, ICE opened family residential centers (FRCs). *Id*. ¶¶ 8, 9. At the time, ICE used the 2000 INS Detention Standards, blended with traditional juvenile standards, to establish a baseline of performance requirements and oversight procedures for FRCs. *Id*. ¶ 15.

---

[4]    ORR is a program of the Administration for Children and Families (ACF) that was created with the enactment of the Refugee Act, Pub. L. No. 96-212, 94 Stat. 102 (Mar. 17, 1980).

[5]    Declaration of Timothy L. Perry, Deputy Assistant Director, Detention Management Division, Office of Detention and Removal Operations, ICE (Mar. 16, 2007), *Bunikyte*, No. A-07-CA-164-SS (W.D. Tex.), ECF No. 17-1, attached as Exhibit C ¶ 6. Under the catch-and-release policy, the government issued aliens apprehended at or near the border notices to appear in removal proceedings and released them on their own recognizance or bail. *Id*.

1    In the meantime, the numbers of alien minors arriving in the United States

2   each year increased significantly. While the numbers fluctuate from year to year,

3   they remain significantly higher than the approximately 7,000 to 8,000 entering each

4   year in the early 1990s. *See Flores*, 507 U.S. at 294 (recognizing that a surge of

5   "more than 8,500" alien minors represented a "serious" problem). From FY1993

6   until FY2011, the numbers of UACs apprehended by the government stayed

7   relatively consistent year-over-year. Declaration of Toby Biswas, attached as Ex. D

8   ¶ 4. In FY2012, DHS referred 13,625 UACs to ORR. *Id*. In FY2023, ORR received

9   118,938 referrals—a thirteenfold increase from the time the FSA was entered. *Id*.

10    The need to "hous[e] family units," which was not contemplated by the parties

11   in 1997, *see Flores*, 828 F.3d at 906, became a significant issue. U.S. Customs and

12   Border Protection (CBP) reported 14,855 Border Patrol encounters of individuals in

13   family units (FAMUs) along the Southwest border in FY2013.  Ex. A ¶ 8. CBP

14   reported 614,020 Border Patrol encounters with individuals in family units in

15   FY2022, 993,940 individuals in family units in FY2023, and 996,070 in FY2024.

16   Ex. B.

17    More recently, the numbers of encounters along the border have decreased,

18   but they remain higher than they were in the early 1990s. In the first six months of

19   FY2025, Border Patrol reported 22,662 encounters with UACs and 50,662 with

20   individuals in FAMUs along the Southwest border. Ex. A, ¶ 8. Even with stronger

21   enforcement and significantly fewer unlawful entries, however, the FSA continues

22   to frustrate CBP's ability to carry out its mission of protecting the border. *See id.*,

23   ¶ 18. Stronger enforcement has required Border Patrol to keep people in custody

12

longer. [cite] Increases in encounters and the numbers of UACs and FAMUs in custody are difficult to plan for because the increases are neither steady nor predictable. *See generally* Ex. A.

Since 1997, Congress and the agencies enacted protections for UACs in government custody. DHS must notify HHS within 48 hours of the apprehension or discovery of a UAC and transfer them to HHS's custody within 72 hours, absent exceptional circumstances and except when a UAC from a contiguous country is permitted to withdraw his or her application for admission. *See* William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), Pub. L. No. 110-457 § 235, 122 Stat. 5044, 5074 (Dec. 23, 2008) (8 U.S.C. § 1232(b)(2), (3)). Further, UACs in HHS custody must be promptly placed in the least restrictive setting that is in the child's best interest, and, if placed in a secure facility, the placement shall be reviewed monthly. 8 U.S.C. § 1232(c)(2)(A). Other provisions govern legal-orientation presentations and access to counsel. *Id*. § 1232(c)(4) & (5).

In 2014, pursuant to the Prison Rape Elimination Act (PREA), DHS issued regulations to prevent, detect, and respond to sexual abuse and assault in DHS confinement facilities.[6] *See* 79 Fed. Reg. 13,100 (Mar. 7, 2014) (6 C.F.R. § 115.10-95 (detention facilities), *id*. § 115.110-195 (holding facilities)). Under DHS's PREA regulations, juveniles must be detained in the least restrictive setting appropriate to the juvenile's age and special needs, and facilities must hold juveniles apart from adult detainees, unless the juvenile is in the presence of an adult family member, and

---

[6]    Congress enacted PREA in 2003. *See* Pub. L. No. 108-79, 117 Stat. 972 (Sept. 4, 2003), codified at 34 U.S.C. § 30301, *et seq*.

provided the arrangement presents no safety or security concerns. 6 C.F.R. §§ 115.14(a), (b) (detention), 115.114(a)(b) (holding). Further, each facility must supervise detainees through appropriate staffing levels and, where applicable, video monitoring to protect detainees against sexual abuse, and must develop and document comprehensive-supervision guidelines. 6 C.F.R. § 115.13, 115.113. ORR issued similar regulations with respect to UACs in its custody. *See* 79 Fed. Reg. 77,768 (Dec. 24, 2014), codified at 45 C.F.R. pt. 411.

In October 2015, CBP issued its Transport, Escort, and Detention Standards (TEDS), implementing a CBP-wide policy setting nationwide standards to govern CBP's interaction with detained individuals. *See* TEDS, Ex. F. Under the TEDS policy, detainees generally should not be held for more than 72 hours in a CBP facility. *Id*. § 4.1. TEDS establishes national standards for medical screening, gender separation, segregation of juveniles from adult populations (unless the adult is an immediate relative or legal guardian), and family unity. *Id*. § 4.3. It also establishes standards for detainee privacy, hold-room conditions, consular access, lists of legal-services providers, telephone access, bedding, hygiene, and access to food, water, and restrooms. *Id*. §§ 4.6-4.15.

In 2020, ICE updated its standards governing FRCs, the Family Residential Standards (FRS), which likewise set the standards for the care and custody of FAMUs and juveniles. *See* Declaration of Dawnisha Helland, attached as Ex. G; FRS, attached as Ex. H.

In January 2025, President Trump signed the Laken Riley Act into law. Pub. L. 119-1, 139 Stat. 3 (2025). It expanded the category of aliens who are subject to

14

mandatory detention. *Id.* Most importantly, States can now sue for injunctive relief if a decisions by DHS harms the State or its residents, which adds pressure on DHS to end catch-and-release and ensure compliance with the mandatory-detention provisions required under the INA.

**Flores *Litigation Related to DHS***

Since 1997, there has been significant litigation over the FSA's terms, most of which arose from class counsel's fifteen motions to enforce the FSA. Below are examples of the litigation that has occurred in the past decade.

- *Flores v. Johnson*, 212 F. Supp. 3d 864 (C.D. Cal. 2015) (granting Plaintiffs' Motion to Enforce, ECF No. 100, and ruling that the FSA applies to all alien minors in government custody, including those in FAMUs);

- *Flores*, 828 F.3d. at 902–903 (upholding this Court's conclusion that the FSA applies to accompanied-alien minors and that during an emergency or influx, minors must be transferred "as expeditiously as possible" to a non-secure, licensed facility);

- *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1063-67 (C.D. Cal. 2017) (interpreting the FSA to require ICE to make and record continuous efforts to release accompanied minors in expedited-removal proceedings—even though such minors are subject to mandatory detention under 8 U.S.C. § 1225(b)(1)(B)(ii) or (iii)(IV). This Court also concluded that Defendants must assess each individual class member in expedited-removal proceedings for discretionary, humanitarian parole);

15

- *Flores v. Barr*, 407 F. Supp. 3d 909, 916–20 (C.D. Cal. 2019) (permanently enjoining DHS's and HHS's the 2019 Rule implementing the FSA[7] because this Court found that the provisions related to the detention of UACs and the licensing of family-detention facilities were inconsistent with the FSA), *aff'd in part*, *rev'd in part*, *Flores v. Rosen*, 984 F.3d 720, 737 (9th Cir. 2020) (upholding permanent injunction of the 2019 Rule applicable to the care and custody of accompanied minors, based upon its conclusions that the regulations differed substantially from the FSA, but reversing and remanding this Court's decision as to most of the provisions related to Border Patrol custody and UACs, because those provisions were consistent with the FSA);

- ECF No. 1406 at 11 (granting in part Plaintiffs' Motion to Enforce, ECF No. 1392, based on its finding that alien juveniles waiting in Outdoor Congregation Areas (OCAs)—plots of land along the U.S.-Mexico border that are not controlled or owned by CBP—are detained in CBP custody, and ordering CBP to cease "holding" alien children in these sites, and monitor

---

[7] On August 23, 2019, DHS and HHS published final regulations to implement the FSA. *See* 84 Fed. Reg. 44,392–535 (Aug. 23, 2019) (2019 Rule). The 2019 Rule included two sets of regulations: one issued by DHS and the other by HHS. *Id*. at 44,515-30 (DHS); *id*. at 44,530-35 (HHS). The DHS regulations govern the apprehension and processing of unaccompanied and accompanied minors, and the care and custody of accompanied minors. The HHS regulations governed the care and custody of UACs.

