# Exhibit A

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

Jenny Lisette Flores, *et al.,*

Plaintiffs,

v.

Pamela Bondi, Attorney General of the United States, *et al.*,

Defendants.

Case No. 2:85-cv-04544-DMG

District Judge Dolly M. Gee

## DECLARATION OF JOHN MODLIN

I, John Modlin, pursuant to 28 U.S.C. § 1746, and based upon my personal knowledge and information made known to me from official records and reasonably relied upon in the course of my employment, relating to the above-captioned matter, hereby declare as follows:

1.     I currently serve as the Acting Deputy Commissioner of U.S. Customs and Border Protection (CBP). I have held this position since on or about December 29, 2024. On October 20, 2024, I was appointed to the position of Chief Operating Officer of CBP. Prior to this role, I served as the Chief of the United States Border Patrol, Tucson Sector. I have also previously served as Chief of the U.S. Border Patrol, Miami Sector. I have served in the U.S. Border Patrol since 1995. In my career I have also held numerous positions at CBP headquarters and in the field, including Senior Patrol

Agent, Supervisory Border Patrol Agent, Assistant Chief Patrol Agent, Patrol Agent in Charge, Deputy Chief Patrol Agent, and Operations Officer.

2.    In my role as Acting Deputy Commissioner, I am the agency's senior career official, working closely with the Acting Commissioner to ensure that CBP's mission of protecting the United States' borders is carried out effectively in partnership with other federal, state, local, and foreign entities.

3.    In my role as Chief Operating Officer, I ensure that the frontline is equipped with the personnel, tools, and information that are needed, improving the agency's collective capacity to adapt and respond to an ever-changing environment.

4.    I am familiar with the 1997 *Flores* Settlement Agreement (FSA), including the requirement that juveniles be held in facilities that are safe and sanitary; the requirement that juveniles be provided access to food, drinking water, toilets, sinks, medical care, and adequate ventilation; and that CBP monitor its own compliance with these terms. I am aware that according to orders from the courts in the *Flores* litigation, the FSA applies to all juveniles, regardless of whether they are accompanied by adult family members.

5.    CBP's central mission is to facilitate the flow of legal immigration and trade while preventing the illegal smuggling and trafficking of people and contraband. With respect to border management and control, CBP takes a comprehensive approach, coordinating activities in customs, immigration, border security, and

agricultural protection. CBP's mission is extremely complex, requiring CBP to balance many seemingly competing priorities. Among other things, CBP is responsible for securing the border while promoting lawful trade and travel, including: facilitating the entry of individuals authorized to enter the country; apprehending those who use unlawful means to enter or are otherwise inadmissible; aiding other law enforcement agencies to disrupt and dismantle transnational criminal organizations; referring instances where individuals may have been victims of trafficking to U.S. Immigration and Customs Enforcement (ICE); providing emergency assistance to persons in distress; intercepting illicit drugs and weapons, as well as agricultural and floral pests; identifying individuals with suspected national security concerns; and conducting operations at CBP's 328 ports of entry (POEs) and 131 Border Patrol stations.

6.    CBP maintains data and information in its systems of record regarding encounters, processing, dispositions, custody activities, and amenities, among other things. In the course of my job, I rely on data and information pulled from our systems of record and provided to me in regular reporting and upon request. I understand that data provided to me is generally pulled from live CBP systems and data sources, and may be subject to change due to corrections, systems changes, changes in data definition, additional information, or encounters pending final review. Encounter data in this declaration was pulled from CBP systems and is accurate as of the time it was

provided to me and added to this declaration. Recent CBP statistics for encounters on the Southwest land border may be found here:

https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

### The United States Border Patrol

7.      Border Patrol is a component of CBP and is responsible for securing U.S. borders between POEs. This includes the 6,000 miles of Mexican and Canadian international land borders and 2,000 miles of coastal waters surrounding the Florida Peninsula and the island of Puerto Rico. Border Patrol agents work around the clock in all types of terrain and weather conditions and in many isolated communities throughout the United States. There is no typical day for Border Patrol; rather, Border Patrol apprehension rates can vary widely depending on a number of factors, the vast majority of which are outside the control of CBP or Border Patrol. Over the past few years daily apprehensions have been as high as 10,844 on December 18, 2023, and as low as 171 on March 16, 2025.

8.      Moreover, the demographics of aliens crossing the Southwest border have changed substantially over the past decade. For example, in FY2013 the number of individuals apprehended by Border Patrol crossing the Southwest border who were members of family units was 14,855. In FY2022 that number was 482,962, in FY2023 it was 621,311, and in FY 2024 it was 555,578. The numbers of Border Patrol encounters of unaccompanied alien children (UACs) also are significant in recent

years, with 149,093 in FY2022, 131,519 in FY2023, and 99,704 in FY2024. More recently, the numbers of encounters along the Southwest border have decreased, but they remain higher than they were in the early 1990s. Since the beginning of FY2025, as of the date of this declaration, Border Patrol has had 22,662 encounters with UACs, and 50,662 with individuals in family units.

