# Exhibit D-4

 An official website of the United States government    Here's how you know ⌄

# ORR Unaccompanied Alien Children Bureau Policy Guide: Section 3

🔊 Listen ▶

## Services

**Current as of:** May 19, 2025

# 3.1 Summary of Services

**Standard** and **secure care provider facilities**, as well as **out-of-network (OON) facilities** providing these levels of care, must be licensed by an appropriate state agency, or meet the State's licensing requirements if located in a State that does not allow State licensing of programs providing or proposing to provide care and services to **unaccompanied alien children**, and must meet the Office of Refugee Resettlement's (ORR) requirements to ensure a high level of quality care with dignity, respect, and special concern for their particular vulnerability. All care provider facilities provide children with classroom education, health care, socialization/recreation, vocational training, mental health services, access to legal services, access to **Child Advocates** where applicable, and case management. Likewise, OON facilities must provide all services required of in-network care provider facilities, as discussed at Section 1.4.6 Residential Treatment Center and Out-of-Network, subject to the exceptions provided in the policy. Care provider facilities also undertake ongoing efforts to identify and assess relatives or other individuals in the United States as **sponsors** to whom children can be safely **released**. **Care provider facilities'** case management teams use standardized screening tools to assess children for mental health and victims of trafficking issues. Care provider facilities comply with all State child welfare laws and regulations and all State and local building, fire, health, and safety codes.

*Revised 05/19/2025*

## 3.2 Care Provider Admissions and Orientation for Unaccompanied Alien Children

Once the care provider has physical custody of the unaccompanied alien child, the care provider must complete the admissions and orientation process. Care provider staff must be trained in techniques for child-friendly and **trauma-informed** interviewing, assessment, observation and other techniques. Care providers must also be trained to identify suspected victims of trafficking and children who have been smuggled into the country. Foster parents are not responsible for conducting admissions procedures, but they must be trained on the above topics in order to identify issues that may arise and report them to the care provider.

Care providers who operate secure or **heightened supervision facilities** must ensure that the unaccompanied alien children initially placed or **transferred** to their facility are provided a notice in a format and language accessible to the child as to why they were placed in the facility.

If the care provider staff determines during the admissions and intake process that the unaccompanied alien child's health or life is in imminent risk or their condition places the safety of others at imminent risk, the care provider must contact 9-1-1 for crisis response and transportation to the nearest emergency room.

If the care provider determines that the unaccompanied alien child requires medical attention, the care provider arranges for the unaccompanied alien child to be evaluated by a medical and/or mental health provider as soon as possible upon the unaccompanied alien child's arrival at the facility.

Where available, the care provider or any stakeholder may request the appointment of a Child Advocate for an unaccompanied alien child who is a victim of trafficking or is found to be especially vulnerable (See **Section 2.3.4 Child Advocates**). ORR decides whether to appoint a Child Advocate.

*Revised 8/1/16*


## 3.2.1 Admissions for Unaccompanied Alien Children

When a child is first admitted into ORR care, the care provider must immediately ensure the physical and mental well-being of the child after receiving physical custody of a child by:

- Screening for signs/symptoms of illness or mental distress and referring the child for medical care/testing as needed;
- Asking the child about any healthcare conditions or needs they have (including disabilities, allergies, diseases, mental and behavioral health issues, as well as medications) in the child's native or preferred language;
- Reviewing all of the child's records for health issues/needs, including but not limited to those identified while in Customs and Border Protection (CBP) care to identify any immediate needs;
- Ensuring that the child receives appropriate food and beverages upon arrival (after being asked about allergies) at the care provider facility and, if possible, before interacting with other children;
- Ensuring that the child bathes or showers, with assistance if required due to **disability** or young age, within two (2) hours of entering the care provider facility and, if possible, before interacting with other children;
- Providing the child, at a minimum, with the following items: clean clothing and bedding, and personal hygiene items;
- Assisting the child in contacting family members or other relatives if contact is considered safe following ORR and the care provider's internal safety policies and procedures; and
- Creating an inventory list of any cash and other property in the child's possession upon admission. The child may retain some personal property if deemed appropriate by the care provider and/or foster parent or if required under state licensing regulations.

If a healthcare concern is identified through records review or from discussions with the child, parent or primary caregiver, the designated staff immediately notifies the **Case Manager** and care provider medical team.

See also **Section 5.8 Reporting Child-Level Events and Program-Level Events** for information gathered at intakes that may require reporting a **Child-Level Event**.

Within two (2) business days of admission into ORR care, the care provider must also ensure that the child receives a complete initial medical exam (IME), including screening for infectious diseases, by a licensed mid-level healthcare professional or higher (e.g., physicians, physician assistants, nurse practitioners).

When a child is transferred from one care provider to another care provider, the receiving care provider must immediately assess the physical and mental well-being of the child after receiving physical custody of a child by:

- Screening for signs/symptoms of illness or mental distress and referring the child for medical care/testing as needed;
- Asking the child about any healthcare conditions or needs they have (including disabilities, allergies, diseases, mental and behavioral health issues, as well as medications) in the child's native or preferred language;
- Reviewing all of the child's records for health issues/needs, including but not limited to those identified while in CBP care to identify any immediate needs;

5/20/25, 11:29 AM

Case 2:85-cv-04544-DMG-AGR    Document 1567-8    Filed 05/22/25    Page 4 of 51    Page
ORR Unaccompanied Alien Children Bureau Policy Guide: Section 3 | Administration for Children and Families
ID #:52844

- Ensuring that the child receives appropriate food and beverages upon arrival at the care provider facility;

- Ensuring that the child has the opportunity to bathe or shower;

- Providing the child with clean bedding, and, as needed, clean clothes and personal hygiene items;

- Reviewing the existing list of vetted family/sponsors contained in the transfer packet and assisting the child in contacting family members or other relatives on the list, if contact is considered safe, following ORR and the care provider's internal safety policies and procedures; and

- Creating an inventory list for all cash and other property in the child's possession upon admission. The child may retain some personal property with them if deemed appropriate by the care provider and/or foster parent or if required under state licensing regulations.

If a healthcare concern is identified through records review or from discussions with the child, parent, **legal guardian**, caregiver or potential sponsor, the designated staff immediately notifies the Case Manager and care provider medical team.

To identify any of the child's immediate needs or issues, a trained staff member with the care provider must use the *Initial Intakes Assessment* to interview the child within 24 hours of the child's admission to the facility, whether it is the first admission into care or a transfer between facilities. The *Initial Intakes Assessment* guides the interviewer through a series of questions to obtain biographic information (to include information about family members), migration history, information on any immediate medical or mental health concerns (including substance use), current medications, and any concerns about personal safety that the child may have at that time.

Prior to interviewing the child using the *Initial Intakes Assessment*, the care provider informs the child that providing honest and complete answers to all assessments is essential. The care provider also informs the child that self-disclosure of previously unreported criminal history or violent behavior to any other children, care provider staff, ORR, or others, may result in the child's transfer to another care provider facility and may affect their release.

If the child's responses to questions during the *Initial Intakes Assessment*, IME, or other assessments indicate the possibility that the child may have been a victim of human trafficking or labor exploitation, the care provider notifies the Office of Trafficking in Persons (OTIP) within 24 hours. This is essential to ensuring that the children receive the services and supports to which they may be entitled.

If the child's responses to questions during the *Initial Intakes Assessment* identify any preexisting medical, mental health, or cognitive concerns, the interviewer must notify the Case Manager and care provider medical team immediately.

If the child's responses raise suspicions that the child's health or life is at imminent risk or his/her condition places the safety of others at imminent risk, the interviewer calls 9-1-1 for crisis response and transportation to the nearest emergency room and follows **significant incident** reporting procedures (see **UAC MAP Section 5.8.2 Significant Incidents**).

The Disclosure Notice fully explains the child's rights to confidentiality and limits to confidentiality of information, and must be reviewed with the child:

- Prior to the completion of the UAC Assessment within the child's first five (5) days in care (See **Section 3.3.1 UAC Assessment and Case Review**);

- At the beginning of the child's first counseling session the child receives;

- May be reviewed again with the child at the **clinician's** discretion (See **Section 5.9.1 Requirement to Inform Children of Limits to Confidentiality** for discussion of the Disclosure Notice in detail); and

- Must also be reviewed again when a child transfers to a new facility.

*Revised 08/01/2024*

## 3.2.2 Orientation

Care providers must have a standardized and comprehensive orientation that is provided to all admitted unaccompanied alien children. The orientation must be provided within 48 hours of admission and must be presented in a fashion that is appropriate for the age, culture, and language of the child. The comprehensive orientation regarding program purpose, services, rules (provided in writing and orally), expectations, their rights in ORR care, and the availability of legal assistance, and information about U.S. immigration and employment/labor laws in simple and non-technical terms and in a language and manner that the child understands, if practicable. The orientation must be provided in formats that are accessible to unaccompanied alien children who are limited English proficient, deaf, visually impaired or otherwise disabled, as well as those who have limited reading skills.

Care provider facilities must notify the unaccompanied alien children that care provider facilities must accommodate the unaccompanied alien children's language needs while they remain in ORR care.

If the unaccompanied alien child is not literate, the care provider must verbally explain all the documents in the unaccompanied alien child's native or preferred language. If forms are not translated into a language that the unaccompanied alien child can read, to have a **qualified interpreter** orally translate or sign language translate and explain all the documents in the child's native or preferred language, depending on the child's preference, and confirm with the child that they fully comprehend all material. Care providers lacking staff who speak an unaccompanied alien child's native or preferred language must make reasonable efforts to utilize a qualified interpretation or **qualified translator** for the unaccompanied alien child's orientation. In cases where no such service exists, or is unavailable, then care providers must consult with the **ORR/Federal Field Specialist (FFS)**, the **Case Coordinator**, and other relevant stakeholders to create and implement a strategy for communicating with the unaccompanied alien child as effectively as possible and ensuring meaningful access to the care provider's programs and activities.

As part of the orientation, the care provider must also provide the unaccompanied alien child a tour of the facility and note emergency evacuation routes and exits.

The orientation must include the following information:

- an explanation of the nature of the unaccompanied alien child's custody in ORR;
- the care provider's rules, responsibilities, and procedures;
- the unaccompanied alien child's rights and responsibilities, including general legal-related information;
- the care provider's behavior management policies;
- the care provider's grievance policies and procedures;
- emergency and evacuation procedures; and
- other policies and procedures to help the child adjust to the new setting

*Revised 08/01/2024*

# 3.3 Care Provider Required Services

Care providers must comply with all applicable State child welfare laws and regulations (such as mandatory reporting of abuse) and all State and local building, fire, health, and safety codes. Care providers must deliver services in a manner that is sensitive to the age, culture, native language, and needs of each child. Care providers must develop an **individual service plan** for the care of each child.

Care providers are also required to maintain records of **case files** and make regular reports to ORR. Care providers must have accountability systems in place which preserve the confidentiality of client information and protect the records from unauthorized use or disclosure (See Section **5.9.1 Requirement to Inform Children of Limits to Confidentiality**).

Care providers must provide the following minimum services[1] for each child in their care in a manner that is sensitive to the age, culture, native or preferred language, and the complex needs of each unaccompanied alien child:

- Proper physical care and maintenance, including suitable living accommodations, food that is of adequate variety, quality, and in sufficient quantity to supply the nutrients needed for proper growth and development, which can be accomplished by following the U.S. Department of Agriculture's Dietary Guidelines for Americans, and appropriate for the child and activity level, drinking water that is always available to each unaccompanied alien child, appropriate clothing, personal grooming and hygiene items such as soap, toothpaste and toothbrushes, floss, towels, feminine care items, and other similar items, access to toilets, showers, and sinks, adequate temperature control and ventilation, maintenance of safe and sanitary conditions that are consistent with ORR's concern for the particular vulnerability of children, and adequate supervision to protect unaccompanied alien children from others.

- Appropriate routine medical and dental care, **family planning services**, including pregnancy tests and comprehensive information about and access to medical reproductive health services and emergency contraception, and emergency health care services, including a complete medical examination (including screenings for infectious disease) within 48 hours of admission, excluding weekends and holidays, unless the child was recently examined at another ORR care provider facility; appropriate immunizations in accordance with recommendations of the U.S. Department of Health and Human Services/U.S. Public Health Service (PHS), Centers for Disease Control and Prevention (CDC); administration of prescribed medication and special diets; appropriate mental health interventions when necessary.

- An individualized needs assessment, which includes the various initial intake forms, collection of essential data relating to the identification and history of the child and his or her family, identification of the child's individualized needs including any specific problems which appear to require immediate intervention, an educational assessment and plan, identification of whether the child is an Indigenous language speaker, an assessment of family relationships and interaction with adults, peers and authority figures; a statement of religious preference and practice; an assessment of the child's personal goals, strengths and weaknesses; identifying information regarding immediate family members, other relatives, godparents or friends who may be residing in the United States and may be able to assist in family reunification.

- Individual service plans must be implemented and closely coordinated through an operative case management system. Service plans should identify individualized, person-centered goals with measurable outcomes and with steps or tasks to achieve the goals, be developed with input from the unaccompanied alien child, and be reviewed and updated at regular intervals. Unaccompanied alien children ages 14 and older should be given a copy of the plan, and unaccompanied alien children under age 14 should be given a copy of the plan when appropriate for that particular child's development. Individual plans must be in that child's native or preferred language or other mode of auxiliary aid or services and/or use clear, easily understood language, using concise and concrete sentences and/or visual aids and checking for understanding where appropriate.

- Educational services appropriate to the child's level of development and communication skills in a structured classroom setting Monday-Friday, which concentrates primarily on the development of basic academic competencies and secondarily on English Language Training. The educational program must include instruction and educational and other reading materials in such languages as needed. Basic academic areas should include Science, Social Studies, Math, Reading, Writing and Physical Education. The program must provide children with appropriate reading materials in languages other than English for use during leisure time.

- Activities according to a recreation and leisure time plan that include daily outdoor activity, weather permitting, with at least one hour per day of large muscle activity and one hour per day of structured leisure time activities (that should not include time spent watching television). Activities should be increased to a total of three (3) hours on days when school is not in session.

- At least one (1) individual counseling session per week conducted by certified counseling staff with the specific objective of reviewing the child's progress, establishing new short-term and long-term objectives, and addressing both the developmental and crisis-related needs of each child.

- Prior to the completion of the UAC Assessment and prior to starting counseling services, a clinician must review the Disclosure Notice with the child. See **Section 5.9.1 Requirement to Inform Children of Limits to Confidentiality** for the discussion of the Disclosure Notice in detail.

- Group counseling sessions at least twice a week. Sessions are usually informal and take place with all children present. The sessions give new children the opportunity to get acquainted with staff, other children, and the rules of the program. It is an open forum where everyone gets a chance to speak. Daily program management is discussed, and decisions are made about recreational and other activities. The sessions allow staff and children to discuss whatever is on their minds and to resolve problems.

- Acculturation and adaptation services which include information regarding the development of social and inter-personal skills which contribute to those abilities necessary to live independently and responsibly.

- A comprehensive orientation regarding program intent, services, rules (written and verbal), expectations, and the availability of legal assistance.

- Whenever possible, access to religious services of the child's choice.

- Visitation and contact with family members (regardless of their immigration status), which is structured to encourage such visitation. The staff must respect the child's privacy while reasonably preventing the unauthorized release of the child.

- A reasonable right to privacy, which includes the right to wear his or her own clothes when available, retain a private space in the residential facility, group or foster home for the storage of personal belongings, talk privately on the phone and visit privately with guests, as permitted by the house rules and regulations, receive and send uncensored mail unless there is a reasonable belief that the mail contains contraband.

- Services designed to identify relatives in the United States as well as in foreign countries and assistance in obtaining legal guardianship when necessary for the release of the child. Information about U.S. child labor laws and education around permissible work opportunities in a manner that is sensitive to the age, culture, and native or preferred language of each unaccompanied alien child.

- Legal services information, including the availability of free legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, the right to apply for asylum or to request voluntary departure in lieu of deportation. (This information is included in the **Legal Resource Guide for Unaccompanied Alien Children**)

Care providers are also encouraged to draw upon any relevant **Behavioral Notes** or **Historical Disclosures** in a child's **case file** to determine how to might best and holistically meet each individual child's needs while in ORR care. See **Section 5.8.12 Behavioral Notes and Historical Disclosures**.

*Revised 08/01/2024*

## 3.3.1 UAC Assessment and Case Review

Within five (5) days of an unaccompanied alien child's admission, a trained staff member conducts an assessment that covers biographic, family, legal/migration, medical, substance use, and mental health history (the UAC Assessment).

The UAC Assessment is used by the care provider as the basis for an initial release plan for the child and is the initial form used to evaluate the child for services. A child may not be transferred to another ORR care provider or released from ORR custody to a sponsor until the care provider has completed the assessment.

The care provider continues to update the child's case file using another assessment tool (the UAC Case Review). This form is used to make sure that the case is continually updated (initially on the child's 30th day in the care provider's care and subsequently every 30 days or every 90 days in a long-term foster care provider's care). This information is entered into the child's case management record in a timely fashion to identify any changes that impact a release care plan or individual service plan.

In some instances, a child may further disclose facts about their background regarding medical history or other pertinent information after this initial assessment period, many days or weeks later. In such instances, the appropriate place to document this information is

in the Historical Disclosures section of the child's case file. See **section 5.8.12 Behavioral Notes and Historical Disclosures**. For health-related historical disclosures, care providers will notify ORR's Division of Health for Unaccompanied Alien Children.

*Posted 08/02/2023*

## 3.3.2 Long Term and Concurrent Planning

Care providers create long term plans to address the individual needs of each unaccompanied alien child following release from ORR. Whenever possible, this involves releasing an unaccompanied alien child to the care of a family member.

In some cases, care providers may conduct concurrent planning for the child's future. Concurrent planning is the exploring of alternative options to the sponsorship process (including multiple sponsorship options) during the process of preparing to release children to parents, other relatives, or family friends.

In some situations, release to a family member is not an option for the child. In those instances, the care provider must explore other planning options for the future. These include:

- Release to an unrelated sponsor
- Release to a licensed program or other entity
- Preparation for **discharge** and repatriation
- Planning for teens turning 18 years of age, and "aging out" of ORR custody
- **Residential Treatment Center (RTC)** or ORR **Long-Term Foster Care (LTFC)** or transfer to another care provider within the ORR continuum of care that is most appropriate for meeting the unaccompanied alien child's immediate and longer term needs.

