# Exhibit E

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS

WESLEYAN EMPTAGE, by and through )
his next friend and mother, Raoutitee )
Pamela Puran, )
 )
          Plaintiff, )
 )
v. )
 )
MICHAEL CHERTOFF, Secretary of )
U.S. Department of Homeland Security )
(DHS); JULIE L. MYERS, Assistant )
Secretary, U.S. Immigration and Customs )
Enforcement (ICE); JOHN P. TORRES, )
Director, Office of Detention and Removal )
Operations, ICE; MARC MOORE, )
ICE Field Office Director; GARY MEAD )
Assistant Director of Detention and Removal)
Operations at ICE; SIMONA COLON, ICE )
Officer in Charge; JOHN POGASH, ICE )
National Juvenile Coordinator, )
 )
          Defendants. )
                                 )

Civil Action
No.: A-07-CA-158-SS


**DECLARATION OF**
**TIMOTHY L. PERRY**

In accordance with 28 U.S.C. § 1746, I, Timothy L. Perry, make the following declaration under penalty of perjury, pertinent to the above numbered style and cause:

1.     I am the Deputy Assistant Director ("DAD"), Detention Management Division, Office of Detention and Removal Operations ("DRO"), U.S. Customs and Immigration Enforcement ("ICE"), Department of Homeland Security ("DHS" or "Department"). I have served in this position since January 2005. Prior to my current position, I served as a Supervisory Detention and Deportation Officer assigned to the Headquarters office of DRO in Washington, D.C.

2.     As the DAD for the Detention Management Division, I am responsible for managing the ICE detention program from a national level, to include policy development, capacity planning,

development and execution of the detention budget, and oversight of the national detention standards compliance program.

3.      I make the following statements based upon my personal knowledge and access to official ICE and INS records and files.

4.      One of DRO's core responsibilities is the detention of aliens. Each year, the number of aliens detained by DRO has steadily increased. In FY 2006, ICE detained 281,567 aliens.

5.      In order to effectively enforce the nation's immigration laws, the Department began the Secure Border Initiative (SBI). As part of this initiative, DRO is charged with ending the former practice of "catch and release," whereby significant numbers of aliens apprehended at or near the border were issued a Notice to Appear, Form I-862, in immigration court, and then released on their own recognizance or on bail. This practice of "catch and release" meant that many of the aliens apprehended, charged, and then released, failed to appear in immigration court as required, and simply disappeared from the immigration system altogether.

6.      Prior to the opening of family detention facilities, alien families caught illegally crossing the border were most often released rather than detained due to the limited amount of family bed space.  Additionally, when a decision was made to take a family into federal custody, the families, including children, were detained separately.

7.      This practice created enforcement vulnerabilities, in that alien smugglers were reported to have brought children across the border along with groups of smuggled strangers and attempt to pass the groups off as family units. By exploiting children in this manner, smugglers were attempting to avoid detention if apprehended. In addition, families who subjected their children to the dangers of an illegal immigration journey also benefited from the Department's former

2

release policy. By ending the practice of automatically releasing families apprehended at the border, the Department is able to more effectively deter human smuggling and protect children from being subjected to the high-risk situations that are associated with being smuggled into the country.

8.    In light of the vulnerability created by this situation, and the desire to maintain family unity when possible, ICE contracted with Williamson County, Texas to open the T. Don Hutto Residential Center ("Hutto Residential Center") in Taylor, Texas.

9.    Prior to the opening of the Hutto Residential Center, ICE was already operating the Berks Family Shelter Facility ("Berks"), in Berks County, Pennsylvania. Berks was opened in March of 2001, in response to the need for a facility that could detain families together who were in expedited removal proceedings during which detention is statutorily mandatory. See 8 U.S.C. § 1225(b)(1)(B)(iii)(IV). Berks is a very small facility with a maximum capacity of 84 individuals. Due to its limited size, the facility was unable to meet the Department's need to detain the large number of families who were being apprehended for coming into the United States illegally. Further, as the facility is located in rural central Pennsylvania, the geographic location is less than ideal for meeting all of the agency's family detention needs. Consequently, the Department made the decision to open the Hutto Residential Center which is able to accommodate a larger number of families, and is located in the Western region of the United States, where a greater number of families are apprehended.

