# Exhibit G

# UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES; *et al.*, | ) Case No. CV 85-4544-DMG |
| Plaintiffs, | ) |
| v. | ) |
| PAMELA BONDI, Attorney General of the United States; *et al.*, | ) |
| Defendants. | ) |

### DECLARATION OF DAWNISHA M. HELLAND

I, Dawnisha Helland, hereby declare that the following statements are true and correct to the best of my knowledge, information and belief:

1. I am the Deputy Assistant Director for Juvenile and Family Management (JFMD), Non-Detained Management Division, Enforcement and Removal Operations (ERO), U.S. Immigration and Customs Enforcement (ICE), U.S. Department of Homeland Security (DHS) in Washington, D.C. I oversee all national juvenile and family custody programs, including ICE's Family Residential Centers (FRCs).

2. I have been with ICE ERO since 2013. Prior to working for ICE ERO, I served in the United States Army as a Human Intelligence Collector/French linguist, and the United States Border Patrol (USBP) as a Border Patrol Agent.

3. I am responsible for leading a dedicated, high-level operational division created to manage immigration issues related to unaccompanied alien children (UAC), young

adults, and family units (FAMU), and developing and implementing goals, policies, procedures, and operational plans that are sensitive to this population's vulnerabilities and needs.

4. On July 29, 2022, I was appointed by the Court to serve as the Juvenile Coordinator for ICE.

5. I am submitting this affidavit in support of the Government's Motion to Terminate the *Flores* Settlement Agreement.

## Historical Highlights of Family Residential Centers

6. In March 2001, ICE began operating an FRC in Berks County, Pennsylvania (Berks), which included holding FAMUs who were processed for expedited removal.

7. In June 2014, ICE opened a temporary FRC in Artesia, New Mexico (Artesia) while more permanent facilities were being established due to the steady increase in the number of families entering the United States.

8. In July 2014, ICE opened an FRC in Karnes County, Texas (Karnes).

9. In December 2014, ICE opened an FRC in Dilley, Texas (Dilley).

10. After Karnes and Dilley were opened, the temporary FRC Artesia closed on December 31, 2014, as intended.

11. In February 2021, ICE ceased its use of Berks for FAMUs.

12. In 2021, ICE began phasing out the use of FRCs and on December 10, 2021, the last FRC was closed.

13. In March 2025, ICE reopened the Karnes facility to house detained FAMUs.

14. In April 2025 ICE discontinued the use of Karnes as a FRC, resumed the use of Dilley as a FRC, and transferred the FAMUs who were housed at Karnes to Dilley.

**FRC Usage is Necessary for the Safety and Security of Our Borders**

15. FRCs are necessary to reduce the absconder rate and to provide an option for housing members of FAMUs together if the head of household failed to comply with the terms of their release conditions while in immigration proceedings or failed to comply with an immigration judge's order of removal. FAMUs detained at FRCs are often held under mandatory detention provisions, such as (a) expedited removal or (b) the reinstatement of the removal and may also be subject to final orders of removal. In addition, ICE may need to detain FAMUs during the pendency of their case who are not subject to mandatory custody but pose a flight risk. Without FRCs, the ability of ICE to monitor cases of FAMUs and execute removals of FAMUs is compromised.

16. While FRCs were closed between 2021 and 2024, ICE attempted to address FAMU migration numbers through non-detained programs such as family expedited removal management (FERM), which focuses on FAMUs in expedited removal proceedings, and by sending appointment letters (G-56 Initiative) to non-detained families. These programs have limitations and had mixed results.

17. FERM is a program that focuses on FAMUs processed under Expedited Removal proceedings who asserted a fear of persecution or torture. FERM enrollment allows ICE to release these FAMUs with conditions. The FERM family unit head of household (HoH) is placed in ICE's Alternatives to Detention (ATD). ATD uses the Intensive Supervision Appearance Program (ISAP) with Global Positioning System (GPS) monitoring with a mandatory home curfew. The family unit head of household enrolled in FERM is required to have two technology-based monitoring tools: 1. a wearable device for continuous GPS tracking and 2. a SmartLINK compatible device to allow for ongoing communication. Once FERM FAMUs receive a final order of removal, ICE can

contact and communicate with participants using those technology devices as ICE can send notification to the GPS device or use SmartLINK to communicate via telephone.

