ANDREA SHERIDAN ORDIN (SBN 38235)
STRUMWASSER & WOOCHER LLP
1250 Sixth Street, Suite 205
Santa Monica, California 90401
Telephone: (310) 576-1233
Facsimile: (310) 319-0156
E-mail: aordin@strumwooch.com

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>PAMELA J. BONDI, Attorney General of the United States, *et al.*,<br><br>Defendants. | CASE NO. CV 85-4544-DMG (AGRx)<br><br>**NOTICE OF FILING OF INTERIM JUVENILE CARE MONITOR REPORT BY JUVENILE CARE MONITOR PAUL H. WISE** |

1    In accordance with the Court's Orders, the Juvenile Care Monitor has
2    continued to work to ensure an effective transition of monitoring functions
3    pursuant to the Court's Order extending the JCM's term until June 27, 2025.
4    [Doc. 1547.] The Juvenile Care Monitor has discussed drafts of this Report with
5    the Parties. Legal Advisor Andrea Sheridan Ordin submits the attached Interim
6    Juvenile Care Monitor Report.

7

8    DATED:     May 27, 2025          Respectfully submitted,

9
10                                    Andrea Sheridan Ordin
                                      STRUMWASSER & WOOCHER LLP
11

12                                    By   /s/ Andrea Sheridan Ordin
13                                         Andrea Sheridan Ordin

14
                                           *Legal Advisor*
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTERIM JUVENILE CARE MONITOR REPORT
## May 2025

**Submitted by**
**Dr. Paul H. Wise, Juvenile Care Monitor**
**Andrea Sheridan Ordin, Legal Advisor**
**Dr. Nancy Ewen Wang, Medical Advisor**

## I.      SUMMARY

This Interim Report presents the observations and assessments of the Juvenile Care Monitor (JCM), Legal Advisor, and Medical Advisor who are charged with conducting independent assessments of custodial conditions for children held in U.S. Customs and Border Protection (CBP) facilities in the Rio Grande Valley (RGV) and El Paso sectors.   These assessments are required by the provisions of a settlement agreement approved by the Court on July 29, 2022 [Doc. # 1278] (the "Settlement Order" or "Settlement") which mandates specific custodial conditions and procedures for immigrant children in CBP custody in the RGV and El Paso sectors.

The assessments of the JCM team includes the review of custodial data, CBP protocols and documentation, and site visits that include interviews with CBP personnel, contracted medical staff, and children and families in CBP custody.

During this reporting period, the JCM documented many areas of general compliance with the Settlement.  However, several custodial provisions were not fully met in the El Paso sector, including adequate temperature control and the offering of age-appropriate meals for young children.  In addition, in both sectors, assigning caregivers only to the unaccompanied children (UC) holding areas did not meet the Settlement requirement that caregivers be provided for "class members," including children in families, "to provide a safe and secure environment for class members."  Settlement, § 9.A.1.

Of special concern in this interim report are the status and adequacy of CBP's systems and protocols to monitor the provision and quality of all custodial and medical services required by the Settlement.  In addition, this report assesses the current status of the Time in Custody (TIC times) reports that CBP is required to convey to the Plaintiffs and the JCM on a monthly basis.

## II.     MONITORING ACTIVITIES DURING THIS REPORTING PERIOD

*   **Juvenile Priority Facilities**

Since the last JCM Report, the locations of the Juvenile Priority Facilities (JPFs) in both the RGV and El Paso sectors have changed.  In the RGV sector, the JPF was moved in February from the Donna soft-sided facility to the renovated, hard-walled Ursula facility.  In the El Paso sector, the JPF was transferred in March from the Hardened Soft-Sided Facility to the modular, Centralized Processing Center (CPC) located adjacent to the Border Patrol Station on Gateway South Boulevard.  This

facility had been used previously as the JPF prior to the establishment of the soft-sided facility.

- **Site Visits**

Six site visits were conducted at CBP facilities since February 2025 as detailed below.  The JCM team had full access to all sections of all facilities providing care for children.  In addition, the JCM team had full freedom to conduct interviews away from CBP personnel with both children and parents in custody.

