CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
crholguin@centerforhumanrights.org
Bardis Vakili (Cal. Bar No. 247783)
bardis@centerforhumanrights.org
Sarah E. Kahn (Cal. Bar No. 341901)
sarah@centerforhumanrights.org
1505 E 17th St. Ste. 117
Santa Ana, CA 927051
Telephone: (909) 274-9057

*Attorneys for Plaintiffs*

*Additional counsel listed on following page*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| Jenny Flores, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>Pamela Bondi, Attorney General of the United States, *et al.,*<br><br>Defendants. | Case No. CV 85-4544-DMG-AGRx<br><br>**NOTICE OF MOTION TO ENFORCE THE FLORES SETTLEMENT AGREEMENT**<br><br>Hearing: July 18, 2025 |

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe (Cal. Bar No. 299296)
Diane de Gramont (Cal. Bar No. 324360)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email: mwroe@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW
Rebecca Wolozin (admitted *pro hac vice*)
818 Connecticut Ave. NW, Suite 425
Washington, DC 20006
Telephone: (202) 868-4792
Email: bwolozin@youthlaw.org

CHILDREN'S RIGHTS
Leecia Welch (Cal. Bar No. 208741)
2021 Fillmore Street
San Francisco, CA 94115
Telephone: (415) 602-5202
Email: lwelch@childrensrights.org

CHILDREN'S RIGHTS
Eleanor Roberts (admitted *pro hac vice*)
88 Pine Street, Suite 800
New York, NY 10005
Telephone: (212) 683-2210
Email: eroberts@childrensrights.org

ii

To all Parties and their attorneys of record:

Please take notice that on July 18, 2025, at 9:30 a.m., or as soon thereafter as counsel may be heard, Plaintiffs will and do hereby move the Court for a classwide order requiring Defendants to cure breaches of the settlement approved by this Court on January 28, 1997 ("Settlement"), as described in the accompanying memorandum of law.

This motion is based upon the memorandum of law and exhibits filed concurrently herewith, and all other matters of record; it is brought following a meeting of counsel pursuant to Local Rule 7-3 and Paragraph 37 of the Settlement on June 12, 2025.[1]

Dated:  June 17, 2025                    CENTER FOR HUMAN RIGHTS AND
                                         CONSTITUTIONAL LAW
                                         Carlos Holguín
                                         Bardis Vakili
                                         Sarah Kahn

                                         NATIONAL CENTER FOR YOUTH LAW
                                         Mishan Wroe
                                         Diane de Gramont
                                         Rebecca Wolozin

                                         CHILDREN'S RIGHTS
                                         Leecia Welch
                                         Eleanor Roberts

                                         */s/ Sarah Kahn*
                                         Sarah Kahn
                                         *Attorney for Plaintiffs*

---

[1] Over the past year, the Parties met five times about conditions in CBP detention and Plaintiffs sent six letters outlining alleged violations of the Settlement. Plaintiffs requested a meet and confer on this motion on May 30, 2025 and the Parties met and conferred on June 12, 2025. ("Kahn Dec.") ¶¶ 3-4.

CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
crholguin@centerforhumanrights.org
Bardis Vakili (Cal. Bar No. 247783)
bardis@centerforhumanrights.org
Sarah E. Kahn (Cal. Bar No. 341901)
sarah@centerforhumanrights.org
1505 E 17th St. Ste. 117
Santa Ana, CA 92705l
Telephone: (909) 274-9057

*Attorneys for Plaintiffs*

*Additional counsel listed on following page*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION

| | |
|---|---|
| Jenny Flores, *et al.*, | Case No. CV 85-4544-DMG-AGRx |
| Plaintiffs, | **MOTION TO ENFORCE THE FLORES SETTLEMENT AGREEMENT** |
| v. | |
| Pamela Bondi, Attorney General of the United States, *et al.,* | Hearing: July 18, 2025 |
| Defendants. | |

ii

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe (Cal. Bar No. 299296)
Diane de Gramont (Cal. Bar No. 324360)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email: mwroe@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW
Rebecca Wolozin (admitted *pro hac vice*)
818 Connecticut Ave. NW, Suite 425
Washington, DC 20006
Telephone: (202) 868-4792
Email: bwolozin@youthlaw.org

CHILDREN'S RIGHTS
Leecia Welch (Cal. Bar No. 208741)
2021 Fillmore Street
San Francisco, CA 94115
Telephone: (415) 602-5202
Email: lwelch@childrensrights.org

CHILDREN'S RIGHTS
Eleanor Roberts (admitted *pro hac vice*)
88 Pine Street, Suite 800
New York, NY 10005
Telephone: (212) 683-2210
Email: eroberts@childrensrights.org

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................. 1

II.   SUMMARY OF RELEVANT FACTS ............................................... 2

  A.   *CBP Detention Conditions are Prison-Like, Unsafe, and Unsanitary.* ................ 2

  B.   *CBP Detains Children for Extended Periods.* ............................................ 7

  C.   *Time in Custody is Likely Longer than the Data Shows.* ........................... 9

III.  ARGUMENT ..................................................................................... 10

  A.   *CBP Holds Minors in Custody for Extended Periods in Violation of the FSA's Requirement of Prompt Release.* ................................................... 10

  B.   *Conditions in CBP Custody are not Safe and Sanitary, in Violation of the FSA...* 13

    1.   Children Are Held in Unsafe and Unsanitary Conditions. .................. 13

    2.   CBP Detention Violates the FSA's Requirements to Treat Minors with Dignity and Concern for Their Particular Vulnerability. ........................ 14

    3.   CBP Denies Access to Telephones ..................................................... 15

    4.   CBP Fails to Ensure Contact with Family Members ........................... 16

    5.   CBP Fails to Provide Children with Adequate Medical Care. .............. 16

  C.   *Due to Defendants' Repeated and Ongoing Violations, Appointment of a Monitor is Appropriate.* ................................................................ 17

IV.   CONCLUSION ................................................................................. 19

# TABLE OF AUTHORITIES

Cases

*Coleman v. Newsom*, No. 2:90-CV-0520 KJM DB, 2023 WL 8444377 (E.D. Cal. Sept. 21, 2023), *report and recommendation adopted*, No. 290CV0520K JMDBP, 2023 WL 8433698 (E.D. Cal. Dec. 5, 2023) ................................................................... 19

