# EXHIBIT 2

**DECLARATION OF JAVIER HIDALGO**

I, Javier Hidalgo, declare as follows:

1.     I am a Legal Director at Refugee and Immigration Center for Education and Legal Services (RAICES), a legal service provider that defends the rights of immigrants and refugees, empowers individuals, and advocates for liberty and justice. I am an attorney licensed to practice law in Texas and New York.

2.     This declaration is based on my own personal knowledge, observations, and legal work with children and families who are or were previously detained at Karnes Immigration Processing Center (Karnes) and Dilley Immigration Processing Center (Dilley), except as to those matters based on information and belief, which I believe to be true. If called to testify in this case, I would testify competently about these facts.

### Experience Providing Legal Services to Youth in ORR and ICE Detention

3.     I am a Legal Director at RAICES. I joined RAICES in 2018 and have served in my current role since 2023. Before I assumed my current position, I worked as a unit director, and before that as a supervisor and staff attorney. In my role as Legal Director, I work closely with and oversee the work of our Asylum Access Services program (previously known as our Family Detention Services program), which, among other things, serves families detained in Immigration and Customs Enforcement (ICE) family residential centers such as Dilley and Karnes.

1

4. RAICES provides free legal services to families in ICE detention in Karnes and Dilley. Families can contact our team free of charge via the Talton pro bono platform. RAICES is also listed as a pro bono legal services provider on the Executive Office for Immigration Review (EOIR) list provided to families when they arrive at Dilley or Karnes. RAICES has provided pro bono legal services to detained families since 2014. A separate team within RAICES has historically provided legal services to minors in the custody of the Office of Refugee Resettlement (ORR).

## Concerns with ICE Family Detention

5. RAICES attorneys have assisted over 90 families since family detention re-started in March 2025.

6. Detention in prison-like conditions causes severe harm to children. Moreover, RAICES staff, including myself, have observed that the longer a child remains in ICE custody in a family residential center, the more harm they suffer. Continued and prolonged detention puts class members at risk of immediate and irreparable harm.

7. These concerns are validated by a recent study conducted by doctors at Harvard University and Massachusetts General Hospital with the assistance of RAICES, which found "deprivation of liberty, often times accompanied by limited access to basic healthcare whilst in detention, exacerbates existing health problems and may precipitate new morbidities." Shela Sridhar et al., *Child Migrants in Family Immigration Detention in the U.S.: An Examination of Current Pediatric Care Standards and Practices* 37

2

(2023), *available at* https://globalhealth.harvard.edu/wp-content/uploads/2024/01/Child-Migrants-in-Family-Immigration-Detention-in-the-US.pdf. The study concludes that "detention is never in the best interest of children and child detention must end. Immigration detention harms children's mental and physical health at a crucial time of physical, mental, and social development." *Id.* at 2.

8.  Of the approximately 90 families RAICES has helped since March 2025, we have had nearly 40 reports of medical concerns from our clients. This is not surprising, because prolonged and indefinite stays in detention severely harm children. As just one example, a family we serve has neurodivergent children who have become agitated over time in detention. The older of the two children, who experienced trauma directly before coming to the United States, has also become unresponsive at times. We also served a family with a nine-month-old baby who lost 4 kg (8.82 lb) over a month's time in Dilley.

9.  Many of the concerns raised by our recent clients include inadequate medical care from the staff at Dilley. For example, we serve a family whose young son has cancer. Because his family was detained by ICE following an immigration court hearing, he missed a check-in appointment to monitor his cancer and is now experiencing symptoms that are consistent with a recurrence. Yet his family has not been given the opportunity even to monitor his cancer, much less to continue any needed treatments. We served another small child who suffered a head injury while in the custody of U.S. Customs and Border Protection and has not received a neurological evaluation. We served a family

3

whose daughter has cystic fibrosis and is not being given her medicine at Dilley despite doctor's instructions to do so. And we served a family with a three-year-old child who suffers from multiple medical conditions that require ongoing, consistent care but went at least five days in a row without medical care of any kind at Dilley.

### **Dilley does not comply with either the Flores Settlement Agreement or the 2020 Family Residential Standards.**

10.     I have reviewed the Declaration of Dawnisha Helland attached to Defendants' Motion to Terminate and am familiar with the 2020 Family Residential Standards. Ms. Helland states in paragraph 29 of her declaration that "ICE may make minor modifications" to these standards, but in our experience, Dilley is seriously out of compliance with these standards in many areas, including language access, education, legal services, and visitation.

11.     To the extent Dilley is operating under modified standards, such modifications are not publicly available. This creates a significant barrier for advocates: without knowledge of the standard, we cannot inform families of relevant protections or their rights. Moreover, this lack of transparency, coupled with the recent reductions at DHS Office for Civil Rights and Civil Liberties and the Office of the Immigration Detention Ombudsman, effectively removes all internal means of securing accountability for violations or protection for detained families. In addition, these standards are subject to change at any time. Families report that standards/rules at Dilley change frequently.

Even where standards/rules are in place, families report the standards/rules are not consistently practiced by officers and guards working in Dilley. For example, families were told they are allowed to use the gym, but families report they have not been allowed to use the facility and are sent outside by staff. Other staff will then tell the families not to be outside because it is too hot and dangerous to their health. This leaves families frustrated because their movement within Dilley is severely restricted. This chaos and uncertainty is detrimental to the wellbeing of children and families.

