# EXHIBIT 3

**Declaration of Mary Giovagnoli**

I, Mary Giovagnoli, declare as follows:

1. This declaration is based on my personal knowledge and the following facts are true to the best of my understanding and recollection.

Professional Background

2. My name is Mary Giovagnoli. I am an attorney licensed to practice law in the State of Wisconsin.

3. In September 1996, I joined the Immigration and Naturalization Service through the Department of Justice Honors Attorney Program, serving initially as a trial attorney in Chicago, Illinois. In 1997, I joined the INS Office of General Counsel's Asylum and Refugee Law Division. My portfolio included children's asylum issues, expedited removal, and detention. I was one of the drafters of the 1998 Children's Asylum Guidelines and worked extensively on legal issues arising from the care of unaccompanied children in INS custody. Following the creation of the Department of Homeland Security, I was transferred to the United States Citizenship and Immigration Services Office of the Chief Counsel, where I continued to cover children's immigration issues, including the transfer of jurisdiction over unaccompanied children from the legacy INS to the Department of Health and Human Services. I continued this work until January 2005 when I became the Senior Advisor for Congressional Relations at USCIS. I left USCIS in 2008 to pursue immigration policy work at various non-profits.

4. In February 2015, I was appointed to the position of Deputy Assistant Secretary for Immigration Policy, a political Senior Executive Service position, which I held until January 20, 2017. During that time, my portfolio covered a range of immigration issues, and once again included unaccompanied children's

issues, this time with a focus on interagency cooperation and coordination in light of the rapid rise in the number of unaccompanied children entering the United States. My duties included working closely with staff from the Office of Refugee Resettlement to improve communication, track emerging issues, and attempt to resolve policy disputes between DHS agencies and ORR. This work included completing negotiations on a memorandum of understanding governing interactions between the agencies.

5. After my departure from DHS, I served in various non-profit roles, including Executive Director for the Refugee Council USA (2018-2019), and as a Senior Legal Counsel and Senior Counsel for Policy and Advocacy at Kids in Need of Defense (2019-2024), a 501(c)(3) organization serving unaccompanied children through legal representation, social services support, and policy work. In both positions with KIND, I addressed a broad range of legal and policy issues affecting unaccompanied children and served as the policy advisor for the Keeping Kids Safe campaign, an initiative advocating for a new statutory framework for addressing the immigration needs of children.

6. In October 2024 I resigned from KIND to become the first Ombuds for Unaccompanied Children at the Department of Health and Human Services.

Creation of UC Office of the Ombuds

7. The UC Office of the Ombuds ("UCOO") was established by the Unaccompanied Children Program Foundational Rule ("Foundational Rule"), 45 CFR part 410 , subpart K (effective July 1, 2024), pursuant to the authority provided to the Secretary of HHS to "establish policies and programs to ensure that unaccompanied alien children in the United States are protected from traffickers and other persons seeking to victimize or otherwise engage such children in

2

criminal, harmful, or exploitative activity" under the William Wilberforce Trafficking Victims Protection Reauthorization Act, 8 USC 1232.

8.  On December 12, 2024, the Administration for Children and Families ("ACF") published the UCOO Statement of Organization, Functions, and Delegation of Authority, which formally established the office as an independent component within the Immediate Office of the Assistant Secretary. *See* 89 Fed. Reg. 99,875.

9.  As outlined in the Foundational Rule, the UCOO was created as to "be an independent, impartial office," with a mission to ensure the protection and well-being of unaccompanied children during their time in government care and custody, through the discharge process, and while residing in the community.  45 C.F.R. §§ 410.2000(b), 410.2002(a). It is a critical mechanism for expanding government efforts to ensure that providers meet the highest standards of care, that children are protected from trafficking and other harms, and that government resources are used responsibly.

10.  Under the regulation, the Ombuds is authorized to receive reports of concerns regarding ORR's care and custody of unaccompanied children, investigate such reports, work collaboratively with ORR to resolve issues, issue reports concerning the office's own efforts, and make recommendations to ORR regarding program policies and procedures specific to protecting children in the care of ORR, and to provide advice and recommendations to the Assistant Secretary for Children and Families and other senior HHS officials.  45 C.F.R. § 410.2002(a). The UC Office of Ombuds is also responsible for investigating ORR's adherence to Federal law and ORR regulations and issuing findings and recommendations for improvement, thereby enhancing oversight and accountability for ORR's care and custody of UAC. *Id.* At a minimum, the regulation directs the Ombuds to issue an annual report addressing the office's

activities, contemplates active engagement with stakeholders, and recommends a staffing model sufficient to fully investigate cases and inquiries brought to the Ombuds. *Id.*; 45 C.F.R. § 410.2003. In the discussion of staffing included in the publication of the Final Rule, HHS indicated that the Office would initially be funded for ten full-time staff. Preamble to Foundational Rule, 89 Fed. Reg. 34,581.

