# EXHIBIT 4

**Declaration of Tom K. Wong**

I, Tom K. Wong, declare as follows:

1. I have personal knowledge of the facts set forth in this declaration. If called as a witness, I could and would testify competently to the matters set forth below.

2. I submit this declaration in support of Plaintiffs' Opposition to Defendant's Motion to Terminate the *Flores* Settlement Agreement, in *Flores v. Barr*, Case No. 85-cv-4544-DMG (AGRx), in the Central District of California. This declaration updates my September 11, 2019, declaration in support of Plaintiffs' prior opposition to termination of the *Flores* agreement. Specifically, I offer analysis illustrating that the 2015 *Flores* ruling did not cause an increase in family migration.

3. I am a tenured Associate Professor at the University of California, San Diego (UCSD). I work in the Political Science Department, which is consistently ranked as one of the top ten political science departments nationally. I first joined the Political Science Department at UCSD in 2012, and became an Associate Professor with tenure in 2016. At UCSD, I am also the Director of the U.S. Immigration Policy Center (USIPC), which I founded in 2018, and the Co-Director of the Human Rights and Migration Program Minor.

4. I hold a B.A. and a Ph.D. in Political Science from the University of California, Riverside.

5. Outside of academia, I have consulted and advised in the government and philanthropic sectors. From 2015-2016, I served as an advisor to the White House Initiative on Asian Americans and Pacific Islanders, where I worked on the immigration portfolio. I am also on the board of the California Immigrant Policy Center and served on the advisory council of Unbound Philanthropy.

6. I am an expert on U.S. immigration policy. I have written two peer-reviewed books and dozens of peer-reviewed journal articles, book chapters, and reports on this subject.

7. I also have expertise in the conceptualization, design, and implementation of survey research, including surveying hard-to-reach undocumented populations. Several of the peer-reviewed academic journal articles and reports that I have published are based on survey

1

research that I conceptualized, designed, and implemented. This includes embedding survey experiments into questionnaires in order to randomize respondents to different experimental conditions to identify causal treatment effects.

**The 2015 *Flores* Ruling Did Not Increase the Number of Apprehensions of Families at the Southwest Border**

8. In a Notice of Proposed Rulemaking (NPRM) titled, "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children" published September 7, 2018, the Department of Homeland Security (DHS) alleged that a 2015 federal court ruling on the *Flores* Settlement Agreement (henceforth referred to as the 2015 *Flores* ruling) led to an increase in the number of families arriving at the southwest border. DHS alleged that the 2015 *Flores* ruling "severely limited the ability to maintain detention of families together" and "those limitations correlated with a sharp increase in family migration."[1] DHS acknowledged that "it is difficult to definitely prove the casual link" between the 2015 *Flores* ruling and an increase in family migration. Nevertheless, in its Final Rule published August 23, 2019, DHS restated its position that the 2015 *Flores* ruling "correlated with a sharp increase in family migration."[2]

9. As a preliminary matter, the Government's claims about correlation obfuscate the fact that the 2015 *Flores* ruling came in the midst of an increasing trend of migrant family apprehensions, as the graph below, produced by New York University Professors Adam Cox and Ryan Goodman based on CPB apprehension data, shows:

---

[1] U.S. Department of Homeland Security (DHS). "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children," September 7, 2018, pgs. 45493-45494. Online at (last accessed 9/10/19): https://www.regulations.gov/document?D=ICEB-2018-0002-0001

[2] U.S. Department of Homeland Security (DHS). "Apprehension, Processing, Care, and Custody of Alien Minors and Unaccompanied Alien Children," August 23, 2019, pgs. 44484. Online at (last accessed 9/10/19): https://www.federalregister.gov/documents/2019/08/23/2019-17927/apprehension-processing-care-and-custody-of-alien-minors-and-unaccompanied-alien-children

**Graph 1**



*Source:* Cox, Adam & Goodman, Ryan. 2018. Detention of Migrant Families as 'Deterrence': Ethical Flaws and Empirical Doubts, New York, NY: Just Security (relying on CBP apprehension data) *available at* https://www.justsecurity.org/58354/detention-migrant-families-deterrence-ethical-flaws-empirical-doubts/.

10. Furthermore, in that same period, there was no significant difference in the overall trend of arrivals of minors traveling unaccompanied and children migrating with family members, as the graph below, produced by New York University Professors Adam Cox and Ryan Goodman based on CPB apprehension data, shows:

**Graph 2**



*Source:* Cox, Adam & Goodman, Ryan. 2018. Detention of Migrant Families as 'Deterrence': Ethical Flaws and Empirical Doubts, New York, NY: Just Security (relying on CBP apprehension data) *available at* https://www.justsecurity.org/58354/detention-migrant-families-deterrence-ethical-flaws-empirical-doubts/.

