CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
crholguin@centerforhumanrights.org
Bardis Vakili (Cal. Bar No. 247783)
bardis@centerforhumanrights.org
Sarah E. Kahn (Cal. Bar No. 341901)
sarah@centerforhumanrights.org
1505 E 17th St. Ste. 117
Santa Ana, CA 92705l
Telephone: (909) 274-9057

*Attorneys for Plaintiffs*

*Additional counsel listed on following page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| Jenny Flores, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>Pamela Bondi, Attorney General of the United States, *et al.,*<br><br>        Defendants. | Case No. CV 85-4544-DMG-AGRx<br><br>**PLAINTIFFS' RESPONSE TO JUVENILE COORDINATOR REPORTS**<br><br>Judge: Hon. Dolly M. Gee |

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe (Cal. Bar No. 299296)
Diane de Gramont (Cal. Bar No. 324360)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email: mwroe@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW
Rebecca Wolozin (admitted *pro hac vice*)
818 Connecticut Ave. NW, Suite 425
Washington, DC 20006
Telephone: (202) 868-4792
Email: bwolozin@youthlaw.org

CHILDREN'S RIGHTS
Leecia Welch (Cal. Bar No. 208741)
2021 Fillmore Street
San Francisco, CA 94115
Telephone: (415) 602-5202
Email: lwelch@childrensrights.org

CHILDREN'S RIGHTS
Eleanor Roberts (admitted *pro hac vice*)
88 Pine Street, Suite 800
New York, NY 10005
Telephone: (212) 683-2210
Email: eroberts@childrensrights.org

## I. INTRODUCTION

Pursuant to an order of the Court on July 26, 2024, and in accordance with Paragraphs 28A and 30 of the *Flores* Settlement Agreement ("FSA"), the Juvenile Coordinator ("JC") for U.S. Immigration and Customs Enforcement ("ICE") and the Juvenile Coordinator for U.S. Customs and Border Protection ("CBP") filed their 2025 Annual Reports on July 1, 2025. ECF No. 1599-1 ("CBP JC Report"); 1599-2 ("ICE JC Report"). Both reports raise serious questions regarding Defendants' compliance with the FSA.

In March 2025, ICE reinstituted its practice of detaining children with their parents at two secure family detention centers in Texas. ICE JC Report at 2. The first, in Karnes, Texas, was used as the primary facility for families until April 2025.[1] *Id.* The current primary secure facility for holding families is in Dilley, Texas. *Id.* Despite re-opening family detention centers, the ICE JC Report lacks key information and specificity to allow the Court and Plaintiffs to assess compliance with the FSA. For example, despite reference to the 2020 Family Residential Standards and a list of current modifications to those standards, the report did not provide any evidence of compliance with those standards or the FSA. ICE's brief submission purports to cover monitoring activities over the past year, from June 1, 2024, through June 1, 2025, but it does not appear the JC conducted any monitoring activities of any ICE facilities based on the report. *Id.* Additionally, the report indicates that ICE facilities include "temporary staging space (hotels), and secure detention" but provides no information as to the conditions of detention at these "temporary staging spaces." *Id.* at n.1. Moreover, the ICE JC does not describe how ICE plans to monitor and ensure compliance in any facility going forward. In contrast, Plaintiffs' evidence suggests increasingly dire conditions for children in these secure facilities made even more dangerous as lengths of time in custody continue to grow. *See, e.g.*, Decl. of Javier Hidalgo ("Hidalgo Decl.") ¶ 20, ECF No. 1584-3, (noting

---

[1] It is Plaintiffs' understanding that Karnes continues to be available for family detention if needed as overflow from the primary Dilley facility.

class members who have been detained in ICE custody for 50 days, and many detained over 25 days).

