BRETT A. SHUMATE
Assistant Attorney General
Civil Division
DREW ENSIGN
Deputy Assistant Attorney General
WILLIAM C. SILVIS
Assistant Director
KATELYN MASETTA-ALVAREZ
CHRISTINA PARASCANDOLA
Senior Litigation Counsel
JOSHUA C. MCCROSKEY
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-1540
joshua.c.mccroskey@usdoj.gov
*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, | No. CV 85-4544-DMG-AGR |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT** |
| v. | |
| PAMELA BONDI, Attorney General of the United States, *et al.*, | Hearing Date:   August 8, 2025<br>Hearing Time:   10:00 a.m. |
| Defendants. | Honorable Dolly M. Gee<br>Chief United States District Judge |

1

# **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................1

II.   BACKGROUND ............................................................................................1

III.  LEGAL STANDARD .....................................................................................2

IV.   ARGUMENT...................................................................................................2

      A.   The Court should deny the MTE because the FSA should be
           terminated. ............................................................................................2

      B.   The Immigration and Nationality Act, 8 U.S.C. § 1252(f)(1), bars
           Plaintiffs' requests for class-wide injunctive relief. ...........................2

      C.   Plaintiffs fail to show any FSA violations based on time in custody. ..........4

      D.   Plaintiffs do not show any FSA violations based on custodial
           conditions. ............................................................................................7

           1.   Plaintiffs' thin evidentiary showing does not sustain their
                burden to prove noncompliance with the FSA...............................7

           2.   Plaintiffs do not prove FSA violations regarding custodial
                conditions in Border Patrol stations. .................................10

           3.   Plaintiffs do not prove FSA violations regarding custodial
                conditions in ports of entry. .............................................15

           4.   Plaintiffs do not sustain their other general allegations. .................17

      E.   Plaintiffs have not proven that the Court should appoint a monitor. ..........19

           1.   The *Flores* monthly data reporting problems have been
                resolved. ..............................................................................19

           2.   CBP's real-time monitoring of time in custody and expeditious
                processing is accurate. ...............................................20

V.    CONCLUSION .............................................................................................20

ii

# TABLE OF AUTHORITIES

**CASES**

*Demirchyan v. Gonzales*,
No. CV 08-3452 SVW MAN, 2010 WL 3521784 (C.D. Cal. Sept. 8, 2010) .............. 9

*Dep't of Homeland Sec. v. Thuraissigiam*,
591 U.S. 103 (2020) ...................................................................................... 6

*Flores v. Barr*,
No. CV 85-4544-DMG, 2020 WL 2758792 (C.D. Cal. Apr. 24, 2020) ........... 2, 4, 6, 8

*Flores v. Barr*,
No. CV 85-4544-DMG, 2020 WL 5491445 (C.D. Cal. Sept. 4, 2020) ...................... 5

*Flores v. Lynch*,
828 F.3d 898 (9th Cir. 2016) ......................................................................... 6

*Flores v. Sessions*,
394 F. Supp. 3d 1041 (C.D. Cal. 2017) ...................................................... 6, 8, 10

*Galvez v. Jaddou*,
52 F.4th 821 (9th Cir. 2022) ......................................................................... 3

*Garland v. Aleman Gonzalez*,
596 U.S. 543 (2022) ..................................................................................... 3

*Suchite v. ABM Aviation, Inc.*,
741 F. Supp. 3d 878 (S.D. Cal. 2024) ........................................................... 8

*Torres v. Barr*,
976 F.3d 918 (9th Cir. 2020) ...................................................................... 6, 7

**STATUTES**

8 U.S.C. § 1225(b) ............................................................................................. 6

8 U.S.C. § 1229a ............................................................................................... 6

8 U.S.C. § 1252(f)(1) .................................................................................. 1, 2, 3, 5

8 U.S.C. §§ 1221–1231 ...................................................................................... 3

**RULES**

Fed. R. Evid. 802 ........................................................................................ 9

**REGULATIONS**

45 C.F.R. §§ 410.1201–.1204 ..................................................................... 5

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

On June 17, 2025, Plaintiffs filed a Motion to Enforce Settlement ("MTE"), alleging violations of the *Flores* Settlement Agreement ("FSA") and seeking an order against Defendants U.S. Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), and U.S. Immigration and Customs Enforcement ("ICE"). ECF No. 1575. Plaintiffs allege violations of the FSA regarding the time that class members spend in CBP custody, the conditions of CBP custody, and the monthly data reporting from CBP and ICE under FSA ¶ 29.[1] This Court should deny Plaintiffs' MTE. First, for the reasons in Defendants' pending Motion to Terminate Settlement Agreement ("MTT"), ECF No. 1567, the Court should terminate the FSA entirely. Second, under 8 U.S.C. § 1252(f)(1), the Court lacks jurisdiction to grant much of the relief Plaintiffs request. Third, Plaintiffs fail to prove current violations of the FSA and do not show that the Court should grant the relief sought.

## II.    BACKGROUND[2]

In both the U.S. Border Patrol, which operates between ports of entry ("POE"), and the Office of Field Operations ("OFO"), which operates at POEs, CBP ensures that holding facilities are safe and sanitary for class members in compliance with the FSA. *See* Decl. of John Modlin ("Modlin Decl.") ¶¶ 19–34, 43–56, ECF No. 1567-2; Ex. 1, Decl. of Benjamin Hollinder ("Hollinder Decl.") ¶ 5; Ex. 2, Decl. of Luis Mejia ("Mejia Decl.") ¶¶ 5–6. Whenever CBP encounters an alien minor who lacks a lawful basis to be in the United States, CBP processes the minor and will repatriate the minor or transfer the minor to the Department of Health and Human Services ("HHS") or ICE, as appropriate. Modlin

---

[1] Plaintiffs make no allegations regarding unaccompanied alien children. Accordingly, this Opposition focuses on minors in family units.

[2] Given this Court's familiarity with the case, Defendants provide a summary tailored to the issues presented by Plaintiffs' recent MTE. For additional procedural history, see Defendants' MTT 6–19.

