1                UNITED STATES DISTRICT COURT
               CENTRAL DISTRICT OF CALIFORNIA
2                WESTERN DIVISION - LOS ANGELES

3 _____
                       |
    JENNY L. FLORES, ET AL.    |
4                        |
        Plaintiffs,    |  NO. CV 85-4544-DMG
5                        |
    vs.                  |
6                        |
                       |  LOS ANGELES, CALIFORNIA
7     PAMELA BONDI, ATTORNEY     |
    GENERAL OF THE UNITED      |
8     STATES, ET AL.,          |
                       |
9         Defendants.    |

10 _____

11

12

13           TRANSCRIPT OF THE MOTIONS HEARING

14                   BEFORE THE

15            HONORABLE DOLLY M. GEE

16

17

18                   FRIDAY

19              AUGUST 8, 2025

20

21

22         TINA DuBOSE GIBSON, RPR, RCR
             OFFICIAL REPORTER
       FOURTH FLOOR FEDERAL BUILDING
23        MEMPHIS, TENNESSEE 38103

24

25

```
1              A P P E A R A N C E S

2

3       Appearing on behalf of the Plaintiffs:

4           CARLOS HOLGUIN
            SARAH KAHN
5           Center for Human Rights and Constitutional Law
            256 South Occidental Boulevard
6           Los Angeles, CA 90057
            213-388-8693 x 309
7           crholguin@centerforhumanrights.org
            sarah@centerforhumanrights.org
8

9           LEECIA WELCH
            Children's Rights
10          88 Pine Street Suite 800
            New York City, NY 10005
11          510-835-8098
            lwelch@childrensrights.org
12

13          BARDIS VAKILI
            Center for Human Rights and Constitutional Law
14          P.O. Box 770
            Bell Gardens, CA 90210
15          909-274-9057
            bardis@centerforhumanrights.org
16

17          DIANE BEATRIX DE GRAMONT
            MISHAN RAINI WROE
18          National Center for Youth Law
            1212 Broadway, Suite 600
19          Oakland, CA 94612
            510-920-3508
20          ddegramont@youthlaw.org

21

            REBECCA R. WOLOZIN
22          National Center for Youth Law
            818 Connecticut Avenue NW Suite 425
23          Washington, DC 20006
            202-868-4792
24          bwolozin@youthlaw.org

25
```

```
 1              A P P E A R A N C E S

 2

 3        Appearing on behalf of the Defendants:

 4            TIBERIUS DAVIS
             United States Department of Justice
 5           950 Pennsylvania Avenue, Suite 400
             Washington, DC 20530
 6           202-514-4357
             tiberius.davis@usdoj.gov
 7
             JOSHUA CLAYTON MCCROSKEY
 8           CHRISTINA PARASCANDOLA
             DREW ENSIGN
 9           United States Department of Justice
             Office of Immigration
10           Litigation-District Court Section
             P.O. Box 868, Ben Franklin Station
11           Washington, DC 20044
             202-305-1540
12           joshua.c.mccroskey@usdoj.gov
             christina.parascandola@usdoj.gov
13           drew.ensign@usdoj.gov

14

15

16

17

18

19

20

21

22

23

24

25
```

4

```
 1                          FRIDAY

 2                      AUGUST 8, 2025

 3                 ----------------------

 4

 5      COURTROOM DEPUTY:  Calling Item No. 1, Los

 6   Angeles, Civil 85-4544-DMG, Jenny L. Flores et al. v.

 7   Pamela Bondi, et al.

 8       Counsel, please state your appearances starting with

 9   the plaintiffs.

10       MR. HOLGUIN:  Good morning, Your Honor.  Carlos

11   Holguin, Center for Human Rights, for the plaintiffs.

12       MS. WELCH:  Good morning, Your Honor.  Leecia

13   Welch for the plaintiffs.

14       MR. VAKILI:  Good morning, Your Honor.  Bardis

15   Vakili for the plaintiffs.

16       MS. DE GRAMONT:  Good morning, Your Honor.

17   Diane de Gramont for the plaintiffs.

18       MS. KAHN:  Good morning, Your Honor.  Sarah Kahn

19   for the plaintiffs.

20       MS. WROE:  Good morning, Your Honor.  This is

21   Mishan Wroe for the plaintiffs.

22       MS. WOLOZIN:  Good morning, Your Honor.  Rebecca

23   Wolozin for the plaintiffs.

24       MR. DAVIS:  Good morning, Your Honor.  Tiberius

25   Davis on behalf of the defendants.
```

5

| | | |
|---|---|---|
| 12:16:44 | 1 | **MR. MCCROSKEY:**  Good morning, Your Honor. |
| 12:16:48 | 2 | Joshua McCroskey for the defendants. |
| 12:16:48 | 3 | **MR. PARASCANDOLA:**  Christina Parascandola for |
| 12:16:49 | 4 | defendants. |
| 12:16:54 | 5 | **MR. ENSIGN:**  Good morning, Your Honor.  Drew |
| 12:16:55 | 6 | Ensign for the defendants. |
| 12:16:55 | 7 | **THE COURT:**  Good morning, everyone.  I presume |
| 12:16:56 | 8 | that both sides have had a chance to review the Court's |
| 12:16:59 | 9 | tentative ruling regarding the defendants' motion to |
| 12:17:02 | 10 | terminate. |
| 12:16:12 | 11 | **MR. HOLGUIN:**  We have, your honor. |
| 12:17:05 | 12 | **MR. DAVIS:**  Yes, Your Honor. |
| 12:17:05 | 13 | **THE COURT:**  All right.  I don't have a written |
| 12:17:08 | 14 | tentative with regard to the motion to enforce, but I |
| 12:17:10 | 15 | would like to have some discussions with you after the |
| 12:17:14 | 16 | oral argument on the motion to terminate. |
| 12:17:17 | 17 | Who would like to address the motion to terminate? |
| 12:17:38 | 18 | **MR. DAVIS:**  Your Honor, on behalf of the |
| 12:17:38 | 19 | Government, I will be -- |
| 12:17:38 | 20 | **THE REPORTER:**  I'm not sure who is speaking.  I |
| 12:17:38 | 21 | can't tell.  So, please, when you speak, identify |
| 12:17:38 | 22 | yourself for me. |
| 12:17:38 | 23 | **MR. DAVIS:**  Your Honor, on behalf of the |
| 12:17:39 | 24 | Government, I will be doing the motion to terminate, and |
| 12:17:41 | 25 | Mr. McCroskey is going to be doing the motion to enforce. |

6

12:17:44  1    I'm Mr. Davis.

12:17:45  2            **THE COURT:**  All right.  Mr. Davis, would you

12:17:48  3    stand at the lectern, please.

12:18:02  4        All right.  The motion to terminate is, in many

12:18:05  5    ways, deja vu all over again.  What has changed that you

12:18:09  6    think requires this Court to reconsider its many previous

12:18:14  7    decisions on the subject?

12:18:16  8            **MR. DAVIS:**  Your Honor, we obviously

12:18:18  9    respectfully disagree with that.  I would say there are

12:18:20  10   four major changes here.  First is the change in

12:18:23  11   statutory law and interpretations of that law.  The

12:18:26  12   second is regulatory compliance.  The third is the facts

12:18:28  13   on the ground.  And I think the fourth is the shift in

12:18:31  14   policies and executive functions that we're dealing with

12:18:34  15   and the insistence that the executive has to go through

12:18:38  16   notice-and-comment rulemaking and reach a particular

12:18:40  17   outcome in order to satisfy the consent decree here.

12:18:44  18           **THE COURT:**  And so is it your position, then,

12:18:46  19   that when the Government enters into consent decrees that

12:18:50  20   require it to engage in certain conduct that that can all

12:18:54  21   be thrown to the wind because there's been a change in

12:18:57  22   administrations?

12:18:58  23           **MR. DAVIS:**  Two points on that, Your Honor.  I

12:18:59  24   think, first, we moved under Rule 60 because Rule 60

12:19:02  25   allows for several avenues to terminate this sort of

7

| | |
|---|---|
| 12:19:07 | 1 |
| 12:19:09 | 2 |
| 12:19:13 | 3 |
| 12:19:14 | 4 |
| 12:19:17 | 5 |

1  consent decree, if there are changes in laws and facts,

2  which we believe there are here, especially in line with

3  the Supreme Court's ruling in *Horne*.

4      We also believe that this consent decree is not like

5  any other.  There are consent decrees against localities,

6  but none that have dictated the policies of immigration,

7  which is a core executive function for nearly 30 years.

8      **THE COURT:**  It does not dictate the operation of

9  immigration laws.  It dictates the conditions under which

10  minors are held.

11      **MR. DAVIS:**  Are held and released.  And it has

12  implications for the parents as well.  This has a long

13  administrative tail on all types of operations and

14  policies in immigration law.

15      **THE COURT:**  And it is a consent decree that the

16  Government freely entered into on a nationwide basis.

17      **MR. DAVIS:**  I mean, I think, Your Honor, first

18  of all, under 1252(f), that's jurisdictional.  Some of

19  the aspects of this consent decree could not be entered

20  into because we can't consent to jurisdictional issues.

21      **THE COURT:**  Do you deny that this argument has

22  previously been raised already before this Court and the

23  Ninth Circuit?

24      **MR. DAVIS:**  Aspects -- I think the basic point

25  of 1252(f) have, but there have been significant changes

8

| | |
|---|---|
| 12:20:15 | 1 |
| 12:20:17 | 2 |
| 12:20:21 | 3 |
| 12:20:23 | 4 |
| 12:20:25 | 5 |
| 12:20:28 | 6 |
| 12:20:32 | 7 |
| 12:20:36 | 8 |
| 12:20:39 | 9 |
| 12:20:40 | 10 |
| 12:20:41 | 11 |
| 12:20:44 | 12 |
| 12:20:47 | 13 |
| 12:20:50 | 14 |
| 12:20:53 | 15 |
| 12:21:00 | 16 |
| 12:21:04 | 17 |
| 12:21:05 | 18 |
| 12:21:07 | 19 |
| 12:21:09 | 20 |
| 12:21:13 | 21 |
| 12:21:15 | 22 |
| 12:21:19 | 23 |
| 12:21:23 | 24 |
| 12:21:23 | 25 |

1  since then.  One is that there was debate over the scope

2  and the force of that provision.

3       *Aleman Gonzalez* clarified that and made it clear

4  that no injunction or restraint can be done on this sort

5  of nationwide basis or anything in the INA.  In fact,

6  that case was about bond hearings, which is in the --

7       **THE COURT:**  I'm familiar with that case, but the

8  *Aleman* decision and case did not involve a consent

9  decree.

10       **MR. DAVIS:**  I understand, Your Honor, but it's

11  jurisdictional, and we can't consent to jurisdiction.

