# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*,<br><br>            Plaintiffs,<br><br>        v.<br><br>PAMELA BONDI, Attorney General of the United States, *et al.*,<br><br>            Defendants. | Case No. CV 85-4544-DMG (AGRx)<br><br>**ORDER RE DEFENDANTS' MOTION TO TERMINATE [1567]** |

Before the Court is Defendants' Motion to Terminate the *Flores* Settlement Agreement and to Dissolve the Court's 2019 Injunction. [Doc. ## 1567 ("MTT").] The motion is fully briefed. [Doc. ## 1584 ("Opp."), 1612 ("Reply").] The Court held a hearing on the motion on August 8, 2025. Defendants fail to identify any new facts or law that warrant the termination of the *Flores* Settlement Agreement at this time. Therefore, for the reasons set forth below, the Court **DENIES** Defendants' MTT.

# I.
# BACKGROUND[1]

**A.  Settlement Agreement with the INS**

On January 28, 1997, this Court approved the *Flores* Settlement Agreement ("FSA" or "Agreement"), a class action settlement between Plaintiffs—minors subject to detention by United States immigration authorities—and the federal government. *See Flores v. Sessions*, 862 F.3d 863, 866 (9th Cir. 2017). At the time, the Immigration and Naturalization Service ("INS") was the primary agency tasked with enforcing the nation's immigration laws, principally the Immigration and Nationality Act ("INA"). The Agreement accordingly defined the class as "All minors who are detained in the legal custody of the INS." FSA ¶ 10 [Doc. # 101].

Paragraph 40 of the Agreement, the provision governing termination of the FSA, initially stated: "All terms of this Agreement shall terminate the earlier of five years after the date of final court approval of this Agreement or three years after the court determines that the INS [Immigration and Naturalization Service] is in substantial compliance with this Agreement, except that the INS shall continue to house the general population of minors in INS custody in facilities that are licensed for the care of dependent minors." FSA ¶ 40. The parties originally contemplated that Defendants would initiate action to publish the terms of the FSA as a regulation within 120 days after

---

[1] The Court has summarized the background of this case on multiple occasions throughout this litigation, and the Parties should be familiar with the background. Because Defendants' papers reflect a certain degree of amnesia about past events, however, the Court reiterates the factual and procedural background that is the most relevant to the current motions.

final district court approval of the Agreement. *Id.* ¶ 9.  In an effort to do so, in 1998, the INS published a proposed rule, stating that the "substantive terms of the [FSA] form[ed] the basis for the proposed rule." 63 Fed. Reg. 39,759 (1998).  The 1998 proposed rule and accompanying rulemaking process did not result in a final rule. *See Flores v. Rosen*, 984 F.3d 720, 728 (9th Cir. 2020).

On December 7, 2001, the parties stipulated to modify Paragraph 40 such that it now reads:  "All terms of this Agreement shall terminate 45 days following defendants' publication of final regulations implementing this Agreement[.]   Notwithstanding the foregoing, the INS shall continue to house the general population of minors in INS custody in facilities that are state-licensed for the care of dependent minors." *See* MTT, Ex. J at 32 ("FSA (as amended)") [Doc. # 1567-15]. [2]

In 2002, Congress passed the Homeland Security Act ("HSA"), which abolished the INS and transferred its functions to various agencies within the newly created Department of Homeland Security ("DHS"), as well as to the Office of Refugee Resettlement ("ORR"), an agency within the Department of Health and Human Services ("HHS").  6 U.S.C. §§ 251, 279, 291.  Also transferred to DHS were the functions of the former U.S. Customs Service, which had been a part of the Treasury Department. *Id.* at § 203(1).  The immigration and customs security and enforcement-related functions were commingled and vested into two agencies within DHS:  Customs and Border Protection ("CBP") and Immigration and Customs Enforcement ("ICE"). *See* 6 U.S.C. §§ 211, 252; H.R. Doc. No. 108-32.

The *Flores* Agreement is binding upon the named Defendants and their "agents, employees, contractors and/or successors in office." FSA at ¶ 1.  Consequently, after the reorganization of the INS, its "obligations under the Agreement" transferred to DHS and HHS. *Flores v. Barr*, 934 F.3d 910, 912 n.2 (9th Cir. 2019).

//

---

[2] Page citations herein refer to the page numbers inserted by the CM/ECF system.

