1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

10

11  JENNY LISETTE FLORES, *et al.*,

12                              Plaintiffs,

13              v.

14  PAMELA BONDI, Attorney General of the

15  United States, *et al.*,

16                              Defendants.

Case No. CV 85-4544-DMG (AGRx)

**ORDER RE PLAINTIFFS' MOTION TO ENFORCE [1575]**

17
18
19
20
21
22
23
24
25
26
27
28

Before the Court is Plaintiffs' Motion to Enforce the *Flores* Settlement Agreement. [Doc. # 1575 ("MTE").]   The motion is fully briefed.   [Doc. ## 1606 ("Opp."), 1619 ("MTE Reply").]   For the reasons set forth below, the Court **GRANTS in part** and **DENIES in part** Plaintiffs' MTE.

## I.

## BACKGROUND[1]

### A.    Settlement Agreement with the INS

On January 28, 1997, this Court approved the *Flores* Settlement Agreement ("FSA" or "Agreement"), a class action settlement between Plaintiffs—minors subject to detention by United States immigration authorities—and the federal government.   *See Flores v. Sessions*, 862 F.3d 863, 866 (9th Cir. 2017).   At the time, the Immigration and Naturalization Service ("INS") was the primary agency tasked with enforcing the nation's immigration laws, principally the Immigration and Nationality Act ("INA").   The Agreement accordingly defined the class as "All minors who are detained in the legal custody of the INS."   FSA ¶ 10 [Doc. # 101].

Paragraph 40 of the Agreement, the provision governing termination of the FSA, initially stated:   "All terms of this Agreement shall terminate the earlier of five years after the date of final court approval of this Agreement or three years after the court determines that the INS [Immigration and Naturalization Service] is in substantial compliance with this Agreement, except that the INS shall continue to house the general population of minors in INS custody in facilities that are licensed for the care of dependent minors."   FSA ¶ 40.   The parties originally contemplated that Defendants would initiate action to publish the terms of the FSA as a regulation within 120 days after final district court approval of the Agreement.   *Id.* ¶ 9.   In an effort to do so, in 1998, the INS published a proposed rule, stating that the "substantive terms of the [FSA] form[ed]

---

[1] The Court has summarized the background of this case on multiple occasions throughout this litigation, including in its concurrently issued Order re Defendants' motion to terminate.   ("Ord. re 2025 MTT").   The Court repeats here the factual and procedural background that is the most relevant to the current motion.

1  the basis for the proposed rule." 63 Fed. Reg. 39,759 (1998). The 1998 proposed rule
2  and accompanying rulemaking process did not result in a final rule. *See Flores v. Rosen*,
3  984 F.3d 720, 728 (9th Cir. 2020).

4      On December 7, 2001, the parties stipulated to modify Paragraph 40 such that it
5  now reads: "All terms of this Agreement shall terminate 45 days following defendants'
6  publication of final regulations implementing this Agreement[.] Notwithstanding the
7  foregoing, the INS shall continue to house the general population of minors in INS
8  custody in facilities that are state-licensed for the care of dependent minors." *See* MTT,
9  Ex. J at 32 ("FSA as amended") [Doc. # 1567-15]. [2]

10     In 2002, Congress passed the Homeland Security Act ("HSA"), which abolished
11 the INS and transferred its functions to various agencies within the newly created
12 Department of Homeland Security ("DHS"), as well as to the Office of Refugee
13 Resettlement ("ORR"), an agency within the Department of Health and Human Services
14 ("HHS"). 6 U.S.C. §§ 251, 279, 291. Also transferred to DHS were the functions of the
15 former U.S. Customs Service, which had been a part of the Treasury Department. *Id.* at §
16 203(1). The immigration and customs security and enforcement-related functions were
17 commingled and vested into two agencies within DHS: Customs and Border Protection
18 ("CBP") and Immigration and Customs Enforcement ("ICE"). *See* 6 U.S.C. §§ 211, 252;
19 H.R. Doc. No. 108-32.

20     The *Flores* Agreement is binding upon the named Defendants and their "agents,
21 employees, contractors and/or successors in office." FSA at ¶ 1. Consequently, after the
22 reorganization of the INS, its "obligations under the Agreement" transferred to DHS and
23 HHS. *Flores v. Barr*, 934 F.3d 910, 912 n.2 (9th Cir. 2019).

