CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
crholguin@centerforhumanrights.org
Bardis Vakili (Cal. Bar No. 247783)
bardis@centerforhumanrights.org
Sarah E. Kahn (Cal. Bar No. 341901)
sarah@centerforhumanrights.org
1505 E 17th St. Ste. 117
Santa Ana, CA 92705l
Telephone: (909) 274-9057

*Attorneys for Plaintiffs*

*Additional counsel listed on following page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| Jenny Flores, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Pamela Bondi, Attorney General of the United States, *et al.,* <br><br> Defendants. | Case No. CV 85-4544-DMG-AGRx <br><br> **PLAINTIFFS' RESPONSE TO SUPPLEMENTAL JUVENILE COORDINATOR REPORTS AND DATA** <br><br> Judge: Hon. Dolly M. Gee |

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe (Cal. Bar No. 299296)
Diane de Gramont (Cal. Bar No. 324360)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email: mwroe@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW
Rebecca Wolozin (admitted *pro hac vice*)
818 Connecticut Ave. NW, Suite 425
Washington, DC 20006
Telephone: (202) 868-4792
Email: bwolozin@youthlaw.org

CHILDREN'S RIGHTS
Leecia Welch (Cal. Bar No. 208741)
2021 Fillmore Street
San Francisco, CA 94115
Telephone: (415) 602-5202
Email: lwelch@childrensrights.org

CHILDREN'S RIGHTS
Eleanor Roberts (admitted *pro hac vice*)
88 Pine Street, Suite 800
New York, NY 10005
Telephone: (212) 683-2210
Email: eroberts@childrensrights.org

# TABLE OF EXHIBITS

**Exhibit Index to Plaintiffs' Response to
Supplemental Juvenile Coordinator Reports and Data**

| Exhibit No. | Exhibit Description |
|---|---|
| 1 | G.Z.B. Declaration (Dilley), July 28, 2025 ("G.Z.B. Decl.") |
| 2 | R.F.Z. Declaration (Dilley), July 29, 2025 ("R.F.Z. Decl.") |
| 3 | C.G.V. Declaration (Dilley), July 28, 2025 ("C.G.V. Decl.") |
| 4 | C.H. Declaration (Dilley), July 28, 2025 ("C.H. Decl.") |
| 5 | W.M.A. Declaration (Dilley), July 29, 2025 ("W.M.A. Decl.") |
| 6 | E.Z.R. Declaration (Dilley), May 1, 2025 ("E.Z.R. Decl.") |
| 7 | A.D.C. Declaration (Dilley), September 9, 2025 ("A.D.C. Decl.") |
| 8 | A.T. Declaration (Dilley), June 4, 2025 ("A.T. Decl.") |
| 9 | E.M. Declaration (Dilley), June 5, 2025 ("E.M. Decl.") |
| 10 | E.R.R. Declaration (Dilley), May 2, 2025 ("E.R.R. Decl.") |
| 11 | E.O.N.M. Declaration (Dilley), July 28, 2025 ("E.O.N.M. Decl.") |
| 12 | I.C.B. Declaration (Dilley), July 28, 2025 ("I.C.B. Decl.") |
| 13 | F.J.A. Declaration (Dilley), July 28, 2025 ("F.J.A. Decl.") |
| 14 | K.M. Declaration (Dilley), July 28, 2025 ("K.M. Decl.") |
| 15 | B.G.R. Declaration (Dilley), July 29, 2025 ("B.G.R. Decl.") |
| 16 | M.O. Declaration (Dilley), July 29, 2025 ("M.O. Decl.") |
| 17 | Declaration of Leecia Welch, September 15, 2025 |

**Previously Filed Declarations**

| Docket No. | Description |
|---|---|
| 1575-14 | Ex. 12 to CBP MTE, M.M. Declaration (Dilley), May 2, 2025 [Doc. # 1575-14] ("M.M. Decl.") |
| 1584-12 | Ex. 11 to Pls.' Opp'n to MTT, S.L. Declaration (Dilley), May 2, 2025 [Doc. # 1584-12] ("S.L. Decl.") |

