

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**HONORABLE DOLLY M. GEE, JUDGE PRESIDING**

**JENNY L. FLORES, ET AL.,**

**Plaintiffs,**

**Vs.** **No. CV85-04544-DMG**

**PAMELA BONDI, ET AL.,**

**Defendants.**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**STATUS CONFERENCE VIA ZOOM**

**LOS ANGELES, CALIFORNIA**

**FRIDAY, JULY 25, 2025**

**MIRIAM V. BAIRD, CSR 11893, CCRA**
**OFFICIAL U.S. DISTRICT COURT REPORTER**
**411 WEST FOURTH STREET, SUITE 1-053**
**SANTA ANA, CALIFORNIA 97201**
**VELIZBAIRDMIRIAM@GMAIL.COM**

**A P P E A R A N C E S**

**IN BEHALF OF THE PLAINTIFF, JENNY L. FLORES:**

DIANE BEATRIX DE GRAMONT
NATIONAL CENTER FOR YOUTH LAW
1212 BROADWAY, SUITE 600
OAKLAND, CA 94612

NATIONAL CENTER FOR YOUTH LAW
MISHAN RAINI WROE
1212 BROADWAY
SUITE 600
OAKLAND, CALIFORNIA 94612

REBECCA R. WOLOZIN
NATIONAL CENTER FOR YOUTH LAW
818 CONNECTICUT AVENUE NW
SUITE 425
WASHINGTON, DC 20006

LEECIA WELCH
LEECIA WELCH
88 PINE STREET SUITE 800
NEW YORK CITY, NY 10005

**IN BEHALF OF THE DEFENDANT, PAMELA BONDI, ET AL.:**

U.S. DEPARTMENT OF JUSTICE
BY: KATELYN MASETTA-ALVAREZ
CHRISTINA PARASCANDOLA
P.O. BOX 868 BEN FRANKLIN STATION
WASHINGTON, DC 20044

FOR THE SPECIAL MASTER:
STRUMWASSER & WOOCHER, LLP
BY: ANDREA SHERIDAN ORDIN
10940 WILSHIRE BOULEVARD
SUITE 2000
LOS ANGELES, CALIFORNIA

ALSO PRESENT: NANCY EWEN WANG, HENRY MOAK, PAUL WISE, DAWN HELLAND

LOS ANGELES, CALIFORNIA; FRIDAY, JULY 25, 2025; 11:08 A.M.

---

THE CLERK: Calling item number one, case number LACV-85-04544-DMG, Jenny L. Flores, et al., versus Pamela Bondi, et al.

Counsel, please state your appearances, starting with the plaintiffs.

MS. WROE: Good morning, Your Honor. Mishan Wroe for plaintiffs.

MS. WOLOZIN: Good morning, Your Honor. Rebecca Wolozin for plaintiffs.

MS. DE GRAMONT: Good morning, Your Honor. Diane de Gramont for plaintiffs.

MS. WELCH: Good morning, Your Honor. Leecia Welch for plaintiffs.

THE COURT: Are the defendants' attorneys here?

MS. MASETTA-ALVAREZ: Yes, Your Honor. Good morning. It's Katelyn Masetta-Alvarez.

THE COURT: Was there anyone else on your team?

MS. PARASCANDOLA: Christina Parascandola for defendants.

MS. ORDIN: And for the juvenile care monitor, Andrea Ordin, legal advisor.

MR. WISE: Good morning, Your Honor. This is Paul Wise for JCM.

MS. EWEN WANG: Nancy Ewen Wang for JCM.

THE COURT: Good morning, everyone.

MR. MOAK: Good morning, Your Honor. Henry Moak for CBP. Thank you.

11:09AM THE COURT: And Ms. Helland?

MS. HELLAND: Good morning, Your Honor. Very good to see you this year.

THE COURT: Good morning.

Do we have everyone who needs to make an 11:09AM appearance?

All right. Good morning, everyone. And thank you, Mr. Moak, and thank you, Ms. Helland, for your annual reports. I have a number of questions, particularly for Ms. Helland, but let me start with Mr. Moak first.

11:10AM Mr. Moak, I was looking at the chart for the average time in custody. For the period -- that's Table 5, by the way, in your report. From the period from June 2024 to January 2025, the numbers look pretty good.

Then after January 2025, the numbers sort of start 11:10AM getting rather large, although they are tapering off again in June, it looks like. Can you tell me why that was happening.

MS. MASETTA-ALVAREZ: Your Honor, I'm sorry. This is Katelyn Masetta-Alvarez. Defendants would -- because some of these issues are overlapping with issues that plaintiffs 11:11AM have brought up in their motion to enforce, the defendants

would respectfully object to any -- to those questions that would specifically go to those issues that plaintiffs have brought up since the juvenile coordinator is here and not under oath.

11:11AM THE COURT: All right. Well, that sort of limits our ability to talk about the reports, then.

Well, let me go about it in this way. In your report, Mr. Moak, you said that many factors contributed to the children remaining in custody for more than 72 hours, such as an injury or illness; UCs initially claiming to be adults and then proven to be of minor age; resource capacity and/or transportation limitations with HHS, ORR, and ICE.

11:11AM

Are those the primary reasons for those numbers? And is that still persisting, or is that something that's improving over time?

11:12AM

MR. MOAK: Your Honor, CBP continues to work with our partners and predominantly. I couldn't give you a percentage to those that are delayed in our custody, but I would tell you that working with our partners to have the children move forward, that is something we pay close, close attention to all the way back up to the headquarters.

11:12AM

Usually it's a transportation issue and getting the right flights organized and having them move onward is predominantly what I see. There's no policy within CBP that would retain anyone beyond the 72-hour -- in fact,

11:13AM

predominantly our numbers have continued to fall, but I think it would be -- but it is a focus, I guess, is the main way to answer that. It is a focus all the way back to headquarters starting in 0600 every morning to be sure we know what's going on with every family ...

THE COURT: Well, I'm sorry, Mr. Moak. I can't hear you anymore. You might have --

MR. MOAK: I was asking my staff if there was anything else I should add, but they said that was acceptable for now.

THE COURT: You have indicated that your JCD team intends to visit the RGV in El Paso sectors once a quarter moving forward. Is this once per quarter for each of the sectors, or what did you mean by that?

MR. MOAK: Yes, ma'am, once per quarter for each of those two sectors.

THE COURT: I presume that the census is continuing to decline, or is it sort of reaching a plateau at this point?

MR. MOAK: You know, I hate to go into percentages, but it looks like the numbers have drastically fallen. Even in my report, I think I throw out something in this 96 percent, 97 percent decrease. But I think it seems to be leveling off at this point, and it doesn't seem to have changed much since the completion of this year.

THE COURT: In one of your tables you indicate that there are seven minors who are held in ICE secure juvenile detention facilities. Do you have more detailed information about these seven minors? Are they teenagers or people accused of having committed a crime? What's the reason for their being in secure juvenile detention facilities?

MS. MASETTA-ALVAREZ: Your Honor, with all due respect, I'm not sure that Mr. Moak would have the knowledge for the reasons behind those if it's not already listed in his report.

THE COURT: All right. Well, then, I might ask for a supplemental report in that regard.

MS. MASETTA-ALVAREZ: Yes, Your Honor.

THE COURT: What I'd like to do also, Mr. Moak, is ask you about the rate of inaccuracies and improper documentation regarding health intake interviews and medical care reports.

We might have touched on that a bit earlier in our previous meeting with the juvenile care monitors. Are those being addressed at this point? And if so, what actions are being taken to improve the rate of -- improving the rate of inaccuracies in those reports?

MR. MOAK: Ma'am, recently I believe Dr. Wise has met with both OCMO and border patrol, but in those sessions we began to discuss how we record and how we improve on the

accuracy.

Part of the mandate that I've asked of my team or the requirement that I've laid on my team that's in the field is to be sure that we crosswalk the data, what we actually see. And we'll be gaining better fidelity over time to be sure that what we report and what we see in the system is what we see on the ground.

THE COURT: Is this system of reporting something that you include in your Flores implementation trainings?

MR. MOAK: Yes, ma'am. We --

THE COURT: Go ahead.

MR. MOAK: In fact, we continue to add modules in that training because we see best practices and things that help us to stay on top of all the issues.

THE COURT: Are these Flores implementation trainings, or FIT as you refer to them, are they only available by request, or do you do them on a regular basis?

MR. MOAK: The demand signal is larger than our ability to get out in the field at this point, but we are exploring doing it virtually especially for those sectors that we've already been to or those that are -- that we're -- well, the virtual FIT training will happen over time, and that will help us from a travel standpoint, not from a cost but from an ability to do all of the things that we are requiring.

I can honestly tell you that the FIT training -- I may have said this back in our last session. We went to San Diego, sector OFO, San Ysidro, and we did it as an unannounced visit. By the time we were finished with the visit that day, not only were they doing on-the-spot corrections of things that we noticed, but they asked us to return.

11:19AM

Actually a couple of my team will be in San Ysidro next week. So our response time is pretty good, especially for -- we want to do the FIT training. We think it is part of our overall strategy.

11:19AM

I know I'm giving you more than you probably have asked for, but I'm really pretty pleased about the FIT training because it really takes us to the best practices and the application of it and being able to walk around the facility and show them things that they may walk by every day and don't intend to -- if that answers your question.

11:19AM

THE COURT: All right. It does in part. I'm wondering if maybe you should videotape some of your presentations so that you can have those available for those people who need training even when they're not able to be present or do a virtual.

11:20AM

MR. MOAK: That is a great idea. We will bring that up at our next Flores town hall, which is also part of our strategy. We had a town hall May 15th. I think I report

11:20AM

that. There were over 300 -- it varied between 300 and 301. They stayed on the call for an hour and 45 minutes. I think it was actually an hour and 47 minutes, because I was watching -- to have them stay as long as they do and ask the questions.

When we do these town halls, it's not only us talking from the field best practices, but it's OCMO and it's OCC, from our legal counsel. And we have border patrol, OFO -- everybody joins in.

I'm very pleased with the dialogue that we have because we have people across the southwest border and across the nation actually that are in all sectors that listen in and they start to get a better feel.

The FIT training is one of our very -- I guess that's a double entendre, FIT training. But it's really very, very effective, and I'm glad we implemented it.

THE COURT: I am as well. Thank you for doing that. I think that's important, especially as you get new people coming in and are not familiar with the various standards.

I know that we discussed in our last hearing with the juvenile care monitors the need to provide age-appropriate food. Has there been progress in addressing that particular issue?

MR. MOAK: Yes, ma'am. We were actually in the

field this week yesterday in El Paso with Dr. Wang, and my team was there. I think one of the things they noted was the age-appropriate food has been addressed. Going forward through this next period of time, we will always do our best to be with Dr. Wise or Dr. Wang, Ms. Ordin, to be sure that we are on top of the issues that they may find.

THE COURT: Okay. Thank you.

Do plaintiffs or the juvenile care monitors have any questions that they would like to ask of Mr. Moak or inquire about his report?

MS. MASETTA-ALVAREZ: Your Honor, this is Katelyn Masetta-Alvarez for defendants. We would, again just because Mr. Moak is not under oath, we would request a limiting instruction that any questions be specific to his report and not go into any of the issues that are pending in litigation right now.

THE COURT: All right. Well, I will assume that you will raise a timely objection if such a question should be raised. I have not started to address the pending motions yet, so I don't know what all of the issues are that are pending in that particular motion yet.

So if there are issues that are raised that you feel are going to invade that particular motion, then you can certainly object.

MS. MASETTA-ALVAREZ: Yes, Your Honor.

MS. WROE: Thank you, Your Honor.

One question that we have is whether or not the transportation difficulties that Mr. Moak mentions in his report in terms of contributing to length of stay are the same as difficulties in securing transport for deportation.

Like, if transportation means either transportation to another facility or transportation in terms of a deportation flight, or both, that would be helpful clarification.

MR. MOAK: So I would like to get back with opposing counsel on that to be sure that I give the right answer, but I can assure you that the transportation issues typically have been flights and transportation away from our facilities.

I couldn't -- we use a good legal term -- stipulate that it's either to deportation or to other locations in the United States. I don't know that answer.

MS. WROE: Thank you.

