1  CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
2  Carlos R. Holguín (Cal. Bar No. 90754)
   crholguin@centerforhumanrights.org
3  Bardis Vakili (Cal. Bar No. 247783)
   bardis@centerforhumanrights.org
4  Sarah E. Kahn (Cal. Bar No. 341901)
   sarah@centerforhumanrights.org
5  1505 E 17th St. Ste. 117
   Santa Ana, CA 92705
6  Telephone: (909) 274-9057
7
8  *Attorneys for Plaintiffs*
9
10 *Additional counsel listed on following page*

11                 UNITED STATES DISTRICT COURT
12                 CENTRAL DISTRICT OF CALIFORNIA
13                        WESTERN DIVISION
14

15 Jenny Flores, *et al.*,                Case No. CV 85-4544-DMG-AGRx
16              Plaintiffs,               **PLAINTIFFS' RESPONSE TO DECEMBER
17                                        1, 2025 SUPPLEMENTAL ICE JUVENILE
          v.                             COORDINATOR REPORT AND DATA**
18
19 Pamela Bondi, Attorney General of the  Judge: Hon. Dolly M. Gee
   United States, *et al.,*
20
21              Defendants.
22
23
24
25
26
27
28

                                    i

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe (Cal. Bar No. 299296)
Diane de Gramont (Cal. Bar No. 324360)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email: mwroe@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW
Rebecca Wolozin (admitted *pro hac vice*)
818 Connecticut Ave. NW, Suite 425
Washington, DC 20006
Telephone: (202) 868-4792
Email: bwolozin@youthlaw.org

CHILDREN'S RIGHTS
Leecia Welch (Cal. Bar No. 208741)
2021 Fillmore Street
San Francisco, CA 94115
Telephone: (415) 602-5202
Email: lwelch@childrensrights.org

CHILDREN'S RIGHTS
Eleanor Roberts (admitted *pro hac vice*)
88 Pine Street, Suite 800
New York, NY 10005
Telephone: (212) 683-2210
Email: eroberts@childrensrights.org

Pls.' Resp. to Supp. ICE Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

# TABLE OF EXHIBITS

**Exhibit Index to Plaintiffs' Response to**
**December 1, 2025 Supplemental ICE Juvenile Coordinator Report and Data**

| Exhibit No. | Exhibit Description |
|:---:|:---|
| 1 | Declaration of Javier Hidalgo, December 8, 2025 ("Hidalgo Decl.") |
| 2 | Declaration of Leecia Welch, December 8, 2025 ("Welch Decl.") |
| 3 | J.R.F. Declaration (Dilley), September 9, 2025 ("J.R.F. Decl.") |
| 4 | Z.F. Declaration (Dilley), September 10, 2025 ("Z.F. Decl.") |
| 5 | I.B. Declaration (Dilley), September 11, 2025 ("I.B. Decl.") |
| 6 | N.V.S.M. Declaration (Dilley), November 17, 2025 ("N.V.S.M. Decl.") |
| 7 | C.R.G. Declaration (Dilley), November 18, 2025 ("C.R.G. Decl.") |
| 8 | A.K. Declaration (Dilley), November 19, 2025 ("A.K. Decl.") |
| 9 | M.M.S. Declaration (Dilley), November 18, 2025 ("M.M.S. Decl.") |
| 10 | M.R.P. Declaration (Dilley), September 11, 2025 ("M.R.P. Decl.") |
| 11 | N.G.C. Declaration (Dilley), October 10, 2025 ("N.G.C. Decl.") |
| 12 | L.R.L. Declaration (Dilley), October 9, 2025 ("L.R.L. Decl.") |
| 13 | J.V.D.A. Declaration (Dilley), September 10, 2025 ("J.V.D.A. Decl.") |
| 14 | K.M.L. Declaration (Dilley), October 10, 2025 ("K.M.L. Decl.") |
| 15 | N.G. Declaration (Dilley), November 21, 2025 ("N.G. Decl.") |
| 16 | K.V.L. Declaration (Dilley), October 9, 2025 ("K.V.L. Decl.") |
| 17 | V.L.G. Declaration (Dilley), October 9, 2025 ("V.L.G. Decl.") |
| 18 | N.C.G. Declaration (Dilley), September 11, 2025 ("N.C.G. Decl.") |
| 19 | D.C.R.R. Declaration (Dilley), November 21, 2025 ("D.C.R.R. Decl.") |
| 20 | S.M.G. Declaration (Dilley), October 9, 2025 ("S.M.G. Decl.") |
| 21 | N.T.G. Declaration (Dilley), September 10, 2025 ("N.T.G. Decl.") |
| 22 | Q.G. Declaration (Dilley), September 10, 2025 ("Q.G. Decl.") |
| 23 | A.T.L. Declaration (Dilley), September 11, 2025 ("A.T.L. Decl.") |

**Previously Filed Declarations**

| Docket No. | Description |
|---|---|
| 1656-5 | Ex. 4 to Pls.' Resp. to Sept. 2025 Suppl. JC Reports and Data, C.H. Declaration (Dilley), July 28, 2025 [Doc. # 1656-5] ("C.H. Decl.") |
| 1656-15 | Ex. 14 to Pls.' Resp. to Sept. 2025 Suppl. JC Reports and Data, K.M. Declaration (Dilley), July 28, 2025 [Doc. # 1656-15] ("K.M. Decl.") |
| 1656-8 | Ex. 7 to Pls.' Resp. to Sept. 2025 Suppl. JC Reports and Data, A.D.C. Declaration (Dilley), September 9, 2025 [Doc. # 1656-8] ("A.D.C. Decl.") |
| 1656-12 | Ex. 11 to Pls.' Resp. to Sept. 2025 Suppl. JC Reports and Data, E.O.N.M. Declaration (Dilley), July 28, 2025 [Doc. # 1656-12] ("E.O.N.M. Decl.") |
| 1656-4 | Ex. 3 to Pls.' Resp. to Sept. 2025 Suppl. JC Reports and Data, C.G.V. Declaration (Dilley), July 28, 2025 [Doc. # 1656-4] ("C.G.V. Decl.") |
| 1656-17 | Ex. 16 to Pls.' Resp. to Sept. 2025 Suppl. JC Reports and Data, M.O. Declaration (Dilley), July 29, 2025 [Doc. # 1656-17] ("M.O. Decl.") |

iv

Pls.' Resp. to Supp. ICE Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

# TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................1

II.    ICE continues to violate the *Flores* Settlement Agreement ...................1

   A.   Children Are Subjected to Prolonged ICE Detention .........................3

      1.  Unlawful Prolonged Detention at Dilley FRC....................................3

      2.  Lack of sufficient explanations to lawfully justify prolonged detention...............4

      3.  Prolonged detention of children in hotels ...........................................7

   B.   Conditions of Detention at Dilley Continue to Violate the FSA........................8

      1.  Children are detained for prolonged periods in an unlicensed, secure prison-like environment................................................................8

      2.  Dilley still provides dangerously inadequate medical care to children ...............10

      3.  Children are still not being provided know-your-rights trainings and lack sufficient access to legal counsel .......................................13

      4.  Children still lack access to varied child-friendly foods and healthy snacks ......16

      5.  Children still lack access to sufficient hygiene products.....................................18

      6.  Children still lack access to free phone calls to their family members ...............19

      7.  Defendants do not provide *Flores* compliant education or recreation at Dilley .20

   C.   ICE's FSA monitoring system and protocols are woefully deficient to ensure FSA compliance ........................................................................21

III.  CONCLUSION ........................................................................22

## I.    INTRODUCTION

Pursuant to the Court's September 26, 2025 Order, Doc. # 1672, and in accordance with Paragraphs 28A and 30 of the *Flores* Settlement Agreement ("FSA"), the Juvenile Coordinator ("JC") for U.S. Immigration and Customs Enforcement ("ICE") filed a supplemental annual report on December 1, 2025. ICE Juvenile Coordinator Suppl. Report, Doc. # 1692-4 ("ICE JC supplemental report").

