# EXHIBIT 2

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
Bardis Vakili (Cal. Bar No. 247783)
Sarah E. Kahn (Cal. Bar No. 341901)
1505 E 17th St. Ste. 117
Santa Ana, CA 92705
Telephone: (909) 274-9057
Email:   crholguin@centerforhumanrights.org
         bardis@centerforhumanrights.org
         sarah@centerforhumanrights.org

*Attorneys for Plaintiffs*

*Additional counsel listed on following page*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> PAM BONDI, Attorney General of the United States, *et al.*, <br><br> Defendants. | No. CV 85-4544-DMG-AGRx <br><br> **DECLARATION OF LEECIA WELCH IN SUPPORT OF PLAINTIFFS' RESPONSE TO DECEMBER 1, 2025 SUPPLEMENTAL ICE JUVENILE COORDINATOR REPORT AND DATA** <br><br> Honorable Dolly M. Gee <br> Chief United States District Judge |

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe (Cal. Bar No. 299296)
Diane de Gramont (Cal. Bar No. 324360)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email: mwroe@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW
Rebecca Wolozin (admitted pro hac vice)
818 Connecticut Ave. NW, Suite 425
Washington, DC 20006
Telephone: (202) 868-4792
Email: bwolozin@youthlaw.org

CHILDREN'S RIGHTS
Leecia Welch (Cal. Bar No. 208741)
2021 Fillmore Street
San Francisco, CA 94115
Telephone: (415) 602-5202
Email: lwelch@childrensrights.org

CHILDREN'S RIGHTS
Eleanor Roberts (admitted pro hac vice)
88 Pine Street, Suite 800
New York, NY 10005
Telephone: (212) 683-2210
Email: eroberts@childrensrights.org

# DECLARATION OF LEECIA WELCH

I, Leecia Welch, declare as follows:

1. I am a Deputy Litigation Director at Children's Rights. I represent Plaintiffs in the above-titled action. If called to testify in this case, I would testify competently about these facts.

2. Since May 2025, Plaintiffs' co-counsel and I have conducted six monitoring site visits in our role as *Flores* counsel at the South Texas Family Detention Center ("Dilley"). I have attended all of them. We interviewed class members at Dilley on May 1-2, June 4-5, July 28-29, September 9-11, October 9-10, and November 18-19, 2025. We have spoken to approximately 100 family units, some with up to three or four class member children, and amassed extensive evidence of the ongoing *Flores* violations at Dilley.

3. Dilley remains an unlicensed, secure, prison-like facility where children's physical and mental health deteriorate the longer they are detained. During our November 18-19, 2025 site visit, roughly 50% of all the detained families had been at Dilley for 21 days or longer. Defendants have not addressed the vast majority of the violations at Dilley that *Flores* counsel have been raising since May, including inadequate medical care, lack of access to know your rights trainings, lack of access to legal counsel, lack of access to varied, child-friendly foods and snacks, the inability of class members to sleep due to lights kept on in their living areas all night, lack of access to appropriate hygiene products, lack of free calls to family members, and lack of adequate education and recreation. All of these ongoing, unresolved violations are exacerbated by increasing prolonged lengths of detention, as detailed in Paragraphs 24 and 25 below.

4. In recent weeks, conditions of confinement and treatment of families appear to have worsened with families reporting horrific concerns, such as denial of critical medical care, worms and mold in the food that result in children becoming ill, and threats

of family separation by officers and staff. Families report that their children are weak, faint, pale, and often crying because they are so hungry.

5. After each of our site visits, we have provided Defendants with a detailed, comprehensive list of the *Flores* violations that our monitoring revealed. To date, we have sent Defendants meet and confer letters regarding these violations on May 7, May 16, May 28, June 4, June 20, August 14, September 16, September 18, October 9, October 23, and November 25, 2025. As directed by Defendants, we also raised emergency time-sensitive concerns about particular children via email on June 6, June 17, July 30, August 5, October 15, and November 21, 2025. To date, Plaintiffs and Defendants have met and conferred five times (May 14, May 30, July 24, September 17, and October 6, 2025) about the *Flores* violations at Dilley identified in our correspondence. On October 6, Defendants stated they would be following up with a comprehensive written response to our letters. To date, Defendants have not done so – and their position regarding most of the concerns we have repeatedly raised is either denial or remains unknown.[1] The information provided in the ICE JC supplemental report far exceeds any information shared by Defendants in response to our many letters and emails.

