# EXHIBIT 1

CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
Bardis Vakili (Cal. Bar No. 247783)
Sarah E. Kahn (Cal. Bar No. 341901)
256 South Occidental Boulevard
Los Angeles, CA 90057
Telephone: (213) 388-8693
Email:    crholguin@centerforhumanrights.org
          bardis@centerforhumanrights.org
          sarah@centerforhumanrights.org

*Attorneys for Plaintiffs*

*Additional counsel listed on following page*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| JENNY LISETTE FLORES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> PAM BONDI, Attorney General of the United States, *et al.*, <br><br> Defendants. | No. CV 85-4544-DMG-AGRx <br><br> **DECLARATION OF LEECIA WELCH IN SUPPORT OF PLAINTIFFS' RESPONSE TO MARCH 13, 2026 ICE JUVENILE STATUS REPORT AND DATA** <br><br> Honorable Dolly M. Gee <br> Chief United States District Judge |

i

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe (Cal. Bar No. 299296)
Diane de Gramont (Cal. Bar No. 324360)
1212 Broadway, Suite 600
Oakland, CA 94612
Telephone: (510) 835-8098
Email: mwroe@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW
Rebecca Wolozin (admitted pro hac vice)
818 Connecticut Ave. NW, Suite 425
Washington, DC 20006
Telephone: (202) 868-4792
Email: bwolozin@youthlaw.org

CHILDREN'S RIGHTS
Leecia Welch (Cal. Bar No. 208741)
2021 Fillmore Street
San Francisco, CA 94115
Telephone: (415) 602-5202
Email: lwelch@childrensrights.org

CHILDREN'S RIGHTS
Eleanor Roberts (admitted pro hac vice)
88 Pine Street, Suite 800
New York, NY 10005
Telephone: (212) 683-2210
Email: eroberts@childrensrights.org

**DECLARATION OF LEECIA WELCH**

I, Leecia Welch, declare as follows:

1.     I am Chief Legal Counsel at Children's Rights.  I represent Plaintiffs in the above-titled action.  If called to testify in this case, I would testify competently about these facts.  This declaration is an update to my previous declaration filed on December 8, 2025, in support of Plaintiffs' Response to the December 1, 2025 Supplemental ICE Juvenile Coordinator Report and Data.

2.     Plaintiffs' counsel have conducted nine site visits in our role as *Flores* counsel at the South Texas Family Detention Center ("Dilley") since the government began incarcerating families there in April 2025.  I have attended all of them.  We interviewed class members at Dilley on May 1-2, June 4-5, July 28-29, September 9-11, October 9-10, and November 18-19, 2025, and January 14-15, February 11-12, and March 11-12, 2026.  We have spoken to approximately 150 families and amassed extensive evidence of the ongoing *Flores* violations at Dilley.

3.     After each site visit, excluding last week's, Plaintiffs' counsel provided Defendants with a detailed, comprehensive list of *Flores* violations. To date, we have sent Defendants meet and confer letters regarding these violations on May 7, May 16, May 28, June 4, June 20, August 14, September 16, September 18, October 9, October 23, and November 25, 2025, and January 22 and February 19. 2026. As directed by Defendants, we also raised emergency time-sensitive concerns about particular children via email on June 6, June 17, July 30, August 5, October 15, and November 21, 2025, and January 16, February 13, and March 13, 2026. Plaintiffs and Defendants have met and conferred five times (May 14, May 30, July 24, September 17, and October 6, 2025) about the *Flores* violations at Dilley identified in our correspondence.  We have also continued to raise Plaintiffs' concerns in confidential court-ordered mediation sessions over the past two months.

4.    In accordance with the Court's December 15, 2025 Order, the parties began conducting mediation in January 2026.  The parties met on January 23, February 4, and March 2, 2026.  As referenced above, Plaintiffs have also sent two meet and confer letters and two emergency emails during this time.  We are currently working on a follow-up letter to document concerns from our March 11-12 site visit.  There has been some progress in mediation regarding possible reductions in children's length of stay and an agreement to have Dr. Paul Wise conduct medical site visits at Dilley.

5.    However, Defendants have not addressed the vast majority of the violations at Dilley that *Flores* counsel have been raising since May 2025, including Defendants' failure to treat children appropriately, inadequate medical care, lack of information about *Flores* rights and access to counsel, poor children's nutrition, harmful sleeping conditions, lack of free phone calls to family members, and inadequate education and developmentally appropriate activities.  Families consistently report their children are hungry, exhausted, scared, perpetually sick, and despondent from the conditions of confinement at Dilley.

**Dilley Is a Secure Facility**

6.    Dilley is a 56-acre unlicensed, secure ICE facility located in Dilley, Texas.  The facility continues to operate under a contract with CoreCivic.  The perimeter of the facility is surrounded by a high metal fence.  To enter the facility, visitors must proceed through a locked trailer-style building, be subjected to an extensive search for "contraband" items, and pass through a metal detector.

7.    Children and parents consistently refer to Dilley as a prison or jail, and even a concentration camp.  Some children and parents have described Dilley as a living hell, soulless, or a place where God no longer exists.  In January and February 2026, children and families at Dilley reported feeling even more like prisoners as the facility instituted even more severe operational restrictions, practices, and lockdowns after the high-profile detention of five-year-old Liam Conejo Ramos resulted in increased media attention and public outcry about the incarceration of children.  Families consistently reported a

marked increase in the harshness of their treatment by guards at Dilley, including yelling at children, aggressive room sweeps, and lockdowns. Families also reported limitations on mealtimes, library time, computer time, and access to the Internet, in addition to restrictions on their movement throughout the facility. The combined impact of these harsher tactics and restrictions has been to cause class members to suffer even more trauma and fear.

8.      On most of our nine site visits, either CoreCivic staff or an acting ICE compliance office has led a tour of the facility.  The grounds consist of five living zones for detainees with rows of beige trailers of various sizes and configurations.  The facility has the capacity to hold 2,400 people, but there have been between 150-400 family members in total at Dilley during each of our site visits since July. As of March 11, 2026, there were 152 family members at Dilley, and the overall population at Dilley was 388 people, including single females.

9.      On our recent site visits, we were particularly concerned by the alarming amount of time children were being detained. In January, the census at Dilley showed 22 class members had been detained at Dilley for over 100 days. In February, the census showed 32 class members had been detained for over 100 days, and 98 had been detained for over 50 days. In March, eight class members had been detained over 100 days and 20 had been detained over 50 days.  The length of stay in March showed signs of improvement, but only time will tell whether this trend will continue.

### *Flores* Violations at Dilley

10.      Since Dilley re-opened in April 2025, we have met with approximately 150 families in person, in addition to the countless phone calls and emails we have received from detained families.  With the exception of the few isolated improvements noted below, Dilley remains woefully out of compliance with the FSA, and children detained there continue to suffer.  Defendants' assertions of compliance with the FSA in the ICE JC Status Report are again refuted by extensive evidence provided by class members and their parents.

5

*__Inadequate Medical Care__*

11.    Following our site visits to Dilley, we have alerted Defendants to multiple examples of children's medical needs not being met, resulting in escalating and sometimes life-threatening health problems.  We also reported medical needs of parents that impacted their ability to care for their children.  Examples from January, February and March include: a ten-year-old child with Hirschsprung's disease who lacked proper medical care and diet resulting in no bowel movements for over a month; an 18-month old baby who ended up in the hospital for 10 days when her oxygen levels plunged to a life-threatening level;  a nine-year-old girl who left scratch marks across her entire body due to allergies when no special diet was provided; a two-year-old with an infected gum that Dilley staff did not treat for over 23 days, leading her to have a fever, infection, cry relentlessly, and be on a liquid diet the entire time (brief hospitalization not helpful due to lack of dental care available there); a mom who had to be hospitalized for three days without her child due to Dilley's inability to treat a UTI; and, a 32-week pregnant mother with Hepatitis B who was in extreme physical distress due to inadequate treatment options at Dilley.

12.    Despite the assertions in the ICE JC Status Report that "no residents require[ed] hospitalization or emergency-room referral" (Report at 7), I am personally aware of multiple children and parents who were hospitalized, including those noted above.  One extremely troubling hospitalization was that of an 18-month-old baby who was finally hospitalized following weeks of substandard care at Dilley.  She required hospitalization for ten days to treat her for pneumonia, RSV, Covid-19, and respiratory distress. A true and correct copy of a February 27, 2026 news article regarding this child is attached to my declaration as Attachment A.

13.    Children with disabilities and chronic medical conditions continue to deteriorate from Dilley's harsh, restrictive environment, separation from their medical providers, and interruption of their medical and mental health care plans. We have met

6

many children with disabilities who have regressed developmentally and suffered worsening conditions while at Dilley. Parents consistently report concerning behaviors and regression in their children's development, including children hitting themselves in the face, becoming aggressive, and frequently wetting themselves after years of being potty-trained; children asking to sleep with their parents after sleeping alone for years; children becoming despondent and sitting alone in corners; and children regressing in their speech and becoming withdrawn.

14.    Parents I have met at Dilley are often particularly alarmed about their children's worsening mental health.  They report children becoming anxious, stressed, and depressed.  Due to the long length of stay for some families at Dilley, I have been able to meet with some of the same children and teens across multiple site visits.  Unfortunately, I have seen first-hand the toll detention at Dilley takes on these children, including worsening despondency, depression, trouble sleeping, and panic attacks.  Many children look increasingly exhausted, pale, and weak.

15.    Shortly before our Dilley site visit on February 11-12, 2026, our co-counsel team was alerted that a 13-year-old girl at Dilley had attempted to commit suicide.  I had planned to meet with the family on February 11, but when we arrived at Dilley that morning, the family was already gone.  It is my understanding that the family was deported earlier that morning.  I subsequently learned the harrowing details of the child's suicide attempt in a news article.  A true and correct copy of that February 28, 2026 news article is attached to my declaration as Attachment B.

**_Lack of Notice of Flores Rights_**

16.    Since May 2025, Plaintiffs' counsel have repeatedly voiced concerns that children at Dilley are not being apprised of their *Flores* rights.  Moreover, despite the availability of willing legal services providers to conduct Know Your Rights trainings,

there is still no legal orientation program for children and families at Dilley beyond a 13-minute animated immigration law video that never once mentions *Flores*.

17. This video, which I have viewed, discusses complex legal issues like types of visas and defenses. The video does not inform class members of the basic rights that all *Flores* class members are supposed to be afforded and informed of once detained. Class members repeatedly express distress at their limited access to information about their rights and the status of their cases.

18. Compounding this complete lack of information about *Flores* rights, class members also continue to face barriers to making free legal phone calls to counsel, including *Flores* attorneys or other private lawyers. While there is an ICE-provided list of pro bono attorneys, there are only four firms on the list to whom families can make a free legal call using the telephone system at Dilley. If a child's lawyer is not on the list, there is no way to call the lawyer without paying for it. The only option is for the child's lawyer to reach out to a CoreCivic's visitation email address to schedule a legal call with their client. Many families struggle for weeks to figure out how to make an initial call to their lawyer and regularly end up paying for legal calls because of the time-sensitive nature of their legal needs while at Dilley. We have had multiple class members call us and say that they have to pay for the phone call.

