CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
crholguin@centerforhumanrights.org
Bardis Vakili (Cal. Bar No. 247783)
bardis@centerforhumanrights.org
Sarah E. Kahn (Cal. Bar No. 341901)
sarah@centerforhumanrights.org
1505 E 17th St. Ste. 117
Santa Ana, CA 927051
Telephone: (909) 274-9057

*Attorneys for Plaintiffs*

*Additional counsel listed on following page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| Jenny Flores, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> Pamela Bondi, Attorney General of the United States, *et al.,* <br><br> Defendants. | Case No. CV 85-4544-DMG-AGRx <br><br> **PLAINTIFFS' RESPONSE TO MARCH 13, 2026 ICE JUVENILE COORDINATOR STATUS REPORT AND DATA** <br><br> Judge: Hon. Dolly M. Gee |

NATIONAL CENTER FOR YOUTH LAW

Mishan Wroe (Cal. Bar No. 299296)

Diane de Gramont (Cal. Bar No. 324360)

428 13th Street, Floor 5

Oakland, CA 94612

Telephone: (510) 835-8098

Email: mwroe@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW

Rebecca Wolozin (admitted *pro hac vice*)

818 Connecticut Ave. NW, Suite 425

Washington, DC 20006

Telephone: (202) 868-4792

Email: bwolozin@youthlaw.org

CHILDREN'S RIGHTS

Leecia Welch (Cal. Bar No. 208741)

2021 Fillmore Street

San Francisco, CA 94115

Telephone: (415) 602-5202

Email: lwelch@childrensrights.org

CHILDREN'S RIGHTS

Eleanor Roberts (admitted *pro hac vice*)

88 Pine Street, Suite 800

New York, NY 10005

Telephone: (212) 683-2210

Email: eroberts@childrensrights.org

Pls.' Resp. to Juvenile Coordinator Status Reports and Data
CV 85-4544-DMG-AGRX

# TABLE OF EXHIBITS

### Exhibit Index to Plaintiffs' Response to
### March 13, 2026 ICE Juvenile Coordinator Status Report and Data

| Exhibit No. | Exhibit Description |
|---|---|
| 1 | Declaration of Leecia Welch, March 20, 2026 ("Welch Decl.") |
| 2 | Declaration of Lucia González, March 20, 2026 ("González Decl.") |
| 3 | C.C.A. Declaration (Dilley), February12, 2026 ("C.C.A. Decl.") |
| 4 | M.S.P. Declaration (Dilley), March 12, 2026 ("M.S.P. Decl.") |
| 5 | M.M.S. Jan.[1] Declaration (Dilley), January 15, 2026 ("M.M.S. Jan. Decl.") |
| 6 | C.R.B. Jan.[2] Declaration (Dilley), January 15, 2026 ("C.R.B. Jan. Decl.") |
| 7 | N.P.V. Declaration (Dilley), March 11, 2026 ("N.P.V. Decl.") |
| 8 | E.C.M. Declaration (Dilley), March 12, 2026 ("E.C.M. Decl.") |
| 9 | M.T.H. Declaration (Dilley), March 11, 2026 ("M.T.H. Decl.") |
| 10 | J.A. Declaration (Dilley), March 11, 2026 ("J.A. Decl.") |
| 11 | T.M. Declaration (Dilley), March 11, 2026 ("T.M. Decl.") |
| 12 | C.H.H. Declaration (Dilley), January 15, 2026 ("C.H.H. Decl.") |
| 13 | D.P.C.S. Declaration (Dilley), January 14, 2026 ("D.P.C.S. Decl.") |
| 14 | S.K. Declaration (Dilley), March 12, 2026 ("S.K. Decl.") |
| 15 | Declaration of Javier Hidalgo, March 20, 2026 ("Hidalgo Decl.") |
| 16 | N.C.C. Declaration (Dilley), February 12, 2026 ("N.C.C. Decl.") |
| 17 | L.R.C. Declaration (Dilley), February 12, 2026 ("L.R.C. Decl.") |
| 18 | M.B.O.D. Declaration (Dilley), January 14, 2026 ("M.B.O.D. Decl.") |
| 19 | J.V.G. Declaration (Dilley), February 11, 2026 ("J.V.G. Decl.") |
| 20 | Z.V. Declaration (Dilley), February 11, 2026 ("Z.V. Decl.") |
| 21 | A.P. Declaration (Dilley), January 14, 2026 ("A.P. Decl.") |
| 22 | Y.H.H. Declaration (Dilley), January 14, 2026 ("Y.H.H. Decl.") |

---

[1] M.M.S. has both a November (previously filed) and January declaration.
[2] C.R.B. has both a January and October declaration.

| 23 | S.S. Declaration (Dilley), January 15, 2026 ("S.S. Decl.") |
|---|---|
| 24 | A.K. Jan.[3] Declaration (Dilley), January 14, 2026 ("A.K. Jan. Decl.") |
| 25 | A.M.P. Declaration (Dilley), February 12, 2026 ("A.M.P. Decl.") |
| 26 | N.M. Declaration (Dilley), January 14, 2026 ("N.M. Decl.") |
| 27 | J.B.A. Declaration (Dilley), March 12, 2026 ("J.B.A. Decl.") |
| 28 | D.R.R. Declaration (Dilley), January 15, 2026 ("D.R.R. Decl.") |
| 29 | O.S. Declaration (Dilley), August 12, 2025 ("O.S. Decl.") |
| 30 | L.T.P. Declaration (Dilley), January 14, 2026 ("L.T.P. Decl.") |
| 31 | M.S.M. Declaration (Dilley), January 15, 2026 ("M.S.M. Decl.") |
| 32 | N.S.R. Declaration (Dilley), March 12, 2026 ("N.S.R. Decl.") |
| 33 | C.R.B. Oct. Declaration (Dilley), October 10, 2025 ("C.R.B. Oct. Decl.") |
| 34 | K.P.L.R. Declaration (Dilley), November 18, 2025 ("K.P.L.R. Decl.") |
| 35 | M.L.S. Declaration (Dilley), February 12, 2026 ("M.L.S. Decl.") |
| 36 | M.P.P. Declaration (Dilley), February 11, 2026 ("M.P.P. Decl.") |

**Previously Filed Declarations**

| Docket No. | Description |
|---|---|
| 1706-09 | Ex. 8 to Pls.' Resp. to Dec. 2025 Suppl. JC Reports and Data, A.K. Declaration (Dilley), November 19, 2025 [1706-09] ("A.K. Nov. Decl.") |

---

[3] A.K. has both a November (previously filed) and January declaration.

## TABLE OF CONTENTS

**I.  INTRODUCTION** .................................................................................**1**

**II. ICE continues to violate the *Flores* Settlement Agreement.** ....................................**2**

    **A. Children Are Subjected to Prolonged and Unexplained ICE Detention**......**3**

        **1.  Prolonged Detention at Dilley** ......................................................**3**

        **2.  Prolonged detention of children in hotels** .................................**5**

    **B. Conditions of Detention at Dilley Continue to Violate the FSA.** .................**6**

        **1.  Children are kept for prolonged periods in an unlicensed, secure, prison-like environment.** ..........................................................**6**

        **2.  Dilley still provides inadequate medical care to children.** .................**9**

        **3.  Children are still not being provided notice of their Flores rights**...**13**

        **4.  Children still lack access to child-friendly foods and healthy snacks**.......................................................................................**16**

        **5.  ICE Fails to Provide Adequate Sleeping Conditions for Children.** .**20**

        **6.  Children still lack access to adequate hygiene products.** .................**22**

        **7.  Children still lack access to free phone calls to their family members.** ...................................................................................**23**

        **8.  Children's education at Dilley has improved but remains inadequate.** .................................................................................**23**

**III.  Conclusion**...........................................................................................**25**

## I.   INTRODUCTION

Since the parties' last status conference on December 15, 2025, children and families at the South Texas Family Residential Center in Dilley, Texas ("Dilley") have experienced crushing lengths of stay, an epidemic of illnesses, and harsher operational restrictions, limitations, and lockdowns following the high-profile detention of five-year-old Liam Conejo Ramos. Welch Decl. ¶ 7. In accordance with this Court's orders, the parties have simultaneously been attempting to mediate Plaintiffs' concerns regarding the length of detention and harmful conditions children endure at Dilley. *Id.* ¶¶ 3-4.

Despite some progress in mediation and some recent improvements, the March 13, 2026 ICE Juvenile Coordinator Status Report, Dkt. No. 1736-1 ("ICE JC Status Report" or "JC Report") and supporting data confirm Plaintiffs' ongoing concern that ICE remains woefully out of compliance with the *Flores* Settlement Agreement. The ICE JC Status Report and exhibits document that **nearly 600 children spent more than 20 days in ICE custody in December and January alone**[4]; that families complain in meetings with Dilley staff about "food quality," "baby food availability," and "soap and hygiene products" (JC Report at 38); and that lights are still kept on all night while children try to sleep (*Id.* at 31).

Although the JC Status Report states there were "no reportable critical incidents," "no placements on suicide watch," "no residents requiring hospitalization or emergency room referral[s]," "no . . . administrative or disciplinary segregation," "no facility-wide lockdown," and disputes any and all medical complaints (*Id.* at 7, 16-19, 32), multiple families share a vastly different experience – one where class members and their families have experienced hospitalizations, lock downs, room sweeps, and retaliation for filing grievances. *See* Section II.B.1. One family spoke with class counsel from disciplinary segregation, and another reported a suicide attempt by their 13-year-old daughter. *See* C.C.A. Decl. ¶ 27; Welch Decl. ¶ 15, Attachment B. Plaintiffs also present overwhelming

---

[4] Dec. 2025 ICE Family Residential Center 20-Day Report, Dkt. No. 1736-2 (Dec. 20-Day Census Chart); Jan. 2026 ICE Family Residential Center 20-Day Report, Dkt. No. 1736-3 (Jan. 20-Day Census Chart) (collectively, "20-Day Census Charts"). *See* González Decl. at ¶¶ 5-14 for Plaintiffs' data analysis methodology.

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

evidence from class members documenting ongoing FSA violations enumerated below, all of which underscore ICE's failure to treat children commensurate with their vulnerability. Welch Decl. ¶ 5.

## II.    ICE continues to violate the *Flores* Settlement Agreement.

The ICE JC Status Report documented an alarming increase in detention time for class members at Dilley in December 2025 and January 2026 – with nearly 600 children languishing at Dilley for over 20 days.[5] 20-Day Census Report; González Decl. ¶ 6. Plaintiffs also present voluminous evidence that children at Dilley continue to suffer. Welch Decl. ¶¶ 5, 10, 13, 21. Ongoing FSA violations include inadequate medical care, lack of information about *Flores* rights and access to counsel, lack of access to healthy and safe child-friendly foods and snacks, the inability of class members to sleep due to lights on in their living areas all night, lack of free calls to family members, and inadequate education and developmentally appropriate activities. *Id.* ¶¶ 5, 11, 16, 19, 22, 27-30. Families consistently report their children are hungry, exhausted, perpetually sick, and despondent from the conditions of confinement at Dilley. *Id.* ¶ 5.

Plaintiffs' counsel have conducted nine site visits at Dilley since the government began incarcerating families in April 2025. *Id.* ¶ 2. After each site visit, Plaintiffs' counsel provided Defendants with a detailed, comprehensive list of *Flores* violations. *Id.* ¶ 3. As directed by Defendants, Plaintiffs' counsel also raised emergency time-sensitive concerns about particular children via email on multiple occasions. *Id.* Plaintiffs and Defendants have met and conferred five times (May 14, May 30, July 24, September 17, and October 6, 2025) about the *Flores* violations at Dilley identified in our correspondence. *Id.* In accordance with this Court's orders, the parties also began conducting mediation sessions in January 2026. The parties met on January 23, February 4, and March 2, 2026, and Plaintiffs' counsel sent two additional meet and confer letters

---

[5] The 20-Day Census Reports again undercount actual length of stay because they only provide facility length of stay from a book-in date, rather than total custody length of stay from the date of apprehension. *See* González Decl. ¶ 6. The 600 number provided above is from Plaintiffs' own analysis. *Id.*

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

and two emergency emails since mediation began. *Id.* ¶ 4. While Plaintiffs have repeatedly reported over the last year that Dilley remains seriously out of compliance with the FSA, *Id.* ¶ 10, the ICE JC Status Report states unequivocally that Defendants find Dilley in full compliance. JC Report at 8, 57. Despite some progress in mediation regarding possible reductions in children's length of stay, and an agreement to have Dr. Paul Wise conduct medical site visits at Dilley, the parties still fundamentally disagree as to FSA compliance at Dilley.

### A. Children Are Subjected to Prolonged and Unexplained ICE Detention.

#### 1. Prolonged Detention at Dilley

During December and January, ICE detained at least 595 children for more than 20 days. 20-Day Census Charts; González Decl. ¶ 6. At least 265 of these children were detained for more than 50 days and a shocking 55 children were detained more than 100 days. 20-Day Census Charts; González Decl. ¶ 16. The minimal explanations listed in the 20-day Census Charts again demonstrate that Defendants are failing to comply with their obligations to release children without unnecessary delay and make and record prompt and continuous efforts toward family reunification and release. FSA ¶¶ 14, 18; *see also* González Decl. ¶ 14 (explaining data issues regarding release explanations).

Despite the Court's order to provide "detailed reasons" for detentions over 20 days, the reasons given in the 20-Day Census Charts do not appear to be individualized and remain vague. 20-Day Census Charts. The Charts label almost all children with stays over 20 days (who were not released in each month) as being detained because they had pending immigration cases and appeals or pending voluntary departure and "Immigration and Nationality Act (8 U.S.C. 1101 et seq.) [Hold]/Significant likelihood of removal/Flight risk." *Id.* Detaining children because of pending immigration cases and appeals is an insufficient basis for prolonged detention. *See* Order re Pls.' Mot. to Enforce, Apr. 24, 2020, Dkt. No. 784 at 13-14. Additionally, ICE does not include any information about the individualized reasons that any particular child was determined a

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

"Flight risk"; for many children it is unclear whether their prolonged detention is allegedly justified by "significant likelihood of removal" or because of "flight risk".[6]

Moreover, ICE provided no individualized explanations for the class members who were released after months of detention. The 20-day Census Charts document that 38 children were held in custody for over 100 days and then released with no explanation in December and January. 20-Day Census Charts. These charts also show 121 children were held in custody for over 50 days and then released with no explanation. *Id.*

The 20-day Census Charts again suggest that Defendants are failing to make individualized determinations as to whether removal is imminent and whether class members are eligible for release. For example, one family who ICE reported had been detained for 88 days awaiting a deportation flight in December, was still detained an additional 37 more days prior to removal. Dec. 20-Day Census Chart at 3 row 11; Jan. 20-Day Census Chart at 3 row 8. For another family, nothing in the report indicates that ICE did any individual screening to determine whether the family could be released while their immigration appeal was pending. This family eventually withdrew their appeal and was removed after 129 days in custody. Dec. 20-Day Census Chart at 3 row 9; Jan. 20-Day Census Chart at 3 row 11. ICE reported in the December data that another family, who agreed to voluntary departure and had already been detained for 58 days by the end of December, was not scheduled for a departure flight until January 30, 2026. ICE provided no specific information about why this family remained detained until their removal. Dec. 20-Day Census Chart at 10 row 9.

As this Court has concluded, continued detention when removal is not imminent or "ready to take place" is a violation of paragraphs 14 and 18 of the FSA. *See* Order re Pls.' Motion to Enforce, April 24 2020, Dkt. No. 784 at 13-14. In addition, continued

---

[6] Further, all six children with stays over 20 days whom courts forced ICE to release because of a successful habeas petition, are listed without a "Flight Risk" designation. This begs the question of which individualized reasons ICE used to justify those lengthy detentions prior to a federal court's ruling them unlawful. In the absence of federal court interventions, these six children might have continued to remain in unjustified prolonged detention without individualized determinations, like so many of the other children at Dilley. *See* González Decl. ¶ 14 for explanation of data analysis.

detention of class members, even where the child has a final removal order, is a violation of FSA paragraph 14 *unless* ICE has provided an individualized assessment that determines continued detention is necessary for safety or because of a flight risk, which is not happening. *Id*. at 17-18; Order re Pls.' Mot. to Enforce, June 27, 2017, Dkt. No. 363 ("June 2017 Order") at 24, n. 16 (Class members awaiting removal should not "be treated any differently . . . with regard to the release provisions under the Agreement . . .").

ICE's choice to add the words "Flight risk" with no justification to almost every class member's reason for length of stay shows a complete absence of individualized assessments. Plaintiffs have raised concerns about prolonged detention of class members at Dilley for many months, and the December and January census data demonstrate hundreds of children experienced extremely prolonged lengths of stay. González Decl. ¶ 16. Based on Plaintiffs' Dilley site visit last week, lengths of stay show signs of improvement, but only time will tell whether this trend will continue. Welch Decl. ¶ 9.

### 2. Prolonged detention of children in hotels

The December 2025 ICE Hotel Stays Report, Dkt. No. 1736-6, and January 2026 ICE Hotel Stays Report, Dkt. No. 1736-7 again reveal unexplained prolonged detention of children in hotels that appears to violate the Court's Orders limiting the use of hotels to "*brief* hotel stays (not more than 72 hours) as necessary and in good faith to alleviate bottlenecks in the intake processes at licensed facilities." Order re Defs.' *Ex Parte* Appl. to Stay, Sept. 21, 2020, Dkt. No. 990 at 5; *see also* Order re Pls.' Mot. to Enforce Settlement as to "Title 42" Class Members, Sept. 4, 2020, Dkt. No. 976 at 17 (permitting exceptions "for one to two-night stays while in transit or prior to flights . . .").

The December and January Hotel Stays Reports reveal that 43 children spent more than 72-hours in hotels, including one eight-year-old child who spent more than 16 days detained in a hotel only to eventually be released from custody. Dec. 2025 ICE Hotel Stays Report, Dkt. No. 1736-6 (Dec. Hotel Stay Rep.); Jan. 2026 ICE Hotel Stays Report, Dkt. No. 1736-7 (Jan. Hotel Stay Rep.) (collectively, "Hotel Stays Reports"). Additionally, during our March *Flores* site visit to Dilley, counsel for Plaintiffs met a family that had spent nine days in a hotel, during which time ICE told them they could

not alert family members or their attorney where they were, and that they were not allowed to look out the window. *See* M.S.P. Decl. ¶¶ 10-14.

**B.      Conditions of Detention at Dilley Continue to Violate the FSA.**

Plaintiffs' counsel have now met with approximately 150 families at Dilley since it re-opened in April. Welch Decl. ¶ 10. While there were some improvements in March 2026, children detained at Dilley continue to suffer. *Id.* ¶¶ 5, 10, 13, 21. Class members and their families consistently report serious concerns regarding Dilley's secure, prison-like environment, inadequate medical care, lack of information about *Flores* rights and access to counsel, lack of access to healthy and safe child-friendly foods and snacks, the inability of class members to sleep due to lights on in their living areas all night, lack of free calls to family members, and lack of adequate education and developmentally appropriate activities. *Id.* ¶¶ 5, 12, 17, 20, 23, 28-31.

**1.   Children are kept for prolonged periods in an unlicensed, secure, prison-like environment.**

Dilley remains an unlicensed, secure ICE facility operating under a contract with CoreCivic. Welch Decl. ¶ 6-9. In January and February 2026, children and families at Dilley reported feeling even more like prisoners as the facility instituted even more severe operational restrictions, practices, and lockdowns after the high-profile detention of five-year-old Liam Conejo Ramos resulted in increased media attention and public outcry about the incarceration of children. Welch Decl. ¶ 7; M.M.S. Jan. Decl. ¶ 24 ("After three months, this place feels like a prison more than ever. Every day they have new rules that are more restrictive and make you feel even worse."); C.R.B. Jan. Decl. ¶ 12 ("A lot of things are even worse and more strict than when I arrived in October."); N.P.V. Decl. ¶ 20 ("I never got to see the little boy, Liam, when he was here, but I saw him on the news. I was happy when he was released, but I couldn't help but think 'what about the rest of us?'").

Families consistently reported a marked increase in the harshness of their treatment by guards at Dilley. S*ee, e.g.,* E.C.M. Decl. ¶¶ 15, 27 (guard yelled at family for being animals and provoked child with autism); M.T.H. Decl. ¶ 13 (staff are rude to children);

J.A. Decl. ¶ 15 (same); M.M.S. Jan. Decl. ¶ 13 ("Some of the guards are awful to the children."); T.M. Decl. ¶ 19 (staff mock family who was in medical isolation); C.H.H. Decl. ¶ 46 ("[The staff] treat us like animals . . ."); D.P.C.S. Decl. ¶ 23 ("[Workers] laugh at the kids' pain."); C.C.A. Decl. ¶ 20 (staff laughed in child's face as he ripped up her drawing); S.K. Decl. ¶ 30 (staff threatened to separate family when toddler wouldn't stop crying from untreated toothache). Families also reported frequent hours-long lockdowns following an escape attempt, a peaceful internal protest, multiple external protests, reported cases of measles, and congressional visits. Welch Decl. ¶ 7; Hidalgo Decl. ¶ 13; M.S.P. Decl. ¶ 36 (lockdown because "[c]ongresspeople had come here to investigate the detained mariachi brothers."); E.C.M. Decl. ¶ 24 (class member locked in room due to congressional visit); N.C.C. Decl. ¶ 16 (since the protest, sometimes families are forced to stay in their rooms); L.R.C. Decl. ¶ 19; M.B.O.D. Decl. ¶ 26 (officers yelled and locked families in their rooms with no explanation); J.V.G. Decl. ¶ 30 ("There have been four separate days when they locked us down in our rooms."); Z.V. Decl. ¶ 21("On those [lockdown] days, they have prevented us from leaving [our rooms] even to take our pills.").

Families also reported limitations on mealtimes, library time, computer time, and access to the Internet,[7] in addition to restrictions on their movement throughout the facility. Welch Decl. ¶ 7; Hidalgo Decl. ¶ 13; C.R.B. Jan. Decl. ¶ 12 ("[M]ealtimes are limited to one hour now when they used to be two hours. . . . Also, they changed the rules so that now all kids have to be with their parents most of the time . . ."); A.K. Jan. Decl. ¶¶ 17-18 (receive only one hour for meals now); C.H.H. Decl. ¶ 40 (now there is no Gmail, ChatGPT, or Google); A.P. Decl. ¶ 32 ("[W]e can't use anything at all on the computers. Nothing works. Everything is blocked."); A.K. Jan. Decl. ¶ 18 (staff now

---

[7] Class members routinely report that they are impeded from contacting their lawyer without access to Gmail. *See* Section II.B.3. Class members routinely report that they cannot contact their lawyer without access to Gmail. *See*, A.P. Decl. ¶¶ 34-36; M.M.S. Jan. Decl. ¶ 12; Y.H.H. Decl. ¶ 11; C.H.H. Decl. ¶¶ 40-42; S.S. Decl. ¶¶ 57-58; M.S.P. Decl. ¶ 35.

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

require young children to be held in parents' arms while waiting in line for food, which can take 30 minutes); A.P. Decl. ¶ 60 ("When [the single women] move around the facility, the children and I are locked in."); S.S. Decl. ¶ 56 (same).

Families also reported increasingly aggressive room searches and sweeps resulting in the confiscation and destruction of children's drawings. Welch Decl. ¶ 7; Hidalgo Decl. ¶ 14; Z.V. Decl. ¶ 20 ("The officers have used false fire alarms to make us leave our rooms so they can search them."); A.M.P. Decl. ¶ 18 (After protest, staff "said they were throwing away the crayons for our security and so the children would not write more letters about the conditions at Dilley."); C.C.A. Decl. ¶ 8 ("[S]taff came into our room and took drawings from my daughters where they wrote down that they are in prison."); N.C.C. Decl. ¶ 17 (during searches, staff confiscate things like toothbrushes, letters, hair products, and drawings of Bratz dolls). In the wake of these increasingly aggressive practices, families also consistently report fear of meeting with politicians, talking to media, and utilizing the internal grievance system[8] due to concerns of retaliation by staff. Hidalgo Decl. ¶ 13; A.K. Jan. Decl. ¶¶ 23-29 (family was threatened with separation due to complaints about lack of baby food); M.M.S. Jan. Decl. ¶ 19 (staff discourage people from making grievances and say it will impact their immigration case); N.M. Decl. ¶ 24 (same); C.V.H. Decl. ¶ 38 ("Every time we write grievances, we are afraid they are going to retaliate against us."); A.M.P. Decl. ¶ 17 (Staff threw away flyers that said make grievances to inform *Flores* Counsel); E.C.M. Decl. ¶ 24 (staff don't want families to speak with media); C.C.A. Decl. ¶¶ 5-6, 13-14 (people who filed lots of grievances were not allowed to speak with congresspeople and staff retaliated against

_____

[8] There is a notable disparity between the number of reported grievances each month and the number of grievances that ICE deems "founded." Report at 36. In November 2025, 78 grievances were filed and none were apparently founded; in December 2025, 76 were filed and only 14 were founded; in January of 2026, 89 were filed and only four were founded; and, in February 2026, 26 were filed and only one was founded. *Id.* Class members also report that Dilley staff do not read the grievances, rarely respond, and rip them up. *See* C.H.H. Decl. ¶ 83; S.S. Decl. ¶ 59; A.K. Jan. Decl. ¶ 51; A.P. Decl. ¶ 37; D.P.C.S. Decl. ¶ 22, M.B.O.D. Decl. ¶ 21; M.M.S. Jan. Decl. ¶ 5.

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

family after they spoke to media/Flores ); S.K. Decl. ¶ 50 ("[T]hey said they would write a report against me once they realized I was going to talk to Flores counsel.").

These harsh tactics and restrictions make the children at Dilley feel even more like prisoners and create additional stress. S.S. Decl. ¶ 52 ("[I]t's like being in a prison here or a concentration camp."); J.A. Decl. ¶ 23 (family feels like they are in jail); J.B.A. Decl. ¶ 18 ("[O]ur son . . . feels like a prisoner here."); A.K. Jan. Decl. ¶ 20 (two-year-old and parents are crying everyday); A.P. Decl. ¶ 19 (mom hears child crying from the showers, constantly sobbing); C.H.H. ¶ 51 (child cries while praying for release).

In stark contrast to these first-hand accounts, the ICE JC Status Report asserts that Dilley maintains a "stable operational environment with no reportable critical incidents," "no administrative or disciplinary segregation," no destruction of personal property "unrelated to protest activity," and "no facility-wide lockdown." JC Report at 7, 31, 32. Plaintiffs do not know how these terms are defined by CoreCivic, but it simply does not seem possible for both families' and the ICE Juvenile Coordinator's assertions to be true.

### 2.  Dilley still provides inadequate medical care to children.

Dilley continues to provide dangerously inadequate medical care to children. In December 2025, Plaintiffs informed the Court that Dilley families had raised concerns over inadequate medical care to RAICES attorneys *on at least 360 occasions*. Pls.' Resp. to Supp. Juvenile Coordinator ICE Report, Dec. 8, 2025, Dkt. No 1706 at 15; Hidalgo Decl. ¶¶ 17-20. Since that time, RAICES attorneys have received at least 375 additional concerns over medical care. Hidalgo Decl. ¶¶ 17-20.

Following Plaintiffs' January, February, and March 2026 site visits to Dilley, class counsel alerted Defendants to multiple examples of children's medical needs not being met, resulting in escalating and sometimes life-threatening health problems, including: a 10-year-old child with Hirschsprung's disease who lacked proper medical care and diet resulting in no bowel movements for over a month (D.R.R. Decl. ¶¶ 4-7); an 18-month-old baby who went to the hospital for 10 days when her oxygen levels plunged to a life-threatening level (Welch Decl. ¶¶ 11-12, Attachment B); a nine-year-old girl who left scratch marks across her entire body due to allergies and no special diet provided (A.P.

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

Decl. ¶¶ 4, 38-40 ); a two-year-old with an infected gum that Dilley staff did not treat for over 23 days, leading her to have a fever, infection, cry relentlessly, and be on a liquid diet the whole time (S.K. Decl. ¶¶ 4, 21, 24, 26, 30); a teenager with appendicitis who needed emergency surgery in part because he hesitated going to medical, knowing the nurses would turn him away, which the first nurse did (O.S. Decl. ¶¶ 11-38); a mother who had to be hospitalized for three days without her child due to Dilley's inability to treat a UTI (MMS. Jan. Decl. ¶¶ 14-15); and a pregnant mother with Hepatitis B who was in extreme physical distress due to inadequate treatment options at Dilley (N.M. Decl. ¶¶ 14-17).

Families continue to report that Dilley staff not only belittle their illnesses but actually mock them. A.P. Decl. ¶ 50 ("For any illness, the only advice is to drink more water, which is undrinkable."); D.P.C.S. Decl. ¶ 29 ("I started throwing up. I asked to go to the doctor, but because I only speak Spanish the guards I asked just watched and laughed at me."); L.R.C. Decl. ¶ 7 ("[The n]urse was just laughing and not putting our information in. I got so angry because it was an urgent medical problem . . ."); T.M. Decl. ¶ 19 ("[The g]uards who knew I was in isolation because of tuberculosis now mock me and say, 'TB, no TB, TB, no TB' when they see me. This is embarrassing for me."); S.K. Decl. ¶ 30 (staff accuse mother of beating her child instead of providing necessary medical care to crying two-year-old with an infected tooth).

Dilley staff also frequently ignore medical issues or actively make things worse. L.P.T. Decl. ¶¶ 11-12 (medical staff would not give mother and child with autism prescribed medications and said nothing could be done about child's hives outbreak); M.B.O.D. Decl. ¶¶ 9, 11 (inadequate tooth removal led to another removal days later and child not allowed to see doctor despite persistent stomach pain on his right side); C.H.H. Decl. ¶ 23 ("The first time I went to medical because [my son] had [a] fever, they told me he was big enough to tolerate the fever, so they would not give him any medication."); M.S.M. Decl. ¶ 14 (sickness broke out in entire facility and children could not get examined or receive medicine in timely manner); M.M.S. Jan. Decl. ¶¶ 14-17 (after discharge from hospital, staff took one week to dispense prescribed medication); A.P. Decl. ¶¶ 15-16

10

(family told by medical to eat bananas after severe stomach issues, but facility has never offered bananas).

Children with disabilities and chronic medical conditions continue to deteriorate from Dilley's harsh, restrictive environment, separation from their medical providers, and interruption of their medical and mental health care plans. Welch Decl. ¶ 13. For example, an 11-year-old child on the autism spectrum regressed developmentally from his prolonged detention in Dilley. S.S. Decl. ¶¶ 16-28 (more stimming, more aggression, increased repetitive behaviors, continuous crying, and less talking). This same child was also denied a special diet despite medical documentation that he could not eat gluten, sugar, or lactose. *Id.* at ¶¶ 31-32. Another little boy with ADHD is no longer receiving proper treatment, causing severe aggression and deterioration. J.B.A. Decl. ¶¶ 10-11 (Dilley staff confined the boy to his room and took away his toys, despite the psychologist's orders). Another young girl with autism and an intellectual disability was denied necessary medication and therapy that she was receiving before Dilley. C.C.A. Decl. ¶ 4 ("She also used to receive psychological and speech therapy, but she hasn't received any of that here. Her condition has gotten worse now that she's detained."); *see also* L.T.P. Decl. ¶¶ 11-12 ("I am autistic and so is my youngest child, and they are not giving us our prescribed medications, even though we have to take them every morning and evening."). A five-year-old nonverbal child who was being tested for autism and other developmental delays pre-apprehension has been unable to get test results or services at Dilley and has become increasingly aggressive and anxious. N.S.R. Decl. ¶¶ 8, 11-13.

Parents are often particularly alarmed about their children's worsening mental health. Welch Decl. ¶ 14; Hidalgo Decl. ¶ 21; A.P. Decl. ¶¶ 18-20 (child who stopped wearing diapers years ago has begun wetting herself); C.H.H. Decl. ¶ 35 ("He is a big kid who has slept alone for years, but here, he always asks if he can sleep with me."); A.K. Jan. Decl. ¶ 44 (two-year-old started hitting himself at Dilley); N.M. Decl. ¶ 25 ([The children] chew their nails, many have regressed to wetting the bed again, they are all deteriorating psychologically); Y.H.H. Decl. ¶¶ 12 (child is deteriorating). Families

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

report children being anxious, stressed, and depressed. E.C.M. Decl. ¶ 12 ("I feel so much anxiety and nerves that I have to use the bathroom every 5 minutes here. I keep wondering what is wrong with me."); N.C.C. Decl. ¶ 14 (child cannot eat from depression); N.S.R. Decl. ¶ 4 (severe stress has caused child's constipation for nine days). For some teenagers at Dilley, mental health deterioration has been particularly dire, resulting in panic attacks, suicidal ideation and, in at least one known case, a suicide attempt. Welch Decl. ¶ 15, Attachment B; C.R.B. Jan. Decl. ¶ 5 ("Being at Dilley this long has been extremely hard on my mental health. It is really getting to me. I am having panic attacks. I have had a couple of medical emergencies in the past couple of months.").[9] For class members with pre-existing mental health issues, any treatment provided by the staff psychologist is painfully inadequate. C.R.B. Oct. Decl. ¶ 16 (psychologist appointments last 10 minutes, aren't helpful to youth, and state that they should just not worry); A.K. Jan. Decl. ¶ 44 (psychologist implied that toddler hitting himself is normal by saying her child does that too); A.P. Decl. ¶ 22; C.C.A. Decl. ¶ 4 (therapies for autism not provided); S.S. Decl. ¶¶ 16-28 (same).

Again, the ICE JC Status Report presents a vastly different picture of children's medical care at Dilley than the one experienced by families. Welch Decl. ¶¶ 11-15. The report states that "no residents require[ed] hospitalization or emergency-room referral" (JC Report at 7); there were "no reportable critical incidents." (*Id.* at 7); "[n]o systemic medical or behavioral health deficiencies were identified" (*Id.* at 12) and that "available documentation does not substantiate" any of the medical concerns raised by Plaintiffs' counsel (*Id.* at 19). Moreover, while it may be true that there were "no placements [of residents] on suicide watch" (*Id.* at 7), the ICE JC Status Report fails to acknowledge that a thirteen-year-old girl tried to slit her wrist with a plastic knife from the cafeteria "after guards took away drawing materials," and she was "put into isolation without seeing a doctor." Welch Decl. ¶ 13, Attachment B.

---

[9] The ICE JC Status Report acknowledges that mental health services at Dilley are generally limited to "orientation" and "psychoeducation" rather than "structured treatment plans" due to the "short lengths of stay" (JC Report at 22) but fails to account for the fact that some children have remained at Dilley for four to six months or longer.

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

### 3. Children are still not being provided notice of their *Flores* rights.

Since May 2025, Plaintiffs' counsel have repeatedly voiced concerns that children at Dilley are not being apprised of their *Flores* rights. Welch Decl. ¶ 16. Moreover, despite the availability of willing legal services providers to conduct Know Your Rights trainings, there is still no legal orientation program for children and families at Dilley beyond a thirteen-minute animated immigration law video that never once mentions *Flores*. *Id.*; Hidalgo Decl. ¶ 23.[10]

Although the ICE JC Status Report states that families "receive I-770 forms, Notice of Rights (Exhibit 6) forms, a list of free legal services, a Sponsor Information Form, and a legal orientation" at intake (JC Report at 3), class members consistently report they have not received any handouts or other written materials[11] addressing their *Flores* rights. Order Approving Final Notice of Rights, Jan. 5, 2021, Dkt. No. 1056; M.L.S. Decl. ¶¶ 21-22 ("I have never seen something that looks like the I-770 form that you are showing me before.") Z.V. Decl. ¶ 16 ("I have not received any training about my rights either. I have never seen the I-770 form that you are showing me."); J.V.G. Decl. ¶¶ 18-19 ("No one has ever given us a know your rights paper either. I do not recognize the I-770 paper that you are showing me or the Flores Settlement Agreement Notice of Rights paper that you are showing me either. I have never seen one of those papers here."); J.A. Decl. ¶ 8 ("I don't remember receiving any paper with a notice of my

---

[10] Notably, the CoreCivic Resident Handbook explicitly authorizes "open access" to "group presentations on U.S. immigration law and procedures and all other relevant issues related to the immigration court, appeals, and discharge processes, including a resident's legal rights." CoreCivic Resident Handbook at 31 (July 25). Moreover, ICE's own Family Residential Standards ("FRS") expressly provide that "An electronic presentation will not be considered a replacement or substitute for an in-person or live [legal rights] presentation, when available." 2020 Family Residential Standards, FRS Section 6.4 (M), at page 8; https://www.ice.gov/doclib/frs/2020/6.4_LegalRightsGroupPresentations.pdf; https://www.ice.gov/detain/detention-management/family-residential.

[11] Even when written materials are provided, they are often inaccessible to non-English speakers. *See* K.P.L.R. Decl. ¶ 9; N.S.R. Decl. ¶ 7; S.K. Decl. ¶ 45; D.P.C.S. Decl. ¶ 43 ("I keep getting paperwork that I do not understand because it is always in English, and the staff here will not let us know what exactly it says.").

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

rights."); M.S.P. Decl. ¶ 25 ("No one has ever told us about our rights, given us a 'know your rights' training, or given us a paper with information about my children's rights here. I have never seen an I770 form either. . . . [O]fficial told me that when we got here, we should have gotten a packet with information about free lawyers. I tried to tell him that I never got those papers . . ., [but] [h]e told me I was lying and that I must have received it."); L.R.C. Decl. ¶ 25 ("The only thing they told us about [the rights of] kids in particular is that they should not experience sexual abuse.").

Class counsel have never spoken with a single family who recalls learning about their child's *Flores* rights in a video or training provided by ICE or CoreCivic at Dilley. *See, e.g.,* N.C.C. Decl. ¶ 15 ("We have never gotten an orientation here about our legal rights. They haven't told us about our children's rights under Flores or their right to a bond hearing."). A.M.P. Decl. ¶ 16 ("We have never been given a know your rights orientation or told about our rights here. They never told us anything about Flores. They have only told us what we cannot do – for example, they told my husband and I that we cannot hold hands or kiss or go to one another's rooms."); M.P.P Decl. ¶ 15 ("When we first got here, they told us at intake that we would come back the next day to watch a video about our rights. We came back the next day, but they said it would need to be another day. They haven't called us back about it. They haven't told me anything about Flores or my son's rights or anything about a right to a bond hearing."); S.S. Decl. ¶¶ 69, 74 ("We received no Know-Your-Rights training. I also remember very clearly the day we entered Dilley and no video at all was playing. . . . No one has explained that our children have the right to be released without us."); M.S.M. Decl. ¶ 32 ("No one has ever mentioned *Flores* or talked to me about my children's right to be released."); C.R.B. Jan. Decl. ¶ 15 ("Since we have been here, no one has told us about our rights. In three months, there hasn't been a know your rights presentation."); D.P.C.S. Decl. ¶ 18 ("I have not seen any sort of videos since I got here that say anything about rights."); L.T.P. Decl. ¶ 5 ("I have been detained at Dilley for 90 days. . . . We do not know whether we have any rights and we have been terrified the entire time we have been here."); J.A. Decl. ¶ 8 ("I don't remember watching a video or learning about my rights. When we first

14

arrived there were videos on in the room we were sent to, but I didn't understand what it was talking about."); M.T.H. Decl. ¶ 14 ("I was not shown a video about our legal rights. I was not told about Flores by the staff here . . ."); N.P.V. Decl. ¶ 12 (no video or orientation about rights); T.M. Decl. ¶ 13 ("I don't remember them showing any videos about our rights. No one has ever talked to me about my son's rights as a child here."); E.C.M. Decl. ¶ 16 (no training or video about rights); J.B.A. Decl. ¶ 9 ("[W]e have never received a training about our child's rights or learned about Flores. I have only gotten an orientation about what we are supposed to do and not do at this facility."); L.R.C. Decl. ¶¶ 25, 30, 32. ("No one has ever given us any information about our daughter's rights in detention. They showed us an animated video about the norms that we have to follow here, but the video never said that kids under 18 years get certain kinds of treatment or talked about rights at all."); M.M.S. Jan. Decl. ¶ 22 (ICE never informed mother of daughter's *Flores* rights, and when she learned about her rights through attorneys, ICE denied the mother's Flores request citing family unity policy).

Compounding this utter lack of information about *Flores* rights, class members also continue to face barriers to making free legal phone calls to counsel, including *Flores* attorneys or other private lawyers. Welch Decl. ¶ 18; M.B.O.D. Decl. ¶ 29 ("If we want to call Flores lawyers . . . we have to pay. I have asked and the staff have said that there's no other way to make calls."); M.L.S. Decl. ¶ 28 (used money to call *Flores* attorneys). While there is an ICE-provided list of pro bono attorneys, there are only four firms on the list to whom families can make a free legal call using the telephone system at Dilley, one of which is the ABA. Welch Decl. ¶ 18; C.H.H. Decl. ¶ 53 ("The only numbers we can call for free are the pre-programmed pro bono contacts on a specific list, but any other pro bono contacts not on that list cannot be called for free."). Otherwise, families struggle to make initial contact with outside lawyers and have no way to reach them without paying for it. Welch Decl. ¶ 18; M.B.O.D. Decl. ¶ 29 (have to pay for any lawyers not on the list); J.V.G. Decl. ¶ 13 ("We have never been allowed to call our lawyer for free.") (had to wait for family to add money to account to contact lawyer); M.S.M. Decl. ¶ 31 ("I have a lawyer but I do not get to make free calls to him. I have to

use my money if I want to call him."); T.M. Decl. ¶ 17 ("It costs us money to use the phones, even to call our attorney . . ."). Lastly, many class members report not ever being told they could access pro bono lawyers or receiving the pro bono attorney list at all. M.S.P. Decl. ¶ 25 (never received list of pro bono attorneys, no staff explained to us that list existed, staff accused family of lying when they said they didn't receive it, and family still hasn't been able to use it); N.P.V. Decl. ¶ 12 (was told there was a list of free attorneys but was never able to get ahold of them); M.L.S. Decl. ¶ 28 ("We never received information about how to call lawyers or how to call people for free.").[12]

### 4. Children still lack access to child-friendly foods and healthy snacks.

The vast majority of families Plaintiffs have spoken to over the past 10 months raise concerns about their children's poor nutrition at Dilley. Welch Decl. ¶¶ 19-20. Families report that the food makes children sick; express concern that the only fresh fruit provided to their children for months on end has been red apples; complain about the food taste, variety, and quality; and describe snacks as limited to cookies and sometimes granola bars. *Id.*; L.R.C. Decl. ¶ 21 ("Recently, they served fried shrimp, and all the kids started throwing up after eating them. Kids were vomiting on to the tables. So much of the food is dirty, left out too long, or undercooked that it is no wonder it makes kids sick.); A.P. Decl. ¶ 45 ("There's no proper nutrition here. Almost all the food is spicy or fried in oil, like burgers and hot dogs."); D.P.C.S. Decl. ¶ 27 ("Some of the sauces truly look like vomit, and their smell makes the kids gag."); M.B.O.D. Decl. ¶ 13 ("The food here is terrible"); M.M.S. Jan. Decl. ¶ 6 ("My grievances about the food have to do with the fact that my daughter has been given the same food every day for months. There are few options, especially for a vegetarian[s]."); J.V.G. Decl. ¶ 43 (four-year-old girl stopped eating because she doesn't like the food); N.C.C. Decl. ¶ 10 (food at Dilley is very bad); S.K. Decl. ¶ 35 ("All my kids here hate the food. It's too salty. It's inedible. The last three or four days they've improved the food. It's because there have been

---

[12] Lawyers can make appointments through CoreCivic to speak to their clients and those calls are free to families, but families cannot initiate calls to their lawyers for free. Welch Decl. ¶ 18. Thus, if a detained person wants to speak with their lawyer for free, they must wait and hope their lawyer schedules a call with them.

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

people from Congress here and now Flores counsel is here."); J.B.A. Decl. ¶ 13 (food is too spicy for eight-year-old boy); N.S.R. Decl. ¶ 9 ("Most kids here do not get fresh fruit other than red apples.").

Class members report that food served to them has been contaminated with worms[13] and mold, causing many children to become ill and vomit repeatedly. During our January 2026 site visit, one mother reported:

> The only fresh vegetables are a mix of cabbage and lettuce, which aren't always fresh. Sometimes they're served moldy. If we show the staff the visible mold, they just take it out. Sometimes, people would bring the moldy cabbage to the staff, and they'd take it and eat it and say this is normal food. They'd just destroy the evidence so it wasn't brought anywhere else. In November, there was an incident where boiled vegetables were served with live worms. We received no specific explanations regarding the worms. Some families got sick from it though. One family was vomiting, and they were told if their daughter vomits more than 8 times, then they can go to medical. If she vomits less than that, then don't.

A.P. Decl. ¶¶ 46-47; *see also* M.B.O.D. Decl. ¶ 14 ("In December, there were worms in the broccoli and chicken. A woman showed worms in the chicken to an official and made a grievance."); C.H.H. Decl. ¶ 30 ("There was one day that there were worms and mold in the broccoli. Sometimes there is also hair in the food."); N.C.C. Decl. ¶ 10 ("Back in December, the salad had worms and we were told that it's just normal. We know that some kids here have been vomiting up black from the food."); Ex. 8 to Pls.' Resp. to Dec. 2025 Suppl. JC Reports and Data, [Dkt. No. 1706-09] A.K. Nov. Decl. ¶¶ 11 ("A.K. Nov. Decl.") ("[L]ast week, I was given broccoli and cauliflower that were moldy and had worms."); L.R.C. Decl. ¶ 21 (lettuce had worms).

Families continue to report that due to the lack of child-friendly, varied food, their children are constantly hungry, especially babies and toddlers. *See* A.K. Nov Decl. ¶ 11

---

[13] In response to multiple reports that food served to children was infested with worms, the ICE JC Status Report responds that: "A review of facility records did not identify any grievance, report, or documentation supporting the allegation that wormy food was served to residents. However, there was an isolated event in which residents reported a batch of broccoli and cauliflower was discolored, and some residents stated there were bugs in the food." JC Report at 15. It is unclear whether these are two separate incidents or whether the identified bugs were, in fact, worms.

("Every day I am crying because there is not food for our son to eat. . . . I am so sad all the time that there is not baby food here."); A.K. Jan. Decl. ¶ 41 ("No one ever told me there was Gerber baby food that was available here. One time, I noticed in the playroom that there was a box of that food. I asked the staff if they have this. They said yes, and that was after we had already been detained for 2 to 2.5 months. I was so infuriated."); S.K. Decl. ¶ 36 ("It would be great to have French fries, soup, puree, and pasta for the kids. We would also love to have bananas for the kids. They like bananas, and they're soft. I have never seen Gerber baby food or pouches for the kids here."); M.L.S. Decl. ¶ 13 ("The staff have not given us any baby food for our 15-month-old. She just has to eat the regular food in the cafeteria, so she barely eats anything."); M.B.O.D. Decl. ¶ 15 ("The only items we can have for snacks are apple juice, apples, cookies, and milk. If the dorm runs out of snacks in the morning, which often happens, we have to wait until the night to get more snacks."); L.R.C. Decl. ¶ 22 ("We keep asking the staff why babies have no option for soft food here."); Welch Decl. ¶¶ 19-21; Hidalgo Decl. ¶ 25.

Some children are constantly hungry, in part, because Dilley staff refuse to accommodate documented medical allergies and food sensitivities. *See, e.g.,* A.K. Jan. Decl. ¶¶ 22-26 (special diet requested for toddler-friendly food was denied and parents were threatened with separation); A.P. Decl. ¶¶ 38-41 (certain foods cause little girl to feel itchy and scratch her whole body until it bleeds; mom's request for special diet was denied and doctor refused to write it in medical records); D.P.C.S. Decl. ¶ 27 ("[They] do not make [food] accommodations for medical issues."); M.B.O.D. Decl. ¶ 13 (staff said child could not receive a special diet because there was no religious reason); M.M.S. Jan. Decl. ¶ 7 (vegetarian diet originally not respected until mom got doctor's note from home country); O.S. Decl. ¶¶ 5-9 (for at least 56 days, Halal diet not provided or respected); D.R.R. Decl. ¶¶ 4-6 (child with Hirschsprung's was refused special diet); S.S. Decl. ¶¶ 31-35 (child with medically documented intolerances to gluten, lactose, and sugar was refused special diet).Many children and teens have told us they are eating nothing more than bread with jam, and rice. *See, e.g.,* A.P. Decl. ¶ 48 ("My children aren't getting proper nutrition, and because of this, they're gaining weight, as they mostly eat bread and

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

jam or cookies and milk."); J.V.G. Decl. ¶ 43 ("Now [my child] is eating just rice, because everything else looks so bad."); M.B.O.D. Decl. ¶ 13 ("Because they will not provide plain food, my youngest daughter only eats bread and coffee with milk."); L.R.C. Decl. ¶ 22 ("[A]ll the babies are getting thin because they can only really eat pieces of bread.").

The ICE JC Status Report again ignores the concerns repeatedly raised by families regarding the lack of varied, child-friendly foods and simply repeats previous assertions that Dilley provides "balanced, age-appropriate meals" (JC Report at 46); that "no food-related deficiencies were identified" in resident interviews (JC Report at 30); and that "infants and toddlers are provided with age-appropriate nutrition consistent with pediatric standards" (JC Report at 49). There is a vast discrepancy between the ICE JC Status Report's assertions and the mountain of evidence we have gathered that children's health is suffering due to the nutritional deficiencies in the food served to children at Dilley. Welch Decl. ¶ 29.

Despite installation of water filters in the living quarter following months of complaints from class members, families report continued concerns about the taste of the water and specifically the ongoing lack of access to bottled water for baby formula. S.K. Decl. ¶¶ 31-33 (Lots of bottled water provided to baby when Congresspeople/*Flores* visit; family used to receive three bottles of water per day and now only get two); M.L.S. Decl. ¶ 14 ("Our 2-month-old is taking formula here with the water from the sink, and it is giving him diarrhea all the time. . . . The guards said we would have to buy water bottles from the commissary if we need it. When I went to the medical area to explain that my son had nonstop diarrhea from the water, the doctor put an order that the guards should give me four bottles of water a day for him. But many guards will not give me the water bottles when I ask."). Families also worry that they do not want to cause their children to have digestion issues from the tap water but cannot afford to purchase bottled water for $1.21 per bottle at the commissary. *See* E.C.M. Decl. ¶ 21 ("They do not even give us clean water here. The only way to get clean water is to buy water bottles, and it costs $30 to buy 24 bottles."); J.B.A. Decl. ¶ 14 ("We drink the water from the faucet, but

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

we think the water has given our son diarrhea. The bottled water is $30 for 24 bottles and we cannot afford that."); N.S.R. Decl. ¶ 10 ("I am drinking the water here because bottled water is so expensive at the commissary and we want to save all of our money to buy bottled water for our son."); A.P. Decl. ¶ 49 ("The water smells foul, and there's a white residue on the sink. All Dilley employees drink the bottled water they're given, but we have to buy it from the store; a half-liter bottle costs $1.20."); A.M.P. Decl. ¶ 10 ("We are having to drink the water from the faucet because we can't afford to buy the bottled water from the commissary. Both of my daughters have gotten diarrhea from it."); J.V.G. Decl. ¶ 47 ("I had tap water, I got diarrhea and started vomiting and went to the medical area and they did not give me anything all night. After hours gave me acetaminophen. I could not eat anything, and then I went back to my room and kept vomiting and having diarrhea. We bought medicine at the commissary and I just kept taking it all week. I was sick for a whole week. Since then, we have had to buy water here to stay safe. You can buy 24 bottles for $30.").

### 5. ICE Fails to Provide Adequate Sleeping Conditions for Children.

Families also repeatedly raise concerns that their children cannot sleep because lights are kept on in living areas all night. Welch Decl. ¶ 22; A.P. Decl. ¶ 24 ("The lights are constantly on in the rooms, causing disorientation and preventing proper sleep. The children have difficulty falling asleep and wake up several times during the night."); M.B.O.D. Decl. ¶ 18 ("The rooms where we live smell terrible because kids sometimes wet themselves on the carpet. The lights are always on and cannot be turned off. This is really hard because it means my daughter cannot get relief even when she has a headache."); S.S. Decl. ¶ 46 ("[T]he overheads lights are on 24/7 in this facility and the indoor temperature is always freezing. This is really intolerable for [my autistic son's] sensory needs. His sleep patterns have been disrupted. He struggles to fall asleep and frequently wakes up throughout the night."); J.V.G. Decl. ¶ 41 ("My daughter cannot sleep well here. The lights are on all night, and even though they turn off a couple of lights on the beds, they leave the rest of the lights on. Then the officers do a count with radios on at midnight and dawn, and the children always wake up and feel scared."); Z.V.

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

Decl. ¶ 33 ("It is hard to sleep here because the lights are on 24/7. Even if you want to try to cover your eyes with a towel, they come and take it off. They say that it's because they need to see you. But I don't think a towel over my eyes stops them from seeing me. We have forgotten how to sleep through the night, without waking up every 2-3 hours. This is bad for our brains, because we cannot produce melatonin we need from uninterrupted sleep."); N.C.C. Decl. ¶ 13 ("One of the things that is most difficult is that the light in the room is on all night. . . . There are eye masks, but they hurt our heads because they are so tight. When we tried using them, we would wake up with headaches from how tight they felt."); S.K. Decl. ¶ 43 (mom tried to hang blanket in front of the lights for kids to sleep and was told not allowed); J.A. Decl. ¶ 12 ("It's hard to sleep here because of the loud air conditioning unit and because lights are on and people are always opening the door while we are trying to sleep."); N.P.V. Decl. ¶ 16 ("We have never been given eye masks for sleeping, and I am seeing one for the first time during this interview."); T.M. Decl. ¶ 15 (all are struggling to sleep); E.C.M. Decl. ¶ 23 ("I close my eyes and feel like I can still see as much light as when they are open."); M.S.P. Decl. ¶ 24 (impossible to sleep with lights on, towels not allowed, and guards make lots of noise).

Countless families report their children are exhausted from lack of sleep, which also exacerbates their illnesses and makes it difficult to recover. Welch Decl. ¶ 22; D.P.C.S. Decl. ¶ 38 (lack of sleep is causing everyone headaches); M.B.O.D Decl. ¶ 18 (child who suffers from headache can't get relief when lights are always on); S.S. Decl. ¶ 47 ("Our daughter [] struggles from the lights being on all the time and the air conditioner. These conditions have led to persistent colds, requiring frequent medical attention.").

Sleep is a basic human need that is especially vital for children's healthy development. Welch Decl. ¶ 22, Attachments C and D. Medical professionals and human rights organizations have long recognized the devastating psychological and physiological effects of disrupted sleep. *Id.* This is true even over periods as short as two weeks. *Id.*

The ICE JC Status Report acknowledges that "two of four overhead light banks remain illuminated overnight" and asserts that "nightlights were previously evaluated but determined insufficient for staff to conduct required safety and welfare checks . . .". JC Report at 31. While Plaintiffs' counsel appreciate that lower intensity light bulbs have been installed and nightlights have been considered, the status quo continues to harm children on a daily basis. Welch Decl. ¶ 23, Attachment E (Even CoreCivic's own employee stated: "A lot of these kids have bags under their eyes, which is something you don't see with kids. . . . They have worse bags than their parents."). Nightlights are a commonsense solution used by parents, as well as congregate facilities across the country. Welch Decl. ¶ 24. They should give staff adequate visibility into living areas without disrupting children's sleep. *Id.*

### 6.  Children still lack access to adequate hygiene products.

Although the ICE JC's Status Report states that "[r]esidents are provided with basic hygiene items such as soap and shampoo at no cost *upon intake and through routine distribution*" (JC Report at 16) – the list of hygiene products referenced on page 54 does not include soap or shampoo. JC Report at 54. Infants may be eligible to receive baby shampoo,[14] but older children and teens do not receive soap and shampoo in hygiene kits. Welch Decl. ¶ 25. Families' only option is harsh all-purpose hand soap in the showers, which parents frequently complain causes their children's skin to get dry and rashy. M.S.M. Decl. ¶ 16 ("The[re] is only one soap that we have for our hands, hair, and body, but when we complain the staff just say to buy it in the commissary."); A.P. Decl. ¶ 54 ("The poor-quality soap in the showers, combined with the poor-quality water, causes itching and damages hair."); M.B.O.D. Decl. ¶ 17 ("The soap they have here hurts our skin and hair and make us break out in hives. It is making my and my daughter's hair fall out in big clumps."); C.H.H. Decl. ¶ 25 ("[My son] has had a scaly rash all over his body from the water since week one and it never went away. I am not sure if it is the

---

[14] Some families report that baby shampoo is not consistently available. *See* A.K. Jan. Decl. 46 (sometimes received baby shampoo for two-year-old but sometimes only available to buy at commissary); J.V.G. Decl. 44 (same).

laundry soap, the soap in the showers, or the water, but it just will not get better.”); M.S.M. Decl. ¶ 16 (“Our skin has been hurting from the soap in the bathrooms.”); J.A. Decl. ¶ 20 (family buys soap from commissary to avoid skin problems); N.S.R. Decl. ¶ 12 (“[T]he hand soap they have in the shower is too harsh for my son’s skin.”).

### 7. Children still lack access to free phone calls to their family members.

Plaintiffs’ counsel have repeatedly identified that ICE denies children free phone calls to non-detained family members beyond their initial call upon entering the facility. Welch Decl. ¶ 6; C.R.B. Jan. Decl.¶ 13 (“We have to pay for my calls to my sisters.”); D.P.C.S. Decl. ¶ 9 (must ration minutes on phone calls to family so communication can continue); M.M.S. Jan. ¶ Decl. 20 (“My daughter has never been given free calls to our family. We spend about $100 weekly on phone calls.”); C.H.H. Decl. ¶ 52 (“All the calls to family cost money and no one has ever said there is any way to call family for free.”); Z.V. Decl. ¶ 23 (“There is no way to make free phone calls to family members, except for the original 5-minute call when we were first detained.”); L.R.C. Decl. ¶ 38 (people spend all of their money on water and phone minutes); T.M. Decl. ¶ 18 (“It is very frustrating that we are spending so much money to make phone calls . . .”); E.C.M. Decl. ¶ 24 (“I have to pay to call my dad.”); M.S.P. Decl. ¶ 33 (“When we first got here, they gave us a free phone call during intake, but now we have to pay for calls.”). Class members have the right to speak to family members for free under the Order Approving Final Notice of Rights, Attachment 1, Notice of Rights [Dkt. No. 1056-1] at 2 (pursuant to the Court’s September 18, 2020 Order, Dkt. No. 987)[15] and it is unacceptable to deny children communication with family for months at a time. FSA ¶ 11, 12.A, Ex. 1.A ¶ 11.

### 8. Children’s education at Dilley has improved but remains inadequate.

The ICE JC Status Report notes that the education program at Dilley was expanded in March 2026. JC Report at 41. The new program, which is currently run by CoreCivic

---

[15] Order re January 29, 2021 Status Conference, Dkt. No. 1077, at 2 (“[T]he Court approved the final language of the Notice of Rights”).

staff, is a long-awaited change for younger children at Dilley.[16] Welch Decl. ¶ 28. During Plaintiffs' March site visit, we toured the new classrooms and noted significant improvements from previous tours. *Id.* However, the classrooms are currently divided among only three age groups: PreK-2nd grade, 3rd grade-6th grade, and 7th grade -12th grade. *Id.* This renders the current program inadequate for middle and high school youth at Dilley, many of whom were attending school in the U.S. for years before being apprehended. *Id.*; C.R.B. Jan. Decl. ¶ 11; C.H.H. Decl. ¶ 54; M.P.P. Decl. ¶ 12; E.C.M. Decl. ¶ 12; M.S.P. Decl. ¶ 5.[17]

The ICE JC Status Report also notes improvements to the recreation offered at Dilley, including a schedule of activities such "sand activities," "playscapes," karaoke, bingo and exercises. JC Report at 46. During our recent site visit, we did not observe any of these activities occurring, and reports from families over many months of visits stand in stark contrast to the report's purported schedule. Welch Decl. ¶ 29; M.P.P. Decl. ¶ 12 ("We watch TV together and do the word search worksheets. They don't really have any activities for my son. We mainly just stay in the room."); M.M.S. Jan Decl. ¶ 10 ("There is still very little for my daughter to do. There are even fewer activities for her age than when we arrived."); S.K. Decl. ¶ 20 (two-year-old, one-year-old, and 10-month-old daughter are bored here).

Finally, although the ICE JC Status Report notes that "recreational and educational programming is provided consistently with age and developmental needs" (JC Report at 5), parents continue to report that their toddlers and young children have little to do and desperately need more toys. Welch Decl. ¶ 31; A.P. Decl. ¶ 29 ("My youngest daughter really suffers from the lack of personal toys. She makes her own toys out of scraps. She collects pebbles from the street and paints them into the shapes of minions. The other

---

[16] The ICE JC Status Report states: "Formal special education services are not currently warranted onsite." Report at 42. However, families shared on our March site visit that children with disabilities were not being served by the education program due to the lack of needed supports. *See* J.B.A. Decl. ¶ 12.

[17] In addition, Defendants only expanded the educational program in March, and Plaintiffs have yet to determine whether or not it will be adequate.

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

day, she found a medical glove and made Patrick from SpongeBob SquarePants. She also makes dolls and clothes for them out of paper."); S.K. Decl. ¶ 53 ("[My three kids] can't play here and there aren't enough toys."); A.K. Jan. Decl. ¶ 53 ("We just walk around outside and there is nothing for him to do and not enough toys."). In particular, children with special needs have been struggling with this lack of toys. *See,* J.B.A. Decl. ¶ 11 ("Usually, children can only have toys in the common room and are not allowed to bring them to their rooms, but the psychologist made an exception given our son's isolation. But when my son switched rooms, a new officer saw the toys in his room and took them. He said he could not have them in his room. When my wife explained the psychologist gave permission for the toys, the officer said he didn't care what the psychologist said about the toys, he gives the orders. My son became very upset and went into a crisis mode. He started crying really loudly and hitting the walls."); S.S. Decl. ¶ 24 ("Today, we saw [my son with autism] liven up for the first time when he got to play with the fidget spinner that you brought. He became cheerful and smiled. Lately, you cannot expect any smiles on his face.").

### III.   Conclusion

The ICE JC Status Report's depiction of conditions at Dilley stands in stark contrast to the evidence from class members and their families incarcerated there, as well as press coverage and reports from Congressional delegations. It simply cannot be that both versions are true. The parties have been following this Court's order to mediate Plaintiffs' concerns about conditions at Dilley, but the ICE JC Status Report's categorical denial of FSA violations begs the question: is mediation an exercise in futility? In the meantime, children continue to suffer.

Dated: March 20, 2026             CENTER FOR HUMAN RIGHTS AND
                                  CONSTITUTIONAL LAW
                                  Carlos Holguín
                                  Bardis Vakili
                                  Sarah Kahn

                                  NATIONAL CENTER FOR YOUTH LAW

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
                                  CV 85-4544-DMG-AGRX

Mishan Wroe
Diane de Gramont
Rebecca Wolozin

CHILDREN'S RIGHTS
Leecia Welch
Eleanor Roberts


*/s/ Leecia Welch*

Leecia Welch
*Attorney for Plaintiffs*


**CERTIFICATE OF SERVICE**

I hereby certify that on March 20, 2026, I caused a copy of Plaintiffs' Response to the March 13, 2026 ICE Juvenile Coordinator Status Reports and Data to be served to all counsel through the Court's CM/ECF system.


Dated: March 20, 2026              */s/ Leecia Welch*

Leecia Welch
*Attorney for Plaintiffs*

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX