# EXHIBIT 4

**DECLARATION OF S. MICHAEL MUSA-OBREGON, MANAGING ATTORNEY, MUSA-OBREGON LAW PC**

I, S. Michael Musa-Obregon, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct. If called as a witness, I could and would testify as follows.

1. I am an attorney licensed to practice law in 1993 in NY. I am the managing attorney at Musa-Obregon Law PC. I am well-versed in handling immigration law, and as part of my employment, I engage in the direct representation of immigrants. I handle immigration cases involving detention, deportation, asylum, residency, citizenship, and business immigration law. Through habeas petitions, I have been able to achieve direct releases from federal courthouses for over 35 people. I also supervise attorneys who represent immigrants.

2. I graduated from University of Pennsylvania Law School in 1991 and as a student I clerked for the late U.S. District Judge Clifford Scott Greene. I launched my private practice in 1993. I have personally defended hundreds of immigration matters ranging from deportations to political asylum, complex family petitions, appeals and motions to reopen.

**Musa-Obregon Law PC**

3. The legal team at Musa-Obregon Law PC is committed to providing the highest quality legal representation to clients in all matters of immigration law, from visas to deportation defense. With 100 years of combined experience, we are very familiar with all aspects of these laws and work to successfully navigate the complex federal system to help our clients resolve their specific legal challenges. Our team continually updates its knowledge to stay abreast of the latest changes and interpretations in immigration law, ensuring that our representation is as effective and informed as possible.

4. Our multicultural staff provides services in several languages: English, Spanish, Polish, Portuguese, Russian, Ukrainian, German, Arabic, French, Italian, Urdu, Punjabi, and Hindi, and several Nigerian languages. Having a multilingual team helps minimize communication barriers,

enabling us to serve a broader range of clients effectively. Our cultural competency not only facilitates better communication but also enhances our ability to understand the diverse backgrounds and challenges our clients face, enabling us to provide more personalized and empathetic legal services.

**Our Work Defending Children Facing Prolonged Hotel Detention**

5. In one recent case, a mother and two children aged 12 and 14, whom I represent, were detained on February 12, 2026 during an ICE check-in appointment. I immediately filed a habeas petition in federal court in the Southern District of New York while the family was being detained there.

6. Although I represented that family, ICE moved them out of New York and did not make me aware of where ICE took them. ICE did not provide a method for me to find where they were detained because they were not in the ICE locator system for a very long time.

7. I checked the ICE detainee locator at https://locator.ice.gov/odls/ to find them, as ICE generally publishes information about where anyone over 18 is on that website. This is the typical method used to check where someone is detained. However, the mother's location information never appeared in the locator.

8. Several days later, at the second habeas hearing with the government, the US Attorney told the Court that she might be on her way or was already at Dilley ICE detention Center in Texas. Thereafter, however, I could not obtain any independent verification of her whereabouts or how to contact her until almost two weeks later.

9. After 10 days with no information about where this family was being held, the family was able to make a call to one of their contacts – but not my office or my cell phone.

10. I later learned that ICE had detained them for nine days at a hotel without any way to contact me. But as explained below, her incomunicado status with my office did not end there.

11. On February 18, 2026, I learned from the children's grandmother that Ms. S. had told ICE staff and the detention facility staff that I was her immigration lawyer. I also learned that she was not allowed to call me because of an unnecessary, nonsensical bureaucratic requirement. Apparently, she was told that I was required to re-file a new G-28 with ICE in New York even though we had an active G-28 for my law firm for months with ICE in New York until the day of her detention.

12. The children's grandmother informed me, in sum and substance, that Ms. S. had not been allowed to call me, even after she left the hotel, because I was not on some list of people she could call, even though she had specifically informed ICE that I was her lawyer and my direct contact information and my telephone number.

13. This appeared to me to be either nonsensical since she was allowed to speak to her family without any apparent independent vetting or verification by ICE or the facility, but calling a lawyer was off-limits.

14. The lack of a logical justification for this superfluous requirement appeared to be a deliberate obstacle to access to counsel. A detainee in that facility can speak to any family member or friend without any vetting, but cannot speak to legal counsel unless counsel is registered with ICE?

15. What if she so sought a legal consultation with any lawyer? That would be off limits under this policy, apparently.

16. Regardless, ICE was indeed aware that she had a lawyer, since, on February 12, 2026, the very first day she was arrested, the government represented to the federal judge at a habeas hearing that it had been in touch with ICE regarding her filed habeas petition.

17. We had been in constant contact with ICE before the family's detention, via email, for months with DHS officers, about her appearing regularly at ICE check-ins. This new requirement

-which I did not hear about until many days had passed since her initial detention- made no sense to me, since we already had a G-28 on file with ICE NY; otherwise, they never would have engaged our office over the many months we were accompanying her and assisting her in coordinating her ICE check-ins.

18. The ICE officers absolutely knew we were her authorized representatives registered with ICE; this information is in their files.

19. This new requirement also made no sense for another reason: the new ICE office she was dealing with during her recent detention was apparently in Texas, why did ICE require a new G-28 in NY?

20. Regardless, we did refile another G-28 in NY.

21. Only then was she allowed to call me, but after being forced into an incommunicado status with our office for many days because she had reportedly not been allowed to make even one phone call directly to me to discuss her case or anything else.

22. Ms. S. was not even allowed to call me to tell me that I had to re-file a new G-28. I only learned that first because the children's grandmother,who was serving as a liaison with me, told me.

23. I did not hear from Ms. S. directly until February 24, 2026, 12 days after her transfer from NY.

24. I had no way of knowing where they had been held during those nine days at a hotel, and I had no way to contact them during those nine days.

25. Nor did I hear from her directly for 2 weeks after her arrest by ICE, after she was taken from NY.

26. Later on March 4th, 2026, I heard from the grandmother that they had been suffering a lot physically while in detention, that the children and the mother were sick with fever, diarrhea, and vomiting.

27. My experience shows that ICE held this family, who already had immigration representation, incommunicado and denied them access to their retained attorney almost two weeks after her detention.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: April 30, 2026

/s/ S. Michael Musa- Obregon
S. Michael Obregon-Musa, Esq.