# ICE Juvenile Coordinator's Supplemental Report
Filed Pursuant to the Court's April 3, 2026, Order

## I. Introduction

Pursuant to the Court's April 3, 2026, Order, the ICE Juvenile Coordinator respectfully submits this Supplemental Report. The Court directed ICE to provide:

- A census of minors held in ICE facilities or ICE-contracted facilities for more than 20 days during February 2026, March 2026, and, if possible, April 2026;
- A detailed explanation of the reasons for such prolonged detention, including whether detention occurred in a Family Residential Center and/or hotel;
- Information regarding minors held in hotels for more than 72 hours, including whether minors were held consecutively in multiple hotels;
- Where prolonged detention resulted from transportation difficulties or protracted immigration proceedings, whether such minors were determined to present a flight risk or danger to themselves or others;
- Length of Stay calculation for each minor beginning at apprehension, in addition to the Facility Length of Stay ("FLOS") column; and
- A summary of ICE's compliance with Flores Settlement Agreement (FSA) requirements during February, March, and April 2026, including conditions of confinement and efforts undertaken to address concerns identified by Plaintiffs.
- The Order also directed ICE to address conditions of confinement, including, but not limited to:
    a. provision of age-appropriate food
    b. adequate temperature control
    c. availability of additional clothing
    d. dimmed lighting at nighttime.
- The order also directs ICE to review the conditions described in Plaintiffs' response to the March 2026 supplemental report and describe the efforts undertaken to address those conditions.

## II. Executive Summary

ICE reviewed census data, custody histories, hotel-placement records, transportation information, facility compliance and activity reports, grievance data, inspection findings, and operational information for the reporting period. Based on that review, ICE identified 567 case entries involving minors held in Family Residential Centers for more than 20 days during February and March 2026, as well as 86 minors whose hotel-placement sequences exceeded 72 hours during the same period. The updated FRC reports also include a Time in Custody field that provides a total custody-duration metric separate from FLOS.

The principal reasons for prolonged detention and extended placement were not attributable to a single cause. The records reflect that extended stays resulted from required immigration case-processing events, including scheduled administrative or immigration hearings, USCIS fear/asylum screening, Immigration Judge review, voluntary departure processing, appeal activity, travel or removal logistics, transportation disruption, placement coordination, and certain medical or welfare-related considerations.

ICE also reviewed the conditions-of-confinement issues raised by Plaintiffs, including allegations concerning medical care, food, clothing, lighting, education, language access, staff conduct, and legal access. The available oversight and inspection information reflected stable facility operations overall during the reporting period, while also identifying education as the most persistent compliance concern. ICE and facility staff undertook corrective and monitoring measures during the reporting period to address issues identified through inspections, oversight activity, and operational review.

As set forth below, ICE provides the Court with the census and hotel-placement information requested, explains the principal causes of prolonged detention, describes Time in Custody, LOS, and FLOS methodology, summarizes compliance information for the reporting period, and addresses the issues raised in Plaintiffs' recent filings and correspondence.

**III. Sources, Scope, and Methodology**

**A. Sources of Information**

This Report is based on information compiled from the following sources:

- ICE case-tracking data;

- custody histories and apprehension information;

- facility records;

- hotel placement records;

- transportation records;

- compliance and activity reports;

- grievance data and logs;

- inspection reports;

- declarations or concerns raised in Plaintiffs' recent submissions; and

- internal operational and monitoring records.

**B. Scope of Review**

The review period addressed in this Report is February 2026 through April 2026, unless otherwise stated. Where April information was still being compiled at the time of drafting, ICE has identified those limitations.

## C. Methodology

For purposes of this Report:

- Time in Custody / Length of Stay ("LOS") reflects total time in custody beginning at apprehension;

- Facility Length of Stay ("FLOS") reflects time spent at the relevant facility and is distinct from total time in custody;

- Hotel placements were reviewed separately and, where applicable, consecutive hotel stays were evaluated in the aggregate; and

- Minors were identified for inclusion through ICE custody and placement records.

The FRC 20+ day review was summarized in Exhibit A, and the hotel-placement review was summarized in Exhibit B. For FRC placements, ICE reviewed Time in Custody, FLOS, the narrative reason for length of stay, and disposition or status where reflected in the records. For hotel placements, ICE reviewed the hotel-placement sequence, related transportation or staging events, duration, reason for placement, actions taken, and disposition or status where reflected in the records.

Where allegations raised by Plaintiffs could not be matched to a specific individual, incident, or record due to the absence of sufficient identifiers, ICE notes that limitation in the response section below.

## IV. Census of Minors Held More Than 20 Days

## A. Summary Findings

ICE reviewed the updated February and March 2026 FRC 20+ Day Reports and identified 567 case entries involving minors held in Family Residential Centers during the reporting period.

Each entry includes a narrative explanation in the "Reason for Length of Stay" column. The updated reports also include a "Time in Custody" field, which provides a custody-duration metric separate from facility length of stay. The principal reasons for extended lengths of stay were not attributable to a single cause. Rather, the records reflect that prolonged stays resulted from required immigration case-processing events, including scheduled administrative or immigration hearings, USCIS fear/asylum screening, Immigration Judge review, appeal activity, voluntary departure processing, removal coordination, travel-document issues, and transportation or removal logistics.

The primary driver reflected in each narrative entry was categorized as follows:

## 🦾 Census of Minors Held More Than 20 Days

### Reason Categories

| Reason Category | Case Count | Share of Cases | Summary |
|---|---|---|---|
| Pending scheduled administrative / immigration hearing | 203 | 35.8% | Detention continued while cases awaited scheduled administrative hearings, individual hearings, Immigration Judge action, or other proceedings-related events. |
| Voluntary departure / travel scheduling logistics | 137 | 24.2% | Cases involved voluntary departure processing, commercial or charter flight scheduling, repatriation coordination, travel-document issues, or other transportation logistics. |
| USCIS fear/asylum screening and IJ review process | 135 | 23.8% | Cases involved USCIS positive or negative findings, Notices to Appear, Immigration Judge review of USCIS findings, or fear/asylum-related processing. |
| Removal order / appeal / post-order processing | 79 | 13.9% | Cases involved removal orders, final orders, BIA or other appeal activity, stays of removal, motions to reopen, habeas-related issues, or continued custody pending post-order processing. |
| Other individualized processing considerations | 13 | 2.3% | Entries reflected individualized circumstances not cleanly captured by the categories above. |
| Total | 567 | 100.0% | |

Census of Minors Held More Than 20 Days

## B. Time in Custody Pattern

Across the February and March reports, the records contain 567 total case entries. Based on the updated Time in Custody data, and where necessary calculating total custody time from FLOS plus the period between apprehension and book-in, the average Time in Custody was approximately 57 days, and the median Time in Custody was approximately 44 days.

Most entries clustered between 20 and 60 days, with a smaller but meaningful group exceeding 90 days.

### Time in Custody Pattern

Total Cases: 567



| Up to 30 days | 31–45 days | 46–60 days | 61–90 days | 91+ days |
|---|---|---|---|---|
| 142 | 148 | 105 | 92 | 80 |

## C. FLOS Pattern

The reports also include FLOS with Book-out, which reflects the time spent at the relevant FRC facility. FLOS is distinct from total Time in Custody because a minor may have been apprehended before book-in at the FRC.

Based on the FLOS data, the average FLOS was approximately 53 days, and the median FLOS was approximately 41 days.

### FLOS Pattern

Total Cases: 567



| Under 20 days | 20–30 days | 31–45 days | 46–60 days | 61–90 days | 91+ days |
|---|---|---|---|---|---|
| 17 | 161 | 148 | 90 | 79 | 72 |

**D. Summary**

The February and March 2026 FRC 20+ Days Reports demonstrate a substantial decrease in the number of Flores class members held 20 days or longer in DHS custody. The February 2026 report identified 426 such minors, while the March 2026 report identified 141, reflecting approximately a **67 percent reduction** in the 20+ day Flores cohort at the DIPC between these two months. These figures are derived from IIDS-based FRC 20+ Days reports and reflect all records meeting the 20+ day reporting criteria for each month; some individuals may appear in both months if they remained in custody across the reporting periods (see Exhibit A).

The February and March 2026 FRC 20+ Days Reports further reflect that extended lengths of stay were primarily attributable to required immigration case-processing events rather than unexplained delay. The most common primary driver was continued detention pending scheduled administrative or immigration hearings, followed by voluntary departure processing and travel logistics, USCIS fear/asylum screening or Immigration Judge review, and removal-order or appeal-related activity.

The Time in Custody data provides a measure of the total period a minor was in DHS custody, while the Facility Length of Stay (FLOS) reflects the portion of that period spent at an FRC. Considered together, these metrics show that most cases remained clustered between 20 and 60 days, with a smaller subset involving longer custody periods due to continued proceedings, appeal activity, post-order processing, travel-document coordination, or removal logistics.

A census table containing the individualized information requested by the Court is attached as Exhibit A. For each minor or family unit held more than 20 days, the table identifies the Time in Custody, FLOS, primary reason for continued custody, actions taken by ICE, and the disposition or status. The categories summarized above reflect the principal reason identified in the narrative entry; in some cases, more than one factor contributed to the overall length of custody (for example, a scheduled hearing followed by voluntary departure processing and associated travel arrangements).

**V. Hotel Placements Exceeding 72 Hours**

**A. Summary Findings**

ICE reviewed the February and March 2026 hotel-stay records and identified 86 minors whose hotel-placement sequences exceeded 72 hours during the reporting period.

Of those:

- 38 minors were identified in February 2026;

- 48 minors were identified in March 2026; and

- 86 minors had placement sequences involving hotel placement and related consecutive custody or transportation placements.

ICE reviewed the reason for each placement, the duration of the stay, the related custody or transportation sequence, and the recorded disposition. The relevant information is summarized in Exhibit B.

The principal reasons for hotel placements exceeding 72 hours were transportation scheduling, pre-removal staging, flight delays or cancellations, travel-document or consular coordination, family-unit, or reunification coordination, and medical or facility-availability considerations.

**B. Primary Drivers of Hotel Placements Exceeding 72 Hours**

## 🏨 Hotel Placement Reasons

### Reason Categories

| Reason Category | Case Count | Share of Cases | Summary |
|---|---|---|---|
| Transportation scheduling / pre-removal staging | 38 | 44.2% | Minors were staged in hotel placements while ICE coordinated removal, voluntary departure, or onward travel. |
| Transportation disruption / flight rescheduling | 23 | 26.7% | Hotel stays were extended because of cancelled flights, returned flights, missed landing windows, mechanical issues, manifest discrepancies, or other travel disruptions. |
| Travel-document / consular / POE coordination | 12 | 14.0% | Stays were prolonged while ICE coordinated passports, consular arrangements, Mexican immigration appointments, port-of-entry processing, or related travel-document issues. |
| Family-unit / reunification coordination | 5 | 5.8% | Stays were extended because of family-unit coordination, reunification issues, USC child-related coordination, or related family travel issues. |
| Medical, quarantine, or facility-availability considerations | 5 | 5.8% | Stays were prolonged because of quarantine, facility availability, or other medical or welfare-related placement considerations. |
| Other individualized travel or placement coordination | 3 | 3.5% | Entries reflected individualized circumstances, not cleanly fitting the categories above. |
| **Total** | **86** | **100.0%** | |

Hotel Placement Reasons

**C. Duration Pattern**

Across the February and March hotel-stay records, the placement sequences exceeding 72 hours ranged from 72.1 hours to 425.7 hours, or 3.0 days to 17.7 days.

The median duration was approximately 96 hours, or 4.0 days. The average duration was approximately 134 hours, or 5.6 days.



## D. Disposition Summary



The records reflect the following dispositions for the 86 minors:

## E. Consecutive Hotel Placements

ICE identified 86 minors whose hotel-placement sequences involved consecutive placement activity associated with hotel use, transportation staging, hold rooms, transit locations, or other related custody locations.

Within that group, 44 minors had more than one hotel-stay segment reflected in the records. These placements are summarized in Exhibit B and described, where appropriate, in the accompanying narratives.

**F. Summary**

The February and March 2026 hotel-stay records reflect that hotel placements exceeding 72 hours were primarily attributable to travel and removal logistics rather than a single cause. The most common reason was pre-removal or pre-departure staging while ICE coordinated transportation, removal, voluntary departure, or onward travel.

Other recurring reasons included cancelled or returned flights, missed landing windows, mechanical issues, manifest discrepancies, consular or port-of-entry coordination, family-unit, or reunification issues, and medical or facility-availability considerations, including quarantine-related circumstances. Based on the records, hotel stays continued while ICE coordinated the next required step necessary to effectuate removal, voluntary departure, voluntary return, release, or related onward travel.

A hotel-stay table containing the individualized information requested by the Court is attached as Exhibit B. The table identifies, for each minor, the relevant placement chronology, duration, reason for the extended hotel placement, actions taken by ICE, and disposition or status.

**G. Current Practice Regarding Hotel Use**

ICE recognizes the Court's April 3, 2026 order, which stated that "Defendants shall cease placing minors at hotels, with a narrow exception for brief, one to two-night stays while in transit or prior to flights." Dkt. # 1755.[1] ICE reviewed the hotel placements identified during this reporting period and has identified that most delays were caused by unforeseen circumstances such as mechanical breakdown, flight reschedule, same day travel request, and parental interest accommodation.

**VI. Transportation Delays, Proceedings-Related Delays, and Required Risk Findings**

See the reasons for delays reflected in Column N of the Hotel Stays Report (Exhibit B), including the day-by-day reason entries for minors whose hotel-placement sequences exceeded 72 hours, on the following page.

---

[1] The government recently moved for reconsideration of the Court's April 3, 2026 order regarding hotel use because the Court's prior orders about hotels related to Title 42. Dkt. # 1760.

## 🕐 Transportation Delays, Proceedings-Related Delays, and Required Risk Findings

See the reasons for delays reflected in Column N of the Hotel Stays Report (Exhibit B), including the day-by-day reason entries for minors whose hotel-placement sequences exceeded 72 hours, on the following page.

| Reason for Delay Reflected in Column J | | |
|---|---|---|
| **Reason for Delay Reflected in Column J** | **Case Count** | **Summary** |
| Pre-removal staging / transportation scheduling | 39 | Minors or family units were staged in hotel placements while ICE coordinated removal, voluntary departure, commercial air travel, charter travel, or transportation scheduling from the relevant field office or departure location. |
| Flight disruption / rescheduling | 17 | Delays resulted from cancelled flights, returned flights, missed landing windows, mechanical issues, manifest discrepancies, flightline cancellations, or departure flights being delayed and rescheduled. |
| Family-unit / reunification / consular-document coordination | 13 | Delays involved family-unit coordination, reunification issues, USC child-related coordination, ORR sibling reunification, mixed-nationality family travel, consular coordination, or assistance obtaining a U.S. passport for a child. |
| Port-of-entry / Mexican immigration coordination | 9 | Delays resulted from the need to make or wait for appointments with Mexican immigration officials at the port of entry. |
| Facility-availability / quarantine-related placement | 4 | Hotel placement was used or extended because DIPC was on quarantine due to measles or otherwise unavailable for the relevant placement sequence. |
| Other individualized travel or removal coordination | 4 | Entries reflected individualized circumstances, including return for release, visa-waiver self-surrender travel, or other case-specific travel/removal coordination. |
| **Total** | **86** | |

Transportation Delays, Proceedings-Related Delays, and Required Risk Findings

The hotel-placement records identify 86 Column J delay-reason entries for minors whose hotel-placement sequences exceeded 72 hours. Those entries reflect that extended hotel placements were primarily attributable to transportation and removal logistics, including pre-removal staging, flight scheduling, flight disruption, port-of-entry coordination, family-unit or reunification coordination, consular or travel-document issues, quarantine-related facility availability, and other individualized travel or removal coordination.

The most common reason reflected in Column N was pre-removal staging or transportation scheduling, which accounted for 39 of the 86 entries. Other recurring reasons included flight disruption or rescheduling for 17 entries, family-unit, reunification, or consular-document coordination for 13 entries, port-of-entry or Mexican immigration coordination for 9 entries, facility-availability or quarantine-related placement for 4 entries, and other individualized travel or removal coordination for 4 entries.

For reporting purposes, each Column N entry was assigned to the most specific primary reason reflected in the narrative. Some entries included more than one contributing circumstance, such as a travel-document issue followed by flight rescheduling, or a family-unit coordination issue connected to consular or port-of-entry processing.

## VII. Time in Custody, Length of Stay, and FLOS Methodology

### A. Time in Custody / Length of Stay

For purposes of this Report, Time in Custody / Length of Stay reflects the total custody period beginning at apprehension and continuing through the relevant custody period identified in ICE's records. In the updated FRC reports, the Time in Custody field provides this total custody-duration metric. Where necessary, total custody time was calculated from FLOS plus the period between apprehension and book.

### B. Facility Length of Stay

Facility Length of Stay, or FLOS, reflects the amount of time the minor spent at the relevant facility or placement location, as distinct from total time in custody.

### C. Hotel-Placement Duration

For purposes of the hotel-placement review, ICE reviewed the placement sequence reflected in the hotel-stay records, including book-in and book-out information associated with hotel placements, transportation staging, hold rooms, transit locations, and related consecutive placement events where reflected in the records.

### D. Presentation of Metrics

To provide the Court with a complete picture of time in custody and time at the relevant placement location, this Report, and the attached exhibits present, where available, Time in Custody, LOS, and FLOS for each applicable minor, along with the placement chronology, reason for the extended stay, actions taken by ICE, and disposition or status.

## VIII. Compliance Overview During the Reporting Period

**A.** ICE Weekly Compliance and Activity Information (Compliance Standards Officer Reports)

Overall, the weekly reports indicate that DIPC maintained stable operations from February 2, 2026, through April 17, 2026, while population levels continued to decrease, with ongoing

external oversight and recurring reviews to ensure the education program is properly scaled and meets established standards.

**Population and Operations**

Across the ten weekly compliance and activity reports covering February 2, 2026, through April 17, 2026, DIPC maintained stable operations as its population continued to decline. Over that time, the reported population decreased from under 997 to under 369 by the final report. Weekly narratives further indicated that the reduced population reflected ICE's work to address Plaintiffs' concerns about expeditious processing. Staff have continued to receive training to support these operational goals.

**Oversight and External Activity**

External oversight and visitor activity remained consistent, although the level of activity varied from week to week. Across the ten reports, DIPC recorded two DHS site visits, eleven official tours or visitor events, and one week involving reported media interest or activity. Visitors included representatives, outside officials, Flores-related personnel, medical reviewers, ODO personnel, and other visiting officials. Oversight activity was highest during the week ending March 20, 2026, when five official tours or visits were reported.

**Resident-Issue Indicators**

During the reporting period from February 2, 2026, to April 17, 2026, resident-issue indicators at the DIPC remained low. The number of resident grievances decreased from 26 in February to 11 as of April 17, 2026. In total, 55 grievances were filed during the reporting period; two were substantiated in favor of the residents, while the remaining 53 were determined to be unfounded.

**Medical and Housing Activity**

Medical and housing indicators fluctuated from week to week but did not reflect sustained systemic disruption. Across the ten reports, weekly totals reflected twenty-nine medically housed residents on site, eleven hospital patients, and twenty-six residents referred to the emergency room. Early in the period, medical personnel also implemented precautionary measures relating to potential measles exposure, vaccine administration, and vaccine handling. Although hospitalizations and emergency room referrals varied, the reports did not identify a sustained medical emergency or broader disruption to medical operations.

**Education Compliance**

Education was identified as an area receiving ongoing review in multiple reports, with Education Policy noted as pending and oversight activity highlighting areas for further development. The reports referenced implementation, staffing, and expansion needs within the new education

program, including the continued rollout and growth of school services. Related training and familiarity issues were also noted in certain functional areas.

### Staffing, Training, and Operational Familiarity

Additional recurring issues involved staff training and operational familiarity in selected areas. Early reports noted ongoing efforts to complete training and address corrective actions related to key and lock control, Talton system familiarity, and staffing shortages in some departments. One February report observed that many staff were personnel stationed at the FRC as temporary duty assignment who were still becoming familiar with facility systems and FRC operations. Another report noted delays in processing associated with staffing shortages. Overall, these areas have remained under review, with continued oversight and retraining efforts to support operational effectiveness.

### Overall Assessment

The weekly reports further reflect that DIPC continued to support substantial external oversight without systemic disruption to operations. Weekly narratives referred to inspections and visits by Special Agents, Border Czar Tom Homan, Dr. Paul Wise, Dr. Scott, Plaintiffs' counsel, The Office of Detention Oversight (ODO) personnel, and foreign officials, among others. Despite this level of outside activity, the reports consistently described the facility as continuing daily services, maintaining operational continuity, and adjusting staffing and resources as conditions evolved.

### Summary

The weekly reports reflect that DIPC operated in a stable manner from February 2, 2026, through April 17, 2026, with minimal formally reported grievance and incident activity, fluctuating but manageable medical activity, and ongoing external inspections and official visits. The most significant area receiving ongoing review was Education, as the new program continues to be scaled up and evaluated to ensure it meets established standards. Continued attention was also given to staff training, system familiarity, and aligning staffing and resources with operational needs.

### B. ICE's Independent Inspection Contractor

### Overview of Compliance Efforts

The February, March, and April 2026 compliance reports reflect three consecutive scheduled inspections of the Dilley Immigration Processing Center (DIPC) conducted under the 2020 Family Residential Standards (FRS) and applicable provisions of the FSA. Taken together, these reports show clear progression from partial compliance in February, to corrective action in March, to an overall compliant rating in April.

**February 2026 Inspection**

During the February 17–19, 2026 inspection, DIPC received a rating of partially compliant. Of the standards reviewed, 37 were rated compliant, one was not inspected, and three were not applicable. Two standards were rated non-compliant: FRS 2.8, *Staff-Resident Communication*, based on ICE supervisors not consistently conducting required housing-unit visits, and FRS 7.5, *Post Orders*, based on CoreCivic supervisors not initialing post orders to document required supervisory review. Both findings were identified as repeat deficiencies from earlier inspections.

**March 2026 Inspection**

During the March 17–19, 2026 inspection, DIPC improved to a rating of Compliant with Issues. The previously cited deficiencies under FRS 2.8 and FRS 7.5 were corrected and rated compliant. The March inspection identified one remaining non-compliant standard, FRS 2.10, *Use of Physical Control Measures and Restraints*, after review of a February 10, 2026, use-of-force incident showed that audiovisual recording equipment retrieved from the Emergency Response Team locker did not function properly. The March report also noted that FRS 5.2, *Education Policy*, remained under special assessment review rather than receiving a final rating.

**April 2026 Inspection**

During the April 14–16, 2026 inspection, DIPC received a rating of Compliant. Thirty-nine standards were rated compliant, one standard was rated Compliant with Issues, and three remained not applicable. No standards were rated non-compliant. The report states that the prior FRS 2.10 issue was resolved after the Site Security Manager's special assistant tested the audiovisual equipment and verified that it was functioning properly. The only remaining issue identified in April was FRS 5.2, *Education Policy*, which was rated Compliant with Issues because the facility had not yet formally established the required Special Education Team composed of multidisciplinary staff.

**Overall Independent Inspection Contractor Compliance Trend**

Across the three inspections, the DIPC demonstrated measurable corrective action over time. The February inspection identified repeat supervisory deficiencies, resulting in a Partially Compliant rating. By March, those repeat findings had been corrected, though one remaining operational issue was noted involving audiovisual equipment. The April inspection documented resolution of that issue and an overall Compliant rating, with Education remaining the only area rated Compliant with Issues. As of the April 2026 inspection, the DIPC was operating in substantial compliance with the FRS, including a full review conducted by the medical SME. (See Exhibits 1, 2, and 3)


DIPC Report of Findings - February


DIPC Report of Findings March 2026


DIPC Report of Findings April 2026_

**IX. Flores Allegations and ICE Responses by Category**
Submitted April 9, 2026, by Plaintiff's Counsel

---

**1. Allegations about Prolonged Detention of Children and Families**

**Uncertainty / Prolonged Detention**

**Resident Allegations**
Families report long and uncertain detention periods, often 70 to 125 days or more, with inconsistent information from staff and fear of losing homes, jobs, and schooling. Plaintiffs also reported that 8 children had been detained more than 100 days, 20 children more than 50 days, and one family more than 280 days.

**ICE Responses / Position**
Each case involving a minor is individually reviewed to determine the appropriate timing for release in accordance with applicable laws and the Flores Settlement Agreement. While residents are free to request review of their cases, ICE works to assess cases and discharge minors from custody as promptly as possible, with a focus on ensuring their safety, well-being, and legal rights.

The assessment process includes:

- **Flight Risk Assessment:** Evaluating recent entry, family or community ties in the U.S., compliance history, and immigration status.

- **Likelihood of Removal in the Foreseeable Future:** Reviewing the status of fear claim adjudication, final order of removal, progress on travel documents, and compliance with removal procedures.

- **Compliance with Laws and Court Orders:** Ensuring all relevant immigration laws, regulations, and court orders are followed.

**Family Separation**

**Resident Allegations**
Declarations describe adult-child separations, including medical or operationally driven transfers, and nightly separation of fathers from mothers and children, which residents say causes distress.

**ICE Responses / Position**
Housing assignments are made with consideration of family composition, classification requirements, and the ages of children, and that family unity is preserved except where separation is required for safety or medical reasons.

During the town halls, ICE will share additional information regarding the operational and safety considerations behind family housing practices. These sessions will highlight daily opportunities for family time, explore the possibility of extended evening access where feasible, and provide clear communication about how and when families can spend time together.

---

**2. Allegations that Class Members Lack Access to Legal Information and Counsel, Including Information Regarding Flores**

**Rights / Flores / Release Information**

**Resident Allegations**
Residents say they did not receive clear children's-rights information or I-770 notices and did not understand Flores protections or release options.

**ICE Responses / Position**
Residents watch a Brief Explanation of Your Rights video during orientation to the facility. During orientation, facility rules, expectations, and the grievance process are also discussed with residents in different languages through Language Line.

Immigration rights information is reinforced through tablet-based rights videos, town halls, and daily ICE open-door hours. Form I-770, Notice of Rights and Request for Disposition, is provided as part of the intake and bed-space request process and advises the recipient of the right to use the telephone, the right to be represented by a lawyer, and the right to a hearing before a judge. (See Exhibit 4)

The FSA Exhibit 6 Notice of Rights is likewise provided and includes a certificate of service documenting that the notice was served and read in a language understood by the family. The records further indicate that the field office responsible for the arrest serves the I-770 as part of intake and bed-space processing and that, if the form has not been served before arrival, the Dilley Intake Officer prints the required forms and provides them to the family unit upon arrival. The same procedure applies to Form M-444, Information About Credible Fear Interview, and the reviewed materials indicate that Flores-related documents are served at intake to each arriving family unit. Acknowledgment forms are signed when the I-770 and Flores Notice of Rights are provided, residents sign a 17-100A Orientation Checklist upon completion of orientation, and facility rules and expectations are posted in the activity room and included in the Resident Handbook.



DHS Form I-770 Final
Blank.pdf

**Legal Access / Communication**

**Resident Allegations**

Residents report unreliable mail and email access, limited free legal calling options, blocked or inconsistent Gmail access, and difficulty reaching Flores counsel or non-pro bono attorneys.

**ICE Responses / Position**

The legal-access materials reflect that Know Your Rights videos are available during orientation, play on a continuous loop in intake, are accessible on Talton tablets, are available in the library, and may be viewed on Channel 61 televisions in the living suites. These materials are available in multiple languages, and additional languages are being added. Pro bono legal-services information is provided to residents upon arrival and posted throughout the facility, including in activity rooms, phone rooms, the library, intake, courts, visitation, medical, and dining areas, with monthly updates.

The April 2026 pro bono lists for the San Antonio Immigration Court and Pearsall Immigration Court identify multiple legal-service providers, including American Gateways, RAICES, St. Mary's University School of Law Immigration and Human Rights Clinic, CT Lobos y A Inc., the University of Texas School of Law Immigration Clinic, and the ABA Commission on Immigration Detention Information Hotline. The Pearsall list also includes a RAICES hotline specifically for individuals and families detained at Dilley.

Gmail access was restored on March 6, 2026, through library computers; internet access is permitted except for social media and adult content; LexisNexis is available; and confidential legal visits remain available. Residents receive at least one free intake call, and indigent residents may request free domestic calls from unit managers at any time, including for legal calls. Residents may also make direct or free calls to specified legal and governmental entities, subject to reasonable restrictions on hours, frequency, and duration, but not in a manner that unduly limits efforts to obtain legal representation.

ICE is currently exploring the most efficient way to implement library scheduling for residents with deadlines and provide a multilingual Legal Access Guide explaining free call options, library rules, and how to request additional time.

## Grievance System / Fear of Using It

**Resident Allegations**

Some residents say they were never taught how to file grievances or fear retaliation if they complain.

**ICE Responses / Position**

Review of both weekly compliance snapshots and broader grievance-log information reflects a downward trend in total grievances filed during the February-through-April 2026 period. Total grievances decreased from 26 in February to 18 in March and 11 in April, for a total of 55 grievances.

By grievance type, paper grievances exceeded Talton grievances in February, by a margin of 15 to 11, and in April, by a margin of 6 to 5, while Talton grievances exceeded paper grievances in March, by a margin of 12 to 6. Facility Staff was the most frequently cited grievance category overall, accounting for 30 of the 55 grievances filed during the review period. In April, all 11 grievances were coded under that category.

Disposition Code 3, Not Found in Favor of Inmate/Resident, was the most common disposition and accounted for 44 of the 55 grievances during the review period. Two grievances were found in favor of the residents during the February-through-April 2026 reporting period, including one in February and one in April. At the time of data extraction, three April grievances reflected blank disposition codes and are treated in this Report as pending or blank.

A review of repeat grievance activity showed that 29 of the 55 grievances were submitted by repeat grievance filers, representing six residents during the February-through-April review period. This count reflects the consolidation of entries for resident A451 as a single individual despite variation in initials in the source data.

The broader record also reflects that residents may raise concerns through direct staff communication and the formal grievance process, and that allegations are tracked through the Incident Reporting System, the Talton Grievance Log, and OMS Contact Logs.

ICE is working to post a multilingual grievance instruction sheet, report grievance metrics to increase transparency, and conduct periodic interviews or surveys to test understanding and confidence in the process. (See Exhibit 5)

## 📄 DIPC Grievance Metrics Summary

### February–April 2026

| Grievance Metrics | | | |
|---|---|---|---|
| Month | Total Grievances | Founded Grievances | Founded Grievance Details |
| February 2026 | 26 | 1 | Hygiene-supplies issue; third-shift staff did not provide requested tissue and paper towels and directed the resident to wait until morning. Supervisors reinforced staff responsibilities and expectations. |
| March 2026 | 18 | 0 | No founded grievances identified in the March 2026 materials reviewed. |
| April 2026 | 11 | 1 | As of April 23, 2026, the details of the founded grievance are pending receipt from facility. |

DIPC Grievance Metrics Summary | February–April 2026



FEB-APR 2026
GRIEVANCES_redact

---

### 3. Allegations that Class Members Are Not Provided Safe and Sanitary Conditions, Including Adequate Medical Care, Child-Friendly Food, Hygiene Products, and Healthy Sleeping Conditions

**Medical Care**

**Resident Allegations**

Families report delayed or inadequate care for serious conditions, long waits, limited diagnostics, and reliance on over-the-counter medication in cases they consider more serious.

**ICE Responses / Position**

The inspection, hospitalization, accommodation, and operational materials reviewed for the reporting period reflect that medical and related resident-care standards remained compliant during the February, March, and April 2026 inspection period under the 2020 FRS and applicable Flores requirements.

IHSC's December 17, 2025, focused review found no systemic deficiencies in intake screening, sick call, chronic care, medication administration, emergency response, or behavioral health services. The record further reflects 24-hour medical coverage, offsite referrals as needed, routine wellness checks, and 23 hospital or emergency room visits since January 1, 2026.

A January 20–21, 2026, inspection by ICE's independent medical subject matter expert reflected a favorable review of DIPC's medical and medically related operations during the inspection period. In the sections addressing health care, women's health services, environmental health and safety within medical settings, hunger strikes, suicide prevention, disability-related accommodation processes, medical grievances, and medical post orders, the facility was found compliant with applicable standards.

The report indicates that intake screenings, health assessments, sick call, mental health services, infection-control practices, medication management, and medical documentation were conducted within required timeframes and in accordance with applicable procedures. It also notes that pregnant residents received onsite and offsite specialty care as needed, no hunger strikes or deaths were reported, and no significant deficiencies were identified in the medical areas reviewed. The only notable concerns were staffing levels in certain medical positions and the absence of a formal keep-on-person medication policy beyond rescue inhalers.

A March 24, 2026, Quality Assurance Review by ICE's independent medical subject matter expert confirmed the availability of round-the-clock medical services, the prioritization of

children for care, the use of offsite referrals when clinically indicated, and ongoing wellness monitoring. At the same time, that review indicated that certain protocols could be further formalized and that some medical allegations could not be substantiated due to insufficient records or detail. Taken together, these reviews reflect that the medical system at Dilley was functioning during the reporting period, while also identifying opportunities to improve coordination, documentation, and communication.

An April 14–16, 2026, inspection by ICE's independent medical subject matter expert completed a compliance inspection of DIPC's medical and closely related functional areas. Those areas included health care, environmental health and safety within medical settings, women's health services, suicide prevention, disability-related accommodation processes, medical grievances, and other clinically related or medically adjacent functions. In those areas, the facility was found to be compliant with applicable standards.

As part of the April 14–16, 2026, compliance inspection, DIPC's medical department, together with ICE's independent medical subject matter expert, conducted a comprehensive review of the resident declarations submitted by Plaintiffs to the Court on March 23, 2026, including a separate April 15, 2026, medical review of twelve additional cases. The results are in Exhibits 6, 7, and 8.


6 - 35 cases.pdf


7 - 12 medical cases.pdf


Hospitalizations_re dacted.xlsx

**Overall Assessment**

Within the medical and related areas reviewed, the inspection reflected general compliance with applicable standards. The completed portions of the inspection indicated that policies, logs, staffing practices, and clinical procedures were consistent with required expectations. The strongest and most developed findings concerned health care operations, medical environmental health and safety, medical aspects of sexual abuse and assault prevention and intervention, women's health services, suicide prevention, disability accommodation processes, medical grievances, resident transfers involving medical documentation, and medical post orders.

**Key Strengths**

The most substantial findings appeared in the Health Care section. The review found timely mental, physical, and dental intake screenings; adult comprehensive health assessments completed within 14 days; and child assessments completed within 48 hours. Sick calls were available daily, medical privacy was maintained, and infectious disease protocols were documented and understood by staff. The review also confirmed designated medical leadership and verification of professional licenses.

The Environmental Health and Safety findings, as they relate to medical operations, were likewise favorable. Hazardous materials were inventoried and secured, sharps containers were

properly placed and not overfilled, medical areas were inspected daily, handwashing signage was posted throughout appropriate areas, and audits of sharps and medical instruments were documented. Records were described as accurate, staff as knowledgeable, and required audits as occurring on a daily, weekly, and quarterly basis.

In the Sexual Abuse and Assault Prevention and Intervention area, the inspection reported no incidents since the prior inspection, confirmed that relevant policies remained in place, and noted staff training, public reporting information, and classification-related controls. From a medical and response standpoint, staff appeared to understand how to assess, identify, and respond appropriately when necessary.

The Grievance System also reflected continued compliance in the medical area. Two medical grievances predating the inspection, involving medication access and the sick call process, were addressed within required timeframes and communicated appropriately.

**Notable Issues and Follow-Up Items**

Although the reviewed medical and related sections were broadly positive, several matters warranted follow-up. The Health Care section identified staffing vacancies, including openings for registered nurses, mental health coordinators, medical records staff, a physician, a psychiatric nurse practitioner, and other support positions. While services were still being delivered within required timeframes, those vacancies could create capacity concerns if census increases.

The review also noted the absence of a formal Keep on Person medication policy, apart from the handling of rescue inhalers. The record indicates that staff had discussed the need to formalize guidance for rescue medications kept in residential areas and planned to develop policy language.

In addition, the inspection documented one child TB-positive screening case from April 3, 2026, with follow-up care and coordination with the Department of Health and a TB specialist. The record presents that matter as appropriately managed rather than as a compliance deficiency.

**Broader Medical Context**

Although the facility's overall inspection ratings moved from partially compliant in February to Compliant with Issues in March, to Compliant in April, the identified deficiencies did not concern core medical standards. Instead, they involved staff-resident communication, post orders, use of physical control measures and restraints, and education policy. The inspection record continued to reflect compliance in Health Care, Health Care (Females), Sexual Abuse and Assault Prevention and Intervention, Hunger Strikes, Personal Hygiene, Terminal Illness / Advanced Directives / Death, and Disability Identification, Assessment, and Accommodation.

Hospitalization activity from February through April 2026 was also reviewed. Five hospitalization events were reported in February, with none reported in March or April as of April 19, 2026. Those events included treatment for severe anemia, abdominal pain resulting in

transfer and tumor-resection surgery after imaging identified a 30-centimeter mass, one labor-and-delivery hospitalization, and two hospital transports involving the same minor for respiratory distress.

The record also reflects continued procedures for residents with special needs who require medically approved sensory items or therapeutic supports. Where approved items are not otherwise available in resident property, Medical and Unit staff coordinate to obtain them. Medical review procedures, accommodation practices, and wellness-check procedures remained in place during the reporting period.

Lastly, ICE's independent medical subject matter expert conducted an onsite assessment of the DIPC medical program and reviewed the 35 medical complaints submitted by the Flores Plaintiffs on March 20, 2026, during the April 14–16, 2026 site visit.

**Conclusion**

Taken together, the inspection, quality-assurance, and case-review materials from the February through April 2026 reporting period indicate that DIPC's medical and medically related operations remained functional and compliant with applicable standards. The record reflects ongoing access to care, timely screening and assessment, continuous medical coverage, use of offsite referrals when clinically indicated, routine wellness monitoring, and continued compliance in core medical areas, including health care, health services, infection control, suicide prevention, disability-related accommodation processes, and medical grievances. At the same time, the reviews identified several areas for continued attention, including staffing levels in certain medical positions, further formalization of selected protocols, development of a broader keep-on-person medication policy, and continued improvement in documentation, coordination, and communication. Overall, the materials reviewed do not support the finding of systemic medical noncompliance during the reporting period but instead reflect an operational medical system with identified opportunities for refinement and enhancement.

**Food Service**

**Resident Allegations**
Residents describe food as spicy, greasy, repetitive, and sometimes poor in quality, with concerns about child-friendliness and denied special diets.

**ICE Responses / Position**
The food-service materials reviewed reflect that the facility maintains structured procedures for food procurement, inspection, preparation, service, and monitoring. All food items are purchased through the facility's food-service vendor, Sysco Foods, and are inspected upon arrival for quality and freshness before acceptance. Managers and shift supervisors involved in food service are trained in food safety and sanitation through SERV Safe-certified programs, and food safety oversight extends through receipt, storage, preparation, cooking, holding, service, and post-service review.

The records further show that food complaints are investigated when brought to the attention of the facility and that grievance tracking is monitored. Weekly menu surveys are also conducted with residents to gather feedback regarding food service and resident satisfaction. According to the materials reviewed, no food complaints were brought to the attention of the Food Service Department during the current reporting period.

With respect to food-safety concerns such as mold, contamination, or foreign substances, the records reflect that any affected item is removed from service and separated for review and disposal and that, where necessary, the issue is traced to determine whether it arose during delivery, storage, preparation, or service. One sample of each breakfast, lunch, and dinner meal is also saved and frozen.

The nutrition program operates on a dietitian-approved rotational menu designed to meet age-appropriate caloric and nutritional standards. The records show that vegetables are offered with every meal, fruit rotates regularly, a salad bar with fresh vegetables is prepared for every meal, and fresh fruit is offered daily in the housing complexes. Child-friendly menu items are also included in a manner intended to preserve overall nutritional adequacy.

The materials further reflect that dietary accommodation is available through established channels. Residents may request religious diets through a form, Talton, or the Chaplain, and no religious diet requests have been denied. Medical diets are identified and ordered during intake, the initial physical examination, or at any later point during a resident's stay if medically indicated. Infant formula, stage-appropriate baby food and purees, whole milk for age-eligible children, and modified meal portions for younger children are also provided through established operational channels. Snacks, including cookies, milk, juice, and apples, are available in each complex from 0800 to 2000 and are replenished by counselors at least twice daily or more often as needed.

The weekly diet roster summaries for February, March, and April 2026 further reflect a structured diet-accommodation process that tracks special meal needs across meal service, dining location, and housing-related distribution points. Taken together, those records show an established system for identifying residents who require modified meals and routing those accommodations through separate roster groupings and menu references. The most common accommodation patterns reflected in the records include health-related diets, halal diets, pregnancy-related meal modifications, diabetic diets, soft-food or dental-mechanical diets, lactose-related restrictions, vegetarian accommodations, and allergy-based substitutions or exclusions. The materials also reflect more individualized restrictions tied to specific food sensitivities, indicating that the process is used for both broad diet categories and resident-specific medical or religious needs.

The halal materials reviewed also reflect a more developed program than a simple resident list. In addition to resident rosters, the file set includes a rotating halal menu structure with meal-by-meal planning and substitute menu support, indicating that halal service is being managed as a

recurring operational program rather than as an informal accommodation. The presence of a separate Ramadan list in some of the later rosters further suggests that religious-meal administration was being adapted to changing observance needs.

From an operational perspective, the records reflect a meaningful effort to document meal delivery at the meal level and to separate general special-diet tracking from location-specific service lists. At the same time, the spreadsheets reflect data-quality issues that may affect clarity and downstream reporting, including inconsistent diet labels for similar accommodations, spelling and formatting variations, occasional blending of resident and diet information in the same field, and date entries that do not appear fully standardized.

Taken together, the materials reflect that food service and dietary accommodation were being actively administered through a recurring and organized process, with separate attention to medical, religious, pregnancy-related, and allergy-related needs. The principal weakness reflected in the record is not the absence of a food-accommodation process, but the consistency and organization of the documentation used to track and defend that process. (See Exhibits 9 and 10)

| Weekly Diet Roster Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| Counts reflects primary weekly roster sheets only; duplicate dining location tabs were excluded. | | | | | | | |
| Week | Diet for health | Halal | Ramadan Sub. | Allergy Sub. | Pregnancy/Fruit | All Other Categories | Total |
| Dec 27 - Jan 2 | 74 | 65 | 0 | 16 | 9 | 17 | 181 |
| Jan 10 - Jan 16 | 108 | 83 | 0 | 17 | 15 | 28 | 251 |
| Jan 17 - Jan 23 | 110 | 82 | 0 | 17 | 15 | 27 | 251 |
| Jan 24 - Jan 30 | 73 | 27 | 0 | 10 | 9 | 20 | 139 |
| Feb 21 - Feb 27 | 55 | 16 | 21 | 4 | 6 | 8 | 110 |
| Apr 4 - Apr 10 | 61 | 26 | 28 | 3 | 3 | 10 | 131 |
| Reading notes | | | | | | | 1063 |

The chart shows the top five most visible recurring categories.

All other categories' combines diabetic, soft/mechanical, vegetarian, dairy/lactose, and smller medical labels.

Ramadan sub appears only in later weeks because it was tracked separately there.



DIPC  2026
MEDICAL DIETS (PF)



DIPC HALAL - 2026
NUTRITION STATEME

## Water

### Resident Allegations
Families report poor-quality tap or filtered water, concerns about infant formula preparation, and inequitable access to bottled water.

### ICE Responses / Position
Residents are provided with access to potable water in the housing units as part of daily operations at DIPC.

Municipal utility services support food preparation, sanitation, and overall residential operations. Bottled water for infants under 12 months of age is provided for preparation of infant formula without the need for a medical order. Residents with diarrhea are evaluated and treated by medical staff as clinically appropriate, and bottled water is not itself treated as a medical intervention for diarrhea.

Independent microbial water-quality monitoring conducted by the City of Dilley during the reporting period showed Total Coliform absent in 100 percent of samples, E. coli absent in 100 percent of samples, chlorine residuals absent in 100 percent of samples, and compliant regulatory status for all reporting months reviewed. The City of Dilley public water system maintained full compliance with TCEQ microbial water-quality standards during the reporting period, and Brita water filters were installed in housing units to support resident access to filtered drinking water to address flavor concerns.

**Bathrooms / Hygiene**

**Resident Allegations**
Residents say bathrooms and showers are unsanitary, cleaned too infrequently, lack privacy, and that only harsh soap is consistently available.

**ICE Responses / Position**
Bathroom and hygiene concerns fall within the broader review of hygiene, sanitation, and general living conditions. The inspection and operational materials reviewed during the reporting period continued to reflect compliance with personal-hygiene-related standards and broader safe-and-sanitary-condition requirements.

More specifically, sanitation was monitored through regular CSO inspections and compliance and activity reviews. Hygiene items were routinely issued and replenished, and resident supervisors assessed the need for extra cleaning as needed.

The records further reflect that the February founded grievance concerning hygiene supplies resulted in reinforcement of staff responsibilities and expectations.

**Sleep**

**Resident Allegations**
Families report bright lights, loud air conditioning, night checks, thin mattresses, and crowding that prevent children from sleeping.

**ICE Responses / Position**
Overnight lighting practices were evaluated together with the measures used to reduce sleep disruption while preserving required safety and welfare checks. In the common areas of the living suites, two of the four overhead light banks remain illuminated overnight using lower intensity 3000K soft white lighting. This arrangement is intended to maintain facility security standards while reducing brightness during sleeping hours and allowing resident supervisors to

conduct routine safety checks and observe residents' safety and well-being without entering the living suite. Selected bulbs were replaced with lower intensity 3000K soft white lighting as part of the effort to reduce brightness while preserving sufficient visibility for staff supervision and safety checks. Residents are informed of lighting-related rules and practices during orientation with the unit team, through the Resident Handbook, and through posted rules in the activity rooms. No grievances relating to overnight lighting have been filed since January. Plug-in nightlights were evaluated as a possible alternative but were determined to be insufficient for staff to conduct required safety and welfare checks without entering housing areas. Residents are provided with an eye mask during intake and may request additional eye masks as needed. Residents may not hang blankets or other items to block light because doing so obstructs resident supervisors' view during security rounds.

If a minor is experiencing sleep disruption, medical services are available twenty-four hours a day, seven days a week, and a parent may bring the child to the medical department for assessment. Where appropriate, medical staff may refer the child to the mental health department for further evaluation and support. Children also receive weekly mental-health wellness checks, with more frequent follow-up when indicated.

**Mental Health**

**Resident Allegations**
Residents describe anxiety, depression, panic attacks, regression in children, and mental-health care they view as limited or too narrowly focused.

**ICE Responses / Position**
Mental-health services are available onsite from 7:00 a.m. to 10:00 p.m. and are on call during overnight hours if needed. Children receive weekly wellness checks and more frequent follow-up when indicated. Where medical staff identify issues such as sleep disruption or related concerns, referrals to mental health may be made for further evaluation and support. Mental-health services are also reflected as part of the facility's broader resident-care structure during the reporting period. The medical review and inspection materials did not identify systemic behavioral-health deficiencies during the periods reviewed.

**Disabilities / Special Needs**

**Resident Allegations**
Parents report inadequate accommodations for autism, ADHD, developmental delay, and complex medical conditions, including limited special diets or therapies.

**ICE Responses / Position**
The materials reviewed reflect continued compliance in Disability Identification, Assessment, and Accommodation during the reporting period. Residents with special needs who require sensory items or therapeutic toys identified at intake or during the initial physical examination may receive medically approved supply orders, and Medical and Unit staff coordinate to obtain

those items when necessary. In the educational context, additional special-education support is also being expanded through approved staffing and outside coordination, including the approved Successful Practices Network (SPN) contract for a certified Educational Counselor and licensed Special Education instructor.

## Commissary / Costs

### Resident Allegations
Residents say they must purchase basic items such as hygiene supplies, diapers, bottled water, food, and phone time, forcing trade-offs between basic needs.

### ICE Responses / Position
All residents are provided with clothing, hygiene, and infant-care items at no cost upon intake and through routine distribution. Families with infants receive an additional infant care package with child-specific supplies. The standard hygiene kit includes soap, shampoo, toothbrush and toothpaste, deodorant, feminine hygiene products, toilet paper, towels, and a laundry bag. Infant packages include diapers, wipes, baby soap and shampoo, diaper rash ointment, lotion, and baby towels. These items are provided at no cost and replenished upon request through housing staff, the nursery, or medical staff to ensure families always have adequate hygiene and child-care supplies. Replacement items may be requested from Unit Management Staff or Resident Supervisors in each housing complex.

The commissary is intended for extra or preferred items.



## Clothing / Shoes

### Resident Allegations

Families report too few clothes and shoes, poor durability, and slow replacement of damaged items or cold-weather gear.

### ICE Responses / Position

The clothing-related materials reviewed reflect that, upon intake, resident minors are issued age-appropriate clothing, footwear, and seasonal outerwear. According to the records, minors receive three sets of clothing, six undergarments, six pairs of socks, six bras as applicable, two pairs of shoes, one pair of shower shoes, winter coats or seasonally appropriate clothing, up to three sets of pajamas, caps or beanies, gloves, and hair ties for girls.

The records further reflect that residents may request additional clothing as needed based on normal wear and tear, seasonal conditions, and documented individual need. Laundry facilities are located within the housing units, and detergent and related supplies are provided at no cost.

The materials also show that there were no clothing constraints or shortages during the reporting period. Inspection observations indicate that intake clothing storage areas were well stocked, that

available clothing inventory ranged in size from newborn to adult, that jackets and other outerwear were available, and that residents were observed wearing clean, weather-appropriate clothing.

Taken together, the materials reflect that clothing-related needs were addressed through intake issuance, replacement procedures, on-unit laundry access, and maintained inventory during the reporting period.

---

**4. Allegations that Education Remains Inadequate for Older Youth**

**Education Policy**

**Resident Allegations**

Residents report that, although younger children have shown some improvement, older youth continue to lack a comprehensive educational program and still face limited instruction and uncertainty regarding online learning.

**ICE Responses / Position**

The Educational Policy section was rated Compliant with Issues. The principal issue identified was that the Special Education Team had not yet been established, rendering that component non-compliant.

Overall Assessment

The inspector's notes reflect that an education program was in place and operating, but that important elements of the program were still under development. While classroom instruction, library access, and curriculum planning were underway, the section identified deficiencies significant enough to support a rating of Compliant with Issues rather than full compliance.

Positive Observations

- The education program began on March 2, 2026.

- Classroom instruction was observed in multiple grade bands, including pre-K to Grade 2, Grades 3–6, and Grades 6–12, as well as physical education and art.

- Students in the upper grades were described as engaged in instruction and able to work at their own pace.

- In the Grades 3–6 classroom, students were engaged and had access to multilingual materials.

- The pre-K classroom had age-appropriate furniture, covered outlets, and learning-center materials.

- Physical education was active and participatory.

- The library was well stocked, including substantial English and Spanish-language holdings, with other languages available upon request.

- The curriculum was being developed using Texas State Standards and the Texas Early Learning Guidelines.

Issues Identified

- Initial assessment practices focused solely on the Dynamic Indicators of Basic Early Literacy Skills (DIBELS), a tool designed to screen and monitor early literacy skills in children. At that time, no broader educational assessments were conducted beyond DIBELS.

- In the pre-K to Grade 2 classroom, instruction was not differentiated, and older students were bored because the work focused on kindergarten-level concepts.

- Although the posted schedule reflected one hour for core subjects, observed instruction lasted only about 20 to 30 minutes.

- Computers had been installed but were not yet being used to support instruction because software was still being loaded.

- No textbooks were in use; instruction relied heavily on copied worksheets.

- Many classroom resources and manipulatives were not being fully utilized.

- Teachers were not required to be certified under the contract modification, and only one certified teacher was on staff at the time.

- Most significantly, the Special Education Team had not yet been created, despite being required under the standard.

- The site also reported that there were no identified students receiving special education services.

**Basis for Rating**

The section was rated Compliant with Issues because the education program was functioning in several respects, but important structural and instructional areas for improvement remained. The most significant of these was the absence of the Special Education Team, which rendered that component non-compliant and weighed heavily in the overall section rating.

**Broader Educational Context**

Education remained a primary focus during the reporting period, with the facility organizing educational programming tailored to each student's initial assessment and age range, and

providing instruction in core subjects using resources such as Khan Academy and Khan Academy Kids. Khan Academy is a free online learning platform offering instructional videos, practice exercises, and personalized learning in subjects like math, science, and more for students of all ages, while Khan Academy Kids is a free educational app for young children (ages 2–8) featuring interactive lessons, games, and activities focused on early literacy, math, and social-emotional skills.

The initial assessment completed for each student assists in developing an individualized understanding of the student's educational level and instructional needs and in placing students more appropriately within the educational program. The records further reflect that the facility expanded classroom resources for older students, including access to computers and multiple educational websites that provide adaptive content responsive to students' academic levels and instructional needs. Teachers on staff are developing differentiated classroom activities intended to provide multiple avenues of learning and to better address varying academic levels and needs.

With respect to special education, the records reflect that the contract with SPN has been approved and finalized and that a certified Educational Counselor and a licensed Special Education instructor will be onsite to develop IEPs, 504 plans, and related educational supports. The records also show that the superintendent at Dilley Independent School District agreed that, if special education assistance is needed before the new SPN staff come onboard, such assistance would be provided.

The review also reflects that classroom instruction began on March 2, 2026, and that indoor and outdoor recreation is available daily from 8:00 a.m. to 8:00 p.m. without limitation to residents. Structured programming includes a broad range of creative and recreational activities, including bead bracelet making, jewelry box construction and decoration, birdhouse building, yarn weaving, crocheting, canvas painting, journaling, sports and game tournaments, relay races, hula hoop activities, tug-of-war, Zumba sessions, karaoke, bingo, and chalk art. Outdoor play structures, age-appropriate toys, multilingual books, and cribs are available for young children; activity rooms are open from 8:00 a.m. to 8:00 p.m.; toys are sanitized nightly; residents may check out library books for five days; and children are provided coloring pages they may keep in their living suites.

**Conclusion**:

The inspector's narrative indicates that the education program was operational but still in the process of being fully developed. The review highlighted the ongoing need to establish the Special Education Team, as well as opportunities to further enhance assessment practices, instructional differentiation, staffing qualifications, and the use of available educational resources as the program continues to expand.

---

**5. Allegations about Harsh Staff Treatment**

**Retaliation / Lockdowns / Protests / Visits**

**Resident Allegations**
Declarations describe room confinement, protest-related restrictions, and movement controls during visits that residents perceived as punitive.

**ICE Responses / Position**
DIPC policies and procedures prohibit retaliation. Policy 14101, Resident Grievance System, prohibits staff from harassing, disciplining, punishing, or otherwise retaliating against any resident for filing a grievance, and that prohibition is also reflected in the Resident Handbook.

**Force / Threats / Coercion**

**Resident Allegations**
Some residents allege pushing, threats, coercive language, or intimidation by staff, including threats involving foster care or punishment.

**ICE Responses / Position**
The records further reflect that concerns regarding staff conduct, tone, and professionalism may be raised through direct communication or the grievance process. Where grievances are substantiated, available measures include staff counseling, supervisory review, and reinforcement of operational and professional expectations.

**Isolation / Room Searches / Confiscation**

**Resident Allegations**
Residents report targeted room searches, confiscation or destruction of personal items, and room-level isolation or observation they viewed as punitive.

**ICE Responses / Position**
The policies and operational materials reviewed reflect that the facility distinguishes between systemic disruptions, emergency movement restrictions, routine search procedures, and ordinary operations through established definitions and written procedures. The records further reflect that operations remained secure during the reporting period and that there were no facility-wide lockdowns or emergency responses.

Searches of suites and holding areas may be performed unannounced, on an irregular basis, and in an orderly manner. When possible, an area should be left as it was found, and resident property is to be respected and not carelessly discarded, misplaced, or broken.

During the January-February 2026 protest-related activity, certain handwritten signs, drawings, artwork, and written communications associated with the protest were collected because they were considered unauthorized protest-related materials under housing-unit rules and were treated as soft contraband under policy. The confiscated items were limited to protest-related materials not authorized by policy, and no personal property was destroyed during housing searches. No

searches were conducted in relation to the March and April protests, and no protest-related materials were collected during those later events.

Taken together, the materials reflect that search practices and the handling of protest-related materials were carried out under established written procedures, with protest-related items treated as unauthorized soft contraband rather than as a basis for broader punitive action.

---

**6. Allegations about Lack of Language Translation**

**Language Access / Translation**

**Resident Allegations**
Families report inadequate interpretation services and say they are sometimes asked to sign documents they do not understand.

**ICE Responses / Position**
Rights materials and orientation content are available in multiple languages and that interpreter availability is available via the language line.

As of April 13, 2026, the handbook is now available in Arabic, Bengali, Creole, English, French, Hindi, Portuguese, Punjabi, Romanian, Russian, Spanish, Turkish, Ukrainian, and Vietnamese, ensuring access for most residents. For residents who require information in another language, the Language Line is utilized.

---

**X. Conclusion**

This Juvenile Coordinator's Supplemental Report provides the Court with a consolidated account of ICE's handling of Flores class members in custody during February, March, and April 2026, including minors held more than 20 days in FRCs, hotel placements exceeding 72 hours, and conditions of confinement at the DIPC. Drawing on based automated data, hotel-stay records, facility compliance reports, independent inspections, medical reviews, grievance logs, and Plaintiffs' submissions, the Report addresses the specific items identified in the Court's April 3, 2026, Order and summarizes ICE's compliance with applicable FSA requirements during the reporting period.

With respect to minors held more than 20 days, ICE identified 567 case entries involving Flores class members in FRC custody during February and March 2026. During this reporting period, the "20+ days in custody" Flores cohort at FRCs declined notably. The February 2026 FRC 20+ Days report identified 426 Flores class members who had been in DHS custody for 20 days or longer, compared to 141 in March 2026, representing approximately a 67 percent reduction in the 20+ day FRC cohort between these two months. These figures are based on automated FRC 20+ Days reports and reflect records meeting the 20+ day reporting criteria for each month; some

individuals may appear in both months if they remained in custody across the reporting periods (see Exhibit A). Time in Custody and FLOS data further show that most cases remained clustered between 20 and 60 days, with longer custody periods generally associated with ongoing administrative or immigration proceedings, appeal activity, post-order processing, travel document coordination, or removal logistics rather than unexplained delays.

With respect to hotel use, ICE identified 86 minors whose hotel-placement sequences exceeded 72 hours in February and March 2026. Those placements, summarized in Exhibit B, were primarily driven by transportation and removal logistics, including pre-removal staging, flight scheduling and disruption, port-of-entry or consular coordination, family-unit or reunification considerations, and quarantine- or facility availability factors. Where hotel stays exceeded 72 hours, the records reflect that placements continued while ICE coordinated the next required step—such as removal, voluntary departure, voluntary return, release, or related onward travel— and that use of hotels remained tied to transit or staging needs.

Conditions-of-confinement materials reviewed for this period—including weekly Compliance Standards Officer reports, the independent inspection contractor's February–April 2026 inspections, IHSC and independent medical reviews, and grievance and operational records— reflect that DIPC generally operated in a stable and compliant manner. The independent inspection contractor documented measurable improvement over three consecutive inspections, from a partially compliant rating in February, to Compliant with Issues in March, to an overall Compliant rating in April, with Education Policy (FRS 5.2) remaining Compliant with Issues due to the pending establishment of the Special Education Team. Medical and medically related standards were found compliant during the inspection and quality assurance reviews, with 24-hour medical coverage, offsite referrals as needed, and functioning systems for screening, sick call, mental health services, and medical grievances, while also identifying staffing and protocol formalization needs as areas for continued attention.

The record further reflects structured systems for food service and diet accommodation, potable and filtered water, hygiene and sanitation, lighting and sleep-related practices, mental health services, disability-related identification and accommodation, clothing issuance and replacement, and grievance and legal access processes. Grievance data show a total of 55 grievances filed from February through April 2026, with two substantiated and the remainder not found in favor of the resident, alongside a downward trend in total grievance volume and continued availability of both formal and informal reporting channels. At the same time, the reviews and Plaintiff declarations have highlighted areas where communication, documentation, transparency, and resident understanding—particularly regarding grievances, legal access, and education for older youth—can be strengthened.

ICE acknowledges the concerns raised by Plaintiffs regarding prolonged detention, legal information and access, safe and sanitary conditions, education, staff conduct, and language access. In response, ICE and facility staff have undertaken and planned measures described in

this Report, including enhanced grievance and legal access guidance, continued scaling and refinement of the education program (with particular focus on older youth and special education capacity), ongoing medical and mental health program enhancements, and sustained oversight of hotel use and FRC custody duration for Flores class members. ICE will continue to monitor the 20+ day cohort, hotel placements, transportation and case processing drivers of length of stay, and conditions of confinement at DIPC; will implement corrective and preventive actions where issues are identified; and will report to the Court as required, with the goal of ensuring that Flores class members are treated in a manner consistent with the FSA and applicable standards.

# EXHIBIT A

## FRC 20 + Days Report: February – March 2026

This document is based on data from the ICE Integrated Decision Support (IIDS) system, a data warehouse that contains dynamic data extracts from the Enforcement Integrated Database (EID).

Source: IIDS data as of April 14, 2026.

# EXHIBIT B

## Hotel Stays Report - February 2026 - March 2026

This document is based on data from the ICE Integrated Decision Support (IIDS) system, a data warehouse that contains dynamic data extracts from the Enforcement Integrated Database (EID).

Detainee and detention history source: DSSDM and ETL data as of April 23, 2026.
Placement source: Data reported manually by JFMD staff.

# EXHIBIT C

ICE Accompanied Children Report – February - March 2026

This document is based on data from the ICE Integrated Decision Support (IIDS) system, a data warehouse that contains dynamic data extracts from the Enforcement Integrated Database (EID).

Source: IIDS data as of April 14, 2026.