CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
crholguin@centerforhumanrights.org
Bardis Vakili (Cal. Bar No. 247783)
bardis@centerforhumanrights.org
Sarah E. Kahn (Cal. Bar No. 341901)
sarah@centerforhumanrights.org
1505 E 17th St. Ste. 117
Santa Ana, CA 927051
Telephone: (909) 274-9057

*Attorneys for Plaintiffs*

*Additional counsel listed on following page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| Jenny Flores, *et al.*,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>Todd Blanche, Acting Attorney General of the United States, *et al.*,<br><br>　　　　Defendants. | Case No. CV 85-4544-DMG-AGRx<br><br>**PLAINTIFFS' RESPONSE TO MAY 4, 2026 ICE JUVENILE COORDINATOR STATUS REPORT AND DATA**<br><br>Judge: Hon. Dolly M. Gee |

i

Pls.' Resp. to ICE Juv. Coord. Status Report and Data
CV 85-4544-DMG-AGRX

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe (Cal. Bar No. 299296)
Diane de Gramont (Cal. Bar No. 324360)
428 13th Street, Floor 5
Oakland, CA 94612
Telephone: (510) 835-8098
Email: mwroe@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW
Rebecca Wolozin (admitted *pro hac vice*)
818 Connecticut Ave. NW, Suite 425
Washington, DC 20006
Telephone: (202) 868-4792
Email: bwolozin@youthlaw.org

CHILDREN'S RIGHTS
Leecia Welch (Cal. Bar No. 208741)
2021 Fillmore Street
San Francisco, CA 94115
Telephone: (415) 602-5202
Email: lwelch@childrensrights.org

CHILDREN'S RIGHTS
Eleanor Roberts (admitted *pro hac vice*)
88 Pine Street, Suite 800
New York, NY 10005
Telephone: (212) 683-2210
Email: eroberts@childrensrights.org

# TABLE OF EXHIBITS

## Exhibit Index to Plaintiffs' Response to

## May 4, 2026 ICE Juvenile Coordinator Status Report and Data

| Exhibit No. | Exhibit Description |
|---|---|
| 1 | Declaration of Leecia Welch, May 17, 2026 ("Welch Decl.") |
| 2 | Declaration of Elora Mukherjee, May 18, 2026 ("Mukherjee Decl.") |
| 3 | C.G.C. Declaration (Dilley), April 22, 2026 ("C.G.C Decl.") |
| 4 | A.O. Declaration (Dilley), May 08, 2026 ("A.O. Decl.") |
| 5 | M.T.H. Declaration (Dilley), April 22, 2026 ("M.T.H. Apr. Decl.") [1] |
| 6 | R.G.H. Declaration (Dilley), April 22, 2026 ("R.G.H. Decl.") |
| 7 | S.D.C. Declaration (Dilley), March 11, 2026 ("S.D.C. Decl.") |
| 8 | G.S. Declaration (Dilley), April 22, 2026 ("G.S. Decl.") |
| 9 | R.R.M. Declaration (Dilley), April 23, 2026 ("R.R.M Decl.") |
| 10 | O.S. Declaration (Dilley), May 16, 2026 ("O.S. May Decl.") [2] |
| 11 | A.L.G. Declaration (Dilley), March 11, 2026 ("A.L.G. Decl.") |
| 12 | Declaration of Rodolfo Altillo, May 14, 2026 ("Altillo Decl.") |
| 13 | E.C.M. Declaration (Dilley), April 23, 2026 ("E.C.M. Decl.") |
| 14 | W.L. Declaration (Dilley), March 12, 2026 ("W.L. Decl.") |
| 15 | J.A.I. Declaration (Dilley), April 23, 2026 ("J.A.I. Decl.") |
| 16 | Y.G.P. Declaration (Dilley), April 23, 2026 ("Y.G.P. Decl.") |
| 17 | O.B. Declaration (Dilley), April 23, 2026 ("O.B. Decl.") |

---

[1] M.T.H. has both a previously filed March declaration and a current April declaration.

[2] O.S. has both a previously filed August declaration and a current May declaration.

**Previously Filed Declarations**

| Docket No. | Description |
|---|---|
| 1764-3 | Declaration of Rebecca Wolozin, May 1, 2026 ("Wolozin Decl.") |
| 1748-5 | Declaration of M.S.P., March 12, 2026 ("M.S.P. Decl.") |
| 1764-5 | Declaration of Michael Musa-Obregon, April 30, 2026 ("Musa-Obregon Decl.") |
| 1764-4 | Declaration of Lyndsey Marcelino-Schalkwyk, April 28, 2026 ("Marcelino-Schalkwyk Decl.") |
| 1748-3 | Declaration of Leecia Welch, March 20, 2026 ("Welch Mar. Decl.") |
| 1748-25 | Declaration of A.K., January 14, 2026 ("A.K. Decl.") |

## TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................1

II. ICE Continues to Violate the *Flores* Settlement Agreement. .......................2

    A. Children Are Subjected to Prolonged and Unexplained ICE Detention. ............3

        1.  Prolonged Detention at Dilley..............................................................3

        2.  Increased Prolonged Detention of Children in Hotel Rooms ..................6

    B. Conditions of Detention at Dilley Continue to Violate the FSA. .......................9

        1.  Children's Mental Health Is Deteriorating as They Continue to Experience Long Stays and Harsh Treatment at Dilley.............................9

        2.  Dilley Still Provides Inadequate Medical Care to Children. ..................12

        3.  Children Are Still Not Being Provided Notice of Their *Flores* Rights. ..14

        4.  Children Still Lack Access to Child-Friendly Foods, Healthy Snacks, and Safe Drinking Water.......................................................................17

        5.  ICE Fails to Provide Adequate Sleeping Conditions for Children. ........20

        6.  Children Still Lack Access to Adequate Hygiene Products. ..................21

        7.  Children Lack Access to Appropriate and Clean Clothing......................22

        8.  Children Still Lack Access to Free Phone Calls to Their Family Members.............................................................................................23

        9.  Children's Education at Dilley Has Improved but Remains Inadequate and Recreation Remains Insufficient. ................................24

III. CONCLUSION..................................................................................................25

## I.   INTRODUCTION

ICE resumed incarcerating children and families at the South Texas Family Residential Center in Dilley, Texas ("Dilley") over a year ago. Since that time, thousands of children have been subjected to prolonged detention in unsafe and unsanitary conditions, with limited access to information about their *Flores* rights. This is Plaintiffs' fourth response in nine months to Defendants' fanciful reports of compliance with the *Flores* Settlement Agreement ("FSA"). In reality, little has improved at the facility, and children continue to suffer.

During the March 30, 2026 status conference, the ICE Juvenile Coordinator confirmed that ICE decided in January that "to facilitate cooperation with the Court and class counsel," it would "begin to exercise discretion in considering family units for conditional release . . . around the 20-day mark." Tr. of Mar. 30, 2026 Status Conf. 20:10-12 [Dkt. 1757]. However, the latest ICE JC Report calculates the average time in custody as nearly 60 days. May 4, 2026 ICE Juv. Coord. Suppl. Rep. at 4 [Dkt. 1768-1] ("ICE JC Report"). The ICE JC Report states that 567 children spent more than 20 days in ICE custody in February and March alone, with 63 children languishing at Dilley for more than 90 days in February, and 17 children at Dilley for more than 90 days in March. ICE JC Report at 3, 5; Ex. A, Feb. and Mar. 2026 ICE Fam. Residential Ctr 20-day Rep. [Dkt. 1768-2] ("20-day Census Charts").[3] While time in custody finally started to decrease in March for some children, the ICE JC Report's absurd explanation that "extended lengths of stay were primarily attributable to required immigration case-processing events" offers little assurance that ICE's exercise of discretion will ever result in substantial compliance with this Court's orders. ICE JC Report at 6. Under the FSA, ICE must release children expeditiously and provide *individualized* evidence about permissible reasons that ICE holds any child for over 20 days. *See*, Order re Pls.' Mot. to

---

[3] Plaintiffs' counsel's review of this data indicates there may be duplicates or other possible errors; counsel are unable to independently verify these numbers but rely on what Defendants have reported to the Court and Plaintiffs' counsel.

Enforce at 15-16, Apr. 24, 2020, [Dkt. 784] ("April 2020 Order"). ICE is clearly not doing so.

As with previous status reports, the latest ICE JC Report again disputes that there are any *Flores* violations at Dilley, with the possible exception of education, which the report calls "the most persistent compliance concern." ICE JC Report at 2. Presumably as evidence of purported *Flores* compliance, the ICE JC Report asserts that (a) there was a decrease in resident grievances and only two of 55 grievances had any merit; (b) Dilley received an "overall compliant rating in April" from River Tech; (c) "no food complaints were brought to the attention of the Food Service Department during the current reporting period"; (d) "[n]o grievances relating to overnight lighting have been filed since January"; and (e) "[t]he medical review and inspection materials did not identify *systemic behavioral health deficiencies* during the periods reviewed." *Id.* at 12-13, 23, 26 (emphasis added). The implication is that ICE need not address Plaintiffs' voluminous evidence of ongoing *Flores* violations because its own alternate, internal metrics do not identify any problems whatsoever.

Defendants' insistence that Dilley is fully compliant with the FSA is refuted once again by numerous new class member declarations from March and April 2026 alone. Families continue to report that their children are hungry, exhausted, anxious, and depressed. Welch Decl. ¶ 6. Ongoing FSA violations include inadequate medical care, lack of information about *Flores* rights and access to counsel, lack of access to healthy child-friendly food and safe drinking water, lack of clothing, inability of class members to sleep due to lights on in their living areas all night, lack of free calls to family members, and inadequate education and developmentally appropriate activities. *Id.*

**II.      ICE Continues to Violate the *Flores* Settlement Agreement.**

Since Dilley re-opened a little over a year ago, Plaintiffs' counsel have conducted ten site visits. After each site visit, Plaintiffs' counsel provided Defendants with a detailed, comprehensive list of *Flores* violations. Welch Decl. ¶ 3. Unfortunately, the concerns raised in the first letter sent on May 7, 2025, remain virtually the same as the concerns raised in the last letter sent on April 28, 2026. *Id.* ¶ 5. Plaintiffs' counsel have

also raised emergency time-sensitive concerns about particular children via email after each site visit and on several other occasions. *Id.* ¶¶ 3-4. Defendants generally send an indifferent response. *Id.* ¶ 3.

Pursuant to this Court's orders, the parties began conducting mediation sessions in January 2026. The parties met on January 23, February 4, March 2, and April 27, 2026. Plaintiffs' counsel have sent four additional meet and confer letters, and four emergency emails since mediation began. *Id.* ¶ 4. Despite some progress in children's length of stay and an agreement to have Dr. Paul Wise conduct medical site visits at Dilley, the parties still fundamentally disagree as to FSA compliance at Dilley. *Id.* ¶¶ 4-5.

**A. Children Are Subjected to Prolonged and Unexplained ICE Detention.**

**1. Prolonged Detention at Dilley**

During February and March, ICE reports that they detained 567 children for more than 20 days. ICE JC Report at 3. Defendants' data show that ICE detained 132 of those children between 51 and 90 days in February and 39 children between 51 and 90 days in March. 20-day Census Charts. ICE held 63 children at Dilley for more than 90 days in February and 17 children at Dilley for more than 90 days in March. *Id.* Defendants' explanations for prolonged detention demonstrate that they are failing to release children without unnecessary delay and failing to make and record prompt and continuous efforts toward family reunification and release in violation of the FSA. FSA ¶¶ 14, 18.

For over a decade, this Court has repeatedly made clear that Defendants can detain children for *up to* 20 days "if 20 days is as fast as Defendants [can] in good faith and in the exercise of due diligence" screen families and conduct individualized flight risk determinations. *See* Order re Resp. to Order to Show Cause at 10, 14, Aug. 21, 2015 [Dkt. 189] ("August 2015 Order"); Order re Pls.' Mot. to Enforce and Appoint a Special Monitor at 30, June 27, 2017 [Dkt. 363] ("June 2017 Order").

Detaining children past 20 days because of standard pending immigration cases and appeals violates this Court's orders. *See* April 2020 Order at 13-16. When detaining a child for more than 20 days, ICE must provide individualized explanations of why that specific child is deemed a flight risk and evidence supporting that finding. *See* Order re

Updated Juv. Coord. Reps. at 5, June 26, 2020 [Dkt. 833] ("June 2020 JC Order") ("For each minor detained at an FRC for more than 20 days . . . the ICE Juvenile Coordinator shall give a detailed individualized explanation of why that minor is a flight risk (cursory explanations such as 'In custody—pending IJ hearing/decision,' 'pending USCIS response,' 'plaintiff in a pending lawsuit'. . . shall not be acceptable explanations) . . . [rather] a prior unexplained failure to appear at a scheduled hearing would be a satisfactory explanation for continued detention if that explanation is verified in a declaration by an ICE representative under penalty of perjury.")

This Court has also held that ICE cannot detain children with removal orders for over 20 days if removal is not imminent. *See* June 2017 Order at 24 n. 16 (Class members awaiting removal should not "be treated any differently . . . with regard to the release provisions under the Agreement . . ."). Continued detention when removal is not imminent or "ready to take place" is a violation of ¶¶ 14 and 18 of the FSA *unless* ICE has provided an individualized assessment and determined that continued detention is necessary for safety reasons or because of a flight risk, and provides evidence, such as a sworn statement, about the reasoning. April 2020 Order at 13-14, 17-18; June 2020 JC Order at 5; *see* June 2017 Order at 25-27.

No individualized evidence showing flight risk or safety reasons has been provided for any of the thousands of children held over 20 days during the past year. ICE detained hundreds of children for more than 20 days in February and March for the same immigration proceeding and removal reasons that this Court has previously found insufficient to justify prolonged detention: 203 children because they had ongoing court cases; 137 children while they awaited voluntary departure or travel documents; 135 children during credible fear screenings; 79 children pursuing potential appeals; and 13 due to "processing considerations." ICE JC Report at 4; *see also* Mukherjee Decl. ¶¶ 8, 10, 15. This Court has explicitly and repeatedly rejected these "explanations." June 2020 JC Order at 5; August 2015 Order at 10; June 2017 Order at 24 n. 16; April 2020 Order at 13-14; 16.

Despite the Court's April 3, 2026 Order, the reasons given in the 20-day Census Charts remain just as vague as in previous data and rely on unsupported statements the Court has held do not excuse prolonged detention. Order re Mar. 30, 2026 Status Conf., Apr. 3, 2026 [Dkt. 1755]; 20-day Census Charts; June 2020 ICE JC Order at 5. For children who remain in custody or whom ICE deported after stays over 20 days, the Charts describe almost all of them as detained because they had pending cases, appeals, or voluntary departure and "Immigration and Nationality Act (8 U.S.C. 1101 et seq.) Significant likelihood of removal/Flight risk." 20-day Census Charts. Nothing in the lengths-of-stay descriptions supports designating any specific child as a "Flight risk." *Id.* Nor does "significant likelihood of removal" indicate ICE applied the *imminent* removal standard required for continued detention beyond permissible processing times. *Id.*; April 2020 Order at 13-14, 18. Additionally, for many children it is unclear whether their prolonged detention is allegedly justified by "Significant likelihood of removal" or because of "Flight risk." *Id.* For example, ICE's full explanation for one 64-day detention prior to removal is:

> Detention was continued pending a scheduled administrative hearing. The Immigration Judge ordered removal. FAMU removed day 64. Immigration and Nationality Act (8 U.S.C. 1101 et seq.)/Significant likelihood of removal/Flight risk.

20-day Census Charts at 2, row 4. ICE's insistence that immigration proceedings justify prolonged detention and that the agency can label children flight risks without supporting evidence indicates that ICE is failing to undertake individualized fact assessments. Nothing in the report or charts provides evidence that ICE engages or ever plans to engage in "case-by-case" determinations based on evidence of flight risk behavior for any class member.

Additionally, ICE has not provided individualized explanations for class members ultimately released after months of detention. ICE has labeled almost all children released after 20 days as "Immigration and Nationality Act (8 U.S.C. 1101 et seq.) Hold" with no supporting facts that could justify prolonged detention. 20-day Census Charts. For example, ICE's full explanation for a 66-day detention prior to release is:

Detention was continued pending USCIS fear adjudication and subsequent IJ review. Due to Habeas filing FAMU was released on day 66. Immigration and Nationality Act (8 U.S.C. 1101 et seq.) Hold.

20-day Census Charts at 9, row 19.

This entry exemplifies the arbitrary nature of ICE's decision to subject children to prolonged detention prior to release. The 20-day Census Charts document that ICE held 246 children in custody for over 20 days before releasing them with no explanation in February and March. 20-Day Census Charts. These charts also show ICE held 98 children in custody for over 50 days and 50 children for over 90 days before releasing them without any explanation regarding why ICE detained them for so long. *Id.* This suggests that each of these children was held for more than 20 days, some for months, even though ICE was aware their removal was not imminent.

Plaintiffs have raised concerns about prolonged detention of class members at Dilley for nearly a year, yet the February and March census data demonstrate hundreds of children still experience illegal lengths of stay.

### 2. Increased Prolonged Detention of Children in Hotel Rooms

The ICE JC report demonstrates that DHS continues to hold more and more children for long periods of time in hotel rooms in violation of this Court's orders.[4] Ex. B, ICE Hotel Stays Rep. Feb. and Mar. 2026 [Dkt. 1768-3] ("Hotel Stays Report"); Order re Ps.' Mot. to Enforce Settlement as to "Title 42" Class Members at 17, Sept. 4, 2020 [Dkt. 976] ("Sept. 4, 2020 Order") (allowing only for "one to two-night stays while in transit or prior to flights, if minors are traveling longer distances, or due to unexpected flight delays."); Order re Defs.' Ex Parte App. to Stay at 2, Sept. 21, 2020 [Dkt. 990]; *Flores v. Garland*, 3 F.4th 1145, 1156-57 (9th Cir. 2021). Defendants have reported a sharp increase in class members experiencing extended hotel stays in recent months. Hotel Stays Report; ICE Hotel Stays Rep. Dec. 2025 [Dkt. 1736-6] ("Dec. Hotel Stays

---

[4] Plaintiffs direct the Court to their recently filed Opposition to Defendants' "Motion to Reconsider" outlining in greater detail Defendants' unlawful practice of holding class members in hotel rooms. Pls.' Opp. to Defs.' Mot. for Reconsideration, May 1, 2026 [Dkt. 1764] ("Pls. Opp.").

Report"); ICE Hotel Stays Rep. Jan. 2026 [Dkt. 1736-7] ("Jan. Hotel Stays Report"). Defendants attributed the increase in December and January in part to "holiday and winter weather disruptions." *See* Mot. For Reconsideration at 12, Apr. 17, 2026 [Dkt. 1760]. But the Hotel Stays Report shows that the number of children DHS held isolated in hotel rooms for over 72 hours *doubled* to 86 children in February and March 2026 from 43 children in December 2025 and January 2026. Hotel Stays Report; Dec. Hotel Stays Report; Jan. Hotel Stays Report; *see also* Pls.' Resp. to March 13, 2026 ICE Juv. Coord. Status Rep. and Data at 10 [Dkt.1748] ("Pls.' March 2026 Resp."). Defendants do not explain or even acknowledge this disturbing increase in their status report. ICE JC Report at 6.

Defendants attempt to justify prolonged hotel detention by describing circumstances that would predictably take long periods of time to resolve. For example, DHS held some children in hotel rooms while procuring travel documents and coordinating scheduling. Hotel Stays Report; *see also* Pls. Opp. at 15-16. DHS held one family with three children in two hotels for over two weeks (17.7 days) in order to obtain a U.S. passport for their child prior to removal. Hotel Stays Report at 4. As with most other children in Defendants' Hotel Stays Report, Defendants do not provide any explanation for why the family had to remain in active ICE custody isolated in a hotel as opposed to an alternative to detention while their child's travel documents were obtained. *Id.*

Nor do Defendants provide any explanation to justify the frequent movement of children between hotels at all hours of the day and night *within the same city* when unforeseen delays occur. Hotel Stays Report. For example, DHS held one child in three different hotels over a period of six days in Phoenix while waiting for a canceled flight to be rescheduled; DHS held another child in three different hotels in San Antonio over the period of four days due to "flight scheduling." *Id.* at 2-3.

Finally, Defendants' refusal to timely provide Plaintiffs with notice of holding class members in hotels and detailed reasons for their detention in irregular unlicensed placements likewise violates the FSA and this Court's prior orders. *See* Sept. 4, 2020

Order at 17; Declaration of Rebecca Wolozin, May 1, 2026 [1764-3] ("Wolozin Decl.") (detailing monthslong email correspondence requesting information specific to hotel detentions with no substantive reply).[5] Defendants' withholding information about class members placed in hotels, together with persistent inaccuracies and substantial omissions in the data produced to Plaintiffs and filed with the Court, raises serious concerns. Defendants omitted nine children who appear in the monthly data reports produced to Plaintiffs from the Hotel Report data filed with the Court. This includes multiple children whom Plaintiffs specifically flagged for Defendants in mid-April. *See* Wolozin Decl. ¶¶ 12-13, Ex. C; Hotel Stays Report. For example, 12-year-old M.M.S. and 14-year-old C.M.S., whose nine-day hotel stay is discussed in Plaintiffs' opposition to Defendants' Motion to Reconsider, do not appear in the latest Hotel Stays Report. Wolozin Decl. ¶ 12; Hotel Stays Report; *see* Pls. Opp. at16 (citing Declaration of M.S.P., March 12, 2026 [Dkt. 1748-05] ("M.S.P. Decl.") and Declaration of Michael Musa-Obregon, April 30, 2026 [Dkt. 1764-5] ("Musa-Obregon Decl."). Additionally, four children who appeared in the Hotel Stays Report data filed with the Court did not appear in the March data Defendants provided to Plaintiffs, despite being within the parameters of both data sets. Plaintiffs alerted Defendants to these errors on May 8, 2026. Plaintiffs' evidence suggests that these children were likely being held in a hotel room without access to the outdoors or to counsel with ICE officers or transportation contractors remaining in the room for the duration. *See* M.S.P. Decl. ¶¶ 10-16; Declaration of Lyndsey Marcelino Schalkwyk ¶ 16, April 28, 2026 [Dkt. 1764-4] ("Marcelino-Schalkwyk Decl.").

Defendants' February and March 2026 data and explanations regarding holding children in hotels shows increased noncompliance with the FSA. Defendants are placing a growing number of children in unsafe conditions that are inconsistent with their

---

[5] Plaintiffs sent another email on May 8, 2026, questioning much of this data. Defendants responded on Friday, May 15 stating only that they had added one identified missing class member to the monthly data and plan to file corrected data to replace the filed ICE Family Residential Center 20-day Report data at Dkt. 1768-2. Defendants also stated they were continuing to look into data issues Plaintiffs identified in the filed Hotel Stays Report at Dkt. 1768-3.

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

particular vulnerabilities as minors. FSA ¶¶ 11, 12.A. *See also*, Pls. Opp. at 7-9 (describing Defendants' past statements on the record that they were complying with the FSA by ceasing "hoteling programs" and relying on hotel placement for only "brief, ad hoc hotel stays" subject to this Court's prior orders); Marcelino-Schalkwyk Decl. ¶¶ 11-13 (describing children with preexisting medical conditions held for prolonged period in a hotel room); *see also*, Tr. of Mar. 30, 2026, Status Conf. 29:16-23 [Dkt. 1757] (ICE Juvenile Coordinator acknowledged that medical exams and services are typically not available during hotel stays.)

**B.    Conditions of Detention at Dilley Continue to Violate the FSA.**

Plaintiffs' counsel visited Dilley again in April. Welch Decl. ¶ 2. Class members and their families continue to report serious concerns regarding the impact of prolonged detention on children's mental health, inadequate medical care, lack of information about *Flores* rights and access to counsel, lack of access to healthy and safe child-friendly foods and snacks, illness from drinking the water, lack of clothing, lack of sleep due to lights on in their living areas all night, lack of free calls to family members, and lack of adequate education and developmentally appropriate activities.[6] *Id.* ¶ 6.

**1. Children's Mental Health Is Deteriorating as They Continue to Experience Long Stays and Harsh Treatment at Dilley.**

Dilley's harsh, prison-like environment remains unsuitable for children. *See, e.g.,* C.G.C. Decl. ¶ 15, ("If I had to describe Dilley with one word, it would be 'horrible.'"); A.O. Decl. ¶ 7 ("I'm detained like someone who committed a crime."); M.T.H. Apr.

---

[6] Exhibit 6 of the ICE JC Report reviews 35 declarations filed by Plaintiffs in an unsuccessful attempt to discredit the sworn statements of class members and their families. Ex. 6, ICE Juv. Coord. Suppl. Report Flores Declarations 35 Cases [Dkt. 1768-10] ("ICE Resp. 35 Cases"). ICE's chart does not disprove Plaintiffs' concerns but rather lists when grievances were not filed, demonstrates the inadequacy of medical interventions, disputes a declarant's statement with no contrary evidence, and misquotes declarations in failed efforts to undermine the declarants. *Id.*; Welch Decl. ¶¶ 24-28. Notably, ICE admits that it took drawings and artwork "because they were considered protest-related materials . . ." and repeats the false assertion that there were no lockdowns from January to February 2026, in direct contradiction to many sworn statements. ICE Resp. 35 Cases at 3; *see* Pls.' March 2026 Resp. at 12.

Decl. ¶ 9 ("Recently [my son] asked me: when are we going to get out of jail? . . . [W]e cannot leave or go to a park, [] he cannot have his toys . . . it feels like a jail."); R.G.H. Decl. ¶ 7 ("[My son] misses school, his friends, playing, our apartment . . ., his freedom . . ."); S.D.C. Decl. ¶ 5 ("I have started to feel like . . . I'm stuck between four walls."); G.S. Decl. ¶ 59 ("If I could change one thing here it would be to shut down the whole facility.").

Children's mental health continues to deteriorate at Dilley with devastating results. *See* Mukherjee Decl. ¶ 24 ("Every child who I have represented in federal immigration custody from March 1, 2026 to date has experienced mental health distress in detention."); C.G.C. Decl. ¶ 8 (child feels depressed, cries, and wants to be alone); M.T.H. Apr. Decl. ¶ 9 ("Sometimes my son will just burst from all of his emotions and start crying."); R.G.H. Decl. ¶ 24 (son is depressed); R.R.M. Decl. ¶ 10 ("My daughter cries all the time and is sad and doesn't want to be here. She misses her friends from school and was doing very well there. Now that she's here, she doesn't like to leave the room or go outside."); O.S. May Decl. ¶ 9 (Dilley is "mentally devastating for children."); S.D.C. Decl. ¶ 5, 9 (child is depressed and has no energy even for things he used to love to do); A.L.G. Decl. ¶ 11 ("[My child's] anxiety has led her to start biting her nails non-stop . . ."); A.O. Decl. ¶ 13 ("I worry for my son's mental state . . . he's waking up at night very frightened and scared and crying a lot. He's become more aggressive."); Altillo Decl. ¶ 24.

Long lengths of stay and the arbitrariness of release decisions exacerbate the impact of detention on children's mental health. *See* O.S. May Decl. ¶ 84-85 ("I lost a year of my life at Dilley. I lost a year of memories, of progress, of everything. . . . Dilley distances kids from the real world and takes away all the normalcy from everything."); G.S. Decl. ¶ 45 ("It makes me feel hopeless to be here for so long, because now it'll take me and my whole family a long time to get back to normal because of how much money and education we have lost."); A.O. Decl. ¶ 22 ("[My son's] friend left and yesterday he was crying a lot and asking for this friend. It's hard for him to be here for so long . . . The kids leave and he's the only one who stays."); M.T.H. Apr. Decl. ¶ 9 ("My son sees other

friends leave here and asks: when we will be able to leave? Why are we still here?"); R.G.H. Decl. ¶ 24; S.D.C. Decl. ¶¶ 5-11 ("I have started to feel like all the days are the same . . . I keep a calendar in my notebook where I mark an 'X' next to each passing day to track how long I've been here . . . it makes me cry with anxiety that I might not get out of here. Everything feels so bad . . . [i]f we had only spent a couple of days, maybe things would feel different."); Mukherjee Decl. ¶ 13 ("[My 9-year-old client] could not understand why he was detained at Dilley for weeks on end. He grew increasingly disoriented and distressed at Dilley, hitting himself, crying through the night, and begging to return to his home . . ."). In March and April, *Flores* Counsel met with families who had been detained for 323 days (O.S. May Decl. ¶ 4), 143 days (S.D.C. Decl. ¶ 4), 135 days (A.O. Decl. ¶ 4), 91 days (E.C.M. Decl. ¶ 4), 90 days (C.G.C. Decl. ¶ 4), 77 days (A.L.G. Decl. ¶ 3), 76 days with 10 of those days spent in CBP (M.T.H. Apr. Decl. ¶ 4), two months (W.L. Decl. ¶ 4), and 50 days (J.A.I. Decl. ¶ 4).

To make matters worse, families still consistently report harsh treatment by guards at Dilley. One parent shared this shocking treatment:

> About 5 officers with ICE badges and about 10 staff from CoreCivic came into the hallway between the rooms where we sleep . . . and they started covering our windows by standing in front of them . . . We saw they brought chains and shackles into the room across from us. They grabbed this woman from that room and she and her daughter started crying. She . . . started saying her case was not over and that they could not deport her at this point. But then, they chained her right there. Her 10-year-old cried harder as she watched her mom be shackled. The officers just took them away and put them in a car. It made us all so scared.

S.D.C. Decl. ¶ 12; *see also* M.T.H. Apr. Decl. ¶ 6 (officers threatened to chain parents up in front of their son); G.S. Decl. ¶ 49 ("One time ICE told my dad to get lost. My dad was just trying to ask if there was an appeal in our file."); R.G.H. Decl. ¶¶ 18, 35 ("No one here is qualified to work with children – they treat the children like adults."); R.R.M. Decl. ¶¶ 17, 20 ("CoreCivic staff yell at my daughter whenever she doesn't stay near me. . . . [S]taff are not nice to us and refuse to give us what we need."); Y.G.P. Decl. ¶ 10 (staff prohibited storing stroller into the room at night even though cats were sleeping in it, causing severe allergic reactions for the baby); O.S. May Decl. ¶ 23 ("[S]taff ate pizza,

donuts, and outside food that the kids cried when they saw, but they didn't care and ate in front of them cruelly. They would eat candy and lollipops in the middle of the recreation area, knowing that all the kids would do anything to get what they have but can't."); Altillo Decl. ¶¶ 12, 14 (one parent reported guards frequently wake children and another reported ICE threw away a child's belongings).

Families report they fear ICE retaliation for raising concerns about conditions at Dilley or trying to advocate for themselves in their immigration cases.[7] *See* O.S. May Decl. ¶ 31 ("We believe [my older sister] was separated from us to live in a different part of Dilley because she spoke to the media. . . . It felt like retaliation . . ."); R.G.H Decl. ¶ 33 ("I know of a friend here who files grievances and has been told if he doesn't stop, he'll be sent somewhere else."); A.O. Decl. ¶ 9 ("They have threatened to separate me from my son . . ."); G.S. Decl. ¶ 19 ("Once when we talked to ICE, they said that if we didn't sign our travel documents we could be separated. My dad was scared of this so he signed for us."); Altillo Decl. ¶ 13 (Clients fear reporting bad behavior "because the guards say they will file reports on [family members'] behavior with ICE and the immigration court.").

In response to Plaintiffs' concerns regarding children's serious mental health deterioration at Dilley, the ICE JC Report merely states: "The medical review and inspection materials did not identify systemic behavioral health deficiencies during the periods reviewed." ICE JC Report at 26. Either these materials omit overwhelming facts on the ground, or the ICE JC Report simply ignores them.

## 2. Dilley Still Provides Inadequate Medical Care to Children.

Dilley continues to provide inadequate medical care to children and their parents. *See* Mukherjee Decl. ¶ 19 ("Nearly all of my clients who have been detained at Dilley

---

[7] Across the past two reports, defendants assert there were 324 grievances, yet only 22 were deemed "founded." Given persistent concerns raised by class members over the past year, family's fear of submitting grievances, and the apparent unlikelihood a grievance will be deemed "founded," Plaintiffs question the purpose and legitimacy of the grievance process. ICE JC Report at 12; March 13, 2026, ICE Juv. Coord. Suppl. Report, at 33-34 [Dkt. 1748-1] ("Mar. ICE JC Report"); *see also* O.S. May Decl. ¶¶ 39-42.

from March 1, 2026 to date have expressed concern about the medical care provided to them at Dilley."). Since Dilley re-opened, families have raised medical care concerns to RAICES attorneys *on at least 948 occasions*. Altillo Decl. ¶ 17; Pls.' March 2026 Resp. at 14.

Class members and their families continue to report that Dilley neither provides adequate medical care nor appropriately accommodates children's special needs. Mukherjee Decl. ¶¶ 11, 18, 22 (discussing child still detained at Dilley after 147 days who developed breathing difficulties and regressed behaviorally and a nonverbal five-year-old with developmental delays who struggled to eat and did not have a bowel movement for nine days); Altillo Decl. ¶¶ 17-23 (discussing medical care delays of a client with bleeding rashes, lack of access to medications, denial of dental intervention to children in pain, and medical staff dismissing child weight loss and health concerns).

Families continue to report that Dilley staff minimize or ignore their medical concerns. *See* S.D.C. Decl. ¶ 20 ("The nurses here only ever give Tylenol regardless of the type of sickness."); W.L. Decl. ¶ 11 ("We went to the medical building the first two times my daughter was sick, but it was useless. They only give out Tylenol or ibuprofen so it's not useful to go."); G.S. Decl. ¶ 57 ("My sister has a lot of stomach pain. We think it's from the food, but we aren't sure what it is. They are just giving her Ibuprofen and Tylenol."). In many declarations, families at Dilley report that medical staff give out only over-the-counter painkillers regardless of the medical issue:

> My whole head is inflamed. It feels like there is water in my ears, and they feel bad. I have pain that goes up my neck and into my teeth. I do not know what is causing it. But no matter what type of pain or sickness we have, whenever we go to medical, they give us ibuprofen. I wish there was some way to get a real diagnosis.

A.L.G. Decl. 9.

The ICE JC Report asserts that medical care at Dilley remained fully compliant with the FSA in February, March, and April 2026. ICE JC Report at 19. The Report notes, however, that a review "identified several areas for continued attention, including staffing levels in certain medical positions, further formalization of selected protocols,

13

development of a broader keep on person medication policy, and continued improvement in documentation, coordination, and communication." *Id.* at 22.

Furthermore, the ICE JC Report provides three conflicting hospitalization datapoints, also demonstrating the need for improved documentation.[8] ICE JC Report at 12, 19, 21-22; Ex. 8, Hospitalizations February-April 2026 [Dkt. 1768-12] ("Hospitalizations Report"). First, the Report notes from February to April 17, there were "eleven hospital patients, and twenty-six residents referred to the emergency room." ICE JC Report at 12. Later, the Report identifies "23 hospital or emergency room visits since January 1, 2026." *Id.* at 19. Finally, the same Report states there were "five hospitalization events . . . in February, with none reported in March or April." *Id.* at 21; Hospitalizations Report.

### 3. Children Are Still Not Being Provided Notice of Their *Flores* Rights.

Once again, the ICE JC Report fails to address Plaintiffs' concern that children at Dilley are not being apprised of their *Flores* rights. As repeatedly noted, Dilley has no legal orientation program for children and families at Dilley beyond a 13-minute animated immigration law video that never once mentions *Flores*. Welch Decl. ¶ 8; Altillo Decl. ¶¶ 29-31.[9]

To date, Plaintiffs' counsel have not spoken with a single family at Dilley who recalls learning about their child's *Flores* rights in a video, training, or documentation provided by ICE or CoreCivic. *See* Welch Decl. ¶ 9; *see also, e.g.* O.S. May Decl. ¶ 10

---

[8] Similarly, in March, ICE reported there were no ER visits or hospitalizations despite evidence to the contrary. Mar. ICE JC Report at 13; Declaration of Welch. ¶¶ 11-12, Mar. 20, 2026, [Dkt. 1748-2] ("Welch Mar. Decl.")

[9] As repeatedly noted, the CoreCivic Resident Handbook explicitly authorizes "open access" to "group presentations on U.S. immigration law and procedures and all other relevant issues related to . . . discharge processes, including a resident's legal rights." Welch Decl. Attach. A at 31. In addition, ICE's Family Residential Standards ("FRS") expressly provide that "[a]n electronic presentation will not be considered a replacement or substitute for an in-person or live [legal rights] presentation, when available." 2020 Family Residential Standards § 6.4 at 415, https://www.ice.gov/doclib/frs/2020/2020family-residential-standards.pdf.

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

("No one ever discussed my rights with me for more than 10 months."); R.G.H. Decl. ¶¶ 21-22; E.C.M. Decl. ¶ 14; J.A.I. Decl. ¶ 17; O.B. Decl. ¶¶ 8-9; R.R.M. Decl. ¶ 11 ("No one told me about my or my daughter's legal rights until RAICES attorneys met with me after I had been here more than two weeks. I only heard about *Flores* from other people here after they saw me crying and told me about it and the 20 days and gave me the RAICES phone number."); S.D.C. Decl. ¶ 17; W.L. Decl. ¶ 9; A.O. Decl. ¶ 10; G.S. Decl. ¶ 14. Not only does it violate the FSA to withhold information on *Flores* rights, but also it causes extreme distress and confusion among families at Dilley. Welch Decl. ¶ 10.

The ICE JC Report again asserts that the 13-minute video, I-770 form, FSA Exhibit 6, and CoreCivic Resident Handbook satisfy ICE's obligation to inform class members of their *Flores* rights. ICE JC Report at 16. This Court has repeatedly held otherwise. *See, e.g.*, Order Approving Final Notice of Rights, Jan. 5, 2021 [Dkt. 1056]. No matter how many times a JC Report from ICE suggests that the FSA requires nothing more than the provision of the unrelated video, two forms that do not explain *Flores* rights, and a CoreCivic handbook, that does not make it so.[10]

Compounding this lack of information about *Flores* rights, class members continue to face barriers to making free legal phone calls to counsel, including *Flores* attorneys or other private lawyers. Welch Decl. ¶ 11; S.D.C. Decl. ¶ 21 ("I haven't been able to make any free pro bono calls here by using the system where you are supposed to mark 6. I saw a woman try it recently, and it did not work."); *see also* Altillo Decl. ¶¶ 32-39 (describing recent changes to attorney visitation at Dilley that limit class members' access to counsel). Sometimes, class members are unaware they even have the right to call attorneys for free. *See* O.B. Decl. ¶ 12 ("I have not contacted lawyers because I thought I have to pay. This is the first time I am hearing I don't have to pay for calling lawyers.");

---

[10] Neither the video nor the CoreCivic Resident Handbook mentions *Flores* or otherwise explains *Flores* rights. Welch Decl. ¶ 8. The I-770 form only addresses the "right to use the telephone," "the right to be represented by a lawyer," and the "right to a hearing before a judge." Ex. 4, DHS Form I-770 (4/15) [Dkt. 1768-8]. Exhibit 6 of the FSA only addresses the right to call a lawyer and seek judicial review "if you believe you have not been properly placed or that you have been treated improperly." *See* FSA Ex. 6.

O.S. May Decl. ¶ 28 (For 10 months, we "were always paying for the phone. No one ever told us anything about free calls to our family or even to our attorney."). Although the ICE report asserts "indigent residents may request free domestic calls from unit managers at any time, including for legal calls," not one family Plaintiffs' counsel have spoken to has ever been aware of this option. ICE JC Report at 17; Welch Decl. ¶ 12.

The JC Report asserts, "Gmail access was restored on March 6, 2026 through library computers. Internet access is permitted except for social media and adult content." ICE JC Report at 17. Despite this assertion, families have consistently reported since March 6 that there is still little to no Gmail access. *See* R.G.H. Decl. ¶ 29; A.L.G. Decl. ¶ 20; O.S. May Decl. ¶ 43; S.D.C. Decl. ¶ 16 ("There is still no way to communicate with people via our Gmail emails . . ."). Families at Dilley further report that the internet restrictions and lack of simple internet research options have impeded their ability to work on their immigration cases or otherwise advocate for themselves. *See* A.L.G. Decl. ¶ 22 ("The facility also took away our access [to] ChatGPT after they noticed people printing information about how to ask for information and make grievances. The staff are just trying to stop us from having access to tools to advocate for ourselves."); S.D.C. Decl. ¶¶ 16-17.

Limited interpretation access for non-English and non-Spanish speakers further exacerbates families' confusion about their legal cases, potential release dates, and their *Flores* rights. *See* R.G.H. Decl. ¶ 21 ("They tried to get me to sign a piece of paper that might have been about this. But it was in English and I didn't understand."); O.B. Decl. ¶¶ 13-14 ("I can't understand anything here – no one has explained anything to me in French. There does not seem to be anyone here besides me who speaks French. . . . I have not had a translator or interpreter since we arrived here."); S.D.C. Decl. ¶ 23 ("[T]he people who do not know Spanish or English really struggle here. My mom tries to help the Turkish families and other families who do not know English or Spanish with the tablets, but they do not really have a way to understand things."); W.L. Decl. ¶ 16 ("It's been difficult for us to communicate with the staff because we don't speak English. If something really important is happening, they'll find an interpreter but it's not something

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

that is usually available."); A.O. Decl. ¶ 19 ("No one has offered me interpretation for [rare identifying language], even if I'm speaking to the officers here."); G.S. Decl. ¶ 48.

### 4. Children Still Lack Access to Child-Friendly Foods, Healthy Snacks, and Safe Drinking Water.

Families continue to report concerns about their children's nutrition at Dilley. Countless children and parents have reported that the food makes them sick. *See* A.O. Decl. ¶ 15 ("My son has not been eating well. Lots of people are getting sick . . ."); W.L. Decl. ¶¶ 12-13 ("The green beans here are especially gross and they have caused my daughter to throw up and have diarrhea. The cauliflower once had bugs in it and now everyone here is afraid to eat that and won't accept it. The food is unhygienic here. . . . Our daughter . . . hasn't been growing or gaining weight."); O.S. May Decl. ¶ 21 ("Many times, people would stop eating for several days after finding mold or even worms in their food. I saw a real worm in the food before. My older sister once found a human fingernail in her food."); C.G.C. Decl. ¶ 11 ("The food has made my mom sick. When she ate the meatballs, she felt sick and had to go to the bathroom right away."); R.R.M. Decl. ¶ 8 ("My daughter does not eat the food because she doesn't like it; she only eats the salad. I only eat the salad because the other food makes me sick."); *see also* Altillo Decl. ¶ 28 (family denied bottled water for formula).

Children and their parents also express concerns about food taste, variety, and quality. *See, e.g.*, Mukherjee Decl. ¶ 26 ("Every verbal child and parent who I have worked with at Dilley from March 1, 2026 to date has reported that the food is not appropriate or palatable for children and families."); O.S. May Decl. ¶¶ 21-22 ("The food at Dilley is one of the biggest issues for all the residents. . . . The food was very greasy and very repetitive. I was eating the same things for the last 10 months."); C.G.C. Decl. ¶ 11 ("Mostly they give the same food – so when you've been here twelve weeks, it repeats a lot."); M.T.H. Apr. Decl. ¶ 10 ("My son still does not eat well here. The food is too spicy and has too many condiments and sauces for him."); R.G.H. Decl. ¶ 19 ("It's all processed, frozen food."); E.C.M. Decl. ¶ 17 ("The only fruit they give us is from cans. When my son sees some people with special diets getting fresh grapes, he really craves

them. I told him that once we get out of here, he can have all the grapes he wants."); J.A.I. Decl. ¶ 9-10 ("We are tired of not having fresh fruit here."); G.S. Decl. ¶ 40 (food is very bad and not fresh); Altillo Decl. ¶¶ 23, 26.

Families continue to report that due to the lack of varied, child-friendly food, inappropriate mealtimes, and the prohibition of food in rooms, their children are constantly hungry. *See* G.S. Decl. ¶ 41 ("Right now, there are certain times to eat, and if you don't go then you'll starve."); Mukherjee Decl. ¶¶ 21-22 (one child's stomach "appeared visibly distended and uncomfortable" during zoom video calls and another child "refused to eat solid food for twelve days" at Dilley); A.O. Decl. ¶ 15 ("The last few weeks my son has been eating milk, juice, and apples. He doesn't eat much else. No one has offered me any toddler food or pouches for my son."); J.A.I. Decl. ¶¶ 9-10, 15 ("I don't go to breakfast because it is too early and it's just the same thing every day. It's also hard because they serve dinner very early. We have to buy food at the commissary because we're hungry by 8 p.m."); C.G.C. Decl. ¶ 12 ("They tell you that you can have as many servings of the food as you want, but when it's good – like the pizza – you can only get one serving. . . . My mom will buy me ramen and chips from the commissary for the days that I'm not eating the food."); M.T.H. Apr. Decl. ¶ 10 ("[D]inner is served at 5 p.m., so by 8 p.m. [my son] is hungry. We have to buy food for him to eat at the commissary."); E.C.M. Decl. ¶ 17 ("[B]reakfast and dinner are served so early. I need to buy snacks at the commissary because [my son] is hungry in the evenings."). It is unclear why food from the commissary is permitted in the rooms at all times, but families cannot take food from the cafeteria to their rooms and save it for later when children are hungry. Welch Decl. ¶ 16.

The ICE JC Status Report ignores families' constant and repeated concerns, instead echoing previous assertions that Dilley receives no food complaints and has multiple diets available. ICE JC Report at 22-24. The ICE JC Report does not address the voluminous evidence Plaintiffs have gathered that children's physical and mental health are suffering due to the food served at Dilley. The Report also omits that families at Dilley have raised concerns about the lack of fresh fruit during town hall meetings with

18

CoreCivic staff. *See* E.C.M. Decl. ¶ 19 ("At the community meeting about a week ago, a [] mother raised how hard it was for children not to get fresh fruit when they are seeing other people eat it who have special diets.").

Despite installation of water filters in the living quarters following months of complaints from class members, families still repeatedly report that the water tastes bad and makes them sick. *See, e.g.,* E.C.M. Decl. ¶¶ 18 ("The tap water always tasted weird and made me feel a weird sensation when I would drink it . . . one day, I saw a bunch of white particles in the bottom of the cup of water from the melted ice . . ."); C.G.C. Decl. ¶ 13 ("The water from the tap here tastes weird . . ."); J.A.I Decl. ¶ 11 ("When I first came to Dilley, I drank the water and it made my stomach hurt right away. I didn't want to drink it after that."); R.R.M. Decl. ¶ 9 (water makes family sick); A.L.G. Decl. ¶ 14 ("[T]he tap water gives our daughter diarrhea. The guards say the water is fine, but they will not drink it. It tastes so bad."); A.O. Decl. ¶ 15 ("My son has had diarrhea here, and I think it's because of the water."); G.S. Decl. ¶ 43 ("They put filters on the water, but it still smells like chloride. . . . One time it caused us to throw up."); Mukherjee Decl. ¶ 25 ("I have reviewed medical records from Dilley for my clients in which children report that they are suffering from stomach pain, vomiting, diarrhea, and other stomach issues as a result of drinking the water that is available for free at Dilley."); Altillo Decl. ¶ 27.

Recently, CoreCivic lowered the price of bottled water at Dilley, which has made it possible for some families to buy bottled water. *See* G.S. Decl. ¶ 43 ("A lot of people complained when Congress came, so they had to lower the price."); M.T.H. Apr. Decl. ¶ 11 ("They recently brought down the cost of a pack of water from $30 to $9. About a month or so ago, a lot of the children became sick and were vomiting a lot. They told the parents the children needed to be drinking more water. The families complained and complained because they could not afford the water. The guards told us they were dropping the price of the water because of this . . ."); E.C.M. Decl. ¶¶ 18-19 ("[I]t used to cost $30 for a 24-pack . . . They recently reduced the price of water to $9 and now I have the 'luxury' of drinking clean water, too."). Despite this welcome gesture, some families still cannot consistently afford to buy bottled water. *See* R.R.M. Decl. ¶ 9 ("My daughter

19

and I can't drink the water here because it makes us sick; our friends give us bottled water and we split a bottle between us."); A.O. Decl. ¶ 15 ("I could buy water, but I don't have money to do that very often."); Mukherjee Decl. ¶ 25 ("Families use their limited commissary funds to purchase bottled drinking water."); Altillo Decl. ¶ 27.

Despite endless complaints from families about the tap water, the ICE JC Report categorically denies them. ICE JC Report at 24-25. The Report asserts that the water is tested monthly and that "bottled water is not itself treated as a medical intervention for diarrhea." *Id.* at 25. Yet families continue to report being told to drink bottled water at medical visits and that the tap water makes their children sick. *See, e.g.*, M.T.H. Apr. Decl. ¶ 11; Declaration of C.H.H. ¶ 26, Jan. 15, 2026, [Dkt. 1748-13] ("C.H.H. Decl."); Declaration of M.L.S. ¶ 14, Feb. 12, 2026, [Dkt. 1748-36] ("M.L.S. Decl."). It is unclear what it will take for ICE to provide children with safe water to drink.

### 5. ICE Fails to Provide Adequate Sleeping Conditions for Children.

Families also continue to raise concerns that their children cannot sleep because lights are kept on in living areas all night, and the eye masks offered do not provide an adequate solution. *See* C.G.C. Decl. ¶ 9 ("It's hard to sleep here because the lights are on all night . . ."); R.G.H. Decl. ¶ 26 ("We have bad sleep here; the lights hit our eyes all night. We feel like caged chickens in an incubator."); E.C.M. Decl. ¶ 16 ("It is very hard to sleep with the lights on all night. It's harder for my son because he has to sleep on the top bunk. The officers will not let parents sleep on the top bunk . . . They offer eye masks but they are so tight and uncomfortable."); R.R.M. Decl. ¶ 14 (lights cause headaches); J.A.I. Decl. ¶ 13 (the eye masks are too tight); O.S. May Decl. ¶¶ 26-27 (lights are barely dimmed at night and eye masks are made of an irritating material); A.L.G. Decl. ¶ 6 (child cannot sleep because lights stay on all night); G.S. Decl. ¶ 44 ("Back at home, I like to sleep in darkness. It's not dark here. You can't put something up like a towel to block the light. . . . We don't feel comfortable using the eye masks."); Mukherjee Decl. ¶¶ 10, 13-14 (clients cannot sleep because lights are always on).

More recently, children and parents report that back pain due to poor quality mattresses is also impeding children's sleep. *See, e.g.*, C.G.C. Decl. ¶ 9 ("My back hurts a

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

lot from the bed because the mattress is so thin."); R.G.H. Decl. ¶ 26 ("My son is not comfortable because the bed is hard; the metal sticks in his back."); E.C.M. Decl. ¶ 16 ("My son . . . [has] back pain from the bunk beds."); R.R.M. Decl. ¶ 14 ("The beds are too hard and hurt our backs and necks. We wake up sore all over our bodies."); A.L.G. Decl. ¶ 7 ("We also wake up with back pain here, because the mattresses are so thin. My daughter sleeps on top of me trying to be more comfortable.").

Families report their children are exhausted from lack of sleep, which is impacting their physical and mental health. *See* S.D.C. Decl. ¶ 11 ("Having to sleep with the lights on all the time for months has made me so tired. I do not know what it means to have a pleasant night of sleep anymore."); W.L. Decl. ¶ 14 ("She can't sleep for long periods of time because the lights are on and people are coming in and out of the room to inspect. It's as though she's always only half asleep."); J.A.I. Decl. ¶ 13 ("Even after two months, I'm not used to it and it is still really hard to sleep."); A.O. Decl. ¶ 14 ("I try to get [my son] to sleep around 8 p.m. but he often can't fall asleep until midnight or 1 a.m.").

In response, the ICE JC Report states that "no grievances related to overnight lighting have been filed since January" but that "if a minor is experiencing sleep disruption . . . [the child's parent] may bring the child to the medical department for assessment." ICE JC Report at 26. Given that the medical department does not have the authority to turn the lights off at night so that children can sleep, it is unclear what will come from such an assessment. Welch Decl. ¶ 18.

Lack of sleep harms children's brain development and undermines long-term physical and mental health. Welch Mar. Decl. Attachs. C & D. For some children, lack of sleep is the most pressing issue they face at Dilley. *See* C.G.C. Decl. ¶ 19 ("If I could change one thing here, it would be to turn off the lights at night.").

### 6. Children Still Lack Access to Adequate Hygiene Products.

Although the ICE JC Report states that "the standard hygiene kit includes soap, shampoo, toothbrush and toothpaste, deodorant, feminine hygiene products, toilet paper, towels and a laundry bag," families continue to report that they do not receive soap and shampoo in hygiene kits. ICE JC Report at 27; Welch Decl. ¶¶ 19-20. Instead, the only

free option is harsh all-purpose hand soap in the showers, which causes children's skin to get dry and break out in rashes. *See, e.g.,* G.S. Decl. ¶ 23 ("We haven't gotten any shampoo. They said those are only for babies. If we want shampoo, we have to buy it at the store."); E.C.M. Decl. ¶ 20; R.G.H. Decl. ¶¶ 14-15; J.A.I. Decl. ¶ 14 ("When we first got here, they gave us lotion, toothpaste, deodorant, and a tooth brush. . . . The hygiene kit doesn't include soap or shampoo. They said we should use the hand wash in the shower, but my mom used it and it caused little spots on her arms. Now we buy soap [and] shampoo . . . from the commissary"); R.R.M. Decl. ¶ 21; A.L.G. Decl. ¶ 13; A.O. Decl. ¶ 16 ("The only soap that is available is the same soap that is used to wash hands or do dishes. They have never offered me any different soap for my son either.").

### 7.  Children Lack Access to Appropriate and Clean Clothing.

Plaintiffs' counsel have heard repeated complaints regarding the lack of clothing at Dilley. R.G.H. Decl. ¶¶ 16-17 (child's foot fungal infection keeps returning because he has to wear shoes when they are wet); J.A.I. Decl. ¶ 12 ("They do not give kids enough clothes."); R.R.M. Decl. ¶ 20 ("Neither my daughter nor I have enough clothes and they are too big for us."); W.L. Decl. ¶ 19 ("Our daughter wasn't given the right size of clothing at first and we had to fill out a form and then wait a week to get clothes that fit her. Shoes are the hardest part. The shoes break every couple of weeks and when it rains."); O.S. May Decl. ¶ 26 (younger siblings had to wash their clothes every day, and class member waited a whole week for new shoes when his broke); *see also* S.D.C. Decl. ¶ 18 ("I have very sensitive skin, and the borders of the laundry machines, which are always dirty, give me rashes and hives. My skin feels so itchy, and sometimes it is red. The feeling does not go away.").

One mother explained the lengthy, frustrating procedure:

The process to get more clothes is complicated. You have to make a written request and explain why you need more clothes. Then they go to your room and check your clothes to see if the reason you gave was true. It can take days for them to check the clothes in your room. It's also hard because children are only allowed to have one pair of shoes – even when it is raining a lot and their shoes are really soggy.

For two weeks, I had been asking for new shoes for my son because the soles were

broken. I had been waiting and waiting, but then the day a senator came to Dilley – I was suddenly able to get the new shoes. I notice that things families have been asking for often happen around the time the politicians visit.

M.T.H. Apr. Decl. ¶¶ 17-18.

### 8. Children Still Lack Access to Free Phone Calls to Their Family Members.

ICE continues to deny children free phone calls to non-detained family members beyond their initial call upon entering Dilley. But class members have the explicit right to speak to family members for free. FSA Ex. 1 ¶ A.11; *see also* Attach. 1, Order Approving Final Notice of Rights, at 2 [Dkt. 1056-1] ("Notice of Rights").[11] It is unacceptable to deny children communication with family for months at a time. FSA ¶¶ 11, 12.A, 18.

The ICE JC Report states, "indigent residents may request free domestic calls from unit managers at any time," yet class counsel have never met with anyone at Dilley who made a free phone call to family beyond the initial five-minute call. ICE JC Report at 17; Welch Decl. ¶ 12. Families at Dilley cannot make free phone calls to family members, have never been able to do so, and rack up high phone bills as a result. *See* O.S. May Decl. ¶ 28 ("Many people that didn't have money would go for weeks or even months without communicating with their families. It was one of the most taxing things for people there. Some people paid more than $500 just for phone calls to be able to stay in touch with their loved ones."); C.G.C. Decl. ¶ 17 ("I talk to my stepdad and siblings on the phone every day. I don't know how much it costs, but I know we have to pay for the calls and it adds up."); E.C.M. Decl. ¶ 21 ("When we got here, we were given $5 each for a call, but after that children have to pay for calls to family members. We end up spending $26-30 every two days on phone calls to my children in Miami.").

Some class members cannot speak to their non-detained family at all, because they cannot afford to do so. *See* R.G.H. Decl. ¶ 27 ("I can't call my family because they are

---

[11] The Notice of Rights was created pursuant to Order re Pls. Mot. to Enforce and Aug. 2020 ICE Juv. Coord. Interim Report, at 2, September 18, 2020, [Dkt. 987]. The "Court approved the final language of the Notice of Rights." Order re Jan. 29, 2021 Status Conf., at 2 [Dkt. 1077].

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

not in this country and it costs too much. I have to pay to call anyone I know here."); W.L. Decl. ¶ 15 ("We have access to phones here but it's too expensive for us to make phone calls. It costs too much money for us to be able to actually use the phones.").

### 9. Children's Education at Dilley Has Improved but Remains Inadequate and Recreation Remains Insufficient.

The ICE JC Report notes that the education program at Dilley still has outstanding "implementation, staffing, and expansion needs." ICE JC Report at 12. During Plaintiffs' March and April site visit tours of the new classrooms, Plaintiffs noted improvements from previous tours. However, the classrooms are currently divided among only three age groups: Pre-K to 2nd grade, 3rd grade to 6th grade, and 7th grade to 12th grade. *Id.* at 29; *see also* A.L.G. Decl. ¶ 12 ("The class she goes to is for children who are ages 4 to 7, and it makes our 4-year-old feel frustrated because she does not understand the things that the older kids do.").

The current program remains inadequate, especially for middle and high school youth, many of whom were attending school in the U.S. for years before being apprehended. *See* R.R.M. Decl. ¶ 19 ("[My daughter] is not learning anything."); J.A.I. Decl. ¶ 16 ("When I first got here, I went to the classroom but no one was teaching us. . . . Now they have Khan Academy on some of the computers . . . that is better but it is not like high school in the U.S. . . . It's not the same at all."); C.G.C. Decl. ¶ 14 ("It's not the same as actual school. They do kind of teach us, but not the level I was being taught at my school. I miss my robotics and science classes the most."); O.S. May Decl. ¶ 44 ("I went to both the old and new version of school at Dilley. The new way wasn't really improved. . . . It wasn't a school."); *see also* M.T.H. Apr. Decl. ¶ 14 ("My son had started going to school at Dilley and was excited about the new program, but soon he didn't want to go again. He said the teachers were just teaching the same things and he wasn't learning anything new.").

Language access at school for non-English and Spanish speakers also remains an issue. *See* W.L. Decl. ¶ 10 ("My biggest concern for my daughter here is that there is no school. . . . Our daughter went for one day and the teacher told her that if she can't speak

English, she shouldn't speak at all. . . . I asked her to go back and try again but she cried and said she is scared.").

The ICE JC Report also notes improvements to the recreation offered at Dilley, but class members still report there is little to do. ICE JC Report at 31; *see* R.R.M. Decl. ¶ 19 ("There is nothing more than coloring here for my daughter."); W.L. Decl. ¶ 20 ("There is not a lot for our daughter to do here. She watches TV. She has used the recreation space but she's pretty bored here."); G.S. Decl. ¶ 55 ("I feel very bored here a lot. . . . The timing to go anywhere is all limited too."); A.O. Decl. ¶ 21 ("[My son] feels very bored. Some days we can't go outside because the sun is so strong here."). Finally, parents continue to report that their toddlers and young children have little to do and desperately need more toys. *See*, e.g., M.T.H. Apr. Decl. ¶¶ 15-16 ("Not having toys here is one of the things that makes my son feel like he is in jail. He doesn't understand why he can't have his own toys."); O.S. May Decl. ¶ 38 ("There are no teddy bears or toys for kids at Dilley. . . . Because there were no toys, [my younger siblings] were really sad. They knew they were supposed to have toys, and they would miss theirs at home so it's mentally damaging for them.").

## III.    CONCLUSION

The ICE JC Report's depiction of conditions at Dilley remains in stark contrast to the voluminous evidence from class members and their families incarcerated there. As this Court has previously noted, "None of [Defendants'] generalized evidence, however, undermines the veracity of Plaintiffs' first-hand experiences." June 2017 Order at *9. Defendants point to policies of compliance, but "[t]he mere existence of those policies tells the Court nothing about whether those policies are actually implemented, and the current record shows quite clearly that they were not." Order re Pls.' Mot. to Enforce Settlement of Class Action and Defs.' Mot. to Amend Settlement Agreement at 18, July 24, 2015 [Dkt. 177].

The parties have been following this Court's order to mediate about conditions at Dilley, but thus far, mediation has not led Defendants to substantially comply with the FSA. Children continue to experience the same harmful conditions.

Dated: May 18, 2026

CENTER FOR HUMAN RIGHTS AND
CONSTITUTIONAL LAW
Carlos Holguín
Bardis Vakili
Sarah Kahn

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe
Diane de Gramont
Rebecca Wolozin

CHILDREN'S RIGHTS
Leecia Welch
Eleanor Roberts

*/s/ Leecia Welch*

Leecia Welch
*Attorney for Plaintiffs*

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX

# CERTIFICATE OF SERVICE

I hereby certify that on May 18, 2026, I caused a copy of Plaintiffs' Response to the May 4, 2026 ICE Juvenile Coordinator Status Report and Data to be served to all counsel through the Court's CM/ECF system.


Dated: May 18, 2026                                /s/ Leecia Welch
                                                                 Leecia Welch
                                                                 *Attorney for Plaintiffs*

Pls.' Resp. to Supp. Juvenile Coordinator Reports and Data
CV 85-4544-DMG-AGRX