CENTER FOR HUMAN RIGHTS & CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
crholguin@centerforhumanrights.org
Bardis Vakili (Cal. Bar No. 247783)
bardis@centerforhumanrights.org
Sarah E. Kahn (Cal. Bar No. 341901)
sarah@centerforhumanrights.org
1505 E 17th St. Ste. 117
Santa Ana, CA 92705l
Telephone: (909) 274-9057

*Attorneys for Plaintiffs*

*Additional counsel listed on following page*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| Jenny Flores, *et al.*,<br><br>       Plaintiffs,<br><br>   v.<br><br>Todd Blanche, Acting Attorney General of the United States, *et al.,*<br><br>       Defendants. | Case No. CV 85-4544-DMG-AGRx<br><br>**PLAINTIFFS' RESPONSE TO JULY 1, 2026 ICE JUVENILE COORDINATOR ANNUAL REPORT**<br><br>Honorable Dolly M. Gee<br>Chief United States District Judge |

NATIONAL CENTER FOR YOUTH LAW

Mishan Wroe (Cal. Bar No. 299296)

Diane de Gramont (Cal. Bar No. 324360)

428 13th Street, Floor 5

Oakland, CA 94612

Telephone: (510) 835-8098

Email: mwroe@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW

Rebecca Wolozin (admitted *pro hac vice*)

2300 18th St. NW, P.O. Box 21156

Washington, DC 20009

Telephone: (202) 964-0406

Email: bwolozin@youthlaw.org

CHILDREN'S RIGHTS

Leecia Welch (Cal. Bar No. 208741)

2021 Fillmore Street

San Francisco, CA 94115

Telephone: (415) 602-5202

Email: lwelch@childrensrights.org

CHILDREN'S RIGHTS

Eleanor Roberts (admitted *pro hac vice*)

88 Pine Street, Suite 800

New York, NY 10005

Telephone: (212) 683-2210

Email: eroberts@childrensrights.org

**TABLE OF EXHIBITS**

**Exhibit Index to Plaintiffs' Response to**

**July 1, 2026 ICE Juvenile Coordinator Annual Report**

| Exhibit No. | Exhibit Description |
|---|---|
| 1 | Declaration of Leecia Welch, July 15, 2026 ("Welch Decl.") and Attachment A, 2025-26 Excerpts from Declarations of Families Detained at Dilley ("Attach. A") |
| 2 | Declaration of Avneet Chhabra, July 10, 2026 ("Chhabra Decl.") |
| 3 | Declaration of Elora Mukherjee, July 11, 2026 ("Mukherjee Decl.") |
| 4 | Declaration of Rodolfo Altillo, July 9, 2026 ("Altillo Decl.") |
| 5 | M.A.B.H. Declaration (Dilley), June 1, 2026 ("M.A.B.H. Decl.") |
| 6 | J.C.B. Declaration (Dilley), June 3, 2026 ("J.C.B. Decl.") |
| 7 | N.A.A. Declaration (Dilley), June 2, 2026 ("N.A.A. Decl.") |
| 8 | L.R.V. Declaration (Dilley), June 2, 2026 ("L.R.V. Decl.") |
| 9 | M.P.O Declaration (Dilley), June 1, 2026 ("M.P.O. Decl.") |
| 10 | L.R.P Declaration (Dilley), June 8, 2026 ("L.R.P. Decl.") |
| 11 | M.G.O. Declaration (Dilley), June 2, 2026 ("M.G.O. Decl.") |
| 12 | J.C.M. Declaration (Dilley), June 8, 2026 ("J.C.M. Decl.") |
| 13 | D.C. Declaration (Dilley), June 2, 2026 ("D.C. Decl.") |

# TABLE OF CONTENTS

I.  INTRODUCTION ...........................................................................................................1

II. ICE Continues to Violate the *Flores* Settlement Agreement .......................................2

    A. Children Are Subjected to Prolonged and Unexplained ICE Detention .............3

        1.  Prolonged Detention at Dilley...............................................................3

        2.  The Report Fails to Address Continued Prolonged Hotel Detention .......6

    B. Conditions of Detention at Dilley Continue to Violate the FSA .......................7

        1.  Children at Dilley Are Treated Like Prisoners .........................................8

        2.  Dilley Provides Inadequate Medical Care to Children ...........................10

        3.  Children Have Not Been Provided Notice of Their *Flores* Rights or Free Access to Counsel ..................................................................13

        4.  Children Still Lack Access to Child-Friendly Foods, Healthy Snacks, and Safe Drinking Water.................................................................16

        5.  ICE Provides Poor Sleeping Conditions for Children ...........................19

        6.  Children Still Lack Access to Adequate Hygiene Products ...................20

        7.  Children Still Lack Access to Free Phone Calls to Family Members ....21

        8.  Children Lack Access to Appropriate and Clean Clothing....................22

        9.  Children's Education at Dilley Has Improved but Remains Inadequate, and Recreation Remains Insufficient .................................23

III. CONCLUSION..........................................................................................................25

## I.   INTRODUCTION

ICE resumed incarcerating children and families at the South Texas Family Residential Center in Dilley, Texas ("Dilley") more than a year ago. Since then, Plaintiffs have repeatedly brought the same serious violations of the *Flores* Settlement Agreement ("FSA") to Defendants' attention. Yet those violations persist unabated. Thousands of children have endured prolonged detention in unlicensed facilities with unsafe and unsanitary conditions while being denied meaningful access to information about their *Flores* rights. The ICE JC Annual Report continues to portray a fiction of compliance, ignoring the extensive record of *Flores* violations documented by Plaintiffs and experienced daily by detained children. ICE Juv. Coord. Annual Rep. 2026 [Doc. # 1802-1] ("ICE JC Annual Rep." or "JC Report"); *see* Welch Decl, Attach. A.[1]

Since Dilley re-opened, ICE has detained thousands of children there for more than 20 days. The May 2026 ICE JC Report calculated that children detained during February and March spent an average of nearly 60 days in custody. May 4, 2026 ICE Juv. Coord. Suppl. Rep. at 4 [Doc. # 1768-1] ("May ICE JC Rep."). Yet the ICE JC Annual Report asserts average lengths of stay of only 47.5 days in February and 40.2 days in March, and claims that the average length of stay from June 1, 2025 through May 31, 2026 was 27.4 days. JC Report at 3 [Doc. # 1802-1]. Even that unreliable figure exceeds this Court's 20-day benchmark.

More importantly, however, the reported averages warrant careful scrutiny because they likely undercount children's total time in DHS custody including time at the border and isolated in hotel rooms, and they obscure the egregiously prolonged detention many children have experienced since Dilley reopened. The JC Report omits critical information, including the monthly number of children detained for more than 20 days, and once again fails to provide the specific, individualized evidence this Court has required to justify detaining any child beyond 20 days. *Id*.; *see* Apr. 24, 2020 Order at

---

[1] All page references herein are to page numbers inserted by the CM/ECF system. All previously filed documents, including declarations, include docket numbers.

15–16 [Doc. # 784].[2]

The JC Report again disputes that there are any *Flores* violations at Dilley, except that education services are rated "Compliant with Issues." JC Report at 14 [Doc. # 1802-1]. Presumably as evidence of purported *Flores* compliance, the JC Report asserts that (a) of the 386 grievances submitted by residents from June 2025 to April 2026, only 26 were founded; (b) the 14 food service grievances were all unfounded; (c) of the separate 69 medical grievances noted in the "Medical Grievance Log," none were "found in favor of the resident." *Id.* at 20-22;[3] ICE Juv. Coord. Annual Rep. 2026 Exhibits at 39-43 [Doc. # 1802-2] ("ICE JC Exhibits"). Measured against Plaintiffs' voluminous evidence of *Flores* violations over the same period, this grievance data demonstrates nothing more than failed self-monitoring.

Class member declarations from June 2026, as well as the chart summarizing declarations previously filed with this Court, show year-long ongoing FSA violations by DHS. *See* Welch Decl. ¶¶ 8, 44-46, Attach. A. These include inadequate medical care, lack of information about *Flores* rights and access to counsel, lack of access to healthy child-friendly food and safe drinking water, lack of adequate clothing, inability of class members to sleep due to lights on in their living areas all night, lack of free calls to family members, and inadequate education and developmentally appropriate activities. *Id.* at ¶ 8. Violations at Dilley continue to inflict profound harm on children. Class members consistently describe feeling depressed and anxious, losing weight, becoming ill from the food, crying frequently, and struggling to sleep. *Id.*; *see* Sections II.B.1, 4, 5.

**II.    ICE Continues to Violate the *Flores* Settlement Agreement**

Since Dilley re-opened in May 2025, Plaintiffs' counsel have conducted 12 site visits. Welch Decl. ¶ 2. After each site visit, Plaintiffs' counsel provided Defendants with

---

[2] Court orders are identified by date, in accordance with the citations in the Court's Sept. 26, 2025 Order [Doc. # 1672].

[3] The JC Report references 69 medical grievances in one section and 64 medical grievances in another section. *Compare* ICE JC Annual Rep. at 22 [Doc. # 1802-1] *with* ICE JC Exhibits at 39 [Doc. # 1802-2].

Pls.' Resp. to ICE Juv. Coord. Annual Report
CV 85-4544-DMG-AGRX

a detailed, comprehensive list of *Flores* violations. Welch Decl. ¶ 3. The concerns raised in the last letter sent on June 4, 2026, remain virtually the same as the concerns raised in the first letter sent on May 7, 2025. *Id.* ¶ 5. Plaintiffs' counsel have also raised emergency time-sensitive concerns about particular children via email after each site visit and on several other occasions. *Id.* ¶ 3.

Pursuant to this Court's orders, the parties conducted mediation sessions from January to April 2026. *Id.* ¶ 4. Despite some progress in children's length of stay at Dilley and an agreement to have Dr. Paul Wise conduct medical site visits at Dilley, the parties still fundamentally disagree as to FSA compliance at Dilley. *Id.*

## A. Children Are Subjected to Prolonged and Unexplained ICE Detention

### 1. Prolonged Detention at Dilley

ICE's prior JC reports indicate that nearly 1,560 children were detained at Dilley for over 20 days during just one six-month period.[4] In Defendants' May ICE JC Report, Defendants reported detaining 567 children for more than 20 days in February and March 2026, with 171 of those children facing detention for between 51 and 90 days, and 80 children languishing at Dilley for over 90 days. *See* May ICE JC Rep. at 3 [Doc. # 1768-1]; Ex. A, Feb. and Mar. 2026 ICE Fam. Residential Ctr. 20-day Rep. [Doc. # 1768-2]; Pls.' Resp. to May 4, 2026 ICE JC Report at 8 [Doc. # 1779].[5]

---

[4] ICE's 20-day census data has only been provided to the Court for August, September and December 2025, and January, February and March 2026. *See* Ex. A, Feb. and Mar. 2026 ICE Fam. Residential Ctr. 20-day Rep. [Doc. # 1768-2]; May ICE JC Rep. at 3, 5 [Doc. # 1768-1]; Jan. 2026 ICE Fam. Residential Ctr. 20-Day Rep. [Doc. # 1736-3]; Dec. 2025 ICE Fam. Residential Ctr. 20-Day Rep. [Doc. # 1736-2]; Sept. 2025 ICE 20-Day Rep. [Doc. # 1692-9]; Aug. 2025 ICE 20-Day Rep. [Doc. # 1692-6]; Dec. 1, 2025 ICE Juv. Coord. Suppl. Rep. at 2 [Doc. # 1692-4] ("Dec. ICE JC Rep.") (tallying reported numbers). Plaintiffs' counsel's review of Defendants' past data indicates there may be duplications or other possible errors. Counsel are unable to independently verify these numbers but rely on what Defendants have reported to the Court and Plaintiffs' counsel.

[5] Previous ICE JC Reports provided similarly high numbers of children detained at Dilley longer than 20 days, and these lengths likely excluded children's length of stay in hotels, transit, and CBP. *See* Pls.' Resp. to Mar. 13, 2026 ICE JC Rep. at 8, [Doc. # 1748] ("During December and January, ICE [reported that they] detained at least 595 children

Rather than disclose how many children were detained for 20 days or longer over the past year, the JC Report instead only provides monthly <u>average</u> daily population counts and monthly <u>averages</u> of the length of stay for children who have been <u>released</u> or <u>removed</u> from Dilley. JC Report at 1-3 [Doc. # 1802-1]. ICE's presentation of the data obscures the true scope of prolonged detention in three important ways. First, although still above this Court's 20-day limit, the reported averages are substantially lower than those ICE previously reported to the Court – but ICE offers no explanation for the discrepancy.[6] Compare May ICE JC Rep. at 4  [Doc. # 1768-1] (reporting a 57-day average for February and March) with JC Report at 3-4 [Doc. # 1802-1] (reporting averages of 47.5 and 40.2 days for those same months and an annual average of 27.4 days). Second, data providing *only* the averages conceals the extraordinary length of detention experienced by hundreds of individual children who have been detained for over 80 days during the past year. *See, e.g.*, Chhabra Decl. ¶ 21, Ex. B;  Pls.' Resp. to Mar. 13, 2026 ICE JC Rep. at 8, [Doc. # 1748]. Third, the ICE JC Annual Report again fails to provide the individualized evidence this Court has repeatedly required to justify detaining any child beyond 20 days.

---

for more than 20 days. . . . At least 265 of these children were detained for more than 50 days and a shocking 55 children were detained more than 100 days."); Pls.' Resp. to Dec. 1, 2025 ICE JC Rep. at 6-7, [Doc. # 1706] ("ICE [reported that they] detained nearly 400 children for more than 20 days at Dilley in August and September 2025 alone." In September alone, "over 50 children were held for at least 30 days, and over 25 for at least 40 days, not counting time in hotels or transit."). Before the May 2026 report, ICE's data did not include custody between apprehension and book into Dilley, indicating many more children with stays over 20 days were likely excluded from the reported data.

[6] The June 15, 2026 Order requires Defendants to provide data on: "(ii) the average time in CBP or ICE custody *for minors currently in the agency's facilities* and for minors who have been released during the period from June 2025 to May 2026." *Id*. at 1-2 [Doc. # 1794] (emphasis added). They have failed to do so. Defendants may be artificially lowering the average length of stay, as their data excludes all children with long stays who continue languishing in detention. Additionally, since this average refers only to time in ICE custody, it necessarily excludes the days any released children spent detained in CBP. The total secure detention daily average is likely higher.

Plaintiffs' site visits confirm what ICE's averages conceal. During the March, April, and June 2026 site visits, alone, *Flores* Counsel met with families who had been detained for 323 days (O.S. May Decl. ¶ 4 [Doc. # 1779-11]), 143 days (S.D.C. Decl. ¶ 4 [Doc. # 1779-8]), 135 days (A.O. Decl. ¶ 4 [Doc. # 1779-5]), 91 days (E.C.M. Decl. ¶ 4 [Doc. # 1779-14]), 90 days (C.G.C. Decl. ¶ 4 [Doc. # 1779-4]), 77 days (A.L.G. Decl. ¶ 3 [Doc. # 1779-12]), 76 days with 10 of those days spent in CBP (M.T.H. Apr. Decl. ¶ 4 [Doc. # 1779-6]), two months (W.L. Decl. ¶ 4 [Doc. # 1779-15]), and 50 days (J.A.I. Decl. ¶ 4 [Doc. # 1779-16]). Welch Decl. ¶ 10. During most site visits, the number of children experiencing exceptionally prolonged detention exceeded the number of families Plaintiffs' counsel were able to interview. *Id.* Given the numerous children who have been detained at Dilley for more than 50, 80, or 100 days, ICE's attempt to attribute its prolonged detention practices to a handful of purported outliers lacks credibility. *See* JC Report at 5 [Doc. # 1802-1]; Mukherjee Decl. ¶¶ 8-23; Altillo Decl. ¶¶ 10-15.

Nor has ICE complied with this Court's repeated orders requiring individualized, fact-specific explanations for every child detained beyond 20 days. For nearly a decade, this Court has rejected the type of generalized justifications ICE nonetheless has continued to provide over the past year, and has required ICE to identify the specific facts justifying each child's continued detention. *See, e.g.,* June 27, 2017 Order at 25-27 [Doc. # 363] (requiring individualized assessments and evidence to justify detention longer than 20 days); Apr. 24, 2020 Order at 14-18 [Doc. # 784] (same); June 26, 2020 Order at 5 [Doc. # 833] ("For each minor detained at an FRC for more than 20 days . . . the ICE Juvenile Coordinator shall give a detailed individualized explanation of why that minor is a flight risk (cursory explanations such as 'In custody-pending IJ hearing/decision,' 'pending USCIS response,' 'plaintiff in a pending lawsuit' . . . shall not be acceptable explanations) . . . [rather] a prior unexplained failure to appear at a scheduled hearing would be a satisfactory explanation for continued detention if that explanation is verified in a declaration by an ICE representative under penalty of perjury."); Sept. 18, 2020 Order at 13 [Doc. # 987] (Requiring "*[s]pecific* explanations for the continued detention of each minor detained at an FRC beyond 20 days,"); Sept. 26, 2025 Order at 2 [Doc. #

1672] (same); Apr. 3, 2026 Order at 2 [Doc. # 1755] (same). Despite attributing prolonged detention to a small number of purported "Failure to Comply" cases and national security concerns,[7] ICE has never submitted evidence demonstrating why any particular child posed a flight risk or safety concern. *See, e.g.*, June 26, 2020 Order at 5 [Doc. # 833]. *See* Altillo Decl. ¶ 12; Mukherjee Decl. ¶¶ 10, 12-22. Without individualized evidence, these generalized assertions cannot justify prolonged detention under *Flores*.

ICE's release decisions further demonstrate the arbitrary nature of its detention practices. Hundreds of children were detained for weeks or months before being released without any explanation for why prolonged detention had supposedly been necessary. *See, e.g.*, Pls.' Resp. to May 4, 2026 ICE JC Rep. at 11 [Doc. # 1779]; Pls.' Resp. to Mar. 13, 2026 ICE JC Rep. at 9 [Doc. # 1748]. As one parent observed:

> Every day I just hope they will let us go. . . . But we know there are some moms with children who have been here for 50 days. It makes me lose hope and feel demoralized when I hear that such long detention is possible. It's so hard, because it makes it clear that in reality the government does not apply the *Flores* laws that they had us sign, because if they did, we would not be here still.

M.A.B.H. Decl. ¶ 37.

At no point during the past year has ICE been compliant with the FSA's prohibition against prolonged detention of children in unlicensed detention facilities.

**2. The Report Fails to Address Continued Prolonged Hotel Detention**

On April 3, 2026, the Court reminded Defendants that, "[a]s previously ordered, Defendants shall cease placing minors at hotels, with a narrow exception for brief, one to

---

[7] *Flores* counsel has met at least one of the families with such a "national security designation" and is aware of the background of the family's case. Significantly, a federal judge ordered ICE to release the family (which included five-year-old twins) from Dilley after a successful habeas petition. *El Gamal v. Noem*, No. 5:25-cv-1261, R. & R. at 23-24 (W.D. Tex. Apr. 20, 2026) (Chestney, Mag. J.) [Doc. # 59] ("The Government has intervened in this case repeatedly and aggressively from its inception (addressed *infra*), which has significantly contributed to the reality of Petitioners' prolonged detention.").

Pls.' Resp. to ICE Juv. Coord. Annual Report
CV 85-4544-DMG-AGRX

two-night stays while in transit or prior to flights." Apr. 3, 2026 Order at 4 [Doc. # 1755]. The Court later denied Defendants' motion for reconsideration and reiterated that prolonged hotel detention is not permitted without a showing of exigent circumstances and good cause. May 18, 2026 Order at 4 [Doc. # 1775].

Despite these orders, ICE continued to hold children in hotels for prolonged periods of time in April and May 2026. In May 2026, ICE held 24 children in hotels for over three days, including two children held in various hotels for over 15 days and four additional children held in hotels for over 10 days. Chhabra Decl. ¶ 22, Ex. B. In April 2026, ICE held 36 children in hotels for over three days, including numerous children held for over five days. As Plaintiffs have previously established, prolonged unlicensed hotel detention violates the FSA and is fundamentally inappropriate for children, particularly because children detained in hotels are denied access to counsel and the outdoors. *See* Pls.' Opp'n to Defs.' Mot. to Reconsider at 6-11 [Doc. # 1764]; *see also* M.S.P. Decl. ¶¶ 10-14 [Doc. # 1748-5]; Marcelino Schalkwyk Decl. ¶¶ 4-13, 16 [Doc. # 1764-4].

The ICE JC Annual Report provides no justification or explanation for these prolonged hotel stays. Remarkably, the JC Report fails to mention hotel detention at all, despite the Court's recent orders related to hotel detention and the Court's order that the Annual Reports include "discussion of compliance with the terms of the FSA as to any minors detained by the agencies during the reporting period." June 15, 2026 Order at 2 [Doc. # 1794].

**B.      Conditions of Detention at Dilley Continue to Violate the FSA**

Dilley remains a highly restrictive, unlicensed detention facility. Welch Decl. ¶ 8. As discussed repeatedly in Plaintiffs' four previous responses to the ICE JC reports over the last year, class members and their families have consistently reported serious concerns regarding inadequate medical care, lack of information about *Flores* rights and access to counsel, lack of access to healthy and safe child-friendly foods and safe drinking water, lack of adequate clothing, lack of sleep due to lights on in their living areas all night, lack of free calls to family members, and lack of adequate education and

developmentally appropriate activities. Pls.' Resp. to May 4, 2026 ICE JC Rep. [Doc. # 1779]; Pls.' Resp. to Mar. 13, 2026 ICE JC Rep. [Doc. # 1748]; Pls.' Resp. to Dec. 1, 2025 ICE JC Rep. [Doc. # 1706]; Pls.' Resp. to Sept. 8, 2025 ICE JC Rep. [Doc. # 1656]; Welch Decl. ¶ 8. [8]

## 1. Children at Dilley Are Treated Like Prisoners

Dilley's harsh, prison-like environment remains harmful and unsuitable for children. *See, e.g.*, J.C.B. Decl. ¶ 64 ("My child has visited Germany, and we've seen the concentration camps in Munich. We've been to Dachau. He asked me if we are in a concentration camp here. . . . My kid says, 'Dad, but it is equal to where we are. And they don't let us leave.' They aren't killing us, but it feels like it."); N.A.A. Decl. ¶ 21 ("It feels like a jail here. Some of the guards actually tell us we're here because we committed crimes and we should be happy to be here. . . . They try to make you feel like you're a criminal even when you're a straight A student."); L.R.V. Decl. ¶ 24 ("It feels like a prison – even with the school and things – they are constantly counting us, surveilling us, and monitoring our every move."); M.P.O. Decl. ¶ 22 ("I wouldn't wish this place on anyone."); M.A.B.H. Decl. ¶ 19.

Children and families report demeaning, rude and racist treatment by guards at Dilley on each site visit. *See, e.g.*, L.R.P. Decl. ¶ 32 ("Some staff . . . speak to us in a gross and rude way. Sometimes, they are racist."); J.C.B. Decl. ¶ 69 ("I feel like we are treated as animals here. This feels like a business."); L.R.V. Decl. ¶¶ 14-15 ("[The guards] treat us like animals. One time a guard in the cafeteria was complaining about the families at Dilley and said we should be appreciative of the food here. She said, 'Why are they complaining? If they were in their own countries, they would be eating shit.'"); N.A.A. Decl. ¶ 18; M.G.O. Decl. ¶ 40; M.P.O. Decl. ¶ 11 ("We can't even vent or laugh with other families without having an issue with the guards. They will threaten you with . . . a report or make a loud 'shhh' noise for you to stop talking."); Altillo Decl. ¶¶ 25-26.

---

[8] In this response, Plaintiffs cite to declarations from our June site visit as well as to previously filed declarations to demonstrate that FSA violations are ongoing. Attachment A to the Welch Decl. compiles 12 categories of the most persistent *Flores* violations in declarations filed during the past year.

Pls.' Resp. to ICE Juv. Coord. Annual Report
CV 85-4544-DMG-AGRX

The JC Report alleges no use-of-force incidents involving minors, no restraint incidents involving minors, and no minors placed in isolation or room restriction from April 7, 2025 to April 30, 2026, even though many declarations over the past year raised use of force and room restrictions. *Compare* ICE JC Exhibits at 31 [Doc. # 1802-2] *with e.g.,* C.C.A Decl. ¶ 14 [Doc. # 1748-4] ("For the past couple of days, my children and I have been locked down in our room. They put us on lockdown after a staff member pushed my daughter and took all of her coloring materials away."), N.P.V. Decl. ¶ 19 [Doc. # 1748-8] ("It was difficult during the protests because we kept getting put on lockdown in our rooms. They would make us stay in our rooms, and we were unable even to go to medical."), *and* M.B.O.D. Decl. ¶ 26 [Doc. # 1748-19] ("On January 9, 2026, staff started yelling at us in the morning to go to our rooms and then locked us all in our rooms without any explanation. They did not tell us when we would be allowed to leave. . . . [T]he children all started crying. It was terrifying.").

Dilley is not a safe environment for children. In June 2026, one family described several deeply troubling incidents they experienced while detained at Dilley. *See* L.R.V. Decl. ¶¶ 8-10, 14-17. For example, the parent recounted:

> [T]wo of my daughters went to take a shower. One was changing and one was in the shower. One of the male cleaning staff came in the bathroom without knocking and my daughter raced into the shower again because she was partially undressed. . . . Then my daughter, who was showering, yelled out to ask if her sister was still there. Then the staff member left and went outside. He then knocked and said "cleaning" – but came right back in. My daughter came out of the shower after getting dressed and was startled and stared at him and then he left again. My daughters were really shaken up about the incident. I submitted a grievance right after it happened. Later that day, the manager said the girls had to do a physical and mental exam as part of the procedure for the grievance. . . . Since that day, my daughters have been scared to go in the bathroom alone and I have been scared, too. Now they only go to the bathroom together, and someone stands outside.

L.R.V. Decl. ¶ 17. Plaintiffs do not know whether CoreCivic investigated this grievance, what findings, if any, it reached, or what corrective action, if any, was taken.

Despite the constant threat to children's safety at Dilley, ICE's grievance system is, at best, ineffective. The JC Report states that families filed 132 grievances regarding

staff treatment,[9] yet CoreCivic deemed only six "founded." JC Report at 20-21 [Doc. # 1802-1]; *see also* ICE JC Exhibits at 34 [Doc. # 1802-2]. The JC Report does not explain the standards used to classify grievances as "founded," "unfounded," or "ungrievable." However, it appears that complaints that fall under the categories of "State and Federal Court decisions" and "State and Federal laws and regulations" are not grievable, which would seem to *preclude* class members from using the grievance system to redress FSA violations. JC Report at 21 [Doc. # 1802-1]. This revelation undermines the credulity of Defendants' repeated insistence that class members use the grievance system. At base, a grievance system that families do not understand, that rarely substantiates complaints, and that provides little transparency about investigations or outcomes does not meaningfully protect children.

## 2. Dilley Provides Inadequate Medical Care to Children

Class members and their families continue to report that Dilley neither provides adequate medical care nor appropriately accommodates children's special needs. Mukherjee Decl. ¶¶ 24-34 (child detained at Dilley for about 170 days developed breathing difficulties and regressed behaviorally; a nonverbal five-year-old with developmental delays struggled to eat and did not have a bowel movement for nine days); Altillo Decl. ¶¶ 16-22 (discussing lack of medical treatment for chronic medical conditions, lack of medical treatment for a child with bloody stools, denial of medical care for child with a jaw condition, and delayed medical care for child having an allergic reaction). Since Dilley re-opened, families have raised medical care concerns to RAICES attorneys *on at least 1,480 occasions.* Altillo Decl. ¶ 16; Pls.' Resp. to Mar. 13, 2026 ICE JC Rep. at 14 [Doc. # 1748].

---

[9] The JC Report states that 386 grievances were filed from June 25, 2025 to April 2026, with 132 relating to staff treatment, but Exhibit I states that 375 grievances were filed from April 7, 2025 to April 30, 2026, with 115 relating to facility staff. *Compare* JC Report at 20-21 [Doc. # 1802-1] *with* ICE JC Exhibits at 34 [Doc. # 1802-2]. It is unclear why the longer time frame reflected in the Exhibit lists fewer grievances than the shorter time frame listed in the JC Report.

Pls.' Resp. to ICE Juv. Coord. Annual Report
CV 85-4544-DMG-AGRX

Certain especially egregious medical concerns from the past year are illustrative: a two-month-old baby developed a respiratory infection after being put in isolation with his 15-month-old sister who had COVID and multiple other infections (M.L.S. Decl. ¶¶ 14, 16-19 [Doc. # 1748-36]); a pregnant woman with Hepatitis B whose viral load was so high she risked getting liver cancer and passing the disease to her baby was denied treatment (N.M. Decl. ¶¶ 13-17 [Doc. # 1748-27]); a child with a serious tooth and gum infection received only ibuprofen and a liquid diet for more than 20 days while the underlying infection persisted (S.K. Decl. ¶¶ 21-24, 26-27 [Doc. # 1748-15]); a child suffering in agony from appendicitis was told during a medical exam to come back in three days (the examiner believed he was exaggerating his symptoms), delaying his transfer to the emergency room (O.S. Aug. Decl. ¶¶ 25-30 [Doc. # 1748-30]); and a child with Hirschsprung's disease was not provided the treatment or diet her condition required resulting in the child going 34 days without a bowel movement, and experiencing extreme pain, fevers, and vomiting (D.C.R.R. Decl. ¶¶ 3-5, 8 [Doc. # 1706-20]; D.R.R. Decl. ¶ 7 [Doc. # 1748-29]).

Despite the number of dangerous medical situations faced by children and raised to Defendants, families continue to report that Dilley medical staff minimize, misdiagnose or ignore their concerns, delay treatment, and deny access to doctors.

> Medical seems incompetent. My sister and my dad go a lot. The nurses supposedly consult with the doctor, but we never see the doctor when we go to the medical unit. My dad has a problem with his spine. In California, he was getting injections and special medicine for his back pain because it's so bad. Here, they just give him ibuprofen, and this causes his stomach to hurt. My dad also had an infection where he was peeing blood here, and he never saw a doctor for that.

L.R.P. Decl. ¶¶ 19-2.

> When you go to the doctor here, you have to wait for a long time. Four days ago, I asked for an appointment for medicine for a yeast infection, but they did not give me an appointment. Then, I went back, and they told me they did not have the cream I needed to treat the infection. I am still waiting for it. They said I might not get it until Friday, which is four days from now.

Pls.' Resp. to ICE Juv. Coord. Annual Report
CV 85-4544-DMG-AGRX

M.A.B.H. Decl. ¶ 36; J.C.M. Decl. ¶¶ 16-19 (mother concerned with lack of adequate diagnoses and treatment after daughter fell off monkey bars); N.A.A. Decl. ¶ 20; J.C.B Decl. ¶¶ 44-46 (ten-year-old with heart murmur not seen by cardiologist for 60 days).

The information Defendants provide in their report about the medical, dental, and mental health services purportedly available at Dilley provides no insight into diagnoses and treatment protocols and practice, which the above examples demonstrate can mean the difference between a treated and manageable illness and a life-threatening medical condition. *See, e.g.*, JC Report at 9 [Doc. # 1802-1]. Nor do Defendants acknowledge or provide updates on the status of any alleged improvements to medical services as discussed in the May Report. May ICE JC Rep. at 21-22 [Doc. # 1768-1].

In addition, children's mental health continues to deteriorate at Dilley, and is exacerbated by increased lengths of stay. *See* Mukherjee Decl. ¶ 35 ("Every child who I have represented in federal immigration custody from March 1, 2026 to date has experienced mental health distress in detention."); Altillo Decl. ¶¶ 23-24; J.C.M. Decl. ¶¶ 13-14 ("My daughter is . . . stressed. She was very social and liked to play and hangout with younger kids before coming here, but now she doesn't. I have noticed a big change in her."); D.C. Decl. ¶ 28 ("[My son] had these hyperactive behaviors before we got here, but now they've gotten worse. He's deteriorated a lot in the past few days. It's not controllable now."); L.R.P. Decl. ¶ 38 ("Being at Dilley makes me nervous. I am not free, and my only friends are my sisters. I am sad after two months of living here.").

> I have trouble sleeping because of all my racing thoughts. Will I go back to school? Will I go back to LA? Has my GPA gone down? I had a 4.0, and I was hoping to get scholarships. Now I don't know what is going to happen. . . . My little brother is not doing okay. He is crying a lot, and always saying how much he misses his family. . . . He's always saying how much he doesn't want to be here.

N.A.A. Decl. ¶¶ 16, 19.

> Being here is terrible for my son. He says he does not want to be here. My son feels really sad, especially in the morning. When he wakes up, he tells me he does not like being incarcerated. I tell him he must have faith in God that soon we will get out of here. My son no longer wants to eat.

12

M.A.B.H. Decl. ¶¶ 19-20; L.R.V. Decl. ¶¶ 20-21.

The ICE JC Annual Report paints a picture of mental health services at Dilley starkly at odds with the experiences reported by class members. The JC Report asserts that: "Therapeutic approaches include Cognitive Behavioral Therapy (CBT), Dialectical Behavior Therapy (DBT), trauma-focused CBT and DBT, somatic experiencing, and brain spotting." JC Report at 10 [Doc. # 1802-1]. But families consistently report they lack therapeutic supports their children need:

> My son [] has autism. We have very clear medical documentation of his diagnosis. The conditions in this detention center have severely negatively affected him. . . . We do see the psychologist sometimes, but it's super brief. They ask how the kids are doing and if we're getting what we need. We respond, and that's it. That is the 5-minute conversation and then we meet in a week, and we get a sticker. And that's the whole visit.

S.S. Decl. ¶¶ 16, 28 [Doc. # 1748-24]; J.B.A. Decl. ¶ 10 [Doc. # 1748-28] ("[M]y son was diagnosed with ADHD and we were in the process of getting treatment when we were arrested. . . . [T]he psychologist told us that there was nothing they could do for him, and we should basically keep him inside of his room at all times."); C.R.B. Decl. ¶ 16 [Doc. # 1748-34] ("[M]ental health appointments here. . . . aren't helpful. They last not even ten minutes."). Although Defendants assert that "services include family sessions, group sessions, psychoeducation, parenting education, and therapeutic or wellness-related programming such as Zumba and crochet," no family has ever reported receiving any wellness-related programming beyond brief check-ins, and Plaintiffs' counsel have never witnessed evidence of Zumba or crochet on any facility tours. JC Report at 10 [Doc. # 1802-1]; Welch Decl. ¶ 16.

### 3. Children Have Not Been Provided Notice of Their *Flores* Rights or Free Access to Counsel

The ICE JC Annual Report again asserts that a video and resident handbook that do not mention *Flores* at all, together with two documents that address only the right to use the telephone, be represented by a lawyer, and have a hearing before a judge, satisfy Defendants' *Flores* rights notice obligation. *See* JC Report at 14, 18 [Doc. # 1802-1]. This Court has repeatedly held otherwise. *See, e.g.*, Jan. 5, 2021 Order Approving Final

Notice of Rights [Doc. # 1056]. Plaintiffs attempted to resolve this issue during mediation, but Defendants have not responded to Plaintiffs' proposal. Welch Decl. ¶ 21. Defendants were noncompliant with the FSA's notice of rights requirement throughout the reporting year.

Plaintiffs' counsel have not spoken with any families at Dilley who recall learning about their child's full *Flores* rights in a video, training, or documentation provided by ICE or CoreCivic. *See* Welch Decl. ¶ 20*; see, e.g.*, D.C. Decl. ¶ 43 ("I don't recall any know your rights presentation. I remember I was given info on pro bono lawyers, but that was it."); J.C.M. Decl. ¶ 7 ("I have never received an orientation or video about my rights."); L.R.P. Decl. ¶ 15 ("No one ever explained my rights to me here. I asked for them, and ICE told me they don't know what our rights are."); J.C.B. Decl. ¶ 24 ("We received no presentation about rights.").

Recently, families started reporting that ICE required them to sign a document informing them that children have the right to be released within 20 days, while simultaneously telling them that those rights did not actually apply:

> They did not tell us anything about our *Flores* rights. Earlier that day, we met with an ICE agent, and they showed us a piece of paper saying that children could not be detained more than 20 days, but they didn't explain anything. I'm not sure what the point of the paper is since we've been here more than 40 days so far.

N.A.A. Decl. ¶ 11.

> No one has given me a handout about my children's rights. I do not remember watching a video about my children's rights either. They showed us a video when we got here, but it was about immigration law and credible fear interviews. I've heard from many people that they are no longer showing the immigration video, though. I have not heard about my children's right to be released from Dilley without me. No one has told me anything about bond hearings.

M.G.O. Decl. ¶¶ 16-19; L.R.V. Decl. ¶ 6; L.R.P. Decl. ¶ 16 ("When we first arrived to Dilley, we signed a form about *Flores*. But ICE told me we don't qualify for *Flores*. They didn't tell me why.").

Class members also consistently report barriers to making free legal phone calls, emailing counsel, and preparing their immigration cases. Welch Decl. ¶ 23; Mukherjee Decl. ¶¶ 38-43; *see, e.g.,* M.A.B.H. Decl. ¶ 32 ("I have not been able to call lawyers and do not have money for lawyers. . . ."); O.B. Decl. ¶ 12 [Doc. # 1779-18] ("I have not contacted lawyers because I thought I have to pay. This is the first time I am hearing I don't have to pay for calling lawyers."); S.D.C. Decl. ¶ 21 [Doc. # 1779-8] ("I haven't been able to make any free pro bono calls here by using the system where you are supposed to mark 6. I saw a woman try it recently, and it did not work."); Z.V. Decl. ¶ 24 [Doc. # 1748-21] ("I cannot call my lawyer for free either. I have to pay to call him on his cell phone. I have never heard anyone tell me I should be able to call my lawyers for free."). Although the JC Report asserts "indigent residents may request free domestic calls . . . [for] legal calls," not one family Plaintiffs' counsel have spoken to has ever been aware of this option. JC Report at 23 [Doc. # 1802-1]; Welch Decl. ¶ 26.

> We never received information about how to call lawyers or how to call people for free. I only learned how to call *Flores* attorneys, because other people detained here gave me your information. I used my money to pay for that call, because I do not know how to make calls any other way.

M.L.S. Decl. ¶ 28 [Doc. # 1748-36].

Despite Defendants' claim that "Gmail access was restored on March 6, 2026 through library computers," families have consistently reported since March 6 that there is still little to no Gmail access and the other services are limited. JC Report at 19 [Doc. # 1802-1]; Mukherjee Decl. ¶¶ 40-41; *see, e.g.*, M.A.B.H. Decl. ¶ 33 ("When I got here, there was no way to use my own email address. I cannot open my Gmail account or create new Gmail accounts. There are a lot of restrictions, and we can only use the email they allow here."); M.G.O. Decl. ¶ 30 ("I cannot use my Gmail here either because they took away my phone and the computers only allow you to access Proton for email."); A.L.G. Decl. ¶ 20 [Doc. # 1779-12] ("We still do not have access to Gmail here to contact our lawyers. Yesterday, someone new to Dilley asked the library how to email his lawyers, and the people in the library said he could not use Gmail . . . . But people have to pay for Proton."); Welch Decl. ¶ 25. Recently, some families with long detention stays

reported to their attorneys that their email accounts were suddenly closed down without advance notice resulting in the deletion of all previous emails. Mukherjee Decl. ¶ 41; Altillo Decl. ¶ 35.

Limited interpretation access for some languages and documents further exacerbates families' confusion about their legal cases, potential release dates, and their *Flores* rights. J.C.M. Decl. ¶¶ 10-11 ("These papers are all in English. . . . [W]e don't receive the papers in our own language. For the *Flores* document, an ICE agent told me what it means, but the paper was still in English. We didn't even get a copy of that one."); O.B. Decl. ¶¶ 13-14 [Doc. # 1779-18] ("I can't understand anything here – no one has explained anything to me in French. . . . My daughter speaks only [language]. I have not had a translator or interpreter since we arrived here.").

Together, evidence demonstrating the lack of notice of children's *Flores* rights, lack of access to free legal calls and email communication, and lack of consistent language access reveals that Defendants have been non-compliant with the FSA's notice of rights and access to counsel requirements throughout the reporting-year.

### 4. Children Still Lack Access to Child-Friendly Foods, Healthy Snacks, and Safe Drinking Water

Families continue to report concerns about their children's nutrition at Dilley. J.C.B. Decl. ¶ 58 ("The food here is not healthy. All the kids need this to be better.") In June, children and parents continued to report that the food makes them sick. *See* J.C.M. Decl. ¶ 20 ("The food here makes us sick. We are losing weight. We eat the food and have to go right to the bathroom. Sometimes we eat, sometimes we don't. If we do eat, we go directly to the bathroom afterwards."); N.A.A. Decl. ¶ 12 ("Often when I eat the food, it will hurt my stomach. I have lost six pounds. My little brother also doesn't like the food. He would eat it at first, but then he started getting belly aches and now he doesn't want to eat it at all."); M.G.O. Decl. ¶¶ 37-38 ("My children have been sick with stomach aches since getting here . . . . I think the food makes them sick to their stomachs. . . . There are so many kids who do not eat because they get stomach pain and diarrhea."); M.A.B.H. Decl. ¶ 21-22 ("[E]very time I eat, I get a lot of gas and stomach pain . . . .

[M]y son had a really intense pain in his stomach, and I took him to the doctor here. They said his pain may just be because he is not eating well.").

Children and their parents also continuously express concerns about the food taste, variety, quality, over-use of sauces and condiments, and lack of special diets.[10] *See, e.g.*, Mukherjee Decl. ¶ 37 ("Every verbal child and parent who I have worked with at Dilley from March 1, 2026 to date has reported that the food is not appropriate or palatable for children and families."); Altillo Decl. ¶¶ 27-28; N.A.A. Decl. ¶ 12 ("The food here overuses condiments, and I don't eat much of it. I will just eat a few of the meals. Even the fruit is bad – it's canned and tastes metallic like it's expired."); M.G.O. Decl. ¶ 38 ("The food here is repeated a lot. It's always the same. It also has too many condiments for children to eat it. . . . [T]he staff just give us the same food over and over again."); L.R.P. Decl. ¶ 17 ("Most of the time, the food here is horrible.").

> [My son] is simultaneously hungry and doesn't want to eat anything, so I mostly give him milk and cookies. As a mom, it makes me feel worried that he has not been eating. . . . We have not been able to get a special diet for him either because it's so complicated to be eligible for one. So, I just pray to God that we will get out of here soon.

M.A.B.H. Decl. ¶¶ 21, 23.

> My twelve-year-old has had an especially hard time with the food. . . . she is allergic to artificial coloring. Lately, she's had a horrible allergic reaction to the artificial coloring in the food here. It has really flared up badly. Her lips and mouth have been swollen and inflamed. She really can't eat much of anything. I asked for her to be put on a special diet, but they said that is not necessary and she should just avoid foods with artificial coloring.

L.R.V. Decl. ¶ 12.

Rather than responding to these concerns, the JC Report simply echoes previous assertions about Dilley's menu and claims that there have only been 18 food service

---

[10] While the ICE JC Annual Report devotes several pages and exhibits to explaining the availability and contents of special meals, the "Special Diets for Minors Log" lists only nine children who have received special diets at Dilley over the last year – out of thousands of detained children. ICE JC Annual Rep. at 5-7 [Doc. # 1802-1]; ICE JC Exhibits at 25 [Doc. # 1802-2]. According to the log, only two children have been given special diets in 2026 so far. *Id.*

Pls.' Resp. to ICE Juv. Coord. Annual Report
CV 85-4544-DMG-AGRX

grievances from June 2025 to April 2026, none of which have been founded. JC Report at 6 [Doc. # 1802-1]. In light of Plaintiffs' evidence, the absence of a single founded food service grievance is not believable.

Despite installation of water filters in the living quarters following months of complaints from class members, families still repeatedly report that the water tastes bad and makes them sick. *See, e.g.,* M.G.O. Decl. ¶ 39 ("The water here is really bad, too. We do not have enough money in our commissary account to buy water, so we have to drink water from the tap, but it gives us diarrhea. So, we have consistent diarrhea."); M.A.B.H. Decl. ¶ 21 ("For the most part we are buying potable water bottles here . . . . I am always trying to make sure I can buy it for my son because I don't want us to get a stomach illness. It is expensive but we do it to stay healthy."); Altillo Decl. ¶ 27; Mukherjee Decl. ¶ 36.

> When we first arrived, my son drank the water. It made his stomach hurt and he got diarrhea that day. The water also comes out dirty. . . . I raised the issue with medical, and they said the filtered water was fine. I asked her why all the medical staff drink bottled water and she just kind of stared at me.

L.R.V. Decl. ¶ 13.

> I don't drink the water from the tap here because it tastes really bad and looks cloudy. I drank the water when I first got here for about a week. I got a lot of stomachaches. Some people drink it because they don't have money to buy bottled water. A lot of people say the water made them feel bad when they drank it.

N.A.A. Decl. ¶ 13.

Families also report inconsistent access to infant formula, baby food, safe options for cleaning bottles, and access to bottled water for infant formula. *See, e.g.*, M.L.S. Decl. ¶ 14 [Doc. # 1748-36] ("Our 2-month-old is taking formula here with the water from the sink, and it is giving him diarrhea all the time. . . . [T]hey said we had to use the sink water for formula. The guards said we would have to buy water bottles from the commissary . . . ."); Y.G.P. Decl. ¶ 9 [Doc. # 1779-17] ("One time, a guard refused to let me have bottled water for her formula and said I would need to use the tap water.").

While there have been minor improvements over the last year, Defendants are still not providing children with age-appropriate food.

### 5.  ICE Provides Poor Sleeping Conditions for Children

Lack of sleep also remains a serious, issue rendering detention at Dilley unsafe for children. Families report each site visit that children cannot sleep because ICE keeps the lights on in living areas all night, guards are loud or conduct room checks in disruptive ways, and bunk beds are uncomfortable. *See, e.g.*, M.P.O. Decl. ¶ 19 ("It is hard to sleep here because the lights are on all night. We wake up many times throughout the night because the lights never go off."); L.R.V. Decl. ¶ 18 ("Between all the noise, the loud guards, and the lights on – my children have had a hard time sleeping here. We are able to turn off some of the lights, but it is still very difficult. During the night, they are also checking on us every 40 minutes."); L.R.P Decl. ¶ 18 ("The lights are on all night, you cannot sleep, and the bed is hard."); L.R.V. Decl. ¶ 18.

Some families report cruel treatment by guards in the night that terrifies children and further disrupts sleep. One parent described the following incident:

> It is difficult for my children to sleep here because the lights are on all night. . . . A couple of nights ago, we all woke up when a bunch of ICE officers came into the room at 3 a.m. They were checking for things, but I am not sure what they were looking for. It was terrifying. When they saw that I woke up, they left the room.

M.G.O. Decl. ¶ 36.

Another parent recounted the following:

> One female guard liked to torment the families at night by jumping repeatedly on an area of the metal hallway outside the rooms that made a loud booming sound. She would hold on to a pole and jump with all her weight so that she could make a very large sound. I saw how she did it. She would make sure to jump on that area throughout the night to startle and awaken us. It went on for a month off and on. I confronted her about it directly, but she said she didn't speak Spanish. I then went to a supervisor, but the behavior continued. Then my son (who understands English) heard her talking in English to another guard who was telling her to stop making that noise. She said: "What are those Latinos going to do to me?"

L.R.V. Decl. ¶ 16.

19

Children are exhausted from lack of sleep, which is negatively affecting their physical and mental health. Lack of sleep harms children's brain development and undermines long-term physical and mental health. Welch Mar Decl. Attachs. C & D [Doc. # 1748-2].

### 6. Children Still Lack Access to Adequate Hygiene Products

Over the past eight months, Defendants' reports to the Court have provided inconsistent and contradictory descriptions of what hygiene items children actually receive. Welch Decl. ¶ 34; JC Report at 8 [Doc. # 1802-1] (not listing soap or shampoo in the list of "routine hygiene items"); *cf.* May ICE JC Rep. at 27 [Doc. # 1768-1] (stating "[t]he standard hygiene kit includes soap [and] shampoo."); *see also* Mar. 13, 2026 ICE Juv. Coord. Status Rep. at 16 [Doc. # 1736-1]; Dec. ICE JC Rep. at 29 [Doc. # 1692-4].

Hygiene products provided to children held at Dilley are inadequate and of poor quality. The all-purpose foaming hand soap in the showers causes children's skin to get dry and break out in rashes. *See, e.g.,* M.P.O. Decl. ¶ 13 ("He was using the hand soap in the shower but I was worried because the soap was too harsh for his skin and his arms were getting really dry."); L.R.V. Decl. ¶ 13 ("I have bought a toothbrush, toothpaste, water and soap from the commissary. The toothbrush they gave us when we first arrived fell apart after a couple uses and my son said the toothpaste was not good. The handwash in the shower made my children's skin itchy."); L.R.P. Decl. ¶ 36 ("The soap here is for hands, not for the body. . . . The only thing you can do is pay for better soap and shampoo."); M.G.O. Decl. ¶ 32 ("When we first got here, they gave us a really small shampoo bottle. When it ran out, I spent a week asking for more shampoo, but the staff said they did not have any more. So, since then, we have had to buy it at the commissary."); J.C.B. Decl. ¶¶ 60-61 ("I used the shampoo they gave us upon entry and asked for more, and they said they don't have anymore. It lasted three days. The soap is the hand soap from the bathroom. . . . and it's foam soap. You can't really wash your body with foam.").

Defendants continue to detain children for weeks and months, while providing them with inadequate hygiene products designed for short-term temporary use. Families

should not have to buy basic hygiene products for their children at the commissary because the government has decided to hold them in custody for lengthy periods of time. To comply with the FSA, every hygiene kit should include body soap, shampoo safe for children or teenagers to use long-term, and regular toothbrushes that do not disintegrate after a few uses, in addition to the other items provided. All hygiene items should be replenished routinely at no cost. It is difficult to understand why this simple sanitation and hygiene problem remains unresolved.

### 7. Children Still Lack Access to Free Phone Calls to Family Members

ICE continues to deny children free phone calls to non-detained family members beyond their initial call upon entering Dilley. But class members have the explicit right to speak to family members for free. FSA Ex. 1 ¶ A.11; *see also* Attach. 1 Notice of Rights, Jan. 5, 2021 Order at 2 [Doc. # 1056-1].[11] It is unacceptable to deny children communication with family for days, weeks, or months at a time. FSA ¶¶ 11, 12.A, 18.

The JC Report states that "[i]ndigent residents may request free domestic calls, including legal calls, through Unit Management at any time," yet class counsel have never met with anyone at Dilley who made a free phone call to family beyond the initial five-minute call. JC Report at 18 [Doc. # 1802-1]; Welch Decl. ¶ 26.

> My son hasn't been able to make any calls to family since we arrived here because I didn't have any money in my account. No one has ever told me that my son could make free phone calls to his family. They gave my son and me a phone card when we first arrived. My card was for five minutes and my son's card was for three minutes, I think. I used my card, but my son has not been able to use his card. When we try to use it, the phone just cuts off.

M.P.O. Decl. ¶ 12; M.A.B.H. Decl. ¶ 31 ("We have to pay to call our family members from here, so we only have been able to call my son's family when there is money in the commissary. I have not heard about free phone calls.").

> When we first got here, we could not make any calls to anyone because we did not have money in our commissary account. I was allowed to make one

---

[11] The Notice of Rights was created pursuant to the September 18, 2020 Order at 2 [Doc. # 987]. The "Court approved the final language of the Notice of Rights." Jan. 29, 2021 Order at 2 [Doc. # 1077].

call, but the person I called did not pick up. There is definitely no way to make free calls to family. If you do not have money, you cannot call anyone.

M.G.O. Decl. ¶ 25.

Notwithstanding ICE's claims, Plaintiffs' evidence shows that free phone calls to family members are not and have never been available to families at Dilley.

### 8. Children Lack Access to Appropriate and Clean Clothing

Appropriate, clean, and adequate quantities of clothing and shoes are essential to ensuring safe and sanitary conditions for children. Defendants' Report states that "[f]ollowing the May 29, 2026 Facility Administrator meeting, the facility modified intake issuance so residents will begin receiving six sets of clothing at intake" and that "[c]hildren receive two pairs of shoes and one pair of shower shoes, with replacement shoes available for wet, muddy, damaged, ill-fitting, or unusable footwear." JC Report at 7-8 [Doc. # 1802-1]. Despite these assertions, during Plaintiffs' June site visit, Plaintiffs' counsel heard repeated complaints regarding the lack of adequate clothing at Dilley. M.P.O. Decl. ¶ 20 ("My son only has one pair of pants and two pairs of shorts. He has one pair of shoes, and they won't let you wash them. No one has told us we could get more clothing or shoes than we have."): L.R.P. Decl. ¶ 35 ("My sisters and I need more clothes. We can only get three shirts, three pants, and one pair of shoes.").

> [W]e have been waiting for new shoes for my daughter for more than a week. . . . She could not wear them without getting her feet wet. When my son's pants broke, I submitted a paper saying they were broken and requesting replacements. But the staff said we were lying and that we had hidden the pants in an effort to get more clothes. They searched our room to try to prove we were just trying to get more clothes. Now my son only has one pair of shorts that need to be washed every day. I also asked for a sweater for my daughter because only my son and I got sweaters, but the staff said they do not have any in her size, so she still does not have one.

M.G.O Decl. ¶¶ 33-35.

The ICE JC Annual Report does not identify when the new policy of issuing children six sets of clothes will be implemented. If consistently carried out, the policy would be a welcome improvement. However, the persistent reports throughout the past

22

year that even existing clothing policies – such as the requirement that children receive two pairs of shoes – are not being followed demonstrate year-long ongoing violations of the FSA by Defendants' failing to ensure children are held in safe and sanitary conditions.

### 9. Children's Education at Dilley Has Improved but Remains Inadequate, and Recreation Remains Insufficient

The JC Report acknowledges that the education program at Dilley has "issues" and states it "will continue to be prioritized for enhancements." JC Report at 14 [Doc. # 1802-1]. The JC Report notes: "Observed issues include limited instructional time, attendance controls for older students, computer monitoring, curriculum delivery, overreliance on worksheets, inconsistent use of classroom materials for hands-on or project-based learning, and incomplete special education infrastructure. The required Special Education Team had not yet been formally established in the reviewed materials." *Id.* at 16. The JC Report states that "full performance [is] scheduled for July 15, 2026." *Id*. at 24.

These "issues" are consistent with the concerns observed on our tours and shared by class members and parents. Welch Decl. ¶¶ 36-39; Mukherjee Decl. ¶ 46. Over the course of the past year, Plaintiffs have repeatedly raised the inadequacy of educational services, especially for middle and high school youth, many of whom were attending school in the U.S. for years before being apprehended. As a junior who was a cheerleader with a 4.0 GPA noted: "I have been to the school here twice, but it's mainly just drawing so I decided not to go back. There's not really teaching or learning. It's not like my high school where there were group projects, homework, and exams." N.A.A. Decl. ¶ 17; *see* L.R.V. Decl. ¶ 22 ("My younger kids are going to the school. My son went for a day and found it too boring. My oldest daughter felt the same. The only reason the younger kids go is because they are bored. They say they mainly just draw. Sometimes there will be basic math . . . ."); J.C.M. Decl. ¶ 23 ("My daughter doesn't want to go to the school anymore because every day is the same. She says they just color to pass the time."); L.R.P. Decl. ¶ 34 ("The education is monotonous and boring here; I know all the material already. It doesn't work. I will only get Fs for grades now because I am not at my old

school."); M.G.O. Decl. ¶ 45 ("[T]he school only gives them coloring, and the children feel like they are not learning."); J.C.B. Decl. ¶¶ 49-51 ("[T]hey just draw and play on the computers. They don't do math or teach [my son] English. The school is repetitive. My son has done the same homework five times. . . . It's a daycare really, not a school.")

The ICE JC Annual Report presents a mythical account of recreational opportunities at Dilley that bears little resemblance to Plaintiffs' counsel's observations during site visits or to the experiences consistently described by class members. Welch Decl. ¶¶ 41-43; JC Report at 17 [Doc. # 1802-1]. The JC Report states that "[a]ctivities include bead bracelet making, jewelry box construction and decorating, birdhouse building, yarn weaving, crocheting, canvas painting, journaling, sports and game tournaments, relay races, hula hoop activities, tug-of-war, Zumba, karaoke, bingo, and chalk art." *Id*. at 17. This is inconsistent with families' reports that their children are bored and have little to do. J.C.M. Decl. ¶ 29 ("There is not enough recreation for my daughter here. There are a few Legos; mostly they just let her draw. We have to buy more colors at the store here. The guards just give them one or two to draw with."); Welch Decl. ¶¶ 41-43. One mother shared that children are not even allowed to play with a rolled-up piece of paper in their rooms:

> There is nothing for the kids to do in their rooms, which is hard because the kids have to be in their room by 8 p.m. All they can do is just watch TV. There are no toys in the rooms. One day, my son and the other kids living in our room were playing with a ball that they made from rolling up paper. The boys were just playing and having fun. As soon as the guard heard the boys laughing, she came in and said they had to stop. . . . That's how it is here."

M.P.O. Decl. ¶¶ 17-18; *see* D.C. Decl. ¶ 33 ("Before detention, he was sleeping with a stuffed animal, a bear, but not anymore obviously."). Plaintiffs' evidence demonstrates that Defendants have failed to comply with the FSA over the course of the reporting year by denying detained children adequate, age-appropriate, and varied educational and recreational programing tailored to the needs and particular vulnerabilities of children held in prolonged detention.

## III.    CONCLUSION

The ICE JC Annual Report once again portrays conditions at Dilley in a manner fundamentally at odds with the extensive evidence provided by class members and their families. Instead, Plaintiffs have documented a year of Defendants' recalcitrant non-compliance with the basic requirements for holding children in immigration detention. As in prior intermediary reports, Defendants rely heavily on their grievance system and written policies as proof of compliance. But this Court has long recognized that "[t]he mere existence of those policies tells the Court nothing about whether those policies are actually implemented, and the current record shows quite clearly that they were not." July 24, 2015 Order at 18 [Doc. # 177]. The evidence before the Court once again demonstrates the same disconnect between Defendants' purported policies and their ongoing violations of the FSA's mandate to ensure conditions are safe and sanitary and account for the particular vulnerability of the minors Defendants detain.

Dated: July 15, 2026

CENTER FOR HUMAN RIGHTS AND CONSTITUTIONAL LAW
Carlos Holguín
Bardis Vakili
Sarah Kahn

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe
Diane de Gramont
Rebecca Wolozin

CHILDREN'S RIGHTS
Leecia Welch
Eleanor Roberts

*/s/ Leecia Welch*

Leecia Welch
*Attorney for Plaintiffs*

Pls.' Resp. to ICE Juv. Coord. Annual Report
CV 85-4544-DMG-AGRX

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2026, I caused a copy of Plaintiffs' Response to the July 1, 2026 ICE Juvenile Coordinator Annual Report to be served to all counsel through the Court's CM/ECF system.


Dated: July 15, 2026

*/s/ Leecia Welch*
Leecia Welch
*Attorney for Plaintiffs*

Pls.' Resp. to ICE Juv. Coord. Annual Report
CV 85-4544-DMG-AGRX