# EXHIBIT 4

**DECLARATION OF RODOLFO C. ALTILLO**

I, Rodolfo C. Altillo, swearing under penalty of perjury, make the following declaration:

1.  My name is Rodolfo C. Altillo, and I serve in the role of Managing Attorney for the Asylum Access Services ("AAS") team at the Refugee and Immigrant Center for Education and Legal Services ("RAICES"). I have been in the role of Managing Attorney since July 2025. I have been licensed in the State of Texas since December 2020 and in the State of Maryland since December 2017; I am an attorney in good standing in each state.

2.  In my current role as the Managing Attorney for AAS (formerly known as the Family Detention Services Program), I oversee free legal services for detained people and families facing expedited removal from the U.S., as well as people seeking asylum and related protections, at the Dilley Immigration Processing Center ("Dilley").

3.  RAICES is a 501(c)(3) nonprofit, non-partisan organization founded in 1986 and headquartered in San Antonio, Texas. Additional offices are located statewide in Austin, Corpus Christi, Dallas, and Houston. As a humanitarian aid organization in service to immigrant, refugee, and asylum-seeking people and families, RAICES provides free and low-cost immigration legal services, including, but not limited to, assistance with asylum applications, removal defense, DACA renewals, and status adjustments. RAICES provides this full range of immigration-related services to individuals who are in detention, or who are continuing to fight their cases following release.

4.  AAS provides *pro bono* legal services for minors who are *Flores* class members and their families detained at Dilley. Since Defendants resumed detaining families at Dilley in April 2025, RAICES has served more than 500 families in ICE custody.

1

5.  Through my current role as Managing Attorney of AAS, I am familiar with the terms and requirements of the *Flores* Settlement Agreement ("FSA"), as well as subsequent agreements and judicial orders related to it.

6.  I am also familiar with U.S. Immigration and Customs Enforcement's ("ICE") Family Residential Standards ("FRS"). Between 2017 and 2025, I worked at Kids In Need of Defense ("KIND"), providing *pro bono* legal services to "Unaccompanied Alien Children" ("UCs"), including those detained under the custody of the Office of Refugee Resettlement ("ORR"), and families separated by the Trump Administration's "Zero Tolerance Policy."

7.  I have reviewed RAICES' prior declarations detailing ICE's non-compliance with protections for minors, and I am familiar with prior judicial orders instructing ICE with regard to its compliance.

8.  The facts set forth below are known personally to me and, if called as a witness, I could and would testify competently thereto under oath.

9.  RAICES has noted a deterioration in specific areas regarding Defendants' treatment of class members over the last few months, and several elements of their non-compliance with the FSA remain as previously reported in declarations to this Court.

**Exceedingly long periods of detention.**

10. Although RAICES has noticed ICE has started to release some families within 20 days of their arrival at Dilley, numerous families remain in federal custody far beyond that timeframe. As of July 08, 2026, the length of detention for the families we serve range from 28 to 96 days, all above 20 days. Thus, the average length of detention for clients currently detained at Dilley is about 53 days.

11. RAICES routinely sends formal e-mail correspondence to ICE officials titled "Release Status and Potential Violation of Flores Settlement," which notes the number of days the family has been detained and requests the status of release and any proper documentation that ICE has made prompt and continuous efforts to release *Flores* Class Members and their parent(s). These requests are routinely ignored by ICE and remain unanswered, despite many follow up e-mails sent by staff. For example, since May 01, 2026, RAICES has sent approximately 30 of these e-mails to ICE on behalf of the families detained at Dilley. The e-mail notices have included families that were detained from 18 to 104 days. To date, only 17 emails have received a response.

12. Among these responses given by ICE, "failure to cooperate" or "national security risk" have not been offered as reasons for prolonged delay. When ICE has responded to our e-mails, no documentation has been provided and the following types of responses have been offered:

   a. Eight (8) responses cited families would remain detained pending removal proceedings and their upcoming hearings before EOIR;

   b. Seven (7) responses stated families were pending release or removal, generally without an approximate date of release or removal;

   c. One (1) response confirmed family's removal; and

   d. One (1) response stated the family's continued custody was pending review.

13. The following example illustrates how ICE fails to respond at all to notices where families have been in prolonged ICE detention:

   a. On June 1, 2026, ICE was notified that a family had already been detained for 104 days. No response was received. RAICES followed up on June 3 after 106 days in

3

detention and again on June 8 after 111 days in detention. No response was ever provided. RAICES learned the family was released on or about June 11, after 114 days in custody.

14. When ICE does respond to RAICES' inquiries, the most frequent response is that families will remain detained through the pendency of their removal proceedings. The following examples illustrate how ICE keeps families detained for the purpose of continuing their removal proceedings while detained, even when it leads to prolonged detention:

    a.  On April 24, 2026, RAICES notified ICE that a family had been detained for 18 days and inquired on the status of release efforts;

        i.  ICE replied on April 27 that the family would remain detained due to their upcoming hearing on April 30;

        ii.  RAICES followed up on May 1 and May 5, 2026 regarding release status. ICE replied on May 5 that the family would remain detained until their upcoming hearing on May 14, 2026;

        iii.  RAICES followed up on May 14, May 15, and May 18 regarding release status. ICE replied on May 19, 2026 that the family, who had already been detained for 43 days, would remain detained until their upcoming hearing on June 01, 2026;

        iv.  RAICES followed up on June 1 and June 09 regarding release status. ICE replied on June 09 that the family, who had already been detained for 64 days, would remain detained until their upcoming hearing on June 11, 2026;

4

    v. RAICES followed up on June 16, 2026 regarding release status. ICE replied on June 17 that the family, who had already been detained for 72 days, would remain detained until their upcoming hearing on June 25, 2026;

    vi. As of July 8, 2026 the family remains detained and their removal proceedings remain pending. They have now been detained for 93 days.

b. On June 03, 2026, RAICES notified ICE that a family had been detained for 25 days and inquired on the status of release efforts.

    i. RAICES followed up on June 10, June 12, June 16, June 22, and June 23, regarding release status. No response.

    ii. ICE replied on June 24, 2026 that the family, who had already been detained for 46 days, would remain detained until their upcoming hearing on June 25, 2026.

    iii. The family's removal proceedings were dismissed at the June 25 hearing and an appeal is due on July 27, 2026. RAICES followed up on June 25, 2026 regarding release status. No response.

    iv. Generally, when removal proceedings are dismissed, the Government is no longer prosecuting the case and no longer asking the court to issue a removal order. However, the Government has been strategically seeking dismissal of removal cases to then use administrative processes to expeditiously remove immigrants.

    v. As of today, the family remains detained after 60 days in detention.

c. On June 23, 2026, RAICES notified ICE that a family had been detained for 36 days and inquired on the status of release efforts. ICE replied on June 24, 2026 that

5

the family would remain detained until their upcoming hearing on July 07, 2026. The family remains detained after 51 days in detention.

15. While some families who have final orders of removal get removed expeditiously, others remain in prolonged custody:

    a. On March 24, 2026 RAICES notified ICE that a family had been detained for 92 days and inquired on the status of release efforts. ICE replied on March 26, 2026 that there were no plans for release and that the client would be removed "soon." On May 13, 2026, after the family remained detained for 142 days, RAICES once again followed up with ICE. No response. RAICES was unable to continue representing this family and it is unclear how much longer they remained detained after the 142 days;

    b. On April 27, 2026, RAICES notified ICE that a family had been detained for 32 days and inquired on the status of release efforts. No response. RAICES continuously followed up on April 29, May 05, May 12, May 13, May 14, 2026, all with no response. On June 12, 2026, ICE responded that the family would be released that same day. The family had been detained for 66 days.

    c. On May 21, 2026, RAICES notified ICE that a family had been detained for 32 days and inquired on the status of release efforts. After not receiving a response, RAICES followed up May 26 after the family had been detained for 37 days. ICE responded on May 27 stating the family was pending removal. The family was removed on or about June 11, 2026, after approximately 53 days in detention.

**Ongoing medical concerns.**

16. The most common and frequent complaint among clients at Dilley continues to be medical and mental health concerns. From May 2025 to May 2026, RAICES received approximately 1,480 reports of medical concerns at Dilley.

17. Clients have repeatedly shared complaints regarding Dilley's capacity to treat urgent, chronic, or complex medical needs. One client has a herniated disc and at times experiences excruciating pain she describes as "Level 10." Despite the severe pain, she is only given ibuprofen or acetaminophen and has been denied physical therapy. Another client reported that her 5-year-old son had been having blood in his stool. She took her son to medical and they took stool samples. However, after approximately a month, no results have been shared and no treatment given to her 5-year-old son, who continued to experience bloody stools.

18. A father shared with RAICES that one of his sons has a jaw condition and a wire in the apparatus he has in his mouth to help with the condition broke, making eating difficult and causing his son to bleed. When he took him to medical, he was told that they do not offer that kind of medical care at Dilley and the child would have to get medical care once he is released.

19. A mother shared with RAICES that she was concerned about her 7-year-old daughter's well-being after she sustained an injury that caused bleeding in her "private area." Medical staff concluded, without any imaging or X-rays, that there was no internal bleeding and did not offer additional treatment or follow up. The child continued to bleed the next day and continued to complain of pain in her private area.

7

20. A father told RAICES that when they were detained, his one-year-old son was still drinking formula. However, medical staff told him their one-year-old cannot drink formula anymore and forced them to switch to milk. However, the switch caused their son severe diarrhea and he has developed diaper rash, which causes him pain and discomfort.

21. One mother shared that her daughter was having an allergic reaction that was causing her lip to swell on a Saturday night. When she took her to medical, she was told that a doctor would not be available until Sunday morning. A nurse determined the allergic reaction was not urgent, gave the child Benadryl, sent her back to her dorm, and told them to come back the next morning. The child was not monitored and no further guidance given on what to do if the child's state worsened overnight. The child continued to feel tingling in her lips and had to wait until the next morning to get medical care.

22. RAICES clients also continue to complain that their medical concerns are ignored or dismissed by staff, without any examination, and then told their maladies are just psychological. For example, one client reports that she had thyroid issues and pre-diabetes that she managed with medication and specialized diet prior to detention. When she first arrived at Dilley, she did not have access to her medication. After alerting medical staff, they told her she would be evaluated in two months. After two months, no evaluation was given. She is also concerned about her pre-diabetes because she is experiencing vision loss. Medical staff have not evaluated, examined, or treated her medical conditions. Instead, a nurse told her that a miracle has occurred and she has been cured. Moreover, the nurse told her that all her medical concerns are due to mental health and she just needs to walk more. The only medication she has received for her concerns are antacids and ibuprofen.

8

**Ongoing mental health concerns.**

23. RAICES clients also report deteriorating mental health and inadequate care. For example, a client told RAICES that she suffers from anxiety and panic attacks, and that her condition has worsened from the stress of detention. She has had heart palpitations, shaking body and hands, temporary vision loss, and trouble sleeping. She requested medical care and did not receive it promptly, despite being in distress and having other detainees assist her. When she followed up with her request, she was told not to remind staff anymore and that staff would let her know when she can receive care. When she finally saw a counselor, he was not very helpful. Rather than providing support, he told her she would be deported, asked her several questions unrelated to her concerns, and she felt she was being interrogated rather than receiving help. She requested to see another counselor and was told she would have to wait.

24. Children's mental health also deteriorates during detention. One mother told RAICES that her five-year-old son always asks her when they will be able to leave and that he does not want to be there anymore. His mental health is also impacting his appetite and he does not want to eat. Another father told RAICES that he is concerned about his eight-year-old son's deteriorating mental health. The stress of detention is causing him to not eat well and to wet his bed. Although he is seeing a therapist, his condition is not improving. He has noticed that other children in detention are also wetting their beds and not eating well.

**Harsher treatment of families.**

25. Between May and June 2026, families detained in Dilley continued to report mistreatment and general rudeness by ICE and CoreCivic staff. From January to May 2026, RAICES has received approximately 106 complaints of mistreatment at Dilley.

9

26. Most commonly clients report being yelled at and being treated rudely by officers, guards, and medical staff. One client reported being yelled at by an ICE officer after trying to address an error with her name. Another client reported medical staff became angry because he knocked on their door and was told he is rude and has no manners. Even when just getting their medication, one client reports the pharmacist treated her rudely, aggressively placed her medication on the counter, and shutting the window where she gets her medication.

**Inadequate Food and Water.**

27. Families continue to report concerns about the quality and appropriateness of the food and water provided at Dilley. Consequently, many resort to not eating and experience weight loss, use their limited funds to buy food at the commissary, or experience gastrointestinal problems when eating the food and drinking the water at Dilley out of necessity. For example, many clients have reported that they experience stomach aches after drinking the water. One client reported that he gets itchy after drinking the water. Thus, many parents resort to buying bottled water for their children, especially if they are already sick. Similarly, several families have reported that they experience nausea, vomiting, and diarrhea after eating the food at Dilley.

28. Several clients also report that their requests for their dietary needs are not accommodated. For example, one mother reports that she and her son are lactose intolerant and also have food sensitivities. She has requested lactose free milk for her son and a blander diet since food tends to be too salty and fried. Another mother told RAICES that her son does not eat the food because it has too much spice and the meat they serve looks weird to her and she

10

cannot tell what kind of meat it is. She mostly resorts to buying food for him from the commissary.

**Lack of Legal Orientation Program and Legal Rights Group Presentations**

29. As of July 8, 2026, Class members and their family members detained in Dilley continue to be inadequately informed about their legal process and rights. Families do not have access to a Legal Orientation Program, and do not receive a Legal Rights Group Presentation provided for in section 6.4 of the FRS. While some families report they are given a "Flores Notice" after arriving at Dilley, many do not understand the content of the Notice and some report they only received an English copy.

30. As set forth in previous declarations, RAICES requested the requisite permission to provide detained class members and their families with Legal Rights Group Presentations. After Defendants denied the request without explanation, RAICES submitted a FOIA request on June 12, 2025 to seek clarification on DHS's reason for the denial and what they would approve. The FOIA request remains pending without a response as of July 8, 2026. RAICES remains willing and able to provide these services to detained families and adequately explain the rights they have under *Flores* and generally while detained.

**Hindered Legal Access**

31. Families continue to report receiving inaccurate or misleading legal advice from non-attorney ICE and CoreCivic staff at Dilley. The advice appears intended to deter families from further pursuing legal relief and to pressure families to accept removal or voluntary departure instead. For example, a family was told by ICE that their case was complicated and they would be detained for a lengthy period related to stay of removal and her pending habeas case.

11

32. A father told RAICES that ICE was pressuring him and his son to accept voluntary departure. The officers were angry and asking why they wanted to fight their case if there was nothing else left to do in their case. He felt pressured to sign but his son did not, causing them to then be in different procedural postures and without counsel to explain the possible consequences of that decision.

33. Another parent told RAICES that her child has approved Special Immigrant Juvenile Status (SIJS) and is currently waiting for a visa to become available. When the parent addressed the matter with ICE and showed them an official USCIS Approval Notice of the SIJS I-360 Petition, the officer told them the document did not count as a notice and did not discuss the issue further.

34. Clients have also reported issues with accessing e-mail and free legal calls. One client informed us they were given a list of attorneys and legal services providers but were never told legal calls were free. Several clients have told us that they are not told how to make the free legal calls and that they are actually charged when making calls to legal services providers like RAICES. One client reported she was unable to call us because she did not have funds in her commissary account.

35. Several clients have also reported issues with internet and e-mail access. In part, this seems to be due to Dilley policy changes that were not announced to clients or to RAICES. For example, at some point Dilley stopped allowing families to use Gmail and instead transitioned to Proton Mail. However, one client alerted RAICES that Proton mail had been blocked. Recently, clients have started e-mailing from Atomic Mail accounts. Similarly, several clients have reported to RAICES that only certain computers have internet access but that those computers don't have the function to save information, such as their

12

immigration applications and other legal documents. This inconsistent and non-continuous use of email services and internet access limits both the information and documents clients can send and receive regarding their case and any evidence necessary for their case.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 9, 2026

Austin, Texas

_____

Rodolfo C. Altillo, Esq.

13