UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **CV 85-4544-DMG (AGRx)** | Date | August 17, 2026 |
| Title | ***Jenny Flores, et al. v. Todd Blanche, et al.*** | Page | **1** of **18** |

Present: The Honorable DOLLY M. GEE, CHIEF UNITED STATES DISTRICT JUDGE

| | |
|---|---|
| DEREK DAVIS | NOT REPORTED |
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiff(s) | Attorneys Present for Defendant(s) |
| None Present | None Present |

**Proceedings: IN CHAMBERS—ORDER DISCHARGING ORDER TO SHOW CAUSE [1794] AND APPOINTING SPECIAL MASTER AND INDEPENDENT MONITOR**

Between July 2025 and June 2026, the Court held five status conferences with the parties and the Juvenile Coordinators for Customs and Border Protection ("CBP") and Immigration and Customs Enforcement ("ICE"), as part of its oversight of the *Flores* Settlement Agreement ("FSA").[1] The CBP and ICE Juvenile Coordinators filed reports before each status conference, and Plaintiffs filed responses to each report, attaching numerous declarations attesting to violations of the FSA. On June 15, 2026, the Court issued an Order to Show Cause why an Independent Monitor and Special Master should not be appointed to oversee aspects of certain CBP facilities and ICE's Dilley Immigration Processing Center ("Dilley"). [Doc. # 1794 ("OSC").] On July 6, 2026, Defendants filed a Response to the OSC. [Doc. # 1803 ("Defs. Response").] On July 16, 2026, Plaintiffs filed a Response to the OSC. [Doc. # 1813 ("Pls. Response").] The Court held the 2026 annual status conference on August 4, 2026, where the parties had an additional opportunity to respond to the Court's OSC and proposed appointment order. [Doc. # 1825.] Following the hearing, Plaintiffs filed two additional declarations [Doc. ## 1822, 1823] and Defendants filed an additional declaration [Doc. # 1824].

Having carefully considered the parties' written responses, the parties' additional comments at the 2026 annual status conference, and the voluminous record before the Court, the Court hereby **DISCHARGES** the OSC and **APPOINTS** a Special Master and Independent Monitor for the following reasons.

[1] The status conferences were held on July 25, 2025, September 22, 2025, December 15, 2025, March 30, 2026, and June 1, 2026. [Doc. ## 1613, 1671, 1713, 1754, 1789.]

## I.
## RELEVANT BACKGROUND[2]

### A. CBP

On June 17, 2025, Plaintiffs filed a Motion to Enforce the FSA against CBP, citing minors' extended time in custody ("TIC") and detention in unsafe and unsanitary conditions. [Doc. # 1575.] On August 15, 2025, the Court granted in part and denied in part Plaintiffs' Motion to Enforce. [Doc. # 1638 ("Aug. 15, 2025 MTE Order").][3] The Court noted that while Plaintiffs had shown that the TICs likely violated the FSA, "and seem particularly unnecessary given the extremely low census," the reporting at the time showed that average TICs for family units were going down. *Id.* at 7.[4] The Court wanted the benefit of Defendants' explanations for extended TICs to assess whether further remedies to enforce the FSA were warranted. *Id.* at 7–8. As for detention conditions, the Court found that Plaintiffs had shown by a preponderance of the evidence that Defendants failed to substantially comply with the FSA in two regards: (1) inadequate temperature controls in the Rio Grande Valley ("RGV"), El Paso, and San Diego (San Diego SSF, Chula Vista, and Otay Mesa Port of Entry ("POE")) sectors; and (2) inadequate sleep conditions caused by lighting issues in the El Paso and San Diego (San Diego SSF, Chula Vista, and Otay Mesa POE) sectors. *Id.* at 10–12.

As part of their Motion to Enforce, Plaintiffs sought appointment of an Independent Monitor to monitor compliance in all CBP sectors, including by "validating data," "monitoring time in custody," and "monitoring and providing guidance on CBP's systems for tracking [time in custody] and expeditiously processing minors for release or transfer." [Doc. # 1575-1 at ¶ 5.] The Court denied Plaintiffs' request for re-appointment of a monitor, without prejudice, and informed the parties that it may reconsider Plaintiffs' request depending on the contents of the forthcoming Juvenile Coordinators' supplemental reports. Aug. 15, 2025 MTE Order at 13.

Since then, the CBP Juvenile Coordinator filed four supplemental reports. [*See* Doc. ## 1648-1 (filed September 8, 2025), 1692-1 (filed December 1, 2025), 1735-1 (filed March 13, 2026), 1767-1 (filed May 4, 2026).] Plaintiffs filed four responses in turn. [*See* Doc. ## 1656 (filed September 15, 2025), 1707 (filed December 8, 2025), 1747 (filed March 20, 2026), 1780

---

[2] The Court incorporates by reference the background summarized in its previous orders and repeats here only the factual and procedural background that is most relevant to the OSC.

[3] The Court incorporates its Aug. 15, 2025 MTE Order herein by reference.

[4] All page references herein are to page numbers inserted by the CM/ECF system.

(filed May 18, 2026).] Most recently, on July 1, 2026, the CBP Juvenile Coordinator filed a 2026 Annual Report. [Doc. # 1801-1 ("2026 CBP Annual Report").] Plaintiffs filed a response to the 2026 CBP Annual Report [Doc. # 1814], and Defendants filed a reply [Doc. # 1821].

In 2022, the parties entered into a supplemental settlement agreement regarding conditions at CBP facilities in the RGV and El Paso sectors. [Doc. ## 1254-1 ("2022 CBP Settlement").] The 2022 CBP Settlement expired on July 29, 2026. [*See* Doc. # 1547 at 12.]

**B. ICE**

In April 2025, after a long hiatus, ICE resumed its practice of detaining families at the South Texas Family Residential Center, also known as Dilley. [Doc. # 1599-2 at 2.] Since then, the ICE Juvenile Coordinator has filed five reports/supplemental reports regarding conditions there. [*See* Doc. ## 1599-2 (filed July 1, 2025), 1648-4 (filed September 8, 2025), 1692-4 (filed December 1, 2025), 1736-1 (filed March 13, 2026), 1768-1 (filed May 4, 2026).] Plaintiffs filed responses to each of the Juvenile Coordinator's reports, along with numerous declarations. [*See* Doc. ## 1601 (filed July 11, 2025), 1656 (filed September 15, 2025), 1706 (filed December 8, 2025), 1748 (filed March 20, 2026), 1779 (filed May 18, 2026).] On July 1, 2026, the ICE Juvenile Coordinator filed a 2026 Annual Report. [Doc. # 1802-1 ("2026 ICE Annual Report").] Plaintiffs filed a response to the 2026 ICE Annual Report [Doc. # 1811], and Defendants filed a reply [Doc. # 1820].

On December 15, 2025, the Court exhorted the parties to conduct mediation discussions with the assistance of former Special Master/Independent Monitor, Andrea Ordin, Dr. Paul Wise, and the Juvenile Coordinators. [Doc. # 1714.] The Court ordered the parties to discuss issues relating to conditions of confinement and notice of rights that were potentially the subject of Plaintiffs' proposed motion to enforce. *Id.* On June 5, 2026, the parties filed a joint status report regarding their mediation efforts. [Doc. # 1792.] The parties' mediation efforts focused on conditions at Dilley and class members' notice of *Flores* rights. *Id.* at 2. Plaintiffs reported their position that the conditions at Dilley continue to violate the FSA and the parties' mediation efforts are at an impasse. *Id.* at 3. Defendants reported their position that conditions at Dilley do not violate the FSA and that Defendants were "amenable to continuing mediation on the notice-of-rights and medical issues." *Id.*

## II.
## LEGAL STANDARD

Federal Rule of Civil Procedure 53(a)(1) provides that the Court may appoint a special master to "make or recommend findings of fact" if some "exceptional condition" warrants it and to "address . . . posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Fed. R. Civ. P. 53(a)(1). Under Rule 53, special masters may be appointed "because of the complexity of litigation and problems associated with compliance with the district court order." *United States v. Suquamish Indian Tribe*, 901 F.2d 772, 775 (1990); *see also Hook v. State of Az.*, 120 F.3d 921, 926 (9th Cir. 1997) (concluding "exceptional circumstances" existed to appoint a special master where district court detailed history of noncompliance and lacked resources to constantly monitor compliance with consent decree). Indeed, even "the prospect of noncompliance is an 'exceptional condition' that justifies reference to a master." *See Nat'l Org. For the Reform of Marijuana Laws v. Mullen* (*NORML*), 828 F.2d 536, 542 (9th Cir. 1987). "It is within a district court's discretion to appoint a master, and to decide the extent of the duties of a special master." *In re Hanford Nuclear Reservation Litigation*, 292 F.3d 1124, 1138 (9th Cir. 2002).

Courts also have authority to appoint a special master under the All Writs Act, 28 U.S.C. section 1651(a), which provides that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a). "One of the recognized applications of the All Writs Act is the issuance of orders necessary to ensure the integrity of orders previously issued." *See NORML*, 828 F.2d at 544 (holding the appointment of a special master to monitor compliance with a court order validly applied the All Writs Act where "district court had reason to doubt" compliance).

## III.
## DISCUSSION

The Court starts by clarifying the relevant legal standard. The Court is *not* conducting a civil contempt inquiry, and the purpose of appointing a Special Master/Independent Monitor is *not* to impose a sanction on Defendants. *See* Defs. Response at 10. As in 2018, "Defendants entirely misapprehend the purpose of the Monitor's appointment and the scope of the Court's authority for doing so." *See* Nov. 5, 2018 Order at 2 [Doc. # 518.] Rule 53 and the All Writs Act "authorize the appointment of a special master to *monitor* compliance with a court's orders, and not to *coerce* that compliance or *punish* a defendant for non-compliance." *Id.*; *Compare NORML*, 828 F.2d at 542–44 (holding that Rule 53 and Section 1651(a) confer such authority to appoint special

masters), *with Kelly v. Wengler*, 822 F.3d 1085, 1097 (9th Cir. 2016) (holding that a contempt sanction may "coerce[] compliance with a court order" or punish violations thereof), *and Labor/Cmty. Strategy Ctr. v. L.A. Cty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009) (holding that civil contempt sanctions may be imposed only if a breach is shown by clear and convincing evidence). Thus, the clear and convincing evidence standard used for civil contempt proceedings is inapplicable here. Rather, the Court may appoint a monitor if "some exceptional condition" exists, and/or if there are any "posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." *See* Fed. R. Civ. P. 53(a)(1).

For the reasons discussed below, the Court finds that the appointment of a Special Master and Independent Monitor is warranted due to a combination of Defendants' history of non-compliance, current instances of non-compliance, ongoing disputes between the parties relating to implementation of the FSA, and the complexity of the litigation. *See* Fed. R. Civ. P. 53(a); *Hook*, 120 F.3d at 926; *NORML*, 828 F.2d 536 at 542.

## A. CBP

### 1. Time in Custody

Approximately one year has passed since the Court found that class members' extended times in custody ("TIC times") in CBP facilities likely violated the FSA but deferred decision on potential re-appointment of an independent monitor. *See* Aug. 15, 2025 MTE Order at 7. At the time, the Court observed average TIC times for family units decreasing gradually from 177.39 hours in February 2025 to 77.84 hours as of June 10, 2025, which seemed to suggest a possibility for improvement through CBP's own monitoring efforts. *Id.* These figures captured average TIC times for class members in family units ("FMUs") detained in CBP custody at the Southwest Border ("SWB"). [Doc. # 1599-1 at 12.]

The same data points in the 2026 CBP Annual Report show that while average TIC times remained below 72 hours between June 2025 and February 2026, the averages rose above 72 hours from March 2026 to June 2026. *See* 2026 CBP Annual Report at 7. For minors in FMUs at CBP facilities at the SWB, the average TIC rose to 121.75 hours in March 2026, 76.62 hours in April 2026, 90.63 hours in May 2026, and 85.81 hours as of June 10, 2026. *Id.* For minors in FMUs at U.S. Border Patrol facilities at the SWB, the average TIC times were 146.37 hours in March 2026, 85.22 hours in April 2026, 105.71 hours in May 2026, and 88.34 hours as of June 10, 2026. *Id.*

Throughout the past year, Plaintiffs have submitted declarations showing that class members in FMUs were detained in CBP facilities for well over 72 hours. *See*, *e.g.*, Declarations of V.O. at ¶¶ 4, 6 (at least 20 days at Chula Vista) [Doc. # 1747-1]; M.T.H. at ¶¶ 2, 4–6 (10 days in San Diego) [Doc. # 1748-10]; S.K. at ¶¶ 4–5 (six days in San Diego) [Doc. # 1748-15]; N.M. at ¶¶ 4, 9–10 (10 days in Texas) [Doc. # 1748-27]; W.L. at ¶¶ 4–5 (eight days in CBP facility) [Doc. # 1779-15]; M.G.O. at ¶ 7 (five days in RGV) [Doc. # 1811-12]; D.C. at ¶¶ 4–5 (seven days at Otay Mesa POE) [Doc. # 1811-14]. Plaintiffs' analysis of Defendants' census data shows that in March 2026 approximately 156 minors were detained in CBP custody for over 72 hours, and in May 2026, that number rose to approximately 164 minors. *See* Declaration of Avneet Chhabra ("Chhabra Decl."), Ex. A [Doc. # 1811-3]. In March 2026, of the 156 minors detained for over 72 hours, 46 minors were from the RGV Sector, 16 minors were from the El Paso Sector, and 19 minors were from the San Diego Sector. *Id.* In May 2026, of the 164 minors detained for over 72 hours, 50 minors were from the RGV Sector and 30 minors were from the El Paso Sector. *Id.* Most recently, Plaintiffs' counsel reported meeting with three families at the Chula Vista CBP station in July 2026 who had been detained in CBP custody for at least nine days, 16 days, and 28 days. Supplemental Declaration of Sarah Kahn at ¶¶ 2–5 [Doc. # 1823].

Defendants contend that the FSA "does not set a hard 72-hour limit for transfer or release when more than 130 minors are in government immigration custody." [Doc. # 1821 at 3 (citing FSA ¶¶ 12.A3, 12.B).] Instead, the "applicable FSA standard is 'as expeditiously as possible.'" *Id.* Based upon the data discussed above, however, it does not appear that CBP has been processing class members as expeditiously as possible. The parties have long acknowledged that 72 hours is a reasonable benchmark given that CBP facilities are intended only for short-term use and are not suitable for minors for longer periods of time. *See* Declaration of Margaret Isaacs at ¶ 5 (noting the "unique nature of CBP facilities . . . generally designed to be temporary, short-term holding facilities.") [Doc. # 1606-5]; *see also* Declaration of Luis Mejia at ¶ 7 ("POEs are not designed or intended for long-term custody[.]") [Doc. # 1606-2]. Indeed, in crafting the 2022 CBP Settlement, both sides agreed that "extended time in custody" meant over 72 hours, which would trigger "additional steps to ensure that conditions remain safe and sanitary." *See* 2022 CBP Settlement at 19. The parties' own agreement in the 2022 CBP Settlement informs what is considered "safe and sanitary" under Paragraph 12.A of the FSA. *See* FSA at ¶ 12.A.

Defendants argue that CBP processes minors as expeditiously as possible in light of certain operational concerns. Defs. Resp. at 15. "The exact time it takes to move an individual out of custody depends on a number of factors, such as the availability of ICE bedspace, the availability of repatriation flights and the cadence of such flights, and the time it takes to receive travel documents for aliens being repatriated." Declaration of Colin Lane at ¶ 7 [Doc. # 1803-1]. Reliance on generic excuses such as transportation delays, however, would give Defendants a free

pass to hold minors in conditions that all parties agree are *only meant for short-term stays*. The number of minors detained for over 72 hours is especially troubling given the current relatively low census numbers. *See* 2026 CBP Annual Report at 3 ("Nationwide, children and family encounters were down 89% in FY 2026 between October and May, compared to FY 2025 from October to May.").

It appears the same issues with extended TIC times in CBP facilities that Plaintiffs raised a year ago persist in the RGV, El Paso, and San Diego (including the Otay Mesa POE) sectors. The Court finds that appointment of a Special Master/Independent Monitor is warranted to monitor class members' TIC in these sectors.[5]

**2. Safe and Sanitary Conditions**

In the August 15, 2025 MTE Order, the Court granted Plaintiffs' motion on the issues of (1) inadequate temperature controls in the RGV, El Paso, and San Diego (including Otay Mesa POE) sectors; and (2) inadequate sleep conditions caused by lighting issues in the El Paso and San Diego (including Otay Mesa POE) sectors. Aug. 15, 2025 MTE Order at 10–12.

In the past year, Plaintiffs have continued to raise complaints regarding "freezing" temperatures in the RGV, El Paso, and San Diego sectors. *See*, *e.g.*, Declarations of J.E.R.V. (Chula Vista) at ¶ 9 ("It was freezing.") [Doc. # 1707-2]; L.R.B. (Chula Vista) at ¶ 16 ("The temperature is cold") [Doc. # 1707-3]; O.C.P. (Chula Vista) at ¶ 33 ("In the first station it was freezing. We were all so cold") [Doc. # 1707-4]; T.H.H. (Chula Vista) at ¶ 17 ("It is very cold in the cell where we sleep.") [Doc. # 1707-5]; N.V.S.M. (RGV) at ¶ 7 ("We called it the icebox; it was freezing there.") [Doc. # 1706-7]; K.M.L. (San Diego) at ¶¶ 5, 10–11 ("[T]hey brought me to an ice box."; "it was freezing"; "My baby was crying a lot, from the cold") [Doc. # 1706-15]; V.O. (Chula Vista) at ¶ 24 ("The kids are very cold.") [Doc. # 1747-1]; C.H.H. (RGV) at ¶ 13 ("It was super cold") [Doc. # 1748-13]; D.P.C.S. (RGV) at ¶ 11 ("It was so cold") [Doc. # 1748-14]; S.K

[5] Plaintiffs request that the Court modify its proposed order to oversee nationwide time in CBP custody. Pls. Response at 19–22. Plaintiffs cite to evidence of noncompliant TIC times between February 2026 and May 2026 in the "Del Rio Sector (51 children held over 72 hours); Laredo Sector (101 children held over 72 hours); and Tucson Sector (47 children held over 72 hours)." *Id.* Given that the Court's focus in the August 15, 2025 MTE Order was on enforcement in the RGV, El Paso, and San Diego sectors, and Plaintiffs' declarations throughout the past year have been specific to those regions, the Court declines to expand its remedial order to oversee nationwide time in CBP custody without a more targeted motion addressing those areas of concern. The Court notes, however, that what it has held in this Order and in numerous prior orders regarding the standard for "safe and sanitary" conditions applies with equal force to other CBP facilities. What is considered "safe and sanitary" does not change with geography. CBP should not require another motion and another court order to bring itself into compliance.

(San Diego) at ¶ 8 ("The room was very cold") [Doc. # 1748-15]; L.T.P. (El Paso) at ¶ 4 ("a place that was so cold that everyone calls it an icebox.") [Doc. # 1748-31].

Defendants argue that the declarations are either "too few, too dated, [or] too vague to support finding noncompliance in the RGV and El Paso Sectors." Defs. Resp. at 13. There is at least one declaration arising out of the RGV (N.V.S.M. Decl.) and El Paso (L.T.P Decl.) sectors from around October 2025. Additionally, Plaintiffs filed a declaration in June 2026 from a parent detained with two minor children in the RGV sector around April 2026. Declaration of M.G.O. (RGV) at ¶ 7 ("CBP kept me in iceboxes with my children for five days. First, we spent a few hours at the icebox in Brownsville, and then they moved us to McAllen."). In the 2026 CBP Annual Report, the Juvenile Coordinator Division ("JCD") noted that out of 28 interviews with children and/or parents or legal guardians, eight interviewees complained about facilities being too cold.[6] 2026 CBP Annual Report at 28. In light of the prior history of non-compliance, and persistent complaints regarding cold temperatures even after the Court's August 15, 2025 MTE Order was issued, the Court finds that monitoring of adequate temperature controls in the RGV, El Paso, and San Diego sectors is appropriate.

In December 2025, Plaintiffs also submitted declarations raising complaints about lighting issues in the San Diego sector. *See* Declarations of J.E.R.V. at ¶ 9 ("The lights were always on, day and night."); L.R.B. at ¶ 19 ("The lights are on all night."); O.C.P. at ¶ 32 ("The lights are on all night here."); T.H.H. at ¶ 20 ("The lights are on all night."). Although the declarants were detained in the San Diego sector between September and December 2025, given the prior history of noncompliance documented in the August 15, 2025 MTE Order, the Court finds that monitoring of lighting conditions is appropriate.

In its August 15, 2025 MTE Order, the Court noted that the issue of access to soap appeared to be in the process of getting resolved. *See* Aug. 15, 2025 MTE Order at 9 n.5. Several of the same declarants detained in the San Diego sector in late 2025, however, raised issues about access to soap. *See* Declarations of L.R.B. at ¶ 18 ("There is no soap, but they gave us shampoo and we are using this as soap."); O.C.P. at ¶ 22 ("There was no soap to wash our hands."); T.H.H. at ¶ 23 ("There is no soap to wash our hands"). In the 2026 CBP Annual Report, JCD noted that inspections in the San Diego sector (and at the Otay Mesa POE) in November 2025 and March 2026 showed facilities did not have soap or hand sanitizer inside holding areas and instead were available upon request. 2026 CBP Annual Report at 30, 32–33, 36. Given that the issue remains

[6] The majority of these interviews appear to have taken place in the RGV, El Paso, and San Diego sectors. *See* 2026 CBP Annual Report at 27.

live, the Court finds that monitoring of access to soap in the San Diego sector (including Otay Mesa POE) is appropriate.

In light of the foregoing, the Court finds that appointment of a Special Master/Independent Monitor is warranted to oversee (1) conditions pertaining to adequate temperature controls in the RGV, El Paso, and San Diego sectors, (2) conditions pertaining to adequate sleeping conditions based on lighting in the San Diego sector, and (3) access to soap in the San Diego sector (including Otay Mesa POE).

**B. ICE**

Throughout the past year, Plaintiffs have alleged that Defendants are not in compliance with the FSA because they subject class members to prolonged detention at Dilley and in hotels, and in conditions that are not safe and sanitary. The Court has endeavored, where possible, to use the least intrusive mechanisms for enforcement in an effort to conserve the parties' and Court's resources.[7] *See* Sept. 26, 2025 Order at 2 (reiterating the Court's confidence that the ICE Juvenile Coordinator "can help resolve issues identified by Plaintiffs in an expeditious manner, thereby obviating the need for further time-consuming litigation and the reappointment of an independent monitor.") [Doc. # 1672]. It was only after numerous status conferences, voluminous declarations filed by Plaintiffs alleging FSA violations[8], continued disputes about on-the-ground conditions, and attempted mediation by the parties, that the Court issued its OSC.

Even so, the Court narrowly ordered Defendants to show cause why a Special Master/Independent Monitor should not be appointed to oversee three specific issues: (1) TIC at Dilley; (2) access to adequate medical care at Dilley; and (3) class members' notice of *Flores* rights. *See* OSC. At the 2026 annual status conference, the Court stated its intention to include monitoring of Defendants' use of hotels to detain minors as that continues to be an area of concern. The Court finds that appointment of a Special Master/Independent Monitor to oversee these categories is warranted for the reasons stated below.

[7] Defendants' argument that "the Court has not made any findings of noncompliance as to ICE in almost six years," *see* Defs. Response at 11, is hyperbole given that Dilley did not house children for a majority of those years. It also ignores the Court's clear attempt to provide Defendants with opportunities—throughout the course of the past year—to address Plaintiffs' persistent allegations of non-compliance, so that a motion to enforce and findings of non-compliance could be avoided.

[8] Since Dilley re-opened in 2025, Plaintiffs have filed a total of 105 declarations of class members and parents interviewed at Dilley. Declaration of Leecia Welch ISO Pls. Response to 2026 ICE Annual Report ("Welch Decl.") at ¶ 44 [Doc. # 1811-2].

### 1. Time in Custody at Dilley

The Court highlighted troubling TIC data points pertaining to minors detained at Dilley in its OSC and incorporates them by reference here. *See* OSC at 5–6. Based on six months of census data reported to the Court, Plaintiffs approximate that 1,560 minors were detained at Dilley for longer than 20 days. Welch Decl. at ¶ 9. In the 2026 ICE Annual Report, Defendants report that the *average* length of stay ("ALOS") at Dilley, for minors who have been booked out of ICE custody, was 40 days in January 2026, 47.5 days in February 2026, 40.2 days in March 2026, 37.1 days in April 2026, and 23.5 days in May 2026. *See* 2026 ICE Annual Report at 3. The fact that the monthly *averages* have been over 20 days for five consecutive months is particularly concerning for three reasons.

First, these figures pertain only to minors who have been booked out, but do not include the TIC for minors who are currently detained.[9] *Id.* ("Average Length of Stay (ALOS) is the average length of stay for aliens that have been booked out. ALOS is not calculated for aliens who are currently detained."). Second, when *averages* are well-above 20 days, that necessarily means certain class members are being detained for protracted amounts of time. Plaintiffs' review of ICE's monthly data showed that 66 class members were detained for over 80 days in February 2026, 20 class members for over 80 days in March 2026, 11 class members for over 80 days in April 2026, and 6 class members for over 80 days in May 2026. *See* Chhabra Decl. at ¶¶ 16–21, Ex. B. In June 2026 Plaintiffs' counsel met with "four class members [who] had been detained for over 100 days, four [who] had been detained for 50 to 74 days, and 25 [who] had been detained for 20 to 49 days." Welch Decl. at ¶ 11. Third, the ALOS figures discussed above do not capture class members' total time in Defendants' custody (i.e., does not include any time spent in CBP facilities or hotels before arriving at Dilley or after departure from Dilley).

[9] At the annual status conference and in their reply to the 2026 ICE Annual Report, Defendants stated that they provided the ALOS for only those minors who had been booked out based on the Court's June 15, 2026 Order. In the June 15, 2026 Order, the Court ordered each Juvenile Coordinator to include "the average time in CBP or ICE custody for minors currently in the agency's facilities and for minors who have been released during the period from June 2025 to May 2026." *See* OSC at 1–2. The Court's intended meaning behind "minors *currently in the agency's facilities* <u>*and*</u> for minors who have been released" was to capture the average TIC for all minors, including those who remained in ICE's custody at the end of the reporting month. To the extent there has been confusion, the Court endeavors to make clear that the Court seeks the most accurate picture of class members' total time in custody. As Plaintiffs point out, excluding the TIC for minors who are currently detained from the ALOS may artificially lower the average figure. [Doc. # 1811 at 8.] These figures also do not include minors' TIC before and after their detention at Dilley. The conflicting interpretation of data parameters is even more reason why a Special Master/Independent Monitor would be useful to monitor compliance with the Court's past orders.

In response to the Court's OSC, Defendants argue that "the FSA and this Court's prior orders do not mandate a strict 20-day rule. The legal requirement is and always has been expeditious processing, which is a circumstance-dependent standard." Defs. Response at 16. Defendants' argument fails to consider the history of the case. In August 2015, the Court recognized that when there is an "influx of minors into the United States" under the terms of the FSA, "Paragraph 12A gives Defendants some flexibility to reasonably exceed the standard five-day requirement so long as the minor is placed with an authorized adult or in a non-secure licensed facility, in order of preference under Paragraph 14, 'as expeditiously as possible.'" Aug. 21, 2015 Order at 10 [Doc. # 189]. In response to the Government's position that it needed 20 days during an influx, the Court stated: "At a given time and under extenuating circumstances, if 20 days is as fast as Defendants, in good faith and in the exercise of due diligence, can possibly go in screening family members for reasonable or credible fear, then the recently-implemented DHS polices may fall within the parameters of Paragraph 12A of the Agreement, especially if the brief extension of time will permit the DHS to keep the family unit together." *Id.* In that same order, the Court noted that it appeared "Defendants routinely failed to proceed as expeditiously as possible to place accompanied minors," citing to evidence that a minor was detained for well over a month at Dilley. *Id.* at 11.

In June 2017, the Court reiterated that while a 20-day period for release could fall within the FSA's parameters, Plaintiffs' and Defendants' evidence showed that Defendants were detaining a significant number of class members for well over 20 days and found that Defendants were in non-compliance with Paragraphs 12.A and 14 of the FSA, notwithstanding the emergency-influx exception.[10] June 27, 2017 Order at 30–31 [Doc. # 363]. Defendants cannot claim amnesia as to the history of the case and circumvent the extended 20-day time period that Defendants themselves previously requested. This is especially true where Defendants do not provide any detailed basis for why 20 days is insufficient to expeditiously process class members at a time when the census is at a historic low. While Defendants note that the ALOS is impacted by "exceptional cases involving national security and families that fail to comply with removal," the evidence cited is either minimal or vague. *See* Defs. Response at 16; Declaration of Dawnisha Helland ("Helland Decl.") at ¶¶ 7–10 [Doc. # 1803-2]. For example, "two families were considered national security risks" and "several other family units were classified as Failure to Comply (FTC) cases." Helland Decl. at ¶¶ 8–9. It is unclear to the Court when these families

[10] The Court noted then, as it does here, "What is more, Defendants' length-of-stay statistics only account for individuals *already released*." June 27, 2017 Order at 30 [Doc. # 363].

were detained, which month's ALOS were affected by their detentions, and how many class members were a part of these family units.[11]

Defendants attest that each minor's case is "individually reviewed to determine the appropriate timing for release in accordance with applicable laws and the Flores Settlement Agreement." Helland Decl. at ¶ 5. In light of the above-discussed data showing *averages* well-above 20-days, sustained over a five-month period, however, the Court has serious concerns that ICE is not in substantial compliance with Paragraphs 12.A, 14, and 18 of the FSA. The Court finds that appointment of a Special Master/Independent Monitor is warranted to oversee class members' TIC at Dilley, especially considering Defendants' prior history of non-compliance. [*See* Doc. ## 189, 363, 784.]

Moreover, as the Court stated at the 2026 annual status conference, the Court's oversight of ICE's compliance with its past orders and the FSA requires an accurate picture of class members' TIC. As stated above, minors' TIC at Dilley alone does not provide an accurate picture because it does not include the time spent in unlicensed facilities before or after Dilley. As part of monitoring TIC for class members at Dilley, the Special Master/Independent Monitor shall have access to and validate *cumulative* time in DHS custody, which would include time spent in unlicensed facilities before and after Dilley, regardless of which DHS component agency operates the facility in which the minor is held.

**2. Time in Custody in Hotels**

Plaintiffs have repeatedly raised concerns regarding Defendants' practice of detaining class members in hotels for prolonged periods of time. [*See* Doc. ## 1656 at 9, 1706 at 12–13, 1748 at 10–11, 1779 at 11–14.] Following ICE's December 2025 and January 2026 census data regarding hotel stays, where at least one minor was consecutively held in a hotel for 16 days, the Court reiterated that Defendants must comply with its September 4, 2020 Order [Doc. # 976 ("Sept. 4, 2020 Order")], which ordered Defendants to cease placing minors in hotels subject to certain exceptions. [Doc. # 1755 ("Apr. 3, 2026 Order").] Defendants filed a motion for partial

[11] On August 6, 2026, the ICE Juvenile Coordinator, Ms. Helland, filed a supplemental declaration following the annual status conference to provide an explanation for why some families have been detained for longer than 20 days as of August 6, 2026. Supplemental Declaration of Dawnisha Helland ("Suppl. Helland Decl.") [Doc. # 1824]. In the declaration, Ms. Helland provided a breakdown of the number of class member whose lengths of detention were impacted by a specific incident (i.e., an earthquake in Venezuela that resulted in a temporary suspension of removal flights to that country starting June 24, 2026). *Id.* at ¶¶ 5–9. This information is at least more specific in comparison to the minimal and vague descriptions described above. This particular natural disaster does not appear to have any bearing on the data points from January 2026 to May 2026, discussed above.

reconsideration, arguing that the Court's September 4, 2020 Order only applied in the context of Title 42 COVID-era expulsions. [Doc. # 1760.] The Court denied the motion for reconsideration and reiterated that the September 4, 2020 Order and subsequent September 21, 2020 Order [Doc. # 990 ("Sept. 21, 2020 Order")] applied to *all* class members. [Doc. # 1775 ("May 18, 2026 Order") at 3–4.]

According to Plaintiffs' analysis of Defendants' monthly census data, in May 2026, 27 minors were detained in hotels for over 72 hours, and in April 2026, 36 minors were detained in hotels for over 72 hours. *See* Chhabra Decl. at ¶ 22, Ex. B. In May 2026, two minors were held in several hotels for 15 total days, four minors were held in several hotels for over 10 days, and one minor was held in a hotel for over five days. *Id.* In April 2026, six minors were held in hotels for over five days. *Id.* In March 2026, Plaintiffs submitted a declaration from a parent who attested to being detained in a hotel for nine consecutive days with two minor children. Declaration of M.S.P. at ¶¶ 3, 10, 16 [Doc. # 1748-5]. Based on a review of Defendants' February 2026 monthly census data, Plaintiffs identified seven minors who were detained in consecutive hotels (including transit) for six to 13 nights. Declaration of Rebecca Wolozin ("Wolozin Decl.") at ¶ 12 [Doc. # 1764-3.] Plaintiffs further claim that Defendants have not been providing immediate notice of such placements, nor an explanation for why the prolonged placements are necessary. *See* Pls. Response at 24; Wolozin Decl. at ¶¶ 13–15.

In their reply to the 2026 ICE Annual Report, Defendants assert that "ICE has taken steps to comply with the April 3, 2026 Order . . . and May 18, 2026 Order" but provides no factual detail beyond that. [Doc. # 1820 at 4.] Defendants cite to the April 17, 2026 Declaration of Dawnisha Helland [Doc. # 1760-1], which was filed in support of Defendants' motion for partial reconsideration, but the declaration does not address the specific minors Plaintiffs identify above as having been detained in hotels for well over 72 hours. Defendants' response also does not address why they have not provided Plaintiffs with immediate notice or identified exigent circumstances and good cause for prolonged hotel placements.

The Court finds that appointment of a Special Master/Independent Monitor is necessary to oversee Defendants' compliance with the Court's prior orders regarding time in custody in hotels. [*See* Doc. ## 976, 990, 1755, 1775.]

**3. Medical Care at Dilley**

Under Paragraph 12.A of the FSA, following arrest, class members shall be held in "facilities that are safe and sanitary and that are consistent with [Defendants'] concern for the particular vulnerability of minors." FSA at ¶ 12.A. "[A]ssuring 'safe and sanitary' conditions

includes protecting children from developing short- or long-term illnesses as well as protecting them from accidental or intentional injury." *Flores v. Barr*, 934 F.3d 910, 916 n.6 (9th Cir. 2019). Exhibit 1 to the FSA also specifies that minors detained in licensed programs shall receive, *inter alia*, "[a]ppropriate routine medical and dental care, family planning services, and emergency health care services, including a complete medical examination (including screening for infectious disease) . . . ; administration of prescribed medication and special diets; [and] appropriate mental health interventions when necessary." FSA, Ex. 1 at ¶ A.2.

Plaintiffs have raised issues pertaining to inadequate medical care in response to every Juvenile Coordinator report filed in the past year. [*See* Doc. ## 1656 at 15–16, 1706 at 15–18, 1748 at 14–17, 1779 at 17–19.] Families commonly report ineffective medical care such as children only receiving Tylenol or Ibuprofen in response to various medical needs. *See*, *e.g.*, Declarations of M.M.S. at ¶ 16 (nine-year-old receiving apple juice and Tylenol after fainting, with no bloodwork) [Doc. # 1748-6]; A.M.P. at ¶ 12 (two-year-old "has had a cold, vomiting, diarrhea, and respiratory issues for months. We have been to medical at least nine times. All they give her is Tylenol and allergy medicine.") [Doc. # 1748-26]; S.D.C. at ¶ 20 ("The nurses here only ever give Tylenol regardless of the type of sickness.") [Doc. # 1779-8]; W.L. at ¶ 11 ("We went to the medical building the first two times my daughter was sick, but it was useless. They only give out Tylenol or ibuprofen so it's not useful to go.") [Doc. # 1779-15]. Families also report delays in medical treatment. *See*, *e.g.*, Declarations of O.S. at ¶¶ 11–31 (minor "crying in pain" while waiting for medical care, eventually had emergency surgery for appendicitis) [Doc. # 1748-30]; S.M.G. at ¶¶ 5–6 (two-year-old with fever and diarrhea sent to hospital after six days of having a fever and repeated visits to Dilley's medical) [Doc. # 1706-21]; J.C.B. at ¶¶ 2, 44–46 (10-year-old with heart murmur waited nearly 60 days before seeing a cardiologist) [Doc. # 1811-7].

Defendants contend that ICE is compliant with the FSA's requirements for medical care at Dilley. Defs. Response at 14–15. The 2026 ICE Annual Report and past supplemental ICE Juvenile Coordinator reports summarize Dilley's medical protocol. 2026 ICE Annual Report at 9–11. But as this Court has previously stated, "proper policy design, without proper implementation, does not offer Class Members the baseline of care bargained for in the FSA." Apr. 24, 2020 Order at 6 [Doc. # 784]. Defendants report that between August 2025 and May 2026, detainees at Dilley filed 64 grievances pertaining to medical services, and "none were found in favor of the resident." 2026 ICE Annual Report, Ex. J [Doc. # 1802-2]. Meanwhile, Plaintiffs report that between May 2025 and May 2026, the Refugee and Immigrant Center for Education and Legal Services ("RAICES") received around 1,480 complaints from detainees regarding medical concerns at Dilley. *See* Declaration of Rodolfo C. Altillo at ¶ 16 [Doc. # 1811-5]. The Court recognizes that the ICE Juvenile Coordinator has worked diligently to investigate some of the medical concerns raised by Plaintiffs. [*See* Doc. ## 1768-10, 1768-11.] Plaintiffs raise

sufficient evidence, however, to seriously call into question Defendants' compliance with Paragraph 12 and Exhibit 1 of the FSA.

At a minimum, the evidence regarding medical care is conflicting and the reported differences in reality are stark. The Court finds that appointment of a Special Master/Independent Monitor to oversee Defendants' compliance with the FSA as to medical care at Dilley is warranted.

**4. Notice of Rights**

Paragraph 24.D of the FSA requires Defendants to provide minors who are not released with three specific advisals: (1) Form I-770; (2) Exhibit 6 of the FSA (explanation of right of judicial review); and (3) a list of free legal services available in the district. FSA at ¶ 24.D. Paragraph 12.A of the FSA also requires that whenever the Government "takes a minor into custody, it shall expeditiously process the minor and *shall provide the minor with a notice of rights*, including the right to a bond redetermination hearing if possible." FSA at ¶ 12.A (emphasis added). In its September 18, 2020 Order, the Court examined the plain language of Paragraph 12.A and concluded that "Paragraph 12.A must be read to provide a broader notice of rights than provided for elsewhere in the FSA, and at minimum should include a notice of rights pertaining to custody and release such that Class Members may act upon them." Sept. 18, 2020 Order at 5–6 [Doc. # 987]. On January 5, 2021, the Court approved a final Notice of Rights that discussed class members' right to release without unnecessary delay and a summary of other key, basic rights under the FSA. [Doc. ## 1056, 1056-1.] Subsequently, the parties reached an impasse in finalizing the ICE Directive regarding the Notice of Rights. [Doc. ## 1057, 1100.]

On December 15, 2025, the Court ordered the parties to discuss whether the previously approved Notice of Rights should be resurrected, "though a protocol for dissemination had not been agreed upon." [Doc. # 1714.] On April 3, 2026, the Court ordered the parties to continue discussions regarding whether the Notice of Rights should be resurrected, and to "discuss the protocol for dissemination of such information since this was not previously agreed upon." [Doc. # 1755.] On June 5, 2026, the parties filed a joint status report stating that on April 15, 2026, Plaintiffs provided Defendants with a proposed written notice of *Flores* rights, and that Defendants were still considering Plaintiffs' proposal or an alternate proposal. [Doc. # 1792.]

Defendants rightfully point out that the Notice of Rights "raises serious, difficult issues." Defs. Response at 17. The Court disagrees, however, with Defendants' assertion that "there is nothing for an independent monitor and special master to monitor as to a notice of rights because the Court has not yet made any rulings on these complex issues related to the implementation of such a notice." *Id.* As stated in the proposed appointment order, the Special Master would assist

the parties in finalizing the notice of rights, if necessary,[12] and the manner in which such notice should be disseminated. [Doc. # 1794 at 9.] The appointment of a Special Master seems particularly warranted considering Plaintiffs' evidence that, of the 175 families class counsel has interviewed since May 2025, none recall learning about their child's rights under the FSA. Welch Decl. at ¶¶ 2, 20; *see* Sept. 18, 2020 Order at 6 ("Because ICE has not provided [a notice of rights pertaining to custody and release], ICE is not compliant with Paragraph 12.A.").

The Court finds that appointment of a Special Master is warranted to monitor compliance with Paragraph 12.A of the FSA and the Court's September 18, 2020 Order. In addition, given the complexity and sensitivity of the issues involved, and the parties' reported impasse in discussions, the Court finds that appointment of a Special Master to assist the parties in negotiating the notice and dissemination protocol is appropriate under Rule 53(a)(1)(C) because this task cannot be effectively and timely addressed by the District Judge or Magistrate Judge, who already are overburdened in one of the busiest trial courts in the nation.[13] Fed. R. Civ. P. 53(a)(1)(C).

Any unresolved legal disputes pertaining to the notice and dissemination protocol shall be addressed through motion practice, and the final notice and dissemination protocol itself, shall be approved by the Court through a joint stipulation or by disposition of a motion.

## D. Objections and Proposed Modifications to Appointment Order

The Court addresses any objections and proposed modifications to the appointment order that have not already been addressed in the discussion above.

### 1. Defendants' Objections and Proposed Modifications

First, Defendants assert that the appointment term should be limited to one year from the date of the appointment order. Defs. Response at 20. The Court grants the proposed modification and limits the appointment term to one year, but includes an opportunity for extension if requested by a party under the terms described in the Appointment Order.

[12] Absent clarification from the parties, it was the Court's impression that the parties already finalized the Notice of Rights, which the Court approved. [Doc. # 1056, 1056-1.]

[13] Of course, if the parties can agree on an alternative mediator to assist them with this task, they are not prohibited from doing so. The Court has suggested the Special Master due to her particular familiarity with all the issues and the resulting economies and efficiencies entailed.

Second, Defendants object to the vagueness of the "Monitoring Protocol" provision. Defs. Response at 20–21. Defendants propose that the Monitoring Protocol must include specific metrics the Special Master/Independent Monitor will apply for each item they will monitor, and for the parties to have an opportunity to review and provide comments on a draft of the Monitoring Protocol before it is finalized. *Id.* The "metrics" are substantial compliance with the FSA and the Court's prior orders construing the FSA. The Court will request that the Special Master/Independent Monitor prepare a summary "Monitoring Protocol" consistent with this Order.

Third, Defendants propose more specific timelines pertaining to the "Reporting" provision. The Court grants Defendants' request for more specificity relating to timelines and incorporates certain changes into the Appointment Order. To the extent the Court did not adopt every proposed modification, the Court denies Defendants' request for those particular modifications.

Fourth, Defendants object to a paragraph under the "Notification of Noncompliance" provision, which permits the Special Master/Independent Monitor to notify the Juvenile Coordinators and parties of any concerns or issues relating to suspected breaches of the FSA beyond the areas of monitoring detailed in the Appointment Order. *See* Defs. Response at 21–22; OSC at 11. Defendants contend that the Special Master/Independent Monitor "should not be permitted to unilaterally expand monitoring beyond the scope of the Court's appointment order." Defs. Response at 22. To be clear, the language of the Notification of Noncompliance does not permit the Special Master/Independent Monitor to unilaterally expand monitoring. Rather, during the course of their monitoring duties as specified in the Appointment Order, if the Special Master/Independent Monitor discover other potential breaches of the FSA, they are permitted to bring them to the Court and parties' attention. Following receipt of such information, the Court retains sole authority to modify the scope of monitoring, after the parties receive notice and an opportunity to comment or object. This provision is consistent with the Court's prior Appointment Order. [*See* Doc. # 494.]

Fifth, Defendants object to paying full compensation for the Special Master and Independent Monitor. Under Rule 53(g)(3), the Court "must allocate payment among the parties after considering the nature and amount of the controversy, the parties' means, and the extent to which any party is more responsible than other parties for the reference to a master." Fed. R. Civ. P. 53(g)(3). All three factors weigh decisively in favor of allocating payment to Defendants. First, Defendants' argument that the "nature" of the case being a "nonmonetary public-interest case" means that "neither the taxpayers nor the Plaintiff class should have to pay" is absurd. Applying that logic would mean that Rule 53 special masters could never be appointed in such cases absent the existence of "a fund" under Rule 53(g)(2)(B). Second, it should go without saying that the United States Government has more means than detained children or the non-profit organizations

that represent them. Lastly, the Court's appointment of the Special Master and Independent Monitor comes only after the Court waited a full year for Defendants to show substantial compliance with the Court's prior orders and the FSA. There would be no need for the Special Master/Independent Monitor if Defendants were in substantial compliance with the Court's orders.

Sixth, Defendants point out that the 2022 CBP Settlement should not be a part of the monitoring scope due to its expiration on July 29, 2026. Since the 2022 CBP Settlement has expired as of the date of this Order, the Court will remove references to the 2022 CBP Settlement in its Appointment Order.

**2. Plaintiffs' Objections and Proposed Modifications**

Plaintiffs request that the Court clarify that the Special Master/Independent Monitor's authority to verify the monthly data provided by Defendants to Plaintiffs' counsel under Paragraph 28A and 29 of the FSA is not limited to specific sectors or facility types. Pls. Response at 22. Plaintiffs contend that such verification is needed because "the monthly census data produced by CBP and ICE under Paragraph 28A and 29 of the FSA has included persistent data errors." *Id.*

To clarify, the Special Master/Independent Monitor should verify *all* the monthly data provided by Defendants to Plaintiff's counsel under Paragraph 28A and 29 of the FSA. The purpose behind verifying *all* of the monthly data, irrespective of which sector or facility a class member is held in, is to ensure that monitoring over time in custody as to class members detained in the specific CBP sectors identified herein, at Dilley, and in hotels (i.e., within the scope of this Order), is *accurate*.

## IV.
## CONCLUSION

For the foregoing reasons, the Court finds that appointment of a Special Master/Independent Monitor is appropriate under Federal Rule of Civil Procedure 53(a) and the All Writs Act, 28 U.S.C. section 1651(a). The Appointment Order shall issue separately.

The Court **DISCHARGES** the June 15, 2026 OSC.

**IT IS SO ORDERED.**