CENTER FOR HUMAN RIGHTS &
CONSTITUTIONAL LAW
Carlos R. Holguín (Cal. Bar No. 90754)
crholguin@centerforhumanrights.org
Bardis Vakili (Cal. Bar No. 247783)
bvakili@centerforhumanrights.org
Sarah E. Kahn (Cal. Bar No. 341901)
skahn@centerforhumanrights.org
1505 E 17th Street, Suite 117
Santa Ana, CA 92705
Telephone: (619) 983-7910

*Attorneys for Plaintiffs*

*Additional counsel listed on following page*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

Jenny Flores, *et al.*,

Plaintiffs,

v.

Todd Blanche, Acting Attorney General of the United States, *et al.*,

Defendants.

No. CV 85-4544-DMG-AGRx

**DECLARATION OF LEECIA WELCH IN SUPPORT OF PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT RE: DEFENDANTS' FAILURE TO PROVIDE CLASS MEMBERS WITH NOTICE OF THEIR *FLORES* RIGHTS**

Honorable Dolly M. Gee
Chief United States District Judge

NATIONAL CENTER FOR YOUTH LAW
Mishan Wroe (Cal. Bar No. 299296)
Diane de Gramont (Cal. Bar No. 324360)
428 13th Street, Floor 5
Oakland, CA 94612
Telephone: (510) 835-8098
Email: mwroe@youthlaw.org

NATIONAL CENTER FOR YOUTH LAW
Rebecca Wolozin (admitted *pro hac vice*)
2300 18th Street NW, P.O. Box 21156
Washington, DC 20009
Telephone: (510) 835-8098
Email: bwolozin@youthlaw.org

CHILDREN'S RIGHTS
Leecia Welch (Cal. Bar No. 208741)
2021 Fillmore Street
San Francisco, CA 94115
Telephone: (415) 602-5202
Email: lwelch@childrensrights.org

CHILDREN'S RIGHTS
Eleanor Roberts (admitted *pro hac vice*)
88 Pine Street, Suite 800
New York, NY 10005
Telephone: (212) 683-2210
Email: eroberts@childrensrights.org

# TABLE OF ATTACHMENTS

## ATTACHMENT INDEX TO WELCH DECLARATION

| DOCKET NO. | DESCRIPTION |
|---|---|
| A | MEET & CONFER REQUEST LETTER RE: ICE VIOLATIONS OF THE *FLORES* SETTLEMENT AGREEMENT, MAY 7, 2025 ("PLS.' MAY 7, 2025 DILLEY LETTER") |
| B | MEET & CONFER MEMO LETTER RE: ICE VIOLATIONS OF THE *FLORES* SETTLEMENT AGREEMENT, MAY 16, 2025 ("PLS.' MAY 16, 2025 DILLEY LETTER") |
| C | MEET & CONFER FOLLOW-UP LETTER RE: DEFENDANTS' RESPONSES, MAY 28, 2025 ("PLS.' MAY 28, 2025 DILLEY LETTER") |
| D | MEET & CONFER MEMO LETTER RE: ICE VIOLATIONS OF THE *FLORES* SETTLEMENT AGREEMENT, JUNE 4, 2025 ("PLS.' JUNE 4, 2025 DILLEY LETTER") |
| E | MEET & CONFER REQUEST LETTER RE: ICE VIOLATIONS OF THE *FLORES* SETTLEMENT AGREEMENT, JUNE 20, 2025 ("PLS.' JUNE 20, 2025 DILLEY LETTER") |
| F | MEET & CONFER MEMO LETTER RE: ICE VIOLATIONS OF THE *FLORES* SETTLEMENT AGREEMENT, AUGUST 14, 2025 ("PLS.' AUGUST 14, 2025 DILLEY LETTER") |
| G | MEET & CONFER FOLLOW-UP LETTER RE: JC REPORT CONCERNS, SEPTEMBER 16, 2025 ("PLS.' SEPTEMBER 16, 2025 DILLEY LETTER") |

| | |
|---|---|
| H | MEET & CONFER FOLLOW-UP LETTER RE: ICE VIOLATIONS OF THE *FLORES* SETTLEMENT AGREEMENT, SEPTEMBER 18, 2025 ("PLS.' SEPTEMBER 18, 2025 DILLEY LETTER") |
| I | MEET & CONFER REQUEST LETTER RE: VIOLATIONS OF *FLORES* SETTLEMENT AGREEMENT, OCTOBER 23, 2025 ("PLS.' OCTOBER 23, 2025 DILLEY LETTER") |
| J | MEET & CONFER REQUEST LETTER RE: ONGOING VIOLATIONS OF *FLORES* SETTLEMENT AGREEMENT AT DILLEY, NOVEMBER 25, 2025 ("PLS.' NOVEMBER 25, 2025 DILLEY LETTER") |
| K | MEET & CONFER REQUEST LETTER RE: ONGOING VIOLATIONS OF FLORES SETTLEMENT AGREEMENT AT DILLEY, JANUARY 22, 2026 ("PLS.' JANUARY 22, 2026 DILLEY LETTER") |
| L | DILLEY SITE VISIT FOLLOW-UP RE: ONGOING VIOLATIONS OF *FLORES* SETTLEMENT AT DILLEY, FEBRUARY 19, 2026 ("PLS.' FEBRUARY 19, 2026 DILLEY LETTER") |
| M | DILLEY SITE VISIT FOLLOW-UP LETTER RE: ONGOING VIOLATIONS OF *FLORES* SETTLEMENT AGREEMENT AT DILLEY, APRIL 9, 2026 ("PLS.' APRIL 9, 2026 DILLEY LETTER") |
| N | DILLEY SITE VISIT FOLLOW-UP LETTER RE: ONGOING VIOLATIONS OF *FLORES* SETTLEMENT AGREEMENT AT DILLEY, APRIL 28, 2026 ("PLS.' APRIL 28, 2026 DILLEY LETTER") |
| O | DILLEY SITE VISIT FOLLOW-UP LETTER RE: ONGOING VIOLATIONS OF *FLORES* SETTLEMENT AGREEMENT AT DILLEY, JUNE 4, 2026 ("PLS.' JUNE 4, 2026 DILLEY LETTER") |

| | |
|---|---|
| P | DILLEY SITE VISIT FOLLOW-UP LETTER RE: ONGOING VIOLATIONS OF *FLORES* SETTLEMENT AGREEMENT AT DILLEY, JULY 21, 2026 ("PLS.' JULY 21, 2026 DILLEY LETTER") |
| Q | DILLEY SITE VISIT FOLLOW-UP LETTER RE: ONGOING VIOLATIONS OF *FLORES* SETTLEMENT AGREEMENT AT DILLEY, SEPTEMBER 15, 2026 ("PLS.' SEPTEMBER 15, 2026 DILLEY LETTER") |
| R | DILLEY SITE VISIT FOLLOW-UP LETTER RE: ONGOING VIOLATIONS OF *FLORES* SETTLEMENT AGREEMENT AT DILLEY, OCTOBER 21, 2026 ("PLS.' OCTOBER 21, 2026 DILLEY LETTER") |
| S | DILLEY SITE VISIT FOLLOW-UP LETTER RE: ONGOING VIOLATIONS OF *FLORES* SETTLEMENT AGREEMENT AT DILLEY, NOVEMBER 12, 2026 ("PLS.' NOVEMBER 12, 2026 DILLEY LETTER") |
| T | *FLORES* SETTLEMENT AGREEMENT PROPOSED NOTICE OF RIGHTS ATTACHMENT TO L. WELCH, APRIL 15, 2026 EMAIL ("APRIL 15, 2026 FLORES NOTICE OF RIGHTS") |
| U | J. MCCROSKEY EMAIL CORRESPONDENCE TO PLAINTIFFS RE: DHS DOCUMENT REQUEST, JUNE 5, 2026 ("DEFS.' JUNE 5, 2026 CORRESPONDENCE TO PLS.") |
| V | 2025-26 EXCERPTS FROM DECLARATIONS OF FAMILIES DETAINED AT DILLEY REGARDING KNOW YOUR RIGHTS ("KNOW YOUR RIGHTS DECLARATION EXCERPTS") |

# DECLARATION OF LEECIA WELCH

I, Leecia Welch, declare as follows:

1. I am Chief Legal Counsel at Children's Rights. I represent Plaintiffs in the above-titled action. If called to testify in this case, I would testify competently about these facts.

## Plaintiffs' Site Visits

2. Since the South Texas Family Detention Center in Dilley, Texas ("Dilley") reopened in April 2025, Plaintiffs' counsel have made 15 site visits to interview class members. I have attended all of them. In 2025, we visited Dilley on May 1-2, June 4-5, July 28-29, September 9-11, October 9-10, and November 18-19. In 2026, we have visited on January 14-15, February 11-12, March 11-12, April 22-23, June 1-2, July 14-15, September 8-9, October 6-7, and November 3-4. Across these site visits, we have spoken with more than 200 families about the conditions at Dilley and ongoing violations of the *Flores* Settlement Agreement ("FSA").

## Plaintiffs' Correspondence and Meet and Confer Efforts

3. Between May 2025 and November 2026, Plaintiffs sent Defendants 19 letters raising concerns about class members' lack of information regarding their *Flores* rights at Dilley, among other serious *Flores* violations. The letters are dated May 7, May 16, May 28, June 4, June 20, August 14, September 16, September 18, October 23, and November 25, 2025, and on January 22, February 19, April 9, April 28, June 4, July 21, September 15, October 21, and November 12, 2026. True and correct copies of these letters are attached to my declaration as Attachments A through S.

4. The parties met and conferred about these concerns on May 14, May 30, July 24, and September 17, 2025.

5. On December 15, 2025, the Court ordered the parties to engage in mediation. Order re December 15, 2025 Status Conference at 1, December 15, 2025 [Doc. # 1713].[1] The parties held mediation sessions on January 23, February 4, and March 2, 2026, and met briefly on March 10 and April 27, 2026. On April 15, 2026, Plaintiffs emailed Defendants a proposal to address their failure to provide class members the required notice of *Flores* rights at Dilley. A true and correct copy of the proposed notice of rights included in the email is attached to my declaration as Attachment T. Plaintiffs updated the previously approved Notice of Rights, *Flores* Settlement Agreement Notice of Rights Pursuant to September 18, 2020, Court Order, January 5, 2021 [Doc. # 1056-1], to account for changes on the ground since the parties last considered a notice of rights. Circumstances have changed in this iteration of family detention such that an updated notice of rights is necessary. For example, when the parties previously considered a notice of rights, DHS was permitting regular in-person know-your-rights presentations. Additionally, most of the families Plaintiffs' counsel have met with over the past year and a half were arrested in the interior of the United States, not at the border. Many of these class members lived here for years and had close ties to their communities and schools, including to potential caregivers in their communities. Based on our interviews with class members, these families have different questions about their children's custody and release rights than recent border arrivals. On June 5, 2026, Plaintiffs reported to the Court that the parties' mediation efforts were at an impasse.

6. In addition to the correspondence, meet and confer calls, and mediation sessions noted above, Plaintiffs have also documented their concerns regarding Defendants' FSA violations, including the failure to provide class members with meaningful notice of their *Flores* rights, in responses to the Juvenile Coordinators' Reports filed with the Court on September 15, 2025, December 8, 2025, March 20, 2026,

[1] Previously filed documents include docket numbers. Documents filed for the first time in this same filing do not.

May 18, 2026, and July 15, 2026. Pls.' Resp. to Suppl. Juvenile Coordinator Reports and Data at 6 [Doc. # 1656]; Pls.' Resp. to Dec. 1, 2025 ICE JC Rep. at 13 [Doc. # 1706]; Pls.' Resp. to Mar. 13, 2026 ICE JC Rep. at 13 [Doc. # 1748]; Pls.' Resp. to May 4, 2026 ICE JC Rep. at 14 [Doc. # 1779]; Pls.' Resp. to July 1, 2026 ICE JC Annual Rep. at 13, 21 [Doc. # 1811].

7. On August 17, 2026, the Court issued an order appointing a Special Master/Independent Monitor ("SM/IM") to address issues regarding time in custody, medical care, and notice of *Flores* rights. Order Discharging Order to Show Cause and Appointing Special Master and Independent Monitor, August 17, 2026 [Doc. # 1827]. Subsequently and pursuant to this Court's August 17, 2026 order, the SM/IM provided the monitoring protocol to the parties on September 22, 2026, regarding these areas. Notice of Monitoring Protocol, September 22, 2026 [Doc. # 1831].

8. On September 15, 2026, Plaintiffs again raised concerns with Defendants regarding the lack of notice of *Flores* rights at Dilley. Attachment Q. In this letter, Plaintiffs asked Defendants to explain the process ICE currently uses to inform class members of their *Flores* rights; produce any notices or written materials ICE currently provides to families concerning *Flores* rights; and provide Defendants' position on the proposed notice of rights Plaintiffs shared with Defendants in April 2026. *Id*. at 4. Defendants did not respond.

9. On October 21, 2026, Plaintiffs sent another letter renewing the request for this information. Plaintiffs noted that it had been over six months since Plaintiffs requested Defendants' position on the proposed notice of rights. Plaintiffs informed Defendants that if no agreement was reached by November 13, 2026, Plaintiffs would file a motion. Attachment R at 2. To date, Plaintiffs have not received a substantive response from Defendants to either letter or to the proposed notice of *Flores* rights.

### *Flores* Notice of Rights Violations at Dilley

10. Since Dilley reopened, I have spent 30 days conducting site visits and interviews. In all that time, I have seen nothing indicating that class members receive a written notice of their comprehensive *Flores* rights at intake or afterward. I have also seen nothing indicating that Dilley has a legal orientation program that presents those rights to families. To date, Plaintiffs' counsel have not spoken with a single family at Dilley who recalls learning about their child's comprehensive *Flores* rights from ICE or CoreCivic.

11. I have watched the 13-minute animated immigration law video provided by Defendants. It addresses asylum eligibility, voluntary departure, and stipulated removal through a robotic-sounding voice. The video does not mention *Flores*. Instead, it states that children have the same rights as adults. It informs viewers that they may use the law library or consult a pro bono attorney but provides no way to ask questions. A transcript of this immigration video is available upon request from the Court.

12. I have also reviewed the Resident Handbook, the I-770 form, and Exhibit 6 of the FSA. Dilley Immigration Processing Center Resident Handbook ("Resident Handbook"), Declaration of Leecia Welch, May 18, 2026 ("Welch May Decl., Attach. A"), [Doc. # 1779-2]; Ex. 4, DHS Form I-770 (4/25) [Doc. # 1768-8] ("Form I-770"); FSA Ex. 6. The Resident Handbook does not mention *Flores*. Resident Handbook [Doc. # 1779-2]. The I-770 form only references the "right to use the telephone," "the right to be represented by a lawyer," and the "right to a hearing before a judge." Form I-770 at 2 [Doc. # 1768-8]. Exhibit 6 of the FSA only refers to the right to call a lawyer and seek judicial review "if you believe you have not been properly placed or that you have been treated improperly." FSA Ex. 6. These materials clearly do not explain the full scope of children's *Flores* rights to families or children.

13. ICE has not allowed RAICES[2] to give group presentations at Dilley regarding children's *Flores* rights since it reopened. No parent or child I have interviewed has ever described having access to a group presentation about their legal rights – *Flores* or otherwise – provided by a legal service provider or lawyer. We first raised concerns regarding the lack of know-your-rights presentations at Dilley in May 2025. Attachment D at 2-3. In July 2025, Defendants confirmed that there were no plans to allow RAICES or any other legal service provider to conduct group presentations at Dilley. Attachment F at 2, 11.

14. In June 2026, families began telling me and my colleagues that ICE agents had met with them, told them their children had the right to be released after 20 days, and asked them to sign a form in English. Families said they were not given a copy of the document. Multiple families (especially those detained for long periods) reported confusion about this form because the ICE agent presenting it would also tell them that, in reality, children could not be released from Dilley without their parents, and it was up to the immigration judge to decide when to release the family. I have heard variations of this same story from multiple families for several months. Plaintiffs have asked Defendants for a copy of the form and have not received one. Attachment U. Defendants have denied that such a document is being provided to families. *Id*. As noted above, Plaintiffs have also asked for an explanation of the meetings ICE is conducting with families. Attachment Q at 1-2; Attachment R at 2. Defendants have not responded to these requests.

15. I have spoken to dozens of families who are bewildered regarding their children's *Flores* rights, the status of their immigration cases, whether *Flores* still applies or not, and how to understand what is going on when information is not translated for them. Families regularly express frustration to me about the lack of know-your-rights trainings and the lack of accurate information about their children's *Flores* rights.

---

[2] Refugee and Immigrant Center for Education and Legal Services ("RAICES") is a legal and social services nonprofit organization based in Texas.

**Access to Counsel**

16. Compounding this lack of information about *Flores* rights, class members have frequently reported barriers to making free legal calls, including to *Flores* counsel and other private lawyers. Families have consistently told me the only way to reach counsel is to wait for counsel to schedule a legal visit. Others said they had trouble placing free calls to the approved pro bono list and instead paid for calls to listed organizations such as RAICES. Although the ICE Juvenile Coordinator Report states that indigent residents may request free legal calls, *Flores* ICE Juvenile Coordinator's Annual Report 2026 at 18 [Doc. # 1802-1] ("ICE JC Report 2026"), no family I interviewed knew of that option. Every time I have spoken with a family I previously met, they have told me they still had no way to access free phone calls.

17. Since January 2026, families have told me their ability to email lawyers has been limited. Families have reported they cannot use Gmail or other independent providers, and could use only Atomic or Proton email platforms, which have many limitations. Families consistently state that they have difficulty setting up the accounts, that they cannot send attachments, and that email length is restricted.

18. Defendants have maintained that Gmail access was restored in March 2026. ICE JC Report 2026 at 19 [Doc. # 1802-1]. However, multiple families have disputed this assertion. Several families told me that they could not access email because their Gmail required two-factor authentication they could not complete without their phones, while others told me that when they tried to set up Proton or Atomic accounts, they subsequently lost access to those accounts without warning. Since October 2026, families also told me that their computer time is limited to one hour a day.

**Plaintiffs' Dilley Declaration Chart re: Notice of *Flores* Rights**

19. Plaintiffs have filed 105 declarations from children and parents interviewed at Dilley and are filing 32 more today. I have reviewed all of them.

20. Attachment V is a chart compiling quotations from these declarations regarding class members' lack of information about their *Flores* rights. As with Welch July Decl., Attachment A [Doc. # 1811-2], Plaintiffs' counsel prepared the chart by excerpting quotes from the redacted declarations submitted to the Court. For each declaration, the chart lists relevant quotations and corresponding paragraph numbers, the docket number, the date taken, the declarant's initials, whether the declarant was a parent or child, and the ages of any parent declarant's children detained at Dilley.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 20th day of November 2026 at Seattle, Washington.



Leecia Welch

# ATTACHMENT A

CHILDREN'S RIGHTS

May 7, 2025

Christina Parascandola
Trial Attorney
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
*Via email* to Christina.Parascandola@usdoj.gov

Re: ICE violations of the *Flores* Settlement Agreement

Dear Christina:

We write to meet and confer regarding violations of the *Flores* Settlement Agreement ("Settlement Agreement" or "FSA") occurring in the Dilley Family Detention Center ("Dilley").

On May 1 and 2, *Flores* counsel interviewed class members at Dilley. As you are aware, Dilley is an unlicensed secure facility operated by CoreCivic. Similar to the Karnes Family Detention Center, Dilley has a secured perimeter and class members report feeling like they are in a prison.

FSA ¶ 11 requires DHS to treat "all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors." Similarly, FSA ¶ 12.A requires that when DHS hold children in its custody, children must be held "in facilities that are safe and sanitary and that are consistent with [DHS's] concern for the particular vulnerability of minors." FSA ¶ 12.A further requires DHS to "provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor."

As outlined below, class members at Dilley have inadequate access to water, food, legal services and medical care. Class members also have inadequate age-appropriate activities consistent with their particular vulnerability as minors, and family separation and poor sleeping conditions are resulting in unnecessary mental and physical health concerns and injuries. Accordingly, class members are not being held in "safe and sanitary" conditions consistent with a "concern for the particular vulnerability of minors." To avoid motion practice, Plaintiffs request a meet and confer call to discuss what steps Defendants will take to remedy these violations promptly and ensure future compliance with the FSA.

## I. Tour and Detention Standards

During the tour led by CoreCivic on Thursday, May 1, 2025, the DOJ attorneys told *Flores* counsel we were not permitted to ask the CoreCivic tour leader any questions during the tour. We were instead instructed to direct all questions to the DOJ in writing following the tour. We understand that a government contractor would not be expected to answer every possible question that might arise on a tour, but we cannot recall being directed not to ask a single question on a *Flores* site visit tour. We take

issue with this practice as it results in inefficient and unnecessary work for everyone. As directed, however, our questions are listed in Attachment 1 to this letter.

## II. Prolonged Detention of Minors

Under the FSA, DHS should typically not hold minors in CBP custody for longer than 72 hours, or 3 days. FSA ¶ 12.A. Nonetheless, some families we spoke with had been held in CBP facilities and other makeshift detention sites for prolonged periods of time before being transferred to Dilley.

In addition to being a violation itself, lengthy detention in CBP and ICE custody exponentially compounds the harms of detention and of the other violations identified throughout this letter. As we have repeatedly stated, CBP facilities are not designed to hold class members for more than 72 hours. *Flores* counsel remains deeply concerned that class members are experiencing prolonged stays in unsafe and unsanitary prison-like conditions only to be transferred to another unlicensed, unsafe prison-like facility.

Class members and their families have repeatedly reported that the government does not appear to consider the time spent in CBP custody cumulatively with the time spent in family detention when evaluating its compliance with *Flores* prohibitions against prolonged custody in unlicensed facilities.

## III. Lack of Water (FSA ¶ 12.A)

Class members at Dilley reported that they are not provided with potable water, and that bottled water must be purchased for $1.50 per bottle. We were consistently told the water at Dilley has a bad smell and taste, and families do not feel it is safe for children to drink. These reports are consistent with previous documented concerns about the water in Dilley being contaminated with E. coli and toxins from fracking.[1]

One mother reported that the tap water caused her baby to have severe, explosive diarrhea. Guards at Dilley denied her requests for either boiled water or safe, drinkable water to make bottles with powdered formula. Another mother reported that the tap water appears white and dirty. Her child had not had any water at Dilley despite having been detained for almost a week. Many class members have only drank lemonade and juice since they arrived at Dilley because safe water is not made available to them and they cannot afford to buy bottled water.

Obviously, ensuring sufficient potable water is a basic requirement of the FSA. Defendants must urgently address this issue and ensure that class members are provided with adequate potable water at all times. Babies should not be getting sick and children should not have to subsist entirely on high-sugar drinks because water is unavailable to them.

[1] *See, e.g.*, James Keith, *Dilley residents question water quality*, KENS 5 News, Apr. 24, 2017, https://www.kens5.com/article/news/local/dilley-residents-question-water-quality/273-433706487 (discussing Texas Commission on Environmental Quality report regarding high levels of e. coli in fields in Dilley); Environmental Working Group Tap Water Database, *Utility - City of Dilley, Texas*, https://www.ewg.org/tapwater/system.php?pws=TX0820001 (showing radium levels in Dilley tap water are 33 times higher than the Environmental Working Group health guidelines and 5x higher than the national average) (accessed May 7, 2025).



88 Pine Street, Suite 800 | New York, NY 10005 | P 212.683.2210 | F 212.683.4015 | www.childrensrights.org

## IV. Inadequate Food (FSA ¶ 11, 12.A)

Class members and their parents reported that the food provided is not appropriate for young children and there is inadequate access to formula for babies and toddlers. Families also complained that there are generally not child-friendly meals at Dilley.

We heard repeatedly that class members are skipping meals because they do not like the food, or because it is served at times when they are not hungry. Some parents shared that they must request formula each time they give their baby a bottle (even during the night) rather than being provided a can of formula and that some toddlers have been denied formula altogether. The lack of adequate, appropriate food for young children must be urgently addressed.

## V. Inadequate Medical Care (FSA ¶¶ 11, 12.A)

The lack of water and adequate food discussed above threatens children's health and safety, especially as the temperatures and sun exposure get increasingly intense. In addition, families reported concerning experiences with the medical care provided at Dilley. For example, one eight-year-old child was forced to wait for two hours in excruciating pain as his broken arm became increasingly swollen and grotesque before finally being taken to the local emergency room for treatment. A nine-year-old child suffered two severe asthma attacks before being provided with an inhaler despite repeated requests by his parents.

As was the case at Karnes, we also met with class members whose mental health was deteriorating due to the prison-like environment. This includes a toddler who was throwing himself on the ground and getting bruises due to his anxiety, a child who was crying every night because she was separated from her father, and children becoming increasingly despondent and isolated due to the lack of information about when they will be released coupled with the stress of detention.

## VI. Inadequate Language Access (FSA ¶ 11, ¶ 12.A)

Throughout the facility, Plaintiffs' counsel observed important legal notices posted only in English and sometimes in Spanish. In particular, flyers regarding free legal services were posted only in English. A significant number of class members detained in Dilley spoke neither English nor Spanish. Some class members reported being unable to communicate with the staff in the facility due to language barriers.

## VII. Inadequate Sleeping Conditions (FSA ¶¶ 11, 12.A)

DHS must provide children adequate sleeping conditions as part of its obligation to provide "safe and sanitary" conditions and act consistently with "concern for the particular vulnerability of minors." *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1060 (C.D. Cal. 2017) (citing FSA ¶ 12A). Multiple class members and parents reported that lights are kept on in their trailers throughout the night making it difficult for children to sleep. In addition, guards enter the trailers throughout the night letting the door slam repeatedly. On top of the constant disruptions throughout the night, parents taking medication are awakened at 5 a.m. to go to the medication window. For a week, one mother was forced to wake all four of her young children (ages 9 months, 4 years, 8 years and 9 years) at 5 a.m. to walk to the medical area with her so she could take her thyroid medication. They would then go back to their room and unsuccessfully attempt to go

back to sleep – only to be awakened again at 6 a.m. for breakfast. Her children were so exhausted after a week of this treatment that she told the medical provider she was going to stop taking the thyroid medication. Only then did staff offer to stand outside her trailer at 5 a.m. while she walked over to the medical area for five minutes and took her medications so she could avoid disrupting her children's sleep.

Constantly interrupting children's sleep is unsafe and certainly inconsistent with the needs of vulnerable minors.

## VIII. Lack of a Child-Appropriate Environment (FSA ¶¶ 11, 12.A)

DHS has an obligation to treat children "with special concern for their particular vulnerability as minors." FSA ¶ 12.A. This necessarily includes concern for minor's developmental needs.

### A. Lack of Age-Appropriate Activities

Like Karnes, Dilley provides inadequate activities for children of all ages. Multiple families reported that toys are in limited supply for young children and only allowed in a designated common area. *Flores* counsel were not permitted to bring any toys to facilitate our interviews with children. This was a departure from standard practice of allowing us to have toys in our interview room to facilitate our interviews and ease the stress of class members. Although we appreciated that there were Dilley staff in a small room with toys where young children could go while we conducted our interviews with their parents, those toys were not permitted to leave the room. It was problematic to be denied the use of fidgets or coloring materials to make interviews more comfortable for our clients who, as the FSA acknowledges, are particularly vulnerable. We have repeatedly objected to this departure from how we have been permitted to conduct *Flores* interviews for decades.

Class members and families reported that there were no activities for older children at Dilley other than some balls in the recreation tent and a single play station. During our tour, we were told that children had activities like movies with popcorn, karaoke, and snow cones – but none of the families we spoke to had ever seen these activities happening before. Families reported that for the most part, staff do not interact with them or their children.

In addition, class members do not have access to education at Dilley apart from one hour a day per age group (e.g., 9-12th grade combined have one hour per day). No other educational content is provided. We were told by class members that the education room had just opened days before our site visit and kids mainly received coloring sheets or a math or English worksheet when they went there. Plaintiffs' counsel are deeply concerned about the harm to children of prolonged lack of access to age-appropriate education while in DHS custody. Education worksheets are woefully insufficient to meet the particular needs of class members. Many class members at Dilley (and Karnes) had been attending school in the United States for years and were actively missing weeks of schooling while detained at Dilley. Their families expressed extreme concern for the trauma these children experienced during interior apprehensions and the lasting impact their apprehension and imprisonment in CBP and ICE facilities will have. Lack of education and recreation only exacerbates the disruption to their daily lives and harm these children have already experienced.

B. Limitations on access to family members

Children reported that they had to pay for calls outside of the facility—even to their family members. This precluded some class members from calling loved ones, causing children additional unnecessary distress. This practice fails to safeguard the particular vulnerability of minors, including their need to maintain connection with their family members.

Class members also reported that their fathers are forced to reside and sleep apart from their families in a separate area of Dilley. Fathers are only permitted to be with their children from 8 a.m. to 11 a.m. and from 4 p.m. to 8 p.m. Fathers are generally not permitted to be alone with their children, even to allow mothers to take a shower or use the restroom. On the rare occasion where a father is permitted to be alone with his child, it was described as a one-off situation solely for the convenience of Dilley staff. Separating children from their fathers at night and a large part of the day caused distress for children and further impeded mothers' ability to care for their children, particularly in the case of mothers caring for multiple small children.

One particularly alarming situation exemplifies the harm already caused by Dilley's family separation policy. Despite being at Dilley with her husband, a mother with four small children was not permitted to leave any of them alone with their father. She was told by Dilley staff that when she needed to take her 9-month-old and four-year-old daughters to the ladies' restroom or shower trailers, she should leave her eight- and nine-year-old sons just outside the trailer door, unsupervised. One day when she was in the ladies' restroom with her girls, she heard a blood curdling scream and ran out the door to find her 8-year-old son on the ground after he fell forward and smashed his arm playing around the stairs. As it turned out, her son had completely snapped the bone in his arm while she was forced to leave him unattended. Dilley's family separation policy is not only demeaning to the important role fathers play in the care of their children, but also dangerous.

C. Lack of Information

Class members experienced extreme distress because they were provided no information about their continued detention and their cases. Most did not know how long they would be detained, or what would happen to them. Some families were discouraged from contacting pro bono legal service providers or told that legal services access may no longer be available at Dilley.

******

Plaintiffs are hopeful that we can work with Defendants to remedy these Settlement violations to avoid motion practice. To assist in the discussion of how to remedy the issues, please provide answers to the questions listed in Attachment 1, as well as DHS's medical, family separation and security protocols, including:

A. The anticipated or actual staffing plans for medical services at Dilley;
B. The medical screening protocols for entry and for reports of illness or injury;
C. Protocol for interpretation services, including interpretation for medical complaints, evaluation, and treatment;

D. The schedule and reasons for frequent room inspections; and
E. The family separation schedule and reasons children in dual parent families are not permitted to be alone with their fathers.

Given the urgency of the issues raised above, we request that you provide Defendants' availability for a meet and confer regarding these issues as soon as possible for a meeting before May 15, 2025.

Best wishes,

Leecia Welch

Copies to Andrea Sheridan Ordin, aordin@strumwooch.com; Dr. Paul H. Wise, pwise@stanford.edu; Dr. Nancy Ewen Wang, ewen@stanford.edu.

# ATTACHMENT B

CHILDREN'S RIGHTS

May 16, 2025

Joshua McCroskey
Trial Attorney
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
*Via email* to Joshua.C.McCroskey@usdoj.gov

Re: ICE violations of the *Flores* Settlement Agreement

Dear Joshua:

We write to follow up on the parties' May 14, 2025 meet and confer regarding violations of the *Flores* Settlement Agreement ("Settlement Agreement" or "FSA") occurring in the Dilley Family Detention Center ("Dilley").

While we appreciated your time and responses to some of our questions, we left the hour-long call with very little new information regarding the concerns raised in our May 7, 2025 letter, and no clear sense of when further information will be provided.

We have memorialized our concerns and our understanding of Defendants' positions below. We have also highlighted areas where we expect to receive further information from Defendants. Please let us know if you have a different understanding of the remaining disputes.

1. **Family Detention Standards**: Despite repeated requests, Plaintiffs' counsel have not been provided with the "modified" family residential standards allegedly applicable to detention of children at Dilley. During the call, Defendants' counsel shared that there have been some modifications to the publicly available standards posted at https://www.ice.gov/detain/detention-management/family-residential and previously shared with Plaintiffs. However, you were unable to articulate what those modifications are (other than that the education standards have been lowered) or confirm whether there is a publicly available document articulating those modifications. It is our understanding that Defendants' counsel agreed to determine whether there is a comprehensive list of modifications that your client is willing to share. Without a thorough review of the applicable standards, Plaintiffs' counsel cannot assess the extent to which the "modified" standards comply with the FSA. ***Plaintiffs again request a complete set of the "modified" family residential standards by May 22, 2025, or an explanation of why such standards are not available.***

2. **Lack of Access to Legal Services.** Plaintiffs' counsel expressed serious concerns about class members' lack of access to legal counsel because legal services flyers are only posted in English, it is unclear if class members have to pay for initial legal calls, and class members do not receive Know Your Rights (KYR) presentations. During our call, Defendants' counsel agreed to check with your client about the English-only legal services flyers and the status of KYR presentations at Dilley. We are aware that legal services providers have made their flyers available to ICE in

multiple languages; such flyers must be posted in the telephone rooms, library, and sleeping trailers (which are equipped with telephones) at Dilley and KYR presentations must resume promptly. ***Please let us know when you have complied with these requests.***

*3.* **Prolonged Detention of Minors**: During the call, Defendants' counsel stated that the "typical" time in custody at Dilley is 20 days (as previously noted in email correspondence), but that there may be variations on a case-by-case basis. Defendants' counsel agreed to ask DHS when they start the clock for this "typical" limit, because Defendants' counsel could not clarify if the 20-day benchmark was being calculated from when a class member first entered CBP custody. It is our understanding based on many interviews with class members at Dilley that significant numbers of children have been detained far beyond 20 days inclusive of their time in CBP facilities and other makeshift detention sites (such as jails, airports, and administrative offices). ***Plaintiffs request that Defendants clarify (a) whether days in CBP custody and other makeshift detention sites are being included in the 20-day benchmark calculation and (b) if such days in custody are not being included in the 20-day calculation, provide a detailed explanation.***

**4.** **Water**: Despite concerns class members raised regarding the taste, smell and sickening quality of the tap water at Dilley, Defendants' counsel asserted that the water has been lab tested by the city and is potable. Defendants' counsel did not have an explanation for why children have to pay $1.50 per bottle of water when it was provided without charge at Karnes (and every other facility *Flores* counsel have ever visited). According to the Family Residential Standard 1.2 ("Environmental Health and Safety"), facilities must have a copy of the "testing and safety certification" for water, which includes testing in a state laboratory of drinking and waste water. ***Please provide a copy of the lab testing and safety certification. In addition, given that Core Civic is offering children free apple juice and milk, please provide an explanation why bottled water cannot also be provided free of charge.***

**5.** **Inadequate Food**: Defendants' counsel asserted during the call that families with babies and toddlers are provided with cans of formula and that child-friendly food options are available at Dilley. That information conflicts with information shared by many families. Please provide written confirmation that babies and toddlers are being provided with cans of formula, as well as a sample menu of the child-friendly food options available. In response to your request for suggestions for child-friendly food, we recommend that children be provided food such as cereal, bananas, other fruits and vegetables such as berries, carrots, and tomatoes, yogurt, eggs, a sandwich bar, cheese, and low sugar drink and snack options during all meal services. Plaintiffs will inquire with our clients whether they have any additional requests.

*6.* **Inadequate Medical Care**: As noted in our May 7 letter, Plaintiffs were concerned about several medical incidents reported by families at Dilley. ***Plaintiffs request a response to the following questions that Defendants' counsel were unable to answer on the call: (a) what medical services are available at Dilley; (b) what medical protocols are being followed for emergency medical situations, mental health needs, and routine medical needs; (c) who holds the medical contract at Dilley and what qualifications or certifications do staff have (e.g. are they doctors, nurses,***

***pediatricians, physician's assistants, etc.); (d) why morning medication is being dispensed only at 5 a.m.; and (e) whether Dilley is following the Family Residential Standard 4.3 ("Health Care").*** During the call, Defendants' counsel shared that Dilley has medical isolation rooms and quarantine rooms and is equipped to handle emergencies that require transporting individuals form different parts of the facility to the medical building. Defendants' counsel did not have information regarding staffing ratios, medical services available, medical protocols, or whether individual or group counseling is available. Defendants' counsel was unsure if there have been modifications to the Section 4.3 Health Care Family Residential Standards. Defendants' counsel were also unsure whether parents and class members who need to take medications on an empty stomach could be dispensed medication later than 5 a.m. ***Please provide a written response to these issues.***

7. **Inadequate Language Access:** Plaintiffs' counsel have raised concerns about inadequate language access at Dilley, and Defendants have acknowledged that the majority of families detained at Dilley are not Spanish speakers at this time. In particular, many notice of rights flyers are only in English. The Family Residential Standards state: "Centers generally will provide Spanish translation of all written materials whenever necessary to ensure meaningful access to Center programs, services and activities, as well as to protect due process rights for residents who speak Spanish. Centers also will translate written materials for other frequently encountered language groups with LEP." *Id*. at 4-5. Defendants' counsel shared that Dilley staff have cell devices and pocket technology to use for language translation upon request; our understanding was that no further actions were planned to ensure language access. ***Please confirm whether the language access Family Residential Standard requirements are being followed and provide an update on whether written materials are being translated, as required, and in which languages.***

8. **Inadequate Sleeping Conditions:** Plaintiffs' counsel heard concerns from families that children are having difficulty sleeping because lights are kept on and doors are slammed by Dilley guards throughout the night. Defendants' counsel confirmed that lights in the common area (which are a few feet away from the bunk beds) are kept on all night, but stated that lights directly above the bunk beds are turned off. This is consistent with reports from families and is negatively impacting children's sleep because the room is too bright. Defendants' counsel further stated that guards had been instructed that they did not need to enter the sleeping quarters to do their checks. It is unclear if this is actually true, because nearly all of the families we met with complained about the noise from slamming doors. ***It is our understanding that Defendants are unwilling to take any further steps to improve the sleeping conditions at Dilley, but please let us know if that is incorrect.***

9. **Lack of Child-Appropriate Environment**:

   a. **Contact with fathers:** During our call, Defendants' counsel stated that children have "unrestricted" access to family members from 6 am – 8 pm, but were unsure if children in dual parent family units were allowed to be alone with their fathers. Families told us that the timing of family access was significantly more restricted than that, and were very clear about the restriction on children's access to their fathers. At a minimum, staff training is

needed to ensure that families are provided accurate information regarding if and when fathers can take care of their children while mothers attend to personal matters, such as showering or using the restroom. Defendants' counsel further reported that the "childcare room" is operating and available, but that is not consistent with the information from our tour. ***Please confirm these updates in writing.***

b. **Education:** It is our understanding that Family Residential Standard Section 5.2 ("Education Policy") has been modified such that children at Dilley receive only one hour of education per day by age grouping (*e.g.*, 9th-12th graders get a total of one hour). In contrast, Section 5.2 requires educational assessments, year-round daily education in all core classes for an hour each per day (science, English language arts, math, social studies, and physical education), special education services, field trips, and many other requirements. ***Please provide us with a copy of the modified "Education Policy" standard and an explanation for the reduction in access to education to just one hour per weekday.***

c. **Recreation:** Children and families complained about the lack of toys and recreation at Dilley. Family Residential Standard Section 5.6 ("Recreation") provides a detailed description of the recreational activities that must be made available to children, including stating that facilities must "provide various activities and equipment daily as part of the activities program. Activities should include arts and crafts, entertainment, reading materials, table games, puzzles and board games." Section 5.6 also requires structured programming for toddlers at least three times per week and areas for toddlers that include "activities, games, and toys." Please let us know if there have been modifications to the recreation standards. We saw little indication of recreation on our tour, and families confirmed children had little or nothing to do for most of the day. ***Please provide us with any modifications to the recreation standards and an update as to what steps your client plans to take to comply with these standards.***

10. **Lack of Information.** As noted previously, class members experienced extreme distress because they were provided no information about their continued detention and their cases. During the call, Plaintiffs' counsel asked about access to case managers. Defendants' counsel did not have information about case managers***. Please let us know if class members have access to case managers while at Dilley and, if so, what case manager responsibilities are, how many case managers are employed at Dilley, and how often children meet with case managers.***

**Please provide a written response to each of the questions and requests above, as well as the tour questions from our previous letter, no later than May 22, 2025.**

Best wishes,

Leecia Welch

# ATTACHMENT C

CHILDREN'S RIGHTS

May 28, 2025

Joshua McCroskey
Trial Attorney
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
*Via email* to Joshua.C.McCroskey@usdoj.gov

Re: ICE violations of the *Flores* Settlement Agreement

Dear Joshua:

We write to follow up on the parties' May 14, 2025 meet and confer regarding violations of the *Flores* Settlement Agreement ("Settlement Agreement" or "FSA") occurring in the Dilley Family Detention Center ("Dilley"); our May 16, 2025 letter; and the email we received from you on May 22, 2025.

Plaintiffs' May 16, 2025 letter memorialized our concerns and our understanding of Defendants' positions regarding FSA violations at Dilley and requested responses to the outstanding issues we discussed during our May 14, 2025 meet and confer. Defendants have not responded to any of these concerns other than to state generally that our allegations reflect "inaccurate understandings" or "temporary issues." Nor have Defendants told us the steps you will take to rectify these violations. Instead, you asked for the names of the class members and their parents who raised concerns about their treatment at Dilley.

Our May 16 letter identified numerous FSA provisions and Family Residential Standards with which Dilley is not in compliance. The issues we have raised include: (1) lack of access to legal services; (2) prolonged detention of minors; (3) water safety and charging children for bottled water; (4) inadequate food; (5) inadequate medical care; (6) inadequate language access; (7) inadequate sleeping conditions; (8) lack of a child-friendly environment; and (9) lack of access to information. ICE does not need to know the names of the children and parents who brought these concerns to our attention in order to provide responses or conduct a reasonable investigation, and we are under no obligation to share that information as part of a meet and confer process. Plaintiffs have satisfied our obligations to meet and confer regarding these concerns.

We are particularly troubled by Defendants' steadfast refusal to provide the operable "modified" Family Residential Standards for Dilley despite our repeated requests and in the face of admissions that such modifications exist. During the May 14 call, Defendants' counsel shared that there have been some modifications to the publicly available 2020 standards posted at https://www.ice.gov/detain/detention-management/family-residential and previously shared with Plaintiffs. However, you were unable to articulate what those modifications are (other than that the education standards have been lowered) or confirm whether there is a publicly available document articulating those modifications. It is our understanding that Defendants' counsel agreed to determine whether there is a comprehensive list of modifications that your client is willing to share, but no such list has been provided.

Defendants' Motion to Terminate also indicates that written modifications or updates to such standards may exist. An ICE declaration states: "ICE may make minor modifications to [the 2020 Family

Residential Standards] depending on circumstances, such as when detention times are anticipated to be very short, but the facilities will generally meet all substantive requirements." Declaration of Dawnisha Helland at ¶ 29.

By May 30, please send to Plaintiffs the "modified" Family Residential Standards in effect at Dilley or provide a list of modifications as discussed in our past call and as suggested by Ms. Helland's declaration. If there is no such document or list of modifications, please explain what you meant when you told us the modified standards exist or to what Ms. Helland referred in her declaration.

We appreciate the offer to have a call to provide answers to the questions attached to our May 7, 2025 letter that we were not permitted to ask on our tour. We are available on May 29 at 2:30 p.m. ET or May 30 at 12 or 2:30 pm E.T. Please let us know if any of those times work for you.

Best wishes,



Leecia Welch

# ATTACHMENT D

CHILDREN'S RIGHTS

June 4, 2025

Joshua McCroskey
Trial Attorney
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
*Via email* to Joshua.C.McCroskey@usdoj.gov

Re: ICE violations of the *Flores* Settlement Agreement

Dear Joshua:

We write to memorialize the parties' May 30, 2025 meet and confer regarding conditions at the Dilley Family Detention Center ("Dilley"). We appreciate your time and responses to our questions and ask that you respond in writing with any concerns or corrections to our understanding as set forth below no later than June 13, 2025.

**Modification to 2020 Family Residential Standards**

Defendants stated that the current modifications to the Family Residential Standards are not publicly available, but that you were willing to share them during our call. Plaintiffs' understanding of the modifications based on our conversation is as follows:

- **Section 2.8 Staff-Resident Communication:** This section has been modified to reflect faster staff-resident communication, *i.e.*, within 24-48 hours.
- **Section 3.1 Behavior Management:** This section has been modified to shorten the behavior management process such that administrative reviews are occurring more quickly.
- **Section 4.3 Health Care**: Defendants noted that the health care standards have not been modified.
- **Section 5.1 Correspondence and Other Mail:** Because of the length of stay at Dilley, mail and packages cannot be accommodated, but legal correspondence is being accommodated, and other correspondence can be requested and approved by the facility.
- **Section 5.2 Educational Policy:** As previously discussed, the educational policy standards have been modified such that children are grouped by age (*e.g.*, 9th to12th graders grouped together) to receive one hour a day of education.
- **Sections 5.3 -5.5:** Standards for escorted trips for non-medical issues, marriage requests, and the voluntary work program are not in effect.
- **Section 5.6 Recreation:** Defendants noted that while there are many recreational activities, not all the activities laid out in the standard may be available at Dilley. Defendants stated recreational activities include:

  - Structured age-appropriate indoor and outdoor activities, educational packets, toys, games, puzzles, books, TV, PlayStation, large muscle activities, and time in the education room, gym, and child care facility;
  - Playground playscape in the outdoor recreation areas, plus additional playscapes have been ordered;
  - Handball, volleyball courts, shaded pavilion, soccer, games;
  - Structured gym activities on a daily or hourly basis (some pick-up, some more structured), storytelling with puppets, karaoke, etc.
- **Section 5.9 Visitation**: Defendants stated that they did not believe in-person visitation was available, but FaceTime calls are available upon request.
- **Section 6.1 Resident Handbook:** This section has been modified to reflect the other modifications.
- **Section 6.4 Legal Rights Group Presentations:** We did not discuss whether these standards have been modified, but Defendants said during our conversation that Know Your Rights ("KYR") presentations have not been happening at Dilley.

As previously noted, the declaration of Dawnisha Helland submitted with Defendants' Motion to Terminate indicates that: "ICE may make minor modifications to [the 2020 Family Residential Standards] depending on circumstances, such as when detention times are anticipated to be very short, but the facilities will generally meet all substantive requirements." Declaration of Dawnisha Helland at ¶ 29. Plaintiffs disagree with Defendants that the modifications shared above are "minor."

During our call, Defendants were not aware of any plans to memorialize the modifications to the 2020 Family Residential Standards. Plaintiffs stressed the importance of publishing these modified standards so that class members, their families and their advocates are aware of the operable standards and the expectations of CoreCivic and its staff.

**Defendants' Responses to Tour Questions**

Defendants also shared the following information in response to Plaintiffs' tour questions:

- **Time in custody**: ICE calculates a class member's time in custody based on when they enter ICE custody; it is not cumulative with a class member's time in CBP custody.

- **Length of stay**: Defendants' understanding of Judge Gee's ruling is that 20 days is not a hard and fast rule, but rather a benchmark for the amount of time class members can be in family detention before ICE either removes or releases them.

- **Courtrooms**: The courtrooms at Dilley are functional and being used for virtual hearings. Judges are virtual, but attorneys can appear either on site or virtually.

- **Childcare room**: The childcare services room is now available for class members when parents have court hearings, medical appointments, or need childcare.

- **Water**: Defendants confirmed that CoreCivic keeps copies of lab results of water testing and, in response to concerns Plaintiffs raised, the facility has tasted and smell-tested the resident water throughout the living spaces and did not note any concerns. Staff also has not reported receiving a pattern of water-quality complaints. Bottled water remains available for $1.21 per bottle.

- **Food**: Defendants reported that the child-friendly food options at Dilly now include: hot/cold cereal, eggs, potatoes, steamed rice, chicken, pasta, veggies, hamburgers, hot dogs, taquitos, and soft-tacos. There is also fresh fruits and vegetables, including a salad bar and self-serve items (salad bar, beans, rice, PB & J, etc.).

- **Legal services access**: Defendants stated that there is now a list of legal services providers available in English, Spanish, Chinese, and Arabic posted in the living suites, television rooms, and libraries; translation services are available for any residents who do not speak those languages; and all legal calls are free.

- **KYR access**: Defendants shared that there is no KYR provider in place at Dilley. ICE is still working on a provider or to get its own program to cover substantially the same material and they welcome proposals. Defendants were not aware of the status of the RAICES KYR that was used at Karnes and when Dilley first opened. ICE is assessing for a number of things regarding the content of the proposal.

- **Language Access**: Defendants stated that primary or preferred language is identified during the intake process. Dilley staff use their translation services for initial interviews and orientation about services and rights and responsibilities in the facility. Anything that requires a resident's signature is provided in the resident's preferred language or translated. Videos are played in a loop in English, Spanish, and French; the Language Line and mobile devices are used for translation. There is an ICE poster in 15 languages about how to ask for assistance if a resident does not speak English.

- **Library**: Class members can use the Internet and play games on the library computers; use personal email; and check out books from the library. Computers have safety and security settings to prevent access to adult content.

- **Grievance Procedure**: Defendants noted that grievances and medical requests are primarily submitted electronically on tablets, but they can also be submitted on paper in the grievance boxes. Designated staff check the boxes and retrieve any requests daily.

- **Phone Calls**: Defendants confirmed that domestic phone calls are $.07 per minute; international land line calls are $.15 per minute; and international mobile calls are $.35 per minute. Individuals can request free calls to family or people helping with immigration proceedings.

- **Family Integrity**: Defendants clarified that fathers in dual parent families are permitted to be with their children from 6 am to 8 pm and can be alone with their children in the common areas. Fathers are not permitted in the living areas where the mothers are assigned and mothers may not go to living areas where fathers are assigned. Single-parent fathers with children are housed in a separate housing area with fathers and kids. Defendants were not sure if male children in dual-parent families are permitted to be housed with their fathers rather than their mothers.

- **Education**: Defendants confirmed that there is still just an hour of education per day based on age clusters.

- **Medical Services**: Defendants shared:

    - There are initial medical, dental, vulnerability, and mental health screenings upon arrival, and re-evaluation if there is a known acute or emergent condition.
    - There are sick-calls every day where medical professionals go to housing units and residents can identify in advance if they have something specific they want to talk about or have assessed during the sick call (general medical, dental, or mental health needs).
    - The facility has the capacity to provide different medications – some through pill lines, but more common ones like inhalers and topical creams are provided to residents directly.
    - There are 14 evaluation rooms including negative pressure rooms, AEDs and EKG machines, oral suction machines, blood pressure monitors, nebulizers, mobile radiology, and an x-ray machine
    - Urgent care is available right away and there is capacity to access off-site emergency care 24 hours per day.
    - They have capacity to provide routine and emergency dental care.
    - They have independently licensed mental health counselors that can be requested through the sick call process, but can also be requested on an urgent or emergency basis. If someone is identified as having an existing mental health condition, they will be regularly evaluated by mental health staff. Residents are advised that suicidal thoughts and expressing thoughts of self-harm is going to be a medical emergency and they should request help right away. Group counseling is not yet available.
    - As of Friday, May 30, there had been no suicide attempts at the facility since it opened in April.
    - The "fasting pill call" is between 5 and 6 am.

Thank you again for providing substantive responses to our tour questions. As we discussed, we will follow up with Defendants about any violations of the modified standards and the FSA that Plaintiffs identify during our Dilley site visit today and tomorrow.

Best wishes,

Leecia Welch

# ATTACHMENT E

CHILDREN'S RIGHTS

June 20, 2025

Joshua McCroskey
Trial Attorney
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
*Via email* to Joshua.C.McCroskey@usdoj.gov

Re: ICE violations of the *Flores* Settlement Agreement

Dear Joshua:

We write to meet and confer regarding violations of the *Flores* Settlement Agreement ("Settlement Agreement" or "FSA") that persist at the Dilley Family Detention Center ("Dilley").

On June 4 and 5, *Flores* counsel again interviewed class members at Dilley, an unlicensed secure family detention facility operated by CoreCivic.

As you know, FSA ¶ 11 requires DHS to treat "all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors." Similarly, FSA ¶ 12.A requires that when DHS holds children in its custody, children must be held "in facilities that are safe and sanitary and that are consistent with [DHS's] concern for the particular vulnerability of minors." FSA ¶ 12.A further requires DHS to "provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor." Additionally, Defendants have asserted they are in compliance with modified Family Residential Standards, as described in our June 4, 2025 letter, but have only shared a verbal description of the modifications. Based on Defendants' description of the modifications, Defendants are out of compliance with the modified standards at least with respect to family unity, language access, medical care, recreation, and legal services access.

Class members at Dilley have reported they have inadequate access to water, food, legal services, mental health support and medical care. Class members also continue to have inadequate age-appropriate activities consistent with their particular vulnerability as minors. Additionally, family separation at night and for periods during the day, improper treatment by staff and poor sleeping conditions are resulting in unnecessary mental and physical health concerns. Accordingly, class members are not being held in "safe and sanitary" conditions consistent with a "concern for the particular vulnerability of minors." Plaintiffs again request a meet and confer call to discuss what steps Defendants will take to remedy these violations promptly and ensure future compliance with the FSA. We have also attached a list of questions from our June 4, 2025 tour during which we were again asked to send all questions in writing rather than raise them during the tour.

**I. Prolonged Detention of Minors (FSA ¶ 12.A)**

Defendants' counsel have previously agreed that 20 days is the benchmark for time in custody at Dilley, however some of the class members we spoke to had been detained at Dilley for as long as 53 and 42 days. Staying beyond 20 days has become commonplace. Plaintiffs are alarmed by the increasingly long lengths of stay in a secure, unlicensed facility and consider this prolonged detention of class members to be a blatant violation of the FSA and the Court's previous orders. Class members frequently referred to Dilley as a "prison" and reported that the stress of detention is causing a precipitous decline in their mental health.

**II. Lack of Water (FSA ¶ 12.A)**

Class members at Dilley reported that potable water is currently limited primarily to the cafeteria - although we also observed some canteens for individual cup use located in the outdoor area. If parents want to have potable water for their children in their living areas, they have to bring pitchers to the cafeteria during mealtimes and transport them back to their rooms for group use by families in the trailer. Given the distance, the limited mealtimes, and the size of the pitchers – this process is overly cumbersome, unreasonable, and results in insufficient access to water.

Families have been told by staff that they should not drink the water from the sinks in their rooms, and report they are not permitted to have reusable water bottles, only single serve cups. Staff prohibit families from re-filling water bottles that they have purchased from the commissary (for $1.21 per bottle) with water from the cafeteria. Families continue to report that water has a foul odor in some parts of the facility.

Given that water is a basic necessity, required by the FSA, and the summer temperatures will continue to rise making hydration crucial, we ask that these barriers to children's easy access to potable water be promptly removed.

**III. Inadequate Food (FSA ¶ 11, 12.A)**

Parents continue to report that their children and toddlers are not eating the food at Dilley. We did not see the range of foods you noted during our May 30, 2025 meet and confer on the menu. Families shared that there are generally not child-specific options and the only fresh fruit available are red apples. The only snacks we observed available on the tour were snack cookies (i.e. Teddy Grahams) and apples. The varied foods described in the May 30, 2025, meet and confer did not appear to be and were not reported to be available between mealtimes, either. Additionally, parents reported that they are not provided with adequate formula and boiled or bottled water to mix it. The lack of adequate, appropriate food for children on a flexible schedule that can accommodate their developmental needs continues to be a problem.

**IV. Inadequate Medical Care (FSA ¶¶ 11, 12.A)**

We remain concerned about the medical care being provided at Dilley. For example, as noted in my June 6, 2025, email, we met with a child who has leukemia who had not received follow up care despite his mother sharing her concerns during the medical intake. Parents also reported that their children's

symptoms were not appropriately treated. For example, one family reported that the medical staff repeatedly refused a nasal decongestant to her child despite his significant difficulty breathing, particularly while he slept. She reported that he was instead provided with allergy medicine which, as expected, had no impact on his symptoms. Families also reported that the pill line can be 30-60 minutes long, during which families are required to wait with their children in the increasing heat.

For babies, parents reported being given inadequate amounts of diapers and wipes at a time, requiring them to repeatedly request additional supplies throughout the day every day and causing concerns about diaper rash and other skin diseases. Families also did not have access to any sterilizing equipment for baby bottles and were not given dish soap to wash their babies' bottles.

Class members and their parents also reported that their mental health was deteriorating due to the prison-like environment, separation from their fathers, and fears about deportation. Multiple children were experiencing nightmares, depression, and anxiety. Some children had attended "mental health sessions," but reported that they were simply told nightmares were normal and they should practice deep breathing.

### V. Inadequate Language Access (FSA ¶¶ 11, 12.A)

Throughout the facility, Plaintiffs' counsel observed important legal notices posted only in English and sometimes in Spanish. In particular, some flyers regarding free legal services were posted only in English, although we were pleased to observe during the tour that the legal flyer in the telephone area now has information in several languages. The "emergency protocols" in the residential unit trailers were posted only in English and Spanish. A significant number of class members detained in Dilley spoke neither English nor Spanish.

Some class members reported being unable to communicate with the staff in the facility due to language barriers. Some non-English and non-Spanish class members had not seen or experienced staff using interpretation or translation devices for interactions throughout the day and reported that interpretation was primarily available in the legal consultation rooms and not elsewhere. Other class members reported observing staff refusing to use their interpretation devices, even when requested by non-English and non-Spanish speaking families.

### VI. Inadequate Sleeping Conditions (FSA ¶¶ 11, 12.A)

DHS must provide children adequate sleeping conditions as part of its obligation to provide "safe and sanitary" conditions and act consistently with "concern for the particular vulnerability of minors." *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1060 (C.D. Cal. 2017) (citing FSA ¶ 12A). Multiple class members and parents again reported that lights are kept on in their trailers throughout the night making it difficult for children to sleep. In addition, guards still enter the trailers throughout the night letting the door slam repeatedly and have walkie talkies on high volume causing families to awaken. Families also reported constant sleep disruption by facility staff throughout the night and while their children were napping during the day.

## VII. Lack of a Child-Appropriate Environment (FSA ¶¶ 11, 12.A)

DHS has an obligation to treat children "with special concern for their particular vulnerability as minors." FSA ¶ 12.A. This necessarily includes concern for minor's developmental needs.

### A. Lack of Age-Appropriate Activities

Dilley continues to provide inadequate activities for children of all ages. On our tour, we observed very few available toys, games, or art materials. The few toys we did see appeared very worn down. Multiple families reported that toys are in limited supply for young children and only allowed in a designated common area. Some parents reported that staff confiscated their children's own dolls and crayons that were kept in their living area. In addition, despite Defendant's report at our May 30, 2025 meet and confer that play structures had been and would be installed at the facility, we did not observe any play structures available in public spaces for children. We saw a small plastic structure with a toddler slide in a fenced-in area by the child care center, but were told by class members that it was only available to children whose parents were in legal meetings.

Class members and families reported that there were no activities for older children at Dilley other than some balls in the recreation tent. During our tour, we were told that children had activities like movies with popcorn, karaoke, and snow cones – but families who had been at Dilley for two months reported they had only seen activities offered one time on a holiday. Most families reported never having seen such activities or any other structured activities.

In addition, class members complained about not having access to education at Dilley apart from one hour a day per age group (e.g., 9-12th grade combined have one hour per day). No other educational content is provided. Multiple class members reported that the content available even in their designated hour is well below their age- and grade-level.

The library was an important space for most families, but the increasingly restricted time families were permitted to be in the library created distress. Class members were particularly upset that they are now limited to using computers in the library for only one hour per day, and as the facility census continues to increase, we are concerned that even more limitations will be placed on library access. Class members reported that they were required to either be actively reading or using a computer in order to remain in the library space – rendering the space inaccessible to families with toddlers and babies. Lack of education, recreation and structured activities exacerbate children's mental health challenges and feelings of emptiness and isolation, particularly given the long periods of time children are being held in these facilities.

### B. Limitations on access to family members

Fathers being forced to reside and sleep apart from their families in a separate area of Dilley continues to cause children extreme levels of distress. This is exacerbated because even during the day, fathers are not allowed in children's living areas and children are not permitted in their father's living area. Even worse, single fathers who arrive at Dilley with teenage daughters are also not permitted to live together resulting in their daughters not sleeping or staying in a living area with any parent. Although Defendants stated that families can spend time together from 6 a.m. until 8 p.m. each day, class members reported that

families' time together is minimal outside of mealtimes as access to the library is increasingly limited, outdoor time frequently gets cancelled due to high temperatures, and the gym does not have space for families to spend time together (unless they are actively playing with balls on the court). The gym also was not conducive to families spending time together because it is cold and loud. This makes it difficult for families to sit quietly and be with each other, to do quiet activities together, and makes it particularly inhospitable for babies and young children to spend time with their fathers. We did not observe any designated space for families with young children to spend time together. This forced separation also creates significant stress and mental health challenges for the mothers charged with children's constant care and supervision, resulting in further stress and harm for children.

Children again reported that they had to pay for calls outside of the facility—even to their family members. Parents were unaware that they could request free calls beyond a 3-minute free phone card provided at intake. This practice fails to safeguard the particular vulnerability of minors, including their need to maintain connection with their family members. Parents also reported being unable to access their phones and personal items either to get needed contact information or to complete multi-factor authentication that was required for them to log into their existing email accounts. This severely restricted class members' access to communication with family members outside of the facility.

### C. <u>Lack of Information</u>

Class members again expressed extreme distress because they were provided no information about their continued detention and their cases. Parents reported that the questions they posed on the "tablets" went unanswered and they had no case managers to help navigate concerns. Rules frequently changed, and families reported not being provided a list of pro bono legal service providers or any legal orientation information.

******

Plaintiffs would like to set up a time with Defendants discuss these Settlement violations and the attached tour questions. Please let us know if you are available on June 25, 2025.

Best wishes,



Leecia Welch

# ATTACHMENT F

CHILDREN'S RIGHTS

August 14, 2025

Joshua McCroskey
Trial Attorney
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
*Via email* to Joshua.C.McCroskey@usdoj.gov

**Re: ICE violations of the Flores Settlement Agreement**

We write to memorialize the parties' July 24, 2025 meet and confer conversation and reiterate our ongoing concerns about violations of the Flores Settlement Agreement ("FSA") at the South Texas Family Residential Center in Dilley ("Dilley"). Class members at this unlicensed,[1] secure facility are being subjected to increasingly long lengths of stay (some children as long as 80 days), during which they have inadequate access to water, food, legal services, hygiene products, education, recreation, mental health support, and medical care.

The Court made clear during the July 25, 2025 status conference and the August 8, 2025 hearing that she wants the appropriate Juvenile Coordinator to be involved in resolving the parties' disputes about conditions in facilities where children are detained. Plaintiffs' counsel's understanding was that the DOJ would object to counsel directly contacting the Juvenile Coordinator. However, to give both the parties and the Court confidence that every effort is being made to address reports by class members and violations raised by counsel outside of court, we request that Defendants' counsel invite the ICE Juvenile Coordinator to the upcoming meet and confer. During that call, we would like to clarify what steps, if any, ICE will take to resolve Plaintiffs' concerns. We would also like to address our remaining tour questions and a few new questions from our most recent tour.[2] *See* attached Tour Questions. Please provide the ICE Juvenile Coordinator's and Defendants' availability during the week of September 1, 2025, for such a meeting.

**<u>Summary of July 24, 2025 Meet and Confer Call</u>**

During the July 24, 2025 meet and confer call, the parties discussed the tour questions attached to our June 20, 2025 correspondence. We did not have sufficient time to address all of the tour questions, but we were able to discuss some of Plaintiffs' concerns related to class members' time in custody, lack of access to water and snacks, lack of access to sterilized bottles for babies, lack of access to language translation, and exorbitant charges for phone calls to family members.

---

[1] In Defendants' objections to the Court and during the August 8 court hearing, there was some suggestion that Dilley is a licensed facility. If this is the case, please provide proof of licensure.
[2] Given the laborious process of compiling all of our tour questions, sending them to DOJ attorneys, and then scheduling multiple calls to discuss them, we reiterate our request to allow tour questions to be addressed on the tours going forward.

Plaintiffs expressed concern about class members' length of stay at Dilley and asked whether 20 days was still being used as a benchmark. Defendants stated that 20 days was still being utilized as the benchmark but noted that complications can make removals take longer, so some families are spending more than 20 days at Dilley. We then asked Defendants whether there was a procedure for class members to be processed out of secure detention when their removal is not imminent. Defendants responded that cases are reviewed after 20 days but were not aware of any consistent procedure for re-reviewing class members' cases after that initial review. Defendants stated that class members could ask questions on tablets, and ICE would evaluate how long they could hold families on a case-by-case basis. It is clear from these responses that Defendants are not in compliance with the FSA's requirements that ICE "make and record the prompt and continuous efforts" to release class members "without unnecessary delay." FSA ¶¶ 12.A, 12.C, 18, 14.

Plaintiffs expressed concern about children's hydration and access to water as the facility staff tell families not to drink the water in their rooms, but at the same time does not provide free bottled water, does not allow thermoses for water, and does not allow families to refill purchased water bottles with water from the cafeteria. In fact, on our most recent visit, families reported not being permitted to bring water bottles to the cafeteria and being told to throw away purchased water bottles rather than refill them. Defendants stated they did not know of a policy prohibiting people from reusing water bottles and reiterated their position that drinking water has been tested. Plaintiffs asked if water has been tested from each sink, and Defendants did not have a response.

Plaintiffs expressed concern about parents' inability to sterilize their babies' bottles and the lack of non-sugary snacks for children. Defendants stated families could wash baby bottles in the sink or request new ones. Plaintiffs stressed the importance of access to sterile bottles for each feeding. Plaintiffs again requested that children be provided with non-sugary snacks.

Plaintiffs asked how class members who do not speak the posted languages learn about their rights and the rules at Dilley. Defendants stated that the posters are now or will soon be posted in English, Spanish, Chinese, and Arabic, and that the ICE handbook is available in 13 languages on the tablet. Plaintiffs asked how families would know the handbook exists in those languages on the tablet and did not receive a response. Defendants did not know exactly where in living areas tablets are kept and said they would confirm where they are. Defendants did not know of a process for getting a handbook if a family did not speak or read one of the 13 languages, but said that their understanding was that Dilley staff would use a language line to review the handbook during intake. Defendants stated if we met a family with language issues during interviews we should flag it for the DOJ attorney.

Plaintiffs asked if there were updates regarding plans for RAICES to provide Know-Your-Rights trainings. Our understanding is that there are no plans for families to receive such presentations, but please let us know if that is incorrect.

Plaintiffs asked Defendants about the cost for class members to make phone calls. Defendants stated that prices for phone calls vary: $0.07 per minute for domestic, $0.43 per minute with

taxes for international mobile calls, and $0.27 per minute for video calls, but that families could request free family calls. Defendants did not know whether families were made aware they could request free calls or whether staff can deny requests for free calls.

Overall, Defendants' responses to our tour questions reinforced our concerns that ICE is flagrantly violating numerous provisions of the FSA as discussed in more detail below.

**Summary of July 28 and 29, 2025 Site Visits Concerns**

On July 28 and 29, 2025, *Flores* counsel again interviewed class members at Dilley. Our interviews and tour made it clear that Defendants remain woefully out of compliance with FSA ¶¶ 11, 12.A and 12.C, 14, 18, and 24A, as well as the "modified" Family Residential Standards.[3]

***FSA Requirements***

FSA ¶ 11 requires ICE to treat "all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors." Similarly, FSA ¶ 12.A requires that when ICE holds children in its custody, children must be held "in facilities that are safe and sanitary and that are consistent with [ICE's] concern for the particular vulnerability of minors." FSA ¶ 12.A also requires ICE to "provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor."

The FSA further requires that, whenever ICE "takes a minor into custody, it shall expeditiously process the minor," "place all minors as expeditiously as possible," and "make and record the prompt and continuous efforts" to release class members "without unnecessary delay," FSA ¶¶ 12.A, 12.C, 18, 14.

This Court has precluded ICE from detaining children in family detention for prolonged or indefinite periods**.** *Flores v. Lynch*, 212 F. Supp. 3d 907, 915 (C.D. Cal. 2015). The FSA "creates a presumption in favor of releasing minors." *Flores v. Barr*, 934 F.3d 910, 916 (9th Cir. 2019); *accord Flores v. Lynch*, 828 F.3d 898, 901, 903 (9th Cir. 2016) (minors must be released "as expeditiously as possible"); *Flores v. Sessions*, 862 F.3d 863, 866 (9th Cir. 2017). "[H]old[ing] minors in indefinite detention in unlicensed facilities constitutes a fundamental and material breach of the parties' Agreement." *Flores v. Barr*, 2020 WL 2128663, at *7 (C.D. Cal. Mar. 28, 2020) (Quoting *Flores v. Sessions*, No. CV 85-4544-DMG (AGRx), 2018 WL 4945000, at *2 (C.D. Cal. July 9, 2018)).

---

[3] The July 1, 2025 ICE Juvenile Coordinator's Report does not indicate that there are modifications to the language access or medical care standards, but our interviews indicate that Dilley is out of compliance with many of those FRS provisions. ECF 1599-2 ("ICE JC Report"); ECF 1599-3 ("Exhibit to ICE JC Report"). Further, there is no justification for the assertion in the Exhibit to the ICE JC Report that modifications to education and recreation comply with the FSA. The education and recreation offerings do not. Finally, the modified FRS restrictions on mail are obstructing access to legal services and family members in violation of the FSA.

***Ongoing FSA Violations at Dilley***

**I. Prolonged Detention of Minors (FSA ¶ 12.A)**

Defendants have repeatedly stated that 20 days is the "benchmark" for class members' time in custody at Dilley. In addition, Defendants asserted in their reply regarding their Motion to Terminate the FSA that "class members are generally at FRCs for 20 days or less." ECF 1612 at 13. Plaintiffs reiterate their position that the Court's ruling regarding 20 day lengths of stay was premised on Defendants' assertion that 20 days is the length of time necessary for ICE to complete its processing of class members pursuant to the Agreement in good faith.

Nevertheless, despite these repeated representations, many class members we have spoken to have experienced crushingly long lengths of stay, including 80, 79, and 77 days (excluding their time in CBP custody). Stays exceeding 20 days have become the status quo at Dilley. One family who had been in custody for over 40 days received news from ICE during our visit that they would remain in custody for at least 30 *more* days. Another mother and daughter who had been seeking voluntary departure for years, were told after 45 days of detention at Dilley that they would have to wait in custody even longer, because ICE allegedly needed to determine that they were family members—although the two had previously been detained by DHS together, and gone to years of ICE check-ins without ICE raising this concern— because they had different last names. When we met them on their 56th day at Dilley they still had no information on whether and when they would be released. Another family, who had been detained for 77 days, was still waiting for ICE to gather information needed for their passports and reported speaking with many children detained for over 50 days.

We are extremely alarmed by these lengths of stay. This prolonged detention of class members is a flagrant violation of the FSA and the Court's previous orders. It is especially concerning considering the lack of procedures for reviewing the cases of families who remain at Dilley beyond 20 days.

Plaintiffs' counsel are particularly concerned about the number of class members who have already experienced lengthy stays and have been advised by ICE that there is no end in sight to their detention. As we have previously informed Defendants, lengthy detention increases exponentially the harms that each condition described below poses to children's well-being.

At our next meet and confer call, please provide Plaintiffs' counsel with answers to the following questions:

- Given that we met with families who have been at Dilley for over 70 days without receiving information on how much longer they will be detained, what process will the government use for families whose deportation is not imminent to prevent indefinite detention? *See* April 24, 2020 Order [Doc. # 784] at 18 (holding that a final order of removal cannot be the dispositive consideration if removal is not "imminent," and there are no other indicia of a minor's flight risk); *id.* at 13 ("The definition of 'imminent' is 'ready to take place' or 'happening soon.'").

- How does the government define imminent deportation justifying continued detention after 20 days? (i.e., what factors or criteria are considered in determining whether deportation is sufficiently imminent, including concrete logistical arrangements, a definite date of removal, how many days fall before that date, etc.)
- Are case reviews prompted at regular intervals after a child has been detained more than 20 days? If so, what are those intervals and what categories of information are considered at each review? If there are specific factors that contribute to prolonged detention or prevent release or removal, please identify those factors.
- What good faith efforts are being made during these prolonged periods to process children for release pursuant to the FSA's terms? Paragraph 19 requires ICE to "make and record the prompt and continuous efforts on its part" toward reunification and release pursuant to Paragraph 14.

**II. Lack of Potable Water (FSA ¶ 12.A)**

Class members at Dilley continue to lack ready access to potable water. Although Defendants stated in the July 24, 2025 meet and confer that drinking water has been tested, they were not able to confirm whether it has been tested in the living quarters (where families must stay from 8 pm to 6 am). Families we spoke with this visit again shared that staff instruct them not to drink the water in some living areas and that they fear drinking the water due to the color and smell. They also note that Dilley staff seem to only drink bottled water.

Families again reported they are not permitted to reuse purchased water bottles and children are not permitted to have thermoses to carry water around with them. Staff continue to restrict families from bringing water bottles into the cafeteria to re-fill with filtered water and tell families to throw out the bottles they have purchased after they finish them.

The small pitcher in each living area is inadequate to meet the needs of the twelve people living there. Families reported being prevented from having more than one small pitcher. When parents want to have potable water for their children in their living areas, they have to fill the one pitcher with filtered water or ice from other areas and transport it back to their rooms for group use by all families in the living area. Given the size of the pitchers and the process for filling them, this situation is overly cumbersome, unreasonable, and results in insufficient access to water.

Months after we first raised this problem, we are concerned that children still do not have ready access to potable drinking water. Given that water is a basic necessity, is required by the FSA, and summer temperatures regularly surpass 90 degrees making hydration crucial, we insist that these ongoing barriers to children's easy access to potable water be removed.

At the time of our call, please provide Plaintiffs' counsel with answers to the following questions:

- Will ICE provide families with consistent access to free bottled water and/or additional pitchers in each living area?
- Will ICE permit families to refill used plastic water bottles in the cafeteria or provide families with reusable water bottles to refill in the cafeteria or from the filtered containers?
- Will ICE clearly mark which sinks in the residential areas are non-potable?

Plaintiffs' counsel also again request a copy of the test results of any water tests conducted on water at the facility, along with information identifying the source of that water and in what areas of Dilley it is available. Due to conflicting information about the potability of the water, Plaintiffs' counsel also request to collect samples of the water at our next visit so that we may conduct testing.

**III. Inadequate Food (FSA ¶ 11, 12.A)**

Parents continue to report that their children are not eating the food at Dilley, and that there is no process to request alternative food items when they have a condition that prevents them from eating the provided meals (*e.g.*, food allergies, diabetes, constipation, medical conditions, and religious requirements). The lack of alternative options and absence of institutional tracking of dietary restrictions is even more troubling for the many children who remain detained for longer periods of time. Without adequate food options, these children are put at risk for health complications and denied their freedom to practice their religion.

We did not see the range of foods noted during our May 30, 2025 meet and confer on the menu or available between mealtimes. Toddlers do not have access to soft foods appropriate for their age and there are no child-specific meals. Families with small children often resort to buying ramen noodles from the commissary to feed their toddlers because there are few food options that are soft enough to eat in the facility. The only fresh fruit available is red apples. The only snacks we observed on the tour were Teddy Grahams snack cookies and red apples.

Additionally, parents reported that they are not provided with adequate formula and new or sterilized bottles. Parents are also not provided with clean water to mix it. Parents have been denied requests for formula and for new bottles because their babies are older than 12 months old. Because of this, at least one family has been reusing the same unsterilized bottle for over a month. Families also did not have access to any sterilizing equipment for baby bottles. Despite Defendants' July 24, 2025 statements that families get new bottles after each formula feeding, as stated above, some families we spoke to have been denied new baby bottles for over a month.

The lack of adequate, appropriate food and formula for children, toddlers, and babies on a flexible schedule that can accommodate their developmental needs continues to be a problem notwithstanding the myriad times Plaintiffs have brought these issues to your attention.

At the time of our next call, please provide answers to the following questions:

- Regarding the sterilization of baby bottles:
  - If the bottles are intended to be reused, will the facility provide 24/7 access to bottled or filtered water and sterilizing equipment to clean formula bottles?

  - If the bottles are not intended to be reused, will the facility provide mothers with 24/7 access to a daily supply of new bottles in their living areas, without having to request them from staff?
- Will the facility provide 24/7 access to bottled or filtered water for mixing baby formula and cleaning formula bottles?
- Will the facility permit babies older than 12 months to drink formula?
- Will the facility provide toddlers additional soft snack foods?
- Will the facility provide children more varied nutritious snacks (e.g., different fresh fruits/vegetables, yogurts, cheese, non-sugary crackers or pretzels, bread, nuts/protein butters, protein bars)?

**IV. Inadequate Medical Care (FSA ¶¶ 11, 12.A)**

As noted in previous letters and emails, we remain extremely concerned about the lack of medical care at Dilley. For example, on this visit we met with a child who had to wait a full day to be seen while he was suffering from appendicitis. One family reported that a toddler has suffered from constipation and bloody stools since June 18, had been prescribed a suppository on June 21, but had still not received the prescription or any other follow up care for over a month. Families also reported that the pill line can be up to two hours long each morning, during which families, including sick or injured children if they need medication, are required to wait in the intense heat. Another child reported a painful cavity but had not received treatment.

The lack of adequate medical care provided to parents also impacts children and shows a singular lack of concern for their vulnerability as minors. For example, as we have emailed about twice, the father of one class member has a chronic spinal injury for which he takes medication, without which it is very painful for him to walk. Since the facility has not provided him consistent access to pain medication for his condition and the rules require young children to remain with their parents, this child has been essentially confined to her room for over 50 days of detention. This isolation has contributed to the child's deteriorating mental health.

Class members and their parents continue to report that their mental health was deteriorating due to the prisonlike environment, separation from their fathers, and fears about deportation.

At the time of our next call, please provide answers to the following questions:

- Will medical create an option for direct referral to a medical doctor not requiring a visit with the nurse, nurse referral, and waiting period between the nurse visit and an appointment with a doctor?
- Will ICE create a clear process for requesting emergency medical care and a clear procedure for response to urgent requests, so that serious medical incidents do not worsen while a child waits in the hall or waiting room?
- Will ICE ensure that where a child reports a serious medical issue, at minimum, more than one nurse must conduct or be present for diagnosis and potential decision to refer?
- Will ICE organize the pill distribution process so that (1) the line shortens or medication is delivered to rooms; (2) any wait in the medical line, especially since many who are

waiting are sick or injured, is not in an area exposed to the sun and elements; (3) water and seats are available while people wait?

- Will ICE begin treating cavities?

**V. Inadequate Sleeping Conditions (FSA ¶¶ 11, 12.A)**

DHS must provide children adequate sleeping conditions as part of its obligation to provide "safe and sanitary" conditions and act consistently with "concern for the particular vulnerability of minors." *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1060 (C.D. Cal. 2017) (citing FSA ¶ 12A). Multiple class members and parents again reported that lights are kept on in their living trailers throughout the night making it difficult for children to sleep. In addition, guards still enter the trailers early in the morning letting the door slam repeatedly and have walkie talkies on high volume causing families to awaken. This is particularly distressing to families when guards are a different gender, especially for families whose religious beliefs require heightened vigilance against cross-gender interaction (for example, uncovered hair in front of the opposite gender). The guards in the hall at night also talk loudly, which further prevents families from sleeping. Families reported consistent sleep disruption.

At the time of our next call, please provide information regarding what measures the facility will take to reduce disruptions to children's sleep, including whether the facility will change its policy regarding the lights to allow the front lights of each room to be dimmed or turned off during certain hours.

**VI. Inadequate Hygiene Products (FSA ¶¶ 11, 12.A)**

DHS must hold children in "safe and sanitary" conditions. FSA ¶ 12.A. Children reported that the showers only have harsh hand wash dispensers (which Plaintiffs observed on our tour), and that their only option is to purchase shampoo, body soap, and deodorant at the commissary. Some class members reported breaking out into rashes and hives from regularly using the hand soap on their bodies. Children detained for prolonged periods need access to free hygiene items that are appropriate for their skin and hair. Some class members without money reported they have had no access to shampoo to wash their hair for months on end. Denial of these necessary hygiene items clearly violates the FSA.

Class members also reported having to wait weeks for replacement clothes. One child did not receive a sweater for 15 days because none were available. Another child we met with was still wearing a shoe with hole, even though she had requested new shoes the week before. Children must have access to adequate clothing and shoes, and should not have to wait extended periods for replacement items.

At the time of our next call, please indicate whether the facility will provide daily access to body wash and shampoo in order to come into compliance with the FSA.

**VII. Inadequate Access to Legal Services (FSA ¶ 24.D.)**

Class members lack adequate access to legal services at Dilley. During our July 24, 2025 meet and confer, Defendants stated that legal calls are free, yet many families reported they had no

way to make free legal calls and have been paying to call lawyers. On the tour, the ICE official was not aware of how families could make free legal calls, nor were instructions explaining the process for free legal calls posted near the telephones. Class members are entitled to free legal calls, but without instructions on how to make the call, the right is meaningless. Please clarify whether class members are being provided free legal calls and, if so, how the process for making such calls is being communicated to families.

Further, several families reported having difficulty communicating with their lawyers. Families lack information on the process for making appointments with outside lawyers and lawyers have reported having difficulty speaking to their clients. Accurate and full information about access to counsel must be provided to families in the facility handbook and during know your rights trainings.

Plaintiffs also remain concerned about the lack of a Know Your Rights/Legal Orientation Program (LOP) at Dilley. During our next call, please indicate whether there are plans for an independent organization to provide a LOP, how ICE is ensuring that all legal calls are free, and how ICE is communicating to families that legal calls are free and the process for making a free legal call. If there are reasons the instructions for making free calls and the list of free legal service providers are not posted on the wall directly next to each telephone in multiple languages, please explain those reasons.

## VIII. Lack of a Child-Appropriate Environment (FSA ¶¶ 11, 12.A)

DHS has an obligation to treat children "with special concern for their particular vulnerability as minors." FSA ¶ 12.A. This necessarily includes concern for minors' developmental needs.

### A. Lack of Age-Appropriate Activities

Dilley continues to provide inadequate activities for children of all ages. On our tour, we again observed very few available toys, games, or art materials. Class members and families reported that there are limited activities for older children at Dilley other than some balls in the gym. During our most recent visit, class members reported that although they used to be able to play with balls until 8 pm, recently Dilley has denied them access to balls after 6 pm. Children also reported being told they cannot play soccer or kick a ball inside the gym and are generally not allowed to play soccer outside, either, due to the heat. These limitations may seem insignificant to adults, but the recent restrictions on access to one of the only activities they enjoyed matters a great deal to the children we met.

Despite Defendants' report at our May 30, 2025 meet and confer that play structures were being installed at the facility, only one playground for small children was available in the common area. The playground suitable for elementary school age children was surrounded by yellow safety tape and was still not open. Further, neither the child nor toddler play areas have any shade, and children report that they are often prevented from playing outside during the day due to heat. It was obvious during our tour that families and children need more shady areas, as we observed them huddled closely together in a few of the only small patches of dirt and grass under trees.

In addition, as Plaintiffs have repeatedly noted, class members do not have access to education at Dilley apart from one hour a day per age group (*e.g.*, 9-12th grade combined have one hour per day). No other educational content is provided. Multiple class members reported that the content available in their designated hour is well below their age- and grade-level. Class members also reported that they stopped going to school after being at Dilley for a month because the content started to become repetitive. When a child asked about the repetition, the teacher shared that there is only one month's worth of educational content taught at Dilley.

The library was an important space for most families, but the increasingly restricted time families are permitted to be in the library has created distress. Class members were particularly upset that they are now limited to being in the library for a few hours based on family group type. As the facility census continues to increase, we are concerned that even more limitations will be placed on library access. Lack of education, recreation, and structured activities exacerbates children's mental health challenges and feelings of emptiness and isolation, particularly given the long periods of time some children are held at Dilley.

At the time of our next call, please provide the following information:

- Whether the facility has plans to increase access to educational services and recreation, especially as children's length of stay increases. Please describe what the plans are.
- Does the facility intend to build additional shade structures to make outdoor activities more possible during periods of excessive heat?

**B. Limitations on access to family members**

Fathers being forced to reside and sleep apart from their families in a separate area of Dilley continues to cause children distress. This is exacerbated because even during the day, fathers are not allowed in children's living areas and children are not permitted in their father's living area. In one family where the son was placed with the father and the daughter with the mother, the son and daughter could not spend time in each other's living areas. Although Defendants stated that families can spend time together from 6 a.m. until 8 p.m. each day, this is simply not true. Class members reported that families' time together in the library is increasingly limited, outdoor time frequently gets cancelled due to high temperatures, and the gym is not conducive to families spending time together because it is cold and loud.

Children again reported that they had to pay for calls to their family members. Despite Defendants' statement on July 24, 2025 that children could ask for free phone calls to family members, families reported asking and being denied free calls beyond one 3-minute free phone card provided at intake. One mother reported being unable to make any phone calls to family for over a month, despite begging officers to allow her daughter to make one free call to her father. She was only able to call him when another family gave her money for a call. This practice clearly fails to safeguard the particular vulnerability of minors, including their need to maintain connection with their family members.

Families also reported that they could not receive visits or send or receive mail, which further restricted class members' communications with their family members outside of Dilley. ECF

1599-3. Parents also reported being unable to access their phones and personal items to retrieve needed contact information. This severely restricted class members' access to communication with family members outside of the facility.

**C. Lack of Information**

Class members again expressed extreme distress because they were not provided information about their continued detention and their cases. Families are kept in the dark about their cases and rights, which vulnerable children find terrifying and which is inconsistent with concern for the particular vulnerability of minors. FSA ¶ 12.A. Parents reported that when they posed questions on the "tablets" about their case or why they were at Dilley after 20 days, they were generally told they just had to wait. They received no further case management or information. One family reported that they had been unable to ask questions on the tablet when they did not have any money in their account. Families are not receiving know-your-rights presentations and class members are unaware of their rights, which exacerbates their confusion and distress. Facility staff tell children if they run, kick balls in the gym, or speak loudly they can get reports made against them. One family detained for 42 days never received any information about the process for requesting bottles for their baby. ICE asked another family multiple times to sign papers that they did not understand, and that family received no information about their rights to consult with a lawyer. Another family only learned that they had a right to consult with a lawyer during a CAT interview.

During our next call, please inform Plaintiffs' counsel of whether ICE, at regular intervals, is required to meet in-person with a family to discuss their case, i.e., their release or removal.

*****

As noted above, Plaintiffs request a meet and confer call with Defendants and the ICE Juvenile Coordinator to determine what steps ICE will take to remedy these violations, which we have described multiple times over the past three months. Plaintiffs believe that there must be immediate and verifiable improvement in each area outlined above. Otherwise, it will be clear that the parties have reached an impasse and that court involvement is critical to bringing Defendants into compliance with the FSA.

Please let us know your availability during the week of September 1, 2025 for a call.

Best wishes,

Leecia Welch

# ATTACHMENT G

National Center for Youth Law

BOARD OF DIRECTORS

President
**Mary Bissell**
ChildFocus

Vice President
**Mona Tawatao**
Equal Justice Society

Secretary
**Denise Forte**
The Education Trust

Treasurer
**Brian Rocca**
Morgan, Lewis & Bockius LLP

**Dr. Jason Okonofua**
University of California, Berkeley

**Sophie Fanelli**
The Stuart Foundation

**Laura K. Lin**
Simpson Thacher & Bartlett LLP

**Peter B. Edelman**
Georgetown University Law Center

**Lori A. Schecter**
McKesson Corporation

**Sandeep Solanki**

**June Dipchand**
McKesson Skadden, Arps, Slate, Meagher & Flom LLP

**Frank Figgers**
One Voice

**Preetha Chakrabarti**
Crowell and Moring LLP

Executive Director
**Shakti Belway**

Christina Parascandola
Trial Attorney
Office of Immigration Litigation
Christina.Parascandola@usdoj.gov

*Via email*

Sept. 16, 2025

Dear Christina,

We look forward to speaking tomorrow at our scheduled Meet and Confer to discuss concerns raised following our past two monitoring visits to Dilley. We are frustrated that Defendants have not yet confirmed whether or not the ICE JC will be present for our call, but we are hopeful this meeting will be productive.

In addition to the questions and concerns submitted related to our July visit, we hope to discuss the following concerns that arose out of our most recent visit. In many cases, the issues from the July visit persist. Please note that this is a summary of the concerns expressed by Plaintiffs in their response to the ICE JC report filed yesterday, Sept. 15, 2025, along with accompanying declarations.

As you are aware, FSA ¶ 11 requires DHS to treat "all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors." Similarly, FSA ¶ 12.A requires that when DHS hold children in its custody, children must be held "in facilities that are safe and sanitary and that are consistent with [DHS's] concern for the particular vulnerability of minors." FSA ¶ 12.A further requires DHS to "provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor."

**Prolonged custody, including of families and children not in expedited removal proceedings**

We continue to be concerned that children are being held in family detention for far too long. In addition to the prolonged custody we have raised after every visit, we are concerned that many children we spoke with had been arrested despite having active pending relief and no possibility of being placed in expedited removal. These children are ineligible for imminent removal. Detaining class members indefinitely without a plan for imminent removal is a violation of the Court's repeated admonitions that children may not be kept in unlicensed secure facilities except for the short period during which DHS is executing either release or removal. We reiterate our previous questions about what processes are in place to review children's cases to avoid unlawfully holding children in family detention when removal or release is not imminent and/or efforts to release these children as soon as DHS confirms removal is not imminent. How and when does DHS intend to remedy this violation of the FSA?

**Re-detention of previously released families**

Similarly, we are aware of several cases where families have been released from family detention with alternatives to detention only to be re-detained without concrete removal plans in place and with no apparent violations of terms of placement on alternatives to detention, therefore again subjecting class members to unlawful prolonged detention in secure unlicensed facilities. Please explain what justification DHS has for this occurrence and what process DHS is using for review of these cases.

**Family Separations**

Plaintiffs are deeply concerned by reports of class members separated from parents against the family's wishes and sent to ORR custody and class member reports of being threatened with family separation. Separation of children from their parents is deeply traumatic and harmful to class members and contrary to the FSA, as we have explained extensively in our motions to enforce over the past years. Even separating fathers from the rest of their families at night while held together at Dilley is traumatic for children and remains a concern for Plaintiffs' counsel. Possibly permanent, and certainly long term, separations where children are sent to ORR custody and parents are transferred to adult detention are even more concerning. How does DHS intend to remedy this disregard for the special vulnerability of children?

**Lack of access to legal information and counsel, including *Flores* rights**

As outlined in our response to the ICE JC report and accompanying declarations, Plaintiffs reiterate our concern that there is no LOP/KYR program for families at Dilley, orientation videos shown during intake are presented in a time and manner that prevents class members and their families from meaningfully understanding their rights, children and families remain unaware of their rights under the FSA and their right to make free legal calls, and children and families remain unaware of *how* to make free legal calls. When does DHS intend to provide an LOP/KYR program to all families detained at Dilley?

**Language Access Concerns**

Plaintiffs are concerned that most information is first presented to class members in English, requiring children and their families to search for information in a language they recognize. Furthermore, class members who do not speak Spanish or English have little or no language access outside of formal legal or medical interactions. The tablet instructions are only in Spanish and English, despite Defendants' past assurances that the tablets allow for broader language access for non-English non-Spanish speakers. Finally, it appears that none of the limited activities or education available for children are provided in

any language other than English or Spanish, raising the same issues for families who speak other languages. How and when will DHS remedy these language access issues?

**Insufficient basic necessities to guarantee safe and sanitary conditions – please provide a plan to remedy each of these concerns.**

Access to clean-tasting drinking water remains an unaddressed problem. Plaintiffs were particularly frustrated by the disingenuous statement in the ICE JC Report that bottled water is "available" when Defendants know families are obligated to *pay* for that water, and many families do not have sufficient funds to do so.

Children and families have been given fewer and fewer articles of clothing, making it necessary to do laundry every day and to have few or no clean clothing if clothing is soiled. Most recently, families reported receiving only two shirts, one pair of shorts, and one pair of pants. This is wholly inappropriate and far fewer than what class members need for basic hygiene in addition to being dramatically fewer than the six sets of clothing Defendants and the facility claimed to be giving families when Dilley initially opened.

Food continues to be of extremely limited variety, including no changes to the availability of healthy and varied snacks for children between meals.

Defendants continue to provide inadequate amounts of hygiene products, including toothbrushes that fall apart, insufficient toothpaste, only harsh hand soap for all washing purposes (including hair, face, body) causing widespread skin issues.

**Inadequate medical and mental health care – please provide a plan to improve access to medical care.**

While many families reported having weekly meetings with counselors, all reported that these were very short - five to ten minutes - and largely unhelpful, while the treatment they endure in detention continues to cause severe deterioration of children's mental health.

Many families at our most recent visit again reported medical care to be unhelpful or actively harmful, worsening their medical concerns. Families also reported witnessing frightening medical events where those in need were not promptly provided with medical attention. Furthermore, we observed basic medications available for sale in the commissary that should be provided promptly, adequately, and free of charge at the medical complex. This raised concerns that the barriers to accessing medical care through the medical complex causes families to forgo medical attention and/or to be forced to purchase basic medicines from the commissary rather than being treated by the facility holding them.

**Poor sleeping conditions**

Lighting and night-time interruptions that Plaintiffs have raised after every visit to Dilley remain unaddressed or insufficiently addressed. How does DHS intend to provide age-appropriate sleeping conditions for class members?

**Insufficient educational materials**

Plaintiffs' concerns about education persist for the reasons previously elaborated. The quantity and quality of educational activities available to class members is inadequate and only available to children who are English or Spanish-speakers. The educational packets provided by the facility in no way provide a replacement for the schooling that many children, especially those who had been attending schools in their U.S. communities, are missing. When does DHS intend to provide meaningful access to educational services?

Best regards,

Rebecca Wolozin

Rebecca Wolozin
National Center for Youth Law
bwolozin@youthlaw.org

# ATTACHMENT H

CHILDREN'S RIGHTS

September 18, 2025

Christina Parascandola
Senior Litigation Counsel
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
*Via email* to christina.parascandola@usdoj.gov

Re: ICE violations of the *Flores* Settlement Agreement

Dear Christina,

We write to memorialize the parties' September 17, 2025 meet and confer call regarding *Flores* violations at the Dilley Family Detention Center ("Dilley"). Much of the conversation focused on issues the parties have discussed several times in previous meet and confer calls that have been happening since May. Across four trips to Dilley and over sixty interviews, children and parents have consistently raised the same concerns. We appreciate your offer to follow up on some of these issues and ask that you respond in writing with any corrections to our understanding of Defendants' positions as set forth below no later than September 25, 2025.

**Juvenile Coordinator Role in Addressing Concerns at Dilley**

In accordance with the Court's repeated and longstanding directives, including most recently during the status conference on July 25, 2025, and the oral argument regarding Plaintiffs' Motion to Enforce the Settlement on August 8, 2025, Plaintiffs' counsel asked Defendants to include the ICE Juvenile Coordinator ("JC") in the parties' meet and confer conversations in our August 14, 2025 letter and follow-up emails. Defendants' counsel chose not to include the ICE JC on our correspondence or in our meeting on September 17, 2025. Defendants stated that the *Flores* Settlement Agreement ("FSA") does not expressly require the JC to be involved or present in meet and confer conversations. Defendants' counsel stated that we should not presume that the JC is closer to the facts. Defendants' counsel further stated that absent an FSA provision or order from the Court specifically requiring direct communication between Plaintiffs and the juvenile coordinators, Defendants would not agree to the participation of the JC in conversations or correspondence concerning Dilley.

**Defendants' Responses to Questions in Plaintiffs' August 14, 2025 Letter**

Defendants shared the following information in response to the questions raised in Plaintiffs' August 14, 2025 Letter:

- **Length of stay at Dilley**: In response to Plaintiffs' question regarding whether 20 days is still the benchmark for length of stay at Dilley, Defendants stated that their understanding is that people are at Dilley for different reasons and sometimes it takes time to arrange for deportation. Defendants stated that ICE does a custody review around 15 days at Dilley and then at regular intervals after day 20.

Defendants stated that ICE has released families based on custody reviews. **Defendants' counsel agreed to find out the time interval and criteria used by Defendants for custody reviews. Plaintiffs' counsel remains extremely concerned about length of stay at Dilley—which persists for many children well beyond 20 days—and the impact it is having on children. We intend to raise this issue with the Court if it persists.**

- **Water**: Defendants' position regarding water at Dilley is that it is safe to drink the tap water found in the family's living quarters. Defendants further stated that for anyone preparing baby bottles, bottled water is available for free. Otherwise, bottled water is available "by request" meaning that it may be *purchased* at the commissary. Children and parents have repeatedly told Plaintiffs' counsel that the tap water in living quarters has a foul smell, is discolored, and makes people sick. Families do not have complaints about the filtered water in the cafeteria, but they are not allowed to access this water outside of mealtimes and may not bring this water back to their living quarters. **It is our understanding that Defendants are looking into whether there are improvements that could be made to ensure that families have ready access to clean-tasting water. If ICE is unwilling to make improvements, we will raise this issue with the Court.**

- **Bottles:** Defendants stated that the facility provides disposable bottles with nipples for residents, so sterilization is not necessary. Defendants stated that families can obtain bottles 24/7 upon request, and they are stored in housing pantries. Defendants stated detained families have access to liquid dishwashing soap and sinks with hot running water. Plaintiffs shared that families reported that they are not provided with adequate formula and new or sterilized bottles, nor clean water to mix with the formula. Parents have also been denied requests for formula and for new bottles because their babies are older than 12 months old. **Defendants' position is that disposable bottles are available in a locked cabinet in the pantry of the living quarters common area, and that parents can request replacements as needed. If ICE is unwilling to provide multiple disposable bottles to any parents with bottle-fed children and regularly replace these bottles and/or provide sufficient equipment to sterilize reusable bottles, we will raise the issue with the Court.**

- **Food**: Defendants stated that snacks include apples, cookies, and soft granola bars, and that the facility rotates snack offerings for variety. Plaintiffs' counsel noted that after four visits, we have not heard of or seen any variety. **It is our understanding that Defendants' counsel will look into whether other types of fruit and snacks, such as bananas, tangerines, yogurt, non-sugary crackers, and string cheese could be made available. If ICE is unwilling to make improvements in the variety of snacks available to children, including by ensuring that healthy, low-sugar snacks and produce are available, we will raise this issue with the Court.**

- **Medical Services**: Plaintiffs raised concerns about access to emergency medical care and the pill distribution process. **Defendants agreed to look into the emergency medical care protocols at Dilley and confirm what can be shared with Plaintiffs' counsel.** We have repeatedly asked to

review the medical protocols in use at Dilley. We remain concerned about access to emergency medical services (including deferral/denial of emergency care and transfers to hospitals equipped to provide emergency care), services for children with serious chronic health conditions, and services/accommodations for children with disabilities. We are particularly concerned about whether severe, chronic, acute, or complex medical conditions and disabilities are considered in custody determinations. **If medical protocols do not reflect adequate attention to these issues, or if families report that medical practices do not comply with the provided protocols, we will raise this issue with the Court.**

- **Legal services access**: Defendants stated that they believe they are in compliance with the FSA because information is posted on bulletin boards and a handbook is provided at intake. Plaintiffs' counsel explained that children have not received Know Your Rights (KYRs) trainings since Dilley opened. At least one legal services provider, RAICES, has provided ICE with a proposed KYR curriculum including a KYR PowerPoint nearly identical to the one approved by ICE that RAICES used to provide KYR presentations at Karnes family detention, but was told it was deficient. ICE has not explained the deficiency, however, and, in the meantime, children are not being apprised of their rights. **Please let us know Defendants' final position on whether KYRs will be provided at Dilley so that we may assess whether or not to raise the issue with the Court.**

- **Hygiene products**: Defendants stated that families are provided body wash/shampoo, deodorant, body lotion, a toothbrush, and toothpaste and can ask for replacements, as needed. Plaintiffs shared that families report having to buy these basic hygiene products in the commissary and do not seem to understand they can get replacements. Families consistently reported, and we verified on our tour, that the soap in the showers is the same hand soap available at sinks and is so harsh it is causing skin rashes on some children's bodies. **Please let us know what steps ICE will take to ensure children have access to body soap in showers and are provided with replacement hygiene products on a regular basis, including by ensuring this information is clearly communicated to families.**

Please let us know when Defendants are available for a follow-up call so that the parties can conclude the meet and confer process on these issues and the discussion of the tour questions attached to our August 14, 2025 letter.

Best wishes,



Leecia Welch

# ATTACHMENT I

CHILDREN'S RIGHTS

October 23, 2025

Christina Parascandola
Senior Litigation Counsel
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
*Via email* to christina.parascandola@usdoj.gov

**Re: Meet and Confer Regarding Violations of Flores Settlement Agreement**

Dear Christina:

We write to further meet and confer regarding ongoing violations of the Flores Settlement Agreement ("FSA") at the South Texas Family Residential Center in Dilley ("Dilley"). During our most recent site visit to Dilley on October 9 and 10, 2025, class members and their families shared the same concerns we have been raising for the past five months. Given that our previous letters have already provided detailed descriptions of the concerns and the corresponding FSA paragraphs that they violate, we mainly provide summaries below. We also eagerly await the government's written response to our prior meet and confer letters, which you stated was forthcoming when we last spoke on October 6, 2025.

As you are aware, FSA ¶ 11 requires DHS to treat "all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors." Similarly, FSA ¶ 12.A requires that when DHS hold children in its custody, children must be held "in facilities that are safe and sanitary and that are consistent with [DHS's] concern for the particular vulnerability of minors." FSA ¶ 12.A further requires DHS to "provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor."

Conditions at Dilley continue to flagrantly violate these provisions.

***Prolonged custody, including of families and children not in expedited removal proceedings***

We remain concerned that children are being held in a secure, unlicensed detention facility for far too long. Many of the families we spoke with had been in custody for more than 30 days and some much longer. The Court has repeatedly ordered that children may not be kept in unlicensed secure facilities except for the short period during which DHS is executing either release or removal. *Flores v. Sessions*, 394 F. Supp. 3d 1041 (C.D. Cal. 2017); *Flores v. Sessions*, No. 85-cv-4544, 2018 WL 4945000. **We reiterate our previous questions about what processes are in place to review children's and family's cases to avoid unlawfully holding children in family detention when removal or release is not imminent and/or release them as soon as DHS identifies that removal is not imminent.**

Please also include an explanation of the bases for why certain families are being deemed a flight risk or otherwise determined to need to stay over 20 days, and who is making this determination. The Court has previously held that Defendants must engage in individualized determinations and cannot institute a no-release policy based on assertions of general absconding or being in expedited removal. *See e.g., Flores v. Barr*, No. 85-cv-4544, 2020 WL 2758792, at *11 (C.D. Cal. Apr. 24, 2020. Yet, we continue to meet class members with long lengths of stay, who do not understand the reasons for their prolonged detention and who have not been informed of any individualized determination.

***Family Separations***

Plaintiffs remain deeply concerned as we continue to encounter class members either threatened with family separation or actually separated from parents and/or siblings. Furthermore, as we have repeatedly noted, separating fathers from the rest of their families at night while held together at Dilley is traumatic for children. Permanent separations where children are sent to ORR custody and parents are transferred to adult detention are even more concerning. In Plaintiffs' October 15 email, we raised specific examples of particular children who were separated from parents, and we have not yet received a response. **Please provide an explanation for why separations continue to be threatened and used against class members generally, and the status of the previously-identified separated families.**

Additionally, Plaintiffs remain concerned about ICE's practice of denying children free phone calls to their family members who are not at Dilley beyond their initial call upon entering the facility. Many class members are distressed that they do not have the funds to communicate with parents or siblings who are not detained with them for weeks at a time. **Please provide an explanation for what steps ICE will take to ensure children can communicate for free with non-detained family members.**

**Further, for any families who are currently separated in different ICE or ORR facilities, we request that ICE assist families in having phone calls with each other until they are reunited.**

***Lack of access to legal information and counsel, including Flores rights***

As outlined in our September 15, 2025 response to the ICE JC report and the accompanying declarations, Plaintiffs reiterate our concern that there is still no LOP/KYR program for families at Dilley; orientation videos shown during intake are presented in a time and manner that prevent class members and their families from meaningfully understanding their rights; children and families remain unaware of their rights under the FSA and their right to make free legal calls; and children and families remain unaware of *how* to make free legal calls due to conflicting or unclear directions or because directions are provided in a language class members cannot understand. Class members repeatedly express distress at their limited access to legal information about their rights or the status of their cases. Families receive insufficient instructions on how to make free legal phone calls, and the instructions seem to indicate that free legal calls can be made only to a small number of pro bono contacts on an ICE-provided list.

This prevents class members from calling other lawyers for free and denies them access to counsel. For example, class members cannot call *Flores* attorneys or private lawyers for free.

**Please provide an update on when an LOP/KYR program will be made available at Dilley and what steps Defendants will take to ensure children have access to free legal calls and understand how to make them. We would also like a copy of all materials provided to class members at Dilley addressing their rights, including their rights under the FSA.**

***Language Access Concerns***

Plaintiffs remain concerned that class members who do not speak Spanish or English have little or no language access outside of the extremely limited legal or medical interactions they may have. As previously noted, the tablet instructions are only in Spanish and English, despite Defendants' past statements that the tablets allow for broader language access for non-English non-Spanish speakers. Obviously, it is difficult to use the tablet if you are unable to understand the instructions. Further, many families report that they cannot use the tablet because they are required to have funds in their account that they simply do not have. In addition, none of the limited activities or education available for children are provided in any language other than English or Spanish. **Please provide Defendants' position on if/how these concerns will be addressed.**

***Insufficient basic necessities to guarantee safe and sanitary conditions***

During our recent interviews, class members continue to report the following concerns:

- Access to clean-tasting drinking water remains an unaddressed problem. During this October visit, several parents reported that ***Dilley staff recently began requiring them to present a doctor's note each time they request bottled water to mix with their babies' formula – meaning parents have to receive doctors' notes multiple times a day in order to feed their infants.***
- Children and families have been given fewer and fewer articles of clothing, making it necessary to do laundry every day and to have little or no clean clothing if clothing is soiled. Although we have repeatedly been told on our site visits that children receive three sets of clothes, nearly every family we talk to reports this is inaccurate.
- Food continues to be of an extremely limited variety, and there have been no changes to the availability of healthy and varied snacks for children between meals. Families with small children repeatedly reported a lack of child-friendly food options.
- Defendants continue to provide inadequate amounts of and flawed hygiene products, including toothbrushes that fall apart, insufficient toothpaste, and only harsh hand soap for all washing purposes (including hair, face, body) causing widespread skin issues.[1] Families we spoke to report that they must spend their limited resources on these basic items for their children at the commissary.
- Inadequate medical and mental health care

[1] During the October site visit, *Flores* counsel confirmed that the soap dispensers in the shower are labeled "hand soap" and that it is the same soap used in the sink for hand washing.

   - Families continued to report that meetings with counselors are five to ten minutes and largely unhelpful, and that detention continues to cause severe deterioration in children's mental health.
   - As noted in my October 15 email, families again reported concerning problems with lack of medical care. For example, one child was being given a different dosage of epilepsy medicine than his prescription requires. The same child had not been referred to a specialist after his foot was broken in two places when a Dilley staff person dropped a volleyball base on it. Another child was hit in the face with the back end of a mop by a Dilley staff person causing pain and bleeding and had not been referred to an optometrist despite ongoing issues with blurry vision. Yet another child suffered from mutism and had complicated medical needs that were not being met. We have not received **any** response to our email elevating these medical concerns.
- Poor sleeping conditions
   - Lighting and night-time interruptions that Plaintiffs have raised after every visit to Dilley remain unaddressed or insufficiently addressed.
- Insufficient educational materials
   - Plaintiffs' concerns about education persist for the reasons previously elaborated. The quantity and quality of educational activities available to class members is inadequate and only available to children who are English or Spanish-speakers. Families also reported during this recent site visit that the classroom can only accommodate approximately 15 children at a time – and some children are being turned away. The educational packets provided by the facility in no way provide a replacement for the schooling that many children, especially those who had been attending schools in their U.S. communities, are missing. For example, a 16-year-old class member educated in the United States reported that when he went to the classroom for the 9th-12th grade hour, he was given a worksheet on the meaning of the stars and stripes of the American flag. Such content may be appropriate for an elementary school age child, but not for an 11th grader.

As you know, we have repeatedly asked Defendants to provide their position regarding most of these concerns so that we can determine to what extent the parties have reached an impasse requiring court intervention. Defendants stated at the parties' October 6, 2025 meet and confer that they were working on a comprehensive written response; however, no such response has been provided. While we understand the government shutdown may be contributing to the delay, we note that we have never received a substantive response from Defendants regarding most of the concerns we have been raising since May 2025, long before the shutdown.

To date, Defendants also have not provided a clear position on the Court's directive to include the ICE Juvenile Coordinator in the parties' meetings regarding concerns at Dilley. Our repeated attempts to include her in the process have been rejected. We appreciate that Defendants have indicated a willingness to comply with the Paragraph 29 process, however, as previously noted, Paragraph 29 was not meant to be a substitute for resolving issues Plaintiffs' counsel have

identified during site visits.[2] The Court has been exceedingly clear that she expects the Juvenile Coordinator to assist the parties in addressing *Flores* violations at Dilley. **We again request that Defendants' response to this letter provide Defendants' position on the role of the Juvenile Coordinator so that the parties can communicate it to the Court.**

Please let us know Defendants' positions on the issues addressed in this letter by no later than October 31, 2025.

Best wishes,



Leecia Welch

[2] Plaintiffs intend to invoke Paragraph 29 but are waiting on Defendants' "comprehensive" written response and the ICE Juvenile Coordinator's Supplemental Response prior to doing so in the hope that many of the issues we have repeatedly raised will be thoroughly addressed.

# ATTACHMENT J

CHILDREN'S RIGHTS

November 25, 2025

Christina Parascandola
Senior Litigation Counsel
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
*Via email* to christina.parascandola@usdoj.gov

**Re: Ongoing Violations of *Flores* Settlement Agreement at Dilley**

Dear Christina:

We write to further meet and confer regarding ongoing violations of the *Flores* Settlement Agreement ("FSA") at the South Texas Family Residential Center in Dilley, Texas ("Dilley"). During our November 18 and 19, 2025 site visit, class members and their families shared many of the same concerns we have raised repeatedly about Dilley since May 7, 2025. Given that our previous letters have already provided detailed descriptions of the concerns and the corresponding FSA paragraphs that they violate, in this letter we just provide summaries of these ongoing violations.

In addition, we note that we have still not received a substantive written response to our prior meet and confer letters, which you stated was forthcoming seven weeks ago. We also find it quite disheartening that the "urgent requests" emails that we send to DOJ after each of these visits regularly go unanswered. Finally, because of your multiple requests that we not include the ICE Juvenile Coordinator in our communications to Defendants about violations, we are not including her in this correspondence. However, the lack of response to our concerns coupled with the urgency of the requests reinforces our need to include the ICE Juvenile Coordinator when we identify urgent needs of class members.

As you are aware, FSA ¶ 11 requires DHS to treat "all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors." Similarly, FSA ¶ 12.A requires that when DHS holds children in its custody, children must be held "in facilities that are safe and sanitary and that are consistent with [DHS's] concern for the particular vulnerability of minors." FSA ¶ 12.A further requires DHS to "provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor."

Children at Dilley continue to suffer due to Defendants' flagrant violations of these provisions.

***Prolonged custody, including of families and children not in expedited removal proceedings, is a clear violation of the FSA.***

Over the past six months, hundreds of children have been held at Dilley, a secure, unlicensed detention facility, for extended periods of time.[1] Many children we spoke to last week had been in custody for 40 to 50 days, and some families have been detained for much longer. Defendants are violating this Court's repeated orders that children may not be kept in unlicensed, secure facilities except for the short period during which DHS is actively executing either release or removal. *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1071 (C.D. Cal. 2017); *Flores v. Sessions*, No. 85-cv-4544, 2018 WL 4945000. **Defendants have not answered Plaintiffs' previous questions about what processes are in place to individually review children's cases to (i) avoid unlawfully holding children in family detention when removal or release is not imminent and/or (ii) release them as soon as DHS identifies that removal is not imminent. In the absence of any information to the contrary, Plaintiffs understand that no such process exists. Defendants are unlawfully detaining a group of class members in violation of the FSA and the Court's prior orders.**

We also remain concerned that some families are being unreasonably deemed a flight risk or otherwise determined to need to be detained for more than 20 days for reasons this court has deemed illegitimate, and we seek an immediate answer to who makes these determinations. The Court has previously held that Defendants must engage in individualized determinations and cannot institute a no-release policy based on assertions of general absconding or being in expedited removal. *See e.g., Flores v. Barr*, No. 85-cv-4544, 2020 WL 2758792, at *11 (C.D. Cal. Apr. 24, 2020); *Flores v. Sessions*, 394 F.Supp.3d 1041, 1066 (C.D Cal. 2017); *Flores v. Sessions*, No. 85-cv-4544, 2018 WL 4945000, at *3. **Class members are increasingly being detained for long periods in direct contravention of this Court's order.**[2]

Most recently, class members have reported that ICE agents have told families at Dilley that *Flores* protections regarding time in custody no longer apply as of November 1, 2025. **We demand that DOJ immediately instruct your client that *Flores* remains fully in effect as to DHS and ensure that all DHS staff and contractors are properly trained in and comply with *Flores* requirements. Please confirm how and when DOJ has conveyed this information to your client.**

***Class members' lack of access to legal information and counsel, including Flores rights, remains unchanged.***

Plaintiffs have repeatedly voiced concern that there is still no Legal Orientation Program or Know Your Rights program for families at Dilley. Defendants' on-going refusal to provide legal rights presentations violates Family Residential Standard (FRS) 6.4, which ensures that families must have "open access to these presentations." FRS 6.4 at 1. The families we spoke to last week continue to remain unaware of their rights under the FSA. As previously noted, the orientation videos shown during intake are presented in a time and manner that prevent class

[1] We have also heard many horrifying accounts of children's interior apprehension and treatment in ICE detention prior to transport to Dilley, including lack of access to water, lack of food, no medical screening, no private toilets, and no phone calls to family. Please provide us with ICE's protocols for how such interior apprehensions and detentions are supposed to be conducted and any corrective action being taken.

[2] Notably, many families we have spoken with who simply wanted to be removed or voluntarily depart have still been detained at Dilley for over 40 days.

members and their families from meaningfully understanding their rights. Most families are exhausted and disoriented when they arrive at Dilley and are not able to retain complicated legal information, to the extent they can even hear or understand the video. And this video, which *Flores* Counsel have now seen portions of multiple times, discusses complex legal issues like types of humanitarian visas and defenses. It does not inform class members of the basic rights that all *Flores* class members are supposed to be afforded once detained. Class members repeatedly express distress at their limited access to information about their rights or the status of their cases. One major cause of distress comes from ICE agents telling class members that asylum no longer exists in this country. This type of coercive misinformation amplifies the psychological harm that children experience in detention at Dilley, in violation of FSA ¶¶ 11 and 12.

We also remain concerned about the barriers class members face to making free legal phone calls to counsel, including *Flores* attorneys or other retained private lawyers. Notwithstanding the many occasions on which we have raised this violation to Defendants, families still receive insufficient instructions on how to make free legal phone calls. According to class members and their parents, the instructions ICE provides regarding free legal calls seem to incorrectly indicate that they can be made only to a small number of pro bono contacts on an ICE-provided list.

**Please provide an update on when an LOP/KYR program will be made available at Dilley and what steps Defendants will take to ensure children have access to free legal calls to any attorney or legal service provider and understand how to make them. Please also share a copy of all materials, including video recordings, provided to class members at Dilley addressing their rights, including their rights under the FSA.**

Additionally, Plaintiffs remain concerned about ICE's practice of denying children free phone calls to their family members who are not at Dilley beyond their initial call upon entering the facility. Many class members are distressed that, for weeks at a time, they do not have the funds to communicate with parents or siblings who are not detained with them. Others report they are unable to contact their family members to ask them to put money in their accounts. **Please provide an explanation for what steps ICE will take to ensure children can communicate for free with non-detained family members.**

***Language access concerns have not been remedied.***

Plaintiffs reiterate our serious concerns about the lack of language access for class members who do not speak Spanish or English. Despite the express requirements of FRS 1.0, families we spoke with are extremely frustrated by Dilley staff's unwillingness to communicate with them using a translation device even when they are holding phones in their hands. Countless families also report challenges understanding paperwork they are being asked to sign. In addition, as previously noted, the tablet instructions are only in Spanish and English, despite Defendants' past statements that the tablets allow for broader language access for non-English and non-Spanish speakers. **Plaintiffs understand Defendants' non-response and the prevalence of the on-going concerns to be representative of Defendants' failure to adhere to FRS 1.0 and FSA ¶¶ 11 and 12.**

***Insufficient basic necessities make a mockery of "safe and sanitary conditions" required by the FSA.***

Defendants remain woefully out of compliance with the FSA with respect to basic conditions at Dilley:

- **Inadequate medical care:** Families continue to report problems accessing needed medical care. Most recently, severe medical issues included a child with pneumonia who failed to receive a chest x-ray and further follow-up, and multiple severe cases of food poisoning. Families who went to the medical unit after their children got food poisoning were told only to return if the child vomited eight times. One child has a severe ear infection that has not been appropriately treated such that the child is now experiencing hearing loss. Another child fell and experienced head trauma but has not been seen by a specialist for evaluation. Additional serious violations include: a lack of doctors at the facility at night, days-long wait times for appointments with a doctor, and a lack of access to follow-up care and specialist care. Many children report going to the medical unit feeling sick and feverish but receiving no treatment because medical staff tell them that they are fine. Additionally, obtaining needed medications and even non-prescription and basic health items like diaper cream remains extremely challenging due to early pill window times and long lines. Plaintiffs' counsel has repeatedly identified to Defendants that the pill line operation has impeded adequate access to medical care for class members, but its operation and the ensuing FSA violations remain unchanged. **Defendants continue to violate FSA ¶ 12.A right to safe conditions as a result of poor or no medical care, particularly in acute health situations.**

- **Lack of safe and appropriate child-friendly food**: Interviews with class members reveal that food quality and variety continue to deteriorate. Class members reported that food served to them recently was contaminated with **worms and mold,** causing many children to become ill and vomit repeatedly. Despite months of raising food-related violations with Defendants, families continue to report that their children are not eating and are being denied the special diets they need to stay healthy. Additionally, despite our repeated requests and time spent elaborating in detail how to address the lack of healthy and varied snacks available to class members, there also have been no changes to the availability of snacks for children between meals. Families continue to report that due to the lack of child-friendly and varied food, their children are weak, faint, pale, and constantly crying due to hunger. **Children's health is being jeopardized, and these issues must be addressed immediately.**

- **Insufficient hygiene products**: Defendants continue to provide deficient/inadequate amounts of hygiene products. The products that children do receive include toothbrushes that fall apart, ineffective deodorant, insufficient toothpaste, and only harsh hand soap for all washing purposes (including hair, face, and body).[3] Families report that they must spend their limited resources on basic items for their children at the commissary. To

[3] During the November site visit, *Flores* counsel again confirmed that the soap dispensers in the shower are labeled "hand soap" and that it is the same soap used in the sink for hand washing. The only difference was that the color of the hand soap changed from pink to green.

make matters worse, basic hygiene products, such as shampoo, are now selling out at the commissary for long periods of time. Families who have children under four years old specifically report that the hand soap is too harsh on their skin. Requests for baby wash provided to babies have been denied. **ICE must provide class members with sufficient and functioning hygiene products, including body wash, shampoo, toothbrushes, toothpaste, and deodorant.**

- **Water Concerns**: Six months after Plaintiffs' counsel began alerting Defendants to the lack of potable water for class members in many areas of the facility, class members now report that water filters have been installed on sinks in the living quarters. Despite the filters, they report continued concerns about the taste of the water and the lack of access to bottled water for baby formula. Since Plaintiffs' counsel first raised the issue of lack of access to bottled water for baby formula, parents reported being rationed one bottle of water per day for baby formula. That amount is obviously insufficient. **Dilley staff must ensure babies and toddlers have ready access to free bottled water for baby formula, and children with sensitive digestive systems must be provided with free bottled water upon request.**

- **Inadequate mental health care**: Mental health care at Dilley also continues to be an issue. Families report that the on-site therapist and psychologist ask only very basic questions in appointments that last five minutes. Families report that children are mentally regressing, ceasing to talk, hitting themselves in the face, becoming aggressive, and hitting their heads against walls and floors due to the anxiety and trauma they experience at Dilley.

- **Poor sleeping conditions**: Lighting and night-time interruptions that Plaintiffs have raised after every visit to Dilley remain unaddressed or insufficiently addressed. The combination of keeping lights on all night and packing trailers with up to 6 different families makes it impossible for children to get adequate sleep. Parents continue to report concerns that their children are exhausted due to these conditions.

- **Insufficient educational materials**: Plaintiffs' concerns about education persist for all the reasons previously elaborated. Families now report that classrooms have a maximum capacity of around 12-15 kids, so children can get schooling only if they show up early. Children who arrive after the capacity has been reached are denied access to any education for the day. Plaintiffs' counsel were also shocked to hear that classroom instructors are asking class members about sensitive immigration issues, including asking them to write essays on why they are afraid to return to their home countries. In addition to being wholly inappropriate and demonstrating a complete lack of awareness of trauma-informed treatment of children, this kind of assignment and activity can prejudice children's legal rights and relief and interfere with their attorney-client relationships if they are represented. This assignment has caused many children discomfort and harm. It must stop.

- **Threatening and coercive treatment**: Class members report that certain staff members at Dilley yell and swear at them and refuse to speak to them in a language they can

understand. Some staff members have told class members and their families that if they get in trouble or file any sort of report against Dilley that this will just delay their case. Plaintiffs' counsel continues to hear reports of aggressive, threatening, and coercive treatment of class members and their parents by DHS staff and contractors. This includes officers and staff threatening families with criminal charges and family separation if they do not comply with DHS orders, whether or not those orders are lawful. **Threatening and coercive treatment from DHS staff and contractors, like threats that families will face felony charges and separation from their children, violate FSA ¶¶ 11 and 12.**

Plaintiffs have engaged in a good faith effort to address the majority of these concerns about Dilley with Defendants outside of litigation since our first site visit in May 2025. Despite our requests over the course of many months, Defendants have not provided requested positions, policies, or protocols to Plaintiffs in writing regarding most of these concerns. Nor have Defendants responded to the tour questions we have dutifully attached to our site visit letters at Defendants' request (in lieu of answering our questions on tours). Rather than work to resolve these violations, Defendants have denied the violations exist, failed to provide requested information, failed even to offer their positions on the concerns, and refused to include the ICE Juvenile Coordinator in the parties' communications and/or meetings regarding concerns at Dilley.

Plaintiffs intend to update the Court at the upcoming status conference on these ongoing violations and Defendants' refusal to meaningfully engage with our efforts to meet and confer to address the conditions at Dilley. Unless these issues are promptly corrected, Plaintiffs intend to seek court intervention.

Best wishes,

Leecia Welch

# ATTACHMENT K

CHILDREN'S RIGHTS

January 22, 2026

Christina Parascandola
Senior Litigation Counsel
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
*Via email* to christina.parascandola@usdoj.gov

**Re: Ongoing Violations of *Flores* Settlement Agreement at Dilley**

Dear Christina:

We write to meet and confer regarding the ongoing violations of the *Flores* Settlement Agreement ("FSA") at the South Texas Family Residential Center in Dilley, Texas ("Dilley"). During our January 14 and 15, 2026 site visit, class members and their families shared the same concerns we have raised repeatedly since May and that the parties have been ordered to discuss at mediation. Given that we have already provided detailed descriptions of the concerns and the corresponding FSA paragraphs that they violate in prior letters, we have provided summaries of ongoing violations in this letter.

As you are aware, FSA ¶ 11 requires DHS to treat "all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors." Similarly, FSA ¶ 12.A requires that when DHS holds children in its custody, children must be held "in facilities that are safe and sanitary and that are consistent with [DHS's] concern for the particular vulnerability of minors." FSA ¶ 12.A further requires DHS to "provide access to toilets and sinks, drinking water and food as appropriate, medical assistance if the minor is in need of emergency services, adequate temperature control and ventilation, adequate supervision to protect minors from others, and contact with family members who were arrested with the minor."

Many children we met with at Dilley had been detained for over 100 days and nearly everyone we met was sick. These children were suffering immensely, and we ask ICE to immediately address the flagrant *Flores* violations described below.

***Prolonged custody, including of families and children not in expedited removal proceedings, is a clear violation of the FSA.***

Since Dilley opened in April, hundreds of children have been detained for extended periods of time. As of last Thursday, 22 children detained at Dilley had been in custody for 100 days or more. Defendants are violating the Court's repeated orders that children may not be kept in unlicensed, secure facilities except for the short period during which DHS is actively executing either release or removal. *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1071 (C.D. Cal. 2017); *Flores v. Sessions*, No. 85-cv-4544, 2018 WL 4945000. **Defendants have not answered Plaintiffs' previous questions about what processes are in place to individually review children's cases to (i) avoid unlawfully holding children in family detention when removal or release is not imminent and/or (ii) release them as soon as DHS identifies that removal is**

**not imminent. During mediation, Plaintiffs would like Defendants to clarify (1) whether 20 days is still being used as a benchmark for children's length of stay at Dilley and (2) the processes currently in place to individually review children's cases in accordance with past *Flores* court orders. Given the significant number of releases that families have reported since our site visit, we would also like a response to our prior question regarding ICE's plans for the continued use of Dilley.**

***Class members' lack of access to legal information and counsel, including information regarding their Flores rights, remains unchanged.***

Plaintiffs have repeatedly voiced concerns that there is still no Know Your Rights program for families at Dilley. Defendants' on-going refusal to provide legal rights presentations violates Family Residential Standard (FRS) 6.4, which ensures that families must have "open access to these presentations." FRS 6.4 at 1. Many of the families we spoke to last week were unaware of their rights under the FSA. As previously noted, the orientation videos shown during intake (to the extent they address *Flores* rights at all) are presented in a time and manner that prevent class members and their families from meaningfully understanding their rights. Most families are exhausted and disoriented when they arrive at Dilley and are not able to retain complicated legal information, to the extent they can even hear or understand the video.

Plaintiffs have also repeatedly raised concerns that ICE agents are telling families at Dilley that *Flores* protections no longer exist. We shared this concern in Plaintiffs' November 25, 2025 letter concerning the Dilley site visit, Plaintiffs' December 8, 2025 response to the ICE JC's report, and a follow-up email sent on January 7, 2026 attaching ICE's response to a grievance stating Flores is "not applicable anymore." On the site visit last week, families reported that ICE agents again told them that *Flores* is "over" in a meeting about two weeks ago. This is clearly unacceptable.

We also remain concerned about the barriers class members face to making free legal phone calls to counsel, including *Flores* attorneys or other retained private lawyers. According to class members and their parents, the instructions ICE provides regarding free legal calls still incorrectly indicate that they can be made only to a small number of pro bono contacts on an ICE-provided list.

Class members also reported last week that access to counsel has recently been curtailed further because families at Dilley are now prohibited from using Gmail or other independent email providers to send email to their lawyers or family members. They are only permitted to use a platform called Proton that is run and sanctioned by Core Civic. This platform does not allow them to send attachments and limits the size of emails to a small number of characters. Concerningly, class members and their families have told us that the platform sometimes blocks emails to their lawyers. Class members are also blocked from using Google or even the EOIR website to check on the status of their immigration cases.

**At mediation, we would like to discuss why ICE has refused to allow a weekly Know Your Rights training for families at Dilley conducted by independent legal service providers and what ICE will do to ensure children are able to make free legal calls to attorneys. We**

**would also like to discuss what steps DOJ has taken or will take to ensure that all DHS staff and contractors are properly trained in and comply with *Flores* requirements, including refraining from telling families that *Flores* no longer exists.**

***Communication barriers with separated family members have not been remedied.***

Plaintiffs also remain concerned about ICE's practice of denying children free phone calls to their family members who are not at Dilley beyond their initial call upon entering the facility. Many class members are distressed that, for weeks at a time, they are unable to communicate with parents or siblings who are not detained with them. Multiple children experienced separation from siblings and other family members who ICE sent to other facilities and denying children the ability to speak to their siblings and other family members is creating unnecessary harm. These children are offered no more than one 15-minute phone call every 20 days with their separated and detained family members, which is understandably causing extreme distress. **We would like an explanation of what steps ICE will take to ensure children can communicate for free with non-detained family members and more frequently with family members who are being detained at other facilities.**

***Language access concerns have not been remedied.***

Plaintiffs reiterate our serious concerns about the lack of language access for class members who do not speak Spanish or English. Despite the express requirements of FRS 1.0, families remain frustrated by Dilley staff's unwillingness to communicate with them. Families were particularly upset that paperwork they are being asked to sign is not being translated. **Plaintiffs have no choice but to assume Defendants' non-response and the prevalence of the on-going concerns is representative of Defendants' failure to adhere to FRS 1.0 and FSA ¶¶ 11 and 12.**

***Dilley continues to lack basic necessities to ensure "safe and sanitary conditions" required by the FSA.***

Defendants remain woefully out of compliance with the FSA with respect to basic conditions at Dilley:

- **Inadequate medical care:** Families continue to report problems accessing needed medical care. Most recently, severe medical issues included:
    - A ten-year-old girl with Hirschsprung's disease, a serious congenital condition that can lead to bowel obstruction, who ICE has refused to release for over 90 days, and who Dilley is denying a special diet or medical attention, even though she has had no bowel movement in the past 35 days, thus putting her life at risk.
    - A 33-week pregnant woman with a high viral load of hepatitis B that ICE has detained for 99 days without adequate treatment, despite doctors warning that the baby will contract hepatitis B if the mother is not moved to a hospital capable of treating hepatitis B.

  - A nine-year-old with food allergies has not been provided a special diet for 110 days who is suffering from red blisters in her mouth and hives all over her body.
  - An eleven-year-old with autism and severe food intolerances who has been acutely regressing while detained for 80 days without accommodations for his diet and medical needs.
  - A fourteen-year-old with autism who is being denied his prescription medications. An epidemic of children sick with a virus causing fever, vomiting, and cough during the visit.

Additional violations include: challenges obtaining needed medications (and even non-prescription and basic health items like diaper cream) due to extremely long pill lines, lack of medical capacity, and refusals to schedule appointments with a doctor.

- **Lack of safe and appropriate child-friendly food**: Class members continue to report poor food quality and variety. Many families were again concerned that their children are not eating and are being denied the special diets they need to stay healthy, including a two-year-old who has been denied baby food and formula. Additionally, there also have been no changes to the availability of healthy snacks for children between meals. Families report that their meal times have been shortened from two hours to one and moved earlier in the day, such that many families can now only eat lunch at 11 am – 12 pm and dinner at 4 – 5 pm, which leads children to feel hungry at night. Additionally, due to the increased number of people at the facility, families regularly spend about 40 minutes waiting in line for food during meals, leaving children only 20 minutes to eat. Families continue to report that due to the lack of child-friendly and varied food, their children are fainting, weak, dysregulated, and constantly hungry. **Children's health continues to be jeopardized, and these issues must be addressed immediately.**

- **Insufficient hygiene products**: Defendants continue to provide deficient/inadequate amounts of hygiene products. The products that children do receive still include toothbrushes that fall apart, ineffective deodorant, insufficient toothpaste, and only harsh hand soap for all washing purposes (including hair, face, and body). Families report that they must spend their limited resources on basic items for their children at the commissary, which they can now only access once per week. Several families reported again that the hand soap in the shower is too harsh on their children's skin resulting in skin rashes. **ICE must provide class members with sufficient and functioning hygiene products, including body soap, shampoo, conditioner, toothbrushes, toothpaste, and deodorant.** ***See also*** **FRS 4.5 D (requiring bar of soap, deodorant, comb/hairbrush, tube of toothpaste, toothbrush, bottle of shampoo, bottle of conditioner, container of skin lotion, baby hygiene items, sunscreen and lip balm).**

- **Inadequate mental health care**: Lack of access to effective mental health care at Dilley also continues to be an issue. Families report that the on-site therapist and psychologist ask only very basic questions in appointments that last five minutes. Families report that children are regressing developmentally, hitting themselves in the face, becoming aggressive, and crying all night long due to the anxiety and trauma they experience at

Dilley.

- **Poor sleeping conditions**: Lighting and night-time interruptions that Plaintiffs have raised after every visit to Dilley remain unaddressed or insufficiently addressed. The combination of keeping lights on all night and packing trailers with up to 6 different families makes it impossible for children to get adequate sleep. Parents continue to report concerns that their children are exhausted due to these conditions. In addition, staff often wake families up in the living quarters close to midnight or as early as 5 am, which prevents children from having a full night of sleep.

- **Insufficient education**: Plaintiffs' concerns about education persist for all the reasons previously elaborated. Families continue to report that the classroom has a maximum capacity of around 12-15 kids, so children can get schooling only if they show up early enough to secure one of the very limited classroom spots. Despite representations made to the Court in the ICE JC Report, the education program at Dilley has not expanded in January and children continue to receive only one hour of education on weekdays. **At mediation, we would like to discuss whether Dilley still intends to expand its education program and, if so, when.**

- **Grievance System:** Last week, we asked about the grievance system in all of our interviews – and the responses varied. Some families reported having no knowledge of the process, while others reported that they had filed upwards of 15 grievances. Class members report that when they file grievances, they generally do not get a response, and those who get responses often get responses that do not address their concerns. For example, as noted above, one family that filed a grievance about *Flores* rights received the written response that "*Reno v. Flores* is not applicable anymore." Almost every family reported that they feared retaliation for making grievances, and multiple families stated that they were too scared to file one. Some staff members have told class members and their families that if they get in trouble or file any sort of report against Dilley that this will hurt their immigration case. Families also reported push back from staff about making grievances. One family reported that a staff member scolded a group of families after one woman filed a written grievance about the bathroom sanitation; the staff member told them they should not write down concerns. Multiple families reported an incident where one staff member falsely accused a mother of hitting that staff member despite many witnesses seeing that it did not happen after that mother had filed many notarized grievances. Another family reported that after filing a typed-up grievance seeking release under *Flores*, staff tore the grievance and posted it in the library with language above it saying not to print statements like this anymore. The grievance system at Dilley is clearly not working effectively.

- **Staff treatment**: Plaintiffs' counsel continues to hear reports of aggressive, threatening, and coercive treatment of class members and their parents by DHS staff and contractors. This includes officers and staff threatening families with criminal charges and family separation if they do not comply with DHS orders, whether or not those orders are lawful. Certain staff members at Dilley yell at children and refuse to speak to them in a language they can understand. Another woman reported staff laughing at her family when they

had food poisoning and tried to ask to go to the doctor. English-speaking class members have overheard staff insult people in English, while they thought the class members could not understand them.

Plaintiffs have engaged in a good faith effort to address our concerns with family detention outside of litigation since our first site visit to Karnes nearly a year ago. Despite our repeated attempts over the course of many months, the conditions at Dilley last week were worse than ever in most respects.

Plaintiffs are hopeful that Defendants will come to the mediation tomorrow prepared to offer solutions to the consistent issues Plaintiffs have been identifying for many months. Without concrete answers and solutions from Defendants, Plaintiffs have no choice but to seek court intervention.

Best wishes,



Leecia Welch

# ATTACHMENT L

CHILDREN'S RIGHTS

February 19, 2026

Christina Parascandola
Senior Litigation Counsel
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
*Via email* to christina.parascandola@usdoj.gov

**Re: Ongoing Violations of *Flores* Settlement Agreement at Dilley**

Dear Christina:

We write to provide updated information regarding the ongoing violations of the *Flores* Settlement Agreement ("FSA") at the South Texas Family Residential Center in Dilley, Texas ("Dilley"). During our February 11 and 12, 2026 site visit, class members and their families again raised concerns regarding extremely long times in custody and children's deteriorating mental health, lack of adequate medical care, lack of nutritious food and snacks, children's sickness from the tap water, inability to sleep due to the lights being on all night, lack of education, and lack of access to counsel and information regarding their *Flores* rights. We appreciate the information provided during my recent tour of the facility, as well as in Defendants' January 22, 2026 Response to Plaintiffs' Paragraph 29 letter ("Paragraph 29 Response") and Defendants' February 10, 2026 email, but interviews with class members about the actual conditions at Dilley stand in stark contrast to many of Defendants' assertions.

In order to proceed efficiently to a resolution of the parties' ongoing disagreements, we provide a summary below of Plaintiffs' positions on the most pressing concerns we continue to see at Dilley along with our understanding of Defendants' positions and any outstanding questions we would like answered.

***Prolonged detention of children and families.***

We have repeatedly raised concerns regarding the many hundreds of children who have been detained at Dilley for extended periods of time. Although Defendants' response to Plaintiffs' Paragraph 29 letter states that ICE is "exercising discretion and considering family units for parole at around the 20-day mark," 32 children had been detained at Dilley for more than 100 days as of last week. Approximately 90 children had been detained for more than 50 days. Accordingly, Defendants continue to violate the Court's repeated orders that children may not be kept in unlicensed, secure facilities except for the short period during which DHS is actively executing either release or removal. *Flores v. Sessions*, 394 F. Supp. 3d 1041, 1071 (C.D. Cal. 2017); *Flores v. Sessions*, No. 85-cv-4544, 2018 WL 4945000.

Defendants' description of their process for making and recording prompt and continuous efforts toward the release of class members in the Paragraph 29 Response conflicts with the reality on the ground. Given that many hundreds of children have been detained for longer than 20 days and families nearly universally describe being completely in the dark about the status of their cases and the reasons for their prolonged detention, Defendants are far from their "goal of minimizing unnecessary delays and ensuring that each family's case is handled with care and diligence." Paragraph 29 Response at 3. The lack of prompt and continuous efforts to release such a large number of class members shows that Defendants continue to violate many children's *Flores* rights.

***Class members' lack of access to legal information and counsel, including information regarding their Flores rights, remains unchanged.***

The families we spoke to last week continue to report that they are not being apprised of their children's rights under the FSA. We have yet to talk to a family who recalls being provided with a *Flores* notice of rights or learning about their child's *Flores* rights in a video or other materials provided by ICE or CoreCivic. During my tour, the new video shared with Plaintiffs on February 2, 2026, was only playing on the TV in the intake area and was inaudible. However, as we have noted, the video does not mention *Flores* rights at all.

Moreover, the Court has previously indicated that "Paragraph 12.A must be read to provide a broader notice of rights than provided for elsewhere in the FSA, and at minimum should include a notice of rights pertaining to custody and release such that Class Members may act upon them," the FSA provides "legal services providers . . . near-unfettered access to minors in custody," and held that class members are entitled to be informed of at least some of their *Flores* rights by an attorney and to consult with attorneys about their rights under the FSA "as often as needed." *Flores v. Barr*, No. CV-85-4544-DMG (AGRx), 2020 WL 5666551, at *4 (C.D. Cal. Sept. 18, 2020); *Flores v. Barr*, No. CV-85-4544-DMG (AGRx), 2020 WL 5491445, at *10 (C.D. Cal. Sept. 4, 2020); Attachment 1 to Order Approving Final Notice of Rights, Jan. 05, 2021 at 7 [Doc. # 1056-1].

Class members also continue to report that access to counsel remains significantly curtailed; there is no mail service and families at Dilley report that they are still prohibited from using Gmail or other independent email providers to send emails to their lawyers and family members. They have recently been relegated to an email platform called Proton that is run and sanctioned by CoreCivic. This platform does not allow them to send attachments; places a strict character limit on emails; blocks emails to their lawyers; and requires them to repeatedly set up a new account. It is my understanding that CoreCivic plans to restore access to Gmail promptly, but personnel were unsure about the timing. There currently is no method for class members to send or receive confidential written communications from their lawyers while at Dilley. Additionally, class members have no way to contact *Flores* counsel or any other lawyers they may have who are not on the pro bono list provided by ICE without spending money.

**We appreciate Defendants' February 10, 2026 email regarding information provided to class members. We understand Defendants' position to be (1) that the FSA is satisfied because class members receive an I-770 form and a list of pro bono counsel, and the legal**

**rights video, which omits any mention of *Flores* rights, is played at intake; (2) in-person Know Your Rights trainings—including notice of *Flores* rights—are not required by the FSA; and (3) NGOs will not be permitted to conduct KYR trainings at Dilley. Furthermore, our site visits and follow-up with Defendants indicate that ICE does not have policies/protocols in place for having attorneys advise class members of their *Flores* release rights and options for facilitating release, and ICE does not believe it is required to do so.**

**Plaintiffs' position is that class members are not receiving an FSA-compliant notice of their *Flores* rights, including their right to release, in accordance with the Court's previous orders. Please let us know by February 27, 2026, if our understanding of Defendants' position is incorrect. Please also let us know whether families' access to Gmail has been restored and, if not, when it will be available.**

***Class members at Dilley are not being provided with "safe and sanitary conditions" as required by the FSA.***

**Inadequate medical care:** As noted in our February 13, 2026 email, Plaintiffs remain extremely concerned about children's medical care at Dilley. Plaintiffs' counsel have overwhelming evidence that children's routine medical needs are not being met, resulting in escalating and sometimes life-threatening health problems. Since our last visit, examples of serious medical concerns include:

- An 18-month-old class member, despite going to Dilley's medical unit eight or nine times, ended up in the hospital for 10 days when her oxygen levels plunged to the 50s, a life-threatening level. She was put on oxygen for 10 days and diagnosed with pneumonia, Covid-19, RSV, and severe respiratory distress.

- Two-month-old and 15-month-old sibling class members were extremely ill after a month of detention. The two-month-old had to be rushed to the hospital – and was eventually diagnosed with bronchitis. The two-month-old suffered from constant diarrhea because Dilley staff did not consistently provide his mother with bottled water for formula. The 15-month-old was sick with multiple infections, and both babies were recently placed in medical isolation together with their mother while the 15-month-old waited days for medication, placing the two-month-old at serious risk. During this time, ICE denied the children access to their father.

- A two-year-old class member has been to medical eight or nine times, but remained very sick with a hacking cough and fever. The child has had a cold, diarrhea and respiratory issues for months, and has been vomiting. The child's belly button also recently started to protrude since entering detention, suggesting she might have a hernia. The child's mother stated that her concerns about her child's health have been repeatedly downplayed by Dilley medical staff, and she is worried that there has not been appropriate testing to diagnose her child's health concerns.

- A child lost hearing in one ear due to improper medical care and had not been permitted to see a specialist during her months at Dilley.

- Many children and families reported fear of going to medical due to a concern that they would get measles, as they did not get clear information about measles infections and protocols.
- A child fell into severe depression as her father started to go blind while at Dilley, while being denied prescribed medications and glasses.

Plaintiffs have repeatedly requested the medical protocols in use at Dilley in order to better understand the medical system in place and why so many children become and remain extremely sick despite the medical care that Defendants assert is available to them. Defendants' February 10, 2026 email provides information regarding medical site visits, inspections and various oversight mechanisms in use by ICE, but does not address the actual medical protocols in place at Dilley. Defendants' Paragraph 29 response letter also fails to provide or explain the medical protocols used at Dilley – simply stating that "dental, mental-health and medical services are available 24 hours a day." Paragraph 29 Response at 11. Defendants have further stated that Dilley adheres to the 4.3 Health Care Family Residential Standards, but those standards do not include medical protocols, either.

**It is our understanding that Dr. Wise has requested information regarding the medical protocols, policies, and practices at Dilley, but has not received them. Please let us know by February 27, 2026, whether Dr. Wise will be provided with the requested information and allowed to meet with medical staff at Dilley to ask questions regarding any systems they may have in place.**

**Lack of safe and appropriate child-friendly food**: Once again, nearly every family reported concerns that their children are not eating. Additionally, families noted that there have been no changes to the availability of healthy snacks for children between meals. Mealtimes also continue to be only one hour - with some families being forced to eat dinner from 4 to 5 pm. This means that the children are hungry when they go to bed several hours later.

Defendants' Paragraph 29 Response and February 10, 2026 email paint a vastly different picture of the food available at Dilley than we have discussed with families or seen in their boxed lunches during our interviews. Defendants insist that there are child-friendly meals and point to a wide range of foods. Paragraph 29 Letter Response at 7. Defendants also assert that pantries are stocked with varied snacks, including yogurt, fresh fruit, apples, cookies and crackers. Defendants' February 10, 2026 email also alleges that a variety of fresh fruit and varied snacks are available in the housing areas. However, we have spoken to more than 100 families, and they consistently complain about the food taste, variety, and quality. Their requests are modest. They simply ask for more soft, plain meals, such as soups and baked chicken, that are not highly processed and saturated with sauce and condiments.

They consistently report that the only fresh fruit provided for months has been red apples and that snacks are limited to sugary cookies and sometimes granola bars. Many children and teens have told us they are eating nothing more than bread with jam and rice. Countless parents tell us their children regularly refuse to eat. **There is a serious discrepancy between the information provided by Defendants and the voluminous evidence we have gathered that children's physical health is suffering due to the nutritional deficiencies of the food at Dilley. Please**

**let us know by February 27, 2026, whether ICE is willing to make adjustments to the menu and snacks available to class members. These adjustments should be made based on a survey given to all residents by a neutral third-party.**

**Insufficient hygiene products**: During last week's site visit, families continued to express concerns about the harsh body wash/shampoo in the showers, and that they must spend their limited funds buying their children basic hygiene products at the commissary because the products provided by CoreCivic are inadequate. Defendants' Paragraph 29 Response asserts that the hygiene kits at Dilley include soap and shampoo, but this is contradicted by previous reports to the Court as well as a hygiene kit photo I was shown on the tour. I was also told that bar soap, such as Dove, is available only if prescribed by medical. **Please let us know by February 27, 2026, whether ICE will provide class members with sufficient and functioning hygiene products, including bar soap, shampoo, conditioner, toothbrushes, toothpaste, and deodorant. *See* Family Residential Standard 4.5 D.**

**Poor sleeping conditions**: Nearly every family complains that their children cannot sleep due to the lighting over their bunk beds. They also tell us that the night-time noise and interruptions, such as guards speaking loudly on walkie-talkies, interfere with children's sleep. Countless families report that their children are exhausted from lack of sleep, which also exacerbates their illnesses and makes it difficult to recover. Families further report that the eye masks provided to shield their eyes from the lights are extremely tight and uncomfortable, and children will not wear them.

**Plaintiffs understand that Defendants' position is that lights in the living areas must be kept on at all times due to safety concerns and eye masks should resolve Plaintiffs' concerns. However, the masks have not resolved the problem. Plaintiffs propose that ICE use small nightlights rather than overhead lights during sleep times. Nightlights are a commonsense solution used by parents across the country. They will give staff adequate visibility into living areas without disrupting children's sleep.**

**Please let us know by February 27, 2026, whether ICE will use nightlights rather than overhead lights during children's bedtime hours.**

**Insufficient education**: Plaintiffs' concerns about education persist for all the reasons previously raised. Defendants have reported that a comprehensive education program is under development, but a date certain for completion has not been provided. **Please let us know by February 27, 2026, whether or not the expanded education program will begin in March.**

**Harsh and Retaliatory Staff treatment**: Families again reported hostile, coercive, and threatening treatment of class members and their parents by Dilley staff. Plaintiffs are concerned about retaliation against detained families after multiple families reported that CoreCivic staff have escalated the use of extremely aggressive room searches and sweeps since the families staged a peaceful protest inside Dilley on January 24, 2026. Shockingly, several families shared that items like children's drawings, crayons and letters to government officials have been confiscated or ripped up in front of the children and thrown in the garbage. Destroying a child's drawing, even if it is about how being locked up at Dilley makes them feel, is cruel and

unnecessary. Such behavior certainly flies in the face of FSA ¶ 11 requiring DHS to treat "all minors in its custody with dignity, respect and special concern for their particular vulnerability as minors."

**Please provide Defendants' reasons for conducting searches of class members' rooms and destruction of children's artwork and other important documents by February 27, 2026.**

Despite Plaintiffs' repeated attempts over nearly a year to resolve our concerns, and Defendants' recent responses to those concerns, the conditions at Dilley remain dire for children and flagrantly violate the FSA. Please provide the information requested above by February 27, 2026, so that we can ascertain whether additional mediation sessions will be productive.

Best wishes,

Leecia Welch
Chief Legal Counsel
lwelch@childrensrights.org

# ATTACHMENT M

CHILDREN'S RIGHTS

April 9, 2026

Christina Parascandola
Senior Litigation Counsel
Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
*Via email* to christina.parascandola@usdoj.gov

**Re: Ongoing Violations of *Flores* Settlement Agreement at Dilley**

Dear Christina:

We write to provide updated information regarding the ongoing violations of the *Flores* Settlement Agreement ("FSA") at the South Texas Family Residential Center in Dilley, Texas ("Dilley").

During our March 11 and 12, 2026 site visit, class members and their families continued to express concerns about prolonged detention resulting in children's deteriorating mental health, lack of adequate medical care (some examples were noted in our March 13, 2026 email), lack of nutritious food and snacks, sickness from the tap water, inability to sleep due to the lights being on all night, lack of adequate education for older youth, lack of access to counsel and information regarding their *Flores* rights, lack of free phone calls to attorneys and family members, lack of language translation, and harsh treatment by Dilley guards. We appreciate the information in Defendants' March 13, 2026 ICE Juvenile Coordinator Status Report and Data to the Court, but as noted in Plaintiffs' March 20, 2026 Response, interviews with class members about the actual conditions at Dilley stand in stark contrast to many of Defendants' assertions.

Given that mediation is ongoing and Plaintiffs have provided extensive evidence in our March 20, 2026 Response, we provide the bulleted summary below of ongoing *Flores* violations from our March site visit:

- ***Prolonged detention of children and families.*** Although the number of class members at Dilley has decreased and time in custody has improved, 8 children had been in custody for over 100 days and 20 children had been in custody for over 50 days as of our March site visit. As the Court noted at the March 30 Status Conference, this is unacceptable.[1]

- ***Class members still lack access to legal information and counsel, including information regarding their Flores rights.*** The families we spoke to continue to report

[1] One family including a single mother and four minor children ages 16, 9, 5 and 5, had been detained for 282 days as of our site visit on March 12, 2026. We followed up on March 13 regarding the serious unmet dental needs of one of the five-year-old twins. Detaining these children for ten months is shocking and cruel, and we request their immediate release.

that they are not being apprised of their children's rights under the FSA. We have yet to talk to a family who recalls being provided with a *Flores* notice of rights or learning about their child's *Flores* rights in a video or other materials provided by ICE or CoreCivic. Class members still report that access to counsel remains significantly curtailed; there is no mail service; and Gmail and other independent email providers do not work consistently, despite Dilley staff telling us that Gmail is up and running. Class members also have no reliable way to contact *Flores* counsel or any other lawyers they may have who are not on the pro bono list provided by ICE without paying for the calls.

- ***Class members at Dilley are not being provided with "safe and sanitary conditions" including adequate medical care, child-friendly food, hygiene products, and healthy sleeping conditions.*** Plaintiffs remain concerned about children's medical care, nutrition, access to hygiene products, and sleeping conditions at Dilley. Given Dr. Wise's on-going assessment of Dilley and our previous correspondence, we will not reiterate in this letter the same concerns we have been raising for the past year. Notably, however, we continue to hear that parents have challenges getting bottled water for their babies' formula. We do not understand how this problem persists despite Defendants' repeated claims that bottled water is available for babies. Similarly, class members continue to report that they receive no ongoing access to shampoo, body wash, or other necessary hygiene items besides the harsh soap in the shower. In terms of improvements, we were relieved to learn that mealtimes were returned to two-hour windows instead of one-hour windows, and that some adults had received eye masks that were helping them to sleep with the lights on all night. Parents continue to report that their children are unable to use the eye masks due to their young age or discomfort and are not sleeping.

- ***Education remains inadequate for older youth.*** On the tour and during interviews, Plaintiffs noted improvements in the educational program for younger children but continue to have concerns about the educational program available to youth in 7th to 12th grade. Plaintiffs were informed that new computers and online learning would be available soon to older youth, but the start date for a comprehensive education program for older youth remains unknown.

- ***Harsh staff treatment.*** Families again reported hostile and threatening treatment of class members and their parents by some Dilley staff. Notable examples included: class members being yelled at by guards and told they are animals, families being yelled at and told they are lying when they asked for a list of free attorneys that they never received; and class members being confined to their rooms when Congressman Castro visits Dilley.

- ***Lack of language translation.*** Multiple families also reported concerns about the lack of translation. In particular, families reported that there is little to no interpretation

provided at Dilley in most circumstances. This is particularly distressing when families are asked to sign documents in a language they cannot understand.

Plaintiffs have proposed some next steps to the mediators regarding prioritizing discussion of these concerns in mediation while Dr. Wise conducts his on-site assessments at Dilley. We will address our proposal in separate correspondence.

Best wishes,

Leecia Welch
Chief Legal Counsel

# ATTACHMENT N

CHILDREN'S RIGHTS

April 28, 2026

Joshua C. McCroskey
Trial Counsel
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
*Via email* to Joshua.C.McCroskey@usdoj.gov

**Re: Ongoing Violations of *Flores* Settlement Agreement at Dilley**

Dear Joshua:

We write to provide updated information regarding the ongoing violations of the *Flores* Settlement Agreement ("FSA") at the South Texas Family Residential Center in Dilley, Texas ("Dilley").

During our April 22 and 23, 2026 site visit, class members and their families continued to report the same *Flores* violations we have been hearing for nearly a year: children's deteriorating health from prolonged detention, lack of adequate medical care, lack of nutritious food and snacks, sickness from the tap water, inability to sleep due to the lights being on all night, lack of access to counsel and information regarding their *Flores* rights, lack of free phone calls to attorneys and family members, lack of language translation, and mistreatment by Dilley guards.

Given that Plaintiffs have provided extensive evidence of these concerns numerous times, we again provide a bulleted summary below of ongoing *Flores* violations from our April site visit:

- ***Prolonged detention of children and families.*** Although the number of class members at Dilley has decreased and time in custody has improved, as of our site visit four children had been in custody for over 320 days; nine children had been in custody for between 53 to 121 days, and approximately 15 children had been in custody for between 20 and 48 days. Time in custody continues to violate multiple court orders, to cause significant mental deterioration of children, and to raise serious medical concerns for children.

- ***Class members still lack access to legal information, including information regarding their Flores rights.*** Families continue to report that they are not being apprised of their children's rights under the FSA. There are no posters or notices posted describing children's rights under the FSA. Families consistently report that they are unaware that they have the right to request that their child be released

- ***Class members still lack sufficient access to counsel.*** Families also continue to report that they have challenges accessing counsel. Although Gmail has apparently been restored, the secondary authorization requirements continue to impede many families' ability to use it. Other independent email providers do not work consistently. Class

members continue to have no reliable way to contact *Flores* counsel or any other lawyers who are not on the pro bono list provided by ICE without paying for the calls.

- ***Class members at Dilley are not being provided with "safe and sanitary conditions" including adequate medical care, child-friendly food, hygiene products, and healthy sleeping conditions.*** Plaintiffs' counsel continue to hear concerns about children's medical care, nutrition, access to hygiene products, and sleeping conditions at Dilley.
    - *Medical care* – Plaintiffs shared specific concerns regarding medical care in our April 24, 2026 email.
    - *Lack of child-friendly food and clean water:* On this visit, children again shared that the mealtimes are too early; they are not eating the food because it is too heavily sauced; there is not enough variety or child-friendly options (like yogurt and bananas); there are inadequate portions of food they like (like pizza) and in the "special diet" meals; and they are hungry in the evening. They also told us that they have gotten sick from eating the food and drinking the tap water. They continue to lack access to fresh fruit, which they report was also raised in a recent community meeting.
    - *Bottled water:* Families reported that the price of a pack of bottled water has recently been lowered from $30 a pack to $9. Families told us that they had complained about the cost of water in a community meeting last month. Many families had shared that they were spending money on the water for their children even though they could not afford it because otherwise their children were getting sick. While the decreased cost was a welcome improvement, some families still cannot afford it. The number of families who tell us their child got sick from the tap water grows every site visit. Children should not have to pay for bottled water.
    - *Hygiene products*: Teens and parents continue to report that the hygiene kits consist of toothbrushes that break after the first use, toothpaste that runs out after two days, deodorant that doesn't work, and a tiny tube of lotion. Families are told that the hygiene kits do not include soap or shampoo – as repeatedly reported – because they are expected to use the harsh hand soap in the showers. Families who can afford it buy all these products for their children at the commissary. We have yet to talk to a family who reports that hygiene products for youth are replenished free of charge.
    - *Sleep*: As in previous visits, nearly every child and teen we met with looked exhausted. They uniformly express that they can't sleep because the lights are on all night. Teens tell us that even after months at Dilley, they cannot get used to having lights on all night and the eye masks are tight and uncomfortable, making it difficult to sleep with the eye masks on. This problem must be fixed.

- ***Education remains inadequate for older youth.*** Plaintiffs again noted improvements in the educational program for younger children. However, some families who have been at Dilley for months reported that their children have grown bored with the curriculum

because it is repetitive. During the tour, Plaintiffs' counsel were pleased to see new computers in the 7th-12th grade classroom and that a few teens were using Khan Academy for online learning. Although teens were already using Khan Academy on the computers in the library, some teens reported that availability in the classrooms is still an improvement. It remains to be seen whether Dilley will offer an education program for the older youth.

- ***Mistreatment by staff.*** Families again reported mistreatment by some Dilley staff. Examples included:
    - Staff yelling at and scolding children for normal child behavior, like spilling milk or leaving a parent's side;
    - Staff not allowing a mother to bring her baby stroller inside even though cats were lying in it during the night causing her baby (who is allergic to cats) to have allergic reactions;
    - Staff refusing to provide a mother with bottled water for her baby's formula;
    - Staff yelling at or harshly scolding children in the library for not having their ID; and
    - Staff threatening families that they will not be able to visit their sick family member in the medical unit if they keep pressing staff for medical care.

- ***Lack of language translation.*** Families again reported concerns about the lack of available translation services. Families who do not speak English or Spanish consistently share they feel completely in the dark about how anything works at Dilley due to the lack of translators.

While Plaintiffs await Defendants' response on *Flores* notice of rights issues, Plaintiffs propose the parties schedule a time with the mediators to discuss class members' ongoing concerns with nutrition, clean water and sleeping conditions. Other than the recent decrease in the cost of bottled water, we have seen minimal improvement in these issues, and they remain extremely problematic to the children and parents at Dilley.

Best wishes,

Leecia Welch
Chief Legal Counsel

# ATTACHMENT O

CHILDREN'S RIGHTS

June 4, 2026

Joshua C. McCroskey
Trial Counsel
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
*Via email* to Joshua.C.McCroskey@usdoj.gov

**Re: Ongoing Violations of *Flores* Settlement Agreement at Dilley**

Dear Joshua:

We write to provide updated information regarding the ongoing *Flores* Settlement Agreement ("FSA") violations at the South Texas Family Residential Center in Dilley, Texas ("Dilley").

During our June 1 and 2, 2026 site visit, class members and their families continued to report concerns about children's deteriorating health from prolonged detention; lack of nutritious food and access to special diets; lack of access to baby formula and bottled water; sickness from the tap water; inability to sleep due to excessive noise, uncomfortable bunkbeds, and lights on all night; lack of information regarding their *Flores* rights; lack of free phone calls to family members and to their attorneys; lack of appropriate clothing; and mistreatment by Dilley guards and staff.

Given that Plaintiffs have repeatedly provided extensive evidence of these concerns, we provide a bulleted summary below:

- ***Prolonged detention of children and families.*** Although the number of class members at Dilley has decreased and time in custody has improved, many families continue to be detained for far longer than 20 days. As of June 1, some children had been at Dilley for 55 days, 103 days, 136 days, and 159 days. Time in custody continues to violate multiple court orders and result in serious harm to children's mental health.

- ***Class members still lack access to legal information, including information regarding their Flores rights.*** Families and class members continue to report that they are not being apprised of children's rights under the FSA. There are no posters or notices posted describing children's rights under the FSA. The only difference during this visit is that families reported that ICE now has them sign a document stating children have the right to be released after 20 days. Multiple families (especially those detained for long periods) reported confusion about this form because the ICE agent presenting it would also tell them that, in reality, children could not be released from Dilley without their parents, and it was up to the immigration judge to decide when to release the family. Families report they are not given a copy of this form to refer to later. It is fundamentally inappropriate for ICE agents to inform children and their families of this "right to release" with no context and no opportunity to speak to counsel. We met with

families who had signed this document, and yet were still detained after 20 days. Please send class counsel a copy of the document described.

- ***Class members at Dilley continue to be denied "safe and sanitary conditions," including child-friendly foods, necessary special diets, clean water, adequate clothing, adequate hygiene products, and healthy sleeping conditions.*** Plaintiffs' counsel continue to hear concerns about children's medical care, nutrition, access to hygiene products, and sleeping conditions at Dilley.
    - *Medical care:* Families again reported that it takes multiple visits to medical before they can see a doctor. Families also reported that medical refuses children special diets even when they have extreme allergies or have been diagnosed with pre-diabetes. Parents reported they cannot go off site for a needed doctor's appointment without leaving their child alone at Dilley, which they believe is unsafe. Referrals to specialists, if they occur at all, are inordinately delayed.
    - *Lack of child-friendly food and clean water:* On this visit, children again shared they are not eating the food because it is too heavily sauced, spicy, repetitive, and there is not enough variety or child-friendly options. Several children again told us that they have gotten sick from eating the food and drinking the tap water. One teen told me she has lost six pounds. Some families said that each of their family members experience gas, stomach pain, and diarrhea after eating food served at Dilley. Another child told us that he refuses to eat the food at Dilley anymore. One small glimmer of hope is that families reported that some additional fresh fruits were occasionally added to the menu. But, as we reported in an urgent email, a mother of a 13-month-old was denied formula for several days due to her baby's age – despite the fact that the baby was not eating anything else. For several days after being detained, the mother was not told that baby food was available.
    - *Bottled water:* Everyone we spoke to again said the tap water smelled bad, looked dirty, tasted bad, and/or had made them sick. Some families were not aware that the price of water had been lowered, and others reported not being able to afford it even at a lower price point. The mom of the 13-month-old mentioned above told me that she was using tap water for her son's formula because she couldn't afford bottled water; no one had told her the baby was entitled to free bottled water. The baby has had diarrhea for eight days. Our team has been actively meeting with children in immigration custody for more than a decade, and this is the only facility we have ever visited that charges children for bottled water. Meanwhile, there are massive stacks of bottled water out and available for CoreCivic staff. Dehydration is a serious concern for children as the summer temperatures rise. Children and babies must be given water that does not make them sick.
    - *Hygiene products*: Teens and parents continue to report that the hygiene kits consist of toothbrushes that break after a couple uses, toothpaste that runs out

after two days, deodorant that doesn't work, and a tiny tube of lotion that doesn't help with the dry skin. For the first time, however, it was reported that some hygiene kits now include combination shampoo/body wash, the toothbrushes in some hygiene kits look sturdier, and one family reported that some staff would replenish products. The vast majority of families continue to report that staff will not replenish products, and they must buy basic hygiene items for their children at the commissary. Some families mentioned that in addition to being denied shampoo replenishment, CoreCivic increased the commissary price of shampoo. At the very least, it appears that additional training is needed to ensure that hygiene products are promptly and sufficiently replenished.

  - *Inadequate clothing*: Families continue to report that their children do not have adequate clothing. Although the policy has apparently been updated to provide children with two pairs of shoes, some families reported they still have only one pair. In addition, the policy of only giving children three changes of clothes – often ill-fitting – needs to be addressed. This is especially urgent given rising summer temperatures. Families report that if their child gets a pair of sweatpants for when it is cold indoors from the air conditioning, they can only get two pairs of shorts. Other families report being denied replacement clothing when their children's clothing no longer fits or wears out. This is not reasonable for active children.
  - *Sleep*: Children again reported they can't sleep because the lights are on all night. Some parents said that they were detained at Dilley for several weeks before anyone told them they were permitted to turn off some lights at night. More teens reported that their backs hurt from the bunk beds. Depriving children of sleep is inhumane.

- ***Education remains inadequate for older youth.*** Some families again reported satisfaction with the classrooms for the younger children. Others said the curriculum was not at all challenging for their children, but better than nothing. The 7th-12th grade classroom, however, continues to be woefully inadequate. The teens we met with report that all they do in class is independent work on Khan Academy and drawing. It is nothing like an actual high school curriculum. If this is all there is for the teens – it is not acceptable. Even children who are below 7th grade informed us that the education is repetitive and they do the same homework every day.

- ***Mistreatment by staff.*** Families again reported mistreatment by some Dilley staff. Examples included:
  - Staff tormenting families by stomping repeatedly on the metal walkways in the middle of the night to make loud pounding noises to startle families for weeks because… "what are those Latinos going to do about it?";
  - Male cleaning staff walking in on showering teenage girls in the bathroom without knocking and then re-entering even after he was aware they were in the bathroom alone;

- Staff responding to complaints from families about the food by saying: "Why are they complaining? If they were in their own countries, they would be eating shit";
- Staff yelling at children for having fun or laughing;
- Staff intimidating families in the cafeteria if they do not leave immediately after finishing their meals;
- Staff waking families in the middle of the night to search their rooms;
- Staff telling people they would make reports that would affect their immigration case and length of stay for walking to a different housing unit to talk to a friend;
- Staff refusing to give pertinent information to families, like how to access the law library; and
- Staff telling families they should feel lucky to be at Dilley.

I personally witnessed CoreCivic staff interfere with a father's attempt to share his written grievance with me following our interview. CoreCivic staff refused to allow him to return to the office where I was conducting my legal interviews and told him he was not permitted to show me the grievance. The issue was elevated to a supervisor who also attempted to prevent me from reviewing the grievance privately with the father. Ultimately, I insisted that they allow the father to speak with me in the office about the grievance.

Staff's treatment of this father was deeply concerning. The father and his children have the right to share and review legal documents related to class members' rights with class counsel. CoreCivic employees may not impede a parent from sharing with counsel his own written grievance about a serious, dangerous incident that happened to his children, especially considering the alleged importance ICE and CoreCivic place on Dilley's grievance system. I would like assurances that the father who shared his grievance with me will not be retaliated against for doing so.

As noted during the status conference, Plaintiffs are dissatisfied with the pace of mediation with respect to the conditions at Dilley. Other than a reduction in the price of water, the introduction of some fresh fruit to the menu, and minor improvements to the hygiene kit, there has been no progress on conditions since the parties updated the Court on mediation on April 27, 2026. Defendants have not responded to Plaintiffs' proposal regarding notice of children' *Flores* rights. If Defendants have updates to share in advance of the June 5th deadline, Plaintiffs are willing to meet and discuss them. Otherwise, we propose that both parties provide separate updates to the Court in a jointly filed status report.

Best wishes,



Leecia Welch
Chief Legal Counsel

# ATTACHMENT P

CHILDREN'S RIGHTS

July 21, 2026

Joshua C. McCroskey
Trial Counsel
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
*Via email* to Joshua.C.McCroskey@usdoj.gov

**Re: Ongoing Violations of *Flores* Settlement Agreement at Dilley**

Dear Joshua:

We write to provide updated information regarding the ongoing *Flores* Settlement Agreement ("FSA") violations at the South Texas Family Residential Center in Dilley, Texas ("Dilley").

During our July 13 and 14, 2026 site visit, class members and their families continued to report concerns about children's deteriorating mental health from prolonged detention; lack of adequate medical care; lack of nutritious food and baby food; sickness from the food and tap water; inability to sleep due to excessive noise, uncomfortable bunkbeds, and lights on all night; lack of information regarding their *Flores* rights; lack of free phone calls to family members; lack of free phone calls and obstructed email access to their attorneys; and mistreatment by Dilley guards and staff.

Given that Plaintiffs have repeatedly provided extensive and detailed evidence of these concerns, including in our response to the ICE Juvenile Coordinator's Annual Report, Dkt. No. 1706, we provide a bulleted summary below:

- ***Prolonged detention of children and families.*** As of July 15, there were 116 children at Dilley – which is a significant increase from the 74 children noted in the ICE Juvenile Coordinator's Report. Nearly half of those children had been in custody for over 20 days as of our site visit. Many children had been in custody for over 50 days. We met with families who had been at Dilley for egregiously long periods, including 96, 91, 69, 59, and 58 days. Defendants' ongoing practice of detaining children past 20 days without making individualized determinations that they are a flight risk or safety concern continues to violate this Court's orders and results in needless suffering and lasting harm to children. *See, e.g.,* June 27, 2017 Order at 25-27 [Dkt. 363] (requiring individualized assessments and evidence to justify detention longer than 20 days); Apr. 24, 2020 Order at 14-18 [Dkt. 784] (same); June 26, 2020 Order at 5 [Dkt. 833] ("For each minor detained at an FRC for more than 20 days . . . the ICE Juvenile Coordinator shall give a detailed individualized explanation of why that minor is a flight risk (cursory explanations such as 'In custody-pending IJ hearing/decision,' 'pending USCIS response,' 'plaintiff in a pending lawsuit' . . . shall not be acceptable explanations) . . . [rather] a prior unexplained failure to appear at a scheduled hearing would be a satisfactory explanation for continued detention if that explanation is verified in a

declaration by an ICE representative under penalty of perjury."); Sept. 18, 2020 Order at 13 [Dkt. 987] (requiring "[s]pecific explanations for the continued detention of each minor detained at an FRC beyond 20 days,"); Sept. 26, 2025 Order at 2 [Dkt. 1672] (same); Apr. 3, 2026 Order at 2 [Dkt. 1755] (same).

- ***Class members still lack access to legal information, including information regarding their Flores rights.*** Families continue to report that ICE is not informing them of their children's rights under the FSA beyond requiring them to sign a document stating that children have the right to be released after 20 days. Plaintiffs previously requested a copy of this document and were informed that no such document existed. We renew our request that Defendants produce it or clarify ICE's process for presenting *Flores* rights to class members. In any event, requiring parents to sign a document about a single poorly explained *Flores* right that ICE is not honoring does not satisfy Defendants' obligation to provide class members with an explanation of their full *Flores* rights. Indeed, some families expressed understandable confusion about the document because their children had already been detained for more than 50, 60, or 90 days.

- ***Class members at Dilley continue to be denied "safe and sanitary conditions," including adequate medical care, child-friendly foods, clean water, adequate clothing, adequate hygiene products, and healthy sleeping conditions.*** Plaintiffs' counsel continue to hear concerns about children's access to medical care, nutrition, hygiene products, and safe sleeping conditions at Dilley.
    - *Medical care:* Families again reported serious barriers to obtaining necessary medical care. Children and parents with severe infections described waiting weeks for treatment beyond ibuprofen, Tylenol, or allergy medication. One pregnant mother who experienced bleeding and abdominal pain had already waited two weeks to see an obstetrician. A child with debilitating anxiety had waited three weeks for something as simple as a stress ball to prevent him from repeatedly chewing his hands. Another child has an ear infection that has persisted for weeks without being treated with antibiotics.
    - *Lack of child-friendly food, baby food, and clean water:* Families continue to report that many children refuse to eat the food at Dilley because it is overly sauced, spicy, repetitive, unhealthy, and lacks sufficient variety or child-friendly options. Children and parents also continue to report becoming sick after eating the food or drinking the tap water. One teenager reported losing 8 to 10 pounds during his detention, and several mothers expressed concern that their children were losing weight as well. One mother was told that no baby food was available for her infant. If Defendants' policy permits infants to receive baby food at meals, Defendants should ensure that all parents of infants are affirmatively informed of that option upon arrival and at each meal.
    - *Bottled water:* Everyone we spoke to again said the tap water smelled bad, looked dirty, tasted bad, and/or had made them sick. Dehydration is a serious

concern for children with the extreme summer heat. Children must be given water that does not make them sick.

- *Hygiene products*: The vast majority of families continue to report that hygiene products are inadequate, and they must buy basic hygiene items for their children at the commissary. Several families reported that CoreCivic has significantly increased the commissary prices of necessary items like shampoo and tampons in recent months.
- *Inadequate clothing*: Although some families reported an improvement in the amount of clothing provided, implementation remains inconsistent. Several families reported being unable to obtain properly sized clothing for their children, and multiple families stated that their children had received only one pair of shoes despite Defendants' stated policy of providing two pairs. This is particularly problematic and unsanitary given the rain in recent weeks. These continuing deficiencies indicate a need for both increased inventory across a full range of sizes and staff training to ensure compliance with Dilley's own policies.
- *Sleep*: Families continue to report that children are unable to sleep because lights remain on throughout the night, beds are uncomfortable, and guards conduct noisy nighttime patrols. Chronic sleep deprivation is particularly harmful to children, affecting their physical health, emotional well-being, and ability to learn and function during the day. Children should not be subjected to conditions that routinely deprive them of adequate sleep.

- ***Lack of free phone calls and email.*** Families continue to report that children and parents are not afforded free phone calls to family members or legal counsel beyond the five-minute phone card provided during intake. Families also report that Defendants continue to obstruct communication with counsel by restricting access to reliable, free forms of email. Although Dilley permits the use of Atomic Mail and Proton Mail, neither provides a satisfactory means of communicating with counsel. Families consistently report that Atomic Mail is unreliable, with emails frequently failing to reach their intended recipients. Proton Mail presents different barriers. While initially free, it requires a paid subscription after a limited period, and payment must be made electronically. Many detained families lack both the financial resources and the means to make electronic payments. As a result, they are often forced to repeatedly create new email accounts after the free period expires, losing access to prior accounts and disrupting ongoing communications with attorneys and family members. In addition, Proton Mail does not allow e-mail attachments, which inhibits families from sending or receiving paperwork related to their cases. Gmail is only available to those who can comply with two-factor authentication, which families are unable to do because ICE holds their cell phones, so a second factor of authentication is not available. In practice, families at Dilley continue to lack free, reliable, and consistent means of communicating with legal counsel.

- ***Education remains in flux and recreation is inadequate.*** During the site visit, Plaintiffs' counsel learned that CoreCivic had entered into a subcontract with SPN to provide educational services at Dilley. According to facility staff, the program is expected to include 16 teachers, a special education instructor, and a principal once it is

fully operational. However, staff acknowledged that they do not know when the full program will begin because background checks for most of the teachers remain pending due to processing backlogs. In the meantime, educational services appeared unchanged. During our tour, children continued to be taught in the same three mixed-age classrooms observed on prior site visits. Although the new contract represents a promising step, it has not yet translated into meaningful improvements for children at Dilley. In addition, despite the lengthy list of recreational activities described in the ICE Juvenile Coordinator's Annual Report, children and parents continue to report that there is very little to do at Dilley. For example, not a single child or parent interviewed during the July site visit had heard of activities such as jewelry box decorating or birdhouse building. To the contrary, families found the suggestion that these activities were being offered to be highly implausible.

- ***Mistreatment by staff.*** Families continue to report harsh and intimidating treatment by some Dilley staff. Parents described children being routinely yelled at and threatened with disciplinary reports for behavior that is entirely developmentally appropriate. One parent reported that her child had become so fearful of interacting with guards that he would wet himself rather than ask for permission to use the bathroom. Plaintiffs also learned of two mothers whose commissary privileges were temporarily suspended after they became frustrated while advocating for needed medical care. These reports are particularly troubling because commissary food is often the only food children will eat at Dilley. Denying families access to commissary as punishment directly harms children by restricting access to the only food they are able to eat after 8 p.m. when meal services has concluded and the snack pantries are locked.

The conditions at Dilley—and the prolonged detention of children there—continue to flagrantly violate the FSA. For more than a year, Plaintiffs have repeatedly sought to remedy these violations through the meet-and-confer process, court-ordered mediation, and responses to the ICE Juvenile Coordinator's reports. Yet children remain subjected to the same unlawful conditions. We will await the Court's ruling on the pending Order to Show Cause before determining our next steps, but we again urge Defendants to take immediate action to remedy these ongoing violations.

Best wishes,



Leecia Welch
Chief Legal Counsel

# ATTACHMENT Q

CHILDREN'S RIGHTS

September 15, 2026

Joshua C. McCroskey
Trial Counsel
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
*Via email* to Joshua.C.McCroskey@usdoj.gov

**Re: Ongoing Violations of *Flores* Settlement Agreement at Dilley**

Dear Joshua:

We write to provide updated information regarding the ongoing *Flores* Settlement Agreement ("FSA") violations at the South Texas Family Residential Center in Dilley, Texas ("Dilley").

During our September 8 and 9, 2026 site visit, class members and their families continued to report FSA violations, including excessive time in custody, lack of adequate medical care, lack of nutritious food and exorbitant food prices at the commissary, sickness from the tap water, inability to sleep due to excessive noise and lights on all night, lack of information regarding their *Flores* rights, lack of free phone calls to family members, lack of free phone calls and obstructed email access to their attorneys, and poor treatment by Dilley guards and staff.

Given that Plaintiffs have repeatedly provided extensive and detailed evidence of these concerns, we summarize the most significant ongoing issues below:

- ***Prolonged detention of children and families.*** As of September 9, there were 64 children at Dilley. About one-third of those children had been in custody for over 20 days. One child had been detained over 75 days and 3 children had been detained over 100 days. We met with families who had been at Dilley for extremely long periods, including 151, 87, and 41 days. Despite the decrease in the census, Defendants continue to detain children for more than 20 days without making individualized determinations that they are a flight risk or safety concern in violation of this Court's orders. *See, e.g.,* June 27, 2017 Order at 25-27 [Dkt. 363] (requiring individualized assessments and evidence to justify detention longer than 20 days).

- ***Class members still lack access to legal information, including information regarding their Flores rights.*** Families continue to report that ICE fails to meaningfully inform them of their children's rights under the FSA. Instead, ICE requires parents to sign a document, written in English, that families have told us states only that their children have a right to release after 20 days. Many parents report refusing to sign because ICE does not provide the document in a language they can understand. Families also question the purpose of acknowledging a purported 20-day right when they routinely see children detained well beyond 20 days.

Plaintiffs have previously requested a copy of this document, but Defendants have represented that no such document exists. We renew our request that Defendants: (1) explain the process ICE currently uses to inform class members of their *Flores* rights; (2) provide any documents that ICE currently gives to families regarding the children's *Flores* rights; and (3) provide Defendants' position on the proposed notice of rights Plaintiffs shared with Defendants on April 9, 2026.

- ***Class members at Dilley continue to be denied "safe and sanitary conditions," including adequate medical care, child-friendly foods, clean water, adequate hygiene products, and healthy sleeping conditions.*** Plaintiffs' counsel continue to hear concerns about children's access to medical care, nutrition, hygiene products, and safe sleeping conditions at Dilley.
  - *Medical care:* Families again reported serious concerns about inadequate medical care at Dilley. Children and parents described having to make repeated requests before being seen by a doctor and receiving little more than Tylenol for a wide range of medical conditions. One mother reported that her child was not receiving adequate treatment for asthma and that her daughter had persistent rashes on her arms and legs for which she had been unable to obtain appropriate medical care. Families also reported a recent COVID outbreak at the facility but said they had received little or no information about the outbreak and had not observed meaningful precautions being implemented to prevent further spread of the virus.
  - *Lack of child-friendly food, and clean water:* Families continue to report that many children struggle to eat the food served at Dilley because it is overly sauced, oily, spicy, highly processed, and repetitive. Parents consistently report that their children are hungry again by the evening, particularly because dinner is served at 4:00 p.m. As a result, families report having little choice but to purchase additional food from the commissary to attempt to ensure their children have enough to eat in the evening. During our visit to the commissary, we were particularly troubled to see that CoreCivic charges $14 for a single box of cereal—an extraordinary price for families who are relying on commissary items to meet their children's basic nutritional needs.
  - *Bottled water:* Every family we interviewed again raised concerns about the drinking water at Dilley, reporting that the tap water smelled foul, appeared dirty, tasted bad, or made their children feel sick. During our visit, temperatures exceeded 100 degrees, making reliable access to clean, potable drinking water especially critical. Children should not have to choose between drinking water they believe makes them sick and going without adequate hydration.
  - *Hygiene products*: The vast majority of families continue to report that the hygiene products provided at Dilley are inadequate, forcing them to purchase basic necessities for their children at the commissary. Families report that the deodorant provided is ineffective and that the foam soap does not adequately remove the dust, dirt, and sweat that children experience in Dilley's extreme heat. These are not minor inconveniences. Inadequate access to basic hygiene

products causes significant discomfort and, families report, contributes to rashes, skin irritation, and other medical concerns, like urinary tract infections.

- *Inadequate footwear*: Families generally reported improvement in the quantity of clothing provided at Dilley but continued to raise concerns about its condition and quality. Some families reported receiving clothing that was seemed unclean, was worn or otherwise in poor condition. Families also consistently raised concerns about the shoes provided to children, describing them as poorly made, uncomfortable, lacking adequate support, and prone to breaking after limited use.
- *Sleep*: Families continue to report that children are unable to get adequate sleep because lights remain on throughout the night and guards are loud or conduct frequent, disruptive nighttime patrols. For children detained for weeks or even months, this is not an occasional disturbance—it is a chronic deprivation of restorative sleep. Parents consistently describe children who are exhausted, irritable, and struggling to function during the day. Subjecting children to these conditions night after night raises serious concerns for their health and well-being.

- ***Lack of free phone calls and email.*** Families continue to report that children are not afforded free phone calls to family members or legal counsel beyond the five-minute phone card provided during intake. Families also report that Defendants continue to obstruct communication with counsel by restricting access to reliable, free forms of email. During our visit, Gmail was still not working and families reported intermittent functioning of the other email services. Families also reported that library time had been further reduced to 1.5 hours a day due to the increase in the single female population at Dilley. In practice, families at Dilley continue to lack free, reliable, and consistent means of communicating with legal counsel.

- ***Education remains inadequate for older youth.*** Although families reported improvements in education for younger children since our last site visit, older youth continue to describe significant deficiencies in the education provided at Dilley. Students in the 7th-12th grade classroom report that instruction remains rudimentary; that they cannot access more challenging educational content online; and that they are prohibited from using online programs through which they could earn academic credit. These deficiencies are particularly concerning for high school students who remain detained at Dilley for months and risk falling further behind academically while in custody. We again saw no indications that the organized recreational activities ("jewelry box construction and decorating, birdhouse building, yarn weaving, crocheting, canvas painting, journaling, sports and game tournaments, relay races, hula hoop activities, tug-of-war, Zumba, karaoke, bingo, and chalk art") detailed in the ICE Juv. Coord. Annual Rep. 2026 were available at Dilley.

- ***Harsh treatment by staff.*** Families continue to report troubling treatment by some Dilley staff. Parents described children being treated harshly by library staff, being scolded for filing grievances, being mocked by staff, and being threatened with disciplinary reports.

Families also reported being directed to remain in their rooms during visits by Congressional delegations, limiting their ability to be seen or heard by outside officials. These reports are particularly concerning because they describe conduct that clearly discourages families from raising complaints or speaking openly about conditions at Dilley.

- ***Unsafe treatment during transport.*** Families consistently report to *Flores* counsel and other advocates that children are subjected to unsafe and distressing conditions during transport to deportation flights. In one recent instance, a family that included a class member who was seven months pregnant spent nearly 24 hours on a bus after their deportation flight did not take off - purportedly due to mechanical problems. During that time, the family reported inadequate access to food and restrooms.[1] This was not an isolated report. We have repeatedly heard from families who spent prolonged periods on buses awaiting deportation flights without adequate access to food and restrooms, only to be transported back to Dilley because of mechanical problems or other delays. These conditions impose needless physical and emotional distress on children who are already enduring the strain of detention and removal.

As you know, many of the concerns we have repeatedly raised regarding conditions at Dilley will now be subject to oversight by the Special Master and Independent Monitor. We urge Defendants to take immediate action to remedy these ongoing violations rather than await further monitoring or intervention.

Plaintiffs request that, by September 23, Defendants: (1) produce any agreements, policies, or other documents concerning CoreCivic's pricing of food, water, and hygiene products sold to class members through the commissary; (2) explain the process ICE currently uses to inform class members of their *Flores* rights; (3) produce any notices or written materials ICE currently provides to families concerning *Flores* rights; and (4) provide Defendants' position on the proposed notice of rights Plaintiffs shared on April 9, 2026.

[1] The same family also endured a devastating separation from four young U.S.-citizen siblings. For weeks, the family worked with ICE to arrange for the children to reunite and travel together to their mother's country of origin. ICE then abruptly reversed course and deported the mother and two older siblings over the weekend without the four younger children. The result is precisely the family separation the family had worked for weeks to avoid: the mother and older siblings are now in another country, while four young children remain in the United States. This international separation has caused profound distress to the entire family and stands in stark contrast to Defendants' repeated assertions that they are committed to preserving family unity.

Please let us know your availability during the weeks of September 21 or September 28 to discuss these requests and Defendants' response to the concerns raised in this letter.

Best wishes,

Leecia Welch
Chief Legal Counsel

# ATTACHMENT R

CHILDREN'S RIGHTS

October 21, 2026

Joshua C. McCroskey
Trial Counsel
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
*Via email* to Joshua.C.McCroskey@usdoj.gov

**Re: Ongoing Violations of *Flores* Settlement Agreement at Dilley**

Dear Joshua:

We write to provide updated information regarding the ongoing *Flores* Settlement Agreement ("FSA") violations at the South Texas Family Residential Center in Dilley, Texas ("Dilley").

During our October 6 and 7, 2026 site visit, class members and their families continued to report FSA violations, including excessive time in custody, inadequate medical care, lack of nutritious food, sickness from food and tap water, inability to sleep due to excessive noise and lights on all night, lack of information regarding their *Flores* rights, lack of free phone calls to family members, lack of free phone calls and obstructed email access to their attorneys, and poor treatment by Dilley guards and staff.

Given that Plaintiffs have repeatedly provided extensive and detailed evidence of these concerns, we are summarizing only selected issues that are currently a focus of independent monitoring:

- ***Prolonged detention of children and families.*** As of October 7, there were 45 children at Dilley. Seventeen of those children had been in custody for over 20 days. Four children had been detained over 100 days. We met with families who had been at Dilley for extremely long periods, including 180, 143, 116, 44, 42, 38, and 37 days. Despite the decrease in the census, Defendants continue to detain children for more than 20 days without making individualized determinations that they are a flight risk or a safety concern in violation of this Court's orders. *See, e.g.,* June 27, 2017 Order at 25-27 [Dkt. 363] (requiring individualized assessments and evidence to justify detention longer than 20 days).

- ***Class members at Dilley continue to be denied "safe and sanitary conditions," including adequate medical care, child-friendly foods, clean water, adequate hygiene products, and healthy sleeping conditions.***
  - *Medical care:* Children and parents again described having to make repeated requests before being seen by a doctor and receiving little more than Tylenol for a wide range of medical conditions. One father reported that his 8-year-old son has been suffering from stomach pains, and when his son started vomiting and had chills, the doctor told them it was because of the food, but did not prescribe any special diet. Additionally, the son has four teeth with cavities for which he has not received treatment. Additionally, one 15-year-old reported waiting days

for Tylenol to be issued when he had a headache. One mother reported bringing her child who was trembling with fever to the medical unit, whose staff told her the child was fine and just needed to eat and drink.

- *Lack of child-friendly food and clean water:* Children continue to struggle with eating the food served at Dilley because it is overly condimented, spicy, fried, and lacks variety. Multiple families report stomach pain following meals, one family reported being served undercooked potatoes and meat, and another child reported seeing blood when he cut into the chicken. Parents consistently report that their children are not eating enough due to these issues and that they must buy expensive food at the commissary so that children won't go hungry in the evening. One family reported, as we have heard before, that allergies and dietary issues are not being accommodated.
- *Bottled water:* Families again reported that the tap water smelled bad, tasted bad, or made their children feel sick. Every family we spoke to reported buying bottled water at the commissary for these reasons.
- *Hygiene products*: The vast majority of families continue to report that the hygiene products provided at Dilley are inadequate, forcing them to purchase basic necessities for their children at the commissary.
- *Sleep*: Families continue to report that children are unable to get adequate sleep because lights remain on throughout the night and guards are loud or conduct frequent, disruptive nighttime patrols.

- ***Class members still lack access to legal information, including information regarding their Flores rights.*** Families continue to report that ICE fails to meaningfully inform them of their children's rights under the FSA. Instead, parents report that ICE tells them during a meeting only that their children have a right to release after 20 days. ICE then has them sign a form, which they consistently report not understanding. Many parents report confusion about this meeting with ICE and question the purpose when they routinely see children detained well beyond 20 days. Families also continue to face challenges accessing counsel, including lack of free phone calls and intermittent email access.

Plaintiffs have repeatedly asked Defendants to address our concerns about class members' lack of meaningful notice of their FSA rights. In our September 15, 2026 letter, Plaintiffs requested that, by September 23, Defendants: (1) produce any agreements, policies, or other documents concerning CoreCivic's pricing of food, water, and hygiene products sold to class members through the commissary; (2) explain the process ICE currently uses to inform class members of their *Flores* rights; (3) produce any notices or written materials ICE currently provides to families concerning *Flores* rights; and (4) provide Defendants' position on the proposed notice of rights Plaintiffs shared on April 9, 2026. We have not yet heard back from Defendants regarding these requests.

It has been over six months since Plaintiffs requested Defendants' position on our proposed notice of rights. If the parties are not able to reach agreement on a notice and adequate process to

inform class members of their *Flores* rights by November 13, 2026, Plaintiffs intend to file an appropriate motion with the Court.

Best wishes,

Leecia Welch
Chief Legal Counsel

# ATTACHMENT S

CHILDREN'S RIGHTS

November 12, 2026

Joshua C. McCroskey
Trial Counsel
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
*Via email* to Joshua.C.McCroskey@usdoj.gov

**Re: Ongoing Violations of *Flores* Settlement Agreement at Dilley**

Dear Joshua:

We write to provide updated information regarding the ongoing *Flores* Settlement Agreement ("FSA") violations at the South Texas Family Residential Center in Dilley, Texas ("Dilley").

During our November 3 and 4, 2026 site visit, class members and their families continued to report FSA violations, including excessive time in custody; inadequate medical care; lack of nutritious food; inability to sleep due to excessive noise and lights that stay on all night; lack of information about their *Flores* rights; lack of free phone calls to family members; lack of free phone calls to, and obstructed email access to, their attorneys; inadequate education for high school students; and poor treatment by Dilley guards and staff.

Because Plaintiffs have repeatedly provided extensive, detailed evidence of these concerns, we summarize here only selected issues that are currently a focus of independent monitoring:

***Prolonged detention of children and families.*** As of November 4, there were 72 children at Dilley, which is a significant increase from last month's visit when there were 45 children. Twenty-five of those children had been in custody for over 20 days. Four children had been detained over 100 days and an additional five for over 50 days. Families we interviewed have now been detained even longer than last month, for periods including 208, 171, 144, 70, 57, 49, and 48 days. Despite the Court's orders, Defendants continue to detain children for more than 20 days without individualized determinations that they are a flight risk or a safety concern. *See, e.g.,* June 27, 2017 Order at 25-27 [Dkt. 363] (requiring individualized assessments and evidence to justify detention longer than 20 days).

***Lack of safe and sanitary conditions.*** Class members at Dilley continue to be denied "safe and sanitary conditions," including adequate medical care, child-friendly foods, clean water, adequate hygiene products, and healthy sleeping conditions.

- *Medical care:* Children and parents again described having to make repeated requests before seeing a doctor and receiving little more than Tylenol for a wide range of medical conditions. Multiple parents reported that their children developed rashes while at Dilley and that the creams provided at medical have made them worse. A child whose medical needs Plaintiffs identified for Defendants last month reported that the child is still waiting for a pair of glasses.

- *Lack of child-friendly food:* Children continue to struggle to eat the food served at Dilley, which families describe as oily, over-processed, unappetizing, and lacking in variety. One family reported being served a green, rotten sausage and said the milk offered to children is often expired. Multiple families reported that their children are losing weight because they will not eat the cafeteria food. Families again reported that they may not take food their children will eat, such as cereal, from the cafeteria and must instead buy it at the commissary at high prices.
- *Tap water:* Families again reported that the tap water tastes bad and has an odd odor. They questioned whether filters were being changed regularly. Families continue to report that they must buy water at the commissary, which has increased the price of a single bottle of water to $.39.
- *Hygiene products*: The vast majority of families continue to report that the hygiene products provided at Dilley are inadequate, forcing them to purchase basic necessities for their children at the commissary. The harsh foaming hand soap in the showers continues to cause rashes for many children.
- *Sleep*: Families continue to report that children cannot sleep because lights remain on throughout the night, guards' radios are loud, and guards conduct frequent, disruptive nighttime patrols.
- *Clothing and bedding:* Multiple families reported that their children were given only one pair of shoes. After the heavy rains in late October, many children's shoes were soaked or broken, and replacements were sometimes not provided in a timely manner. Some children reported only being given sweatpants even though daytime temperatures are still very hot. Families also objected to the restriction on washing their children's sheets, even when children wet the bed due to trauma.

***Inadequate education for high school students.*** Older class members report dissatisfaction with the education at Dilley. High school students say they are extremely bored because of the lack of instruction and the lack of grade level content, and that they are frustrated by the inability to open many of the educational web links in their online coursework. They also cannot earn academic credit, which they find demotivating and demoralizing. Juniors and seniors report becoming increasingly depressed as they fall further behind their non-detained peers.

***Harsh treatment by staff.*** Parents continue to report harsh, rude, and disrespectful treatment of their children. Recent examples include:

- Cafeteria staff forcing a child with autism out of a stroller and on to the floor because strollers are not allowed in the cafeteria.

- Staff telling the mother of a child with autism "so now everyone has autism?" when she explained why her child was hyperactive in their living quarters.

- A parent receiving a "report" for having her children wear sandals to the cafeteria when their only pairs of shoes were soaked and they had been waiting days for a second pair.

***Lack of access to legal information, including information about Flores rights.*** Families are more confused than ever about their children's legal rights. Multiple families reported being unaware of an immigration video and not having been given a resident handbook. Families continue to report that the only mention of the FSA is when ICE tells them that their children have a right to release after 20 days. ICE then has them sign a form that does not appear to contain what is said orally. Families expressed confusion and frustration about this interaction with ICE and questioned the purpose when they routinely see children detained well beyond 20 days. Families also continue to face obstacles reaching counsel, including a lack of free phone calls, limited library and computer time, and intermittent email access.

Best wishes,

Leecia Welch
Chief Legal Counsel

# ATTACHMENT T

# Flores Settlement Agreement Notice of Rights

All children and youth under the age of 18 detained in immigration custody have rights under an agreement signed by the federal government in a case called *Flores*. Detained parents are being provided this notice to explain the rights their children have under the *Flores* Agreement. The *Flores* Agreement only applies to children and youth, and it does not apply to parents. You have the right to keep this notice with you at all times, even if you cannot read or understand it.

**Children and youth under the age of 18 in immigration detention have rights, including the following:**

- Be represented by a lawyer at no cost to the Government. If you cannot afford a lawyer, you may call one from the list of lawyers at the end of this Notice;
- To make free legal calls to the lawyers in the list at the end of this Notice or to any other lawyer upon request even if you have not yet retained a lawyer;
- To have a comprehensive orientation regarding the detention facility, including services, rules, expectations and how to access legal assistance;
- To be held in a facility that is safe and sanitary, including having:
    - Adequate hygiene products such as soap, shampoo, lotion, toothbrush, toothpaste, feminine products, and deodorant
    - Appropriate and adequate clean clothes
    - Adequate towels, sheets and blankets
    - Adequate baby and toddler supplies including diapers, bottles, formula, wipes, baby shampoo, baby clothes, baby food, and bottled water
    - Appropriate medical, dental and mental health care
    - Clean drinking water and nutritious meals and snacks
    - Comfortable temperatures in living areas
    - Comfortable sleeping conditions;
- To make free phone calls to your family members;
- To have appropriate educational services, including instruction and reading materials in Science, Social Studies, Math, Reading, Writing and Physical Education;
- To have appropriate recreational activities;
- To have access to one individual counseling session and two group counseling sessions per week, if desired;
- To have visitation and contact with family members;

**Flores Settlement Agreement Notice of Rights**

- To have a bond hearing before an Immigration Judge under certain circumstances, upon request. If you would like a bond hearing, you may ask for help from a lawyer of your choosing or from the list of lawyers at the end of this Notice.

**Right to Release Without Unnecessary Delay**

- Children and youth under the age of 18 also have the right to be released without unnecessary delay if your detention is not required to secure your appearance in immigration court or to ensure your safety or the safety of others. Your parent may ask for help from a lawyer of their choosing or on the list of lawyers at the end of this Notice in seeking review of your case.

- Even if the Government chooses not to release your family together, children and youth under 18 have the right to be released to a capable and willing custodian, identified by your parent. The custodian may be your family member (such as a parent, grandparent, uncle, aunt, or brother or sister), or an unrelated family friend, living here in the United States. Because you are a minor, your parent must take the necessary steps to request your release. Your parent may also decide that you will remain in immigration detention together. If your parent is interested in learning more about this release right, your parent may consult with a lawyer of your choosing or from the list of lawyers at the end of this Notice prior to making any decisions.

- Your parent is not required to make a decision about your release and you have the right to stay together. If your parent makes no decision, you will remain with them in detention unless ICE decides to release your family together. Any decision your parent makes must be voluntary and made with an understanding of your rights under the *Flores* Agreement. No one may coerce your parent into making any particular decision.

- If you or your parent have any questions about your rights under the *Flores* Agreement, you or your parent may also make free calls to the attorneys for children in the *Flores* case at 800-XXX-XXXX (leave a message with your name and A#) or send an email to info@XXXX.

# ATTACHMENT U

**From:** McCroskey, Joshua C. (CIV) <Joshua.C.McCroskey@usdoj.gov>
**Sent:** Friday, June 5, 2026 3:35 PM
**To:** Leecia Welch <lwelch@childrensrights.org>
**Cc:** Becky Wolozin <bwolozin@youthlaw.org>; Eleanor Roberts <ERoberts@childrensrights.org>; Diane de Gramont <ddegramont@youthlaw.org>; Mishan Wroe <mwroe@youthlaw.org>; Carlos Holguín <crholguin@centerforhumanrights.org>; Sarah Kahn <sarah@centerforhumanrights.org>; Silvis, William (CIV) <William.Silvis@usdoj.gov>; Celone, Michael A. (CIV) <Michael.A.Celone@usdoj.gov>; Paul Wise <phwise100@gmail.com>; Andrea Sheridan Ordin <aordin@strumwooch.com>; Lesnau, Jessica R. (CIV) <Jessica.R.Lesnau@usdoj.gov>; Katherine Johnson <kjohnson@childrensrights.org>
**Subject:** RE: Follow up letter from June 1-2 site visit

Hi Leecia,

Thank you for your June 4th letter. In the letter, you state that "families reported that ICE now has them sign a document stating children have the right to be released after 20 days" and you ask that we "send class counsel a copy of the document described." DHS has found no indication that this allegation is true, and it has no such document in use to send class counsel. Will you please send the names and A-numbers of those who provided the reports? And, in general, for any specific allegations in the letter, DHS will need the names and A numbers of those involved to investigate.

The letter also references the JSR due today and mentions the issue of whether DHS has any further updates to discuss. This morning DHS provided updates to Dr. Wise regarding some of the medical issues he has been reviewing. DHS is also working on the notice-of-rights issue but is not likely to have updates for you today.

Thank you for sending Plaintiffs' draft JSR in the other email thread. We are reviewing and determining whether we can submit a mutually agreed statement or should provide a separate statement. Thank you (and Andrea separately) for the offers of a call. I will call you and/or Andrea if anything comes up that would be helpful to talk through.

Best,
Joshua

# ATTACHMENT V

**2025-26 Excerpts from Declarations of Families Detained at Dilley**

## KNOW YOUR RIGHTS

| Dkt. No. | Decl. Date | Decl. Initials | Parent / Child | Age(s) of Child(ren) | Decl. Para. No. | Quotation |
|---|---|---|---|---|---|---|
| 1575-13 | 5/1/2025 | F.Y. | Parent | 1, a few mos. | 20 | "They haven't told me anything about what is happening or what to do about my case." |
| 1575-14 | 5/2/2025 | M.M. | Child | 15 (Declarant), 12, 10 | 22 | "We want to know when we will be released. We have heard some rumors about families being released but no one has told us anything." |
| 1575-16 | 5/1/2025 | A.T. | Child | 11 | 24, 40 | "They told us nothing. We didn't know where we were, what the rules were, how long we would be here. . . . We heard that we were supposed to be released after 20 days because I am a minor but now it is 23 days and we have not been released." |
| 1575-27 | 5/2/2025 | L.Q.A. | Parent | 5 | 8 | "I'm upset because no one here is telling me anything. Talking to the *Flores* attorneys is the first time I have spoken to anyone. The people here tell me that they don't have any information." |
| 1656-5 | 7/28/2025 | C.H. | Parent | 6 | 38 | "I have not been told about my rights or about a case called *Flores*." |
| 1656-12 | 7/28/2025 | E.O.N.M. | Child | 13 (Declarant), 9 | 46 | "No one has talked to us about *Flores* here, except the RAICES lawyers." |
| 1656-15 | 7/28/2025 | K.M. | Parent | 6 | 41 | "Nobody at CoreCivic or ICE has explained my *Flores* rights to me. One staff member told me I wouldn't be here longer than 20 days. But we are now in this facility for almost 90 days. Nobody has explained why we were not released like other families who were released after 20 days." |
| 1656-17 | 7/29/2025 | M.O. | Parent | 2 | 32 | "No one has spoken to me about my rights since being here. The immigration officers who were in New York told me that I would not be held more than 20 days, but it's been over 40 days." |
| 1706-4 | 9/9/2025 | J.R.F. | Parent | 5 | 34 | "When we arrived at Dilley, there was an orientation that was about four minutes long and a handout in English. Someone translated it. It didn't say anything about *Flores*. I only heard of *Flores* through RAICES." |
| 1706-5 | 9/10/2025 | Z.F. | Parent | 6 | 51 | "We have never had a presentation about our rights." |
| 1706-6 | 9/11/2025 | I.B. | Parent | 7, 2 | 57 | "No one here tells us anything, nothing about our rights or anything else. We were never told about the *Flores* Agreement." |
| 1706-8 | 11/18/2025 | C.R.G. | Parent | 14 | 20 | "No one has mentioned the *Flores* case to me, or that my son has rights under *Flores*." |
| 1706-10 | 11/18/2025 | M.M.S. | Parent | 9 | 19-20 | "We have never been given a legal orientation or know your rights presentation. The only topic ICE has presented on is how to self deport. No one here has informed me of my daughter's rights under *Flores*." |
| 1706-11 | 9/11/2025 | M.R.P. | Parent | 8 | 56 | "I never received a know-your-rights training." |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1706-12 | 10/10/2025 | N.G.C. | Parent | 5 | 17 | "In the ten days that I have been here, no one has told me anything about how this system works or given us a know your rights training. I have not been explained anything about my daughter's rights under *Flores*." |
| 1706-14 | 9/10/2025 | J.V.D.A. | Parent | 16, 11, 6 | 43 | "We did not receive any Know Your Rights training." |
| 1706-15 | 9/10/2025 | K.M.L. | Parent | 6 mos. | 33, 35-36 | "I have not received any information about my rights or my baby's rights here. . . . I have never heard the word *Flores* or about that before. I only heard from other detainees that we can't be here for more than 20 days, I didn't know about my child's right to release. I would want to know more about how it works in practice. If she could be released to her father who lives here in the U.S. directly, then maybe I would do that." |
| 1706-16 | 11/21/2025 | N.G. | Parent | 13, 11, 4 | 4-5 | "A group of us had a meeting with ICE and asked about the *Flores* rule and whether it could help us. Officers [at Dilley] and ICE supervisor [at Dilley] told us that this rule was revoked 21 days ago. They've lied to us so many times. They laugh at us and tell to call Trump when we ask about the rules. We were only given an instruction manual in Spanish about the rules for regular detention centers and not a family center. Eventually we were able to translate some of it into [our language]. Yesterday after that meeting we met with one of the officers and asked them why they are lying about the *Flores* rule no longer being in place. The ICE officer told us that management was telling them to say that to us. Yesterday we asked for documents about the *Flores* rule, the supervisor [at Dilley] disconnected the interpreter and told us he would not say anything, he told us if we wanted to know we should call Trump." |
| 1706-17 | 10/9/2025 | K.V.L. | Parent | 6 | 41 | "We have not heard before about our daughter's right to be released and stay in the U.S. without us. We thought we all couldn't be here past 20 days, that's what the people here say. RAICES would be the best organization to give this information out about children's rights to release, definitely not an ICE agent." |
| 1706-19 | 9/11/2025 | N.C.G. | Parent | 14 | 14 | "I learned about the *Flores* rules from a friend here. Friends say that children can't stay for more than 21 days. But I know a little girl who is six years old who has been here for about 33 days. Another friend told me about *Flores*, and I think she learned about it from her lawyer. But no one here has explained the *Flores* rights to me for my child." |
| 1706-22 | 9/10/2025 | N.T.G. | Child | 16 | 14 | "We have never received any 'know your rights' trainings or handouts about my rights under *Flores*." |
| 1706-23 | 9/10/2025 | Q.G. | Parent | 16 | 8-9, 11, 12 | "I said I will accept leaving the country, but I wanted my son to stay and continue his case. They told me he didn't have any rights, and they wanted us both to just accept being deported. But I wanted him to have the opportunity to stay, even if I have to go. And my son agreed, he wants to stay at least until he can finish his case. . . . As far as I can remember, we have never received a presentation of our rights. . . . I do not remember any of the staff or officers telling me that I had a right to request that my son be released from here without me . . . for the whole time I have been here." |
| 1706-24 | 9/11/2025 | A.T.L. | Parent | 17 | 13 | "No one here has told me about [my son]'s rights under *Flores* that I can remember." |
| 1748-5 | 3/12/2026 | M.S.P. | Parent | 14, 12 | 26, 28-29 | "Staff do not tell us things about our rights. For example, no one told us about *Flores* lawyers being here or talked to us about how our children have certain rights under *Flores*. No one who works here ever mentioned the word *Flores*, explained who [*Flores* counsel] were, or told us about any rights under *Flores*. I only heard about [*Flores* counsel] and *Flores* because my friend explained that there were *Flores* lawyers here to |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | me after she spoke with you. . . . No one has ever said anything to me about any limit on the number of days that someone can be detained. We never received any information about my children's right to be released from Dilley without me." |
| 1748-6 | 1/15/2026 | M.M.S. | Parent | 9 | 21-22 | "We have still never been given a legal orientation or know your rights presentation during our three months here. I have heard they now play a video when you first arrive here, but ICE keeps telling families that *Flores* doesn't exist and is no longer in effect. ICE says *Flores* only applies in California. No one here ever informed me of my daughter's release rights under *Flores*." |
| 1748-7 | 1/15/2026 | C.R.B. | Child | 16 | 15 | "Since we have been here, no one has told us about our rights. In three months, there hasn't been a know your rights presentation." |
| 1748-8 | 3/11/2026 | N.P.V. | Parent | 14, 11, 7 | 12-13 | "We never had an orientation about our rights here. We never saw any videos. . . . No one ever told us about the *Flores* case or any rights my children have." |
| 1748-9 | 3/12/2026 | E.C.M. | Child | 13 | 14, 16 | "I have only ever heard of *Flores* from my mom's friend who told us that *Flores* allows children to [be] release[d] after 20 days. . . . I have never been to a 'know your rights' training here or seen a video about my rights." |
| 1748-10 | 3/11/2026 | M.T.H. | Parent | 6 | 14 | "When we arrived, they told us about the dos and don'ts of being here and understanding the rules. I was not shown a video about our legal rights. I was not told about *Flores* by the staff here, but we have heard about the case from some families and that kids are not supposed to be here for over 21 days." |
| 1748-11 | 3/11/2026 | J.A. | Child | 17 | 8 | "No one has explained to me what my rights are here. The ICE officers have told us our lawyer isn't going to be able to do anything to help us, and we are just going to be deported. I don't remember watching a video or learning about my rights. When we first arrived there were videos on in the room we were sent to, but I didn't understand what it was talking about. I don't remember receiving any paper with a notice of my rights." |
| 1748-12 | 3/11/2026 | T.M. | Parent | 2 | 13 | "I don't remember them showing any videos about our rights. No one has ever talked to me about my son's rights as a child here." |
| 1748-13 | 1/15/2026 | C.H.H. | Parent | 13 | 57 | "No one who works here has ever mentioned *Flores* to me. They did say originally that we were only supposed to be here 21 days, but then agents said that rule changed." |
| 1748-14 | 1/14/2026 | D.P.C.S. | Parent | 15 | 17-18 | "When we got to Dilley, no one ever told me anything about my rights or the rules. The only rights staff told us about was our right to sign [for] voluntary departure for $1,000. They told us to raise our hands if we wanted to sign, but they did not do anything else to explain our rights. Instead, they sent us to our rooms if we did not agree. I have not seen any sort of videos since I got here that say anything about rights." |
| 1748-15 | 3/12/2026 | S.K. | Parent | 2, 1, 10 mos. | 18 | "We received no know-your-rights presentation upon arrival. Nobody has told us anything. We don't remember seeing a video when we got here." |
| 1748-17 | 2/12/2026 | N.C.C. | Parent | 14, 13, 10 | 15 | "We have never gotten an orientation here about our legal rights. They haven't told us about our children's rights under *Flores* or their right to a bond hearing." |
| 1748-18 | 2/12/2026 | L.R.C. | Parent | 15 | 25 | "No one has ever given us any information about our daughter's rights in detention. They showed us an animated video about the norms that we have to follow here, but the video never said that kids under 18 years get certain kinds of treatment or talked about rights at all." |
| 1748-19 | 1/14/2026 | M.B.O.D. | Parent | 17, 14 | 8 | "They have not shown us a Know-Your-Rights video at Dilley. Instead, when we got here, ICE told us asylum does not exist and that they do not understand why we came for help when there is no help available." |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1748-20 | 2/11/2026 | J.V.G. | Parent | 4 | 18-20, 22 | "We have never received any sort of know your rights training. The ICE officers who come every week are supposed to answer questions, but they just say we have to wait and do not give us information about our rights. No one has ever given us a know your rights paper either. I do not recognize the I-770 paper that you [*Flores* counsel] are showing me or the *Flores* Settlement Agreement Notice of Rights paper that you are showing me either. I have never seen one of those papers here. We never saw a video when we got here with any information about our rights. No one has ever told us about a video that we can watch either. . . . No one ever told us about our daughter's right to be released from Dilley to a sponsor in the United States without us or shown us paperwork about that." |
| 1748-21 | 2/11/2026 | Z.V. | Child | 17 | 15-16, 17-19 | "There was a video playing in the background about voluntary departure and deportation, but it did not let us know any of our rights in detention. I also think it might have been muted, because I do not remember any sound, but I remember seeing the information on the screen about self-deportation. I have not received any training about my rights either. I have never seen the I-770 form that you [*Flores* counsel] are showing me. . . . [W]e have never seen a video about our rights since being at Dilley. We have used the tablets to ask ICE agents questions. There is no information on the tablet about my rights that I know of. . . . No one who works at ICE has ever told me about *Flores*." |
| 1748-24 | 1/15/2026 | S.S. | Parent | 11, 11 | 69-72, 74 | "We received no Know-Your-Rights training. I also remember very clearly the day we entered Dilley and no video at all was playing. All the staff and ICE officers here say *Flores* doesn't work. It's history now. It's a story from back in the 1900s, it's buried. . . . There was an ICE officer . . . and he was asked why we are being held here. The questioner referenced *Flores*, and he said there is no *Flores*. To be precise, he said, 'It does not work. Forget about it. There are only the orders from Donald Trump.' This incident happened once around November 15th and again two weeks ago. It's happened twice. . . . No one has explained that our children have the right to be released without us." |
| 1748-25 | 1/14/2026 | A.K. | Parent | 2 | 28, 52 | "When it comes to *Flores*, they said *Flores* doesn't exist. . . . ICE officers regularly talk about the fact that *Flores* doesn't apply. They say, 'We'll keep you here as long as necessary.' They literally say this is the Trump administration's decision." |
| 1748-26 | 2/12/2026 | A.M.P. | Parent | 9, 2 | 16 | "We have never been given a know your rights orientation or told about our rights here. They never told us anything about *Flores*." |
| 1748-28 | 3/12/2026 | J.B.A. | Parent | 8 | 9 | "Since we have been here, we have never received a training about our child's rights or learned about *Flores*. I have only gotten an orientation about what we are supposed to do and not do at this facility." |
| 1748-31 | 1/14/2026 | L.T.P. | Parent | 14, 15 | 5 | "We do not know whether we have any rights and we have been terrified the entire time we have been here." |
| 1748-32 | 1/15/2026 | M.S.M. | Parent | 10, 5 | 32 | "No one has ever mentioned *Flores* or talked to me about my children's right to be released." |
| 1748-33 | 3/12/2026 | N.S.R. | Parent | 5 | 6 | "When we first arrived here, they showed us a video about immigration rights, but it did not say anything about the rights of children in detention or mention *Flores*. I saw something about *Flores* on TV, but no one has talked to me about it here." |
| 1748-34 | 10/10/2025 | C.R.B. | Child | 16 | 14 | "Since we have been here, no one has told us about our rights. There hasn't been a know your rights presentation. The only time I heard about *Flores* was when we spoke to an attorney from RAICES a few days ago." |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1748-36 | 2/12/2025 | M.L.S. | Parent | 15 mos., 2 mos. | 21, 26 | "No one has ever given us any information about our children's rights here. . . . The people who work here have never said the word *Flores*, and we have only heard it from other people here who have spoken about it a lot." |
| 1748-37 | 2/11/2026 | M.P.P. | Parent | 7 | 15 | "They haven't told me anything about *Flores* or my son's rights or anything about a right to a bond hearing." |
| 1779-5 | 5/8/2026 | A.O. | Parent | 3 | 10 | "No one has told me about any rights my son has here or any rights that are specific to him as a child. I don't remember being shown any video about my rights or my son's rights here." |
| 1779-7 | 4/22/2026 | R.G.H. | Parent | 10 | 21-22 | "When we arrived at Dilley, someone told us that the *Flores* law applied to us, but they didn't tell us what that meant. They tried to get me to sign a piece of paper that might have been about this. But it was in English and I didn't understand. No one has told me about my rights except my RAICES lawyer; she is the only one who has told me about [my child]'s *Flores* rights, that [my child] can't stay here longer than 20 days and that his *Flores* rights are being violated. I have never seen a video about our rights." |
| 1779-8 | 3/11/2026 | S.D.C. | Child | 15 | 17 | "I have never seen a video about my rights. I only ever found out about my rights when I looked them up in ChatGPT. But then the library took away access to ChatGPT, too, which I used to look up legal information and medical questions about how to treat my allergies." |
| 1779-9 | 4/22/2026 | G.S. | Child | 12 | 14-18 | "We never received a know your rights training. I have never heard of or seen an I-770 form. We remember the video playing when we first came in. There was someone talking on it, but we don't remember anything about it. Before meeting with you . . . [o]ur lawyer said we are going to do the parole request under *Flores*. We never heard it from anyone here though. We never knew we were only supposed to be here for 20 days. Some people have been here for 10 months, so that doesn't seem true. I have never received an individual release hearing." |
| 1779-10 | 4/23/2026 | R.R.M. | Parent | 11 | 11 | "No one told me about my or my daughter's legal rights until RAICES attorneys met with me after I had been here more than two weeks. I only heard about *Flores* from other people here after they saw me crying and told me about it and the 20 days and gave me the RAICES phone number. I never saw a video or got a form about my rights." |
| 1779-11 | 5/16/2026 | O.S. | Child | 16 | 14 | "We never heard the word '*Flores*' except from our lawyer. ICE never mentioned the *Flores* agreement to us. However, when we found out about it and asked them about it, they said our case was different." |
| 1779-14 | 4/23/2026 | E.C.M. | Parent | 13 | 14 | "During the orientation, I remember that they spoke to us about getting money for voluntary departure. I don't recall anyone mentioning anything about *Flores* or *Flores* rights." |
| 1779-15 | 3/12/2026 | W.L. | Parent | 7 | 9 | "No one has explained to us what our rights are here at Dilley or what rights our daughter has here. We were not shown any video about our daughter's rights here." |
| 1779-16 | 4/23/2026 | J.A.I. | Child | 16 (Declarant), 12 | 17 | "When we got here, they gave us an orientation about the rules and layout here. They didn't tell us about our rights. We learned about *Flores* from other residents." |
| 1779-18 | 4/23/2026 | O.B. | Parent | 4 | 7-10, 13-14 | "No one has told me how long we will be at Dilley. No one has told us anything about our rights here at Dilley. We never saw a video and no one has told us about *Flores*. This is the first time I am hearing about *Flores*. No one has discussed my daughter's right to be released, and I don't want us to be separated. . . . I can't understand anything here – no |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | one has explained anything to me in French. There does not seem to be anyone here besides me who speaks French. My daughter speaks only [language]. I have not had a translator or interpreter since we arrived here.” |
| 1811-6 | 6/1/2026 | M.A.B.H. | Parent | 5 | 7, 17-18, 24-26 | “No one has told me why I have been detained so long. I signed a *Flores* paper when they brought me to Dilley because the ICE officers told me that I had to sign it. . . . Then, they made me sign the *Flores* paper. But they just put the paper in front of me and told me to sign it. They did not give me the paper after, and I did not get a copy of it, so I do not know what it says exactly. No one told us what would happen next. . . . No one has told me why we are still here. They just say I have another court date on June 9th. I do not know what needs to happen for us to be freed, and the only answer I have heard is that we just have to wait. No one has given me a handout about my son’s rights. We never watched a video about my child’s rights either.” |
| 1811-7 | 6/3/2026 | J.C.B. | Parent | 10 | 22, 24-27, 32 | “Officer [] said we couldn’t leave because we had to wait for court. I asked if he could please abide by the *Flores* law. He just said we had to wait for court. . . . We received no presentation about our rights. We never received a copy or paper of reasons why we’re detained or what our charges are. . . . They don’t give you any information or reason for being here. I said I wanted to use the *Flores* law. They said to me that I’ve lost my chance to do that. . . . Some information about rules here are on the walls, and the staff just say, ‘Read them.’ They don’t explain how things work like phones or laundry. . . . Information like how to send mail to your court or judge is not given out.” |
| 1811-8 | 6/2/2026 | N.A.A. | Child | 17 (Declarant), 4 | 11 | “Then two days later, we had an orientation with a video. It was about immigration. . . . They did not tell us anything about our *Flores* rights. Earlier that day, we met with an ICE agent, and they showed us a piece of paper saying that children could not be detained more than 20 days, but they didn’t explain anything. I’m not sure what the point of the paper is since we’ve been here more than 40 days so far.” |
| 1811-9 | 6/2/2026 | L.R.V. | Parent | 12, 14, 16, 17 | 6, 9 | “When we arrived at Dilley on April 1, 2026, they didn’t give us an orientation. The day after we arrived, ICE gave us a paper to sign that said that children can’t be detained more than 20 days. But the ICE agent told us that even though the paper said kids couldn’t be here more than 20 days . . . it really didn’t apply to anyone in this facility because the immigration judge isn’t going to let kids leave without their parent or vice versa. . . . I asked ICE why this happened, but they never told me why. To this day, no one has ever provided me with an explanation.” |
| 1811-10 | 6/1/2026 | M.P.O. | Parent | 14 | 10 | “When we first got here, they didn’t do any kind of orientation. They didn’t show us a video or anything. No one has ever told us about our *Flores* rights other than an ICE agent saying my son isn’t supposed to be here for longer than 20 days. No one told us anything about our case or what would happen next. I have no idea whether anything will happen after 20 days.” |
| 1811-11 | 6/8/2026 | L.R.P. | Child | 16 (Declarant), 17, 14, 12 | 14-16 | “I don’t understand why we have to be here at Dilley. My siblings and I don’t have deportation orders. Our immigration cases were closed, and we all have social security numbers, work authorization, and real IDs. No one ever explained my rights to me here. I asked for them, and ICE told me they don’t know what our rights are. When we first arrived to Dilley, we signed a form about *Flores*. But ICE told me we don’t qualify for *Flores*. They didn’t tell me why.” |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1811-12 | 6/2/2026 | M.G.O. | Parent | 7, 9 | 12-19 | "When we got to Dilley, the staff processed us and took us to our room. The next day, ICE wanted to speak with us, so they took us to room number 100, along with everyone else who arrived. They said that we could not spend more than 20 days at Dilley. They then asked us to sign a paper about the *Flores* law. I signed for myself and for my children. But now I think it was a lie because there are many people like me who have been detained for over 50 days and have not been freed. We later learned from the news that people are mostly getting out using habeas corpus petitions. After we signed the paper, the officers kept the paper and did not even give us a copy. I have only heard about *Flores* from ICE when they had us sign the paper. Since then, no one here has told me how long we will be here. No one has given me a handout about my children's rights. I do not remember watching a video about my children's rights either. They showed us a video when we got here, but it was about immigration law and credible fear interviews. I've heard from many people that they are no longer showing the immigration video, though. I have not heard about my children's right to be released from Dilley without me. No one has told me anything about bond hearings." |
| 1811-13 | 6/8/2026 | J.C.M. | Parent | 7 | 7-11 | "I have never received an orientation or video about my rights. On April 9th, ICE had us sign a paper that said *Flores* exists, but they aren't applying it right now. I signed it. The paper just notifies us of *Flores*, but RAICES told me that ICE doesn't respond to many parole requests that use *Flores*. We received another document called 'Notice to Alien of File Custody Review' on May 26th, which said we have to wait another month here when we have already been here since April. These papers are all in English. There sometimes is a translator in person, but we don't receive the papers in our own language. For the *Flores* document, an ICE agent told me what it means, but the paper was still in English. We didn't get a copy of that one." |
| 1811-14 | 6/2/2026 | D.C. | Parent | 4 | 22-25, 43 | "The next day, May 14th, ICE provided me with a paper and asked me to sign the paper. There was no interpreter or translator. The form said it was a *Flores* notice. I asked one of the ICE officers what this meant, and he said they wouldn't keep me here for more than 20 days. I haven't received any follow-up, though, on when or if I'm being released and I've been here for more than 20 days, even more if you count my time before Dilley. My understanding is that they only started to give this piece of paper out to people in the month of May. The only thing I know is that they called my sponsor and asked whether they could purchase tickets for us, but I'm still here. It's been more than a week since they called my sponsor, and today is day 21 since I signed that form. . . . I don't recall any know your rights presentation. I remember I was given info on pro bono lawyers, but that was it." |
| Ex. 2 | 10/6/2026 | W.D.B. | Parent | 12 | 6, 17-20 | "No one who works here has mentioned *Flores* to me, though I heard about it from RAICES attorneys, who told me we should only be here 20 days. . . . There was no know your rights training. They do not do that. There is a wall with a paper with numbers for lawyers like RAICES, but that is all. No one ever showed us a paper about *Flores*. I have never seen this paper that you are showing me that says Exhibit 6. We never received a handbook either. I do not recall the staff here giving me any papers or talking about *Flores* at all. I think there may have been a video that had some animations on it when we got here, but we did not understand what that was about at all. I do not remember that video saying anything about *Flores* either. I think it said something about voluntary |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | departure. The video came in Spanish, too. I don't remember anyone who works for ICE or Dilley saying anything about my son's rights while here one way or another." |
| Ex. 3 | 10/7/2026 | T.C. | Parent | 10, 8 | 14, 17-19 | "We did not get any paper with our rights on it, and we have never received any rights-related papers over the past few months. . . . I do not remember ever seeing a video about my rights here, either. I have never heard about *Flores* before. No one who worked here ever mentioned this to us or told us about how long our child could be detained. . . . No one ever told us about any of our children's rights." |
| Ex. 4 | 10/7/2026 | Y.W. | Parent | 9 | 6, 9, 11, 13-15 | "Someone asked me to sign a paper and told me that my daughter could stay with me if I signed it, but it was in English, and I did not understand it, so I did not sign it. . . . No one told us anything about our rights. . . . No one did any kind of know your rights training, but when we got to our dorms, a staff person told us about the rules. . . . I never received any sort of handout or handbook in [language]. I have never seen a video about my rights since being here. I have never heard about *Flores* before." |
| Ex. 5 | 10/7/2026 | J.P.R. | Child | 9 | 22 | "We didn't see a video about *Flores*; the video was just about the rules of being here." |
| Ex. 6 | 10/6/2026 | M.M.V. | Child | 15 | 8-10, 14-15, 35-36, 38 | "They wanted to trick us into signing papers that said we would take voluntary departure. The papers were only in English, and ICE provided no translator. The ICE officials told us that we just needed to sign the papers and did not explain what they were. I started to read them because I speak English. When ICE realized that I spoke and read English, they told me I was too young and that, because I was under 18, I was not allowed to look at the papers. They put me in another room. Then, they threatened my dad and told him he had to sign the paper on the third line. He said that he did not want voluntary departure. He asked for the paper in Spanish, and they said no and just kept saying he had to sign that line. Only afterwards, when I could see him again, did I see the paper and know that they had been coercing him to sign the voluntary departure form. That form included language indicating you had no issue with going to your former country, which is not true for us. Those officers treated us terribly. The ICE staff tried to intimidate us. Whenever ICE wants you to sign something, they use so much intimidation to coerce people into signing papers against their interest. This can be especially bad for people who do not speak English, who have no way to know what is happening. . . . They told me I had no rights and that I did not even have the right to talk. . . . No one ever gave us a know your rights training, nor have we ever received a handout with our rights printed on it. The second day after we got here, ICE told us that we cannot spend more than 20 days here under *Flores* and that we needed to sign a paper. That was the only time that anyone from ICE talked to us about *Flores*. But I read the paper, and it did not mention *Flores*, nor 20 days, nor anything about rights, so it seemed suspicious that they wanted us to sign. They kept asking us to sign the paper, but we refused. The paper had an area to sign, but it did not look like the Exhibit 6 document that you are showing me. They also did not let us keep it. They just showed it to us, so we cannot show it to you because we do not have it. . . . The staff has not explained our rights to us. What we learn is from the other people detained with us. It's so clear that ICE does not care about the *Flores* rules because there are people who have spent many months here. ICE has never tried to explain why we have been here for over a month despite them telling us we would be here for a maximum of 20 days. . . . ICE officers only spoke with us when we got here, and speaking with the *Flores* lawyer |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | now is one of the first times we are hearing about our rights. In the 36 days we've been here no one else has explained anything." |
| Ex. 7 | 11/4/2026 | D.Z.C. | Parent | 17, 11 | 8-9 | "When we got here, they told us to sign a paper if we wanted to leave. They didn't explain what the paper said, but I think it was for voluntary departure. We refused to sign. They told us we were going to be here 2–3 days. They did not tell us about our *Flores* rights at all. We never received a paper with our rights." |
| Ex. 8 | 11/4/2026 | K.O.C. | Parent | 7 | 8, 14-15, 23-24 | "I asked them if I could be reunited with my daughter, and the ICE officers told me I had to sign a paper to have my daughter brought to me. They did not explain what the paper said. They told me that if I didn't sign, my detention experience would be worse. . . . I signed a paper when I got here, but I don't know what it said. I was just recently traumatized and couldn't think straight. No one has given me information on when I'll leave, but they did tell me that they would try to deport me as soon as possible. . . . I was not told about my rights or my daughter's rights. I was not shown a video that explained my rights. I learned about *Flores* from another person detained here. No one has told me that my child has a right to be released in 20 days." |
| Ex. 9 | 11/4/2026 | P.G.P. | Parent | 17, 11 | 8-10 | "When we got here, the ICE officers tried to make us sign a paper, saying that if we wanted to leave Dilley we should sign there. They told us that if we signed, we'd each get $3,000. We refused to sign. They said we'd be here for 2-3 days, but we've been here for almost two weeks now. I was not told about my children's *Flores* rights." |
| Ex. 10 | 11/4/2026 | Y.M.P. | Parent | 5 | 8-10, 13 | "When I arrived at Dilley, they told me that I would be here 20 days, but it's been more than 20 days, and they have told me nothing else. No one told us our rights. No one told us about my son's rights or a case called *Flores*. Since arriving at Dilley, I have contacted ICE through the tablet, but they only told me that they have no flight seats available. . . . No one has told me anything about my rights. They asked if I wanted a lawyer, and I told them no; I turned myself in. I just want to get to my daughters." |
| Ex. 11 | 11/4/2026 | Y.Z. | Parent | 7 | 17, 19, 21, 30 | "When we arrived at Dilley, there was an orientation but I only remember that they told me I would be deported. . . . Someone told me something about my rights, but all I could think about was my son, I can't remember what they told me. They mentioned that my children can go to school here, something along those lines, but I could not think or process what they were saying. . . . No one has ever mentioned *Flores* to me or told me that my child and I have any rights related to conditions or release. . . . We cannot communicate with the staff. They do not have translators or staff who speak our language. We can speak only with the other families from our country. Because of the language barrier, it is difficult for us to communicate and ask for anything we need." |
| Ex. 12 | 7/15/2026 | W.P.P. | Parent | 8, 10 | 10, 14 | "We arrived in the middle of the night, around 2 a.m., and it took about three hours for us to go through the intake process. I don't remember any informational video playing when we were in there. . . . Several days after we arrived, maybe five days, there was an official who gathered us in a group and told us about *Flores* and said we could only be held here for 20 days. I don't remember learning anything else about other *Flores* rights. And anyway, we have been here far longer than 20 days." |
| Ex. 13 | 7/15/2026 | Y.P.R. | Parent | 7, 13 | 7-8 | "They did not give us an orientation. All the staff did was tell us about some of the paths here and some of the rules about when my daughter could be by herself. They have never given us an orientation or shown us a video about our legal rights. The only thing they have ever said about *Flores* is that under *Flores*, children are not supposed to be here |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | longer than 20 days. They had us sign a paper about that. But we have now been here for 70 days." |
| Ex. 14 | 10/6/2026 | D.C.S. | Parent | 6 | 10-11 | "When we arrived, we received information about our *Flores* rights, namely that we can't be here longer than 20 days. I signed a piece of paper about that. It was in English, and I couldn't understand it. I have asked why I'm still here, but the ICE official just keeps saying there is a process that we have to follow." |
| Ex. 15 | 10/7/2026 | S.R.A. | Parent | 9 | 18-22, 25-26, 28, 43 | "I did not get any presentation about our rights. I had to sign two things when we arrived. . . . The other was about *Flores*. The page was in English. It was much longer than the Exhibit 6 you are showing me. It said *Flores* applies and you can't be here more than 20 days. I signed it. But they didn't tell me that I'd sign it and it'd mean absolutely nothing. . . . When we have to sign something in English, the ICE agent just explains what it means to us, but we don't get it in Spanish. We don't have an official translator, and we don't receive a copy. . . . There was a video that I saw the second day here about the rules of this facility. It was about the schedule of eating, stuff like that. The only type of handbook I've seen is the one in the room that explains how to use the phones. . . . Beyond the *Flores* paper we signed, no one has mentioned *Flores*. . . . I am nervous about retaliation sometimes. Some people are told not to tell *Flores* counsel anything." |
| Ex. 16 | 9/9/2026 | G.Z.R. | Parent | 7 | 24 | "When I got here, I was presented with a paper in English to sign. I think it said something about our rights, but it was not translated. I refused to sign it because I did not understand what it said." |
| Ex. 17 | 9/9/2026 | I.O.R. | Parent | 13, 15, 17 | 8 | "The next day, I met with a staff person who gave me a rule book. She did not tell me about our legal rights or my children's rights under *Flores*. A day or two later, some immigration people talked with a group of residents about *Flores*, but all they said was something about 20 days. They gave me a paper in English to sign, but I didn't sign it because I couldn't understand what it said. They have never shown me or told me there was an immigration video we could watch." |
| Ex. 18 | 11/4/2026 | M.A.G.Z. | Child | 17 (Declarant), 11 | 6, 11, 23 | "They told us we would just be at a detention facility for 2–3 days, and then we would be out. . . . No one has told me anything about our legal rights except ICE said we could fight using *Flores*, but that it was not going to help us. They said that *Flores* lawyers would just talk to us and not do anything about our case. . . . If I could change one thing about this place, it would be to get out of here and not have been lied to about being here for just three days. They shouldn't be able to tell people it will just be three days when lots of people have been here more than twenty days." |
| Ex. 19 | 7/14/2026 | E.N.P. | Parent | 7, 9 | 9-10 | "When we arrived, they did an intake and took us to our room. The next day they gave an orientation about the rules of the facility. They told us things like kids under twelve have to be with their parents at all times and that if there's a problem you can talk to a counselor. They did not tell us about our legal rights. The next day, we met with four ICE agents and they had me sign a paper that said that under *Flores*, children are not supposed to be here for more than 20 days. That is the only thing I have heard about *Flores*. We have not been shown a video about our legal rights, and no one has given us information about my children's *Flores* rights other than that piece of paper." |
| Ex. 20 | 7/29/2026 | L.Z. | Parent | 14, 17 | 10-16, 30 | "When we arrived at Dilley the second time, they had us sign papers about *Flores* that said we cannot be detained for more than 20 days without a hearing. There was a lot of paperwork, because they had each of us sign. We were allowed to keep one copy. We |

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | have never seen a video about *Flores*, and no one talked to us about *Flores* rights besides what the paper said. No one told me anything else about *Flores*. But I researched it myself on the computers in the library. No one who works at Dilley has told me about my daughters' rights to release from Dilley without me. A lawyer mentioned it to me though. I do not really know what to think about it. I am just waiting for my lawyer to tell me more. We asked an ICE officer why we are still here after more than 40 days, and they just said, 'There's nothing that can be done.' We do not know when we will be released from here. No one has mentioned anything about an individual release hearing. It feels worse being here than it did last time we were here. We feel like we have been lied to and tricked. It feels horrible. It just feels like a lie because ICE said we had all these rights, but once they brought us here, we did not. They just lied and violated my daughters' rights. . . . There are a few workers who will use their phones to help translate. But most of the staff here will not. For the most part, I do not communicate with people here because of that." |
| Ex. 21 | 10/6/2026 | A.C. | Parent | 10 | 11-12 | "They did not tell us much of anything about my daughter's rights. They just said we could talk to an attorney. They gave us a piece of paper that I think was about *Flores* that said that kids couldn't be here for more than 20 days. They had us sign it. I didn't really know what it was about. They have not shown us a video about our immigration rights or given me a resident handbook." |
| Ex. 22 | 7/15/2026 | W.T.P. | Child | 10 (Declarant), 8 | 8 | "The only video showing was *Bluey*—just *Bluey* the whole time. We were so tired." |
| Ex. 23 | 11/3/2026 | J.O. | Parent | 7, 5, 3 | 8 | "The next morning, they gave us some papers to read. One paper said something about *Flores* and that my children would be able to see a judge. The other paper was something they gave me to sign about the first paper. This was the only orientation that we had. We were not shown a video about my children's rights or immigration. My friend told me that children have the right to be released after 20 days, but no one here has talked to me about that." |
| Ex. 24 | 10/7/2026 | J.M.O. | Parent | 5, 3 | 47-50 | "I received a handbook about my rights. It says when you are sleeping, the officers will pass with flashlights to see if everything is good. That doesn't happen. The lights are just on all the time. The book also said there would be a translator when needed. This doesn't happen either. The book doesn't mention *Flores*. No one ever told me I can't be here for more than 20 days." |
| Ex. 25 | 10/7/2026 | Y.D. | Parent | 14 | 9 | "They did not give us a handbook of the rules or an orientation about my daughter's rights. They just told us the rules and showed us where we can go and can't go. They just said that my daughter can't be here for more than 20 days under *Flores*. They gave us a piece of paper in Spanish that said that but did not explain anything else." |
| Ex. 26 | 10/6/2026 | D.L.R. | Parent | 7, 14 | 17-18 | "I signed something. The official said it was about our *Flores* rights. He said it applies only to the kids, not me. He said we couldn't be here more than 20 days under *Flores*. The paper was in English. I didn't even read it, but it did not look like the Exhibit 6 you're showing me now. Everything I've signed here has been in English. There is no official translator; someone from ICE or CoreCivic just explains it to us." |
| Ex. 27 | 7/15/2026 | X.W. | Parent | 10, 8 | 9 | "The language barrier makes life very difficult here. We mostly use hand gestures to express ourselves. A lot of people speak Spanish, and they can get their necessities much faster than we can." |

| | | | | | | |
|---|---|---|---|---|---|---|
| Ex. 29 | 10/7/2026 | S.N.K. | Child | 17 (Declarant), 12, 4 | 10 | "At the hospital, ICE came and told us that children are not supposed to be in detention for more than 20 days. Then they gave us a paper to sign. They didn't tell us anything else. They just told us not to fight with anyone." |
| Ex. 30 | 7/15/2026 | L.R.O. | Parent | 2 | 6 | "We have never received a legal orientation here. ICE spoke to us in a group and gave us a list of pro bono attorneys. They told us that kids can't be here for more than 20 days, but that it depends on each case." |
| Ex. 31 | 9/8/2026 | A.D.G. | Child | 17 (Declarant), 13 | 7 | "They never gave us an orientation. We didn't even know when or where the meals were. We missed breakfast, lunch, and dinner the first day and breakfast the second day because we didn't know where to go." |
| Ex. 33 | 11/4/2026 | N.A.P. | Parent | 4 | 6, 19 | "ICE told me that I'd be in [my country of origin] in no more than three days. They lied to me. . . . No one has explained my rights or my son's rights to me since I've been here. I have not received a paper with my son's rights on it. I only know about *Flores* from the people detained here." |
| **Total Families Who Raised Complaints About Know Your Rights: 95** | | | | | | |