16

compliance with the FSA with respect to any alien juveniles present at OCAs).[8]

### *Resumption of Operations in FRCs*

In March 2025, ICE resumed the operation of FRCs to house family units, for the purpose of increasing compliance with immigration obligations, reducing the number of absconders, and housing members of the same family together. *See* Ex. G ¶¶ 13-15. Without FRCs, ICE's ability to monitor immigration cases and execute removal orders is compromised.[9] *Id.* ¶¶ 15-28. FRCs provide a safe setting for family units awaiting removal together while advancing the public-policy interests in reducing the number of absconders and enabling ICE to better manage its resources. *Id.* ¶¶ 19, 20, 23.

---

[8]     Beginning in October 2022, large groups of aliens began to enter the United States through Mexico, and congregate in the areas east of the San Ysidro Port of Entry, known as OCAs, including remote areas that are not reachable by bus or car and lack basic amenities, like shade and drinking water. Ex. A ¶ 18. There, the aliens waited until Border Patrol agents could arrive. *See* ECF No. 1406 at 1-3. The groups consisted of dozens to hundreds of aliens, often believed to be assisted by cartel-affiliated smuggling organizations. ECF No. 1398-1 ¶ 7. The OCAs were neither established nor maintained by CBP. ECF No. 1479-1 ¶ 6.

[9]     The most reliable factor for determining whether an alien is removed when a final order is issued is whether the alien is in detention when this occurs. 84 Fed. Reg. at 44,488. In many cases when an alien was at large when a final order of removal was issued, ICE expended significant resources to locate, detain, and subsequently remove the alien in accordance with the final order. *Id.*

According to ICE data, family units on ATD tend to abscond at a higher rate than non-family unit participants. *Id.* (noting that the absconder rate for FAMUs was 30 percent, while the absconder rate for non-FAMUs was 19 percent).

17

***This Court's Retention of Jurisdiction over ORR's Implementation of the***
***FSA at Secure, Heightened Supervision, and Out-of-Network Facilities***

On April 30, 2024, HHS issued a rule governing the placement, care and custody of UACs. *Unaccompanied Children Foundational Rule*, 89 Fed. Reg. 34, 384 (Apr. 30, 2024) (Foundational Rule). Defendants moved to terminate the FSA as to HHS, under Rule 60(b)(5), based on the Foundational Rule. ECF No. 1414. On June 28, 2024, this Court conditionally and partially terminated the FSA as to HHS, except for FSA ¶¶ 28.A, 32, and 33, which concern collection of certain information about UACs, attorney-client visits, and site visits, and as to the FSA provisions governing secure, heightened supervision, and out-of-network facilities. ECF No. 1447. This Court also held that termination was contingent on the Foundational Rule not being subsequently rescinded or modified inconsistent with the FSA, and retained jurisdiction to modify its order, "should further changed circumstances make it appropriate." *Id.* at 21.

With respect to UAC placements at secure, heightened supervision, and out-of-network facilities, the Court ruled that the Foundational Rule failed to implement the FSA by: (1) "appear[ing] to impermissibly allow isolated or petty offenses to be considered in the decision to place [UACs] in a heightened supervision facility"; (2) "appear[ing], impermissibly, to allow placement in a heightened supervision facility solely because a child is ready to 'step down' from a secure facility"; and (3) "fail[ing] to provide substantive protections for the children placed at [out-of-network] facilities," and failing to ensure that out-of-network placements are governed by the same standards as those in network providers. *Id*. at 12-13. As to

18

Defendants' argument that the parties did not contemplate out-of-network facilities in the FSA, this Court concluded that out-of-network facilities have "typically" been considered a form of secure placement, and did not consider that any out-of-network facility must be State licensed. *See* 45 C.F.R. § 410.1001.

### 2025 ORR Policy Guidance

On May 19, 2025, HHS promulgated policy guidance in response to this Court's concerns in its Order Partially Terminating the FSA as to HHS, ECF No. 1447. Ex. D ¶¶ 5-17. Although ORR has been implementing the Foundational Rule in accordance with this Court's June 28, 2024 order, these updates explicitly establish that it is doing so through formal guidance. First, ORR revised the UAC Policy Guide to delete references to isolated and petty offenses as a basis for placement in a heightened-supervision facility. Ex. D ¶ 7. Second, ORR updated its UAC Policy Guide to remove a provision that previously listed the step-down of children from a secure placement to a heightened-supervision facility as a possible justification alone for placement. *See id.* ¶¶ 8-9. Third, ORR clarified that the same standards that apply to in-network providers will generally apply to out-of-network placements. *See id.* ¶¶ 10-18; Policy Guide § 3.3. The UAC Policy Guide update also clarifies that behavior-management policies, as described in the Foundational Rule and Policy Guide, will apply to out-of-network placements. Ex. D ¶ 13.

## LEGAL STANDARDS

"Pursuant to Rule 60(b)(4), a litigant may attack a judgment as void due to lack of subject matter jurisdiction." *Wages v. IRS*, 915 F.2d 1230, 1234 (9th Cir. 1990).

Rule 60(b)(5) provides that a court "may relieve a party ... from a final judgment, order, or proceeding" when "the judgment has been satisfied, released, or discharged" or when "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). The Supreme Court has explained that the disjunctive language of Rule 60(b)(5) clarifies that each of these grounds for relief is "independently sufficient." *Horne*, 557 U.S. at 454. Under the first clause of Rule 60(b)(5), relief from judgment is appropriate when a judgment has been satisfied according to its own provisions.

In contrast, the "equitable" clause of Rule 60(b)(5) allows a court to modify or vacate an order if "a significant change either in factual conditions or in law renders continued enforcement detrimental to the public interest." *Id.* at 447 (cleaned up). Where the government seeks relief from an "institutional-reform" decree, courts must apply a "flexible approach" to "ensure that responsibility for discharging the [government's] obligations is returned promptly to the [government] and its officials when the circumstances warrant." *Id.* at 448–50 (internal quotation marks and citation omitted). A flexible approach is necessary for several reasons. First, "the passage of time frequently brings about changed circumstances—changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights—that warrant reexamination of the original judgment." *Id.* at 447–48. Second, these types of decrees often involve core-government responsibilities and raise separation-of-powers concerns. *Id.* at 448. Last, "public officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law." *Id.* Future officials

20

then "inherit overbroad or outdated consent decrees" that unduly constrain "their ability to fulfill their duties as democratically-elected officials." *Id.* at 449.

When determining whether to vacate an injunction under Rule 60(b)(5), courts must also consider "whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law." *Id.* at 454. Further, if the government has implemented a "durable remedy," judicial oversight should cease. *Id.* at 450. Rule 60(b)(5) also permits modification of a decree if it is "suitably tailored" to resolve problems created by changed circumstances. *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992).[10] Once a party carries its burden to show that changed circumstances warrant relief from a consent decree, "a court abuses its discretion when it refuses to modify an injunction or consent decree in light of such changes." *Horne*, 557 U.S. at 447 (internal quotations and citation omitted).

Rule 60(b)(6) permits relief from judgment for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). It permits the district court to vacate judgments "whenever such action is appropriate to accomplish justice." *Henson v. Fid. Nat'l Fin., Inc.*, 943 F.3d 434, 443–44 (9th Cir. 2019) (internal quotations and citation omitted). Relief under the rule is available only in "extraordinary circumstances."

---

[10] "To the extent *Rufo* and *Horne* differ as to the appropriate course of action when a party seeks a Rule 60(b)(5) modification to an order in an institutional reform case," the Court should follow *Horne* because Defendants seek the FSA's termination, not a partial modification, and because "*Horne* is the latest ruling in a trend of decisions that lower the threshold for defendants to obtain a modification to, or the dissolution of, orders in long-lasting institutional reform cases." *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1199–1201 (10th Cir. 2018).

*Buck v. Davis*, 580 U.S. 100, 123 (2017). But "[i]n determining whether extraordinary circumstances are present, a court may consider a wide range of factors," such as "the risk of injustice to the parties and the risk of undermining the public's confidence in the judicial process." *Id.* at 123 (internal quotations and citation omitted).

## ARGUMENT

I.  **Dissolving the FSA as to DHS and Vacating the Permanent Injunction as to the 2019 DHS Rule Are Required under § 1252(f) and the Supreme Court's Decision in *Aleman Gonzalez*.**

This Court must dissolve the FSA as to DHS and lift its injunction enjoining the 2019 DHS Rule because this Court lacked jurisdiction to enjoin the 2019 Rule or enter the FSA in the first place with respect to the former INS, and ICE and CBP as its successors, under 8 U.S.C. § 1252(f)(1). The Supreme Court's decision in *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022) has resolved any doubt that § 1252(f)(1) divested courts of jurisdiction to restrain the operation of the immigration-detention provisions in the INA. Relief is thus warranted under Rule 60(b)(4) because the injunction is void for lack of jurisdiction and under Rule 60(b)(5) due to a change in decisional law. Indeed, "[a] court errs [under Rule 60(b)(5)] when it refuses to modify an injunction or consent decree in light of" "changes in either statutory or decisional law." *Agostini v. Felton*, 521 U.S. 203, 215 (1997).

Section § 1252(f)(1) divests lower federal courts of authority to enjoin or restrain the operation of the detention provisions of the INA. In 2022, the Supreme

22

Court held that "§ 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Aleman Gonzalez*, 596 U.S. at 548–50. The Court also explained that "injunctive relief on behalf of an entire class of aliens" enjoining or restraining the operation of the INA's detention provisions "is not allowed[.]" *Id.* at 550–51 (holding that a class-wide injunction requiring the Government to provide bond hearings for class members detained under 8 U.S.C. § 1231(a)(6) were "barred" because they "interfere with the Government's efforts to operate § 1231(a)(6)[.]"). That holding clarifies that the FSA and this Court's 2019 injunction were inappropriate exercises of jurisdiction.

Section 1252(f)(1) codifies section 242(f)(1) of the INA, which refers to "the provisions of chapter 4 of title II" of the INA (as amended by IIRIRA), *i.e.*, sections 231 through 244 of the INA, 8 U.S.C. §§ 1221–1231 and 1252–1254a. *Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022). These sections include the sources of DHS's authority to detain class members, which are in §§ 1225(b)(1)(B)(ii), 1225(b)(1)(B)(iii)(IV), 1225(b)(2)(A), 1226, and 1231(a). The applicable detention authority depends upon the status of the alien's immigration proceedings and the alien's criminal history.

Specifically, aliens in expedited-removal proceedings "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). Likewise, inadmissible aliens seeking admission "shall be detained for a proceeding under

23

section 1229a." *Id.* § 1225(b)(2)(A). Outside of expedited-removal proceedings, the Government has discretion to detain or release an alien on bond pending a decision on whether he or she is to be removed, *id.* § 1226(a), unless detention is mandatory under § 1226(c) due to certain criminal offenses.

Because the detention of class members by ICE and CBP is pursuant to provisions governed by § 1252(f)(1), *Aleman Gonzalez* makes plain that this Court lacked jurisdiction to enter the FSA. *See Florida v. United States*, 660 F. Supp. 3d 1239, 1267 (N.D. Fla 2023) (recognizing that *Flores* may be causing violations of § 1225(b) and chastising the government for failing to move for relief in this Court under *Aleman Gonzalez*). The same is true of this Court's permanent injunction of DHS's 2019 regulations, which DHS issued pursuant to sections of the INA that govern immigration custody. This Court has not previously wrestled with *Aleman Gonzalez* and did not have the benefit of the Supreme Court's clarification on the scope of § 1252(f)(1) when it approved the FSA in 1997 or permanently enjoined the 2019 DHS rule. But it must do so now given that courts must account for "changes in either statutory or decisional law," *Agostini*, 521 U.S. at 215, especially where the changes establish that the court lacks jurisdiction. Under *Aleman Gonzalez*'s construction of § 1252(f)(1), this Court must dissolve the FSA as to ICE and CBP and the 2019 injunction of DHS's Rule. Fed. R. Civ. P. 60(b)(4)-(5).

24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

**II.    This Court Should Dissolve the Consent Decree Because Its Terms Have Been Substantially Satisfied as to HHS and DHS.**

    **A.    HHS's Recent Policy Guidance Makes Plain that It Has Satisfied the Conditions of the FSA.**

HHS's policy guidance establishes that it is implementing the Foundational Rule in accordance with this Court's concerns as to placement of UACs in secure, heightened supervision, and out-of-network facilities, as articulated in this Court's June 28, 2024 order. ECF No. 1447.

Specifically, this Court concluded that the Foundational Rule was inconsistent with the FSA in that it allowed ORR to consider isolated or petty offenses when placing a UAC in a heightened-supervision facility. *Id*. at 12. ORR has now clarified that isolated and petty offenses are not a basis for such placement. *See* Ex. D-3 - UAC Policy Guide § 1.2.4. ORR further clarified that it will consider whether the child "has a non-violent criminal or delinquent history not warranting placement in a secure facility but which evidences a behavioral concern that requires an increase in supervision" when determining whether to place a UAC in such a facility. Ex. D ¶ 7.

HHS also has responded to this Court's conclusion that HHS appeared to allow placement in a heightened-supervision facility "solely because a child is ready to 'step-down' from a secure facility." ECF No. 1447 at 12. ORR has foreclosed such an interpretation in its updated policy guidance by removing the provision at issue. *See* Ex. D ¶ 8.

25

1    ORR also addressed this Court's conclusion that the Foundational Rule

2    "fail[ed] to provide substantive protections for the children placed" at out-of-

3    network facilities and to ensure that out-of-network placements are governed by the

4    same standards as in-network providers, ECF No. 1447 at 13. In response, ORR has

5    updated its Policy Guide to explicitly establish that it applies the same standards to

6    out-of-network placements that apply to in-network placements, taking into account

7    the specialized nature of out-of-network facilities and ORR's single-case agreements

8    with such facilities for individual children. In particular, ORR updated its UAC

9    Policy Guide § 1.4.6 and the definition of an OON to make clear that, wherever

10    possible, the same standards applicable to in-network providers apply to out-of-

11    network placements. *See* Ex. D ¶¶ 10-18.

12    Because the new policy guidance eliminates any basis for concluding that the

13    Foundational Rule does not satisfy the FSA, this Court must dissolve the FSA as to

14    HHS. Fed. R. Civ. P. 60(b)(5).

15    **B.    DHS Has Substantially Satisfied the Terms of the FSA.**

16    Termination is likewise necessary as to DHS because DHS has substantially

17    satisfied the terms of the FSA. As this Court has recognized, termination of the FSA

18    is appropriate "so long as the requisite legal standards for termination are met." ECF

19    No. 1447 at 16 (terminating portions of the FSA as to HHS). As the parties stipulated

20    in 2001, the terminates automatically "45 days following defendants' publication of

21    final regulations implementing this Agreement." Ex. J.

22    In the context of institutional-reform litigation, the Supreme Court has

23    criticized lower courts for focusing too narrowly on the terms of the consent decree

26

rather than the broader question, "whether, as a result of important changes during the intervening years, the [government] was fulfilling its obligations under the [law] by other means." *Horne*, 557 U.S. at 439. Indeed, the *Horne* Court recognized that it "was error" for the lower courts to not consider that a government may fulfill the principal goals of the underlying decree, "even without having satisfied the [verbatim terms of the] original order." *Id.* at 466. So too here.

This Court should terminate the FSA with respect to DHS in light of DHS's 2019 regulations, which are the latest in decades of efforts aimed at the original goal of the FSA: to create a comprehensive scheme to protect alien juveniles in U.S. custody. *See*, *e.g.*, *Flores v. Huppenthal*, 789 F.3d 994, 1001 (9th Cir. 2015) (observing that the critical question in that case was whether the objective of the district court's order—satisfaction of the underlying federal law—had been achieved); *United States v. City of Miami,* 2 F.3d 1497, 1505 (11th Cir. 1993) ("A court faced with a motion to terminate . . . a consent decree must begin by determining the basic purposes of the decree."). Further, continued enforcement of the FSA instead of the policies of the people's representatives is not in the public interest because continued enforcement interferes with the Executive Branch's authority to enforce the immigration laws. *See infra* Section III.A.

The conditions of confinement today are far from the conditions that prevailed in the original litigation. Today, there is a routine policy of minimizing the "practice of commingling harmless children with adults of the opposite sex," *Flores*, 507 U.S. at 328 (Stevens, J. dissenting) (citing evidence from the 1980s about conditions of confinement in INS custody), and the law provides protective and safe custody for

27

minors in either DHS or HHS custody, *see* 6 U.S.C. § 279; 8 U.S.C. § 1232; 6 C.F.R. §§ 115.10–.195; 8 C.F.R. §§ 236.3; 45 C.F.R. pts. 410, 411. More specifically, under the regulations governing ICE custody, FRCs provide children with the very "education, recreation, [and] visitation" provisions that were lacking when the Supreme Court initially heard this case. *Flores*, 507 U.S. at 328; *see* 8 C.F.R. § 236.3(i)(4)(iv) (education); § 236.3(i)(4)(vi) (recreation time); § 236.3(i)(4)(xi), (xii), (xiii), and (xv) (visitation); *see also* Ex. H, FRS § 5.2 (setting forth requirements to ensure that FRCs provide education for all residents 4 to 17 years of age, regardless of English proficiency or disability).

Beyond resolving the concerns that instigated this lawsuit, the DHS regulations generally incorporate the portions of the FSA that the parties contemplated in 1997 and should go into effect. Previously, this Court deemed only two of the DHS provisions to be inconsistent with the FSA: the provisions related to "expeditious release" of accompanied minors (FSA ¶¶ 14, 18); and the licensing requirements for FRCs (FSA ¶ 19). *Flores*, 407 F. Supp. 3d at 916–20, *aff'd in part, rev'd in part* 984 F.3d 720. This Court did not find that any of the other DHS regulatory provisions were inconsistent with the FSA. *See generally id.* While the DHS regulations do not mirror the expeditious-release provision of the FSA, as this Court has interpreted it to apply to accompanied children, the FSA was intended to provide for prompt release of UACs to a parent or caregiver. The law surrounding the treatment of UACs has changed entirely to address this central concern of the FSA, evidenced by Congress's definition of UACs, 6 U.S.C. § 279(g)(2), and mandates for protecting UACs, including 8 U.S.C. § 1232. DHS should not remain

28

subject to the FSA based on this Court's conclusion that DHS's regulations governing the custody of accompanied children do not mirror an agreement that was never designed to cover that population.

Further, incorporating the FSA's expeditious-release provisions for accompanied children would contravene current federal statutes. *Rufo*, 502 U.S. at 384 (courts should modify a decree due to a "significant change . . . in law."). On April 1, 1997, two months *after* the parties agreed to the FSA, the mandatory-detention provisions in §§ 1225(b) and 1226(c) went into effect. *See supra* Section I. These provisions were a stark change from the detention statute in place during the initial *Flores* litigation, negotiations, and the signing of the FSA, as the previous statute permitted, during deportation proceedings: continued detention; release under bond in the amount of not less than $500; or release on conditional parole. 8 U.S.C. § 1252(a) (1996). Although this Court determined that the parties were aware of these changes when they signed the FSA, *see Flores*, 394 F. Supp. 3d at 1065 n.15, the Supreme Court has since clarified that § 1252(f)(1) strips this Court of jurisdiction to enjoin or restrict the expeditious-release provisions in the FSA on a class-wide basis. *See supra* Section I (discussing *Aleman Gonzalez*, 596 U.S. at 550-51). Given these legal changes, requiring DHS to incorporate the FSA's expeditious-release provisions for all accompanied children would contravene federal law. This Court therefore cannot require that DHS include such a provision in its regulations where doing so would be unlawful. 5 U.S.C. § 706(2)(A).

Likewise, requiring DHS to comply with independent-licensing requirements for FRCs amounts to an impossible task. State licensing of such facilities is in most

cases impossible because family detention is not something that states license. *See Flores*, 394 F. Supp. 3d at 1069. Of course, family detention generally only arises in the immigration-law context.

The FSA is also silent about licensing requirements for family detention—indeed, it is silent about family detention altogether. The FSA speaks only to licensing of facilities for "dependent children," FSA ¶ 6, *i.e.*, UACs. *See Flores*, 828 F.3d at 906 (agreeing that dependent children were UACs, but erroneously finding that accompanied children could somehow be placed in those same licensed facilities). Given the changed circumstances warranting FRCs—the pronounced increase in family-unit apprehensions since 2013 and perverse incentive that the lack of detention creates, leading hundreds of thousands of children to be taken on the most dangerous migration journey in the world—this Court should recognize the imperative that the government have the flexibility necessary to administer and enforce immigration law, and allow the licensing regulation to take effect.

Moreover, all FSA provisions that are consistent with the 2019 DHS regulations must be terminated. *Flores*, 984 F.3d at 744 (stating that the DHS regulations that were consistent with the FSA "may take effect."). The Ninth Circuit found that only two of the DHS provisions were inconsistent with the FSA (the provisions related to "expeditious release," as applied to accompanied minors, FSA ¶¶ 14, 18, and the licensing requirements for FRCs, FSA ¶ 19). *Id.* at 737–40. On that basis alone, the FSA should be terminated in full except as to Paragraphs 14, 18, and 19 as they apply to accompanied children. The permanent injunction should

30

1    further be lifted from the corresponding sections of the 2019 Rule, for the reasons

2    explained *supra*.

3         Further, this Court must terminate the FSA in its entirety as to CBP and lift

4    the injunction on DHS's regulations related to CBP, as the Ninth Circuit explicitly

5    found the regulations primarily governing CBP custody to be consistent with the

6    FSA. *Id.* at 737 (concluding that 8 C.F.R. § 236.3(f) and (g)(2) were consistent with

7    the FSA and "may take effect"). These provisions mirror the requirements in FSA

8    ¶¶ 11, 12, and 25. The mandate on the Ninth Circuit's opinion issued on July 26,

9    2021. ECF No. 93. Accordingly, by the clear terms of the FSA, ¶¶ 11, 12, and 25

10    have terminated.[11]

11         Additionally, because the substantive terms of the FSA are terminated as to

12    CBP, this Court should also relieve CBP of the FSA's administrative and monitoring

13    obligations. Thus, this Court must relieve CBP of Sections X (reporting), XI

14    (attorney-client visits), and XII (facility visits) of the FSA, as well as the

15    transportation obligations of Section VIII (incorporated in 8 C.F.R. § 236.3(f),

16    which has not been found inconsistent with the FSA) and terminate this Court's

17    jurisdiction over CBP as to this litigation. *See Horne*, 557 U.S. at 450 (cautioning

18    that federal-court decrees should be limited to "reasonable and necessary

19    implementations of federal law."); *see also Patterson v. Newspaper & Mail*

20    *Deliverers' Union of New York*, 13 F.3d 33, 39 (2d Cir. 1993) (explaining that, once

21    a decree has served its purpose, "all of its provisions may be ended").

22     

23    ---

[11]    The Court, therefore, must terminate the 2022 CBP Settlement, ECF No. 1254-1, as the Settlement interprets FSA ¶¶ 11 and 12.

31

**III.** **Termination of the FSA Is Warranted Because Prospective Application Is No Longer Equitable.**

**A. This Court Should Terminate the FSA Because It Improperly Commits Immigration Enforcement and Detention Decisions to the Judiciary Rather Than to the Executive.**

Courts must ensure that a consent decree "does not put the court's sanction on and power behind a decree that violates Constitution, statute, or jurisprudence." *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 846 (5th Cir. 1993) (en banc) (citation omitted). The Ninth Circuit has held that "a district court may not approve a consent decree that conflicts with or violates an applicable statute." *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1185 (9th Cir. 2013) (internal quotations and citation omitted). Likewise, although the Attorney General has the authority to settle litigation, this authority "does not include license to agree to settlement terms that would violate the civil laws governing the agency." *United States v. Carpenter*, 526 F.3d 1237, 1242 (9th Cir. 2008) (citation omitted); *cf. Biodiversity Assocs. v. Cables*, 357 F.3d 1152, 1169-70 (10th Cir. 2004) ("If the statute changes, the parties' rights change, and enforcement of their agreement must also change. Any other conclusion would allow the parties, by exchange of consideration, to bind not only themselves but Congress and the courts as well."). Because the FSA—through its terms, interpretation and applications, as well as its duration—is contrary to law, it is no longer equitable and must be terminated.

1    **1.  Enforcing the FSA Is Inequitable Because It Indefinitely Entangles**
2    **the Judiciary in Managing Immigration Policy.**

3       The FSA violates the separation of powers by permitting ongoing judicial
4    micro-management of immigration matters committed to the Executive Branch.
5    Judicial incursions into the realm of immigration affairs represent "substantial
6    intrusion[s]" into the workings of the political Branches entrusted to implement
7    policies towards migrants. *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S.
8    252, 268 n.18 (1977). The Supreme Court has explained—in this very case—"[f]or
9    reasons long recognized as valid, the responsibility for regulating the relationship
10   between the United States and our alien visitors has been committed to the political
11   Branches of the Federal Government." *Flores*, 507 U.S. at 305 (quoting *Mathews v.*
12   *Diaz*, 426 U.S. 67, 81 (1976)). One of the underpinnings for this long-recognized
13   proposition is that immigration policy involves "changing political and economic
14   circumstances" that are appropriate for the political Branches to address, not the
15   Judiciary. *Mathews*, 426 U.S. at 81; *see also San Francisco v. USCIS*, 944 F.3d 773,
16   809 (9th Cir. 2019) (Bybee, J., concurring) ("In the immigration context . . . [w]e are
17   limited . . . in our ability . . . to shape our immigration policies. We lack the tools of
18   inquiry, investigation, and fact-finding that a responsible policymaker should have
19   at its disposal.").

20       This is one reason Congress enacted § 1252(f)(1). "For more than a century,"
21   it has been well settled that a matter implicating foreign relations—such as
22   immigration policy—is a "fundamental sovereign attribute" of the government's
23   Executive and Legislative Branches and "largely immune from judicial control."

33

*Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (quoting *Fiallo v. Bell*, 430 U.S. 787, 792 (1977)); *see also Shaughnessy*, 342 U.S. at 588–89 ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations . . ."). For these reasons, even aside from the jurisdictional bar to class-wide injunctive relief under § 1252(f)(1), respect for the political Branches' authority over immigration policy dictates a narrow standard of judicial review over executive and legislative decisions in the realm of immigration. *Fiallo*, 430 U.S. at 792, 796; *Mathews*, 426 U.S. at 81–82.

Contravening these well-settled principles of the limited judicial role, the FSA has created a substantial and unprecedented intrusion of the Judiciary into the Executive's administration of immigration policy. The scope of the FSA was too broad from the start and its overbreadth exacerbated when it is interpreted to apply to the very different context of *accompanied* children. The FSA "sets out nationwide policy for the detention, release, and treatment of minors in the custody of the INS." FSA ¶ 9. It governs an open-ended, ever-changing, and never-ending class of "[a]ll minors who are detained in the legal custody of the INS." *Id.* ¶ 10. This class has included millions of people over the years.[12] The FSA—originally designed to address a very specific set of narrow circumstances—has been interpreted to address the custody of all minors at all stages. *Id.* ¶¶ 12, 14–19, 21–27. It specifies details

---

[12]    In practice under this class definition, the class's legal goals are not determined by named individual Plaintiffs with concrete interests at stake. Rather, the advocacy organizations acting as class counsel have been deciding the objectives of the litigation. The United States respectfully submits that no class counsel is adequate to such a monumental task.  *See* Fed. R. Civ. P. 23(g).

34

about conditions of custody at various facilities, procedural provisions, and release policies. *Id.* Paragraph 9 of the FSA mandates rulemaking and provides that "[t]he final regulations shall not be inconsistent with the terms of this Agreement." *Id.* ¶ 9. And the FSA puts no temporal limit on the judicial intrusion. Instead, amended Paragraph 40 states that the FSA "shall terminate 45 days following defendants' publication of final regulations implementing this Agreement," *id.* ¶ 40 (as amended Dec. 7, 2001, Ex. J), which criteria can only be satisfied by a determination by the judiciary that the executive's regulations are sufficient. As explained below, publishing final regulations implementing the FSA to meet criteria determined by the judiciary—without regard to any comments received or to any changed circumstances since 1997—would be contrary to the APA.

While the scope of the FSA was broad from the beginning, this Court's interpretation and enforcement of the FSA have significantly expanded it beyond lawful bounds. Even when the FSA has been silent or unclear, this Court has issued specific directives to the government about managing nationwide-immigration enforcement. For example, while the FSA "does not address the potentially complex issues" of housing family units, "does not contain standards related to the detention of . . . family units," and "gave inadequate attention to some potential problems of accompanied minors," *Flores*, 828 F.3d at 906, this Court nonetheless applied the FSA to FAMUs and required release of accompanied minors under specified deadlines and standards irrespective of the custody status of their parents or legal guardians. Also, in 2020, this Court recognized that "Paragraph 12.A does not enumerate which rights must be included in a notice." ECF No. 987 at 6. Yet this

Court nonetheless interpreted Paragraph 12.A to require a very specific "notice of rights pertaining to custody and release." *Id.* In contrast, when ruling on the OCA issue, this Court held that the FSA's use of the phrase "following arrest" did not require any actual "arrest" to be triggered. *See* ECF No. 1406 at 10. In practice, the FSA has effectively been interpreted as if it were an open-ended grant of authority to the *Judiciary* to set policy regarding alien children. That is not equity.

Further compounding the judicial intrusions upon the authority of the Executive, this Court has repeatedly applied the FSA to situations the parties did not anticipate, such as to aliens held pending expulsion pursuant to the Title 42 public health order issued during the pandemic. *See* ECF No. 976. This Court also interpreted the FSA's terms to apply to placements in out-of-network facilities, ECF No. 1447 at 13, despite the absence of any mention of such facilities or any indication that the parties even contemplated out-of-network facilities in 1997. And in 2024, this Court applied the FSA's requirements to OCAs, a novel situation that this Court called "open-air detention sites," despite acknowledging that "it may be true that CBP did not initially *intend* for these locations to become" detention sites and CBP did not actually hold anyone in detention at the sites. ECF No. 1406 at 9.

This Court has also tried to prohibit the use of FRCs because they are not state-licensed, even though state-licensing of those facilities is in most cases literally impossible and not legally necessary. *See Flores*, 394 F. Supp. 3d at 1069. It is well settled under the intergovernmental-immunity doctrine that "the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943); *see also Trump v. Vance*, 591 U.S. 786, 829–31, 831 n.5

(2020) (Alito, J., dissenting) (collecting cases showing that "two centuries of case law prohibit the States from taxing, regulating, or otherwise interfering with the lawful work of federal agencies, instrumentalities, and officers"). It follows that immigration detention should not be required to be governed by state-licensing standards.

This Court also has stretched the FSA to dictate how the Government may implement the immigration-detention statutes. It required the Government to show that it detains families only for the amount of time needed to expeditiously screen family members for reasonable or credible fear, a requirement absent in any statute, *Flores*, 394 F. Supp. 3d at 1070. It placed temporal limits on times in custody irrespective of the Government's enforcement needs, *see* ECF No. 833 at 3 (requiring ICE to release children detained at FRCs for more than 20 days), *modified*, ECF No. 1024. Likewise, although the expedited-removal statute does not require an individualized assessment of release for accompanied children placed in expedited removal, this Court ordered the government to individually assess those accompanied children for release where federal law does not permit release. *Flores*, 394 F. Supp. 3d at 1066–67; *Flores v. Barr*, 934 F.3d 910, 916–17 (9th Cir. 2019); ECF No. 784 at 16. In addition, though the FSA explicitly grants flexibility to the government during times of influx, this Court has rendered that flexibility illusory. *See*, *e.g.*, *Flores*, 212 F. Supp. 3d at 916 ("Defendants shall not selectively apply the "influx" provision . . . ."). Although reversed by the Ninth Circuit, this Court sought to expand the FSA to require the government to release parents from immigration

detention. *See Flores v. Lynch*, 212 F. Supp. 3d 907, 916–17 (C.D. Cal. 2015), *aff'd in part, rev'd in part*, 828 F.3d 898.

Beyond dictating how the Government must enforce the immigration-detention statutes, this Court also has overridden the agencies' expert judgments regarding the actions necessary to protect class members and the community. This Court prohibited ORR from placing children in particular secure facilities based on gang affiliation. ECF No. 470 at 19–20. This Court further ordered ORR to stop its uniform requirement that post-release services be in place in the community before releasing a child to a sponsor. *Id.* at 30. It ordered ORR to cease elevating release decisions to the ORR Director or his designee, for children previously placed in restrictive settings. *See id.* at 29. It further ordered Defendants to transfer all class members out of residential-treatment centers "unless a licensed psychologist or psychiatrist has determined or determines that a particular Class Member poses a risk of harm to self or others." *Id.* at 14. And, during the COVID-19 pandemic, this Court required ORR to release children to sponsors without conducting the fingerprint-background checks that ORR believed necessary to address "the dangers" inherent to releasing unaccompanied youth to "improperly vetted sponsor[s]." ECF No. 784 at 11–12; *see also* ECF No. 833 at 5 ("ORR shall review and amend its fingerprinting policy to provide for a less onerous chain of approvals or show cause to this Court why the policy, as written, is imperative[.]"). More broadly, during the pandemic, this Court interpreted the FSA to afford it greater authority to "require heightened inspections" of government facilities and to require the release of class members. ECF No. 740 at 9, 11.

By engaging in such wide-ranging management of Executive agencies, this Court has exceeded the Constitutional limits on the judicial role. The FSA's general terms and expansive interpretations have encouraged Plaintiffs' systemic challenges, seeking "*wholesale* improvement . . . by court decree"—"properly matters that should be pursued in the 'offices of the Department[s] [of Homeland Security and Health and Human Services] or the halls of Congress, where programmatic improvements are normally made.'" *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1011 (9th Cir. 2021) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990)). Plaintiffs' counsel may "think that the third branch is more convenient or accessible," but the traditional, customary mode of operation of the courts—consistent with Article III—is limited to controversies reduced to more manageable proportions. *Id.* at 1012; *see Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 841 (1994) (Scalia, J., concurring) (equitable courts historically lacked jurisdiction to require performance of anything "'more than a single affirmative act'" and did not "issue" relief "that required ongoing supervision"). This Court, by contrast, has exercised general supervisory authority over the federal-immigration agencies and directed changes by the agencies through court decree.

This Court has often characterized its longstanding and increasingly intrusive interference as mere enforcement of the FSA. *See*, *e.g.*, *Flores*, 407 F. Supp. 3d at 928. But the "Constitution's division of power among the three branches is violated where one branch invades the territory of another, whether or not the encroached-upon branch approves the encroachment." *New York v. United States*, 505 U.S. 144,

39

182 (1992). And the FSA "is no ordinary contract," because it is now effectively open-ended and, as interpreted in response to Plaintiffs' insistence, "it requires continuing supervision by the district court." *Evans v. City of Chicago*, 10 F.3d 474, 477–78 (7th Cir. 1993) (en banc) (plurality opinion). Indeed, in its recent ruling concerning termination of the FSA as to HHS, this Court concluded that it "also retains jurisdiction to modify the [FSA] or this Order should further changed circumstances necessitate"—essentially retaining never-ending jurisdiction over the FSA. ECF No. 1447 at 20. This Court's "decrees implicate the citizenry's interests as well as those of the parties and bear directly on the salubrious operation of public institutions." *In re Pearson*, 990 F.2d 653, 658 (1st Cir. 1993); *see Rufo*, 502 U.S. at 381 (noting that consent decrees "reach beyond the parties involved directly in the suit and impact on the public's right to the sound and efficient operation of its institutions" (quoting *Heath v. De Courcy*, 888 F.2d 1105, 1109 (6th Cir. 1989)).

For these reasons, "[c]onsent alone is insufficient to support a commitment by a public official that ties the hands of his successor." *Evans*, 10 F.3d at 478; *see David B. v. McDonald*, 116 F.3d 1146, 1150 (7th Cir. 1997) ("[I]in a democracy the people may vote out politicians whose acts displease them, and elect new representatives who promise change."); *cf. Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 497 (2010) ("Perhaps an individual President might find advantages in tying his own hands . . . He cannot, however, choose to bind his successors by diminishing their powers . . ."). As the D.C. Circuit has explained, there are "potentially serious constitutional questions about the power of the Executive Branch to restrict its exercise of discretion by contract with a private

40

party." *Nat'l Audubon Soc., Inc. v. Watt*, 678 F.2d 299, 301 (D.C. Cir. 1982). Thus, the government's consent to the FSA 28 years ago—*i.e.*, five Presidential Administrations ago—does not render lawful the breach of the separation-of-powers that the FSA continues to impose.

In addition, institutional-reform decrees, such as the FSA, may not exist in perpetuity because they remove authority from the elected branches of government to the judicial branch. In *Horne*, the Supreme Court expressed concern that "[i]njunctions of this sort bind state and local officials to the policy preferences of their predecessors and may thereby improperly deprive future officials of their designated legislative and executive powers." 557 U.S. at 449 (internal quotations and citation omitted). The Supreme Court therefore criticized the lower courts for failing to consider "whether, as a result of important changes during the intervening years, the State was fulfilling its obligations under the [law] by other means." *Id.* at 439. And the Court went on to observe that a "flexible approach" to modifying such consent decrees allows courts to "ensure that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant." *Id.* at 450 (quotations and citations omitted).

Focusing on the terms of the original injunction, instead of the underlying federal law, causes the court to "improperly substitute[] its own educational and budgetary policy judgments for those of the state and local officials to whom such decisions are properly entrusted." *Id.* at 455. To avoid this danger, courts must consider "whether ongoing enforcement of the original order [is] supported by an ongoing violation of federal law." *Id.* at 454. If the government has implemented a

41

"durable remedy," judicial oversight should cease. *Id*. at 450. Additionally, "federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate [federal law] or does not flow from such a violation." *Id.* (alteration in original) (citation omitted); *see also United States v. Washington*, 573 F.3d 701, 710 (9th Cir. 2009) ("The [Supreme] Court has repeatedly reminded us that institutional reform injunctions were meant to be temporary solutions, not permanent interventions, and could be kept in place only so long as the violation continued."); *Evans*, 10 F.3d at 480 ("[E]ntry and continued enforcement of a consent decree regulating the operation of a governmental body depend on the existence of a substantial claim under federal law.").

Here, the FSA and its enforcement by this Court implicate each of the Supreme Court's concerns in *Horne*. The FSA raises sensitive separation-of-powers concerns and involves immigration and foreign policy—areas of core Executive Branch responsibility. For nearly three decades, the FSA has improperly divested Executive Branch officials of their full legitimate policymaking powers. Even if concerns about violations of the Constitution existed in 1997, the agencies have addressed them by promulgating regulations that far exceed the constitutional floor. *See generally* 2019 Rule; Foundational Rule; *see also* Ex. D (describing further updates to ORR's UAC Policy Guide to establish policies consistent with the court's June 28, 2024 order as to HHS). Indeed, the Supreme Court found that the former INS's *1988 Rule* did not violate alien minors' substantive or procedural due process rights. *Flores*, 507 U.S. at 315. So the FSA is in many respects void *ab initio*.

42

But, despite its manifold actions to enforce the FSA over the last twenty-eight years, this Court has not analyzed "whether ongoing enforcement of the original order [is] supported by an *ongoing violation of federal law*" for decades now. *Horne*, 557 U.S. at 454 (emphasis added). Nor has it asked whether its enforcement of the FSA is inhibiting the legitimate policymaking discretion of the Executive Branch in immigration matters where the federal government must be able to adapt to changing circumstances. *See Mathews*, 426 U.S. at 81; *Flores*, 507 U.S. at 305. This Court instead has been zealously focused on the original terms of the FSA. This incorrect focus (*Horne*, 557 U.S. at 455) has frozen federal officials' ability to address and respond to a series of immigration crises since 2014, contributing substantially to the intolerable situation on the Southern Border.

The Court should thus dissolve the FSA because it is precisely the type of institutional-reform injunction that the Supreme Court cautioned against: it prevents the government from exercising its constitutional powers to develop new policies to address the changes in immigration to the United States. The FSA divests the Executive of its power to respond to new situations and foreign-relations concerns and transfers that power to the Judiciary, which is not equipped to change nor responsible to the public for its failures.

Moreover, the public interest is not served by permitting the unelected class counsel to wield litigation to facilitate this Court's indefinite supervision of the American immigration system, which involves multiple agencies, hundreds of thousands of class members, and vast taxpayer resources. This Court should end its

1    superintendence of this aspect of immigration policy and return responsibility for

2    determining and executing immigration policy to the political branches.

3        **2. Enforcing the FSA Is Inequitable Because It Prescribes the**

4           **Substantive Result of Agency Rulemaking**

5        In addition to exceeding a proper judicial role, the FSA impermissibly

6    mandates the substantive results of agency rulemaking. Paragraph 9, which requires

7    the Government to "publish the relevant and substantive terms of this Agreement as

8    a Service regulation," and Paragraph 40, which provides the termination of the FSA

9    after publishing such regulations, create an obligation that exceeds the Executive

10    Branch's authority to bind successors.

11        In 2019, the government published regulations to set forth a nationwide policy

12    addressing the custody and care of children in immigration custody. *See* 2019 Rule,

13    84 Fed. Reg. 44,392. This was performed consistently with the government's

14    understanding that the FSA required it to engage in a rulemaking process regarding

15    the treatment of detained minors—but not that the FSA required any foreordained

16    result. ECF No. 639 at 26, 46–51.

17        This Court disagreed. It interpreted Paragraphs 9 and 40 of the FSA to mean

18    that the final regulations must match *exactly* the substantive terms of the FSA—as

19    well as this Court's subsequent interpretation of those terms. *See Flores*, 407 F.

20    Supp. 3d at 925 ("Since '[c]onditions subsequent are not favored by the law, and are

21    construed strictly,' and the New Regulations do not codify numerous relevant and

22    substantive terms of the *Flores* Agreement, the *Flores* Agreement remains fully

23    intact." (alteration in original) (quoting 17A C.J.S. *Contracts* § 451 (2019))). As

44

interpreted by this Court in 2019, the FSA requires any future Executive Branch officials to adopt the specific policies in the FSA that were agreed to by the Clinton Administration over 25 years ago. Even more concerning, this Court suggested in 2024 that the FSA could continue to bind agencies' policy choices forever, even *after* the publication of consistent regulations and the Agreement's termination. *Id.* ("The Court's termination of the FSA as to HHS is therefore *conditional* on there not being a recission of those regulations, such as the Foundational Rule, in a manner inconsistent with the FSA.") (emphasis added). Consequently, if voters express a preference for an alternative, they are without recourse. Voters' preferences and the sovereign interests of the Executive are irrelevant. That is no way to run a democracy.

Despite HHS's publication of regulations implementing the FSA, this Court retained jurisdiction "to modify the Agreement or this Order should further changed circumstances necessitate, to ensure that the Rule faithfully implements the FSA as the parties originally contemplated." *Id.* Thus, this Court interpreted the FSA to require the government to engage in rulemaking with a preordained result, and to bind the government to that result in perpetuity.

Requiring the agencies to adopt a substantive policy through rulemaking when the agency has legitimate policymaking discretion to make other policy choices exceeds the judicial role. "[C]ourts cannot invade the jurisdiction of the other departments of government in matters of policy, and for a court to substitute its judgment or discretion for that of a member of the executive branch of government would amount to such an invasion." *Huntt v. Gov't of Virgin Islands*, 382 F.2d 38,

45

45 (3d Cir. 1967). As a general matter, courts considering whether to ratify consent decrees have been careful to emphasize that a permissible decree does not mandate the substantive result of any subsequent rulemaking. *See Housatonic River Initiative v. EPA*, 75 F.4th 248, 267–68 (1st Cir. 2023) ("Importantly, as the Petitioners concede, the Settlement did not legally constrain the EPA in deciding what provisions to include in the final permit."); *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1121, 1129 (D.C. Cir. 1983) (holding that a consent decree was permissible when it "did not specify the substantive result of any regulations EPA was to propose" and did not "prescribe the content of the regulations"). Under its interpretation of the FSA, this Court has forced the agencies to adopt a specific substantive rule or else forever be subject to this Court's jurisdiction and management. This Court, however, has no authority to exercise such control.

Mandating the substantive result of rulemaking through a settlement also violates the APA, which renders prospective application of the FSA inequitable and contrary to the public interest. Section 4 of the APA, 5 U.S.C. § 553, prescribes a three-step procedure for "notice-and-comment rulemaking." First, the agency must issue a "[g]eneral notice of proposed rule making." *Id.* § 553(b). Second, after the required notice, the agency must "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c). "An agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see Dep't of Com. v. New York*, 588 U.S. 752, 773 (2019) (agencies "examine[] 'the relevant data' and articulate[] 'a satisfactory

46

explanation' for [the] decision, 'including a rational connection between the facts found and the choice made'" (citation omitted). Third, when promulgating the final rule, the agency must include in the rule's text "a concise general statement of [its] basis and purpose." 5 U.S.C. § 553(c).

"The process of notice and comment rule-making is not to be an empty charade." *Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 528 (D.C. Cir. 1982). Interested parties must have the opportunity "to participate in a meaningful way in the discussion and final formulation of rules." *Id.* Therefore, APA rulemaking does not permit a contractual agreement to preordain any specific outcome. Indeed, "a binding promise to promulgate [final regulations] in the proposed form would seem to defeat Congress's evident intention that agencies proceeding by informal rulemaking should maintain minds open to whatever insights the comments produced by notice under § 553 may generate." *NRDC v. EPA*, 859 F.2d 156, 194 (D.C. Cir. 1988).

Likewise, the Ninth Circuit has held that a court must not enter or enforce a consent decree that would require an agency to violate "procedural requirements" for rulemaking set by statute. *Conservation Nw.*, 715 F.3d at 1186. In *Conservation Northwest*, the Ninth Circuit considered "whether a district court may approve resolution of litigation involving a federal agency through a consent decree, which substantially and permanently amends regulations that the agency could only otherwise amend by complying with statutory rulemaking procedures." *Id.* at 1183. The Ninth Circuit held that the district court had abused its discretion by approving

1    that kind of consent decree, which "impermissibly conflicts with laws governing the

2    process for such amendments" to the regulations. *Id.* at 1189.

3         Here, as interpreted by this Court, the FSA requires the agencies to close their

4    eyes to alternatives and to adopt the provisions of the FSA in the final rule without

5    regard to any comments received, changed circumstances since 1997, or new policy

6    insights. *See* FSA ¶ 9 ("The final regulations shall not be inconsistent with the terms

7    of this Agreement."). If the government were to engage in rulemaking while

8    irrevocably committed to those specific terms, the final rule would be subject to

9    challenge for failing to comply with the APA's rulemaking process. Thus, the FSA

10   is improper because it "impermissibly conflicts with laws governing the process" for

11   rulemaking. *Conservation Nw.*, 715 F.3d at 1189. The Executive officials did not

12   have the authority to agree to the FSA as so interpreted, *see Carpenter*, 526 F.3d at

13   1242, and consequently this Court does not have the authority to enforce the FSA

14   prospectively, *see Conservation Nw.,* 715 F.3d at 1185.

15        The judicial involvement in this case has been excessive and has continued

16   for too many years. Therefore, prospective application of the FSA is not equitable.

17   This Court should grant this request for relief under Rule 60(b)(5) and terminate the

18   FSA. In the alternative, this Court should grant relief from judgment under Rule

19   60(b)(6) because this case presents the kind of "extraordinary circumstances" that

20   cause injustice to the parties and risk "undermining the public's confidence in the

21   judicial process." *Buck*, 580 U.S. at 123.

22

23

48

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**B. Termination of the Consent Decree Is Warranted Due to Changes in Factual and Legal Circumstances**

The Executive Branch and its agencies must respond to changes in immigration trends and foreign relations to effectively administer and enforce the immigration laws. But the FSA prevents the Executive from exercising this authority. Refusing to terminate the FSA despite the changes in immigration priorities and migration influxes "insulate[s] the policies embedded in the order . . . from challenge and amendment" merely because it was written as a consent decree rather than a regulation. *See Horne*, 557 U.S. at 453. Dramatic changes in migration trends, foreign policy, and immigration priorities counsels against continued judicial enforcement of the FSA. DHS's 2019 regulations address many of these changes and fully respect the constitutional and statutory rights of alien minors, and they should control.

Current immigration policies to limit unlawful entry further justify termination of the FSA. Immigration policy by definition involves "changing political and economic circumstances," making it particularly appropriate for political maintenance and control. *Mathews*, 426 U.S. at 81. A "significant change" in factual circumstances or law "renders continued enforcement of the judgment detrimental to the public interest." *Horne*, 557 U.S. at 453 (citation omitted). And such significant changes in circumstances are present here.

The number of children crossing or attempting to cross the Southwest border rose to unprecedented numbers in FY2024, and the FSA hamstrung the government

49

in addressing this catastrophic illegal migration.[13] In FY2024, the total number of family-unit apprehensions at the Southwest border was 555,578 (Ex. A ¶ 8)—compared to 473,682 in FY2019, when this Court last considered the government's motion to modify the FSA—a nearly 40% increase in family-unit apprehensions when reported on an annual basis.[14] Likewise, UAC crossings have increased: in FY2023, the total number of UAC apprehensions at the southwest border was 131,519, and in FY2024, almost 100,000, compared to 76,020 in FY2019. Ex. A ¶ 8; Ex. H. The surge in border encounters of accompanied and unaccompanied minors undermines the ability of DHS to comply with the FSA. Ex. A ¶¶ 16-18, 32-34.

In considering termination of the FSA, the relevant timeline is the change from when the FSA was entered. The border situation is nothing like what it was in 1997. In the 1990s, INS encountered 7,000 to 8,000 alien minors each year at the border. Ex. D-1 at 1. Given the stability in alien-minor entries during the 12 years of litigation, the parties reasonably agreed that an "influx" occurred when the INS had more than 130 minors in its custody. FSA ¶ 12A. These numbers demonstrate the stark contrast between the situation today and the situation in 1997, when the FSA

---

[13]     The government recognizes that this Court has previously found that these changes in the landscape of immigration are not significant enough, on their own, to warrant termination or amendment of the FSA, ECF Nos. 177, 455. But border encounters are constantly evolving, and spikes in encounters that overwhelm the agencies and prevent faithful enforcement of the immigration statutes are important changes in circumstances that the Court should consider.  Ex. A ¶¶ 7, 8, 14-18.

[14]     *See* CBP, Southwest Border Migration FY2019, https://www.cbp.gov/newsroom/stats/sw-border-migration/usbp-sw-border-apprehensions-fy2019 (updated Nov. 3, 2023) (viewed May 20, 2025), attached as Ex. H.

was entered. Nothing in the FSA suggests that the parties anticipated that the government would eventually encounter hundreds of thousands or even tens of thousands of alien minors per year. The antiquated FSA simply does not account for today's border encounters and need for placements.

Mandating continued adherence to the obsolete FSA is particularly inequitable because—as the Ninth Circuit has expressly recognized—the FSA "does not address the potentially complex issues involving the housing of family units and the scope of parental rights for adults apprehended with their children." *Flores*, 828 F.3d at 906. Nevertheless, even though the FSA never contemplated regulation of *accompanied* children, this Court has relied upon the FSA to dictate national policy for them for the last decade. Imposing regulations on the custody of children with their parents or legal guardians, while admittedly blind to their distinct needs and interests—and those of their parents and legal guardians—is fundamentally inequitable.

Further, the changed conditions of confinement warrant the termination of the FSA, or at the very least the FSA provisions related to custody conditions. In years leading up to the FSA, alien minors detained in INS facilities had "virtually no access to health care or personal counseling[,] no access to formal education . . . [and] little access to attorneys, telephones, or other means to prepare their legal cases." Michael A. Olivas, Unaccompanied Refugee Children: Detention, Due Process, and Disgrace, 2 Stan. L. & Pol'y Rev. 159, 160 (1990); *see generally* Compl. The original challenge in this case was to the conditions of UAC confinement—Plaintiffs alleged that their detention violated their due-process right because they: (1) did not

51

receive any educational materials; (2) did not have access to medical or mental-health care; (3) lacked access to phones and could not communicate with family members or attorneys; (4) received zero recreation time; (5) were denied family visitation; (6) were subject to strip searches; (7) were held with unrelated adults; and (7) could not be released from these conditions unless a parent or legal guardian submitted to an interrogation. *See generally* Compl. It is undeniable that conditions have drastically improved.

Under the HHS's and DHS's own policies and regulations, the agencies provide all the relief originally sought in the complaint to the extent permitted by law. Alien minors receive formal education, have routine access to doctors, dentists and psychologists, and have access to regular phone calls to talk to family and attorneys. *See* 8 C.F.R. § 236.3(i)(4); 45 C.F.R. §§ 410.1302, 410.1307, 410.1309; FRS § 4.3. They have food menus designed by dieticians, access to showers, clean clothing, toys, television, recreation time, and more. *See* 8 C.F.R. § 236.3(i)(4); 45 C.F.R. 410.1302; FRS § 4.1. Strip searches are prohibited, and minors are no longer held with unrelated adults. 8 C.F.R. § 236.3(g); 6 C.F.R. §§ 115.10-95, 115.110-195; TEDS §§ 3.0, 4.0; FRS § 2.6-2.7. As to UACs, HHS releases minors without unnecessary delay to a vetted sponsor—who need not be a parent or legal guardian—so long as release from detention is permitted by statute and does not present a danger to the minor or to others and the minor is not a flight risk. 45 C.F.R. § 410.1201. Because the government's custody regulations and policies now provide the precise relief sought in the original complaint, judicial oversight is no longer equitable. *Horne*, 557 U.S. at 466.

The FSA has thus warped federal policy in a manner that few could defend: even though its terms were admittedly set without ever *considering* the unique issues presented by accompanied children, it nonetheless has dictated national policy concerning them. It does a profound disservice to those children and their parents and legal guardians to saddle them with policies that were designed without any consideration of their actual needs. Continued application of such unreasoned policy is not remotely equitable.

It also does a profound disservice to those who may be harmed by illegal aliens. In January 2025, Congress and President Trump recognized this harm by enacting the Laken Riley Act. The FSA, as amended in 2001, could not have considered such an Act. Now, DHS could be sued because it decides to release an illegal alien subject to mandatory detention. The FSA does not permit DHS the flexibility to ensure compliance with this new statute.

As the Supreme Court recognized in *Horne*, where officials "inherit overbroad or outdated consent decrees that limit their ability to respond to the priorities and concerns of their constituents, they are constrained in their ability to fulfill their duties as democratically-elected officials." *Horne*, 557 U.S. at 449. The FSA, however, is an inherently overbroad and outdated consent decree that has constrained subsequent administrations from responding to continuous surges in family-unit apprehensions. Even though the FSA is silent about family detention or release provisions for accompanied minors, this Court has interpreted the FSA to provide the same rights of release to accompanied minors as UACs, even though their parents and guardians were not subjects of the FSA. *See supra*, section II.B.

53

As of March, 2025, DHS has re-instituted FRCs, which will house accompanied minors and their accompanying family members, to ensure proper custodial conditions for family units who are subject to detention and to ensure the United States retains its ability to enforce immigration laws. Ex. F ¶ 13. These FRCs are necessary to ensure that DHS can comply with the mandatory-detention authorities, as well as keep families together while they await a decision on their immigration proceeding. *Id.* ¶¶ 15, 29.

The FRCs are also preferable compared to keeping families in CBP custody while they await a decision in their immigration proceedings, as the FRCs have more amenities and are better equipped for longer-term detention. *See* Ex. A ¶¶ 17, 56 (stating that CBP facilities are not designed for long-term care). When FRCs are unavailable, CBP must house families in facilities that are not designed for long-term detention and lack the amenities of FRCs. To avoid detaining family units at CBP facilities during their immigration proceedings—while also allowing the government to comply with the mandatory-detention statutes—this Court should terminate the FSA and permit the previously enjoined DHS regulations to go into effect so that DHS can utilize FRCs.

The FSA as interpreted by this Court and the Ninth Circuit would require DHS to present parents and/or legal guardians of accompanied minors with a binary choice to either waive the child's right to be released under the FSA or waive her parental right and permit her child to be temporarily released to someone else's care and custody. While holding accompanied children in immigration detention may contravene the FSA, it is consistent with the detention statutes and does not violate

class members' due process rights or any other federal law. *Flores*, 507 U.S. at 302, 309, 315. Given the reopening of FRCs that are equipped to hold children and families, this change in factual circumstance warrants the termination of the FSA provisions related to release.

## CONCLUSION

For the foregoing reasons, Defendants request that this Court terminate the FSA as to all Defendants and dissolve this Court's injunction of DHS's regulations for apprehension, processing, care, and custody of alien minors, ECF No. 690.

DATED: May 21, 2025

Respectfully submitted,

YAAKOV ROTH
Acting Assistant Attorney General
DREW C. ENSIGN
Deputy Assistant Attorney General
Civil Division
WILLIAM C. SILVIS
Assistant Director

*/s/ Katelyn Masetta-Alvarez*
KATELYN MASETTA-ALVAREZ
CHRISTINA PARASCANDOLA
MICHAEL CELONE
Senior Litigation Counsel
JOSHUA C. MCCROSKEY
Trial Attorney
United States Department of Justice
Office of Immigration Litigation – General
Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
202-514-0120
Katelyn.Masetta.Alvarez@usdoj.gov

*Attorneys for Defendants*

56

## **CERTIFICATE OF SERVICE**

I certify that on May 22, 2025, I served a copy of the foregoing pleading on all counsel of record by means of the District Court's CM/ECF electronic filing system.

/s/ Katelyn Masetta-Alvarez
Senior Litigation Counsel
U.S. Department of Justice
Office of Immigration Litigation

## **CERTIFICATE OF COMPLIANCE**

I certify that this brief contains 14,883 words. Defendants have filed concurrently with this motion an ex parte application for leave to file an oversized memorandum of points and authorities not to exceed 15,000 words.

*/s/ Katelyn Masetta-Alvarez*
Senior Litigation Counsel
U.S. Department of Justice
Office of Immigration Litigation