<u>Border Patrol Apprehension and Processing for *Flores* Class Members</u>

9.      Once a Border Patrol agent encounters an individual the agent believes to be unlawfully present, the agent will first establish alienage and determine if the individual is a minor. If the individual presents signs of an emergent medical issue, the Border Patrol agent will render first aid, if necessary, and coordinate transportation of that individual to the appropriate medical center (likely, the closest available hospital).

10.     Once initial questioning is completed in the field, aliens will be brought to a Border Patrol station for further processing. Once aliens are in custody at a Border Patrol facility, Border Patrol agents collect biographic and biometric information from certain aliens and conduct records checks through CBP and other law enforcement systems. Agents also question aliens individually on issues related, for instance, to their biometric and biographic results, ability to lawfully enter or remain in the United States, and fear of returning to their country of origin.

11.     When a child is apprehended, the Border Patrol agent will process the child and complete steps to document the apprehension. For instance, the Border Patrol

agent may use a form related to screening required under the Trafficking Victims Protection and Reauthorization Act (TVPRA) or a sworn statement for certain children being placed in removal proceedings before an immigration judge. All children are provided an I-770, Notice of Rights.

12.    If the child appears unaccompanied, the agent will ask further questions to determine if the child is an "unaccompanied alien child" or UAC. UACs are processed pursuant to special procedures established by Congress in 2008 through the TVPRA. The TVPRA places specific restrictions on the manner in which UACs may be processed. With respect to a UAC, Border Patrol agents screen the child to determine, among other things, whether he or she has a fear of return to his or her country of origin or has been a victim of a severe form of trafficking in persons. If the child is from Mexico or Canada, does not have protection concerns, and is capable of making an independent decision to withdraw his or her application for admission to the United States, the child may be allowed to withdraw the application for admission. Where DHS seeks to remove a UAC, it must initiate removal proceedings under 8 U.S.C. § 1229a, as UACs are not subject to expedited removal or other streamlined removal processes.

13.    UACs who are placed in removal proceedings are transferred to the custody of the Department of Health and Human Services (HHS) within 72 hours after they are identified as being unaccompanied. In some cases, however, a child cannot

be transferred to HHS immediately-such as when HHS does not have any immediately available bed space. In such cases, Border Patrol will continue to provide care to the child until HHS can accept custody.

14.     Children who are determined to be accompanied by their parents or legal guardians (accompanied children) are processed under the Immigration and Nationality Act, including voluntary return, expedited removal (including, where appropriate, referral for a credible fear determination), placement of the child (usually with his or her family) into removal proceedings under 8 U.S.C. § 1229a by issuing a Notice to Appear (NTA), or, in limited instances, parole or reinstatement of a prior removal order.

15.     Border Patrol normally seeks to transfer to ICE all aliens in its custody who cannot be immediately repatriated, rather than releasing aliens directly from its custody. *See, e.g.,* Securing Our Borders, Executive Order No. 14165 (January 20, 2025) (ending catch and release policy); Memorandum from Pete Flores, Senior Official Performing the Duties of the Commissioner, "Ending Catch and Release" (January 20, 2025). Border Patrol, however, has been forced to release families directly when border apprehensions have outpaced DHS's available family detention, processing and transportation capacity.

16.     From 2021 to 2024, USBP facilities faced significant increases in individuals in custody which required USBP to take major mitigating steps. For

example, USBP erected Soft Sided Facilities in 7 Southwest Border Sectors: San Diego, Tucson, Yuma, El Paso, Del Rio, Laredo, and Rio Grande Valley. USBP also entered into transportation contracts (including air and bus) to transfer aliens to other facilities consistent with capacity limitations and custodial requirements. USBP met the overwhelming strain on its law enforcement resources on the Southwest border by using Data Entry Initiative contractors, Border Patrol Processing Coordinators, temporary duty assignments from Northern Border sectors, the DHS Volunteer Force, and requests for assistance from numerous other government agencies, among other efforts, to ensure adequate processing of aliens in custody. Even with this significant increase in resources, Border Patrol was forced to release people from custody when the strain on its resources became too great. This was particularly true for family units who could not be transferred to ICE because ICE did not have any family residential centers during that time period.

17.    Border Patrol facilities are designed to be short-term holding facilities for processing aliens before they are transferred to ICE, HHS, or another agency as appropriate, voluntarily returned if from a contiguous country, or released as appropriate. They are not designed for long-term care and detention. Every effort is made to hold detainees for the least amount of time required to process, transfer, or remove those in custody as promptly as is appropriate and operationally feasible.

18.    A recent *Flores* court decision held that children who were waiting

outdoors in open air congregation areas for pickup by Border Patrol would be considered in Border Patrol custody if Border Patrol agents directed them to certain areas to wait for transport to Border Patrol facilities, thus triggering the requirements of the FSA. Because Border Patrol cannot provide all the amenities required by the FSA to minors waiting outside in open air congregation areas, Border Patrol had to limit its engagement with aliens it encountered in these locations to avoid triggering the FSA requirements. The court order thus complicated Border Patrol's ability to bring aliens quickly and safely into Border Patrol facilities for processing. To my knowledge the issue of aliens congregating in outdoor areas for pickup by the Immigration and Naturalization Service (INS) was not a challenge that existed in 1997.

<u>Custody Conditions in Border Patrol Facilities</u>

19.    Because the apprehension rates for Border Patrol can vary widely, over the years Border Patrol has developed custody practices that are adaptable and scalable to ensure the provision of safe, secure, and clean facilities to process detainees regardless of the number of aliens being held in Border Patrol custody and what types of facilities it is using for custody. Border Patrol also complies with the requirements of CBP's National Standards on Transport, Escort, Detention and Search (TEDS Policy) as they pertain to detention conditions for minors.

20.    Detainees held in Border Patrol custody are normally separated for safety and security reasons based on factors such as age and sex and whether they claim to

be in a family unit. Where operationally feasible, children are separated by both age and sex and adults are separated by sex. Unaccompanied children should not be held with adults who are not related to them. Separation of families, while being held in a Border Patrol facility, is sometimes required in order to ensure the safety and security of all those being held in custody by Border Patrol. Normally, for example, groups of teenage boys and girls are segregated and placed in separate rooms. However, every effort is made to keep young children with their parents. Whenever operationally feasible, unaccompanied juvenile siblings should not be separated unless separation is deemed necessary for safety purposes. Moreover, Border Patrol agents provide opportunities for contact between family members who may be separated while in the facility for at least one hour every twenty-four hours. These visits are tracked in the system of record.

21.    Traditionally, Border Patrol has held detainees in Border Patrol stations. The stations have limited available space, but Border Patrol nonetheless prioritizes children and ensures that all children in custody are provided with the amenities necessary to ensure safe and sanitary conditions.

22.    Beginning in approximately 2021, in response to massive growth in the numbers of aliens entering the United States by crossing the Southwest border between POEs (and in particular an increase in the number of children and families being apprehended), Border Patrol stood up soft-sided facilities (or other similar facilities)

in its busiest Sectors. These facilities are much larger than brick-and-mortar Border Patrol stations and provide an easier way for Border Patrol to ensure that large numbers of aliens in custody are provided with necessary amenities.

23.    In soft-sided facilities children and families are held in large pods which can hold more people than traditional holding rooms in Border Patrol stations. The pods where the families and children reside while in Border Patrol custody are constructed of plywood walls with plexiglass fronts and are laid out in a manner so that they are easy to monitor with fewer Border Patrol agents or contract personnel. Children are able to move freely about their pod, and the facility does not have any fencing or other enclosures except as needed for security reasons. In some facilities the pods have an open center area surrounded by sub-pods, and the doors to each sub-pod remain unlocked so that children can move freely in and out and can congregate in the center common area. In the pods, children have access to children's books, age-appropriate television, and toys.

24.    Border Patrol also uses other types of facilities that are more permanent but differ from Border Patrol Stations. For example, in El Paso Sector, Border Patrol has a modular facility that is more permanent than a soft-sided facility and has larger pods and more space than a Border Patrol station, and in the Rio Grande Valley (RGV) Sector, Border Patrol spent over $9 million reconfiguring a warehouse to provide a more permanent custody facility with larger pods and more holding space.

25.     Regardless of whether children are held in Border Patrol stations, soft-sided facilities, or other similar facilities, all facilities ensure safe and sanitary conditions by maintaining (or purchasing as needed) an adequate supply of items including clothing and undergarments, diapers and wipes, soap or hand sanitizer, feminine hygiene products, toothbrushes, and toothpaste. All these items are available within reach where space allows, or upon request. Mats and blankets (usually mylar blankets, but cloth blankets are available in some locations) are provided to all detainees. Facilities also have functioning toilets and sinks which are inspected daily and cleaned at least twice a day, and an adequate supply of toilet paper.

26.     Age-appropriate food is provided for children, including bottles and formula. Some facilities provide meals to children in custody, including tender-age children, via a contractor, who must comply with all applicable sanitation and food-preparation requirements. Where possible menus include a menu specific for children ages 2-5 as well as food appropriate for older children, and all menus are reviewed by a nutritionist. For smaller facilities meals may be provided through delivery or using meals that may be prepared onsite at the facility. Snacks are also made available to children at all facilities at all times, along with bottled water (or other potable water sources with cups), milk, and juice. Posters in English and Spanish, with pictures of available hygiene products, toys, snacks, and baby needs are displayed prominently near the hold rooms. In some locations, families and children also are shown a video

that provides information about available amenities. In most facilities people in custody may help themselves to snacks and supplies from a cart or table.

27.    All facilities endeavor to provide space sufficient for children to sleep, and where possible will dim the lights in the nighttime hours to make it easier for them to do so. CBP's TEDS Policy provides that "[r]easonable efforts will be made to provide showers, soap, and a clean towel to juveniles who are approaching 48 hours in detention." Therefore, where possible given the limitations of available facilities and the time spent in custody, children may also be offered showers with shampoo and body wash, clean clothes, and the opportunity to launder their existing clothes.

28.    Aliens in Border Patrol custody are informed of their rights orally during processing through prominently displayed posters and notices in multiple languages that outline the credible fear process and the right to consult with an attorney or representative, and by video that may be shown during intake or processing.

29.    Border Patrol facilities generally maintain an ambient temperature in all pods or holding rooms that is between 66 and 83 degrees Fahrenheit, though the precise range may vary depending on location. Border Patrol agents or facility contract personnel check and record the temperature with a handheld gauge generally once per shift.

30.    Border Patrol makes every effort to provide children with recreation time in available space and child-appropriate activities. Border Patrol has a contract that

can be scaled up or down as needed to provide child caregivers who care for children by, among other things, interacting with the children and reading, playing, watching movies, and otherwise engaging with the children in custody.

31. Border Patrol also takes a number of steps to monitor the time that families and unaccompanied children spend in custody. Border Patrol generates automatic reports that assist with identifying priority cases such as aliens with medical needs and those with a high time in custody (TIC), which are monitored by Border Patrol management at the headquarters and local levels for resolution.

32. It is imperative that CBP maintain the flexibility to expand and contract operations as needed to respond to changing conditions on the border. In mid-March 2025, as the number of aliens in Border Patrol custody significantly decreased each day, CBP began reducing the number of soft-sided facilities along the Southwest border, saving between $5 and $30 million per month in operating costs for each facility. Even throughout the time that Border Patrol operated soft-sided facilities it maintained the ability to expand or reduce their operations (by closing portions of a particular facility or placing it in "warm" status so that it could be made available again very quickly if needed), allowing for continued flexibility. At smaller Border Patrol stations, CBP may need to maintain flexible contracts for meal services, portable toilets and decontamination systems, and emergency cleaning services to address higher volumes of aliens in CBP custody during a surge. Overall, each sector must

have the flexibility needed for its particular circumstances to be able to provide needed resources when conditions require them to do so.

33.    Responding to a surge or reduction in apprehensions is not just a matter for the affected sector but must constantly be evaluated across other sectors as well. For example, in the past, Border Patrol implemented a system of remote processing to allow agents located in other sectors to process aliens in sectors experiencing an influx or surge. Virtual Processing maximizes processing in a busy sector while freeing up resources on the ground to respond to the immediate needs of those in custody.

34.    As noted above, the large increase in aliens apprehended along the Southwest border, particularly children and families, and large-group surrenders, which often include children, can quickly overwhelm affected stations. It takes time to process each alien properly, and Border Patrol will continue to process each person in accordance with the law and procedures laid out above. Unfortunately, the need to properly process aliens and make appropriate decisions about custody and detention— combined with limited capacity at HHS and DHS facilities and the strain on resources created by the influx—may result in longer periods in CBP custody.

## The Office of Field Operations

35.    The Office of Field Operations (OFO) is another CBP component and is the primary federal law enforcement organization responsible for preventing the entry of terrorists and their weapons at official CBP POEs, and for preventing the illicit

trafficking of people and contraband from entering or leaving the United States at POEs. OFO does not just operate at land borders, but also at seaports and airports, all of which vary widely in space, size, and operating conditions. No POE is the same as any other, and OFO often must quickly adapt to meet its custody obligations in these vastly differing environments. This can require allocating significant resources to coordinate with federal partners to accommodate the needs of POEs in remote parts of the Southwest land border, and updating dated infrastructure not originally designed for longer periods of detention for alien minors. At air POEs, this has involved repurposing "transit lounges" into holding rooms for inadmissible applicants for admission. At land POEs, this has involved repurposing rooms designed for asylum interviews into rooms for holding children and families. Moreover, the numbers of individuals OFO processes through its POEs may vary drastically based on border policy decisions. OFO systems of record show the drastically changed numbers of inadmissible aliens encountered at POEs from 216,526 (including 6,122 aliens in family units and 3,088 unaccompanied children) in FY2012, to 1,342,121 (including 435,244 aliens in family units and 10,708 unaccompanied children) in FY2024.

<u>OFO Apprehension and Processing for *Flores* Class Members</u>

36.    OFO conducts immigration inspections of all individuals applying for admission into the United States at a POE. When OFO encounters an individual who is inadmissible to the United States, OFO detains the individual for a short period of

time for processing. OFO maintains custody of detainees only for the short period necessary to transfer a detainee to another federal, state, or local law enforcement agency, or less commonly, release the individual. Most commonly, OFO maintains custody over inadmissible aliens while they await either expedited removal, withdrawal, or transfer to ICE, or, in the case of UACs, to HHS custody. At times, OFO may transfer UACs to the custody of Border Patrol in a nearby sector for processing given the higher volume of processing performed by Border Patrol and, in certain sectors, the availability of a Centralized Processing Center (CPC).

37.     All inadmissible accompanied and unaccompanied alien children are processed in a structured manner. Upon arrival, subjects begin in a primary inspection and are then referred to secondary inspection at the POE where additional screening occurs. Generally, in secondary inspection, each inadmissible alien is initially examined for contraband or anything that may harm the alien, officers, or the traveling public, in a manner that is appropriate for the juvenile's age. The TEDS Policy limits more invasive searches of juveniles unless consent is given by the child's parent or legal guardian, or in the case of a UAC, unless the UAC consents and CBP legal counsel is consulted. Any baggage or property is also examined in order to avoid concealed contraband entering the POEs. This procedure exists to ensure officer and detainee safety. After initial examination, children are permitted to retain their outer layers of clothing. All personal property that is removed from an alien is labeled using

a baggage tag and stored in an area that is not accessible to detainees. Personal property is generally returned when the aliens leave the POE.

38.     During the inspection, biographical information is obtained, and biometrics are taken and entered into CBP's secondary processing system. All encounters of accompanied and unaccompanied alien children are reported to the duty supervisor(s) and receive priority attention. After an alien is encountered and detained, their immigration status is determined.  Once a processing determination is made, all pertinent documents are completed including the preparation of any arrest report(s), the service of immigration forms, consular notifications, and communication with family members, as appropriate.

39.     Officers record the location of any parents/legal guardians, as well as the location and contact information for any relatives in the United States for all accompanied and unaccompanied alien children. For UACs that information is made available to HHS/ORR.

40.     Detainees brought inside to the processing area are placed into hold rooms based on a number of factors including age, sex, whether they are traveling as a family unit, and if they are suspected of a serious crime.

41.     Children are separated from unrelated adults as quickly as operationally possible. Families are customarily segregated from the rest of the detained population and every effort is made to maintain family unity keeping in mind limitations on space

1   and other operational concerns including the sex and age of the minor and any

2   accompanying adult.

3

4        42.    OFO policy implementing the TVPRA requires that all UACs be

5   screened to determine whether they: are a national or habitual resident of a contiguous

6   territory; are able to make an independent decision to withdraw his or her application

7

8   for admission; have a fear of return to their home country; and/or have been a victim

9   of a severe form of human trafficking or are at risk of being trafficked. OFO also

10  encourages POEs to prominently display a poster explaining the dangers of human

11  trafficking, in both English and Spanish, to further encourage potential trafficking

12

13  victims to self-report, depending on the feasibility for each POE.

14

15                          <u>OFO Custody Conditions</u>

16

17       43.    OFO generally meets the same standards for custody that are found in

18  Border Patrol facilities with some important distinctions based on the very different

19

20  environments in which OFO operates. Because some POEs may have significant space

21  limitations, not all juveniles in OFO custody are detained in traditional hold rooms or

22  pods. Many POEs do not have space for such facilities. Accordingly, to ensure that

23

24  juveniles are detained in the least restrictive setting appropriate for their age and needs

25  and detained separately from unrelated adults, juveniles may be detained in areas

26

27  ordinarily used for secondary processing, or other temporary hold areas. At times this

28  may include an empty office or other similar space. This is done to ensure that, when

juveniles must be detained, they are as comfortable as possible and can be monitored appropriately. As with Border Patrol, it is important for OFO to have operational flexibility to fulfill its obligations to care for minors in the wide variety of environments in which OFO operates.

44.     Consistent with the FSA, and the TEDS Policy, all holding rooms afford children access to: toilets and sinks; drinking water and food (this includes meals and/or snacks as appropriate depending on the length of stay); emergency medical assistance; adequate temperature control and ventilation; and adequate supervision to protect children from others.

45.     While some larger POEs may have meal contracts, at many POEs OFO utilizes purchase cards to buy meals and/or contracted vendors or services to provide nourishment for aliens detained in CBP custody. Children are offered at least three meals a day, consisting of at least two varied hot meals daily. All menu items are stored in appropriate, temperature-controlled, insulated and sealed containers. Meals requiring refrigeration, if kept onsite, are stored in refrigerators, and meals requiring preparation are either made-to-order or cooked in microwave ovens depending on the capabilities of the particular POE. Special meals are purchased when a detainee cannot consume what is on the menu for religious or medical reasons. Snacks and juice are available to all detainees between meals. Additionally, between meals children have open access to snacks such as cookies, cereal bars, graham crackers, pudding, and

crackers. Baby formula is also procured and provided to individuals with infants. All holding rooms/areas have potable water readily accessible for detainees in custody whether through drinking fountains or with purchased bottled water and accompanying cups.

46.     OFO facilities maintain or can purchase as needed a supply of clothing, towels, baby products, and personal hygiene items. Clean age-appropriate clothing, including undergarments and socks, are either available or can be purchased and distributed as needed.

47.     Children are also provided with personal hygiene items. The POEs purchase disposable toothbrushes, toothpaste, shampoo, soap, deodorant, and feminine hygiene products. Where children must sleep in custody, the POEs will make every effort to give detainees some comfort to sleep while in custody including the use of folding mats, foam sleeping mats, cots, and/or blankets to provide protection from the floor.

48.     The POEs ensure that each detainee is able to maintain acceptable personal hygiene practices. Where feasible, each child is provided a clean towel, shampoo, soap and a shower every 48 hours. Additionally, they are given a disposable toothbrush and toothpaste. Children detained for more than 48 hours have the opportunity to change clothes after showering. Underwear is available or can be purchased to be provided to children who do not have a change. The POEs also provide

male and female detainees personal hygiene items appropriate for their sex.

49.    Many holding rooms are designed with a readily accessible bathroom and are wall screened to allow children privacy when using the facilities but still ensure they are monitored and protected. Where children are not held in holding rooms they are given access to bathrooms as needed. Waste baskets/cans are provided in bathroom areas. Also, soap or hand sanitizer are provided to allow children to wash off their hands before eating or after utilizing the facilities.

50.    Consistent with the FSA and the TEDS Policy, all areas where children are temporarily held maintain a temperature between 66 and 80 degrees Fahrenheit and have adequate temperature control monitoring and acceptable ventilation. POEs have been provided with infrared digital thermometers to further ensure that the hold rooms' temperature is properly regulated.

51.    POEs ensure that holding rooms are regularly cleaned and sanitized. Cleaning of hold rooms is conducted a minimum of once per shift. POEs follow the same basic procedure: cleaning and sanitizing the hold rooms and processing area, emptying trash cans, and resupplying the hold room toilet areas.

52.    During every shift turnover, a walkthrough and review is conducted of the hold rooms and the general facility by a duty supervisor. CBP officers or contract staff are assigned to monitor the hold rooms to ensure that they are free of any hazards, and to monitor temperature and cleanliness, and ensure that hold rooms are properly

stocked with toilet paper, soap, sanitizers, and other supplies as needed.

53.    The lights in the processing area and hold rooms normally remain on at all times while children are in CBP custody for security reasons and due to operational necessity. Officers must be able to maintain a line of site over the holding rooms to ensure the safety and security of the detainees.

54.    CBP Officers serve the Notice of Rights and Request for Disposition (Form I-770) on all children apprehended at a port of entry, whether they are accompanied or unaccompanied.

55.    All children are advised that they have the rights to: use the telephone, have a hearing before an immigration judge, and be represented by an attorney in those proceedings. If the child is less than 14 years of age or unable to understand the notice, the notice is read and explained by an officer to the child and/or an accompanied parent in a language he or she understands, or is explained through a contracted interpreter service. The signed I-770 form is placed in the alien's A-file.

56.    POEs are not designed for long-term care and detention. Every effort is made to promptly process, transfer or remove those in custody as expeditiously as possible in accordance with the FSA and the TEDS Policy.

## Office of the Chief Medical Officer (OCMO)

57.    OCMO, within CBP's Operations Support component at CBP headquarters, is responsible for, among other things, safeguarding the health of

persons in CBP custody and countering health security threats at our nation's borders. OCMO serves as the principal health and medical advisory office for CBP, and employs a core staff of medical professionals to provide consistent, safe, and effective medical support to CBP operations and aliens in CBP's custody. OCMO provides enterprise-wide direction, oversight, and management of CBP health/medical activities and programs, and provides medical support to operations. OCMO is also CBP's health and medical representative to DHS and other Federal, state, and local organizations, and coordinates and collaborates with all CBP components, including senior leadership, regarding medical-related initiatives and programs. OCMO encompasses several divisions and uses contracts to provide medical screening. The OCMO Border Health System (BHS) Division is the program office responsible for the operational requirements on the medical services contracts. The BHS Division also manages technology and information systems utilized to capture all electronic medical records.

58.    It is the policy of CBP that all aliens in custody receive appropriate medical support in accordance with applicable authorities, regulations, standards, and policies. CBP provides enhanced medical support efforts for aliens in custody. CBP's enhanced medical support approach includes the identification of Medical Priority Facilities (MPF) using an operational risk management methodology. An MPF is a CBP facility that has been identified to have a need for on-site medical support due to

the number of persons in custody at those locations. CBP considers essential elements of volume (number of persons apprehended/in custody), demographics (priority emphasis on juveniles), FMUAs, duration of TIC, and remoteness of a facility and availability of local medical care in an operational risk management methodology for designating an MPF. Designations of MPFs will change as circumstances on the border change. For any location identified by CBP as a MPF, CBP provides medical care through a Medical Services Contract (MSC) provider, which is currently Loyal Source Government Services (LSGS). At MPFs, the MSC provides frontline medical staff, which includes advanced practice providers (APPs), such as nurse practitioners and physician assistants, and medical support staff, such as emergency medical technicians, who provide medical care to persons in custody. The MSC frontline medical staff are remotely supported by supervising physicians, pediatric advisors and Patient Safety Risk Managers (PSRMs). The physician support provides APPs with virtual consultation capabilities for complex medical conditions and concurrence with treatment for higher risk patients. PSRMs conduct regular site visits to monitor patient safety standards, protocols, training and medical supply inventory.

59.    As contractors, MSC employees are not directly supervised by CBP employees. CBP employees do not direct the day-to-day operations of the MSC, nor do they have control over the contractor's medical decisions. However, CBP OCMO is responsible for oversight of the contract itself, including through setting substantive

standards and requirements, and for monitoring compliance with those standards. CBP OCMO undertakes this oversight primarily through setting policies for the implementation of CBP medical care, such as through development of the Elevated in Custody Medical Risk policy and the Medical Process Guidance.

60.     As required by the CBP Medical Process Guidance, all children in CBP custody receive a Health Interview upon their intake into a holding facility. The Health Interview is a tool for CBP personnel and/or the MSC to record the observation and identification of potential medical issues for persons in custody. Children under the age of 12, and those who are identified as having a potential medical issue, then receive a Medical Assessment. The Medical Assessment is a tool used by medically trained personnel to assess and confirm potential medical issues of aliens in CBP custody. Additionally, while CBP is not equipped to provide comprehensive mental health care, children are asked basic mental health questions during their health interview, to identify acute or emergent mental health issues. Children with complex or urgent medical issues are transferred to the local health system.

<u>CBP's Layered and Integrated Monitoring Approach</u>

61.     CBP has implemented many components of a multi-layered and integrated monitoring program designed to ensure CBP's compliance with its custody standards and other requirements, including the requirements of the FSA. This includes real time monitoring by operators in the field and at the headquarters level,

comprehensive medical monitoring systems, and the Juvenile Coordinator Division (JCD) of the Office of Accountability, which conducts regular inspections at CBP facilities.

62.    At the headquarters level, both Border Patrol and OFO employ daily reports, live dashboards, and specialized coordination teams to monitor TICs and facility capacity, ensuring compliance with legal requirements and safe housing of minors and family units. Overcrowding and prolonged custody cases are quickly identified, and actively managed through decompression strategies, transfers, and executive briefings to maintain operational efficiency and legal compliance. At the field level, facility management is constantly monitoring TICs, with special attention given to UACs and family units. The provision of amenities also is constantly tracked and monitored by field personnel using CBP systems of record as well as eyes-on oversight of detainees.

63.    With regard to the provision of medical care, OCMO BHS is building a four-phase Compliance Analysis Process (CAP) that will monitor compliance with medical requirements in a number of ways, including a layered approach of random patient chart reviews, unannounced site visits, and real-time juvenile patient monitoring dashboards. Phases I to III of the CAP have been completed. Phase I includes random, unannounced site visits and is already in place. During these site visits, BHS personnel observe medical staffing contract requirements and conduct

interviews with providers and medical support personnel, patients, and facility leadership. Additionally, BHS conducts inspection of the medication administration process, patient white boards, "at-risk" alerts, and general patient process flows. Random and unannounced site visits of MPFs allow BHS personnel to observe the process and generate a report of findings for corrective action. A standardized site visit checklist provides continuity in the analysis of the medical process. In FY2024, OCMO conducted 158 qualitative site visits to field locations to assess care. A planned addition to Phase I of the CAP will be to generate a "report card" that assigns a score to each required element of the medical process. This "report card" will be given to the MPF and MSC leadership.

64.    Phase II of the CAP involves the real-time monitoring of juvenile dashboards with patient level information, which allows BHS staff to identify all juveniles in custody for more than 12 hours without a medical assessment, all juveniles in custody for 5 or more days without a repeat assessment, all juveniles with an Elevated in Custody Medical Risk level of "high risk" based on his or her diagnosis, and all juveniles who have been referred to the hospital. This dashboard monitoring by BHS personnel assists with ensuring that no juvenile is missed in the medical process and allows action while the patient is still in custody. Any identified deficiencies are addressed through corrective action reports that the MPF and/or the MSC are required to provide within 30 days.

65.    Phase III of the CAP consists of random chart reviews. These reviews include selecting 10 or more sample juvenile charts and tracking those for the entire time the juvenile is in CBP custody, from apprehension to release, assessing for medical process compliance, to determine whether there are any gaps within the CBP and the MSC operation. This chart review also generates a "report card" that is provided to the MPF and MSC leadership and is used for accountability of the contractor in their performance rating. If MPF and MSC identify any deficiencies, corrective action will be required within 30 days and the same sample will be used for a Medical Quality Management (MQM) review. An MQM review looks at the clinical medical care rendered by the contracted medical staff to ensure it is appropriate and compliant with CBP medical protocols. Phase III also involves automation tools for Medical Protocol monitoring to "flag" areas in real time, specifically for medical notifications; enhanced medical monitoring; medication reviews; medical quality management; medical documentation, communication, and continuity of care.

66.    OCMO currently manages its compliance program through combinations of manual and semi-automated systems. Phase IV of the CAP will be the development of a Compliance Program Management Information System (CPMIS) that will fully automate the management of OCMO's compliance process from the beginning to end. The CPMIS is expected to be operational by the end of FY 2025. CPMIS is a central system (one-stop shop) with a life-cycle approach to managing OCMO's internal

compliance program. Compliance reports and recommendations from outside OCMO will be managed in the same system to facilitate a fully integrated compliance program. CPMIS will be designed to cyclically manage inspections, analyze results of the inspections, facilitate the development of standardized reports and appropriate corrective actions, implementation, monitoring, and evaluation of corrective actions. This system will facilitate transparency and allow all major stakeholders to work and view pertinent information and required actions in a common platform.

67.    Finally, JCD evaluates CBP compliance with the FSA and related CBP policies. JCD has delivered 7 annual and 12 interim reports to the *Flores* court since 2017. These reports summarize Compliance Reviews, census information, and updates from CBP components. Over the past 7 JCD Annual Court Reports submitted, JCD has generally determined that CBP is substantially compliant with the FSA.

68.    JCD has also conducted over 280 compliance reviews of CBP facilities where people are held since 2016. JCD conducts announced and unannounced compliance reviews in approximately 20 locations every fiscal year, covering multiple facilities in each location. JCD utilizes protocols based on measurable criteria to ensure reviews are standardized. The areas reviewed include physical, data, medical, food, caregiver, and interviews. These reviews are a snapshot in time and limited in scope but provide an additional layer of assessment related to a facility's overall compliance with applicable standards. JCD issues a supporting Dashboard Report to

facility and headquarters management and requests the facility to respond with corrective actions taken for identified issues within 30 days of issuance of the Dashboard Report. The JCD Director briefs Sector Chiefs on the results.

69.    JCD also conducts *Flores* Implementation Training (FIT) to CBP sectors and field offices. FIT was developed in FY24 to provide holding facilities an overview of the FSA and related CBP policy requirements from a compliance review perspective. FIT also provides useful tools to manage these requirements and a walk through of each facility pointing out areas of concern. JCD has conducted 26 FIT sessions reaching 251 CBP personnel. FIT is included in the FY25 CBP Priorities.

70.    Finally, JCD conducts Town Halls in order to deliver a clear understanding of CBP policy requirements to personnel in the field involved with the care and custody of juveniles. Speakers include subject matter experts from OCC, OCMO, OFO, and Border Patrol. There is an average attendance of more than 200 personnel per event, and the most recent town hall in May 2025 had nearly 300 participants.

71.    JCD is part of the Office of Accountability which also houses CBP's Management Inspection Division (MID). While JCD focuses on inspections related to compliance with the FSA, even in the absence of the FSA both JCD and MID have the capability to conduct inspections related to compliance with any of CBP's policies, including the TEDS Policy. CBP takes seriously its obligations to keep minors safe in

its custody, regardless of the existence of the FSA, and expects that it will continue to use its resources within the Office of Accountability to meet these obligations even if the FSA were terminated.

I declare, under penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this 21st day of May, 2025.

*John Modlin*
_____
John Modlin
Acting Deputy Commissioner
U.S. Customs and Border Protection
U.S. Department of Homeland Security