*Posted 1/28/2015*

## 3.3.3 Screening for Child Trafficking and Services for Victims

Care providers must screen all unaccompanied alien children to identify potential victims of a severe form of trafficking. The law recognizes two (2) forms of trafficking: **labor trafficking** and **sex trafficking**.[2] Labor trafficking of a child has three (3) elements:

- **Action**: the child was recruited, harbored, transported, provided, or obtained
- **Means**: through the use of force, fraud, or coercion
- **Purpose**: for involuntary servitude, peonage, debt bondage, or slavery.

Sex trafficking of a child has two (2) elements:

- **Action**: the child was recruited, harbored, transported, provided, obtained, patronized, or solicited
- **Purpose**: for a commercial sex act. A commercial sex act is defined as any sex act on account of which anything of value is given to or received by any person.

*Force, fraud, or coercion (means) is not a required element for sex trafficking of a child.*

The UAC assessment tool has questions designed to assist care providers in identifying victims of trafficking and children vulnerable to being trafficked. The questions in the assessment tool cover a wide range of indicators of trafficking.

Care providers must distinguish between the elements of a trafficking offense and indicators that trafficking may have occurred. A child may have experienced an indicator of trafficking, such as owing a financial debt, but may not be a victim of trafficking. A child is not a

Case 2:85-cv-04544-DMG-AGR   Document 1567-8   Filed 05/23/25   Page 9 of 51   Page ID #:52849

victim of trafficking unless there is forced labor or commercial sex.

**Trafficking vs. Smuggling**

Smuggling is a distinct crime from human trafficking. Smuggling involves a person being transported illegally over a national border. A child who was smuggled into the United States could have been trafficked while they were smuggled or smuggled as part of a trafficking scheme, but being smuggled does not automatically make the child a victim of trafficking.

**Actions When Care Provider Suspects Trafficking**

If a care provider suspects that a child is a trafficking victim, the care provider must document this concern as a Historical Disclosure in the child's case file (see **Section 5.8.12 Behavioral Notes and Historical Disclosures**) and refer the child's case to the Office on Trafficking in Persons (OTIP) for further assessment. This referral is appropriate if the care provider suspects the child was a victim of trafficking at any point in the child's life and in any country. In addition, ORR must refer any trafficking concerns to the Homeland Security Investigations division (HSI) and the Human Smuggling and Trafficking Center (HSTC) at the U.S. Department of Homeland Security. Referrals to OTIP, HSI, and HSTC may include supporting documents relevant to investigative purposes. ORR may also request assistance from other federal agencies (e.g., U.S. Department of Labor) in assessing a child's case for potential trafficking concerns.

If OTIP identifies the child as a victim of a severe form of trafficking, OTIP issues the child an *Eligibility Letter*, which makes the child eligible for federally funded benefits and services to the same extent as a refugee, without regard to immigration status. Prior to issuing an *Eligibility Letter*, upon receipt of credible information that a child who is seeking assistance may have been subjected to a severe form of trafficking in persons, OTIP issues an *Interim Assistance Letter*, making the child eligible for such benefits and services for a 90-day period (which may be extended for an additional 30 days). OTIP issues *Eligibility* and *Interim Assistance Letters* to children by name, in care of the care providers. The care providers retain the original letter until release, and keep copies after release (See **Section 5.6.2** for care provider responsibilities relating to retention of original *Eligibility* and *Interim Assistance Letters*).

**Additional Measures**

Care providers must take additional safety steps when caring for child victims of trafficking, including:

- Carefully verifying all family and sponsor relationships in order to screen for traffickers who may attempt to coerce or threaten a child;
- Adjusting the in-care safety plan as appropriate, to allow for only supervised phone calls or to revise the list of approved phone/visitation contacts for the unaccompanied alien child (See **Section 3.4 Safety Planning**);
- Training staff and volunteers on how victims of trafficking are subject to many different methods of coercion and control, including strong bonds with an abuser and not understanding the full reality of abuse;
- Supporting unaccompanied alien children in an age-appropriate manner to identify healthy relationships and to understand common recruitment and deception tactics used by traffickers;
- Implementing additional safety measures, such as increased staff supervision or in-depth trauma-informed interviews during the planning process;
- Creating a safety plan that includes a list of safe persons, phone numbers, places to contact, and list of unsafe persons and places;
- Engaging the unaccompanied alien child in developing a plan of action for the child to take if they feel threatened or unsafe.

*Revised 08/02/2023*

# 3.3.4 Safety Planning

5/20/25, 11:27 AM       Office of Unaccompanied Alien Children Bureau Policy Guide: Section 3 The Administration for Children and Families
Case 2:85-cv-04544-DMG-AGR    Document 1567-9    Filed 05/22/25    Page 10 of 51
Page ID #:52850

Care providers are responsible for safety planning for the facility as a whole and for developing in care individual safety plans for those children for whom it is appropriate.

**Overall Safety Planning**

Care providers must develop a written safety plan that includes policies and procedures for all unaccompanied alien children in its care and program staff. The safety plan must address **emergency** situations covering the following areas: evacuations (for example due to a hurricane, fire, or other emergency), medical and mental health emergencies, disease outbreaks, and unaccompanied alien children leaving premises without permission.

Care providers and foster care programs must meet the safety requirements maintained by State and/or local licensing entities, fire code regulations, and local zoning, and building code regulations.

Care provider residential facilities (with the exception of individual foster care homes) must meet the following minimum safety and security related requirements:

- Controlled entry and exit from the premises to ensure unaccompanied alien children remain within the facility perimeter and to prevent access by the public without proper authorization.
- Video monitoring in common and living areas.
- A communications system and alarm system for all areas of the residential structure.
- Effective video monitoring of the exterior of the building and surrounding premises, including the ability to permanently download footage when necessary.
- A system for physically counting the residents and a written policy that provides that staff regulate resident movement.
- A daily log on resident population movement (for example, arrivals and departures, room assignments).
- "Mirrored windows" or small windows in the doors of any rooms used for one-on-one meetings with the children.
- A facility inspection checklist that includes the safety related components of all residential operations and program functions.
- Quarterly conducted safety assessments which document any deficiencies that could impact the safety of staff or children and **corrective action** plans for any outstanding deficiencies.
- Spot inspections in order to note safety concerns through day-to-day observations, which are tracked and incorporated into the quarterly safety assessment.

**Individualized In-Care Safety Plans**

Care providers must create in-care safety plans for unaccompanied alien children for whom such plans are appropriate, including but not limited to those who:

- Are victims of trafficking, at high risk for trafficking, or victims of other crimes
- Have a history of criminal, juvenile justice, or gang involvement
- Have a history of behavioral issues or violence
- Have individualized needs, disabilities or medical or mental health issues
- Have a history of substance abuse
- Are parenting or pregnant
- May be subject to bullying
- Present a risk of running away

**Safety Planning for Off-Site Outings**

5/20/25, 11:27 AM    ORR Unaccompanied Alien Children Bureau Policy Guide: Section 3 | The Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR    Document 1567-9    Filed 05/22/25    Page 11 of 51
Page ID #:52851

Off-site outings may be used to meet minimum service requirements found in **Section 3.3 Care Provider Required Services** (e.g., recreation and leisure time services, educational services, religious services) or to supplement those services.

Prior to approving a child's participation in an off-site outing, care providers must assess the child's current behavior and level of functioning to identify potential safety risks. As part of the assessment, care providers must take into consideration individualized safety plans created for children with specific safety or behavioral concerns. In addition, care providers must ensure that all staff involved in the outing are aware of and understand any individual needs of or concerns about each child being considered for participation in the outing.

Children who are currently identified, following an individual assessment, as presenting an active safety risk or active runaway risk are not permitted to participate in off-site outings. All assessments for safety risk or run risk will be evaluated on an individual basis and in no event will a care provider use a safety plan or individualized safety plan to bar children from outings based on factors unrelated to the child's behavior or a specific safety concern.

If a child previously ran away from ORR custody, the child must be assessed in the seven (7) days following a runaway attempt or unauthorized absence. The child cannot participate in off-site outings during the seven-day (7) assessment period.

Children in ORR care and custody have significant trauma which can result in maladaptive emotional and behavioral reactions triggered by everyday life. These reactions, by themselves, do not constitute active runaway planning or a runaway attempt. For example, a child expressing extreme anger and pushing past a staff member when told to stay inside the facility because the time for outdoor activity has ended, does not, by itself, constitute a pre-meditated runaway attempt.

The seven-day (7) assessment must not rely solely on these emotions and behaviors. The seven-day (7) assessment must evaluate both the child's verbal statements of a desire to run away from the care provider in conjunction with any actions taken to facilitate running away, including, but not limited to:

- Identifying means of egress;
- Seeking information on maps and roads adjoining the facility; or
- Purchasing transit tickets.

Verbal statements, alone, do not constitute active run risk.

If a child is not permitted to participate in an off-site outing, care providers must make reasonable efforts to provide comparable and comprehensive on-site services in accordance with State licensing regulations and child welfare best practices to ensure that all minimum required services under the Flores Settlement Agreement are provided to the child (see **Section 3.3**). For children who are approved to participate in outings after the seven-day (7) assessment, care providers must explain to the children the program's expectations for appropriate behavior during the off-site outing.

Under no circumstances, may a care provider deny a child access to routine or emergency medical, dental, mental health, or other required services, listed in **Section 3.3**.

*Revised 02/27/2025*

## 3.3.5 Academic Educational Services

Care providers must conduct an educational assessment within 72-hours of an unaccompanied alien child's admission into the facility in order to determine the academic level of the child and any particular needs they may have. Care providers must provide educational services based on the individual academic development, literacy level, and linguistic ability of each unaccompanied alien child.

Each unaccompanied alien child must receive a minimum of six (6) hours of structured education, Monday through Friday, throughout the entire year in basic academic areas (Science, Social Studies, Math, Reading, Writing, Physical Education, and English as a Second

Language (ESL), if applicable). Care providers adapt or modify local educational standards to develop curricula and assessments, based on the average length of stay for unaccompanied alien children at the care provider facility, and provide remedial education and after school tutoring as needed. Learning materials must reflect cultural sensitivity. Care provider facilities must provide educational instruction and relevant materials in a format and language accessible to all unaccompanied alien children, regardless of the child's native or preferred language, including, but not limited to, providing services from an in-person, qualified interpreter, written translations of materials, and qualified remote interpretation when in-person interpretation options have been exhausted. Any academic breaks must be approved in advance by the care provider's **ORR/Project Officer (ORR/PO)**. In no event will any academic break be approved that is over two (2) weeks in duration.

Unaccompanied alien children may be separated into class groups according to their academic development, level of literacy, and linguistic ability rather than by chronological age. As needed, unaccompanied alien children must be provided an opportunity for learning advancement, such as independent study, special projects, pre-GED classes, and college preparatory tutorials, among others. Academic reports and progress notes are included and updated in the unaccompanied alien child's case file which is either sent to another care provider in the event of a transfer or release to the unaccompanied alien child upon discharge.

*Revised 02/27/2025*

## 3.3.6 Vocational Educational Services

Care providers are encouraged to create vocational training opportunities that will provide unaccompanied alien children with practical and competitive job skills and assist in the preparation for adulthood. Vocational programs may not replace academic education or be a substitute for the basic subject areas.

Care providers must document all vocational programs, including the name of the vocation or trade, staff or volunteer qualifications, frequency and duration of courses, community partnerships, course curriculum, and student capacity. If funds are generated from the sale of items made by unaccompanied alien children in the program, they must be provided to the unaccompanied alien child upon release from the facility. These funds may not be used to supplement the facility's program. If care providers plan to regularly sell items made by unaccompanied alien children, they must have written standardized procedures for the sale, accounting, and dispensing of funds to unaccompanied alien children upon release.

*Posted 1/28/2015*

## 3.3.7 Services Related to Culture, Language, and Religious Observation

Unaccompanied alien children entering ORR custody come from a wide array of cultures, practices, languages, and beliefs. Care providers must have the cultural awareness and systems in place to support the cultural identity and needs of each unaccompanied alien child.

ORR requires care providers to respect and support the cultural identity of unaccompanied alien children by:

- Allowing unaccompanied alien children regular contact with safe family members or other support systems through telephone calls, letters, and visits.
- Addressing the unaccompanied alien child by their given name.
- Including of cultural awareness in daily activities, such as food menus, choice of clothing, and hygiene routines.
- Celebration of culture-specific events and holidays.
- Academic education that covers various cultures within a classroom setting.

Care providers must make reasonable efforts to provide comprehensive services and literature in the native or preferred language of each unaccompanied alien child; provide qualified interpreter or qualified translator as needed; and allow unaccompanied alien

children to communicate in their preferred language when they choose. All required documents provided to unaccompanied alien children must be translated in the unaccompanied alien child's preferred language, either written or verbally. However, care provider facilities must not create their own translations of ORR-issued form templates or handouts.

If after taking reasonable efforts, care provider facilities are unable to obtain a qualified interpreter or qualified translator for the unaccompanied alien children's native or preferred language, depending on the children's preference, care provider facilities must consult with qualified ORR staff for guidance on how to ensure meaningful access to their programs and activities for the children, including those with limited English proficiency. Care provider facilities must prioritize the ability to provide in-person, qualified interpreters for unaccompanied alien children who need them, particularly for rare or indigenous languages. After care provider facilities take reasonable efforts to obtain in-person, qualified interpreters, then they may use qualified remote interpreter services. Care provider facilities must translate all documents and materials shared with the unaccompanied alien children, including those posted in the facilities, in the unaccompanied alien children's native or preferred language, depending on the children's preference, and in a timely manner.

Care providers must provide opportunities for unaccompanied alien children to observe and practice their spiritual or religious beliefs, including but not limited to, the celebration of religious holidays, displaying religious art, wearing religious articles of jewelry, following certain food preparation and/or dietary restrictions and attending services and activities (as long as it is safe for the unaccompanied alien child and staff). Care providers are encouraged to work with clergy or other members of the religious community to provide spiritual/religious services to unaccompanied alien children in ORR's custody. Care providers must provide access to recognized members and leaders of religious communities to ORR care provider facilities in accordance with safety policies and procedures. Upon request from an unaccompanied alien child, assuming that the request is reasonable and the safety of the unaccompanied alien child and staff is not adversely impacted, care providers must transport unaccompanied alien children to places of worship.

If an unaccompanied alien child requests religious and/or cultural information or items, such as books or clothing, the care provider must provide the applicable materials in the unaccompanied alien child's native or preferred language, depending on the child's preference, and as long as the request is reasonable.

Care provider services also help unaccompanied alien children obtain the skills necessary to acculturate to the United States and to live independently and responsibly. Acculturation services include:

- Providing English language classes
- Access to community services
- Academic education, including, for example, geography
- Celebration of U.S. holidays
- Discussion of US. laws
- Food and entertainment
- Field trips to local historical, scientific or cultural points of interest

*Revised 08/01/2024*

## 3.3.8 Recreation and Leisure Time Services

Care providers must develop recreation and leisure plans that include daily outdoor activities, weather permitting, for unaccompanied alien children in their care. The plan includes at least one (1) hour per day of large muscle activity and one (1) hour per day of structured leisure time activities other than television (three (3) hours per day on when school is not in session).

Recreation and leisure time activities are separate from the required physical educational requirement.

Care providers that do not have sufficient on-site recreation areas must take unaccompanied alien children to off-site parks, community recreation centers or other suitable locations and provide a higher staff-to-child ratio in those instances.

Care providers must screen television, movies, and video games for appropriateness before being provided to unaccompanied alien children and these may not be substituted for recreational or leisure activities. (Television viewing limitations and other related policies vary from facility to facility.)

Children must have access to appropriate reading materials in languages other than English for use during the unaccompanied alien child's leisure time.

*Revised 08/01/2024*

## 3.3.9 Nutritional Services

Care providers must provide nutritional services in accordance with U.S. Department of Agriculture and U.S. Department of Health and Human Services nutritional guidelines and State licensing requirements. They also must establish procedures to accommodate dietary restrictions, food allergies, health issues, and religious or spiritual requirements.

*Posted 1/28/2015*

## 3.3.10 Calls, Visitation, Mail and Email

### Calls

**Care providers** must ensure the privacy and safety of all children by having internal policies and procedures for calls (including landline telephone calls, cell phone calls, calls on social media apps, video calls, virtual meeting calls, etc.), such as verifying the identity of callers and the recipients of outgoing calls.

Care providers must provide children with opportunities to participate in calls with approved family members, **sponsors**, and other approved contacts living in the United States and abroad. Care providers must provide opportunities for calls that are at reasonable times for the child and the call participant (e.g., including incorporating work schedules and time zones for each call participants into call scheduling). Children may choose whether they want to participate in calls and may choose to end a call at any time.

The care provider must ensure that they make a proper attempt for children to have the call, and at minimum three (3) attempts must be made to connect the child with the call recipient. If the call does not connect, the care provider must properly document the call attempt in the call log, stating that the call was not connected after at least three (3) attempts in a 24 hour period. If the recipient calls the child back care providers must make reasonable attempts to connect the child and the approved caller.

- **Weekdays**— Care providers must provide children with daily MINIMUM 10-minute calls (ORR encourages calls to be longer than the MINIMUM requirements) or a MINIMUM of 50-minute calls allocated throughout the five (5) weekdays (Monday through Friday) as the child and the care provider determine is appropriate based on the child's unique situation, and/or child and their family's preference. ORR encourages care providers to go above the minimum whenever possible (for example, allowing 30-minute, 45-minute, or 60-minute calls every weekday). Time taken to connect calls must not be included in the minimum time allotment.
- **Weekends, Holidays, and Child's Birthdays**— Care providers must provide children with opportunities for daily MINIMUM 45-minute calls during weekends, holidays, and the child's birthday. Time taken to connect calls must not be included in the minimum time allotment.
- **Exceptional Circumstances**— If a child is experiencing a family emergency, such as grieving the loss of a loved one, or experiencing a mental health crisis, the care provider must adjust the child's call time to permit more time as necessary

(without infringing upon call time for other children at the facility or program).

Care providers must exhaust all efforts to utilize video calls over audio-only calls, where the family, sponsor and/or other approved contacts have access to video calling technology. If there are barriers to implementing a video call (due to weak signal in the location of the approved call participant, call participant's lack of access to internet, costs to the call participant etc.) reasonable attempts at getting through to the family members, sponsors, and/or other approved contacts should be made. Care providers must attempt at least three (3) times to connect a video or audio-only call.

Care providers are prohibited from taking away or threatening to take away opportunities to communicate with approved family members or sponsors as a form of punishment (see **Section 3.3.13 Behavior Management**).

**Attorneys of record** representing children have unlimited call access to children and the child may speak to other appropriate stakeholders, such as their consulate, the case coordinator, or child advocate. Calls with **legal service providers** (LSP), attorneys of record, case coordinators, **child advocates**, consulates, or others are not included in the minimum requirement stipulated above.

Care providers must create a list of approved and prohibited persons that a child may contact and may only prohibit calls if the care provider can document valid reasons for concern (for example, suspected smuggler or trafficker or past trauma with a particular individual). Care providers must maintain a call log in the child's case file that documents all opportunities provided to the child to participate in calls, attempts to make calls, and actual connected calls to family members, sponsors, LSPs, attorneys of record, consulates, case coordinators, child advocates, or other approved contacts.

**Visitation**

Care providers must encourage visitation between children and family members, sponsors, and/or approved visitors (e.g., other close contacts of the child that are approved by the care provider), unless there is a documented reason to believe there is a safety concern, as outlined in an individualized in-care safety plan per **Section 3.3.4 Safety Planning** regardless of the family member, sponsors, and/or approved visitor's immigration status. Care providers must have policies in place to ensure safety and privacy of children, staff, and visitors. Care provider policies include those that ensure that the child, staff, and visitors are safe, and that the child may communicate with the visitor in private while maintaining line of sight. Care providers must have an alternative public place for visits. Prior to any visit, all visitors must be informed of visiting hours and the circumstances that could result in the termination of the visit. Visits may be terminated if a child, staff, or visitor's safety or well-being is at risk, or if the child chooses to end the visit. Visitors must provide their name, address, and relationship to the child. Family, sponsor, and/or other approved visitors may only visit with the approved child for whom they are approved to visit and not with other children in the facility. Care providers must keep a list of approved and/or prohibited visitors.

Visitation must be supervised by staff in a way that respects the child's privacy, protects the child from potential harm, and ensures the child remains safely within ORR care. The staff must respect the child's privacy while reasonably preventing the unauthorized release of the child.

Visitors are prohibited from allowing children to use their personal cell phone to make calls, access the internet, or update social media without care provider's awareness. Visitors are prohibited from recording or taking photos of the child who they are visiting during the visit, unless approved by the FFS, Project Officer, or other ORR official. If approved, to take photos of the child who they are visiting, visitors must not take photos of other children in care.

Please note that the guidelines above are for family, sponsors, and other approved visitors visits only. For the separate processes that apply to attorneys, consulates, Protection and Advocacy (P&A) organizations, Congress, media organizations, and other stakeholders, see **Sections 5.2 ORR Policies on Requests to Tour ORR Care Provider Facilities**, **5.1.4 Requests to Visit a Facility**, **5.4.4 Visitation**, and **7.9 Requests to Visit Influx Care Facilities**.

**Mail**

Care providers must notify children that they have a right to send and receive mail. Care providers ensure that all mail, letters, packages, baggage, and any other items delivered to the care provider and addressed to the child are promptly delivered to the child. In addition, children must have access to postage to send letters to family, sponsors, and/or other approved contacts.

If there is reason to believe that contraband is included in a package or the mailed item presents a safety issue, the child must open the item in the presence of a care provider staff member who may conduct an inspection. If there is reason to believe it would be dangerous for the unaccompanied alien child to open an item, the care provider must call the appropriate authorities to properly handle suspicious packages. Children must not open mail in the presence of other children. Care providers must confirm the identity of the sender prior to release of mail. Care providers must keep a list of approved and/or prohibited mail recipients/senders and a mail log to track incoming and outgoing mail.

**Email**

Care providers must confirm the identity of the sender prior to a child accessing their email. Care providers must keep a list of approved and/or prohibited email recipients/senders and an email log to track incoming and outgoing emails. Children must also be given the opportunity to send emails to family members, sponsors, LSPs, attorneys of record, and others, if possible.

If a child has been hospitalized, this policy on calls, visitation, mail and email must be applied, to the extent possible.

*Revised 08/01/2024*


## 3.3.11 Clothing and Personal Grooming

**Care providers** must provide new clothing and footwear, items for personal hygiene, grooming, and hair as deemed appropriate and needed.

If the unaccompanied alien child arrives at the care provider facility with appropriate clothing the child will be allowed to wear it. Care providers will not use footwear as a means to control behavior.

Care providers also ensure that unaccompanied alien children have the appropriate time, space, and items for personal grooming and hygiene. Shaving facial hair may not be required if it violates the unaccompanied alien child's cultural norms, religious beliefs, or personal preferences, and head scarves may be worn for religious reasons.

Care providers must have standardized policies and procedures regarding gang-related symbols and tattoos. While the unaccompanied alien child is in the custody of ORR, care providers must ensure that any gang-related symbols, tattoos, accessories, or paraphernalia on an unaccompanied alien child are covered or confiscated.

*Revised 4/24/2017*


## 3.3.12 Assignment of Chores

Care providers may assign individual chores to unaccompanied alien children to teach them responsibility for their own living environment, but unaccompanied alien children may not be required to clean areas they do not occupy or use, such as administrative offices. Care providers must have written policies and procedures regarding chores, chore assignments, and schedules.

*Posted 1/28/2015*


## 3.3.13 Behavior Management

Behavior management strategies used by the care provider must meet child welfare best practice standards. ORR approves care provider written policies and procedures for behavior management, including rules for the program to provide clear guidance to care providers for the management of behavior of children in care. Care providers must not use behavior management practices that are punitive in nature, involve punishment, involve negative reinforcement, or involve consequences or measures that are not constructive and are not logically and proportionally related to the behavior being regulated. Most importantly, ORR expects care providers to utilize trauma-informed, linguistically responsive and evidence-based child-behavior management practices that take into consideration the range of ages and maturity of children placed in the program, and that are culturally sensitive to the needs of each child. This includes, but is not limited to, creating a structured environment with routines and schedules and fostering a supportive environment that encourages cooperation, communication, problem-solving, use of de-escalation strategies, and positive behavioral management skills. Care providers must avoid using threats, which include a statement of an intention to inflict pain, injury, damage, or other hostile actions on someone in retribution for something done or not done. Threats interfere with a child's ability to feel safe and develop trusting relationships with staff and can lead to less compliance with program rules and staff requests.

Therefore, to ensure the well-being of the child, care providers are prohibited from using the following measures:

1.  Sanctions that adversely affect the child's health or the physical, emotional, and/or psychological wellbeing of the child or consequences that deny or threaten to deny a child meals, hydration, sufficient sleep, routine personal grooming activities, access to a bathroom, exercise (including daily outdoor activity), medical care, religious observations and services or legal assistance.

2.  Threatened or actual corporal punishment, defined as: the infliction of physical pain on any part of a child's body as a means of controlling or managing the child's behavior.

3.  Threatened or actual withholding or limiting of communication with families or sponsors (including access to a child's personal cell phones or tablets in Long Term Foster Care settings) as is outlined in **Section 3.3.10 Calls, Visitation, Mail and Email**.

4.  Threatened or actual use of **seclusion** by care providers other than secure care providers in **emergency safety situations** as is outlined in **Section 3.3.15 Use of Restraints or Seclusion in Emergency Safety Situations**.

5.  Threats of writing a Significant Incident Report (SIR) to force a child to comply when a SIR is not warranted; and/or threat of a step-up in care provider facility type or transfer.

6.  If a level or points system is being used by the program, threats to take a child's level or points away without clear reasoning or in a manner disproportionate to the behavioral issues observed. Reasoning for a child not earning a level or points, or dropping in level or losing points, must be clear to the child, and proportionate to the behavioral issues observed. The care provider must explain to the child why they did not progress in the level or points system for that particular day.

7.  Threatening children with unfavorable consequences related to family/sponsor unification or legal matters (e.g., immigration, asylum, delays in reunification/discharge, loss of placement or shelter).

8.  Forced chores or work that serves no purpose except to demean or humiliate the child.

9.  Forced physical movement, such as push-ups and running, or uncomfortable physical positions, as a form of punishment or humiliation.

10.  Conducting a search of a child's personal belongings for the purpose of behavior management.

11.  All restraints, except as outlined in **Section 3.3.15 Use of Restraints or Seclusion in Emergency Safety Situations** and **Section 3.3.17 Planned Use of Restraints for Transporting Children To and From Secure Care Providers (that are not RTCs)**. This does not prohibit the use of holds to calm or comfort a child, which a child may request to stop at any time, as outlined in **Section 4.2.2 Care Provider Requirements**. **The following types of restraints are prohibited in all scenarios and in all care provider settings:**
     1.  **Prone physical restraints**;
     2.  **Chemical restraints**; and
     3.  **Peer restraints**

12.  Medication interventions that are not prescribed by a physician for a medical diagnosis.

5/20/25, 11:27 PM    ORR Unaccompanied Children Bureau Policy Guide: Section 3 | The Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR    Document 1567-9    Filed 05/22/25    Page 18 of 51
Page ID #:52858

Additional general requirements and expectations of care providers include:

1. Care provider staff must not engage in, or otherwise permit, harassment, bullying, threats, ridicule, insults, or discriminatory/prejudicial treatment, especially on the basis of a child's actual or perceived race, national origin, ethnicity, immigration status, religion, sex, sexual orientation, disability, or any other characteristic. More details on expectations for staff members' treatment of children can be found in **Section 4.3.5 Staff Code of Conduct**.

2. Care providers must not attempt to change or discourage a child's actual or perceived sexual orientation, identity, or expression as outlined in **Section 3.5 Guiding Principles for the Care of LGBQI+ Unaccompanied Alien Children**.

3. Involving law enforcement should be a last resort applied when all other de-escalation measures have been exhausted and the child still poses a threat of harm to self or others that cannot be addressed by appropriate program staff.

*Revised 02/27/2025*

## 3.3.14 Transportation Services

When ORR plans to release an **unaccompanied alien child** from its care to a sponsor, ORR must assist without undue delay in making transportation arrangements. In its discretion, ORR may require the care provider facility to transport an unaccompanied alien child. In these circumstances, ORR may, in its discretion, either reimburse the care provider facility or directly pay for the child and/or sponsor's transportation, as appropriate, to facilitate timely release.

Care providers are required to provide the following additional transportation services:[3]

- Individual transfers from one ORR care provider to another
- Group transfers due to an emergency situation or an **influx**
- ORR requests for special initial placements
- Local services and appointments, such as medical and dental appointments, immigration court hearings, or community services as part of the individual service plan
- Release of unaccompanied alien children to sponsors who are not able to pick up the unaccompanied alien child, as approved by ORR

ORR must ensure unaccompanied alien children have access to medical care, including transportation across State lines and associated ancillary services if necessary to access appropriate medical services, including access to medical specialists, family planning services, and **medical services requiring heightened ORR involvement**. This applies regardless of whether Federal appropriations law prevents ORR from paying for the medical care itself.

The care provider must comply with all State and local licensing requirements and State and Federal regulations, such as meeting or exceeding the minimum staff/child ratio required by the care provider facility's licensing agency, maintaining and inspecting all vehicles used for transportation, etc.

Unaccompanied alien children must be transported in a manner that is appropriate to the child's physical and mental needs, including the proper use of car seats for young children.

The care provider facility or contractor must conduct all necessary background checks for individuals transporting unaccompanied alien children. To the greatest extent possible under the circumstances, when transporting unaccompanied alien children care providers will assign transport staff of the same sex as the child.

**NOTE: Sexual abuse** and **sexual harassment** related issues are addressed in separate policies implementing the interim final rule on standards to prevent, detect, and respond to sexual abuse and sexual harassment. See **Section 4: Preventing, Detecting, and Responding to Sexual Abuse and Harassment**.

## 3.3.15 Use of Restraints or Seclusion in Emergency Safety Situations

**Summary**

Restraints must only be used in limited situations in which an unaccompanied alien child is in an emergency safety situation, and as consistent with the use of restraints according to state laws or licensing standards. Types of restraints allowed are listed by care providers type below.

Seclusion is only allowed at a secure care provider that is not a residential treatment center (RTC), as is detailed below.[4] Restraints or seclusion must be used only as a last resort in emergency safety situations and must be terminated as soon as the physical safety of the child and others can be ensured. Care providers must debrief the use of restraints or seclusion with the child and staff member after its use, and follow ORR's reporting requirements as is specified in **Section 5.8.2 Significant Incidents**.

**Restraints Which May Be Used in All Types of Care Provider Facilities**

**Personal restraints** are permitted according to applicable state and federal laws and licensure requirements but only in emergency safety situations.

Staff are permitted to physically console, hold, or hug a child with the child's verbal permission as is outlined in **Section 4.2.2 Care Provider Requirements**. These actions are not considered restraints and do not need to be reported to ORR as SIRs.

Seclusion and mechanical restraints are prohibited in all care provider facilities except secure care provider facilities (that are not an RTC).

**Restraints and Seclusion Allowed Only in Secure Care Provider Facilities (that are not RTCs)**

In addition to personal restraints permitted in care provider facilities as described above, **mechanical restraints** may also be permitted in a *secure* care provider setting (that is not a residential treatment center (RTC)), in accordance with applicable state, federal laws, and licensure requirements; and, in an emergency safety situation.

Seclusion may only be used in a secure care provider facility (that is not an RTC) in accordance to applicable state, federal laws, and licensure requirements; and, in an emergency safety situation. All instances of seclusion must be supervised and for the short time-limited purpose of ameliorating the underlying emergency risk that poses a serious and immediate danger to the safety of others.

**Use of Restraints and Seclusion as a Last Resort During an Emergency Safety Situation**

Restraints or seclusion may only be used to ensure the immediate physical safety of the child and others during an **emergency safety situation**. Restraints or seclusion may never be used as a means of coercion, discipline, convenience or retaliation by staff.

Restraints or seclusion must only be used as a last resort and used only when de-escalation techniques and less restrictive interventions prove ineffective in ensuring the immediate physical safety of the child and others. Only staff with appropriate training on the use of restraints and seclusion should use such methods to manage the child's behavior and only in during an emergency safety situation. Restraints and seclusion may only be used in a manner that is safe, proportionate, and appropriate to the severity of the behavior and the child's chronological and developmental age, size, sex, personal history and physical, medical, and psychiatric condition.

The use of restraints or seclusion must terminate when the emergency safety situation has ended and the physical safety of the child and others can be ensured. The type or technique of restraint or seclusion used must be the least restrictive intervention that will be effective to protect the child and others from immediate physical harm. Staff must review behavioral and medical conditions of the child on an ongoing basis during the emergency safety situation to justify the need for ongoing restraint and determine whether the

5/20/25, 11:27 AM    ORR UAC Unaccompanied Children Program Policy Guide: Section 3 | The Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR    Document 1567-9    Filed 05/22/25    Page 20 of 51
Page ID #:52860

restraint may be made less restrictive. The type or technique of restraint or seclusion used must be the least restrictive intervention that will be effective to protect the child and others from immediate physical harm.

All facilities must have restraint and seclusion policies that align with the UAC Policy Guide and all applicable state and federal laws and licensure requirements. As is specified in **Section 3.3.13 Behavior Management**, care provider facilities must provide their restraint and seclusion policies to ORR in the behavioral management plan for approval.

Only staff trained and certified in the use of restraints, seclusions, and de-escalation techniques may implement restraints or seclusion. Care providers must maintain a record of staff who have been trained and certified for reference in case use of restraint or seclusion is required in an emergency safety situation.

**Post Intervention**

Staff must provide the child with an opportunity to discuss the emergency safety situation as soon as possible after the event has been de-escalated or as soon as the child is ready to discuss the event, and no more than 24 hours after the child's release from the emergency restraint or seclusion. The discussion must be held in the child's native or preferred language. The discussion must be held in private as soon as possible and should include the staff[5] involved and a clinician trained in the use of restraints and seclusion. The child may request that the staff involved in administering the restraint be excluded from the discussion if they are uncomfortable with it. Additionally, the supervisor(s) of the staff involved in the emergency safety situation must review the event, as soon as possible and within 72 hours of the event, and identify additional de-escalation strategies that could have been employed to avoid or minimize the use of restraints or seclusion.

**Reporting the Use of Restraints or Seclusion**

Staff must report the use of restraints or seclusion during an emergency safety situation within 24 hours in a Significant Incident Report following **Section 5.8.2 Significant Incidents**, as well as any reporting requirements required by state law or licensing and federal laws. The report must include a description of the circumstances that required the use of restraint or seclusion and a description of the restraint used, including the length of use, type of restraint used, and justification for use of restraint or seclusion. Additionally, the report must document the interventions used by staff, including all de-escalation techniques employed prior to the use of restraints or seclusion. Care providers must also file an addendum to the SIR following **Section 5.8.4 Report Addendums**, which must confirm the care provider discussed the restraint with the child, indicate the child's response and provide any other relevant information.

**Restraints and Seclusion Prevention Strategies**

Restraints and seclusion are often preventable, and can be very traumatizing practices for children and staff that can impede the therapeutic alliance and create a culture of distrust and violence. For children who have experienced traumatic events, the use of restraints and seclusion often replicates the experience of abuse and poses a barrier to healing and recovery. Therefore, every effort should be made to prevent the need for use of restraints and seclusion.

Effective strategies include the following:

- Workforce training: Workforce training on trauma and its impact on the developing brain and behavior can help staff understand and address the underlying cause or reason for unsafe behavior, recognize the signs of trauma before immediate safety concerns arise, and provide non-aversive interventions, such as sensory regulation, positive behavioral interventions and supports, crisis prevention, and culturally responsive de-escalation techniques to prevent the need for use of restraints or seclusion.
- Organizational leadership support: There are a number of steps that organizations can take to support a prevention-first approach to the use of restraints and seclusion. These include incorporating an understanding of the prevalence and impact of trauma, as well as the complex paths to healing and recovery into all aspects of service delivery; reviewing agency policies, procedures and practices to ensure that the organizational culture emphasizes non-coercive, trauma-

informed approaches promoting safety and respect; using data to inform practice; and incorporating prevention tools, such as crisis plans, comfort rooms, and sensory tools.

- Use of sensory or quiet rooms: Facilities can set up a sensory or quiet room specifically designed to have a calming effect to improve focus and reduce anxiety, which can help a child de-escalate, and allow the child with the option to leave at any time. Sensory and quiet rooms have been found to help children regulate their bodies and emotions in times of extreme stress.

*Revised 02/27/2025*

## 3.3.16 Notification and Reporting of the Death of an Unaccompanied Alien Child

### Summary

To appropriately respond to the death of an unaccompanied alien child in the care and custody of ORR, ORR and its care providers must report the death to appropriate Federal, State, and local authorities. ORR must also notify the child's parent, legal guardian, or next-of-kin; attorney; Congressional committees identified below, and consulate officials of the death.

If an investigation is conducted, both ORR and care providers must follow-up with all investigations in order to remain informed of the progress and results of any investigation. Once ORR receives the results of any investigation, ORR will inform the unaccompanied alien child's parents, legal guardian, or next-of-kin of the results in a timely manner.

### Reporting to Local Authorities and ORR

**Q1: To whom must the care provider immediately report an unaccompanied alien child's death?**
A1: The care provider must immediately report the death to:

1. Local law enforcement, as appropriate;
2. The care provider's State or local licensing authority;
3. Child Protective Services, as applicable; and
4. ORR via a Significant Incident Report.

### Notification and Reporting within the US Department of Health and Human Services (HHS)

**Q2: Who must ORR immediately notify after receiving a report of an unaccompanied alien child's death?**
A2: ORR must immediately notify the appropriate staff in ORR, Office of the Administration for Children & Families (**ACF**) and U.S. Department of Health and Human Services (**HHS**).

### Notifications to External Parties
**Q3:Who must ORR notify within 24 hours of an unaccompanied alien child's death?**

A3: ORR must notify:

1. The unaccompanied alien child's parent, legal guardian, or next-of-kin;
2. The unaccompanied alien child's attorney of record or the care provider's local legal service provider;
3. The applicable Embassy;
4. The applicable consulate;
5. The child advocate, if applicable;
6. Congressional officials — (including majority and minority staff of the Senate and House Committees on the Judiciary, the Senate Committee on Health, Education, Labor and Pensions, the House Committee on Energy and Commerce, and the Senate and House Committees on Appropriations);

7. The local U.S. Immigrations and Customs Enforcement (ICE), Field Office Juvenile Coordinator (FOJC)

8. The U.S. Department of Homeland Security, ICE, Enforcement and Removal Operations, Juvenile and Family Residential Management Unit (ERO/JFRMU); and,

9. The U.S. Department of Health and Human Services, Office of the Inspector General (HHS/OIG).

**Method of Notification**

**Q4: How must care providers and ORR make notifications?**

A4: Care providers and ORR must make all notifications to the family telephonically, and to others telephonically or by email as appropriate, and follow-up within 24 hours with a written notification that includes documentation of the initial notification. Notifications must be provided in a language the recipient can understand. ORR must utilize translation services as appropriate when making notifications to individuals who may not understand or read English. All reports, notifications, and acknowledgments of receipt (if possible) must be documented and maintained in the unaccompanied alien child's case file.

**Notifications to Congress**

Upon certification by medical doctor of an unaccompanied alien child's death from an ORR care provider, ORR notifies Congressional committees' points of contact by email within 24 hours of the reported death.

**Ongoing Reporting and Follow-Up**

**Q5: Are there ongoing reporting requirements?**

A5:Yes, both ORR and care providers must make reasonable efforts to remain informed of the progress and results of any investigation and post-mortem medical examination. ORR will timely inform the decedent's parents, legal guardian, or next-of-kin of the results of any investigations, examinations, and reports. ORR will provide the final investigation results, if applicable, and the original death certificate to the unaccompanied alien child's parents, legal guardian, or next-of-kin. The care provider must maintain a copy of the death certificate and any reports in the unaccompanied alien child's case file.

**Q6: Will ORR internally review the care provider who had physical custody of the decedent at the time of the death?**

A6: Yes, ORR will review all investigation results, the decedent's case file and records, and any other available information. ORR will determine whether ORR policies and procedures were properly followed and whether the care provider appropriately responded to any related issues that arose prior to the death and to the death itself.

*Revised 08/02/2023*


# 3.3.17 Planned Use of Restraints for Transporting Children To and From Secure Care Providers (that are not RTCs)

ORR only allows the planned use of soft restraints[6] (e.g., leg or ankle weights) offsite during transportation for children to and from secure care providers (that are not an RTC) , and only when the care provider has made an individualized assessment that a child poses a serious risk of physical harm to self or others or a serious risk of escape from ORR custody. ORR also allows the use of restraints and seclusion off-site in emergency safety situations as is specified in **Section 3.3.15 Use of Restraints or Seclusion in Emergency Safety Situations.**

All use of restraints must follow applicable state licensing requirements, state and federal laws.

Any situation involving transportation to or from offsite outings with a child to or from a secure care facility (that is not an RTC) must be provided by appropriately trained care provider staff or an agency experienced in secure transportation of children. Staff responsible for transporting children must be trained on de-escalation strategies and resolving conflict without the use of restraints, the safe and effective use of approved soft restraints, and the emergency use of safe and approved personal or mechanical restraints

5/20/25, 11:27 AM    ORR Unaccompanied Children Program Policy Guide: Section 3 — Office of the Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR    Document 1567-9    Filed 05/22/25    Page 23 of 51
Page ID #:52863

during an emergency safety situation as is defined in in **Section 3.3.15 Use of Restraints or Seclusion in Emergency Safety Situations**.

Whenever soft restraints are used, their use must take into account the child's age, size, sex, personal history and physical, medical, and psychiatric conditions. If the care provider or transport agency believes the child cannot be transported safely in soft restraints to a non-emergency appointment or hearing due to the existing serious risk of violence or escape, the FFS and the secure care provider must work with the legal service provider (LSP) or attorney of record and any other appropriate parties to schedule a new appointment or hearing for the child at a later date. In the event of a medical emergency, the care provider must safely and appropriately transport the child to the emergency room for evaluation using soft restraints or must contact 9-1-1 for crisis response and transportation to the nearest emergency room.

Care providers and contractors that provide secure transport must submit the program's internal written policies and procedures concerning secure transportation services and use of soft restraints in offsite outings to ORR for approval.

If using restraints during transport, care providers must document all instances of the use of restraints in transportation logs. Use of soft restraints must be reported as Significant Incident Reports, as outlined in **Section 5.8.2 Significant Incidents**. The Significant Incident Report must include details of why the soft restraints were needed. Staff must provide the child with an opportunity to discuss the use of restraints as soon as possible with a trained clinician and staff involved as is appropriate / possible. If the staff is employed by a transportation agency, a trained clinician should discuss the event with the child instead.

Secure care providers must include policies regarding the use of restraints during transportation of unaccompanied alien children and during offsite outings in their behavior management plan, which must be approved by ORR before being implemented.

*Revised 02/27/2025*


## 3.3.18 Restraints in Immigration Court and Asylum Interviews

A care provider may restrain an unaccompanied alien child while at an immigration court or asylum interview if the child exhibits imminent runaway behavior, makes violent threats, demonstrates violent behavior, or if the secure facility has made an individualized determination that the child poses a serious risk of violence or running away if the child is unrestrained in court or the interview. If a secure care provider (that is not a Residential Treatment Center (RTC)) believes a child poses a serious risk of violence during a future court appearance or interview, the care provider and the FFS should contact their attorney or legal service provider as soon as possible to discuss alternatives to transporting the child that day, including asking for a later court date and/or requesting video/conferencing. If a care provider has considered all possible alternatives and none are suitable and the care provider believes using restraints is necessary in order for the child to appear in court without a serious risk of violence, the care provider must receive FFS Supervisor for approval before applying the restraint. If there is not an agreement between the care provider and the attorney of record or LSP, the request will be escalated to the FFS Supervisor for a final decision.

*Posted 07/08/2024*


## 3.3.19 Accommodations for Saravia Hearings

Eligible unaccompanied alien children who have a scheduled *Saravia* hearing have the option of attending their *Saravia* hearing in the jurisdiction where they were apprehended, the jurisdiction or their residence (before arrest), or at an immigration court close to their current ORR placement and can attend any preliminary hearings via video teleconference (VTC). However, they must attend the final *Saravia* hearing in person. Note that ORR is responsible for providing access to VTC technology.

If the unaccompanied alien child opts to transfer their *Saravia* hearing to an immigration court close to their current ORR placement, the care provider program should notify the assigned ORR/Federal Field Specialist (ORR/FFS) and the child's attorney within 24 hours

5/20/25, 11:27 AM
Case 2:85-cv-04544-DMG-AGR   Document 1567-9   Filed 05/22/25   Page 24 of 51
ORR-4.4 Unaccompanied Alien Children General Policy Guide: Section 3.4 Administration of Children and Families
Page ID #:52864

of said decision. Prompt notification is required as any Change of venue form must be filed within five (5) days of receiving notice of the upcoming *Saravia* hearing.

In addition, ORR must provide all transportation accommodations for *Saravia* hearings in accordance with its transportation policies and procedures (See **Section 3.3.14 Transportation Services**).

*Posted 02/12/2021*

## 3.4 Health Care Services

ORR facilitates and funds health care for all unaccompanied alien children in its custody. ORR has developed its medical services policies with the goals of ensuring the children's physical and mental well-being and the safety of care providers, medical personnel, and communities.

Each care provider program that accepts placement of children in ORR custody must have an established network of healthcare providers, including specialists, emergency care services, mental health practitioners, and dental providers available to provide healthcare services to admitted children.

Through its care providers and other health care professionals, ORR provides the following health care services, which must be available before children may be placed at the care provider:

- Routine medical and dental care;
- Family planning services, including pregnancy tests and comprehensive information about and access to medical reproductive health services and emergency contraception;
- Emergency health services;
- A complete medical examination (including screening for infectious diseases) within 48 hours of admission (excluding weekends and holidays and unless the child was recently examined at another facility);
- Immunizations;
- Administration of prescribed medications and special diets; and
- Appropriate mental health interventions.

Care providers must deliver services in a standardized manner that is sensitive to the age, culture, native language, and needs of each child. Care providers also must meet state and local licensing and public health requirements.

Serious medical services, including significant surgical or medical procedures, abortions, and medical services that may threaten the life of a child, require heightened ORR involvement and limited decision-making by ORR-funded care providers (see **Policy Memorandum: Medical Services Requiring Heightened ORR Involvement** (PDF)).

*Posted Date 1/8/2024; Effective Date 1/15/2024*

## 3.4.1 Healthcare Eligibility and General Standards

Healthcare eligibility is effective on the first day that an unaccompanied alien child has been placed in the physical custody of ORR. Eligibility for ORR coverage ends on the day the child leaves ORR's custody.

Care providers create collaborative partnerships with healthcare professionals and organizations to ensure children have access to healthcare. To ensure quality care, ORR requires care providers to partner with licensed medical practitioners (including physicians, physician assistants, and nurse practitioners) acting within their scope of practice to provide or supervise all medical evaluations and management. In addition, mental health services must be delivered by either a licensed medical healthcare provider or a non-licensed

5/20/25, 11:27 AM    ORR Unaccompanied Children Program Policy Guide: Section 3 | The Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR    Document 1567-9    Filed 05/22/25    Page 25 of 51
Page ID #:52865

mental healthcare provider under the supervision of a licensed provider. Any hospital or dental care provider providing services to children must be accredited by the Joint Commission or other nationally recognized accrediting body.

### Access to Interpreters During Healthcare Visits

Care providers must ensure that unaccompanied alien children are able to communicate with physicians, clinicians, and other healthcare staff in their preferred language during all medical and mental health examinations, treatment sessions, and other health encounters. To strengthen comprehension and age-appropriate communication, care providers must prioritize services from in-person, qualified interpreters before using qualified remote interpretation services.

Options for appropriate language access during healthcare visits, **in order of** preference, include:

1. An in-person bilingual/multilingual physician or advanced practice provider (APP) at a community-based or onsite care provider medical clinic who can speak directly to the child in their preferred language;

2. An in-person **Certified Medical Interpreter** (a qualified interpreter who holds a certificate in medical interpretation) **OR** an in-person bilingual/multilingual registered nurse (RN) or licensed vocational/practical nurse (LVN/LPN) employed at the healthcare provider's clinic who can speak directly to the child in their preferred language;

3. A qualified in-person interpreter;

4. Care provider staff who serve in the clinical role of RN or LVN/LPN in their current job position and are fluent in the child's preferred language;

5. A remote Certified Medical Interpreter;

6. Qualified remote interpretation services (e.g., by telephone or video, as appropriate).

Only care provider staff who serve in the clinical role of RN or LVN/LPN in their current job position at the care provider program can serve as interpreters during healthcare visits; no other care provider staff may perform this function. In addition, neither online translation services (e.g., Google Translate) nor the child's relatives or friends can be used for interpretation services during healthcare visits.

### Access to Medical Chaperones at Healthcare Visits

A **medical chaperone** is a member of the healthcare team who has been trained to act as a witness for both the patient and the healthcare professional during a **physical exam**. To ensure the safety and well-being of children, ORR requires a medical chaperone to be present for all **sensitive physical exams** (including the initial medical exam, if applicable) unless the child is 14 years or older and declines their presence. This requirement applies regardless of the sex of the child or healthcare provider performing the examination. The presence of a medical chaperone must be documented in the child's health record. Healthcare providers are also subject to their own states' laws and licensing requirements governing the use of medical chaperones.

Care providers must inform the child that a medical chaperone will be present during sensitive physical exams and explain their role. In addition, ORR recommends the presence of a medical chaperone during the non-sensitive components of a physical exam, as staffing allows. Care providers must inform the child of their right to have a medical chaperone present for non-sensitive components of the physical exam upon request.

### Responsibilities and Contingencies Regarding Medical Chaperones

It is the healthcare provider's responsibility to ensure the presence of a medical chaperone. Any healthcare professional (e.g., nurse, medical assistant) employed by the healthcare provider or clinic who has been trained to act as a medical chaperone can serve in this role. Whenever possible, the medical chaperone should be the same sex as the child, or the sex that the child requests.

When initiating a partnership with a healthcare provider outside of the care provider program, the care provider must inform the healthcare provider of this requirement and confirm that the healthcare provider can consistently ensure the presence of a medical

chaperone for all sensitive physical exams.

If the community healthcare provider cannot ensure the presence of a medical chaperone and the care provider has a staff member who serves in the clinical role of RN or LVN/LPN in their current job position, that staff member can serve in the role of medical chaperone during the sensitive physical exam, only if the child is comfortable with the care provider staff member being present.

An employee of the healthcare provider or care provider who is currently serving in the clinical role of RN or LVN/LPN and designated as the interpreter during a physical exam may also serve as the medical chaperone for the exam if they have completed required medical chaperone training and no other option is available.

A child may decline the presence of a medical chaperone at any time, either before or during any portion of the exam. If a child declines the presence of a medical chaperone, a good faith attempt should be made to counsel the child about the role and importance of the medical chaperone. If the child continues to decline, is 14 years or older, and has no diagnosed cognitive or intellectual disability, their decision must be respected.

If the healthcare provider refuses to proceed without the presence of a medical chaperone, the sensitive physical exam may be deferred to another time or different healthcare provider. Any decision by a child to decline a medical chaperone, or refusal by a healthcare provider to conduct a sensitive physical exam without a medical chaperone present, must be documented in the child's health record.

***Presence of Care Provider Staff During Healthcare Visits***

Children have the right to have confidential time with their healthcare provider. Healthcare visits do not require care provider line-of-sight or sound supervision. Non-medical care provider staff may only be present during the child's visit with a healthcare provider in the following circumstances:

- A child is tender age (12 years or younger);

- A child has individualized needs that require assistance, such as a disability or other medical or behavioral/mental health conditions; and/or

- A child specifically requests the presence of care provider staff.

Care provider staff are responsible for communicating relevant medical history to the healthcare provider, while also ensuring the child has an opportunity to speak with their healthcare provider privately, if they wish. This does not conflict with the medical chaperone requirement during sensitive physical exams.

*Revised 02/27/2025*

## 3.4.2 Initial Medical and Dental Examinations and Follow-up Care

Each unaccompanied alien child must receive a comprehensive initial medical examination (IME) within two (2) business days of admission into ORR care. Children admitted with urgent medical needs or pre-existing medical conditions must be evaluated as soon as possible as is specified in **Section 3.4.3 Requests for Healthcare Services, including Medical Services Requiring Heightened ORR Involvement**.

The purpose of the IME is to assess general health, administer immunizations in keeping with U.S. standards, identify health conditions that require further attention, and detect contagious diseases, such as influenza or tuberculosis. Care providers must ensure that healthcare professionals are following ORR's latest guidance and reporting their findings on ORR forms. Payment for the IME is pre-approved by ORR.

5/20/25, 11:27 AM    ORR Unaccompanied Alien Children Bureau Policy Guide: Section 3 | The Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR    Document 1567-9    Filed 05/22/25    Page 27 of 51
Page ID #:52867

Children who transfer between ORR care provider programs do not need to receive a new IME, however state licensing may require a new "baseline" medical examination.

Children must receive follow-up care for identified conditions as recommended by the healthcare provider. Services should be requested following the process laid out in **Section 3.4.3.** Children must receive follow-up vaccinations in accordance with the Advisory Committee on Immunization Practices (ACIP) Catch-up schedule. Additionally, children in care for more than a year must receive an annual physical examination, which must include hearing and vision screening, and follow-up care for acute and chronic conditions.

Children must receive an initial dental examination (IDE) between 60 and 90 days after admission into ORR care, or sooner if directed by state licensing.

Children with an urgent dental issue (acute tooth pain, procedure(s) needed to maintain basic function, i.e., severe and/or acute infection or a severe and/or acute infection is imminent), should receive care as soon as possible and should not wait for the IDE. Children who are given a dental treatment plan for any identified issue should receive treatment as recommended by the dental provider. Children who remain in care must receive preventative follow-up dental examinations after the IDE as recommended by the dental provider (or not less than every six (6) months).

*Revised 08/01/2024*

## 3.4.3 Requests for Healthcare Services, including Medical Services Requiring Heightened ORR Involvement

Care providers have a responsibility to initiate healthcare services when they observe unaccompanied alien children in need of medical attention. Established policies and procedures should foster an atmosphere that encourages children to request healthcare services as needed. Children must be able to make written and/or verbal requests for emergency and non-emergency healthcare. The care provider must also have a process for children with language and literacy barriers to communicate their healthcare needs. Care provider staff must clearly explain the process for requesting healthcare services and address any questions and concerns from children regarding those processes. All requests from a child must be documented and maintained in the child's health record. If there is a healthcare concern that is not a clear emergency, the care provider must triage the concern with a healthcare professional as soon as possible but no more than two (2) hours after the request or observation that a child is in need of healthcare services. If the child has any questions or concerns about healthcare or healthcare services they have received, the care provider must direct those questions to the healthcare provider.

Care provider facilities must notify ORR within 24 hours of an unaccompanied alien child's need or request for **medical services requiring heightened ORR involvement** or the discovery of a pregnancy.

The care provider must follow **Policy Memorandum: Medical Services Requiring Heightened ORR Involvement** (PDF) for serious medical services and requests for abortions.

*Revised 08/01/2024*

## 3.4.4 Medication Administration and Management

Care providers must have policies and procedures based on State or local laws and regulations to ensure the safe, discreet, and confidential provision of prescription and nonprescription medications to unaccompanied alien children, secure storage of medications, and controlled administration and disposal of all drugs.

This includes:

5/20/25, 11:27 AM                    ORR 4 Unaccompanied Alien Children Bureau Policy Guide: Section 3 | US Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR   Document 1567-9   Filed 05/22/25   Page 28 of 51
Page ID #:52868

- Locking cabinets, closets, and refrigeration units.

- Recording all prescribed medications in the child's file.

- Training all staff or foster parents who dispense medications in the "Five Rights of Medication Administration" (right recipient, right medication, right dose, right time, and right route of administration).

- Confirming that the child has ingested the medication.

- Documenting that prescribed or over-the-counter medications have or have not been administered (by whom, and if not, for what reason, including the date, time of administration, name of medication, and dosage).

- Prohibiting one child to deliver medications to another.

- Disallowing an unaccompanied alien child's self-administration of medications, either orally or topically, outside the presence of a staff member.

A licensed health care provider (a nurse, physician, physician's assistance, nurse practitioner) must write or verbally order all nonprescription medications. Verbal orders must be documented in the child's case file.

*Revised 9/12/2015*

## 3.4.4.1 Informed Consent for Psychotropic Medication

This policy provides guidance on implementing 45 C.F.R. § 410.1310.  Additionally, ORR policy and procedures related to the administration of psychotropic medication to children in ORR custody were developed pursuant to a Settlement Agreement in *Lucas R. v. Becerra*, which became effective on May 3, 2024. In accordance with the Settlement Agreement, care providers must obtain informed consent before administering psychotropic medication to any child in ORR custody.  Compliance by ORR and care providers is regularly monitored through several mechanisms described below.

Psychotropic medication is prescription medication that is prescribed for the treatment of symptoms of psychosis or another mental, emotional, or behavioral disorder and that is used to exercise an effect on the central nervous system to influence and modify behavior, cognition, or affective state. The term includes the following categories:

1. psychomotor stimulants;

2. antidepressants;

3. antipsychotics or neuroleptics;

4. agents for control of mania or depression;

5. antianxiety agents; and

6. sedatives, hypnotics, or other sleep-promoting medications.

Except in the case of psychiatric emergencies (as defined below), care providers shall not initiate new psychotropic medication for a child in ORR custody without obtaining informed consent prior to the administration of the medication. Psychotropic medications shall be used to treat psychiatric conditions only after completion of a diagnostic assessment by a licensed medical professional and consideration of other situational factors that may be contributing to the child's condition (e.g., trauma) and must be administered at dosages that do not exceed the dosing guidelines for the child's age and weight, where available. For more information on dosage guidelines, care providers should consult the American Academy of Child and Adolescent Psychiatry 's (AACAP) **online guide on psychiatric medication** ⧉ .

Psychotropic medication must be aligned with the child's diagnosis (*i.e.*, the medication is appropriately used on- or off-label to treat the child's specific diagnosis and not used due to other therapies being inconvenient or more expensive, recognizing that payment systems may utilize formularies), and only administered in accordance with the licensed medical professional's instructions, based upon the child's symptoms.  The child must be periodically assessed by a licensed medical professional for side-effects and benefits.

ORR strictly prohibits providers from administering psychotropic medication to children as a form of punishment, for the convenience of staff members or caregivers, as a substitute for adequate staffing and/or adequate, continuous programming to meet a child's individual needs, or as a substitute for other clinical services, accommodations or supports.

**Persons Authorized to Provide Informed Consent**

Three (3) categories of persons are authorized to provide informed consent for the administration of psychotropic medication to children in ORR custody. These persons are known as **Authorized Consenters**. The three categories of Authorized Consenters are listed below in the order of preference for obtaining informed consent.

- **Primary Consenter**: a parent or legal guardian, whether residing in the United States or in another country.
- **Sponsor Consenter**: a brother, sister, or grandparent or other close relative who has been the child's primary caregiver potential sponsor recorded in the UAC Portal as possessing a pending application that is undergoing review for sponsorship of the child.
- **UAC Consenter**: a child in ORR custody aged 16 or 17 years old from whom a licensed medical professional has obtained informed consent.

**Centralized Concurrence Unit (CCU)**

The **Centralized Concurrence Unit (CCU)** is a panel of licensed psychiatrists). Care providers may seek concurrence from the CCU in circumstances where informed timely consent from an Authorized Consenter is not possible. The Care Provider must demonstrate its efforts to obtain informed consent from an Authorized Consenter were unsuccessful, or that neither the child nor another available person qualifies to serve as the child's Authorized Consenter.

In situations where a Primary Consenter or Sponsor Consenter denies consent, care providers can request that the CCU concur with their request for an override of the consent denial. The CCU may only concur to override denial of consent if, after consulting with the prescribing licensed medical professional and the care provider,[7] the CCU finds in its professional judgment that:

- Administering the prescribed medication is in the best interest of the child; <u>and</u>
- Failure to take the prescribed medication is likely to:
  - Either result in observable and material impairment to the growth, development, or functioning of the child or place the child at imminent risk of substantial bodily harm or of inflicting substantial bodily harm to others; <u>and</u>
  - All other reasonable measures alone have been determined unlikely to prevent the child from the impairment or harm described above.

The CCU must make two documented attempts to contact the Primary Consenter or Sponsor Consenter to obtain the basis for the denial of consent, if not provided by the Care Provider or prescribing clinician.

The Primary Consenter or Sponsor Consenter will be notified of the CCU's override of their denial in a language that the Primary Consenter or Sponsor Consenter understands. The Primary Consenter or Sponsor Consenter will also be provided instructions for reporting any concerns to the Court Appointed Monitor (see below for more details).

The CCU cannot override a UAC Consenter's denial of consent.

The CCU must also document and track any instance it concurs to override the Primary Consenter or Sponsor Consenter's denial of consent.

**Obtaining Informed Consent for Providing Psychotropic Medication to Children**

Informed consent for administering psychotropic medication to children in ORR custody is a two-step process that care providers must follow. First, the care provider must obtain verbal consent from an authorized consenter within five (5) calendar days of a licensed medical professional prescribing the medication. Second, the care provider must obtain written consent from an authorized consenter within 25 calendar days of a licensed medical professional prescribing the medication.

The care provider must obtain verbal consent before commencing any new course of psychotropic medication to a child in ORR custody, at which time they will receive up to a 30-day supply of the medication. Upon obtaining the written consent, the care provider will be able to receive the remaining portion of the prescription beyond a 30-day supply. Therefore, it is essential that care providers promptly obtain verbal consent within five (5) calendar days and written consent within 25 calendar days of the medication being prescribed.

For care providers admitting children who are already receiving psychotropic medication without documented informed consent, the care provider will seek verbal informed consent within five (5) days of admitting the child to their program and obtain written consent within 25 days of admitting the child to their program.

Care providers should first seek informed consent from the Primary Consenter. Although the child may have two parents or legal guardians available, informed consent is only required from one parent. A Primary Consenter is deemed unavailable to provide informed consent when at least one of the circumstances listed below applies.

- The child has no living parent or legal guardian, as documented in the case file.
- The parent or legal guardian has failed to respond after the care provider made three separate attempts to contact them over two (2) separate days. These attempts must be documented in the case file.
- The child has a parent or legal guardian residing in the United States who was contacted but has declined to sponsor the child.
- There is a documented history of abuse, abandonment, or neglect by the parent or legal guardian, and the unaccompanied child (who must be aged 14 years or older) voluntarily states in writing that they do not wish for the parent or legal guardian to act as their Primary Consenter. The fact that a child traveled unaccompanied to the United States cannot be the basis for considering that child abandoned by their parent or legal guardian.

If a Primary Consenter is not available, the care provider should seek informed consent from the Sponsor Consenter if one exists for the child. A Sponsor Consenter is deemed unavailable to provide informed consent when at least one of the circumstances listed below applies.

- The potential sponsor does not meet the criteria to serve as the Sponsor Consenter.
- The potential sponsor has failed to respond after the Care Provider made three (3) separate attempts to contact them over two separate days. These attempts must be documented in the case file.

If neither a Primary Consenter nor a Sponsor Consenter is available to provide informed consent, then the care provider should seek informed consent from the unaccompanied child, if the child is 16 or 17 years old (UAC Consenter).

If there is no Authorized Consenter (Primary Consenter, Sponsor Consenter, or UAC Consenter) available to provide informed consent, the care provider should contact the CCU as soon as possible for a decision as to whether they concur with administering the prescribed psychotropic medication to the child.

Care providers are responsible for immediately alerting ORR's Division of Health for Unaccompanied Alien Children (DHUAC) whenever a child in their care consents to the administration of any antipsychotic or three (3) or more psychotropic medications, or when the care provider is concerned about the psychotropic medication being prescribed. Care providers will relay this information via email to ORRDHUAC@acf.hhs.gov under the subject line 'Lucas R. Psychotropic Medication Alert'.

**Components Necessary for Informed Consent**

Care providers must convey information regarding the medication and treatment plan to the Authorized Consenter in a language that the Authorized Consenter understands and in an age- and culturally- appropriate manner. If an Authorized Consenter is unable to read, care providers must verbally review the written consent form with the Authorized Consenter in the Authorized Consenter's preferred language. The review of the written consent form may occur at the same time as the care provider is obtaining verbal consent, as the information conveyed to the Authorized Consenter is the same for obtaining both verbal and written consent. If an Authorized Consenter is unable to write or sign their name, it is acceptable for the Authorized Consenter to affix their mark to the written consent form (i.e., their fingerprint or an "X" suffices as their signature). The Authorized Consenter may transmit their signed written consent form as a picture via a communications application (e.g., WhatsApp), text message, email, or other means of electronic communication as returning the signed form timely via mail may not be possible.

The care provider must convey to the Authorized Consenter the fourteen topics listed below prior to obtaining verbal and written consent.

1. The child's diagnosis.
2. The nature of the child's specific condition to be treated.
3. Purpose of the medication.
4. Beneficial effect on the child's condition that is expected from the medication.
5. Risks and benefits of not consenting to the medication and risks and benefits of polypharmacy.
6. Description of any accompanying discomforts, possible side effects, risks associated with the medication, and the nature and possible occurrence of irreversible symptoms.
7. Whether the medication is habituating in nature.
8. Alternatives to the use of the medication that have been attempted and were unsuccessful.
9. Generally accepted alternative medications and non-pharmacological interventions, if any, as well as the risks and benefits of those alternatives.
10. Name, credentials, and contact information for the prescribing medical professionals.
11. Right of the Authorized Consenters to withhold consent and an explanation of the next steps that will be taken to address the child's condition if they do not consent (i.e., seek override from the CCU, if necessary).
12. Right of the Authorized Consenter to withdraw consent at any time, with an explanation of the next steps that will be taken (i.e., seek override from the CCU, titrate the child off the medication over time).
13. Explain that delay or denial of step-down to a less restrictive placement or release of the child will not occur to punish the child or the Authorized Consenter withholding or withdrawing consent.
14. Other information that the care provider, treating mental health professional, or treating medical professional determines is necessary for the Authorized Consenter to provide informed consent.

**Updating and Renewing Informed Consent**

Programs will renew the verbal and written informed consents when either of the two conditions detailed below occur.

1. The type of psychotropic medication prescribed changes.
2. The dosage for the psychotropic medication increases beyond the parameters indicated in the initial informed consent as permissible as titration. Every six (6) months after the date that the Authorized Consenter provided verbal informed consent.

**Obtaining Child's Assent or Agreement to Take Psychotropic Medication**

Separately from obtaining informed consent, care providers are required to obtain informed assent or agreement from children aged 14 years or older to take the prescribed psychotropic medication. While the child's denial of assent or refusal to take the medication does not nullify the informed consent from an Authorized Consenter or concurrence from the CCU, administering the medication requires the child's willingness to take the medication. Children who decline to provide assent will not be administered the medication,

5/20/25, 11:27 PM                    ORR UAC Unaccompanied Alien Children Bureau Policy Guide: Section 3 | The Administration for Children and Families
Case 2:85-cv-04544-DMG-AGR    Document 1567-9    Filed 05/22/25    Page 32 of 51
Page ID #:52872

except in the case of Emergency Administration as described below. To accomplish receiving informed assent from a child aged 14 years or older, the care provider must:

- Discuss with the child in an age and developmentally appropriate manner and in a language that the child understands:
  - The purpose of the medication and that it is part of their treatment plan;
  - The potential side effects of the medication; and
- Offer the child an opportunity to voice reactions or concerns regarding the medication.
- Show the child a written notice explaining that the child may speak privately with the prescribing licensed medical professional if the prescriber is willing to do so. This written notice should include the date that it was shown to the child and be included in the child's case file.

**Emergency Administration of Psychotropic Medication to Children**

Administration of psychotropic medication to a child in ORR custody without prior consent is permissible in an emergency. The administration of psychotropic medication to a children in ORR custody without receiving the child's prior assent is also permissible in an emergency. An emergency exists where the immediate failure to administer psychotropic medication to the child poses an imminent threat of death or substantial bodily harm to the child or others. Except where gradual weening off a medication administered on an emergency basis is medically necessary, use of the emergency medication must terminate when the emergency has ended.

ORR's Division of Health for Unaccompanied Alien Children (DHUAC) will monitor any care provider that administers psychotropic medication for an emergency to the same child three or more times while the child is placed at their program. In addition, DHUAC will monitor any care provider that administers psychotropic medication for an emergency five (5) or more times within 30 days to any children in their program. DHUAC's monitoring efforts will be reported to the Court Appointed Monitor, who is responsible for ensuring ORR's compliance with the Settlement Agreement in *Lucas R. v. Becerra*.

In circumstances where psychotropic medication is administered to a child in ORR custody for emergency reasons, the care provider must perform the following duties.

- File an Emergency Significant Incident Report in accordance with **UAC Policy 5.8.1 Emergency Incidents**.
- Notify the Primary Consenter or Sponsor Consenter of the emergency administration of psychotropic medication as soon as practicable, but not later than one (1) week after the initial administration.
- Document in the child's case file an explanation of the nature and circumstances of each administration of an emergency medication.
- Conduct a meeting between the case manager, clinician, and the child within one (1) week of the emergency administration to discuss what should be done in the future to meet the child's needs in lieu of administration of emergency medication..

**Monitoring Compliance Regarding Administration of Psychotropic Medication to Children in ORR Custody**

ORR policy and procedures related to the administration of psychotropic medication to children in ORR custody were developed pursuant to a court-enforced Settlement Agreement in *Lucas R. v. Becerra*, which became effective on May 3, 2024. In accordance with the Settlement Agreement, compliance by ORR and care providers will be regularly monitored by the Court-Appointed Monitor. Additionally, the attorneys who represented children in *Lucas R.* (known as Class Counsel) may periodically conduct confidential attorney-client visits with children in ORR custody who are prescribed or administered one (1) or more psychotropic medication(s) (with the children's consent) at the program where they are residing.

Oversight Duties of Licensed Child and Adolescent Psychiatrist(s) within ORR DHUAC

A licensed child and adolescent psychiatrist(s) within ORR's DHUAC will have oversight responsibilities that include:

Case 2:85-cv-04544-DMG-AGR    Document 1567-9    Filed 05/22/25    Page 33 of 51
Page ID #:52873

- Reviewing cases flagged because a UAC Consenter consented to:
  - the administration of antipsychotics;
  - the administration of three (3) or more psychotropic medications; or
  - where care provider expresses concerns about the psychotropic medication being prescribed.

- Conducting retrospective, secondary reviews of psychotropic medication prescriptions for children in ORR custody, where the review must examine:
  - Administration of any psychotropic medication to a child aged three or younger.
  - For children aged four or older:
    - Simultaneous administration of three or more psychotropic medications for 90 days or more.
    - Administration of two or more antipsychotic medications for 60 days or more.

  - A minimum of an annual review of instances where the CCU overrides a denial of consent by a Primary Consenter or Sponsor Consenter.
  - Use of psychotropic medication dosages in excess of the parameters for a child's age and weight as noted in the "literature based maximum dosage" established by the Texas Health and Human Services Commission (HHSC) document entitled "**Psychotropic Medication Utilization Parameters for Children and Youth in Texas Public Behavioral Health** ⧉ (PDF)". As the document is periodically updated, care providers should utilize the most current version available.

- Conducting an annual case review of at least 30 case files for children administered psychotropic medication to evaluate care provider compliance with the duty to exercise reasonable and diligent efforts to compile and maintain the child's medical records.
- DHUAC will track and document its oversight duties and report their efforts to the Court Appointed Monitor for inclusion in the Monitor's report to the court overseeing the Settlement Agreement.

*Posted 03/17/2025; Special note regarding the effective date of UAC Policy Section 3.4.4.1: ORR is implementing this section of the UAC Policy Guide across the care provider network over several months. The implementation will proceed in phases, according to a transition schedule that covers a 21-month period. Therefore, the effective date of UAC Policy Section 3.4.4.1 for each care provider will vary, depending on the transition deadline established for each care provider. UAC Policy Section 3.4.4.1 will become fully effective for all ORR programs by August 3, 2026. ORR's DHUAC will also be fully responsible for their oversight duties as of May 3, 2026.*

## 3.4.5 Responding to Medical Emergencies

All medical emergencies must be immediately addressed. A medical emergency is characterized by signs or symptoms that would reasonably be considered to require immediate medical attention to prevent death, loss of or significant damage to an organ or body function. Medical emergencies also include pregnancy complications.

The policy on communicating about medical emergencies involving pregnancy, birth, or abortion can be found in **Policy Memorandum: Medical Services Requiring Heightened ORR Involvement** (PDF).

*Posted 8/4/2021; Revised 08/02/2023*

## 3.4.6 Management of Communicable Diseases

From intake to release, care providers must observe all children for signs or symptoms of communicable diseases and act accordingly to protect others against possible infection.

5/20/25, 11:27 PM    ORR-4 Unaccompanied Alien Children General Policy Guide: Section 3 Tips Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR    Document 1567-9    Filed 05/22/25    Page 34 of 51
Page ID #:52874

Facilities must be aware of the list of notifiable diseases in their States. Each facility must have policies and procedures for identifying, reporting, and controlling communicable diseases that are consistent with State and local laws and regulations. Further, each facility must inform ORR about each suspected or confirmed case and follow ORR medical guidance on managing cases and contacts, which is prepared and disseminated to care providers by the ORR/Medical Services Team. ORR has protocols for diseases of public health concern that have been diagnosed in unaccompanied alien children, including varicella and tuberculosis. The care provider is responsible for training all staff about its current communicable disease plan.

Care providers must have an identified space within the shelter facility that may be used for quarantine or isolation in the event that an unaccompanied alien child must be separated from the general population for a medical reason. An unaccompanied alien child may be placed in medical isolation and excluded from contact with the general population in order to prevent the spread of an infectious disease due to a potential exposure, protect other unaccompanied alien children and care provider facility staff for a medical purpose, or as required under State, local, or other licensing rules, as long as the medically required isolation is limited only to the extent necessary to ensure the health and welfare of the unaccompanied alien child, other unaccompanied alien children at a care provider facility, and care provider facility staff, or the public at large. The space must be suitable to house a child for days or weeks.

Unaccompanied alien children must be admitted to a hospital if clinically indicated, if public health needs require it, or if isolation at the facility cannot be achieved safely and effectively. An unaccompanied alien child's refusal of treatment that puts others at risk for spread of the disease is considered a public health justification for isolation.

Facilities must provide regular updates to ORR regarding the mental and physical health of children in isolation. Standard programs and **restrictive placements** must provide all mandated services to the greatest extent practicable under the circumstances to unaccompanied alien children in medical isolation. Medically isolated unaccompanied alien children still must be supervised under State, local, or other licensing ratios, and, if multiple unaccompanied alien children are in medical isolation, they should be placed in units or housing together (as practicable, given the nature or type of medical issue giving rise to the requirement for isolation in the first instance).

*Revised 08/01/2024*

## 3.4.7 Maintaining Health Care Records and Confidentiality

Care providers are responsible for procuring and maintaining records of health care services received by unaccompanied alien children while in their care. Care providers must request records for all office visits (medical, dental, mental health), hospitalizations, radiology and lab results, and procedures.

Care providers must maintain the children's individual health files separately from the children's case files unless state licensing requirements dictate otherwise. In addition, care providers must report health information to ORR as directed and retrieve records upon ORR's request, even after a child's release. Upon a child's transfer to another ORR program, care providers must transfer with the child all medical, dental, and mental health records. Upon release from ORR custody, children are entitled to receive copies of their health records. At a minimum, all children at release must receive:

- Initial medical screening documentation;
- Immunization records; and
- Lab test results or radiograph readings.

Also upon release, children who have been hospitalized for any medical or mental health issues must receive copies of their relevant health records, including hospitalization admission note and discharge summary.[8]

*Confidentiality of Healthcare Information*

The care provider must have written policies, procedures, and practices that protect the confidentiality of medical information. To safeguard children's privacy, care providers must use discretion when communicating with an unaccompanied alien child about medical appointments in the presence of others. Care provider staff also must dispense medication in a private location. Similarly, medical disclosure to staff about a child's health condition should be determined by the Program Director on a need-to-know basis.

For confidentiality policies on issues related to pregnancy, birth, and abortion, care providers must follow the **Policy Memorandum: Medical Services Requiring Heightened ORR Involvement** (PDF) — **Notification Section**.

*Posted 8/4/2021*

## 3.4.8 Medical Clearance Prior to Release or Transfer

Unaccompanied alien children who have serious physical or mental health issues or have had exposure to a communicable disease may not be transferred or moved until they have been medically cleared by a physician or ORR is consulted. Pregnant unaccompanied alien children should be medically cleared for travel by plane if required by the air carrier (generally, after 36 weeks of pregnancy) or if they delivered within the past seven (7) days. Children with medical needs must have follow-up services or other arrangements in place prior to their discharge.

Unaccompanied alien children who need to remain on prescription medication must receive a minimum of a 30 day supply of medication, or the remainder of their medication if on a time-limited course, prior to transfer or release. The unaccompanied alien child and the accepting care provider (in the case of a transfer) or a sponsor (in the case of release) must be instructed in the proper administration of medications. Care providers may not release unaccompanied alien children with any narcotic medications. As part of release planning, if an unaccompanied alien child is on any chronic **psychotropic medications**, the care provider must address the unaccompanied alien child's situation, including likelihood of maintaining medications upon release from ORR custody, with the prescribing psychiatrist to determine if medications should be continued or if a period of weaning off the medication is required before release.

Unaccompanied alien children who are infectious with communicable diseases of public health concern, which have potential to cause outbreaks, will not be released from ORR care until they are non-infectious. However, if an infectious child must be moved internally within a facility, to another facility, or to the hospital, care providers and others having interaction with the child must follow Standard Precautions, depending on the mode of disease transmission (e.g., surgical mask should be worn by children with diseases spread by the respiratory route). The care provider must provide the medical, dental, and mental health records to the unaccompanied alien child upon release or to the accepting care provider in the event of a transfer.

*Posted 5/11/2015*

## 3.4.9 Provider Reimbursement

Each ORR-funded care provider program must have an established network of healthcare providers, including specialists, emergency care services, mental health practitioners, and dental providers that will accept ORR's fee-for-service billing system.

Payment for health services for unaccompanied alien children in ORR care is managed by a third-party entity. Healthcare providers are encouraged to enter into an agreement with the third-party entity before providing care for children. Contracting with the third-party entity in advance will facilitate the appointment scheduling and billing process. Programs should submit the names of selected healthcare providers directly to the third-party entity who will then contact the healthcare providers and work out an agreement. Facilities providing emergency or urgent services do not need to have an agreement with the third-party entity prior to administering care.

5/20/25, 11:27 AM
UAC-4-Unaccompanied Alien Children Bureau Policy Guide: Section 3 | The Administration for Children and Families
Case 2:85-cv-04544-DMG-AGR   Document 1567-9   Filed 05/22/25   Page 36 of 51
Page ID #:52876

ORR does not permit or reimburse **sexual orientation and identity (SOI) change efforts**, commonly referred to as "conversion therapy," for children in ORR custody under any circumstances. (See **Section 3.5.6 Prohibition on Sexual Orientation and Identity Change Efforts**)

ORR does not reimburse care providers and medical providers for transportation costs associated with mobile medical providers. Transportation for services, including but not limited to medical, radiology, laboratory, and dental services, are at the care provider's expense. Care providers should take transportation fees into consideration when contracting with mobile medical providers.

Treatment authorization requests for non-emergency, scheduled office visits (primary care, specialty consultations, mental health, and dental care), laboratory tests, surgeries and procedures, physical therapy, and other specialized health treatments must be pre-approved before services are rendered. Prior authorization by ORR to cover the related costs in no way implies consent to conduct the procedure or provide the medical service when consent by a parent or legal guardian is required and cannot be obtained.

Considering the high turnover and short-term stay of most children in ORR custody, some services are not appropriate (e.g., cosmetic treatment, medical consultations for minor health concerns where safe and effective home remedies exist, specialty consultation for a stable condition that cannot be resolved before discharge and will not affect treatment or care while in custody, etc.)

*Revised 02/27/2025*

# 3.5 Guiding Principles for the Care of LGBQI+ Unaccompanied Alien Children

All children in ORR care are entitled to human rights protections and freedom from discrimination and abuse. Care providers must ensure that children who are lesbian, gay, bisexual, queer or questioning, or intersex (**LGBQI+**) and nonbinary children are fairly treated and served during their time in ORR custody.

ORR requires care providers to operate their programs following the guiding principles below. Care providers must ensure that LGBQI+ children:

- are treated with dignity and respect
- receive recognition of their sexual orientation and/or identity
- are not discriminated against or harassed based on actual or perceived sexual orientation or identity
- are cared for in an inclusive and respectful environment

Care providers must:

- maintain the privacy and confidentiality of information concerning sexual orientation and identity (See **Section 5.10 Information Sharing**)
- use chosen names and pronouns in accordance with the child's self-determined identity
- house LGBQI+ children according to an assessment of the child's identity and housing preference, health and safety needs, and State and local licensing standards
- offer an individualized assessment to determine whether additional or alternate restroom accommodations should be provided
- allow LGBQI+ children to dress and express themselves according to their identity
- allow LGBQI+ children to choose the sex of staff to conduct a pat-down search if one is necessary

More details about the protections of LGBQI+ children can be found below and in **Section 4: Preventing, Detecting, and Responding to Sexual Abuse and Harassment**.

### 3.5.1 Zero Tolerance for Discrimination and Harassment

LGBQI+ children have the right to be free from discrimination and harassment based on actual or perceived sexual orientation or identity (SOI). More specifically, care providers may not label a child as a likely abuser or punish a child for their sexual orientation, identity, or expression. All children must be treated fairly and equally and provided with inclusive, safe, and nondiscriminatory services.

*Revised 02/27/2025*

### 3.5.2 Prohibition on Segregation and Isolation

Care providers must be responsive to the needs of LGBQI+ children in an inclusive and respectful environment. Care providers may not isolate or involuntarily segregate children solely because of their sexual orientation, identity, or expression. In addition, one-on-one supervision may only be utilized in exigent circumstances.

*Revised 02/27/2025*

### 3.5.3 Confidentiality with Regard to Sexual Orientation and Identity

As noted above, the privacy and confidentiality of children with regard to sexual orientation and identity must be protected. Care providers must ensure that information about sexual orientation and identity is kept confidential and is only shared when disclosure is necessary for medical or mental health treatment, or the child requests the information be shared for a particular purpose. As with all information gathered during the course of service provision, care providers must implement appropriate controls on information dissemination within the care provider facility in order to ensure that sensitive information is not exploited to any child's detriment by staff or other children. (See **Section 5.10 Information Sharing**)

*Revised 02/27/2025*

### 3.5.4 Housing

When making housing assignments for an intersex child, the care provider must consider the child's self-identification and the effects of a housing assignment on the child's health and safety. Care providers must not base housing assignment decisions of intersex children solely on the identity documents or physical anatomy of the child. The child's self-identification of their sex and self-assessment of safety needs must always be taken into consideration as well. The care provider's housing assignment of an intersex child must be consistent with the safety and security considerations of the care provider facility and State and local licensing standards. If State and local licensing standards conflict with the care provider's determination for a child's housing assignment, the care provider should immediately contact the ORR/Federal Field Specialist (ORR/FFS) for further guidance.

*Revised 02/27/2025*

### 3.5.5 Restroom and Dressing Area Accommodations

If a child expresses safety or privacy concerns or the care provider otherwise becomes aware of privacy or safety concerns related to restrooms or dressing areas, the care provider must take reasonable steps to address those concerns. This may include, for example:

5/20/25, 11:27 AM    ORR Unaccompanied Alien Children Bureau Policy Guide: Section 3 | The Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR    Document 1567-9    Filed 05/22/25    Page 38 of 51
Page ID #:52878

the addition of a privacy curtain or partition; permission to use a nearby restroom or office; or a separate changing schedule. The care provider should contact the ORR/Federal Field Specialist (ORR/FFS) for further guidance if the care provider is uncertain about the appropriate steps to take.

*Revised 12/20/2023*

### 3.5.6 Prohibition on Sexual Orientation and Identity Change Efforts

**Sexual orientation and identity (SOI) change efforts**, commonly referred to as "conversion therapy," or "reparative therapy", are practices that aim to suppress or alter an individual's sexual orientation, identity, or expression. ORR does not permit or reimburse SOI change efforts for children in ORR custody under any circumstances or allow **Post-Release Services** providers to refer children in their caseload to SOI change efforts. (See **Section 3.4.9 Provider Reimbursement** and **Section 6.2.11 Services for Children Requiring Special Consideration**)

*Revised 02/27/2025*

# 3.6 ORR Long–Term Foster Care

ORR provides long-term foster care placements for certain unaccompanied alien children who meet the requirements under **Section 1.2.6 Long-Term Foster Care** is defined as an ORR-funded and administered family placement in a community based setting. Children placed into ORR long-term foster care remain in the care and custody of ORR. ORR long-term foster care programs are not State funded and are not part of the State child welfare system. However, ORR long-term foster care families are licensed by the State to serve as foster families, and as such, adhere to standards of care as outlined by the State licensed child placement agency, State licensing regulations, and any ORR policies related to long-term foster care. Foster care providers must comply with all applicable State child welfare laws and regulations and all State and local building, fire, health, and safety codes. Foster care providers must deliver services in a manner that is sensitive to the age, culture, native language, sexual orientation and individualized needs of each child. The child attends community-based school and receives on-going case management and counseling services, as well as other services as needed.

*Posted 10/5/2015*

### 3.6.1 ORR Long–Term Foster Care Service Provision

In ORR long-term foster care placements, long-term foster care providers must offer every child the following services:

- A comprehensive program orientation
- Case management services
- Educational services in a community based school
- Weekly individual counseling sessions
- Legal services and representation , as applicable
- Individualized Safety Plans
- Services related to culture, language, and religious observation
- Recreation and Leisure Time Services
- Acculturation and Adaptation services
- Telephone Calls, Visitation, and Mail
- Opportunities for vocational education and independent Living

5/20/25, 11:27 AM          ORR Unaccompanied Alien Children Bureau Policy Guide: Section 3 | The Administration for Children and Families
Case 2:85-cv-04544-DMG-AGR   Document 1567-2   Filed 05/22/25   Page 39 of 51
Page ID #:52879

For information regarding transfers into ORR long-term foster care, please see section **1.2.6 Long-Term Foster Care**.

For information about monitoring of ORR long-term foster care programs please see section **5.5.3 Foster Care Monitoring**.

*Posted 10/5/2015*


**3.6.2 Change in Placements while in ORR Long-Term Foster Care**

Foster care providers must make every effort to place and keep children in the least restrictive setting. Foster care provider facilities must provide support services and appropriate interventions, when necessary, to help keep a child in the placement. A change of placement from long-term foster care to a more restrictive setting or a more therapeutic setting may be considered after reasonable efforts have first been made to provide additional services or manage the child's behavior in order to maintain the current placement. If it is determined that a child requires transfer into a more restrictive placement, please see section **1.2 ORR Standards for Placement and Transfer Decisions**. For placements into an Residential Treatment Center (RTC) please see section **1.4.6 Residential Treatment Center and Out-of-Network Placements**.

*Posted 10/5/2015*


## 3.6.3 Additional Questions and Answers about this Topic

**Q: Is release to a sponsor possible after a transfer to ORR long-term foster care?**

A: Yes. In the event that a sponsor is identified after a transfer to ORR long-term foster care has occurred, the sponsorship process must be pursued. Case managers must be continually assessing cases for potential sponsors in long-term foster care. Please refer to **Section 2: Safe and Timely Release from ORR Care** for further information.

*Posted 10/5/2015*


# 3.7 Legal Services

All unaccompanied alien children should receive the following immigration legal-related services when in ORR legal custody:

- **Know Your Rights (KYR) presentations**;
- **Confidential legal consultations**, which are legal screenings for potential immigration legal relief from removal, as well as human trafficking concerns.

Additionally, unaccompanied alien children may also receive direct legal representation in seeking immigration legal relief and/or protection from removal.

In-person meetings are preferred during the course of providing legal counsel to any unaccompanied alien child, though telephonic or teleconference meetings between the unaccompanied alien child's attorney or U.S. Department of Justice (DOJ) Accredited Representative and the unaccompanied alien child may substitute as appropriate. Either the unaccompanied alien child's attorney, DOJ Accredited Representative, or a care provider staff member or care provider must always accompany the unaccompanied alien child to any in-person courtroom hearing or proceeding, in connection with any legal representation of an unaccompanied alien child.

An unaccompanied alien child in ORR care must be able to conduct private communications with their attorney of record, DOJ Accredited Representative, or **legal service provider** in a private enclosed area that allows for confidentiality for in-person, virtual, or telephonic meetings.

Care provider facilities must make qualified interpretation and/or translation services available to unaccompanied alien children, child advocates, and legal service providers upon request while unaccompanied alien children are being provided with those services. Such services must be available to unaccompanied alien children in enclosed, confidential areas.

*Revised 08/01/2024*

## 3.7.1 Know Your Rights Presentation & Confidential Legal Consultation for Legal Relief

Children in ORR legal custody receive a **Know Your Rights (KYR) presentation** (in-person, telephonic, or video presentation) within ten (10) business days of admission to an ORR care provider facility[9], within ten (10) business days of a child's transfer to ORR facility (except ORR Long-Term Foster Care or ORR **Transitional Foster Care**), and every six (6) months for unrepresented children who remain in ORR custody, as practicable. Such presentation must be provided by an independent legal service provider (LSP) that has appropriate qualifications and experience, as determined by ORR, to provide such presentation and must include information notifying the unaccompanied alien child of their legal rights and responsibilities in the immigration system, including protections under child labor laws, and of services to which they are entitled, including educational services. The presentation must be delivered in the native or preferred language of the unaccompanied alien child and in an age-appropriate manner. The information from the presentation must also be posted for unaccompanied alien children in an age-appropriate format and translated into each child's native or preferred language, in any ORR contracted or grant-funded facility where unaccompanied alien children are in ORR care. For children released prior to receiving the KYR presentation, LSPs must follow up as soon as practicable to complete the presentation , in-person or telephonically. Among the topics covered in the presentation are information on the availability of legal assistance, the right to be represented by counsel at no expense to the government, the right to a removal hearing before an immigration judge, notification regarding the child's ability to petition for Special Immigrant Juvenile (SIJ) classification, to request that a juvenile court determine dependency or placement for the purpose of altering the child's custody status or seeking release from ORR custody, and notification of the ability to apply for asylum or other forms of relief from removal, including voluntary departure in lieu of deportation, and the risk determination hearings available in certain situations (see **Section 2.9 Risk Determination hearings for Unaccompanied Alien Children**).

In addition to the KYR presentation, all children undergo a confidential legal consultation with a qualified attorney (or paralegal working under the direction of an attorney, or DOJ Accredited Representative) to determine possible forms of relief from removal in relation to the unaccompanied alien child's immigration case, as well as other case disposition options such as, but not limited to, voluntary departure. As part of the confidential legal consultation, the legal service provider also will identify indicators of mistreatment, exploitation, or trafficking. As part of the confidential legal consultation process, LSPs notify children if they are potentially eligible for immigration legal relief. Children are screened by LSPs in a private setting at the care provider facility or in the community at a setting arranged by the LSP. Care providers are responsible for providing a private setting if the children attend the confidential legal consultation at their facility. Care providers are also responsible for providing legal service providers information in accordance with **Section 5.10.3 Information Sharing with LSPs, Attorneys of Record, and Child Advocates** in preparation for the child's confidential legal consultation.

Children in ORR custody receive a confidential legal consultation within ten (10) business days of admission to an ORR care provider facility. In the case where a child is unable to participate in person within the ten (10) business days time limit (e.g., due to medical isolation), the LSP must make every effort to ensure that the child receives confidential legal consultation as soon as possible, including performing it remotely if needed.

Such legal consultation must occur within ten (10) business days of a child's transfer to a new ORR facility (except ORR long-term foster care or ORR transitional foster care) or upon request from ORR. ORR must request an additional legal consultation on behalf of a child, if the child has been identified as:

(A) A potential victim of a severe form of trafficking; or

5/20/25, 11:27 AM  Children Entering the United States Unaccompanied: Section 3 | The Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR   Document 1567-9   Filed 05/22/25   Page 41 of 51
Page ID #:52881

(B) Having been abused, abandoned, or **neglected**; or

(C) Having been the victim of a crime or domestic violence; or

(D) Persecuted or in fear of persecution due to race, religion, nationality, membership in a particular social group, or for a political opinion.

When an unaccompanied alien child requests legal counsel, ORR must ensure that the child is provided with a list and contact information for pro bono counsel, and reasonable assistance to ensure that the child is able to successfully engage an attorney at no cost to the government. ensure that the child is provided with a list and contact information for pro bono counsel, and reasonable assistance to ensure that the child is able to successfully engage an attorney at no cost to the government.

Under rare cases where an LSP requests additional information for legal consultation beyond those specified as files to be automatically provided in **Section 5.10.3**, the LSP should also follow the case file request process outlined in **Section 5.10.1 UAC Case File Request Process**.

*Revised 08/01/2024*

## 3.7.2 Direct Legal Representation

ORR funds legal service providers (LSPs) to provide direct immigration legal representation or representation in non-immigration related matters to the extent of available appropriations, and insofar as it is not practicable for ORR to secure pro bono counsel. ORR prioritizes direct representation for the following classes of children:

- Upon their placement in a Long-Term Foster Care (LTFC) facility or in a residential treatment center (RTC) outside a licensed ORR facility and for whom other legal assistance does not satisfy the legal needs of the individual child. LSPs must coordinate with ORR staff and care provider staff to timely identify such children;
- With no identified sponsor who are unable to be placed in LTFC facilities. LSPs must coordinate with ORR staff and care provider staff to timely identify such children;
- In ORR custody who must appear before EOIR, including children seeking voluntary departure, and for whom other available assistance does not satisfy the legal needs of the individual child. LSPs must coordinate with ORR staff and care provider staff to timely identify such children;
- In ORR custody who must appear before ORR appellate procedures, including **Placement Review Panel (PRP)** and risk determination hearings;
- In need of judicial bypass or similar legal processes as necessary to enable an unaccompanied alien child, per their request, to access certain lawful medical procedures that require the consent of the parent or legal guardian under State law, and when the unaccompanied alien child is unable or unwilling to obtain such consent;
- In state juvenile court proceedings, when the unaccompanied alien child already possesses Special Immigrant Juvenile classification;
- Enrolled in ORR **Unaccompanied Refugee Minor (URM) program**, provided they have not yet obtained immigration relief (including related petitions) or reached 18 years of age at the time of retention of an attorney;
- Released to a sponsor residing in the defined service area of the same LSP who provided the child legal services in ORR custody, to promote continuity of legal services and advance ORR's goal of universal representation;
- In need of obtaining an employment authorization document; and
- Other categories of unaccompanied alien children, up to funded capacity.

Attorneys of record who are funded by ORR are not, solely by reason of such funding, prohibited from representing the child in ORR custody with respect to any other matter. This includes but is not limited to: step-up to a more restrictive placement, release from ORR

custody, and with respect to administration of psychotropic medications; however, ORR need not fund such representation.

Attorneys of record for the child in ORR legal custody notify ORR of their role by submitting a completed *Notice of Attorney Representation form* to the ORR care providers. This includes, but is not limited to, Legal Service Providers funded by ORR who are representing a child in an immigration proceeding, in a risk determination hearing, or in other individual matters, as specified in the Notice of Attorney Representation form, who have entered into formal representation for an unaccompanied alien child. Care providers will upload the form into the ORR case management database within five (5) days of receiving the completed form and include a copy of the form in the unaccompanied alien child's case file. The *Notice of Attorney Representation form* details the purpose of legal representation and the representation timeframe. Attorneys of record who are representing an individual child and who are identified on the *Notice of Attorney Representation form* are eligible to receive updates on their client's case, as relevant to the purpose of the representation, and to request a copy of their client's case file from ORR, in accordance with **Section 5.10.1 UAC Case File Request Process**.

*Revised 08/01/2024*

### 3.7.3 Attorney Request for Information on UAC Case

*Information Sharing Between Care Providers & Legal Service Providers*

In accordance with **Section 2.3.2 Case Managers** and **Section 5.10.3 Information Sharing with LSPs, Attorneys of Record, and Child Advocates**, care provider staff may provide legal service providers (LSPs) information about a child's case to assist in the legal relief sought by the child. Care provider staff must also provide the child's attorney of record a copy of the **Notice of Placement in Restrictive Setting** for children placed in heightened supervision, secure, and Residential Treatment Centers in accordance with **Section 1.4.2 30-Day Restrictive Placement Case Review**.

According to **Section 4.10.4 Notification and Access to Attorneys/Legal Representatives, Families, Child Advocates and Sponsors** and **Section 5.8.11 Notification to Attorneys, Legal Representatives, Child Advocates, Families, and Sponsors**, some information about children may remain confidential and require express permission from the child to share. In such cases, care providers may confer with the unaccompanied alien child to ascertain whether the confidential information may be released to the LSP.

*Requests for Copies of Documents in the UAC Case File*

An attorney of record individually representing[10] an unaccompanied alien child may request a copy of the child's case file or documents in the child's case file in accordance with **Section 5.10.1 UAC Case File Request Process** and **Section 5.10.3**. Upon receipt by ORR of proof of representation and authorization for release of records signed by the unaccompanied alien child or other authorized representative, ORR must share, upon request and within a reasonable timeframe to be established by ORR, the unaccompanied alien child's complete case file, apart from any legally required redactions, to assist in the legal representation of the unaccompanied alien child. In addition to sharing the complete case file, upon request by an attorney of record or DOJ Accredited Representative, ORR must promptly provide the attorney of record or DOJ Accredited Representative with the name and telephone number of potential sponsors who have submitted a completed **family reunification** application to ORR for their client, if the potential sponsors have provided consent to release of their information. Furthermore, and absent a reasonable belief based upon articulable facts that doing so would endanger an unaccompanied alien child, ORR must ensure that unaccompanied alien children are allowed to review, upon request and in the company of their attorney of record or DOJ Accredited Representative if any, such papers, notes, and other writings they possessed at the time they were apprehended by the U.S. Department of Homeland Security (**DHS**) or another Federal department or agency, that are in ORR or an ORR care provider facility's possession.

*Revised 08/01/2024*

### 3.7.4 Feedback in Relation to Legal Services

Legal service providers and attorneys of record are encouraged to work in coordination with their regional organizational representative to resolve concerns related to providing children with ORR-funded legal services in accordance with ORR policy. Emerging issues from legal service providers or related to immediate performance of legal services at care provider facilities can be elevated to ORR by sending an email to **UACLegalServicesSupport@acf.hhs.gov**. ORR will collaborate with the regional organizational representative to address such emerging issues as needed.

*Revised 08/01/2024*

### 3.7.5 Retaliation for Action Against ORR by Legal Service Providers

ORR must presume that legal service providers and other legal representatives are acting in good faith with respect to their advocacy on behalf of unaccompanied alien children, and ORR must not retaliate against a legal service provider or other legal representative for actions taken within the scope of the legal service provider's or representative's responsibilities. For example, ORR must not engage in retaliatory actions against legal service providers or any other representative for reporting harm or misconduct on behalf of an unaccompanied alien child or appearance in an action adverse to ORR.

ORR recognizes attorneys' ethical obligation to pursue legal remedies for their client, which may include engaging in legal action that is in opposition to ORR. In addition, ORR will not maintain a list of LSPs or other attorneys who have filed actions against ORR for purposes of impeding their ability to provide legal services to unaccompanied alien children.

*Revised 08/01/2024*

## 3.8 Children with Disabilities in ORR Care and Custody

This policy provides guidance on implementing 45 C.F.R. § 410.1311. Additionally, ORR policy and procedures related to children with disabilities in ORR custody were developed pursuant to a Settlement Agreement in *Lucas R. v. Becerra*, which became effective on May 3, 2024. In accordance with the Settlement Agreement, compliance by ORR and care providers will be regularly monitored by a Court-Appointed Monitor until the Settlement Agreement terminates. Additionally, the attorneys who represented children in *Lucas R.* (known as Class Counsel) may periodically conduct confidential attorney-client visits with children in ORR custody who have been identified as having disabilities. Additionally, pursuant to the Settlement Agreement, ORR will work with experts to undertake a comprehensive needs assessment to evaluate the adequacy of services, supports, and resources currently in place for children with disabilities in ORR's custody across its network, and to identify gaps in the current system, which will inform the development of a disability plan. The needs assessment may also inform potential future policy changes that best address how to effectively meet the needs of children with disabilities in ORR's care and custody.

Consistent with section 504 of the Rehabilitation Act and HHS's implementing regulations at 45 C.F.R. part 85, ORR must administer the UAC Bureau in the most integrated setting appropriate to the needs of unaccompanied alien children with disabilities unless ORR can demonstrate that this would fundamentally alter the nature of the UAC Bureau's program. Therefore, where appropriate, ORR must make and document reasonable modifications to its program, including the provision of services, equipment, and treatment so that a child with one or more disabilities can have equal access to the UAC Bureau program in the most integrated setting appropriate to their needs. Furthermore, all children in ORR's care and custody, including children with disabilities, must be placed in the least restrictive setting in their **best interests**.

ORR's commitment to nondiscrimination aligns with the **U.S. Department of Health and Human Services' Nondiscrimination Notice** ⧉ as well as **ORR's Nondiscrimination Notice**. ORR must provide such notice in writing to the children in its custody to inform them of the protections against discrimination under section 504 of the Rehabilitation Act at 45 C.F.R. part 85 assured to children with

disabilities in its custody. ORR must also provide written notice of the available procedures for seeking reasonable modifications or making a complaint to HHS's Office of Civil Rights about alleged discrimination against children with disabilities in ORR's custody. This notice must be provided in a manner that is accessible to children with disabilities. A commitment to non-discrimination is likewise expected of all grantee and contracted programs that are part of ORR's care provider network as well as any out-of-network program engaged by ORR to provide services to children in ORR care and custody. ORR's grantee and contracted programs must have policies consistent with 45 C.F.R. § 84.7 requirements.

Concerns regarding possible violation of ORR's Nondiscrimination Notice should be emailed to **uachearings@acf.hhs.gov**.

*Posted 07/17/24; Special note regarding the effective date of UAC MAP Section 3.8: ORR is implementing this section of the UAC MAP while it undergoes a comprehensive needs assessment. Modifications to this section will occur throughout the assessment period with the expectation that this section will be fully implemented by May 3, 2025.*

## 3.8.1 Defining Disability for Children in ORR Custody

Children in ORR custody are presumed to have a disability if they meet the broadly-construed criteria defined in **42 U.S.C. § 12102** ↗ (PDF). In accordance with federal law, a disability is present if the child has a physical or mental condition that substantially limits their ability to participate in major life activities.[11] This condition may currently exist or have existed in the past with the possibility of future recurrence. It also applies if the child was or is currently perceived to have a disability. However, a condition is not considered a disability if it is minor or if the child is expected to recover from the condition in six months or less.

Furthermore, a child may have a disability even if the child can perform major life activities with assistance. This assistance can include the administration of medication, provision of reasonable accommodations, aids, services, and/or the implementation of learned behavioral or adaptive neurological modifications. It also includes the utilization of assistive technology, devices, or equipment. Whether the use of eyeglasses or contact lenses is considered a disability is contingent upon the circumstances. Therefore, guidance from a medical professional to ascertain whether a child has a disability is necessary in circumstances where ordinary eyeglasses or contact lenses are utilized by the child to assist them in performing life activities.

*Posted 07/17/24; Special note regarding the effective date of UAC MAP Section 3.8: ORR is implementing this section of the UAC MAP while it undergoes a comprehensive needs assessment. Modifications to this section will occur throughout the assessment period with the expectation that this section will be fully implemented by May 3, 2025.*

## 3.8.2 Identifying Children with Disabilities in ORR Custody

Care providers may become aware of a child's disability (or disabilities) in multiple ways. First, the disability (or disabilities) may be apparent upon the child's admission to an ORR Program or discovered during the Initial Medical Examination that is conducted within two business days of the child's admission to an ORR Program in accordance with **Section 3.4.2 Initial Medical and Dental Examinations and Follow-up Care**. Second, the care provider may learn of the child's disability (or disabilities) after a triggering event which requires that the child be evaluated for a disability. It is also possible that a treating mental health or medical professional may diagnose a child with a disability during a routine mental health or medical evaluation.

**Disabilities Apparent at Admission or via the Initial Medical Examination**

Information regarding a child's disability (or disabilities) may be conveyed to ORR at the time of their referral from another federal agency. In addition, some children, their parents, or sponsors may disclose that the child has a disability (or disabilities), or their condition(s) may be apparent upon their admission to an ORR Program. Furthermore, the results of the Initial Medical Examination (IME) may either confirm a previously disclosed condition or alert the care provider to the possibility that a child has a condition(s) that is (are) considered a disability.

Care providers are expected to promptly initiate the provision of auxiliary aids and services, supports, and reasonable accommodations or program modifications as needed for children identified as having a disability (or disabilities) that is (are) apparent or known upon or shortly after admission or through the IME. The services must incorporate guidance from a treating professional with expertise in the child's disability or disabilities. In addition, the services, supports, and accommodations must be documented in the child's Individualized Section 504 Service Plan described at **Section 3.8.3 Individualized Section 504 Service Plan** if one is determined to be necessary to meet the child's disability-related needs. If the care provider believes that they are unable to meet the child's disability-related needs, the care provider must immediately consult with the ORR Division of Health for Unaccompanied Alien Children (DHUAC). DHUAC will work with the care provider to ascertain whether ORR can provide additional services or support or identify community resources to assist the care provider in meeting the needs of the child. If the care provider believes that they are still unable to meet the needs of a child with one or more disabilities, even with additional support and services provided or identified by ORR, the care provider must document their concerns in accordance with **Section 1.3.3 Care Provider Placement Acceptance** and inform their ORR Project Officer (PO) or Contract Officer Representative (COR) immediately. A care provider's consideration of whether they can meet the needs of a child with one or more disabilities must be ascertained independently for each child and documented in ORR's online case management system along with the reasons why they believe they cannot meet the needs of the child, even with additional support or services provided or identified by ORR.

A child whose disability (or disabilities) is (are) apparent at admission or known through the IME is considered as having an identified disability (or disabilities) unless a subsequent evaluation by a professional with expertise in the disability (or disabilities) provides a written professional opinion indicating that the child does not have the disability (or disabilities). Therefore, care providers must indicate on all appropriate assessment forms that the child has a disability (or disabilities) (i.e., UAC Assessment, Case Reviews) and must proceed with the family reunification process with the expectation that a TVPRA Home Study will be required.  This includes promptly arranging for the home study to occur as soon as possible and planning for and establishing post release services as soon as possible. Background checks for potential sponsors for any case referred for a home study because of a child's disability (or disabilities) may be conducted concurrently to the referral and home study process itself. Unless results of the background check are required prior to the initiation of the home study for a specified safety reason, the home study should be conducted pending receipt of background check results.

Care providers must notify the assigned legal service provider that the child has a disability (or disabilities) and refer the child for the appointment of a child advocate as soon as possible. Furthermore, care providers must inform DHUAC by emailing **ORRDHUAC@acf.hhs.gov** within 24 hours of identifying that a child has a disability (or disabilities).

A child identified as having a disability that is apparent upon admission or known through the IME will not be re-evaluated based on the same presenting symptoms except upon the recommendation of a medical or mental health professional.

**Disabilities Identified via a Professional Evaluation Required Subsequent to a Triggering Event**

A child in ORR care and custody must be evaluated by a professional to determine whether they have one or more disabilities if at least one of the triggering events listed below happens.

- If a child is hospitalized for a psychiatric-related reason.
- If a child is under consideration for hospitalization for a psychiatric-related reason.
- If a child is under consideration for placement in or transfer to a Residential Treatment Center (RTC) or similar restrictive therapeutic facility.
- If a child is under consideration for placement in a secure facility.
- If a licensed medical or mental health professional treating the child recommends an evaluation for a disability.
- At the request of the child after being informed of the purpose, scope, and nature of the evaluation. The child may make the request directly or through their parent or legal guardian, or through their attorney or a legal service representative, and/or through their child advocate.

Evaluations must begin within 30 calendar days of one of the triggering events described above. The evaluations must be conducted by a professional evaluator with expertise in the type of disability (or disabilities) or condition(s) that the child is suspected of having or with expertise in treating the symptoms of the suspected disability (or disabilities) that the child is manifesting.  If the evaluator is skilled in a field that requires licensing (i.e., medical doctor, clinical social worker), the evaluator must possess a professional license in good standing. The medical or mental health professional treating the child may serve as the evaluator, if they are skilled in performing the disability-related evaluation, or they may refer the child to another professional skilled in performing the disability-related evaluation. Care providers must consult with Point Comfort Underwriters (PCU) to ascertain whether a professional evaluator is part of their network before engaging the services of that professional evaluator. In addition, care providers are encouraged to consult with and seek the assistance of DHUAC as needed on matters related to conducting evaluations or seeking a professional appropriate to conduct the evaluations.

Prior to the child's evaluation for a disability, the mental health professional and/or medical professional providing services to the child should educate the child on the process in a manner that is age appropriate, trauma-informed, explained in the child's preferred language (using interpretation services to translate if necessary) and respectful of the child's culture. If possible, the discussion with the child should include the child's parent or legal guardian as well as the professional evaluator (if already selected and available). If possible, the care provider should inform and educate the parent or legal guardian separately prior to the joint conversation with the child, emphasizing the importance of providing a supportive and empowering environment for the child during the joint conversation educating the child about the process. Topics that should be covered during the discussion with the child include, but are not limited to:

- The reason(s) that an evaluation for a disability is necessary;
- The scope of the evaluation (timeline, steps, persons involved); and
- An explanation that their reunification process will continue, but may require additional support (e.g., a TVPRA Home Study and/or Post Release Services). This discussion should emphasize that work on the additional support has already begun or will begin promptly with the goal being timely unified with their sponsor.

During the discussion and afterward, the child should be provided ample opportunity to ask questions and express their opinions in an atmosphere that is welcoming and supportive. Answers to the child's questions should be truthful, age appropriate, and handled by the person best suited to address the question. For example, a medical question should be answered by the licensed medical professional providing services to the child and familiar with their medical history. Similarly, a mental health and/or behavioral-related question should be answered by a licensed medical professional providing services to the child and familiar with their mental health and/or behavioral history.

The evaluation must commence as promptly as possible unless the child is released to a sponsor or another entity, including the Unaccompanied Refugee Minor (URM) Program. The care provider must receive a written report from the professional evaluator within 60 calendar days of the triggering event described above.

A child identified as having one or more disabilities after a professional evaluation will not be re-evaluated based upon the same presenting symptoms except upon the recommendation of a medical or mental health professional.

A referral for an evaluation or an incomplete evaluation for a disability should not delay the release of a child from the UAC Bureau unless the evaluation is necessary to inform ORR's release decision. This limitation on release delays due to an evaluation includes releases to the Unaccompanied Refugee Minor (URM) Program. The Case Manager should review **Section 3.8.4 Release of Children with an Identified or Suspected Disability** for guidance on how to handle any potential release delays which may occur while waiting for a professional evaluation to determine whether the assessment is necessary to make an informed release decision.

The professional evaluator's report should:

- Confirm whether the child has one or more disabilities;
- Identify the type (or name) of the disability (or disabilities) that the child has;

- Explain the symptoms manifested (or likely to be manifested) by the child due to the disability (or disabilities);
- Describe the circumstances that are likely to trigger symptoms of the disability; and
- Offer recommendations for services, supports, reasonable accommodations or program modifications to meet the child's disability-related needs and to enable the child to reside in the least restrictive setting in their best interests and the most integrated setting appropriate to their needs.

If the professional evaluator recommends placement in a more restrictive program (i.e., an RTC or other restrictive therapeutic facility, heightened supervision facility, or secure facility) the professional evaluator's written report should also include the reasons that the restrictive facility is necessary and identify the services and care that the restrictive facility must provide the child, and why the child's needs cannot be met in a more integrated and less restrictive setting with additional services, supports, and/or accommodations. In the case of step-up to an RTC or another restrictive therapeutic facility, the professional evaluator's written report will only fulfill the written recommendation requirement specified in **Section 1.4.6 Residential Treatment Center and Out-of-Network Placements** if the professional evaluator is a licensed psychologist or psychiatrist who has also determined that the child is a danger to themself or others. Otherwise, per **Section 1.4.6 Residential Treatment Center and Out-of-Network Placements** a separate recommendation from a licensed psychologist or psychiatrist is required before the child with a disability is placed in a RTC or other restrictive therapeutic facility.

A referral for an evaluation or an incomplete evaluation for a disability (or disabilities) should not delay the step-down of a child from a restrictive facility unless the evaluation is necessary to inform the next placement appropriate to serve the child. The Case Manager should review **Section 1.4.2 30 Day Restrictive Placement  Review** for guidance on stepping a child down from a restrictive facility. Likewise, a pending, scheduled, or partially completed evaluation will not be a justification to delay an otherwise appropriate release of a child to a suitable sponsor, although such an evaluation may inform the suitability determination where appropriate.

Upon receipt of a professional evaluator's written report confirming that a child has one or more disabilities, the care provider must establish an Individual Section 504 Service Plan for that child in accordance with  **Section 3.8.3 Individualized Section 504 Service Plan**, if one is deemed necessary to meet the child's needs.

The care provider will provide a copy of the professional evaluator's written report to the child's parent or legal guardian unless a child welfare concern exists and is documented in the child's case file in ORR's online case management system. The clinician and/or medical professional providing services to the child will explain the professional evaluator's written report to the child's parent or legal guardian in their preferred language. The clinician and/or medical professional providing services to the child will also explain the professional evaluator's written report to the child in a manner that is age appropriate, trauma-informed, and respectful of the child's culture. If possible, the clinician and/or medical professional must include the child's parent(s) or legal guardian(s) as well as the professional evaluator (if available). If possible, the care provider should explain the professional evaluator's written report to the parent or legal guardian separately prior to a joint conversation with the child, emphasizing the importance of providing a supportive and empowering environment for the child during the joint conversation educating the child about the evaluation process. At the child's request and/or with their consent, the child may ask for their attorney (or a legal service provider) and/or their child advocate to join the discussion. A copy of the professional evaluator's written report may be given to an attorney who has provided ORR a completed and signed **Notice of Attorney Representation (Form L-3).** (PDF) The care provider must provide a copy of the professional evaluator's written report to the child advocate appointed to the child, if requested by the child advocate.

In accordance with  **Section 5.10.2 Limits to Sharing Information with DHS and EOIR**, ORR and care providers are restricted from sharing certain case file information with entities under the U.S. Department of Homeland Security for immigration enforcement purposes. Likewise, ORR and care providers shall not share any evaluation report(s), related clinical or mental health documents, or Child Level Event reports (CLE) with any component of the U.S. Department of Homeland Security (DHS) for the purposes of any deportation, removal, application of relief from removal, custody hearing, or U.S. Citizenship and Immigration Services (USCIS) adjudication.

A copy of the professional evaluator's written report must be uploaded to the child's case file in ORR's online case management system within 24 hours of receipt by the care provider.

*Posted 07/17/24; Special note regarding the effective date of UAC MAP Section 3.8: ORR is implementing this section of the UAC MAP while it undergoes a comprehensive needs assessment. Modifications to this section will occur throughout the assessment period with the expectation that this section will be fully implemented by May 3, 2025.*

## 3.8.3 Individualized Section 504 Service Plan

Individualized Section 504 Service Plans assist care providers in identifying and documenting the child's disability-related needs as well as the services, supports, and reasonable accommodations that must be provided to enable the child to reside in the least restrictive setting in their best interest and the most integrated setting appropriate to their needs. The Individualized Section 504 Service Plan also incorporates disability-related requirements necessary for the completion of the reunification process (i.e., a home study), which allows the care provider to plan and commence crucial steps early in the process (i.e., identification of post-release services).

An Individualized Section 504 Service Plan must be established for every child in ORR custody who has an identified disability or disabilities, unless the child is released from ORR custody before a plan is established. Release cannot be delayed to establish an Individualized Section 504 Service Plan. This requirement applies for children whose disability is apparent at admission or via the IME. The requirement also applies for children whose disability is identified via a professional evaluation after a triggering event. The Individualized Section 504 Service Plan must be completed and implemented within 60 calendar days of identifying the child's disability. The Individualized Section 504 Service Plan may be implemented in phases or in a piecemeal manner during this time; however, implementation of the full Individualized Section 504 Service Plan must be in place as soon as is practicable, and in all cases, within 60 days of identifying the child's disability or disabilities. Continued refinement of the Individualized Section 504 Service Plan after the 60-day deadline is allowable so long as the child remains in ORR care and custody.

ORR will make best efforts to develop and implement an Individualized Section 504 Service Plan before any step-up of a child with an identified disability (or disabilities), unless the child is released to a sponsor or placed in a URM program earlier. If an Individualized Section 504 Service Plan is not developed and implemented before step-up, ORR will document in the child's case file in ORR's online case management system the specific reasons why it was not feasible to do so before step-up and will complete development and begin implementation of the Individualized Section 504 Service Plan, within 30 days of the step-up.

**Development of the Individualized Section 504 Service Plan**

Development of the Individualized Section 504 Service Plan is a collaborative endeavor that includes input from the child (if able and willing to communicate about their service plan, including preferences and needs), the parent(s) or legal guardian (if and when available), the professional evaluator (in-person or via their written report), care provider staff (i.e., clinician, case manager), medical and/or mental health staff treating the child, the child advocate appointed to serve the child, and ORR staff (i.e., Federal Field Specialist, DHUAC staff). An attorney who provides ORR with a completed and signed **Notice of Attorney Representation (Form L-3)** (PDF) may also participate in the development of the Individualized Section 504 Service Plan if the child consents.

The Individualized Section 504 Service Plan will be tailored to the needs of each child identified as having one or more disabilities. The Individualized Section 504 Service Plan must include the following components:

- Identification of the child's disability-related needs;
- Identification of the specific triggers, behaviors and/or symptoms related to the child's disability;
- Identification of services, supports, and reasonable accommodations and modifications responsive to the child's disability-related needs;
- Documentation of reasonable accommodations or program modifications required to maintain the child in the most integrated setting appropriate to the child's needs while in ORR custody;
- A transition plan for release from ORR custody; and

5/20/25, 11:27 AM                    ORR 4 Unaccompanied Children Child Placement Policy Guide: Section 3 Us Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR   Document 1567-9   Filed 05/22/25   Page 49 of 51
Page ID #:52889

• Identification of Post Release Services planned or established for the child after their release from ORR custody.

In developing the Individualized Section 504 Service Plan, ORR must consider all recommendations from the professional who evaluated the child and determined that the child has one or more disabilities. ORR will include a written explanation of any significant departures from such a professional's major recommendations in the Individualized Section 504 Service Plan.

ORR will make and document efforts to place each child with an identified disability (or disabilities) in a placement that can provide access to the services and supports identified in the child's Individualized Section 504 Service Plan. ORR may, however, maintain a child in their current shelter or foster care placement upon a determination that maintaining their current placement would be in the best interest of the child.

A copy of the Individualized Section 504 Service Plan must be uploaded to the child's case file in ORR's online case management system within 24 hours of its completion. In addition, a copy of the Individualized Section 504 Service Plan shall be given to an attorney who has provided ORR a completed and signed **Notice of Attorney Representation (Form L-3)** (PDF), indicating they are representing or providing legal assistance to the child, upon their request. The care provider may provide a copy of the Individualized Section 504 Service Plan to the child advocate appointed to the child, if requested by the child advocate.

**Review of the Individualized Section 504 Service Plan**

A review and possible revision of the Individualized Section 504 Service Plan is required as described below.

• Every six months.
• Within 30 days of a transfer to a restrictive setting (or more restrictive setting).
• Within 30 days of the hospitalization of the child for psychiatric reasons; for children with multiple hospitalizations for psychiatric reasons within a 3-month period, only one review is required within the 3-month span with the 30-day deadline for the review counted from the first hospitalization.
• At the recommendation of a licensed medical or mental health professional.

The review of the Individualized Section 504 Service Plan will consider whether it was implemented as specified and is responsive to the child's disability-related needs. Specifically, the review will determine whether the services, supports, reasonable modifications, and accommodations set out in the Individualized Section 504 Service Plan have been and are currently being provided to the child. If not, ORR will include in the revised Individualized Section 504 Plan a brief written explanation of why the Individualized Section 504 Service Plan has not been fully implemented and what steps will be taken to ensure full implementation of the Individualized Section 504 Service Plan with any needed revisions thereto. The review will revisit the identification of the child's disability-related needs and triggers and individualized plan. The review will also consider whether the Individualized Section 504 Service Plan adequately supports the child's placement in the least restrictive setting in the child's best interest and the most integrated setting appropriate for the child's disability-related needs and also includes a transition plan to enable safe release to a suitable sponsor without unnecessary delay due to the child's disability (or disabilities).

If needed, the Individualized Section 504 Service Plan will be revised through a collaborative endeavor that includes input from the child (if able and willing to communicate about their service plan, preferences, and needs), the parent(s) or legal guardian (if and when available), the professional evaluator (in-person or via their written report), care provider staff (i.e., clinician, case manager), medical and/or mental health staff treating the child, the child advocate appointed to serve the child, and ORR staff (i.e., Federal Field Specialist, DHUAC). ORR will consider whether additional or alternative services, supports, reasonable modifications, or accommodations should be provided. An attorney who provides ORR with a completed and signed **Notice of Attorney Representation (Form L-3)** (PDF) may also participate in the development of the Individualized Section 504 Service Plan if the child consents.

A copy of the revised Individualized Section 504 Service Plan must be uploaded to the child's case file in ORR online case management system within 24 hours of its completion. In addition, a copy of the revised Individualized Section 504 Service Plan shall be given to an attorney who has provided ORR a completed and signed **Notice of Attorney Representation (Form L-3)** (PDF), indicating they are

representing or providing legal assistance to the child, upon request. The care provider must provide a copy of the professional evaluator's written report to the child advocate appointed to the child, if requested by the child advocate.

**Effect of Individualized Section 504 Service Plan on Release from ORR Custody**

ORR cannot delay the release of a child to a sponsor or entity because an Individualized Section 504 Service Plan is incomplete or because development has not begun. For children identified as having one or more disabilities while in ORR custody but released before an Individual Section 504 Service Plan could be developed and implemented, the care provider must document in the child's case file in ORR's online case management system that the child was released before the Individualized Section 504 Service Plan was completed.

*Posted 07/17/24; Special note regarding the effective date of UAC MAP Section 3.8: ORR is implementing this section of the UAC MAP while it undergoes a comprehensive needs assessment. Modifications to this section will occur throughout the assessment period with the expectation that this section will be fully implemented by May 3, 2025.*

## 3.8.4 Release of Children with an Identified or Suspected Disability

ORR cannot delay release of a child solely because of the following reasons unless the child's disability-related needs require it:

- The process for establishing an Individualized Section 504 Service Plan has not commenced or is incomplete.
- A referral of the child for a disability evaluation has not occurred unless the evaluation is necessary for ORR's assessment of whether the sponsor is capable of caring for the child's physical and mental well-being.
- A disability evaluation is incomplete unless the evaluation is necessary for ORR's assessment of whether the sponsor is capable of caring for the child' physical and mental well-being.
- Post-release services are not in place.

Decisions regarding the release of children in ORR custody and care identified as having a disability follow the procedures described in **Section 2.7 Recommendations and Decisions on Release**.

For children with disabilities who were released from ORR custody and with the consent of either the sponsor or the child (if the child is 14 or older), ORR will, within a reasonable timeframe, share the child's treatment records with the child's new community-based provider(s), upon request. The child's treatment records must be requested in accordance with **Section 5.10.1 UAC Case File Request Process**.

*Posted 07/17/24; Special note regarding the effective date of UAC MAP Section 3.8: ORR is implementing this section of the UAC MAP while it undergoes a comprehensive needs assessment. Modifications to this section will occur throughout the assessment period with the expectation that this section will be fully implemented by May 3, 2025.*

# Footnotes

1. 22 U.S.C. § 7102

2. ORR transportation requirements are based on standards cited in "Caring for Our Children: National Health and Safety Performance Standards for Out-of-Home Child Care Programs", 2nd Ed., released by the American Academy of Pediatrics, American Public Health Association and the National Resource Center for Health and Safety in Child Care.

3. The Children's Health Act of 2000 imposes requirements regarding the use of restraints and involuntary seclusion in facilities that receive Federal funding such as Medicaid and Medicare funding, and specifically includes facilities that provide inpatient psychiatric

5/20/25, 11:27 PM    ORR Unaccompanied Children Bureau Policy Guide: Section 3 | The Administration for Children and Families

Case 2:85-cv-04544-DMG-AGR    Document 1567-9    Filed 05/22/25    Page 51 of 51
Page ID #:52891

services for children under the age of 21 years, which may apply to ORR's residential treatment centers that receive Medicaid. See 42 U.S.C. § 290ii & 290jj, et seq. The Centers for Medicare & Medicaid Services (CMS) issued regulations implementing these requirements at 42 CFR 483, Subpart G, which establishes the federal minimum standard for restraints and seclusion in these facilities. The definitions of seclusion and types of restraint in this document are based on the CMS regulations.

4. Some states prohibit the use of restraints and seclusion. States may also prohibit the use of certain types of restraints (such as chemical restraints) or impose limitations on the implementation of restraints or seclusion, such as specific time limits or requirements for a written order by licensed physicians.

5. A staff must be trained in de-escalation methodologies and should employ the methodology they used for de-escalation to facilitate the conversation.

6. Soft restraints are a type of mechanical restraint, typically made of cloth material designed to safely fit around a person's wrists, ankles, or chest. Care providers must receive approval from ORR about what type of soft restraint they plan to use before employing a soft restraint.

7. If the basis for the denial of consent is not provided to the CCU by the care provider or prescribing licensed medical professional, the CCU shall make two documented attempts to contact the Primary Consenter or Sponsor Consenter to obtain the basis for the denial of consent.

8. For hospitalizations, discharge instructions are not considered the complete medical records.

9. At an emergency facility, legal services are provided as soon as possible and to the extent practicable.

10. An attorney of record does not include class counsel for a class action.

11. 42 U.S.C. § 12102(2) notes that major life activities include, but are not limited to: caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. It also includes the operation of major bodily functions including the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

- Next>