10.    With the desired goal of detaining all adults, and ending the process of "catch and release," the Department considered detaining all families separately, in that the parents or guardians would be detained in an adult facility and the children would be transferred to the care

of ORR. However, this has been unnecessary, as the utilization of the Hutto Residential Center

has allowed the Department to detain families in one facility so as to permit the Department to

effectively enforce the immigration laws of the United States while simultaneously maintaining

family unity. Both the family units themselves, as well as the Department, benefit from the use

of family detention facilities. The benefits to families include a reduction of stress on both the

parents and the children, the ability to allow for continuous contact between parents and children,

and the ability to allow for parents to continue making appropriate decisions for their own

children on a day to day basis. Some of the benefits to the Department include a reduction in

costs for placement and removal, and better control over case management.

11.     Like Berks, the Hutto Residential Facility was originally used to accommodate families

that were being processed for expedited removal. Expedited removal is a statutory removal

process applied to certain illegal aliens apprehended near the border, whereby the aliens are

expeditiously returned to their country of origin as soon as circumstances allow. This expedited

process considerably shortens the average length of stay in a detention facility. For an alien

subject to expedited removal the length of stay is estimated to be twenty days or less. Over time,

considering the benefits to both the agency and to the families, the Hutto Residential Facility was

expanded so as to accept aliens that were apprehended on the interior and were not subject to

expedited removal. As such, the average length of stay at the Hutto Residential Facility has

increased to an average of fifty days.

12.     When contracting with Williamson County for use of the Hutto Residential Center, DRO

took considerable care to specifically identify significant adaptations and improvements, both

cosmetic and structural, which had to be completed to ensure that the facility would be

4

appropriate to care for the needs of families with children. Such required adaptations included

adding safety precautions, including the installation of padding on the edges of bunk beds,

modifying stair railings, and installing bedrails. DRO also specifically requested that items such

as stuffed toys, arts and crafts supplies, playground equipment, and picnic tables be provided for

the resident's use. Further, the facility was specifically designed to allow for all members of a

family to be housed in the same living unit and to provide a private space for each family.

Modifications were also made to the living areas in order to facilitate indoor recreational

activities.

13.     DRO has made exceptional efforts in the past, and plans to continue such efforts in the

future, to make the Hutto Residential Center as pleasant for children as possible, while still

maintaining a safe and secure environment for all residents. Such improvements include:

painting murals on walls, plans to install additional privacy curtains surrounding the toilet

facilities in the resident's rooms, allowing residents greater freedom of movement throughout the

facility utilizing a "hall pass" system, and providing a greater number of multi-language reading

materials, for children and adults alike.

14.     The Hutto Residential Center has also been subject to significant oversight through ICE's

national detention standards program.

15.     In November 2000, the INS promulgated detention standards (hereinafter "ICE Detention

Standards"). The standards were the result of collaboration with the American Bar Association,

The Department of Justice, the INS, and other organizations involved in pro bono representation

and advocacy for immigration detainees. The standards are tailored to serve the needs of ICE

detainees. To address the family residential setting, these standards have been blended with

traditional juvenile standards that were used prior to the enactment of the Homeland Security

Act, which transferred care of unaccompanied alien children to Health and Human Services,

Office of Refugee Resettlement, to establish a baseline of performance requirements and

oversight procedures for family facilities.

16.    Due to the unique nature of a family facility, these requirements, standards, policies and

procedures, have evolved as ICE has gained experience with this program. These changes have

consistently been made with the goal of providing for the safety, security, and comfort of the

family population, while at the same time, meeting the appropriate needs of the facility's

complex demographics. To that end, the Assistant Secretary for ICE has actively solicited input

from Non-Governmental Organizations in the ongoing development of family detention

standards and their comments are being thoroughly considered as this process continues.

17.    The ICE Detention Standards encompass a range of issues ranging from religious services

to access to legal services and materials.

18.    In order to ensure that detention facilities are operated in a safe, secure, and humane

condition, INS implemented the Detention Management Control Program (DMCP) in January

2002. The DMCP is a robust inspections program that provides a series of requirements

designed to ensure that inspections of detention facilities are conducted in a uniform manner and

focus on compliance with the ICE Detention Standards.

19.    Per the DMCP, all ICE detention facilities that detain aliens for more than 72 hours are

reviewed annually using procedures and guidance outlined in the DMCP. DRO strives for one-

hundred percent compliance with the applicable Detention Standards. Therefore, if a facility is

found to be deficient in any portion of any standard, the facility is required to provide a Plan of

6

Action (POA) indicating the corrective measures that will be taken in order to address the deficiency, and DRO will follow up with the facility to ensure that corrective action has been implemented and the deficiency is corrected.

20.     DRO staff also complete Special Assessments and Quality Assurance Reviews. Special Assessments are used to evaluate the facility's policies and staff actions immediately after a specific incident, for example, but not limited to, escape, death, suicide, disturbance, or allegations of staff mistreatment. Special Assessments are conducted within one to two days of the triggering incident. Quality Assurance Reviews are additional site visits are used as a quality control measure for the inspection process. During a Quality Assurance Review, a headquarters staff officer reviews a facility to ensure that the conditions of confinement and compliance levels reported in the annual review are accurate.

21.     Pursuant to these policies, the Hutto Residential Facility has already been inspected twice. The first inspection took place prior to its opening in April 2006, and the facility was inspected again in July 2006. A third inspection is scheduled to be conducted in late March 2007. In order to ensure the highest level of care and treatment for its detainee population, and to ensure independent internal management oversight, ICE has created a Detention Facilities Inspection Group (DFIG) within the Office of Professional Responsibility (OPR). The purpose of the DFIG will be to independently validate detention inspections conducted by DRO by performing quality assurance over the review process, insuring consistency in application of detention standards, and verifying corrective actions. This new layer of OPR oversight will complement the current ICE DRO Detention Standards Compliance Program and ensure detention facilities are safe, secure and providing appropriate conditions of confinement. In fact, pursuant to this new policy, the

7

DFIG conducted a review of the Hutto Residential Facility in early March 2007.

22.    On page 4 of their complaint, plaintiffs argue that ICE should use the Intensive Supervision Appearance Program ("ISAP"), which utilizes tools such as electronic monitoring (bracelets), home visits, work visits and reporting by telephone to ensure compliance with release conditions rather than placing families in the Hutto Residential Center.  While ICE uses all available alternatives to detention as appropriate, detention is still the best avenue of ensuring that an alien appears for all administrative procedures and hearings as required under the INA.

23.    Additionally, the ISAP program currently has institutional limitations that inhibit its wide-spread use as an alternative to family detention.  Such limitations include contract provisions that currently limit the program to 1,800 participants.  The program currently has 1,732 participants enrolled; therefore, is running at near capacity.  Additionally, in order to enroll in the ISAP program, the participant must have a verified residence established within a 50-mile radius of the DRO/ISAP facility.  There are currently only nine locations where the ISAP program can be administered.  These locations do not include Texas.  This limitation, combined with the civil liability constraints which prevent government-incurred costs for transporting non-criminal aliens to facilitate release, results in a considerable difficulty with utilizing ISAP for significant numbers of families apprehended near the border.

24.    Moreover, existing policy concerning enrollment in the ISAP program is applied consistently to all apprehended aliens.  ICE already enrolls family cases when appropriate pursuant to that policy.

25.    ICE is firmly committed to ensuring that family detention facilities are operated in a safe, secure, and humane condition for children and adults alike.  As stated earlier, the established

8

review procedures ensure comprehensive oversight of detention facilities. Inadequacies are identified and corrected, while best practices are tailored specifically to the needs of the population, thus improving operations.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed on this 15Th day of March 2007.

Timothy L. Perry
Department of Homeland Security
Immigration and Customs Enforcement
Office of Detention and Removal Operations

9