18. From FY21 - FY24, a total of 326,824 FAMU HoH were enrolled in ATD (non-FERM). The number of FERM participants in FY23-FY24 was 14,436 FAMU HoH.

19. The effectiveness of immigration enforcement efforts is significantly diminished without an option for detention. Without FRCs, the only option is to release aliens in a family unit, which is not an option under the President's executive orders.

20. While utilizing ATD rather than detention, a total of 69,312 FAMUs Head of Households absconded from ATD between fiscal years 2021 and 2024.

21. ICE considers an absconder from the ATD program to be an individual who has failed to report, who has been unresponsive to attempts by the Government to contact him or her, and whom the Government has been unable to locate.

22. During the period starting June 1, 2023 and ending February 28, 2025, FAMUs placed on ATD (electronic monitoring) in the FERM program had a 16% absconder rate. During the same period, FAMUs not placed on electronic monitoring and enrolled in only check-in programs, had a 68% absconder rate. These data are from ICE's G-56 Initiative.

23. The number of participants ICE can place on ATD is limited due to budget (cost of technology devices and monitoring services) and limited human resources. Thus, it is generally not operationally efficient and not cost effective to apply technology throughout a FAMU's entire immigration process, which can take many years to resolve. Because of this, ICE must regularly review ATD cases on a case-by-case basis and escalate or de-escalate the level of monitoring technologies based on prior compliance and the procedural posture of the immigration case.

24. ICE regularly terminates participants from the ATD program based on these case reviews and places FAMUs on non-detained case management. Consequently, many FAMUs are in non-detained case management without monitoring technology or reporting requirements. Once their case status changes or there is a need to serve a

decision or notice in person, ICE requests the FAMUs to report to an ICE office via sending an appointment letter, G-56, to the last address on file which results in more no-shows as explained in paragraph 16. A significant number of FAMAs who were terminated from the ATD program and to whom ICE has sent a G-56 to the last address on file, however, do not report as required.

25. Since June 2023, ERO issued 12,815 G-56 letters to FAMU head of households with a final order of removal but are no longer on ATD. Of those, 8,627 letter recipients failed to respond.

26. Moreover, a substantial percent of FAMUs who received final orders of removal and were directed to report for removal either destroyed or removed their monitoring devices and absconded. In Fiscal Year 2023, from June to September, which is when the program was initially implemented at a small scale, 14 FAMU individuals (including all members of the family) absconded after removal was scheduled and after they were notified to report in for removal. This is 3.3% of total FAMU individuals scheduled for removal in the FERM program. In Fiscal Year 2024, 1,332 FAMU individuals absconded after removal was scheduled and after they were notified to report in for removal. This is 19% of total FAMU individuals scheduled for removal. In Fiscal Year 2025, 692 FAMU individuals absconded after removal was scheduled and after they were notified to report in for removal. This is 31% of total FAMU individuals scheduled for removal.

27. Contrary to Congressional mandates to detain, the Flores Settlement Agreement release requirements and budget constraints resulted in many FAMUs being released without any type of monitoring technology. As noted, ICE issues an appointment letter, G-56, for them to report to ICE office for case review, service of decision or document, and removal. When a FAMU fails to respond to the letter or fails to report as requested, it is a failure to report, and, therefore, a violation of the conditions of release.

28. When ICE can execute a removal order against a FAMU, the use of FRCs is also necessary. Because removal arrangements can take more than 72 hours in some cases,

depending on factors such as flight schedules and country requirements, FRCs provide a safe setting for FAMUs to await removal together and prevent FAMUs from absconding.

29. In 2020, ICE updated its standard governing FRCs, the Family Residential Standards, which likewise set the standards for the care and custody of FAMUs and juveniles. See ICE, Family Residential Standands (FRS): Program Philosophy, Goals, and Expected Outcomes, https://www.ice.gov/doclib/frs/2020/1.0_Overview.pdf (viewed May 19, 2025). The FRCs conditions of detention are governed by the Family Residential Standards. ICE may make minor modifications to these standards depending on circumstances, such as when detention times are anticipated to be very short, but the facilities will generally meet all substantive requirements.

I declare, under penalty of perjury under 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information and belief. Executed on this 21st day of May, 2025.

_____
Dawnisha Helland
Juvenile Coordinator
Deputy Assistant Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security