The dates and location of the site visits to CBP facilities and in-person and virtual meetings with CBP personnel were as follows:

- **CBP Rio Grande Valley**
    - February 3, 2025 – Donna JPF (Dr. Wise)
    - March 21, 2025 – Ursula JPF (Dr. Wise)
    - April 28, 2025 – Ursula JPF (Dr. Wise)

- **CBP El Paso**
    - February 5, 2025 – EHF (Dr. Wise)
    - March 5, 2025 – EHF (Ms. Ordin and JCD* and OCMO**)
    - April 29, 2025 – CPC (Dr. Wise)

- **Significant In-Person and Virtual Meetings with CBP.**
    - February 25, 2025 – (JCM and JCD)
    - March 5, 2025 – (OCMO and Dr. Wise in Washington DC)
    - April 10, 2025 – (JCM and OCMO)
    - April 23, 2025 – (JCM and JCD)
    - May 2, 2025 – (JCM and OCMO)

    *Juvenile Coordinator Division
     **Office of the Chief Medical Officer

- **CBP Data Analysis**

The number of families and UCs has fallen dramatically over the past several months.  CBP has reported that the total number of family encounters on the Southwest Land Border fell from 36,711 in October 2024 (first month of the fiscal year) to 831 in March 2025 (approximately 98% reduction).  There were 6,603

UCs encountered in October 2024 and 666 in March 2025 (approximately 90% reduction).

CBP provides reports to the JCM and Plaintiffs all children in families and UCs who remain in custody for greater than 72 hours.  According to the reports for the El Paso sector, there were 25 children in families and 1 UC held for greater than 72 hours in each of February and March 2025. In RGV, there were 39 children in families and 1 UC and 45 children in families and 1 UC for February and March, respectively.  For March 2025 in the RGV sector, there were 17 children in families held longer than 7 days and 1 longer than 14 days (held for 20 days).  In El Paso in March, there were 10 children in families held longer than 7 days, among which 8 were held longer than 14 days (longest 23 days).  Figures for April are not yet available.  In addition, the total number of children in families and UCs apprehended in the RGV and El Paso sectors for February and March are not yet available.

These figures should be viewed with some caution as recent observations by the JCM and the Plaintiffs have raised questions regarding the complete accuracy of the provided data, in particular, whether all children with TIC times greater than 72 hours were actually included in the monthly reports.  As noted later in the report, discussions regarding the accuracy of the provided data are continuing and technical changes in the parameters used to generate the data are being refined.

## III.   CUSTODIAL CONDITIONS AT CBP FACILITIES

There has been a dramatic reduction in the number of UCs and families apprehended at the Southwest land border.  This has been reflected in the downsizing of the JPFs in both sectors and eased pressures on custodial and processing systems.

## A.    Overcrowding

There was no evidence of overcrowding during any of the site visits.  It should be noted that even when the census is low there is still the potential for overcrowding. This can occur when individuals in custody are held in limited spaces.  However, this was not observed during any of the site visits.  Many of the pods in the JPFs were empty and the number of individuals in each of the occupied holding pods was observed to be far below capacity.

## B.    Nutrition

The Settlement requires that CBP ensure that children have access to age-appropriate meals and snacks that meet their daily nutritional needs.  Water and adequate hydration are also mandated by the Settlement.

Site visit interviews with families, children, caregivers, and BP agents, all reported that bottled water and snacks were always available from soon after apprehension through their entire time in CBP custody.   In both the RGV and El Paso JPFs, bottled water, snacks, including fresh bananas or apples, were available in or adjacent to the UC and family holding pods.  During all site visits to the JPFs, infant formula, bottled water, and mixing instructions were readily available.  Inspection of perishables in storage, including snacks and infant formula, were within their accepted expiration dates.

**RGV.** In the Ursula JPF, interviews with families and UCs reported that food was generally adequate in quantity and quality, except for some reports of hot meals served cold.  Dinner menu items were varied, in accordance with menu standards.  Food service for toddlers continued to be provided to children between 2 and 5 years, as per parental request.

**El Paso.** Food service in the El Paso CPC showed a marked deterioration from that provided in the Hardened Soft-Sided Facility (which had its own on-site kitchen).  Interviews with parents, children and caregivers reported highly variable food quality, including hot meals served cold and off-tasting burrito offerings.  There was also no variation in dinner content despite relatively long stays for many children in family units. Significantly, there was no toddler food service available at the CPC; very young children were offered adult meals.  This represented a departure from the prior practice of providing toddler-appropriate meals to children in the 2-5 age group as part of CBP's commitment to offer age-appropriate meals.

CBP reports that the El Paso sector is reviewing its current and upcoming food contracts to better provide age-appropriate food for young children.  The JCM will continue to monitor this issue and work with CBP to ensure appropriate food offerings for all children in custody.

## C.    Warmth, Garments and Sleep

The Settlement requires that children are held in facilities that maintain a temperature within the 69° to 83° Fahrenheit range.  In addition, extra garments should be available for children who feel cold.  Posters explaining the availability

of these garments should be posted in areas easily viewed by children and families in custody.  Holding conditions should be compatible with sleep during night hours, including the availability of sleeping mats, blankets, and reduced lighting when possible.

**RGV.** Site visits to the Ursula facility in the RGV found temperatures in the holding areas to be in compliance with the range mandated by the Settlement.  All holding pods had operating digital thermometers which read in the 70º to 72º Fahrenheit range.  Interviews with parents, children, and caregivers suggested that there was an adequate supply of extra garments for children.  Posters that explain that garments are available were displayed in the holding areas.  However, several parents reported that they did not know that these were available upon request.

**El Paso.** In the El Paso CPC during the April 29, 2025 site visit, temperature control was reported to be a persistent problem.  Interviews with BP agents, parents, children, and caregivers all reported that temperatures in holding pods could vary dramatically.  Of greatest concern were cold temperatures far below the mandated range.  The JCM received reports from caregivers and BP agents of temperatures reaching the mid 50s in some pods; during the JCM site visit a temperature of 62º Fahrenheit was observed in an unoccupied holding pod using a handheld thermometer.  There was a general lack of confidence that the thermometers located in the holding pods were fully functional.  BP reported that it became aware of the inadequate temperature control in the CPC soon after the CPC had been redesignated as the JPF. BP reported that the problem was currently being addressed by the involved contractors.  As the temperatures in each pod could apparently vary dramatically over the course of a few hours, BP attempted to mitigate the problem by actively shifting families and UCs to pods in which temperatures were acceptable at the time.  A supply of extra garments were available for children upon request.  Posters that explain that garments are available were displayed in the holding areas.

## D.    Caregivers

The Settlement recognizes that "Caregivers are a critical component of CBP's efforts to meet the unique needs and vulnerabilities of class members in custody, and to provide a safe and secure environment for class members."  This has required that the Caregiver program provide a variety of direct custodial care services to all children in CBP custody in the RGV and El Paso sectors, including "observing and reporting inappropriate behavior, detainee health conditions, and the recognition and referral of those detainees displaying emotional and mental distress."  *See* Settlement, § VII.9B.  CBP has assigned oversight of the Caregiver

Program to the Office of Chief Medical Officer (OCMO) which underscored the importance of the Caregiver component to health and safety.

There has been a major reduction in the Caregiver program in both the RGV and El Paso sectors. Reduction was to be expected given the sharp decline in families and UC apprehensions at the border. However, the role and functions of the caregivers have also been highly curtailed. Caregivers in both sectors were assigned to the UC holding pods only. Caregivers were no longer deployed family holding pods unless there were no UCs in custody. This is a sharp departure from the Statement of Work for Caregivers which required support for both families and UC's while in BP custody.

Any elimination of Caregiver support for families in custody removes an important means by which CBP can prevent injuries and medical harm among children in custody. The original priority for the caregiver program was to deploy caregivers in the shower area. This was done to help prevent injuries and to ensure compliance with all Prison Rape Elimination Act (PREA), *Flores*, and TEDS requirements, particularly when a parent has multiple small children. Interviews with caregivers and BP agents suggested that caregiver coverage of showering for families was highly variable and occurred only when the number of UCs in custody was low and caregiver staffing allowed.

Caregivers also provide a crucial layer of CBP's system of medical vigilance as caregivers are trained to provide a frontline capacity to observe levels of distress and the well-being of children in custody and to communicate parental concerns about their children's medical condition. This should not be considered a marginal role; rather, it has served as an essential means by which CBP assures that a child not initially identified as being at medical risk does not deteriorate in a general, family holding pod while in custody.

## E.     Holding Members of Family Separately While in Custody

The Settlement explicitly supports family unity while in CBP custody.   The section entitled "child-appropriate environment" begins with "Absent an articulable operational reason, class members apprehended with adult family members (including non-parents or legal guardians) shall remain with that family member during their time in CBP custody." The Settlement goes on to insist that "When there is an operational need to house family members separately, CBP shall make and record the reasons for holding them apart and all reasonable efforts to ensure that the family members have the opportunity to interact."

During prior site visits, it was a routine practice to hold some children separately from their parents or family members while in custody. As noted in earlier reports, any separation of children, particularly young children, from parents or family members for substantial periods of time in custody creates the potential for profound and lasting harm.

Recent site visits to both the RGV and El Paso JPFs revealed that cases of children being held separately were far less common than previously and were generally confined to gender dissimilarity, such as cases in which a mother and older adolescent son could not be held together. Fathers were regularly held separately from their families when children were held with the mother. There was substantial improvement in the visitation regimen for parents and children held separately. Interviews with parents and children generally reported daily visits, however, several families who had been held for prolonged periods reported that there were only intermittent visits despite the low census.

## F.    Trauma-Informed Care and Child-Appropriate Environment

The Settlement mandates that the JPFs implement care strategies that attend to the emotional and psychological challenges that migrant children confront both before and during CBP custody. Recognizing the potential that children in CBP care may have experienced trauma in their home communities, on their journey, and while in custody, the Settlement calls upon CBP to make efforts to foster reassurance, resilience, and psychological well-being. *See* Settlement, §§ VII.3.D.7, VII.8.B8.

Interviews with UCs and families continue to confirm that all felt physically safe while in CBP custody. A single complaint of rude and harsh language was reported to the JCD and JCM during the March site visit to the El Paso JPF. In addition, a declaration obtained by Plaintiff attorneys included allegations of abusive verbal and physical treatment of parents while in CBP custody in RGV. All children and families interviewed by the JCM during this reporting period said that they had been treated professionally by CBP personnel and contractors while in the RGV and El Paso JPFs. Recently, UCs have also been interviewed by Homeland Security Investigations (HSI) an arm of the Department of Homeland Security. That UCs and families feel safe in CBP custody is a fundamental precondition for trauma-informed care. The JCM will continue to be vigilant in identifying any abusive or unprofessional treatment of families or UCs in both the RGV and El Paso sectors.

During recent visits, observations and interviews with families and UCs have noted adequate environmental safeguards and child-friendly materials for the areas

7

designated for tender-aged UCs.  As of April 28, 2025, the Ursula facility had enhanced the child-friendly environment for UCs. But for UCs in El Paso and children in families at both facilities, the child-friendly materials were minimal.

Televisions were generally available in all family and UC holding pods in both JPFs and are being used to provide child-appropriate programming and procedural information.  Mandated information posters regarding detainee rights were posted in or adjacent to the UC and family holding pods in both JPFs.

There was no outside recreation in either location. The UCs had regular access to telephone calls, but some families with children reported delays in obtaining telephone calls.

## IV.   ENHANCED MEDICAL SUPPORT

The Settlement requires a robust medical care system for juveniles in CBP custody. CBP has addressed this requirement by deploying contracted medical teams in the RGV and El Paso JPFs and any other facilities housing children.  These teams include an advanced medical practitioner (either a nurse practitioner or physician assistant) and 2-3 medical support personnel, usually medical assistants or emergency medical technicians.  These teams are required to be present 24 hours a day, 7 days a week.  In addition to the on-site medical teams, supervising physicians, including pediatricians, are assigned in each sector to provide on-call consultation, clinical protocol development, and quality assurance reviews.

JCM monitoring has focused not only on whether the required medical system is in fact present in the JPFs but also on the system's performance in providing quality medical services to children in CBP custody.

Prior JCM reports have noted major improvements in the medical protocols and capabilities of CBP's medical system over the past 5 years and particularly, since the tragic death of 8-year-old Anadith Reyes while in CBP custody (See JCM report of July 2023).

Recent site visits and ongoing engagement with CBP's Office of the Chief Medical Officer (OCMO) have documented continued progress in strengthening CBP's medical system for children in custody.  Of greatest importance are those components that ensure that no child will suffer from preventable medical harm or death while in CBP custody.

In this regard, it is important to recognize the special character of CBP's medical mission as a frontline, law enforcement agency.  CBP's medical system is not

intended to provide comprehensive medical services.  Rather, it is focused on ensuring high quality care for a rapid turnover of large numbers of children from all over the world who generally come into custody after arduous and often dangerous journeys. Accordingly, JCM reports have elevated those elements of the CBP medical care system that are of particular importance in meeting these focused objectives, including:

- The identification of children at elevated medical risk
- The reduction of medical risk in CBP facilities;
- Systematic vigilance to identify children experiencing medical deterioration while in custody;
- Enhanced pediatric consultation and medical monitoring of children at elevated medical risk while in CBP custody;
- Improved conveyance of medical information among CBP personnel, contracted health providers, and subsequent medical providers.

## A.    Identification of Children at Elevated Medical Risk

OCMO has instituted an improved, systematic mechanism for ensuring that examining medical personnel recognize and respond to elevated risk in children soon after entry into custody.  The implemented OCMO protocol defines elevated risk on the basis of a list of specified diagnoses.   The Electronic Medical Record (EMR) flags the child at elevated risk whenever one of the elevated risk diagnoses is noted in the EMR record.  The OCMO protocol requires that these alerts be followed by direct consultation with the on-call pediatric consultant and that the child be included in the Enhanced Medical Monitoring (EMM) system.  This system requires around the clock medical status assessment at least every 4 hours.

Site visit interviews and reviews of medical documentation suggested routine provider compliance with the OCMO risk assessment protocols.   JCM review of the medical records of children identified as being of elevated risk found that the pediatrician consultant had been contacted by the intake medical provider and the management plan discussed.  This elevated risk protocol appears to be functioning well and the EMM assessments are occurring as required.

The reliance on a specified list of risk diagnoses requires that the included diagnoses receive ongoing reassessment and refinement as needed.  The JCM will continue to assess any revision OCMO makes in this list of high-risk diagnoses.

**B.      Conveying Essential Medical Information to CBP within the JPFs**

It is essential that medical providers convey information regarding children at increased medical risk to appropriate CBP personnel.

CBP has implemented a system by which the identification of a child at elevated medical risk will trigger an alert on the BP custodial dashboard.  In this manner, medical information is now immediately available to BP facility leadership.  This is an important improvement in the coordination of medical and custodial supervision.  Site visits have confirmed that this system is functioning well and that BP facility supervisors have access to documentation regarding the presence of children at elevated medical risk.

**C.      Strengthened Procedures for Referral to Local Medical Facilities**

The CBP medical system relies upon local health facilities to provide definitive care for individuals whose medical conditions are too serious or complex to be addressed adequately by CBP medical capabilities.

Prior JCM reports have noted that on occasion, a medical decision to transfer a patient to a local health facility had been questioned by CBP personnel because of the burden it places on BP staffing.  The number of transfers to health facilities has fallen in association with the major declines in apprehensions.  Interviews during this reporting period suggested that medical personnel have been able to refer patients to local health facilities with full BP logistical support.

OCMO has also instituted an important new monitoring capability that is able to identify cases in which a medical decision for referral has been made but that transport to a facility has not occurred.  This will permit OCMO monitoring personnel to inquire as to the status of these cases and support appropriate decision-making in the field.

**D.      Supervision and Accompaniment of Children in Hospitals by Border Patrol Agents**

As noted in a prior JCM report, concerns have been raised by hospital physicians regarding CBP custodial policies when children are undergoing sensitive medical examination and treatment in hospital settings.  Current CBP custodial policies mandate specific security procedures when individuals in CBP custody are transported to hospitals and receive care in unsecured hospital environments. These security concerns are real and attend to the prevention of harm to the child, hospital staff, BP personnel, and to prevent escape.

10

However, current custodial policies for children in medical facilities warrant
review and clarification as they have been interpreted as disallowing standard
medical practices regarding privacy during sensitive medical examinations, such as
a gynecological examination of a teenage girl  The use of a medical curtain or soft
partition in a hospital examination room would seem a common-sense approach to
meeting both privacy and security requirements.  However, this approach requires
careful BP and OCMO review and ultimately, enhanced guidance to BP agents
responsible for the security of children during transport and medical evaluation.

**E.    Ensuring Strong Communication between CBP and Hospital Medical
Personnel**

High-quality medical systems ensure good communication of medical information
whenever a patient is referred for care to another medical facility.  Prior JCM reports
have identified considerable variation in how medical information is provided
between CBP and medical providers at the referral hospital.

Interviews with medical providers in the JPFs and reviews of the medical records
of children referred to local hospitals have disclosed major improvements in the
communication between CBP and local referral facilities.  Standard use of CBP
EMR summaries have improved referral documentation.  In addition, purposeful
OCMO engagement with the principal referral hospitals in each sector have
improved the conveyance of patient information back to JPF medical providers
after hospital evaluation and management.    Because of its medical importance,
this  component of care should continue to be monitored closely.

There continues to be a lack of clarity regarding CBP's role in ensuring that
hospital medical providers have access to detained parents or adult family member
who have information regarding a child's medical history.  A full medical history
of a child's illness and prior treatment is an essential component of standard
medical practice.  If a parent or adult family member is not transported to the
hospital with the child, it would be necessary for CBP to make arrangements for
hospital personnel to speak with the adult in custody or otherwise receive critical
medical information regarding the child's health status and prior management.

**F.**     **Conveyance of Medical Information from CBP to the Office of Refugee Resettlement (ORR), Immigration and Customs Enforcement (ICE), or a Child's Parents or Guardian.**

Good medical practice requires that all relevant medical information be provided to parents and/or subsequent health providers upon transfer from CBP custody. This is particularly important when a child at elevated medical risk leaves CBP custody.

It is difficult for the JCM to ascertain how well CBP is conveying important medical information to ORR or ICE upon transfer as these agencies are not part of the JCM purview. However, CBP and ORR have enhanced their digital sharing of medical information for UCs being transferred to ORR. This is expected to help ensure that ORR health providers have full access to the medical evaluations and management of UCs while in CBP custody. A standard procedure for the transfer of medical information from CBP to ICE for children in families is also essential to maintain treatment and prevent medical deterioration during removal operations or soon thereafter. The JCM will continue to discuss with OCMO the quality of CBP's transfer of medical information to ICE.

It is also essential that parents receive documentation of all medical care provided their children while in CBP custody. This is particularly important as most families will not be transferred to another U.S. agency but will be removed to their home or third countries. JCM examination of transfer documentation during site visits has found that the inclusion of completed medical summary forms (Form 2501) in materials provided parents prior to removal, while improved over the past 6 months, remains somewhat variable. OCMO is acutely aware of the necessity to standardize the provision of medical summary forms to parents and is developing procedures to monitor that delivery.

## V.     THE ASSESSMENT OF CBP MONITORING CAPABILITIES

The Settlement Agreement of July 2022 (the Settlement) envisioned a transfer of compliance monitoring responsibilities from the Court-appointed Juvenile Care Monitor (JCM) to internal CBP monitoring systems. Accordingly, the Settlement included a provision terminating the JCM role after 16 months from the initiation of the Settlement. This duration was extended several times by agreement of both parties and the Court and is currently scheduled to end on June 27, 2025.

In anticipation of the transfer of compliance monitoring responsibilities to CBP, the Settlement included provisions that permitted the JCM to review all relevant CBP medical and custodial protocols in order to provide CBP with

recommendations for enhancements and refinements.  The Settlement also required that the Final report "shall inform the Court and the Parties of the Juvenile Care Monitor's assessment of the efficacy of CBP's internal monitoring protocols…." The Settlement requires that "prior to the effective transition of monitoring functions, the JCM shall approve Defendant's final monitoring protocols." *See* Settlement, § IX.12.  CBP has been forthcoming in sharing relevant monitoring protocols as they have been developed and the JCM has been active in engaging with CBP on the nature, scope, and quality of these protocols.

Many of the CBP monitoring protocols have required detailed technical and operational scrutiny and discussion.  For the purpose of this interim report, CBP monitoring systems can be assessed in 4 operational categories:

- Overcrowding
- Time in Custody
- Amenities
- Medical Care

## A.    Overcrowding

Experience has shown that the prevention of overcrowding is a central custodial concern.  This is because overcrowding not only results in inappropriately confined living spaces but also the overburdening of virtually all custodial capabilities, including nutrition, hygiene, and medical care.

As has been noted in prior reports, CBP has implemented a strong, real-time system for monitoring facility censuses.  This system provides census figures to CBP personnel at the headquarters, sectoral, and facility levels.  CBP is also aware of the holding capacities of all custodial facilities based on initial construction specifications.  This allows CBP to monitor the census in relation to the designated maximum occupancy for all facilities holding children.

**Summary Assessment:** CBP currently has a real-time capacity to accurately monitor overcrowding in its facilities.

## B.    Time in Custody (TIC Times)

CBP has a strong capability to monitor TIC times of all children in custody.  This capability is available to all supervisory CBP personnel in close to real-time.  This allows CBP supervisors at the national and sector level to identify UCs exceeding 72 hours in custody as well as the ability to monitor TIC times of families

throughout the CBP detention system.

In addition to its general TIC time monitoring activity, CBP has also provided the JCM and Plaintiffs with monthly reports of children who have been held in custody for longer than 72 hours in the previous month.  These data are important as they allow the JCM and Plaintiffs to assess custodial trends and the emergence of holding challenges within any given sector.

Analysis of the provided monthly data, however, has raised questions regarding the accuracy of the reports.  Prior concerns noted the apparent underreporting of families with TIC times greater than 72 hours.  Plaintiffs have also noted that certain minors with protracted TIC times were not included in the monthly reports.  As of April, 2025, CBP has developed new formats and certain revised parameters that should better ensure that all children are included in the monthly reports.

**Summary Assessment:**  CBP has a strong capability to monitor TIC times of all children in custody.  This capability is available to all supervisory CBP personnel in close to real-time.

However, there remain concerns regarding the monthly reports CBP has been providing the JCM and Plaintiffs on all children with TIC times greater than 72 hours.  The JCM expects that the data concerns conveyed to CBP can be readily resolved and any additional revisions in the collection or interpretation of the provided data can be discussed and collaboratively implemented.  However, until further analysis of the reports and joint technical discussions, the JCM cannot yet express confidence in the monthly TIC data.

## C.    General Conditions and Amenities

The JCM has consistently reported on general custodial conditions and the provision of amenities required by the Settlement.  These standards relate to nutrition and water, temperature regulation, garments, sleep conditions, and hygiene and sanitation.

Prior JCM reports have documented CBP's general compliance with the conditions and amenity requirements of the Settlement.  However, in the past, certain arenas of custodial care have been variable in their compliance, including the provision of additional garments when children were cold, showering and toothbrushing opportunities, and food offerings for young children.

Although the Facility Amenities Logs are available to national supervisors, the review of the Logs are primarily the responsibility of the local EHF and CPC

Juvenile Coordinators and assigned sector supervisors.  This local level of
monitoring is augmented by JCD visits and reporting.

## C.1 Amenities Logs

CBP utilizes a standard digital form to ensure that all required amenities and
welfare checks have been documented.  These are generally completed by CBP
personnel stationed in the holding areas who can observe detainee movements and
provided services.  The JCM has reviewed the Amenities Logs in both sectors
during JPF site visits.  Prior JCM visits during periods of very high census found
that certain amenities were documented with varying accurately.  However, during
this reporting period, the very low censuses have been associated with more
accurate logging, particularly for welfare checks, the availability of sleeping mats
and blankets, the delivery of meals, and showering. However, some required
amenities may not be captured by the logs.  For example, sleep conditions, food
quality, or the availability of toddler meals are not recorded.

The April JCM visit to the El Paso CPC identified noncompliance with food and
temperature provisions of the Settlement.  The inappropriateness of food offerings
(such as the providing adult meals to very young children) or food quality are not
generally recorded.  However, CBP reports that it will address both young child
food menus and food quality through contract mechanisms. The regular recording
of holding pod temperatures should be a component of facility amenities
monitoring but during this site visit appeared to be of variable accuracy.  CBP has
reported that it has recently taken steps to improve the recording of holding pod
temperatures.

The documentation of noncompliance with these Settlement provisions during the
April site visit to the El Paso JPF does not appear to have been a failure of the
monitoring system per se, as CBP facility personnel were aware of these arenas of
noncompliance.  Rather, the problem reflected the inadequacy of an appropriate
ameliorative response.  As noted, CBP has subsequently been making efforts to
address these areas of concern.  The JCM will continue to work with CBP to
improve these custodial elements and examine their status on upcoming site visits.

## C.2. Juvenile Coordinator Division.  CBP also relies on the Juvenile Coordinator
Division (JCD) to assess CBP's compliance with the Settlement and other CBP
regulations.  This unit conducts comprehensive inspections of CBP facilities and
conveys its findings and recommendations to CBP operational personnel and
leadership.  This unit has also provided annual reports to the Court regarding its
findings and general assessment of CBP compliance with the Settlement.

15

In the last year, JCD has conducted more than 26 sessions of *Flores* implementation training and two Town Halls to deliver understanding of CBP policy requirements.  Approximately 400 personnel responsible for the care and custody of minors attended the Town Halls.

The JCM has reviewed the JCD inspection protocols and has observed this unit's inspection visits to CBP facilities on multiple occasions.  The JCD utilizes a comprehensive questionnaire in its interviews of parents, guardians, and both accompanied and unaccompanied children.  The JCM has noted that these visits are thorough and conducted by committed and skilled personnel.  At the conclusion of a site visit, the JCD provides a preliminary verbal assessment of compliance.  The JCD then prepares a summary report of any issues that need to be addressed and requests and receives a written response addressing issues of concern.  The JCD Director briefs the Section Chiefs on the results.  The results are then included in the Annual Report.

While the JCD inspections provide a very good assessment of Settlement compliance, they occur relatively infrequently, generally twice per year for EHFs and once a year for other facilities.  While the JCD has made some unscheduled site visits to address custodial concerns or court orders, the JCD is not well structured to quickly address concerns at facilities experiencing unexpected custodial challenges, such as a rapid surge of apprehensions.

**Summary Assessment:** The Amenities Logs and the inspection reports from the JCD provide CBP with important, though partial, sources of insight into compliance with the Settlement.  Unlike the constant assessment of overcrowding and TIC times by national CBP supervisors, the systematic review of the Amenities Logs and other uncaptured amenities, such as food quality, are the responsibility of CBP facility or sector personnel.

While JCD facility inspections remain important, the infrequency of JCD facility visits will limit its contribution to identifying emerging amenities failures in a timely manner.

Ensuring compliance with the amenities sections of the Settlement will primarily depend on the vigilance of CBP managers at the facility and sector level.

## D.    Caregivers

As discussed above, the Caregiver Program is a critical component of custodial care provided in the Settlement.  OCMO has assumed responsibility for the management of the Caregiver Program including the monitoring of its

performance.  Any functional elimination of Caregivers in the family holding areas would be a significant area of noncompliance with the Settlement.  OCMO has informed JCM that it will ensure compliance and require support for both families and UC's while in CBP custody.  During the remainder of the JCM term, the monitoring the Caregiver Program will receive high priority.

**Summary Assessment:** Given the reduction in caregiver presence in the JPFs, OCMO's role in monitoring the caregiver program requires urgent clarification.  This monitoring role will also need to ensure greater uniformity in caregiver contributions to CBP custodial care for children.

## E.    Child-Appropriate Environment

The Settlement recognizes that a central requirement of a child-appropriate environment is the housing of a child with her parents, legal guardians, or other family members.  *See* Settlement, § VII.8.B.  The Settlement requires a documented, specific operational need to justify holding a child separately from an adult family member.  The Settlement permits this practice when age and gender discontinuities exist (eg. holding a teenage female separately from her father who will be housed with other fathers or single adult males) or when another specific operational need for separate housing can be articulated, a need that must be documented.

When a documented operational need exists for housing children separately from their parents, legal guardians, or other family member, the Settlement requires regular opportunities for family visitation while in custody.  The JCM has documented considerable variation in visitation opportunities in the El Paso and RGV sectors, and a lack accurate documentation of visits.

**Summary Assessment:** As with the provision of amenities, the monitoring of compliance with the Settlement's family housing, access to phones, visitation, provision of child-friendly materials and recreation is the responsibility of CBP operation leaders at the facility level.  The JCM will continue to assess the provision of an adequate child-appropriate environment, including access to phones, visitation, child-friendly materials, and recreation.

## F.    Medical Care

Over this reporting period, CBP has continued to make substantial progress in the scope and quality of its medical monitoring systems for children in custody.

Responsibility for CBP's medical monitoring system lies with the Office of the

Chief Medical Officer (OCMO), CBP. Accordingly, the JCM has had regular, ongoing engagement with OCMO regarding medical monitoring system development in addition to assessing medical monitoring performance during site visits.

OCMO's monitoring protocols have been developed to provide OCMO managers and health personnel with the ability to remotely assess and in near real-time critical components of CBP's medical system, including the following major elements:

- Emergency transfer to a local hospital from the field prior to arrival at CBP facility.

- Remote access to all Electronic Medical Records (EMRs) for all children in custody

- Additional identification of children at elevated medical risk through mandated medical examination within 24 hours of apprehension.

- Mandated consultation with on-call pediatricians for all children identified at elevated medical risk and/or require isolation.

- Administration of medication

- Entrance of children with elevated risk into the Enhanced Medical Monitoring (EMM) system and the performance of all EMM checks

- Referral of children from a CBP facility to a local hospital

- Instances when a medical decision to refer has been made but no transport to hospital has occurred

- The conveyance of medical information to the Office of Refugee Resettlement, DHHS for appropriate placement and medical management for all unaccompanied children.

These important capabilities will continue to be assessed. However, several issues will require special attention as they continue to be addressed, including:

- Review of sentinel events (health-related occurrences in CBP custody that warrant detailed medical review) by supervisory physicians

- Assurance that medical documentation of CBP care is provided to ICE and parents upon their transfer out of CBP custody

**Summary Assessment:** Ongoing engagement with OCMO and greater experience reviewing the implementation of the medical monitoring system in the JPFs suggest that CBP's medical monitoring capabilities have improved substantially and have the capacity to ensure high quality medical care.  Continued JCM assessments will focus on whether these improvements are sustained and the remaining monitoring issues are addressed adequately.