*Flores v. Barr*, 934 F.3d 910 (9th Cir. 2019) ..................................................... 10, 13, 16

*Flores v. Rosen*, 984 F.3d 720 (9th Cir. 2020) ......................................................... 10

*Flores v. Sessions*, 394 F. Supp. 3d 1041 (C.D. Cal. 2017) ............................................. 13

*Franco-Gonzalez v. Holder*, Case No. 2:10-cv-02211-DMG-DTB (C.D. Cal. March 2, 2015) ..................................................................................................... 18

*Pinel v. Aurora Loan Servs., LLC*, 814 F. Supp. 2d 930 (N.D. Cal. 2011) ..................... 15

*Serpa v. Cal. Sur. Investigations, Inc.,* 215 Cal. App. 4th 695 (2013) ............................ 15

Statutes

8 U.S.C. § 1182(d)(5)(A) .................................................................................... 7

Rules

Fed. R. Civ. P. 53(a) ......................................................................................... 18

**TABLE OF EXHIBITS**

| Exhibit | Exhibit Description | Short Cite |
|---------|-------------------|------------|
| 1 | Declaration Sarah Kahn, June 15, 2025 | Kahn Dec. |
| 2 | Declaration of Diane De Gramont, June 12, 2025 | de Gramont Dec. |
| 3 | Declaration of T.M. (New York), June 5, 2025 | T.M. Dec. |
| 4 | Declaration of K.V.L (Ohio CBP Office), May 2, 2025 | K.V.L. Dec. |
| 5 | Declaration of A.B (San Diego SSF), March 7, 2025 | A.B. Dec. |
| 6 | Declaration of G.A.D (San Diego SSF), March 7, 2025 | G.A.D. Dec. |
| 7 | Declaration of L.G.C.G (San Diego SSF), March 7, 2025 | L.G.C.G. Dec. |
| 8 | Declaration of R.S.R (San Diego SSF), February 13, 2025 | R.S.R. Dec. |
| 9 | Declaration of M.I.J (San Diego), March 26, 2025 | M.I.J. Dec. |
| 10 | Declaration of V.I.B.G (New York), March 26, 2025 | V.I.B.G. Dec. |
| 11 | Declaration of F.Y (El Paso), May 1, 2025 | F.Y. Dec. |
| 12 | Declaration of M.M (El Paso), May 2, 2025 | M.M. Dec. |
| 13 | Declaration of M.P.C. (El Paso), May 2, 2025 | M.P.C. Dec. |
| 14 | Declaration of A.T. (O'Hare Airport), May 1, 2025 | A.T. Dec. |
| 15 | Declaration of F.O. (Ursula), April 30, 2025 | F.O. Dec. |

| 16 | Declaration of G.B.A. (Ursula), April 30, 2025 | G.B.A. Dec. |
|----|-----------------------------------------------|-------------|
| 17 | Declaration of M.H. (Ursula), April 30, 2025 | M.H. Dec. |
| 18 | Declaration of M.L.R.L. (Ursula), April 30, 2025 | M.L.R.L. Dec. |
| 19 | Declaration of L.N (Chula Vista), April 10, 2025 | L.N. Dec. |
| 20 | Declaration of W.J. (Chula Vista), April 10, 2025 | W.J. Dec. |
| 21 | Declaration of S.G. (Chula Vista), April 10, 2025 | S.G. Dec. |
| 22 | Declaration of A.K. (Otay Mesa), March 26, 2025 | A.K. Dec. |
| 23 | Declaration of S.K. (Otay Mesa), May 22, 2025 | S.K. Dec. |
| 24 | Declaration of I.G. (Otay Mesa), May 22, 2025 | I.G. Dec. |
| 25 | Declaration of L.Q.A (Buffalo), May 2, 2025 | L.Q.A. Dec. |

## I.    INTRODUCTION

U.S. Customs and Border Protection ("CBP") detention facilities are harsh, prison-like, unsafe, and unsanitary and were never intended for prolonged detention of any person, much less a child. Plaintiffs bring this motion to enforce the Flores Settlement Agreement ("FSA" or "Settlement") and address that children now languish for weeks in CBP custody, during which time they are not even considered for release, until, in many cases, they are transported to Immigration and Customs Enforcement ("ICE") custody and detained for weeks or months more.

At the heart of the FSA is an agreement between the parties that children should not be detained in prison-like conditions. However, despite a decrease in border encounters, CBP increasingly holds children for prolonged periods of time while refusing to consider individuals in its custody for release. Compounding this cruelty, CBP frequently then transfers children to recently reopened ICE Family Detention Centers for weeks of *additional* detention, where ICE "restarts the clock" for children's time spent in custody.

During their extended detention, CBP holds children in increasingly harsh conditions, including in Ports of Entry ("POE"), which are meant to hold individuals for only a few hours, in violation of ¶ 12A of the Settlement. Children are particularly vulnerable to the trauma caused by the confusion, cruelty, and deprivation  endemic to CBP custody.

CBP's widespread, consistent, and ongoing violations of the FSA throughout its nationwide system of detention, as well as Defendants' repeated failure to provide accurate data on time in custody to Plaintiffs, justify the appointment of an Independent Monitor to validate Defendants' data, ensure compliance with the Settlement's requirement that children be expeditiously processed, and ensure that during processing, children are detained only in safe and sanitary facilities.

## II.   SUMMARY OF RELEVANT FACTS

A.   *CBP Detention Conditions are Prison-Like, Unsafe, and Unsanitary.*

In CBP facilities across the country, including in cases documented by class counsel in New York, Maine, Illinois, Ohio, Arizona, Texas, and California, Plaintiffs report being held for days and sometimes weeks in restrictive, traumatic conditions. Kahn Dec. ¶ 5. CBP often leaves blinding lights on 24 hours a day in cells or rooms with no windows and no access to natural light, so that children do not even know whether it is day or night. *See, e.g.,* S.K. Dec. ¶ 14 ("For five days we were without a window, without sun. There was a light on 24 hours.") M.R.L. Dec. ¶ 18 ("we cannot go outside. We cannot see the sun or breathe the air outside.").

Children frequently report they do not have access to soap to wash their hands or regular showers. A.K. Dec. ¶ 20 ("I was washing her clothes in the sink and having them dry out. There was not even soap to clean them with. It was horrible."); G.B.A. Dec. ¶ 11 ("There is water but no soap to wash our hands."); K.V.L. Dec. ¶ 11 ("It was four days before my son or I could shower or change clothes. They didn't even let my son change his underwear. Now he has a rash."); S.G. Dec ¶ 11 ("For the first five days we were here, they offered to let us take a shower, but it was in the middle of the night at eleven, one and two AM and the showers were cold, so we didn't take them because we were sleeping. Only in the last three days [before the scheduled *Flores* interviews] have we been allowed to bathe at a normal time.").

In POEs, which include CBP offices, airports, and other spaces meant for interviews or detention of only a few hours, conditions are especially unsafe for children. S.K. Dec. ¶¶ 9, 11 ("They took us to a white room with a chair and table, a small room, and began asking us questions, interrogating us about how we made it to the border . . . for days I slept in that small room."); A.T. Dec. ¶ 10 (11-year-old boy held in O'Hare airport for five days was "not permitted to flush the toilet" and "had to ask an agent to come and flush the toilet for" him); K.V.L. Dec. ¶¶ 7, 8 ("It was not suited for children . . . . there was a large window that looked out on the office space and agents working on

Motion to Enforce
CV 85-4544-DMG-AGRX

their computers. All the agents were men. The room had a toilet that was completely visible to anyone walking by the room. We could only go pee because it was so uncomfortable to go to the bathroom within the view of all those men.").

CBP fails to treat children in its facilities with concern for their particular vulnerability as minors. As one parent shared:

> The rooms have hard walls, like cement, and there is a window facing the hall but you cannot go out or see the sun. We are never allowed to go out. The children keep telling us, "This is not America." They feel imprisoned and confused. They are seeing the sun for the first time in this interview room. They both ran to the window and stared out, and my son asked, "Is that America?"

F.O. Dec. ¶¶ 6-7.

Prolonged detention in prison-like conditions is causing children significant harm. L.N. Dec. ¶ 20 ("My children are deteriorating psychologically. My son has started hitting himself in the head and complaining of boredom. My daughter is always crying. I am very scared that my children are going to hurt themselves."); S.K. Dec. ¶ 16 ("There was not even a single toy. They were not allowed even to jump, to move, to play with each other. Can you imagine being three years old and told not to move for five days? Officers would stop by the room and if the children were moving, the officer would tell them that if they didn't stop, they would be taken away.").

Children also increasingly report cruel behavior by CBP agents, including refusing to let them change their clothes or shower and then sneering that they smell bad, or threatening children with separation or deportation if they try to play. *See e.g.* S.G. Dec. ¶ 4, 6, 8-9 ("They told us to 'shut the f--k up' and that asylum had been canceled by President Trump and that there would be no asylum for five years. They handcuffed my mom and they ordered us into a car and took us to Chula Vista detention center. We were still soaking wet and dirty and cold and stinky . . . They talk in English thinking we can't understand the rude things they say, but I understand a lot of English so I can understand what they say.  I heard one officer say about us 'they smell like sh--,' and another officer responded 'they are sh--.' . . . They treat us like we are not human beings."); V.I.B.G.

Dec. ¶¶ 15-16, 24 ("They yelled at me 'f---ing bi---, shut up!' They treated us like animals." "The staff told us we were criminals; they said you can ask your God to save you, see if they exist."); M.H. ¶ 20 ("you can see the hate in their eyes"); S.K. Dec. ¶¶ 20-22 ("The switch to flush the toilet was outside the room. Every thirty minutes they would flush it. It was extremely loud, we could not sleep. There were a few kind officers, four, but the rest of them tortured us.").

In addition to harsh facilities and cruel treatment, children are regularly forced to use the restroom in full view of other detained families and guards, which is especially traumatizing because of their particular vulnerability as minors. L.N. Dec. ¶ 14 ("There are no doors on the toilet, so everyone can see you using the bathroom. It is completely humiliating. My older children are having a hard time using the bathroom because they are embarrassed. There are beds right next to the toilet…"); A.K. Dec. ¶ 25 ("There was one toilet in the room for 23 people. There was a panel on one side of the toilet, but it wasn't fully covered, so if someone was in front of you, they could see you going to the bathroom."); S.G. Dec. ¶ 5 ("The sleeping place was actually a prison cell. It is very, very cold. There is no door for the toilet, and the floor is very dirty. It's very embarrassing to not have privacy to use the toilet."); A.L.W. ¶ ("There was a toilet in the corner of the cell, but it wasn't private, it was out in the open. There were so many cameras around the cells that I was afraid to go to the bathroom because I didn't want to undress in front of a camera. I developed a kidney infection.").

Children are given no reassurance or information about what is happening to them, causing confusion and fear. *See, e.g.*, A.T. Dec. ¶¶ 23-34 ("We learned we were being transferred to another facility. We had no idea where we were going or who these people were. We were already paranoid because of the persecution we faced in [our home country]. We didn't know what they would do to us or where they would take us and we were disoriented and exhausted. It was terrifying."); V.I.B.G. Dec. ¶ 19 (They "could hear the chain of the handcuffs on the floor from down the hall; they'd shake their heads, cry, and put their hands over their ears. They'd say mom they are going to kill us.").

Fathers are routinely detained apart from their families with little visitation. *See, e.g.*, M.M. Dec. ¶¶ 15, 17 ("We were allowed only twenty minutes every five days in a freezing room to see each other . . . [officers] would not speak to us. If we spoke to an officer, if we asked for water or to see our family, if we asked for a phone call or lawyer or even to know what was happening, they would shut the door on us."); M.I.J. Dec ¶ 8 ("I didn't see my children for two weeks. It was so hard . . . it felt like many years."). CBP separates children from accompanying adults who are not the child's biological parent with no explanation. *See, e.g.,* R.S.R Dec. ¶ 27 ("I was able to see [my husband] again when we were called for this interview, and he informed me that agents called my father from their cell last night and took him. They did not say where. He has not been brought back. We do not know where he is. [My husband] is distraught not knowing anything about it. I don't know how I will tell [my son]."); A.B. Dec. ¶ 5-10 ("I am desperate to know where my children are and if they are ok . . . I have been here 10 days, they won't tell me where my [older] kids are, if they are ok or if they are even in this facility . . . My [younger] children are worried about me and they are worried about their siblings.").

This separation is even scarier for children because many are not allowed to make a phone call. K.V.L Dec. ¶ 16 ("They didn't let us make any phone calls. They could have done anything to us or sent us anywhere and no one would have known. It was quite a few days before anyone knew what happened to us."); L.C.G. Dec. ¶¶ 15-16 ("I have not been allowed to use a phone, not even at the first station. I haven't spoken to my mom . . . I don't know if my family is ok . . . they don't know whether I am alive . . . I begged him to help me call my mom but he only told me that he doesn't speak Spanish."); L.N. Dec ¶ 23 ("We have not been allowed to use the phone even once since we arrived here eight days ago . . . I asked if at least my children could call their father, even for one minute, but the officers refused.").

CBP also routinely denies children and families the opportunity to contact a lawyer, even in the few facilities that allow calls to loved ones. M.L.R.L. Dec. ¶ 19

("They give us one call per day. I cannot call a lawyer. They did not give us a list of legal service providers. There is an agent outside listening to our phone calls."); S.G. Dec. ¶ 12 ("they haven't given us a list of lawyers and no one told us we can have a lawyer. My father has a lawyer but we haven't been able to contact him to even let him know we're here or that we are alive."); S.K. Dec. ¶ 25 ("We got only one call at 3am. No other calls in the five days."); M.H. Dec. ¶¶ 11-12 ("We weren't able to sleep much. Around 1am they took us to a room and . . . made me sign this form. Around 2am they woke me and my son again. They took us to a room and asked me to sign a paper. I was so tired I could barely see. I asked why they woke my son, who is very young.").

Finally, children in CBP custody lack adequate access to medical care. Freezing air makes many of the children sick. See, e.g. T. M. Dec. ¶ 7 ("The cell was freezing cold, and there was a fan in the ceiling that constantly blew cold air on all of us. We asked the guards to turn off the fan, because we were worried about the baby getting sick, but they just laughed at us."); M.P.C. Dec. ¶ 5 ("Both of my kids got sick while we were in there. I think they got sick because of the cold."); A.K. Dec. ¶ 16 ("Many kids in the room got sick because of the cold, including fever, diarrhea, and vomiting.").

Prolonged detention is especially harmful to children with disabilities, who often do not receive medication or individualized care in custody. R.S.R. Dec. ¶¶ 6-10 ("[My son] has been diagnosed with autism and ADHD. We have medication . . . I gave his medications to the doctors, but they have not given them to [him] . . . Without the medicine, [my son] only eats the chips here . . . I am very worried about [him] . . . his medication helps calm him down . . . I have asked so many times but they will not give it . . ."). CBP agents with no medical training often make their own assessment of an injured child and deny them access to a medical professional. S.G. Dec. ¶ 7 ("my tonsils were very swollen and painful . . . They just said to see a throat doctor when I get to where I'm going, once I'm out of this place."); S.K. Dec. ¶ 27 ("His face and head were so badly injured that he became dizzy and was vomiting. I was terrified that he had a concussion or could be seriously hurt. I asked them to x ray him or give him a test or scan

1    or to take him to a hospital but they refused."); A.K. Dec. ¶19 ("When my daughter was

2    sick, a member of medical staff said it's my own fault that my daughter was sick, because

3    it was my decision to bring her here. When I asked for medication, staff told us to go

4    home and we'd get it there.").

5         B.    *CBP Detains Children for Extended Periods.*

6         CBP has adopted a policy of refusing to consider arriving non-citizens for release,

7    including families who cannot be returned to their home country or who may have some

8    pathway to lawful status.[2] CBP, like ICE, has discretion to parole individuals in its

9    custody, including those placed in expedited removal proceedings, "on a case-by-case

10   basis for urgent humanitarian reasons or significant public benefit."[3] 8 U.S.C. §

11   1182(d)(5)(A). Instead, CBP keeps accompanied children in its custody until it removes

12   them from the United States or transfers them to ICE custody where they can request

13   parole from ICE.[4]

14        In December 2024, Border Patrol ("BP") reported that among 47,324 individuals

15   processed, CBP released 7,041 with a notice to appear (about 15%); in April 2025, BP

16   reported that among the 8,383 individuals processed, it released only 2 with a notice to

17

18

19   [2] *See* Executive Order, *Securing our Borders* (January 20, 2025), Sec. 5., *available at*

20   https://www.whitehouse.gov/presidential-actions/2025/01/securing-our-borders/ (last
     visited June 15, 2025) (ordering "termination of the practice commonly known as 'catch-

21   and-release,' whereby illegal aliens are routinely released into the United States shortly
     after their apprehension'"").

22   [3] By entering the FSA, the Executive Branch recognized, and Congress has since re-

23   affirmed, that the extreme harm of imprisonment to traumatized children who frequently
     had no or little agency in the decision to cross the border creates a presumption that

24   release of a minor is for urgent humanitarian reasons and a significant benefit to the

25   public. *See, e.g.* 8 C.F.R. 212.5(b)(3) (establishing that parole of noncitizens in expedited
     removal "would generally be justified" on a "case-by-case" basis, and that "[m]inors may

26   be released with an accompanying parent or legal guardian who is in detention"); 8

27   U.S.C. § 1232(b)(3) (DHS "shall transfer the custody of [any] child to[HHS] not later
     than 72 hours after determining that such child is an unaccompanied [] child.").

28   [4] There are now about 500 individuals detained at Dilley. Kahn Dec. ¶ 10.

                                    7
                                                              Motion to Enforce
                                                              CV 85-4544-DMG-AGRX

appear (about 0.0002%).[5] While children await transfer, CBP does not make prompt and continuous efforts towards release with their family, to a sponsor, or to a licensed facility, violating FSA ¶ 18.

CBP detention is intended only to accommodate short lengths of stay between apprehension at the border and the next step in a person's immigration case. Indeed, CBP's own written policy directs it to release or transfer those in its custody within 72 hours.[6] Yet its no-release policy, in combination with its violation of FSA ¶ 18, results in a greater proportion of children in CBP custody experiencing prolonged detention—in the punishing conditions described above—despite a significant decrease in the number of children apprehended. In May 2024, CBP encountered 92,063 individuals in family units and unaccompanied children. *See* Exh. 2, Declaration of Diane de Gramont ¶ 30 ("de Gramont Dec."). According to Defendants' monthly data provided under FSA Paragraph 28A, CBP detained 2,240 of those children for over 72 hours in CBP custody. *Id.* ¶ 21. About 7% (156) of them were held for over 7 days and less than half a percent (9) were held over 14 days. *Id.*, Ex. A. By contrast, CBP encountered only 2,931 individuals in family units and unaccompanied children in February 2025. *Id.* ¶ 30. Despite these significantly lower encounter numbers, 301 children were detained in CBP custody for over 72 hours that month. Of these 301 children, nearly 60% (179) were detained for over 7 days and approximately 23% (69) were held for over 14 days, more than 7 times the number of children held over 14 days in May 2024. *Id.* ¶ 30 & Ex. A.

CBP has continued to detain children for prolonged periods in March and April 2025, despite continued low encounter numbers and the opening of ICE family detention centers; 213 children were held for over 72 hours and 14 children were held for over 20 days in April, including toddlers. *Id.* ¶¶ 25-26, 30, Ex. A.

---

[5] Kahn Dec. ¶ 13.

[6] U.S. Customs and Border Protection, National Standards on Transport, Escort, Detention, and Search ("TEDS") § 4.1 (October 2015), *available at* https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf (last visited June 15, 2025).

Prolonged CBP detention is only the start of the imprisonment most will endure. For children in families not deported after weeks in CBP custody, CBP eventually transfers them to recently reopened ICE family detention centers, where ICE detains them for an additional period of weeks or longer. *Id.* ¶ 17; *see also, e.g.,* A.K. Dec. ¶ 6 (42 days in CBP custody at Otay Mesa before transfer to ICE); F.Y. Dec. ¶ 6 (30 days in CBP custody in Texas before transfer to ICE); M.I.J. Dec. ¶ 7 (over 23 days in CBP custody in Texas and California before transfer to ICE); M.M Dec. ¶ 7 (21 days in CBP custody in Texas before transfer to ICE); V.I.B.G. Dec. ¶ 4 (13 days in CBP custody in Vermont, New York, Michigan, and Texas before transfer to ICE).

C.    *Time in Custody is Likely Longer than the Data Shows.*

Further, time in custody ("TIC") is likely even longer than Defendants' data shows. Defendants have long been required to "provide Class Counsel on a monthly basis statistical information collected pursuant to Paragraph 28A of the [Flores] Agreement." Order Re Response to Order to Show Cause at 15, August 21, 2025 [Doc. #189]. In December 2024, Defendants acknowledged significant errors in CBP's monthly reporting that led to an undercount of children in custody longer than 72 hours. de Gramont Dec. ¶ 5. In January 2025, Defendants represented to the Court that, going forward, CBP's monthly data would include "all minors, including both accompanied and unaccompanied children, who remained in CBP custody for more than 72 hours, regardless of their transfer location." Defs. Surreply in Opposition to Plaintiffs' Motion to Modify at 5, January 23, 2025 [Doc. #1543].

Then, based on March 2025 interviews with individuals at the Karnes family detention facility, Plaintiffs' counsel identified several class members missing from Defendants' monthly CBP and ICE reports. de Gramont Dec. ¶¶ 10-19. In response, Defendants acknowledged several errors that resulted in undercounting the number of children with TIC over 72 hours. *Id.* ¶¶ 11–19. Given these numerous errors that came to light only after Plaintiffs identified specific missing children, Plaintiffs requested a mechanism to review Department of Homeland Security ("DHS") search parameters. *Id.*

¶ 18. Defendants have not responded to that request. *Id*.

Similarly, the Juvenile Care Monitor ("JCM") has reported data veracity issues as far back as summer of 2024 regarding Juvenile Processing Facilities subject to the 2022 CBP Settlement Agreement. JCM Final Report (Dec. 13, 2024) at 4 [Doc. # 1522] ("recent JCM visits to the RGV and El Paso facilities raised questions as to whether the data provided actually captured all children in families with TIC times over 72 hours."). These problems persisted in May 2025. Status Report by Juvenile Care Monitor (May 27, 2025) at 14 [Doc. # 1570] "the JCM cannot yet express confidence in the monthly TIC data."); *see also* Motion to Modify 2022 Settlement (December 20, 2024) [Doc. #1526-1] at 20.

Accordingly, prolonged CBP custody is likely more prevalent than the data reflects.

### III.    ARGUMENT

#### A. *CBP Holds Minors in Custody for Extended Periods in Violation of the FSA's Requirement of Prompt Release.*

The FSA requires that, whenever DHS "takes a minor into custody, it shall expeditiously process the minor." FSA ¶ 12A. The Settlement further requires that DHS must ordinarily "release a minor from its custody without unnecessary delay" to a parent, a legal guardian, or other qualified adult custodian, or transfer them to a licensed facility within five days of apprehension.[7] FSA ¶¶ 12A, 14. In furtherance of this release requirement, DHS must "make and record prompt and continuous efforts on its part toward family reunification and the release of the minor." FSA ¶ 18. The Settlement is clear that prompt and continuous efforts toward release must begin "upon taking a minor into custody." *Id*. The FSA explicitly requires that minors be provided an individualized determination of their eligibility for bond. FSA ¶ 24A.

---

[7] Even during influx exceptions under FSA ¶¶ (12)(A)(3), (B), the FSA permits only the amount of delay necessary for processing children "as expeditiously as possible." FSA ¶ 12(b).

Defendants' prolonged detention of children in CBP custody violates the FSA in at least three ways. First, CBP appears to have adopted a blanket policy of refusing to consider families for parole or release, in violation of FSA ¶¶ 14 and 24A. The FSA forbids DHS from indefinitely detaining children because one of its subcomponents has implemented a blanket policy against release. *Flores v. Barr*, 934 F.3d 910, 916-917 (9th Cir. 2019) (holding that the INA allows and the FSA "requires the government to consider releasing [minors] subject to expedited removal"). CBP does not consider alternatives to detention, although a DHS-operated "Family Case Management Program… had a 100 percent attendance record at court hearings;" Defendants discontinued the program in 2017 purportedly "for cost reasons, while acknowledging that the program was generally less expensive than detention." *Flores v. Rosen*, 984 F.3d 720, 743 (9th Cir. 2020).

Second, CBP does not begin prompt and continuous efforts towards release when it takes a child into custody. Instead, it warehouses families in limbo awaiting transfer to ICE family detention centers, where Defendants consider eligible children for parole for the *first* time. *See* Defendants' Notice of Motion to Terminate Settlement Agreement at 17, May 22, 2025 [Doc. #1567] ("MTT"). Further, DHS restarts the TIC clock upon transfer, ignoring the time children have already endured in CBP. Kahn Dec. ¶ 11; *see, e.g.*, L.Q.A. Dec. ¶ 7 (stating agents "told me that they could not tell me how long we would be in custody, but that the five days in CBP did not count towards that time and it would be a fresh start in terms of my time in detention when we arrived at the new center.").

Just one year ago, the Court held that expeditious processing requires "that the 'clock' begins ticking as soon as minors are 'in custody' of CBP," regardless of the facility or location where they are detained, not at the time the child is transferred between unlicensed, secure locations. Order re Plaintiffs' Motion to Enforce Settlement re "Open Air Detention Sites" at 11, April 3, 2024 [Doc. # 1406] ("OADS Order").

Third, Defendants fail to expeditiously transfer children to a safe and sanitary

11

facility, in violation of FSA ¶ 12. CBP detention is not safe and sanitary—certainly not for more than 72 hours. Prolonging detention exacerbates the harm caused by violations of the FSA's safe and sanitary provision. *See* September 2024 JCM Report at 14 [Doc # 1468] (the "issue [of inadequate age-appropriate food] becomes increasingly problematic as time in custody rises, as some families with young children had been in custody for longer than a week."); Dec. 2024 JCM Rep. at 14 ("[H]olding children at elevated medical risk in custody for what appears to be increasingly longer times in custody will inevitably place additional stress on the ability of the CBP medical system to ensure the well-being of children at elevated medical risk while in custody.").

Even a few days in an unsafe or unsanitary facility violates the Settlement, and this Court has previously ordered Defendants to transfer children subjected to such conditions to a safe and sanitary facility. Order Re Plaintiffs' Motion to Enforce Settlement as to Title 42 Class Members at 12, September 4, 2020, [Doc. # 976] ("Hotelling Order") (holding that detaining children in unlicensed hotels for "approximately five days" on average "prior to expulsion", where "hoteling is *not* part of a good faith effort towards placing children in licensed programs," violated the FSA); OADS Order at 11 (ordering that, because conditions in OADS violate the FSA, CBP must "process[] Class Members as expeditiously as possible" and "place Class Members in facilities that are safe and sanitary and that are consistent with DHS's concern for the particular vulnerability of minors.").

CBP may not detain children for weeks in conditions that violate the FSA while refusing to expeditiously process them for release and family reunification.[8] If CBP refuses to promptly release children, it must transfer them to a safe and sanitary facility

---

[8] Nor may they release *Ms. L.* class members without their parents. The settlement in that case requires that "DHS [be] committed to protecting family unity by ensuring that noncitizen children in DHS custody are not separated from their accompanying noncitizen parent or Legal Guardian, except in limited permissible circumstances." Ms. L. Settlement, Case 3:18-cv-00428-DMS-AHG, Dkt. 721-1 (S.D. Cal. Dec. 1, 2023) at V(B); *see also* In Chambers Order re Defendants' Ex Parte Application to Stay at 2, July 25, 2020 [Doc. # 887].

where they will be expeditiously processed and provided an individualized determination of their eligibility for release. FSA ¶¶ 12A, 14, 18, 24A.

        B. *Conditions in CBP Custody are not Safe and Sanitary, in Violation of the FSA.*

The Settlement guarantees class members a minimum level of care while they await release or transfer to a licensed placement. FSA ¶ 12(A) ("[e]very effort must be taken to ensure [] the safety and well-being of the minors detained in these facilities"). However, class members frequently report that CBP detention imposes (1) unsafe and unsanitary conditions, (2) harsh treatment inconsistent with their vulnerability as minors, (3) denial of access to phone calls, (4) separation from accompanying parents and relatives with minimal visitation, and (5) inadequate medical care. If CBP cannot promptly release a child, it must expeditiously transfer the child to a facility that is safe and sanitary and consistent with DHS's concern for the particular vulnerability of minors.

        1.    <u>Children Are Held in Unsafe and Unsanitary Conditions.</u>

The FSA requires CBP to "hold minors in facilities that are safe and sanitary" and provide "access to toilets and sinks, drinking water and food . . . adequate temperature control and ventilation." FSA ¶ 12.A. The safe and sanitary provision further requires adequate access to hygiene items, including "soap, towels, showers, dry clothing, [and] toothbrushes." *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1057 (C.D. Cal. 2017). Paragraph 12.A encompasses safeguards that "reflect a commonsense understanding" of what constitutes safe and sanitary conditions, with concern for the particular vulnerability of minors. *Flores v. Barr*, 934 F.3d 910, 916 (9th Cir. 2019).

As described above, CBP fails to provide safe and sanitary conditions. Class members report being denied access to soap, regular showers, and clean clothes. *See, e.g.,* G.B.A. Dec. ¶ 11; S.G. Dec ¶ 11; F.Y. Dec. ¶ 13; G.A.D. Dec. ¶ 15; L.N. Dec. ¶13; M.H. Dec. ¶ 14; M.L.R.L. Dec. ¶ 14.

Further contributing to the violations of ¶ 12A, CBP detains children in POE facilities not intended for detention, including a glass-walled cell in the back of an office,

POE interview rooms with only metal furniture, and airports. These locations have no apparent adult qualified to care for children. *See, e.g.* G.B.V. Dec. ¶¶ 7-11; A.T. Dec. ¶ 10; V.I.B.G. Dec. ¶ 12; K.V.L. Dec. ¶¶ 7, 8; S.K. Dec. ¶¶ 9-11; A.K. Dec. ¶ 22. As this Court has held, facilities may be unsafe in violation of the FSA if they are operated with a "lack of qualified, specialized supervision" and run by "an adult who has no qualifications or training in childcare," especially when there is "vague and minimal" oversight. Hoteling Order at 14.

Further, although at least some class members held in POEs appear on Defendants' monthly data, their location is not clearly identified and class members report they were not able to use a phone while in the facilities, making it "unusual[ly] difficult[] [to] locat[e] children." *Id.*; *see* K.V.L Dec. ¶ 16. This "process is woefully inadequate and not substantially compliant with Paragraph 32," which contemplates "attorneys having near-unfettered access to minors in custody." Hoteling Order at 10.

> ### 2.    CBP Detention Violates the FSA's Requirements to Treat Minors with Dignity and Concern for Their Particular Vulnerability.

Under the FSA, "[f]ollowing arrest, the INS shall hold minors in facilities that are … consistent with the INS's concern for the particular vulnerability of minors." FSA ¶ 12.A; FSA Exh. 2(b) (DHS shall "treat and shall continue[] to treat minors with dignity, respect and special concern for their particular vulnerability."). The FSA requires DHS to "place each detained minor in the least restrictive setting appropriate to the minor's age and special needs." FSA ¶ 11.

In 2022, parties reached a Settlement "clarifying the Parties' understanding of the meaning of certain provisions of the Flores Settlement Agreement ('Settlement'), as they apply to conditions of CBP detention." CBP Settlement. [Dkt. 1254-1] (May 21, 2022) at 1. The settlement, pursuant to parties' interpretation of FSA ¶ 11's requirement to treat children with concern for their particular vulnerability, requires CBP to provide a "child-appropriate environment," to take a "trauma-informed approach to class members in custody," and to "foster reassurance, resilience, orientation, recreation, and distraction"

for class members. CBP Settlement §§ VII.3.D.7, VII.8. The JCM reports that even in the covered RGV and El Paso sectors, CBP staff and caregivers have failed to inform, reassure, or orient class members, leading children to consistently express anxiety because of a lack of information. *See* Apr. 2024 JCM Rep. 22-24; Aug. 2024 JCM 18-19; Dec. 2024 JCM Rep. 10.

Since January 2025, families and children detained by CBP have increasingly reported cruel, aggressive, and harmful behavior by agents who have near complete authority over them. *See e.g.* V.I.B.G. Dec. ¶¶ 15-16, 24; S.G. Dec. ¶ 9; S.K. Dec. ¶¶ 20-22.

Furthermore, CBP fails to provide basic information to children about what is happening to them, which can be especially traumatizing for children fleeing persecution who have been detained and/or transferred without any explanation. *See, e.g.,* V.I.B.G. Dec. ¶ 27; M.H. Dec. ¶¶ 11-12; A.T. Dec. ¶¶ 23-34.

Prolonged detention in CBP's inhumane conditions causes children to experience profound fear, discomfort, and disorientation, often going weeks without seeing the sun or being able to play. *See, e.g.,* L.N. Dec. ¶ 20; S.K. Dec. ¶ 16; F.O. Dec. ¶¶ 6-7.

Such treatment disregards children's basic developmental needs and the particular vulnerability of minors.

3.   CBP Denies Access to Telephones.

Under Paragraph 24.D, CBP must "promptly provide each minor not released" with a "list of free legal services" and a form I-770, which includes "a statement that the minor or UAC may make a telephone call to a parent, close relative, or friend." 8 C.F.R. § 236.3(g)(i).

CBP's failure to provide phone access impermissibly frustrates the purpose of providing the legal service provider phone list and notice of the right to call a trusted friend or family member required by ¶ 24.D. Because "[t]he implied covenant of good faith prevents one contracting party from 'unfairly frustrating the other party's right to receive the benefits of the agreement actually made,'" it thus violates the Settlement. *See*

*Serpa v. Cal. Sur. Investigations, Inc.,* 215 Cal. App. 4th 695, 706, (2013) (citation omitted). Because "[c]ourts must interpret contractual language in a manner that gives force and effect to every provision, and not in a way that renders some clauses nugatory, inoperative or meaningless," denial of phone access also violates the rights established in the notices required by Paragraph 24.D. *Pinel v. Aurora Loan Servs., LLC*, 814 F. Supp. 2d 930, 943 (N.D. Cal. 2011).

Many class members report that CBP fails to provide them phone calls or, in some facilities, provides only occasional, two- to five-minute supervised calls. *See, e.g.,* S.K. Dec. ¶ 25. For young children who have fled their home and community, the sudden loss of contact with family on the outside magnifies the trauma of imprisonment. *See* L.G.C.G. Dec. ¶¶ 15-16; L.N. Dec ¶ 23; R.S.R. Dec. ¶ 16.

Even for families who are able to call a loved one, CBP denies them the opportunity to contact a lawyer. M.L.R.L. Dec. ¶ 19; S.G. Dec. ¶ 12; F.Y. Dec. ¶ 15.

4.    <u>CBP Fails to Ensure Contact with Family Members.</u>

The FSA requires the government to ensure "contact with family members who were arrested with the minor." FSA ¶ 12.A. This requirement is critical. As the JCM has noted, "to hold a child separately while in custody is bad for children," because "[s]eparating a child from a parent can be profoundly traumatic for children and can have lasting, harmful effects." JCM Report September 2023 [Doc. #1360] at 28.

Children reported being held separately from their parent while in CBP custody, often with extremely limited visitation, and children are permanently separated from accompanying adults who are not their biological parent. *See, e.g.*, R.S.R Dec. ¶ 27; A.B. Dec. ¶ 5-10; M.M. Dec. ¶ 15; M.I.J. Dec ¶ 8; A.K. Dec. ¶ 10.

5.    <u>CBP Fails to Provide Children with Adequate Medical Care.</u>

The FSA requires CBP to "provide access to . . . medical assistance if the minor is in need of emergency services." FSA ¶ 12.A. Additionally, the Ninth Circuit has affirmed this Court's orders establishing that "assuring 'safe and sanitary' conditions includes protecting children from developing short- or long-term illnesses as well as protecting

them from accidental or intentional injury." *Flores v. Barr*, 934 F.3d 910, 916 (9th Cir. 2019).

The JCM has specifically found that quicker transfer of youth from CBP custody could protect them from preventable harm and death: "The most effective, immediate step to prevent adverse child outcomes in CBP custody is to reduce the clinical burden on the CBP medical system by expediting the transfer of children at elevated medical risk out of CBP custody." Juvenile Care Monitor Report July 2023 at 42 [Doc. #1352] (July 2023 JCM Report).

As length of detention increases, CBP is rescinding protections for medically vulnerable people. Despite the CBP medical system's limited capacity to treat acute and complex medical issues, CBP recently issued a memorandum rescinding four policies aimed at protecting medically at-risk people in its custody, including a 2023 memorandum directing DHS to "minimize the length of time in CBP custody" for injured, ill, and medically at risk individuals, elderly people, and families with minors under 12, and to "ensure timely medical assessments, recurring wellness checks, and follow up assessments by medical providers."[9]

Further, CBP agents without medical training frequently assess medical complaints and make decisions to deny care when they conclude the matter is not urgent. *See, e.g.*, S.G. Dec. ¶ 7; S.K. Dec. ¶ 27; A.K. Dec. ¶19; M.P.C. Dec. ¶ 13.

Some parents reported their children being denied medication they had been using previously, and children with disabilities, especially mental health needs, decompensate in custody. *See, e.g.*, R.S.R. Dec. ¶¶ 6-9, 18.

C. *Due to Defendants' Repeated and Ongoing Violations, Appointment of a Monitor is Appropriate.*

The FSA provides vital protections for vulnerable children. As Defendants note, the parties have disputed Defendants' compliance with the Settlement numerous times

---

[9] Pete Flores, Acting Commissioner, *Rescission of Legacy Policies Related to Care and Custody,* (May 5, 2025) Exhibit 3 rescinding Raul Ortiz, Chief of U.S. Border Patrol, *Custodial Considerations for Medically At-Risk Individuals* (May 19, 2023) Exhibit 1-A.

over its history. MTT at 15-18. Those disputes clearly continue, and Defendants now

bemoan their resolution through motions to enforce after robust monitoring by class

counsel. *Id*. at 5-6, 15-17.

Accordingly, to reduce the burden on the parties and the Court, appointment of an

Independent Monitor who can examine Defendants' compliance with the Settlement and

validate Defendants' data is warranted. *See* Fed. R. Civ. P. 53(a); *Franco-Gonzalez v.

Holder*, Case No. 2:10-cv-02211-DMG-DTB (C.D. Cal. March 2, 2015) ("Because of the

complexities of the Injunction and the Implementation Plan Order and because of the

importance of Defendants' compliance with them," appointing a Monitor "is necessary

pursuant to Fed. R. Civ. P. 53 and this Court's inherent powers to enforce its Orders.").

As this Court has explained, "[b]ecause of the complexity of the Flores Agreement, the

Court's findings of non-compliance, and ongoing disputes between the parties relating to

the implementation of the Flores Agreement . . . appointment of a Special Master and

Independent Monitor is warranted." Order Appointing Special Master (Oct. 5, 2018)

[Doc. # 494] at 3 ("Oct. 2018 Order").

This Court has recognized that effective enforcement of the FSA's requirements

may require independent monitor intervention. This is especially important because

limitations to Plaintiffs' counsel's access sometimes make it difficult to identify and

interview class members. Kahn Dec. ¶¶ 6-9. In 2018, the Court appointed Special Master

Andrea Ordin and empowered her to hire expert Independent Monitors, whose

appointment Defendants agreed to renew in the 2022 CBP Settlement. October 2018

Order at 3; CBP Settlement ¶ IX.

The monitoring and guidance of Special Master Ordin and Independent Monitors

Dr. Paul Wise and Dr. Nancy Wang have led to some important improvements to

conditions and medical care in the RGV and El Paso Sectors of Border Patrol. *See, e.g.*,

Dec. 2024 JCM Final Report at 7 ("For the first time this year, the attached child

appropriate menus for toddlers have been implemented in both JPF's;" JCM Report at 13,

September 10, 2024 [Doc. # 1468] (Raising the minimum age of children held separately

from parents from 6 to 12 years old); Dec. 2024 JCM Report at 11-28 (noting improvements to provision of medical care). Though these modest steps do not amount to substantial compliance with the Settlement, they demonstrate the positive impact the monitors' involvement likely had on many children.

A monitor should have authority to monitor TIC and Defendants' prompt and continuous efforts to release or transfer children and to access and validate Defendants' data. In cases involving complex detention conditions issues, courts have appointed data experts to resolve disputes in the accuracy and methods of reporting compliance with court orders. *Coleman v. Newsom*, No. 2:90-CV-0520 KJM DB, 2023 WL 8444377, at *2 (E.D. Cal. Sept. 21, 2023), *report and recommendation adopted*, No. 290CV0520K JMDBP, 2023 WL 8433698 (E.D. Cal. Dec. 5, 2023). As noted above, *supra* § II(C), discrepancies in reported data have been consistently identified since the summer of 2024. de Gramont Dec. ¶¶ 5-19; Dec. 2024 JCM Report at 4. To meaningfully assess Defendants' compliance with the FSA, Plaintiffs must have access to complete and accurate ICE and CBP data.

## IV.    CONCLUSION

For the foregoing reasons, this Court should grant this motion and enter an order in the form lodged concurrently herewith.

Dated:  June 17, 2025

CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
Carlos Holguín
Bardis Vakili
Sarah Kahn

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe
Diane de Gramont
Rebecca Wolozin

CHILDREN'S RIGHTS
Leecia Welch

Motion to Enforce
CV 85-4544-DMG-AGRX

Eleanor Roberts

*/s/ Sarah Kahn*
Sarah Kahn
*Attorney for Plaintiffs*

"The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,967 words, which complies with the word limit of L.R. 11-6.1.

Dated: June 17, 2025                 */s/ Sarah Kahn*

Sarah Kahn
*Attorney for Plaintiffs*

20

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2025, I caused a copy of Plaintiffs' Motion to Enforce Settlement to be served to all counsel through the Court's CM/ECF system.


Dated: June 17, 2025                         */s/Sarah Kahn*
                                             Sarah Kahn
                                             *Attorney for Plaintiffs*