12. Language access is a serious concern at Dilley and far out of compliance with requirements of the Family Residential Standards as addressed on pages 4-5 of the publicly available version of the standards. In our experience the staff at Dilley mainly speak English; if they do speak a second language it is almost certainly Spanish. We are seeing families detained from many different countries who speak neither English nor Spanish. Many families are provided materials and asked to sign documents that are only in English and not in a language they understand, potentially resulting in coerced waiver of rights. Conversations with ICE agents are also not carried out in a person's native language. One of our clients has spent 26 days in Dilley while having only one conversation with guards or ICE agents at which an interpreter was present.

13. Standard 6.4 of the Family Residential Standards states that legal service providers can request approval to provide legal-rights group presentations. RAICES has been providing approved legal-rights group presentations at Karnes for several years. When it

5

became known that ICE would begin using Dilley to detain families, RAICES also learned there was a need for a legal service provider to provide legal-rights group presentations at Dilley. This need is exacerbated by recent reports that the government will be ending its contracts for the provision of legal orientation programs, including at family residential centers. On or about April 22, 2025, I provided ICE Assistant Field Officer Director Melissa De Leon a request to provide legal rights group presentations at Dilley. In compliance with Standard 6.4, I included a detailed outline for a presentation substantially similar to the outline previously submitted and approved for use at Karnes. While Ms. De Leon initially approved the presentation and allowed our team to provide a presentation that first week, the following week she wrote that we needed to "revisit" the presentation because it would need to be approved by the Field Office Director. After providing the requested materials for the Field Office Director to review, on May 5, 2025, Ms. De Leon informed me that ICE's Office of Principle Legal Advisor (OPLA) found the presentation does not meet the requirements of Section 6.4. Since Section 6.4 does not enumerate specific requirements, I asked Ms. De Leon what in the proposed presentation did not meet the requirements and which requirements were not met. Because I have not yet received an answer to that inquiry, I have had to submit a Freedom of Information Act request seeking this information.

14.   In addition to providing families with information about their rights, the legal rights group presentations serve as a way to let families detained in Dilley know about

6

our services and that we are available to provide support. Without legal rights group presentations, fewer families are made aware of the legal services we make available to them.

15. Standard 5.9 of the Family Residential Standards allows for visitation from family members and community service organizations. Nevertheless, ICE has consistently denied such visitations to families detained in Dilley. We understand ICE claims to be operating under a modified standard, but to date no such standard has been publicly disclosed.

16. Standard 5.2 of the Family Residential Standards addresses education for children at Dilley, but families report that their children receive no formal education. I am informed that only one hour of education per day in mixed-age groups is available. For example, 9th-12th graders receive one hour of education in a combined group. The lack of education and structure only exacerbate the harm of detention for children, some of whom were attending school here in the United States prior to being detained in Dilley.

17. Families also often disclose to us that Dilley has a lack of appropriate dietary options that negatively affects the health of their children. Families report that their children often refuse to eat the available food or get sick from eating it. Families describe the long lines at the cafeteria in Dilley, stating they have to wait outside in the heat for approximately 20-25 minutes at meal times. Once inside, the cafeteria is infested with flies, and families report finding dead flies in their food daily. Parents also report that the

7

water offered tastes bad and makes the children sick. Nonetheless, this is the only water offered for free for use in mixing with formula for infants. The only alternative available to parents is to pay for packaged snack food and bottled water. Many families are unable to afford this, particularly when subjected to prolonged periods of detention with their tender-aged children.

18. Defendants also state that children are being provided all the relief sought in the original Flores Complaint, but that is certainly not the case at Dilley. As discussed above, children have no formal education, no visitation, and limited access to attorneys. Children have to pay to make phone calls to family, making their sudden separation from their friends, family, schools, religious practices, and communities all the more traumatic. Children report that many ICE officers are rude or harsh and fail to treat them with dignity and concern for their wellbeing. Fundamentally, ICE detention is an extremely restrictive and carceral setting not licensed for the care of children, and children consistently describe it as scary, depressing, and punitive.

## Family Detention Is Inhumane and Unnecessary

19. Defendants' concern about so-called "absconders" is entirely unfounded. Many of the families detained at Dilley were detained while attending their scheduled immigration court hearings around the nation. These are often families who have been living here for some time. The minor children are often attending school in their community. These are all families who are complying with their legal obligations and present no flight risk.

8

**Importance of Flores Settlement Agreement**

20. Since I began working with detained families in August 2018, the protections set forth in the Flores Settlement Agreement have served as a check against the inhumane treatment of children ICE keeps in settings indistinguishable from adult prisons. The ability to identify and escalate violations of the Agreement to class counsel and this Court has time and again ameliorated many of the most harmful behaviors by ICE. And yet ICE continually refuses to voluntarily comply with the settlement. Vigilant monitoring and constant efforts to hold ICE accountable continue to be necessary to protect children detained in Dilley. This is true even in the extremely basic realm of the length of detention. Although ICE generally complied with the 20-day limit on detention when it first restarted family detention, it has been steadily growing less compliant with that limit over time. There are now class members who have been detained for at least 50 days, and more than 15 families RAICES is working with have been detained over 25 days. If the Agreement is terminated, ICE would have no incentive to avoid prolonged detention of children in facilities that are not licensed childcare facilities and that are in no way appropriate for the detention of children.

1  I declare under penalty of perjury that the foregoing is true and correct. Executed
2  on this 20th day of June, 2025, at San Antonio, Texas.

_____
Javier Hidalgo