11.     The Foundational Rule contemplates that the Ombuds Office would have timely access to unaccompanied children, ORR care provider facilities, children's case files, care provider and federal staff, and statistical and other data. 45 C.F.R. § 410.2002(a)(5), (6); 45 C.F.R. § 410.2002(b).

12.     Although the office officially "opened for business," on July 1, 2024, it was not yet operational.  The first staff member, a senior advisor, joined the office in August. She began to receive and investigate inquiries soon thereafter.  I was hired at the end of August/beginning of September and entered on duty on October 20, 2024. As the Ombuds and the Director of the Office, I worked closely with my senior advisor, who later became the Deputy Director, to set up an organization that would fulfill the duties of the office and embody the core principles of ombuds work: independence, impartiality, and confidentiality.  We worked diligently to set up all required government operations systems and protocols regarding the protection of personally identifiable information, record keeping, information systems integrity and other matters.

13.     We acted quickly to bring on staff with expertise in child welfare and custodial care, hiring three case managers and a supervisory case manager to conduct initial research and investigation into cases; these four staff members joined the office in December 2024.  In January 2025, our administrative assistant joined the office.  We were unable to fill two other posted positions, a communications specialist and a data analyst, prior to the hiring freeze imposed around the time of President Trump's inauguration.  We attempted to fill a senior

4

advisor position temporarily through a detail announcement until such time as normal hiring practices were resumed.

14. Much of my work prior to the inauguration involved establishing the office's ability to fulfill its mission. This required educating stakeholders, including government employees, about the nature of our work, our emphasis on confidential communications, problem solving, and most importantly, our independence from the Office of Refugee Resettlement. Ensuring the ability to visit shelters and other custodial care sites without interference, to speak privately with unaccompanied children, facility personnel, and government staff, and to access sensitive data regarding unaccompanied children, as contemplated by the Foundational Rule, were all critical components of our mission. We spent several months negotiating a memorandum of agreement ("MOA") with staff from the Unaccompanied Children's Program outlining procedures for visiting facilities, conducting interviews, reviewing new policies and procedures, data sharing and protection, and identifying areas for further research and cooperation.

15. In January of 2025, we completed negotiations on the MOA and notified ORR of our plans to conduct site visits in late January, February and March. We also published our office charter which laid out our methods of engagement with the public and constituted an agreement between the Ombuds and the head of the Administration for Children and Families recognizing the duties of each party to maintain the independence of the Ombuds office, including limiting access to certain types of information that could be shared with senior agency officials.

16. All these safeguards were necessary to ensure that the UCOO would be able to closely monitor implementation of the Foundational Rule without interference and with direct and protected lines of communication to children, their families, the public, and government contractors and employees. Our office was not designed to conduct investigations for criminal matters of fraud, abuse, or

exploitation, but instead to address the types of problems and concerns that arise from everyday management of a complex program involving children. I frequently told people that we were there to identify issues before they became problems and problems before they became crises.

Barriers to Independent Oversight by Office of Ombuds

17.     Beginning on January 20, 2025, my office was prevented from fully conducting its work. The new administration put a hold on all travel and stakeholder engagement almost immediately. Although there was a process for travel waivers, we were not granted waivers to travel. We were forced to cancel a planned national stakeholder engagement as well. We continued to work individual cases but did not have the authority to visit sites where violations or problems had allegedly occurred, which made it difficult to fulfill our regulatory mandate to conduct investigations and monitor ORR's compliance with federal law and policy.

18.     Within the first few weeks of the administration, I received a copy of an email which instructed the Office of Communications at ACF to remove information about the Ombuds office from the main page of the ORR website, based on specific direction from "the White House." We were eventually able to work with ORR to place information about the office elsewhere on the website, but the direct order to remove information about the Ombuds office concerned me because it would make it difficult for stakeholders, particularly children and sponsors who might not be aware that an ombuds office existed, to find and use our services, as the information about the office included a link to our complaint form.

19.     Because my office was brand new, 4 of the 7 staff members, including me, were considered probationary employees. Four of our staff members were also

hired as remote workers, ensuring that our office had greater national coverage and that our case managers were "on the ground," and better able to respond quickly to urgent situations. Throughout January and February, I responded to numerous requests for information on both my probationary workers and remote workers, limiting my own ability to conduct Ombuds related work.

20. On February 14, 2025, I was removed from the position of UCOO Ombuds, allegedly because my skills and expertise did not meet government needs and because of poor performance but placed on administrative leave. The remaining three probationary employees received the same notice and were placed on administrative leave. Our terminations were supposed to be effective on March 14, 2025, but intervening court orders resulted in the cancellation of my termination. I remained on administrative leave until May 8, 2025, when I was notified that my earlier firing had not been performance based but was part of a mass firing of probationary employees. At the same time, however, I was also informed that I was now being terminated because my continued employment did not advance the public interest.

21. As a practical matter, my termination and that of other probationary employees deprived the office of its leader and cut the Ombuds office in half, severely limiting the office's ability to conduct its work. I subsequently learned that a career official in the Office of Administration, with no expertise in children's issues or immigration, was serving as the Acting Ombuds. It is my understanding that the current Acting Ombuds has taken on this position as an ancillary duty to his role as Acting Associate Commissioner and Deputy Associate Commissioner of the Children's Bureau within the Administration for Children and Families (ACF). I am concerned that, despite the day-to-day management of the office by the UCOO Deputy Director, who is a highly qualified individual, the ability to preserve the independence of the office and to fulfill its mission is being

7

undermined by the fact that the Acting Ombuds is simultaneously holding a separate senior position within ACF.

22.  Based on my observations and conversations with non-profit leaders, the Ombuds office is still unable to conduct stakeholder engagements.  I have spoken to many people who were surprised to learn that the office continues to exist, because they assumed that, as a new office, all the team must have been probationary.  The inability of the remaining staffers to conduct outreach and meet with stakeholders, particularly during site visits, impairs the office's ability to build trust, to identify emerging problems, and to make people aware of the services UCOO provides.

23.  To my knowledge the UCOO has not yet conducted site visits, although I understand that a new system for approving travel has been put in place at HHS.  I am concerned that the decision of whether and when to travel for site visits will no longer be within the UCOO's discretion but will be subject to scrutiny that could compromise confidential information or other elements of an investigation.

24.  At the time of my departure, my office was not being invited to meetings within ORR that led to many significant policy changes that have made it more difficult for children to be released to sponsors. I attempted to warn the Acting Principal Deputy Assistant Secretary, Andrew Gradison, that increasing the eligibility requirements for potential sponsors would result in longer periods of custody for children, and that if ORR proceeded with the plan, it would require increasing services to these children based on the emotional, educational, and other harms that could result from prolonged custody.  I was told that the length of time and the services available did not matter if children were being protected from traffickers. As I feared, the number of children released to sponsors has declined

8

exponentially over the past several months and children's length of stay in custody have greatly lengthened.[1]

25. I am deeply concerned that the current administration intends to sideline the Ombuds office, as it has already done with the statutory Office of the Immigration Detention Ombudsman and the USCIS Ombudsman's Office, reducing vital independent oversight to nothing more than a hollow title. Without the kind of internal accountability and impartial assessment of policy changes that the Ombuds office could provide, there is no confidential recourse for raising concerns about the treatment of unaccompanied children that do not rise to the level of criminal or other illegal activity. I believe this will have a chilling effect on the ability of children and the public to report violations of ORR's regulations and policies and challenge other decisions regarding unaccompanied children and will allow the government to implement policies that are not in the best interest of children.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on this 13th day of June, 2025, at Washington, D.C.

*Mary E Giovagnoli* (signature)

Mary E Giovagnoli

---

[1] *See* ORR Fact Sheets and Data, Average Monthly Data, https://acf.gov/orr/about/ucs/facts-and-data (average length of care for children discharged from ORR custody has increased from 37 days in January 2025 to 191 days in May 2025); *id.*, Released to Sponsors (number of children released to sponsors has declined from 5,151 in January 2025 to 118 in May 2025).

9