11. However, while the trend lines of the raw apprehensions data presented above themselves undermine the Government's argument that the 2015 *Flores* ruling could cause an

increase that was already extant, further rigorous statistical analysis much more convincingly establishes this same conclusion.

12. In a report I published in October 2018,[3] I conducted such analysis and concluded that there was no statistically significant increase in U.S. Border Patrol apprehensions of families at the southwest border after the 2015 *Flores* ruling. In other words, there is no evidence that the 2015 *Flores* ruling increased the number of families arriving at the southwest border. Below I describe my statistical analysis and how my analysis leads to this conclusion.

13. Using interrupted time series analysis (ITSA) and publicly available data obtained from U.S. Customs and Border Protection (CBP) (The monthly number of U.S. Border Patrol apprehensions of families at the southwest border is a metric used by CBP as a proxy for number of families coming to the border), I analyzed the relationship between the 2015 *Flores* ruling and the monthly number of U.S. Border Patrol apprehensions of families at the southwest border. ITSA is a quasi-experimental research design that is used to evaluate trends before, immediately following, and during the period after an intervention, including a change in law such as the 2015 *Flores* ruling. ITSA estimates three main parameters: $ß_1$ is the slope or trajectory of the outcome variable before the start of the intervention; $ß_2$ is the change in the level of the outcome variable in the period immediately following the start of the intervention; and $ß_3$ is the treatment effect of the intervention over time.

14. Table 1 presents the results of the ITSA analysis. To produce these results, I created a statistical model, Model 1, which estimates the relationship between the 2015 *Flores* ruling and the monthly number of U.S. Border Patrol apprehensions of families at the southwest border. As Table 1 shows, in Model 1, the $ß_1$ coefficient is positive and statistically significant, which affirms that the monthly number of apprehensions of families was increasing before July 2015. Both the $ß_2$ and $ß_3$ coefficients are statistically insignificant, however, which

---

[3] Wong, Tom K. 2018. Did a 2015 *Flores* Court Ruling Increase the Number of Families Arriving at the Southwest Border? Washington, DC: Center for American Progress available at https://www.americanprogress.org/issues/immigration/news/2018/10/16/459358/2015-flores-court-ruling-increase-number-families-arriving-southwest-border/.

shows that the 2015 *Flores* ruling is not statistically significantly related to an immediate or long-term increase in the monthly number of apprehensions of families at the southwest border.

15. Put simply, this first analysis shows that the 2015 *Flores* ruling did not cause an increase in the migration of families.

**Table 1**



TABLE 1
The 2015 *Flores* ruling and the U.S. Border Patrol apprehensions of family units at the southwest border

| *Flores* ruling time frame | Model 1 |
|---|---|
| ß1 Pre-July 2015 | 106.2** 34.18 |
| ß2 July 2015 | 579.7 1,647.54 |
| ß3 Post-July 2015 | -44.72 52.81 |
| ß0 Constant | 315.48 345.51 |
| Observations | 83 |

Note: Six additional models were run specifying six different pseudo-interventions. The models produce qualitatively similar results: *significant at the .05 level; **significant at the .01 level; ***significant at the .001 level; standard errors in parentheses.

Sources: Data for fiscal year 2012 are available at U.S. Customs and Border Protection, "United States Border Patrol Southwest Family Unit Subject and Unaccompanies Alien Children Apprehensions Fiscal Year 2016: Statement by Secretary Johnson on Southwest Border Security," available at https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016 (last accessed October 2018). Data for fiscal year 2013 to fiscal year 2017 are available at U.S. Customs and Border Protection, "United States Border Patrol: Total Family Unit* Apprehensions By Month - FY 2013, FY 2014, FY 2015, FY 2016, FY 2017," available at https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Total%20Monthly%20Family%20Units%20by%20Sector%2C%20FY13-FY17.pdf (last accessed October 2018). Data for fiscal year 2018 are available at U.S. Customs and Border Protection, "Southwest Border Migration FY2018," available at https://www.cbp.gov/newsroom/stats/sw-border-migration (last accessed October 2018).

16. To support even more confident statistical causal inference, I ran a series of variations on Model 1, specifying pseudo-interventions—meaning evaluating different start dates for any purported effect on family migration patterns from the 2015 *Flores* ruling—to address the possibility that more time needs to elapse before such an effect is evident. The pseudo-interventions analyzed include each of the six months after the 2015 *Flores* ruling. Additional models were run specifying the intervention as: August 2015; September 2015; October 2015; November 2015; December 2015; and January 2016. These variations on Model 1 produced qualitatively similar results to those presented in Table 1 and lead to the same conclusion: the 2015 *Flores* ruling is not statistically significantly related to increases in the monthly number of U.S. Border Patrol apprehensions of families at the southwest border.

17. Again, this second analysis also shows that the 2015 *Flores* ruling did not cause an increase in the migration of families.

18. Because the monthly numbers of family apprehensions at the southwest border exhibit seasonal trends, it is important to check the robustness of the results presented above using autoregressive integrated moving average (ARIMA) ITSA. ARIMA modeling removes time trends—the so-called "noise"—in order to isolate the impact of an intervention—known as the "signal". ARIMA modeling begins by identifying and removing noise, or the extent to which the data in a time series can be accurately predicted by time itself. Identifying and removing noise then allows one to evaluate the extent to which an intervention has an effect on an outcome of interest that is completely independent from underlying time (i.e., seasonal) trends.

19. After seasonal trends are taken into account, the conclusion remains the same: the 2015 *Flores* ruling remains statistically insignificantly related to increases in the monthly number of family apprehensions at the southwest border. Figure 1 illustrates the results after time trends are removed.

**Figure 1**



20. Table 2 reports the results of the ARIMA ITSA. To produce these results, I created a statistical model, Model 2, which re-estimates the relationship between the 2015 *Flores* ruling and apprehensions; it shows that after identifying and removing time trends, there is no statistically significant relationship between the 2015 *Flores* ruling and the monthly number of U.S. Border Patrol apprehensions of families at the southwest border.

**Table 2**

**TABLE 2**
**ARIMA ITSA results**

| *Flores* ruling time frame | Model 2 ARIMA (1,1,0) |
|---|---|
| July 2015 | 0.034 |
|  | 0.069 |
| Observations | 83 |

Note: The ARIMA (1,1,0) model indicates one lag and the first order difference of the detrended dependent variable. Standard errors are in parentheses.
Sources: Data for fiscal year 2012 are available at U.S. Customs and Border Protection, "United States Border Patrol Southwest Family Unit Subject and Unaccompanies Alien Children Apprehensions Fiscal Year 2016: Statement by Secretary Johnson on Southwest Border Security," available at https://www.cbp.gov/newsroom/stats/southwest-border-unaccompanied-children/fy-2016 (last accessed October 2018). Data for fiscal year 2013 to fiscal year 2017 are available at U.S. Customs and Border Protection, "United States Border Patrol: Total Family Unit* Apprehensions By Month - FY 2013, FY 2014, FY 2015, FY 2016, FY 2017," available at https://www.cbp.gov/sites/default/files/assets/documents/2017-Dec/BP%20Total%20Monthly%20Family%20Units%20by%20Sector%2C%20FY13-FY17.pdf (last accessed October 2018). Data for fiscal year 2018 are available at U.S. Customs and Border Protection, "Southwest Border Migration FY2018," available at https://www.cbp.gov/newsroom/stats/sw-border-migration (last accessed October 2018).

CAP

21. In the simplest terms, this final analysis also shows that the 2015 *Flores* ruling did not cause an increase in the migration of families.

22. I note that my analysis presented above precedes the 84,490 family units apprehended by the U.S. Border Patrol in May 2019.[4] However, it would be irresponsible to suggest, as a matter of statistical causal inference, that the 2015 *Flores* ruling caused the increase in the number of families apprehended at the southwest border in May 2019. To begin, from July 2015 to May 2019, a total of 45 months elapsed. However, it is not just the length of time in between the 2015 *Flores* ruling and the 2019 increase in the number of families apprehended at the southwest border that is at issue, but also the fact that the 2015 *Flores* ruling was a constant during this entire time period. A constant simply cannot cause an outcome that varies over time.

---

[4] U.S. Customs and Border Protection. "Southwest Border Migration FY19," September 9, 2019. Online at (last accessed September 10, 2019): https://www.cbp.gov/newsroom/stats/sw-border-migration

7

**It is not possible to credibly compare CBP data on family apprehensions since 2019 to previously reported data.**

23. Moreover, it is unclear whether the method used to count the number of families apprehended at the southwest border has changed in recent years.

24. For example, in data published by CBP titled, "Southwest Border Migration FY2017,"[5] there is no asterisk next to "Family Units." However, in data currently published by CBP titled "Southwest Border Migration FY2019," there is an asterisk next to "Family Units," which reads, "Family Unit represents the number of individuals (either a child under 18 years old, parent, or legal guardian) apprehended with a family member by the U.S. Border Patrol."[6] Whereas in the absence of the asterisk one is left to conclude that "Family Units" refers to the number of families apprehended at the border, the presence of the asterisk implies a count of all of the individuals in the families that are apprehended at the border. Such a substantial methodological change could double or triple the reported number and would generally materially increase the total number of "family unit" apprehensions reported to the public. To the extent that the underlying method used to count the number of families apprehended at the southwest border has changed, one is unable to credibly compare recently reported data to previously reported data.

**Conclusion: The implication of this analysis is that application of the *Flores* agreement is not a driver of migration trends.**

25. The underlying thrust of the Government's arguments about the trends in apprehension data and migration patterns at the southern border seems to be that they demonstrate that US immigration policy is the primary driver of migration trends and, as a result, the public interest requires the Government be given maximum flexibility to manage this policy in order to control (and reduce) migration – including through more aggressively using detention (including in facilities that are not state licensed) as a deterrent. However, rigorous statistical analysis of the

---

[5] U.S. Customs and Border Protection. "Southwest Border Migration FY17," December 15, 2017. Online at (last accessed September 10, 2019): https://www.cbp.gov/newsroom/stats/sw-border-migration-fy2017

[6] U.S. Customs and Border Protection. "Southwest Border Migration FY19," September 9, 2019. Online at (last accessed September 10, 2019): https://www.cbp.gov/newsroom/stats/sw-border-migration

Government's own data shows that this factual premise is wrong. As demonstrated above, the 2015 *Flores* ruling did not cause an increase in the migration of families to the United States. Furthermore, based on this analysis, it is reasonable to extrapolate and surmise that enforcement and detention policy generally and the existence and interpretation of the *Flores* settlement agreement in particular does not have a causal impact on migration trends.

**Recent trends in Southwest Land Border Encounters further supports the conclusion that the *Flores* agreement is not a driver of migratory trends**

26. The migration data available since 2019 does not change my conclusions regarding the effect of the *Flores* settlement agreement on family migration. Family migration has fluctuated significantly since 2019, ranging from a monthly high of 123,815 to a low of 829. Given that the *Flores* settlement has remained constant during this period, there is no evidence of correlation—much less causation—between recent family migration numbers and the *Flores* settlement. Suggesting otherwise would be irresponsible and inaccurate.

27. In fiscal year 2019, CBP recorded 527,112 southwest border land encounters of individuals in a family unit (FMUA). The monthly high during fiscal year 2019 was recorded in May, with 88,587 FMUA southwest border encounters.[7]

28. In fiscal year 2020, CBP recorded 70,994 southwest border land encounters of FMUA. The monthly high during fiscal year 2020 was recorded in October, with 13,719 FMUA southwest border encounters.[8]

29. In fiscal year 2021, CBP recorded 479,728 southwest border land encounters of FMUA. The monthly high during fiscal year 2021 was recorded in August, with 86,631 FMUA southwest border land encounters.[9]

30. In fiscal year 2022, CBP recorded 560,646 southwest border land encounters of individuals in a family unit (FMUA). The monthly high during fiscal year 2022 was recorded in May, with 59,556 FMUA southwest border land encounters.[10]

---

[7] U.S. Customs and Border Protection. "Southwest Border Migration FY19," February 12, 2025. Online at (last accessed June 18, 2025): https://www.cbp.gov/newsroom/stats/sw-border-migration
[8] *Id.*
[9] *Id.*
[10] *Id.*

9

31.   In fiscal year 2023, CBP recorded 821,537 southwest border land encounters of individuals in a family unit (FMUA). The monthly high during fiscal year 2023 was recorded in September, with 123,815 FMUA southwest border land encounters.[11]

32.   In fiscal year 2024, CBP recorded 804,456 FMUA southwest border land encounters. The monthly high during fiscal year 2024 was recorded in December, with 123,498 FMUA southwest border land encounters.[12]

33.   In comparison, CBP recorded only 1,139 FMUA southwest border land encounters in February 2025, 829 FMUA southwest border land encounters in March 2025, 1,003 FMUA southwest border land encounters in April 2025, and 863 FMUA southwest border land encounters in May 2025.[13]

34.   As the *Flores* agreement remained a constant over this period, it clearly cannot be the cause of both increases and decreases in FMUA southwest border land encounters.

I declare under penalty of perjury that the foregoing is true and correct and of my own personal knowledge.

Executed on June 18, 2025, in San Diego, California.

Tom K. Wong
Associate Professor
University of California at San Diego

---

[11] U.S. Customs and Border Protection. "U.S. Border Patrol and Office of Field Operations Encounters by Area of Responsibility and Component," June 17, 2025. Online at (last accessed June 18, 2025), https://www.cbp.gov/newsroom/stats/nationwide-encounters
[12] *Id.*
[13] *Id.*

10