Similarly, the CBP JC Report primarily focuses on the RGV and El Paso sectors where CBP has made continued improvements, but the report fails to adequately address how CBP will remedy its admittedly significant *Flores* compliance failures at various CBP sites across the border. *See, e.g.* CBP JC Report at 13-14, 16-17, 24-26. Furthermore, the report raises concerns about the provision of basic hygiene items and length of custody for family units. *Id.*

## II. ICE has not shown compliance with the *Flores* Settlement Agreement

First, Plaintiffs reassert that family detention is not only cruel and fundamentally harmful to children but also unjustified. *See, e.g.*, Pls.' Opp. to Defs.' Mot. to Amend Settlement, ECF No. 122; Pls.' Mot. to Enforce at 15-17, ECF No. 201; Pls.' Opp. to Defs.' Mot. to Terminate Settlement at 19-24, ECF No. 1584. The ICE JC suggests that ICE now has a blanket policy of holding *all families* in ICE detention because of an alleged high risk that families will not comply with immigration enforcement if ICE uses alternatives to detention. ICE JC Report at 2. She relies on dubious claims that appear to conflict with ICE's publicly available data and which disregard ICE's widespread ongoing efforts to target *compliant* rather than non-compliant individuals for arrest and detention in ICE's secure family detention facilities.[2] The Court should therefore put little

---

[2] Ms. Helland asserts, without submitting any evidence or data to the Court, that individuals did not appear for scheduled removal in 33% of such cases. She provides no evidence that this statistic—if accurate—applies to any families held in family detention facilities. In contrast, Plaintiffs' counsel interviewed multiple families who were arrested *while complying* with ICE directives to appear at immigration court hearings or present themselves at checkpoints, which is likewise widely supported by public reporting. *See, e.g.*, Decl. of E.M.L. ¶¶ 6-10, ECF No. 1584-7 (family with pending relief presented at a CBP check-point); Decl. of C.M.Z. ¶¶ 5-6, ECF No. 1584-9 (family arrested at immigration courthouse after attending scheduled hearing); *see also, e.g.*, Martha Bellisle et al., *Immigration officers intensify arrests in courthouse hallways on a fast track to deportation*, Associated Press (June 11, 2025), https://apnews.com/article/immigration-court-arrests-ice-deportation-99d822cdc93ae7dc26026c27895d5ea1; Maanvi Singh and Will Craft, *As deportations ramp up, immigrants increasingly fear ICE check-ins: 'All*

stock in the Government's attempt to justify holding families in secure unlicensed facilities as necessary.

Second, the ICE JC provides limited and flawed data regarding length of children's custody. Defendants previously confirmed that when ICE calculates a child's time in custody, they do not include the child's time in CBP custody and therefore it does not indicate the total amount of time a child has been in immigration custody. Decl. of Leecia Welch ("Welch Decl.") Ex. A at 2, ECF No. 1584-2. As reported by Plaintiffs, juvenile care monitors, and Defendants, children routinely spend significant periods of time in CBP custody prior to transfer to an ICE facility. *See* CBP JC Report at 12; Pls. CBP Mot. to Enforce at 7-10, ECF No. 1575 (detailing CBP "time in custody" ("TIC") times of one to four weeks). *See also, e.g.*, Decl. of M.M. ¶¶ 22, 26, ECF No. 1575-14 ("We have been at Dilley 21 days . . . I have been in immigration detentions for almost two months now."). Furthermore, families at both Karnes and Dilley have been detained in ICE custody for increasingly lengthy periods of time. *See* Hidalgo Decl. ¶ 20.

Third, the ICE JC provides no information about what monitoring, if any, occurred over the course of the last year and provides no evidence of compliance with the FSA at any ICE facility where children are currently detained.

The ICE JC Report references 2020 Family Residential Detention Standards and provides a list of "modifications" to those standards and whether those standards affect compliance with the FSA. ICE JC Report at 2. However, it is clear from the report that ICE views the 2020 Family Residential Detention Standards as optional and malleable according to ICE's desires. *See* ECF No. 1599-3 (noting modifications to standards due to "rapid transition and changing operational environment"); Welch Decl. Ex. A at 1-2; Hidalgo Decl. ¶ 11. Moreover, the list of "modifications" is vague and unhelpful in understanding exactly which standards have been modified in what ways. Plaintiffs are concerned that such easy modification of the standards and little information as to what the modifications are makes the standards virtually meaningless.

---

*bets are off'"*, The Guardian (April 6, 2025), https://www.theguardian.com/us-news/2025/apr/06/deportations-immigrants-ice-trump.

Additionally, the report does not explain what operational needs are considered before modifying the standards, how long ICE plans to operate under the current modifications, or whether ICE intends to further modify the current or previous standards and in what way. Nor does the report indicate whether ICE intends to reimplement standards deemed unnecessary for lengths of stay less than 20 days given that time in ICE custody continues to climb.

While the ICE JC report failed to provide any information about the JC's monitoring efforts or results of monitoring if it did occur, Plaintiffs have submitted copious declarations and evidence of the increasingly harmful conditions in ICE's family detention centers. In addition to lengthy times in CBP and ICE custody, families report harsh treatment, few options for recreation or educational services, poor medical services, and high levels of trauma and unmet mental health needs. *See, e.g.,* Decl. of A.L.W. ¶¶ 18, 23, ECF No. 1575-5 ("This place is a prison . . . I don't understand why I'm required to have a stranger hold my baby instead of my own family"); Decl. of K.V.L. ¶¶ 18-19, ECF No. 1575-6 ("It's really hot in our room here…the tap water smells so horrible and it looks white and dirty. But you have to buy bottled water"); Decl. of V.I.B.G. ¶¶ 39-40, 42, ECF No. 1575-12 ("The clothes smell really bad. . . the towels are all black with dirt. . . My kids are very hungry."); Decl. of M.P.C. ¶¶ 27-31, ECF No. 1575-16 (class member recounting learning that his father had tried to commit suicide, and being "so shocked and scared"); Decl. of L.Q.A. ¶ 12, ECF No. 1575-27 ("In the play area, they only have about 4 pieces of broken crayons left. I asked if they would get more crayons and a guard said probably not because the kids keep breaking them and eating them."); Decl. of L.J.H.G. ¶¶ 15, 19, ECF No. 1584-6 ("My son is not really eating here . . . My son does not have enough clothes here . . . He has no t-shirts and only one pair of shorts"); Decl. of E.M.L. ¶¶ 19, 22, ECF No. 1584-7 ("A guard comes into our room every half hour or hour, 24 hours a day . . . Some things here are really bad—really scary."); Decl. of Y.F.A. ¶ 11, 16, ECF No. 1584-8 ("With the lack of sleep and anxiety, my son is throwing himself against the floor and getting bruises . . . They give my son diapers, but they only give three or four at a time so I am constantly asking for more.");

Decl. of C.C.B.C. ¶¶ 14, 24, ECF No. 1584-10 ("I am really worried about my health conditions because my feet have started to get really swollen . . . There have only been two times in my life they have been swollen like this. Once when I was two, and then had to go to the hospital for 28 days. And now. . . I also really miss my dog Toby. He's my service dog."); Decl. of E.D.C. ¶ 21, ECF No. 1584-15 ("Since I've been here, I have seen many medical emergencies. The first one was a kid fainting."); Decl. of N.K.N.N. ¶ 19, ECF No. 1584-11 ("I'm not really hungry that much any more [sic]. I eat less than before. I feel really sad and angry all the time. I don't want to die here. And I don't want to live here either.").

Finally, the ICE JC also reports that children designated as "accompanied" have been held alone and away from their families in secure juvenile detention at NWRJDC for an average of nearly two and a half months. ICE JC Report at 3. However, the report provides no information as to whether the JC monitored that facility or whether it is in compliance with the FSA. Given that children are held alone at NWRJDC for *months*, it is critical that the ICE JC provide compliance information for this facility.

In short, based on reports of class members and their parents, ICE is failing to treat class members "with dignity, respect and special concern for their particular vulnerability of minors" and are causing great harm. FSA ¶ 11. The ICE JC Report provides no information to alleviate Plaintiffs' deep concerns regarding the safety of children detained by ICE.

**III.   CBP remains noncompliant with elements of the FSA across the Border**

   A. <u>Children are not held in safe and sanitary conditions.</u>

The CBP JC Report indicates consistent noncompliance with elements of the FSA, particularly the requirement to provide *sanitary* detention conditions to children. FSA ¶ 12.A. For example, the report identified that most hold rooms and holding areas visited during the JC's monitoring did not have hand soap or hand sanitizer available, and detainees would have to affirmatively request soap or hand sanitizer while held in those locations. CBP JC Report at 21, 30-31. This appears to include areas where detainees would use the restrooms and eat ("holding areas"). *Id.* The report also repeatedly notes

that children and their parents were unaware of what they could request or what amenities were available. *Id.* at 23, 26. It is unreasonable and developmentally inappropriate to require children to request soap or hand sanitizer every time they use the bathroom or at any regular interval throughout the day. This is especially true given consistent evidence through Plaintiffs' counsel interviews, monitor's interviews, and the interviews conducted by the JC that children and their parents are unaware they can even request items to address basic needs, and requests are denied. *See, e.g., id.;* Pls.' Mot. to Modify 2022 CBP Settlement at 12, 14, 17, ECF No. 1526-1 (citing class member declarations from RGV and El Paso sectors).

      The JC also admits that CBP did not provide notice of rights, dental hygiene kits, hygiene kits for showers (even when requested) and certain required clothing items in the non-juvenile priority facilities it monitored. CBP JC Report at 16 (Table 7). While the JC suggests this was due to the limited time children spend in these facilities, he does not explain if there is any plan to address these deficiencies or cease holding children in facilities that are incompatible with *Flores* compliance. Additionally, following inspections, the JC identified a lack of toys or recreation for children in multiple facilities including the Donna JPF. *Id.* at 18, 22. These findings align with the findings of the JCM. Final Juvenile Care Monitoring Report at 12 ("Final JCM Report"), ECF No. 1578 ("minimal [child-friendly] materials have been available in older UC and family holding areas.").

      Concerningly, the JC's report highlights the significant reduction of the Caregiver program and the transfer of caregiver duties in several sectors to CBP personnel, particularly for the care of accompanied children. CBP JC Report at 13-14. As addressed in each of Ms. Ordin and Dr. Wise's JCM reports, the caregiver program is a central tenet of appropriate treatment of children in CBP custody and an area where CBP continues to be noncompliant with respect to the 2022 CBP Settlement. *See* Final JCM Report at 3, 9-10, 20 ("Rather than observing significant improvements in the Caregivers' performance in 2025, the JCM observed further diminishment."). In the 2022 CBP Settlement, the

Parties agreed the Caregiver program would be a critical component of providing safety to children in CBP custody. Requiring CBP staff to perform caregiver duties without requiring this staff to have specific child-focused training is insufficient to satisfy the requirements of the program. There is no evidence that CBP officers are adequate replacements to caregivers hired and trained for the Caregiver program and therefore Plaintiffs are concerned the elimination of the Caregiver program in various sectors will result in non-compliance with the FSA's requirement that children be treated with respect and concern for their particular vulnerability as minors. *Id.*; *see also* CBP JC Report at 13-14; FSA ¶ 11.

Finally, the report states that now only 29 CBP across the southwest border facilities have contracted medical support staff, compared to the 45 facilities that had contracted medical support staff prior to May 2025. CBP JC Report at 14. The JC does not state the total number of USBP facilities in which children may be held nor does he clarify whether children have been or may be held in stations or placements without medical support staff, or whether there is any plan to restrict placement of children to facilities capable of *Flores* compliance that have the requisite staffing and services to meet children's needs.

### B.  The Juvenile Coordinator's monitoring is insufficient.

The JC admits that despite having designated a new facility as the JPF for El Paso in March 2025, his team did not inspect that facility prior to initiating its use as the JPF and still has not completed an inspection of that facility. *Id.* at 13. Notably, the JCM noted failure to comply with age-appropriate food and ambient temperature control in the current El Paso JPF. Final JCM Rep. at 3, 7-9 ("the current CPC facility has been associated with a prolonged violation of the temperature provisions of the Settlement"). This glaring failure highlights the limited ability of the CBP JC to effectively monitor CBP facilities that hold children, particularly as those facilities are decentralized and spread across border stations that are fundamentally inappropriate for holding children.

Additionally, despite the proliferation of locations where children may be held, including along the Northern Border, the JC appears to plan for his team "to attempt" to monitor all nine SWB sectors and four SWB field officers with at least *one visit* per year to various sites. CBP JC Report at 6. The JC has completed an average of just three visits per year to either RGV or El Paso sectors since 2022. *Id. See also*, Final JCM Rep. at 18-19 (JCD inspections "occur relatively infrequently" and "the JCD is not well structured to quickly address concerns"). Further, the planned increase to quarterly visits (four per year) for these two sectors going forward "will require scheduling adjustments for visits and may require alternative ways of providing [*Flores* Implementation Training]." CBP JC Report at 7. In other words, the CBP JC cannot realistically complete the level of monitoring and training the JCM believes to be necessary to ensure compliance in just two of CBP's 20 border patrol sectors, even with the various monitoring systems and records in place.

Furthermore, the highlighted "rapidly mobilized" visits in the report were a direct result of Court enforcement of the FSA. *Id.* (noting visits at the suggestions of the Court-appointed Special Master, to address declarations provided by Plaintiffs' counsel regarding COVID-19, and because of Court-mandated reporting in response to Plaintiffs' motions to enforce). As the Court is aware, Defendants currently seek to end the Juvenile Care Monitor's term and have moved to terminate the FSA, thus seeking to eviscerate the primary mechanism upon which the JC relied to initiate responsive site visits.

### C. CBP continues to hold children for prolonged periods in inappropriate placements.

Children must be expeditiously moved out of secure unlicensed facilities under the FSA, and typically they must be transferred or released from CBP custody within 72 hours. CBP facilities, especially border stations and hold rooms where many families are now being held, are designed as temporary facilities and are fundamentally unfit to hold children for any long period of time.

The CBP JC Report highlights the drastic decrease in census over the past five months, paired with a deeply concerning *increase* in length of time in custody for children in family units. *Id.* at 12. The average time in custody reached 177 hours (approximately 7 days) in March 2025. *Id.* (Table 5); *cf.* Decl. of A.K., ECF No. 1575-24 (mother describing being detained with her two-year-old daughter at Otay Mesa[3] for approximately 42 days, apart from her husband and the child's father, prior to being transferred to Karnes). While the most recent data indicates a return to an average just above 72 hours, the JC did not provide any detailed explanation for the prolonged TIC times despite the very low census. Plaintiffs are concerned the JC appears to not monitor the length of custody of family units unless those families are held for more than 120 hours rather than the typical 72-hour mark. CBP JC Report at 5.

The JC should explain how CBP will avoid these prolonged detention times as CBP increasingly holds families and children in small border stations and hold rooms along the border and provide specific explanations, rather than providing vague reference to a list of possible reasons for the cause of these prolonged stays in CBP custody.

### IV. Conclusion

For the reasons described above, and in Plaintiffs' recent CBP Motion to Enforce, ECF No. 1575, and Opposition to Defendants' Motion to Terminate the FSA, ECF No. 1588, neither CBP nor ICE are substantially complying with the FSA. Additionally, Plaintiffs respectfully request the Court order the ICE Juvenile Coordinator to provide a detailed description of monitoring activities, assessment of compliance, accurate data, and an explanation of plans to ensure compliance with the requirements outlined in the parties' agreements.

---

[3] This facility is in the San Diego sector, which does not appear to have any designated Juvenile Priority Facilities.

Dated: July 11, 2025

CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
Carlos Holguín
Bardis Vakili
Sarah Kahn

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe
Diane de Gramont
Rebecca Wolozin

CHILDREN'S RIGHTS
Leecia Welch
Eleanor Roberts


*/s/ Rebecca Wolozin*

Rebecca Wolozin
*Attorney for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that on July 11, 2025, I caused a copy of Plaintiffs' Response to Juvenile Coordinator Reports to be served to all counsel through the Court's CM/ECF system.

Dated: July 11, 2025          */s/Rebecca Wolozin*
                              Rebecca Wolozin
                              *Attorney for Plaintiffs*