Decl. ¶¶ 9–17, 36–42. "Every effort is made to hold detainees for the least amount of time required to process, transfer, or remove those in custody as promptly as is appropriate and operationally feasible." *Id.* ¶¶ 17, 56. Since January 2025, the number of children that CBP has encountered and apprehended has dramatically decreased. 2025 CBP Juvenile Coordinator Annual Report 8–12, ECF No. 1599-1. During the 30 days prior to June 9, 2025, Border Patrol apprehended a daily average of 25 unaccompanied alien children, with an average time in custody of less than 19 hours, and a daily average of 13.8 family units with an average time in custody of 87.75 hours. *Id.* at 9.

Under FSA Paragraph 29 and Court orders, CBP and ICE provide monthly reports to Plaintiffs' counsel about minors who were in CBP or ICE custody for more than 72 hours during the previous month. Ex. 3, Decl. of Latoya Morgan ("Morgan Decl.") ¶ 5; Ex. 4, Decl. of Dawnisha M. Helland ("Helland Decl.") ¶ 9. After being notified that some class members were erroneously missing from the reports, CBP and ICE identified the problems and corrected how they pull data for these reports. Morgan Decl. ¶¶ 7–8; Helland Decl. ¶¶ 10–14.

## III.    LEGAL STANDARD

To enforce the FSA as a contract, Plaintiffs must prove by a preponderance of the evidence that CBP and ICE "are currently in breach of the FSA." *Flores v. Barr*, No. CV 85-4544-DMG-AGRx, 2020 WL 2758792, at *3 (C.D. Cal. Apr. 24, 2020). The Court applies the doctrine of substantial compliance. *Id.*

## IV.    ARGUMENT

### A.    The Court should deny the MTE because the FSA should be terminated.

For all the reasons stated in Defendants' pending motion to terminate, the Court should terminate the FSA and, thus, deny the MTE. *See* MTT 22–55.

### B.    The Immigration and Nationality Act, 8 U.S.C. § 1252(f)(1), bars Plaintiffs' requests for class-wide injunctive relief.

The Court should deny the relief Plaintiffs request because Congress has stripped this Court of jurisdiction "to enjoin or restrain the operation" of the immigration-detention

provisions of the INA on a class-wide basis. Plaintiffs ask the Court to order that CBP "expeditiously process class members," "make and record prompt and continuous efforts on its part toward family reunification and the release of a minor," process class members for "individualized bond determination[s] where appropriate pursuant to Paragraph 24A of the Settlement," effect transfers to other facilities "expeditiously," and "hold minors in [CBP] custody only for the amount of time DHS reasonably requires to process the minor for release and/or actively arrange for and complete transport of the minor to a more suitable facility." Proposed Order ¶¶ 1–3, ECF No. 1575-1.

In 8 U.S.C. § 1252(f)(1), Congress provided that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation" of 8 U.S.C. §§ 1221–1231 "other than with respect to . . . an individual alien." 8 U.S.C. § 1252(f)(1). *Galvez v. Jaddou*, 52 F.4th 821, 830 (9th Cir. 2022). These sections include the sources of DHS's authority to detain class members, which are in §§ 1225(b)(1)(B)(ii), 1225(b)(1)(B)(iii)(IV), 1225(b)(2)(A), 1226, and 1231(a).

The Supreme Court has stated that "§ 1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." *Garland v. Aleman Gonzalez*, 596 U.S. 543, 550 (2022). The Supreme Court held that § 1252(f)(1) prohibited injunctions requiring the Government to provide bond hearings to a class because the injunctions "require officials to take actions that (in the Government's view) are not required by § 1231(a)(6) and to refrain from actions that (again in the Government's view) are allowed by § 1231(a)(6)." *Id.* at 551.

Here, Plaintiffs' requested class-wide relief would violate § 1252(f)(1) because it would require CBP to take actions that are not required, or in some cases even permitted, by the relevant statutory provisions. For example, Plaintiffs want the Court to order CBP to consider families for parole or release into the United States. MTE 11. But individualized consideration of release or parole is a procedural step that the covered provisions of the INA do not require. *See Aleman Gonzalez*, 596 U.S. at 551. The FSA is

3

1    an injunction. *Flores*, 2020 WL 2758792, at *2. Thus, the FSA and any enforcement of

2    the FSA is subject to § 1252(f)(1). *See* MTT 22–24. Under § 1252(f)(1), the Court lacks

3    jurisdiction to order the requested class-wide relief.

4    **C.    Plaintiffs fail to show any FSA violations based on time in custody.**

5    When CBP takes a minor into custody, it expeditiously processes the minor in

6    compliance with Paragraph 12.A of the FSA. Paragraph 12.A states that "[w]henever the

7    [Immigration and Naturalization Service ("INS")] takes a minor into custody, it shall

8    expeditiously process the minor." FSA ¶ 12.A. Although Paragraph 12.A contemplates

9    that minors will be released or transferred to a placement under Paragraph 19 within a

10   certain number of days, it provides that during an "influx of minors into the United States,"

11   the INS shall place minors "as expeditiously as possible." FSA ¶ 12.A.3. The FSA defines

12   "influx of minors into the United States" as "those circumstances where the INS has, at

13   any given time, more than 130 minors eligible for placement in a licensed program under

14   Paragraph 19, including those who have been so placed or are awaiting such placement."

15   FSA ¶ 12.B. Plaintiffs do not dispute that at all relevant times the "influx" provision has

16   been in effect based on the number of minors in immigration custody.

17   CBP must conduct several steps to "process" individuals suspected of being

18   unlawfully present. Agents "collect biographic and biometric information from certain

19   aliens and conduct records checks through CBP and other law enforcement systems." *Id.*

20   ¶¶ 9–10. Agents may also have to question aliens individually. *Id.* Agents provide children

21   or their accompanying parents with certain forms, notices, and screenings. *Id.* ¶¶ 11-12.

22   For children in family units, Border Patrol processes the family for the appropriate

23   immigration disposition. *Id.* ¶ 14. Plaintiffs do not allege that CBP is failing to perform

24   expeditiously any of this processing.

25   Plaintiffs argue that CBP is violating the FSA by "refusing to consider families for

26   parole or release" and by not beginning "prompt and continuous efforts towards release

27   when it takes a child into custody." MTE 11. In this argument, Plaintiffs conflate

28   Paragraphs 12.A, 14, 18 and 24.A of the FSA. Paragraph 14 states, "Where the INS

4

determines that the detention of the minor is not required either to secure his or her timely appearance before the INS or the immigration court, or to ensure the minor's safety or that of others, the INS shall release a minor from its custody without unnecessary delay" to a sponsor who meets certain requirements under Paragraphs 14–17. FSA ¶ 14. Paragraph 18 provides, "Upon taking a minor into custody, the INS, or the licensed program in which the minor is placed, shall make and record the prompt and continuous efforts on its part toward family reunification and the release of the minor pursuant to Paragraph 14 above." FSA ¶ 18. Finally, Paragraph 24.A. generally requires that a "minor in deportation proceedings shall be afforded a bond redetermination hearing before an immigration judge in every case." FSA ¶ 24.A. As explained above, 8 U.S.C. § 1252(f)(1) prohibits the Court from enforcing these provisions on a class-wide basis.

Moreover, the former INS's responsibilities were split among CBP, ICE, and HHS. Paragraphs 14, 18, and 24.A do not apply to CBP's operations that cover initial apprehension and processing. In a different context, the Court has expressed that different parts of the FSA only become applicable after certain periods of time or procedural triggers. *See Flores v. Barr*, No. CV 85-4544-DMG-AGRx, 2020 WL 5491445, at *7 (C.D. Cal. Sept. 4, 2020). In the few hours or days that minors in family units spend in CBP custody, CBP could not conduct the rigorous and extensive suitability assessments required to protect children released to sponsors under Paragraph 14. *See* 45 C.F.R. §§ 410.1201–.1204 (outlining HHS's suitability review process in the context of unaccompanied alien children). Although Paragraph 18 starts with the phrase "[u]pon taking a minor into custody," it contemplates a vetting process that would ordinarily take longer than a family unit would spend in CBP custody. In addition, Paragraph 18 does not logically apply to the situation of family units because there is no need to work towards "family reunification" when the child is already with a parent. To the contrary, time spent in CBP custody is often spent working towards processing the family in a manner that will maintain family unity—removing the family together or placing them at an ICE family residential center. And, as the Ninth Circuit recognized, the FSA does not require the

5

1    release of parents. *Flores v. Lynch*, 828 F.3d 898, 908–09 (9th Cir. 2016). Thus, Paragraph
2    18 is inherently contradictory when family units are encountered.

3        Plaintiffs also fail to acknowledge that parole and release on bond are not the only
4    types of release. CBP may work expeditiously toward removal from the United States,
5    which is one form of release from immigration custody. *See Dep't of Homeland Sec. v.*
6    *Thuraissigiam*, 591 U.S. 103, 119 (2020). This Court has found that expeditious
7    processing can encompass detention for a limited period if the government is working as
8    quickly as it can toward completing the expedited removal process or executing a final
9    order of removal when removal is "imminent" or "ready to take place." *See Flores*, 2020
10   WL 2758792, at *10, *12; *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1070 (C.D. Cal.
11   2017).

12       As to Paragraph 24.A, the Court cannot require bond hearings where detention is
13   mandatory. *See* 8 U.S.C. § 1225(b). In expedited removal, detention is presumptively
14   mandatory, and family units have no statutory right to bond redetermination hearings. *Id.*
15   § 1225(b)(1)(B)(ii), (iii)(IV). Likewise, inadmissible applicants for admission are subject
16   to mandatory detention pending removal proceedings under 8 U.S.C. § 1229a.  8 U.S.C.
17   § 1225(b)(2)(A). In addition, Paragraph 24.A has never applied to OFO's operations
18   because the provision requires a bond redetermination hearing only for those in
19   "deportation proceedings." FSA ¶ 24.A. At the time the FSA was being adopted, aliens
20   who arrived at POEs were placed in *exclusion* proceedings, not deportation proceedings.
21   *Torres v. Barr*, 976 F.3d 918, 927–28 (9th Cir. 2020) (en banc). Thus, by its own terms,
22   Paragraph 24.A has never applied to those aliens who arrive at POEs.

23       To the extent Plaintiffs want CBP to transfer children in family units to ICE faster,
24   Plaintiffs fail to show that CBP is not moving as expeditiously as possible. Although
25   Plaintiffs argue that minors' time in CBP custody is too long, Plaintiffs present no
26   evidence of unreasonable delay. For example, Plaintiffs point to A.K.'s and F.Y.'s
27   declarations regarding the unusual length of time those families spent in CBP custody. *See*
28   MTE 9. For A.K.'s family, OFO was diligently working with ICE to secure commercial

6

airline flights for removal. Mejia Decl. ¶ 26. Securing flights can be a lengthy process because of "limited numbers of flights to a particular country (in this case Kazakhstan), procurement issues, and limitations by certain countries on the numbers of individuals who can be repatriated in a given time period." *Id.* Likewise, Border Patrol diligently worked to process and transfer F.Y., but it was slowed down by a medical issue, the age of one of the children, and a credible fear determination. Hollinder ¶ 33.

Plaintiffs also argue that DHS should not "restart" the time-in-custody calculation after CBP transfers a minor to ICE. MTE 11. Because the parties signed the FSA before the INS was dissolved, they did not account for CBP's function of transferring minors to other federal agencies. *See* Modlin Decl. ¶¶ 17, 36. Regardless, the real issue is whether each agency is expeditiously performing its responsibilities. CBP and ICE are doing so. Irrespective of how custody is calculated, the length of time in custody is brief and reasonable under the FSA.

Finally, Plaintiffs incorrectly contend that CBP fails "to expeditiously transfer children to a safe and sanitary facility." MTE 11–12. Plaintiffs base this contention on their premise that CBP facilities are not safe and sanitary. As discussed below, that premise is wrong.

### D. Plaintiffs do not show any FSA violations based on custodial conditions.

1. Plaintiffs' thin evidentiary showing does not sustain their burden to prove noncompliance with the FSA.

Although Plaintiffs allege nationwide noncompliance with the FSA and seek nationwide remedies, Plaintiffs do not provide enough evidence to meet their burden of proof. There are over 120 border stations within 20 U.S. Border Patrol Sectors and 328 POEs. *See* Hollinder Decl. ¶ 9; Mejia Decl. ¶ 2; Sectors and Stations, *U.S. Customs & Border Protection*, https://www.cbp.gov/border-security/along-us-borders/border-patrol-sectors (last modified Apr. 22, 2025). Recognizing the vast territory covered by CBP operations, this Court has held that "[o]ne or two declarations from detainees located within . . . sectors that span over one hundred miles and have multiple CBP stations is not

7

1   enough to satisfy the preponderance of the evidence standard regarding the conditions at
2   those facilities." *Flores*, 394 F. Supp. 3d at 1053.

3       In support of the MTE here, Plaintiffs filed twenty-three declarations from
4   individuals who had been detained at different locations across the country at various times
5   over a five-month period. Almost all the declarations are from January, March, April, or
6   May and do not show that CBP is "currently in breach of the FSA" now in July. *Flores*,
7   2020 WL 2758792, at *3. And Plaintiffs file very few declarations as to each location.

8       Plaintiffs filed declarations from nineteen individuals who were detained in six
9   Border Patrol Sectors. Plaintiffs filed no evidence about fourteen of the twenty Border
10  Patrol Sectors. Plaintiffs provided one declaration about a station in the Detroit Sector, Ex.
11  4, K.V.L. Decl. (May 2, 2025); one declaration about a station in the Buffalo Sector, Ex.
12  25, L.Q.A. Decl. (May 2, 2025); two declarations about the Swanton Sector, Ex. 3, A.L.W.
13  Decl. (June 5, 2025); Ex. 10, V.I.B.G. Decl. (Mar. 26, 2025), and three declarations about
14  the El Paso Sector, Ex. 11, F.Y. Decl. (May 1, 2025); Ex. 12, M.M. Decl. (May 2, 2025);
15  Ex. 13, M.P.C. Decl. (May 2, 2025). Plaintiffs filed five declarations about the Rio Grande
16  Valley ("RGV") Sector. Ex. 10, V.I.B.G. Decl. (Mar. 26, 2025); Ex. 15, F.O. Decl. (Apr.
17  30, 2025);[3] Ex. 16, G.B.A. Decl. (Apr. 30, 2025); Ex. 17 M.H. Decl. (Apr. 30, 2025); Ex.
18  18, M.L.R.L. Decl. (Apr. 30, 2025). Plaintiffs present eight declarations about the San
19  Diego Sector, but five of the declarations are from January or March and make allegations
20  about the San Diego Soft-Sided Facility, a location that Border Patrol has not used since
21  March 2025. *See* Hollinder Decl. ¶ 71; Ex. 5, M.I.J. Decl. (Mar. 26, 2025); Ex. 6, A.B.

---

[3] The Court should disregard Exhibit 15 because the Certificate of Interpretation is
insufficient. Under Rules 604 and 901(a) of the Federal Rules of Evidence, "written
translations must be properly authenticated." *Suchite v. ABM Aviation, Inc.*, 741 F. Supp.
3d 878, 883 (S.D. Cal. 2024). Plaintiffs must show that any interpretation is "an accurate
translation done by a competent translator." *Id.* (citation omitted). Exhibit 15 has two
problems. First, the Certificate of Interpretation states that the interpreter translated the
declaration of a different individual from F.O. *See* ECF No. 1574-13 at 5. Second, the
certificate does not identify the interpreter other than by what appears to be a first name
"Yalda." ECF No. 1575-17 at 5.

Decl. (Mar. 7, 2025);[4] Ex. 7, G.A.D. Decl. (Mar. 7, 2025); Ex. 8, L.G.C.G. Decl. (Mar. 7, 2025); Ex. 9, R.S.R. Decl. (Jan. 13, 2025). Allegations about the closed soft-sided facility do not show current noncompliance. Plaintiffs also filed three declarations about the alleged conditions at Chula Vista Station in April 2025. *See* Ex. 19, L.N. Decl. (Apr. 10, 2025); Ex. 20, W.J. Decl. (Apr. 10, 2025); Ex. 21, S.G. Decl. (Apr. 10, 2025).

Plaintiffs' evidence is even more lacking as to OFO. Plaintiffs filed declarations from individuals detained at just two POEs: one declaration from an individual who was at the O'Hare International Airport under the Chicago Field Office, Ex. 14, A.T. Decl. (May 1, 2025), and three individuals who were at the Otay Mesa POE under the San Diego Field Office, Ex. 23, S.K. Decl. (May 22, 2025); Ex. 24, I.G. Decl. (May 22, 2025); Ex. 22, A.K. Decl. (Mar. 26, 2025). These snapshot accounts reveal nothing about the general ongoing operations at those two POEs and do not prove any FSA violations at the other 326 POEs across the country.

Plaintiffs do not present comprehensive evidence showing any failure to substantially comply with the FSA in a Border Patrol sector or OFO POE. Lacking that proof, Plaintiffs attempt to stitch together a narrative from individual anecdotes arising from different locations, times, circumstances, and CBP components. Plaintiffs do not show a lack of substantial compliance in any particular location or as to any amenity.

Moreover, Plaintiffs' evidence fails to establish any nationwide or systematic failure by CBP. Plaintiffs provide no basis to believe that the conditions alleged by their witnesses would be the same as conditions that exist at other CBP facilities in different locations. Each CBP facility applies CBP policies on holding and detention in a manner appropriate

---

[4] The Court should disregard Exhibit 6. Exhibit 6 does not identify the translator or contain a certificate of interpretation from the translator. Instead, it contains hearsay from one of Plaintiffs' attorneys about what the translator affirmed. ECF No. 1575-8 at 5. This hearsay is inadmissible, Fed. R. Evid. 802, meaning the declaration lacks sufficient authentication. *See Demirchyan v. Gonzales*, No. CV 08-3452 SVW MAN, 2010 WL 3521784, at *10 (C.D. Cal. Sept. 8, 2010), *supplemented*, No. CV 08-3452 SVW MANX, 2013 WL 1338784 (C.D. Cal. Mar. 28, 2013).

to address the unique operational and factual circumstances at a given time in any given facility. Because of operational and geographic variations, "there is no one-size-fits-all operational structure or operational processes for [Border Patrol] facilities." Hollinder Decl. ¶ 7. Similarly, "OFO operates at land, sea, and air POEs, all of which vary widely in space, size, and operating conditions." Mejia Decl. ¶ 6. "Plaintiffs' handful" of declarations as to each Border Patrol station or POE does not meet their burden of proof to show a lack of substantial compliance. *Flores*, 394 F. Supp. 3d at 1053 n.3. For this reason, the Court should deny the MTE.[5]

## 2. Plaintiffs do not prove FSA violations regarding custodial conditions in Border Patrol stations.

Although the Court need not analyze each Border Patrol Sector given Plaintiffs' lack of evidence, the evidence overall contradicts or provides reasons for the conditions alleged. *See generally* Hollinder Decl.

### a. Swanton Sector

Including all of Vermont and parts of New York and New Hampshire, Swanton Sector covers an area of approximately 24,000 square miles and includes eight Border Patrol stations. Hollinder Decl. ¶ 11. Plaintiffs filed declarations from two individuals who were apprehended in Swanton Sector. A.L.W., V.I.B.G., and their children were detained in Massena Station and Burke Station. *Id.* ¶¶ 12, 19.

In the MTE, Plaintiffs cite A.L.W.'s allegations that the individuals had no privacy while using the toilet. MTE 4. At Burke Station, each cell contains a restroom with a toilet. Hollinder Decl. ¶ 16. A small partition limits the view of the toilet area from a person looking into the restroom from outside the cell. *Id.* Border Patrol does not offer complete privacy because of safety concerns, including the prevention of suicide attempts and any

---

[5] To the extent the Court finds that Plaintiffs have met their burden on any of their claims regarding CBP conditions, any findings of fact reached by the Court should not extend beyond the specific POE or Border Patrol station about which Plaintiffs have actually provided affirmative evidence, as opposed to conjecture and speculation.

1    abuse that Border Patrol must guard against. *Id.* Burke Station has unfortunately had

2    attempted suicides in the restrooms that would have been successful had there been

3    complete privacy. *Id.*

4         Plaintiffs also appear to cite A.L.W.'s concern about the temperature in the holding

5    room at Massena Station. MTE 6. Personnel at Massena Station check the temperature

6    once per shift to ensure that the temperature stays around 72 degrees, and additional

7    clothes and blankets are available to children upon request. Hollinder Decl. ¶ 13. Plaintiffs

8    have not proven any lack of substantial compliance at any facility in the Swanton Sector.

9              b.    *El Paso Sector*

10        El Paso Sector contains the state of New Mexico and Hudspeth and El Paso

11   Counties of Texas—a total of 125,500 square miles. Hollinder Decl. ¶ 22. The sector

12   includes ten Border Patrol stations. *Id.* ¶ 23. Plaintiffs filed declarations from three

13   individuals who were detained with their children in the El Paso Sector. F.Y., M.M., and

14   M.P.C. were detained at the Migrant Central Processing Center ("MCPC") at the El Paso

15   Station. *Id.* ¶¶ 33, 35, 39.

16        Plaintiffs cite F.Y.'s allegation that there was no soap. MTE 13 (F.Y. Decl. ¶ 13).

17   CBP records show that a few hours after their arrival, both of F.Y.'s children were

18   provided showers and clean clothing. Hollinder Decl. ¶ 34. In addition, F.Y. and her

19   children were provided showers 14 additional times. *Id.* ¶ 35. With each shower, F.Y. and

20   her children received body wash, shampoo, a toothbrush/toothpaste, and towels. *Id.* On

21   recent site visits, the Juvenile Care Monitor ("JCM") noted that wash basins were supplied

22   with soap. Juvenile Care Monitor Final Report, June 2025 ("June 2025 JCM Report"), at

23   8, ECF No. 1578.

24        Plaintiffs cite M.M.'s allegation that he was held with his brother, separate from his

25   other family members. MTE 16 (M.M. Decl. ¶ 15). Border Patrol sometimes has to group

26   detainees based on age, sex, and demographics because of operational and space

27

28

11

constraints and to maintain safe conditions for younger detainees. Hollinder Decl. ¶ 35.[6] At MCPC, when families are held separately, they are provided the opportunity to visit each other. *Id.* If operationally feasible, and absent a safety or security concern, family units are placed together for visitation periods for a minimum of one hour, three times a day. *Id.*; *see* June 2025 JCM Report 13.

Plaintiffs mention M.P.C.'s concern about the temperature. MTE 6 (M.P.C. Decl. ¶ 5). Personnel at MCPC monitor temperature ranges to maintain a temperature of between 69° and 83° Fahrenheit. Hollinder Decl. ¶ 25. MCPC maintains a stock of additional blankets and sweaters or jackets that class members can request. *Id.* ¶ 26; June 2025 JCM Report 8. Posters in all holding areas where children are held inform the minors that extra clothes are available. Hollinder Decl. ¶ 26; June 2025 JCM Report 8. Plaintiffs have not proven a lack of substantial compliance in the El Paso Sector.

### c.    RGV Sector

RGV Sector covers more than 34,000 square miles of Southeast Texas and includes nine stations. Hollinder Decl. ¶ 41. Five of Plaintiffs' declarants were detained in RGV Sector. V.I.B.G., F.O., G.B.A., M.H., M.L.R.L., and their children were held at the RGV Central Processing Center ("Ursula") in Ursula, Texas. *Id.* ¶¶ 47, 50, 57, 62, 66.

Plaintiffs cite allegations that there was no soap, regular showers, or clean clothes. MTE 2, 13 (G.B.A. Decl. ¶ 11; M.H. Decl. ¶ 14; M.L.R.L. Decl. ¶ 14). Upon intake to Ursula, all minors are provided an opportunity to shower with provided hygiene products (including toothbrushes and toothpaste) and clean clothing. Hollinder Decl. ¶ 43. On recent site visits, the JCM noted that wash basins were supplied with soap and documented regular shower and toothbrush availability. June 2025 JCM Report 8. The JCM also reported an adequate supply of extra clothes. *Id.* Signs are posted in areas where children

---

[6] Due to a typographical error, the Hollinder Declaration contains two consecutive paragraphs numbered 35. This citation refers to the second paragraph.

are held notifying them of various amenities that are available to them, including clothing, snacks, drinks, and medical care. Hollinder Decl. ¶ 43.

Plaintiffs have not proven violations of the FSA in RGV Sector.

### d.    *San Diego Sector*

San Diego Sector encompasses 56,831 square miles. Hollinder Decl. ¶ 70. The sector operated the San Diego Soft-Sided Facility from January 2023 to March 2025. Hollinder Decl. ¶ 71. Plaintiffs submitted the declarations of eight individuals who were held in San Diego Sector. Five of the eight, M.I.J., A.B., G.A.D., L.G.C.G., and R.S.R., were detained at the San Diego Soft-Sided Facility. L.N., W.J. and S.G. were detained at Chula Vista Station.

Plaintiffs cite allegations that there was no soap, no regular showers, and no clean clothes. MTE 13 (G.A.D. Decl. ¶ 15; S.G. Dec ¶ 11; L.N. Decl. ¶13). At the San Diego SSF, all cells besides isolation cells had soap dispensers located next to the sinks, whose contents were checked daily by the cleaning staff and were refilled as needed. Hollinder Decl. ¶ 73. Additionally, the amenities poster was posted in every pod so that it was visible from every cell. *Id.* This poster told detainees that they could request amenities including snacks, water, toothbrushes, and extra clothing. *Id.* G.A.D. claims that he and his family were not provided showers. *Id.* ¶ 78. Showers are generally provided every 48 hours, and, at the time of his declaration, G.A.D. and his family had been in custody for less time than that. *Id.* He also claims that they "were only provided a small sponge on the first night to brush their teeth." *Id.* CBP records show that toothbrushes were provided twice during the family's two-day detention at the SSF. *Id.*

Although Chula Vista Station does not have any hand soap dispensers in the cells, the amenities poster is posted along the walls and against the cell windows. *Id.* ¶ 74. This poster shows detainees that hygiene items, including soap, are available upon request. *Id.* Additionally, when subjects request or are due for showers, soap/shampoo is provided to them. *Id.* Multiple hand sanitizers are located in the hallways between holding rooms. *Id.* CBP records show that L.N.'s family was given clean clothing and was provided showers

13

on four occasions during the time covered by L.N.'s declaration. *Id.* ¶ 86. Similarly, CBP records show that S.G. got showers on April 4, 6, and 9. *Id.* ¶ 95.

Plaintiffs cite two allegations that the toilets at the Chula Vista Station do not have privacy. MTE 4 (L.N. Decl. ¶ 14; S.G. Decl. ¶ 5). At the Chula Vista Facility, the toilets are behind a half wall, and cells that regularly hold unaccompanied juvenile detainees have a swinging door equal in height to the level of the half wall. Hollinder Decl. ¶ 74.  Due to the rapid transition from the SSF to the Chula Vista Facility, not all cells had been modified to include doors for restroom areas. *Id.* A request for modification of the remaining cells has been submitted. *Id.*

Plaintiffs cite M.I.J.'s allegation that he was separated from his wife and children. MTE 5 (M.I.J. Dec ¶ 8). San Diego Sector may hold adults separately from their spouse/significant other and child to best operationalize the limited detention space and to conform to sex segregation and juvenile/adult segregation practices for the safety of younger detainees.  Hollinder Decl. ¶ 72. When it is not operationally feasible to hold family members together in the same holding room, visitation is offered once a day for a period of one hour when operationally feasible. *Id.*

### e.    Detroit Sector

The Detroit Sector along the northern border of the United States covers 863 miles of international water boundary and includes five stations. Hollinder Decl. ¶ 96. Plaintiffs' one declarant was detained at the Sandusky Bay Station. *See* K.V.L. Decl. Plaintiffs quote K.V.L.'s allegation that her son was not allowed to shower or change clothes for four days. MTE 2 (K.V.L. Dec. ¶ 11). CBP records show that K.V.L's son was provided a shower on their second full day in custody, April 25, and then again on April 27. Hollinder Decl. ¶ 101. Detainees at the station are offered soap and hand sanitizer. *Id.* ¶ 105. In addition, new clothing items and laundry services are available at the station when requested or needed. *Id.* ¶ 106.

Plaintiffs also note that K.V.L. alleges that the toilet was not private. MTE 2–3 (K.V.L. Dec. ¶¶ 7, 8). The holding room has a window to the primary processing area for

14

safety, but the toilet does have a concrete wall for some privacy. Hollinder Decl. ¶ 100. Plaintiffs have not shown FSA violations at the Sandusky Bay Station.

### f.    Buffalo Sector

Covering 450 miles of international border, the Buffalo Sector includes six stations. Hollinder Decl. ¶ 107. Plaintiffs' declarant L.Q.A. was detained at the Buffalo Station. Plaintiffs do not cite any specific allegations of FSA violations from L.Q.A.'s declaration, and Border Patrol has provided factual responses to the declarant's allegations, showing substantial compliance. *See* Hollinder Decl. ¶¶ 108–12.

### 3.    Plaintiffs do not prove FSA violations regarding custodial conditions in ports of entry.

Plaintiffs do not prove any FSA violations at POEs. *See generally* Mejia Decl.

### a.    POEs are not irregular locations.

Plaintiffs argue that POEs are especially unsafe and "not intended for detention." MTE 2, 13. However, OFO ensures that any space it uses for detention is safe and sanitary. Modlin Decl. ¶¶ 43–44. Plaintiffs contend that POEs lack a qualified adult providing supervision. MTE 14. But any children in custody are monitored for safety. Modlin Decl. ¶ 53. Moreover, all the individuals that Plaintiffs discuss were accompanied by a parent or legal guardian who was able to supervise the child, so Plaintiffs' argument amounts to speculation.

Plaintiffs also suggest that it is unusually difficult to locate children at POEs because the exact POE is not identified in the monthly data reports. MTE 14. The FSA requires collecting data on "to whom and where [minors are] placed, transferred, removed or released." FSA ¶ 28.A. CBP satisfies that requirement by reporting the field office's area of responsibility within which the minor was held. The FSA does not require always identifying the exact facility in the data reporting. Moreover, the list of POEs is publicly available. They are official CBP locations. Class counsel can visit POEs and interview any class members who are there, as class counsel did when they visited the Otay Mesa POE.

1

### b.    Otay Mesa POE

2        The Otay Mesa POE is a land POE in San Diego County, California. Mejia Decl. ¶

3    20. It rarely has had to detain minors. *Id.* Plaintiffs present the declarations of three

4    individuals who were at the Otay Mesa POE., A.K., S.K., and I.G. Most of the allegations

5    come from A.K. whose family was transported out of custody at the POE over four months

6    ago on March 12, 2025. *Id.*¶ 27.

7        Plaintiffs cite A.K.'s allegation of receiving no soap or clean clothes. MTE 2 (A.K.

8    Decl. ¶ 20). Children have access to sinks to wash their hands, and the POE recently took

9    steps to ensure that soap and hand sanitizer are available upon request. Mejia Decl. ¶ 21.

10    While Otay Mesa does not have showers, aliens in custody may be transported to the San

11    Ysidro POE for showers. *Id.* CBP records show that A.K.'s family was offered showers at

12    least 14 times. *Id.* ¶ 32.

13        Plaintiffs rely on A.K.'s allegation that the father was separated from the mother

14    and child. MTE 16 (A.K. Decl. ¶ 10).  While the port endeavors to hold children in the

15    same area as their parent or other accompanying adult, it may be necessary at times to hold

16    families separately based on the sex of the parent(s) or child(ren) for space, safety, and

17    operational reasons. Mejia Decl. ¶ 23. In such cases, the port takes steps to facilitate family

18    visitation at mealtimes as well as through other means. *Id.* CBP records reflect that the

19    family was provided "family time" on at least eight occasions. *Id.* ¶ 28.

20        Plaintiffs also point to A.K.'s allegation that the toilets were not private. MTE 4

21    (A.K. Decl. ¶ 25). The toilet in each hold room is behind a half-wall so that it is not visible

22    from the hold room or to the officers responsible for welfare checks. Mejia Decl. ¶ 21. As

23    mentioned above, CBP facilities must balance privacy with safety. *See* Hollinder Decl. ¶

24    16.

25        Plaintiffs cite A.K.'s allegation that the hold room was extremely cold. MTE 6

26    (A.K. Decl. ¶ 16). Otay Mesa maintains hold rooms at a temperature of between 66 and

27    80 degrees Fahrenheit. Mejia Decl. ¶ 30.

28

Plaintiffs point to S.K.'s allegation that the lights were always on and that the family did not go outside. MTE 15 (S.K. Decl. ¶ 14, 16). It is not operationally feasible to provide children with an outdoor or recreation space given the limitations of the facility. Mejia Decl. ¶ 24. Each cell has the ability to dim lights, and the POE makes reasonable efforts to dim lights and minimize noise and disruptions between 10:00 PM and 6:00 AM. *Id.* However, officers may need to turn lights on during the night for safety. *Id.*

Plaintiffs have not proven any noncompliance at the Otay Mesa POE.

### c.    *O'Hare International Airport POE*

The O'Hare International Airport is one of the busiest POEs in the country, but it rarely has to detain children for significant periods of time. Mejia Decl. ¶¶ 7–8. Plaintiffs filed a declaration from A.T. Plaintiffs cite A.T.'s allegation that he was "not permitted to flush the toilet." MTE 2 (A.T. Decl. ¶ 10). This is not a violation of any FSA provision. Officers generally make efforts to flush the toilet after use, or as often as needed to ensure proper functioning. Mejia Decl. ¶ 12. Moreover, the flushing mechanism is outside the detention cell for security reasons to prevent the flushing of contraband, and in any event OFO does not own the facilities at the airport and is not able to reconfigure the flushing system. *Id.* Plaintiffs have not proven any FSA violations at O'Hare.

### 4.    Plaintiffs do not sustain their other general allegations.

Plaintiffs broadly allege several other claims, but they do not show a lack of substantial compliance.

### a.    *Allegations about the Particular Vulnerability of Minors*

Plaintiffs allege that CBP officers or agents treated families in an unprofessional manner. MTE 3, 15 (S.G. Decl. ¶¶ 4, 6, 8–9; V.I.B.G. Decl. ¶¶ 15-16, 19, 24, 27; S.K. Decl. ¶¶ 20–22; M.H. ¶ 20). These four accounts are inconsistent with the professionalism that the JCM and individuals interviewed by the JCM have reported. *See* Interim Juvenile Care Monitor Report, May 2025, at 7, ECF No. 1570 ("All children and families interviewed by the JCM during this reporting period said that they had been treated

professionally by CBP personnel and contractors while in the RGV and El Paso JPFs.");
June 2025 JCM Report 12 ("Families and UCs have consistently reported to the JCM that
they feel physically safe while in CBP custody."). Moreover, all CBP employees "are
subject to standards of conduct." Hollinder Decl. ¶ 9. They are required to be professional
and considerate in their contact with detainees. *Id.* Failing to follow those professional
standards could result in disciplinary action. *Id.* Members of the public may submit
complaints to CBP's Office of Professional Responsibility, and all reports of misconduct
are referred to for "investigation, fact-finding, or immediate management action." *Id.* ¶ 10.

Plaintiffs also make allegations about whether children are provided information
and allowed to play outside. MTE 15. Plaintiffs do not link these allegations to specific
requirements in the FSA, and Plaintiffs do not identify what specific actions they believe
would be sufficient. CBP does share information with children through amenities posters
and caregivers. Hollinder Decl. ¶¶ 28, 43–44, 90. And, while the FSA does not require
outdoor recreation and not all CBP facilities can provide it, facilities do allow movement
and play, and some provide outdoor recreation. *Id.* ¶¶ 52, 103, 111; Mejia Decl. ¶ 24.

### b.    Allegations about Telephone Access

Plaintiffs allege that CBP limits class members' access to using the telephone and
to contacting lawyers. *See* MTE 5, 16. CBP records show that many of the declarants did
receive phone calls. *See* Hollinder Decl. ¶¶ 38, 53, 61, 64, 68, 104. Some stations have
less capacity to offer phone calls, but they are still available on a limited basis when
requested. *Id.* ¶¶ 88, 109. Morever, the FSA does not require that minors in family units
receive phone calls within a certain time after initial apprehension and detention. Plaintiffs
cite Paragraph 24.D and form I-770. But neither establishes that CBP must arrange
immediate phone calls.

### c.    Allegations about Medical Care

Plaintiffs allege that CBP is failing to provide adequate medical care. MTE 16–17.
However, CBP provides medical care to all children in its custody. Modlin Decl. ¶¶ 57–
60. The JCM has found that CBP has "made major strides in implementing a robust

18

medical care system for children in custody." June 2025 JCM Report 14–15. CBP's Chief Medical Officer reviewed the medical records of the children related to the declarants submitted in support of the MTE. Ex. 5, Decl. of Margaret Brewinski Isaacs ¶ 9. The Office of the Chief Medical Officer found that the medical care provided was generally adequate, and the Office took corrective action in the few cases where it found deficiencies. *Id.* ¶¶ 11–15. Plaintiffs have not proven a lack of substantial compliance with the FSA.

### E. Plaintiffs have not proven that the Court should appoint a monitor.

#### 1. The *Flores* monthly data reporting problems have been resolved.

Plaintiffs have not proven that the Court should appoint a monitor to review CBP's and ICE's monthly data reporting under FSA Paragraph 29. CBP acknowledges that its prior reporting had limitations, but CBP has worked with Plaintiffs and the JCM to resolve the issues. Morgan Decl. ¶¶ 6–8. Plaintiffs have not identified any issues in the two most recent CBP reports. The JCM reviewed the revised parameters implemented by CBP, as well as recent data reports, and found that Plaintiffs should be able to have confidence in the CBP data going forward. June 2025 JCM Report 4. Moreover, the CBP data system is proprietary and extremely complex. Morgan Decl. ¶ 4. Plaintiffs have not shown that any external monitor would be familiar enough with these systems to be effective.

ICE also acknowledges that there were errors in its reporting as a result of reopening family residential centers. Helland Decl. ¶¶ 8, 10–11. But these issues were not longstanding; they arose only as a byproduct of the change in enforcement operations this Spring. *Id.* ICE identified the issues and is confident that future reporting will be complete. *Id.* ICE also added reviewers to check the reports going forward. *Id.* ¶ 13.

CBP and ICE resolved the problems, and the parties can continue to work out any future issues that may arise.

19

2.     CBP's real-time monitoring of time in custody and expeditious processing is accurate.

Plaintiffs ask the Court to appoint a monitor to assess CBP's internal monitoring of times in custody and its efforts to release or transfer minors. MTE 19; Proposed Order ¶ 5. Plaintiffs have not identified any issues in CBP's internal real-time monitoring. Indeed, CBP has robust real-time capability to monitor times in custody, potential overcrowding, and issues with transfers. Modlin Decl. ¶ 62; *see* June 2025 JCM Report 16–17. The difficulties with the monthly reporting to class counsel arose from the retrospective nature of this data pull that exists only for the purpose of complying with the FSA and court orders. Those difficulties do not affect CBP's real-time operational use of the data. The Court should not appoint a monitor to review those matters.

## V.     CONCLUSION

Plaintiffs have not proven any breaches of the FSA or that the proposed remedies are appropriate. The Court should deny the MTE.

1    Dated: July 18, 2025                    Respectfully submitted,

2                                            BRETT A. SHUMATE
3                                            Assistant Attorney General
                                             Civil Division
4

5                                            DREW ENSIGN
                                             Deputy Assistant Attorney General
6

7                                            WILLIAM C. SILVIS
                                             Assistant Director
8

9                                            KATELYN MASETTA-ALVAREZ
                                             CHRISTINA PARASCANDOLA
10                                           Senior Litigation Counsel

11
                                             */s/ Joshua C. McCroskey*
12                                           JOSHUA C. MCCROSKEY
13                                           Trial Attorney
                                             U.S. Department of Justice, Civil Division
14                                           Office of Immigration Litigation
                                             General Litigation and Appeals Section
15                                           P.O. Box 878, Ben Franklin Station
                                             Washington, DC 20044
16
                                             (202) 305-1540
17                                           joshua.c.mccroskey@usdoj.gov
18

19                                           *Attorneys for Defendants*

20

21

22

23

24

25

26

27

28

21

**L.R. 11-6.2 Certification**

The undersigned counsel of record for the United States certifies that this brief contains 6,999 words, which complies with the word limit of L.R. 11-6.1.

Dated: July 18, 2025

*/s/ Joshua C. McCroskey*
JOSHUA C. MCCROSKEY
Trial Attorney
U.S. Department of Justice, Civil Division
Office of Immigration Litigation