12  And that's one of the grounds of Rule 60 is whether it's

13  void at the time for lack of jurisdiction.  And so we

14  can't consent away jurisdiction in that sense.

15       So the fact that 1252(f) under *Aleman Gonzalez*

16  clearly applies to a lot of the provisions here indicates

17  that there has been a clarification and change in law and

18  that the order should be terminated because it's well

19  within the teeth of that jurisdictional bar.

20       And it's not just a consent decree, Your Honor.  In

21  your 2019 order, you made clear, like, this is an

22  injunction.  It has equitable aspects to it.  It's an

23  institutional reform well within *Horne*.  And *Horne* makes

24  clear --

25       **THE COURT:**  It was an injunction to enforce a

12:21:25  1    consent decree that was entered into voluntarily by the

12:21:28  2    Government.  It is remedial to enforce a decision by the

12:21:35  3    Government in 1997 to bind itself to these requirements

12:21:40  4    in the interest of minors.  That is not the same as a

12:21:45  5    situation that was in *Aleman* where the Court was

12:21:49  6    interpreting a statute and then issued a nationwide

12:21:53  7    injunction.

12:21:55  8        **MR. DAVIS:**  I understand that, Your Honor, but,

12:21:56  9    again, this is a jurisdictional issue; and we can't, even

12:21:59  10   through a consent decree, get rid of jurisdictional

12:22:03  11   issues and give the Court or the parties the power to

12:22:06  12   issue these sorts of --

12:22:06  13       **THE COURT:**  Wasn't that statute in effect before

12:22:08  14   the *Flores* settlement agreement came into effect?

12:21:55  15       **MR. DAVIS:**  I believe it was passed the year

12:22:14  16   before, Your Honor; but, again, there were real disputes

12:22:16  17   over the scope and force of that section, including in

12:22:21  18   parts of the *Flores* Settlement Agreement, such as the

12:22:22  19   bond hearing, which is what *Aleman Gonzalez* clears up.

12:22:24  20       If there wasn't a dispute there, it wouldn't have

12:22:26  21   gone to the Supreme Court and required this ruling.  So I

12:22:28  22   think the scope of that and its force has been clarified.

12:22:31  23   That's a significant change in law since even your 2019

12:22:34  24   ruling.

12:22:34  25       **THE COURT:**  *Aleman* came down in 2022.  It is now

12:22:38  1    2025.  Three years have passed.

12:22:42  2           **MR. DAVIS:**  Your Honor, I think the previous --

12:22:44  3           **THE COURT:**  It's still new?

12:22:46  4           **MR. DAVIS:**  I believe it is.  And I think part

12:22:47  5    of the reason is the previous administration didn't want

12:22:49  6    to move to terminate.  They were trying, especially with

12:22:52  7    HHS, to rule make.  That was sort of their priority.  And

12:22:55  8    *Horne* makes clear that just because previous officials

12:22:57  9    agreed with the policy injunction or a consent decree

12:23:01  10   that that cannot bind future policy makers who have

12:23:04  11   differences with it from raising these issues.

12:23:07  12       So I think we're raising this quite early on in a

12:23:10  13   new administration that ran on immigration issues and won

12:23:13  14   on them and is trying to make a change that they think is

12:23:17  15   important based on changes in the facts and the law on

12:23:17  16   the ground.

12:23:18  17       And two laws have been passed since then very

12:23:22  18   recently.  One is a Laken Riley Act, which increases

12:23:26  19   mandatory detention even for arrests for a number of

12:23:29  20   additional violations of law.  And the other is the Big

12:23:32  21   Beautiful Bill, which gives express funding for family

12:23:35  22   centers and says that the Government has the ability to

12:23:37  23   hold families in detention until they are removed in

12:23:41  24   further removal proceedings.

12:23:42  25       But, currently, under the *Flores* Settlement

12:23:45  1    Agreement, that's essentially void because we can't

12:23:47  2    actually have family centers that aren't state licensed,

12:23:50  3    but states don't license them because they don't

12:23:53  4    otherwise have detention facilities for families.  That's

12:23:57  5    not typical in criminal law.  That's solely in sort of

12:23:58  6    the immigration executive-function type of realm.

12:24:01  7        And under the *Flores* Settlement Agreement, we can't

12:24:04  8    hold the children for the entire period of removal most

12:24:06  9    of the time, and so it sort of undermines this new change

12:24:10  10   in law that Congress just passed.

12:24:12  11       **THE COURT:**  Given the update that the Government

12:24:13  12   provided regarding the status of licensing in the Texas

12:24:18  13   family detention centers or family residential centers,

12:24:24  14   there is licensing in Texas now, isn't there?

12:24:27  15       **MR. DAVIS:**  I think that might be the only

12:24:29  16   state, if I'm not mistaken, or maybe there's one other.

12:24:32  17   But in most places where there are sort of detention

12:24:35  18   facilities or a lot of unaccompanied and accompanied

12:24:37  19   minors crossing the border, there aren't these detention

12:24:41  20   facilities available.

12:24:45  21       And I believe Your Honor previously had acknowledged

12:24:46  22   that, that matters of where these detention facilities

12:24:47  23   are, that we can't just move people to Texas or Florida

12:24:47  24   or wherever else they are easily.

12:24:52  25       And so the fact that we don't have the ability to do

12

12:24:54  1    these detention facilities in most of the country, I

12:24:58  2    think does undermine the Big Beautiful Bill and the

12:25:02  3    provisions that Congress set out there and our ability to

12:25:03  4    use these family centers going forward, which is a better

12:25:06  5    way of keeping families together.

12:25:06  6         THE COURT:  Does the One Big Beautiful Bill

12:25:08  7    indicate that these family residential centers should not

12:25:12  8    have decent conditions and sanitary and safe conditions?

12:25:16  9         MR. DAVIS:  No, of course not, Your Honor, but

12:25:18  10   my point is that this is a new provision of law that is

12:25:21  11   allowing the federal government to use these detention

12:25:30  12   facilities and to keep families there through the

12:25:32  13   entirety of the removal process, but that seems contrary

12:25:32  14   to the *Flores* Settle Agreement, so we think that that, at

12:25:33  15   least for that point, is a significant change in law

12:25:35  16   passed by Congress.

12:25:36  17        THE COURT:  Why would they not simply coexist?

12:25:39  18        MR. DAVIS:  I don't know how --

12:25:40  19        THE COURT:  Why would you not have family

12:25:42  20   residential centers that actually comply with the

12:25:46  21   requirements of *Flores?*

12:25:48  22        MR. DAVIS:  I think they could comply with some

12:25:51  23   of the conditions and treatment, but not the release

12:25:51  24   provisions.  I believe under the *Flores* Settlement

12:25:55  25   Agreement, we have to release the children within a

13

12:25:56    1    certain amount of time, or at least do our best to --

12:25:58    2        THE COURT:  Well, I acknowledge that there's

12:26:01    3    some tension between some of the agreements that the

12:26:03    4    parties have reached.  For example, in the CBP

12:26:07    5    settlement, there is a priority for family unification

12:26:12    6    that has always been intentioned with the concept of

12:26:15    7    prompt release.

12:26:18    8        It seems to me that sometimes that is going to be a

12:26:21    9    difficult decision that parents are going to have to

12:26:23   10    make.

12:26:24   11        MR. DAVIS:  Maybe, Your Honor, but I still think

12:26:27   12    that under the settlement, we have to try to

12:26:30   13    expeditiously release at least the children.  And yes,

12:26:33   14    maybe the parents will decide that the children should

12:26:36   15    stay with them instead, but I think that that itself is

12:26:38   16    contrary to the Big Beautiful Bill, which says that the

12:26:41   17    Government can hold the families together through the

12:26:44   18    detention procedures and removal process.  And so that is

12:26:46   19    a new change in law.

12:26:48   20        I also think there's been changes in facts.  And I

12:26:51   21    know Your Honor disagrees with that.  But since -- at the

12:26:53   22    time of the settlement, which was right after I was born,

12:26:56   23    nearly 30 years ago, there was only about 8,000

12:27:00   24    unaccompanied minors crossing the border, and that was

12:27:04   25    considered a serious issue at the time.  Now we're in the

14

```
12:27:07   1      hundreds of thousands.
12:27:08   2           When it came to accompanied families --
12:27:09   3               THE COURT:  I don't think you mean now.
12:27:12   4               MR. DAVIS:  Well, the last three years it's gone
12:27:14   5      down, but it's still higher than it was during the
12:27:17   6      settlement period.  And in the last three years it was
12:27:20   7      higher than it was during --
12:27:20   8               THE COURT:  Well, numbers have fluctuated over
12:27:22   9      the past decades.  Why are we focusing on the past three
12:27:27  10      years and not now?
12:27:29  11               MR. DAVIS:  Well, Your Honor, because I think it
12:27:30  12      shows that the Flores Settlement Agreement can't be a
12:27:35  13      set-in-stone thing that governs this area of law for all
12:27:37  14      time because the executive needs the flexibility to
12:27:40  15      handle these changes in circumstances.
12:27:40  16               THE COURT:  You know, that is the frustrating
12:27:42  17      thing about this whole set of circumstances that has
12:27:44  18      lasted for decades is that there are two things that the
12:27:49  19      Government can do to free itself from the Flores
12:27:54  20      Settlement Agreement.
12:27:54  21           One is to pass final regulations that reflect the
12:27:58  22      protections under Flores.  The other is to engage in
12:28:03  23      substantial compliance so that I can say that the
12:28:08  24      settlement agreement is terminated.
12:28:10  25           Neither of those things have been satisfied, and yet
```

15

12:28:12  1    you're trying to work around those two requirements that

12:28:16  2    are plainly in the agreement in order to end the

12:28:21  3    settlement agreement in a workaround.

12:28:25  4          MR. DAVIS:  Two things on that, Your Honor.

12:28:26  5    First, I think *Horne* and Rule 60 make clear that all of

12:28:30  6    these changes in facts, law, circumstances have to be

12:28:32  7    considered anew, and that these changes do matter.

12:28:36  8    There, the plaintiffs were arguing that they didn't fully

12:28:38  9    substantially comply with the injunction as it was

12:28:41  10   written and what it prescribed, but they had done other

12:28:43  11   things that essentially had satisfied it.  And the Court

12:28:46  12   didn't consider that, and so the Supreme Court said you

12:28:48  13   need to consider those changes in totality.  And so I

12:28:50  14   think all of these changes do matter.  I also --

12:28:52  15         THE COURT:  I have been considering changes, and

12:28:54  16   that's the reason why I terminated it as to ORR.  I did

12:28:57  17   not terminate it as to CBP and ICE because there

12:29:04  18   continued to be violations of the agreement.

12:29:05  19         MR. DAVIS:  Your Honor, you terminated it

12:29:07  20   partially for HHS based on the rulemaking, but that isn't

12:29:12  21   because of the changes in the law or the changes in the

12:29:13  22   facts on the ground.  That's because they passed

12:29:16  23   rulemaking that substantially complied with parts of the

12:29:19  24   *Flores* Settlement Agreement.

12:29:21  25         My sort of first-line point is that those

16

12:29:24  1   significant changes in the facts and the law need to be

12:29:26  2   considered as well.  And if the massive influx in

12:29:30  3   immigration isn't enough for changes in facts, I'm not

12:29:31  4   really sure what is.

12:29:32  5         THE COURT:  How about the lack of influx now?

12:29:36  6         MR. DAVIS:  I mean, it's still higher than it

12:29:38  7   was during the settlement agreement.  I believe we're

12:29:41  8   still in the tens of thousands halfway through the year,

12:29:44  9   and we don't know that that will last necessarily.  There

12:29:45  10  are 11 million illegal immigrants in the last three

12:29:48  11  years, and the proportion of those illegal immigrants

12:29:51  12  that were accompanied families grew substantially as a

12:29:53  13  matter of proportion.

12:29:56  14      So in 2020, during the pandemic, it was about

12:29:59  15  11 percent.  In the years following, it grew up to

12:30:02  16  35 percent.  That is a significant change in the

12:30:05  17  proportion and the amount of people who are following

12:30:06  18  under the *Flores* Settlement Agreement and our ability to

12:30:09  19  detain and process them.

12:30:10  20        THE COURT:  Well, as I said, it's changing all

12:30:13  21  the time, and now it's going down.

12:30:15  22        MR. DAVIS:  Again, Your Honor, I think that's

12:30:16  23  actually a good reason why the *Flores* settlement

12:30:19  24  agreement shouldn't continue to operate in this area

12:30:21  25  because --

17

12:30:21  1      **THE COURT:**  Well, what's troubling is that, even

12:30:23  2      though the census vote is going down, the conditions are

12:30:27  3      deteriorating.  It seems contrary intuitively that that

12:30:31  4      should happen unless it's willful.

12:30:33  5      **MR. DAVIS:**  I would respectfully disagree with

12:30:36  6      that, Your Honor.  I think at the time that this lawsuit

12:30:37  7      was filed, there were very few protections.  The

12:30:42  8      Government then engaged in rulemaking in the '80s.  The

12:30:42  9      Supreme Court upheld those rules.

12:30:45  10      And since then, there's only been an increased

12:30:48  11      amount of rules, protections, conditions for children in

12:30:50  12      regulations, in policies, in practice on the ground, for

12:30:54  13      education, for treatment, for recreation --

12:30:56  14      **THE COURT:**  Largely because of motions to

12:30:57  15      enforce that plaintiffs brought that resulted in remedial

12:31:01  16      orders by this Court.

12:31:02  17      **MR. DAVIS:**  I think some of it has been changes

12:31:04  18      in law like the TVPRA and Homeland Security Act, and I

12:31:08  19      think some of it has been based on own initiative because

12:31:12  20      we don't want children to be in terrible conditions,

12:31:15  21      but --

12:31:15  22      **THE COURT:**  Oh, on your own initiative.

12:31:02  23      **MR. DAVIS:**  I think so, Your Honor.

12:31:18  24      **THE COURT:**  I've been involved in this case for

12:31:20  25      about ten years now.  I don't think it was always on your

18

12:31:22  1    own initiative.

12:31:24  2        **MR. DAVIS:** Well, I will -- can I, for a second,

12:31:28  3    address the rulemaking point, which is what you sort of

12:31:30  4    led with. That's how to get out of this situation. HHS

12:31:33  5    did rule make, and the whole point of the rulemaking was

12:31:36  6    to incorporate and fully comply with the *Flores*

12:31:42  7    Settlement Agreement.

12:31:42  8        Now, plaintiffs had interpretive disputes about

12:31:44  9    aspects they thought were ambiguous that the Court agreed

12:31:48  10   with. And so the way that they attempted to resolve that

12:31:51  11   is through a normal APA process, which is interpretive

12:31:54  12   rulemaking that doesn't require notice-and-comment.

12:31:56  13       And they said, look, we don't interpret our rules as

12:31:59  14   we pass them to be contrary to what the Court wanted. We

12:32:02  15   interpret them to be in line, and we think that's

12:32:05  16   sufficient.

12:32:05  17       It's, frankly, like a little bit Lucy and the

12:32:08  18   football, that they have tried to pass these regulations,

12:32:12  19   and the answer is, well, we could interpret them

12:32:15  20   different ways. We say, no, we don't interpret them

12:32:17  21   different ways, the way the APA allows us to do, and then

12:32:18  22   they say, well, no, you still have to go back through

12:32:20  23   full notice-and-comment rulemaking.

12:32:22  24       And that raises another issue that intrudes on both

12:32:25  25   the APA and executive functions, which is the APA

19

| | |
|---|---|
| 12:32:29 | 1 |
| 12:32:32 | 2 |
| 12:32:34 | 3 |
| 12:32:39 | 4 |
| 12:32:42 | 5 |
| 12:32:43 | 6 |
| 12:32:46 | 7 |
| 12:32:48 | 8 |
| 12:32:51 | 9 |
| 12:32:52 | 10 |
| 12:32:55 | 11 |
| 12:32:56 | 12 |
| 12:33:00 | 13 |
| 12:31:24 | 14 |
| 12:31:24 | 15 |
| 12:33:09 | 16 |
| 12:33:11 | 17 |
| 12:33:15 | 18 |
| 12:33:19 | 19 |
| 12:33:22 | 20 |
| 12:33:24 | 21 |
| 12:33:28 | 22 |
| 12:33:31 | 23 |
| 12:33:32 | 24 |
| 12:33:35 | 25 |

requires notice-and-comment, and it requires input from the public, responses to consider multiple different policy changes and different interests.  And so there can't, by the nature of the APA, be a predetermined outcome.

What plaintiffs seem to suggest is there has to be a predetermined outcome because of the settlement agreement, and that's in contrast with the APA, and I think executive functions, that we have to predetermine what the rulemaking process will come out with.

**THE COURT:**  Because the agreement that you entered into explicitly says that the rules cannot be inconsistent with the *Flores* Settlement Agreement.

**MR. DAVIS:**  Well, I think for HHS, they're not inconsistent, and the guidance makes that clear, and that should be sufficient.  But I think, in any event, that still intrudes on executive and is contrary to the APA, which is contrary to law, to say that there has to be a specific outcome in the rulemaking process.  That's not how APA notice-and-comment process is supposed to do.

If we had a rulemaking in another area, let's say nuclear energy, and we said this is the outcome, we're going to do it, notice-and-comment, like, say what you want, but we know what the outcome is, that would be a violation of the APA, and it could be vacated under that

20

12:33:35  1    reasoning.

12:33:38  2         We think that having that be required, including for

12:33:41  3    just disputes on interpretation, is a serious violation

12:33:44  4    of the APA, and we think HHS has, in good faith, passed

12:33:50  5    regulations that substantially comply with the *Flores*

12:33:55  6    Settlement Agreement, and for any disputes, has given

12:33:57  7    interpretations.

12:33:59  8         And we agree with the Court, we interpret it in the

12:34:00  9    way that the Court wants us to, and we're going to do

12:34:00 10    that going forward.  And if that's -- I'm still sort of

12:34:07 11    unsure what is other than predetermined outcomes and

12:34:12 12    rulemaking.

12:34:12 13              THE COURT:  All right.  Anything further?

12:31:24 14              MR. DAVIS:  Nothing further, Your Honor.

12:34:15 15              THE COURT:  All right.  Who would like to

12:34:16 16    address these issues on behalf of the plaintiffs?

12:34:24 17              MR. HOLGUIN:  Carlos Holguin on behalf of the

12:34:25 18    plaintiffs, Your Honor.

12:34:25 19         Plaintiffs have obviously read the Court's tentative

12:34:30 20    and would submit on the tentative so far as our

12:34:35 21    opposition is concerned.

12:34:36 22         In the way of segue to perhaps the next motion, I

12:34:43 23    would like to go back to what the Court wrote in 2019.

12:34:46 24    When the Court wrote:  The evidentiary record before this

12:34:49 25    Court overwhelmingly shows that throughout several

21

12:34:53  1    presidential administrations, the agreement has been

12:34:55  2    necessary, relevant, and critical to the public interest

12:34:59  3    in maintaining standards for the detention and release of

12:35:04  4    minors arriving in the United States borders.  Defendants

12:35:04  5    cannot simply ignore the dictates of a consent decree

12:35:08  6    merely because they no longer agree with its approach as

12:35:11  7    a matter of policy.

12:35:11  8        And what the Government is here, quite obviously,

12:35:14  9    trying to do is to free itself from the *Flores* Settlement

12:35:18  10   so that it can detain children as long as it wishes.  And

12:35:22  11   yet we're being told on the other side of the coin that

12:35:25  12   somehow there's a durable remedy that these policy

12:35:29  13   statements that they've got are going to protect children

12:35:31  14   going forward.

12:35:32  15       It can't be both ways.  And I think given that this

12:35:34  16   administration's propensity for visiting hardship upon

12:35:39  17   children, we have to know which way this is going to go

12:35:42  18   were this settlement to be terminated.  It remains a

12:35:45  19   vital protection for children, vulnerable children, and

12:35:48  20   one that is perhaps even more important under given

12:35:52  21   circumstances where this administration is opposed to the

12:35:55  22   policy choices that simply require the prompt release of

12:35:59  23   children and reunification to their families and decent

12:36:04  24   treatment while they are in CBP and ICE custody.

12:36:08  25           **THE COURT:**  How would you respond to Mr. Davis's

12:36:12    1    contention that the ORR policies that have come into

12:36:16    2    existence are sufficient to explain their position on the

12:36:21    3    interpretation of regulations that they have enacted?

12:36:26    4         MR. HOLGUIN:   Well, in the first instance, Your

12:36:27    5    Honor, I think that we're a little concerned that this

12:36:31    6    sort of blunderbuss motion that the Government has

12:36:35    7    brought is extremely difficult to deal with when we're

12:36:38    8    talking about individual regulations and individual

12:36:40    9    provisions of the *Flores* Settlement that need to be

12:36:44   10    examined.

12:36:45   11         This is also a second bite at the apple.  The

12:36:47   12    Government has brought a motion before to have HHS

12:36:49   13    relieved of certain of its obligations under the *Flores*

12:36:52   14    Settlement.  This Court did so showing flexibility that

12:36:55   15    the Government has said has been sorely lacking in this

12:37:03   16    litigation, but has not.  And if they wish to bring

12:37:07   17    another motion that deals specifically with what HHS has

12:37:11   18    and has not done and whether or not that comprises or

12:37:13   19    composes a -- amounts to a durable remedy, it may do so.

12:37:17   20         But right now, we've got this scattergun approach

12:37:21   21    that the Government has provided, has hoisted upon us and

12:37:23   22    the Court, and we're unable to speak intelligently about

12:37:27   23    specific amendments to the regulations that may or may

12:37:30   24    not be required in order to bring it within the

12:37:33   25    termination clause of the *Flores* Settlement.

23

12:37:37  1       So we would be happy to deal with these things, but

12:37:39  2   it's extremely difficult to go forward on a motion for

12:37:43  3   wholesale termination with respect to talking about these

12:37:47  4   individual changes in HHS policy and whether they amount

12:37:51  5   to a durable remedy.

12:37:53  6       THE COURT:  Would it be your position that it

12:37:55  7   has to be by rulemaking, or can it be by policy?

12:37:58  8       MR. HOLGUIN:  Your Honor, we have -- the parties

12:38:03  9   bargained for regulations here.  That is the fundamental

12:38:07 10   deal that -- bargain that was struck between the parties.

12:38:07 11       So as a general matter, plaintiffs are inclined to

12:38:07 12   stick by the letter of agreement saying we bargained for

12:38:18 13   regulations, the Government agreed to provide them.  It

12:38:19 14   has not done so, and it may not do so by way of -- it

12:38:23 15   does not come into compliance by way of informal policy

12:38:28 16   statements.

12:38:29 17       Now, if the Government were to be truly interested

12:38:34 18   in having HHS exit entirely from the settlement, all it

12:38:39 19   needs to do is enact those or promulgate those changes

12:38:41 20   that they have in formal policies into their regulations.

12:38:46 21       THE COURT:  How do you respond to Mr. Davis's

12:38:48 22   assertion that dictating the outcome of the regulations

12:38:51 23   is contrary to the APA?

12:38:53 24       MR. HOLGUIN:  Well, first of all, that's an

12:38:57 25   argument that's been looked at and rejected already.

24

| | |
|---|---|
| 12:39:00 | 1 |

There is no -- there's nothing that prevents the
Government from amending its regulations later on if it
decides that in the public interest this needs to be
done.  If the Government wants to publish proposed rules
that truly implement the *Flores* Settlement and there's
public outcry about it or whatever, as plaintiffs counsel
we're more than willing to sit down with them and to work
out any differences such that the regulations do not have
to be contrary to what the public is asking for.

But I would say that in addition to the -- to what
HHS has done in promulgating regulations, those
regulations do not parrot the *Flores* Settlement either.
The *Flores* Settlement talks about substantive and
relevant terms.

And as long as the protections that the children
receive under federal regulations are equivalent to what
the Government promised -- how the Government promised to
treat them in *Flores,* then there is a reasonable argument
that there is a durable remedy, particularly,
particularly if there's a history of the Government
actually complying with what it has said it's going to
do, which in this case we think the evidence shows that
the Government has yet, including HHS and ORR, has yet to
establish they have -- are in substantial compliance with
the remaining portions of the *Flores* Settlement.

25

| | | |
|---|---|---|
| 12:40:24 | 1 | **THE COURT:**  All right.  Thank you. |
| 12:40:27 | 2 | **MR. HOLGUIN:**  Thank you. |
| 12:40:28 | 3 | **THE COURT:**  Mr. Davis, any final words? |
| 12:40:30 | 4 | **MR. DAVIS:**  Just briefly, Your Honor.  I didn't |
| 12:40:34 | 5 | hear anywhere in that response why the guidance was |
| 12:40:38 | 6 | actually insufficient other than they would prefer |
| 12:40:41 | 7 | rulemaking because that's what's in the agreement and |
| 12:40:44 | 8 | because there's too many things going on here, but these |
| 12:40:46 | 9 | are clear legal arguments that under the APA, we can do |
| 12:40:50 | 10 | interpretive rules.  That's what was done here to comply |
| 12:40:53 | 11 | with the Court's order and that should be sufficient, and |
| 12:40:56 | 12 | there was no real response to that point.  And so I think |
| 12:40:58 | 13 | at a minimum, HHS -- |
| 12:40:59 | 14 | **THE COURT:**  Policy and interpretive rule? |
| 12:41:02 | 15 | **MR. DAVIS:**  Yes, I believe so.  So I think |
| 12:41:05 | 16 | that's sufficient here.  And I just want to highlight |
| 12:41:10 | 17 | that based on the motion to enforce, which I'm not going |
| 12:41:13 | 18 | to get too into, that's for the next portion, plaintiffs |
| 12:41:17 | 19 | seem to believe that even if we fully did rulemaking the |
| 12:41:19 | 20 | way they wanted to, that this Court could still retain |
| 12:41:23 | 21 | jurisdiction and if there were sort of any changes in the |
| 12:41:25 | 22 | future to those rules that were contrary to the |
| 12:41:27 | 23 | agreement, that they could just come back to this Court |
| 12:41:28 | 24 | under that agreement.  So it's sort of unclear when this |
| 12:41:31 | 25 | will end. |

26

| | |
|---|---|
| 12:41:32 | 1 |
| 12:41:35 | 2 |
| 12:41:38 | 3 |
| 12:41:41 | 4 |
| 12:41:45 | 5 |
| 12:41:49 | 6 |
| 12:41:52 | 7 |
| 12:41:54 | 8 |
| 12:41:58 | 9 |
| 12:42:01 | 10 |
| 12:42:04 | 11 |
| 12:42:07 | 12 |
| 12:42:10 | 13 |
| 12:42:13 | 14 |
| 12:42:19 | 15 |
| 12:42:20 | 16 |
| 12:42:21 | 17 |
| 12:42:25 | 18 |
| 12:42:29 | 19 |
| 12:42:31 | 20 |
| 12:42:38 | 21 |
| 12:42:40 | 22 |
| 12:42:43 | 23 |
| 12:42:50 | 24 |
| 12:42:53 | 25 |

1    And they also seem to, in at least a footnote,

2    suggest that the children need to be released sooner and

3    that possibly the family should be released as well.  We

4    think, given CASA, this is starting to become a bit of an

5    equitable issue where the original class and the original

6    consent decree and the injunctions entered were about a

7    particular class of minors in the nation, and now it's

8    expanding to encompass their families as well, and --

9         THE COURT:  Well, what's good for the goose is

10    good for the gander, and all of this has been litigated

11    before; and to the extent that the plaintiffs lost on

12    that argument, they're bound by prior rulings as well.

13    The Ninth Circuit has already ruled that *Flores* does not

14    apply to adults, and so that is off the table.

15         MR. DAVIS:  Understood, Your Honor.  Nothing

16    further.

17         THE COURT:  All right.  This matter will stand

18    submitted, and we'll issue after the hearing.

19    I'm going to turn to the motion to enforce right

20    now.  As I said, it is disturbing to me that given the

21    low census numbers that we are seeing, the kinds of

22    complaints that we are seeing that for quite some time

23    now I've been happy to say had sort of receded into the

24    background and seemed to be able to be addressed

25    individually by the juvenile coordinators, who I think

|            |    |
|------------|----|
| 12:42:57   | 1  | have been doing a good job of trying to address issues as |
| 12:43:00   | 2  | they come up. |
| 12:43:01   | 3  | So the question I have with regard to the issues |
| 12:43:05   | 4  | that are raised in the current motion to enforce is:  Why |
| 12:43:09   | 5  | have those not simply been given to the juvenile |
| 12:43:14   | 6  | coordinators to address substantively rather than having |
| 12:43:21   | 7  | attorneys deal with that? |
| 12:43:25   | 8  | And for that, perhaps I'll have the plaintiffs since |
| 12:43:28   | 9  | they brought the motion to address. |
| 12:43:28   | 10 | **MR. VAKILI:**  Good morning, Your Honor.  Bardis |
| 12:43:28   | 11 | Vakili for the plaintiffs. |
| 12:43:42   | 12 | And just so I understand the question, Your Honor, |
| 12:43:45   | 13 | are you suggesting that the -- is the question that why |
| 12:43:47   | 14 | didn't the parties go directly to juvenile coordinators |
| 12:43:51   | 15 | to resolve -- |
| 12:43:52   | 16 | **THE COURT:**  Why didn't they, yes.  I reviewed |
| 12:43:54   | 17 | the papers, and it indicates, I think it was Ms. Kahn's |
| 12:44:07   | 18 | declaration, that there were numerous efforts from 2024 |
| 12:44:09   | 19 | on to meet with opposing counsel to deal with some of |
| 12:44:10   | 20 | these issues.  Why is this a Local Rule 7-3 issue as |
| 12:44:14   | 21 | opposed to simply going to the juvenile coordinator to |
| 12:44:15   | 22 | say, hey, there are some problems here at this location, |
| 12:44:17   | 23 | can you address that? |
| 12:44:20   | 24 | **MR. VAKILI:**  Well, for one thing, Your Honor, we |
| 12:44:23   | 25 | think the issues are -- have changed rapidly, and so |

28

| | |
|---|---|
| 12:44:28 | 1 |

there's an urgency to the situation that led us to the

12:44:35  2    conclusion that we had to move quickly as we get here

12:44:38  3    more stories of kids held for days and weeks in CBP

12:44:42  4    custody.

12:44:42  5         THE COURT:  But the interactions for the meet

12:44:44  6    and confer happened in 2024.

12:44:47  7         MR. VAKILI:  Correct, Your Honor.  And -- well,

12:44:49  8    we -- the parties meet and confer, I think, throughout

12:44:52  9    the process, and so prior to filing this motion, I think

12:44:54  10   there was a -- I believe there was a meet and confer.

12:44:58  11        THE COURT:  Many.

12:44:59  12        MR. VAKILI:  Many.  Many.  You know, the parties

12:45:00  13   do raise issues --

12:45:00  14        THE COURT:  So I think that goes to the core of

12:45:02  15   my question is:  Why are the attorneys meeting and

12:45:05  16   conferring on this instead of -- I mean, I think the

12:45:09  17   reason why I sort of breathed life into the juvenile

12:45:14  18   coordinator position is because it is in the consent

12:45:17  19   decree, and that is a role that we're trying to make more

12:45:21  20   robust by having them be able to have rules and protocols

12:45:25  21   for self-monitoring.

12:45:26  22        So when there are conditions on the ground that need

12:45:29  23   to be addressed quickly, it certainly is more quick to

12:45:33  24   have a juvenile coordinator address an issue immediately

12:45:37  25   at a facility than to have litigation about it.

12:45:42  1      **MR. VAKILI:**  Well, what -- certainly -- so a

12:45:44  2   couple of things, Your Honor.  One is we -- when things

12:45:48  3   are ongoing at the facility, it wasn't clear to us that

12:45:52  4   the juvenile coordinator had dispute resolution

12:45:56  5   authority, the authority to issue sort of a binding order

12:46:00  6   to resolve things.

12:46:02  7      **THE COURT:**  Well, is there a dispute about

12:46:05  8   whether there is adequate food or when the temperature is

12:46:11  9   too cold?  Isn't that just a factual issue whether it is

12:46:16  10  or it isn't?

12:46:18  11     **MR. VAKILI:**  Well, so there are disputes, Your

12:46:21  12  Honor, about certain factual issues, whether there's

12:46:25  13  enough phone access or visitation.  Those kinds of things

12:46:28  14  might be able to be addressed through dispute resolution

12:46:34  15  process.

12:46:34  16     The fundamental thing here and the thing that I

12:46:36  17  think all parties agree is the CBP facilities are

12:46:36  18  structurally and by design inappropriate for holding

12:46:47  19  anyone for long periods.  And so this isn't really

12:46:49  20  about -- and much less children.  And so this isn't

12:46:50  21  really about -- you know, we tried, Your Honor, in the

12:46:50  22  past to get at the conditions and issues to get orders

12:46:53  23  that food should be improved or water should be improved.

12:46:56  24     What this motion is really about is moving kids out

12:46:59  25  of these facilities that cannot be -- these -- you know,

30

| | | |
|---|---|---|
| 12:47:02 | 1 | you can't pop windows into a border patrol station.  You |
| 12:47:08 | 2 | can't -- there's no yard, there's no rec yard for kids to |
| 12:47:11 | 3 | walk out of.  And so when kids are there for a day, maybe |
| 12:47:15 | 4 | that, you know, while processing, I-213s are done, |
| 12:47:19 | 5 | they're waiting for a transport somewhere, maybe that's |
| 12:47:22 | 6 | tolerable under the *Flores* Settlement Agreement. |
| 12:47:23 | 7 | But for days and weeks, these are structural |
| 12:47:25 | 8 | problems that I don't know that the juvenile coordinator |
| 12:47:28 | 9 | can say, you can fix this or change the conditions. |
| 12:47:32 | 10 | These kids have to be moved out of the facilities. |
| 12:47:35 | 11 | **THE COURT:**  All right.  Admittedly, some of the |
| 12:47:36 | 12 | issues may not be within the realm of the juvenile |
| 12:47:41 | 13 | coordinator to immediately address, but some of the |
| 12:47:43 | 14 | specific conditions that this Court has time and again |
| 12:47:45 | 15 | ruled on, like, food, temperature, access to telephones, |
| 12:47:51 | 16 | that sort of thing, that certainly can be addressed by a |
| 12:47:58 | 17 | juvenile coordinator. |
| 12:47:58 | 18 | **MR. VAKILI:**  I think that's right, and we're |
| 12:47:59 | 19 | certainly hoping to, when we're dealing with situations |
| 12:48:02 | 20 | like that where there are conditions that can be resolved |
| 12:48:06 | 21 | in that way, we're open and willing and will continue to |
| 12:48:11 | 22 | use a juvenile coordinator.  If we didn't use it to the |
| 12:48:13 | 23 | extent maybe we should have, we're happy to continue to |
| 12:48:15 | 24 | augment our practices, but this motion here really is |
| 12:48:18 | 25 | about the stuff that can't be fixed. |

12:48:21  1          This is about children who for years were held for

12:48:26  2     brief periods of time.  Even when there was tens of

12:48:29  3     thousands of families crossing the border, CBP managed to

12:48:34  4     move those kids through the process very quickly.  The

12:48:38  5     average was never, according to the juvenile coordinator,

12:48:38  6     more than 58 hours in CBP custody.  That's the kind of

12:48:44  7     brief detention that everybody seems to want.  The

12:48:46  8     highest folks at the agency level are saying the same

12:48:49  9     thing.  We don't think CBP should hold anyone for this

12:48:49  10    long.

12:48:57  11         And yet what we're seeing now is kids staying for

12:48:58  12    days and weeks, and there's just no condition remedy that

12:49:02  13    can fix that.  There's nothing that can fix children

12:49:05  14    being held day in and day out with no access to the

12:49:09  15    outside, no access to the sunlight, not knowing what's --

12:49:10  16    not being told what's going to happen to them and doubt

12:49:14  17    sector by sector about, am I going to see my dad today

12:49:18  18    for 15 minutes?  Well, maybe if it's operationally

12:49:21  19    feasible.

12:49:22  20         These are all structural problems.  The policies

12:49:24  21    aren't enough.  And so the motion really seeks more than

12:49:28  22    anything else an order that paragraph 12 requires to the

12:49:32  23    extent CBP is going to keep kids in custody and choose

12:49:36  24    not to release them, which they don't have to do.

12:49:40  25         To the extent that that's what they are going to do,

12:49:40  1      they need to transfer those children to safe and sanitary

12:49:44  2      facilities that are consistent with the vulnerability of

12:49:48  3      minors as the agreement requires because those things

12:49:52  4      just cannot be fixed structurally.

12:49:54  5           THE COURT:  Refresh my recollection.  In the

12:49:57  6      past, the -- even when this first started coming to the

12:50:03  7      fore in 2015, I know that time in custody has always been

12:50:08  8      an issue.  But that was time in custody in some of the

12:50:13  9      other facilities that CBP runs, not the stations,

12:50:17  10     correct?

12:50:18  11          MR. VAKILI:  Right, so the facilities have

12:50:19  12     changed over the years.  There are some of these sort of

12:50:22  13     pop-up facilities where kids have been held, but these,

12:50:26  14     what we're talking about here, are the ports of entries,

12:50:28  15     these structures that have existed for decades and cannot

12:50:31  16     be changed.

12:50:32  17          THE COURT:  Right.  And is that a different

12:50:33  18     thing, the ports of entry, now they're being held longer

12:50:37  19     in those places than have been in the past?

12:50:40  20          MR. VAKILI:  Certainly, as far as the record in

12:50:41  21     *Flores* is concerned, yes.  I don't -- I can't -- I'm the

12:50:46  22     newest, probably, person to this case, Your Honor.  I

12:50:49  23     can't think of a time in the record in my review of the

12:50:53  24     record where ports of entry time in custody has been

12:50:54  25     addressed.  It is something new that we're seeing.

33

```
12:50:57   1            I will tell you, again, I've been doing this work
12:51:00   2       for a long time, which I may say is in my back yard.  I
12:51:03   3       have never seen custody times like what we're seeing at
12:51:07   4       the port of entry and the conditions there.  Nobody wants
12:51:09   5       that.  And I keep coming back to this, Your Honor, it's
12:51:13   6       hard to figure out why we're here on this one.  The
12:51:16   7       agency heads say, we want kids in these facilities for as
12:51:21   8       little time as possible, people in these facilities for
12:51:23   9       as little time as possible because they're not
12:51:24  10       appropriate by design for long-term custody.  And so what
12:51:29  11       are we doing here is the thing I've repeated myself over
12:51:32  12       and over again preparing for this hearing.
12:51:35  13            What it is is, although the agency heads say that's
12:51:39  14       what they want, on the ground it's not happening, despite
12:51:41  15       the plummeting border encounter numbers.  And so
12:51:45  16       something is going on here.  And so there's something
12:51:47  17       happening with the internal monitoring that's
12:51:49  18       insufficient.  There's data disputes that we've been back
12:51:53  19       and forth with the Government over for the better part of
12:51:56  20       a year that we try to rely on to track the stuff that
12:52:00  21       makes it difficult.
12:52:01  22            And so as to why we think that there's -- sort of a
12:52:03  23       two pillars of the remedy we're seeking, Your Honor, are
12:52:07  24       in order that kids must be moved promptly into facilities
12:52:10  25       that are indeed safe and sanitary and consistent with the
```

12:52:14  1    well-being and vulnerability of a minor and the least

12:52:15  2    restrictive setting available for their age.  That's one.

12:52:17  3        And, two, an independent monitor that can track

12:52:20  4    these times in custody and in real-time address them.  To

12:52:23  5    the extent Your Honor's first question suggests that they

12:52:26  6    could just do that anyway.  Well, there's no independent

12:52:29  7    monitors.  I think what we need is independent monitors

12:52:30  8    to really address this because the failure --

12:52:30  9            THE COURT:  Why --

12:52:34  10           MR. VAKILI:  -- insufficient monitoring --

12:52:36  11   sorry, Your Honor.

12:52:36  12           THE COURT:  Why would the juvenile coordinators

12:52:38  13   not be able to address that?

12:52:41  14           MR. VAKILI:  Time in custody?  If I recall, Your

12:52:45  15   Honor, the -- other times in the past when we've asked

12:52:49  16   for a monitor, the Court has given sort of a provisional

12:52:53  17   period for the juvenile coordinator to try to resolve

12:52:55  18   that.

12:52:55  19       If that's something the Court wants to contemplate,

12:52:58  20   I just wouldn't give a lot of leash.  These conditions

12:53:00  21   are so very difficult.  Your children -- picture any

12:53:07  22   child you've ever known from 15 to 4 held in a locked

12:53:11  23   room, lights on all the time, not knowing what's

12:53:15  24   happening to them and suffering --

12:53:16  25           THE COURT:  I'm very familiar with these

35

12:53:18  1      conditions and have issued orders asking the defendants

12:53:21  2      to improve those conditions repeatedly.  So what is

12:53:25  3      disturbing to me, as I said, is that it is happening now

12:53:28  4      when the census is lower and that it is happening at the

12:53:33  5      border stations, which in the past have not been places

12:53:37  6      where even past administrations have -- including this

12:53:40  7      administration in the first go-around were keeping

12:53:45  8      children.

12:53:46  9           So in these meet and confers that you've had with

12:53:50  10     opposing counsel, what has been the response about that?

12:53:52  11          **MR. VAKILI:**  About times -- there has been

12:53:56  12     really no resolution.  It's just a lot -- these things do

12:53:59  13     begin to feel like Ground Hog Day all over again.  We

12:54:03  14     meet, they take it under advisement, we get back the

12:54:05  15     reply -- the response comes back later.  We just --

12:54:10  16          **MR. MCCROSKEY:**  Your Honor, I would object under

12:54:12  17     Rule 408 to any testimony about the discussion of meet

12:54:15  18     and confers and attempts to reach settlement on these

12:54:17  19     issues.

12:54:18  20          **THE COURT:**  Isn't this the 7-3 requirement?

12:54:22  21          **MR. MCCROSKEY:**  Your Honor, it is a requirement

12:54:25  22     about meeting and conferring under the local rules, but

12:54:29  23     it's to avoid the need for a motion, and that's an

12:54:35  24     attempt to --

12:54:36  25          **THE COURT:**  All right.  Well, I won't ask him.

36

| | |
|---|---|
| 12:54:38 | 1 |
| 12:54:41 | 2 |
| 12:54:43 | 3 |
| 12:54:44 | 4 |
| 12:54:45 | 5 |
| 12:54:49 | 6 |
| 12:54:55 | 7 |
| 12:55:00 | 8 |
| 12:55:04 | 9 |
| 12:55:06 | 10 |
| 12:55:07 | 11 |
| 12:55:09 | 12 |
| 12:55:14 | 13 |
| 12:55:20 | 14 |
| 12:55:22 | 15 |
| 12:55:25 | 16 |
| 12:55:26 | 17 |
| 12:55:28 | 18 |
| 12:55:28 | 19 |
| 12:55:28 | 20 |
| 12:55:28 | 21 |
| 12:55:28 | 22 |
| 12:55:48 | 23 |
| 12:55:50 | 24 |
| 12:55:54 | 25 |

I'll ask you, then, next.

**MR. MCCROSKEY:**  Okay.

**MR. VAKILI:**  One last point on the juvenile
coordinators, Your Honor.  They have been around for a
long time.  I don't doubt that they're efforting, but --
to do their work in good faith, but these things have
happened under their watch.  This escalation, very rapid
of detention times, has happened under their watch, and
we just don't think it's in the children's best interest
to wait any longer.

**THE COURT:**  Well, their hands might be bound.
But in any event, I appreciate your attempt to explain
history when you're the newest member of the team here.

**MR. VAKILI:**  I appreciate that, Your Honor.  You
know, without the benefit of a tentative, I'm happy to
address other aspects of the order.

**THE COURT:**  I will hear from the defendants at
this time.  Thank you.

**MR. VAKILI:**  Okay.

**THE REPORTER:**  I'm sorry, can you remind me of
your name, sir?

**MR. MCCROSKEY:**  Yes.  This is Joshua McCroskey.

**THE COURT:**  So, Mr. McCroskey, without talking
about what you've discussed with opposing counsel, why is
this happening now?

UNREDACTED TRANSCRIPT

12:55:56  1          **MR. MCCROSKEY:**  I'm sorry, Your Honor, when you

12:55:59  2    say why, is this --

12:56:00  3          **THE COURT:**  Why is this happening now; that is,

12:56:03  4    why are minors being held for long periods of time at the

12:56:07  5    border stations?  This has not been a situation that

12:56:10  6    we've had to encounter in the past, not even during the

12:56:14  7    first Trump administration.

12:56:16  8          Usually, they were transported to other facilities,

12:56:18  9    and then we dealt with the conditions at the other

12:56:21  10   facility, not at the border station.  I don't think

12:56:23  11   anybody ever wanted to have minors held for long periods

12:56:26  12   of time at the border stations.

12:56:29  13         **MR. MCCROSKEY:**  Your Honor, there have always

12:56:31  14   been difficult cases where processing has taken longer

12:56:35  15   periods of time.  And, you know, when you've had tens of

12:56:39  16   thousands of children crossing the border and then

12:56:43  17   they've been released the next day, that does keep the

12:56:46  18   average times in custody low.  But that -- you know,

12:56:50  19   there have always been situations where certain

12:56:53  20   individuals, certain families, it's taken longer

12:56:56  21   to process --

12:56:57  22         **THE COURT:**  I understand that, and I have

12:56:59  23   accounted for that and been understanding of situations

12:57:01  24   where there was difficulty obtaining transportation or

12:57:04  25   there were questions about whether or not the adult that

38

12:57:07    1    was with the child was actually a parent, that sort of

12:57:11    2    thing.

12:57:11    3        But now, the census is low, and I've asked for

12:57:18    4    information, because of my remedial responsibilities

12:57:23    5    under this agreement, to monitor what's happening with

12:57:27    6    regard to long periods of time in custody, and I'm met

12:57:31    7    with an objection from defendants that I shouldn't even

12:57:35    8    be asking about that.

12:57:37    9        What is happening with regard to why children are

12:57:40    10   being held for long periods of time at the stations?

12:57:44    11       MR. MCCROSKEY:  Your Honor, as has been in the

12:57:48    12   filings and the declarations we submitted with our

12:57:51    13   oppositions, some sectors did have soft-sided facilities

12:57:56    14   that were temporarily set up to deal with the kind of

12:58:01    15   surgence that we've seen over -- at times over the last

12:58:04    16   ten years.  And those facilities have been closed now

12:58:08    17   because the numbers have gotten down to a more manageable

12:58:12    18   level to where it's -- it is not expedient from a

12:58:16    19   resource perspective to keep those facilities open.

12:58:19    20       THE COURT:  So you're saying that there are no

12:58:21    21   other facilities available for them other than the border

12:58:26    22   stations?

12:58:27    23       MR. MCCROSKEY:  Your Honor, again, this -- you

12:58:30    24   know, this was kind of a theme in our opposition that

12:58:32    25   this is a sector-by-sector question.  There are some

12:58:36   1    sectors like Arizona that do have, you know, more

12:58:41   2    centralized processing facilities that are able to

12:58:44   3    provide more amenities than a particular station could

12:58:49   4    but, again, not as a sector-by-sector question.

12:58:54   5        And Mr. Holguin remarks that the Government's motion

12:58:58   6    in his view was a blunderbuss motion that hindered us

12:59:03   7    from viewing individual settlement agreement provisions,

12:59:06   8    and I would counter that plaintiffs' motion to enforce is

12:59:10   9    also a blunderbuss motion that makes it difficult to

12:59:13  10    analyze any particular provision or any particular

12:59:17  11    amenity at a location.

12:59:20  12        THE COURT:  All right.  Well, we don't have to

12:59:23  13    proceed in a blunderbuss way.  In the past ten years,

12:59:30  14    often we've had status conferences where we address

12:59:32  15    certain issues that come up and I have had great

12:59:36  16    receptivity from defendants, both counsel and the

12:59:43  17    juvenile coordinators in addressing issues that I have

12:59:44  18    found in the past to be violative of the agreement to

12:59:49  19    address them, and that was done in a very orderly

12:59:53  20    fashion.

12:59:53  21        I repeatedly admonished both sides to make use of

12:59:57  22    the juvenile coordinators so that we wouldn't have to

01:00:00  23    have litigation on some of these issues, and the response

01:00:09  24    right now seems to be I shouldn't even be asking about

01:00:12  25    these things.  I understand that's part of the motion to

40

01:00:15  1    terminate the agreement entirely, so now that I'm going

01:00:19  2    to be ruling on that, however, I'm hoping that we can

01:00:21  3    address some of these issues that are immediately facing

01:00:25  4    minors at the border without having the need to have

01:00:28  5    litigation about it.  It seems like we've been able to

01:00:31  6    address some of these issues very rapidly and on a

01:00:35  7    case-by-case basis quite readily over the years.

01:00:39  8         MR. MCCROSKEY:  Your Honor, for the purpose of

01:00:40  9    what's pending today, I'll note that plaintiffs have

01:00:46 10    brought a motion to enforce, and so it is their burden to

01:00:52 11    prove violations.  And so our response is just focused on

01:00:59 12    the evidence that they've brought forward for this

01:01:02 13    particular motion is not sufficient to prove the kinds of

01:01:06 14    nationwide violations that --

01:01:07 15         THE COURT:  Well, do you deny that some of these

01:01:10 16    statements in the declarations are true?

01:01:14 17         MR. MCCROSKEY:  Yes, Your Honor.  In both

01:01:16 18    Exhibit 1 and Exhibit 2, as well as Exhibit 5, the

01:01:24 19    defendants' oppositions, you had an official from border

01:01:27 20    patrol going through the records as to the declarants who

01:01:27 21    were in border control custody.

01:01:30 22         Then in Exhibit 2, you have a declarant from the

01:01:33 23    Office of Field Operations going through the records as

01:01:35 24    to plaintiffs' declarants who were in ports of entry.

01:01:39 25         And then in Exhibit 5, you have CBP's chief medical

01:01:46  1    officer going through the medical records as to

01:01:48  2    plaintiffs' declarants and showing that in many cases,

01:01:51  3    they are -- either their recollection or their

01:01:53  4    understanding of the situation was incorrect.  And

01:01:55  5    plaintiffs acknowledge that in their reply that their

01:01:58  6    declarants may have misunderstood or misremembered

01:02:05  7    things.

01:02:05  8        And perhaps, Your Honor, if we had 40 declarations

01:02:08  9    about a particular location and they painted a consistent

01:02:12  10   theme, then individual discrepancies or problems in any

01:02:15  11   particular declaration wouldn't be an issue.  But when in

01:02:18  12   some cases here we have one declaration from plaintiffs

01:02:21  13   about a sector or two declarations --

01:02:24  14       **THE COURT:**  Well, I agree with you that some of

01:02:25  15   these are snapshots and whether or not some of them are

01:02:32  16   accurate or not, we can go one by one over them in that

01:02:35  17   regard, but the overall gestalt of the declarations

01:02:42  18   pertains more to the time in custody.  And even though

01:02:52  19   some of the individual conditions like temperature and

01:02:55  20   food and access to a telephone, those sorts of things can

01:02:57  21   probably be handled by a juvenile coordinator.  The issue

01:02:59  22   of time in custody may not be.

01:03:00  23       And so that really is, I guess, the focal point of

01:03:10  24   what I'd like to talk to you about is what can be done

01:03:13  25   about that when these facilities are simply not designed

42

01:03:19   1    to hold minors.

01:03:23   2        **MR. MCCROSKEY:**  Your Honor, we agree with the

01:03:25   3    point that plaintiffs have made and that you're making

01:03:27   4    now.  As our own declarants have said, CBP does try to

01:03:34   5    transfer individuals out of its custody as quickly as it

01:03:37   6    can.

01:03:37   7        The question, though, is:  Does the *Flores*

01:03:41   8    Settlement Agreement require something different from

01:03:45   9    what CBP is already doing?

01:03:46  10        And plaintiffs haven't shown that there's a

01:03:50  11    particular number of hours or a particular situation

01:03:55  12    where border patrol or the Office of Field Operations has

01:03:58  13    not been doing as much as it can.

01:04:00  14        **THE COURT:**  Well, on the other hand, I have been

01:04:03  15    asking for information to assist me in making that

01:04:06  16    determination, and I did it through the juvenile

01:04:10  17    coordinator reports as we have done in the past, and I'm

01:04:12  18    met with an objection from your office that I shouldn't

01:04:15  19    even be asking about that sort of thing.

01:04:18  20        **MR. MCCROSKEY:**  Your Honor, we think that the

01:04:21  21    *Flores* Settlement Agreement is something that if

01:04:26  22    plaintiffs want a new order or a new action from the

01:04:30  23    Court, it is their burden to prove that they're entitled

01:04:33  24    to that action.

01:04:34  25        And so, yes, Your Honor, the Government would object

43

01:04:37  1    to the Court as kind of a free-standing matter taking

01:04:42  2    action to enforce the settlement agreement in the absence

01:04:45  3    of a proven violation.

01:04:47  4         **THE COURT:**  Well, you're right.  There are some

01:04:49  5    facilities that are in the motion that were not part of

01:04:52  6    the original remedial orders that I issued.  To that

01:04:57  7    extent, I suppose I'm going to have to issue another

01:05:00  8    order.

01:05:00  9         But with regard to the RGV, which has been at issue

01:05:05  10   for the past umpteen years, I think we have clear track

01:05:13  11   record in the past with regard to remedial orders

01:05:17  12   requiring CBP to make sure that the time in custody is

01:05:19  13   not unduly and unnecessarily prolonged.

01:05:24  14        And when I ask for information about that, I expect

01:05:27  15   to get information from that through the juvenile

01:05:32  16   coordinators.  In fact, I don't think the juvenile

01:05:34  17   coordinators themselves balked at giving that information

01:05:38  18   because that was a regular part of the report and the

01:05:41  19   exchange in how we tried to improve the conditions there

01:05:44  20   over the years.

01:05:46  21        What I'm concerned about right now is that you're

01:05:49  22   telling the juvenile coordinators not even to respond to

01:05:52  23   those requests.  That is new.

01:05:54  24        **MR. MCCROSKEY:**  Your Honor, certainly, if the

01:05:57  25   Court overrules the Government's objections, we will

44

01:06:00  1    comply with the reporting obligations that you've ordered

01:06:04  2    for the supplemental reports.  Our point, however, is

01:06:13  3    that that is far afield from what the settlement

01:06:16  4    agreement itself requires.  It requires an annual report

01:06:18  5    from the juvenile coordinators.  And anything extra,

01:06:22  6    supplemental reports, or additional inquiry or looking

01:06:29  7    into factual situations on the ground or specific cases,

01:06:32  8    that's something that's not in the settlement agreement.

01:06:35  9        And, certainly, Your Honor, the Court has remedial

01:06:39  10   authority if plaintiffs prevail on a motion to enforce.

01:06:43  11   But at this point, the Court has been taking actions *sua*

01:06:50  12   *sponte* without ruling on the motion to enforce.  And

01:06:55  13   that's what we would object to.

01:06:56  14       **THE COURT:**  I don't think I've been doing

01:06:59  15   anything *sua sponte*.  Everything that I've been doing has

01:07:03  16   been as a result of my remedial orders, and the minute

01:07:05  17   order that I issued most recently asking for juvenile

01:07:10  18   coordinators' reports has to do with the locations that

01:07:12  19   are the subject of the CBP settlement and the *Flores*

01:07:16  20   Settlement Agreement.

01:07:16  21       I didn't ask for information regarding Otay Mesa or

01:07:21  22   Karnes or any other location that wasn't on the radar

01:07:25  23   through previous orders.  But I will have to deal with

01:07:30  24   the motion to enforce on its merits.

01:07:33  25       I guess the message that I am trying to convey is

45

01:07:36  1    that for the last several years, we have done well in

01:07:40  2    working together informally to address individual issues

01:07:44  3    as they came up for the benefit of minors.  It is not to

01:07:49  4    the benefit of minors for us to engage in ongoing

01:07:52  5    litigation about what are basic issues of sanitary and

01:08:00  6    safe conditions.  Those are issues that should be

01:08:03  7    addressed immediately when they arise.

01:08:04  8        And so I expect that as to those facilities that

01:08:08  9    have already been the subject of previous orders, that

01:08:12  10   that is the overriding consideration in addressing those

01:08:16  11   issues, that the interest of the minors should be

01:08:20  12   addressed when we're talking about sanitation and safe

01:08:25  13   conditions.  And if we're keeping people for prolonged

01:08:28  14   periods of time at border stations, that is not

01:08:32  15   compliant.

01:08:34  16        **MR. MCCROSKEY:**  Your Honor, the Court recognized

01:08:37  17   earlier in this hearing that the settlement agreement

01:08:40  18   does contemplate flexibility for time in custody, and if

01:08:48  19   the Court is inclined to either explain how it views that

01:08:57  20   flexibility should be limited, operationally, CBP would

01:09:01  21   need something clear from the Court to explain why --

01:09:05  22        **THE COURT:**  In order for me to be able to, in a

01:09:09  23   tailored fashion, address issues relating to time in

01:09:42  24   custody, I am -- I have not been prone during this

01:09:17  25   litigation to issue just broad-based decisions without

46

01:09:23  1    regard to individualized considerations.  I have taken

01:09:27  2    into account situations where the defendants have asked

01:09:30  3    for more time.

01:09:32  4        In fact, the 20 days resulted from a defense request

01:09:36  5    to prolong detention because they needed that time in

01:09:39  6    order to do certain kinds of processing.  That was not

01:09:44  7    something that I imposed.  That was what defendants

01:09:47  8    requested, and I granted.

01:09:49  9        But right now, when I ask for information, it's so

01:09:52  10   that I can tailor my orders appropriately.  I'm not going

01:09:58  11   to just issue a broad-based order for the entire nation

01:10:03  12   based on one declaration.  But I have a track record, at

01:10:08  13   least with RGV, and at least as to that sector, I am

01:10:17  14   entitled to information so that I can make more tailored

01:10:20  15   decisions about how to deal with this situation.

01:10:23  16       And that was the reason why I asked for the juvenile

01:10:26  17   coordinator to give me explanations for why the time in

01:10:30  18   custody had been extended.  If they give me a reasonable

01:10:33  19   explanation, I will understand that.  But if people are

01:10:38  20   being kept in those facilities just because of neglect,

01:10:43  21   that is a different question.

01:10:44  22       **MR. MCCROSKEY:**  Yes, Your Honor.  Thank you for

01:10:47  23   clarifying that.  The only point I'll add is that for

01:10:56  24   what we're here for today is, again, plaintiffs' motion,

01:10:59  25   and whether plaintiffs have met their burden of proof to

01:11:04  1    be entitled to any new remedies is a separate question

01:11:08  2    from past remedial orders.

01:11:10  3         **THE COURT:**  I understand and I can see for

01:11:12  4    myself that the plaintiffs' motion deals with a lot of

01:11:16  5    different facilities, and I dealt with that before.  In

01:11:19  6    the original motion to enforce, the very first one, it

01:11:22  7    was for a number of different facilities, and I focused

01:11:25  8    it on the RGV because I saw that the majority of the

01:11:28  9    evidence pertained to that sector.  Similarly, I'm going

01:11:34 10    to do that again here.

01:11:36 11       But the reason why I'm talking with you about the

01:11:39 12    RGV is because we've been dealing with the RGV for ten

01:11:49 13    years, and I am very disappointed when I get an objection

01:11:56 14    from the Government questioning my authority to even ask

01:11:57 15    for information about that sector.

01:11:57 16         **MR. MCCROSKEY:**  Your Honor, I understand the

01:11:58 17    Court's concerns.  Again, as I've stated previously, the

01:12:04 18    Government maintains its position that any new remedial

01:12:07 19    orders should be in response to a motion that plaintiffs

01:12:10 20    have proven not in response to a different kind of

01:12:15 21    inquiry not contemplated by the settlement agreement.

01:12:18 22         **THE COURT:**  All right.  Thank you.

01:12:20 23       Anything further from the plaintiffs?

01:12:23 24         **MR. VAKILI:**  Briefly, Your Honor.

01:12:30 25       So, Your Honor, there are a few things in the record

01:12:34  1    that are undisputed and nationwide.  One of those is time

01:12:38  2    in custody.  So outside of RGV in all the sectors, the

01:12:43  3    time in custody is up in the facilities outside of RGV.

01:12:47  4    The structures of these facilities, the defendants admit

01:12:50  5    and do not contest, are not suitable.  There's no

01:12:53  6    windows.  There's no -- so there are things that are

01:12:56  7    truly universal.

01:12:57  8        If Your Honor finds that there violations are not

01:13:00  9    only insofar as the proof is, Your Honor can issue a

01:13:06  10   ruling requiring prompt transfer, but as it did in 2015,

01:13:11  11   those -- all the Court is doing is interpreting what, in

01:13:14  12   this case, paragraph 12 requires, all of the sectors

01:13:17  13   across the facility -- across the nation need to comply

01:13:21  14   with the *Flores* Settlement Agreement sets as the

01:13:25  15   nationwide standards, not sector by sector.

01:13:28  16       And so I take the point that the proof is only to

01:13:31  17   violations of certain facilities.  In order that children

01:13:34  18   must be moved, processed promptly out of facilities that

01:13:38  19   are not safe and sanitary and not consistent with

01:13:41  20   vulnerability of minors, those are the standards

01:13:44  21   nationwide of the settlement agreement.

01:13:46  22       So as you said in 2015, every facility would have to

01:13:49  23   comply with that because that's what the *Flores*

01:13:55  24   Settlement Agreement requires.  What we're really lacking

01:13:57  25   here is a policy that's nationwide.  That's what the

49

01:14:00  1    agreement calls for, that requires prompt moving of

01:14:03  2    children out of CBP custody.

01:14:06  3        If they're going to stay in custody, okay, but they

01:14:09  4    have to be held in facilities that account for their

01:14:12  5    vulnerability.  And that's what the structure of the

01:14:15  6    agreement requires, that it gives this leeway that if a

01:14:18  7    licensed facility is not immediately available that they

01:14:22  8    can be placed in an INS detention facility for the time

01:14:25  9    necessary to get them placed or released.

01:14:27 10        This is all very well within paragraph 12.  And Your

01:14:30 11    Honor did allow expeditious processing to extend all the

01:14:33 12    way out to (inaudible), but we are seeing cases going far

01:14:37 13    beyond that, and the conditions are far worse in these

01:14:40 14    facilities than they were in those facilities.

01:14:43 15        And so I understand the record is what it is.  We

01:14:48 16    can't be in 400 facilities around the country all the

01:14:51 17    time.  This is six months of gathering data, and it's a

01:14:55 18    geographically diverse representation of CBP's practices

01:15:00 19    as we could do and the urgency required us to come.  This

01:15:03 20    is part of why we think a monitor, an independent monitor

01:15:07 21    that can be more nimble.  We think the data that we're

01:15:15 22    getting also does not accurately reflect, and we're

01:15:15 23    having a very hard time getting that accurate data.  We

01:15:15 24    think the monitors should be able to track that as well

01:15:21 25    so we can accurately track that because this does strike

01:15:22   1    us, based on the data, as a nationwide problem.

01:15:25   2         **THE COURT:**  All right.  Thank you.

01:15:30   3         **MR. VAKILI:**  Thank you.

01:15:30   4         **MR. MCCROSKEY:**  Your Honor, may I briefly?

01:15:31   5         **THE COURT:**  Yes.

01:15:32   6         **MR. MCCROSKEY:**  Thank you.  Just this -- a

01:15:42   7    couple of points, briefly, Your Honor.

01:15:44   8         First of all, taking it somewhat in reverse on data,

01:15:49   9    as shown in Exhibits 3 and 4 to the opposition,

01:15:55  10    defendants have worked with plaintiffs to resolve the

01:15:58  11    data issues, and plaintiffs have not pointed to recent

01:16:05  12    issues since those corrections have been made.

01:16:11  13         And as regards to the CBP data, the juvenile care

01:16:17  14    monitor has looked at that and determined that the new

01:16:19  15    updated parameters are sufficient.

01:16:24  16         And similarly, too, ICE has not had long-standing

01:16:28  17    data reporting issues.  There were temporary issues as

01:16:31  18    the result of the reopening of the family residential

01:16:34  19    centers, and those have now been resolved and ICE has

01:16:38  20    produced reports to plaintiffs that are designed to be

01:16:43  21    overinclusive to make sure that ICE is covering its

01:16:47  22    reporting obligations.  So there is not a need for an

01:16:49  23    independent monitor on those issues.

01:16:52  24         And then, secondly, Your Honor, plaintiffs have

01:17:00  25    suggested this idea of the *Flores* Settlement Agreement is

01:17:03  1      a nationwide consent decree, and so there should be a

01:17:07  2      nationwide order requiring nationwide compliance.  That

01:17:12  3      is not something contemplated by the settlement agreement

01:17:16  4      that plaintiffs can just get a nationwide order requiring

01:17:21  5      compliance whenever plaintiffs ask for it.

01:17:24  6          To get specific remedial orders, they need to prove

01:17:28  7      specific violations.  And I think the Court has already

01:17:31  8      recognized that you understood -- understand that

01:17:34  9      remedial orders have to be limited to the actual issues

01:17:38  10     that there's evidence for.

01:17:41  11         And then, as regards to time in custody, there are

01:17:46  12     just a couple of brief points I want to make about that.

01:17:49  13     One is that plaintiffs' own analysis of the data suggests

01:17:54  14     a decreasing concern about times in custody.  So in

01:18:02  15     plaintiffs' motion, they looked at the February data and

01:18:07  16     found 179 children who were in CBP custody over seven

01:18:13  17     days.

01:18:13  18         But then with their reply, plaintiffs submitted an

01:18:18  19     analysis of the May data and there were only 46 children

01:18:23  20     who were in custody over seven days; and that suggests

01:18:25  21     that, yes, there was a transition period at the beginning

01:18:29  22     of this administration, but there are decreasing times in

01:18:35  23     custody.

01:18:35  24         And I also don't want the Court to lose sight of the

01:18:38  25     fact that thousands of children right now are not

01:18:41  1    spending any time in Government immigration custody, and

01:18:48  2    that is a significant difference compared to just a year

01:18:50  3    or two ago.

01:18:51  4        And then, lastly, Your Honor, on the time in custody

01:18:54  5    issue, the Court has already recognized that there are

01:18:57  6    limitations to what the Court can do in terms of remedy

01:19:03  7    because parents don't have release rights under the

01:19:06  8    settlement agreement, and it would put CBP in a very

01:19:11  9    difficult place operationally if there were different

01:19:13  10   release standards for parents versus children.

01:19:16  11       And this is something that came up previously with

01:19:19  12   ICE, in that, it was never resolved.  If the parents are

01:19:23  13   subject to mandatory detention either under 1225 as --

01:19:29  14   Section 1225 as inadmissible applicants for admission or

01:19:32  15   are in expedited removal, it's the parents are subject to

01:19:38  16   mandatory detention, and there is no easy way to have the

01:19:44  17   children be analyzed for relief under a different

01:19:48  18   provision.

01:19:49  19       And then, I know Your Honor has already talked about

01:19:53  20   1252(f), and so I don't want to belabor the point, but I

01:19:58  21   will just mention that either release from a certain

01:20:01  22   facility to -- release from custody or transfer to a

01:20:06  23   different facility, those are things that the detention

01:20:11  24   statutes in the INA do not contemplate or do not require.

01:20:17  25   And certainly what plaintiffs are asking for, those

01:20:20  1    transfer or release issues are not required by the

01:20:25  2    statute, and that is exactly what the Supreme Court in

01:20:30  3    the *Aleman Gonzalez* addressed.

01:20:34  4             **THE COURT:**  Well, there are a lot of things that

01:20:36  5    are not required for the statute.  The statute does not

01:20:36  6    require that there be clean air.  It doesn't require

01:20:38  7    there be clean water.  It doesn't require there be food.

01:20:41  8    It doesn't require that there be lighting or adequate

01:20:46  9    temperature controls, but that is what this settlement

01:20:50  10   agreement addresses.  I don't think that they're mutually

01:20:53  11   exclusive.

01:20:54  12            **MR. MCCROSKEY:**  I think there is a distinction,

01:20:57  13   Your Honor, between, you know, purely the conditions of

01:21:01  14   custody of, you know, food, as you mentioned, versus

01:21:06  15   transfer or release because that is exactly the kind of

01:21:12  16   situation that the Supreme Court addressed in *Aleman,* and

01:21:14  17   it says both that the Court cannot restrain the

01:21:19  18   Government from taking an action that's contemplated by

01:21:22  19   the statute, but also that the Court cannot require on a

01:21:28  20   class-wide basis the Government to take an action that is

01:21:30  21   not required by the statute.  And so it works both ways.

01:21:34  22        And in particular, when we're talking about release

01:21:36  23   or transfer and any procedural steps taken with regard to

01:21:40  24   release or transfer, that's something that Congress was

01:21:44  25   clear the Court does not have jurisdiction or authority

01:21:48    1    to do on a class-wide classified basis.

01:21:49    2         THE COURT:  Aren't we really talking, though,

01:21:51    3    about where the children are held in detention?  It's not

01:21:54    4    necessarily always about release.  It is about whether

01:21:59    5    they should be held for long periods of time in a border

01:22:02    6    station that is not designed for children.  It's not

01:22:06    7    saying you don't have the ability to detain them if you

01:22:09    8    think that there is some reasonable basis for doing so.

01:22:12    9    It is that it has to be a safe and sanitary location and

01:22:17    10   that is not a border station.

01:22:21    11        MR. MCCROSKEY:  Your Honor, I would go back

01:22:23    12   again to our opposition and the evidence submitted in our

01:22:25    13   opposition showing that plaintiffs' characterization of

01:22:29    14   these facilities is inaccurate.  They are safe and

01:22:32    15   sanitary for the amount of time required for expeditious

01:22:36    16   processing.

01:22:37    17        THE COURT:  Yes, for a brief amount of time.

01:22:39    18   But that's the problem -- we're going around in

01:22:42    19   circles -- is that it's not been a brief period of time

01:22:45    20   for some of these minors.

01:22:47    21        MR. MCCROSKEY:  Your Honor, the settlement

01:22:51    22   agreement recognizes flexibility, and it does not set a

01:22:53    23   cap on a brief period of time means X number of days.  It

01:22:58    24   recognizes that during periods of influx under the

01:23:03    25   settlement, which we have continually been in --

55

01:23:06  1        THE COURT:  Right, but you're not in a period of

01:23:08  2    influx right now.

01:23:09  3        MR. MCCROSKEY:  We are under the settlement,

01:23:11  4    Your Honor.  Under the settlement's provision of 130

01:23:14  5    minors eligible for placement in the licensed program or

01:23:17  6    already in a licensed program, that provision has been

01:23:17  7    met.

01:23:29  8        THE COURT:  All right.  I don't recall whether

01:23:30  9    the settlement agreement pertains to people coming in or

01:23:30  10   people already here.

01:23:34  11       MR. MCCROSKEY:  Your Honor, for the influx

01:23:37  12   provision, it applies to both.  It's whenever there are

01:23:44  13   130 minors in custody, including those already placed

01:23:46  14   under paragraph 19 licensed programs or those eligible

01:23:49  15   for placement.  And at all times there have been 130

01:23:52  16   minors in the custody of the successors of the INS who

01:24:00  17   are either already placed or eligible for placement.

01:24:03  18       THE COURT:  All right.  Thank you.

01:24:05  19       While all of you are here, I actually would like to

01:24:08  20   have a discussion with you, as well, on a question

01:24:12  21   regarding the open-air detention centers.  Because of

01:24:28  22   other pressing matters, I have not been able to issue my

01:24:30  23   final findings of fact and conclusions of law in that

01:24:31  24   regard after the Court trial.

01:24:33  25       My question is:  Have conditions changed on the

01:24:36  1    grounds regarding the open-air detention centers such

01:24:39  2    that that might affect my order?

01:24:43  3            **MR. MCCROSKEY:**  Your Honor, I'm not aware of any

01:24:46  4    ongoing allegations or concerns about open-air sites.  My

01:24:53  5    understanding is that the census and the number of border

01:24:57  6    crossings has been low enough that border patrol has been

01:25:01  7    able to apprehend and immediately transport everyone to

01:25:04  8    facilities.

01:25:05  9            **THE COURT:**  And do the plaintiffs have any

01:25:07  10   update in that regard?

01:25:10  11           **MS. DE GRAMONT:**  Diane De Gramont for the

01:25:11  12   plaintiffs.  We are not currently aware of active

01:25:14  13   concerns at open-air detention sites.

01:25:17  14           **THE COURT:**  All right.  Thank you.

01:25:18  15       All right.  Thank you to both sides.  I will take

01:25:21  16   both of these matters under submission.

          17       (Adjournment.)

          18

          19

          20

          21

          22

          23

          24

          25

57

1                    **C E R T I F I C A T E**

2

3

4         I, TINA DuBOSE GIBSON, do hereby certify that the

5    foregoing 56 pages are, to the best of my knowledge,

6    skill and abilities, a true and accurate transcript from

7    my stenotype notes of the MOTIONS HEARING hearing held on

8    the 8th day of August, 2025, in the matter of:

9

10   JENNY L. FLORES, ET AL.

11   vs.

12   PAMELA BONDI, ATTORNEY GENERAL

13   OF THE UNITED STATES, ET AL.

14

15

16   Dated this 13th day of August, 2025.

17

18

19

20                        S/Tina DuBose Gibson

                          _____
21                        TINA DuBOSE GIBSON, RPR, RCR
                          Official Court Reporter
22                        United States District Court
                          Western District of Tennessee
23

24

25