B.   **The 2019 Motion to Terminate**

In 2019, Plaintiffs filed a Motion to Enforce the FSA and Defendants filed a "Notice of Termination and Motion in the Alternative to Terminate the Flores Settlement Agreement" soon thereafter. [Doc. ## 639, 634.] Defendants' Motion to Terminate was motivated by DHS and HHS' publication of regulations aimed at sunsetting the FSA. *See* 84 Fed. Reg. 44,392-535 ("2019 Regulations"). The Court granted Plaintiff's Motion to Enforce and denied Defendants' Motion to Terminate. [Doc. # 688.] The Court also issued a permanent injunction ordering that: 1) the FSA will remain in effect and has not been terminated; 2) Defendants must continue to comply with the FSA until they publish final regulations in compliance with the Agreement; and 3) Defendants were permanently enjoined from applying, implementing, or enforcing the 2019 Regulations. [Doc. # 690.]

On appeal, the Ninth Circuit held that this Court did not abuse its discretion when it denied Defendants' Motion to Terminate. The Ninth Circuit agreed that the 2019 Regulations were inconsistent with important aspects of the FSA, and even though certain regulations were consistent with the FSA, partial termination of the FSA was not appropriate because Defendants had only moved to terminate the *entire* Agreement. *See Flores v. Rosen*, 984 F.3d at 737. As a result, the 2019 Regulations were never implemented.

C.   **The 2022 CBP Settlement**

After years of mediation regarding the conditions at CBP facilities, the parties reached a supplemental settlement agreement. [Doc. # 1278 ("2022 CBP Settlement").] The 2022 CBP Settlement clarified the parties' understanding of Paragraphs 11 and 12A of the FSA, as they applied to conditions of CBP detention in the El Paso and Rio Grande Valley ("RGV") sectors.

As part of the 2022 CBP Settlement, Defendants agreed to ensure that CBP facilities in the El Paso and RGV sectors provide class members with access to "toilets, sinks, showers, hygiene kits, drinking water, age-appropriate meals and snacks, medical evaluations and appropriate medical treatment, clothing and blankets, caregivers in

certain facilities, adequate supervision to protect minors from others, and adequate temperature control and ventilation." 2022 CBP Settlement § 2. The 2022 CBP Settlement also required prioritization of family unity so long as it was operationally feasible and created the "Juvenile Care Monitor" ("JCM") role to allow for the independent monitoring of CBP's compliance with the 2022 CBP Settlement and the FSA more broadly. *Id.*

**D.     The 2024 Motion to Terminate**

On April 30, 2024, HHS issued a final rule governing the placement, care, and services provided to unaccompanied children in the custody of ORR. *See* Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34,384 (Apr. 30, 2024) ("Foundational Rule"). On May 10, 2024, Defendants filed a Motion to Terminate the FSA as to HHS under Federal Rule of Civil Procedure 60(b)(5) and Paragraph 40 of the FSA. [Doc. # 1414 ("MTT HHS").] On June 28, 2024, the Court conditionally and partially granted Defendants' motion, except as to Paragraphs 28A, 32, and 33 of the FSA and the FSA provisions concerning secure, heightened supervision, and out-of-network facilities. The Foundational Rule became effective on July 1, 2024. *Id.*

**E.     Current Motion to Terminate & Motion to Enforce**

Defendants now move to terminate the FSA, in its entirety, as to both DHS and HHS pursuant to Paragraph 40 of the FSA, as amended, and Rule 60(b)(4), (b)(5), and (b)(6). Defendants argue that the Court no longer has jurisdiction to oversee the FSA, both DHS and HHS are in substantial compliance with the Agreement, and further continuation of the FSA is no longer equitable or in the public interest. Plaintiffs oppose Defendants' MTT and also move to enforce the FSA, citing extended times in custody and unsafe and unsanitary conditions for minors detained in CBP facilities. The Court will address Plaintiffs' motion to enforce in a separate order.

## II.
## LEGAL STANDARD

Federal Rule of Civil Procedure 60(b)(5) "encompasses the traditional power of a court of equity to modify its decree in light of changed circumstances." *Frew v. Hawkins*, 540 U.S. 431, 441 (2004) (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 380 (1992)). This rule permits a party to be relieved from "a final judgment, order, or proceeding" when "the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable." *See* Fed. R. Civ. P. 60(b)(5). The Supreme Court has interpreted Rule 60(b)(5)'s use of the word "or" to signal that "each of the provision's three grounds for relief is independently sufficient." *Horne v. Flores*, 557 U.S. 433, 454 (2009).

A party seeking modification or termination of a consent decree bears the burden of showing that "a significant change in circumstances warrants revision of the decree." *Rufo*, 502 U.S. at 383 (1992); *see Flores v. Rosen*, 984 F.3d at 741. This "significant change" may be either in factual conditions or in law, and courts take a "flexible approach" to modifying consent decrees in institutional reform litigation to "ensure that responsibility for discharging the State's obligations is returned promptly to the State and its officials when the circumstances warrant." *Rufo*, 502 U.S. at 383; *Horne*, 557 U.S. at 448. If the moving party satisfies its burden, the Court must then determine whether the party's proposed modification is "suitably tailored" to the changed circumstance. *Id.* A modification is suitably tailored when it "would return both parties as nearly as possible to where they would have been absent the changed circumstances." *Kelly v. Wengler*, 822 F.3d 1085, 1098 (9th Cir. 2016) (internal citations omitted).

## III.
## DISCUSSION

**A.    Rule 60(b)(4):  Lack of Jurisdiction**

Defendants first argue that 8 U.S.C. § 1252(f)(1), as interpreted and applied by the Supreme Court in *Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022), requires the Court

to terminate the FSA and dissolve its 2019 injunction enjoining the 2019 DHS Regulations from taking effect. MTT at 32.

Section 1252(f)(1) provides as follows:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter, as amended by the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

8 U.S.C. § 1252(f)(1).

In *Aleman*, the Supreme Court interpreted this Section to "generally prohibit[] lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified statutory provisions." 596 U.S. at 550. Nothing in section 1252(f)(1), nor in the Supreme Court's *Aleman* opinion, however, precludes this Court from continuing to oversee and enforce the FSA, as was provided for in the Parties' Agreement.

As a preliminary matter, courts may not approve settlement agreements that violate federal law, and the parties entered into the FSA in 1997—one year *after* the Illegal Immigration Reform and Responsibility Act of 1996 ("IIRIRA"), of which section 1252(f)(1) is a part, became law. *See United States v. Carpenter*, 526 F.3d 1237, 1241 (9th Cir. 2008) (holding that courts cannot approve settlement agreements that violate the law); *see also* FSA ¶ 41 (stating that the parties knew "of nothing in this Agreement that exceeds the legal authority of the parties or is in violation of any law"). It therefore stands to reason that, if the FSA could not co-exist with section 1252(f)(1), the FSA would not have been approved in the first place. *See Flores v. Lynch*, 828 F.3d 898, 910 (9th Cir. 2016) (explaining that section 1252(f)(1) could not constitute a "change in law"

warranting modification of the FSA because the IIRIRA was passed "in 1996, before the Settlement was approved").[3]  Defendants nonetheless contend that termination and dissolution are appropriate "under Rule 60(b)(4) because the injunction is void for lack of jurisdiction and under Rule 60(b)(5) due to a change in decisional law." MTT at 32.

Defendants have argued on several occasions throughout this litigation that section 1252(f)(1) deprives the Court of jurisdiction to oversee the FSA. To that extent, Defendants' motion is an undisguised motion for reconsideration. The Court remains unconvinced. There is nothing new under the sun regarding the facts or the law. The Court therefore could deny Defendants' motion on that basis alone. *See* C.D. Cal. L.R. 7-18 (motion for reconsideration may be made, *inter alia*, on the grounds of emergence of new material facts or a change of law). Nonetheless, the Court exercises its discretion to address Defendants' motion on the merits.

Section 1252(f)(1) is a "carefully worded provision depriving the lower courts of power to 'enjoin or restrain the operation of'" "sections 1221 through 1232 of the INA." *Biden v. Texas*, 597 U.S. 785, 797, 801 (2022) (quoting 8 U.S.C. § 1252(f)(1)). Defendants assert that section 1252(f)(1) restricts this Court's jurisdiction because Paragraphs 12, 14, 19–24A, and 27 of the FSA "necessarily restrain[] how DHS 'carries out' the detention provisions in §§ 1225, 1226, and 1231." Reply at 11.

Although Defendants cite nine separate paragraphs of the FSA, certain provisions contained in Defendants' list are, in no way, encompassed by sections 1225, 1226, and 1231 of the INA: (1) Paragraph 12A's standards for the conditions of detention facilities, (2) Paragraph 20's solicitation of proposals for licensed programs, (3) Paragraph 23's requirement that minors be placed in the least restrictive setting that is available and appropriate under the specific circumstances, and (4) Paragraph 27's requirement that the INS inform a represented minor's attorney if the minor is transferred to a different

---

[3] At one point in Defendants' MTT, they seem to suggest that the enactment of sections 1225(b) and 1226(c) constitutes a "significant change in law." MTT at 39. These sections went into effect on *April 1, 1997*, over 28 years ago, so to the extent Defendants make this argument, it is untimely and waived.

facility. See FSA ¶¶ 12A, 20, 23, 27. In Defendants' own words, sections 1225, 1226, and 1231 "include the sources of DHS's *authority* to detain class members," not the conditions of detention or appropriate procedures once DHS has already invoked that authority. MTT at 33 (emphasis added). Indeed, in Defendants' 90 pages of briefing across the two motions, Defendants only ever specifically claim that the following provisions of the FSA directly infringe on the Government's ability to carry out the relevant sections of the INA: (1) the FSA's guarantee of bond determination hearings for minors (Paragraph 24A) and (2) the FSA's requirement that minors be processed and transferred or released as expeditiously as possible (included throughout the FSA). MTT at 39; Reply at 11.

As both this Court and the Ninth Circuit have addressed before, the Court's enforcement of the bond hearing and release provisions of the FSA does not conflict with the INA or IIRIRA. *See, e.g., Flores v. Barr*, 934 F.3d at 916 ("The Agreement 'creates a presumption in favor of releasing minors.' That presumption is fully consistent with the [INA's] expedited removal provisions.") (internal citations omitted); *Flores v. Rosen*, 984 F.3d at 738 ("[T]he [INA's] expedited removal [process] does *not* require mandatory detention for minors") (internal quotations omitted). At most, the Court's enforcement of the FSA has only "some collateral effect on the operation of [the] covered provision[s]," which does not amount to "enjoin[ing] or restrain[ing]" the Government's ability to carry out sections 1225, 1226, or 1231. *Aleman*, 596 U.S. at 553 n.4.

The Supreme Court's 2022 decision in *Aleman* compels no different outcome.[4] In *Aleman*, the district court interpreted section 1231(a)(6), in light of the Ninth Circuit's decision in *Diouf v. Napolitano ("Diouf II")*, to require the government, in all cases, to provide bond hearings to 1231(a)(6) detainees after 180 days in detention. *See Diouf II*, 634 F.3d 1081, 1082 (9th Cir. 2011), *abrogation recognized by Rodriguez Diaz v.*

---

[4] Plaintiffs argue that, because the Supreme Court decided *Aleman* three years ago, in 2022, the Court should decline to consider Defendants' argument now. Opp. at 17. The Court agrees that Defendants' lengthy delay is problematic, but in the interests of justice, the Court will nonetheless address Defendants' argument on the merits.

*Garland*, 53 F.4th 1189 (9th Cir. 2022); *Gonzalez v. Sessions*, 325 F.R.D. 616, 619 (N.D. Cal. 2018), *rev'd and remanded sub nom. Garland v. Aleman Gonzalez*, 596 U.S. 543 (2022). The district court certified a class, granted partial summary judgment against the government, and entered class-wide injunctive relief. Specifically, the district court entered the following injunction:

> The Government is enjoined from detaining Plaintiffs and the class members pursuant to section 1231(a)(6) for more than 180 days without [] providing each a bond hearing before an [Immigration Judge] as required by *Diouff II*.

*Gonzalez*, 325 F.R.D. at 619. The Ninth Circuit affirmed the district court's decision, which the Supreme Court reversed, holding that the district court exceeded its jurisdiction in awarding class-wide injunctive relief of that nature. *Aleman*, 596 U.S. at 548.

This case differs from *Aleman* in several important respects. In the course of ruling on a standard litigated injunction, the district court in *Aleman* independently interpreted an immigration statute, concluded what the statute required of the government, and ordered the government to comply with the court's interpretation of the government's statutory obligations. *See generally Gonzalez*, 325 F.R.D. 616. That is significantly different from the circumstances presented here, where the Court simply oversees and enforces a settlement agreement that (1) both sides freely entered, and where (2) both sides agreed to the Court's retention of jurisdiction over the Agreement. Moreover, whereas the injunction by the district court in *Aleman* provided no exceptions to its rule, the FSA contains multiple provisions recognizing, and deferring to, Defendants' discretion. *See Flores v. Session*, 394 F. Supp. 3d 1041, 1066 (C.D. Cal. 2017) (explaining that, in enforcing the FSA, the Court "does not dictate how Defendants must exercise their discretion to parole or release minors in every single case").

*Aleman* did not rewrite standard contract law. *See Flores v. Barr*, 407 F. Supp. 3d 909, 931 (2019) ("The blessing or the curse—depending on one's vantage point—of a

-10-

binding contract is its certitude."), *aff'd in part and rev'd in part on other grounds by Flores v. Rosen*, 984 F.3d 720. Thus, despite Defendants' vehement contentions otherwise, neither the mere passage of time nor changes in presidential administrations can excuse Defendants from holding up their end of the bargain. *See S.E.C. v. Worthen*, 98 F.3d 480, 482 (9th Cir. 1996) ("The mere passage of time [] does not constitute a ground for relief from an 'obey the law' injunction or a reason why prospective application of a judgment is no longer equitable"). If the law sanctioned Defendants' preferred approach to settlement agreements, the Government could simply enter settlement agreements to end litigation, refrain from fulfilling its obligations, and wait until it had been "long enough" to argue that the agreement had become "outdated" and that the judiciary's continued oversight encroaches on the executive's authority. This cannot be a correct reading of the law. The Parties entered into the FSA after 12 years of hard-fought litigation, and neither side sacrificed a potential victory in litigation for an Agreement where one side could unilaterally choose its expiration date or alter other material terms.

Because the Court concludes that neither section 1252(f)(1) nor *Aleman* deprives it of jurisdiction to oversee and enforce the FSA, the Court **DENIES** Defendants' MTT under Rule 60(b)(4).

**B.     Rule 60(b)(5):  Substantial Compliance**

Defendants' next argument is that, even if section 1252(f)(1) and *Aleman* do not deprive the Court of its jurisdiction over the FSA, termination is nonetheless appropriate because Defendants have achieved "substantial compliance" with the FSA's provisions. FSA ¶ 35. Defendants assert that the combination of DHS's 2019 Regulations, the ORR Foundational Rule, and ORR's "UAC Policy Guide" amount to substantial compliance with the Agreement.

Because consent decrees have 'many of the attributes of ordinary contracts [and] . . . should be construed basically as contracts,' the doctrine of substantial compliance, or substantial performance, may be employed." *Jeff D. v. Otter*, 643 F.3d 278, 283–84 (9th

Cir. 2011) (internal citation omitted). "Like terms in a contract, distinct provisions of consent decrees are independent obligations, each of which must be satisfied before there can be a finding of substantial compliance." *Rouser v. White*, 825 F.3d 1076, 1081 (9th Cir. 2016). Substantial compliance "does imply something less than a strict and literal compliance with the contract provisions but fundamentally it means that the deviation is unintentional and so minor or trivial as not 'substantially to defeat the object which the parties intend to accomplish.'" *Wells Benz, Inc. v. United States*, 333 F.2d 89, 92 (9th Cir. 1964) (citation omitted).

### 1. DHS

Defendants assert that the Court should terminate the FSA with respect to DHS because although DHS's 2019 regulations do not "mirror" the FSA, they "resolv[e] the concerns that instigated this lawsuit" and "generally incorporate" the FSA. MTT at 38–40. Defendants acknowledge that this Court and the Ninth Circuit have already deemed DHS's 2019 Regulations to be inconsistent with the FSA, and they present no evidence of amendments to the proposed 2019 Regulations or supplementary regulations that address the inconsistencies. *See Flores v. Rosen*, 984 F.3d at 744 n.11 ("The significant inconsistencies between the DHS regulations and the Agreement . . . preclude a finding of substantial compliance").

Defendants also assert that, where the 2019 Regulations do not implement the FSA, CBP's own "policies" will safeguard the rights of detained minors. As the Court has explained to Defendants before, regardless of the number of policies in place at USBP, CBP, and ICE facilities, "the mere existence of those policies tells the Court nothing about whether those policies are actually implemented." *Flores v. Sessions*, 394 F. Supp. 3d at 1054. Plaintiffs contend that DHS has yet to achieve substantial compliance with integral components of the Agreement. The Court addresses these allegations of continued lack of compliance in its separate order addressing Plaintiffs' motion to enforce.

Because Defendants cannot argue that the 2019 Regulations fully implement the FSA, Defendants instead contend that the DHS Regulations simply need not include the provisions that the courts found to be missing in 2019. MTT at 38. Specifically, Defendants contend that it is not necessary for the federal regulation that replaces the FSA to contain provisions regarding the expeditious release of minors and licensing requirements for Family Residential Centers ("FRCs").

Incredulously, Defendants posit that DHS need not promulgate regulations containing an expeditious release provision because "this Court has interpreted [expeditious release] to apply to *accompanied* children," but "the FSA was intended to provide for prompt release of *unaccompanied* children." *Id.* (emphasis added). This is plainly incorrect and ignores the rulings of at least three separate courts. As this Court and the Ninth Circuit have held time and time again, there is no doubt that the FSA "*unambiguously* applies both to unaccompanied and accompanied minors." *Flores v. Lynch*, 828 F.3d at 907 ("The conduct *Flores* challenged . . . applied to accompanied and unaccompanied minors alike") (emphasis added); *Flores v. Rosen*, 984 F.3d at 727; *see also Bunikyte, ex rel. Bunikiene v. Chertoff*, No. A-07-CA-164-SS, 2007 WL 1074070, at *3 (W.D. Tex. Apr. 9, 2007) ("[T]he *Flores* Settlement, by its terms, applies to all "minors in the custody" of ICE and DHS, not just unaccompanied minors"). Thus, any DHS regulations aimed at implementing the FSA must provide for the prompt release of both accompanied and unaccompanied minors. *Flores v. Rosen*, 984 F.3d at 739 (concluding that the 2019 Regulations were inconsistent with the FSA because, among other reasons, they limited the avenues for release of accompanied children).

Defendants similarly suggest that DHS should be excused from complying with the FSA's licensure requirements for FRCs because the FSA "is silent about family detention." MTT at 40. This argument, too, is recycled from Defendants' previous attempts to modify or terminate the Agreement, and it is no more appealing on this go around. *See Flores v. Lynch*, 828 F.3d at 906 ("[I]t is apparent that this agreement did not anticipate the current emphasis on family detention . . . . Nonetheless, the *Flores*

Settlement, by its terms, applies to all 'minors in the custody' of ICE and DHS, not just unaccompanied minors.") (quoting *Bunikyte*, 2007 WL 1074070, at *3 (alteration in original)).

DHS's 2019 Regulations were inconsistent with the FSA when the Court first considered them, and because DHS has not amended the regulations or promulgated supplemental regulations to address the inconsistencies, they remain inconsistent now.

### 2. HHS

In June 2024, the Court partially terminated the FSA with respect to HHS, except as to Paragraphs 28A, 32, 33, and the FSA provisions governing secure, heightened supervision, and out-of-network facilities. The Court concluded partial termination was appropriate in light of HHS's Foundational Rule implementing the terms of the FSA.[5] [Doc. # 1447 ("HHS Term. Ord.").] HHS later established a "UAC Policy Guide" that Defendants claim "implement[s] the Foundational Rule in accordance with this Court's concerns[.]" MTT at 35. According to Defendants, the UAC Policy Guide clarifies that isolated and petty offenses are not a basis for placing a minor in a heightened-supervision facility, removes the provision that would have allowed placement in a heightened-supervision facility solely because a minor was ready to "step down" from a secure facility, and establishes that the same standards shall be applied at both in-network and out-of-network placements. *See* HHS Term. Ord. at 11–13.

The Parties are in dispute as to whether the conditions and resources at ORR's secure, heightened supervision, and out-of-network facilities are equivalent to those of in-network facilities. *Compare* Opp., Ex. 15 (Declaration of R.H.L.) [Doc. # 1584-16]; Ex. 16 (Declaration of J.J.Z.Y.) [Doc. # 1584-17]; Ex. 17 (Declaration of J.B.Z.V.) [Doc. # 1584-18] *with* Declaration of Toby Biswas ISO Reply ¶¶ 3, 20, 21, 23. Even assuming *arguendo*, however, that ORR currently follows the UAC Policy Guide in full, the

---

[5] Partial termination was permissible in 2024 where it was not in 2019 because, although Defendants moved for full termination of the Agreement, they also explicitly moved, in the alternative, for partial termination.

changes to the Policy Guide are insufficient to warrant termination of the FSA provisions governing secure, heightened supervision, and out-of-network facilities because, by Defendants' own admission, they lack the "force of law."  Reply at 18.  Instead, ORR can modify its Policy Guide easily and unilaterally, and there is no public enforcement mechanism if the agency violates its own policies.  Opp. at 25.

Throughout the entire history of this case, the Parties have understood that "it is necessary . . . for the New Regulations to follow [Administrative Procedure Act] rulemaking procedures."  *Flores v. Barr*, 407 F. Supp. 3d at 924.  This understanding is evidenced by the fact that every time Defendants have attempted to promulgate a rule incorporating the FSA—in 1998, 2019, and 2024—they have always gone through the traditional APA rulemaking process.  *See also* FSA ¶ 9 ("[T]he INS shall initiate action to publish the relevant and substantive terms of this Agreement **as a Service regulation**") (emphasis added).  Termination of the FSA cannot occur until Defendants have published final, federal regulations implementing the FSA.  FSA ¶ 9; FSA (as amended) ¶ 40.

Accordingly, the Court concludes that neither DHS nor HHS is yet in sufficiently substantial compliance to warrant termination of the FSA under Rule 60(b)(5).[6]

## C. Rule 60(b)(5):  Enforcement of Agreement is No Longer Equitable

Defendants spill substantial ink on policy arguments about why it is allegedly no longer equitable for this Court to oversee and enforce the FSA, but they point to no meaningful change "either in factual conditions or in law" since their last motion to

---

[6] Defendants claim in a footnote in their Reply that they move, in the alternative, for partial termination of the FSA.  Reply at 29 n.3.  Defendants' alleged request for partial termination appears nowhere in their MTT, and new arguments cannot be raised for the first time in a reply brief.  *See United States v. Cox*, 7 F.3d 1458, 1463 (9th Cir. 1993).  Regardless, even if Defendants had properly raised the issue, the Court concludes that partial termination is not justified as to DHS for the same reasons that full termination is not.  As explained throughout this Order, Defendants have not promulgated *any* regulations even *purporting* to implement the FSA since their last MTT.  In addition, renewed allegations of FSA violations, which the Court will address in the context of Plaintiffs' motion to enforce, do not instill confidence that substantial compliance is at hand.  As for the HHS, the Court already has partially terminated the FSA as to HHS, except for certain sections for which Defendants still have not demonstrated substantial compliance.

terminate. *See Horne*, 557 U.S. at 447 ("The party seeking relief bears the burden of establishing that changed circumstances warrant relief"). Relying heavily on the Supreme Court's *Horne* decision, Defendants essentially ask the Court to reconsider its ruling on the 2019 Motion to Terminate by repeating their arguments about section 1252(f)(1), making broad statements about separation of powers, and comparing immigration numbers today with those from 1997.[7] But the Supreme Court decided *Horne* in 2009, section 1252(f)(1) became law in 1996, the separation of powers is a foundational principle of our nation, and the FSA "expressly anticipated an influx." *See Rufo*, 502 U.S. at 385 ("[M]odification should not be granted where a party relies on events that actually were anticipated at the time it entered into a decree"); *see also Flores*, 828 F.3d at 910. None of these are "changed circumstances."

The one genuine change in law cited by Defendants is the enactment of the Laken Riley Act in January 2025.[8] Pub. L. No. 119-21 (2025). The Laken Riley Act requires DHS to detain migrants who have been arrested for certain crimes and provides states with standing to sue the federal government if migrants who should have been detained commit a further crime that harms the state or its residents. *Id.* Defendants provide no explanation, however, as to how this Act makes "compliance with the [FSA] substantially more onerous," and the Court sees no apparent conflict between the Act and the FSA at all. *See Rufo*, 502 U.S. at 384.

Lastly, Defendants' argument that "the changed conditions of confinement warrant the termination of the FSA" is without merit. There are improved conditions of

---

[7] Notably, Defendants compare immigration numbers from 2024 with those in 1997, rather than immigration numbers from 2025, which are significantly lower than in 2024. Presumably, this is because a focus on the 2025 immigration numbers would undermine Defendants' argument that it is this Court's interpretation of the FSA which has *caused* the surge in child migration.

[8] In their Reply, Defendants also cite the "One Big Beautiful Bill Act" ("OBBA") as a significant change in law supporting termination of the FSA. Reply at 23. The OBBA allocates $45 billion in additional funding to ICE for detention facilities and provides that migrant families may be detained at FRCs. Pub. L. No. 119- 21, § 90003 (2025). The FSA does not preclude DHS from the use of FRCs— it simply requires that they be licensed and that minors be held in the least restrictive setting possible.

confinement due to remedial measures imposed by this Court in response to Plaintiffs' motions to enforce. These improvements are direct evidence that the FSA is serving its intended purpose, but to suggest that the agreement should be abandoned because some progress has been made is nonsensical. Termination of a consent decree pursuant to Rule 60(b)(5) requires implementation of "a durable remedy," which in this case, as described *supra*, the Parties have always understood to be a compliant federal regulation. FSA (as amended) ¶ 40.

### D.    Rule 60(b)(6):  Extraordinary Circumstances

Lastly, Defendants make a passing reference to Rule 60(b)(6), which permits relief from a final judgment, order, or proceeding for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6); MTT at 58. Relief pursuant to Rule 60(b)(6) "is to be utilized only where extraordinary circumstances prevented a party from taking timely action to prevent or correct an erroneous judgment." *United States v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993). Defendants state that this case presents the "extraordinary circumstances" envisioned by Rule 60(b)(6), but they provide no indication as to what those extraordinary circumstances are. The Court will therefore take this opportunity to address Defendants' broad arguments about the APA and the separation of powers.

As they did in 2019, Defendants contend that the Agreement violates the APA. This contention is deficient for multiple reasons. First, the APA was passed in 1946. It would strain credulity to suggest that the Parties were unaware of the APA when they drafted the Agreement, and as discussed *supra*, the Parties attested to the lawfulness of the Agreement when they drafted it, and courts may not approve consent decrees that violate the law. *See* FSA ¶ 41 ("Defendants' counsel represent and warrant that they are fully authorized and empowered to enter into this Agreement on behalf of the Attorney General, the United States Department of Justice, and the Immigration and Naturalization Service"). Second, the FSA does not "preordain a[] specific outcome" of the federal rulemaking process. *See* MTT at 57. Although the final regulation contemplated by the

Agreement cannot be *inconsistent* with the FSA, the Rule need not be a carbon copy of the Agreement, and it should still go through the standard notice-and-comment rulemaking process. Defendants need look no further than ORR's Foundational Rule, and the partial termination of the FSA as to HHS, to see that this is the case.

The argument that the Court's enforcement of the FSA turns the notice-and-comment rulemaking process into an "empty charade" also holds no water. *See Housatonic River Initiative v. EPA*, 75 F.4th 248, 268 (1st Cir. 2023) (concluding that the settlement did not render the notice-and-comment period as a "façade" because the remedy was "subject to a regulatory public comment process") (internal quotations omitted); *see also Conn. Light & Power Co. v. Nuclear Regul. Comm'n*, 673 F.2d 525, 528 (D.C. Cir. 1982) (explaining that the agency had come "perilously close" to violating the APA because, among other reasons, it allowed only 30 days, the statutory minimum, for notice and comment). The Court only addresses a promulgated regulation when one of the Parties invites it to do so—typically when Defendants file a motion to terminate. Only at that point does the Court consider whether a regulation is consistent with the FSA, and it does so only because consistency with the FSA is a termination requirement agreed to by the Parties.

A critical distinction between the FSA and the cases most heavily relied upon by Defendants is that, here, although the FSA precludes any final regulations from being inconsistent with the Agreement, promulgation of a regulation was not the underlying purpose of the Parties' bargain. Plaintiffs bargained, primarily, for the guarantee that minors detained by the INS (now HHS and DHS) would be held in safe and sanitary conditions. A regulation becomes relevant under the FSA only when Defendants seek to invoke the Agreement's sunset clause. This is distinct from cases like *Citizens for a Better Environment*, where the parties entered into an agreement *specifically and solely for a regulation*. *See Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, (D.C. Cir. 1983) (considering agreement that was entered into because "EPA failed to comply with the statutory directive that the Agency promulgate various regulations" and that

"contain[ed] a detailed program for developing regulations"). In that scenario, if the consent decree also delineated the "particulars" of the regulation, then the EPA would have violated its agreement by promulgating a regulation that differed in any respect from the one outlined by the consent decree, regardless of the notice and comment process. *See id.* at 1124. Here, Defendants do not immediately violate the FSA by promulgating an inconsistent rule—an inconsistent rule just would not be a sufficient basis for terminating the Agreement because it would not satisfy the sunset clause, as drafted and agreed to by the Parties.

In no way has the Court told Defendants to bypass notice and comment procedures, ignore public comments,[9] or promulgate a rule in line with criteria predetermined by the Court instead of by the Parties themselves. The Court has never attempted to limit the notice and comment process, and indeed, in this very same Order, the Court has reminded Defendants of *their* obligation to comply with this process. *See supra* at 15.

Defendants insist that the Court's enforcement of the FSA violates the separation of powers because it impermissibly "binds" the Government's hands. *See* Reply at 14. As an initial matter, although Defendants paint the judiciary as the only branch committed to honoring the Parties' Agreement, Congress has passed two bills—the HSA and the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA")—that preserved the FSA, and the TVPRA partially codified the Agreement. *See Flores v. Lynch*, 828 F.3d at 904.

Further, the Court has no desire or motive to oversee this Agreement in perpetuity, as it has clearly expressed in the past:

---

[9] To the extent that Defendants argue that the Court would decline to terminate the FSA against the public's wishes, the argument is mere speculation, and the Court rejects it. Further, contrary to Defendants' suggestion from this argument, when HHS proposed its 2024 Foundation Rule, the overwhelming majority of comments wanted the Rule to be *more* aligned with the FSA, not less. Opp. at 42 n.24 (citing 2019 Regulations, 84 Fed. Reg. at 44433).

> The Court agrees with Defendants that a district court should not be "doomed to some Sisyphean fate, bound forever to enforce and interpret a preexisting decree without occasionally pausing to question whether changing circumstances have rendered the decree unnecessary, outmoded, or even harmful to the public interest." And the Court is not unsympathetic to the challenges that DHS and HHS employees face in executing our country's immigration policies. But . . . throughout several presidential administrations, the Agreement has been necessary, relevant, and critical to the public interest . . . . Defendants willingly negotiated and bound themselves to these standards for all minors in its custody, and no final regulations or changed circumstances yet merit termination of the *Flores* Agreement.

*Flores v. Barr*, 407 F. Supp. 3d at 928 (internal citations and quotations omitted). Rather, the Court continues to oversee the action only because it is obligated, by law, to do so. The FSA is abundantly clear: the Agreement will be terminated 45 days after Defendants promulgate "final regulations implementing th[e] Agreement" that are not "inconsistent with the terms of th[e] Agreement." FSA ¶ 9; FSA (as amended) ¶ 40. Thus, it is the Government that continues to bind itself to the FSA by failing to fulfill its side of the Parties' bargain.

## IV.
## CONCLUSION

In light of the foregoing, the Court again **DENIES** Defendants' MTT.

**IT IS SO ORDERED.**

DATED: August 15, 2025

_____
DOLLY M. GEE
CHIEF UNITED STATES DISTRICT JUDGE