24 **B.    The 2022 CBP Settlement**

25     After years of negotiations and mediation regarding the conditions at CBP
26 facilities, the parties reached a supplemental settlement agreement. [Doc. ## 1254-1

27

28     [2] Page citations herein refer to the page numbers inserted by the CM/ECF system.

-3-

("2022 CBP Settlement"); 1278 ("Ord. Approving 2022 CBP Settlement").] The 2022 CBP Settlement clarified the parties' understanding of Paragraphs 11 and 12A of the FSA, as they applied to conditions of CBP detention in the El Paso and Rio Grande Valley ("RGV") sectors.

As part of the 2022 CBP Settlement, Defendants agreed to ensure that CBP facilities in the El Paso and RGV sectors provide class members with access to "toilets, sinks, showers, hygiene kits, drinking water, age-appropriate meals and snacks, medical evaluations and appropriate medical treatment, clothing and blankets, caregivers in certain facilities, adequate supervision to protect minors from others, and adequate temperature control and ventilation." Ord. re 2022 CBP Settlement at 2. The 2022 CBP Settlement also required prioritization of family unity so long as it was operationally feasible and created the "Juvenile Care Monitor" ("JCM") role to allow for the independent monitoring of CBP's compliance with the 2022 CBP Settlement and the FSA more broadly. *Id.*

**C.    Current Motion to Enforce & Motion to Terminate**

Plaintiffs now move to enforce the FSA, citing extended times in custody and unsafe and unsanitary conditions for minors detained in CBP and ICE facilities. Defendants oppose the MTE and move to terminate the FSA in its entirety, as to both DHS and HHS. The Court has addressed Defendants' MTT in a separate Order.

**II.**

**LEGAL STANDARD**

This Court has the power to enforce the terms of the Agreement because, with certain exceptions not relevant here, the Agreement "provides for the enforcement, in this District Court, of the provisions of this Agreement. . . ." *See* FSA ¶ 37; *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380-81 (1994); *Dacanay v. Mendoza*, 573 F.2d 1075, 1078 (9th Cir. 1978). "[T]he construction and enforcement of settlement agreements are governed by principles of local law which apply to interpretation of contracts generally." *O'Neil v. Bunge Corp.*, 365 F.3d 820, 822 (9th Cir.

2004) (quoting *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992)).

The *Flores* Agreement is a consent decree. "Consent decrees have the attributes of both contracts and judicial acts," and in interpreting consent decrees, courts apply traditional contract principles. *Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir. 1990). Under California law, a court must interpret a contract with the goal of giving effect to the parties' mutual intention as it existed at the time of contracting. Cal. Civ. Code § 1636. Where the parties dispute the meaning of specific contract language, "the court must decide whether the language is 'reasonably susceptible' to the interpretations urged by the parties." *Badie v. Bank of Am.,* 67 Cal. App. 4th 779, 798, 79 Cal. Rptr. 2d 273 (1998). If the contract is clear, however, the plain language of the contract governs. *Bank of the West v. Superior Court,* 2 Cal. 4th 1254, 1264, 10 Cal. Rptr. 2d 538 (1998).

The Court must consider the contract as a whole and be sure "to give effect to every part, if reasonably practicable, each clause helping to interpret the other." *Pinel v. Aurora Loan Servs., LLC,* 814 F. Supp. 2d 930, 943 (N.D. Cal. 2011) (quoting Cal. Civ. Code § 1641) (internal quotation marks omitted). "Courts must interpret contractual language in a manner that gives force and effect to every provision, and not in a way that renders some clauses nugatory, inoperative or meaningless." *Id.* When necessary, a court can look to the subsequent conduct of the parties as evidence of their intent. *See Crestview Cemetery Assn. v. Dieden,* 54 Cal. 2d 744, 754 (1960). If there is still uncertainty after the Court applies the foregoing rules, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." Cal. Civ. Code § 1654.

# III.

# DISCUSSION

Plaintiffs move to enforce the FSA and request that the Court appoint an Independent Monitor. MTE at 10. Plaintiffs seek an Independent Monitor who will monitor compliance in all CBP sectors, including by "validating data," "monitoring time in custody," and "monitoring and providing guidance on CBP's systems for tracking [time in custody] and expeditiously processing minors for release or transfer." MTE, Proposed Order ¶ 5 [Doc. # 1575-1]. Plaintiffs assert that enforcement of the Agreement and appointment of an additional monitor are most necessary to address CBP's lack of compliance with the FSA's "prompt release" and "safe and sanitary conditions" provisions.[3] MTE at 19–24. Plaintiffs submitted 23 declarations from minors detained in CBP and ICE facilities across the country—in New York, Maine, Illinois, Ohio, Arizona, Texas, and California—in support of their MTE.

## A.    Time in Custody

Plaintiffs assert that CBP's new policy "refusing to consider arriving non-citizens for release" has resulted in the unnecessarily prolonged detention of class members, despite the very low census numbers. MTE at 16. This conclusion appears to be in line with Defendants' own reported statistics, declarations of class members, and recent JCM and Juvenile Coordinator reports. *See, e.g.*, Declaration of Sarah E. Kahn ISO MTE ("Kahn Decl. ISO MTE") ¶ 13 (comparing December 2024 statistics, where CBP released 7,041/47,324 (15%) of individuals, with April 2025 statistics, where CBP released 2/8,383 individuals (0.0002%)) [Doc. # 1575-3]; Declaration of Diane de Gramont ISO MTE ("de Gramont Decl. ISO MTE") ¶¶ 21, 26; Ex. A (comparing May

---

[3] Plaintiffs also state that CBP denies access to telephones, fails to ensure contact with family members, and fails to provide children with adequate medical care. MTE at 24–26. Their Proposed Order does not request any form of relief, however, with regard to these specific issues. Accordingly, the Court takes these additional allegations into consideration insofar as they are evidence of a lack of substantial compliance, but the Court will not issue any relief as to these issues beyond that which already exists in prior orders.

2024 statistics, where 7% of detained minors were held for over seven days and 0.4% were held for over 14 days, with April 2025 statistics, where 60% of detained minors were held for over seven days and 23% were held for over 14 days) [Doc. # 1575-4]; Declaration of A.K. ¶ 6 (42 days in CBP custody)[4] [Doc. # 1575-24]; Declaration of F.Y. ¶ 6 (30 days in CBP custody) [Doc. # 1575-13]; Declaration of M.M. ¶ 7 (21 days in CBP custody) [Doc. # 1575-14]; JCM May 2025 Interim Report at 6 (documenting that families with children are "routinely" in CBP custody for greater than seven days) [Doc. # 1570]; 2025 CBP JC Report at 12 (showing families with children, on average, were held in CBP custody for over 72 hours in February–June of 2025) [Doc. # 1599-1].

Although Plaintiffs are correct that these extended times in custody ("TIC times") likely violate the FSA, and seem particularly unnecessary given the extremely low census, the CBP Juvenile Coordinator's most recent report shows that the average TIC times for family units have been going down over the past few months.  *See* 2025 CBP JC Report at 12 (showing the average TIC times for family units gradually decreasing from 177.39 hours in February 2025 to 77.84 hours as of June 10, 2025).  This indicates that CBP is aware of the issue and is working to resolve it.  Further, as a part of its remedial authority flowing from prior orders to enforce, the Court has already ordered the CBP Juvenile Coordinator to file a supplemental report providing:  (1) a census of minors who were held in CBP custody for over 72 hours during the months of June and July 2025, and (2) the reason why each minor was held for over 72 hours.  *See* Order re July 2025 Status Conference at 1 [Doc. # 1614].  Once the Court has the benefit of Defendants' explanations as to why they have been detaining class members for extended

---

[4] Despite A.K.'s lengthy time in custody, Defendants aver that they were moving as "expeditiously as possible," but that getting a flight back to Kazakhstan for A.K.'s family was a "lengthy process."  MTE Opp. at 10.  When Defendants finally got a flight for the family a month later, the family refused to board the plane because they feared being harmed back in Kazakhstan.  MTE Reply at 15.  Defendants then screened the family under the Convention Against Torture ("CAT"), which they passed, and Defendants transferred the family to ICE custody.  *Id.*  Thus, had Defendants completed the CAT screening for A.K., her husband, and their two-year-old child when they first asserted their fear of returning to Kazakhstan (i.e., when they first arrived), they could have been transferred to ICE detention a month earlier.  *Id.*

periods of time, it will be better able to assess whether further enforcement of the Agreement is warranted, or whether Defendants' delays were reasonable due to operational concerns.  The Court therefore **DENIES** Plaintiffs' MTE insofar as they request new relief on this issue.

The Court will also briefly address Defendants' oral and written objections in connection with the Court's July 25, 2025 Status Conference and July 28, 2025 Order following the status conference.  *See* Order re July 2025 Status Conference at 1 [Doc. # 1614].  Defendants object to the Court's request for supplemental reports from the Juvenile Coordinators including further data about TIC times, ICE's Modified Family Residential Standards, transportation issues as they relate to TIC times, and any issues that overlap with the present MTE and Defendants' pending MTT.  *See* JC Report Objections at 3–9  [Doc. # 1620].  Defendants base their objections on the assertion that the information requested by the Court is "outside the scope of the Juvenile Coordinator's annual report."  *Id.* at 3.  Defendants also object "to any finding that the JCM has the authority to monitor ICE facilities."  *Id.* at 9–10.

The Court **OVERRULES** Defendants' objection to the Court's request that Juvenile Coordinators file supplemental reports.  It is astounding to the Court that Defendants would make such an objection.  First, the Court has an obligation to oversee the FSA and the 2022 CBP Settlement, and it is impossible for the Court to do so in a meaningful way without adequate information.  The parties, presumably, understood this when they drafted the FSA because it created a Juvenile Coordinator role specifically to "review, assess, and report to the court regarding compliance with the terms of this Agreement."  FSA ¶ 30.  Second, the Court has issued remedial orders in the past regarding CBP and ICE facilities and, as such, has the inherent authority to enforce those orders.  *See, e.g.*, Doc. ## 189, 363, 833, 926, 987; *Shillitani v. United States*, 384 U.S. 364, 370 (1966) (explaining that courts have the inherent authority to monitor and enforce their prior orders).  Further, the Court has requested specific information of this type multiple times throughout this litigation and never has been met with blanket

1    objections of this nature.  [*See, e.g.*, Doc. ## 585, 784, 914, 987, 1098, 1229, 1406.]  To

2    the extent the use of the Juvenile Coordinators is a less intrusive enforcement mechanism

3    than the appointment of an independent monitor, the Court has endeavored to use that

4    approach except in the face of persistent violations.

5    **B.    Safe and Sanitary Conditions**

6         The FSA's requirement that minors be held in "facilities that are safe and sanitary"

7    encompasses "a commonsense understanding" of what "safe and sanitary" means, and

8    includes access to toilets and sinks, drinking water and food, soap, towels, showers, dry

9    clothing, toothbrushes, and adequate temperature control and ventilation.  FSA ¶ 12A;

10   *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1057 (C.D. Cal. 2017); *Flores v. Barr*, 934

11   F.3d at 916.

12        Plaintiffs argue that Defendants have violated this provision by maintaining

13   "freezing" temperatures in the facilities and by failing to provide adequate sleeping

14   conditions, access to soap,[5] and by detaining minors in port of entry ("POE") facilities—

15   which are not equipped for detention—for long periods of time.  *See, e.g.*, Declaration of

16   G.B.A. ¶ 11 ("There is water but no soap to wash our hands") [Doc. # 1575-18];

17   Declaration of S.G. ¶ 11 ("[T]hey offered to let us take a shower, but it was in the middle

18   of the night") [Doc. # 1575-23]; F.Y. Decl. ¶ 13 ("There was shampoo for our hair but no

19   soap"); Declaration of K.V.L. ¶¶ 7, 8 (explaining she was detained with her five-year-old

20   son in room with no windows and the toilet was "completely visible" to people walking

21   by the room) [Doc. # 1575-6]; Declaration of A.T. ¶ 10 ("We were not permitted to flush

22   the toilet")[6] [Doc. # 1575-16]; A.K. Decl. ¶ 22 ("I was only able to bathe my [two-year-

23   old] daughter about once every two weeks . . . [because] there was only cold water").

24

25        [5] It appears from the CBP Juvenile Coordinator's most recent report, and from the status
     conference following, that the lack of soap issue is actively being resolved.  2025 CBP JC Report at 21;

26   *see also* Mejia Decl. ¶ 21.

27        [6] The particular restroom mentioned by A.T. must be flushed from outside the detention cell.
     "Officers generally make efforts to flush the toilet after use, or as often as needed to ensure proper

28   functioning."  Mejia Decl. ¶ 12.

1

### 1.    Temperatures

In support of a recurring complaint, Plaintiffs present evidence that class members have experienced extremely cold temperatures while in CBP custody.[7]  *See* Declarations of T.M. (New York) ¶ 7 ("The cell was freezing cold") [Doc. # 1575-5]; V.I.B.G. (New York) ¶ 11 ("It was freezing"); G.A.D. (San Diego) ¶ 15 ("The room is very cold") [Doc. # 1575-9]; R.S.R. (San Diego) ¶ 14 ("[I]n the night time it is very cold") [Doc. # 1575-11]; L.G.C.G. (San Diego) ¶ 18 ("It is cold in the pod") [Doc. # 1575-10]; F.Y. (El Paso) ¶ 7 ("It was extremely cold.  My sons both got sick there because it was so cold."); M.M. (El Paso) ¶ 8 ("It was freezing cold in the detention") [Doc. # 1575-14]; A.T. (O'Hare Airport) ¶ 11 ("It was freezing all the time") [Doc. # 1575-16]; M.H. (Ursula) ¶ 10 ("It is extremely cold in the room") [Doc. # 1575-19]; M.L.R.L. (Ursula) ¶ 11 ("It is very cold. They gave us one sweater, but it is thin and we didn't get anything else to stay warm") [Doc. # 1575-20]; L.N. (Chula Vista) ¶ 15 ("It is always cold in the room") [Doc. # 1575-21]; W.J. (Chula Vista) ¶ 11 ("The facility is usually cold and we are only allowed to wear one layer of clothing at a time") [Doc. # 1575-22]; S.G. (Chula Vista) ¶ 5 ("It is very, very cold"); A.K. (Otay Mesa) ¶ 16 ("Many kids in the room got sick because of the cold"); S.K. (Otay Mesa) ¶ 11 ("It was extremely cold") [Doc. # 1575-25].  This has been a consistent issue throughout this case, across many different sectors.  *See, e.g.*, Ord. re MTE and Appoint Monitor at 15–16 [Doc. # 363]; Dec. 2024 JCM Report at 9–10 [Doc. # 1522]; Ord. re Motion to Modify 2022 Settlement at 4 [Doc. # 1547]; May 2025 JCM Report at 8.

Defendants report that the temperatures in all facilities were within the acceptable range while the declarants and their families were detained.  *See generally* Declaration of Benjamin Hollinder ("Hollinder Decl.") [Doc. # 1606-1].    But this generalized declaration is not enough to contradict the large volume of specific accounts by class

---

[7] Two class members reported being too hot in the "Dilley" and "Karnes" ICE facilities. Declaration of K.V.L. ¶ 18; Declaraion of V.I.B.G. ¶ 34 [Doc. # 1575-12].  Because these are only two individual accounts—each from a different facility—and because Plaintiffs' MTE and this Order focus primarily on CBP facilities, the Court does not address these isolated temperature issues.

members and their families that they experienced extreme discomfort due to cold temperatures. Additionally, as recently as in his May 2025 report, the JCM stated that "[i]nterviews with [Border Patrol] agents, parents, children, and caregivers all reported that temperatures in holding pods could vary dramatically" in the El Paso sector. May 2025 JCM Report at 8. Moreover, even when temperatures are in the acceptable range, children often still feel cold without additional layers, and Plaintiffs' witnesses also reported either not knowing they could request additional layers or receiving only one thin layer. *See, e.g.*, R.S.R. (San Diego) ¶ 14 ("They give us thin metal blankets, but no extra clothes"); *see also* Dec. 2024 JCM Report at 10 ("Children have long reported cold temperatures in CBP facilities and having extra clothing readily available for children has been the primary means of avoiding the necessity of raising the minimum allowable temperatures").

Given the weight of the evidence, the Court finds that Plaintiffs have satisfied their burden of establishing Defendants' substantial non-compliance with the Agreement in the RGV (Ursula), El Paso, and San Diego (San Diego SSF,[8] Chula Vista, Otay Mesa POE) sectors. The Court **GRANTS** Plaintiffs' MTE on the issue of adequate temperature controls at a reasonable and comfortable range in the named sectors.[9] The Court **DENIES** the MTE as to the other cited facilities as to this issue (New York and O'Hare) because Plaintiffs have not provided enough evidence to demonstrate, by a preponderance of the evidence, that Defendants have failed to substantially comply with the FSA's temperature provision in those sectors.

---

[8] The Court acknowledges that the San Diego SSF has not been used since March 2025 but notes the noncompliance nonetheless in case the facility is reopened. *See* Hollinder Decl. ¶ 71.

[9] The Court issued this same ruling in its June 27, 2017 Order as to the RGV sector. [Doc. # 363.] Thus, in addition to enforcing the FSA and 2022 Settlement, the Court also enforces its June 27, 2017 Order on this issue. *See Shillitani*, 384 U.S. at 370 (courts have inherent authority to monitor and enforce their prior orders).

-11-

### 2.    Lights

The other issue most cited by Plaintiffs' declarants was inadequate sleeping conditions and, more specifically, that the lights at CBP facilities were not dimmed at night.  Declarations of K.V.L. ¶ 14 ("My son couldn't sleep.  He woke up so many times because there was an extremely bright light on the entire night"); G.A.D. ¶ 19 ("Lights are blaring at all hours.  My sons can't sleep at night because of the light"); V.I.B.G. ¶ 35 ("I have asked [the staff] to not yell and not turn high lights in [her son's] face, but they still do it"); F.Y. ¶ 11 ("The lights were on all night, they never turned off"); L.N. ¶ 19 ("[T]hey keep the lights on all day and night . . . My children and I are not sleeping enough because it is so difficult to fall asleep"); W.J. ¶ 12 ("The lights in our room are always on.  They never turn them off or dim them and I have to cover my head with my blanket so that I can sleep"); S.G. ¶ 13 ("They leave the lights on all day and night, so it is very hard to sleep"); A.K. ¶ 14 ("There was a light on 24 hours"); S.K. ¶ 18 ("The lights were on all night and day").

In response, Defendants state either that staff members at any given facility make reasonable efforts to dim lights at night, or that it is impossible to dim the lights at a particular facility.  *See* Hollinder Decl. ¶¶ 32, 75, 102.  This evidence, however, is not sufficient to undercut the credibility of the assertions made by numerous detainees, in numerous sectors, across a several months-long time period.  The Court **GRANTS** Plaintiffs' motion to enforce the FSA on the issue of reduced lighting at night in the El Paso and San Diego sectors (San Diego SSF, Chula Vista, Otay Mesa) and **DENIES** the MTE as to the other sectors.[10]

### 3.    Other Prevalent Unsafe and Unsanitary Conditions

Plaintiffs mention a wide variety of conditions at play in the CBP facilities—some of which can be remedied via enforcement or attention by the Juvenile Coordinator, but some of which are impossible to resolve due to the physical limitations of certain CBP

---

[10] To the extent a facility does not have the ability to dim the lights, CBP shall make reasonable efforts to turn off some of the lights to darken the pod areas.  *See* Hollinder Decl. ¶ 32.

facilities (e.g., lack of windows, inability to go outdoors, toilet-flushing mechanisms). This underscores precisely why the prolonged times in CBP custody remain a significant problem. CBP facilities, by design, are not suitable for minors for long periods of time. Indeed, both sides agree that CBP facilities and POEs are "generally designed to be temporary, short-term holding facilities." Declaration of Margaret Isaacs ("Isaacs Decl.") ¶ 5 [Doc. # 1606-5]; *see also* Declaration of Luis Mejia ("Mejia Decl.") ¶ 7 [Doc. # 1606-2]. Thus, although the Court cannot remedy certain problematic, but unchangeable, physical conditions at border stations, the Court reemphasizes Defendants' obligation to process, transfer, and release class members as expeditiously as possible, consistent with the FSA and the 2022 CBP Settlement.

**C.   Monitoring**

Although Plaintiffs request the appointment of an independent monitor, the Court does not find this remedy to be warranted at this time. As mentioned above, the Court has already ordered both the CBP and ICE Juvenile Coordinators to file supplemental reports, due on September 8, 2025, regarding the increase in the average length of time in custody for minors. *See* Ord. re July 25, 2025 Status Conference. Additionally, the JCM is filing an amended Final Report by September 5, 2025. *See* Ord. re JCM's Final Report and June 23, 2025 Status Conference [Doc. # 1591]. A further status conference regarding all three reports is scheduled for September 22, 2025. *Id.* Depending on the contents of those reports, the Court may reconsider what in essence is Plaintiffs' request for *re-appointment* of an independent monitor at that time. For now, the Court **DENIES** Plaintiffs' request for appointment of a monitor.

**IV.**

**CONCLUSION**

In light of the foregoing, the Court **GRANTS in part and DENIES in part** Plaintiffs' MTE. The Court **ORDERS** as follows:

1. The Court **DENIES without prejudice** Plaintiffs' request to re-appoint a monitor. The CBP and ICE Juvenile Coordinators shall comply with the Court's Order re

-13-

July 25, 2025 Status Conference [Doc. # 1614]. Defendants' objections to that Order are **OVERRULED**.

2. With regard to the RGV, El Paso, and San Diego (San Diego SSF, Chula Vista, Otay Mesa) sectors, as required by Paragraphs 12.A, 14, and 18 of the FSA and Sections VII(1) and VII(8)(B) of the 2022 CBP Settlement, the CBP shall expeditiously process class members and begin to make and record prompt and continuous efforts on its part toward family reunification and the release of a minor upon taking the minor into custody. Such efforts shall include expeditious processing for individualized bond determination where appropriate pursuant to Paragraph 24A of the Settlement, and shall continue throughout the child's time in CBP custody including after the minor is transferred, if applicable, to another facility operated by Defendants. If prompt and continuous effort toward release and reunification requires transfer to another facility, CBP must effect any such transfer expeditiously.

3. As required by Paragraph 18 of the FSA and Section VII of the 2022 CBP Settlement to make continuous efforts toward family reunification and release, the Department of Homeland Security ("DHS") shall not "restart the clock" when it transfers a class member from one unlicensed, secure facility to another, regardless of which DHS component agency operates the facility. Expeditious processing begins at apprehension and must continue from apprehension through the child's release from Defendants' custody.

4. With regard to the RGV, El Paso, and San Diego (San Diego SSF, Chula Vista, Otay Mesa) sectors, as required by Paragraphs 11 and 12.A of the FSA and Section VII of the 2022 CBP Settlement, DHS shall hold minors in facilities that are safe and sanitary and are consistent with its concern for the particular vulnerability of minors, for the entirety of their detention in DHS custody. Because CBP facilities are intended only for short-term use, CBP shall hold minors in its custody only for the amount of time DHS reasonably requires to process the minor for release

1  and/or actively arrange for and complete transport of the minor to a more suitable
2  facility.

3  5.  As required by Paragraph 28A of the Settlement, the CBP and ICE Juvenile
4     Coordinators shall maintain accurate records and statistical information on minors
5     held in DHS custody more than 72 hours.  The data provided to Plaintiffs' Counsel
6     under Paragraphs 28A and 29 shall include all children in DHS custody for a
7     cumulative period of more than 72 hours, including minors transferred between
8     DHS component agencies. As required by Paragraphs 28.A, 29, and 32 of the
9     Settlement, DHS shall notify Plaintiffs' Counsel of, or make clear in the monthly
10    data it provides, the location and nature of the facilities where all minors in its
11    custody are held.

**IT IS SO ORDERED.**

DATED:  August 15, 2025

_____
DOLLY M. GEE
CHIEF UNITED STATES DISTRICT JUDGE

-15-