| | |
|---|---|
| 1584-8 | Ex. 7 to Pls.' Opp'n to MTT, Y.F.A. Declaration (Dilley), May 1, 2025 [Doc. # 1584-8] ("Y.F.A. Decl.") |
| 1584-6 | Ex. 5 to Pls.' Opp'n to MTT, L.J.H.G. Declaration (Dilley), May 5, 2025 [Doc. # 1584-6] ("L.J.H.G. Decl.") |
| 1575-27 | Ex. 25 to CBP MTE, L.Q.A. Declaration (Dilley), May 2, 2025 [Doc. # 1575-27] ("L.Q.A. Decl.") |
| 1575-6 | Ex. 4 to CBP MTE, K.V.L. Declaration (Dilley), May 2, 2025 [Doc. # 1575-6] ("K.V.L. Decl.") |
| 1575-10 | Ex. 8 to CBP MTE, C.M.Z. Declaration (San Diego), March 7, 2025 [Doc. # 1575-10] ("C.M.Z. Decl.") |
| 1575-5 | Ex. 3 to CBP MTE, A.L.W. Declaration (Dilley), June 5, 2025 [Doc. # 1575-5] ("A.L.W. Decl.") |

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 1

II.  ICE has not shown compliance with the Flores Settlement Agreement ............. 1

   A. Prolonged Unexplained Detention ............................................................. 1

   B. Conditions of Detention ............................................................................. 5

      1.  Children are kept for prolonged periods in an unlicensed, secure prison-like environment ......................................................................... 5

      2.  Children are not being provided know-your-rights trainings and lack access to free legal counsel .......................................................... 6

      3.  Children lack access to drinkable water and child-friendly foods and healthy snacks ................................................................................. 7

      4.  Children lack access to hygiene products ............................................. 8

      5.  Children lack access to visitation or free phone calls to their family members .... 9

      6.  Children lack education at Dilley ......................................................... 9

      7.  Dilley does not provide adequate care for children with disabilities and is not equipped to respond to medical emergencies ........................ 10

   C.  ICE has not adequately explained its modifications to the 2020 Family Detention Standards and their impact on FSA compliance ........................ 11

III. Lengths of stay in CBP remain very concerning and are in violation of the FSA. ..................................................................................................... 12

IV.  Conclusion ................................................................................................. 14

v

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

## I. INTRODUCTION

Pursuant to the Court's order on July 28, 2025, Doc. # 1614, and in accordance with Paragraphs 28A and 30 of the *Flores* Settlement Agreement ("FSA"), the Juvenile Coordinator ("JC") for U.S. Immigration and Customs Enforcement ("ICE") and the Juvenile Coordinator for U.S. Customs and Border Protection ("CBP") filed their supplemental 2025 Annual Reports on September 8, 2025. CBP Juvenile Coordinator Suppl. Report, Doc. # 1648-1 ("CBP JC Suppl. Report"); ICE Juvenile Coordinator Suppl. Report, Doc # 1648-4 ("ICE JC Suppl. Report"). Both supplemental reports and their accompanying census data on children held for longer than 72 hours in CBP and ICE custody confirm Plaintiffs' concern that CBP and ICE are not in compliance with the FSA's requirements.

## II. ICE has not shown compliance with the Flores Settlement Agreement

First, Plaintiffs reassert that family detention is not only cruel and fundamentally harmful to children but also unjustified. *See, e.g.*, Pls.' Opp. to Defs.' Mot. To Amend Settlement, Doc. # 122; Pls.' Mot. To Enforce at 15-17, Doc. # 201; Pls.' Opp. to Defs.' Mot. To Terminate Settlement at 19-24, Doc. # 1584. The additional information provided in the ICE JC Suppl. Report is rebutted by class members' account of detention conditions and only reinforces Plaintiffs' serious concerns about ICE's compliance with the FSA.

### A. Prolonged Unexplained Detention

The Court ordered the ICE Juvenile Coordinator to provide a census of minors held in ICE facilities for over 72 hours in the months of June and July including "the reason why each minor was held for more than 72 hours." Order re July 25, 2025 Status Conference, Doc. # 1614 at 1. The ICE census data reveals numerous children with prolonged lengths of detention and little to no justification provided, indicating that Defendants are not complying with their obligations to release children without unnecessary delay and make and record prompt and continuous efforts toward family reunification and release. FSA ¶¶ 14, 18.

For example, one young child was detained by ICE for over three months, from May 3, 2025, to August 7, 2025, and the only reason provided for this prolonged detention is "Remained in FRC pending CAT process." ICE July 2025 Census Report, Doc. # 1648-6 at 19-20. Another young child was similarly held at South Texas Family Residential Center ("Dilley") for nearly three months, from May 11, 2025, to August 5, 2025, and the only explanation provided is "Resided at FRC for ER/CF process." *Id*. at 10. The Court has previously found such vague explanations insufficient to show Defendants are meeting their obligations under the Settlement. *See* Order re Plaintiffs' Motion to Enforce, April 24, 2020, Doc. # 784 ("April 2020 Order") at 15-16 (noting that ICE's "spreadsheet does not contain information about flight risk or other factors leading to a denial of release" and merely states reasons such as "pending IJ hearing/decision" or "pending USCIS response").

Numerous other children were detained for well over 72 hours with even less explanation. For example, many children are listed as "booked into the FRC for housing," with no other reason given to justify the long length of stay. This includes two children held for over three weeks—from June 11, 2025, through July 4, 2025. Doc. # 1648-6 at 31; *see also id.* at 26, 28-30, 32. Over a hundred children in the July 2025 census are simply listed as some variation of "Stayed in FRC prior to removal," including children detained over six weeks. *See* Doc. # 1648-6 at 37 (one child listed as detained 5/24/25 to 7/15/25 and another child listed as detained 5/31/25 to 7/16/25); *see also generally* Doc. # 1648-6. Multiple children are listed as a variation of "Stayed in FRC prior to OREC" (Order of Release on Recognizance). *Id*. There is no explanation for why the order of recognizance decision took so much time, even in the case of a child held over seven weeks. *See id*. at 37 (child listed as detained 5/21/25 to 7/11/25 with reason "Stayed in FRC prior to release on OREC").

There is no indication in the ICE JC Suppl. Report or the July 2025 ICE census that ICE is evaluating children's length of stay for compliance with their *Flores* rights. Although some class members were released from Dilley "due to 20 day limitation" according to the June 2025 ICE census, *see* Doc. # 1648-5, that policy seems to have

2

been stopped as it is not reflected in the July 2025 ICE Census. Doc. # 1648-6. However, the ICE JC Suppl. Report provides no explanation for this change in policy. Indeed, despite the Court's order that the ICE JC report include a summary of "how the ICE Juvenile Coordinator monitors FSA compliance," the report includes no discussion of how the JC monitors compliance with the FSA's release provisions. Instead, the report simply cites some general reasons that children may be in custody over 72 hours. *See* ICE JC Suppl. Report at 10 ("CSO interviews cited administrative and judicial stay reviews and adjudications as reasons for extended stays."). As in April 2020, "[i]t is unclear . . . why, given the significantly reduced numbers in custody, 20 days is insufficient time for screening Class Members when it was sufficient in prior influxes involving far more people." April 2020 Order at 15.

*Flores* counsel monitoring visits have also revealed an alarming increase in average time in custody. In July, *Flores* counsel met with several children who had been detained for two or more months. *See, e.g.*, Decl. of K.M. ¶¶ 4, 6 (103 days); Decl. of G.Z.B. ¶ 4 (49 days); Decl. of R.F.Z. ¶ 4 (53 days); Decl. of C.G.V. ¶ 5 (40 days); Decl. of C.H. ¶ 4 (77 days). Despite having repeatedly raised this concern with Defendants, *Flores* counsel observed a continuing trend of increasing time in custody at the most recent site monitoring visit. Welch Decl. ¶ 21. For example, one family counsel interviewed at Dilley in September had been apprehended in April and detained in CBP custody for 16 days before being transferred to the Dilley FRC, where they were detained for 45 days. The family was released in July and ordered to attend check-ins. At their first check-in, in August, the family was re-detained and has now been in ICE custody, enduring their second detention, for 20 days. Welch Decl. ¶ 21.

The prolonged lengths of stay reflected on the July 2025 census and confirmed by Plaintiffs' counsel's most recent site visit to Dilley suggest ICE is routinely holding families, including small children, for longer than 20 days, without any justification. Doc. # 1648-6; Decl. of C.H. ¶ 40 ("Many families stay more than twenty days."); Decl. of W.M.A. ¶ 5 ("I have been detained at this facility for more than 20 days."); Ex. 12 to CBP MTE, [Doc.# 1575-14], M.M. Decl. ¶ 26 ("I have been in immigration detentions

for almost two months now."); Welch Decl. ¶ 21. As this Court has found in a similar context, continued detention for removal when removal is not imminent or "ready to take place" is a violation of paragraphs 14 and 18 of the FSA. *See* April 2020 Order at 13-14. Additionally, continued detention of class members, even where the child has a final removal order, is a violation of FSA paragraph 14 unless ICE has provided an individualized assessment which determines continued detention is necessary for safety or because of a flight risk. *Id*. at 17-18.

The July 2025 ICE census also reveals unexplained prolonged detention of children in hotels that appear to violate the Court's September 4, 2020, and September 21, 2020, order limiting the use of hotels to "*brief* hotel stays (not more than 72 hours) as necessary and in good faith to alleviate bottlenecks in the intake processes at licensed facilities." Order re Defendants' *Ex Parte* Application to Stay, September 21, 2020, Doc. # 990 at 5; *see also* Order re Plaintiffs' Motion to Enforce Settlement as to "Title 42" Class Members, September 4, 2020, Doc. # 976 at 17 (permitting exceptions "for one to two-night stays while in transit or prior to flights"). For example, the census indicates that one unaccompanied child was held in consecutive temporary hotel stays for over two weeks (from 6/24/25 to 7/11/25 and 7/11/25 to 7/14/25) before taking voluntary departure. Doc. # 1648-6 at 16. The reason provided is "Remained in ICE custody pending ORR placement," even though the census does not reflect a transfer to ORR. *Id.* Multiple children in family units are listed as in hold rooms or hotels for over a week. *See, e.g.,* Doc. # 1648-6 at 56 (one child detained in hold rooms or hotels between 7/9/25 and 7/18/25 with reason listed as "Continued detention due to immigration proceedings" and another child detained in hold rooms or hotels between 7/9/25 and 7/17/25 with reason listed as "Continued detention due to HOH not released").

Plaintiffs' counsel will continue to meet and confer with Defendants[1] regarding our concern about the egregious lengths of stay and, if necessary, will raise the issue with the Court.[2]

### B. Conditions of Detention

Children's prolonged lengths of stay in ICE custody are particularly concerning given the conditions of detention class members face at Dilley. Notably, the ICE JC Suppl. Report repeatedly states that ICE's standards were modified in light of the "short length of stay" without acknowledging that many children's stays are anything but short. ICE JC Supp. Report at 7-8. In addition, ICE's repeated assertions of compliance with the FSA are refuted by extensive evidence from Plaintiffs' counsel's four site visits to Dilley since it opened six months ago. Welch Decl. ¶¶ 12-21. Class members and their families consistently report serious concerns with Dilley's secure, prison-like environment, the lack of access to know your rights trainings and free legal counsel, the lack of access to drinkable water and healthy, varied, child-friendly foods and snacks, the inability of class members to sleep due to lights kept on in their living areas all night, the lack of access to hygiene products, the lack of free calls to family members, and inadequate care for acute emergency medical incidents and children with serious illnesses or disabilities. Welch Decl. ¶¶ 3, 12-20.

*1. Children are kept for prolonged periods in an unlicensed, secure prison-like environment*

Dilley is an unlicensed facility surrounded by a secure metal fence perimeter. Welch Decl. ¶ 6. Counsel can meet with families only by passing through metal detectors and several sets of locked doors. *Id*. ¶ 6. There are no family visits at this time for children to

---

[1] Plaintiffs have requested and attempted to confirm with Defendants that the ICE Juvenile Coordinator be present at our upcoming meet and confer so that we may raise our concerns about length of stay and other issues identified in our September monitoring visit directly with the ICE Juvenile Coordinator as encouraged by the Court. Welch Decl. ¶ 5.

[2] Plaintiffs did not receive the July 2025 monthly data reporting under FSA ¶¶ 28A and 29 until Tuesday, September 9, 2025, and have therefore not yet had a chance to discuss their data concerns with Defendants.

connect with un-detained family members, including parents and primary caregivers. *Id*. ¶ 17. Children at Dilley report feeling like prisoners locked up in isolated, cell-like trailers. Ex. 11 to Opp. To MTT, May 2, 2025 [Doc.# 1584-12] S.L. Decl. ¶ 16 (children are "locked away" and "isolated"); E.Z.R. Decl. ¶ 6 ("I feel like I am locked up"). Class members described Dilley as a prison and families have noted that guards refer to them as inmates. *See, e.g.,* Ex. 3 to CBP MTE, June 5, 2025 [Doc. # 1575-5] A.L.W. Decl. ¶ 8 ("This place is a prison."); Ex. 7 to Opp. To MTT, [Doc.# 1584-8] Y.F.A. Decl. ¶ 19; E.M. Decl. ¶ 49; Ex. 5 to Opp. To MTT, [Doc.# 1584-6] L.J.H.G. Decl. ¶ 13 ("The staff here call us inmates because it is like a prison."). Families detained at Dilley are constantly monitored. E.M. Decl. ¶ 21 (even throughout the night "[t]he guards check on you ever 20 minutes."); Y.F.A. Decl. ¶ 10 ("They are constantly coming in the room at all hours of the night.") S.L. Decl. ¶ 14; L.J.H.G. Decl. ¶ 17.

Living in this restricted, prison-like environment has caused sleep deprivation, anxiety and regressed behaviors in class members. Y.F.A. Decl. ¶ 11 ("With the lack of sleep and anxiety, my son is throwing himself against the floor and getting bruises. He wants to leave so badly that he is having these reactions."); E.M. Decl. ¶ 49 ("We are not fine. We all cry every night."); A.T. Decl. ¶¶ 32-35; Ex. 25 to CBP MTE, [Doc.# 1575-27] L.Q.A.Decl. ¶ 20 ("[My son] said he doesn't believe in God anymore because he prays to him but we still haven't been able to get out of here.").

  *2. Children are not being provided know-your-rights trainings and lack access to free legal counsel*

Contrary to the ICE JC Suppl. Report, children and families at Dilley have consistently reported that they are not apprised of their rights under *Flores*, including their right to free legal counsel. Welch Decl. ¶ 13. ICE's Supplemental report claims staff "ensured access to free phone calls for contacting legal service providers" ICE JC Suppl. Report at 6 and "ICE staff provided information on legal orientation programs." *Id* at 6. However, as recently as the September 9-11 site visit and long before then, class members reported never receiving a know-your-rights presentation, having challenges accessing their immigration lawyers, and not being able to call their immigration lawyers

for free. Many families who had been at Dilley for weeks were not aware they could make free legal calls or did not know how to do so. Moreover the list of free legal service providers are most often in English, stapled on top of Spanish-language versions and occasionally other languages. Welch Decl. ¶ 13.

Notably, on several observed bulletin boards, the small print list of which languages materials are available in, was posted at the top perimeter of the bulletin board well above an adult's line of sight. *Id*. ¶ 13. Plaintiffs' counsel did not observe any sign-up sheets available for legal visits. *Id*. ¶ 13.

> 3. *Children lack access to drinkable water and child-friendly foods and healthy snacks*

ICE claims to have resolved issues with accessing water at Dilley by providing "filtered water in living areas and bottled water upon request." ICE JC Suppl. Report at 2. However as recently as September 9-11, class members reported that drinkable water continues to be available only in the cafeteria during mealtimes.[3] Otherwise, bottled water must be purchased for $1.21 per bottle at the commissary, which most families cannot afford. Welch Decl. ¶ 14. The inability of class members to access water they feel comfortable drinking has been consistent and ongoing since May, and raised as a concern at every Dilley site visit since then. *See, e.g.*, Decl. of E.R.R. ¶ 11 (From May: "The water has a bad taste so we don't drink it."); Decl. of E.M. ¶ 28 (From June: "We just don't trust that the water is cleanly dispensed and sometimes the water really smells bad. Maybe that is why so many people here are sick."); Decl. of E.O.N.M. ¶ 32 (From July: "We have all been feeling stomach aches, especially when we drink the water. A lot of people do not like to drink the water here because it is not good . . . They sell water, too, but it is so expensive and we cannot afford it. We have never bought it because it is like $1.25 for a bottle."). Additionally, the JC Suppl. Report does not address the fact that tap

---

[3] Plaintiffs' counsel cannot confirm whether or not drinking water in the living areas is potable, however class members and their families consistently report the water in the living areas is "not drinkable" and tastes bad. Welch Decl. ¶ 14.

water in class members' rooms "smells so horrible and it looks white and dirty." Ex. 4 to CBP MTE, [Doc.# 1575-22] [Doc. # 1575-6], K.V.L. Decl. ¶ 19.

ICE also claims to have resolved issues with child-appropriate foods and healthy snacks at Dilley by providing "dietitian-approved meals and snacks, including child-friendly options." ICE JC Suppl. Report at 2. Yet, class members have continually reported the food is always the same and there are no toddler-friendly options, leading many to lose weight or stop eating entirely. *See, e.g.*, Decl. of Y.F.A. ¶ 11 ("They give the same food here to adults and kids. My son has only eaten 2 days out of the 19 days because he doesn't like the food."); Decl. of L.J.H.G. ¶ 15 (no food for children at Dilley); Decl. of I.C.B. ¶ 9 ("My brother doesn't eat anymore, so he needed PediaSure. My parents had to almost beg the medical staff to give him PediaSure. He doesn't like the food served here and neither do I."); Decl. of E.O.N.M. ¶ 17 (no allergy accommodations). Families also repeatedly reported that snacks are limited to red apples, sugary cookies, milk and apple juice. *See* Decl. of F.J.A. ¶ 14 (only healthy snack available is apples, which child won't eat anymore). Plaintiffs' counsel tours of Dilley confirm that the snacks available to detained children are exclusively Teddy Grahams, apples, milk, and juice. Welch Decl. ¶ 15. While this selection might be appropriate for short stays of 72 hours or less, children detained at Dilley for weeks or months need other options. These concerns continued to be reported during Plaintiffs' September visit. *Id.* ¶ 15.

  4.  *Children lack access to hygiene products.*

The supplemental report further claims "[m]inors were provided with personal hygiene products." ICE JC Suppl. Report at 5. However, as recently as September 9-11, class members reported the only thing available for them in the showers is liquid hand soap. Welch Decl. ¶ 16. Class members must buy necessary hygiene products, such as shampoo and bar soap, from the commissary. *See, e.g.*, Decl. of W.M.A. ¶ 9 ("I have to buy soap and shampoo because the soap that's in the showers is the same hand soap that is at the sink, and it stings my skin."); Decl. of C.G.V. ¶ 19 ("Since I got here, they also raised the prices on items for people detained here to purchase. I have to buy shampoo

and body soap for my daughter because the soap in the showers is just hand soap and it irritates her skin."). The lack of hygiene products is causing medical issues for some class members. *See, e.g.*, Decl. of K.M. ¶ 34 ("A lot of people here have gotten rashes from the soap. But if you want to use a better soap or shampoo, you have to buy it."). Further, during the September visit, counsel heard that class members received only one tooth brush and travel-size toothpaste upon arrival at Dilley, but once that ran out they had to buy more from the commissary. Welch Decl. ¶ 16. The fact that essential items such as body soap, shampoo, toothpaste, menstrual products, and ChapStick are sold at the commissary strongly indicates they are not being provided in a timely or adequate manner for free. *Id.* ¶ 16.

     5.   *Children lack access to visitation or free phone calls to their family members.*

Children also have to pay for phone calls to their family, and thus are denied access to communication with non-detained family members unless they have money. The Supplemental Report states that "[e]ach minor is provided with a free phone call," which as class members have told us, means that they can make one three-minute call upon entry, but have to pay for any further communication. Welch Decl. ¶ 17. This is harmful and isolating for children, especially for families without money. Decl. of B.G.R. ¶ 23 ("When we call my family, like my grandmother, we have to pay to talk to them. We need money in our account to make the call. Another woman in our room has no money and my mom is letting her use some of her minutes."). Additionally, class members detained at Dilley are receiving no visitation from family or friends. Decl. of M.O. ¶ 30 ("No family or other person can visit me here unless they are a lawyer. No one told me why.").

     6.   *Children lack education at Dilley.*

The supplemental report admits there is no consistent structured education available at Dilley and instead children are forced to spend day after day learning only from "educational packets" and workbooks. ICE JC Suppl. Report at 4. Dilley has been open for approximately six months and yet there is no indication as to when there will be adequate educational services provided to class members. Instead, the JC reports that

"ICE *anticipates* issuing a contract modification that will fully implement an education program that meets all of the Flores requirements." *Id.* (emphasis added). This is an inadequate response to concerns that children are bored and spending weeks or even months in a facility where they have insufficient activity and learning opportunities. *See e.g.*, Decl. of B.G.R. ¶ 16 ("From 9 am -3 pm, there is one hour [of classroom time] for each age group. There is a one-hour window for 6th to 8th grades. … They just give worksheets or things to draw.").

Many of the children detained at Dilley are missing important educational milestones and tests and are falling behind in school. Their education cannot be replaced by an hour of filling out "educational packets." Juvenile Coordinator Report (Sept. 8, 2025) [Doc. # 1648-4] at 4. Further, children report that the library contains few or no books in most languages other than English or Spanish and class is conducted in English or Spanish, leaving children who speak other languages without "[e]ducational services appropriate to the minor's level of development," "English Language Training," or "appropriate reading materials in languages" they understand. FSA Ex. 1 ¶ 4;[4] Welch Decl. ¶ 18.

> 7. *Dilley does not provide adequate care for children with disabilities and is not equipped to respond to medical emergencies.*

For children with mental health needs and disabilities, detention in secure, restrictive facilities, prolonged separation from their medical care providers, and interruption of their medical care plans causes dangerous decompensation. Ex. 8 to CBP MTT, [Doc.# 1584-9], C.M.Z. Dec. ¶¶ 8-9 ("I shared that my son has leukemia, but no one did anything . . . I am extremely upset because my son was supposed to have an appointment with the doctor today to see when he needs his next cancer treatmen[t]."); Decl. of A.D.C. ¶ 9 ("We have been telling the staff that being here is very hard for our son because of his condition. He is extremely sensitive to smells, sounds and textures.

---

[4] ICE Family Residential Centers are not licensed, and they do not approach the minimum standards for licensed facilities set out by the FSA. Yet DHS detains children for periods of time the FSA never contemplated for licensed facilities, let alone for unlicensed, secure detention.

There are no therapies or treatments for him here. We have gone to the doctor several times, but the options are very limited. For example, since arriving here, our son started refusing to use the bathroom because of how strong the smells are – the cleaning chemicals and other smells. When he would go in the restroom, he would throw up. Because he would not want to go in there, he would hold it and hold it, and then eventually he would pee his pants."). Similarly, ICE detention centers are not prepared to respond to medical emergencies. One child was made to wait over six hours with acute stomach pain, then was told by a nurse he was fine and should come back in three days. After he vomited, he was finally taken to a hospital, where staff immediately identified that he was suffering from appendicitis and rushed him into emergency surgery. Welch Decl. ¶ 20; *see also* S.L. Decl. ¶ 23 (eight-year-old child waited two hours in excruciating pain at Dilley medical are before being taken to the ER).

### C. ICE has not adequately explained its modifications to the 2020 Family Detention Standards and their impact on FSA compliance.

The ICE JC Supplemental Report references modifications to the 2020 Family Residential Detention Standards made in 2025 "to address operational realities and the short length of stay for families in residential centers." ICE JC Suppl. Report at 7. The report goes on to say that the "modifications did not directly apply to the Flores Settlement Agreement." *Id*. It is difficult to evaluate the standards and their modifications given that Defendants have not shared the specific modifications made. However, based on the description of modifications to "behavior management" Plaintiffs' counsel are concerned this modification does in fact apply to the FSA and its requirement to consider, for example, children's particular vulnerabilities as minors. ICE JC Suppl. Report at 8; FSA ¶ 11. Plaintiffs' counsel are also concerned that the modification to "Correspondence and Other Mail" restricts the FSA's requirements related to family contact and legal services access by preventing class members who are unable to pay for calls from having any other means of communication with their family. It may also restrict class members' access to legal documents from outside attorneys who are not able to travel to Dilley. FSA Exhibit ¶¶ 1.A.11, C(2). Plaintiffs remain concerned that such

easy modifications of the standards combined with how little information as to what modifications are made results in the standards being virtually meaningless.

Additionally, the report still does not explain what operational needs are considered before modifying the standards, how long ICE plans to operate under the current modifications, or whether ICE intends to further modify the current or previous standards and in what way. Nor does the report indicate whether ICE intends to reimplement standards deemed unnecessary for lengths of stay less than 20 days as children's length of time in ICE custody continues to climb.

The ICE JC Supplemental Report only increases Plaintiffs' deep concerns regarding the safety of children detained by ICE.

### III. Lengths of stay in CBP remain very concerning and are in violation of the FSA.

Children must be expeditiously moved out of secure unlicensed facilities under the FSA, and typically they must be transferred or released from CBP custody within 72 hours. CBP facilities, especially border stations and hold rooms where many families are now being held, are designed as temporary facilities and are fundamentally unfit to hold children for any period of time. As the Court recently found, "the physical limitations of certain CBP facilities (e.g., lack of windows, inability to go outdoors, toilet-flushing mechanisms) … underscores precisely why the prolonged times in CBP custody remains a significant problem." Order re Plaintiffs' Motion to Enforce, August 15, 2025, Doc. # 1638, ("CBP MTE Order") at 13. The Court then ordered that "[b]ecause CBP facilities are intended only for short-term use, CBP should hold minors in its custody only for the amount of time DHS reasonably requires to process the minor for release and/or actively arrange for and complete transport of the minor to a more suitable facility." *Id.* at 14-15.

The CBP JC Supplemental Report and census demonstrate that many children are held for far longer than 72 hours in the jail-like conditions of CBP for no reason other than awaiting transfer to *other* Department of Homeland Security custody, namely ICE custody. The June 2025 CBP census reveals that one child was detained by CBP for 472.23 hour*s*—nearly 20 days—"awaiting transfer to ERO," and another child was held

for 351.55 hours—over two weeks—for the same reason. Doc. # 1648-2. This is a clear violation of the FSA, particularly given that ICE family detention has been open for nearly six months now. Multiple additional children in June and July were held in CBP custody for a week or more for the sole reasons that the child is "awaiting transfer to ERO." June CBP Census, Doc. # 1648-2 (children held 167.63 hours (7 days), 166.55 hours (6.9 days), 166.2 hours (6.9 days), 156.2 hours (6.5 days)); July CBP Census, Doc. # 1648-3 (three children held 187.05 hours (7.8 days), child held 178.63 hours (7.4 days), child held 171.20 hours (7.1 days), 165.72 hours (6.9 days)).

Particularly concerning is that the CBP JC Supplemental Report admits that children are spending extensive periods of time awaiting "repatriation together as a family." CBP JC Suppl. Report at 1-2. The CBP census reveals that multiple children were detained for over 12 days in CBP "awaiting transportation for repatriation/family unity." June CBP Census, Doc. # 1648-2 (child held 322.65 hours (13.4 days), three children held 304.75 hours (12.7 days), two children held 290.98 hours (12.1 days)); July CBP Census, Doc. # 1648-3 (listing two children with time in custody ("TIC") of 301.77 hours (12.6 days)). While Plaintiffs do not dispute that repatriation for families "where there are multiple children who have different countries of birth, or where at least one of the children is a United States citizen" is complicated and can take time, it is unacceptable to force children to spend days or weeks in jail-like CBP facilities rather than in a more suitable facility or an alternative to detention while travel is arranged. CBP MTE Order at 9, 13; FSA ¶¶ 11, 12.A.[5]

---

[5] Plaintiffs' counsel would like to clarify that Plaintiffs are not provided the total number of children in families detained in CBP custody, nor is such data available publicly – CBP publicly provides only the number of members of family units encountered, not the number of children in family units detained. In their monthly data, Defendants provide only the number of children detained *over 72 hours*. This limitation makes it difficult for Plaintiffs to adequately convey prolonged detention statistics. In their recent MTE, Plaintiffs described the percent of children detained over 72 hours who were detained for over seven or 14 days, but did not have access to the percentage of all children detained. *See* Ex. A. to Declaration of Diane de Gramont at 2-3, June 12, 2025, Dkt. # 1575-4.

     Although average time in CBP custody appears to be lower on average, some children are still spending dangerous lengths of time in CBP custody and the CBP JC Suppl. Report describes no changes to practices, and certainly no durable policy changes, that would protect average time in custody increasing once again. Neither does the CBP JC Suppl. Report provide any indication of what, if anything, CBP is doing to remedy the ongoing violations, nor how they will comply with the Court's orders and the requirements of the FSA that they expeditiously process children and avoid prolonged stays in CBP facilities, which all parties agree are not designed for long-term detention.

## IV.    Conclusion

     Plaintiffs appreciate the opportunity to respond to Defendants' Supplemental JC Reports and will raise concerns addressed in this response with the Court in a motion to enforce if the parties' meet and confer efforts are unsuccessful.

Dated: September 15, 2025

CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
Carlos Holguín
Bardis Vakili
Sarah Kahn

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe
Diane de Gramont
Rebecca Wolozin

CHILDREN'S RIGHTS
Leecia Welch
Eleanor Roberts

*/s/ Leecia Welch*

Leecia Welch
*Attorney for Plaintiffs*

# CERTIFICATE OF SERVICE

I hereby certify that on September 15, 2025, I caused a copy of Plaintiffs' Response to Supplemental Juvenile Coordinator Reports and Data to be served to all counsel through the Court's CM/ECF system.

Dated: September 15, 2025            */s/ Leecia Welch*
                                     Leecia Welch
                                     *Attorney for Plaintiffs*