And to the extent that Your Honor does order any supplemental reporting regarding reasoning based on Ms. Alvarez's objection, if we could include that. If you would include that question as well, that would be helpful.

Thank you.

THE COURT: Any other questions for Mr. Moak?

Then I will turn to Ms. Helland's report.

Thank you Mr. Moak.

MR. MOAK: Yes, ma'am. Thank you.

THE COURT: Ms. Helland, I haven't had to think about family detention centers for a while, and now we seem to be reopening them.

And I guess the first question that I have for you is: Is the Dilley facility a facility that has -- that was already being used for other purposes and now has been repurposed again for family detention, or was it dormant?

What is -- can you just tell me a little bit about the Dilley facility.

MS. HELLAND: Yes, Your Honor. So you're correct in that Dilley was repurposed. It sat dormant for quite some time, and then we reopened it to allow for families to take residence there while we were waiting for their next step in the immigration process.

THE COURT: Is that the plan going forward, to use Dilley, or is that still something that's dynamic?

MS. HELLAND: I'd say, Your Honor, that that's dynamic right now because it's extremely fluid. Things can change very often right now. It is my understanding that we will be utilizing Dilley for the foreseeable future.

THE COURT: Given that the census seem s to be going down and has gone down substantially, why is the time in custody so much higher for the family units versus the

unaccompanied minors?

MS. MASETTA-ALVAREZ: Your Honor, at this time we would object. We anticipate that this is an issue that is coming up in litigation. Plaintiffs discussed this a little bit in their opposition to the motion to terminate, and we anticipate additional litigation about the family residential centers.

THE COURT: All right.

MS. HELLAND: Your Honor, can you clarify the question if you're referring to the length of stay in the northwest regional juvenile facility. If you're looking at my report and the chart has accompanied and unaccompanied alien children, that is specific to northwest regional juvenile facility.

Can you clarify if that is in fact what you are asking about or if you're asking for --

THE COURT: I am -- well, let me just pull up your report, because I don't think I have the table number or if there was a table. I'm not sure if that is in front of me, but I was inquiring primarily about the Dilley facility and the ICE secured detention.

MS. HELLAND: Yes, Your Honor. So in the chart in my report, you have the average length of stay in the northwest regional that states accompanied children and unaccompanied children.

Then you have the next chart, ma'am, when is less time than both of those is Karnes and Dilley. So again that is the reason why I wanted to clarify, because it is less time than the other chart, which is northwest regional.

11:29AM THE COURT: Can you explain to me what northwest regional refers to.

MS. HELLAND: So northwest regional is the other facility that we're using to house juveniles in our care. So you have two charts, one for family residential and another

11:29AM chart, ma'am, for northwest regional juvenile detention.

THE COURT: Is northwest regional the name of the facility, or is that a region?

MS. HELLAND: Yes, Your Honor. That's the name of the facility.

11:29AM THE COURT: Okay. So that is a secured juvenile detention facility, correct?

MS. HELLAND: Yes, Your Honor.

THE COURT: Given that the length of stay there is -- and that is just as of June 1st?

11:30AM MS. HELLAND: Yes, Your Honor.

THE COURT: Do you know whether that number has decreased or increased since then, or you don't know?

MS. HELLAND: I do not know if the length of stay has decreased for the accompanied children in northwest

11:30AM regional juvenile detention since June 1st.

THE COURT: And what is the census of that facility?

MS. HELLAND: So, Your Honor, as of this morning I had six minors in the facility.

11:31AM THE COURT: So that is separate from the south Texas family residential center, correct?

MS. HELLAND: Yes, Your Honor.

THE COURT: As of June, that chart says there are six there, too?

11:31AM MS. HELLAND: Yes, Your Honor. So the chart that has as of June with the six at the south Texas family residential, that is -- that is for the family residential facility.

And the average time at the northwest regional 11:31AM juvenile detention center is again different. One is for families; the other is for accompanied children. However, at our secure juvenile detention facility, that is not currently being used for families.

THE COURT: Okay. I'm getting confused here. Is 11:32AM the south Texas family residential center the same as what we call Dilley?

MS. HELLAND: Yes, ma'am.

THE COURT: Okay. And is there another name for the north Texas?

11:32AM MS. HELLAND: No, ma'am.

THE COURT: I'm sorry. All of these acronyms are --

MS. WROE: In their reports, in case it's helpful, NWJDC is used instead of northwest juvenile detention center, and you can -- they detain unaccompanied and accompanied kids alone in that facility, in the secure facility, whereas Dilley is family units. So unaccompanied children are not detained there.

THE COURT: All right. So Dilley is the only family residential center?

MS. HELLAND: Yes. In this report Dilley is the only family residential center that we're currently using to house families. There is another family residential center in this report, which is Karnes. Karnes County immigration processing center.

THE COURT: All right, but you're no longer using Karnes, correct?

MS. HELLAND: Correct, Your Honor.

THE COURT: So one of the issues -- and, Ms. Helland, you were not, I don't think, the juvenile coordinator at the time when we were dealing with the family residential centers. But if I recall correctly, one of the issues was about licensure.

At that time there was a concern about licensing. Has that been resolved such that Dilley now does have

licensing?

MS. HELLAND: So I don't know if you --

MS. MASETTA-ALVAREZ: Yes, Your Honor. Yes, Your Honor. We would object to that, Your Honor. That is one of the issues in the motion to terminate, is whether that requirement under the FSA that these facilities be licensed precludes ICE's regulations, previous regulations from going into effect. So we would request that that series of questions be avoided if possible.

THE COURT: All right.

MS. WOLOZIN: Respectfully, Your Honor, that's a factual question, and we've not brought any motion to enforce or any kind of enforcement issue around those things.

The fact that defendants filed a motion to terminate should not interfere with the judge's ability to ask factual questions at a monitoring status hearing. So we would disagree with that objection.

THE COURT: Well, either it is the subject of the motion or it is not. Are you in disagreement about whether it's the subject of a pending motion?

MS. WOLOZIN: The motion is about terminating the Flores settlement agreement, not about whether licensing is or is not required under the agreement.

MS. MASETTA-ALVAREZ: Your Honor, if I may, one of the arguments that defendants make is that the regulations,

the 2019 DHS regulation, should be permitted to go into effect. One of the issues obviously is the licensing issue. So that is an issue that is being currently litigated.

MS. WROE: There is no factual dispute that they are not currently licensed. Defendants don't say that they're licensed in the motion to terminate, and plaintiffs haven't produced evidence to suggest otherwise.

So regardless of whether or not the motion to terminate mentions the word licensure, the judge's question is factual and it is about an issue of which there is no factual dispute.

THE COURT: All right. Well, I'm going to assume that if there is no response to my question, that it is not licensed. Part of the problem I think in the past was that it was somewhat of a political football. I was just wondering that now that the administrations are in sync, that maybe Texas will license Dilley.

MS. MASETTA-ALVAREZ: Your Honor, my understanding from a legal standpoint is that that is being litigated at the Texas Supreme Court right now. So I think there's some -- I think that's still to be determined.

THE COURT: All right. Well, I guess the status of that has not been on my radar for the last several years, so perhaps you can give me an update on that if there is in fact currently litigation on that subject.

MS. MASETTA-ALVAREZ: Yes, Your Honor.

THE COURT: I don't know if this is going to tread into any pending motions or not, but given that the census is so low, I was going to ask both Mr. Moak and Ms. Helland to file a supplemental report that just factually explains, for those minors who are in custody as of June and July, how many of those are over 72 hours. And of those, what was the reason for that?

MR. MOAK: Your Honor, I'm able to do that, and I'll get border patrol and OFO to give me that answer pretty quickly.

THE COURT: Okay. And that would apply to both the CBP and the border patrol facilities?

MR. MOAK: That's correct. Yes, ma'am.

THE COURT: All right. Ms. Helland, that would apply to Dilley for June and July?

MS. HELLAND: Yes, Your Honor.

MS. MASETTA-ALVAREZ: Your Honor, so just to clarify, Your Honor, you're asking for a supplemental report that factually explains why these minors, the who have been in custody in June and July, how many were in custody over 72 hours and the reasons?

THE COURT: Yes. And of those who were over 72 hours, what was the reason for it.

MS. MASETTA-ALVAREZ: And you want that,

Your Honor, I'm sorry, for both CBP and ICE?

THE COURT: Correct. And would September 8th be sufficient time for you to get that information?

MR. MOAK: Yes, Your Honor. That is a very reasonable time. Thank you.

THE COURT: All right. And if --

MS. MASETTA-ALVAREZ: I'm sorry, Your Honor. Defendants would reserve their right to object to that. It doesn't seem to be -- the juvenile coordinator's report is limited to reporting on compliance with the Flores settlement agreement reporting on areas of noncompliance and then opining whether the agencies have substantially complied.

I guess I'm not seeing where this would go into whether especially ICE is in substantial compliance with the Flores settlement agreement.

THE COURT: Well, you, I think, have been new to this, so I will tell you that after ten years of being on this matter, time in custody has always been a serious issue that has been the subject of numerous reports in the past, although in recent years I've been very pleased with the progress in that regard.

I'm a bit concerned that given the low census, that we're seeing some increases. So I'm just trying to see what the reason for that is. Maybe there's a perfectly reasonable explanation for all of these delays, but I don't know what

they are because I'm looking at average times.

Considering that the census is low, I don't think the burden will be high to identify for each of the people who are over 72 hours what the reason may have been for it. It's just a factual issue. I don't need to have argument about it. I just am wondering what the basis for the extended time period is.

MS. MASETTA-ALVAREZ: Yes, Your Honor. I -- Your Honor, if possible, may defendants reserve the right to -- I'd like to confer with my colleagues who have been on this case for much longer than I have. If possible, could defendants reserve the right to object for seven days in writing?

THE COURT: Yes. And if you do, I'll give plaintiffs an opportunity to respond within a week after that.

MS. MASETTA-ALVAREZ: Thank you very much, Your Honor. I appreciate it.

THE COURT: All right. Do plaintiffs or the juvenile care monitors have any questions for Ms. Helland?

MS. MASETTA-ALVAREZ: And for the record, Your Honor, defendants would request the same limiting instruction that any questions, especially from plaintiffs' counsel, be limited to the report.

THE COURT: All right. The same rule will apply.

MS. DE GRAMONT: Yes, Your Honor. As we said in our report, there's really no information about actions that have been taken to monitor conditions in ICE custody in either family detention or northwest regional.

11:43AM So our question is what actions have been taken, what steps have been taken to monitor compliance at those facilities and also to ensure the facilities was -- the Dilley facility was capable of complying before it was opened and used for children.

11:43AM THE COURT: Ms. Helland, do you have any answer for that?

MS. HELLAND: Yes, ma'am. So with regards to the family residential center as well as northwest regional, we use a plethora of different tools to inspect and audit those 11:43AM facilities, including an inspection, independent inspections contract.

And I have staff on site, so the inspections contract is inspecting both of those locations once a month and then again with my staffing on site at Dilley daily. 11:44AM There's also an inspection once a month at least at a minimum for northwest regional with the field office juvenile coordinator in the area of the northwest regional juvenile detention center.

So activities, monitoring activities, you know, 11:44AM they vary. They utilize tools, compliance tools that we've

          created based on the family residential standards as well as the Flores settlement agreement to inspect and audit those facilities.

11:44AM I personally review those compliance checklists and worksheets to determine if the facilities are in compliance, if the field offices are adhering to the things that we've set forth in the family residential standards for any setting in which we're housing children.

11:45AM So again, I have staff there daily that are inspecting these facilities and working with the facilities to ensure that they're adhering to our standards, which as you likely know, the Flores settlement agreement is baked into our standards, right. The standards go a bit above what we have in the FSA.

11:45AM So I can detail all of the day-to-day operations in what we do, but I'll kind of try and keep it high level for you, right. So there are visual inspections for things that they do every day.

11:45AM They go -- they meet with the residents to make sure that they're communicating with the staff there to address grievances. They are inspecting things like food, right. We're checking to make sure the temperature is appropriate. We're making sure that there is age-appropriate food for the children in care.

11:46AM In situations where there may be special

considerations that need to be taken for food, we're ensuring

that that has been addressed, relayed.  And if there is any

corrective action, we're correcting that on the spot.

        There are situations where we're checking just

things like the phone lines to ensure that the language line

is available for interpretations and things of that nature,

right, for us to be able to communicate with the residents in

care that may speak a language or have a dialect of a

language that is not common.  So we're ensuring that they

have translation services available to them.

        There is just a plethora of things.  That list is

just very long that the compliance officers use every day to

inspect and ensure that the facilities are adhering to the

terms set forth in the FSA as well as the family residential

standards.

        But I'd certainly be open to, you know, discussing

that in depth with you all if ever you'd like to really just

take a deep dive into what we do on a day-to-day basis.  I

know you all have visited the facility, you know, a few times

at this point with our officers accompanying you on those

visits and my staff in particular.

        There are field office staff there, but my staff

assigned to me to conduct compliance were also there to

accompany you all.

        THE COURT:  Have the juvenile care monitors had a

chance to go to Dilley yet? And if not, will you be going there?

MS. MASETTA-ALVAREZ: Your Honor, this is Katelyn Masetta-Alvarez. I don't believe the -- I believe juvenile court monitors are -- they're limited to CBP facilities under the 2022 settlement agreement.

THE COURT: Well, I think part of the things was that ICE wasn't using family residential services, so there was no need for them to inspect before. But now that Dilley has come online, I don't know that that's prohibited from there being an inspection there by the juvenile care monitors.

MS. ORDIN: Obviously that's apparently going to be a legal issue that -- I certainly think that reading that settlement the way we would read it is broad enough to include concern over the children who are covered in the 2022 agreement.

It has not been an issue that has been needed to be litigated because, as Your Honor notes, it was not being utilized for the families. So I -- that unfortunately appears to be another pending issue.

THE COURT: All right.

Ms. Helland, you said that there has been an opportunity for the plaintiffs' counsel to visit the facility?

MS. HELLAND: Yes.

THE COURT: When was that?

MS. HELLAND: So I believe the last visit -- I may have to take that as a get-back to give you the exact dates. We're having a visit I know again in another week or so. So we've had visits at least I believe twice now. This will be the third.

THE COURT: Okay. So, recently.

MS. HELLAND: Yes. Yes, ma'am.

THE COURT: And how often are you planning to inspect the facility?

MS. HELLAND: So I'm planning to inspect the facility at least quarterly. Currently there are limitations to travel within the organization; however, I'm not letting that limit me being able to interview families in some of these settings.

So with my staff there on site, I've been able to talk with the staff, but I also intend to increase interviewing families when I'm not on site. Again, even though my staff is on site, I'd like to personally speak with some of the families and residents and children locally at the northwest regional juvenile facility as well.

THE COURT: All right. Thank you.

MS. DE GRAMONT: Your Honor, plaintiffs appreciate the detail about the monitoring activities, and we would

request that both the list of those activities but perhaps more importantly the results of the monitoring be produced in an annual report so that we can actually see what is happening.

11:51AM That would apply both to Dilley and any facility holding families but also to northwest regional, which has been in operation for many years. And so having that report of monitoring findings is essential.

THE COURT: Ms. Helland, again you haven't had the 11:51AM benefit of being -- well, maybe it's not the benefit, but you haven't been with us for all of these years, but Mr. Moak has sort of perfected his reporting skills. You might want to take a look at his report and see if you can itemize some of the categories that can be sort of highlighted as to 11:52AM compliance.

That doesn't mean you have to do every single day of compliance but at a high level some summarization of general compliance with some of the categories such as, you know, hygiene, amenities, lighting, hot and cold temperature. 11:52AM Those have been some of the primary issues that have been the subject of discussion in these reports.

So you might want to take a look at Mr. Moak's report and the categories that he includes in them and perhaps flesh out a little bit more about general compliance 11:52AM in those categories.

MS. HELLAND: Yes, ma'am. Those are certainly being tracked and monitored, so it shouldn't be an issue for me to add our findings to those reports going forward. Thank you.

THE COURT: All right. And if possible, I'm going to ask you to supplement your report with that information, too. Is September 8th sufficient time for you to be able to do that for the months of June and July, Ms. Helland?

MS. HELLAND: Yes. I believe I was waiting for Kate. I just wanted to make sure she wasn't going to say anything. That should be sufficient for me, Your Honor. Thank you.

THE COURT: All right.

MS. MASETTA-ALVAREZ: I do have just a couple of clarifying questions, Your Honor, if you don't mind.

THE COURT: Go ahead.

MS. MASETTA-ALVAREZ: So it sounded -- and maybe I misunderstood. It sounded like Flores' counsel is asking for the actual monitoring reports almost like an attachment. I just wanted to clarify that that is not required --

THE COURT: I'm not asking for any preexisting reports to be attached. I'm just asking for Ms. Helland to summarize the compliance for those categories, similar to what Mr. Moak did.

MS. MASETTA-ALVAREZ: Okay, Your Honor. I see.

Okay. Thank you, Your Honor.

THE COURT: Any other questions from either plaintiffs' counsel or the juvenile care monitors? Do the juvenile care monitors have any statements they would like to make?

MS. WROE: Quickly, Your Honor. With respect to Ms. Helland's supplemental report, her original report references modified standards because of the new -- because of the relative newness of the use of family detention again.

So plaintiffs would just ask that if those modified standards are still in place, as we said in our response, there's no real articulation of how the standards have been modified or what specific changes have been made and how long the modified standards will be in place, given that the agency has described it intends to continue using family detention for the foreseeable future.

So if the supplemental report could address those issues as well, that would be helpful.

THE COURT: Do you understand that request, Ms. Helland?

MS. HELLAND: Yes, Your Honor. I do.

THE COURT: Okay.

MS. WELCH: In terms of the site visits that plaintiffs have conducted at the family detention centers, we have, as Ms. Helland noted, been to Dilley. We were at

Karnes, and we sent a meet-and-confer letter about that.

We were at Dilley twice, and each time we sent very detailed information to the defendants about our concerns at Dilley. So there is a very lengthy record of our concerns. I don't know if Ms. Helland has had access to that, including our issues around the modified standards.

There is quite a long back-and-forth here on these issues that might be helpful to her as she's considering her monitoring, increasing the detail in her monitoring.

THE COURT: Ms. Helland, have you been privy to those comments regarding the plaintiffs' observations?

MS. HELLAND: Yes, Your Honor. So I received a few documents from the last three visits, I believe -- as you stated, Ms. Welch -- from Karnes and twice at Dilley?

So I can confer with Kate on how again to include monitoring activities in the supplemental so that you could see the things that we've done to address any concerns that you all have raised.

THE COURT: All right. Thank you.

MS. MASETTA-ALVAREZ: Your Honor, as far as the modified standards are concerned, plaintiffs' request for those, you know, any request about plans, you know, future planning to keep those in place, to change them, we would object.

That information would fall under, you know, any

planning policies that are not currently in place but fall under the deliberative process privilege. So to the extent that plaintiffs are requesting that, we would object to those, specifically those plans or anticipated policies.

11:57AM MS. WROE: And to be clear, we're not asking for any plans. We're asking how long the modified standards will be in place because the family detention centers are no longer new.

MS. WELCH: And we've been requesting more

11:58AM information on the modified standards for months. So this is a longstanding request of ours to better understand what the actual standards are that are supposed to be applied since many of the Flores standards are not being followed at Dilley.

11:58AM THE COURT: All right. Well, if there are actual standards that are being applied, that should be identified, whether they're modified or they're existing.

MS. MASETTA-ALVAREZ: Thank you, Your Honor.

THE COURT: All right. This is not something that

11:58AM I've had to say for a long time now, but I want to reiterate that the structure of the Flores agreement includes this concept of a juvenile coordinator so that if there are issues that arise, that instead of there being litigation over isolated issues of noncompliance, that those be brought to

11:59AM the juvenile coordinator's attention so that they can be

addressed as rapidly as possible rather than having to have litigation over whether they should be addressed.

So to the extent that there are emergent issues or things that are coming up that can be addressed by the juvenile coordinators in conjunction with the juvenile care monitors, that should be done rather than waiting to have me rule on litigation in that regard. All right.

MS. MASETTA-ALVAREZ: Thank you, Your Honor. Understood.

MS. ORDIN: And, Your Honor, just to return to the juvenile coordinator role for CBP, I'd just like to say on behalf of the juvenile care monitors that looking at the most recent report, it has so much more detail and so many more new programs than the prior year.

It was just -- it's just heartening to see the degree of training, whether it's FIT or the town halls, and plus the increased amount of time that they intend to spend as time goes forward. I'd just like to close back on that issue.

THE COURT: Thank you, Ms. Ordin. This reminds me of a question that I neglected to ask, and that is, we have been talking in the previous hearing about the need to make the caregiver program more robust.

I read somewhere in, I think it might have been, the plaintiffs' objection where someone expressed concern

about a caregiver holding her child. I'm wondering whether there are standards for what the caregivers are supposed to do and whether there's potential for misunderstanding from the people who reside in these facilities as to what the role of the caregivers is.

12:01PM

Do you have any insight in that regard, Ms. Ordin or Dr. Wise?

MS. ORDIN: I do not have any insight on that specific example you're speaking of. However, we are at this very moment pending meetings regarding caregivers the most recent statement of work.

12:01PM

And Dr. Wang has just returned from one monitoring trip devoted in part to determine all of the broader questions regarding caregivers, which, as you know, we consider the most -- one of the most important portions of the 2022 settlement.

12:02PM

THE COURT: I think my point was really just to make sure that those who are receiving caregiver services understand what the role of the caregiver is. And I'm not really sure whether they're supposed to be holding the children or not.

12:02PM

That comment in the plaintiffs' response concerned me because maybe there are some participants who don't quite understand what the caregivers are there for and maybe are misunderstanding that when -- especially if they touch their

12:02PM

children or hold them.

MS. ORDIN: No question about it, and that is a part of these conversations. It has to do with the training of the caregivers and also an understanding by all of the personnel and all of CBP personnel of the duties and responsibilities of the caregivers.

MS. WELCH: Just to clarify, that comment I just wanted to make sure about, that actually was referring to a family detained at Dilley who was unsure why she had to have one of the Dilley staff hold her child instead of another member of her family who was also there.

So it didn't relate to -- it appeared in the ICE portion of the response rather than the CBT caregiver program.

THE COURT: Okay. So that complaint was about a member of a staff holding her child?

MS. WELCH: The declaration discusses a staff member having to hold her child rather than her letting a family member hold the child while she did something.

THE COURT: Okay. Well, that's vague enough that I wasn't really sure what the context was. Sometimes staff do take -- have to jump in when there are not sufficient caregivers.

So it's still a concern as to what standards are in place and whether people know that they are there to be

helpful because, you know, some of them might think that they're in some way intruding on their parenting rights or something.

MS. WELCH:  Your Honor, just so you understand a little bit more about the context at Dilley and how this is coming up -- and this is a bit of a point of dispute really between the parties and the conversations we've had -- but a number of family members at Dilley have expressed concerns that either the fathers of children or other relatives are not able to care for the child when the mom needs to use the rest room or take a shower.

We've been told by the government that that is not the case, but families continue to tell us that there have been restrictions placed on who can care for their child when they need to take a shower or use the rest room since children are being housed with their moms.

So this issue is not really a complaint about the staff so much as a complaint about restrictions on the ability of another family member other than the mom to be able to care for a child so she can use the bathroom or, you know, take a shower.  So that's kind of the context.

THE COURT:  I see.  Thank you.

All right.  Any other comments or questions?

Hearing none, again I want to thank Mr. Moak.  You are doing a good job, and I appreciate your report and the

efforts you are undertaking to train staff to become familiar with the Flores standards.

And, Ms. Helland, welcome aboard. I look forward to your supplemental report on September 8th.

12:06PM With that, I will conclude the hearing, and I will include in my minute order a summary of what we've discussed.

MS. HELLAND: Thank you, Your Honor.

MS. MASETTA-ALVAREZ: Thank you, Your Honor.

THE COURT: Thank you.

(Proceedings concluded at 12:06 p.m.)

CERTIFICATE

I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY RECORDED PROCEEDINGS IN THE ABOVE MATTER.

FEES CHARGED FOR THIS TRANSCRIPT, LESS ANY CIRCUIT FEE REDUCTION AND/OR DEPOSIT, ARE IN CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

/s/ Miriam V. Baird 09/18/2025

MIRIAM V. BAIRD DATE
OFFICIAL REPORTER

## /

**/s** [1] - 37:19

## 0

**0600** [1] - 6:4
**09/18/2025** [1] - 37:19

## 1

**1-053** [1] - 1:24
**10005** [1] - 2:15
**10940** [1] - 2:22
**11893** [1] - 1:23
**11:08** [1] - 3:1
**1212** [2] - 2:5, 2:8
**12:06** [1] - 37:10
**15th** [1] - 9:25
**1st** [2] - 15:19, 15:25

## 2

**2000** [1] - 2:22
**20006** [1] - 2:13
**20044** [1] - 2:19
**2019** [1] - 19:1
**2022** [3] - 26:6, 26:16, 34:16
**2024** [1] - 4:17
**2025** [4] - 1:19, 3:1, 4:18, 4:19
**25** [2] - 1:19, 3:1

## 3

**300** [2] - 10:1
**301** [1] - 10:1

## 4

**411** [1] - 1:24
**425** [1] - 2:12
**45** [1] - 10:2
**47** [1] - 10:3

## 5

**5** [1] - 4:16

## 6

**600** [2] - 2:5, 2:9

## 7

**72** [5] - 5:9, 20:7, 20:22, 20:24, 22:4
**72-hour** [1] - 5:25

## 8

**800** [1] - 2:15
**818** [1] - 2:12
**868** [1] - 2:18
**88** [1] - 2:15
**8th** [3] - 21:2, 29:7, 37:4

## 9

**94612** [2] - 2:6, 2:9
**96** [1] - 6:22
**97** [1] - 6:23
**97201** [1] - 1:24

## A

**A.M** [1] - 3:1
**ability** [5] - 5:6, 8:19, 8:24, 18:15, 36:19
**able** [9] - 9:15, 9:21, 20:9, 25:7, 27:15, 27:17, 29:7, 36:10, 36:20
**aboard** [1] - 37:3
**ABOVE** [1] - 37:14
**acceptable** [1] - 6:9
**access** [1] - 31:5
**accompanied** [5] - 14:12, 14:24, 15:24, 16:16, 17:5
**accompany** [1] - 25:24
**accompanying** [1] - 25:20
**accuracy** [1] - 8:1
**accused** [1] - 7:5
**acronyms** [1] - 17:1
**action** [1] - 25:3
**actions** [3] - 7:20, 23:2, 23:5
**activities** [5] - 23:24, 27:25, 28:1, 31:16
**actual** [3] - 29:19, 32:12, 32:15
**add** [3] - 6:9, 8:12, 29:3
**additional** [1] - 14:6
**address** [4] - 11:19, 24:21, 30:17, 31:17
**addressed** [6] - 7:20, 11:3, 25:2, 33:1, 33:2, 33:4
**addressing** [1] - 10:23
**adhering** [3] - 24:6, 24:11, 25:13
**administrations** [1] - 19:16
**adults** [1] - 5:11
**advisor** [1] - 3:23
**age** [4] - 5:11, 10:23, 11:3, 24:23
**age-appropriate** [3] - 10:23, 11:3, 24:23
**agencies** [1] - 21:12
**agency** [1] - 30:15
**agreement** [9] - 18:22, 18:23, 21:11, 21:15, 24:2, 24:12, 26:6, 26:17, 32:21
**ahead** [2] - 8:11, 29:16
**AL** [3] - 1:4, 1:10, 2:17
**al** [2] - 3:4, 3:5
**alien** [1] - 14:13
**allow** [1] - 13:14
**almost** [1] - 29:19
**alone** [1] - 17:6
**ALSO** [1] - 2:23
**Alvarez** [4] - 3:18, 4:23, 11:12, 26:4
**ALVAREZ** [26] - 2:17, 3:17, 4:22, 7:7, 7:13, 11:11, 11:25, 14:2, 18:3, 18:24, 19:18, 20:1, 20:18, 20:25, 21:7, 22:8, 22:17, 22:21, 26:3, 29:14, 29:17, 29:25, 31:20, 32:18, 33:8, 37:8
**Alvarez's** [1] - 12:21
**amenities** [1] - 28:19
**amount** [1] - 33:17
**ANA** [1] - 1:24
**AND** [1] - 37:12
**AND/OR** [1] - 37:16
**Andrea** [1] - 3:23
**ANDREA** [1] - 2:21
**ANGELES** [3] - 1:18, 2:23, 3:1
**annual** [2] - 4:12, 28:3
**answer** [5] - 6:3, 12:12, 12:17, 20:10, 23:10
**answers** [1] - 9:17
**anticipate** [2] - 14:3, 14:6
**anticipated** [1] - 32:4
**ANY** [1] - 37:15
**appearance** [1] - 4:10
**appearances** [1] - 3:6
**appeared** [1] - 35:12
**application** [1] - 9:15
**applied** [2] - 32:12, 32:16
**apply** [4] - 20:12, 20:16, 22:25, 28:5
**appreciate** [3] - 22:18, 27:24, 36:25
**appropriate** [4] - 10:23, 11:3, 24:23
**ARE** [1] - 37:16
**area** [1] - 23:22
**areas** [1] - 21:11
**argument** [1] - 22:5
**arguments** [1] - 18:25
**arise** [1] - 32:23
**articulation** [1] - 30:12
**assigned** [1] - 25:23
**assume** [2] - 11:17, 19:12
**assure** [1] - 12:12
**attached** [1] - 29:22
**attachment** [1] - 29:19
**attention** [2] - 5:21, 32:25
**attorneys** [1] - 3:16
**audit** [2] - 23:14, 24:2
**available** [4] - 8:17, 9:20, 25:6, 25:10
**AVENUE** [1] - 2:12
**average** [4] - 4:16, 14:23, 16:14, 22:1
**avoided** [1] - 18:9

## B

**back-and-forth** [1] - 31:7
**BAIRD** [2] - 1:23, 37:20
**Baird** [1] - 37:19
**baked** [1] - 24:12
**based** [2] - 12:20, 24:1
**basis** [3] - 8:17, 22:6, 25:18
**bathroom** [1] - 36:20
**BEATRIX** [1] - 2:4
**become** [1] - 37:1
**began** [1] - 7:25

**behalf** [1] - 33:12
**BEHALF** [2] - 2:4, 2:16
**behind** [1] - 7:9
**BEN** [1] - 2:18
**benefit** [2] - 28:10
**best** [4] - 8:13, 9:14, 10:7, 11:4
**better** [3] - 8:5, 10:13, 32:11
**between** [2] - 10:1, 36:7
**beyond** [1] - 5:25
**bit** [8] - 7:18, 13:10, 14:5, 21:22, 24:13, 28:24, 36:5, 36:6
**BONDI** [2] - 1:10, 2:17
**Bondi** [1] - 3:5
**border** [5] - 7:24, 10:8, 10:11, 20:10, 20:13
**BOULEVARD** [1] - 2:22
**BOX** [1] - 2:18
**bring** [1] - 9:23
**broad** [1] - 26:15
**broader** [1] - 34:13
**BROADWAY** [2] - 2:5, 2:8
**brought** [4] - 4:25, 5:3, 18:12, 32:24
**burden** [1] - 22:3
**BY** [2] - 2:17, 2:21

## C

**CA** [1] - 2:6
**CALIFORNIA** [6] - 1:2, 1:18, 1:24, 2:9, 2:23, 3:1
**capable** [1] - 23:8
**capacity** [1] - 5:11
**care** [18] - 3:22, 7:17, 7:19, 10:22, 11:8, 15:8, 22:20, 24:24, 25:8, 25:25, 26:11, 30:3, 30:4, 33:5, 33:12, 36:10, 36:14, 36:20
**caregiver** [5] - 33:23, 34:1, 34:18, 34:19, 35:13
**caregivers** [8] - 34:2, 34:5, 34:10, 34:14, 34:24, 35:4, 35:6, 35:23
**case** [4] - 3:3, 17:3, 22:11, 36:13
**categories** [5] - 28:14, 28:18, 28:23, 28:25, 29:23
**CBP** [8] - 4:4, 5:16, 5:24, 20:13, 21:1, 26:5, 33:11, 35:5
**CBT** [1] - 35:13
**CCRA** [1] - 1:23
**census** [6] - 6:17, 13:23, 16:1, 20:3, 21:22, 22:2
**center** [10] - 16:6, 16:15, 16:20, 17:4, 17:10, 17:12, 17:13, 17:15, 23:13, 23:23
**CENTER** [3] - 2:4, 2:7, 2:11
**centers** [5] - 13:4, 14:7, 17:22, 30:24, 32:7
**CENTRAL** [1] - 1:2
**certainly** [4] - 11:24, 25:16, 26:14, 29:1
**CERTIFICATE** [1] - 37:11
**CERTIFY** [1] - 37:12
**chance** [1] - 26:1
**change** [2] - 13:21, 31:23
**changed** [1] - 6:25
**changes** [1] - 30:13
**CHARGED** [1] - 37:15
**chart** [8] - 4:15, 14:12, 14:22, 15:1, 15:4, 15:10, 16:8, 16:10
**charts** [1] - 15:9
**checking** [2] - 24:22, 25:4
**checklists** [1] - 24:4
**child** [8] - 34:1, 35:10, 35:16, 35:18, 35:19, 36:10, 36:14, 36:20
**children** [17] - 5:9, 5:20, 14:13, 14:24, 14:25, 15:24, 16:16, 17:7, 23:9, 24:8, 24:24, 26:16, 27:21, 34:21, 35:1, 36:9, 36:16
**Christina** [1] - 3:20
**CHRISTINA** [1] - 2:18
**CIRCUIT** [1] - 37:15
**CITY** [1] - 2:15
**claiming** [1] - 5:10
**clarification** [1] - 12:9
**clarify** [6] - 14:9, 14:15, 15:3, 20:19, 29:20, 35:7
**clarifying** [1] - 29:15
**clear** [1] - 32:5
**CLERK** [1] - 3:3
**close** [3] - 5:20, 33:18
**cold** [1] - 28:19
**colleagues** [1] - 22:10
**coming** [4] - 10:19, 14:4, 33:4, 36:6
**comment** [2] - 34:22, 35:7
**comments** [2] - 31:11, 36:23
**committed** [1] - 7:5
**common** [1] - 25:9
**communicate** [1] - 25:7
**communicating** [1] - 24:20
**complaint** [3] - 35:15, 36:17, 36:18
**completion** [1] - 6:25
**compliance** [13] - 21:10, 21:14, 23:6, 23:25, 24:4, 24:5, 25:12, 25:23, 28:15, 28:17, 28:18, 28:24, 29:23
**complied** [1] - 21:12
**complying** [1] - 23:8
**concept** [1] - 32:22
**concern** [4] - 17:24, 26:16, 33:25, 35:24
**concerned** [3] - 21:22, 31:21, 34:22
**concerns** [4] - 31:3, 31:4, 31:17, 36:8
**conclude** [1] - 37:5
**concluded** [1] - 37:10
**conditions** [1] - 23:3
**conduct** [1] - 25:23
**conducted** [1] - 30:24
**confer** [3] - 22:10, 31:1, 31:15
**CONFERENCE** [2] - 1:17, 37:17
**CONFORMANCE** [1] - 37:16
**confused** [1] - 16:19
**conjunction** [1] - 33:5
**CONNECTICUT** [1] - 2:12
**consider** [1] - 34:15
**considerations** [1] - 25:1
**considering** [2] - 22:2, 31:8
**context** [3] - 35:21, 36:5, 36:21
**continue** [3] - 8:12, 30:15, 36:13
**continued** [1] - 6:1
**continues** [1] - 5:16
**continuing** [1] - 6:17
**contract** [2] - 23:16, 23:18
**contributed** [1] - 5:8
**contributing** [1] - 12:4
**conversations** [2] - 35:3, 36:7
**coordinator** [5] - 5:3, 17:21, 23:22, 32:22, 33:11
**coordinator's** [2] - 21:9, 32:25
**coordinators** [1] - 33:5
**correct** [7] - 13:12, 15:16, 16:6, 17:17, 17:18, 20:14, 21:2
**CORRECT** [1] - 37:12
**correcting** [1] - 25:3
**corrections** [1] - 9:6
**corrective** [1] - 25:3
**correctly** [1] - 17:22
**cost** [1] - 8:23
**counsel** [7] - 3:6, 10:8, 12:11, 22:23, 26:24, 29:18, 30:3
**County** [1] - 17:14
**couple** [2] - 9:8, 29:14
**court** [1] - 26:5
**Court** [1] - 19:20
**COURT** [81] - 1:1, 1:23, 3:16, 3:19, 4:2, 4:5, 4:8, 5:5, 6:6, 6:11, 6:17, 7:1, 7:11, 7:14, 8:8, 8:11, 8:15, 9:18, 10:17, 11:7, 11:17, 12:24, 13:3, 13:17, 13:23, 14:8, 14:17, 15:5, 15:11, 15:15, 15:18, 15:21, 16:1, 16:5, 16:8, 16:19, 16:23, 17:1, 17:9, 17:16, 17:19, 18:10, 18:18, 19:12, 19:22, 20:2, 20:12, 20:15, 20:23, 21:2, 21:6, 21:16, 22:14, 22:19, 22:25, 23:10, 25:25, 26:7, 26:22, 27:2, 27:8, 27:10, 27:23, 28:9, 29:5, 29:13, 29:16, 29:21, 30:2, 30:19, 30:22, 31:10, 31:19, 32:15, 32:19, 33:20, 34:17, 35:15, 35:20, 36:22, 37:9
**covered** [1] - 26:16
**created** [1] - 24:1
**crime** [1] - 7:5
**crosswalk** [1] - 8:4
**CSR** [1] - 1:23
**custody** [9] - 4:16, 5:9, 5:18, 13:25, 20:6, 20:21, 21:18, 23:3
**CV85-04544-DMG** [1] - 1:8

## D

**daily** [2] - 23:19, 24:9
**data** [1] - 8:4
**DATE** [1] - 37:20
**dates** [1] - 27:4
**day-to-day** [2] - 24:15, 25:18
**days** [1] - 22:12

**DC** [2] - 2:13, 2:19
**de** [2] - 3:12, 3:13
**DE** [3] - 2:4, 23:1, 27:24
**dealing** [1] - 17:21
**declaration** [1] - 35:17
**decline** [1] - 6:18
**decrease** [1] - 6:23
**decreased** [2] - 15:22, 15:24
**deep** [1] - 25:18
**DEFENDANT** [1] - 2:16
**defendants** [12] - 3:21, 4:23, 4:25, 11:12, 18:14, 18:25, 19:5, 21:8, 22:9, 22:12, 22:22, 31:3
**Defendants** [1] - 1:12
**defendants'** [1] - 3:16
**degree** [1] - 33:16
**delayed** [1] - 5:18
**delays** [1] - 21:25
**deliberative** [1] - 32:2
**demand** [1] - 8:18
**DEPARTMENT** [1] - 2:16
**deportation** [3] - 12:5, 12:8, 12:16
**DEPOSIT** [1] - 37:16
**depth** [1] - 25:17
**described** [1] - 30:15
**detail** [4] - 24:15, 27:25, 31:9, 33:13
**detailed** [2] - 7:3, 31:3
**detain** [1] - 17:5
**detained** [2] - 17:8, 35:9
**detention** [17] - 7:3, 7:6, 13:4, 13:9, 14:21, 15:10, 15:16, 15:25, 16:15, 16:17, 17:4, 23:4, 23:23, 30:9, 30:16, 30:24, 32:7
**determine** [2] - 24:5, 34:13
**determined** [1] - 19:21
**devoted** [1] - 34:13
**DHS** [1] - 19:1
**dialect** [1] - 25:8
**dialogue** [1] - 10:10
**Diane** [1] - 3:12
**DIANE** [1] - 2:4
**Diego** [1] - 9:3
**different** [2] - 16:15, 23:14
**difficulties** [2] - 12:3, 12:5
**Dilley** [28] - 13:7, 13:11, 13:13, 13:18, 13:22, 14:20, 15:2, 16:21, 17:7, 17:9, 17:11, 17:25, 19:17, 20:16, 23:8, 23:19, 26:1, 26:9, 28:5, 30:25, 31:2, 31:4, 31:14, 32:14, 35:9, 35:10, 36:5, 36:8
**disagree** [1] - 18:17
**disagreement** [1] - 18:19
**discuss** [1] - 7:25
**discussed** [3] - 10:21, 14:4, 37:6
**discusses** [1] - 35:17
**discussing** [1] - 25:16
**discussion** [1] - 28:21
**dispute** [3] - 19:4, 19:11, 36:6
**DISTRICT** [3] - 1:1, 1:2, 1:23
**dive** [1] - 25:18
**documentation** [1] - 7:16
**documents** [1] - 31:13
**DOLLY** [1] - 1:3
**done** [2] - 31:17, 33:6
**dormant** [2] - 13:9, 13:13
**double** [1] - 10:15
**down** [2] - 13:24
**Dr** [6] - 7:23, 11:1, 11:5, 34:7, 34:12
**drastically** [1] - 6:21
**due** [1] - 7:7
**duties** [1] - 35:5
**dynamic** [2] - 13:18, 13:20

## E

**effect** [2] - 18:8, 19:2
**effective** [1] - 10:16
**efforts** [1] - 37:1
**either** [6] - 12:6, 12:16, 18:18, 23:4, 30:2, 36:9
**El** [2] - 6:12, 11:1
**emergent** [1] - 33:3
**enforce** [2] - 4:25, 18:12
**enforcement** [1] - 18:13
**ensure** [4] - 23:7, 24:11, 25:5, 25:13
**ensuring** [2] - 25:1, 25:9
**entendre** [1] - 10:15
**especially** [6] - 8:20, 9:9, 10:18, 21:14, 22:23, 34:25
**essential** [1] - 28:8
**ET** [3] - 1:4, 1:10, 2:17
**et** [2] - 3:4, 3:5
**evidence** [1] - 19:7
**Ewen** [1] - 4:1
**EWEN** [2] - 2:23, 4:1
**exact** [1] - 27:4
**example** [1] - 34:9
**existing** [1] - 32:17
**explain** [1] - 15:5
**explains** [2] - 20:5, 20:20
**explanation** [1] - 21:25
**exploring** [1] - 8:20
**expressed** [2] - 33:25, 36:8
**extended** [1] - 22:7
**extent** [3] - 12:19, 32:2, 33:3
**extremely** [1] - 13:20

## F

**facilities** [15] - 7:3, 7:6, 12:14, 18:6, 20:13, 23:7, 23:15, 24:3, 24:5, 24:10, 25:13, 26:5, 34:4
**facility** [25] - 9:16, 12:7, 13:7, 13:11, 14:11, 14:14, 14:20, 15:8, 15:12, 15:14, 15:16, 16:2, 16:4, 16:13, 16:17, 17:6, 23:8, 25:19, 26:25, 27:11, 27:13, 27:22, 28:5
**fact** [5] - 5:25, 8:12, 14:15, 18:14, 19:24
**factors** [1] - 5:8
**factual** [6] - 18:12, 18:16, 19:4, 19:10, 19:11, 22:5
**factually** [2] - 20:5, 20:20
**fall** [3] - 6:1, 31:25, 32:1
**fallen** [1] - 6:21
**familiar** [2] - 10:19, 37:1
**families** [10] - 13:14, 16:16, 16:18, 17:13, 26:20, 27:15, 27:19, 27:21, 28:6, 36:13
**family** [30] - 6:5, 13:4, 13:9, 13:25, 14:6, 15:9, 16:6, 16:11, 16:12, 16:20, 17:7, 17:10, 17:12, 17:13, 17:21, 23:4, 23:13, 24:1, 24:7, 25:14, 26:8, 30:9, 30:15, 30:24, 32:7, 35:9, 35:11, 35:19, 36:8, 36:19
**far** [1] - 31:20
**fathers** [1] - 36:9
**FEE** [1] - 37:15
**FEES** [1] - 37:15
**few** [2] - 25:19, 31:12
**fidelity** [1] - 8:5
**field** [7] - 8:3, 8:19, 10:7, 11:1, 23:21, 24:6, 25:22
**file** [1] - 20:5
**filed** [1] - 18:14
**findings** [2] - 28:8, 29:3
**finished** [1] - 9:4
**first** [2] - 4:14, 13:6
**FIT** [8] - 8:16, 8:22, 9:1, 9:10, 9:13, 10:14, 10:15, 33:16
**flesh** [1] - 28:24
**flight** [1] - 12:8
**flights** [2] - 5:23, 12:13
**FLORES** [2] - 1:4, 2:4
**Flores** [12] - 3:4, 8:9, 8:15, 9:24, 18:22, 21:10, 21:15, 24:2, 24:12, 32:13, 32:21, 37:2
**Flores'** [1] - 29:18
**fluid** [1] - 13:20
**focus** [2] - 6:2, 6:3
**followed** [1] - 32:13
**food** [5] - 10:23, 11:3, 24:21, 24:24, 25:1
**football** [1] - 19:15
**FOR** [5] - 2:4, 2:7, 2:11, 2:20, 37:15
**FOREGOING** [1] - 37:12
**foreseeable** [2] - 13:22, 30:16
**forth** [3] - 24:7, 25:14, 31:7
**forward** [7] - 5:20, 6:13, 11:3, 13:17, 29:3, 33:18, 37:3
**FOURTH** [1] - 1:24
**FRANKLIN** [1] - 2:18
**FRIDAY** [2] - 1:19, 3:1
**front** [1] - 14:19
**FSA** [3] - 18:6, 24:14, 25:14
**future** [3] - 13:22, 30:16, 31:22

## G

**gaining** [1] - 8:5

**GEE** [1] - 1:3
**general** [2] - 28:18, 28:24
**get-back** [1] - 27:4
**given** [5] - 13:23, 15:18, 20:3, 21:22, 30:14
**glad** [1] - 10:16
**government** [1] - 36:12
**Gramont** [1] - 3:13
**GRAMONT** [4] - 2:4, 3:12, 23:1, 27:24
**great** [1] - 9:23
**grievances** [1] - 24:21
**ground** [1] - 8:7
**guess** [5] - 6:2, 10:14, 13:6, 19:22, 21:13

**H**

**hall** [2] - 9:24, 9:25
**halls** [2] - 10:6, 33:16
**hate** [1] - 6:20
**headquarters** [2] - 5:21, 6:3
**health** [1] - 7:16
**hear** [1] - 6:7
**hearing** [5] - 10:21, 18:16, 33:22, 36:24, 37:5
**heartening** [1] - 33:15
**held** [1] - 7:2
**HELLAND** [29] - 4:6, 13:12, 13:19, 14:9, 14:22, 15:7, 15:13, 15:17, 15:20, 15:23, 16:3, 16:7, 16:10, 16:22, 16:25, 17:11, 17:18, 18:2, 20:17, 23:12, 27:1, 27:3, 27:9, 27:12, 29:1, 29:9, 30:21, 31:12, 37:7
**Helland** [18] - 4:5, 4:12, 4:14, 13:3, 17:20, 20:4, 20:15, 22:20, 23:10, 26:23, 28:9, 29:8, 29:22, 30:20, 30:25, 31:5, 31:10, 37:3
**Helland's** [2] - 12:25, 30:7
**help** [2] - 8:14, 8:23
**helpful** [6] - 12:8, 12:22, 17:3, 30:18, 31:8, 36:1
**Henry** [1] - 4:3
**HENRY** [1] - 2:24
**HEREBY** [1] - 37:12
**HHS** [1] - 5:12
**high** [3] - 22:3, 24:16, 28:17
**higher** [1] - 13:25
**highlighted** [1] - 28:14
**hold** [4] - 35:1, 35:10, 35:18, 35:19
**holding** [4] - 28:6, 34:1, 34:20, 35:16
**honestly** [1] - 9:1
**Honor** [64] - 3:8, 3:10, 3:12, 3:14, 3:17, 3:24, 4:3, 4:6, 4:22, 5:16, 7:7, 7:13, 11:11, 11:25, 12:1, 12:19, 13:12, 13:19, 14:2, 14:9, 14:22, 15:13, 15:17, 15:20, 16:3, 16:7, 16:10, 17:18, 18:3, 18:4, 18:11, 18:24, 19:18, 20:1, 20:9, 20:17, 20:18, 20:19, 21:1, 21:4, 21:7, 22:8, 22:9, 22:18, 22:22, 23:1, 26:3, 26:19, 27:24, 29:11, 29:15, 29:25, 30:1, 30:6, 30:21, 31:12, 31:20, 32:18, 33:8, 33:10, 36:4, 37:7, 37:8
**HONORABLE** [1] - 1:3
**hot** [1] - 28:19
**hour** [2] - 10:2, 10:3
**hours** [5] - 5:9, 20:7, 20:22, 20:24, 22:4
**house** [2] - 15:8, 17:13
**housed** [1] - 36:16
**housing** [1] - 24:8
**hygiene** [1] - 28:19

**I**

**ICE** [8] - 5:12, 7:2, 14:21, 21:1, 21:14, 23:3, 26:8, 35:12
**ICE's** [1] - 18:7
**idea** [1] - 9:23
**identified** [1] - 32:16
**identify** [1] - 22:3
**illness** [1] - 5:10
**immigration** [2] - 13:16, 17:14
**implementation** [2] - 8:9, 8:15
**implemented** [1] - 10:16
**important** [2] - 10:18, 34:15
**importantly** [1] - 28:2
**improper** [1] - 7:15
**improve** [2] - 7:21, 7:25
**improving** [2] - 5:15, 7:21
**IN** [4] - 2:4, 2:16, 37:13, 37:16
**inaccuracies** [2] - 7:15, 7:22
**include** [6] - 8:9, 12:21, 12:22, 26:16, 31:15, 37:6
**includes** [2] - 28:23, 32:21
**including** [2] - 23:15, 31:5
**increase** [1] - 27:18
**increased** [2] - 15:22, 33:17
**increases** [1] - 21:23
**increasing** [1] - 31:9
**independent** [1] - 23:15
**indicate** [1] - 7:1
**indicated** [1] - 6:11
**information** [7] - 7:3, 21:3, 23:2, 29:6, 31:3, 31:25, 32:10
**injury** [1] - 5:10
**inquire** [1] - 11:10
**inquiring** [1] - 14:20
**insight** [2] - 34:6, 34:8
**inspect** [6] - 23:14, 24:2, 25:13, 26:9, 27:11, 27:12
**inspecting** [3] - 23:18, 24:10, 24:21
**inspection** [3] - 23:15, 23:20, 26:11
**inspections** [3] - 23:15, 23:17, 24:17
**instead** [3] - 17:4, 32:23, 35:10
**instruction** [2] - 11:14, 22:22
**intake** [1] - 7:16
**intend** [3] - 9:17, 27:18, 33:17
**intends** [2] - 6:12, 30:15
**interfere** [1] - 18:15
**interpretations** [1] - 25:6
**interview** [1] - 27:15
**interviewing** [1] - 27:19
**interviews** [1] - 7:16
**intruding** [1] - 36:2
**invade** [1] - 11:23
**IS** [1] - 37:12
**isolated** [1] - 32:24
**issue** [15] - 5:22, 10:24, 14:3, 18:13, 19:2, 19:3, 19:10, 21:18, 22:5, 26:14, 26:18, 26:21, 29:2, 33:19, 36:17
**issues** [20] - 4:24, 5:2, 8:14, 11:6, 11:15, 11:20, 11:22, 12:12, 17:19, 17:23, 18:5, 19:2, 28:20, 30:18, 31:6, 31:8, 32:22, 32:24, 33:3
**item** [1] - 3:3
**itemize** [1] - 28:13

**J**

**January** [2] - 4:18, 4:19
**JCD** [1] - 6:11
**JCM** [2] - 3:25, 4:1
**JENNY** [2] - 1:4, 2:4
**Jenny** [1] - 3:4
**job** [1] - 36:25
**joins** [1] - 10:9
**JUDGE** [1] - 1:3
**judge's** [2] - 18:15, 19:9
**JUDICIAL** [1] - 37:17
**JULY** [2] - 1:19, 3:1
**July** [4] - 20:6, 20:16, 20:21, 29:8
**jump** [1] - 35:22
**June** [10] - 4:17, 4:21, 15:19, 15:25, 16:8, 16:11, 20:6, 20:16, 20:21, 29:8
**JUSTICE** [1] - 2:16
**juvenile** [32] - 3:22, 5:3, 7:2, 7:6, 7:19, 10:22, 11:8, 14:11, 14:14, 15:10, 15:15, 15:25, 16:15, 16:17, 17:4, 17:20, 21:9, 22:20, 23:21, 23:22, 25:25, 26:4, 26:11, 27:22, 30:3, 30:4, 32:22, 32:25, 33:5, 33:11, 33:12
**juveniles** [1] - 15:8

**K**

**Karnes** [6] - 15:2, 17:14, 17:17, 31:1, 31:14
**Kate** [2] - 29:10, 31:15
**KATELYN** [1] - 2:17
**Katelyn** [4] - 3:18, 4:23, 11:11, 26:3
**keep** [2] - 24:16, 31:23
**kids** [1] - 17:5
**kind** [3] - 18:13, 24:16, 36:21
**knowledge** [1] - 7:8

**L**

**LACV-85-04544-DMG** [1] - 3:4
**laid** [1] - 8:3
**language** [3] - 25:5, 25:8, 25:9

**large** [1] - 4:20
**larger** [1] - 8:18
**last** [5] - 9:2, 10:21, 19:23, 27:3, 31:13
**LAW** [3] - 2:5, 2:7, 2:11
**least** [3] - 23:20, 27:6, 27:13
**Leecia** [1] - 3:14
**LEECIA** [2] - 2:14, 2:14
**legal** [5] - 3:23, 10:8, 12:15, 19:19, 26:14
**length** [5] - 12:4, 14:10, 14:23, 15:18, 15:23
**lengthy** [1] - 31:4
**less** [2] - 15:1, 15:3
**LESS** [1] - 37:15
**letter** [1] - 31:1
**letting** [2] - 27:14, 35:18
**level** [2] - 24:16, 28:17
**leveling** [1] - 6:24
**license** [1] - 19:17
**licensed** [4] - 18:6, 19:5, 19:6, 19:14
**licensing** [4] - 17:24, 18:1, 18:22, 19:2
**licensure** [2] - 17:23, 19:9
**lighting** [1] - 28:19
**likely** [1] - 24:12
**limit** [1] - 27:15
**limitations** [2] - 5:12, 27:13
**limited** [3] - 21:10, 22:24, 26:5
**limiting** [2] - 11:13, 22:22
**limits** [1] - 5:5
**line** [1] - 25:5
**lines** [1] - 25:5
**list** [2] - 25:11, 28:1
**listed** [1] - 7:9
**listen** [1] - 10:12
**litigated** [3] - 19:3, 19:19, 26:19
**litigation** [7] - 11:15, 14:4, 14:6, 19:25, 32:23, 33:2, 33:7
**LLP** [1] - 2:21
**locally** [1] - 27:21
**locations** [2] - 12:16, 23:18
**longstanding** [1] - 32:11
**look** [4] - 4:18, 28:13, 28:22, 37:3
**looking** [4] - 4:15, 14:11, 22:1, 33:12
**looks** [2] - 4:21, 6:21
**LOS** [3] - 1:18, 2:23, 3:1
**low** [3] - 20:4, 21:22, 22:2

## M

**ma'am** [12] - 6:15, 8:10, 10:25, 13:2, 15:1, 15:10, 16:22, 16:25, 20:14, 23:12, 27:9, 29:1
**Ma'am** [1] - 7:23
**main** [1] - 6:2
**mandate** [1] - 8:2
**Masetta** [4] - 3:18, 4:23, 11:12, 26:4
**MASETTA** [25] - 2:17, 3:17, 4:22, 7:7, 7:13, 11:11, 11:25, 14:2, 18:3, 18:24, 19:18, 20:1, 20:18, 20:25, 21:7, 22:8, 22:17, 22:21, 26:3, 29:14, 29:17, 29:25, 31:20, 32:18, 33:8
**mASETTA** [1] - 37:8
**Masetta-Alvarez** [4] - 3:18, 4:23, 11:12, 26:4
**mASETTA-ALVAREZ** [1] - 37:8
**MASETTA-ALVAREZ** [25] - 2:17, 3:17, 4:22, 7:7, 7:13, 11:11, 11:25, 14:2, 18:3, 18:24, 19:18, 20:1, 20:18, 20:25, 21:7, 22:8, 22:17, 22:21, 26:3, 29:14, 29:17, 29:25, 31:20, 32:18, 33:8
**MASTER** [1] - 2:20
**matter** [1] - 21:18
**MATTER** [1] - 37:14
**mean** [2] - 6:14, 28:16
**means** [1] - 12:6
**medical** [1] - 7:16
**meet** [2] - 24:19, 31:1
**meet-and-confer** [1] - 31:1
**meeting** [1] - 7:19
**meetings** [1] - 34:10
**member** [5] - 35:11, 35:16, 35:18, 35:19, 36:19
**members** [1] - 36:8
**mentions** [2] - 12:3, 19:9
**met** [1] - 7:24
**might** [8] - 6:7, 7:11, 7:18, 28:12, 28:22, 31:8, 33:24, 36:1
**mind** [1] - 29:15
**minimum** [1] - 23:20
**minor** [1] - 5:11
**minors** [6] - 7:2, 7:4, 14:1, 16:4, 20:6, 20:20
**minute** [1] - 37:6
**minutes** [2] - 10:2, 10:3
**MIRIAM** [2] - 1:23, 37:20
**Miriam** [1] - 37:19
**MISHAN** [1] - 2:8
**Mishan** [1] - 3:8
**misunderstanding** [2] - 34:3, 34:25
**misunderstood** [1] - 29:18
**Moak** [17] - 4:3, 4:12, 4:14, 4:15, 5:8, 6:6, 7:8, 7:14, 11:9, 11:13, 12:3, 12:24, 13:1, 20:4, 28:11, 29:24, 36:24
**MOAK** [17] - 2:24, 4:3, 5:16, 6:8, 6:15, 6:20, 7:23, 8:10, 8:12, 8:18, 9:23, 10:25, 12:10, 13:2, 20:9, 20:14, 21:4
**Moak's** [1] - 28:22
**modified** [9] - 30:8, 30:10, 30:13, 30:14, 31:6, 31:21, 32:6, 32:10, 32:17
**modules** [1] - 8:12
**mom** [2] - 36:10, 36:19
**moment** [1] - 34:10
**moms** [1] - 36:16
**monitor** [3] - 3:22, 23:3, 23:6
**monitored** [1] - 29:2
**monitoring** [10] - 18:16, 23:24, 27:25, 28:2, 28:8, 29:19, 31:9, 31:16, 34:12
**monitors** [11] - 7:19, 10:22, 11:8, 22:20, 25:25, 26:5, 26:12, 30:3, 30:4, 33:6, 33:12
**month** [2] - 23:18, 23:20
**months** [2] - 29:8, 32:10
**morning** [13] - 3:8, 3:10, 3:12, 3:14, 3:18, 3:24, 4:2, 4:3, 4:6, 4:8, 4:11, 6:4, 16:3
**most** [4] - 33:12, 34:10, 34:15
**motion** [12] - 4:25, 11:21, 11:23, 14:5, 18:5, 18:12, 18:14, 18:19, 18:20, 18:21, 19:6, 19:8
**motions** [2] - 11:19, 20:3
**move** [2] - 5:20, 5:23
**moving** [1] - 6:13
**MR** [17] - 3:24, 4:3, 5:16, 6:8, 6:15, 6:20, 7:23, 8:10, 8:12, 8:18, 9:23, 10:25, 12:10, 13:2, 20:9, 20:14, 21:4
**MS** [80] - 3:8, 3:10, 3:12, 3:14, 3:17, 3:20, 3:22, 4:1, 4:6, 4:22, 7:7, 7:13, 11:11, 11:25, 12:1, 12:18, 13:12, 13:19, 14:2, 14:9, 14:22, 15:7, 15:13, 15:17, 15:20, 15:23, 16:3, 16:7, 16:10, 16:22, 16:25, 17:3, 17:11, 17:18, 18:2, 18:3, 18:11, 18:21, 18:24, 19:4, 19:18, 20:1, 20:17, 20:18, 20:25, 21:7, 22:8, 22:17, 22:21, 23:1, 23:12, 26:3, 26:13, 27:1, 27:3, 27:9, 27:12, 27:24, 29:1, 29:9, 29:14, 29:17, 29:25, 30:6, 30:21, 30:23, 31:12, 31:20, 32:5, 32:9, 32:18, 33:8, 33:10, 34:8, 35:2, 35:7, 35:17, 36:4, 37:7, 37:8

## N

**name** [3] - 15:11, 15:13, 16:23
**Nancy** [1] - 4:1
**nation** [1] - 10:12
**NATIONAL** [3] - 2:4, 2:7, 2:11
**nature** [1] - 25:6
**need** [7] - 9:21, 10:22, 22:5, 25:1, 26:9, 33:22, 36:15
**needed** [1] - 26:18
**needs** [2] - 4:9, 36:10
**neglected** [1] - 33:21
**NEW** [1] - 2:15
**new** [5] - 10:18, 21:16, 30:8, 32:8, 33:14
**newness** [1] - 30:9
**next** [5] - 9:9, 9:24, 11:4, 13:15, 15:1
**noncompliance** [2] - 21:11, 32:24
**none** [1] - 36:24
**north** [1] - 16:24
**northwest** [17] - 14:11, 14:13, 14:24, 15:4, 15:5, 15:7, 15:10, 15:11, 15:24, 16:14, 17:4, 23:4, 23:13, 23:21, 23:22, 27:22, 28:6
**noted** [2] - 11:2, 30:25
**notes** [1] - 26:19
**noticed** [1] - 9:6
**number** [6] - 3:3, 4:13, 14:18, 15:21, 36:8

**numbers** [5] - 4:18, 4:19, 5:13, 6:1, 6:21
**numerous** [1] - 21:19
**NW** [1] - 2:12
**NWJDC** [1] - 17:4
**NY** [1] - 2:15

## O

**OAKLAND** [2] - 2:6, 2:9
**oath** [2] - 5:4, 11:13
**object** [8] - 5:1, 11:24, 14:3, 18:4, 21:8, 22:12, 31:24, 32:3
**objection** [4] - 11:18, 12:21, 18:17, 33:25
**observations** [1] - 31:11
**obviously** [2] - 19:2, 26:13
**OCC** [1] - 10:8
**OCMO** [2] - 7:24, 10:7
**OF** [8] - 1:2, 1:16, 2:4, 2:16, 37:13, 37:17
**office** [2] - 23:21, 25:22
**officers** [2] - 25:12, 25:20
**offices** [1] - 24:6
**OFFICIAL** [2] - 1:23, 37:20
**OFO** [3] - 9:3, 10:9, 20:10
**often** [2] - 13:21, 27:10
**on-the-spot** [1] - 9:5
**once** [5] - 6:12, 6:13, 6:15, 23:18, 23:20
**one** [15] - 3:3, 7:1, 10:14, 11:2, 12:2, 15:9, 16:15, 17:19, 17:22, 18:5, 18:24, 19:2, 34:12, 34:15, 35:10
**online** [1] - 26:10
**onward** [1] - 5:23
**open** [1] - 25:16
**opened** [1] - 23:8
**operation** [1] - 28:7
**operations** [1] - 24:15
**opining** [1] - 21:12
**opportunity** [2] - 22:15, 26:24
**opposing** [1] - 12:11
**opposition** [1] - 14:5
**order** [2] - 12:19, 37:6
**Ordin** [2] - 3:23, 33:20
**ORDIN** [6] - 2:21, 3:22, 26:13, 33:10, 34:8, 35:2
**ordin** [2] - 11:5, 34:6
**organization** [1] - 27:14
**organized** [1] - 5:23
**original** [1] - 30:7
**ORR** [1] - 5:12
**otherwise** [1] - 19:7
**overall** [1] - 9:11
**overlapping** [1] - 4:24

## P

**p.m** [1] - 37:10
**P.O** [1] - 2:18
**Pamela** [1] - 3:4
**PAMELA** [2] - 1:10, 2:17
**PARASCANDOLA** [2] - 2:18, 3:20
**Parascandola** [1] - 3:20
**parenting** [1] - 36:2
**part** [8] - 8:2, 9:10, 9:18, 9:24, 19:14, 26:7, 34:13, 35:3
**participants** [1] - 34:23
**particular** [4] - 10:24, 11:21, 11:23, 25:21
**particularly** [1] - 4:13
**parties** [1] - 36:7
**partners** [2] - 5:17, 5:19
**Paso** [2] - 6:12, 11:1
**past** [2] - 19:14, 21:19
**patrol** [4] - 7:24, 10:8, 20:10, 20:13
**Paul** [1] - 3:24
**PAUL** [1] - 2:24
**pay** [1] - 5:20
**pending** [7] - 11:15, 11:19, 11:21, 18:20, 20:3, 26:21, 34:10
**people** [7] - 7:4, 9:21, 10:11, 10:19, 22:3, 34:4, 35:25
**per** [2] - 6:13, 6:15
**percent** [2] - 6:23
**percentage** [1] - 5:18
**percentages** [1] - 6:20
**perfected** [1] - 28:12
**perfectly** [1] - 21:24
**perhaps** [3] - 19:24, 28:1, 28:24
**period** [4] - 4:16, 4:17, 11:4, 22:7
**permitted** [1] - 19:1
**persisting** [1] - 5:14
**personally** [2] - 24:4, 27:20
**personnel** [2] - 35:5
**phone** [1] - 25:5
**PINE** [1] - 2:15
**place** [6] - 30:11, 30:14, 31:23, 32:1, 32:7, 35:25
**placed** [1] - 36:14
**PLAINTIFF** [1] - 2:4
**plaintiffs** [16] - 3:7, 3:9, 3:11, 3:13, 3:15, 4:24, 5:2, 11:8, 14:4, 19:6, 22:15, 22:19, 27:24, 30:10, 30:24, 32:3
**Plaintiffs** [1] - 1:6
**plaintiffs'** [7] - 22:23, 26:24, 30:3, 31:11, 31:21, 33:25, 34:22
**plan** [1] - 13:17
**planning** [4] - 27:10, 27:12, 31:23, 32:1
**plans** [3] - 31:22, 32:4, 32:6
**plateau** [1] - 6:18
**pleased** [3] - 9:13, 10:10, 21:20
**plethora** [2] - 23:14, 25:11
**plus** [1] - 33:17
**point** [7] - 6:19, 6:24, 7:20, 8:19, 25:20, 34:17, 36:6
**policies** [2] - 32:1, 32:4
**policy** [1] - 5:24
**political** [1] - 19:15
**portion** [1] - 35:13
**portions** [1] - 34:15
**possible** [5] - 18:9, 22:9, 22:11, 29:5, 33:1
**potential** [1] - 34:3
**practices** [3] - 8:13, 9:14, 10:7
**precludes** [1] - 18:7
**predominantly** [3] - 5:17, 5:24, 6:1
**preexisting** [1] - 29:21
**PRESENT** [1] - 2:23
**present** [1] - 9:22
**presentations** [1] - 9:20
**PRESIDING** [1] - 1:3
**presume** [1] - 6:17
**pretty** [4] - 4:18, 9:9, 9:13, 20:10
**previous** [3] - 7:19, 18:7, 33:22
**primarily** [1] - 14:20
**primary** [2] - 5:13, 28:20
**privilege** [1] - 32:2
**privy** [1] - 31:10
**problem** [1] - 19:14
**PROCEEDINGS** [2] - 1:16, 37:13
**Proceedings** [1] - 37:10
**process** [2] - 13:16, 32:2
**processing** [1] - 17:15
**produced** [2] - 19:7, 28:2
**program** [2] - 33:23, 35:14
**programs** [1] - 33:14
**progress** [2] - 10:23, 21:21
**prohibited** [1] - 26:10
**proven** [1] - 5:11
**provide** [1] - 10:22
**pull** [1] - 14:17
**purposes** [1] - 13:8

## Q

**quarter** [3] - 6:12, 6:13, 6:15
**quarterly** [1] - 27:13
**questions** [14] - 4:13, 5:1, 10:5, 11:9, 11:14, 12:24, 18:9, 18:16, 22:20, 22:23, 29:15, 30:2, 34:14, 36:23
**quickly** [2] - 20:11, 30:6
**quite** [3] - 13:13, 31:7, 34:23

## R

**radar** [1] - 19:23
**RAINI** [1] - 2:8
**raise** [1] - 11:18
**raised** [3] - 11:19, 11:22, 31:18
**rapidly** [1] - 33:1
**rate** [3] - 7:15, 7:21
**rather** [5] - 4:20, 33:1, 33:6, 35:13, 35:18
**reaching** [1] - 6:18
**read** [2] - 26:15, 33:24
**reading** [1] - 26:14
**real** [1] - 30:12
**really** [10] - 9:13, 9:14, 10:15, 23:2,

25:17, 34:17, 34:20, 35:21, 36:6, 36:17
**reason** [6] - 7:5, 15:3, 20:8, 20:24, 21:24, 22:4
**reasonable** [2] - 21:5, 21:24
**reasoning** [1] - 12:20
**reasons** [3] - 5:13, 7:9, 20:22
**REBECCA** [1] - 2:10
**Rebecca** [1] - 3:10
**received** [1] - 31:12
**receiving** [1] - 34:18
**recent** [3] - 21:20, 33:13, 34:11
**recently** [2] - 7:23, 27:8
**record** [3] - 7:25, 22:21, 31:4
**RECORDED** [1] - 37:13
**REDUCTION** [1] - 37:16
**refer** [1] - 8:16
**references** [1] - 30:8
**referring** [2] - 14:10, 35:8
**refers** [1] - 15:6
**regard** [4] - 7:12, 21:21, 33:7, 34:6
**regarding** [5] - 7:16, 12:20, 31:11, 34:10, 34:14
**regardless** [1] - 19:8
**regards** [1] - 23:12
**region** [1] - 15:12
**regional** [16] - 14:11, 14:13, 14:24, 15:4, 15:6, 15:7, 15:10, 15:11, 15:25, 16:14, 23:4, 23:13, 23:21, 23:22, 27:22, 28:6
**regular** [1] - 8:17
**regulation** [1] - 19:1
**REGULATIONS** [1] - 37:17
**regulations** [3] - 18:7, 18:25
**reiterate** [1] - 32:20
**relate** [1] - 35:12
**relative** [1] - 30:9
**relatives** [1] - 36:9
**relayed** [1] - 25:2
**remaining** [1] - 5:9
**reminds** [1] - 33:20
**reopened** [1] - 13:14
**reopening** [1] - 13:5
**report** [32] - 4:17, 5:8, 6:22, 7:10, 7:12, 8:6, 9:25, 11:10, 11:14, 12:4, 12:25, 14:12, 14:18, 14:23, 17:11, 17:14, 20:5, 20:19, 21:9, 22:24, 23:2, 28:3, 28:7, 28:13, 28:23, 29:6, 30:7, 30:17, 33:13, 36:25, 37:4
**REPORTER** [2] - 1:23, 37:20
**REPORTER'S** [1] - 1:16
**reporting** [5] - 8:8, 12:20, 21:10, 21:11, 28:12
**reports** [10] - 4:13, 5:6, 7:17, 7:22, 17:3, 21:19, 28:21, 29:3, 29:19, 29:22
**repurposed** [2] - 13:9, 13:13
**request** [9] - 8:17, 11:13, 18:8, 22:22, 28:1, 30:19, 31:21, 31:22, 32:11
**requesting** [2] - 32:3, 32:9
**required** [2] - 18:23, 29:20
**requirement** [2] - 8:3, 18:6
**requiring** [1] - 8:25
**reserve** [3] - 21:8, 22:9, 22:12
**reside** [1] - 34:4
**residence** [1] - 13:15
**residential** [15] - 14:6, 15:9, 16:6, 16:12, 16:20, 17:10, 17:12, 17:13, 17:22, 23:13, 24:1, 24:7, 25:14, 26:8
**residents** [3] - 24:19, 25:7, 27:21
**resolved** [1] - 17:25
**resource** [1] - 5:11
**respect** [2] - 7:8, 30:6
**respectfully** [2] - 5:1, 18:11
**respond** [1] - 22:15
**response** [5] - 9:9, 19:13, 30:11, 34:22, 35:13
**responsibilities** [1] - 35:6
**rest** [2] - 36:11, 36:15
**restrictions** [2] - 36:14, 36:18
**results** [1] - 28:2
**retain** [1] - 5:25
**return** [2] - 9:7, 33:10
**returned** [1] - 34:12
**review** [1] - 24:4
**RGV** [1] - 6:12
**rights** [1] - 36:2
**robust** [1] - 33:23
**role** [3] - 33:11, 34:4, 34:19
**room** [2] - 36:11, 36:15
**rule** [2] - 22:25, 33:7

**S**

**San** [3] - 9:3, 9:8
**SANTA** [1] - 1:24
**sat** [1] - 13:13
**sector** [1] - 9:3
**sectors** [5] - 6:12, 6:14, 6:16, 8:20, 10:12
**secure** [4] - 7:2, 7:6, 16:17, 17:6
**secured** [2] - 14:21, 15:15
**securing** [1] - 12:5
**see** [13] - 4:7, 5:24, 8:5, 8:6, 8:7, 8:13, 21:23, 28:3, 28:13, 29:25, 31:17, 33:15, 36:22
**seeing** [2] - 21:13, 21:23
**seem** [4] - 6:24, 13:4, 13:23, 21:9
**sent** [2] - 31:1, 31:2
**separate** [1] - 16:5
**September** [3] - 21:2, 29:7, 37:4
**series** [1] - 18:8
**serious** [1] - 21:18
**services** [3] - 25:10, 26:8, 34:18
**session** [1] - 9:2
**sessions** [1] - 7:24
**set** [2] - 24:7, 25:14
**setting** [1] - 24:7
**settings** [1] - 27:16
**settlement** [8] - 18:22, 21:10, 21:15, 24:2, 24:12, 26:6, 26:15, 34:16
**seven** [3] - 7:2, 7:4, 22:12
**several** [1] - 19:23
**SHERIDAN** [1] - 2:21
**show** [1] - 9:16
**shower** [3] - 36:11, 36:15, 36:21
**signal** [1] - 8:18
**similar** [1] - 29:23
**single** [1] - 28:16
**site** [6] - 23:17, 23:19, 27:17, 27:19, 27:20, 30:23
**situations** [2] - 24:25, 25:4
**six** [3] - 16:4, 16:9, 16:11
**skills** [1] - 28:12
**someone** [1] - 33:25
**sometimes** [1] - 35:21
**somewhat** [1] - 19:15
**somewhere** [1] - 33:24
**sorry** [5] - 4:22, 6:6, 17:1, 21:1, 21:7
**sort** [5] - 4:19, 5:5, 6:18, 28:12, 28:14
**sounded** [2] - 29:17, 29:18
**south** [3] - 16:5, 16:11, 16:20
**southwest** [1] - 10:11
**speaking** [1] - 34:9
**SPECIAL** [1] - 2:20
**special** [1] - 24:25
**specific** [4] - 11:14, 14:13, 30:13, 34:9
**specifically** [2] - 5:2, 32:4
**spend** [1] - 33:17
**spot** [2] - 9:5, 25:3
**staff** [16] - 6:8, 23:17, 24:9, 24:20, 25:21, 25:22, 27:17, 27:18, 27:20, 35:10, 35:16, 35:17, 35:21, 36:18, 37:1
**staffing** [1] - 23:19
**standards** [21] - 10:20, 24:1, 24:7, 24:11, 24:13, 25:15, 30:8, 30:11, 30:12, 30:14, 31:6, 31:21, 32:6, 32:10, 32:12, 32:13, 32:16, 34:2, 35:24, 37:2
**standpoint** [2] - 8:23, 19:19
**start** [3] - 4:14, 4:19, 10:13
**started** [1] - 11:19
**starting** [2] - 3:6, 6:4
**state** [1] - 3:6
**statement** [1] - 34:11
**statements** [1] - 30:4
**States** [1] - 12:17
**STATES** [2] - 1:1, 37:17
**states** [1] - 14:24
**STATION** [1] - 2:19
**STATUS** [1] - 1:17
**status** [2] - 18:16, 19:22
**stay** [7] - 8:14, 10:4, 12:4, 14:10, 14:23, 15:18, 15:23
**stayed** [1] - 10:2
**STENOGRAPHICALLY** [1] - 37:13
**step** [1] - 13:15
**steps** [1] - 23:6
**still** [5] - 5:14, 13:18, 19:21, 30:11,

35:24
**stipulate** [1] - 12:15
**strategy** [2] - 9:11, 9:25
**STREET** [2] - 1:24, 2:15
**structure** [1] - 32:21
**STRUMWASSER** [1] - 2:21
**subject** [5] - 18:18, 18:20, 19:25, 21:19, 28:21
**substantial** [1] - 21:14
**substantially** [2] - 13:24, 21:12
**sufficient** [4] - 21:3, 29:7, 29:11, 35:22
**suggest** [1] - 19:7
**SUITE** [6] - 1:24, 2:5, 2:9, 2:12, 2:15, 2:22
**summarization** [1] - 28:17
**summarize** [1] - 29:23
**summary** [1] - 37:6
**supplement** [1] - 29:6
**supplemental** [8] - 7:12, 12:20, 20:5, 20:19, 30:7, 30:17, 31:16, 37:4
**supposed** [3] - 32:12, 34:2, 34:20
**Supreme** [1] - 19:20
**sync** [1] - 19:16
**system** [2] - 8:6, 8:8

## T

**Table** [1] - 4:16
**table** [2] - 14:18, 14:19
**tables** [1] - 7:1
**tapering** [1] - 4:20
**team** [6] - 3:19, 6:11, 8:2, 8:3, 9:8, 11:2
**teenagers** [1] - 7:4
**temperature** [2] - 24:22, 28:19
**ten** [1] - 21:17
**term** [1] - 12:15
**terminate** [5] - 14:5, 18:5, 18:15, 19:6, 19:9
**terminating** [1] - 18:21
**terms** [4] - 12:4, 12:7, 25:14, 30:23
**Texas** [6] - 16:6, 16:11, 16:20, 16:24, 19:17, 19:20
**THAT** [1] - 37:12
**THE** [89] - 2:4, 2:16, 2:20, 3:3, 3:16, 3:19, 4:2, 4:5, 4:8, 5:5, 6:6, 6:11, 6:17, 7:1, 7:11, 7:14, 8:8, 8:11, 8:15, 9:18, 10:17, 11:7, 11:17, 12:24, 13:3, 13:17, 13:23, 14:8, 14:17, 15:5, 15:11, 15:15, 15:18, 15:21, 16:1, 16:5, 16:8, 16:19, 16:23, 17:1, 17:9, 17:16, 17:19, 18:10, 18:18, 19:12, 19:22, 20:2, 20:12, 20:15, 20:23, 21:2, 21:6, 21:16, 22:14, 22:19, 22:25, 23:10, 25:25, 26:7, 26:22, 27:2, 27:8, 27:10, 27:23, 28:9, 29:5, 29:13, 29:16, 29:21, 30:2, 30:19, 30:22, 31:10, 31:19, 32:15, 32:19, 33:20, 34:17, 35:15, 35:20, 36:22, 37:9, 37:12, 37:13, 37:14, 37:16, 37:17
**third** [1] - 27:7
**THIS** [1] - 37:15
**three** [1] - 31:13
**throw** [1] - 6:22
**timely** [1] - 11:18
**tools** [3] - 23:14, 23:25
**top** [2] - 8:14, 11:6
**touch** [1] - 34:25
**touched** [1] - 7:18
**town** [4] - 9:24, 9:25, 10:6, 33:16
**tracked** [1] - 29:2
**train** [1] - 37:1
**training** [10] - 8:13, 8:22, 9:1, 9:10, 9:14, 9:21, 10:14, 10:15, 33:16, 35:3
**trainings** [2] - 8:9, 8:16
**TRANSCRIPT** [3] - 1:16, 37:13, 37:15
**translation** [1] - 25:10
**transport** [1] - 12:5
**transportation** [8] - 5:12, 5:22, 12:3, 12:6, 12:7, 12:12, 12:13
**travel** [2] - 8:23, 27:14
**tread** [1] - 20:2
**trip** [1] - 34:13
**TRUE** [1] - 37:12
**try** [1] - 24:16
**trying** [1] - 21:23
**turn** [1] - 12:25
**twice** [3] - 27:6, 31:2, 31:14
**two** [2] - 6:16, 15:9
**typically** [1] - 12:13

## U

**U.S** [2] - 1:23, 2:16
**UCs** [1] - 5:10
**unaccompanied** [5] - 14:1, 14:12, 14:25, 17:5, 17:7
**unannounced** [1] - 9:4
**under** [7] - 5:4, 11:13, 18:6, 18:23, 26:5, 31:25, 32:2
**understood** [1] - 33:9
**undertaking** [1] - 37:1
**unfortunately** [1] - 26:20
**UNITED** [2] - 1:1, 37:17
**United** [1] - 12:17
**units** [2] - 13:25, 17:7
**unsure** [1] - 35:9
**up** [8] - 4:25, 5:3, 5:21, 9:24, 14:4, 14:17, 33:4, 36:6
**update** [1] - 19:24
**utilize** [1] - 23:25
**utilized** [1] - 26:20
**utilizing** [1] - 13:22

## V

**vague** [1] - 35:20
**varied** [1] - 10:1
**various** [1] - 10:19
**vary** [1] - 23:25
**VELIZBAIRDMIRIAM@GMAIL.COM** [1] - 1:25
**versus** [2] - 3:4, 13:25
**VIA** [1] - 1:17
**videotape** [1] - 9:19
**virtual** [2] - 8:22, 9:22
**virtually** [1] - 8:20
**visit** [6] - 6:12, 9:4, 9:5, 26:24, 27:3, 27:5
**visited** [1] - 25:19
**visits** [4] - 25:21, 27:6, 30:23, 31:13
**visual** [1] - 24:17
**Vs** [1] - 1:8

## W

**waiting** [3] - 13:15, 29:9, 33:6
**walk** [2] - 9:15, 9:16
**Wang** [1] - 4:1
**wang** [3] - 11:1, 11:5, 34:12
**WANG** [2] - 2:23, 4:1
**WASHINGTON** [2] - 2:13, 2:19
**watching** [1] - 10:4
**week** [4] - 9:9, 11:1, 22:15, 27:5
**welch** [1] - 31:14
**Welch** [1] - 3:14
**WELCH** [8] - 2:14, 2:14, 3:14, 30:23, 32:9, 35:7, 35:17, 36:4
**welcome** [1] - 37:3
**WEST** [1] - 1:24
**whereas** [1] - 17:6
**WILSHIRE** [1] - 2:22
**wise** [3] - 7:23, 11:5, 34:7
**WISE** [2] - 2:24, 3:24
**Wise** [1] - 3:25
**WITH** [1] - 37:16
**WOLOZIN** [4] - 2:10, 3:10, 18:11, 18:21
**Wolozin** [1] - 3:11
**wondering** [4] - 9:19, 19:16, 22:6, 34:1
**WOOCHER** [1] - 2:21
**word** [1] - 19:9
**worksheets** [1] - 24:5
**writing** [1] - 22:13
**WROE** [8] - 2:8, 3:8, 12:1, 12:18, 17:3, 19:4, 30:6, 32:5
**Wroe** [1] - 3:8

## Y

**year** [3] - 4:7, 6:25, 33:14
**years** [5] - 19:23, 21:17, 21:20, 28:7, 28:11
**yesterday** [1] - 11:1
**YORK** [1] - 2:15
**YOUTH** [3] - 2:4, 2:7, 2:11
**Ysidro** [2] - 9:3, 9:8

## Z

**ZOOM** [1] - 1:17