The ICE JC supplemental report confirms Plaintiffs' ongoing concern that ICE remains woefully out of compliance with the FSA's requirements "to treat all minors in its custody with dignity, respect and special concern for their vulnerability as minors," to maintain "safe and sanitary" detention conditions, and to "place each detained minor in the least restrictive setting appropriate to the minor's age and special needs." FSA ¶¶ 11, 12.A. The ICE JC supplemental report admits that extended length of stay is a "widespread operational challenge," that a "comprehensive education program [is] not in place," that recreation has not been provided in compliance with the FSA, that a new orientation video is being used in lieu of know your rights trainings, and that lights are kept on all night in children's sleeping areas. ICE JC Suppl. Report at 2, 10, 13, 15-16, 30, and 32. Despite these admissions and the overwhelming evidence from class members documenting FSA violations, the ICE JC supplemental report assures this Court that ICE is a "model of regulatory compliance and humane care." *Id*. at 41. Not so. Defendants' actions continue to flagrantly violate the FSA and this Court's orders.

## II.    ICE continues to violate the *Flores* Settlement Agreement.

The ICE JC supplemental report confirms that class members remain detained at the South Texas Family Residential Center in Dilley, Texas ("Dilley") for prolonged periods of time in violation of this Court's prior orders. *Id*. at 2-3. The ICE August 2025 20-Day Report, Doc. # 1692-6 ("Aug. census chart") and the ICE September 2025 20-Day Report, Doc. # 1692-9 ("Sept. census chart") (collectively "census charts") show hundreds of children are being detained for a month or longer for reasons that do not indicate imminent removal despite the government's assurances of their "efforts to minimize detention." ICE JC Suppl. Report at 16; *see also* Hidalgo Decl. ¶¶ 9-12. ICE

detained nearly 400 children for more than 20 days in August and September 2025 alone. ICE JC Suppl. Report at 2. More than 150 of these children appear detained for more than 30 days. Sept. census chart; Aug. census chart.[1] In September 2025, over 200 children were held in ICE detention for at least 20 days, over 50 children were held for at least 30 days, and over 25 for at least 40 days, not counting time in hotels or transit. Sept. census chart. Children on the September census report may have even longer lengths of stay, because the chart does not show later book out dates. *Id.*

Defendants' claims of "substantial compliance" with the FSA fall flat. ICE JC Suppl. Report at 16. Defendants have not addressed the vast majority of the violations at Dilley that *Flores* counsel have been communicating in meet and confer letters since May 2025. Welch Decl. ¶¶ 2-3, 5, 11; Hidalgo Decl. ¶¶ 7-8. Ongoing FSA violations include: inadequate medical care, lack of access to know your rights trainings, lack of access to legal counsel, lack of access to varied child-friendly foods and snacks, the inability of class members to sleep due to lights on in their living areas all night, lack of access to appropriate hygiene products, lack of free calls to family members, and lack of adequate education and recreation. Welch Decl. ¶ 3; *see also* Hidalgo Decl. ¶¶ 23-25, 28-29. In addition, in recent weeks, conditions and treatment appear to have worsened with families reporting horrific concerns, such as denial of critical medical care, worms and mold in their food resulting in children becoming ill, and threats of family separation by officers and staff. Welch Decl. ¶ 4; Hidalgo Decl. ¶¶ 23, 27, 29. Families report that their children are weak, faint, pale, and often crying because they are so hungry. Welch Decl. ¶ 4.

---

[1] The census chart states: "Facility Length of Stay was determined by calculating the time (in days) between Apprehension Date and either Book-out Date or 8/31/2025 for those who remain in custody." Aug. census chart at 1. The same language appears in the September census chart with 9/30/2025 as the cutoff date. Sept. census chart at 1. Accordingly, the full length of stay in the "FLOS" column may be much longer for families that remained in custody past September 30, 2025. Families without a listed book out date have longer stays than the number listed in their "20 Day Case Review" column, *e.g.,* one child remained detained 69 days with FLOS listed as 47 in Sept. census chart at 8.

Plaintiffs' counsel have conducted six site visits at Dilley since Defendants began detaining families there in April 2025. *Id.* ¶ 2. After each site visit, Plaintiffs' counsel have provided Defendants with a detailed, comprehensive list of *Flores* violations. *Id.* ¶ 5. As directed by Defendants, Plaintiffs have also raised emergency time-sensitive concerns about particular children via email on multiple occasions, which have largely gone unanswered. *Id.* ¶ 5. Plaintiffs and Defendants have met and conferred five times about the *Flores* violations at Dilley identified in Plaintiffs' correspondence. *Id.* ¶ 5. On October 6, 2025, Defendants stated they would be following up with a comprehensive written response to Plaintiffs' letters. To date, Defendants have not done so. *Id.* ¶ 5. The vast majority of information in the ICE JC supplemental report has not been previously shared with Plaintiffs despite many attempts to resolve FSA violations through the meet and confer process. *Id.* ¶ 5.

### A. Children Are Subjected to Prolonged ICE Detention.

#### 1. Unlawful Prolonged Detention at Dilley FRC

The Court ordered the ICE JC to file a supplemental report including "a census of minors who were held in ICE facilities or ICE-contracted facilities for over 72 hours during the months of August and September 2025" and "a detailed explanation as to the reason(s) for the prolonged detention of minors in excess of 20 days and for housing in a hotel." Order re September 22, 2025 Status Conference, Doc. # 1672 at 2.

The supplemental ICE census data reveals hundreds of children with prolonged lengths of detention in excess of twenty days with little to no justification since Dilley opened. ICE detained nearly 400 children for more than 20 days in the August and September census data alone. ICE JC Suppl. Report at 2. The minimal explanations listed in the census charts again demonstrate that Defendants are failing to comply with their obligations to release children without unnecessary delay and make and record prompt and continuous efforts toward family reunification and release. FSA ¶¶ 14, 18; *see also* Hidalgo Decl. ¶¶ 9-11, 14-15 (noting that RAICES attorneys have "notified Defendants of at least one hundred forty-seven (147) unique instances of what appear to be unnecessary delay of class member's release" since April).

*Flores* counsel monitoring visits confirm that children and families are being detained for alarming amounts of time. Welch Decl. ¶ 24-25; *See also* Hidalgo Decl. ¶¶ 9-11.  In July, Plaintiffs' counsel met with several children who had been detained for two or more months. Welch Decl. ¶ 24. In September, counsel learned there were families detained at Dilley for approximately 98 days (five children), 74 days (one child), 63 days (one child), and 55 days (three children). Welch Decl. ¶ 24; *see also* J.R.F. Decl. ¶ 4 (30 days at Dilley); Z.F. Decl. ¶¶ 17, 26, 31, 34, 38 (16 days in CBP followed by 60 days at Dilley); I.B. Decl. ¶ 5 (36 days at Dilley). In November, Plaintiffs' counsel met with 13 children who had been in custody for 40 to 70 days and identified families who had been at Dilley for 168 days (five children), 64 days (two children) and 56 days (three children). Welch Decl. ¶ 25. At the time of the November monitoring visit, 81 families, including approximately 115 children, had already been detained at Dilley for 21 days. Welch Decl. ¶ 25; *see also* N.V.S.M. Decl. ¶ 4 (41 days at Dilley); C.R.G. Decl. ¶ 4 (56 days at Dilley); A.K. Decl. ¶ 2 (52 days at Dilley); M.M.S. Decl. ¶ 4 (46 days at Dilley).

## 2. Lack of sufficient explanations to lawfully justify prolonged detention

ICE admits that "extended custody" of children is a "widespread operational challenge." ICE JC Suppl. Report at 2. The ICE JC supplemental report identifies the main reasons for extended stays as: "transportation delays," "medical needs,"[2] and "legal processing." *Id*. at 2. But the accompanying census charts provide no explanation as to why individual children stay in detention for over 20 days when removal is not imminent. Sept. census chart; Aug. census chart; Order re Plaintiffs' Motion to Enforce and Appoint a Special Monitor, June 27, 2017, Doc. # 363 ("June 2017 Order") at 31 ("[U]se of the expedited removal procedure does not automatically render the Agreement's preference-for-release provision inapplicable"); Welch Decl. ¶ 26 (Defendants have no response about why children are held when removal is not imminent); Hidalgo Decl. ¶ 12-15 (ICE

---

[2] Multiple class members' accounts of being denied needed medical care while at Dilley undercut the ICE JC supplemental report's claim that detaining children longer than 20 days is necessary for medical treatment. *See infra* II.B.2.

4

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

does not provide reason for prolonged detention, just says some families will be detained indefinitely, and does not factor in *Flores* mandates when assessing release).[3]

ICE admits to holding children for months based on "administrative stay reviews," "judicial stay reviews," and "documentation verification," with no release option even though these children are not imminently removable based on the plain posture of their immigration cases. ICE JC Suppl. Report at 3; Aug. census chart (Many families remained detained over 20 days at Dilley including after "USCIS issued positive finding decision and subsequently issued a Notice to Appear [because] [d]etention was continued for the scheduled administrative hearing."); Sept. census chart (same). In fact, the reason given for the length of stay for all 399 children is simply "Immigration and Nationality Act (8 U.S.C. 1101 et seq.)." Aug. census chart; Sept. census chart.

Furthermore, in the "20 Day Case Review" column, there is no indication of individualized determinations of flight risk or child-specific concerns other than vague descriptions like "detention was continued for their scheduled administrative proceedings" or "pending USCIS finding." Aug. census chart; Sept. census chart; *see also* Hidalgo Decl. ¶ 16 (stating the family's current immigration case status is not a lawful justification as to why detention has passed 20 days under *Flores*). This Court has previously found such vague explanations insufficient to show Defendants are meeting their obligations under the Settlement. *See* Order re Plaintiffs' Motion to Enforce, April 24, 2020, Doc. # 784 ("April 2020 Order") at 15-16 (noting that ICE's "spreadsheet does not contain information about flight risk or other factors leading to a denial of release"

---

[3] Families similarly report that they are being detained for prolonged periods without explanation. N.V.S.M. Decl. ¶ 19 (family followed judge's orders to apply for asylum in November but told must remain detained until a January court date); C.R.G. Decl. ¶ 5 (After 56 days at Dilley, mother has not been told how long she and her family will remain detained nor received any information about release); Hidalgo Decl. ¶ 12 ("[S]ince the beginning of April 2025, which is when ICE began detaining families in Dilley anew, we have notified Defendants of at least one hundred fifty (150) unique instances of what appear to be *unnecessary* delay of a class member's release.") (emphasis added).

and merely states reasons such as "pending IJ hearing/decision" or "pending USCIS response").

The census charts suggest that Defendants are not exercising due diligence to promptly screen families for relief to determine whether removal is imminent or individually evaluating non-imminently removable class members for release. *Compare* ICE JC Suppl. Report at 16 with Aug. census chart and Sept. census chart; s*ee* Ex. 4 to Pls.' Resp. to Sept. 2025 Suppl. JC Reports and Data, [Doc.# 1656-5] C.H. Decl. ¶ 47 (CFI occurred a month prior); Ex. 14 to Pls.' Resp. to Sept. 2025 Suppl. JC Reports and Data, [Doc.# 1656-15] K.M. Decl. ¶¶ 5-6. 29, 42-44 (Family expressed fear upon apprehension, but spent 18 days in CBP followed by 14 days at Dilley, as well as a day when ICE attempted to put them on a plane, before receiving a CFI screening); N.G.C. Decl. ¶ 20; Hidalgo Decl. ¶¶ 15-19. Defendants continue to rely on delayed screening and ongoing proceedings to justify children's prolonged detention. For example, one family spent 51 days in custody before release because "[d]etention was continued pending the immigration judge hearing. Detentin [sic] was further continued during the appeal period while the FAMU filed an appeal with the BIA." Sept. census chart at 9. Another child remained detained by ICE for over two months, from June 17, 2025 to August 28, 2025, and the only stated reason for this prolonged detention is "[d]etention was continued pending a scheduled administrative hearing. Due to the credibility with head of household's testimony, the immigration judge delayed the issuance of a written decision." Aug. census chart at 2. A third young child was similarly held at Dilley for 56 days, from June 16, 2025 to August 13, 2025, and the only explanation provided is "Detention was continued pending the immigration judge review." *Id*. at 4. Legal services providers working with class members at Dilley also report that ICE is increasingly refusing to release children at Dilley simply because they have a pending immigration case. Hidalgo Decl. ¶¶ 14-19 ("It has become more common, and recently has become the norm, that ICE-ERO indicates an intent to not consider *Flores* protections when making release decisions.") In fact, there has been a "marked decrease" in Defendants' efforts to release class members. Hidalgo Decl. ¶ 19. Class members cannot be detained

for these long periods simply because they have a pending immigration proceedings. June 2017 Order at 24-26, 30-31; Hidalgo Decl. ¶ 16.

As this Court has already held, prolonged detention when removal is not imminent or "ready to take place" is a violation of paragraphs 14 and 18 of the FSA. *See* April 2020 Order at 13-14. Additionally, continued detention of class members, even where the child has a final removal order, is a violation of FSA paragraph 14 *unless* ICE has provided an individualized assessment that determines continued detention is necessary for safety or because of a flight risk. *Id.* at 17-18. Despite the ICE JC supplemental report's assertion that flight risk assessments are occurring, nothing in the census charts indicates that they occur. *See, e.g.*, Aug. census chart (no mention of flight risk); Sept. census chart (same); L.R.L. Decl. ¶ 39 ("We have not heard of an individual release hearing or had a chance to explain why we shouldn't be here anymore."); N.V.S.M. Decl. ¶ 47 (same).

### 3. Prolonged detention of children in hotels

This court has issued orders limiting the use of hotels to "*brief* hotel stays (not more than 72 hours) as necessary and in good faith to alleviate bottlenecks in the intake processes at licensed facilities." Order re Defendants' *Ex Parte* Application to Stay, September 21, 2020, Doc. # 990 at 5; *see also* Order re Plaintiffs' Motion to Enforce Settlement as to "Title 42" Class Members, September 4, 2020, Doc. # 976 at 17 (permitting exceptions "for one to two-night stays while in transit or prior to flights"). The ICE August 2025 72-Hour Report, Doc. # 1692-5 ("Aug. 72-hour report") and the ICE September 2025 72-Hour Report, Doc. 1692-8 ("Sept. 72-hour report") again reveal unexplained prolonged detention of children in hotels that appear to violate those orders. Plaintiffs' counsel have raised concerns regarding prolonged detention in hotels with Defendants regarding the August 2025 data and received no response. Welch Decl. ¶ 5 n.1. Several entries ICE identified as spending over 72 hours also lack a clear explanation for why class members were held in hotels. 72+ hours in a hotel in August 2025, Doc. # 1692-7; 72+ hours in a hotel in September 2025, Doc. # 1692-10.

Additionally, Plaintiffs again question the reliability of Defendants' data. The ICE JC supplemental report only lists 4 children who spent over 72 hours in a hotel in August

and 3 children in September, erroneously excluding several children who spent more than 72 *cumulative* hours held in hotels. *E.g.*, Aug. 72-hour report at 13 (15 days in 5 hotels), *id*. at 9-10 (10 days in 4 hotels); *id*. at 2 (4 nights in 2 hotels); *id*. at 3 (4 nights in 2 hotels); *id*. at 3 (4 nights in 4 hotels); *id*. at 3 (89 hours in hotel). The Aug. 72-hour report provides no explanations for why these children remained in hotels. *Id*. ICE cannot evade the Court's prior order by moving children to different hotels every few days. The exclusion of these children from ICE's 72-hour list raises questions as to ICE's methodology and suggests ICE is grossly undercounting the number of children detained in hotels for more than 72 hours.

Plaintiffs' counsel are concerned by the alarming trend toward longer, unjustified detention of children – both at Dilley and in irregular placements like hotels – in violation of prior, clear orders from this Court.

**B. Conditions of Detention at Dilley Continue to Violate the FSA.**

Children's prolonged detention at Dilley is particularly concerning given the ongoing, widespread FSA violations reported by countless families. Plaintiffs' counsel have met with approximately 100 families at Dilley since it was re-opened in April 2025. Welch Decl. ¶¶ 2, 11. Class members and their families consistently report serious concerns with Dilley's secure, prison-like environment, including inadequate medical care, lack of access to know-your-rights trainings, lack of access to legal counsel, lack of access to varied, child-friendly foods and snacks, the inability of class members to sleep due to lights kept on in their living areas all night, lack of access to adequate or sufficient hygiene products, lack of free calls to family members, and lack of adequate education and recreation. Welch Decl. ¶¶ 3, 12.

**1. *Children are detained for prolonged periods in an unlicensed, secure prison-like environment.***

Dilley is a 56-acre unlicensed, secure ICE facility located in Dilley, Texas. Welch Decl. ¶ 7. The facility continues to operate under a contract with CoreCivic, one of the largest for-profit prison contractors in the United States. *Id*. ¶ 7. The perimeter of the

facility is surrounded by a high metal fence. Ex. 7 to Pls.' Resp. to Sept. 2025 Suppl. JC Reports and Data, [Doc.# 1656-8] A.D.C. Decl. ¶ 18; Welch Decl. ¶ 7. To enter the facility, visitors must proceed through a locked trailer-style building, be subjected to an extensive search for "contraband" items, and pass through a metal detector. *Id.* ¶ 7.

Children at Dilley continue to report feeling like prisoners locked up in isolated, cell-like trailers. *See, e.g.*, I.B. Decl. ¶ 59 ("We are hoping that lawyers can . . . make sure that children can be released from these prisons.); M.M.S. Decl. ¶ 29 ("This place definitely feels like a jail. There is no other way to describe it; it's a jail for children."); A.D.C. Decl. ¶ 18 ("We know we are like prisoners here . . . ."); N.G.C. Decl. ¶ 5 ("It's a prison here – it is truly a living hell."); I.B. Decl. ¶ 32 ("My older son is now becoming so depressed because this is a horrible place for a child."). In some cases, families report sharing their living quarters with up to five other families. N.V.S.M. Decl. ¶ 22 ("Our room now has 12 people in it. It's totally packed."); C.R.G. Decl. ¶ 10 (living with five other moms and their kids); M.M.S. Decl. ¶ 22 (living with four other moms and their daughters).

In addition, families continue to report having difficulty sleeping because lights are kept on in living areas throughout the night. J.R.F. Decl. ¶ 15 ("The lights are on all the time."); J.V.D.A. Decl. ¶ 28 ("The lights are on all the time and the guards' radios are so loud."); Z.F. Decl. ¶ 67 ("Two of the lights must be on in our room at all times, including nights."); K.M.L. Decl. ¶ 20 ("Some of the lights are on all the time."); A.K. Decl. ¶ 27 ("If I could change one thing here, it would be . . . turning the lights off at night . . . ."); N.G. Decl. ¶ 7 ("[We] have asked why adults and children have to sleep with the lights on."); Ex. 11 to Pls.' Resp. to Sept. 2025 Suppl. JC Reports and Data, [Doc.# 1656-12] E.O.N.M. Decl. ¶ 13 ("If you put a blanket over your face in bed to not see the light, the staff will come in the night and pull it off.").

Class members continue to report distress at being separated from one of their parents in the evenings and during other periods throughout the day. E.O.N.M. Decl. ¶ 4 ("The thing we wish the most is that we could all stay together the four of us."). ICE holds dual household families in separate zones – with mothers and children generally in one

zone and fathers living separately in another zone. J.V.D.A. Decl. ¶ 27 ("My husband is in a different part of the facility with other dads. We don't understand why he can't stay with us since we have our own room."); K.V.L. Decl. ¶ 28 ("My husband stays separately from us, with all the other fathers."). Although families are allowed to be together during periods of the day, fathers are separated from their children after 8 pm, which is upsetting to many children. E.O.N.M. Decl. ¶ 8 (sister cried every night because she was separated from her other sibling staying with their father); A.D.C. Decl. ¶ 22 ("My wife has shared that children are really suffering who are separated from their fathers. Last night, she heard a child crying around 1 a.m. When she went to check, the mom said that it was really hard on her because she was used to sleeping with both her parents but, here, she is only able to sleep with her mom."). There are also limited places to be together as a family during the day, as fathers are not permitted in their wives' and children's living quarters and vice versa. J.V.D.A. Decl. ¶ 32 ("I am not allowed to leave my daughter ever. Also, the guards won't let my husband watch her if I'm not there. If I want to take a small break, lie down, or take a shower, I have to be with my daughter at all times.").

### 2. *Dilley still provides dangerously inadequate medical care to children.*

Contrary to the ICE supplemental report, families continue to report serious concerns with medical care at Dilley. Welch Decl. ¶ 13; Hidalgo Decl. ¶ 30 (Dilley families have raised concerns over inadequate medical care to RAICES attorneys on at least 360 occasions). Most recently, families reported children becoming sick from eating contaminated food and receiving inadequate medical care. *See infra* Part II.B.4. Medical staff told one family whose child got food poisoning to only return if the child vomited eight times. Welch Decl. ¶ 13. A staff member hit another child in the eye with a mop, resulting in bleeding, severe irritation, and vision impairment – yet Dilley's medical staff did not see her for two days and provided no treatment. K.V.L. Decl. ¶¶ 22-27 ("We are worried she will have long-term eye issues."). A staff member broke another child's foot by dropping a volleyball net pole on him, and ICE had not yet approved a referral to an orthopedic specialist. V.L.G. Decl. ¶¶ 5-8. An 11-year-old girl's severe ear infection

caused hearing loss, but Dilley's medical staff did not provide a thorough medical exam. N.G. Decl. ¶¶ 12-14. Children report distress from medical unit staff denying treatment or making them wait days for diagnoses when they felt sick and feverish. Welch Decl. ¶ 13; *see, e.g.*, D.C.R.R. Decl. ¶¶ 4-6 (ten-year-old with Hirschsprung's denied medical attention until eighth day at Dilley and denied accommodations thereafter); S.M.G. Decl. ¶ 5 (two-year-old with fever and diarrhea was denied treatment for one week before she was diagnosed with flu and provided rehydration fluids); A.K. Decl. ¶ 16 (two-year-old with fever and ear infection had to wait three days for diagnosis and was denied further testing when infection spread); N.V.S.M. Decl. ¶¶ 34-35 (14-year-old with congestion and sore throat denied consultation with doctor); C.H. Decl. ¶¶ 31-32 (six-year-old denied cavity treatment). In one instance, class members watched in terror as a pregnant woman fainted and seized for an extended time before medical support arrived. J.R.F. Decl. ¶ 41; M.R.P Decl. ¶ 61; N.C.G. Decl. ¶ 11.

Additionally, obtaining needed medications, and even non-prescription and basic health items like diaper cream, remains extremely challenging due to early pill window times and long lines. J.V.D.A. Decl. ¶ 33 (had to go to medical unit twice a day to get a "little lick of cream" for child's allergic reaction); Z.F. Decl. ¶ 71 (family had to wait in pill line for medicine three times per day and it would take them several hours a day because wait times were so long); V.L.G. Decl. ¶ 10 (family had to wait in pill line for 30 minutes twice a day for son's medication); A.D.C. Decl. ¶ 12 (father had to wait in line at 7 a.m., 1 p.m., and 7 p.m. to get a tablespoon of diaper cream for his son); *see also* N.G. Decl. ¶ 11.

For children with disabilities and other previously-diagnosed medical conditions, detention in secure and restrictive facilities, prolonged separation from their medical providers, and interruption of their medical care plans cause dangerous deterioration of their health. Welch Decl. ¶ 14. For example, over the past three months, a child on the autism spectrum regressed developmentally from missing needed therapies and the harsh conditions at Dilley. A.D.C. Decl. ¶¶ 6, 9-12 (nine-year-old child on autism spectrum not receiving needed therapies, vomiting from harsh chemical smell in bathrooms, and

regressing to the point of soiling himself and needing diapers). Another child with Hirschsprung's disease suffered horribly due to a change in medication and diet that caused her to go 10 days without a bowel movement. D.C.R.R. Decl. ¶ 4 (child "cried in pain the entire time" once she finally had a bowel movement and had "blood in her stool"). One child's pain-management plan for serious injuries to his back and arms was so disrupted at Dilley that he could barely walk. N.C.G. Decl. ¶ 8 ("[T]hey haven't given us anything that will help his pain here."); *see also* V.L.G. Decl. ¶ 9 (epileptic class member's medication type and dosage, that he had been taking since he was three, was changed without explanation).

Parents also consistently report concerns regarding their children's mental health. Regression in their children's development is particularly upsetting, including children hitting themselves in the face, becoming aggressive, and frequently wetting themselves after years of being potty trained. *See* A.K. Decl. ¶ 20 (one-year-old has "start[ed] hitting himself in the face"); K.V.L. Decl. ¶ 16 (six-year-old "has started to wet her pants again since coming [here]"); A.D.C. Decl. ¶ 23 (nine-year-old has started needing "to wear diapers . . . [and] we have also seen an increase in tantrums, yelling and having episodes. . ."). Numerous families report kids being constantly on-edge, anxious, stressed, and depressed. I.B. Decl. ¶ 34 (seven-year-old son "cries constantly, he is volatile and emotional"); N.V.S.M. Decl. ¶ 33 ("I feel very sad and stressed to be here. Sometimes I have anxiety attacks here. My nerves are so high. I don't know what is happening. My muscles will twitch because I'm so nervous and on edge."); Ex. 3 to Pls.' Resp. to Sept. 2025 Suppl. JC Reports and Data, [Doc.# 1656-4] C.G.V. Decl. ¶ 13 ("My daughter is suffering here. She wakes up in the middle of the night from nightmares, and she cries at night."). S.M.G. Decl. ¶ 9 ("[My] two year old is always anxious and cannot be still or stay in one place."); K.M.L. Decl. ¶ 26 ("We are locked in here and that it [sic] is difficult. My baby is frustrated and stressed."). Worsening the already difficult physical detention for many families, mental health care at Dilley is sorely lacking. *See, e.g.*, J.R.F. Decl. ¶ 22 ("We've seen the psychologist here, and I told her my daughter is anxious and biting her nails. She just said, 'don't do that' and then they draw."); N.G.

Decl. ¶ 16 ("Some people asked for a psychologist and were told that they could be given pills to sedate their children which would make them like vegetables.").

The ICE JC supplemental report notes that "[i]nspection checklists from the CSO highlighted the importance of 24-hour medical care availability and emphasized ongoing staff training in handling medical emergencies," but provides no information about the providers' specific certifications or how medical services for children are monitored. ICE JC Suppl. Report at 9.[4] ICE's brief discussion of medical services provided at Dilley similarly lacks sufficient detail to support an inference of FSA compliance, particularly in the face of Plaintiffs' frequent communications with class members about their urgent medical issues. *Id.*; Welch Decl. ¶¶ 3, 5.

### 3.  Children are still not being provided know-your-rights trainings and lack sufficient access to legal counsel.

Contrary to the assertions in the ICE JC supplemental report, children and families at Dilley continue to report that they are not apprised of their rights under *Flores*, including their right to access legal counsel. Welch Decl. ¶ 15. The ICE JC supplemental report claims "ICE facilities are required to provide free phone calls to legal counsel" and that "[l]egal orientation programs (LOPs) are made available to educate minors about immigration proceedings, their rights, and available legal options." ICE JC Suppl. Report at 33. However, at the November 18-19, 2025 site visit and long before then, class members reported never receiving a legal orientation program, having challenges accessing their immigration lawyers, and not being able to call their immigration lawyers for free. Welch Decl. ¶¶ 15-16; Hidalgo Decl. ¶¶ 24-25 (RAICES not permitted to conduct know-your-rights trainings for class member at Dilley despite requests and LOPs have been discontinued).

Plaintiffs have repeatedly voiced concern that there is still no legal orientation program or know-your-rights program for families at Dilley despite the availability of

---

[4] Plaintiffs' counsel have asked for information regarding medical services and protocols utilized at Dilley repeatedly, but such information has never been provided.  Welch Decl. ¶ 10.

willing legal services providers to conduct such trainings on a weekly basis. J.R.F. Decl. ¶ 34 ("When we arrived at Dilley, there was an orientation that was about four minutes long and a handout in English. Someone translated it. It didn't say anything about *Flores*. I only heard of *Flores* through RAICES."); J.V.D.A. Decl. ¶ 43 ("We did not receive any Know Your Rights training."); N.T.G. Decl. ¶ 14 ("We have never received any 'know your rights' trainings or handouts about my rights under *Flores*."); Z.F. Decl. ¶¶ 51-52 (no one other than RAICES talked to them about their rights); I.B. Decl. ¶ 57 ("We were never told about the *Flores* Agreement."); M.R.P. Decl. ¶ 56 ("I never received a 'know-your rights training.'"); N.C.G. Decl. ¶ 14 ("[N]o one here has explained the *Flores* rights to me for my child."); C.H. Decl. ¶ 38 ("I have not been told about my rights or about a case called *Flores*.); Q.G. Decl. ¶ 8 ("[ICE officers at Dilley] told me I had no rights."). Several class members report that while they never received a know-your-rights training, ICE officials did explain how to seek voluntary departure and self-deport. *See* K.M.L. Decl. ¶¶ 33-35; C.R.G. Decl. ¶ 18; M.M.S. Decl. ¶ 19.

The ICE JC supplemental report acknowledges there is no live legal orientation program at Dilley but asserts that families are apprised of their legal rights through a "new" video at intake. ICE JC Suppl. Report at 32. The video is generally presented in a time and manner that prevent class members and their families from meaningfully understanding their rights. Welch Decl. ¶ 15. Most families are exhausted, disoriented, and frightened when they arrive at Dilley and are not able to retain complicated legal information, to the extent they can even hear or understand the video. *Id.* ¶ 15. As far as Plaintiffs' counsel are aware, the video does not inform class members of their basic rights under *Flores* nor does it provide an opportunity for class members to ask questions about their legal rights. *Id.* ¶ 15.

Class members and their parents repeatedly express distress at their limited access to information about their rights or the status of their cases. *See, e.g.*, A.T.L. Decl. ¶ 16 ("I wish that there was the opportunity for independent lawyers to tell us about our rights and help us know what our options were."); M.R.P. Decl. ¶¶ 59-60 (did not receive any information about separated husband or immigration case, only voluntary departure);

N.V.S.M. Decl. ¶ 49 ("If I could change one thing, it would be to give people here real information."); N.G. Decl. ¶ 17 (expressing frustration at either the nonexistence or lack of knowledge of any grievance policy or how to make reports at Dilley). No families reported being told they could watch a know your rights video "on demand." *Contra* ICE JC Suppl. Report at 32. *See* N.G. Decl. ¶ 18 (family asked for a manual regarding their rights and the rules of Dilley and were told no); Welch Decl. ¶ 15.[5]  Most recently, class members were not only denied know-your-rights trainings, but also were affirmatively told that *Flores* protections no longer exist. N.G. Decl. ¶¶ 4-5 (ICE officers and supervisors told a group of detained families that the *Flores* rule was revoked).

Class members also continue to face barriers to making free phone calls to legal counsel, including *Flores* attorneys or other private lawyers. K.V.L. Decl. ¶ 40 ("When I called you, Katie Johnson from *Flores*, it was not free. I had to pay."); Q.G. Decl. ¶ 13 ("Until this moment providing this declaration, I did not know that I had the right to make a free call to my son's lawyer."); J.R.F. Decl. ¶ 31 ("I never touch the phone here without having money. I called RAICES and I'm not sure if I was charged. I know they're pro bono, but I don't think the calls to them are free."); E.O.N.M. Decl. ¶ 45 (even calling RAICES costs money); Ex. 16 to Pls.' Resp. to Sept. 2025 Suppl. JC Reports and Data, [Doc.# 1656-17] M.O. Decl. ¶ 31 (have to pay for legal calls with your own money); A.T.L. Decl. ¶ 11 ("[W]e haven't been able to communicate with [our lawyers] while we have been detained."). Notwithstanding the many occasions Plaintiffs have raised this violation to Defendants, families still receive insufficient instructions on how to make free legal phone calls. Welch Decl. ¶ 16. On our site visits to Dilley, *Flores* counsel saw the instructions ICE provides regarding free legal calls, which state that they

---

[5] Language access continues to be a serious problem at Dilley exacerbating families' ability to understand their rights or access legal counsel.  Assertions in the report that "ICE is committed to ensuring minors can communicate in a language they understand" and that "inspection checklists verify the availability of interpreters and other language access services throughout the facility" conflict with the experiences of all of the non-Spanish and English speakers we have met with over the past seven months. *Compare* ICE JC Suppl. Report at 14 *with* Z.F. Decl. ¶ 66 ("There is very little translation available, except for medical staff."); A.K. Decl. ¶ 25; C.H. Decl. ¶ 27.

can be made only to a small number of pro bono contacts on an ICE-provided list. Welch Decl. ¶ 16. Lastly, many class members report not being told they could access free lawyers and never receiving a list of free lawyers. N.T.G. Decl. ¶ 13 ("We were never given a list of available free lawyers. My mom ended up finding out about RAICES from other families living here."); M.R.P. Decl. ¶ 55 ("I didn't receive a list of free legal counsel, I just talked to other people and they told me about RAICES.").

### 4. *Children still lack access to varied child-friendly foods and healthy snacks.*

The ICE JC's supplemental report ignores Plaintiffs' concerns regarding the lack of child-friendly foods and instead simply asserts that "meals continue to meet dietary standards [and] . . . [l]ower-sugar options are available upon request" and shows photos of baby food. ICE JC Suppl. Report at 17, 21. However, for months, families have complained that the food is not nutritious, that it is always the same, and that there are no toddler-friendly options, leading many children to lose weight or stop eating entirely. *See, e.g.*, C.G.V. Decl. ¶ 16 ("The menu has not changed and we've been here for 40 days."); J.R.F. Decl. ¶¶ 19, 40 (child losing weight from not eating food because it is too spicy and heavy); M.R.P. Decl. ¶ 46 ("The kids don't like the food . . . they need plain food."); N.C.G. Decl. ¶ 20 ("[M]any children do not eat the food here."); N.G. Decl. ¶ 22 (too spicy and not nutritious); M.O. Decl. ¶ 25 ("There is no special food for toddlers"; the food is too hard for toddlers to chew). Families continue to report that due to the lack of child-friendly, varied, and sufficient amounts of food, their children are constantly hungry, especially babies and toddlers. *See* I.B. Decl. ¶ 39 (two-year-old "does not eat the food here, he is hungry all the time"); K.V.L. Decl. ¶ 37 (six-year-old girl is losing weight); C.R.G. Decl. ¶ 8 (son barely eats); A.K. Decl. ¶ 11 ("Every day I am crying because there is not food for our son to eat . . . . I am so sad all the time that there is not baby food here."); Welch Decl. ¶ 17; Hidalgo Decl. ¶ 29 ("[F]ood provided at Dilley is not adequate nor appropriate for children, leading to tender-age class members' physical deterioration and loss of weight").

Recent interviews with class members reveal that food quality and variety continue to deteriorate. Class members report that food served to them recently was contaminated with worms and mold, causing many children to become ill and vomit repeatedly. A.K. Decl. ¶¶ 11-12 ("[L]ast week, I was given broccoli and cauliflower that were moldy and had worms."); N.V.S.M. Decl. ¶ 39; N.G. Decl. ¶ 15 ("We were given wormy food and when someone spoke out about it . . . he was taken in the middle of the night and threatened that he and his family would be separated."); Welch Decl. ¶ 13.

The ICE JC supplemental report states that "kitchens in the FRC were subject to regular inspections focused on cleanliness, proper food storage, and adherence to preparation standards" and "daily inspections." ICE JC Suppl. Report at 8-9. But clearly, the inspections are not sufficient if they fail to prevent contaminated food from being served to children. Welch Decl. ¶ 17.

Many families have also reported that their children are being denied the special diets they need to stay healthy. M.M.S. Decl. ¶¶ 10-11 (cafeteria will not accommodate food allergies or vegetarianism for nine-year-old); E.O.N.M. Decl. ¶ 17; A.K. Decl. ¶¶ 13-15; D.C.R.R. Decl. ¶¶ 4-6 (child with Hirschsprung's disease was denied a special diet, leading to vomiting, fever, and severe constipation). Additionally, despite Plaintiffs' repeated detailed suggestions of alternative healthy food and snacks requested by class members, parents report there have been no changes to the availability of snacks for children between meals. *See* K.M. Decl. ¶ 39 (only apples for snacks; never any other type of fruits, like bananas); S.M.G. Decl. ¶ 7; Welch Decl. ¶¶ 17-18. To the extent "low-sugar" snacks are available "upon request," families we have met with are not aware of these additional options. *Compare* ICE JC Suppl. Report at 17 *with* Welch Decl. ¶ 18.

Six months after Plaintiffs' counsel began alerting Defendants to the lack of potable water for class members in many areas of the facility, class members reported in November that water filters have been installed on sinks in the living quarters. Welch Decl. ¶ 19. However, parents continue to report having limited access to bottled water for mixing with baby formula and have voiced concerns that the tap water has caused digestive issues for babies. A.K. Decl. ¶ 12, 17. In October, parents reported needing a

doctor's note to get bottled water for their babies' formula. S.M.G. Decl. ¶ 8 (had to ask doctor for bottled water for baby, because guard would not provide full bottle of water); K.M.L. Decl. ¶ 17 ("Every time I want a bottle of water for my baby's formula, the guards tell me I have to go to medical."). In November, parents reported being rationed one bottle of water per day for baby formula. A.K. Decl. ¶ 17. Otherwise, bottled water can be purchased for $1.21 per bottle at the commissary, which most families cannot afford. Welch Decl. ¶ 19. Being provided with potable drinking water is not only a basic human right, it is also covered by FSA ¶ 12.A. If Defendants choose to detain infants and toddlers, they must take into account their particular vulnerability and ensure that ample bottled water is available to them for formula. *Id.*

### 5. *Children still lack access to sufficient hygiene products*.

Although the ICE JC's supplemental report claims children are "continuously provided with personal hygiene products," as recently as two weeks ago, class members reported that these products continue to be deficient and/or inadequate. ICE JC Suppl. Report at 18. The products that children do receive include toothbrushes that fall apart, ineffective deodorant, insufficient toothpaste, and only harsh hand soap for all washing purposes (including hair, face, and body). N.T.G. Decl. ¶ 15 ("The deodorant they gave us does not work at all and the toothbrushes fall apart."); V.L.G. Decl. ¶ 13 (toothbrushes break immediately); Z.F. Decl. ¶ 68 ("[T]he soap they give us for hair and shower gel is very bad, like hand soap."). Families report that the hand soap is too harsh on their children's skin, leading to rashes and skin peeling. *See* S.M.G. Decl. ¶ 10 ("We did not like using the hand soap they have in the showers on our babies' skin."); C.G.V. Decl. ¶ 19 ("I have to buy shampoo and body soap for my daughter because the soap in the showers is just hand soap and it irritates her skin."); C.R.G. Decl. ¶ 17 ("The products they gave us . . . were very hard on our skin . . . ."); N.C.G. Decl. ¶ 13 ("The soap is harsh and makes people get rashes.") Requests for baby wash have been denied. Welch Decl. ¶ 20. Some families report that they spend their limited resources on basic items for their children at the commissary to keep them safe and healthy. J.R.F. Decl. ¶¶ 24-25; M.R.P.

Decl. ¶ 48 (hygiene products provided "to last one day" – family has to buy toothbrushes, shampoo and body soap); K.V.L. Decl. ¶ 39; A.D.C. Decl. ¶ 15; N.V.S.M. Decl. ¶ 40 ("The only thing we don't pay for [here] is toilet paper."). To make matters worse, basic hygiene products, such as shampoo, are often unavailable at the commissary. M.M.S. Decl. ¶ 23 (commissary was out of shampoo for five days). Examples of basic needs products sold in the commissary include: $5.73 for deodorant, $1.44 for soap, $2.39 for toothpaste and $1.30 for a single dose of Tylenol. Welch Decl. ¶ 20. Class members report that prices are also rising. C.G.V. Decl. ¶ 19.

### 6. *Children still lack access to free phone calls to their family members.*

Plaintiffs' counsel have repeatedly identified that ICE denies children free phone calls to their non-detained family members beyond their initial call upon entering the facility. *See, e.g.*, M.M.S. Decl. ¶ 25 ("My daughter is not permitted to make free phone calls to family members. There are signs that say that calls cost seven cents per minute, but you have to look at the fine print that there is a 23% surcharge."); N.T.G. Decl. ¶ 16 ("We have to pay for phone calls to talk to our family here."); L.R.L. Decl. ¶ 38 (same); K.M.L. Decl. ¶ 31 (same); C.R.G. Decl. ¶ 19 (same); A.D.C. Decl. ¶ 21. Many class members are distressed that, for weeks at a time, they do not have the funds to communicate with parents or siblings who are not detained with them. N.C.G. Decl. ¶ 15 (". . . I have not been able to put any money on my phone account because of a problem with my CoreCivic ID number."). Others report they are unable to contact their family members to ask them to put money in their accounts. Welch Decl. ¶ 10; *see* K.M.L. ¶ 31; N.V.S.M. Decl. ¶ 23.[6] Class members have the right to speak to family members for free under the *Flores* Settlement Agreement Notice of Rights Pursuant to September 18, 2020

---

[6] In November 2025, Plaintiffs' counsel learned that in-person visitation has now started at Dilley for family members and spouses. This is a welcome improvement for families with U.S. citizen relatives, but the vast majority of class members rely on phone calls to keep in touch with their family members. Welch Decl. ¶ 21.

Court Order Doc. # 1056-1 at *2,[7] and it is unacceptable to deny children communication with family for months at a time. FSA ¶ 11, 12.A, and Ex. 1.A ¶ 11.

### 7. *Defendants do not provide* **Flores** *compliant education or recreation at Dilley.*

The ICE JC supplemental report admits that a "comprehensive education program was not in place" for the past seven months but states that "[f]amilies were provided with age-appropriate educational packets and materials" and that a new education program will be starting in January. ICE JC Suppl. Report at 13. Defendants also concede that ICE does not yet provide a "recreation program that complies with all Flores requirements." *Id.* 10. It appears that now Defendants intend to change the FRS and programming to bring it into compliance. *Id.* at 9-10, 13, 15-16. But Defendants do not explain the delay in providing these vital services or deny that they are not currently providing them to children who are languishing for months with little or nothing to do. *See, e.g.*, J.R.F. Decl. ¶ 18 (school is "just drawing"); N.V.S.M. Decl. ¶ 29 ("I feel like I am losing my education here."); N.T.G. Decl. ¶ 11 (school is "just one hour a day"); A.K. Decl. ¶ 21 (no preschool here). Children and families dispute that educational packets provided are "age-appropriate." I.B. Decl. ¶ 45 ("[T]here is really no school for the children"); M.R.P. Decl. ¶ 42 ("All they do at the school here is draw for one hour."). Further, the minimal education that is offered is wholly inaccessible to non-English and Spanish speakers. *See* N.G. Decl. ¶ 26 (the one-hour lessons are with a Spanish-speaking teacher and the family doesn't speak Spanish).

To make matters worse, families now report that classrooms have a maximum capacity of approximately 12 to 15 children, which results in some children being turned away. N.V.S.M. Decl. ¶ 27 ("There is just one professor at the school, only a few kids can go in every day. It's just 12-15 kids is the capacity of the room. If you don't get there early, sometimes you won't be able to get into the classroom because it fills up."); N.G.C. Dec. ¶ 16 ("[W]hen I took my daughter [to the school room] yesterday, they already had

---

[7] Order re January 29, 2021 Status Conference, Doc. # 1077, at 2 ("[T]he Court approved the final language of the Notice of Rights")

15 kids so she was not able to go. They said that was the limit."). Children who arrive
after capacity is reached are denied access to any education for the day.

Classroom instructors now appear to be asking class members about sensitive
immigration issues during their school hour, including asking them to write essays on
why they are afraid to return to their home countries. M.M.S. Decl. ¶ 16 ("The questions
about immigration they ask the kids during class are not proper. What does ICE have to
do with math?"); C.R.G. Decl. ¶ 7 (child asked about immigration case in school);
J.V.D.A. Decl. ¶ 37 (child given assignment in class about his asylum case). In addition
to being wholly inappropriate and demonstrating a complete lack of awareness of trauma-
informed treatment of children, this kind of assignment and activity can prejudice
children's legal rights and relief and interfere with their attorney-client relationships if
they are represented, under FSA ¶ 11.

Countless declarations from class members and families stand in stark contrast to
the report's assertion that "ICE seeks to create a supportive environment where minors
can develop essential life skills, maintain healthy routines, and enjoy meaningful leisure
experiences." ICE JC Suppl. Report at 10. Children are actively suffering while detained
at Dilley with little to no meaningful education, recreation, activities, or toys, in violation
of FSA Ex. 1 ¶¶ 4-7. *See, e.g.*, Welch Decl. ¶ 22; K.M. Decl. ¶ 37 ("There just isn't a lot
to do for a six-year-old girl, especially since we have been in detention for more than 100
days."); N.T.G. Decl. ¶ 20 ("It's just the same thing here day after day after day."); C.H.
Decl. ¶ 27.

**C. ICE's FSA monitoring system and protocols are woefully deficient to
ensure FSA compliance.**

The ICE JC supplemental report purports to describe a variety of "standards and
tools utilized by ICE to ensure compliance with the FSA." ICE JC Suppl. Report at 3-14.
However, the various protocols and checklists attached to the report are generally too
vague, unrelated to actual FSA provisions, or inaccurate to meaningfully achieve this
objective. For example, the "Family Residential Standards JFMD Weekly Compliance
Tool Center: Dilley FRC" document has only one check box for FRS 4.3 Medical Care

compliance: "Did new admission examinations occur in compliance with the requirements?" Doc. # 1692-12 at 2. While admission examinations are an important component of ensuring safe medical care for class members, they should not be the only medical care metric evaluated to ensure compliance with the FSA. As another example, the FRS 4.1 Food Service requirement purports to measure "safety/sanitary measures," "food quality," and food temperatures, but there is no metric to evaluate whether food is actually child friendly. *Id*. at 2. Moreover, it is notable that the FRS 5.2 Education, FRS 5.5 Recreation, and FRS 5.8 Visitation metrics were all marked "Compliant" in August even though ICE's own report admits visitation did not start until November and *Flores*-compliant education and recreation is not slated to begin until January 5, 2026. *Compare Id*. at 2-3 *with* ICE JC Suppl. Report at 10, 16. Given the voluminous evidence of FSA violations, it is clear to Plaintiffs that the current monitoring protocols at Dilley are wholly inadequate to ensure FSA compliance.[8]

## III.    CONCLUSION

The ICE JC supplemental report acknowledges that ICE has been out of compliance with many FSA requirements for seven months, yet somehow still asserts ICE is in "substantial compliance with FSA requirements" and goes "beyond to meet its intent." ICE JC Suppl. Report at 16, 17. ICE's own data and Plaintiffs' declarations from site visits in September, October, and November categorically refute ICE's assertions.

---

[8] The ICE JC supplemental report continues to assert that the 2020 FRS standards "were modified to reflect the abbreviated duration of stay" despite the prolonged detention of hundreds of children. ICE JC Suppl. Report at 14. The report also fails to explain coherently what the actual modifications to the FRS standards were and which FRS standards are currently in place. For example, FRS 4.1 Food Service is a 31-page policy, and the 3 paragraphs describing the modifications to it do not describe what was changed. Family Residential Standards 2020, Doc. # 1567-13; ICE JC Suppl. Report at 8-9. Similarly, 2020 FRS 4.3 Medical Care is a 36-page policy, and the 5 paragraphs describing the modification also do not articulate what changed. Family Residential Standards 2020; ICE JC Suppl. Report at 9.

Given the ongoing FSA violations occurring in family detention and Defendants' recalcitrant or non-existent responses, Plaintiffs may have no choice but to seek court intervention to enforce this Court's previous orders in the near future.

Dated: December 8, 2025

CENTER FOR HUMAN RIGHTS AND
CONSTITUTIONAL LAW
Carlos Holguín
Bardis Vakili
Sarah Kahn

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe
Diane de Gramont
Rebecca Wolozin

CHILDREN'S RIGHTS
Leecia Welch
Eleanor Roberts


*/s/ Leecia Welch*

Leecia Welch
*One of the attorneys for Plaintiffs*

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

**CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2025, I caused a copy of Plaintiffs' Response to Supplemental Juvenile Coordinator Reports and Data to be served to all counsel through the Court's CM/ECF system.


Dated: December 8, 2025

                    */s/ Leecia Welch*
                    Leecia Welch
                    *One of the attorneys for Plaintiffs*