6. Following this Court's directives, Plaintiffs have repeatedly requested that the ICE Juvenile Coordinator be included in the process of resolving *Flores* violations at Dilley. Defendants have been unwilling to involve the Juvenile Coordinator and have insisted that Plaintiffs not communicate with her directly, even if Defendants' attorneys are copied on communications. Defendants' position appears to be that the only way to involve the Juvenile Coordinator is for Plaintiffs to submit a list of questions in accordance with the procedure set forth in Paragraph 29 of the *Flores* Settlement Agreement (FSA).

## Dilley Is a Secure Facility

---

[1] Defendants have also failed to respond to Plaintiffs' November email about concerningly long hotel stays reported in the August 2025 data.

7. Dilley is a 56-acre unlicensed, secure ICE facility located in Dilley, Texas. The facility continues to operate under a contract with CoreCivic, one of the largest for-profit prison contractors in the United States. *See* https://www.corecivic.com/about. The perimeter of the facility is surrounded by a high metal fence. To enter the facility, visitors must proceed through a locked trailer-style building, be subjected to an extensive search for "contraband" items, and pass through a metal detector.

8. Children and parents consistently refer to Dilley as a prison or jail. Some children and parents have described Dilley to me as a living hell, a horrible place, or a place where God no longer exists.

9. On each of our six site visits, either CoreCivic staff or an acting ICE compliance office has led a tour of the facility. The grounds consist of five living zones for detainees with rows of beige trailers. The facility has the capacity to hold 2,400 people, but there have been around 400-470 family members in total at Dilley during each of our site visits since July. As of November 19, 2025, there were about 420 family members, but the overall population at Dilley increased to 830 people with the introduction of single females. Families report that the sudden increase in the population at Dilley has resulted in cramped living quarters, longer wait times for getting into the dining hall, less freedom of movement, more shouting from guards, and lack of adequate hygiene products, like shampoo, at the commissary.

10. As noted previously, Defendants have taken the position that no questions are permitted during the tour. Defendants have directed us to compile our questions and submit them in writing to Defendants' counsel. We have now submitted multiple sets of questions to which Defendants have never responded. For example, we have repeatedly asked for information regarding medical services and medical protocols utilized at Dilley, but such information has never been provided. On the last two site visits, we did not compile additional questions because the process seemed pointless since we have never received answers.

### *Flores* Violations at Dilley

11. Since Dilley re-opened in April, we have met with approximately 100 families in person, not including the countless phone calls and emails we have received from detained families. With the exception of the minimal improvements noted below, Dilley remains woefully out of compliance with the FSA. We have raised the same concerns to Defendants' counsel repeatedly for months. ICE's assertions of compliance with the FSA in their supplemental response are refuted by extensive evidence from our interviews with class members and their parents.

12. As noted above, Dilley class members and their parents consistently voice concerns about inadequate medical care, lack of access to know-your-rights trainings, lack of access to legal counsel, lack of access to varied, child-friendly foods and snacks, the inability of class members to sleep due to lights kept on in their living areas all night, lack of access to adequate or sufficient hygiene products, lack of free calls to family members, and lack of adequate education and recreation.

13. Families continue to report serious barriers to accessing needed medical care. Most recently, families reported children becoming sick from eating contaminated food and receiving inadequate medical care. Medical staff told one family whose child got food poisoning to only return if the child vomited eight times. Children report distress from medical unit staff denying treatment or making them wait days for diagnoses when they feel sick and feverish. One child has a severe ear infection that has not been appropriately treated such that the child is now experiencing hearing loss. Another child fell and experienced head trauma but had not been seen by a specialist for evaluation at the time of our interview. Yet another child was hit in the eye with a mop by a staff member resulting in profuse bleeding and loss of vision – and it took weeks for her to see a specialist. Another child suffered a broken foot when a staff member dropped a volleyball net pole on him. Additionally, obtaining needed medications and even non-prescription and basic health items like diaper cream remains extremely challenging due to early pill window times and long lines. On my visits, families have

shown me the tiny plastic containers they are given with about a tablespoon of diaper cream at a time. To get more, they must wait in line each time.

14. For children with disabilities and other previously-diagnosed medical conditions, detention in secure and restrictive facilities, prolonged separation from their medical providers, and interruption of their medical care plans cause dangerous deterioration of their health. Over the past seven months, we have met with children with life-threatening diseases like leukemia, and children on the autism spectrum who were suffering from missing needed therapies and the harsh conditions at Dilley. Parents consistently report concerning behaviors and regression in their children's development, including children hitting themselves in the face, becoming aggressive, and frequently wetting themselves after years of being potty-trained.

15. Children and families consistently report they are not apprised of their rights under *Flores*, including their right to free legal calls and information about free legal counsel. Plaintiffs have repeatedly voiced concern that there is still no Legal Orientation Program or Know Your Rights program for families at Dilley despite the availability of willing legal services providers to conduct such trainings on a weekly basis. The "orientation video" Defendants' assert is shown to all families is inadequate and no substitute for a live training. The video is generally presented in a time and manner that prevent class members and their families from meaningfully understanding their rights. Most families are exhausted, disoriented, and frightened when they arrive at Dilley and are not able to retain complicated legal information, to the extent they can even hear or understand the video. This video, which I have viewed portions of, discusses complex legal issues like types of humanitarian visas and defenses. The video plays on a loop during intake, cycling through different languages, such that it would take dedicated concentration for anyone to watch it until it gets to a part where it begins in one's own language. It is my understanding that the video does not inform class members of the basic rights that all *Flores* class members are supposed to be afforded once detained. Moreover, showing a video without a live presentation prevents children from having the

opportunity to ask questions about their rights. Class members repeatedly express distress at their limited access to information about their rights or the status of their cases. None of the families I have spoken to reported being told they could watch a know your rights video "on demand" as noted in the ICE JC supplemental report. ICE Juvenile Coordinator Supplemental Report, Doc #1692-4 ("ICE JC Suppl. Report") at 32.

16. Class members also continue to face barriers to making free legal phone calls to counsel, including *Flores* attorneys or other private lawyers. Notwithstanding the many occasions Plaintiffs have raised this violation to Defendants, families still receive insufficient instructions on how to make free legal phone calls. On our site visits to Dilley, we have seen and reviewed the instructions ICE provides regarding free legal calls, which state that they can be made only to a small number of pro bono contacts on an ICE-provided list.

17. Regarding varied, child-friendly foods and snacks at Dilley, once again, ICE claims to have resolved these issues asserting that "[m]eals continue to meet dietary standards . . . [l]ower-sugar options are available upon request" and showing photos of baby food. ICE JC Suppl. Report at 17, 21. Interviews with class members reveal that food quality and variety continue to deteriorate. Class members report that food served to them recently has been contaminated with worms and mold, causing many children to become ill and vomit repeatedly. Despite the pictures of baby food in the ICE JC supplemental report, parents of babies have consistently raised that soft child-friendly food is not available unless they purchase the soup or noodles sold in the commissary.

18. Families continue to report that their children are not eating and are being denied the special diets they need to stay healthy. Additionally, despite our repeated requests and time spent elaborating in detail how to address the lack of healthy and varied snacks available to class members, parents report there have been no changes to the variety of snacks for children between meals. To the extent "[l]ower-sugar" snacks are available "upon request" as noted in the ICE JC supplemental report – families we have met with are not being made aware of additional options. ICE JC Suppl. Report at 17.

Families continue to report that due to the lack of child-friendly, varied, and sufficient amounts of food, their children are constantly hungry.

19. Six months after Plaintiffs' counsel began alerting Defendants to the lack of potable water for class members in many areas of the facility, class members recently reported that water filters have been installed on sinks in the living quarters. Families continue to report concerns about the lack of access to bottled water for baby formula. Parents have described such inconsistent practices related to getting bottled water for formula that it is difficult to understand what the currently policy is. In October, parents reported needing a doctor's note to get bottled water for their babies' formula. In November, parents reported being rationed one bottle of water per day for baby formula, which is obviously insufficient. Otherwise, bottled water can be purchased for $1.21 per bottle at the commissary, which most families cannot afford.

20. Although the ICE JC supplemental report further claims children are "continuously provided with personal hygiene products," as recently as about two weeks ago, class members reported that Defendants continue to provide deficient/inadequate amounts of hygiene products. ICE JC Suppl. Report at 18. The products that children do receive include toothbrushes that fall apart, ineffective deodorant, insufficient toothpaste, and only harsh hand soap for all washing purposes, including hair, face, and body. Families consistently report that the hand soap is too harsh on their children's skin and that their requests for the baby wash provided to babies have been denied. The ICE JC supplemental report shows photos with soap dispensers that are labeled "Citrus Fresh Foaming Handwash," confirming families' reports to Plaintiffs' counsel. ICE JC Suppl. Report at 29. Families report that they must spend their limited resources on basic items for their children at the commissary. To make matters worse, basic hygiene products, such as shampoo, are now selling out at the commissary for long periods of time. Examples of basic needs products sold in the commissary include: $5.73 for deodorant, $1.44 for soap, $2.39 for toothpaste and $1.30 for a single dose of Tylenol.

21. Plaintiffs' counsel have repeatedly told Defendants about ICE's practice of denying children free phone calls to their family members who are not at Dilley beyond their initial call upon entering the facility. Many class members are distressed that, for weeks at a time, they do not have the funds to communicate with parents or siblings who are not detained with them. Others report they are unable to contact their family members to ask them to put money in their accounts. On our most recent visit, we learned that in-person visitation has now started at Dilley for family members and spouses. This is a welcome improvement for families with U.S. citizen relatives who can make the journey, but the vast majority of class members rely on phone calls to keep in touch with their noncitizen or remote family members.

22. The ICE JC supplemental report admits there is no consistent structured education available at Dilley but claims that new education and recreation services will begin in January. To make matters worse, families now report that classrooms have a maximum capacity of around 12 to 15 children. Children who arrive after capacity is reached are denied access to *any* education for the day. During our last site visit, we were also shocked to hear that classroom instructors are asking class members about sensitive immigration issues, including asking them to write essays on why they are afraid to return to their home countries. In addition to being wholly inappropriate and demonstrating a complete lack of awareness of trauma-informed treatment of children, this kind of assignment and activity can prejudice children's legal rights and relief and interfere with their attorney-client relationships if they are represented. Recreation activities remain extremely limited, with minors reporting they are constantly bored with nothing to do. The lack of structured activities exacerbates the trauma of detention and leads to worsening mental health symptoms. Parents also consistently voice concerns about the lack of toys for younger children given the importance of play to healthy development. Some parents report their children are so desperate to play with toys that they have begun playing with rocks they find on the ground at Dilley.

23. Families also continue to complain about the living arrangements at Dilley. Dual household families must live in separate zones – with mothers and children generally in one zone and fathers living separately in another zone. Although families are allowed to be together during the day, fathers are separated from their children after 8 pm, which is upsetting to many children. There are also limited places to be together as a family during the day, as fathers are not permitted in their wives' and children's living quarters and vice versa. Some families report sharing their cramped living quarters with up to five other families. In addition, families continue to report having difficulty sleeping because lights are kept on in living room areas throughout the night.

### Alarming Lengths of Detention at Dilley

24. During our monitoring visits, we have spoken to children and families who have been detained for extremely prolonged periods. In July, we met with several children who had been detained for two or more months. During the September 2025 site visit, we interviewed fifteen families that had been detained over 20 days. ICE census data showed that families had been detained at Dilley for approximately 98 days (five children), 74 days (one child), 63 days (one child), and 55 days (three children).

25. At our site visit on November 18-19, 2025, we met with 13 children who had been in custody for over 40 days and identified families who had been at Dilley for 168 days (five children), 64 days (two children) and 56 days (three children). According to ICE census data, 81 families, including approximately 115 children, had already been detained at Dilley for 21 days or more when we arrived on November 18, 2025.

26. We have repeatedly told Defendants that they are violating this Court's orders that children may not be kept in unlicensed, secure facilities except for the short period during which DHS is actively executing either imminent release or removal. Defendants have not answered Plaintiffs' previous questions about what processes are in place to individually review children's cases to (i) avoid unlawfully holding children in family detention when removal or release is not imminent and/or (ii) release them as soon

as DHS identifies that removal is not imminent.  In the absence of any information to the contrary, Plaintiffs have informed Defendants that we understand that no such process exists.  The minimal information on the detention review process provided in the ICE JC supplemental report is the most information shared with Plaintiffs to date, and it only serves to confirm Plaintiffs' concerns.

27. We have also told Defendants that we remain concerned that some families are being unreasonably deemed a flight risk or otherwise determined to need to be detained for more than 20 days for reasons this Court has deemed illegitimate.  Plaintiffs' counsel have asked repeatedly who makes these determinations, but have received no answer or other information.

28. Most recently, we told Defendants that class members reported that ICE agents have told families at Dilley that *Flores* protections regarding time in custody no longer apply as of November 1, 2025.  We have asked Defendants' counsel to immediately instruct ICE agents that *Flores* remains fully in effect as to DHS, but have not received a response.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 8th day of December, 2025 at San Francisco, California.

                                             _____
                                                       Leecia Welch