### *Lack of Children's Nutrition*

19. The vast majority of families we have spoken to over the past 10 months raise concerns about their children's poor nutrition at Dilley. Families report that the food makes children sick; express concern that the only fresh fruit provided to their children for months on end has been red apples; complain about the food taste, variety, and quality; and describe snacks as limited to cookies and sometimes granola bars. Families also continue to report that their children are not eating and some are being denied the special diets they need to stay healthy.

20.    I have toured the cafeteria and seen individual lunches at Dilly several times during my interviews with families.  While the highly processed food may be tolerable for adults for shorter periods of time, the meals I have seen are inedible for most toddlers and young children.  The meals are also highly sauced and spiced, and include no fresh fruit or fresh vegetables. Most concerningly, families repeatedly report there is no baby food available that is soft or mushed.

21.    The ICE JC Status Report again ignores the reality on the ground of concerns repeatedly raised by families regarding the lack of varied, child-friendly foods. It simply repeats previous assertions that Dilley provides "balanced, age-appropriate meals" (Report at 46); that "no food-related deficiencies were identified" in resident interviews (Report at 30); and that "infants and toddlers are provided with age-appropriate nutrition consistent with pediatric standards" (Report at 49).  There is a vast discrepancy between the ICE JC Status Report's assertions and the mountain of evidence we have gathered that children's health is suffering due to the nutritional deficiencies in the food served to children at Dilley.

**_Poor Sleeping Conditions for Children_**

22.    One of the most consistent complaints we hear from families at Dilley is that children cannot sleep because lights are kept on in living areas throughout the night. Countless families report their children are exhausted from lack of sleep, which also exacerbates their illnesses and makes it difficult to recover.  Sleep is a basic human need that is especially vital for children's healthy development.[1]  Medical professionals and

---

[1] Attached to my declaration as Attachments C and D are true and correct copies of the following journal articles: https://journalofethics.ama-assn.org/article/sleep-human-right-and-its-deprivation-torture/2024-10 and https://www.nih.gov/news-events/nih-research-matters/childrens-sleep-linked-brain-development

human rights organizations have long recognized the devastating psychological and physiological effects of disrupted sleep.[2]

23.    In a March 10, 2026 article, even a former Dilley employee stated: "A lot of these kids have bags under their eyes, which is something you don't see with kids. . . . They have worse bags than their parents."  A true and correct copy of this article is attached to my declaration as Attachment E.

24.    The ICE JC Status Report acknowledges that "two of four overhead light banks remain illuminated overnight" and asserts that "nightlights were previously evaluated but determined insufficient for staff to conduct required safety and welfare checks . . ." Report at 31.  While Plaintiffs' counsel appreciate that lower intensity light bulbs have been installed and nightlights have been considered, the status quo continues to harm children on a daily basis. Plaintiffs have proposed that nightlights are a commonsense solution used by parents, as well as congregate facilities, across the country.  Nightlights would give staff adequate visibility into living areas without disrupting children's sleep.

***Lack of Adequate Hygiene Products***

25.    The December 8, 2025 ICE JC supplemental Report shows photos with soap dispensers that are labeled "Citrus Fresh Foaming Handwash," as proof that families have access to soap and shampoo for showering. December 8, 2025 ICE JC Suppl. Report at 29.  The March ICE JC Status Report instead states that "[r]esidents are provided with basic hygiene items such as soap and shampoo at no cost *upon intake and through routine distribution*." Report at 16 (emphasis added).  This is simply not true.  The ICE JC Report later provides a list of hygiene products on page 54 that does not include soap or shampoo.

_____

[2] *Id.*

10

26.    Moreover, at all nine site visits, families have told me that the only option for washing their children is the harsh all-purpose hand soap in the showers.  Parents frequently complain this hand soap causes their children's skin to get dry and break out in rashes.  Because the harsh hand soap is the only option, families report that they must spend their limited resources on regular soap at the commissary.  Despite raising this issue for months, Plaintiffs' counsel have never been provided an explanation for why CoreCivic cannot simply provide children at Dilley a bar of soap and a bottle of shampoo.

***Lack of Adequate Education and Developmentally Appropriate Activities***

27.    The ICE JC Status Report notes that the education program at Dilley was expanded in March 2026. The new program, currently run by CoreCivic staff, is a long-awaited change for younger children at Dilley. Plaintiffs' counsel have been raising concerns about the minimal education at Dilley since it opened.  During our March site visit, we toured the new classrooms and noted significant improvements from previous tours. However, the classrooms are currently divided among only three age groups: PreK-2nd grade, 3rd grade-6th grade, and 7th grade-12th grade. This renders the current program inadequate for middle and high school aged youth at Dilley, many of whom were attending school in the U.S. for years before being apprehended.  During our tour, there were many children in the classrooms for the two lower grade-level sections, but only one youth in the 7th-12th grade classroom.  We were told that a large shipment of computers was expected shortly as part of the planned expansion of Dilley's educational program.  It is too soon to tell whether Dilley's educational program will ultimately be adequate for class members.

28.    The ICE JC Status Reports also notes improvements to the recreation offered at Dilley, and includes a schedule of activities such as "sand activities," "playscapes," karaoke, bingo and exercises.  Report at 46.  During our recent site visit, we did not

observe any of these activities occurring, and reports from families over many months of visits stand in stark contrast to the purported schedule.

29.    Although the ICE JC Status Report notes that "recreational and educational programming is provided consistently with age and developmental needs" (Report at 5), parents continue to report that their toddlers and young children have little to do and desperately need more toys. Parents consistently voice concerns about the lack of personal toys for younger children given the importance of play to healthy development. Children have reverted to making toys out of trash, rocks, and wrappers. Families report that children cannot have any personal toys in their rooms.

30.    We are now permitted to bring toys and crayons to our client interviews at Dilley.  Our agreement with CoreCivic is that toys must remain in our interview rooms. It is heartbreaking to see the look of desperation on children's faces when they are told they can play with our basic toys, but that we have to take them with us when we leave. One family whose son has autism told us that him holding the fidget spinner we brought was the first time they had seen him smile in weeks. Two parents had tears in their eyes as they took the toys back from their three-year-old girl when their *Flores* interview ended. One two-year-old gasped with excitement when he walked into an interview room and saw a few simple toys laying on the table. Two five-year-old twins hugged a stuffed animal we brought in March because they had been without theirs for months. The hug made them feel happy, but then we had to take the stuffed animal away. While the lack of toys is far from the most pressing issue at Dilley, I would be remiss not to raise how much it affects  younger children.

12

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this 20th day of March, 2026 at San Francisco, California.

Leecia Welch

# ATTACHMENT A

U.S. NEWS

# 911 calls capture kids burning with fever, struggling to breathe at ICE detention center

EMS crews were called to the Dilley Immigration Processing Center in Texas at least 11 times since September for children in medical distress, records show.

Listen: 911 calls from the ICE family detention center in Dilley, Texas

02:03

Get more news **LIVE** on NBC NEWS NOW ❯

Feb. 27, 2026, 5:00 AM EST

**By Mike Hixenbaugh**

**Listen to this article**
with a free account

00:00        08:36    1x

The voices on the emergency calls sound calm. Matter-of-fact. Routine.

---

 **Subscribe to read this story ad-free**
Get unlimited access to ad-free articles and exclusive content.

---

*"Frio County 911. What is your emergency?"*

*"I'm calling from the Dilley immigration center in Dilley, Texas. I'm calling for a little kid going through respiratory distress."*

The callers – medical staff inside the remote facility that houses hundreds of immigrant children and their parents in South Texas – tick through the clinical details: symptoms, vital signs, ages.

ADVERTISING



*"He's a 6-year-old male."*

*"Sixty?"*

*"Six-year-old."*

On the calls, staff at the Dilley Immigration Processing Cente struggling to breathe, burning with fever or appearing letharg detention center that lawyers, immigration advocates and pe suitable for children.

00:19 / 02:03

*"We have a child that is possibly having an allergic reaction. Male, little boy."*

*"It's a 13-year-old. Possible leg fracture."*

*"He's desatting. ... His oxygen level is 80."*

*"Five to 7 years old ... three seizures today."*

Since mid-September, emergency crews have been dispatched to Dilley at least 11 times to treat children in medical distress, according to EMS call logs and 911 audio obtained by NBC News. The calls offer a glimpse into what happens when children fall seriously ill inside a detention center that has become a flashpoint in the national immigration debate.



00:19 / 02:03

—    The Dilley Immigration Processing Center in Dilley, Texas, in Ja

crews have been dispatched to Dilley at least 11 times to treat children in medical distress.    Brenda Bazán

Most of the children were taken to a nearby community hospital, the records show. In at least three cases, children were transferred more than an hour away to a specialized pediatric hospital in San Antonio equipped to treat complex or life-threatening conditions, according to the logs.

In one case involving a 22-month-old in respiratory distress, the boy's condition was so serious, first responders wanted to fly him to the hospital by helicopter but couldn't because of bad weather, the records show. Parents of another toddler with low oxygen refused to be transported.

The records don't include information about what happened after the ambulance rides.

In a more recent case not captured in the dispatch logs, 2-month-old Juan Nicolás was taken to a hospital last week with a respiratory illness after his mother said he choked on his own vomit. The family was later deported to Mexico.

*Do you have a story to share about immigration detention? Contact reporter Mike Hixenbaugh at mike.hixenbaugh@nbcuni.com.*

Dr. Lara Jones, a pediatric critical care physician based in California, said the emergency calls point to potential missed opportunities for earlier medical intervention that might have prevented some children from being hospitalized. She and other physicians argue that holding children in a prisonlike setting is fundamentally incompatible with their health.

"There is absolutely, unequivocally no appropriate way to detain a child, period," Jones said, citing studies showing that detention is associated with serious health consequences for children. "It is causing physical, mental, measurable, studied harm. And there is no context in which that's justified."

00:19 / 02:03



—    Detainees have complained of contaminated food and inadequate medical care at the Dilley
Immigration Processing Center.    Ilana Panich-Linsman / The New York Times via Redux

On Thursday, Jones and a group of physicians sent a letter to Homeland Security Secretary Kristi
Noem and congressional leaders calling on the administration to free every child held at Dilley.

The release of the 911 calls and doctors' warning comes amid broader criticism of Dilley, where
the Department of Homeland Security has sent hundreds of children with their parents since last
spring as part of the Trump administration's expanding immigration crackdown. Lawyers,
human rights advocates and families held at the facility have described contaminated food
inadequate schooling and barriers to timely medical care.

In a statement to NBC News, Ryan Gustin, a spokesperson for
under a federal contract, said no child "has been denied med
delayed medical assessment." Staff are trained to call 911 whe
can be managed on-site, Gustin said, not because of inadequa          00:19 / 02:03
of clinical precaution."

DHS didn't respond to questions about the emergency calls.

This week, the agency published a statement it said was "correcting the record" on what it called "mainstream media lies" about conditions at Dilley, asserting that parents and children "are housed in facilities that provide for their safety, security and medical needs." The agency said families have access to a full medical staff, including a pediatrician, and described the care provided as "the best healthcare" some detainees have received "in their entire lives."



—    An American flag is left on the ground following a protest this n          .  .   . .   ...
Processing Center.   Kaylee Greenlee / Reuters

Kheilin Valero Marcano's account paints a different picture.

By mid-January, Valero Marcano knew something was serious          00:19 / 02:03
Amalia. In the month since federal officers arrested the famil

immigration check-in in El Paso, Texas, and transferred them to Dilley, the 17-month-old's health had steadily declined.

For weeks, according to Valero Marcano and a habeas corpus petition seeking the family's release, Amalia struggled with worsening respiratory symptoms. It began with a fever, then a cough that wouldn't ease. Her nose clogged with thick mucus. Her breathing grew strained and wheezy. Echoing complaints from other families, Valero Marcano said her daughter's care was complicated by a policy at Dilley that requires families to line up outside – sometimes for hours in freezing temperatures or rain – for each dose of medicine.

They stood in line three times a day, she said – in the morning, after lunch and again in the evening – for pain medicine and antibiotics. On blistering cold days, they wrapped Amalia in a blanket, trying to keep her warm.

"Many times I had to take the girl with a fever," Valero Marcano said in Spanish this week in an interview with NBC News.

Amalia didn't improve. She spiraled on the evening of Jan. 18, when – according to Valero Marcano and the 911 logs – medical staff at Dilley noted dangerously low blood-oxygen levels. A nurse explained they were calling for an ambulance.

"Thank God," Valero Marcano remembered saying. "Because you haven't done anything."

After a brief stop at Frio Regional Hospital, Amalia and her mother were transported by ambulance to Methodist Children's Hospital in San Antonio. There, the girl was treated for more than a week for pneumonia, Covid-19, RSV and respiratory distress, according to the family, while Immigration and Customs Enforcement officers stood guard.

After Amalia was discharged, immigration officers returned them to Dilley, where medical staff withheld the nebulizer prescribed by doctors at the hospital, claiming that it was not necessary, according to Valero Marcano and the habeas corpus petition. The family was released from detention the following week, after a lawyer filed the petition

00:19 / 02:03



—    Stiven Arrieta Prieto and Kheilin Valero Marcano entered the U.S. in 2024 with their baby, Amalia. They sought asylum after fleeing Venezuela, saying they were persecuted for opposing President Nicolás Maduro.
NBC News

Valero Marcano said she was not surprised to learn that other children at Dilley had also been rushed to hospitals.

"They should change their ways," she said of the facility. "At l who need it."

In a statement, DHS denied that Amalia's medication was wit "immediately received proper medical care" when she fell ill    00:19 / 02:03
statement said, the girl "was in the medical unit and received

medicines." Gustin, the CoreCivic spokesperson, said detainee privacy protections prevent the company from commenting on individual medical cases.

Dr. Ashley Cozzo, a pediatrician and neonatologist based in Connecticut who also signed the letter calling for children to be released from Dilley, said Amalia's case – along with the other emergency calls – points to potential structural failures.

In pediatrics, she said, the focus is prevention: recognizing warning signs early enough to keep a child out of the emergency room. Based on firsthand accounts and public reporting, Cozzo said she's concerned that conditions at the facility may be contributing to the spread of infectious diseases – including measles, Covid-19 and RSV – and that once children become sick, care is not escalating quickly enough to prevent emergencies.

"Those calls are pointing in the same direction," Cozzo said. "A missed opportunity at early identification and appropriate intervention."



Mike Hixenbaugh

Mike Hixenbaugh is a senior investigative reporter for NBC News, based in Maryland, and author of "They Came for the Schools."

Roberto Daza contributed.

00:19 / 02:03

# ATTACHMENT B

U.S. NEWS

# Worms in food, poor medical care, lights on 24/7: Families tell of life in Texas detention center

Alex Pretti investigation    Renee Good    Immigration poll    ICE agents arrested    Who pays for ICE?                    MINNESOTA

BY GARANCE BURKE, ADAM GELLER AND VALERIE GONZALEZ
Updated 6:36 PM EDT, February 28, 2026
Leer en español

LAREDO, Texas (AP) — A month after ICE agents sent the young Ecuadorian mother and her 7-year-old daughter to a sprawling detention center 1,300 miles from their Minnesota home, they were finally free.

But when the bus pulled up to a migrant shelter in the border city of Laredo, dropping off a half-dozen families lugging bags stuffed with belongings, the stress of recent weeks tracked mother and daughter like the long shadows on that mid-February afternoon.

Night after night inside south Texas' Dilley Immigration Processing Center with hundreds of other families, the grade-schooler wept and pleaded to know why they were being held.

ADVERTISEMENT

National Association of
Pediatric Nurse Practitic

"She would tell me, 'Mom, what crime did I commit to be a prisoner?' I didn't know what to tell her," said the 29-year-old, who spoke on condition of anonymity for fear being identified could negatively affect their immigration case. Her husband was deported to Ecuador soon after they were taken into custody.



Immigrant families settle in for the night at the Holding Institute in Laredo, Texas, on Feb. 12,                    Read More

Many Americans were alarmed last month when photos circulated showing U.S. Immigration and Customs Enforcement agents in Minneapolis detaining a 5-year-old boy wearing a bunny hat and carrying a Spiderman backpack. The concern followed Liam Conejo Ramos and his father when they were sent to Dilley, surrounded by chain-link fences on a dusty plain about 75 miles south of San Antonio.

**RELATED STORIES**



**Takeaways from AP's report on the ICE detention center holding children and parents**



**Attempted suicides, fights, pain: 911 calls reveal misery at ICE's largest detention facility**



**A timeline of the Trump administration's immigration crackdown in Minnesota**

But Liam was hardly an outlier. ICE has been holding hundreds of children at Dilley — many for months.

"We are all Liam," Christian Hinojosa, an immigrant from Mexico, said by phone from Dilley, where she and her 13-year-old son were held for more than four months. They were released this month and allowed to return home to San Antonio where she works as a health aide.

She noted that Liam and his father were released from Dilley after 10 days, when members of Congress and a judge intervened.

"My son says, 'That's unfair, Mama. What's the difference between him and us?'"

ADVERTISEMENT



National Association
Pediatric Nurse Practi

## Ramping up family detentions

When the Obama administration opened Dilley in 2014, nearly all families detained there had recently crossed the border from Mexico. Detentions at the facility were scaled back by the Biden administration in 2021, before it was closed three years later.

—

EDITOR'S NOTE — This story includes discussion of suicide. If you or someone you know needs help, the national suicide and crisis lifeline in the U.S. is available by calling or texting 988.

—

Since being reopened by President Donald Trump's administration last spring, life inside Dilley — a compound of trailers and other prefabricated buildings — has been shaped by three decisive changes.

The number of detained families has risen sharply since last fall. The government is holding many children well beyond the 20-day limit set by longstanding court order. And many detainees have lived in the U.S. for several years, with roots in neighborhoods, workplaces and schools, according to lawyers and other observers.

"Just imagine that you're a child and you're taken out of your surroundings," said Philip Schrag, a Georgetown University law professor and author of "Baby Jails: The Fight to End the Incarceration of Refugee Children in America."

ADVERTISEMENT

Suddenly you're in "a completely strange environment with the doors locked and guards in uniform roaming around," said Schrag, who counseled Dilley detainees as a volunteer lawyer during the Obama administration.

**Have a news tip?**
Contact AP's global investigative team at investigative@ap.org. For secure and confidential communications, use the free Signal app +1 (202) 281-8604.

ICE booked more than 3,800 children into detention during the first nine months of the new Trump administration, according to an Associated Press analysis of data from the University of California, Berkeley's Deportation Data Project. On an average day more than 220 children were held, with most of those detained longer than 24 hours sent to Dilley. More than half of Dilley detainees during that period were children.



A young immigrant girl who just arrived at the Holding Institute, a shelter in Laredo, Texas on Feb. 12, 2026, pets a cat as her mother and other families receive a welcome and instructions on how to purchase tickets to get back to their homes in the U.S. (AP Photo/Valerie          Read More

Nearly two-thirds of children detained by ICE were eventually deported and almost 1 in 10 left the country when their parents accepted voluntary departure, according to an AP analysis of the latest comprehensive

data. About a quarter were released in the U.S. requiring their parents to check in regularly with ICE as their legal cases proceed.

ADVERTISEMENT

▷ :

The number of detainees at Dilley has risen sharply since the period covered by the data, nearly tripling between last fall and late January to more than 1,300, according to Relevant Research, which analyzes immigration enforcement data.

"We've started to use 100 days as a benchmark for prioritizing cases because so many children are exceeding 20 days," said Leecia Welch, the chief legal director at Children's Rights, who visits Dilley regularly to ensure compliance. In a visit this month, Welch said she counted more than 30 children who had been held for over 100 days.

The increased detention of children comes as the Trump administration has gutted a Department of Homeland Security office responsible for oversight of conditions inside Dilley and other facilities.

ADVERTISEMENT

"It's a particular concern that family detention is being increased," said Dr. Pamela McPherson, a child and adolescent psychiatrist contracted by DHS from 2014 until last year to inspect and investigate conditions at Dilley and other ICE facilities holding children.

"Just who's providing that check-and-balance now?"

Rep. Tony Gonzales, who represents the congressional district where Dilley is located, said multiple visits have convinced him criticism of the center is unfair.

He said he'd been impressed by Dilley's facilities and the professionalism and dedication of staff. "They're not doing policy. They're just fulfilling a duty," said Gonzales, a Republican.

DHS did not respond to detailed questions about Dilley submitted by the AP. But both DHS and ICE sharply refuted allegations of poor care and conditions there.

"The Dilley facility is a family residential center designed specifically to house family units in a safe, structured and appropriate environment," ICE Director Todd M. Lyons said in a statement this week. Services include medical screenings, infant care packages as well as classrooms and recreational spaces, ICE said.

But concerns about Dilley are personal for Kheilin Valero Marcano, a Venezuelan immigrant detained with her husband and 1-year-old daughter, Amalia, in December and held for nearly two months.



Migrants from Venezuela, Stiven Arrieta Prieto and his wife, Kheilin Valero Marcano, with their 18-month-old daughter, Amalia Arrieta Valero, pose for a photo in Southern California on Tuesday, Feb. 10, 2026. (AP Photo/Damian Dovarganes)     Read More

When the child got a high fever, Valero Marcano said Dilley staff told her it was just a virus. Two weeks later, Amalia started vomiting, then losing weight. Valero Marcano said she took her to the Dilley doctor's office at least eight times but was offered Tylenol and ibuprofen.

The baby was eventually sent to two hospitals, where doctors diagnosed COVID, bronchitis, pneumonia and stomach virus, she said.

ICE disputed Valero Marcano's account, saying in a statement the baby "immediately received proper medical care" at Dilley before being sent to the hospital. Back in Dilley, "she was in the medical unit and received proper treatment and prescribed medicines," it said.

The family's return to Dilley coincided with a measles outbreak there. They were released earlier this month after their lawyers petitioned the court.

"I'm so worried for all the families who are still inside," Valero Marcano said.

## A teen in distress

After nearly two months in a cramped room at Dilley with three other families, the 13-year-old girl's depression turned increasingly dark.

The eighth grader stopped eating after finding a worm in her food, family members said. Staff sometimes withheld medications she'd long been prescribed to keep her anxiety in check and help her sleep.

When a total lockdown was imposed, a guard blocked the teen from leaving the crowded room to join her mother and sister in the bathroom. She spiraled into crisis, and used a plastic knife from the cafeteria to cut her wrist.

"She said she didn't want to live anymore because she preferred to die rather than having to keep living in confinement," her mother, Andrea Armero, told the AP in a video call from Colombia, where the family was deported this month. The AP generally avoids identifying people who attempt or die by suicide.

The girl's struggles began before she arrived at Dilley. Soon after starting middle school in Colombia, she learned a family member had sexually abused her younger sister. Armero said she saw no option but to leave and in early 2024 she and her daughters traveled to the U.S. border with Mexico, applying for asylum.

Living with family in Florida, the 13-year-old was doing well in school but sometimes experienced panic attacks about being sent back to Colombia. Under a psychiatrist's care, she was prescribed anti-anxiety and anti-depression medications and regularly saw a therapist. Then, in December, ICE agents detained Armero and her daughters during a routine check-in.

At Dilley, the 13-year-old calmed herself by drawing, producing haunting pictures of a girl locked inside gates. But when she and other detainees took part in a protest after 5-year-old Liam and his father got to Dilley, guards took away drawing materials and ordered everyone to stay inside.



This image provided by the family in February 2026 shows a drawing made by a 13-year-old Colombian girl when she was detained at South Texas Family Residential Center in Dilley, Texas, where the Trump administration is holding immigrant families. (AP Photo)    Read More

The teen's mental health collapsed. She tried to harm herself with the plastic knife, Armero said, and repeatedly hit her head. The family was put into isolation without seeing a doctor, then deported to Colombia on Feb. 11 after a judge ordered them removed, she said.

Dilley discharge documents described "active problems," including a "suicide attempt by cutting of wrist" and "self-harm," in addition to a "history of post-traumatic stress disorder" and "history of anxiety." AP also spoke with detainees and attorneys who independently described the girl's suicide attempt.

Responding to questions from AP, a DHS official acknowledged there had been "a case of self-harm" inside the facility, but did not specify what had happened, or how staff handled the incident. When AP asked for details, DHS did not respond to follow-up questions.

"No child at Dilley ... has been denied medical treatment or experienced a delayed medical assessment," said Ryan Gustin, a spokesman for CoreCivic, the for-profit prison company that operates the facility under contract with ICE. Gustin declined to answer specific question about the 13-year-old girl, citing privacy rules.

## Detention weighs on children

On a phone call from inside Dilley, 13-year-old Gustavo Santino-Josa introduced himself to a reporter by name and the 9-digit identification number ICE assigned him when he was taken into custody with his mother.

"Until today I don't know what we did wrong to get detained," Gustavo said. "I've seen my mom cry almost daily and I ask God that we can go out and go home soon."

He worried they might never be released.

"My mom says that as long as there is hope it is worth fighting for," Gustavo said before handing the phone to his mother, Christian Hinojosa, the health care aide originally from Mexico.

"All his friends have left already," his mother said. "Some were deported. Some got released recently. And it hurts. It hurts to see people leaving and you're staying here."



Andrea Armero, right, and her daughter, who were deported from the United States, sit in a park in Colombia, on Wednesday, Feb. 18, 2026. (AP Photo/Fernando Vergara)    Read More

Dilley was built to hold 2,400 people, housed in clusters ICE calls "neighborhoods." Bunk beds are arranged side-by-side for up to four families, frequently putting parents with young children in close quarters.

Once in full operation, Dilley is expected to generate about $180 million in annual revenue for CoreCivic, according to the company's recent filing with securities regulators.

In a video on its website, CoreCivic says Dilley's "open campus layout allows residents to move freely and unescorted throughout the day."

It does not mention that parents and their children are locked inside.

In response to questions from the AP, CoreCivic's Gustin said the staff at Dilley includes a pediatrician, pediatric nurse practitioner, other trained medical professionals, as well as mental health services to "meet the needs of children and families in our care."

In talks with parents of children held at Dilley, however, the same problems come up repeatedly, said Welch, the children's rights lawyer.

Kids cry often and don't get enough sleep, in part because lights are on around the clock, she said. The water tastes terrible and causes stomachaches and rashes, so some families stick to what they can buy in the commissary.

Their children don't eat enough and have lost weight, Welch said. There are classrooms, but instruction is limited to an hour daily, mostly filling out worksheets.

A 14-year-old girl, identified in court papers by the initials NVSM, reported there were tensions with up to 12 people sharing their room. At night when she and her mother tried to sleep, others insisted on turning up the TV.

"I feel very sad and stressed to be here," the teen said in an account filed with the court that oversees a binding settlement governing detention and release of children. "My nerves are so high. I don't know what is happening. My muscles will twitch because I'm so nervous and on edge."

## Concerns about oversight

As the government's detention of parents and their children came under scrutiny in 2014, an ICE official insisted that family detention centers, equipped with basketball courts and medical clinics, were "more like a summer camp."

The characterization irritated McPherson, the child psychiatrist who, along with another physician, was retained in 2014 by DHS to inspect family detention centers. Their contracts were not renewed by the Trump administration last year after DHS announced sweeping staff reductions.

"Having a clean place to sleep, having food, that's not the same thing as having family and community," McPherson said.

The doctors' investigations of family detention centers exposed consistently inadequate staffing and disregard by administrators for the trauma caused by detention, concerns they reported in 2018 to a Senate caucus set up to hear from whistleblowers.

At Dilley, the doctors noted a persistent shortage of pediatricians and the inability to hire a child psychiatrist from the time they began their inspections until they alerted senators.

Employees unsure how to deal with 2-year-olds biting and hitting each other placed the children and their parents in medical isolation for days, McPherson and her colleague told senators. Without supervision, a nurse at Dilley gave adult-strength hepatitis A shots to about 250 children in 2015, the American Immigration Lawyers Association reported.



Kheilin Valero Marcano, hugs her 18-month-old daughter, Amalia Arrieta Valero, in Southern California on Tuesday, Feb. 10, 2026. (AP Photo/Damian Dovarganes)

Read More

DHS responded to many of the findings by making changes before a special committee recommended in late 2016 that the government discontinue family detention except in rare cases. The first Trump administration increased family detention before the Biden administration began phasing it out in 2021.

That the Trump administration is again holding families at Dilley after so many warnings feels "dystopian," McPherson said.

"The decision to knowingly traumatize children and subject them to chronic stress, I just have no words for it," she said.

## Worries even after release

Huddled around picnic tables at the Laredo migrant shelter, parents released from Dilley searched anxiously for flights back to the homes they left behind. They called relatives, friends, teachers, anyone who might help with money to get there.

The young Ecuadorian mom talked of returning to Minneapolis, where her 2-year-old daughter, born in the U.S., was staying with a friend. With her husband deported, parenting will be entirely her responsibility.

That means getting her 7-year-old back in school. Then the woman, who had a work permit and a job in a Minneapolis restaurant before being detained, needs to keep her children fed.

"Let's go home, Mom, but don't go back to work because ICE is going to pick you up again," the little girl said. Her mother tried to reassure her.

That won't happen, she said, because now they have a special paper telling ICE to leave them alone.

She hopes that's a promise she can keep.

**AP**

AP is reporting on conditions inside U.S. immigration detention facilities. Please reach out if you or someone you know has been detained inside immigration detention facilities, or has worked at or has knowledge of contractors at such facilities.    For secure and confidential

0/140

**Your contact info**
We'll be in touch if we look into your question.

| Name |
|---|

| Email address |
|---|

☑ Sign me up for your newsletter!

☐ Please don't publish my name

☐ I am over 16 years old

Submit

If you have any other information, documents, photos or videos you would like to share, please contact AP at investigative@ap.org

For secure and confidential communications, use the free Signal app +(202) 281-8604.

Powered by Hearken

—

AP Data Reporter Aaron Kessler contributed from Washington.

___

Contact AP's global investigative team at Investigative@ap.org or https://www.ap.org/tips/



**GARANCE BURKE**
Burke is a global investigative journalist with The Associated Press based in San Francisco. She focuses on artificial intelligence and government accountability, and her work has been honored as a Pulitzer finalist and with a documentary Emmy Award. She can be reached on Signal at garanceburke33.



**ADAM GELLER**
Geller is an Associated Press national writer based in New York. He is part of a team focused on in-depth enterprise reporting.

# ATTACHMENT C



# AMA Journal of Ethics®

October 2024, Volume 26, Number 10: E784-794

## HEALTH LAW: PEER-REVIEWED ARTICLE

## Sleep Is a Human Right, and Its Deprivation Is Torture

Caitlyn Tabor, JD, MBE and Katherine R. Peeler, MD, MA

### Abstract

Sleep is integral to human health and well-being; it is recognized as a fundamental right by international bodies. Nevertheless, deliberate sleep deprivation is frequently employed as a form of torture, violating the right to health. Legal cases such as *LeMaire v Maass*, *Ireland v UK*, and *Huertas v Secretary Pennsylvania Dept of Corrections* illustrate the varying interpretations of sleep deprivation as torture or cruel and unusual punishment. Ambiguity in domestic and international legal definitions underscores the need for collaboration between health and legal professionals. Clinicians can offer expertise about physiological and psychological consequences of sleep deprivation, which informs what legally counts as torture. This commentary explores the intersection of sleep deprivation, human rights, and the role of medical professionals in addressing, identifying, and preventing sleep deprivation as a means of coercion and abuse.

### Case Law on Sleep

Samuel LeMaire was imprisoned in the Disciplinary Segregation Unit (DSU) in the Oregon State Penitentiary.[1] The DSU contained cells that were "lighted 24 hours per day," which the plaintiff alleged disrupted his sleep and led to psychological problems.[1] The district court found the 24-hour lighting conditions to be unconstitutional, stating: "[t]here is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination."[1] In *Huertas v Secretary Pennsylvania Dept of Corrections*, Hector Huertas made a similar claim: Huertas alleged that the 24-hour lighting within the corrections unit violated the Eighth Amendment's prohibition against cruel and unusual punishment.[2] However, the Third Circuit Court of Appeals found that Huertas' claim did not reach the threshold of being unconstitutional, noting that "not all deficiencies and inadequacies in prison conditions amount to a violation of a prisoner's constitutional rights."[2] Differences in the outcomes of these cases highlight the subjective nature of identifying and defining torture inflicted via sleep deprivation tactics and reveal a need for proper liaising between medical and legal professionals to ensure adequate protection of people experiencing incarceration.

### Sleep and the Right to Health

Sleep is an essential component of the body's homeostasis and physiological functioning. Quantifying sufficient duration and quality of sleep can prove difficult, as sleep patterns and needs vary not only between individuals but also for any given individual in response to aging, changes in routine, and physical demands. However, our understanding of sleep—its mechanics, cycles, and effects on the body—has improved dramatically over the last century, and thus our understanding of its converse—sleep deprivation—has concurrently grown deeper. As sleep is integral to health and the right to health has been recognized by numerous international governing bodies,[3,4] it follows that the purposeful deprivation of sleep violates the right to health though it is frequently used as a means of torture. Perpetrators often avoid accountability by justifying torture based on specific circumstances. Furthermore, the lack of a specific threshold of what constitutes sleep deprivation and the "justification" exemption as interpreted by some states present challenges in prosecuting it as torture. The ambiguity in legal definitions of torture, especially in the context of sleep deprivation, necessitates a careful examination of medical literature, existing laws, and international conventions to protect sleep as an essential human right and prevent its use as a means of coercion and abuse.

The World Health Organization defined health in its 1946 constitution as "a state of complete physical, mental and social well-being" and declared that "the enjoyment of the highest attainable standard of health is one of the fundamental rights of every human being."[3] As is common knowledge and as studied by numerous clinicians and scientists, optimal health is not possible without an appropriate quality and quantity of sleep (ie, proper sleep hygiene). Poor sleep hygiene is associated with cardiovascular disease, inattention, learning difficulties, mental health disorders, and numerous other medical problems in adults and children.[5] Sleep medicine experts consider good sleep to consist of 4 to 5 uninterrupted sleep cycles of light, deep, and rapid eye movement sleep.[6] While beyond the scope of this commentary, the intricacies of these cycles are what lead to the physiological restorative effects necessary for cognition and routine repair that the body performs, and, conversely, interruptions in these cycles lead to specific sleep disturbances and sequelae. Consequently, clinicians recommend 7 to 9 hours of sleep daily (preferably at night) and maintaining a consistent sleep schedule.[6] Sleep deprivation, whether intentional or unintentional, disrupts these processes, making it impossible for the body to function at its highest level.

### Distinguishing Torture From Cruel, Inhuman, or Degrading Treatment

Based on the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (UNCAT), torture is characterized by 4 critical elements: (1) "severe pain or suffering" (either physical or mental), (2) intentionality of the perpetrator to deliberately inflict such pain, (3) a specific purpose (such as "obtaining from him ... information or a confession," intimidation, or punishment), and (4) involvement of persons in an "official capacity."[7,8] This definition has evolved to encompass various forms of harm, including prolonged mental harm or deliberately disrupting senses or personality.[8,9]

The Geneva Conventions, particularly Geneva Convention III of 1949, highlighted the prohibition of torture in conflicts and for individuals not actively engaged in hostilities.[10] President Ronald Reagan signed the UNCAT in 1988, and Congress enacted 18 USC §2340A in 1994 to comply with the Convention.[11] This statute applies only to acts of torture committed outside the United States, although there is "Federal extraterritorial

jurisdiction over such acts whenever the perpetrator is a national of the United States or the alleged offender is found within the United States, irrespective of the nationality of the victim or the alleged offender."[12] The statute defines torture as specific acts intended to cause severe physical or mental pain,[12] omitting the original language about the purpose of harm, thereby introducing ambiguity and, as some have attempted to argue, a torture justification exemption.[13]

While the universally accepted UNCAT definition of torture involves the intentional infliction of severe physical or mental pain or suffering by a public official for a specific purpose,[12] other definitions have been offered. The Inter-American Convention to Prevent and Punish Torture offers a broader definition that does not necessitate severe pain and suffering.[14] In international humanitarian law, torture is not confined to public officials but can be committed by any individual.[15] Despite differing interpretations of torture, the UNCAT definition remains the core reference for defining torture. The UNCAT distinguishes between "torture" and "other acts of cruel, inhuman or degrading treatment or punishment" (CIDT) and *prohibits* torture completely while obligating states only to *prevent* CIDT.[15] Understanding the origins of these distinctions provides insight into the continued difficulty in reaching legal agreement on where the line is between them.

The UNCAT was initially developed in response to a UN General Assembly resolution. The Commission on Human Rights (now the Council on Human Rights) created a draft convention against torture to replace the 1975 declaration against torture,[16] which defined torture as an "aggravated and deliberate form of cruel, inhuman or degrading treatment or punishment." To achieve this goal, the Commission on Human Rights established a working group to examine the distinction between torture and CIDT.[16] The working group concluded that while torture could be defined with reasonable precision, drafting a precise definition of inhuman treatment was impossible.[16] Additionally, because State Parties to the convention would be legally bound to incorporate its terms into their national criminal law, attaching these obligations to a vague concept like CIDT was deemed impractical.[17] Taking into account the Commission on Human Rights' working group's discussions, the recommendations of the European Commission of Human Rights (European Commission), and the European Court's evaluations, the UN General Assembly adopted the definition of torture as outlined in the UNCAT in December 1984.

While the 1975 declaration against torture viewed torture as an aggravated form of inhuman treatment, the UNCAT clarified the distinction to be about purpose more so than severity. As such, Article 16 explicitly refers to "cruel, inhuman and degrading treatment or punishment which do not amount to torture" and only requires State Parties to "undertake to prevent," rather than prohibit, such acts committed under their jurisdiction.[7] This distinction is significant, as the UNCAT mandates that States Parties establish judicial remedies for torture victims, assert criminal jurisdiction over acts of torture and prosecute or extradite its perpetrators, and prohibit the submission of all statements obtained through torture in legal proceedings.[7] None of these obligations apply to inhuman treatment.

The issue of the severity of pain or suffering caused by torture was actually addressed earlier, however. In the 1969 "Greek case" involving Denmark and other states against the Greek military government,[18] the European Commission was tasked with interpreting Article 3 of the European Convention, which prohibits torture or "inhuman or degrading

treatment or punishment." The European Commission categorized Article 3's prohibition into 3 parts: "inhuman treatment" was defined as treatment deliberately causing severe mental or physical suffering that is unjustifiable in the particular situation; "degrading treatment" was described as treatment that grossly humiliates a person before others or forces them to act against their will or conscience; and "torture" was described as inhuman treatment that serves a purpose, such as obtaining information or confessions or inflicting punishment, and is generally a more severe form of mistreatment.[19]

While the European Commission's decision had a significant impact on the 1975 UN declaration against torture,[20] which also recognized torture as an aggravated form of inhuman treatment, the case of *Ireland v United Kingdom* in 1980 presented a challenge to the European Commission's purpose-driven test. This case involved the use of 5 interrogation techniques—including sleep deprivation—by British security forces on Irish Republican Army suspects.[21] The European Commission concluded that the purpose of these techniques was to obtain information and unanimously ruled that they amounted to torture, stating that the systematic application of the techniques for this purpose resembled methods of systematic torture.[21] However, the European Court of Human Rights disagreed with the European Commission's assessment. The European Court acknowledged that the techniques constituted inhuman treatment but did not consider them to be torture.[21] The European Court instead based its decision on a different interpretation of the distinction in Article 3 of the European Convention between torture and inhuman or degrading treatment, emphasizing that this distinction primarily hinges on the intensity of the suffering inflicted. According to the European Court, while the 5 techniques, when used together, undoubtedly amounted to inhuman and degrading treatment, they did not cause suffering of the specific intensity and cruelty associated with torture.[21]

Although both inhuman treatment and torture involve suffering, the European Commission emphasized that the purpose of the conduct is crucial in distinguishing between the two. It maintained that severe suffering might be justifiable in certain circumstances but that torture, with its additional purposeful element of obtaining information or confessions or inflicting punishment, can never be justified.[21] The European Court, however, argued that torture deserved a "special stigma" not attributable to other forms of inhuman or degrading treatment due to the intensity of suffering involved.[21] This distinction formed the basis of the court's decision to classify the 5 techniques as inhuman treatment rather than torture.[21] In summary, the European Commission distinguished torture from CIDT by the purpose of the act, whereas the European Court distinguished torture from CIDT by the severity of suffering from, more so than the purpose of, the act.

Post *Ireland*, the distinction between torture and CIDT based on the severity of suffering led some states to argue that, while torture is forbidden, CIDT might be justified in exceptional circumstances.[17] Both torture and CIDT are forbidden by the UN Declaration of Human Rights (Article 5), UNCAT, the International Covenant on Civil and Political Rights (Article 7), and the European Convention on Human Rights (Article 3).[7,22,23,24] The *legal* distinction between torture and CIDT hinges on the *purpose* behind the acts (torture aims to obtain a confession, while CIDT does not have a specific purpose).[25] However, *medical and psychological research* have demonstrated that there is no significant difference between torture and CIDT from a psychological or neurobiological perspective.[26] This research has led some practitioners to recommend abolishing the distinction altogether.[26]

Thus, there is no justification for torture or CIDT, as the legal distinction between acts of torture and CIDT does not align with their psychological impacts. It is known that torture leads to false confessions and inaccurate information.[27] If it is not the purpose of the offender to obtain false and inaccurate information, then the only other plausible motivation behind the torture is to cause intentional and purposeful harm to a targeted individual, which, by definition, is torture and is illegal under domestic and international law.[9]

### Sleep Deprivation as Torture

Sleep deprivation is carried out in various ways: constant illumination, cold conditions, loud noises being played, constant and repetitive awakening, forced standing, and so on.[28,29] Although the UN Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment has regularly declared that sleep deprivation is capable of amounting to torture, the threshold at which methods to cause sleep deprivation become torture is subject to interpretation.[30,31] Notably, the above conditions occurring in immigration detention centers in the United States have failed to be unanimously recognized as torture, despite various elements of torture—including duration, intentionality, and specific purpose—being behind their use.[28]

It should be noted that sleep deprivation occurs in numerous other circumstances that do not amount to torture. Around the world, work-life boundaries are blurred, as people are constantly on email and social media. Shift workers switch back and forth between day and night shifts. Many of us choose to forgo sleep for other activities despite knowing how poorly we may feel after insufficient or poor-quality sleep. But in all of these circumstances, we have at least limited agency to choose sleep. Persons subjected to sleep deprivation as a form of torture have no agency and no ability to modify their environments or habits to ensure sleep.

### Prosecuting Perpetrators of Sleep Deprivation

Due to certain qualifications contained in definitions of torture and lack of proper documentation of torture tactics, the prosecution of sleep deprivation as a form of torture has been largely unsuccessful.[32] Furthermore, findings in US cases prosecuting sleep deprivation as torture vary significantly. This variation may be explained by the exemption justification that arises under the UNCAT's and earlier conventions' distinguishing torture from CIDT, as exemplified below.

In the United States, sleep deprivation has been historically considered a form of torture since the case of *Ashcraft v Tennessee* in 1944.[33] The individual in this case was subjected to 36 hours of bright lights that caused sleep deprivation, and the court acknowledged it as both physical and mental torture, citing and quoting from an earlier report: "It has been known since 1500 at least that deprivation of sleep is the most effective torture and certain to produce any confession desired."[34] Numerous studies have corroborated that confessions obtained under these conditions are often false and thus of little utility.[33,35]

Legal cases, such as *Keenan v Hall*[36] and *LeMaire v Maass*,[1] have highlighted unconstitutional aspects of subjecting individuals to constant illumination, emphasizing the psychological harm caused by disturbing sleep patterns and exacerbating preexisting mental disorders. In *LeMaire*, Chief Judge Owen Panner noted that "[t]here is no legitimate penological justification for requiring plaintiff to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional."[1]

However, the War Crimes Act, enacted to prosecute violations of the laws of war, has not been effectively utilized for prosecuting acts of sleep deprivation as torture, despite its provisions covering international and non-international armed conflicts involving US citizens.[37]

Challenges persist in fully recognizing and prosecuting sleep deprivation as a form of torture due to varying legal interpretations within the judicial system. Notably, there have been instances in which courts, under the guise of penological purpose, have eroded the authority of cases concerning the prosecution of sleep deprivation as torture, which have laid much of the groundwork for how torture and other acts of CIDT are prosecuted.[38] Violation of the Eighth Amendment's prohibition against cruel and unusual treatment might be overlooked if a government entity deems the practice justified by emphasizing that the penological purpose must specifically align with the prisoner's situation.[38]

Additionally, the lack of a definitive sleep deprivation threshold for torture set by higher courts has contributed to ambivalence in addressing the issue. Despite medical evidence affirming sleep deprivation's cruelty and inhumanity, the absence of a clear legal boundary has left room for interpretation that potentially overlooks violations of the Eighth Amendment in instances of extreme sleep deprivation. In a petition for a *writ of certiorari*—a petition by a higher court to a lower court to review a case—to the United States Court of Appeals for the Ninth Circuit, petitioner Neil Grenning noted: "It's an easy path to ambivalence, despite undisputed medical evidence that it's 'cruel and inhumane,' because no higher court has set a threshold. No court has said, 'This is too much, this is wanton infliction violating the Eighth Amendment.'"[38] Additionally, as Hector Heurtas' case exemplifies, evidence of intentionality can be difficult to prove, making the practice insidious.[2]

While some international conventions have recognized and condemned sleep deprivation as a method of torture or abuse, prosecutions specifically targeting sleep deprivation as a stand-alone crime have been less common. In some cases, instances of sleep deprivation have been included as part of broader charges related to torture or ill treatment, but direct prosecutions solely focused on sleep deprivation are relatively rare in international courts or tribunals. Instances in which sleep deprivation was categorized as torture include reports on Indonesia, Iran, Jordan, Libya, Saudi Arabia, Turkey, and Pakistan, where it was explicitly classified as a "common torture method" or included among other recognized torture methods like loud music.[32] Despite sleep deprivation being acknowledged as a prevalent method of psychological torture, finding corroborating documentation of these practices has hindered its adequate recognition by courts and quasi-judicial bodies like UN treaty bodies. In fact, Appendix M of the Army Field Manual for Human Intelligence Collector Operations No. 2-22.3 continues to permit isolation, sensory deprivation, and sleep deprivation, which can constitute torture or CIDT as defined by UNCAT and US law.[39]

### Legal Definitions and Clinical Assessment

To enable more uniform interpretation of sleep deprivation as torture, medical professionals must provide clarity regarding the extent of pain and suffering experienced by an individual who underwent intentional sleep deprivation to assist courts in assessing whether a specific instance of sleep deprivation meets the threshold of torture. The American Medical Association states that "[a]s citizens and as professionals with specialized knowledge and experience, physicians have an obligation to assist in

the administration of justice."[40] To successfully fulfill this obligation, physicians may testify as expert witnesses in cases prosecuting sleep deprivation as torture. This testimony would serve to show that prolonged sleep deprivation does in fact deserve the "special stigma" of torture due to the very real physical, mental, and emotional impacts it has on its victims.

In a court setting, a medical expert testifying to establish that sleep deprivation amounts to torture would provide a detailed overview of the case, including the circumstances surrounding the sleep deprivation experienced by the individual, such as its duration, the context in which it occurred, and the techniques used to cause sleep deprivation. The expert would additionally discuss the methods used to assess the physical and psychological effects of sleep deprivation on the individual. This discussion might include descriptions of physical examinations, medical tests, and psychological evaluations conducted to evaluate the individual's health status and well-being. The expert would present their findings, highlighting any physical or psychological symptoms observed in the individual as a result of sleep deprivation. The gold standard for conducting and documenting such forensic evaluations is the Istanbul Protocol.[41]

Based on their findings and expertise, the expert would provide their opinion on the severity of the effects of sleep deprivation on a given individual. The medical expert's opinion would allow the court to understand the severity of the specific sleep deprivation a person endured, its effect on a given person's physiology, and the sequelae that resulted, thus providing clarity to the courts as to whether or not a given individual's experience meets the threshold for torture.

### Conclusion
International definitions of torture, such as that of the UNCAT, emphasize severe pain or suffering, intentionality, specific purpose, and official capacity. The justification exemption for CIDT used in the United States[17] is a false argument. There is no significant difference between torture and CIDT from a psychological or neurobiological perspective. Torturing individuals through sleep deprivation or any other means of cruel, inhumane, or degrading treatment as a means to glean confessions or important information does not yield reliable information. And since that information has no value (which, even if it did, we feel would not justify the torture), then the only purpose of the torture or CIDT is to intentionally harm someone, which, by definition, is not a justifiable exemption.

Courts internationally and in the United States have recognized sleep deprivation as cruel and unusual punishment, constituting torture. Sleep deprivation, achieved through techniques like prolonged interrogations and acoustical bombardment, causes severe mental and physical consequences, including increased anxiety, impaired cognitive function, and increased cardiovascular risk. Particularly in light of the subjective nature of mental suffering, the frequent absence of obvious physical evidence, and the purposeful lack of documentation of such evidence by the perpetrators, it is imperative that medical experts bridge the gap between science and the law, testifying to the specific negative effects of sleep deprivation on a given person and thus clarifying thresholds at which maltreatment amounts to torture.

### References
1.  *LeMaire v Maass*, 745 F Supp 623 (D Or 1990).
2.  *Hector Huertas v Secretary Dept of Corrections*, No 12-4530 (3d Cir 2013).

3. Constitution of the World Health Organization. World Health Organization. Accessed November 28, 2023. https://apps.who.int/gb/bd/PDF/bd47/EN/constitution-en.pdf?ua=1

4. Committee on Economic, Social and Cultural Rights. Substantive issued arising in the implementation of the International Covenant on Economic, Social and Cultural Rights. General comment no. 14 (2000): the right to the highest attainable standard of health (Article 12 of the International Covenant on Economic, Social and Cultural Rights). United Nations; 2000. Accessed May 22, 2024. https://digitallibrary.un.org/nanna/record/425041/files/E_C.12_2000_4-EN.pdf?withWatermark=0&withMetadata=0&version=1&registerDownload=1

5. Liew SC, Aung T. Sleep deprivation and its association with diseases—a review. *Sleep Med*. 2021;77:192-204.

6. Baranwal N, Yu PK, Siegel NS. Sleep physiology, pathophysiology, and sleep hygiene. *Prog Cardiovasc Dis*. 2023;77:59-69.

7. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. United Nations. Adopted December 10, 1984. Accessed November 22, 2023. https://www.ohchr.org/en/instruments-mechanisms/instruments/convention-against-torture-and-other-cruel-inhuman-or-degrading

8. Cakal E. Dignity fact sheet collection legal № 1—defining torture. Danish Institute Against Torture; 2019. Accessed October 2, 2023. https://www.dignity.dk/wp-content/uploads/defining-torture-factsheet.pdf

9. Danelius H. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. December 10, 1984. Accessed November 28, 2023. https://legal.un.org/avl/ha/catcidtp/catcidtp.html

10. *Geneva Convention Relative to the Treatment of Prisoners of War*. United Nations. Adopted August 12, 1949. Accessed May 14, 2024. https://www.un.org/en/genocideprevention/documents/atrocity-crimes/Doc.32_GC-III-EN.pdf

11. Pitter L. No more excuses—a roadmap to justice for CIA torture. Human Rights Watch. December 1, 2015. Accessed November 28, 2023. https://www.hrw.org/report/2015/12/01/no-more-excuses/roadmap-justice-cia-torture

12. Torture (18 USC 2340A). US Department of Justice Archives. Accessed November 28, 2023. https://www.justice.gov/archives/jm/criminal-resource-manual-20-torture-18-usc-2340a

13. Devlin J. The ticking bomb and the justification of torture. *E-International Relations*. July 5, 2012. Accessed November 28, 2023. https://www.e-ir.info/2012/07/05/the-ticking-bomb-and-the-justification-of-torture/

14. Inter-American Convention to Prevent and Punish Torture. Organization of American States. Adopted December 9, 1985. Accessed November 28, 2023. https://www.oas.org/juridico/english/treaties/a-51.html

15. Reyes H. The worst scars are in the mind: psychological torture. *Int Rev Red Cross*. 2007;89(867):591-617.

16. Burgers HJ, Danelius H. *The United Nations Convention Against Torture: A Handbook on the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment*. Brill; 1988.

17. De Vos CM. Mind the gap: purpose, pain, and the difference between torture and inhuman treatment. *Hum Rights Brief*. 2007;14(2):4-10.

18. European Commission of Human Rights. *Report of the European Commission of Human Rights on the "Greek Case."* European Commission of Human Rights; 1969. Accessed May 22, 2024.
https://hudoc.echr.coe.int/app/conversion/pdf/?library=ECHR&id=001-167795&filename=THE%20GREEK%20CASE%20%E2%80%93%20DENMARK%20v.%20GREECE%20%3B%20NORWAY%20v.%20GREECE%20%3B%20SWEDEN%20v.%20GREECE%20%3B%20NETHERLANDS%20v.%20GREECE%20%E2%80%93%20Part%20I%20of%20V.pdf

19. Bates E. *The Evolution of the European Convention on Human Rights: From Its Inception to the Creation of a Permanent Court of Human Rights.* Oxford University Press; 2010.

20. Declaration on the Protection of All Persons     from Being Subjected to Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. United Nations. Adopted December 9, 1975. Accessed May 15, 2024.
https://www.ohchr.org/en/instruments-mechanisms/instruments/declaration-protection-all-persons-being-subjected-torture-and

21. *Case of Ireland v the United Kingdom.* European Court of Human Rights. January 18, 1978. Accessed May 28, 2024.
https://hudoc.echr.coe.int/eng#{%22itemid%22:[%22001-57506%22]}

22. Universal Declaration of Human Rights. United Nations. Adopted December 10, 1948. Accessed May 22, 2024. https://www.un.org/en/about-us/universal-declaration-of-human-rights

23. International Covenant on Civil and Political Rights. United Nations. Adopted December 16, 1966. Accessed May 22, 2024.
https://www.ohchr.org/en/instruments-mechanisms/instruments/international-covenant-civil-and-political-rights

24. Council of Europe. Convention for the Protection of Human Rights and Fundamental Freedoms. Council of Europe; 1950. Amended August 1, 2021. Accessed May 22, 2024. https://rm.coe.int/1680a2353d

25. *Prosecutor v Anto Furund`ija,* Case no. IT-95-17/1-T (Int'l Crim Trib for the Former Yugoslavia December 10, 1998). Accessed May 28, 2024.
https://www.icty.org/x/cases/furundzija/tjug/en/fur-tj981210e.pdf

26. Başoğlu M. A multivariate contextual analysis of torture and cruel, inhuman, and degrading treatments: implications for an evidence-based definition of torture. *Am J Orthopsychiatry.* 2009;79(2):135-145.

27. Einolf CJ. How torture fails: evidence of misinformation from torture-induced confessions in Iraq. *J Glob South Stud.* 2022;7(1):ogab019.

28. Peeler KR, Hampton K, Lucero J, Ijadi-Maghsoodi R. Sleep deprivation of detained children: another reason to end child detention. *Health Hum Rights.* 2020;22(1):317-320.

29. Leach J. Psychological factors in exceptional, extreme and torturous environments. *Extrem Physiol Med.* 2016;5(1):7.

30. Rodley NS; Commission on Human Rights. Report of the Special Rapporteur on torture and cruel, inhuman or degrading treatment or punishment. Visit by the Special Rapporteur to Pakistan. E/CN.4/1997/7/Add.2. United Nations. October 15, 1996. Accessed May 14, 2024.
http://hrlibrary.umn.edu/commission/thematic53/97TORPAK.htm

31. Nowak M. What practices constitute torture?: US and UN standards. *Hum Rights Q.* 2006;28(4):809-841.

32. USA and torture: a history of hypocrisy. Human Rights Watch. December 9, 2014. Accessed October 2, 2023. https://www.hrw.org/news/2014/12/09/usa-and-torture-history-hypocrisy

33. *Ashcraft v Tennessee*, 327 US 274 (1946).

34. Camp EW, Bruce AA, Hallam O. Report of Committee on Lawless Enforcement of Law. *Am J Police Sci*. 1930;1(6):575-593.

35. "They want a confession": torture and ill-treatment in Ethiopia's Maekelawi police station. News Release. Human Rights Watch; October 18, 2013. Accessed November 28, 2023. https://www.hrw.org/report/2013/10/18/they-want-confession/torture-and-ill-treatment-ethiopias-maekelawi-police-station

36. *Keenan v Hall*, 135 F3d 1318 (9th Cir 1996).

37. Interrogation policy, Geneva Conventions, and the War Crimes Act. Human Rights Watch. Accessed November 22, 2023. https://www.hrw.org/legacy/backgrounder/usa/qna1006/5.htm

38. Petition for Writ of Certiorari, *Grenning v Miller-Stout*, No. 16-35903 (2018) (No. 18-9052).

39. US Department of the Army. *FM 2-22.3 (FM 34-52) Human Intelligence Collector Operations*. US Department of the Army; 2006. Accessed May 15, 2024. https://irp.fas.org/doddir/army/fm2-22-3.pdf

40. American Medical Association. Opinion 9.7.1 Medical testimony. *Code of Medical Ethics*. Accessed May 15, 2024. https://code-medical-ethics.ama-assn.org/ethics-opinions/medical-testimony#:~:text=As%20citizens%20and%20as%20professionals,Testify%20honestly.

41. Office of the High Commissioner for Human Rights. *Istanbul Protocol: Manual on the Effective Investigation and Documentation of Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*. United Nations; 2022. Accessed May 15, 2024. https://irct.org/wp-content/uploads/2022/08/Istanbul-Protocol_Rev2_EN.pdf

**Caitlyn Tabor, JD, MBE** is the director of the Aging Brains/Elder Protection Project and the United Nations International Comparative Neurolaw Curriculum Project at the Massachusetts General Hospital Center for Law, Brain & Behavior in Boston. She is also a bioethics and neuroethics faculty member at the Center for Bioethics at Harvard Medical School.

**Katherine R. Peeler, MD, MA** is an assistant professor of pediatrics and a faculty member in the Center for Bioethics at Harvard Medical School in Boston, Massachusetts. She is also a pediatric intensive care physician at Boston Children's Hospital and conducts research and advocacy related to the health rights of detained asylum seekers in the United States.

Citation
*AMA J Ethics*. 2024;26(10):E784-794.

DOI
10.1001/amajethics.2024.784.

Conflict of Interest Disclosure
Dr Peeler reports serving as an expert for Physicians for Human Rights. Professor Tabor disclosed no conflicts of interest.

*The viewpoints expressed in this article are those of the author(s) and do not necessarily reflect the views and policies of the AMA.*

Copyright 2024 American Medical Association. All rights reserved.
ISSN 2376-6980

# ATTACHMENT D



**National Institutes of Health**
*Turning Discovery Into Health*

August 30, 2022

# Children's sleep linked to brain development

## At a Glance

- Pre-teens who slept less than nine hours daily had differences in brain structure and more problems with mood and thinking compared to those who got sufficient sleep.
- The findings suggest that sleep interventions might be needed to help improve mental and behavioral health during pre-adolescence and beyond.

Scientists have long recognized that getting enough sleep during childhood can benefit developing brains. However, the underlying brain mechanisms are not well understood. And although experts say that children ages 6 to 12 should get at least nine hours of sleep each day, it's been unclear how less sleep might affect a child's brain.

To get some answers, a research team led by Dr. Ze Wang of the University of Maryland set out to see how lack of sleep affects brain structure and other outcomes. They took advantage of data being collected in NIH's ongoing Adolescent Brain Cognitive Development (ABCD) study. ABCD has enrolled nearly 12,000 volunteers at ages 9 or 10 from research sites across the country. Participants' health, brain structure and function, and other factors



Researchers gained insights into how insufficient sleep affects children's developing brains
*vystekimages / Shutterstock*

will be followed for a decade as they move from adolescence into young adulthood.

The researchers identified more than 4,000 ABCD participants, ages 9 or 10, who generally got nine or more hours of sleep per day, according to their parents. This group was compared to a similar number of age-matched children who typically

got less than the recommended nine hours of sleep. The research team carefully matched the two groups based on some key factors that can confound study results. These factors included sex, household income, body mass index, and puberty status. Participants were assessed and followed over a two-year period. Results appeared in *Lancet Child & Adolescent Health* on July 29, 2022.

The researchers found that children in the insufficient sleep group at the start of the study had more mental health and behavioral challenges than those who got sufficient sleep. These included impulsivity, stress, depression, anxiety, aggressive behavior, and thinking problems. The children with insufficient sleep also had impaired cognitive functions such as decision making, conflict solving, working memory, and learning. Differences between the groups persisted at the two-year follow-up.

Brain imaging at the start of the study and two years later showed differences in brain structure and function in the insufficient sleep group compared to the sufficient sleep group. The findings suggest that sleep affects learning and behavior through specific brain changes.

"Children who had insufficient sleep€"less than nine hours per night€"at the beginning of the study had less grey matter or smaller volume in certain areas of the brain responsible for attention, memory, and inhibition control, compared to those with healthy sleep habits," Wang explains. "These differences persisted after two years, a concerning finding that suggests long-term harm for those who do not get enough sleep."

Because the ABCD study is ongoing, the researchers note that there will be opportunities to add more follow-up measurements and build on their results. "Additional studies are needed to confirm our findings and to see whether any interventions can improve sleep habits and reverse the neurological deficits," Wang adds.

€"by Vicki Contie

# Related Links

- Getting sufficient sleep reduces calorie intake
- Lack of sleep in middle age may increase dementia risk
- Poor sleep linked with higher blood sugar levels in African Americans
- Weekend catch-up can't counter chronic sleep deprivation
- How night shifts disrupt metabolism
- Sleep deprivation increases Alzheimer's protein
- Naps Can Help Preschool Children Learn    ARCHIVE
- Sleep On It
- Good Sleep for Good Health
- ABCD Study

# References

Effects of sleep duration on neurocognitive development in early adolescents in the USA: a propensity score matched, longitudinal, observational study. Yang FN, Xie W, Wang Z. *Lancet Child Adolesc Health*. 2022 Jul 29:S2352-4642(22)00188-

2. doi: 10.1016/S2352-4642(22)00188-2. Online ahead of print. PMID: 35914537.

# Funding

NIH's National Institute on Aging (NIA), National Institute of Biomedical Imaging and Bioengineering (NIBIB), National Center for Advancing Translational Sciences (NCATS), and National Institute on Drug Abuse (NIDA).

## National Institutes of Health

9000 Rockville Pike

Bethesda, Maryland 20892

NIH…Turning Discovery Into Health®

## Follow Us

     

# ATTACHMENT E

*The Atlantic*

POLITICS

# I Recognize the Look on Liam Ramos's Face

The 5-year-old was briefly held at Dilley, where families are sent after ICE roundups.

By Caitlin Dickerson



Illustration by The Atlantic. Sources: Ali Daniels; Ilana Panich-Linsman / Redux.

**MARCH 10, 2026**

SHARE AS GIFT    DISCUSS (59)    REMOVE

W HEN THE FIRST PHOTO of 5-year-old Liam Ramos went viral in January, it became an instant symbol of the Trump administration's mass-deportation campaign: his blue bunny hat, his Spider-Man backpack, his hunched shoulders, his scared eyes as ICE detained him and his father outside their home in a Minneapolis suburb.

The second photo of Liam, a week later, enraged people who were now invested in his story: Lying on his father's lap at the Dilley Immigration Processing Center, about 70 miles south of San Antonio, Texas, he looked pale and lethargic. His eyes were open a

tiny slit. His mother told reporters that Liam had a fever, was vomiting, and refused to eat.

ADVERTISEMENT

What struck me about the second image, and his mother's update, was how familiar his transformation was. I've visited Dilley several times, and have seen many children go from bright-eyed to listless.

With his move to Dilley, Liam became part of an ongoing national experiment in detaining immigrant families. George W. Bush's administration briefly used the practice to provide respite to asylum seekers who had just crossed the border and had no plans for where to go next. But ICE officials soon argued that family detention should be used as a deterrent. In a former medium-security prison surrounded by razor wire north of Austin, young children and their parents wore jumpsuits and were confined to cells for up to 12 hours a day; it closed in 2009 after lawsuits and government inspections showed that children there were sick and malnourished.

The Obama administration eventually opened Dilley on a remote patch of Texas flatland where temperatures can hit 90 degrees even in December. Its open-air layout of trailers was supposed to be more humane. But for years now, in interviews and court filings, families have described an emotionally crushing atmosphere, with revolting food, foul water, and a dangerous lack of medical care. They say bright bedroom lights that never turn off make it almost impossible to sleep, compounding their misery.

J. Weston Phippen: Is it an immigration detention facility or a child-care center?

ADVERTISEMENT

Case 2:85-cv-04544-DMG-AGR    Document 1748-2    Filed 03/20/26    Page 56 of 65
Page ID #:62540

In 2016, a government advisory panel recommended that ICE end the practice of family detention, and instead use monitoring programs that allow people with pending asylum cases to settle and work in the United States. But under Donald Trump, the agency has twice backtracked on plans to do that, arguing that housing children at Dilley is safe and necessary in order to discourage border crossings. Even that rationale, though, no longer adequately describes Dilley's role. Instead of detaining recent border crossers almost exclusively, Dilley is now also housing families that had established lives in the United States and were arrested in ICE sweeps.

When I toured Dilley in the fall of 2019 with a group of reporters, ICE's acting director, Matt Albence, led us across the 54-acre campus, which could detain up to 2,400 people. Albence, who now works for the private prison company GEO Group, said he was proud of how Dilley was run and pushed back against its critics. "This is clearly not a concentration camp," he said.

ON THE TOUR, I learned that when families arrived, they entered a small locked chamber called a sallyport, where they were screened for communicable diseases. Most had just finished an exhausting journey across the southern border, and were given a 15-minute "cool-down period" in an air-conditioned area that looked like a school administrator's office, with tile floors and faux-wood laminate cubicles. After a snack, they started a 12-hour intake process that involved a full physical, a shower, fingerprinting, a rules orientation, and an initial asylum screening called a "credible-fear interview." Girls older than 10 were given a pregnancy test. Then they were assigned to a dorm room in one of Dilley's five "neighborhoods," which were labeled by color and animal, and given name tags that indicated their preferred language.

A sign at reception—RECREATION JUST FOR YOU!—said that karaoke, Hula-Hoops, and air hockey were available every day from 8 a.m. to 8 p.m. "Just let a recreation staff member know what you want to do!" To minimize the risk of sexual harassment and assault, only mothers or fathers could be detained in the facility at a given time. (Posters for how to report sexual assault were everywhere.) This meant that two-parent

Case 2:85-cv-04544-DMG-AGR   Document 1748-2   Filed 03/20/26   Page 57 of 65
Page ID #:62541

families were separated: One parent was sent to a separate adult detention center, sometimes in another state.

Each of Dilley's 20 housing trailers had space for 120 people. The detainees slept in rooms that could accommodate up to six families in double bunk beds. In one room, I saw a teenage girl slumped forward on a couch, holding her head in one hand, staring blankly at the wall in front of her. Former ICE officials who were involved with the facility's planning later told me that the government had deemed individual bathrooms an unnecessary expense. Instead, communal ones were placed at the end of each trailer, a long walk from the farthest bedrooms.

We toured an austere courtroom that reeked of bleach, and an airless cafeteria with a rancid smell. There were amenities, such as a "salon" that offered free haircuts and a computer lab with a few children clicking away under a poster that translated *E pluribus unum* into English and Spanish. We were told that Dilley offered Zumba classes a few times a week. We visited a day care with space for 15 children, which parents could use in two-hour increments; the sole attendant was trying to soothe three crying babies.

ADVERTISEMENT

The few parents and children I saw outdoors looked sedated by the heat. Some huddled near skinny trees. The government had paid for landscaping, but the plants immediately died in the brutal climate, according to Claire Trickler-McNulty, a former senior adviser at ICE.

Eric Schlosser: 'We voted for retribution'

Throughout the tour, we heard coughing and saw faces covered in snot. Parents said they waited hours in the heat and rain outside the medical unit, only to be sent away with Tylenol, ibuprofen, or nothing at all.

On another trip to Dilley about a month later, I met a Mexican mother named Patricia who told me that her teenage daughter was refusing to eat and had tried to

Case 2:85-cv-04544-DMG-AGR     Document 1748-2     Filed 03/20/26     Page 58 of 65
Page ID #:62542

commit suicide a week earlier. "I wouldn't wish this on anyone," Patricia said. A Honduran mother named Cindy told me that her 8-year-old son, Jostin, had become unrecognizable since they arrived. "He acts like a small child," she said. "He speaks in a whisper, constantly asking for Mommy." Jostin wasn't eating either, she explained, and "everytime he goes into the cafeteria, he throws up."

Later, I interviewed a mother and son named Kenia and Michael after they were released from Dilley. Michael, who was 11, started having violent meltdowns in the facility—something that had never happened before—and they continued for months afterward. Detained children experience more stress than their bodies can handle, child-welfare experts told me, and are profoundly destabilized by seeing their parents' fear and helplessness.

ADVERTISEMENT



The advisory panel convened at the end of the Obama administration was supposed to recommend improvements to family detention, but instead voted unanimously to end it. "Detention is never in the best interest of children," the panel's report said.

When Trump took office in 2017, his administration disregarded the recommendation. President Biden's Department of Homeland Security finally closed Dilley in the summer of 2024. Trump reopened it a few months later, as part of a $45 billion expansion of the immigration detention system that has also involved Guantánamo Bay, tent cities on military bases, and converted warehouses.

CoreCivic, the private prison company that operates Dilley, reported that its management revenue from ICE more than doubled between the fourth quarters of 2024 and 2025—partly because of reopening Dilley. In an earnings call last year, CoreCivic's then-CEO called this "truly one of the most exciting periods" in his 32-year career with the company.

T HE TRAILERS AT DILLEY are now rusted from floods, and well past their intended lifespan. ICE created a barrier between some of the trailers so that the facility can house mothers and fathers at the same time. This year, its population has fluctuated between 900 and 1,400, including pregnant women and children as young as two months old, according to Faisal Al-Juburi, a co-CEO of Raices, whose lawyers provide free counsel to families there. Like Liam Ramos, whose family came from Ecuador in 2024 and requested asylum, some detainees have pending applications for legal immigration status. And some were picked up at their court appearances or at appointments at ICE offices.

ADVERTISEMENT



It's become harder to learn what's happening inside Dilley in recent months, though reports suggest that conditions are worsening. ICE is no longer offering tours to journalists. After ProPublica published pictures and letters written by detained children, guards reportedly started confiscating crayons and paper. In 911 logs, ProPublica found reports of "toddlers having trouble breathing, a pregnant woman who passed out and an elementary-school-aged girl having seizures. Local authorities were also called in for three cases of alleged sexual assault between detainees."

Democratic Representative Joaquin Castro of Texas went to Dilley on February 20 and reported that families were "locked up like criminals and being treated like animals," and that some children had untreated asthma and appendicitis. Castro has long opposed family detention and criticized Trump's immigration policies. "There's a lot of little, little kids who really probably don't know how to process this experience," he said in a video posted on YouTube.

Caitlin Dickerson: An American catastrophe

Lawyers at the National Center for Youth Law are allowed to perform periodic inspections of Dilley and interview detainees, under a 1997 federal court settlement that set minimum standards for the detention of children and families. Becky Wolozin, a lawyer at NCYL, told me that since the facility reopened under Trump,

Case 2:85-cv-04544-DMG-AGR    Document 1748-2    Filed 03/20/26    Page 60 of 65
Page ID #:62544

she and her colleagues have interviewed detained children with Wolf-Hirschhorn syndrome, severe autism, and other serious developmental illnesses. There was a measles outbreak earlier this year. Wolozin said that basic childhood illnesses such as ear infections can become dangerous in Dilley because children are often sleep-deprived and malnourished. "Kids have fevers for a frightening amount of time, and persistent coughs and headaches," she said. "We're seeing that only after many, many visits to the medical wing, or even to the hospital, do they actually get treated with antibiotics."

ADVERTISEMENT

In January, an 18-month-old detainee got sick at Dilley with COVID, RSV, pneumonia, and bronchitis and had to be hospitalized for severe respiratory distress, according to a federal lawsuit. ICE then returned her to Dilley, where her lawyers say the medical staff withheld her prescribed medication until the lawyers secured her release. In a statement, a DHS spokesperson said that the child received "proper treatment," including her prescribed medications, and that all detainees "receive timely and appropriate medical care from the moment they enter ICE custody."

Todd Brian, a spokesperson for CoreCivic, said in a statement that the company doesn't "cut corners on care, staff or training, which meets, and in many cases exceeds, our government partners' standards." He said that detainees receive three nutritious meals a day and have access to a team of "registered nurses, licensed vocational nurses, nurse practitioners, and board-certified physicians, including pediatric specialists." Brian said that any allegation that buildings were not being maintained was "patently false," adding, "Emergency medical services are activated immediately when a child's clinical presentation exceeds what can be safely managed on-site."

The Trump administration is fighting restrictions on its use of Dilley—including a 20-day limit on detaining children and families under the 1997 court settlement—by arguing that existing laws are sufficient to keep the children there safe. Al-Juburi told me that the average stay is currently about 63 days, and that one family was detained at Dilley for almost five months. Raices has gotten some clients released through

habeas corpus petitions; Liam Ramos was freed through the same maneuver within days of the Dilley photo going viral. But Al-Juburi said the petitions are time-consuming and must be made one at a time, even though the same legal logic applies to many of the children there.

ADVERTISEMENT



In recent court filings, ICE has called Dilley a "model of regulatory compliance and humane care." DHS said in its statement that children at Dilley "have access to teachers, classrooms, and curriculum booklets for math, reading, and spelling," as well as "3 meals a day, clean water, clothing, bedding, showers, soap, and toiletries," all of which is "generously funded by the U.S. taxpayer." The statement says that detention "is a choice" and encourages families to self-deport.

I recently spoke with a subcontractor who quit working at Dilley this year; he requested anonymity so that he wouldn't lose his security clearance. He said that since he's been out of a job, he's been stressed about money because he has a toddler at home and his partner is pregnant with a second child. But he told me that seeing Liam Ramos and so many other sick and miserable children—the constant crying and vomiting—got to be too much.

"A lot of these kids have bags under their eyes, which is something that you don't see with kids," he said. "They have worse bags than their parents."

View Discussion    59

# ABOUT THE AUTHOR

 **Caitlin Dickerson**
◯ Follow

Caitlin Dickerson is a staff writer at *The Atlantic*. She received the 2023 Pulitzer Prize for Explanatory Reporting.

---

## Explore More Topics

Donald Trump, Immigration, U.S. Immigration And Customs Enforcement, United States Department Of Homeland Security

ADVERTISEMENT



# MORE FROM CAITLIN DICKERSON

See All



Natalie Keyssar for The Atlantic

### 'America Doesn't Want My Children or Grandchildren'

The Cruz family spent years building a life in New York. Then the risks of staying became too great.



Illustration by Ben Kothe / The Atlantic. Sources: Scott Olson / G…

### How ICE Lost Its Guardrails

The Minneapolis shooting will get less official scrutiny because of cuts by the Trump administration.

Case 2:85-cv-04544-DMG-AGR    Document 1748-2    Filed 03/20/26    Page 63 of 65
Page ID #:62547



## Hundreds of Thousands of Anonymous Deportees

Amid the president's fast-moving deportation campaign, the stories of most people being swept up are missed.

Miguel Martinez / Atlanta Journal-Constitution / AP

# MORE FROM POLITICS

See All



Illustration by The Atlantic. Sources: Jim Lo Scalzo / EPA / Bloom…

## Not So Fast, Bill Maher

The comedian was set to receive the Twain Prize before a sudden reversal of course.

JONATHAN L. FISCHER AND ASHLEY PARKER



Stefani Reynolds / Bloomberg

## A Serious Senate Debate About an Unserious Bill

The most pressing question about the SAVE America Act is not whether it's going to pass, but why President Trump and his allies are so determined to see the Senate put up a bill that's doomed to fail.

RUSSELL BERMAN AND YVONNE WINGETT SANCHEZ





Illustration by The Atlantic. Sources: Al Drago / Bloomberg / Gett…    Illustration by Lucy Naland. Sources: Gregory Rec / Portland Press…

## Kristi Noem Bought 11 Warehouses to Use as ICE Jails. Now What?

DHS's next leader will inherit a fast-moving $38 billion plan for industrial-scale immigrant detention.

NICK MIROFF

## A 79-Year-Old Freshman Senator?

Janet Mills does not have a dicey Reddit history or a recently covered-over Nazi tattoo. But her candidacy is haunted by Joe Biden's 2024 debacle.

MARK LEIBOVICH

## The Atlantic Daily

Get our guide to the day's biggest news and ideas, delivered to your inbox every weekday and Sunday mornings. See more newsletters

Sign Up

Your newsletter subscriptions are subject to The Atlantic's Privacy Policy and Terms and Conditions.



## Ideas That Matter

Subscribe and support more than 160 years of independent journalism.

Subscribe

About

Contact

Podcasts

Subscription

Follow

Privacy Policy   Your Privacy Choices        Advertising Guidelines   Terms & Conditions   Terms of Sale   Responsible Disclosure   Site Map

Do Not Sell Or Share My Personal Information

TheAtlantic.com © 2026 The Atlantic Monthly Group. All Rights Reserved.

This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply